IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII
CIVIL NO. 04-00108 JMS KSC
ENGLISH v CITY & COUNTY OF HONOLULU

IN RE: DEPOSITION OF PHILIP E. ENGLISH, VOLUME I

CORRECTION SHEET - RETURN BY NOVEMBER 15, 2005

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| 14 | 15 | add "lessons" after trumpet | clarity |
| 18 | 4-5 | add "more than" before "five years" | clarity |
| 23 | 19-20 | change "San Bernadino" to "San Marino" | accuracy |
| 27 | 9 | change "ago" to "before" | accuracy |
| 28 | 19 | change "marriage" to "maiden name" | accuracy |
| 29 | 13 | add "recollection" after "best" | clarity |
| 30 | 12 | change "yes" to "my best recollection" | clarity |
| 32 | 15 | change "Shawn" to "Sean" | incorrect spelling |
| 33 | 16 | change "another activity" to "other activities" | accuracy |
| 36 | 24 | change "1986" to "1996" | typo |
| 46 | 10 | add "or 2000" after "1999" | accuracy |
| 51 | 21 | change "got" to "have" | clarity |
| 55 | 11 | change "employee" to "employer" | accuracy |
| 58 | 2 | change "That's correct" to "Not exactly" | clarity |
| 59 | 16 | change "No" to "Not exactly" | clarity |
| 59 | 21 | change "That is correct" to "Not exactly" | clarity |
| 76 | 12 | change "No, I didn't" to "I don't think so" | clarity |
| 77 | 10 | add "Gary" before "Kurokawa" | accuracy |

SIGNED BY _Phil Engl_____    DATED: _11/4/05_____



RECEIVED NOV 0 9 2005

COPY

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,        ) CIVIL NO. CV04-00108 JMS/KSC
                               )
5            Plaintiff,        )
                               )
6        vs.                   )
                               )
7    CITY AND COUNTY OF HONOLULU; )
     GARY T. KUROKAWA; ROBERT  )
8    MAGAOTA; ANN C. GIMA; and )  VOLUME I
     GK APPRAISALS, INC.; et al., ) PAGE 1 THROUGH 84
9                              )
             Defendants.       )
10                             )
     _____)

11

12

13

14

15        DEPOSITION OF PHILIP E. ENGLISH

16   Taken on behalf of Defendant City and County of Honolulu,

17   Gary T. Kurokawa, Robert O. Magota and Ann c. Gima, at the

18   law offices of Watanabe Ing Kawashima & Komeiji, 5th

19   Floor, Hawaii Tower, 745 Fort Street, Honolulu, Hawaii

20   96813, commencing at 1:13 p.m., on Friday, September 30,

21   2005, pursuant to Notice.

22

23

     BEFORE:
24
         Donna Kohls, CSR 146
25       Notary Public, State of Hawaii


     CARNAZZO COURT REPORTING CO., LTD.
              532-0222

2

1  <u>APPEARANCES</u>:

2  For Plaintiff:          ROGER S. MOSELEY, ESQ.
                           2300 Alakea Corporate Tower Corporate
3                          1100 Alakea Street
                           1001 Bishop Street
4                          Honolulu, Hawaii 96813

5  For Defendant
   GK APPRAISALS,
6  INC.:                   ANTHONY L. WONG, ESQ.
                           Matsui Chung
7                          1400 Mauka Tower
                           737 Bishop Street
8                          Honolulu, Hawaii 96813

9  For Defendant
   City & County of
10 Honolulu; Gary T.
   Kurokawa; Robert
11 O. Magota; and
   Ann C. Gima:            MICHAEL A. LORUSSO, ESQ.
12                         Watanabe Ing Kawashima & Komeiji
                           23rd Floor, First Hawaiian Center
13                         999 Bishop Street
                           Honolulu, Hawaii 96813

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2

EXAMINATION BY:                                    PAGE

3
Mr. Lorusso

4


5

EXHIBITS MARKED FOR IDENTIFICATION:

