1    Chris Graff performing a narrative write-up, correct?

2    A    Correct.

3    Q    Then do you immediately have a conversation with

4    Chris Graff about what it is that he is doing?

5    A    That is correct.  I just want to be clear.  I may

6    have observed him doing it prior to having a conversation.

7    You are asking when is the very first time.  I'm not

8    saying-- I don't know if I can pin it down to the very

9    first time.  But I knew that he was doing some other kinds

10   of appraisal work.  That was apparent to me.

11        It was also apparent because there was a gentleman by

12   the name of David Matsunami who was coming into the office

13   into the second floor area, which is not a public area,

14   and he was handing Chris envelopes, Chris was handing him

15   stuff and they were exchanging things.  And so I knew

16   there was some activity.  It may be I observed those

17   things first.  And then, on another occasion, when I went

18   up to Chris's desk, we actually engaged in a conversation

19   about what he was doing.

20        So I'm trying to answer your question.  But I don't

21   know if I can say this was the exact first time I saw it

22   because there were these other activities.  There were

23   things I didn't understand.  And at some point in time, I

24   did go to him-- or I was standing at his desk and he was

25   working on one of these reports and we engaged in

1    A    My answer remains the same.  I didn't tell her

2    because I thought she was aware of it.

3    Q    Did anyone tell you that Ann Gima was aware that

4    Chris Graff was performing outside City work during this

5    two to three-month period of time?

6    A    No.

7    Q    That was your assumption, correct?

8    A    That's correct, based on the work environment and the

9    fact that other people seemed to be aware of what was

10   going on.  Again, I'm trying to figure out what is going

11   on here at the Assessment Division.  That's correct.

12   Q    Did other people tell you during this two to

13   three-month period of time that they knew Chris Graff was

14   doing outside City work?

15   A    I had no conversation with anybody else other than

16   Chris.

17   Q    During this two to three-month period of time when

18   you knew that Chris Graff-- this is before you spoke to

19   Chris Graff-- was doing outside work on City time, did you

20   tell Gary Kurokawa?

21   A    No, I didn't.

22   Q    And during this two to three-month period of time

23   when you knew that Chris Graff was doing outside City work

24   on City time, did you tell or notify Bob Magota?

25   A    No, I didn't.

1   Q    As you indicated you, you end up talking to Chris

2   Graff about his outside City work, correct?

3   A    Yes.

4   Q    And is that at his desk?

5   A    So I can be clear, we had conversations that were

6   something like, "I'm doing this appraisal assignment on

7   this commercial property on the Big Island and I'm

8   applying this particular approach."  So our initial

9   conversations are about that.  I'm not going to Chris and

10  confronting him in any way about it.  We are just having

11  conversations and I'm becoming aware that he is performing

12  these types of assignments.

13  Q    At any point in time, do you have a conversation with

14  Chris Graff where you say to him, "Are you doing work

15  outside or outside work on City time"?

16  A    My initial conversation questioning it was, "How can

17  you do this sort of thing?"  And that was my initial

18  conversation, "How can you do this sort of thing?"

19  Q    When you say, "How can you do this sort of thing,"

20  what sort of thing are you talking about, the approach or

21  doing outside City work?

22  A    Doing outside City work, the appraisals that he was

23  performing or parts of the appraisals.

24  Q    And where were you when you had that conversation

25  with him?

143

1    A    I believe we were right there at his desk.

2    Q    Was anyone else around?

3    A    I don't know.  It may have been at lunchtime.  It may

4    have been-- I'm not sure.  I was talking to Chris and I'm

5    not sure if anybody else was around.

6    Q    So even though it may have been at lunchtime, in

7    other words, you don't know what time of the day it was

8    you had this conversation, correct?

9    A    My guess is--

10   Q    I don't want you to guess, Mr. English.

11   A    I don't know what time of day it was.  Midday,

12   something around that time.

13   Q    And you don't remember if it is lunchtime or not

14   lunchtime, correct?

15   A    Mid morning, midday, somewhere around that time.

16   Q    And as you sit here, you are not aware of anyone else

17   being in proximity to you of this conversation that you

18   are having with Chris Graff, correct?

19   A    I wasn't aware.  There may have been people there,

20   but I was talking to Chris and focused on that and I

21   wasn't aware of what other people were doing.

22   Q    When you said that to Chris, this is the first time

23   that you are questioning him about the type of work he is

24   doing, correct?

