Daryl Matthews, M.D., Ph.D.
Teresa Lathrop, M.F.T.
Daryl Fujii, Ph.D.
Todd Elwyn, M.D., J.D.
Sheila Wendler, M.D.

Hawai'i Forensic Associates, LLC
345 Queen Street, Suite 900
Honolulu, Hawai'i 96813
Phone: 808-735-8505
Fax: 808-955-0933

Forensic Consultants in Psychiatry, Psychology, and the Behavioral Sciences

January 25, 2006

Roger S. Moseley, Esq.
Moseley Biehl Tsugawa Lau & Muzzi
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii 96813

  RE: English vs. City & County of Honolulu
    Civil No. 04-00108 JMS-KSC

Dear Mr. Moseley:

I reviewed the material you provided me and examined Mr. English in my office on 08/08/2005. My assistant, Teresa Lathrop, M.S., M.F.T., also participated in the examination. Prior to the examination, I explained to Mr. English that the examination was being conducted at your request and that I would be preparing a report that would be directed to you concerning his psychiatric condition and its relationship to his legal suit. Thus, the evaluation was not confidential. I also explained to him that I would not undertake to provide him with any medical treatment or advice. Mr. English understood these considerations and agreed to proceed with the examination.

It should be noted that this report is reliant on my examination of Mr. English and the records made available to me. Not all records were received in time to be included in this report. `Further record review may change the findings of this report.

**Brief Overview of the Problem**

Mr. English was employed as a Real Estate Appraiser for the City and County of Honolulu. He reported that he suffered retaliation at the hands of his administrators and co-workers after he complained to them about one of his administrators having his own personal/ private work done by a city employee on city time. He alleges that the stress and retaliation at work eventually became so severe that he became symptomatic and eventually was ordered by his physician off all work.

**Psychiatric Symptoms**

Mr. English described current psychiatric symptoms as insomnia, isolative behaviors, weight loss, feelings of being violated, anxiety, paranoia, confusion and difficulty concentrating, tearfulness, emotional and physical fatigue, depression, hopelessness, constant ruminations, frustrations, and low self-esteem/lack of confidence.

In addition, his examination and records reveal a history of long- standing personality traits including moralistic/unrealistic values; loneliness; feelings of being misunderstood; self-importance; preoccupation with rules and details; perfectionism;



Exhibit 27

Roger Moseley
Re: Philip English
January 25, 2006
Page 2 of 52

over-conscientious or scrupulous behaviors with inflexibility, rigidity and stubbornness.

**History of the Problem**

Mr. English stated that he applied for a City and County of Honolulu Appraiser position. At the time, there were several higher level positions open. He had extensive experience managing his own appraiser company and was told that he qualified for Administrator of the Tax Assessment Department. He said at the time Gary Kurokawa was an acquaintance of his and had been serving as the "acting" administrator. Mr. English said that he applied as instructed, but that Mr. Kurokawa got the job on a permanent basis. The "second in command" position, Manager of Appraisal Operations, was also open. Mr. English, again, was encouraged to apply. He said that after his interview for the position, the Corporate counselor told him that he was the most "outstanding applicant" for the position. However, again the "acting" manager, Bob Magota, received the permanent position. Mr. English pointed out that he was tested for these positions and qualified for each one. In fact, his highest ratings were for the management positions. The only current open position after the management positions were filled was for Appraiser Trainee. Mr. English took the position. Within the next years he did well and was advanced from Appraiser II to Appraiser III to Appraiser IV.

Mr. English said that he became good friends with his manager, Bob Magota. Mr. English had been through cancer treatments. He said that Mr. Magota's wife had a similar cancer illness and they had a lot in common. Mr. Magota had been the one who encouraged him to apply for the supervisory positions. Mr. English expressed that he was new to this type of appraising. He said that he had always done real estate appraising, but that this appraising was more like "mass appraisals." It was similar yet different from his experiences.

Mr. English also became friends with Chris Graff, another appraiser. He enjoyed his friendship with Mr. Graff and described him as a "very gregarious guy." However, he said that he began to observe Mr. Graff doing some things on the job that disturbed him. He said that he observed Mr. Graff doing appraisal work for Gary Kurokawa's private company, GK Appraisals, on City and County time. He said that he observed Mr. Graff performing these type "jobs" for Mr. Kurokawa's company on a regular basis. Mr. English's desk was next to Mr. Graff's desk and Mr. English stated that Mr. Graff frequently asked him questions about "this or that" having to do with his performance of this private company work on City time. He said that the office set up for the Appraisers is a very open one, and "everyone" could see what everyone else was doing. He related that sometimes the secretaries would take messages and handle phone calls regarding this private company's work.

