Roger Moseley
Re: Philip English
January 25, 2006
Page 16 of 52

12/18/2001: E-mails between Ann Gima and Phil. Ann instructs Phil not to say that they are using a "new method" as "technically" they have always employed the "market" for valuation of all properties. She tells Phil to "avoid any implications that we are doing something 'new' that is resulting in the higher values." Phil responds, "We can say anything that we can create as an explanation so long as we do not say 'new method' (even though we know that it is a NEW METHOD?) Is that right?" Ann responds, "If taxpayers are questioning the increases in the building make sure you have a good explanation that does not include the words 'new method.'"

12/26/2001: Phil e-mails Ann Gima, "I am extremely fatigued today and I am certain I can not last the whole day. I will leave as soon as I can."

01/09/2002: Mr. Goto reminds Mr. English he has counter duty. Mr. English states he's overwhelmed with other duties and won't be able to make it today.

01/09/2002: Email from Kenneth Goto to Ann Gima Regarding Mr. English: Mr. Goto writes that it seems as if Ms. Gima's talk with Phil did not "penetrate into his head." He states he sympathizes with her frustrations with Phil. He writes that he thought Phil "wasn't a head case like you-know-who," and uses the initials C.G. "But I guess because P.E. comes across like a gentleman and a smart appraiser we haven't noticed the things he's done or was supposed to do that have made you upset." Apparently Ms. Gima had instructed Phil to pull his counter duty. Phil had complied after lunch, but only took a couple of taxpayers and then disappeared and failed to serve until his regular time.

No date: Memo from Gary Kurokawa to Ann Gima, Robert Magota, Susan Bender, and Phil English: In the memo, Mr. Kurokawa thanks them for continuing work on the Waikiki Shores and thinks it had been a very "trying time for us regarding the actual use law on the condos." He was suggesting a system of auditing, apportion of the declarations made by the owners, and he was open to suggestions from the others regarding how to make it a smoother process.

02/15/2002: Memo from Phillip English to Robert Magota, Subject: Complaint against the administrator: Mr. English documents that last week he went to Bob's office to complain that an administrator was having one of his employees work for him on outside work while on city and county time. He indicated that this had been an ongoing situation for the past eighteen months and probably longer than that. His complaint was that it was improper for an administrator to have work done by a city employee on city time.

He understood that warnings had been made to the employee by his supervisor and that he has even been asked to be more discreet. Mr. English points out that being more discreet is not the issue, it's not the employee he's making the claim against but the administrator who should know better. According to Mr. English, others knew about this, were aware of it but were afraid to say anything for fear of retribution. He wrote, "the political nature of the situation was to keep your mouth shut and do your job and not make waves."

Mr. Magota returned an email to Phil, stating that he was addressing the problem with both Chris Graff and Gary Kurokawa. On the same day, 02/15/2002, Phil wrote

Roger Moseley
Re: Philip English
January 25, 2006
Page 17 of 52

a second email saying that Chris had come to talk to him and he had informed him of the complaint.

02/19/2002: Interoffice Email from Ann Gima to Group 3: There are thirteen points she makes in the email. Point number eleven states "If any of you are working at a second job, you **must** disclose and fill out the necessary paperwork. At no time are you to conduct business during working hours." Point number thirteen states that apparently Roger Moseley wrote a letter of complaint. According to Ms. Gima, someone at the office told someone on the phone that the changes in classification that were being made this year was the result of a tax appeal court case for the Waikiki shore. Ms. Gima stated this is an incorrect statement and NO ONE should responding to taxpayers in such a manner. Any changes in classification was the result of classifying condominiums based upon consideration of the unit's actual use.

02/21/2002: Interoffice Email from Bob Magota to Ann Gima with a copy to Gary Kurokawa: In this email, Mr. Magota points out that he finished reading Phil's latest email regarding his work load. He said that Ann needs to come see him "(without Phil)." According to Mr. Magota it appears that Phil was losing control and beginning to panic and he wanted to get Ann's opinion on it before he spoke to Mr. English. He wrote, "He may need some straightening out."

02/21/2002: Interoffice Email from Phil English to Bob Magota: Mr. English attempts to ascertain what has happened to his application for Appraiser IV position. He documents a complaint about the excuses that have been given him such as the loss of paperwork on two different occasions, how he had followed up weekly to find out what had happened to the paperwork and that in December all positions were frozen. He wonders what holds up the allocation. On the same date, Bob wrote Phil a return email documenting that the reallocation had been approved for March 14th.

02/21/2002, Interoffice Email from Phillip English to Ann Gima: In the email Phil complains he has no time to prepare. He says "we are running around like chickens with our heads cut off…again." He then specifically gives five bullet points: he's just completing his organization appeals, he may need to follow-up on more of the declarations, he needs to participate in more of the determination of what buildings are hotels and what are not, he needs to write letters/complaints, he's still answering letters or returning phone calls related to the classification issue. He states that he has approximately 850 appeals and these include the Waikiki Shore, the Imperial Hawaiian Resort, and several other entire projects. He also had a tax appeal court trial coming up in April that he needed to prepare for. He points out that there are nearly 25,000 condos in a complex, specialized market and the model needs to be looked at more carefully. He states that he's not complaining about work but that there's more work than can be realistically done. He asks for some direction as to priority. He also believed there remained a false sense of what the job was and what it would take to get it done.

He admits that he finds himself getting into trouble because he is doing the things he thinks are of the greatest urgency and is extremely frustrated because he gets asked to do many things that are a priority to someone else (or that are not appraiser related functions. That is, they are clerical in nature.) He writes that it is an ethical matter and that he feels responsible to say something because there is not enough hours in the year for him to accomplish everything that he has to get done. He

Roger Moseley
Re: Philip English
January 25, 2006
Page 18 of 52

states he understands that office is shorthanded and that others are also overworked
and he doesn't know if anything is being done to remedy the situation or if the
administration has a realistic view of the task at hand and what it will take to get the
job done.

02/25/2002: Mr. English is reminding Ms. Gima that he wants a response to his
February 21st email about his priorities. He was preparing for a deposition with
Roger Moseley on Thursday and was going to be moving sometime that week. He
had a heavy appeal case load and he needed to prepare for the Waikiki Shores trial
coming up in April. He also says that he continues to believe there's more to be
done than could realistically be done. He says he's been told that "the only way we
can get anything done is to cut corners." He furthers states "If we cut corners on
analyzing data then it will come down to 'garbage in/garbage out' which I believe
already exists and has contributed to some problems. Further, he says that he had
complaints and calls and appeals from taxpayers saying that they are using comps of
highly updated units. He said their data does not reflect condition nor do their
models take condition into account.

02/25/2002: Ms. Gima asks Mr. English to give her what he feels is proper
prioritization of his work load and then she gives him some advice about priorities.
She also points out that no one had assigned him the task of identifying any hotel
properties.

