1    they would-- they wrote down all of the requirements of an

2    appraiser IV and they said I have to be able to do all of

3    these things.

4        One of the things that Gary said I should be able to

5    do is that I should have initiative. That was peculiar to

6    me because I had a meeting with him in January before

7    where he said I was taking too much initiative.

8        I was also told that Ann Gima did not like my emails

9    to her because I signed off my emails as, "Is there

10   anything else that you would like me to do?" And she felt

11   that was obnoxious. And I asked them, "How should I do

12   it? How would you want me to?" And they said, "We don't

13   know. That is your problem. You got to figure that out

14   on your own."

15       There was some discussion about the fact that they

16   had changed the JPR after I had signed it. They gave me

17   the JPR, I reviewed it, I responded. It came back to me,

18   I signed it. Then the next day I got a different JPR with

19   Ann Gima and Gary Kurokawa's signature on it. There was a

20   discussion about removing portions of the language, which

21   I didn't really follow what they were talking about or

22   understand what they were getting at about that.

23       And they told me that this whole discussion of what

24   is going to happen next is up to me. And Waylen repeated

25   that a number of times, "Phil, it's up to what is going to

205

1   happen in the future."  And I pretty much got all of the

2   signals and knew what they were talking about at that

3   point, which was essentially not to bring up anything

4   about any kind of retaliation, not to bring up anything

5   about Gary and Chris's activities at the office, and that

6   would be the possibility for a fresh start.

7        They also talked about, which I perceived as threats,

8   about they could move me to Kapolei.  They knew I was

9   taking the bus, or actually I was riding my bike to work

10  at the time, and they were going to move me to Kapolei.

11       They said they could put me under Bob Magota, which

12  everyone else in the room agreed would be a really bad

13  thing, although I didn't really understand that exactly

14  myself.

15       And the other thing they talked about, actually this

16  was a meeting between Waylen and I after the meeting, that

17  Gary would be willing to move me to another jurisdiction,

18  which I though was rather bizarre because I don't know how

19  he would have the authority to do that.  But that was

20  discussed.

21       Actually what happened was, once the meeting

22  concluded, I asked Waylen if he could please stay back.

23  This was only my second meeting with Waylen.  And because

24  of the way the meeting went, I simply asked him, "What is

25  your relationship with these folks here?"  And he told me

1    that, "I am a personal friend of Gary Kurokawa's."  And he

2    said, "If this goes to trial, I will testify against you."

3          I think the issue that he was talking about

4    testifying against me had to do with something to do with

5    the wording of the JPR, or I'm not really sure.  I don't

6    know for sure, but that is what he told me.

7          And that meeting was concluded.  And that was in

8    November.  Actually that was late November.  And I believe

9    that afternoon I called Roger Moseley.

10          MR. MOSELEY:  I think we need to take a little

11    break here.

12          MR. LORUSSO:  Okay.  Let's take about five

13    minutes.

14          (Recess)

15    Q    (By Mr. Lorusso)  Mr. English, you are okay to

16    continue?  Are you okay to continue?

17    A    Do you have an aspirin?  Is it possible to get an

18    aspirin?

19          MR. LORUSSO:  Let's take a break.

20          (Recess)

21    Q    (By Mr. Lorusso)  Mr. English, given the fact that

22    you had requested aspirin and took two aspirin, are you

23    able to continue with the deposition?

24    A    Yes.

25    Q    It will not affect your ability to tell the truth?

1   work that could be done in an annual cycle.  In that

2   regard, they didn't say here is an appraiser III

3   requirement, that you must meet that, or they never said

4   you have to exceed that.  But the work that they gave me

5   exceeded that.  So it's kind of-- you know, they are

6   giving you work that would exceed those, not just the

7   requirements but your ability to successfully complete it.

8   Q    And were you told with regard to a performance

9   evaluation when you were an appraiser III that it was not

10  acceptable for you to meet the requirements but that in

11  fact had to be, only as to you, something greater than

12  meeting the requirements or meeting the expectations?

