Roger Moseley
Re: Philip English
January 25, 2006
Page 36 of 52

### 01/29/2003, Ms. Gima

Ms. Gima submitted a letter stating that she had reviewed the workplace violence policies and wants to report a situation that needed attention. She wrote that during the course of approximately one year, Phil English had displayed unacceptable behaviors, "raising his voice and other outbursts," and that she had to verbally counsel him about this. She believed that he had irrational beliefs of persecution and retaliation which had escalated into a situation where she had been informed that he had made intimidating and coercive phone calls to a fellow employee. She feared future violence. She also stated Phil's coworkers had expressed fears as to his behavior.

### 02/05/2003, Note, Mr. English

Mr. English noted that he had been called into Bob Magota's office. The door was closed, he was told of an impending disciplinary action, something about an unauthorized leave. The issue had to do with his supervisor, Ann Gima. At that point Mr. Magota asked her to come into the room also. Mr. English requested to have a third party present and said he would like an independent party such as Dwight Ishiguro to attend or his attorney. He subsequently spoke to Dwight who talked to him thirty or forty minutes about this disciplinary action that had something to do with an unauthorized leave in October. They also accused him of insubordination. In his notes, he writes that when he returned from the meeting he believed that someone, "Chris," had tampered with his mobile phone. He wrote at the same time Ann Gima was wandering around the group "humming and whistling" in a mocking fashion. He believed her "gleeful" because he was about to receive disciplinary action.

### 02/10/2003, Notes, author unknown

In attendance: Phil English, Bob Magota, Kevin Mulligan, and Ann Gima. It is unclear who wrote these notes. Mr. Magota is concerned and wants to prevent a hostile work environment. He point out that Mr. English has raised his voice at him and that this type behavior is counterproductive and affects people in the workplace. Mr. English brings up things that he is still unclear about; for example, the extended probation situation and their failure to explain to him why they were going to place him on extended probation. Mr. Mulligan suggested ways to address the level of mistrust; for example, not having Gary Kurokawa be involved with issues with Mr. English. Mr. English points out that there were other issues that were being investigated and so he went to Chris. He wanted Chris to tell the truth because the ethics commission "already knows" and he said, "I'm told people's lifestyles will be changing." There was a reminder to clear leave requests and keep his temper under control. Mr. English stated, "I don't have a temper."

### 02/20/2003, Notes, Mr. English

He documents that he saw a request for leave for Julie on a desk in which she was given different kind of privileges than he had been given. On the same date, he had a handwritten note about noticing that Ryan had been working on blueprints and plans for some proposal or improvement to his house. He wrote that some of the

Roger Moseley
Re: Philip English
January 25, 2006
Page 37 of 52

other workers had been talking to him about it on City and County time. He also noted that Ryan was one of Gary Kurokawa's "special buddies." He alleged that Ann had been especially helpful to Chris, helping him with certain work duties that she refused to help Phil with. He described some situation in which she loudly brought into attention some issue with his work. He called this very abusive and said it had been going on for some time now. Phil noted that he felt very isolated, more than before. The other employees were avoiding him or being careful around him. He thought Susan Bender was a friend and a safe haven for him and she had stated that she should no longer talk to him.

He also noticed that "Dwight the union representative had always been a friend to me (or so I thought)." He now felt that Dwight's loyalty to the office and longtime friendships had affected his objectivity. He thought it strange how people stick together or lay low and stay out of it. He noted that they were nice people, but their sense of right and wrong was definitely skewed. In all there were twenty-seven pages of notes on a small notepad for this date. 02/24/2003, there are two pages of notes, handwritten on a small notepad. Phil is feeling very isolated and depressed. In handwritten notes totaling seventeen pages on 02/27/2003 on a small notepad, Mr. English writes that Kevin, his union rep, has told him that he would most likely be moved out of the division due to his allegations of unethical conduct for fear of future retaliation. Phil believed that he might not have a future in working for the State of Hawaii. He writes that he will be marked because he spoke up. He also wrote that when this "whole thing started" he had to go to Kaiser by ambulance because they thought he was having a heart attack. He attributed his third wife leaving him to his work situation and her fears that he wouldn't be able to take care of her.

**Workplace Violence Reports**

**02/06/2003, Workplace Violence Checklist, Interview of Ann Gima:**

Ms. Gima pointed out that Phil English had words with Chris Graff and Phil had brought some allegations against Chris which was also under ethics investigation. She also said, Phil has been pressuring Chris to "tell him the truth about Gary Kurokawa." This occurred in January of 2003. She had a concern about behavior patterns and outbursts by Phil starting in January of 2002. She said he was upset and threw a box down and his voice was raised when speaking to Ann. She said he was upset and took an accusatory, belligerent tone when he confronted her in July of 2002 about a payroll verification.

She reported that in October of 2002, he had asked for four hours vacation leave and when it was denied, he got upset and raised his voice. It was her opinion that he appears to be a quiet person but he has raised his voice and his attitude can be strained with other employees. She believed he was capable of physical violence. She did not feel in any imminent danger. She further said that his attitude after six months took a downward turn. She said at first he was capable and showed initiative, but now he complained that they haven't taught him anything, he made his own schedule, and his work quality and attitude had gone down. He saw everyone else as wrong, he made mistakes but never admitted responsibility for

Roger Moseley
Re: Philip English
January 25, 2006
Page 38 of 52

errors because he had never been taught or told how to do the task. He also spent a lot of time writing emails and typing which is typically not a requirement of his job.