6

1    Compromise, Settlement and Release Agreement    62

7

2    Chronology produced by deponent                 79

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

STATE OF HAWAII            )
                           )
I, DONNA KOHLS, C.S.R., a Notary Public in and for

the State of Hawaii, do hereby certify:

That on September 30, 2005, at 1:13 p.m., appeared

before me PHILIP ENGLISH, the witness whose testimony is

contained herein, that prior to being examined, the

witness was by me duly sworn; that the proceedings were

taken in computerized machine shorthand by me and were

reduced to print; that the foregoing represents to the

best of my ability, a correct transcript of the

proceedings had in the foregoing matter;

That the witness, if applicable, was notified through

counsel, by mail or by telephone to appear and sign; that

if the transcript is not signed, either the reading and

signing were waived by the witness and all parties, or the

witness failed to appear and the original is therefore

kept on file without signature pursuant to Court Rules.

I further certify that I am not counsel for any of

the parties hereto, nor in any way interested in the

outcome of the cause named in the caption.

Dated:_____OCT 1 0 2005_____


_____
Donna Kohls, C.S.R., No. 146
Notary Public, State of Hawaii
My commission expires: 7-21-2010

53

1    Q    And so the depression begins and it continues on from

2    the point it starts into the future, correct?

3    A    Yes.

4    Q    And while you have the depression, again, just

5    depending on what circumstances are happening with your

6    life, that may affect the level of depression that you are

7    having at any given time, is that a fair statement?

8    A    No.

9    Q    And why isn't the depression affected by what is

10   going on in your life?

11   A    I think you have got it backwards.  I think things in

12   my life have caused me to be depressed.  There is events

13   that have occurred in my life that have caused me to have

14   depression.

15   Q    Since the time you have worked with the City, have

16   you had other employment?

17   A    Yes.

18   Q    And what other employment have you had?

19   A    I worked for a guard company.

20   Q    What guard company?

21   A    It's called Master Guard.

22   Q    And when did you start working for the guard company?

23   A    In April.

24   Q    Of what year?

25   A    Of this year, 2005.

1   Q    For how long a period of time before you started for

2   Master Guard company were you unemployed?

3   A    I guess from December 2003 until that time.

4   Q    Between December 2003 and up until April of 2005 when

5   you began working for the Master Guard company, did you

6   seek other employment?

7   A    Yes.

8   Q    What other employment did you seek?

9   A    I looked for jobs as a driver.  I looked for jobs as

10  wait help at conventions and that sort of thing.  Those

11  were the-- there were various places.  But those were the

12  types of jobs.  This was all part of therapy with Dr. Koff

13  in trying to get me back into the working situation.  And

14  so we decided that we would try to have some kind of job

15  like that.  The guard job has proved to be a good job for

16  that.

17  Q    Any other jobs that you sought in that December 2003

18  up until the April 2005 time period?

19  A    No.

20  Q    With regard to a job as a driver or wait help or as a

21  security guard, was it Dr. Koff who told you that was the

22  only type of job that you could work?

23  A    No.

24  Q    Did you apply for any jobs with regard to doing real

25  estate appraisal?

1    A    No, I didn't.

2    Q    Did you begin to do real estate appraisals on your

3    own?

4    A    No, I did not.

5    Q    Why not?

6    A    I'm trying to get jobs where I can go a little bit at

7    a time to make sure that I can function in them okay.  If

8    I were to-- the idea is I don't want to start a job and

9    then fail.  And that I don't want to experience similar

10   things that I experienced at the City.  I mean, there is

11   no guarantee that an employee won't behave in a way that

12   causes someone to hurt them in a way.  But through the

13   therapy with Dr. Koff, the approach was just to try and

14   get out there, see what kind of job I could get.

15        The therapy from the beginning in fact was to first

16   get me to a point where I could feel comfortable going to

17   the market.  So I mean, I have come a long way since that

18   time and I'm pretty grateful to Dr. Koff for that.  In

19   fact, I really wish I could still have therapy with her.