25   A    That's correct.

1  Q    What was his response?

2  A    His response to me was that he could do this type of

3  work because Gary and David and Chris or Gary, they had

4  worked out this scheme whereby the appraisal assignments

5  that would come to GK Appraisal, that Gary in turn would

6  assign them to David Magota who would in turn assign work

7  to Chris Graff.  And because of that, there was no direct

8  connection between Chris Graff and Gary Kurokawa and that

9  somehow made it all okay.

10  Q    In terms of the timing of this conversation, you have

11  given yourself a six-month period of time.  Do you have a

12  more specific time in terms of when you had this

13  conversation?

14  A    It was pretty much right around August 1st.

15  Q    Of 2001?

16  A    Of 2001.

17  Q    And is there any particular reason why you remember

18  around August 1st of 2001?

19  A    Yes.

20  Q    Why is that?

21  A    Because shortly after that, when I became aware that

22  there was some scheme-- and by the way, I did tell Chris

23  that I thought that was a very thin veil of a scheme and

24  that they needed to be careful that they were doing

25  something that may not be legal.  It bothered me, and the

145

1    activity was open.  And in a conversation I did have with

2    my supervisor, I mentioned it to her.  And I do remember

3    that was maybe right around-- pretty much around the end

4    of August.

5        So it bothered me for a month.  I didn't know what to

6    do.  You have to remember I'm still a new guy in the

7    division and I'm trying to figure out things, I'm being

8    trained and so on.  I'm trying to fit in with fellow

9    employees and so on.  So for a month, I'm thinking what

10   should I do.

11   Q    At the time that you have this conversation with

12   Chris Graff, you are working for the City for a little

13   over a year now, correct?

14   A    That's correct.

15   Q    And you said to Chris Graff be careful, because what

16   you thought they were doing as far as that scheme might be

17   illegal, correct?

18   A    I told him that I thought it was a thin veil and

19   that-- I don't know if I was so specific to say it might

20   be illegal.  I think actually what I suggested to him was

21   that I believe Rene Mancho had just gone to jail for

22   something somewhat similar to that.  So that, I think,

23   is-- that's pretty much what I said to him.  So

24   essentially, "I don't know if this is right.  I think Rene

25   Mancho just went to jail for something similar to this.

1  like a meeting that we set up.  I think she just came,

2  walked up to her desk and I mentioned it to her.  I can't

3  think of what prompted it.  Maybe I just saw Chris doing

4  the work.  I'm not sure.  But I just inquired.  I said,

5  "Ann, you know Chris is doing work for Gary?  You know

6  that, don't you?"  That is basically what I said.

7  Q    What was the response?

8  A    She said, "I don't know what you are talking about."

9  Something maybe she never saw it, and that I should mind

10  my own business and just do the work on my desk.

11  Q    Did she say anything else in that conversation?

12  A    She said nothing else in that conversation.

13  Q    Did you say anything else to Ann Gima during the

14  course of that conversation at the end of August 2001?

15  A    No, I think I pretty much got the message.

16  Q    After that conversation the end of August 2001, did

17  you ever have further conversations with Ann Gima about

18  your allegation that Chris Graff was having or was

19  performing outside City work on City time?

20  A    No, I didn't.

21  Q    To your knowledge, did Ann Gima ever speak with

22  anyone else with regard to the allegation that Chris Graff

23  was performing City work or outside work on City time?

24  A    Not to my actual knowledge, no.

25  Q    After the end of August of 2001 when you had the

1    A    No, not at that time.

2    Q    You then meet with Bob Magota, correct?

3    A    Yes.

4    Q    And where did that meeting take place?

5    A    In Bob's office.

6    Q    Was anyone else present?

7    A    No.

8    Q    Do you recall approximately what time of day that

9    conversation took place?

10    A    I believe it was mid morning.

11    Q    And approximately how long was that conversation?

12    A    20 minutes.

13    Q    And what did you tell Bob Magota?

14    A    I told him that Chris Graff was doing appraisal work

15    for Gary Kurokawa.  And the reason-- should I go on?

16    Q    What did you tell him, that is my question.

17    A    I told him that I was at Chris's desk and the

18    telephone rang, Chris took the call, and then a

19    conversation about you got to do something.  He hung up

20    the phone and said, "Phil, Gary just called me.  I got to

21    finish up this report and deliver to the client by 5:00

22    o'clock this afternoon."  That is what prompted me to go

23    talk to Bob.  And I explained that to Bob.  So he was very

24    clear about what was going on.