Mr. English said that at around this same time, the newspapers had reported that one of Honolulu's City Council members had gone to jail for having her City Council staff perform her private work. He said that he told Mr. Graff that he needed to stop doing this type thing on the job, but Mr. Graff ignored him. Mr. English stated that he became more and more worried about Mr. Graff's unethical behavior. He reported that he began to feel that if he did not say something or do something, he was condoning the behavior. In October 2001, Mr. English reported that he became so distressed by this continued behavior that he approached his direct supervisor,

Roger Moseley
Re: Philip English
January 25, 2006
Page 3 of 52

Ann Gima. He told her what was going on and he said that she responded, "Mind your own business and do your own work."

A few weeks later, Mr. English was still disturbed by the situation, perhaps more disturbed because of what Ms. Gima had said to him. He said that he approached his friend, Bob Magota. Mr. English said that Bob Magota was somewhat concerned, but according to Mr. English, Mr. Magota warned him, "'Phil I wouldn't pursue this, it's your word against theirs.'" However, Mr. Magota also agreed to talk to Gary Kurokawa.

Mr. English said that a day or two later, Mr. Graff approached him and told him that there had been a meeting. Retired Appraiser, David Matsunai, had also been involved in the GK Appraisals' work. Mr. Kurokawa met with Mr. Matsunai and Mr. Graff and informed them that they could keep doing what they were doing, but they needed to be more discreet. Mr. English said that he told Mr. Graff, "That's not enough, you need to stop." On or around February 15, 2002, Mr. English stated that he documented these issues in an email to Bob Magota. He reported the situation as he saw it and asked, "What are you guys gonna do about it?" At the time, Mr. English said that he was still only attempting to get them to stop, as he put it, "pull them up ethically." He said that Bob responded to his email verbally rather then in writing and told him that he was going to deal with the situation. However, Mr. English stated that because of his law suit, he has now been privy to all of the interoffice emails. He stated that he now knew that they were writing emails to each other that said, "'Phil's in a panic, we need to straighten him out.'"

By April or May 2002, Mr. English said that Bob had called him into his office. He alleged that Bob began to speak to him in a very negative manner. He said, "Bob would say, 'you don't like your job much do you?'" He said that Bob talked to him in a threatening manner and pointed out that he was coming in late, not doing paper work correctly, and giving his opinion too much. In addition, his evaluations which had always indicated that he was doing quite well, were now indicating that he was not up to standards.

At his next review, he said that it was noted that he had trouble with work assignments and not following office procedures. He was placed on probation. He reported that he kept asking Bob and Ann Gima to inform him of what was not up to standard so that he could correct it. He asked for a list of what he was doing wrong. However, he stated that they were never clear with him. He contested the probationary status. He said that Dwight Ishigura, a union representative, started communicating with him to help him with questions and paper work.

Mr. English complained bitterly that he often sought help from Ann Gima. He alleged that she was highly critical of him and his work, but refused to help him understand what he was doing incorrectly. He alleged that she said, "'Don't ask me stupid questions, go ask someone else.'" He said that when he would ask the other appraisers, he would get different answers from each. He complained that the office had no clear or written protocols for handling certain situations.

He reported that he began to feel more and more pressure and stress. Mr. English said that prior to taking the City and County position, he had been in the process of rebuilding his life after a nasty divorce. He indicated that the problems at work were

Roger Moseley
Re: Philip English
January 25, 2006
Page 4 of 52

seeping into his personal life. He felt tremendous pressure and stress and brought that attitude home with him to his new wife. He stated that she could tell that her husband was falling apart emotionally and she was extremely worried along with him that he would loose his job and they would have great financial difficulties. He said that they had probably married too quickly. She was a young woman from Thailand and needed financial stability. He reported that on one occasion he shared his marital difficulties with his supervisor, Ann Gima, and she wrote a very sympathetic email to him stating how sorry she was that he was having such a rough time.

Mr. English described his work load. He had been assigned the Waikiki condos which were in the process of being reclassified and in this process of reclassification, the tax rates went up. In addition, he alleged that his office changed the rules and made the reclassifications retroactive. He believed that this may have been illegal, but could not convince his supervisors that this should not be done. This resulted in an exorbitant amount of appraisal appeals. Mr. English said that during one year his appeals alone amounted to one quarter of the appeals handled by the entire office. He was having great difficulty handling this type work load and was upset and emotionally stressed.

One of his friends, Julie Tamaori, wrote an email to him and informed him that Bob Magota was having him watched. He confronted his supervisor in an email, but she told him that they were not watching him. He said that he began to doubt whether his union representative was looking out for his best interests. After he had been placed on probation, his union representative, Waylen, did not call him back from August to November. He said that Waylen had secret meetings with his administration and counseled them that the three months probation was not done correctly. As a result, they told Mr. English that they were going to "pass" on the probation, or in his words, "act like it never happened." They typed out a new review form, not the one he had signed, but did not inform him that they had placed him on probation in a faulty manner. Mr. English stated that he was suspicious of whether Waylen was actually operating in his best interests. He asked Waylen, "What is your relationship with Gary and Ann?" He said that Waylen informed him that they were his personal friends and that if it came to a hearing, he would testify on behalf of them and not Mr. English.