03/13/2002: Email from Ann Gima to Bob Magota: Ms. Gima updates Bob on what
had transpired since his talk with Phil. She wrote he finally submitted his list of
appeals but there was something wrong with them. She still had not received what
he feels was a proper prioritization on his work load and had not had a response
from him on that question. She believed Phil was very preoccupied by the court case
which was scheduled for next month as evident by his need to prepare for a
deposition for two entire days and being seemingly unable to do anything else. He
was continuing to sign in at various times. She said he comes and goes seemingly at
his whim despite my direction and instruction that everyone has set working hours
which they must follow. She said he knows that this is the case.

01/10/2003: A request from Phil English is made on this date to take vacation leave
from 12/31/2002 through 01/03/2003.

05/21/2002: The email was sent by Mr. English to all supervisors, with copies to all
the staff, pointing out an existing problem where appraisers are to act as both the
appraiser representing the tax office and the hearing clerk. He said these problems
arise from this practice range from inefficiency to legal issues. He then delineated in
a long email how the hearings would be much more efficient if run by a hearing clerk
and detailed all the things an appraiser must do when wearing two hats. He asked
them to consider having a hearing clerk at the board of review hearing.

05/22/2002: Mr. English requested that he be allowed to adjust his starting time to
7a.m. to 6:30 with a leaving time of 3:30 p.m. so that he could spend more time
with his son. Request made to Ann Gima.

05/22/2202: Mr. English in an email to Ann Gima, apologizes for giving his opinions
too much and states that he appreciates her as a supervisor. He points out there are

Roger Moseley
Re:  Philip English
January 25, 2006
Page 19 of 52

frustrations in his personal life that are unrelated to his job.  He knows money is an issue for everyone.  He states "I have also realized that contentment is not a hallucination but a realization of what you have."  He believes he has an interesting job and that's what he likes most about it.  He says for her to please excuse him if he asks a stupid question, it is not because he is lazy.  He states that if she could only point him to a manual or memo that would be fine, he would do the legwork.  He tells her that he appreciates all that she has done for him and that he knows he could not have made it to appraiser four if it had not been for her efforts and advice.

05/22/2002: Ms. Gima writes that she sincerely apologizes for her gruffness to Mr. English.  She writes, "I must learn to deal with my frustration and take more initiative before I resort to the disruption in communication we have recently experienced."  She hoped for improved communication for the future and told him to continue to ask questions and voice his opinions but not to be offended when his suggestions are not acted upon and to be prepared to comply with the "old methods."

05/23/2002:  Mr. English writes to Dwight Ishiguro stating that things in the office are slipping from bad to worse and that he thinks he has gotten on the bad side of management.  Phil believes they don't like people who ask too many questions or question what they do.  He also pointed out the thing he had complained about with Chris working on private business on city and county time.  He says that Ann refused to do anything about it because she had never seen it but he proceeded to go to Bob Magota with his complaints.  According to Phil, Bob told him just because one employee has a complaint doesn't mean something's going on and "it would be my word against his."  He said nothing happened and Chris continued to work for GK Appraisals during City and County time.  He further informs Dwight that yesterday he had been called into Bob's office with Ann so that he could be told he was not complying with scheduled office hours and that he had a bad attitude.  He said "he was on someone's sh-t list."  He said that to him it appeared to be a "witch hunt."  He implied that he was being set up.

05/28/2002:  Mr. Ishiguro writes to Mr. English that he was surprised about the email stating that Ann was taking the kind of stand she was against him.  He pointed out that Phil's complaints should have been checked out.  He advised still to keep track of events that occur with date, time, and subject matter because he thought that if this continued, he might need to make a formal complaint.  He also pointed out that some of the managers don't have the necessary skills and that they got there by default.

05/28/2002:  Mr. English thanks Dwight Ishiguro for his advice.  He is surprised that Ann Gima denied knowledge of the fact that Chris Graff had been working for Gary Kurokawa during city and county time.  He described an incident where he had been standing at Chris' desk when Gary called and asked Chris to complete something right then because a client needed it.  Mr. English acknowledged after the phone conversation that it was Gary and that he had to do something right away for a client.  He then worked the rest of the afternoon on City and County time and delivered it that afternoon.  Phil was especially upset that people in charge were deflecting this responsibility to Chris when Gary was the responsible party.

Roger Moseley
Re: Philip English
January 25, 2006
Page 20 of 52

03/31/2002: Mr. English describes to Mr. Ishiguro feelings of being harassed. He asks Mr. Ishiguro's advice on whether he should go to Violet Lee or directly to Chuck Tatto of the ethics board or the prosecutor. Mr. Ishiguro writes back that perhaps he should try and handle it by going to the people involved but at this point Phil does not trust them. He also points out that he feels like he is being targeted even though he was told at one point he had a shot at being supervisor which, in his opinion, meant he was more qualified for the job than any of the other candidates.

05/31/2002: In the email Phil English tells his supervisor, Ann Gima, that he's been informed by Julie Tamaori that he is being "watched by Bob." Phil asked if he was being watched for some reason, "could someone please explain what that reason is." He feels that they are making for a hostile work environment with rumors being allowed to spread that someone's being singled out and watched. Ms. Gima's response is that no, he is not being watched anymore than anyone else is being monitored for their performance. Mr. English points out that it was interesting to him that all these reviews and bad narratives come after his complaint about an administrator using City and County employees to do work for his private company on City and County time.

08/15/2002: In the emails Mr. English is asking Gary Kurokawa whether they have decided to extend his probation or not. As he had already discussed, he did not agree with the extension and believed it to be unwarranted and unjustified and he also felt his only option left was to seek legal counsel to his alternative.

08/15/2002: Mr. Kurokawa emails Mr. English that he has revised the performance evaluation, he was extending it for three months, the revision was needed to amend the evaluation to list goals that, if met, will lead to establishing a satisfactory performance rating.

10/14/2002: In the email to Ms. Gima, Mr. English states, "I am trying. I am reaching out for help. Again, if you do not wish to help me, please say so and send me somewhere else... If it is your desire to see me fail you're right on track." In response Ms. Gima wrote back that she had no desire to see him fail and she was trying to provide him with assistance and she gave him two sentence directions on what to do regarding in question.

10/18/2002: In the email, Ms. Gima informs Gary Kurokawa that she met with Waylen on last Friday and had no disagreements with proceeding as he suggested. She said she would also like to meet with just her, Gary, and Waylen regarding what to do on and review any actions since they had already missed the one month review in September because HR would probably dictate that the probation was terminated anyway. Apparently, Waylen did not want Bob Magota involved in the meeting and there was some issue as to how to continue without involving Bob.