13  A    I was never told that I had to only meet or-- I was

14  never told I had to exceed it.  But the workload that I

15  was given would clearly exceed those expectations.

16  Q    As an appraiser IV, were you told by anyone at the

17  City that it was not acceptable for you to simply, again,

18  meet whatever expectations there were of you with regard

19  to any jobs or requirements that you were requested to do

20  but that in fact you had to exceed the expectations?

21  A    No.

22  Q    With regard to the three areas that you considered to

23  be a threat at that November 2002 meeting, working for Bob

24  Magota, being transferred to Kapolei, being assisted to go

25  to an outside jurisdiction, did anyone tell you that that

1   was related to your having informed anyone at the City

2   that Chris Graff was doing outside work for Gary Kurokawa?

3   A    In that meeting, they wouldn't allow that question to

4   be asked.

5   Q    The question was, did anyone ever tell you?  I wasn't

6   limiting it to that meeting.  Did anyone ever tell you

7   that that is why those three things that you considered to

8   be a threat, that they were all related to the fact that

9   you had informed someone that Chris Graff was performing

10  outside work on City time?

11  A    Did they tell me they were making a threat against

12  those things?

13  Q    Did anyone ever say to you the reason that we are

14  giving these options to you of working for Bob Magota,

15  going to work in Kapolei, assisting you in moving to an

16  outside jurisdiction, was because you had informed people

17  at the City that someone was doing outside work on City

18  time?

19  A    Did they specifically use those words?

20  Q    Did anyone ever tell you or words to that effect.

21  A    In a meeting with Gary and Waylen and Ann, Gary used

22  the words, "Let's start new.  Let's forget about

23  everything before."  Gary used the types of words that

24  said, "Phil, I'm the one, if it wasn't for me, you would

25  not have this job," something to that effect.

242

STATE OF HAWAII                    )
                                   )
     I, DONNA KOHLS, C.S.R., a Notary Public in and for

the State of Hawaii, do hereby certify:

     That on October 4, 2005, at 10:29 a.m., appeared

before me PHILIP E. ENGLISH, the witness whose testimony

is contained herein, that prior to being examined, the

witness was by me duly sworn; that the proceedings were

taken in computerized machine shorthand by me and were

reduced to print; that the foregoing represents to the

best of my ability, a correct transcript of the

proceedings had in the foregoing matter;

     That the witness, if applicable, was notified through

counsel, by mail or by telephone to appear and sign; that

if the transcript is not signed, either the reading and

signing were waived by the witness and all parties, or the

witness failed to appear and the original is therefore

kept on file without signature pursuant to Court Rules.

     I further certify that I am not counsel for any of

the parties hereto, nor in any way interested in the

outcome of the cause named in the caption.

     Dated:_____OCT 1 7 2005_____

     _____

     Donna Kohls, C.S.R., No. 146
     Notary Public, State of Hawaii
     My commission expires: 7-21-2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII
CIVIL NO. 04-00108 JMS KSC
ENGLISH v CITY & COUNTY OF HONOLULU

IN RE: DEPOSITION OF PHILIP E. ENGLISH, VOLUME III

CORRECTION SHEET - RETURN BY NOVEMBER 18, 2005

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 257 | 23 | delete "active" and replace with "action re - " | typo |
| 257 | 25 | delete "active" and replace with "action of" | accuracy |
| 260 | 17 | omit "Mike," | unnecessary |
| 264 | 4 | delete rest of answer after the first comma, substitute with "possibly later in 2003? I did make a recorded statement with attorney Matt Viola who was investigating on behalf of the Ethics Commission" | accuracy |
| 273 | 7 | after "Condominiums" add "represented by Moseley | clarity |
| 273 | 21 | after "valuations" add "for cases under appeal" | clarity |
| 275 | 2 | after "condos" add "appeals" | clarity |
| 280 | 17 | after "was", add "not"; after "area" add "but primarily" | clarity |
| 283 | 20 | change the year to "2000" | typo |
| 306 | 22-25 | delete lines 22-25 and replace statement to read "These things were all done in Feb. 2003 while I was still at the City. Although I was not interviewed myself, my notes indicate that I was aware people were talking about me. But I did not see the reports until after the lawsuit was filed. However, action was taken against me as I was rated substandard on the performance evaluation for "relationship with others" which lead to "special probation"" | clarity |
| 307 | 1 | delete line | accuracy |
| 308 | 7 | At the end of the sentence, add "I was told that other employee will "testify" against me." | clarity |
| 338 | 9 | delete the first "he" and replace with "I" | clarity |