### 02/06/2003 Workplace Violence Checklist, Interview of Bob Magota:

Bob said there had been friction between Phil English and Ann Gima, his supervisor. He challenged her authority. He reported Mr. English capable but sometimes missed deadlines and then stated that he was never told and had not received training. Bob attached a list of training Phil has had. He said others had this training and did not have any problems. He said Phil is defensive, he blames everyone else, and he is not responsible.

He also stated that there was at least one more incident between Ann and Phil but he did not witness it. He said Phil misinterprets what he is told. Bob had told him that the Appraiser IV is not the supervisor. He said that others might see Phil as a quiet person, but he is sometimes an irrational thinker and misses deadlines. He said his language with Ann can be considered abusive at times. He can be charming and then fly off the hammer. He said he did not feel threatened by Phil but he did have concern about being misquoted by Phil.

### 02/10/2003, Workplace Violence Checklist, Interview of Julie Tamayori:

Julie stated that "Phil English is a nice guy: sweet, nice, nonviolent and mild-mannered in appearance; however, he's recently done some backstabbing with a coworker, Chris Graff. Phil is acting like nothing has happened. Phil has made some type of charges against Chris about doing personal work on the job. She had never witnessed Phil being physically aggressive but there where times when he did get argumentative with his supervisor, Ann. Coworkers were scared, ran away last year, 2002, when there was an incident between Phil and his Ann."

She stated further that Phil had explained to her that his ex-wife had accused him of being abusive, but Phil denied it. She stated she saw a parallel between how he described his ex-wife and all the attorneys and judge being on her side to here in the office, how he is claiming everyone is siding with the administration. In her opinion, this "everyone's against me" theme is a bit paranoid. She explained that Phil will lie about things, minor things: for example, that he had to take the day off because of a parent-teacher conference. She found out that there was no school that day and no parent-teacher conferences. She said, "Phil will lie to justify his position. He'll say he's not been told something, in particular about the job, when the information has been provided to everyone via email. He will do things the wrong way even though instructions and emails are provided." She stated that she did not feel threatened by him, but when asked about physical harm she wasn't sure.

### 02/10/2003, Workplace Violence Checklist, Interview of Linda Knowles:

Linda said that Phillip English is stressed. There is tension between Phil and Ann Gima, the supervisor. His email replies to Ann Gima are often obnoxious in tone. He will state that he is not been trained or no one has told him something when email messages have been sent out. She said, "Phil has even gone after one person, Chris, who is the nicest to Phil." She said that Phil had threatened Chris: he better turn Gary in or Chris will lose his job. She felt scared that if he would do that to

Roger Moseley
Re: Philip English
January 25, 2006
Page 39 of 52

Chris that he would do it to someone else if it fit his agenda. She said Phil is charged that he has been ostracized by the group, when in fact he has always been invited to participate when we have food or share things. When asked if she felt threatened she said "no," but that "Phil could stab anyone in the back."

### 02/10/2003, Workplace Violence Checklist, Interview of Carol Kamisato:

Carol was aware of two encounters between Phil and Ann. It got loud when he had been told to go downstairs and work the counter and he had refused. Ann confronted him. She said voices got loud on both sides and Phil had gotten upset. She said that she heard a loud noise and Phil had thrown or dropped a box.

She witnessed another incident, also in 2002. It started at Phil's desk. Ann left and went to her desk. Phil followed and got loud, so loud that it scared Carol and she walked away from the area. She said it went on for approximately ten minutes. She stayed away for twenty minutes. She stated on another occasion, she had gone with Phil to a real property class near Kapiolani Park. She offered him a ride home. She said that when they got to his residence he would not get out of the car which was running. He talked to her for twenty minutes about his ex-wife and mother-in-law and he was justifying the divorce. He mentioned that his ex-wife was telling stories and that the court decision was wrong, that he did not physically abuse his ex-wife. Finally she told him she needed to get home and said that since then she has kept her distance. When asked if she felt threatened she said, "no," but she was scared because of what was going on in Phil's life. She enumerated his stressors such as his divorce, his son adjusting to the divorce, his second wife from Thailand moving out, him investing in a boat with no bathroom or electricity or running water. She said that Phil was being pushed to the limits financially and emotionally. She said he had a lot going on and he might explode. Something might trigger him such as what happened in the "Bryan Xerox case."

### 02/10/2003, Workplace Violence Checklist, Interview of Susanne Foumai:

Su explained that she had some difficulties with Phil over him not being clear about training start times or on another occasion when she tried to explain to him how to do a particular thing on the computer and he kept asking why and how and said that he couldn't do it. He said that she must do it or lose the files. She said he wants an explanation on why it is done. She said that she did feel safe at work. She said that anger management to control his temper, might help.

### 02/12/2003, Workplace Violence Checklist, Interview of Eugenie E. Shito-Leong:

On one occasion, Genie heard Phil talking to Ann in a loud voice. She said she didn't feel comfortable about what was going on. This was in the fall of 2001. She said it was during the appeals timeframe. She said Phil was under pressure just getting a lot of calls from taxpayers about a letter they received regarding their property classification. She said maybe he was on a short temper because of that situation. She heard loud talking. She was worried about him getting violent so she left.