20   But she has really helped me a lot in that regard.

21            MR. MOSELEY:  I think we ought to take a little

22   break here.

23            MR. LORUSSO:  Sure.

24            (Recess)

25   Q    (By Mr. Lorusso)  Mr. English, as you just did in

56

1    terms of taking a break, please feel free at any time that

2    you want, as I told you at the beginning of the

3    deposition, that if you need to take a break, we will take

4    a break.  Do you understand that?

5    A    Yes, thank you.

6    Q    Going back now, in terms of working as a real estate

7    appraiser from December 2003 up until the present time,

8    did Dr. Koff ever say to you you should not work as a real

9    estate appraiser?

10   A    No.

11   Q    Did any physician, psychologist, psychiatrist,

12   counselor ever tell you you cannot work as a real estate

13   appraiser from December 2003 until the present time?

14   A    Well, the only restriction that I'm aware of is that

15   they said that I could not work at the City & County as a

16   real estate appraiser.  That is the only restriction that

17   I'm aware of.

18   Q    In terms of my question, my question was, with regard

19   to working as a real estate appraiser, did anyone tell you

20   that you could not work in your capacity as a real estate

21   appraiser, any health care provider, physician,

22   psychologist, psychiatrist or counselor?

23   A    Maybe I don't understand the question.  But if I

24   could try to answer it--

25   Q    Let me try and rephrase it, then, if you don't

57

1    understand it.  You worked with the City as a real estate

2    appraiser, correct?

3    A    Yes.

4    Q    And before the time you worked for the City, you

5    worked as a real estate appraiser at different times,

6    correct?

7    A    Yes.

8    Q    So now, just in terms of the profession of being a

9    real estate appraiser, that's all I'm referring to, not

10   whether you could or could not work or whether it's for

11   yourself or whether it's for someone else, just simply in

12   the capacity of a real estate appraiser, do you understand

13   that?  Do you understand that is what I'm referring to?

14   A    I understand that.  Maybe what I don't understand is

15   the time frame you are talking about.  Because Dr. Koff

16   and I believe Dr. Kennedy have stated that, at least

17   certainly in the beginning of their treatment or analysis,

18   that I could not work at that time, and whether it's at

19   the City & County Real Estate Property Assessment Division

20   or any work, depending on which doctor it is.

21   Q    Okay.  Let me go back and be clear.  As I understood

22   your testimony a few minutes ago, with regard to December

23   of 2003, when you stopped working for the City, up until

24   the present time, you testified that Dr. Koff never told

25   you you could not work as a real estate appraiser, is that

1    correct?

2    A    That's correct.  But what I'm trying to say is that

3    the entire treatment process that I've been going through,

4    the whole effort of that treatment process is to get me

5    back into a work environment, and that the types of jobs

6    that I applied for were part of the treatment plan with

7    Dr. Koff.  I'm not really sure how I can answer your

8    question any other way.  When I say no, that she didn't

9    say I couldn't work as a real estate appraiser, she wasn't

10   limiting me in that regard.  What we are trying to do is

11   get me back into the work force at some level to start

12   with.

13   Q    Mr. English, we can talk about in terms of what was

14   trying to be done or not trying to be done with regard to

15   your therapy.  But to my specific question, which is a yes

16   or no question, did Dr. Koff ever tell you you could not

17   work as a real estate appraiser from December 2003 up

18   until the present time?

19   A    I don't know how I can answer that question because

20   you are asking me to say that she didn't-- if I said she

21   didn't tell me that I couldn't work as a real estate

22   appraiser, it almost implies like she is saying I could,

23   and she didn't say that.

24   Q    I'm not implying anything, Mr. English.  It's a

25   simple question--

59

1    A    Let me answer the question--

2    Q    Wait.  Did Dr. Koff say to you you should go work as

3    a real estate appraiser?