25    Q    What else did you tell Bob Magota?

1   A    That is what I told him.

2   Q    What did Bob Magota tell you during this October 2001

3   meeting?

4   A    Bob told me that he was upset with Chris if it's

5   found that Chris is doing outside work and that Chris

6   would get into big trouble.  I explained to Bob that Bob

7   needed to be clear that Gary was the one directing Chris's

8   work and that somebody needed to talk to Gary about it.

9   Bob told me at that point that it's just my word against

10  theirs and not to pursue it any further than that.

11  Q    Anything else said by Bob Magota to you?

12  A    I believe he said he will talk to Gary and talk to

13  Chris.

14  Q    Anything else said?

15  A    No.

16  Q    In terms of the statement not to pursue it, did you

17  have an understanding as to what that meant?

18  A    Yes.

19  Q    What was your understanding?

20  A    Not to take it any further, to drop it.  I think he

21  even indicated that other people have tried to bring up

22  lawsuits against the division and have failed and that I

23  should just drop it.

24       And the reason he even mentioned a lawsuit, frankly,

25  at that time is peculiar to me, because that wasn't even a

155

1    about 12:30.

2            (Noon Recess)

3            A F T E R N O O N   S E S S I O N

4            EXAMINATION (Resumed)

5    BY MR. LORUSSO:

6    Q    Mr. English, we are back on the record again.  During

7    the lunch break, did you review any materials to assist

8    you in further preparation for today's deposition?

9    A    No, I didn't.

10   Q    Now, you had indicated that Chris Graff had gotten a

11   phone call from Gary and that an assignment had to be

12   completed by 5:00 o'clock?

13   A    That's correct.

14   Q    And with regard to that particular assignment, do you

15   know if it was in fact for Gary Kurokawa?

16   A    Yes.  Chris had indicated that Gary had called, and

17   the implication was it was Gary Kurokawa, that he was

18   working on an assignment for Gary for GK Appraisals.

19   Q    Is that what Chris specifically stated, that it was

20   for Gary Kurokawa and that it was for GK Appraisals?

21   A    He didn't specifically state it, but clearly that is

22   what it was all about.

23   Q    When you say clearly that is what it was all about,

24   that is what your assumption was, correct?

25   A    I'm hesitating because it seems like it was somehow

1    more than my assumption.  There was evidence that he

2    stopped doing what he was doing and then went to work on

3    this other assignment.  And he was clear in his

4    communication to me that it was Gary, meaning Gary

5    Kurokawa that called.

6         So I don't know how to answer that other than to say

7    that what I observed and what I believed to be true was

8    that it was Gary Kurokawa that called Chris and that he

9    began to work on this other assignment.

10   Q    My question to you is, did Chris Graff specifically

11   use the name Gary Kurokawa?

12   A    No, he didn't.  He didn't need to, actually.

13   Q    That is not my question.  Mr. English, please just

14   listen to my question and just answer my question.

15   A    He didn't need to.

16   Q    My question to you is, he never said the name Gary

17   Kurokawa, yes or no?

18   A    My answer is the same.

19   Q    But that is not my question to you, that he didn't

20   need to or whether he needed to or didn't need to. The

21   question is simply, he did not say Gary Kurokawa, is that

22   correct?

23   A    My answer remains the same.

24   Q    You are not answering my question, then, Mr.

25   English.

1      MR. MOSELEY:  I object.  I think he did answer

2  the question.  He explained his answer, as well, but he

3  answered your question.  And at this point, you are

4  badgering the witness.

5      MR. LORUSSO:  Just for the record, I believe I'm

6  badgering the witness only from the standpoint that I

7  don't believe I'm not getting an answer to my question,

8  which is a simple yes or no answer.

9  Q    (By Mr. Lorusso)  Mr. English, did Chris Graff say to

10  you it was Gary Kurokawa who called him?  Yes or no?

11  A    He did not say that it was Gary Kurokawa because he

12  didn't need to because it was implied.  I knew who he was

13  talking about.

14  Q    By implied, that was your assumption, correct?

15  A    Based on our previous conversations, based on what I

16  saw of the activity that he did from that moment forward,

17  I believed that he was talking about Gary Kurokawa and I

18  believe that today.  That is what I believe.

19  Q    With regard to that particular assignment that you

20  are referring to, did Mr. Graff do anything with that

21  particular assignment, to your knowledge?