Mr. English started looking for an attorney. He said that it was difficult to find someone who would take his case. He knew Roger Moseley from his appraisal work and Mr. Moseley was willing to help him. Mr. English and his attorney went to the Ethics Commissioner. He said that the commissioner asked him to "wear a wire" in order to catch people in the act of working for a private company on City and County time, however, Mr. English declined. He said that he was not deceptive and did not feel comfortable handling things in this manner. However, he said that Susan Bendler, one of the Corporate attorneys, had informed him that the word was around that he might be wearing a wire. He believed Susan to be attempting to help him. Soon, he said that no one would even talk to him in the office. He feared his co-workers believed that he might be attempting to catch them doing something wrong. He also stated that he was contacted by the Federal Bureau of Investigation. The FBI agent questioned him about whether his division was giving favors to Jeremy Harris. He said that he did not know anything about issues with Jeremy Harris.

Roger Moseley
Re: Philip English
January 25, 2006
Page 5 of 52

Mr. English said that he believed that Chris Graff was the best person to approach in order to prove the situation. He said that he went to him and that Chris was grateful that he told him about the Ethics Commission investigation. He said that Chris initially agreed to call the commissioner on the following Monday, however, he never made the call.

In January or February of 2003, Mr. English stated that Bob Magota called him to his office and informed him that they were going to file insubordination claims against him. He said that there were allegations from Ann Gima that he took a leave back in October 2002 without proper authorization. Mr. English explained that he believed there had been a misunderstanding regarding this "leave." He said that he had a broken toe and was gone on a two hour leave for his follow-up medical appointment. By this time, Mr. English had asked for another union representative. Kevin Mulligan was with him at the next meeting with his administration. However, Mr. English was again suspicious that Kevin had already met with Ann Gima and Bob before their scheduled meeting. He said that Kevin pointed out that there was something wrong with them filing at this point in time for an insubordination that occurred approximately four months prior. They decided not to file based on Kevin's statements.

Mr. English alleged that when he returned to his desk after the above meeting, he found a Work Place Violence Report form left on his desk. The form was against him and had been filled out by Julie Tamaori. He was shocked as he had heretofore believed that Julie was one of his friends. Mr. English explained to this examiner that eleven of his co-workers filed Work Place Violence forms against him. However, he also stated that none of the forms actually revealed that he had been violent on the job. Mr. English reported that the Work Place Violence investigator did not find that their claims were substantiated. However, by this time, Mr. English said that Kevin Mulligan had informed him that he was "done" when it came to working for his division or for any division in the City and County.

As these work situations unfolded, Mr. English reported that his stress level continued to increase. He was having difficulty sleeping and he went to see his primary care physician, Dr. Love, at Kaiser. Dr. Love referred him to Jerald Coffee, a social worker, in the mental health clinic. Mr. English said, "For the first time, I broke down and spilled it all out emotionally." His therapist told him that he needed to get away from work in order to get better. On his therapist advice, he went in to his office to fill out leave forms for temporary disability. He said that Tom Reed immediately came to his office. However, he was highly suspicious of Mr. Reed because he seemed not much interested in Mr. English's mental state, but more interested in questioning him regarding his claims against the City and County. Mr. English said that the City hired Reneau Kennedy, Ph.D., to perform his workers' compensation psychological evaluation. He said that she reported that he was not malingering and that he should not be returned to that work place. She referred him to Joan Koff, Ph.D. at Kaiser for mental health treatment.

Mr. English described his symptoms at the time. He said that he was paranoid and afraid to leave the safety of his boat. He was extremely fearful that he would accidentally come across one of his co-workers if he left his boat. Initially, he had a very difficult time even trusting his lawyer or his psychologist, Dr. Koff. He felt that his trust had been violated. He said that heretofore, he believed the world to be an

Roger Moseley
Re: Philip English
January 25, 2006
Page 6 of 52

ethical place, but now he said, "I have made this shift, and I can't seem to go back to being trusting." Now the world seemed unsafe, he had irrational fears that cars next to him might ram into him. He described insomnia and weight loss. He had suicidal thoughts, but stated that he did not act on them. He struggled with being depressed and hopeless. His physician prescribed lorazepam and he said that it was very helpful in allowing him to sleep.

Dr. Koff helped Mr. English to gradually get out more and become more functional. She gradually assisted him by helping him contract to keep active even if it was activity in the confines of his boat. He began taking on projects and fixing his boat. It is an old boat and in need of constant repair. He said that the work helped him take his mind off what had happened to him at the City and County. At first he was unable to go out to the market, but now he can shop. He is more comfortable shopping when he has his son with him. He also feels safe when around another couple that live on a boat near him. His only other support is his church pastor.