10/21/2002: The emails are concerning Mr. English's request for vacation leave on 10/22 and 10/25. Ms. Gima tells him that his leaves will be granted provided he submits some missing work that was due on 10/04. Mr. English states, "Furthermore, I have received very little assistance from you in spite of my request. If there was any delay in my completing my coefficients by 10/04, it should be on record that I did not get the support that I requested." There were a total of eight

Roger Moseley
Re:  Philip English
January 25, 2006
Page 21 of 52

emails back and forth from Ann Gima, Bob Magota, Phil English, and Dwight Ishiguro over this issue.

On 10/30/2002, there is a flurry of emails, over fifteen in regards to Mr. English's request for leave which was disapproved unless Mr. English completed certain work. Mr. English complains to Dwight Ishiguro about the management practices and Ms. Gima complains to Gary Kurokawa about how "Mr. English takes no responsibility for his work product." Mr. English then explains to Mr. Ishiguro that he feels singled out and harassed and that things are getting worse and not better. He is trying to figure out "who is on my side and who I can trust. This is so obvious. In the city and county I do not feel that there are many that I can trust." He was also having difficulty trusting his union representative. There is an email from Ann Gima to Phil English on 10/31/2002 which states that "the list of errors Norma emailed you about must be corrected before we can run the entire population again. November 1, Friday is the deadline and we cannot extend past that day… Because of the situation, your request for vacation for Friday, November 1, is disapproved." In this flurry of emails, Mr. English documented that he needed the leave to take care of doctor's appointments for his follow-up for cancer and his broken toe.

11/13/2002: Mr. English consults Mr. Ishiguro on his problems with management. Mr. English writes, "…plus I don't just roll over and take it when they do things or say things they shouldn't be doing or saying. I have tried my best to document once I figured out what was going on and I appreciate your counsel in this regard." He also enumerates cases where Ann Gima did work for others that she refused to do for him. He continued to feel singled out and mistreated by management and said "Dwight, they are out to get me. They want me to fail."

Mr. English further points out to Mr. Ishiguro that he has tried to follow the areas of evaluation for his second probation but felt that they had been thwarted in the event that he had not been given the assistance requested from Ann. He also complained that there had been absolutely no training for the areas they needed help in. He continued to say that Ann would complain that he had not followed her directions and his statement was that she had never requested the things she was requiring.

He also complained that he had requested leave but had each and every request denied even though it was for necessary medical appointments. His email was several pages long. On 11/21/2002, Mr. English writes to Mr. Ishiguro that he has contacted several attorneys and was waiting to hear back from them. He asked Mr. Ishiguro what he thinks of hiring Peter Trask.

12/05/2002: There are a series of nine emails back and forth from Phil English to Dwight Ishiguro. The gist of the emails is that Mr. English is talking critically about management. Of his own management style he says, "I have also had great successes when managing myself. I have always had excellent professional relationships with all of my employees… I am not just bragging; it is true and it is something I am proud of." On the contrary, he feels his current management style is "Do as I say and if it goes wrong or is unclear, it is your fault." Mr. Ishiguro writes back the "team" is geared to support management and not the lined staff. I believe that this administration does not want to hear of potential problems with the implementation of their new programs. They want us to say yes and implement and fix problems as we go along. This type management is not new." At the same time,

Roger Moseley
Re: Philip English
January 25, 2006
Page 22 of 52

Mr. Ishiguro states, "On some issues, we cannot address because it is 'management's' prerogative." He further writes, "Bottom line is that we cannot grieve bad management." In another email he states, Ann will have to start treating you as a professional and you need to demonstrate the ability to carry out the assignments/duties."

### Records of Kaiser Permanente

**Personal Health Appraisal Summary Report, Undated:**

The assessment format indicated that this thirty-four year old male was healthy with no major problems. He had an incident in the past where he got so constipated he could not have a bowel movement times one year. A total workup was done and it was found he needed more fiber and a more regular diet. It improved his nutrition drastically. Both he and his wife were modifying their lifestyle with exercise and lowering their salt intake. In August of '83, the patient had a leg infection from a dog bite. Mr. English was given a cholesterol test and, on 06/01/1989, he scored in the borderline high range. On 11/01/2000, Mr. English had a recheck with oncology for his nephrectomy performed in November of 1998. It was noted that cancer recurrences usually recur during the first two years post-op. The plan was no need to re-refer; Mr. English was doing well.

**Examination on 05/03/2001:**

The patient was status post-nephrectomy. There was no evidence of recurrent tumor or mass in the post-surgical bed/no evidence of tumor recurrence or metastatic.

**Examination on 05/22/2001:**

Mr. English was taken by ambulance to Kaiser after he was experiencing difficulty breathing in his chest area, worse on inspiration. He was experiencing constant pain which was worse with deep breaths. Diagnostic Imaging Consultation Report's impression was no definite acute pulmonary disease.

**Progress Note, Frank W. Uhr, M.D., 01/13/2003:**

Patient was seen approximately eight days after sustaining an inversion fluxion to his foot when he missed a step coming off his boat. He had a mild swelling and he could precede as tolerated for activities. He should return for follow up in three weeks, take anti-inflammatory medication as needed. If he is back to normal, he can call and cancel the follow up.

**WC-2 Physician's Report, 02/13/2003:**

Tam Sing, M.D., at the Honolulu Urgent Clinic, filed a report as the patient was experiencing work stress. He had associated complaints of agitation and stress related to his job. He stated that this all occurred in the context of him being a "whistle blower" and issues at work.

Roger Moseley
Re:  Philip English
January 25, 2006
Page 23 of 52

**Progress Note, Gerald Coffee, 02/27/2003 through 03/10/2003:**

Mr. English was seen by Gerald Coffee for anxiety.  The note indicated that this was session two.  The problem was occupational stress disorder.  The patient reported ongoing anxiety due to harassment at work and isolation from coworkers.  His symptoms were depressed mood, ongoing decreased energy and self-esteem.  He questioned his decision to "get involved," he is restless about the future, he was isolating and showing withdrawal, and he reported limited to no support from the system.

Also on 02/27/2003, Mr. Coffee noted the patient under cognitive processes from his mental status exam that the patient adhered to idealistic justification (moral/ethical) as justification for actions, not excepting of consequences.

Another session is indicated on 03/10/2003 as his fourth session.  Signs and symptoms included appetite disturbance and decreased energy.  He also reported that he felt like his body was "shutting down," that he was taking frequent and hard naps.  He had decreased motivation and regular activities, a sense of hopelessness and feelings that his career and life were over, suicidal ideation though none at the present, more feeling anxious rather than suicidal.  He was isolating and showing social withdrawal and had difficulty controlling his worry in public places.  He had feelings of anger with is employer for creating a difficult situation and lack of motivation for behavioral change.  He reported holding onto "moral outrage" regarding the unfairness of it.  Then benefits of anti-anxiety and antidepressant medications were discussed.  The benefits of a long term antidepressant rather than diazepam PRN were discussed.  He was also educated regarding the process of loss and the benefits of moving on versus holding on to correct damaging emotions.  He was to speak with his physician about sick leave and to discuss antidepressants.  He was given what Mr. Coffee called reality therapy in that Mr. English was encouraged to finish the process at work if reward/risk was worth it, simultaneously to seek alternate employment to maintain his income and positive reputation in the field.