1

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 344 | 11 | add after the end of sentence "Substandard work report does state that I am substandard in "Relationship with Others."" | clarity |
| 358 | 11 | change the work "but" to "put" | typo |

SIGNED BY _Phil Engh_____    DATED: _11/4/05_____

2

1    I, PHILIP E. ENGLISH, do hereby certify that I have

2  read the foregoing typewritten pages 243 through 401,

3  inclusive, and corrections, if any, were noted by me; and

4  that same is now a true and correct transcript of my

5  testimony.

6

7    Dated _____NOV 18 2005_____

8

9

10   

11

12

13

14  Signed before me this _18th_

15  day of _November_, 2005.

16

17  _____

18

19

20

21

22

23

24

25

COPY

243

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,          ) CIVIL NO. CV04-00108 JMS/KSC
                                 )
5              Plaintiff,        )
                                 )
6        vs.                     )
                                 )
7    CITY AND COUNTY OF HONOLULU; ) VOLUME III
     GARY T. KUROKAWA; ROBERT    ) PAGES 243 THROUGH 403
8    MAGAOTA; ANN C. GIMA; and   )
     GK APPRAISALS, INC.; et al., )
9                                )
               Defendants.       )
10   _____)

11

12

13

14

15            DEPOSITION OF PHILIP E. ENGLISH

16   Taken on behalf of Defendants City & County of Honolulu,

17   Gary T. Kurokawa, Robert O. Magota and Ann C. Gima, at the

18   law offices of Watanabe Ing Kawashima & Komeiji, 5th Floor

19   Hawaii Tower, 745 Fort Street, Honolulu, Hawaii 96813,

20   commencing at 9:51 a.m., on Wednesday, October 5, 2005,

21   pursuant to Notice.

22

23

     BEFORE:
24
          Donna Kohls, CSR 146
25        Notary Public, State of Hawaii


           CARNAZZO COURT-REPORTING CO., LTD.
                     532-0222

256

1    at the City about the outside work being done on City

2    time?

3    A    Yes.

4    Q    Tell me about that.

5    A    There was a meeting.  Initially I was called into Bob

6    Magota's office where he advised me that I would be--

7    there would be some kind of formal disciplinary action.

8    And this was in the beginning of February, I think

9    February 5th, I think.

10   Q    2003?

11   A    2003.  And I asked him what it was about and he

12   explained it had to do with an act of what they called

13   insubordination and that he would call Ann Gima into the

14   meeting.  At that time, I said I would like a third party

15   present.

16   Q    And then was there a third party that was present?

17   A    No.  The meeting was concluded and it was determined

18   that there would be another meeting.  And it was at that

19   second meeting, and I believe it was February 10th, that I

20   did have a third party present.

21   Q    Who was that?

22   A    It was Kevin Mulligan, who was a different HGEA

23   agent.

24   Q    Again, that would be a union agent for you?

25   A    Right.  I actually at that time had asked that my

1   legal counsel be present.

2   Q    Who was your legal counsel?

3   A    This would have been Roger Moseley.  At that time, we

4   had gone to the Ethics Commission.  And by that time, we

5   had spoken to Chuck Tatto.  And they actually decided they

6   didn't want him to be present but that I could have an

7   HGEA agent present.  So I wanted an independent third

8   party there, that was my primary concern, not that he was

9   representing me in terms of an HGEA concern but that there

10  was some independent third party.  There was no specific

11  request that he represent me on the union matter at that

12  time other than he would be there as third-party ears.