### 02/12/2003, Workplace Violence Checklist, Interview of Dwight A. Ishiguro:

Roger Moseley
Re: Philip English
January 25, 2006
Page 40 of 52

Dwight said that Phil is a low key individual and a soft-spoken guy. He is religious, a Christian and Dwight was Buddhist and they would have discussions. Dwight never heard him get upset. Dwight said he had some discussions with Phil because he used to be a union representative. There were no incidences of problems with Phil that Dwight was aware. He said he never saw any outward displays. He said Phil seemed cordial. When asked if physical harm seemed possible, Dwight said he didn't know because anyone could be pushed beyond his or her limits. He recommended that prevention by hearing both sides of the story might help. He said that people need to stay on track; communication between managers and employees need improvement.

**02/12/2003, Workplace Violence Checklist, Interview with Christopher Graff:**

Chris explained a situation when Phil had asked to use the fax machine for personal IRS work. When it was not approved he said Phil slammed things down and was upset. He left the office and slammed the door. He witnessed another incident when Phil was assigned the counter and he didn't report. He was called to go, but didn't want to because he was doing something else. He said that Phil was forced to go to counter duty and slammed boxes on a desk. He also said Phil had mentioned to him that he and Ann had a shouting match. He also believed Phil had become more morose over the years, that he gives comments and suggests that people are out to get him. He seems paranoid. He reported that Phil was acting as a victim and had some job problems he needed to correct. He believed the ladies in the office felt threatened.

**02/13/2003, Workplace Violence Checklist, Interview of Annette Kabasawa:**

Annette was not sure of any conflict. She had heard some others talking, but had never seen anything herself. She didn't know anything about any allegations. She did not feel threatened.

**02/13/2003, Workplace Violence Checklist, Interview of Ryan Fujitani:**

Ryan had had heard from other workers about confrontations with Phil English. He had no direct confrontations with Phil. He said, "but other employees do seem to be on edge." He was worried about Phil being stable. He believed he needed to be cautious around Phil because of his attitude and behavior. He was aware that Phil had a divorce and that his ex-wife took everything. He said that Phil felt like he was the one victimized. He was aware Phil had physical problems; a kidney removed and financial problems. He also mentioned that in conversation Phil sometimes said that he borrowed money from his son. When asked if he felt threatened he said, "not really," but he did start to think about the Byron Uyesugi case and how Phil's behavior seemed weird, a little psycho, especially since hiring Roger Moseley, the same guy he was defending assessments against.

**03/12/2003, Confidential Report from Mike Golojuch to Gary Kurokawa, Administrative Services Officer, Regarding Interim Investigative Report Allegations of Workplace Violence against Phil English:**

Roger Moseley
Re: Philip English
January 25, 2006
Page 41 of 52


His findings included:
1. There was a general concern about Phil English and his behavior over a period of time.
2. Although there was a safety concern among some of the employees, none of them stated anything about getting rid of Phil. The main concern was that he receive some sort of employee assistance counseling.
3. Only one person admitted to feeling threatened by Phil's presence at the worksite.
4. The incidences of loud voices and items being thrown down occurred over six months ago.
5. The most recent confrontation occurred between Phil and Chris Graff on two occasions in January of 2003. These had to do with Phil telling Chris he needed to tell the Ethics Commission the truth.
6. Chris spoke to Chuck Totto, on the ethics commission. Although it was only Chris' side of the story, Chris stated that what he had done was minor. He alleged that Chuck told him that he should not do it again.
7. Only a partial number of real property assessment division personnel have attended workplace violence training.
8. Phil's workplace performance has not always been at satisfactory level.
9. Phil has exhibited inappropriate behavior resulting in disciplinary action that was pending an investigation.
10. During this investigation, Mr. Phil English filed a worker's compensation claim.

Mr. Golojuch's conclusions were that there was some concern that Phil's behavior had upset employees. It was proper for the employees to bring their problems forward; however, there did not appear to be sufficient evidence to conclude that Phil had actually verbally threatened or taken physical action against other employees in the context of workplace violence.

He stated that there was some sort of friction between Mr. English and Ann Gima. He believed Mr. English's actions must be documented carefully. Since he has raised ethics issues, he considers himself protected under the whistle blower provisions. This is true for any retaliation; however, Mr. Golojuch found nothing during the investigation revealing that Phil was under retaliation. He recommended that Phil's behavior be monitored, that Phil be encouraged to go to EAP or other counseling. The division needs to take appropriate steps to correct or improve Phil's work. The division may consider moving Phil to another team. The division must ensure that no retaliation is taken against Phil for filing an ethics complaint. The department will work for the division to receive workplace violence training. After Phil English can be interviewed (he was not available to be interviewed in this investigation,) a full report will be made. The court investigator will continue to coordinate the case with DHR and corporate counsel.