4    A    Absolutely not.

5    Q    Did Dr. Koff say to you you should not work as a real

6    estate appraiser from December 2003 up until the present

7    time?

8    A    Up until the last time?

9    Q    Up until the present time.

10   A    I haven't seen her in a while because I'm not having

11   therapy.

12   Q    Mr. English, please listen to my question.  Just in

13   terms of a time period, December 2003 up until today

14   September 30, 2005, did Dr. Koff say to you you cannot

15   work as real estate appraiser?

16   A    No, she didn't say that to me.  What she said was, we

17   need to get you back in the work force and we need to try

18   and find these kinds of jobs, these entry level jobs where

19   you might be able to start working again.

20   Q    So the answer to my question is no, correct?

21   A    That is correct.

22         MR. MOSELEY:  I might suggest that we clarify

23   the time period.  I'm not sure when Phil was forced to

24   resign, I mean physically forced to resign.  But I think

25   after February 28th, 2004, I don't think he ever actually

60

1   worked, did any work for the City.

2            MR. LORUSSO:   Just so there is no

3   misunderstanding, I'm just making a record, counsel, that

4   in terms of forced to resign, obviously we disagree in

5   terms of forced to resign.

6            MR. MOSELEY:   I'm fine with that clarification.

7   There was a period of time at which he did resign.   I

8   think that may have been in December, but he was not

9   actually doing any work for the City, regardless of his

10  technical status as an employee.   I just wanted to make

11  sure that we are sort of clear on the record there.

12  Q    (By Mr. Lorusso)   Let's talk about that concept just

13  for a second, too.   With regard to your ending of

14  employment with the City, is it your testimony that you

15  were terminated by the City?

16  A    What I recall is that I was forced to resign.

17  Q    By forced to resign, what do you mean by that?

18  A    As I recall, it seems to me that, in order to-- well,

19  there is a couple situations.   We have a doctor's report

20  saying I should not go back to the Assessment Division.

21  My union agent was telling me I shouldn't go back to the

22  Assessment Division.   And in working with the City during

23  a worker's comp claim settlement, they essentially, this

24  is my understanding, said that if you want to settle this,

25  you have to quit or you have to resign your position.

61

1          So I see that as, all of those things put together,

2    they wanted me gone.  And if I wanted to resolve the issue

3    with them, I had to resign my position.

4    Q    With regard to your worker's compensation claim

5    against the City, you were represented by counsel,

6    correct?

7    A    That's correct.

8    Q    In fact, you were represented by Mr. Moseley,

9    correct?

10   A    Yes.

11   Q    And with regard to that worker's compensation claim,

12   you signed a document entitled Compromise, Settlement and

13   Release Agreement, correct?  Is that correct?

14   A    I don't have it in front of me.  I don't recall.  So

15   whatever the document was.  I signed some document.

16   Q    With regard to any document that you would sign,

17   would it be fair to say what you would do is you would

18   read it first, correct?

19   A    Yes.

20   Q    With regard to any agreement that you signed with the

21   City for your worker's compensation claim, again that was

22   done with the advice of counsel, correct?

23   A    Yes.

24   Q    Let me show you what we'll have marked as Exhibit 1

25   to the deposition.

62

1          (Exhibit 1 marked for identification.)

2     Q     (By Mr. Lorusso)   This is a document entitled

3     Compromise, Settlement and Release Agreement, Approval and

4     Order.   First of all, Mr. English, have you ever seen that

5     document before?

6     A     I don't recall.

7     Q     Why don't you take as much time as you want to look

8     at the document.   And I'm only going to ask you a few

9     questions with regard to it right at this moment.   But I

10    want you to be comfortable and, like I said, take as much

11    time as you want to look at this document.

12          Let's go off the record.

13               (Recess)

14    Q     (By Mr. Lorusso) Mr. English, with regard to Exhibit

15    1, the Compromise, Settlement and Release Agreement,

16    Approval and Order, have you had an opportunity to review

17    that document?