22  A    Yeah.  He immediately pulled the paperwork, got the

23  computer going and started working on that assignment.  In

24  fact, I observed him that particular day.  This was mid

25  morning maybe or late in the morning and he worked on that

158

1   assignment for the remainder of the day.

2   Q    And you watched him throughout the rest of the day?

3   A    Not constantly, but certainly I worked in the area

4   and I could see what he was doing, yes.  In fact, I think

5   he even put it in an envelope and walked it over to the

6   client.  It must have been some lender or client downtown,

7   because at the end of the day, he actually physically did

8   that.  I mean, it was an important deal.  He had to get it

9   out, you know, and that is what he did.

10  Q    And as far as walking it to the client, did you go

11  with Mr. Graff?

12  A    No.  But I saw him leave late in the afternoon and I

13  think he even maybe said something to the effect that he

14  is proud he got it done and I think Gary did the

15  appropriate signatures and everything is going.  It's one

16  of these kind of got to go quick, got to get it out, that

17  sort of thing.

18  Q    Did Mr. Graff in fact say that Gary did the

19  appropriate signatures?

20  A    He did say that Gary did sign it.  He did say there

21  were signatures and I believe that Gary signed it.  I'm

22  fairly certain that is what he said.

23  Q    Is that your testimony?

24  A    That is my testimony.

25  Q    With regard to Chris Graff delivering it to a client,

1  you know for a fact that Chris Graff delivered it to a

2  client of GK Appraisals?

3  A    That particular assignment, I believe, I didn't go

4  with him, but it seemed to be what he indicated was his

5  intent, that it was something that he had to do that day

6  and that he was the one who was walking it and delivering

7  it to the client.

8  Q    That is not my question.

9  A    I'm sorry.  I didn't understand.

10  Q    My question is, you know for a fact and you have

11  facts that Chris Graff delivered that particular

12  assignment that we have been talking about to a client

13  that day?  Not your assumption, not your belief, but you

14  know for a fact that that is what Chris Graff did?

15           MR. MOSELEY:  I object.  That question is

16  ambiguous.  How do you prove a fact?  Are you saying that

17  he couldn't prove the fact by saying anything other than

18  saying I observed him take it to X?  The question can't be

19  answered the way you are asking it.

20  Q    (By Mr. Lorusso) Let me ask it this way, Mr. English.

21  Did Chris Graff tell you where he was going?

22  A    No, he didn't.

23  Q    Did you follow Chris Graff out the door?

24  A    No, I didn't.

25  Q    Did you see Chris Graff deliver it to somebody?

1    A    No, I didn't.

2    Q    So in terms of Chris Graff delivering it to a client,

3    that is your assumption, correct?

4    A    I know that was his intent when he left the door.

5    When he was going out of the area-- I didn't even see him

6    go out the door.  But when he left the area, I know that

7    was his intent because he indicated that.

8    Q    What did he specifically say to you?

9    A    I'm not sure I can recollect his exact wording.  But

10   he had all of the stuff put together in an envelope and he

11   had to rush out the door to deliver it to the client.

12   Q    Did he say something to you as he was rushing out the

13   door?

14   A    Something to the effect that, "I got all my stuff and

15   I have got to get this to the client."  And I think it had

16   to be there by 5:00 o'clock, or something to that effect.

17   So he was rushing out the door to make sure he got it to

18   the client on time.

19   Q    Did he say anything else to you?

20   A    No.

21   Q    And he specifically turned and said words to the

22   effect that you just stated to you, correct?

23        MR. MOSELEY:  Objection.  You are misstating the

24   testimony.  I don't think there was any testimony that he

25   turned to Phil.

1   when Bob Magota said that?

2   A    My understanding was don't pursue anything more, that

3   if anybody attempted to pursue anything more, they would

4   not prevail, that was my understanding.

5   Q    I thought you had indicated, though, that Bob Magota

6   said that other people had filed lawsuits against the

7   division and that they had failed, correct?

8   A    Correct.

9   Q    Now, in terms of those other lawsuits or the type of

10  lawsuits that had been filed, did you have an

11  understanding one way or the other what those lawsuits

12  were about or the type of lawsuits that they were?

13  A    I don't think he indicated specifically what type of

14  lawsuits that they were other than that pursuing anything

15  more, you wouldn't prevail.  In other words, his main

16  point was-- this is what his main thrust of what he was

17  saying was.  It's your word against theirs, don't pursue

18  it.  And people have tried to pursue lawsuits before and

19  they haven't prevailed, so don't do it.