Mr. English stated that he continues to have insomnia. On the night before this evaluation, he said that he woke up every hour. Of late, he spends time reading documents for his legal case. He stated that when he is absorbed in his case, it is as if he is "reliving" the trauma over again. He also said that he "had a good cry" before the evaluation. He continues to feel that his "whole world perspective shifted." He mistrusts others and reported, "The burden of rejection has lead to a crisis of confidence and self esteem." He also reported that he continues to live with constant anxiety. He did not believe that he would recover, but said, "I have to learn to live with it."

Mr. English reported that he is in dire financial need. After the resolve of his Workers' Compensation case, he received a settlement of $85,000. However, he said that he had to use most of that money to pay off debts, travel to visit his sick mother, and for his boat loan and repairs. Mr. English stated that although his therapy at Kaiser and his medication were very beneficial, he had to cease treatment in April of this year because he no longer received health benefits.

Mr. English began working for a security company in April of this year on a part time basis. He said that at one time, they had increased his scheduled hours to 37 hours per week. However, when he requested information about the company's health plan, he was told that he did not get health benefits. He said that it was his understanding that those who worked consistently more than 20 hours per week deserved health benefits. Mr. English was very nervous about bringing conflictual issues up with any employer at this point. He stated that soon after he brought up the health care benefits, his work hours were drastically reduced. Currently, he is only assigned one shift per week. He stated that he appreciated the low pressure security job. He works at night and does not have to be around people. Since his problems with the City and County work situation, he does not feel confident enough to be around people in a work setting. He said, "I don't know if I can do what I did before, I don't trust myself in the same way." He said that he is also embarrassed when applying for new jobs because employers always ask him why he left his last position. He worries that no one will hire him knowing that he was a "whistle blower." He has desires to move away from this island, but stated that he was committed to staying with his son until his son completes high school.

Roger Moseley
Re: Philip English
January 25, 2006
Page 7 of 52

### Family History

Mr. English was born on 10/26/1954. He grew up in Pasadena, located in the Southern California area. He has an older brother, older sister, younger brother, and two younger sisters. He said, "I had a great family, super parents." He reported that he was not very close to his father growing up. His father was an executive with Pacific Telephone and traveled frequently. He denied family dysfunctional such as physical or sexual abuse. He denied adolescent dysfunction or rebellion, he said, "I was a kid who played in the orchestra, the brass quintet, and for the church." He reported that on one occasion when he was eighteen years old, his father tried to fight him. As he remembered the incident, he thought that he frustrated his father over something and his father took a few swings at him. He denied history of psychiatric problems in his family during his growing up years, but reported that his mother attempted suicide when he was twenty years old. He thought that her problems were due to marital stress. He said that his father was a "workaholic" like his ex-wife, Corlis. His parents have been retired and living in Northern Nevada for twenty years.

### Educational History

He attended John Muir High School, graduating in 1972. He described himself as an average student overall, but one who excelled in music. He played the trumpet. He attended Pasadena City College and then transferred to California State Los Angeles on a music scholarship. He then transferred to University of Southern California, also on a music scholarship. He said, "My marriage derailed my college," and he dropped out after three years. He bought real estate and attempted to become more business oriented.

### History of Relationships

Mr. English was married for the first time to his "high school sweetheart." He was twenty two years old at the time he married. He said that the marriage ended because the two were very different and wanted different things in life. He also said that some of his friends told him that his wife was unfaithful. He denied history of abuse in this relationship. They were divorced after approximately four years of marriage. There were no children from their union.

Mr. English was married to his second wife, Corlis Chang, in 1984. She is an attorney, practicing in Hawaii. They were married for approximately twelve years and divorced in 1999. The two have a fifteen year old son. He said that his wife handed him divorce papers on the same day his physician notified him that he had been diagnosed with kidney cancer. Mr. English said that his wife tried to "throw him out of the house," but his parents intervened and convinced her to allow him to stay in the house for a time because he was ill with cancer.

He denied abuse in this relationship, but admitted that his wife had reported that he abused her to her physician. The two sought marital therapy, but he said, "My wife fell out of love with me." He said that while they were living in the house together during the divorce proceedings, his wife came to "his part of the house," and started yelling at him. He said that he told her to leave because she was yelling and not

Roger Moseley
Re: Philip English
January 25, 2006
Page 8 of 52

helping the situation. When she continued to yell, he placed his hand behind her back and escorted her out of the room. He said that she turned and said, "That's it buddy, that's physical abuse." He asked this examiner if this would be considered abuse, and said, "Maybe it would since I touched her." He denied further instances of physical incidents and denied restraining orders or police interventions.