**Kaiser, Initial Psychological Evaluation, Joan H. Koff, Ph.D., 05/06/2003:**

The presenting problem was that the patient indicated on 02/12/2003, he began to discover he was being persecuted because he had begun a process of "whistle blowing."  He said that his administration was preparing to file an insubordination complaint against him around that same time.  He told Dr. Koff that he found a paper stuck to his chair that reported he had been involved in workplace violence with a formerly friendly coworker named Julie.  He said when he saw this he began to feel a great deal of anxiety and felt that things were "spinning out of control."  He began to see a therapist, Gerry Coffee, M.S.W., about the situation.  He claimed that he was being investigated by his administration for workplace violence, that there had been complaints by his co-employees and that an administrative agent, Michael Gulich, was interviewing everyone at his work.  He consulted with his union agent and claimed that the union agent advised him that he may not be able to work for this office or the City and County or possibly for the state any longer.

**Kaiser Progress Note, Joan Koff, Ph.D., 02/12/2003 through 02/23/2004:**

Roger Moseley
Re:  Philip English
January 25, 2006
Page 24 of 52

During the approximate year Dr. Koff treated Mr. English for a total of 24 individual psychotherapy sessions lasting 45 to 50 minutes.  On 02/12/2003, Dr. Koff noted that the patient was feeling a little bit better.  His depression was a little less.  He made statements that he behaved "like a doormat."  He believed that his TDI was being delayed purposefully.  He had been prescribed Trazedone and Zoloft but had not taken any.

Over the period treated, some of his symptoms included his isolating, difficulty trusting people, and feelings of humiliation.  He complained of the unfairness of being the one responsible for twenty thousand Waikiki units and that the number of appraisals required of him was excessive.  His second wife was leaving him during this period due to unnatural strains.  He had been prescribed lorazepam PRN and took it throughout the period of treatment.  He had worries and anxieties about his personal safety and the safety of his son since he was seen as a whistle blower.  He demonstrated isolative behaviors and on outings in public places, he feared his anxiety would overwhelm him.

He believed that his union had divided loyalties and he believed that the deterioration of his marriage with his current wife was due to the "domino effect," meaning that his work situation had caused the end of his marriage.  His work situation had also eroded his self-confidence.  He had increased anxiety and felt stressed.  He had difficulty trusting people.  He was thankful for his church which had many times provided him with food since his financial situation was very difficult without work.  He shared his fears and worries about his pending legal situation.  At times he felt extremely shamed and humiliated.

There was slow improvement.  In July of 2003, he was experiencing extreme financial stress.  He believed there was relentless criticism after reporting the wrongdoing at work.  His self-confidence was down.  He distrusted people and was upset and had difficulty focusing.  He also had vague suicidal ideation and Dr. Koff made frequent safety plans with him.  He had difficulty figuring out his TDI: the amount of money he was receiving and what the statement indicated he had received.  It left him anxious and confused.  During the same period of time, from 05/15/2003 through 11/17/2003, Mr. English attended group therapy at Kaiser with social worker, Lily Mundone, L.S.W.  During the period covered he attended a total of sixteen group sessions.  Most of the progress notes indicated that he participated in the group and shared his anxieties, fears, and depression over his work situation with them.

### Initial Report, Psychological Evaluation, Reneau Kennedy, ED.D, Clinical and Forensic Psychologist, 04/20/2003:

Dr. Kennedy was hired by Thomas Riddle of the Workers' Compensation Administration Department of Human Resources to perform a psychological evaluation on Phillip English for his workers' compensation claim.  She examined him on 04/18/2003 in a nine hour evaluation that included psychological testing, clinical interview, and mental status exam.  She issued a preliminary report on 04/20/2003.  It was her opinion that Mr. English was in current severe mental distress and that his condition warranted immediate medical attention and relief from the workers' compensation department.  Dr. Kennedy ruled out malingering of his symptoms for secondary gain.  She found Mr. English in acute need of assistance both

Roger Moseley
Re:  Philip English
January 25, 2006
Page 25 of 52

psychiatrically and financially.  She found him totally unable to work at the time of the evaluation and his psychiatric needs overrode alternate temporary work relocation.  She planned to consult with his psychological treatment providers at Kaiser concerning her initial findings.  She found that there was more than sufficient data to support Mr. English's claim for workers' compensation and she stated that because he was currently without financial resources that immediate financial relief would diminish some of the pressure Mr. English was living under.  A full report was being prepared; however, it could not be completed until Dr. Kennedy received all the records that had been ordered.

**Full Report, Independent Psychological Evaluation, Reneau Kennedy, ED.D, Clinical and Forensics Psychologist, 04/30/2003:**

Dr. Kennedy's full psychological evaluation was twenty-three pages long.  She reviewed all the records that had been provided her which were extensive.  Dr. Kennedy outlined a history of Mr. English's present claim.  In her history taking she noted that in 1999 Mr. English had applied for both the positions of  real property administrator and real property assessor; however, in both instances the jobs had been given to the acting administrator and acting assessor.  Dr. Kennedy pointed out that a supervisor noted that Mr. English had been disappointed and displeased that he hadn't been chosen because he thought he was the best candidate for those jobs.

Dr. Kennedy noted that Mr. English had been hired in June of 2000 in an entry level position, that he initially took the job in order to get out of the stress of being in private practice work.  However, she pointed out that his goal for taking the job must have changed because in November of 2000 he wrote that he had nothing to lose and that he wanted to see things corrected and done right.

During that first year, Mr. English began to notice that his friend, Chris Graff, was conducting business for GK Appraisals which is a Real Estate Appraisal Firm owned by Mr. Kurokawa and that he was performing this work on City and County time.  In August of 2001, Mr. English issued a verbal complaint about this behavior to Ann Gima, his supervisor.  According to a note by Mr. Riddle, Mr. English said that Ms. Gima responded that she didn't know anything about the situation, but she was going to look into it.  Mr. English submitted a second verbal complaint in February of 2002 to Ron Magota, Ms. Gima's supervisor, who was supervised by Mr. Kurokawa.  Mr. Riddle's notes indicated that Mr. Magota gave a verbal warning to Mr. Graff about this behavior and also spoke to Mr. Kurokawa who indicated that he had told all of his employees not to work on city time.  Mr. English was not happy with the outcome so he filed a complaint against the administrator for this type of behavior.

Further emails indicated that Mr. English had suffered retaliation due to the written complaints.  He cited the administrator's lack of "moral compass."  Dr. Kennedy also pointed out that there was a note from OSHA indicating that Mr. English had requested to use the office fax machine for personal reasons in 2002.