13  Q    During the course of that meeting-- strike that.  Who

14  else was there besides yourself, Kevin Mulligan, Bob

15  Magota?

16  A    Ann Gima.

17  Q    Anyone else?

18  A    No.

19  Q    Where was this meeting held?

20  A    On the third floor conference room of the Bethel

21  Street Building.

22  Q    And what was discussed at the meeting?

23  A    The discussion had to do with their alleged active

24  insubordination.

25  Q    Was that defined for you, what the active

258

1   insubordination was?

2   A    Yes, they explained to me what they alleged to be the

3   insubordination.

4   Q    What was the insubordination that was alleged?

5   A    It was that they claimed that I left the office

6   without authorization.

7   Q    And when was it that you were alleged to have left

8   the office without authorization?

9   A    It was October 25th, which was a Friday.

10  Q    Of 2002?

11  A    Yes.

12  Q    What else was discussed at that meeting?

13  A    That was the purpose of the meeting, primarily.

14  Kevin Mulligan told them something is not right about

15  this, that it was improper anyway that they bring up a

16  claim of insubordination so far away from the act and that

17  he was concerned that there were some other larger issues

18  at play.

19       I at that meeting brought up the fact that I felt

20  that this was part of the retaliation activity.  That was

21  your question that led to this.

22  Q    Tell me what Bob Magota said at the meeting, other

23  than perhaps what you already testified to.

24  A    Well, Bob Magota said that it wasn't part of the

25  retaliatory activity specifically because they had had a

259

1  meeting on January 15th with Mike Golojuch, who is the

2  administrative services officer, and his assistant, Violet

3  Lee, specifically about this issue.  So he claimed that it

4  couldn't be part of the retaliation because they had

5  already met and they didn't know that I had gone to the

6  Ethics Commission, according to Bob.

7  Q    Do you have any facts to indicate that at that

8  February 10, 2003 meeting that Bob Magota did know that

9  you had gone to the Ethics Commission?

10 A    Well, according to the work place violence report by

11 Christopher Graff, he reported that I told him that I went

12 to the Ethics Commission on January 7 and again on January

13 10th.

14 Q    But my question to you is, do you have any facts that

15 Bob Magota knew that you had gone to the Ethics Commission

16 before the February 10, 2003 meeting?

17 A    Specifically I know that Chris reported it to his

18 supervisor, that is all I know.

19 Q    And his supervisor was who?

20 A    Ann Gima.

21 Q    And as far as the report, the report was before

22 February 10, 2003?

23 A    And before January 15th, correct.

24 Q    What else did Bob Magota say at that meeting?

25 A    He made some representations that I had had a meeting

260

1   with a witness in an ethics investigation and that I

2   attempted to coerce the witness into telling the truth.

3   And I explained to him that I didn't attempt to coerce the

4   witness but that I urged Chris to go to Chuck Tatto and

5   tell him everything that had been going on.  In fact, if

6   you want, we can go to that discussion with Chris maybe

7   later.

8   Q    We'll take care of that.

9   A    Okay.  But I explained to him that I in no way was

10  coercing Chris, but I was urging him to tell the truth.

11  And I told Bob and Ann at that meeting that they should

12  also tell the truth.  That all of us, everyone involved in

13  this should step up and tell the truth.

14  Q    Did Bob Magota say anything else other than what you

15  already testified to?

16  A    Well, there were many things said in the meeting,

17  Mike, so I can't recall all of the things.  But so far he

18  did say that, based on Kevin Mulligan's advice, that they

19  were not going to go forward with a formal disciplinary

20  action, that they were going to make it a verbal warning

21  instead of a formal disciplinary action.  Those are the

22  things that stand out in my mind.  Certainly there were

23  more things that were said.

24  Q    In terms of the other things that are said, since

25  this is my opportunity to ask you these questions, Mr.

300

1    A    I don't recall any at the moment.

2    Q    You had indicated that you spoke with an individual

3    at the FBI, correct?