**Medical Records Review, Mark Killen Stitham, M.D., Ltd., dated 08/20/2003:**

At the request of Thomas Riddle, Workers' Compensation Administrator, Dr. Stitham performed a record review. He did not examine Mr. English. Mr. Riddle asked Dr. Stitham to address Mr. English's personality problems and his response to the many stressors he had experienced in recent years. Mr. Riddle wanted Dr. Stitham to comment on how these problems affect his daily life and his employment. Dr. Stitham's 08/20/2003 bill, indicates that he spent 3.50 hours on the record review

Roger Moseley
Re: Philip English
January 25, 2006
Page 42 of 52

and his report. His report was 9 pages in length. Dr. Stitham's opinions are summarized.

He found Mr. English's situation to be an "exceedingly complex case." Dr. Stitham found that Mr. English exhibited denial and projection defenses, "The former is seen by his denial of raised voices or any personal problems [which are extensive]. The latter can be seen in his blaming his problems on everyone else rather than accepting responsibility for his performance failures." Dr. Stitham was surprised that Dr. Kennedy did not find Mr. English to have an Axis II diagnosis. His record review revealed grandiosity, rigidity, and paranoia. He surmised that Mr. English might have Bipolar Affective Disorder currently in the depressed phase.

Dr. Stitham did not find Mr. English credible regarding statements that all of his problems were work related. He enumerated personal problems, non-work related, that were revealed in the records. He wrote, "...in reasonable medical probability, this early middle-aged man had a rather severe mood disturbance which subsequently affected his work performance. Due to his personality structure, he reacted with defenses of projection and denial."

Dr. Stitham further opined that the Claimant was too ill to work and required treatment and medication. He recommended that the treating physician investigate for possible Bi-polar Affective Disorder. It is most likely a "typing error," however, it should be noted that Dr. Stitham did not examine Mr. English, but in the last paragraph of his report he writes, "This report is based upon the record review and the examination of the claimant and is totally independent of the requesting agent."

**Report of Industrial Injury or Illness, Supervisor's Response, OSHA, Form 300 Log No. 030135, Regarding Employee Phillip E. English:**

The supervisor indicated that the knowledge of the facts about Mr. English's injury did not agree with the statements of Mr. English. He also stated that the injury was due to one of the following; misconduct, negligence, intoxication, or intent to injure self or another. The supervisor wrote the facts as he saw them:

1. Mr. English claimed the injury occurred on 01/02/2003 which was questionable because Mr. English was on vacation from 12/21/2002 to 01/03/2003.

2. The supervisor stated that Mr. English alleged injury based on "stress associated with retaliation from internal investigation of wrongdoing in the department was unfounded." The supervisor indicated that Mr. English had been warned numerous times regarding his work performance, insubordination, behavior, and attitude, and stated that these were not related to his claim. If Mr. English was suffering injury due to stress, the supervisor believed that he brought it upon himself and it was not due to retaliation on the employer's part.

3. He further pointed out that Mr. English had retained an attorney for his Ethics Commission complaint and that that attorney, Mr. Roger Moseley, had tax appeal cases pending against the city before the board of review, the tax appeal court, the circuit court and the supreme court. Mr. English was the city's main witness and was responsible for running the assessments that are the subject to these appeals. The supervisor alleged that Mr. Moseley was providing free legal services to Mr. English

Roger Moseley
Re:  Philip English
January 25, 2006
Page 43 of 52

for his Ethics Commission complaint and that it was evident that Mr. English had been providing information to Mr. Moseley in support of his recent circuit court and tax appeal court filings.  The supervisor said this was an obvious conflict of interest that had not been resolved at this time.

4. The supervisor responded to the first complaint of an internal investigation.  He said that in late 2001 Mr. English raised allegations that another employee, a close, personal friend, Mr. Chris Graff, was involved in outside employment during city working hours and was doing this on instruction of Mr. Gary Kurokawa.  The supervisor pointed out that allegations could not be proven and that Mr. Graff denied the allegations.  Mr. English wasn't satisfied with the actions taken by Mr. Magota.

5. The supervisor responded to the second complaint having to do with Mr. English's claim that administration was retaliating because he submitted an Ethics Commission complaint.  The supervisor claimed to be unaware of the ethics complaint investigation initiated by Mr. English until 01/22/2003 when Mr. Graff brought it to the attention of Ms. Gima and Mr. Magota.  Mr. Graff said that Mr. English had verbally threatened and intimidated him twice regarding his role as a potential witness.

6. Mr. English had received a verbal reprimand for work related issues on 02/10/2003 which included failure to follow his supervisor's instructions, insubordination, and inappropriate conduct towards his supervisor which occurred on 10/25/2002.  According to the supervisor, these issues had been discussed at an earlier meeting on 01/15/2003.  At that time, they were unaware that Mr. English had filed with the ethics commission investigation.  Therefore, it was their contention that they could not be retaliating over this issue as they were unaware of the complaint.

7. At the 02/10/2003 meeting, the supervisor stated that Mr. English admitted that he had spoken to Mr. Graff before he had been interviewed by Mr. Totto.  Mr. English also admitted that he had said if other employees don't start coming forward to tell the truth, their lifestyles are going to change.  The supervisor indicated that this could be construed as a threat.  The supervisor believed that Mr. English might be using his claim of stress to delay other ongoing internal investigations by the employer.

8. It also appeared to the supervisor that he might be trying to avoid completing current work assignments and had already missed two deadlines, one on 02/11/2003 and 02/18/2003 that he had been aware of since 12/12/2002.