18    A     I just reviewed it.

19    Q     With regard to that document, on page 8 of that

20    document, is that your signature?

21    A     Yes, it is.

22    Q     And the document is dated January 20th, 2004,

23    correct?

24    A     Yes.

25    Q     And on the next page of that document, there appears

1  the names of a number of people, including your attorney

2  Mr. Moseley, is that correct?

3  A    Yes.

4  Q    If you look at Exhibit No. 1, can you look at

5  paragraph 11 which appears on page six of the document.

6  A    Yes.

7  Q    And with regard to paragraph 11, it indicates, and

8  please make sure I'm reading this, "In further

9  consideration for the agreements of Employer as set forth

10  herein, Claimant hereby voluntarily quits, resigns and

11  terminates his employment with Employer, fully, finally,

12  irrevocably and forever, effective January 31, 2004, and

13  Claimant hereby waives, releases and discharges the City &

14  County of Honolulu from any and all of the City & County

15  of Honolulu's obligations pursuant to any collective

16  bargaining agreement."

17       I read that correctly?

18  A    Yes.

19  Q    It further indicates in that paragraph, "Claimant

20  further waives any reemployment and priority placement

21  rights as part of this agreement."  Did I also read that

22  correctly?

23  A    Yes.

24  Q    With regard to Exhibit 1, based upon paragraph No.

25  Number 11, would you agree me that you signed a document

64

1  that indicated that you voluntarily quit, resigned and

2  terminated your employment with the City?

3  A   Based on No. 11?

4  Q    Yes, based on paragraph 11.

5  A    In context of the entire document, it's telling me,

6  the way I read it, is that the only way this agreement

7  will go forward is if I voluntarily sign this.

8  Q    Are you saying that you signed Exhibit 1 under

9  duress?

10 A    No.  I'm saying that the only way that they would

11 agree to it is if I agreed to resign.

12 Q    And with regard to resigning, that was a choice that

13 you could make with the advice of counsel, correct?

14 A    I had the choice to resign or not, but I could only

15 do it in that context, because that was the only way that

16 they would settle the worker's comp claim.

17 Q    And with regard to paragraph 11, it indicates that

18 you voluntarily quit, correct?

19 A    Because that was the only way--

20 Q    That is not my question.  I'm simply--

21 A    I voluntarily signed it because I had no other

22 choice.  In order to settle this thing, I had to

23 voluntarily sign it.

24 Q    When you say that you had no other choice, I come

25 back again to make sure, Mr. English, are you saying that

1    you signed this agreement, Exhibit No. 1, under duress?

2    A    I'm saying exactly what I said before.  I don't know

3    how else to say it.  The only way that this agreement

4    would go forward is if I signed this.  So I had no other

5    choice but to sign it.

6    Q    You signed it with advice of counsel, correct?

7    A    I did.

8    Q    And you signed it on your own free will and volition,

9    correct?

10   A    Under the circumstances of what was being discussed,

11   yes.

12   Q    Okay.  We can put that aside, Mr. English.

13   A    Okay.

14        MR. MOSELEY:  Before we go on, can we have an

15   exhibit convention agreed to here that we just start from

16   one, and with whatever deposition of whatever exhibit, we

17   just go next in order?  Are you okay with that?

18        MR. LORUSSO:  Yes.

19        MR. WONG:  A single comprehensive set of

20   exhibits?