20  Q    Now, in terms of lawsuits, though, did you have an

21  understanding as to what, if any, lawsuits had ever been

22  filed against the division and had failed?

23  A    I didn't really-- no, I didn't, because I wasn't

24  really focusing on that part.  I was focusing on the part

25  that is don't pursue anything, just drop it.  So that is

1  within a day or two?

2  A    Yes.

3  Q    Do you know if in fact at that point in time Bob

4  Magota spoke with Gary Kurokawa?

5  A    I don't know if did he or not.

6  Q    And do you know if Bob Magota spoke with Chris Graff

7  at that point in time?

8  A    I don't know if he did or not.

9  Q    During this period of time that we have been talking

10  about, which is now leading us up to mid February 2002,

11  had you spoken with any counsel with regard to your

12  concerns or allegations?

13  A    Nobody.  I believe that this was an internal matter

14  that would be handled internally and that it would stop.

15  Q    What is the next thing that happened in terms of your

16  concerns and allegations after you had gotten the email

17  response from Bob Magota?

18  A    The next thing that happened to me would have been

19  that I believe, at some point, and I don't know if it's in

20  March or April, but I was called into a meeting with Bob

21  Magota and Ann Gima.  And in the meeting, Bob would say

22  things to me.  The very first thing he would say was

23  something to the effect, "You must not like your job very

24  much."  And then the next thing they started to say things

25  like, "You are coming and going as you please," you are

1    doing this, you are doing that.

2       And it was really shocking to me because, first of

3    all, I did like the job a lot.  And I'm trying everything

4    that I know to do to comply with what I know to be the

5    things that I'm to comply with.  So at that point, that is

6    the very first thing that I notice, that something doesn't

7    seem right, what's going on.

8    Q    So this is in March or April of 2002, correct?

9    A    I believe that is the time frame.  I'm not sure.

10   Q    As far as the meeting, is this something that you

11   were told about the meeting by someone in order to show up

12   at the meeting?

13   A    Yeah.  I would usually get a call from Bob Magota and

14   he would say I want you to come to my office right now.

15   Q    Did this meeting take place in Bob Magota's office?

16   A    Yes.

17   Q    It was just the three of you, yourself, Bob Magota

18   and Ann Gima, correct?

19   A    Right.

20   Q    Anyone else there?

21   A    No.

22   Q    Other than what you have testified to, did Bob Magota

23   say anything else to you?  You testified that he said you

24   must not like your job.

25   A    I think, at one of the very first meetings, he asked

174

1    me if I would like to seek counseling, which also

2    surprised me quite a bit.  And I told him, "No. I don't

3    know why you should be asking me that question."

4    Q    What else was said by Bob Magota at the meeting?

5    A    I think he made again these assertions that I was

6    coming and going as I please, and that I was placing leave

7    papers on Ann Gima's desk at times when they felt it

8    wasn't appropriate.  And that when-- actually this is Ann

9    Gima, not Bob Magota.  Ann Gima had made some comments, as

10   well.  So that's about it for Bob.

11   Q    I want to be very clear in terms of who said what.

12   Bob Magota said, "You must not like your job" correct?

13   A    "You must not like your job very much."

14   Q    And he also said you were placing papers on Ann

15   Gima's desk at times that it was not appropriate, or words

16   to that effect?

17   A    Well, I think what he was saying, these are leave

18   papers, and he was saying that I was placing them on her

19   desk when she wasn't around.  And so there was some kind

20   of accusation associated with that, that I was doing

21   something inappropriate.

22   Q    And did Bob Magota say anything else to you?

23   A    Not anything other than what I have already stated.

24   Q    And then Ann Gima also said things to you, correct?

25   A    Correct.

175

1    Q    What did she say to you?

2    A    She told me that she didn't want me asking any

3    questions of her that I should already know the answers

4    to, in her view.  And that I should go ask the other

5    appraisers if I needed instructions on how to do things or

6    how office procedures are being handled.

7        And I asked her, "Is it okay if I ask sometimes a

8    stupid question." Because I'm trying to learn, I'm trying

9    to do what they want me to do.  And she said, "No, go ask

10   somebody else."

11   Q    Did she say anything else?

12   A    No.

13   Q    Did you say anything else other than what you have

14   already testified to?

15   A    No.  Let me go back.  I did say something else.

16   Q    What else did you say?

17   A    I said I would try my very best to comply with

18   everything they have said and that I didn't believe I was

19   doing anything wrong.  That as far as putting papers down

20   on a desk for leave and that sort of thing, I was doing

21   everything that I thought was appropriate.