Mr. English alleged that Corlis placed everyone and everything ahead of their marriage. In his opinion, her priorities were incorrect as she prioritized her profession, her family, and their son above their marriage. He reported, "My son is just like me and so she has problems with him too." He said that both he and his son are very emotional and have more needs than his wife in this area. He said that his son has had a very difficult time since the divorce. According to Mr. English, his wife's family attended St. Louis private school and so his son was also sent to St. Louis. He said that his son hated the school and eventually refused to attend. He was moved to Waldorf School. He reported that his son has been under psychological or psychiatric care since the divorce and currently is under the care of Dr. Richard Szuster, a child/adolescent psychiatrist.

He stated that he married a third time in June 2000. He said, "We married too quickly, she was a younger woman and needed more financial stability than I could give." He directly relates the failure of his third marriage to his work stressors with the City and County of Honolulu. He said that his wife believed that he would loose his job and feared the financial insecurity. He also said that he was always "emoting" and telling her about the work problems. The two were separated after approximately two years of marriage. There were no children from this union.

Mr. English expressed concern that he has had three marriages. He said that he has trouble viewing himself as a person who has been divorced even once. He said, "When I married Corlis, I gave her my life heart, I can't take it back." He said that he felt the same way about his marriage to Pam, his third wife. He reported no current relationships.

**Employment History**

Mr. English worked for First Interstate Bank in Southern California in 1979. He said, "They were good to me and trained me to be a real estate appraiser and helped me get licensed professionally." In 1986 he left the bank and became a sole practitioner, independent appraiser. He said that he was very successful. Since his wife was from Hawaii, in June of 1987, they decided to relocate to Honolulu as they believed Hawaii a better place for family life.

After relocating, he worked for 1st Nationwide as a Senior Appraiser. In 1989, he again left the bank and started his own business. He said that his wife was quite the "entrepreneur," and they eventually had fourteen employees working in their business. Mr. English explained that the appraiser business is often wrought with unethical practitioners. However, he said that his business only appealed to those who wanted high quality, extremely ethical appraisals. He was proud of his reputation and practices and said that "high power" attorneys, accounting firms, and banks were his usual clientele.

Roger Moseley
Re: Philip English
January 25, 2006
Page 9 of 52

Mr. English stated that after he experienced his second divorce from his wife of twelve years and after undergoing nephrectomy for kidney cancer, he decided to lesson the stress in his life. He phased out his private business. He reported that he had some job opportunities on the Mainland in Seattle and wanted to relocate. However, he said, "My first job is my son," and he decided to stay in Honolulu to be near him. He said, "Honolulu has been good to me, I could do something good for Honolulu." He sought employment with the Honolulu City and County Appraiser Department. He was hired in June 2000.

**Substance Use History**

Mr. English denied alcohol or drug abuse. He has never had a DUI or blackout from substances. He drinks occasionally. Sometimes he will have one or two beers per week, some weeks he does not drink at all. He said that during his early college years he smoked marijuana, but discontinued after college.

**Criminal/Civil History**

Mr. English denied history of criminal behavior or previous civil suits.

**Medical History**

In 1998 Mr. English reported that he was doing yard work when he fell out of a tree. He stated that he was unconscious for approximately ten minutes and badly bruised. He was taken to the emergency room as he feared that he might have broken bones. However, instead, he said the x-rays revealed a spot on his left kidney. Later tests confirmed a renal cell carcinoma, a cancer that does not respond to chemotherapy or radiation. He said that his physician informed him that he had perhaps a 65% chance of living with this condition. A radical nephrectomy was required and performed in November 1998. Mr. English is now past the five year mark and stated that there have been no relapses or new cancers. He denied further serious medical problems.

**Psychiatric History**

Mr. English and his second wife, Corlis, attended marital therapy for approximately three months with Dr. Yano. He said that he overheard Corlis in tears telling her physician, "My husband is abusing me." He denied abuse and said he was shocked at her statement. As a result, the two began marital therapy with Dr. Yano, however, Dr. Yano usually saw them in separate sessions. Mr. English said that after three months Dr. Yano told him, "Phil there's nothing wrong with you." He ceased treatment.

Mr. English was in crisis and under mental health care during his divorce from Corlis. He said that he had attempted suicide by ingesting a large amount of aspirin. His wife found out and gave him Epicate, but he said that he did not regurgitate the aspirin, neither did he seek emergency care. He sought treatment for approximately one year for divorce issues with Kaye Wong, Ph.D., a therapist with Biodyne. During this time he was prescribed lorazepam, prn and took the medication for approximately three months.

Roger Moseley
Re: Philip English
January 25, 2006
Page 10 of 52

At the time of his work injury, he was referred by his physician to Kaiser Psychiatric Clinic. He was in treatment with Joan Koff, Ph.D. until approximately one month ago when his medical benefits expired. Kaiser physicians prescribed lorazepam again. He was given a three year refill. He pointed out that he took the medication sparingly. He had filled the prescription four times in three years. He said that the medication lorazepam was perfect for him because he only has one kidney and other medications might have caused kidney difficulties.