Dr. Kennedy summarized further emails which were often attempts by Mr. English to gain guidance from them in prioritizing his work.  He expressed frustration in his emails about the type of work that would be assigned.  According to his supervisors, Mr. English seemed to expect to be treated differently and was always criticizing other employees and management.

Roger Moseley
Re:  Philip English
January 25, 2006
Page 26 of 52

Mr. English was promoted in March of 2002 to Real Property Appraiser IV position; however, his 04/12/2002 performance evaluation showed a decline in all four ratable performance factors.  It was noted he had difficulty organizing and prioritizing his tasks, and he disagreed with established office work processes, and that he resisted completing tasks in the prescribed manner.  Mr. English entered a written response that he disagreed with this evaluation and he believed it was a lack of insight on leadership that caused the confusion.

In further emails to Mr. Ishiguro, Mr. English pointed out that he thought that they were out to get him and that he felt harassed.  He believed that because he had come forward about Mr. Kurokawa's behaviors, he had become subject to many complaints and scrutiny against him.  By August of 2002, Mr. English's performance evaluation was below requirements in attitude toward work.  According to his administrator, he had difficulty in independently performing all of responsibilities as appraiser four and that they had talked to him at least three times, making efforts toward addressing his various issues and problems.  It was recommended he have an additional three month probation period.  Mr. Magota advised Mr. English to seek counseling through the city's employee's assistance program, but according to his supervisor, Mr. English raised his voice at Mr. Magota and stated there was nothing wrong with him and he didn't need counseling.  After this bad evaluation and return to probationary period, Mr. English sought legal counsel.

In September of 2002, Dr. Kennedy pointed out that Mr. English reportedly posted a "help wanted" article on the employee's bulletin board showing numerous job opportunities.  He did this to express his dissatisfaction at the salaries the city paid its employees.  His supervisor believed Mr. English was becoming frustrated and outspoken about his salary.  Dr. Kennedy pointed out that there were disagreements and confusion about Mr. English taking leave time.  Mr. English pointed out an email to Mr. Ishiguro that he felt Ms. Gima would help others but not him.  He reiterated about them making life difficult for him and made statements like "they had picked the wrong guy this time."  He believed that people were singling him out.

Further handwritten notes were referred to by Dr. Kennedy of meetings Mr. English had with his supervisors trying to straighten these problems out.  Mr. English was not happy with these meetings and did not feel any satisfaction.  Dr. Kennedy pointed out that in February of 2003, Mr. Chris Graff submitted a confidential workplace violence incident report saying that Mr. English had verbally threatened and intimidated him on 01/17/2003.  According to Mr. English, he had encouraged Mr. Graff at that meeting to "just tell the truth and get you on the good guys' side."  Dr. Kennedy pointed out that Mr. English stated that there were rumors going around that he "might be wearing a wire."

Dr. Kennedy also noted that in February of 2003, Mr. Totto, executive director of the legal counsel for the Honolulu Ethics Committee Commission had emailed Mr. Kurokawa about a complaint alleging use of city resources for non-city purposes by Mr. Kurokawa and Chris Graff.  According to Dr. Kennedy, in the interview Mr. English pointed out that Mr. Totto was a "haole but that the supreme court justice, Paula Nakagima was Japanese and wanted the state to win."  Dr. Kennedy wrote that Mr. English reported that he thought his career as an appraiser and supervisor was finished.  He believed that perhaps he should return to college for retraining.

Roger Moseley
Re: Philip English
January 25, 2006
Page 27 of 52

He reported the following symptoms: difficulty sleeping, nightmares, tearfulness, isolative behaviors, hyper-alertness, stomach problems, and migraine headaches. Mr. English's support network was limited to Frank Ramil, who was the pastor of Fellowship Bible Church. Dr. Kennedy noted that Mr. English's mother was in ill health and had recently been diagnosed with lung cancer. Mr. English also reported to Dr. Kennedy that he was shocked when his second wife filed divorce papers. He thought their marriage was struggling, but not to the point of divorce. He also told Dr. Kennedy that he had discovered his wife was seeing another man regularly.

In the interview with Dr. Kennedy, Mr. English told her that he told his son when he was eight years old that he had wanted to kill himself and that this disclosure had deeply effected his son. He said that his second wife viewed this as an attack. Dr. Kennedy wrote that Mr. English had told her in 1999 his company had suffered from a recession and had downsized from twelve employees to two. He reported he chose employment with the City and County of Honolulu upon his doctor's advice that he needed better stability than private practice offered and he needed to diminish his stress to ensure long term health benefits.

Dr. Kennedy noted that Mr. English experienced his first depressive episode in 1998 during marital turmoil with his wife. He attempted suicide twice; first with a large bottle of Aspirin, and second by hanging. After the first attempt, he was admitted to Queen's Medical Center. He then subsequently attended marriage counseling at Biodine for approximately one year.

According to other notes by Dr. Kennedy, Mr. English reported his depression worsened after he was told by his doctor and psychologist to go off work. He was without a paycheck for six weeks and had to borrow money from his pastor in order to get by. The money problem heightened to the point where he again felt suicidal.

Dr. Kennedy administered a battery of psychological tests. Mr. English's MMPI-2 profile was not valid for statistical analysis or normative base comparisons. The validity scales revealed that he responded in an exaggerated manner as he endorsed an extreme number of symptoms and attitudes. His MMPI-2 results likely arose from either a magnified "plea for help or severe psychological deterioration." Dr. Kennedy believed Mr. English's responses were the former.

On the Butcher Treatment Planning Inventory, Mr. English's scores again indicated elevated exaggeration scales. The findings were consistent with his MMPI-2 findings where he is overtly endorsing acute emotional distress. The treatment issue scales for the Butcher Treatment Planning Inventory indicated that he was high on sommatization scale, indicating that he's experiencing a considerable amount of physical distress at the time of the testing. Dr. Kennedy found that Mr. English endorsed symptoms which are commonly associated with channeling psychological conflict into physical symptoms. Mr. English reported a number of symptoms reflecting the presence of possible mood disorder; specifically, the depression scale indicated he felt very depressed. He also had a very high anxiety scale suggesting he felt anxious, tense, and fearful. The tests were informative to the point that Mr. English tends to internalize emotional conflict into physical symptoms. This would be in line with his physicians telling him that as a post-cancer survivor, he would need to consider less stressful work environments; however, he has not find the

Roger Moseley
Re: Philip English
January 25, 2006
Page 28 of 52

government to be a less stressful work environment and it may not be in his best interests to continue in that line of work.