4    A    Yes.

5    Q    When you spoke with this individual, was it just

6    yourself and the FBI agent or was it just yourself and the

7    FBI agent?

8    A    It was just the two of us.

9    Q    On the phone or in person?

10   A    It was a telephone conversation.

11   Q    Who was this FBI?

12   A    I think his name was Mark Nakano.

13   Q    When did this conversation take place?

14   A    Right around August 14, 2002.  I don't know if it was

15   that day or the next day after that.  Right around that

16   day.

17   Q    And in terms of what you told the FBI agent, what did

18   you tell the FBI agent?

19   A    I told him about the activity, that Chris Graff was

20   doing work for Gary Kurokawa, and that at that time I

21   didn't know I was being retaliated against for it or not.

22   I suspected it, but I wasn't really sure.  That is pretty

23   much what I told him.  I gave him an outline of the things

24   we already discussed.

25   Q    And what did the FBI agent tell you?

368

1   Q    You make claims in the complaint that you were

2   defamed.  Are you aware that was in the complaint?

3   A    Yes.

4   Q    And in terms of any type of defamation against you,

5   what was said and who said it and when?

6   A    I was told by Susan Bender that in a meeting, I guess

7   supervisors or I'm not sure who was in the meeting, that

8   Bob Magota told everybody there that Phil English is

9   whacko.  I was also told that Bob Magota had a luncheon

10  meeting with an outside MAI appraiser, Chris Graff told me

11  about this, and that Bob told this MAI that Phil English

12  is making trouble in our office or that he is a

13  troublemaker, or something to that effect.

14  Q    Anything else?

15  A    Sure.  Certainly any reference to me being similar to

16  Brian Uesugi is extremely defamatory and not to mention

17  damaging to me.  And I think that goes along with the

18  other workplace violence reports or interviews or whatever

19  they are.  They claim things and they attack me-- they

20  make claims that just aren't true about my character and

21  the type of person that I am.  And I think that is true

22  also of Ann Gima, not in any of her performance reviews

23  but subsequent to January and February, she starts to

24  claim that I have outbursts and I yell at people and these

25  sorts of things, which are not true.  I never did that nor

371

1    know?

2    A    I'm not sure.  In fact, even Chris Graff may have put

3    it in his, too.  I don't know if I mentioned his name.

4    But it was an interesting theme that seemed to be shared

5    by a number of them.

6    Q    As far as Tom Riddle, that is with the Labor Board,

7    correct?

8    A    Tom Riddle is the administrator for worker's comp for

9    the City & County, correct.

10   Q    Is it that he was saying that is what you were or is

11   he merely referencing information that was being provided

12   to him, if you know?

13   A    I believe he was referencing information that was

14   provided to him.  But he is transmitting that.  It's kind

15   of like spreading a rumor kind of thing, you know what I'm

16   saying.

17   Q    Would that be the same of the investigator Mike

18   Golojuch?

19   A    Correct.

20   Q    As far as the statement that you are saying that Bob

21   Magota stated that you were whacko, when did that occur?

22   A    That occurred in 2002.  It could have been around May

23   or June, was my recollection.  This was relayed to me by

24   Susan Bender who had attended a meeting in proximity to

25   her telling me that.

1   Q    Do you know who that meeting was with?

2   A    It was with Bob Magota and I believe it was other

3   supervisors as well as Corp Counsel.  So I don't know all

4   of the individuals.  But I know Bob and Susan were there,

5   certainly.

6   Q    And with regard to that particular statement, to your

7   knowledge, was that statement or reference to you being

8   whacko, was that ever relayed to anyone in group 3?

9   A    I don't know.

10  Q    Was that statement ever relayed to Ann Gima?

11  A    I don't know.  Maybe.  I never thought about it

12  before.

13  Q    And was that statement ever relayed to Gary Kurokawa?

14  A    Again, it may have been.

15  Q    But you don't know?

16  A    I don't know.

17  Q    And with regard to that particular statement, do you

18  have knowledge if anyone believed that about you?

19  A    No, I don't.

20       MR. LORUSSO:  Why don't we take a break.

21       (Recess)

22  Q    (By Mr. Lorusso)  Mr. English, with regard to the

23  comment that you are saying that Susan Bender attributed

24  to Bob Magota of you being whacko, did that statement

25  damage you in any way?