9. The supervisor further opined that Mr. English filed his workers' compensation claim immediately after receiving notice that he was under investigation for threatening and abusive behavior towards coworkers.  He said Mr. English also delayed the meeting that was supposed to address these threats scheduled for 03/03/2003.

10.  The supervisor further pointed out that on 02/28/2003, Mr. English was supposed to be at a mandatory training class and instead appeared at the office asking a secretary for a workers' compensation application.  When he was told that

the application had to be submitted to management for review, the secretary stated he became very upset and gave her a glaring look that frightened her.

11. The supervisor stated that Mr. English had deceived another employee to find out who had submitted workplace violence allegations against him. The second internal investigation was ongoing and included acts of insubordination and work performance issues. These incidents occurred on February 11, 18, 19, and 25, 2003.

12. The supervisor said that this investigation had also been delayed due to Mr. English's recent absence from work.

13. The supervisor further spoke to issues of behavior, personal problems and work performance. Mr. English's claim of retaliation might also stem from delays in his promotion to Real Property Appraiser IV position. He alleged that Mr. English was hired at the same time as another employee and that both of them had to wait to receive this promotion from 11/01/2001 to February of 2002. Therefore, this was proof that there was no "singled out" retaliation.

14. The supervisor also said that after his promotion to Real Property Appraiser IV, Mr. English's work performance became more problematic. He missed deadlines, he failed to follow supervisor's instructions that were clearly outlined, and he became more argumentative and insubordinate and made excuses for his inability to complete assignments. Some of these excuses were statements such as "you never told me." Ms. Gima had to give him instructions in writing through email. He complained that he had not received proper training and used this as an excuse. The supervisor pointed out that Ms. Gima and technical staff were available to assist him. The division had provided classroom training to Mr. English and an exhibit was attached delineating all training.

15. Also, it was pointed out that Mr. English had recently applied for Real Property Appraiser VI position in March of 2001. In his application, he emphasized his competency and capabilities in the assessment field contradicting his claim of lack of training.

16. The supervisor documented that Mr. English had problems planning ahead and scheduling his work, setting priorities, multitasking, and completing assignments.

17. Mr. English complained to management that certain clerical tasks such as using the copy machine were "below him" and that he shouldn't be required to do such menial tasks. When it was explained to him that the division was understaffed, he became even more upset. The supervisor opined that Mr. English expected to be treated differently and was always criticizing other employees and management.

18. The supervisor also said that last year at a meeting with Ms. Gima, Mr. Magota advised Mr. English to seek counseling from the City's Employee Assistance Program. Mr. Magota was very considerate of Mr. English's personal problems and how they were affecting his job performance. On this occasion, according to the supervisor, Mr. English raised his voice at Mr. Magota and stated there was nothing wrong with him and he didn't need counseling. He also said that everyone was out to get him. He told Mr. Magota that he felt paranoid.

Roger Moseley
Re: Philip English
January 25, 2006
Page 45 of 52

19. According to the supervisor, Mr. English initiated many discussions with other employees about his personal life, anyone who would listen, or was in any way sympathetic to his problems. He was constantly portraying himself as the victim and would blame others for his problems. A list of these "victim" situations is included: a.) His second wife filed for divorce in 1999; he blamed her for the breakup of their marriage. He said that his wife knew the judge and his attorney did a poor job of representing him and he got an unfavorable outcome. B.) Mr. English was required to attend the Kids First Program on 03/24/1999. It was mandatory to attend with his wife and son before the divorce decree could be entered. In a letter dated 03/24/1999, Mr. English stated he was unable to attend because he was out of the country. He had told other employees that during and after his divorce, he had great difficulty and so he was traveling to Thailand to do some "soul searching." C.) He was trying to gain custody of his son and complained that his second wife was doing a poor job of raising him. He was concerned for the child's welfare. He had strong suspicions that his son was being molested by someone at the Catholic school he was attending. D.) He was having marital problems with his third wife. They had married in June of 2000 and he said that she needs to "grow up." His third wife who was a former employee of his export business in Thailand left him in late 2002.

20. He openly discussed his financial problems with other employees and management. One sympathetic employee offered to give him money and another offered him a loan. The supervisor pointed out that Mr. English was originally hired at a salary rate of $29,340 as a Real Property Appraiser II.

21. He had openly criticized Mr. Kurokawa and management for the way the office was being run.

22. His financial problems were extensive. There is detailed information about his second divorce decree and how much money the family owed. His wife's income and expense statement on the divorce decree said that her monthly income was $11,230, but she had to cash her IRA account, pay bills on credit card accounts, borrow money form her mother, and cash out an insurance policy to make ends meet. In the settlement, Mr. English said that he would have to receive spousal support or he would have to use his credit cards to pay for his living expenses which included child support of $370 per month.

He told other employees that he had never paid his child support payments to his second wife. In the decree, he received $25,000 in the division of property and also $77,000 from his wife's retirement plan which he withdrew in 1999 for a total settlement of $102,000. The wife was awarded the Kahala house and sole responsibility for the mortgage payments. The following year August 2000, he filed Chapter 7 Bankruptcy. He owed $2,100 to the IRS for his retirement withdrawal. He owed money for his attorney and legal services provided in his second divorce.