21        MR. MOSELEY:  Yes.

22   Q    (By Mr. Lorusso)  With regard to your employment with

23   the City, at least according to Exhibit 1, the Compromise,

24   Settlement and Release Agreement, it indicates that you

25   are no longer employed with the City as of January 31,

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII
CIVIL NO. 04-00108 JMS KSC
ENGLISH v CITY & COUNTY OF HONOLULU

IN RE: DEPOSITION OF PHILIP E. ENGLISH, VOLUME II

CORRECTION SHEET - RETURN BY NOVEMBER 18, 2005

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 90 | 2-3 | after "administrator" add "or may have been Appraisor VI or V" | accuracy |
| 101 | 25 | add "to six" after "three" | accuracy |
| 103 | 10 | change "administrator" to "assessor" | accuracy |
| 119 | 7 | replace "not advance directly to an" with "become" | clarity |
| 123 | 2 | delete "But" | clarity |
| 128 | 25 | after "groups" add "I think" | clarity |
| 143 | 3 | change the second "It" to "There" | clarity |
| 144 | 3 | change the first "and" to a comma, delete "or Gary" after "Chris" | clarity |
| 144 | 6 | change "Magota" to "Matsunami" | accuracy |
| 147 | 1 | change "Magota" to "Matsunami" | accuracy |
| 147 | 7 | change "Magota" to "Matsunami" | accuracy |
| 147 | 10 | change "Magota" to "Matsunami" | accuracy |
| 147 | 12 | change "Magota" to "Matsunami" | accuracy |
| 149 | 23 | change "Five" to "Four" | accuracy |
| 152 | 22 | *add "* Law suits against the division may have been in another conversation " | trouble recalling |
| 154 | 15 | delete entire line and substitute it with "We met one time again.  I am not sure when it was" | accuracy |
| 155 | 21 | delete "didn't", delete sentence from the comma and substitute with "was for Gary" | clarity |
| 156 | 18 | add "He said Gary called him." | clarity |
| 156 | 23 | add "He said Gary called him." | clarity |
| 157 | 13 | add at the end of the sentence "because he said Gary called him" | clarity |

RECEIVED NOV 0 9 2005

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 157 | 18 | after "today" add "because he said Gary called him" | clarity |
| 166 | 4 | after "weeks" add ", not sure" | trouble recalling |
| 170 | 18 | delete "No" and substitute with "Don't know" | clarity |
| 172 | 2 | delete "Yes" and substitute with "I think so. Not sure" | clarity |
| 174 | 23 | at the end of the sentence add "and not that I recall at the moment" | clarity |
| 230 | 4 | after "review" add "changed to probation" | clarity |

SIGNED BY _Phil Eng_____    DATED: _11/4/05_____

2

241

1       I, PHILIP ENGLISH, do hereby certify that I have read

2   the foregoing typewritten pages 135 through 240,

3   inclusive, and corrections, if any, were noted by me; and

4   that same is now a true and correct transcript of my

5   testimony.

6

7       Dated _____NOV 18 2005_____

8

9

10      _____

11

12

13

14  Signed before me this _____

15  day of _November_, 2005.

16

17  _____

18

19

20

21

22

23

24

25

COPY

85

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,                ) CIVIL NO. CV04-00108 JMS/KSC
                                  )
          Plaintiff,              )
                                  )
     vs.                          )
                                  )
CITY AND COUNTY OF HONOLULU;      ) VOLUME II
GARY T. KUROKAWA; ROBERT          ) PAGES 85 THROUGH 242
MAGAOTA; ANN C. GIMA; and         )
GK APPRAISALS, INC.; et al.,      )
                                  )
          Defendants.             )
                                  )
_____ )

DEPOSITION OF PHILIP E. ENGLISH

Taken on behalf of Defendants City & County of Honolulu,

Gary T. Kurokawa, Robert Magota and Ann C. Gima, at the

law offices of Watanabe Ing Kawashima & Komeiji, 5th

Floor, Hawaii Tower, 745 Fort Street, Honolulu, Hawaii

96813, commencing at 10:29 a.m., on Tuesday, October 4,

2005, pursuant to Notice.


BEFORE:

     Donna Kohls, CSR 146
     Notary Public, State of Hawaii

CARNAZZO COURT-REPORTING CO., LTD.
532-0222

1   A    Right.

2   Q    With regard to that process of applying for the

3   administrator position, please explain to me or tell me

4   what process you went through for that position?