22       And also, of course I told Bob and Ann that I did

23   like my job very much and I didn't really understand what

24   was going on, why I was called in.

25   Q    And then the meeting ended?

192

1  reviews.  But before we get to that, as far as this issue

2  about the set time or having a set time, were you informed

3  by Ann Gima that, as far as anyone's schedule, that there

4  could not be staggered schedules any further as to any

5  appraiser, not just you?

6  A    Subsequent to the meetings, yes.

7  Q    Approximately when was that?

8  A    In May or June of 2002.

9  Q    And that applied to everyone, correct, all the

10 appraisers in the groups?

11 A    That is what she said, yes.  I'm not sure that in

12 practice it did, but that is what she said, yes.

13 Q    When you say you are not sure in practice, were there

14 appraisers who were coming and going as they pleased?

15 A    Most definitely.

16 Q    And which appraisers were those?

17 A    There is a lot of appraisers.  There is 30-some-odd

18 appraisers that are spread out all over the place.  But

19 appraisers-- well, I'll give you an example.  There was a

20 gentleman by the name of Clinton Wang who would come into

21 the office and then leave.  And the reason he left was

22 because he had a second job.  During the day, he was a

23 resident manager.  So he would come into the office, make

24 an appearance and leave and go do his resident manager job

25 and then come back to the office.

193

1    Q    With regard for Mr. Wang doing that, was he informed

2    that he could not keep his second job?

3    A    When it was discovered, he was informed that he

4    couldn't keep a second job.

5    Q    In terms, though, of your testimony that while the

6    appraisers were told they could not come and go as they

7    pleased and they had to have a set schedule, you testified

8    that that was merely a statement, in essence, but it

9    wasn't really the practice, is that a correct statement?

10   A    Generally people kept a set schedule.

11   Q    Were there appraisers who after being informed that

12   they had to be on a set schedule did not keep that set

13   schedule?

14   A    I don't know any other appraisers who were informed

15   of that.

16   Q    Is it your testimony that the keeping of a set

17   schedule only applied to you?

18   A    I would say that I was held to a different standard

19   than other appraisers.

20   Q    What was the different standard that you were held

21   to?

22   A    That other appraisers had the ability to maybe come

23   in late, maybe they were stuck in traffic, they couldn't

24   catch their bus, something to that effect.  But I was held

25   to a standard where that was considered some kind of

194

1    violation.

2    Q    Who were these other appraisers?

3    A    Again, generally that was the practice in the office,

4    that if there was a lot of traffic or if you missed your

5    bus, it wasn't a big deal to come in a little bit late.

6    Q    Were there ever circumstances where you-- strike

7    that.  In terms of you getting back and forth to work, did

8    you take a bus?

9    A    Yes.

10   Q    Were there ever circumstances that because the bus

11   was late, you were late?

12   A    Yes.

13   Q    And were you reprimanded in any way for that?

14   A    I wasn't reprimanded, but I was told to deduct that

15   time from my time sheet.

16   Q    Were others also told to deduct that time from their

17   time sheet, if you know?

18   A    I don't know.  But I know a lot of people came and

19   went freely without, as far as I know, having this kind of

20   issue.

21   Q    But you don't know if others were told to deduct

22   time, correct?

23   A    I'm unaware of it.

24   Q    And in terms of being stuck in traffic, again, it's

25   your testimony that that standard only applied to you,

195

1  that even if you were stuck in traffic, that that was not

2  acceptable?

3  A    The part about being unacceptable applied to me where

4  it did not appear to apply to others.

5  Q    When you say it did not appear, do you know if in

6  fact others had to follow the same standard as you?

7  A    You mean did they have to mark out their time that

8  they came in ten minutes late or something to that

9  effect?

10  Q    Right.

11  A    I'm not aware of anybody ever having to do that.  It

12  was more or less acceptable that if you got stuck in

13  traffic, you missed your bus, it's not a big deal, it's an

14  occasional thing, don't worry about it, except in my case.

15  Q    When you say that you don't know if it applies to

16  others, do you know if in fact there were circumstances

17  where someone had either missed their bus or that they

18  were stuck in traffic and they were told that's okay, you

19  don't need to deduct any time?

20  A    I don't know the specific instance.  But I know that

21  was generally what was accepted in the office.  As a

22  general rule, that is how people operated.