**Typical Day**

On a typical day, Mr. English arises between 5:30 and 6:30 a.m. He has a cup of coffee and reads his Bible and prays for approximately thirty minutes to one hour. He reported that his boat is old and needs much repair. He said that he had learned to do many "labor" type jobs since acquiring the boat, "I even learned how to weld," he said. After his devotions, he usually begins one of the many projects related to repairing his boat or sometimes he does an odd job for one of the other boat owners for money. Mr. English said, "I'm good for about half a day." After he works in the morning, he stated that he must rest to "recharge" himself. He said that prior to his current psychiatric state he usually had energy to work ten to twelve hours days. In the afternoons, he sometimes checks in with his attorney or works on paperwork for his legal suit. He has very little money and said that he can only afford approximately one to two meals a day. He also said that he has a low appetite. He usually goes to sleep at approximately 9:30 p.m., but said that he constantly tosses and turns and has difficulty sleeping through the night.

During the summer, Mr. English also has custody of his fifteen year old son for four to five days per week. When he works a shift with the security firm, his hours are from 6:00 p.m. to 6:00 a.m. Currently, he has only one shift on Fridays and makes $8.00 per hour. He attends church on Sundays. He also helps out with the church youth group, participating as a chaperone on outings or recreational activities.

**Mental Status Examination**

Mr. English arrived to his examination on time. He was cooperative and pleasant throughout the examination. He was dressed professionally and was neat and well groomed. There were no behavioral abnormalities. He sat comfortably, made good eye contact, and made no abnormal movements. His speech was fluent, coherent, and normal in rate and productivity. He reported, "I had a good cry this morning." His mood was somewhat frustrated, depressed, and negative. He had thoughts that he viewed the world differently now. He saw himself as having lost his previous "trusting" nature. His affect was normal in range and appropriate to the situation. There was no imminent suicidal or homicidal ideation although he admitted to suicidal thoughts and behaviors in the past.

His thought processes were logical and goal directed. There was no evidence of hallucinations, delusions, obsessions, compulsions, phobias or other abnormal mental phenomena. On cognitive screening, he was correctly oriented to the date, city, and naming of the last four presidents. His attention was normal as evidenced by his ability to recite the months of the year backwards. His memory was normal as evidenced by his ability to remember three of three words at five minutes. Insight and judgment were fair.

Roger Moseley
Re: Philip English
January 25, 2006
Page 11 of 52

### Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

The client's response on the MMPI-2 showed marginal validity. He attempted to present himself in an overly positive light. His approach indicated that he presents himself in a moralistic and unrealistically virtuous manner. He may have more psychological problems then he reflects in his answers to the items.

His profile presents a mixed picture with physical complaints and depressed affect as his salient features. His physical complaints may be extreme and reflect a general lack of effectiveness in life. There are likely to be long-standing personality problems that pre-dispose him to physical symptoms under stress. He is most likely quite tense and nervous. He may become quite irritable and even hostile if his symptoms are not given "proper" attention.

In addition, he endorsed a number of items that indicate low morale and depressed mood. He reported a preoccupation with feeling guilty, unworthy, regretful, and unhappy with life. He indicated that he is plagued by anxiety and worry about the future. Sometimes he feels hopeless, as if he is a condemned man. He may feel that life is no longer worthwhile and that he is loosing control of his thought processes. He views the world as a threatening place and sees himself as being unjustly blamed for others' problems. He feels he is getting a raw deal out of life. He feels misunderstood and lonely. He seems rather high-strung and believes that he feels things more intensely than others do.

Interpersonally, he appears to be rather passive-dependent in relationships. He may manipulate others through physical symptoms and be hostile if sufficient attention is not paid to his complaints. He seems introverted and may have difficulty meeting others. He is probably shy and may be uneasy and somewhat rigid and over-controlled in social situations.

Individuals with this profile are often seen as neurotic and may receive a diagnosis of Somatoform Disorder. Actual organic problems such as ulcers or hypertension might be present. He is probably not a strong candidate for psychotherapy treatment approaches that require self-scrutiny, insight development, and high motivation for change. Behavioral modification techniques are most likely the best approach for treatment. He is generally pessimistic and shows low energy, seeming to have little hope of getting better. He harbors many negative work attitudes that could limit his adaptability in the work place. His low morale and lack of interest in work could impair future adjustment to employment. These factors should be taken into consideration in treatment.

### Record Review

All records received were reviewed, however, not all records are summarized.

### Department of Personnel, City and County of Honolulu, Employment Application, dated 05/18/1999:

Roger Moseley
Re: Philip English
January 25, 2006
Page 12 of 52

Mr. English applied for Real Property Appraiser II, III, and IV.