Dr. Kennedy diagnosed:
Axis I: major depression, recurrent, severe without psychotic features; with history of inter-episode recovery; occupational problem
Axis II: No diagnosis or condition
Axis III: Kidney cancer with nephrectomy
Axis IV : Problems with primary support group, marital separation, ill health of mother, and child visitation difficulties with his ex-spouse; problems related to the social environment, inadequate social support, living alone, difficulty with acculturation, feelings of discrimination, adjustment to current transition; occupational problems: difficult work conditions, job dissatisfaction, discord with boss and coworkers; housing problems: recent complaint by boatyard manager with potential eviction; Economic problems, financial problems while off from work
Axis V: global assessment of functioning was 55 current.

Dr. Kennedy found a number of factors contributed to Mr. English's mental functioning. He had several life problems prior to working for the City and County of Honolulu in 1998. They included undergoing surgery for cancer, a difficult divorce with problems relating to visitation to his thirteen year old son, and severe financial problems. He had two suicidal attempts during the break up of his second marriage. In addition, his third marriage has since undergone difficulties and he anticipated it would end in divorce.

Dr. Kennedy also found Mr. English's work situation to be a factor contributing to his current mental health. He believed he had received unfair discriminatory treatment from his supervisors. He believed that this treatment was directly related to their unethical workplace behaviors that he had "blown the whistle on." He prided himself at having a superior work ethic and thus it was very difficult for him to cope with the work environment where he believed he was not accepted, appreciated, or viewed as a collaborative worker.

Dr. Kennedy could not determine with finality how much of his difficulties prior to the work situation contributed to current problems. She did elaborate on his history of severe depression and significant physical problems. Also, she indicated that the number of relationship problems in the past five years were also contributory. She documented that according to his performance appraisals, he had initially done well and was viewed by others as performing so, but there was deterioration around the same time and period that he became concerned about potential ethical problems.

Dr. Kennedy found that the current situation, for both his coworkers and superiors at the Department of Budget and Fiscal Services, was that each party felt they had been wronged and that their emotional detachments had been eroded to a point that might now be beyond repair.

Dr. Kennedy was asked to identify subsequent, non-related work injuries or issues that might be cause of his current condition. Dr. Kennedy opined that Mr. English was not coping well with being out of work, that the process of the ethics investigation coupled with his own workers' compensation claim was very unpleasant and emotional disturbing for him. She stated he was uncomfortable being the focus

Roger Moseley
Re:  Philip English
January 25, 2006
Page 29 of 52

of attention.  She also pointed out he had several family issues that were painful:
being separated from his third wife, difficulty with visitations to his son, and his
mother ill with cancer.  She stated that he cared about his loved ones, and therefore
these issues impacted his wellbeing.

Dr. Kennedy responded that further care was warranted and also
psychopharmicalogical treatment was indicated for Mr. English's depression.  She
recommended a course of cognitive behavior or dynamic psychotherapeutic
treatment and believed the therapy would ease symptoms of depression and help
him with his methods for coping with his situational problems. She also
recommended he reevaluate his career path.  She thought therapy could be
accomplished on an outpatient basis and that it would probably depend on how long
the work related stressors continue.

Dr. Kennedy did not believe Mr. English was ready to return to usual and customary
duty either part time or fulltime.  She believed that the place-of-employment
relationships were most likely irreparably damaged.  She also opined that if an
alternate placement was available, he might be able to return possibly part time or
fulltime.  She also recommended that any sanctions he had received be either
suspended, or kept at the other place of work, and not transferred to where he might
be placed.

## Letters

### 01/16/2003, Letter to Phil English from Waylen Toma, Business Agent:

The letter was written to cure of confusion.  According to Mr. Toma, Mr. English was
'never on any probation.'  Mr. Toma says he would have filed a grievance if the
division had argued this issue.  The agent clarifies that at the meeting that he had
recommended that some of the language be removed; however, Mr. English had
wanted the language left in because it might be in his best interest as he was talking
to an attorney.  He advised him at that time that his civil case might be weakened
because the offer was made by the employer to change the language in the
purposed attachment.

Mr. Toma documents that during the week after the meeting, he received two phone
messages from Mr. English as well as two emails.  According to Mr. Toma, the
changes to the performance evaluation had been sent to Mr. English and they were
awaiting his concurrence on the proposed changes which included a removal of all
bracketed language.   He advised Mr. English to agree to reasonable requests of
management.

### 02/07/2003, Letter from Gary Kurokawa to Phil English

Mr. Kurokawa writes to Mr. English regarding his serious allegations of ethical
misconduct.  Mr. Kurokawa writes that he wants to do an inquiry and follow up, but
he needs to clarify the allegations.  He asked if the supervisor asked him to do
something that was wrong, and if so who asked him to do it and what was he
specifically asked to do.  He asked him if a supervisor asked him to "protect the
office."  He asked him if a supervisor asked him to "not reveal the truth or cover up

Roger Moseley
Re:  Philip English
January 25, 2006
Page 30 of 52

the truth."  According to Mr. Kurokawa, Mr. English also said the amount of work and the time frame which you are given to accomplish the assessments is an ethical violation.  He asked for a standard provision or resource by which he could research and reply to that concern.  He also wanted specific occasions and reasons when Mr. English felt he had been ethically challenged at work.

**State of Hawaii Division of Boating and Recreation, Mason Young, Acting Administrator, 04/17/2003:**

This note notifies Mr. English that he is in default in his account, that as of 03/31/2003, he was in default in the amount of $1,235.72.  Failure to cure his default within fifteen days of receipt of the notice would result in the termination of his permit and require his vessel to leave the harbor.

**Case, Bigelow, & Lombardi, Roger S. Mosley, 04/25/2003:**

Mr. Moseley in this letter was requesting that Mr. Riddle expedite Mr. English's claim due to the fact that he could not pay his health insurance starting 03/01/2003.  It would be cancelled due to nonpayment and the fact that he was to be evicted from his boat because he couldn't pay his slip as of 04/30/2003.

**Department of Human Resources, City and County of Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/29/2003:**

Mr. Riddle responds to Mr. Moseley's letter of 04/28/2003 by saying "there is little that can be done under workers' compensation that will help Mr. English."  He said that he had explained that these type claims take some time to process.  He said he had worked hard to secure an early appointment with Dr. Kennedy for the evaluation and that he had been trying to obtain the records from Kaiser for some time.  He further stated that he called Kaiser and asked for the records; however, he was unwilling to intercede for Mr. English with his boat rental fees or his health insurance.  He thought that was the job of his attorney.  He could also do nothing regarding the waiting of the physician's form for TDI because his office handled only workers' compensation.

**Department of Human Resources, City and County of Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/30/2003:**

Mr. Riddle had been concerned about Mr. English after his discussion with Dr. Kennedy.  He was concerned Mr. English's past history of multiple suicide attempts and suicidal ideation.  He believed that Mr. English's stress had reached a crisis level and only seemed to be getting worse.  He was contacting Mr. Moseley, Mr. English's attorney, to get him to contact Mr. English's pastor to assist him in his current crisis.  He also gave him the crisis hotline and suicide prevention hotline.