373

1    A    Yes.

2    Q    How did it damage you?

3    A    It damaged my reputation.  I mean, he is telling

4    other people in the office that Phil English is whacko.

5    And he is the assessor for the City & County of Honolulu.

6    What else could they possibly think.

7    Q    How did it damage your reputation?

8    A    He is obviously making a disparaging remark about me.

9    And I don't know the context of the conversation other

10   than the fact that Susan Bender made it clear that Bob was

11   telling people that I'm whacko.  So it was obviously a

12   disparaging comment about me and it was apparently amongst

13   a group of, I believe, supervisors or something to that

14   effect.

15        So again, it's like these performance reviews.  There

16   is like a record of these things being said, these

17   comments being made to people in authority in the

18   division.  That's very damaging to me.  And beyond that,

19   truly it's hurtful to me, as well.  I mean, people can say

20   sticks and stones or whatever, something like that, that

21   is a rather childish thing.  This could really impact how

22   people generally in my professional community view me.

23        People need to take care in how they communicate

24   things about other people.

25   Q    First of all, at that meeting, the only ones that you

385

1    So I had two meetings with Bob and Ann.  And had some

2    of these other reviews which were starting to be a little

3    disturbing, then I get this one that I'm rated down for

4    attitude towards my work.  It didn't make sense.  Not only

5    to me it did not make sense, but to others it didn't make

6    sense either.

7    Q    And this meeting that you are referring to, and

8    perhaps we have covered it already but I want to be clear,

9    this meeting that you had with Bob Magota and Ann Gima,

10   was it on August 14, 2002 or some other day?

11   A    I had a meeting with them on that day as well as

12   previous meetings, as well.

13   Q    And you specifically asked in that meeting or stated

14   that is it because I came forward with regard to

15   individuals doing outside work on City time, is that why

16   I'm being evaluated in this manner?

17   A    I did specifically ask that question at that meeting.

18   Q    And what were you told?

19   A    Bob Magota said it's unrelated and that was it.

20   There was no more discussion about that.  It was like,

21   again, we are not going to talk about that issue.  It's

22   not related, don't talk about it any more.

23   Q    Were you told not to talk about it any more in that

24   meeting?

25   A    I wasn't allowed to talk about things in that

1  meeting, that's true.  And I write that in my notes of the

2  meeting, that I was trying to explain things to Bob and he

3  would not let me talk.

4  Q    Just with regard to doing the outside work, were you

5  specifically told don't say another word about outside

6  work?

7  A    I wasn't specifically told that, no.  Those words

8  were not specifically used.

9  Q    The words that were used that you testified to was

10  that your evaluation was unrelated to your coming forward

11  about the outside work, correct?

12  A    Bob said it's unrelated and that was it.

13  Q    After he said it was unrelated, did you say anything

14  else about the outside work?

15  A    It wasn't an environment where I could say anything

16  else.

17  Q    When you say it's not an environment that you could

18  say anything else, what do you mean by that?

19  A    Exactly what I was saying before, that I was trying

20  to explain things.  Should I tell you what it was?

21  Q    Please.

22  A    Bob asked me, for example, "Do you feel paranoid?"

23  And I told Bob, "Yes, may I explain."  Obviously I was

24  going to explain to him people are telling me I'm being

25  watched.  I need to know what is going on.  I'm getting

387

1    these types of reviews and I don't understand.  If there

2    is a problem, people should tell me this is how you do

3    it.  I'm not being told.  I'm trying to explain these

4    things to Bob and he would not let me talk about it.

5        So the way the meeting was conducted wasn't a meeting

6    where I could really ask questions or offer comments or

7    anything.  It wasn't that kind of a meeting.

8    Q    What I'm trying to understand and want to make very

9    clear, when you say you are trying to explain versus these

10   are things like you are thinking to yourself that you want

11   to say as opposed to you actually start to say them and

12   then you are cut off from saying them, what happened at

13   that meeting?  Was it that you wanted to explain but that

14   you never opened your mouth about it or you did open your

15   mouth about it and someone cut you off?