In his bankruptcy filing, according to the supervisor, Mr. English stated that his occupation was Real Estate Appraiser from 1989 to 1996; however, from 1996 to 1997, his new business was exporting personal care products to Thailand and the Philippines. He lost this business due to inflated money exchange rate. He then returned to real estate appraisal in 1998; however, he had not listed this export business on his application with the city. The supervisor wrote that Mr. English had been less than honest on his job application, stating that he made an annual salary

Roger Moseley
Re: Philip English
January 25, 2006
Page 46 of 52

of between $40,000 to $45,000 as owner and appraiser of his company for ten years. Mr. English had not worked for quite sometime, had not been making any money for quite sometime, and had been living on his retirement and divorce settlement.

He complained frequently that his third wife was sending money home to her family in Thailand and he was upset over this. He was often behind on his rent for his Hawaii Kai condominium that he had resided in since 1999. In August of 2002 he decided to buy a boat to live on. He told others he was having problems qualifying for a loan to purchase the boat. He had to borrow money from relatives to do so. Soon after moving out of his condo and onto his boat, his third wife left him.

23. In the preceding year he had become more open and frustrated about his salary and told other employees that he would earn just as much money working for City Mill. He posted a help wanted article dated September 2002 on the employee bulletin board showing mainland job opportunities to express his dissatisfaction at the salaries the city paid its employees.

24. Last year, he asked Mr. Magota to use the office fax machine to send documents to the IRS when he was told that the fax machine was only for work related purposes. Mr. English became very upset, gave Mr. Magota a glaring look, and left the building slamming the door behind him.

25. He had argumentative and intimidating behavior towards others including his supervisors. He had been warned numerous times of this behavior. At a meeting on 08/14/2002, he was given an extended probationary period after a six month normal probation for Real Property Appraiser IV position.
When warned about raising his voice in hostility towards Ms. Gima he denied that he had ever raised his voice at her. This contradicts witness's statements. Mr. English said that on 10/25/2002 Ms. Gima was the aggressor and charged at him; however, he had told another employee that he had gotten into an argument with her, admitted to yelling at her, and boasted at getting the best of her in this confrontation. When told by Mr. Magota to control his temper, he denied having a temper. On numerous occasions, he has demonstrated his temper in front of other employees and management.

**Psychological Report, Robert J. Sbordone, Ph.D., Inc., dated 10/26/2005:**

Dr. Sbordone reported that his evaluation took 8.5 hours. He administered four psychological tests and wrote a 47 page report. His testing results and opinions are summarized.

According to Dr. Sbordone, the Beck Anxiety Inventory assessed Mr. English's subjective symptoms of anxiety. His score was 34 in the severely anxious range, however, Dr. Sbordone did not find him visibly anxious upon examination. His Beck Depression Inventory-II score placed him in the severely depressed range, but Dr. Sbordone found that he was euthymic except when discussing the actions of his former supervisors and coworkers.

Dr. Sbordone administered the Personality Assessment Inventory assessing long standing personality characteristics. According to Dr. Sbordone, Mr. English may not

Roger Moseley
Re: Philip English
January 25, 2006
Page 47 of 52

have answered the questions in an entirely forthright manner, however, there was no evidence to suggest that he was defensive or motivated to portray himself as being free of common shortcomings or faults. He may have portrayed himself in an unduly negative manner and had unusual combinations of clinical features.

His clinical scales suggested depression, hostility, and pessimism because of negative life experiences that he believed were caused by others. He exhibited heightened sensitivity in social interactions, suspiciousness and hostility and was socially isolative. He appeared to harbor anger and resentment as much at himself as at others. He appeared to have experienced a traumatic event. His self-concept was harsh and negative. He had indecision and uncertainty about his plans for the future. He also exhibited recurrent suicidal ideation.

Mr. English was also administered the Minnesota Multiphasic Personality Inventory-2. The scoring indicated he may have distorted the test responses to create a certain impression or that he may be generally unsophisticated. His profile indicated much psychological distress with intense self-doubt and low morale. He exhibited major problems with anxiety and depression and tends toward being high strung and insecure. Individuals with this pattern tend to have high standards, but feel that they fall short and blame themselves harshly. He demonstrated insecurity and pessimism about his future and felt inferior, had little self-confidence, and did not feel capable of solving his own problems. He exhibited introversion and low self-esteem. He worried a great deal about his problems, but had little energy to solve them. Antidepressant medication was suggested and cognitive-behavioral psychotherapy.

Dr. Sbordone found a "striking discrepancy" between Mr. English's claims of harassment and the statements of his former supervisors and coworkers. He opined that if Mr. English's assessment of these events was accurate then his resultant problems socially, financially, and psychologically were most likely the result of the exacerbation of his preexisting psychological problems by the work harassment. However, he also reports that if his perception of the events that occurred at work reflect "a pattern of self-defeating behavior, projection, and inflexible thinking then the actions of the City and County of Honolulu must be seen as appropriate and not retaliatory."

Dr. Sbordone also points out the importance of Mr. English's significant non-industrial stressors such as severe financial problems, bankruptcy, a failed business, renal cancer, his mother's health problems, a custody dispute, suspicions that his son was being molested at school, and two divorces. He opines that Mr. English's problems thus could not all be caused by the workplace.