5   A    Upon submitting this application or another one,

6   which I don't recall, I received communication from Roy

7   Amemiya's office, and they called me in for an interview.

8   I interviewed with Roy Amemiya, Eileen Tengan and Chris.

9   I don't know his last name.   Chris something.

10  Q    And when did this interview take place,

11  approximately?

12  A    Actually I don't recall.   I don't recall.

13  Q    And where did the interview take place?

14  A    It took place at Honolulu Hale on the second floor in

15  the director's offices area.

16  Q    And what was your understanding of what the

17  administrative position was?

18  A    That it would be a position that would be responsible

19  for the Real Property Assessment Division, all of its

20  employees and carrying out the assessments for the City &

21  County of Honolulu.

22  Q    After you had interviewed, what was the outcome of

23  that interview?

24  A    Well, during the interview, again, I interviewed then

25  to find out what the position was about, and I revealed to

1  Q    (By Mr. Lorusso)  I'm sorry.  Thank you.  June 1,

2  2000, you begin your employment with the City, correct?

3  A    Yes.

4  Q    June 1, 2000, if you could refresh my recollection,

5  your immediate supervisor was who?

6  A    Michael Okamoto.

7  Q    Then shortly thereafter you had indicated it had

8  became Ann Gima, correct?

9  A    Approximately two months later.

10  Q    With regard to other appraisers that were working

11  within your division, who else was working within your

12  division?

13  A    When I started?

14  Q    Yes, if you recall.

15       MR. MOSELEY:  If you can answer.

16       THE WITNESS:  Well, there was Jody Chung.

17       MR. MOSELEY:  Actually, I am going to object.

18  Your question is ambiguous.  You want to know all the

19  appraisers in the assessment division at the time he

20  started?

21  Q    (By Mr. Lorusso)  What I'm trying to find out is,

22  with regard to individuals that you were working with.

23  A    In my group?

24  Q    In your group.

25  A    They were divided up into six groups.  So when I

133

1  Q     That was something that you were used to, correct,

2  before your employment with the City?

3  A     Absolutely.  I don't know how you can get along

4  without them.

5  Q     As far as government functions as far as a City

6  entity, that was a different setting for you in terms of

7  not having clerical, secretarial staff, correct?

8  A     Certainly I didn't have access to that kind of

9  support.  In that regard, that is true.

10  Q     Now, Mr. English, with regard to your employment with

11  the City, at some point in time you indicate that there is

12  an individual or individuals who are doing work that is

13  not City work on City time, correct?

14  A     That's correct.

15  Q     And when was that?

16  A     When did I first observe it?

17  Q     Yes.

18  A     It would have been sometime in early 2001.

19  Q     By early 2001, what do you mean by that?

20  A     Sometime in the first quarter, maybe, of 2001.

21  Q     By first quarter, January, February, March of 2001,

22  correct?

23  A     That's correct.  That is approximately.  Could have

24  been in the first six months.  But sometime in the first

25  half of 2001 I observed this activity.

1  Q    So as you are indicating, it was either between

2  January and March or January and June of 2001, correct?

3  A    It's definitely within the first six months.

4  Q    And what did you observe and who did you observe?

5  A    I observed Christopher performing appraisal

6  assignments that I of course later learned were for GK

7  Appraisals.  He was doing narrative write-up on commercial

8  properties, and that is what I observed.  In fact, he and

9  I discussed it to some degree.

10 Q    Just for the record, when you said that he was doing

11 narrative write-up, what do you mean?

12 A    In the appraisal work, there is a certain amount of

13 analysis that goes into it.  That would be the

14 mathematics, the spreadsheets and that sort of thing,

15 income.  In fact, he was primarily involved in the income

16 approach to these appraisal assignments.

17     So he would do an income analysis, a cash flow

18 analysis, and then he would do the narrative portion of

19 the appraisal, which could be the description of the

20 property, the area, the market, as well as in the income

21 narrative, which would be the written portion of

22 explaining the analysis and conclusions.

23 Q    How is it that you observed him doing these narrative

24 write-ups?

25 A    In every case, wherever we were located, it's an open