23  Q    And how do you know that was the general rule?

24  A    Because you can observe people.  I worked there for a

25  period of time and you know people come in late sometimes

196

1    or, you know, they miss their bus, whatever.  They had to

2    pick up their car at the mechanic and it caused them to be

3    delayed and it didn't seem to be an issue.

4    Q    You know that those incidents or instances occurred

5    where people may be late or delayed or had to pick up

6    their car, but you don't know what the outcome of them

7    doing that was with regard to their keeping of time, is

8    that correct?

9    A    My understanding of the outcome is that it was not an

10   issue.

11   Q    And when you say it's not an issue, was there anyone

12   in particular that you are aware of where those instances

13   occurred and they were told by anyone at the City not a

14   problem, not an issue?

15   A    Yes.

16   Q    And who?

17   A    Bob Magota told me that it's okay if you come in ten

18   minutes late or 15 minutes late, don't worry about it.

19   And that was generally what was the standard acceptable in

20   the office.  And that was the standard that I believed to

21   be the case.  You have to understand, if I can say it.  I

22   usually came to work at least a half hour early.  But

23   there was a couple of instances where I did come in late

24   and I was told that I had to mark that time off.  This

25   happened subsequent to right around the time frame of the

197

1    May and June meetings-- no, I'm sorry.  It actually

2    happened in August of 2002.

3        But other than that, I'm not aware of anybody who

4    ever had to mark off 10 or 15 minutes of their time

5    because they were delayed for some reason.  It may have

6    happened but I'm certainly not aware of it.

7    Q    Were there any other conversations other than the

8    ones you have already testified to with Ann Gima with

9    regard to your allegation that Chris Graff was performing

10   outside work on City time, other than what you have

11   already told me about?

12   A    No.

13   Q    Were there any other instances when you had a

14   conversation with Bob Magota about Chris Graff performing

15   outside City work on City time, other than what you have

16   already testified to?

17   A    Well, the answer is no.  But I attempted to bring it

18   up a couple times and was told that I could not.

19   Q    And by a couple, how many times are you talking

20   about?

21   A    Two times that I can think of.

22   Q    And one of them you had started to tell me about

23   before.  You were in a meeting, it was yourself and Bob

24   Magota, correct?

25   A    Yes.

1    Q    And who else was there?

2    A    Ann Gima.  This would have been the second of these

3    meetings that we had.  And I indicated to Bob that they

4    started making these assertions about me coming and going

5    and these kinds of things only after I had come forward

6    and said that Chris was doing work for Gary.  And Bob just

7    shut off that conversation completely.

8    Q    How did he shut off that conversation?

9    A    He said, "This has nothing to do with it and we are

10   not going to talk about that."

11   Q    So in terms of this has nothing to do with it, in

12   other words, there were other issues being discussed,

13   correct?

14   A    The issues regarding you must not like your job very

15   much, you are coming and going as you please, et cetera.

16   And I was trying to raise the point that I don't

17   understand why these things are-- why you are making these

18   claims, because I am trying to do what you asked me to

19   do.  And I only started to have these meetings with Bob

20   and Ann after I had stepped forward.

21   Q    And then, in another meeting, who was present?

22   A    Waylen Toma.

23   Q    And that was your union representative, correct?

24   A    He was a union agent.

25   Q    I'm sorry, union agent.  But he was there on your

1    behalf?

2    A    That was my understanding at the time.

3    Q    And who else was there?

4    A    Gary Kurokawa.

5    Q    And who else?

6    A    Ann Gima.

7    Q    Anyone else?

8    A    No.

9    Q    And I assume you had notified Waylen Toma about the

10   meeting or did he arrange a meeting?

11   A    It was arranged between Gary and Waylen.

12   Q    And in terms of the meeting being arranged, what was

13   to be the purpose of the meeting?

14   A    It was a discussion of whether or not my probation

15   would be extended.

16   Q    That was as an appraiser IV, correct?

17   A    That's correct.

18   Q    When did this meeting take place?

19   A    November.

20   Q    Of 2002?

21   A    Yes.

22   Q    When you say that Waylen Toma and Gary had arranged

23   the meeting, do you mean simply from the standpoint of the

24   scheduling, when it would be scheduled, like the date and

25   time?

200

1    A    It was my understanding that Waylen and Gary had a

2    few meetings to discuss the issue and that, when I heard

3    about it, I heard there was some sort of deal made between

4    Waylen and Gary and that there would be a meeting the next

5    day.