**Human Resources Department, City and County of Honolulu, Notice of Examination Results for Phil English, no date on score sheets:**

Real Property Appraiser II, qualified with a score of 78
Real Property Appraiser III, qualified with a score of 78
Real Property Appraiser IV, qualified with a score of 90

**City and County of Honolulu, Department of Civil Service, Probationary Performance Evaluation, dates indicated:**

08/09/2000: Philip had been attending training sessions and working and accompanying an experienced appraiser. He received "exceeds requirements" in his attitude toward work and "meets requirements" in quantity of work, quality of work, and relationship with people. "Philip has an easy going personality and shows a willingness to learn new things."

11/03/2000: "His experience and appraisal background have lent additional credibility at the Board of Review. He is currently assisting in the preparation for cases at the Tax Appeal Court and analyzing and evaluating the multiple regression models to be used…" "He works well with his fellow employees and is tactful and courteous in his dealings with the public." He met minimum requirements of the position, was given a satisfactory rating, and he was granted permanent status.

03/29/2001: "He has a strong background and foundation in the real estate profession and has been able to apply his skills to the assessment area." "He has a good attitude toward his work and works well with his fellow employees and is tactful and courteous in his dealings with the public." Given ratings of "exceeds requirements" in quantity of work, quality of work, attitude toward his job and relationship with people.

04/23/2001: He was promoted from Appraiser II to and Appraiser III position. Again, he received "exceeds requirements" rating in all areas. He continued to be involved in the review and preparation for cases at the Tax Appeal Court. He was responsible for researching and defending all 2001 appeals before the Board of Review.

06/25/2001: During this period, Mr. English had worked in an Appraiser III position. His work was rated, "exceeds requirements," in all areas. His background in real estate had made him "extremely valuable." He had continued to have responsibility for all of the Waikiki area condominiums and was involved in the review and preparation for cases at the Tax Appeal Court. He was granted permanent status.

04/12/2002: Mr. English achieved "meets requirements" in the four areas which is lower than previous evaluations. In an attached summary it is noted that during the period covered Mr. English was reallocated from the Appraiser III position to Appraiser IV. He continued to be assigned the responsibility for all Waikiki area condominiums. He was involved in review and prep for tax appeal court. He completed analysis for the 2002 assessments and currently had 866 individual

Roger Moseley
Re: Philip English
January 25, 2006
Page 13 of 52

appeals to resolve. His background and foundation in real estate process had been invaluable.

While he continued to progress in his learning of office procedures, he seemed to be having difficulties in organizing and prioritizing the many and varied tasks associated with his position. It is quite often disagrees with established office work processes and voices his opinion as he believes things may be better accomplished and resists completing tasks in the prescribed manner. He was advised he needed to appreciate there were constraints that they needed to work within and that focusing his energies on accomplishing his assigned duties within these constraints was a more productive pursuit. The evaluation indicates that he gets along well with fellow employees.

Mr. English writes a rebuttal to the comments and states that he had been performing tasks over and above the Appraiser III level during the whole period covered. He believed that he should get a rating of "exceeds requirements." He notes that none of these things had been brought to his attention by his supervisor. If they had been, he would have made appropriate adjustments. He stated that he had in many emails requested to be given more guidance on procedures and that he had yet to receive a response to those emails requesting guidance. He said that he believed that there was lack of foresight, insight, and leadership on the part of his supervisors and management that caused great confusion.

He pointed out that he had more management experience than the administrator, the assessor, and any of the supervisors, with the exception of Mike Okamoto. He pointed out that he had been interviewed for the administrative position and that not even one of the other applicants was "close" in the interview. He pointed out that at the time of his interview, Gary Kurokawa had stated to him that there were exciting changes coming and that Bob Magota was looking for outside appraisers to bring in fresh, new blood with market experience. He stated that he believed there was a serious problem in the office in terms of established office practices and he hoped to be part of positive change in the office. He believed his ideas and comments were encouraged and he said he felt a great failure that he had not been a more positive influence on the office. He requested the performance standards be changed to "exceeds requirements" and that all negative comments be removed from the record.

05/13/2002: Probationary Performance Report for Appraiser IV Position,

Mr. English receives "meets requirements" in the four areas of assessment: quantity of work, quality of work, attitude toward work, relationship toward people and supervision of employees.

08/05/2002: Draft submitted to Bob Magota from Ann Gima regarding Mr. English's probationary period as Appraiser IV:

He was still on assignment for responsibility of the Waikiki condos. The volume of appeals and number of units in the area necessitates use of good time management skills in order to meet deadlines. Over the course of the past two months, Phil encountered difficulty in independently performing all of his responsibilities as appraiser four. His performance had been discussed with him at least three times

Roger Moseley
Re: Philip English
January 25, 2006
Page 14 of 52

and efforts had been made to address various issues and problems, including misunderstandings and miscommunications. At the present time, there were issues affecting his attitude and subsequent work performance. She said he would benefit from an additional three month period of review for further training and instruction. She stated he met minimum requirements of the position and overall satisfactory rating was recommended.