**Case, Bigelow, & Lombardi, Roger S. Moseley, 04/30/2003:**

Mr. Moseley was concerned and upset with Mr. Riddle.  He believed that Mr. Riddle had indicated Mr. English's annual performance evaluation would be placed on hold.  However, Mr. English received it in the mail and it was very negative.  He informed Mr. Riddle that Mr. English's present condition had worsened since receiving the

Roger Moseley
Re:  Philip English
January 25, 2006
Page 31 of 52

evaluation.  He believed that Mr. English's supervisors continued to attempt to retaliate with this evaluation.  Mr. Moseley called for the discharge of Robert Magota and Ann Gima for their "despicable act of sending this evaluation to Mr. English at this present time."

### Email from Thomas Riddle to Reneau Kennedy, 04/30/2003:

Mr. Riddle informed Dr. Kennedy that he had passed on the information to Mr. English's attorney about Mr. English's need to talk to someone like his pastor or the suicide crisis centers.  Mr. Riddle informed Dr. Kennedy that he had spoken with Robert Magota who had assessment division about Dr. Kennedy going to the division to speak with people in the office to glean more information.

### Letter from Thomas Riddle to Mr. Moseley, 05/01/2003:

Mr. Riddle thanked Mr. Moseley for his letter and points out that he can only handle workers' compensation issues.  He said if Mr. Moseley had questions about control, supervision, authority, responsibility, or anything else that occurs within the City, he would have to take these concerns to the director of the Department of Budget and Fiscal services, Ivan Lui-kwan.

### Case, Bigelow, & Lombardi, Roger S. Moseley, 05/02/2003:

Attorney Moseley writes Mr. Riddle requesting that he assist in preserving the health insurance coverage of Mr. English.  HGEA had informed him that the city needed to contact them to confirm that Phil had been on authorized leave without pay since 02/28/2003.  Mr. Moseley left Mr. Riddle the phone number of who to call to make this confirmation.

### Email from Phillip English to "Mom and Dad":

This email written by Mr. English to his father's address, states that he was going on two-week work leave immediately and he had a meeting with the administrative service officer regarding complaints against him including workplace violence and sneaking around trying to gather info on people for a lawsuit.  Mr. English informed his father that the new union agent said that something "really stinks."  He said it sounded like retaliation and harassment.  According to Mr. English, his union agent told him that he would probably not be able to work in the assessment division in the future for fear of retaliation.  Mr. English informed his father he was pretty shook up about this; however, he said he had an ally that they do not know about and "I'm sure he is on my side."

### Case, Bigelow, & Lombardi, Roger S. Moseley, 05/03/2003:

This letter to Dr. Reneau Kennedy states that Mr. English was assigned approximately 20,000 condominium and co-op units in one of the most complicated real estate markets in the world, Waikiki.  Even if the co-op units were counted as single units, it would still be an excess of 18,000 properties.  He included attached with this letter the IAAO standards (International Association of Assessing Officers).  These standards indicated that 5,000 properties per assessor would be cause for

Roger Moseley
Re:  Philip English
January 25, 2006
Page 32 of 52

concern.  (Standard On Mass Appraisal of Real Property, 03/19/1984, International
Association of Assessing Officers, No. 5 Managerial Considerations 5.2 Staffing)

**07/24/2003 Letter to Thomas Riddle, City and County of Honolulu, Workers'**
**Compensation, from Joan H. Koff, Ph.D.:**

Dr. Koff was responding to Mr. Riddle's letter of 07/09/2003.  She had reviewed Mr.
English's records and had determined the date of injury most appropriate for his
current situation as 01/30/2003.  This is the date that Mr. English came to Kaiser to
see his primary care physician, James Love, M.D., and complained of the undue
stress related to his work situation.  Dr. Love noted at that time that he wasn't
sleeping well and had lost weight.  He had anxiety and was referred to behavioral
medicine.  Treatment at that time began with therapist Gerry Coffee, M.S.W.

**08/28/2003, Letter from Joan Koff, Ph.D., to Thomas Riddle, City and**
**County of Honolulu, Workers' Compensation Division:**

Dr. Koff pointed out that she had frequently asked to receive a copy of Mr. English's
independent psychological evaluation and that she had only recently received it from
his attorney, Roger Moseley.  She stated that after viewing the report and her own
clinical impressions, she believed Mr. English suffered from a work-related injury on
01/30/2003.  She believed the injury was an acute exacerbation of a preexisting
depressive disorder.  Dr. Koff agreed with Dr. Kennedy that Mr. English suffered from
a major depressive disorder; however, she believed the stressors were in a
significant measure due to work difficulties.  She attributed his housing problems,
financial distress, economic problems, and feelings of discrimination, as well as
marital separation all as secondary to his work problems.  She believed that his
psychosocial environmental problems noted by Dr. Kennedy would not likely be
present to any significant degree if it were not for the injury of 01/30/2003.  She
recommended continued treatment.

He was presently receiving individual therapy and group psychotherapy, and had
recently been assessed for psychotropic medication.  The psychotropic medication
was difficult due to his history of kidney cancer with nephrectomy which some
medications would not be suitable for.  She agreed with Dr. Kennedy that the patient
would not be able to return to work in his current department.  She did not agree
that he was ready to return to work in another capacity.  She believed that, if his
condition improved, he would eligible for rehabilitation service and find his way to
reemployment at a later time.

Mr. English admitted to having two previous suicidal attempts, that his current
suicidal thoughts were only ideation with no plan.  He reported suicidal attempts in
1998 and 1999 related to the divorce by his wife of fifteen years.  He was currently
willing to contract for safety.  He was having difficulty paying the rent for his boat as
he hadn't received any temporary disability insurance.  Dr. Koff noted under mental
health history that the patient had a paternal grandmother reportedly with
schizophrenia.  Dr. Koff also tested Mr. English with the MMPI-2 and the Millon
Behavioral Health Inventory.

The Millon Behavioral Health Inventory indicated that he came become distraught
emotionally and may be inclined to expect trouble in relationships.  He anticipates

Roger Moseley
Re:  Philip English
January 25, 2006
Page 33 of 52

being hurt by others which might account for his detached and isolated lifestyle. When life events are going extremely well, his behavior might be more affable and go in a comfortable direction; however, on distress, he may revert to a fearful, troubled, and restricted lifestyle.  His moodiness and isolation make him highly susceptible to body elements of the psychosomatic nature.  What he probably needs most is nurturing, understanding responses; however, his demands and complaints may exacerbate others.  His future appears to look bleak and hopeless to him.  He has a feeling of being without personal resources and is unable to gain support from others in dealing with the concerns that must be faced.  He also indicated a history of chronic gastrointestinal disorder.  Dr. Koff diagnosed:
Axis I: Major Depressive Disorder, Recurrent, Moderate; Anxiety Disorder NOS Psychological Factors Effecting Physical Condition
Axis II: Deferred
Axis III: kidney cancer
Axis IV: moderate to severe work-related stress
Axis V: current GAF was 55, past year probable was 55.