16   A    I attempted to explain.  In fact, I said I would like

17   to explain.  And Bob, his voice got loud and he was

18   talking over me.  It was pretty much I got the message

19   that I'm not going to explain anything.  He is going to do

20   the talking.  Ann is going to do the talking.  So I just

21   got quiet and didn't pursue it at that point.

22       Bob actually was not only just speaking loud, but he

23   was actually staring me down during that meeting, too.  So

24   that was very intimidating.

25   Q    What does that mean in terms of staring you down,

388

1    from your perspective?

2    A    He was looking at me very intensely with kind of not

3    such a nice look on his face as if he was gritting his

4    teeth and he was staring right at me.  If he could stare

5    right through me, he would.  It was while he was speaking

6    and when Ann was speaking.  When Bob wasn't speaking, he

7    continued to look at me that way.  And from my

8    perspective, I'm still trying to find out really what is

9    going on because I truly am trying to comply with

10   everything they say.

11       So for me this is a very bizarre thing that is

12   happening.  I have had these other two strange meetings.

13   I don't understand why this is happening and then this is

14   happening.  So I'm felling pretty intimidated by that at

15   that point.

16   Q    In terms of being intimidated, are you feeling

17   physically intimidated?

18   A    I didn't think he was going to strike me or

19   anything.  But in terms of a person staring you down like

20   that, there is a certain level of intimidation involved.

21   Q    And in terms of that intimidation, you decided at

22   that point not to say anything further in the meeting?

23   A    I don't know that I didn't say anything further.  But

24   as I attempted to try and explain and he raised his voice

25   and was staring at me the way that he was, I basically

389

1  felt intimidated enough that I knew this is not a place

2  for me to try to pursue this any more.  I better just sit

3  back and listen.

4  Q    At any of the times that you attempted to say

5  something, did Bob Magota raise his voice with you when

6  you were trying to say something about you having come

7  forward with regard to the outside work?

8  A    When I first brought it up, he did raise his voice.

9  When he said it's not related, his voice was raised at

10  that point.  In other words, that is it.  We are not going

11  to talk about it.  It's not related.  That is a done

12  deal.  Nothing more to say about it.  So you know in a

13  meeting like that, particularly not just your boss but

14  your boss's boss, at that point you know he is saying that

15  is it, we are not going to talk about that any more.

16  Q    That's how you took the raising of his voice,

17  correct?

18  A    I'm sure that is how he intended it.

19  Q    But that is how you took it, correct?

20  A    Absolutely how I took it.

21  Q    Then you said the next day you met with Gary Kurokawa

22  about your performance evaluation, correct?

23  A    Correct.

24  Q    It was just you and him one on one?

25  A    Yes.

403

1    STATE OF HAWAII                )
                                     )
2        I, DONNA KOHLS, C.S.R., a Notary Public in and for

3    the State of Hawaii, do hereby certify:

4        That on October 5, 2005, at 9:51 a.m., appeared

5    before me PHILIP E. ENGLISH, the witness whose testimony

6    is contained herein, that prior to being examined, the

7    witness was by me duly sworn; that the proceedings were

8    taken in computerized machine shorthand by me and were

9    reduced to print; that the foregoing represents to the

10   best of my ability, a correct transcript of the

11   proceedings had in the foregoing matter;

12       That the witness, if applicable, was notified through

13   counsel, by mail or by telephone to appear and sign; that

14   if the transcript is not signed, either the reading and

15   signing were waived by the witness and all parties, or the

16   witness failed to appear and the original is therefore

17   kept on file without signature pursuant to Court Rules.

18       I further certify that I am not counsel for any of

19   the parties hereto, nor in any way interested in the

20   outcome of the cause named in the caption.

21       Dated:_____OCT 1 7 2005_____

22

23       _____
         Donna Kohls, C.S.R., No. 146
24       Notary Public, State of Hawaii
         My commission expires: 7-21-2010

25