Dr. Sbordone reported that the MMPI-2 results over the past several years have remained consistent. He points to the lack of psychological improvement and stability of his elevated profile across 8 of the 10 clinical areas even after he has not worked for the City and County for two years. Dr. Sbordone sees this as evidence that his problems have been longstanding and non-remitting and thus part of his personality structure verses caused by his work problem.

Dr. Sbordone opines that Mr. English's recurrent depression may have been exacerbated by the work stress, but points out that he has been quite reluctant to

Roger Moseley
Re: Philip English
January 25, 2006
Page 48 of 52

move on even though encouraged to do so by his psychotherapists. Dr. Sbordone finds that Mr. English is naïve to the effect that allegations of illegal activities would have on coworkers and supervisors. Mr. English continued to maintain that his "whistle blowing" was justified. Dr. Sbordone sees this as reflecting "a long-standing pattern of moral rigidity and self-defeating behavior: which he apparently fails to acknowledge since he appears to project the blame for his failures on the actions of others." Dr. Sbordone points to Mr. English's history of blaming others for his life problems.

Further, Dr. Sbordone does not find that Mr. English's capacity to work has been compromised since he had a job as a security guard at the time of his examination. He was puzzled by the fact that Mr. English had not sought work again as an appraiser since his current job did not provide him with medical benefits. He stated, "At the risk of sounding cynical, I suspect that he will work in this capacity again after his law suit is settled."

Dr. Sbordone diagnosed:
Axis I:    1. Major depression, recurrent, severe without psychotic features.
           2. Anxiety disorder.
           3. Psychological factors affecting medical condition.
Axis II:   Rule out personality disorder with borderline, self-defeating, and dependent features.
Axis III:  History of kidney cancer with nephrectomy.
Axis IV:   Financial difficulties, inadequate social support, dissatisfactions with his Current job, the health of his mother, and fears of becoming homeless.
Axis V:    GAF: 65 (current)

**Report of Dirk Von Guenthner & Associates, dated 11/04/2005:**

Mr. Guenthner's attached Curriculum Vitae indicated that he is employed in forensic research and litigation support services in the area of accounting. He holds a Bachelor of Science degree in business administration with a major in accounting. His report was 42 pages in length.

His conclusions are summarized:

1. He concluded that the Plaintiff misrepresented himself in his employment application to the City. He opined that Mr. English was not actually successful at operating and managing a large appraisal firm as he seemed to indicate on his application. According to Mr. Von Guenthner, the Plaintiff's business was operating with either no revenue or not enough in its last years of operation. Therefore, he did not find that Mr. English could have been paying himself the salary that he indicated on his application.
2. He found that Mr. English omitted two part-time jobs in his application. He did not reveal that he had worked as a clerk at City Mill and a carpet cleaner for another company. Mr. Guenthner believed that if Mr. English had included these two jobs, the City interviewer would most likely have discovered that Mr. English had mental health issues. He believed the interviewer would have been able to discover that Mr. English did not have the "mental fortitude" to do the job.

Roger Moseley
Re: Philip English
January 25, 2006
Page 49 of 52

3. Mr. Guenther summarized that in the three years prior to employment with the City, Mr. English: attempted suicide, experienced kidney cancer, experienced divorce, had problems with the IRS, was about to file bankruptcy, and was severely emotionally upset over personal problems.
4. He reports that during a 17 month period, Mr. English incurred new debt of up to $150,235 and then filed bankruptcy in 2000 with $193,035 in unsecured debt, $21,000 of secured debt to the IRS totaling to $215,035 of liabilities and $3,370 of assets. He found that Mr. English lived a lifestyle way above his means with no ability to pay back his debt.
5. He found that in 1999, Mr. English's income and expense statement filed in Family Court under penalty of perjury was false. He reported that Mr. English was not earning this amount and has never since earned it.
6. Mr. Guenther noted that Mr. English's Appraiser IV application documented the salary he earned in his private practice to be greater than when he first applied.
7. He reported that Mr. English took on part time work after leaving his job with the City. He worked for cash and did not report this on his tax returns.
8. He opined that Mr. English was not competent to perform as an Appraiser IV based on other factors which impacted his life.
9. He found the "Whistle Blower" issue to be "hoopla" and claimed there was no evidence made available to him that justified his Whistle Blowing claims.
10. He pointed out that it had not been determined that Mr. English was innocent or guilty of the charges of violence in the work place due to the fact that Mr. English was never interviewed.
11. Mr. Guenther pointed out that Mr. English received a Workers' Compensation settlement of $85,000 and in that settlement Mr. English admitted that he had not sustained any permanent disability.
12. Mr. Guenther reported that special damages for lost wages prepared by Thomas Ueno, CPA, were made without Mr. Ueno reviewing all the facts of the case.
13. He further pointed out that Robert Sbordone, Ph.D. had opined that Mr. English would most likely work as a professional appraiser again at some point.
14. He noted that Mr. English's attorney participated in a news release criticizing the Real Property Assessment Division. He reported that the attorney's activity included contacting the FBI and the United States Attorney office in an attempt to strengthen Mr. English's claims.
15. Mr. Guenther believed that Mr. English should consider himself to have experienced "good fortune" to have already received an $85,000 workers' compensation claim. Mr. Guenther did not find that Mr. English was entitled to any further remuneration.