6    Q    When did you hear that there would be-- strike that.

7    When did you hear that there was a deal made?

8    A    Actually Dwight Ishigura emailed me that there was

9    some dealing, I think that is the term he used, deal, made

10   between Gary and Waylen.

11   Q    And before you went into the meeting, did you have an

12   understanding what that deal was?

13   A    None whatsoever.

14   Q    Did you contact Dwight and ask him what that deal

15   was?

16   A    Just to give some perspective on this, I met with

17   Waylen in August about this JPR, this performance

18   evaluation, once for about an hour.  Waylen told me there

19   is something wrong, it doesn't look right.  I got an email

20   from Gary Kurokawa that said your probation is going

21   forward.  This is in August.  That is, in effect, why I

22   contacted Waylen.

23        Now we are already in November and, as far as I'm

24   concerned, I'm on probation.  Between August and November,

25   apparently there were a number of meetings between Gary

201

1   and Waylen and Gary, Waylen and Ann Gima.  And during the

2   course-- I didn't know that, of course.  But I

3   corresponded to Dwight, actually complaining to Dwight, "I

4   haven't heard from Waylen, I don't know what is going on,

5   can you let me know."

6        And Dwight says, "I will try to talk to Waylen." And

7   he tries to communicate to Waylen.  It wasn't until the

8   day before that Dwight emailed me and said there is some

9   deal between Waylen and Gary.

10  Q    Going back to my question, before you went to the

11  meeting, did you inquire of Dwight Ishigura what the deal

12  was?

13  A    Dwight didn't know what the deal was.

14  Q    You made that inquiry of him?

15  A    I think Dwight told me that, at some point, that he

16  didn't-- he wasn't involved in any communications between

17  Waylen and administration, I think is the way he put it.

18  Q    But my question is, did you ask Dwight what is the

19  deal, or words to that effect?

20  A    I think the words that I used, "Do you know what is

21  going on?  Do you know what is happening?"

22  Q    And his response was he didn't know?

23  A    He didn't have any communications with Waylen with

24  regards to what was going on between Waylen and the

25  administration.

202

1    Q    Before the meeting, did you speak with Waylen Toma

2    and say, "I heard that there is a deal.  What is the

3    deal," or words though that effect?

4    A    No, I wasn't even given an opportunity.  I showed up

5    at the meeting and everybody was already there.

6    Q    When you say you weren't given an opportunity, did

7    anyone from the City prevent you from contacting your

8    union agent, Waylen Toma?

9    A    I was attempting to get information about what was

10   going on primarily through Dwight.  And I don't think that

11   I ever directly tried to call Waylen to ask him.  But the

12   reason being is that Dwight was a union guy and he was in

13   relative contact with Waylen.  And for me, it seemed like

14   a simple avenue to say, "Hey, Dwight, can you talk to the

15   guy because you see him periodically."  So I never

16   attempted to contact him directly.  I just went to Dwight

17   and said, "Hey, can you ask him."  That is what happened.

18   Q    Going back to my question.  Was there anyone in the

19   City who prevented you from contacting your union agent,

20   Waylen Toma?

21   A    No.

22   Q    Did anyone from the City at any time prevent you from

23   contacting any representative from the union?

24   A    Not that I'm aware of.

25   Q    You then go into this meeting with Waylen Toma, Ann

1    Gima, Gary Kurokawa, correct?

2    A    Correct.

3    Q    What happens in the meeting?

4    A    The meeting is primarily conducted by Waylen.  Waylen

5    apparently has specific issues that he wants to have

6    discussed at the meeting.  He tells them that he doesn't

7    believe that they should go forward with the probation,

8    albeit this is the end of my probation that he is telling

9    them that, but that my probation should not go forward.

10        And I attempt to ask the question, "What I would like

11   to know is why are these things happening to begin with?"

12   And Waylen literally puts his arm across my chest and

13   says, "No, we are not going to talk about that."  So I

14   think Gary-- should I continue?

15   Q    Please.

16   A    Gary started to communicate at that point.  And Gary

17   said to me that, "Phil, we should get a fresh start.  We

18   should forget about everything that happened before."  He

19   went on to say that, if it wasn't for Gary, that I would

20   not have gotten the job.

21        And then the next thing he said was, "We could have

22   come up with other things in your JPR."  Essentially they

23   were holding back.  The discussion went from there to

24   holding back.  The discussion went from there to where we

25   are going to go from here.  And the discussion was that