There was a second draft of this probationary narrative. Despite written instructions regarding work hour instructions and leave requests, he was still not complying. He needed to be reminded or told instructions that had previously been given. When he was told to check if he had received all appeals, he said that was a clerical job and took over a week to check and claimed that he didn't received all the copies. She stated too often he was not following through on instructions. She said he occasionally exhibited lack of good judgment and she enumerated five instances of that. He admitted he had an attitude that was counterproductive and an outburst regarding his belief that he was being watched on 05/31. She stated that instead of extending his probation, she wanted to meet with him and get through to the problem. She stated it was clear that he didn't like his job and that he wasn't putting the amount of effort into his work that he'd previously displayed.

08/14/2002: Probationary Performance Evaluation Report

For the period covered, Mr. English met requirements in quantity of work, quality of work, and relationships with people. His attitude toward work was rated below requirement.

It is noted that Mr. English submitted a statement that he did not agree with the review, nor did he agree with the three month extension of probation. It was unwarranted and unjustified.

A secondary narrative is included that enumerates areas for Mr. English to improve. 1. Develop a work plan for organize and prioritize work to meet deadlines. 2. Demonstrate knowledge of routine aspects of the job in accordance with work expectations. 3. Demonstrate the ability to follow instructions. 4. Obtain written, prior approval for leave.

On 08/14/2002, Mr. English wrote notes about his performance evaluation session with Bob. He said that Mr. Bob Magota accused him of sneaking around to put in his leave papers. He said that Mr. Magota raised his voice at him when he tried to explain himself. He said that Mr. Magota asked him if he felt paranoid and he told him that he did. He told Mr.Magota he had felt like an outsider since he began the job. He said that Mr. Magota dressed him down in front of the whole group when he had asked an ethical question by saying, "I've seen this kind of thing before when an outside appraiser cannot make the change to mass appraising." He went on to say that Mr. English had "just the fundamentals of appraising." Mr. English said that this all started after he made the complaints about Gary. He alleged that Bob raised his voice, became defensive, and said this has nothing to do with it. In the notes he also said that Bob asked him, "Are you overwhelmed with work?" and he kept telling him that he was not overwhelmed but that there was more work to get done than can be done in one year.

Roger Moseley
Re: Philip English
January 25, 2006
Page 15 of 52

**Department of Personnel, City and County of Honolulu, Employment Application, Real Property Appraiser VI, 03/29/2001:**

Mr. English applied for this position. On 04/04/2001, Mr. English submitted an addendum to his application for Real Property Appraiser VI listing over thirty properties that met the criteria of "very difficult appraiser situations." Additionally, in 1989, he began his own appraisal firm, Phillip English and Associates, with twelve employees including six appraisers and six fulltime staff working for him before he ceased his business due to illness.

**Real Property Assessment Division Memorandum, Robert O. Magota, 11/07/2001:**

Mr. Magota requested that Mr. English, Real Property Appraiser III, be reallocated to the Real Property Appraiser position VI. He stated he had fulfilled all requirements including training, education, and experience for this reallocation. In addition, he pointed out that Mr. English had over twenty-two years of appraisal experience in the private sector and government service.

**<u>Interoffice E-mails, various dates:</u>**
Note there were approximately 379 emails that were reviewed. A portion of these are summarized here.

09/04/2001: E-mail from Ann regarding mandatory to report to the Director vacation leaves on a daily basis and requirement to write requested vacation leave on the calendar when submitting leave papers to her.

09/07/2001: Reminder from Ann Gima for employees to e-mail her their start time, lunch time, and Pau Hana times in order to update Mr. Magoda's list. Also, they were informed to notify her when they leave early, and when they were out of the office for research, fieldwork, appointments, etc.

10/01/2001: Phil requests time to talk with Bob Magoda. Also, an e-mail from Phil to Bob informing him that he is going with Susan to Astin to review documents for Waikiki Shore, "Anne seems upset about something."

10/02/2001: Phil asks Bob if he can see him on this date in the afternoon.

10/05/2001: Phil writes Bob to let him know that he had been given contrary instructions about a work matter from Anne. He writes a second email on the same date for clarification regarding his instructions. "What are my instructions? What do you want me to do with the mounting permits behind my desk?"

10/05/2001: Bob Magoda writes Phil with more details regarding the particular work matter and tells him, "check with Annie if you are unsure." Phil responds that he will ask Ann again and "thanks for the advice."

11/06/2001: E-mail from Ann Gima to Gary Kurokawa regarding work assignments. Phil's main responsibility was to create IDLIST for queries "(his main focus for the present is to complete and review the valuations for the 2002 year)"