Dr. Koff created a treatment plan including collaboration with other treatment providers as well as his new psychiatrist, Dr. Balogh.  Initial treatment would be for fifteen sessions of cognitive, behavioral, individual psychotherapy on a weekly or bimonthly basis; supported group therapy to lessen than isolation and increase support; psychotropic medication, evaluation, and prescription; and, as needed, crisis intervention.

**Case, Bigelow, & Lombardi, Roger S. Moseley, 08/28/2003:**

Attorney Moseley, representing Mr. English, wrote to Thomas Riddle of the workers' compensation administration requesting all records that were available on his client. He also in the letter acknowledged the settlement offer made by Mr. Riddle's department verbally in workers' comp only, in the amount of a cash payment of $60,000, six months continued treatment pursuant to an acceptable treatment plan, and Mr. English's resignation from his job.  He notified Mr. Riddle that Mr. English and he were in the process of evaluating the offer.

**Honolulu Advertiser, "Lawyer Says Tax Agency Rotten," 02/19/2004:**

According to the plaintiff's lawyer, the faulty property tax assessments alleged in former city appraiser's lawsuits are "very widespread and many Honolulu residents are likely being overcharged by the city." The federal lawsuit filed by Phillip English charges that division officials knowingly sent out incorrect property tax bills and retaliated against English after he challenged the practice.  Moseley, English's attorney, said the division was chronically understaffed, leaving the employees overworked, demoralized, and afraid to complain about problems.  The suit also charges that city employees were working for Gary Kurokawa, assessment division administrator's private business, during city time.  Chuck Totto, the City Ethics Commission Director stated that a complaint filed by English last year remains pending.

According to this article, the city sent property tax bills totaling more than 400 million for 2003.  Assessments had increased over 6.6% over 2002.  By November, about 1.4 million in refunds had been returned to 147 property owners who

Roger Moseley
Re: Philip English
January 25, 2006
Page 34 of 52

successfully challenged their assessments. There were more than 16,000 appeals
still pending. Federal lawsuits stated that city officials knowingly sent out incorrect
property tax bills, had appraisers do work on city time for a company owned by the
head of the assessment division and his family, and retaliated against the appraiser
who tried to blow the whistle. Rather than correct the faulty tax bills, according to
English, a supervisor stated that "if taxpayers didn't like the assessment they could
file appeals." Also according to English, officials discouraged taxpayers from
challenging their bills and refused to provide the information they needed and rigged
the outcome of some real hearings. English stated that he would point out the faulty
assessments to his supervisors, but would be ordered to process them anyway.

**Handwritten Notes**
Note that there were approximately 24 handwritten note entries reviewed. Some of
these notes were quite extensive, one by Mr. English was 27 small notebook sized
pages.

**08/01/2002, Notes written by Gary Kurokawa**

Mr. Kurokawa lists three things that were discussed in the meeting, all specific
directions as to how Mr. English could improve his job performance:
"I. Get model priorities done by dates. 'Cannot do all' everything. Look for the big
fires. If the models are due, turn them in 80% okay, 20% to look at and work on.
'Cannot do everything well.'
II. Check in with supervisor before you leave.
III. Chain of command, communications, and using proper venue."

**09/09/2002, Notes, Phil English**

The note indicates that on this date Ann Gima spoke angrily with him when he asked
her about work matters. When he asked her for specifics, he said she refused to tell
him any. He said she "remained very curt with me. It is very hostile. I still do not
know or understand why she treats me this way. It's very upsetting and disturbing
to be singled out and not know why." In addition, he pointed out that she spends
most of the days talking with her few favorites.

**09/16/2002, Notes, author unknown**

Mr. Kurokawa had a meeting with Waylen Tomma, an agent with HGEA. It was
suggested by Waylen that the administration not pursue probation based upon the
language that was used in the performance evaluation rating. According to Mr.
Tomma, the language was that of a punitive nature that maybe a grievable issue. It
was suggested that they monitor Phil for a three month period and if that
performance is not satisfactory, they can implement a special probation. The notes
seem to be written by Ann Gima.

**11/22/2002, Notes, Phil English**

Mr. English writes notes about his meeting with Waylen, Gary, and Ann. Many issues
were covered and solutions brought forth. He notes, some things were
accomplished, however, it was pointed out in the meeting that Waylen was a
personal friend of Gary's and that Phil believed, "that it was left up to me to agree to

Roger Moseley
Re:  Philip English
January 25, 2006
Page 35 of 52

the 'deal' made between Gary K. and Waylen T."  He ended the meeting by asking if
he could think about all these things.  He was given until 11/22/2002 to respond.
The notes of the meeting were twelve pages long.  He wrote, "So there offer to me
was more of a threat.  Do what we say or we will put you under Bob M. or move you
to Kapolei."  He was also upset that they had offered to arrange to move him to the
Big Island because they had heard he wanted to move there; however, his plan was
to stay on Oahu for five years until his son was out of high school.

**12/04/2002, Notes, Phil English**

In the notes he says that Susan Bender offered him a "haven if he needed someplace
to go and talk."  Susan believed that Chris could refuse the work assigned by Gary if
he so chose.  However, she stated, she did not have firsthand knowledge of this
activity.  She was suspicious of one incident where she witness Gary come over and
hand Chris a disk.

**12/18/2002 and 12/19/2002, Notes, Phil English**

In the notes Mr. English writes about instances where he is suspicious that his
supervisor Ann Gima is talking about him to other coworkers.  He writes that if he
walks over where they are talking, they become quiet and secretive.  He also
documents an incident of Chris not being reprimanded when he was out to lunch
from 11:30 until 1:15.  He believed this to be a double standard since lunch is not
supposed to go past 12:30.

**01/21/2003, Notes, typewritten, Mr. English**

He writes, "Susan Bender came to my desk before going to a doctor's appointment
to tell me that Chris has talked to Lee Agsalud and that the word is out not to talk to
me because I might be wearing a wire.

**01/24/2003, Notes, Mr. English**

Ann was very condescending to him and he writes, "...that is she will find something
wrong or something for me to do whether it is substantive or not."

**02/13/2003, Typewritten Note, Phil English**

It said that Ann G. was talking to Carl T. about something to do with him.  He said
there was a great deal of whispering and he didn't know what they were saying but
when he got up to get water they both looked at him and stopped talking.  He was
confident that Ann was discussing his personal issues.

**02/30/2003, Notes, Mr. English**

He documents that he had written letters to two taxpayers who were enquiring why
their tax payments went up so much.  He said that Ms. Gima instructed him to
change the letters in a way that did not make it appear that the office had done
something wrong.  He had a problem with this and felt uncomfortable with her
request to write a letter that seemed to cover up some error on the department's
behalf.