### **Diagnosis**

|  |  |
|---|---|
| Axis I: | Major Depressive Disorder, Recurrent, Moderate, Without Psychotic Features, With History of Interepisode Recovery History of Panic Disorder Not Otherwise Specified |
| Axis II: | Personality Disorder Features (Paranoid, Obsessive Compulsive, Narcissistic) |

Roger Moseley
Re: Philip English
January 25, 2006
Page 50 of 52

        Axis III:        History of kidney cancer and nephrectomy, 1998

        Axis IV:        Occupational problems
                          Financial problems
                          Housing problems
                          Problems with access to medical care
                          Psychiatric problems of fifteen year old son
                          History of marital problems

        Axis V:         Current: 55   Highest in Past Year: 55

**Conclusions**

Mr. English had been married for approximately twelve years when in 1998 his wife told him that she did not love him anymore and filed for divorce. By his report, she was a successful attorney and very capable of getting the divorce settlement that was most beneficial to her situation. Also, in 1998, Mr. English was diagnosed with kidney cancer and underwent nephrectomy. His situational life difficulties, both physical and emotional, precipitated a severe depression. He had two suicide attempts and was diagnosed with a Major Depressive Disorder.

He received psychiatric/psychological treatment, including medication, and stated that he eventually got better. He had only recently recovered from this serious psychiatric disorder when he began working for the City and County of Honolulu as an Appraiser in June 2000. Mr. Guenthner in his 11/04/2005 report indicated that the interviewer would have ruled Mr. English out for the appraiser job if he had known that Mr. English did not have the "mental fortitude" to perform the work. I found no evidence in the records reviewed that Mr. English had a problem performing his job until 2002 when he claimed that he witnessed unethical practices in his work place. The <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision</u>, states, "Major Depressive Episodes may end completely (in about two-thirds of cases), or only partially or not at all (in about one-third of cases)." Mr. English has Major Depressive Disorder with Interepisode Recovery. He was recovered at the time of his interview in 2000. Neither Mr. Guenthner, nor the County interviewer would have enough psychiatric training to predict or assess mental illness in Mr. English.

Mr. English had misgivings that the job he was hired for was beneath his skill level. Even so, initially, he felt good about his new career, his administrators, and co-workers. His early employee evaluations confirm his success at work. However, he believed that after he "blew the whistle" on his administrator's inappropriate behaviors, he was subject to retaliation. He believes his employee evaluations and subsequent return to probationary status are a result of this retaliation.

If it can be presumed that Mr. English did witness and confront inappropriate/illegal behaviors on the part of his supervisor, then his psychiatric symptoms are resultant from this work situation. His tenuous psychiatric state, including some entrenched personality disorder features, was not able to withstand the stress and pressure of

Roger Moseley
Re: Philip English
January 25, 2006
Page 51 of 52

dealing with this possibly volatile situation. Currently, he is not recovered. He is able to go out more and has ceased his most total isolative behaviors, but he is negative and pessimistic about his future.

While it is beyond the scope of my expertise to determine unlawful or inappropriate behaviors by Mr. English's superiors, it is important to note that I found no indication in Mr. English's personality features of a tendency to malinger, distort, or deceive.

Even the defense expert, Robert Sbordone, Ph.D., in his 10/26/2005 report opined that if Mr. English's assessment of these events was accurate then his resultant problems socially, financially, and psychologically were most likely the result of the exacerbation of his preexisting psychological problems by the work harassment. He further notes that if Mr. English's perception of the events reflects "a pattern of self-defeating behavior, projection, and inflexible thinking then the actions of the City and County of Honolulu must be seen as appropriate and not retaliatory." While Dr. Sbordone and I are qualified to diagnose personality disorders, neither of us are able to determine unlawful or inappropriate behaviors by Mr. English's superiors.

Also important are Mr. English's current employment difficulties. He continues to exhibit diminished confidence that he can express himself at work without fear of retribution. His personality disorder features undermine the ability necessary to lift himself out of his occupational decline. He lacks the interpersonal skill set to recover from his work injury and develop a new career at his previous level of employment. In short, his mental health disorders prevent his ability to "bounce back," and continue on in some productive employment venue. His long-term prognosis is not good.

He is in need currently of continued psychiatric treatment, and has responded well to such treatment in the past. However, he has no further medical insurance, and cannot afford to pay for treatment. Mr. English is in need of long-term psychiatric intervention, most probably he will need two to five years, including psychotherapy and medication. Dr. Stitham in his 08/20/2003 report, did not have the benefit of an actual examination of Mr. English. Although I disagree with his specific diagnosis, we both agree that Mr. English has a mood disorder and requires treatment.

fIt is also evident that his ability to perform in a similar work capacity has been compromised. His anxiety is such that he has difficulty trusting himself or others in a professional work setting, where he must constantly interact with others. This may improve should he receive proper treatment, but it is impossible to predict at this time if and when he might return to professional work. His mental illness has curtailed his earning ability significantly.

Please let me know if further clarification is needed at this point.

Sincerely,


Daryl B. Matthews, M.D., Ph.D.

Roger Moseley
Re:  Philip English
January 25, 2006
Page 52 of 52