Page 1

IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,                    ) CIVIL NO. 04-00108
                                      )
              Plaintiff,              )
                                      )
vs.                                   )
                                      )
CITY AND COUNTY OF                    )
HONOLULU; GARY T.                     )
KUROKAWA; ROBERT O.                   )
MAGOTA; ANN C. GIMA; and              )
GK APPRAISALS, INC.; JOHN             )
DOES 1-10; JANE DOES 1-10;            )
DOE PARTNERSHIPS; DOE                 )
CORPORATIONS 1-10; AND DOE            )
ENTITIES 1-10,                        )
                                      )
              Defendants.             )
                                      )


DEPOSITION OF ROBERT MAGOTA

VOLUME I

Taken on May 31, 2006, commencing at 10:30 a.m. at the Law Offices of Moseley Biehl Tsugawa Lau & Muzzi, Alakea Corporate Tower, 1100 Alakea Street, 23rd Floor, Honolulu, Hawaii, before Rita King, a Certified Court Reporter in the State of Hawaii.


Ralph Rosenberg Court Reporters, Inc.

Ofc: 808.524.2090   Fax: 808.524.2596

EXHIBIT A

Page 2

```
 1  COUNSEL APPEARING:
 2
 3  Attorney for Plaintiff:
 4       ROGER S. MOSELEY, ESQ.
         Moseley Biehl Tsugawa Lau & Muzzi
 5       Alakea Corporate Tower
         1100 Alakea Street, 23rd Floor
 6       Honolulu, Hawaii  96813
         808.531.0490
 7
 8  Attorney for Defendants City & County of
    Honolulu, Gary T. Kurokawa, Robert O. Magota and
 9  Ann C. Gima:
10       MICHAEL L. LORUSSO, ESQ.
         Kawashima Lorusso & Tom, LLP
11       Topa Financial Center
         745 Fort Street, 5th Floor
12       Honolulu, Hawaii  96813
         808.275.0300
13
14  Attorney for Defendant GK Appraisals, Inc.:
15       ANTHONY L. WONG, ESQ.
         Sumida & Tsuchiyama
16       735 Bishop Street, Suite 411
         Honolulu, Hawaii  96813
17       808.356.2600
18
    Also present:
19
         Philip English
20       Chelsea Moseley
         Brian Steinwascher
21
22
23
24
25
```

Page 4

```
 1         E X H I B I T S (Cont'd)
 2
    Deposition
 3  Exhibits   Description                   Marked
 4
    35     Notification of Personnel Action    102
 5
    36     Notification of Personnel Action
 6         8-15-01                             103
 7  37     Email 8-22-01                       103
 8  38     Email 2-15-02                       108
 9  39     Performance Evaluation Report 4-12-02  138
10  40     Notification of Personnel Action
           5-16-02                             144
11
    41     Email 4-12-02                       149
12
    42     Notification of Personnel Action
13         8-26-02                             152
14  43     Email 8-12-02                       156
15  44     Ann Gima's Notes                    157
16  45     Email 10-18-02                      158
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1             I N D E X
 2
    WITNESS                              PAGE
 3
 4  ROBERT MAGOTA
 5      Examination by Mr. Moseley          5
 6
 7             E X H I B I T S
 8
    Deposition
 9  Exhibits   Description              Marked
10  21    Employment Application          51
11  22    Notice of Examination Results   72
12  23    Notification of Personnel Action
          6-16-00                         73
13
    24    Performance Evaluation Report 8-11-00  74
14
    25    Performance Evaluation Report 11-3-00  75
15
    26    Notification of Personnel Action
16        12-29-00                        79
17  27    Memo - 2-5-01                   89
18  28    Notification of Personnel Action
          3-7-01                          90
19
    29    Performance Evaluation Report 4-5-01   92
20
    30    Performance Evaluation Report 4-23-01  94
21
    31    Performance Evaluation Report 6-26-01  95
22
    32    Email 10-1-01                   98
23
    33    Email 10-1-01                   100
24
    34    Email 10-2-01                   100
25
```

Page 5

```
 1              ROBERT MAGOTA,
 2  a witness herein, having been first duly sworn by
 3  the Notary Public, was examined and testified as
 4  follows:
 5              EXAMINATION
 6  BY MR. MOSELEY:
 7      Q.  Good morning, Mr. Magota.  Could you
 8  state your full name for the record, please.
 9      A.  Robert Osamu Magota.
10      Q.  And what's your address?
11      A.  3138 Waialae Avenue, unit 434, Honolulu.
12      Q.  I've actually known you for so many
13  years, my name's Roger Moseley, I'm comfortable if
14  you'd call me Roger, I'm happy to call you whatever
15  you want, although if you don't tell me something
16  different I'm likely to call you Bob.  Would that
17  be all right?
18      A.  That's fine.
19          MR. MOSELEY:  Not to be overly friendly
20  with your client, Mike.
21          MR. LORUSSO:  That's not a problem.
22      Q.  BY MR. MOSELEY:  Bob, have you had your
23  deposition taken before?
24      A.  Yes.
25      Q.  And how many times?
```

Page 6

1   A.  I would say about, possibly, four or five
2  times.
3   Q.  Four or five times.
4   A.  Roughly, yes.
5   Q.  And in what kind of cases?
6   A.  Tax appeal cases.
7   Q.  When was the last time you had your
8  deposition taken in a tax appeal case?
9   A.  I take that back, excuse me.  There was a
10 deposition related to the assessment, but it was a
11 condemnation case by the city, and that was
12 probably, maybe, approximately, a year ago or
13 year-and-a-half.
14  Q.  And the next most previous deposition was
15 potentially a time I took your deposition, around
16 2002?
17  A.  That may have been the last one, I
18 believe.
19  Q.  Well, I'm going to go over some of the
20 ground rules just in case, although, you know,
21 sometimes things a year ago aren't really present
22 in your mind so maybe I'll refresh your
23 recollection.
24         There are several different reasons for
25 taking a deposition, and I want to explain them to

Page 7

1  you because then a number of the things may make a
2  little more sense.  One reason to take a deposition
3  is to actually find out what the witness knows.
4  And in this case, and in most cases, that's
5  probably the primary purpose.
6         Another purpose is to preserve your
7  testimony in case when you're walking back with
8  Mike Lorusso here he jaywalks across the street
9  with you, and you get hit by a bus and Mike goes
10 scot-free and you're unable to testify at trial,
11 it's possible your deposition testimony could be
12 used at trial rather than live testimony.  There
13 are other instances other than death that that
14 could happen, but that's another major important
15 piece.
16         And the third major important piece is
17 that part of it is to sort of tie you down and
18 commit you to certain testimony and certain facts
19 so that we don't have to worry later on if you're
20 going to change your story at trial because if you
21 change your story at trial, we'll be able to do
22 what's called impeachment, we'll be able to pull
23 out the deposition and say, hey, we asked you this
24 question back on May 31st, 2006 and you gave us
25 this answer and now you're giving us another

Page 8

1  answer, which one is true, then you're faced with
2  the problem of having inconsistent testimony and
3  the problem of your credibility and that kind of
4  thing.
5         So in light of these purposes of a
6  deposition, it's very important that you understand
7  the questions and that your answers are responsive.
8  If you don't understand the question, and, believe
9  me, I ask questions sometimes that I don't
10 understand, I'll get to the end and go What on
11 earth was I asking, so don't be ashamed or shy
12 about saying, Roger, I just don't understand what
13 you're talking about.  Because if you don't do
14 that, then I'm going to presume you understood the
15 question, and that your answer's going to be
16 responsive.  And that's another thing, the answer
17 has to be responsive to the question.  If I ask you
18 whether it's daylight outside and you say the
19 answer is South King Street, the answer doesn't do
20 anybody any good because it's just not a responsive
21 answer to the question, so try to be responsive.
22         A couple sort of more mundane things.
23 When you answer, try to answer "yes" or "no" or
24 give an explanation rather than um-hum or huh-uh
25 because if you answer like that, which is what you

Page 9

1  would do in conversation, and you would answer
2  something to me um-hum, and I would know what
3  you're meaning because you're probably nodding your
4  head giving me some other affirmative sign, the
5  court reporter can't get that down.  So we need to
6  have verbal answers that are recordable by the
7  court reporter without confusion.  There are other
8  things, other than um-hum and uh-uh, but those are
9  the best examples.
10        The other thing is, that in conversation
11 oftentimes people will start talking before the
12 other person is finished, and it's a very natural
13 thing to do because you know what the rest of the
14 question is, and, you know, I'll probably do it,
15 too, but try to wait until I'm finished asking the
16 question before you start the answer, that will
17 also give your attorney a half a beat to jump in
18 and object and instruct you not to answer, whatever
19 he's going to do.  But if you blurt out the answer
20 before he gets a chance to figure out what the
21 question is, A and B, what the objection is, then
22 he's not going to be very happy about that, and I
23 will try very hard not to ask my next question
24 before you're concluding your answer.  It's very
25 difficult, because we're all conversational

Page 10

1  animals, not to do that kind of stuff.
2       Do you have any questions about any of
3  this?
4       A.  May I get some more water?
5       Q.  Absolutely.
6       (A discussion was held off the record.)
7       Q.  BY MR. MOSELEY: I'm not going to do a
8  huge amount of background questioning on you
9  because, actually, I've done that in the past and
10 I'm fairly familiar with a lot of the things you've
11 done, but can you very briefly give me your
12 educational background.  Let's start after high
13 school.
14      A.  After high school, I attended the
15 University of Hawaii for approximately three years
16 and then transferred to Whittier College, in
17 California, and graduated from Whittier College.
18      Q.  In economics or something, right?
19      A.  Business administration.
20      Q.  And your focus was management?
21      A.  Yes.
22      Q.  And what was your first job?
23      A.  My first job was working for the
24 insurance company.
25      Q.  And what insurance company was that?

Page 11

1       A.  Liberty Mutual.
2       Q.  What did you do there?
3       A.  Claims adjuster.
4       Q.  Did you do that after you got out of
5  college?
6       A.  Yes.
7       Q.  You had no employment throughout college?
8       A.  I worked part time at J.C. Penney.
9       Q.  Doing what?
10      A.  Sales.
11      Q.  What did you sell?
12      A.  Shoes and plants, two different
13 departments.
14      Q.  J.C. Penney sold plants, this was in
15 California?
16      A.  Whittier, California.
17      Q.  Any other jobs you had before you
18 graduated from college?
19      A.  I worked briefly at a body and fender
20 shop.
21      Q.  What did you do there?
22      A.  Sanding cars.
23      Q.  I'll bet that was fun.
24         Any other jobs before you graduated from
25 college?

Page 12

1       A.  Dishwasher.
2       Q.  Where?
3       A.  J.C. Penney, Ala Moana Shopping Center.
4       Q.  When did you have that job?
5       A.  When I was at the University of Hawaii.
6       Q.  Any other jobs when you were at the
7  University of Hawaii?
8       A.  When I was at J.C. Penney, Ala Moana
9  Shopping Center, I went from the coffee shop to the
10 shoe department, within the same store.
11      Q.  Any other employers, though, other than
12 J.C. Penney?
13      A.  I believe I covered.
14      Q.  Did you have a paper route when you were
15 a kid or anything like that?
16      A.  No.
17      Q.  And then what did you do after you were
18 working for Liberty Mutual as an adjuster?
19      A.  I started working for the Los Angeles
20 County Assessor's office.
21      Q.  What did you do for them?
22      A.  Real property appraiser.
23      Q.  Was this before or after the enactment of
24 Proposition 13 that you started?
25      A.  I started before Proposition 13, right

Page 13

1  before.
2       Q.  Did the appraisal methodology change with
3  the advent of Proposition 13 in California?
4       A.  Prior to Proposition 13, they were on
5  more of a mass appraisal basis, and after
6  Proposition 13 they looked at more single property
7  appraisal.
8       Q.  When you say single property appraisal,
9  was it the case that Proposition 13 essentially
10 kept the valuation the same unless it was either
11 sold or approved on that particular property?
12      A.  When a property changed ownership, it
13 could trigger a reappraisal, along with other new
14 construction, things like that.
15      Q.  So it was sort of a different focus than
16 it is here in Honolulu, presently, right?
17      A.  Yes.
18      Q.  How long did you work for the Los Angeles
19 county assessor?
20      A.  Approximately, four years or so, from
21 1978 to 1982.  Approximately.
22      Q.  Did you grow up in California or did you
23 grow up here?
24      A.  California.
25      Q.  In the L.A. area?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 14

1  A. Yes.
2  Q. What job did you have after 1982?
3  A. I applied for a job with the City and
4  County of Honolulu.
5  Q. And what job was that?
6  A. Real property appraiser.
7  Q. Did you apply for that job while you were
8  at the assessor's office while you were in Los
9  Angeles?
10 A. Yes.
11 Q. What prompted you to make the decision to
12 leave there and move here?
13 A. My family lived here.
14 Q. They had moved here in the meantime from
15 the L.A. area?
16 A. Actually, when I was still in high
17 school.
18 Q. So they moved and left you here.
19 A. No, they moved to Honolulu --
20 Q. And you moved, and that's why you went to
21 the U.H. for three years, before you went back to
22 Whittier?
23 A. Yes.
24 Q. What was your last position before you
25 left the Los Angeles County Assessor's Office?

Page 15

1  A. Real property Appraiser II.
2  Q. Is that, roughly, comparable to the
3  Appraiser II position here in Honolulu?
4  A. No.
5  Q. What are the distinctions?
6  A. It's equivalent to the real property
7  Appraiser IV here.
8  Q. They had fewer steps, is that it?
9  A. Correct. Yes.
10 Q. And when you were hired here in the City
11 and County of Honolulu assessment division, what
12 was your beginning position?
13 A. When you say beginning position...
14 Q. Your starting position. Did you start as
15 an Appraiser II or Appraiser IV?
16 A. Here in Honolulu.
17 Q. Yes.
18 A. Appraiser IV.
19 Q. So you came to, roughly, the same level
20 position that you had left in Los Angeles.
21 A. Yes.
22 Q. And that was in 1982?
23 A. 1982.
24 Q. Are you familiar with Phil English, the
25 man seated here to my left?

Page 16

1  A. Yes, I know Phil English.
2  Q. When did you first meet Phil English?
3  A. When you say meet, face-to-face or...
4  Q. Face-to-face. Let's try face-to-face.
5  A. Face-to-face, when he was hired by the
6  City and County of Honolulu as an appraiser.
7  Q. When Phil English was hired as an
8  appraiser by the city, what was your position at
9  that time?
10 A. I was the real property assessor.
11 Q. Were you the acting or interim assessor
12 or were you -- I mean, who was the assessor before
13 you?
14 A. The assessor before me was Richard
15 Nathaniel.
16 Q. And he had died, right?
17 A. When he passed away, yes, he was the
18 acting administrator.
19 Q. So he was promoted to or moved up to
20 acting administrator and then you became the
21 assessor?
22 A. No. You have to excuse, I'm trying to
23 remember when Mr. Nathaniel passed away. The
24 administrator was a gentleman by the name of
25 Raymond Higa, and Richard Nathaniel was the

Page 17

1  assessor at the time, and I believe when Mr. Higa
2  retired Mr. Nathaniel became the acting
3  administrator. I don't recall who the acting
4  assessor was, it was not me, when Richard Nathaniel
5  was still alive.
6  Q. Were you ever the acting assessor?
7  A. When Richard Nathaniel passed away, Gary
8  Kurokawa became the acting administrator, and he
9  asked me to be the acting assessor.
10 Q. Prior to Richard Nathaniel passing away,
11 was Gary Kurokawa the acting assessor?
12 A. I cannot recall.
13 Q. But at the point Nathaniel died, Gary
14 Kurokawa became acting administrator and you became
15 acting assessor, right?
16 A. Yes.
17 Q. And when did you become the regular
18 official assessor?
19 A. Probably around the end of 1999.
20 Q. So you were a full-fledged assessor at
21 the time of Phil English came on board as an
22 appraiser?
23 A. Yes.
24 Q. Now, before Phil started work in your
25 first face-to-face meeting with him, you indicated

Page 18

1  you might have had other contacts with him?
2     A.   Yes.
3     Q.   And what were those contacts?
4     A.   Several months before Phil English was
5  hired he had contacted our office.
6     Q.   Did he contact you?
7     A.   The phone call did come to me.
8     Q.   And what was that phone call about?
9     A.   Mr. English was asking about when certain
10 positions would be filled, vacant positions.
11    Q.   And what positions were those?
12    A.   The real property Appraiser II position.
13    Q.   And what did you tell him?
14    A.   I told him that the interviews would be
15 held, I don't think I gave him a date, but that we
16 were planning on filling some of the positions on
17 the real property Appraiser II level.
18    Q.   Is there anything else you told him at
19 that time?
20    A.   Well, I know we had a discussion touching
21 on different topics.
22    Q.   Do you remember any of the topics?
23    A.   One topic he mentioned to me was, of
24 course, he wanted to know when we would fill the
25 vacancy because he was having some financial

Page 19

1  problems. Another topic he had brought up to me
2  was a prior illness that he had recovered from.
3     Q.   And what was that illness?
4     A.   He had told me that he had had cancer,
5  and that it was in remission. I believe, the
6  kidney.
7     Q.   Any other topics?
8     A.   He told me about his background,
9  appraisal background.
10    Q.   Do you remember what he had told you at
11 the time about his background?
12    A.   He had mentioned that he had his own
13 appraisal company at one time.
14    Q.   Had you heard of his company?
15    A.   No.
16    Q.   Anything else?
17    A.   When we were discussing his illness, he
18 was concerned about, something about a physical
19 that the city would give or health requirement or
20 something like that as part of the hiring process.
21    Q.   And what did you tell him?
22    A.   I told him that even though his -- I told
23 him that I didn't see his cancer being a problem if
24 it was in remission, and the reason for that is I
25 mentioned to him that my wife is also a cancer

Page 20

1  survivor, and that she has been able to work
2  full-time.
3     Q.   Did you discuss at all your plans for the
4  assessment division or any changes you intended to
5  make or goals or objectives, that kind of thing?
6     A.   I did mention to him about a proposed
7  reorganization of our division.
8     Q.   And what sort of reorganization was that?
9     A.   We would be adding some new positions and
10 realigning the various sections and branches within
11 the division.
12    Q.   And the purpose for that was what?
13    A.   Part of it was to increase staff, part of
14 it was to improve efficiency, along those lines.
15    Q.   Was there a need to increase the staff at
16 that time?
17    A.   The areas that we would be increasing
18 staff was the appraiser assistant positions. Also,
19 my position would be changed.
20    Q.   To what?
21    A.   As the real property assessor, I was in
22 charge of the appraisal section and the clerical
23 section, and the proposed reorganization that was
24 being worked on, my duties and responsibilities
25 would change, and I would become the assistant real

Page 21

1  property administrator.
2     Q.   So you would have additional
3  responsibilities?
4     A.   Yes.
5     Q.   What does PTO mean?
6     A.   Property Technical Office.
7     Q.   Is that the other major piece of the
8  assessment division?
9     A.   The assessment division -- are we talking
10 about before the reorganization?
11    Q.   Yes.
12    A.   Before the reorganization, we had three
13 branches, basically.
14    Q.   Okay. What were they?
15    A.   The assessment branch, that included the
16 clerical section, tax maps branch, and the property
17 technical office.
18    Q.   And after the reorganization, were you in
19 charge of all of those?
20    A.   I was to assist Mr. Kurokawa in the
21 operations for all the branches.
22    Q.   After the reorganization, was there
23 somebody who was specifically charged with running
24 the assessment branch besides you?
25    A.   That's one position I forgot to mention

Page 22

1  earlier. When I became the assistant
2  administrator, my old position included just the
3  appraisal section and the clerical section. My old
4  position -- well, first of all, the clerical
5  section would become a separate branch now.
6     Q.  So now there are four branches.
7     A.  Yes.
8     Q.  And was there an additional head or
9  position at the beginning of each one of those
10 branches?
11    A.  Yes. My old position, the
12 responsibilities were reduced because the clerical
13 section is now separate. My old position became --
14 I believe it was called chief appraisal officer.
15    Q.  And who filled that position after you
16 became the assistant administrator?
17    A.  Stephen Yee.
18    Q.  I remember Stephen.
19       How about who became the head of the
20 clerical branch?
21    A.  Georgette Wong was the head tax clerk
22 prior and after the reorganization.
23    Q.  So her duties didn't really change?
24    A.  No, she was still in charge of the
25 clerical section.

Page 23

1     Q.  What was the reason for increasing the
2  staff of appraiser assistants?
3     A.  To help to provide more support for the
4  appraisal staff.
5     Q.  Was there a perception that the support
6  was not adequate at that time?
7        MR. LORUSSO: Objection, vague and
8  ambiguous, lacks foundation.
9     Q.  BY MR. MOSELEY: By the way, unless he
10 instructs you not to answer, you still get to
11 answer the question.
12    A.  I lost track of your question again. If
13 you can repeat that.
14    Q.  Okay. What I asked you was, was there a
15 perception at that time that there weren't enough
16 or the staff was not adequate, in terms of
17 appraiser assistants, when this change was being
18 made?
19       MR. LORUSSO: Same objections.
20       MR. MOSELEY: Off the record.
21       (A discussion was held off the record.)
22    Q.  BY MR. MOSELEY: I'm sorry. Your answer
23 was?
24    A.  Could you repeat the question again.
25    Q.  When the change was being made or

Page 24

1  contemplated to add more appraiser assistants, was
2  the belief at that time that the staff of appraiser
3  assistants was somehow inadequate in its present
4  form?
5        MR. LORUSSO: Same objections.
6        THE WITNESS: I wouldn't say inadequate,
7  I would say that any additional support to the
8  appraisers was what we were looking at.
9     Q.  BY MR. MOSELEY: So you were trying to
10 make a good situation better?
11    A.  Yes.
12    Q.  About how many properties does the
13 average appraiser in the assessment division have
14 now?
15       MR. LORUSSO: By now meaning 2006.
16       MR. MOSELEY: Yes, right now, today.
17       THE WITNESS: I would have to get back to
18 you on that.
19    Q.  BY MR. MOSELEY: How many appraisers are
20 there, there's like 35 or something?
21    A.  Between 35 and 40, but, again, I would
22 have to get back to you on that.
23    Q.  Do you know how many properties there are
24 in the City and County of Honolulu?
25    A.  I believe it was, approximately, 265,000,

Page 25

1  somewhere around there.
2     Q.  So if we were to divide 265,000 by, say,
3  40, would we roughly come out with sort of an
4  average number of properties per appraiser?
5     A.  That would be an approximation.
6     Q.  So might it be in the range of 8,000, of
7  course, I'm just doing the math roughly, does that
8  sound about right?
9     A.  It may be.
10    Q.  Do you guys keep track of those kind of
11 numbers?
12    A.  Yes, we do. I just haven't looked at
13 them lately.
14    Q.  Do you remember the IAAO?
15    A.  Yes.
16    Q.  The IAAO is the International Association
17 of Assessing Officers, right?
18    A.  Yes.
19    Q.  Does the IAAO put out guidelines with
20 respect to -- first of all, what is the IAAO?
21    A.  The IAAO is a educational nonprofit
22 organization that provides training and support to
23 assessors.
24    Q.  It's sort of like a professional group
25 for government assessors, right?

Page 26

1  A. Yes.
2  Q. And do they provide guidelines as to what
3  the optimal workload for assessors would be or
4  appraisers would be in assessment operations?
5  A. In the past they did.
6  Q. Do you have any idea what those
7  guidelines were?
8  A. I have not seen anything from the IAAO,
9  currently, as far as statistics. I know in the
10 past they did have some numbers.
11 Q. Were they like 5,000 properties per
12 appraiser, something along that order? They had
13 recommendations as to what they felt was optimum,
14 right?
15 A. Yes. The recommendations, though, date
16 back to, I believe, 1984, 1990. So as far as
17 current figures, I have not seen any or I am not
18 aware of any.
19 Q. At the time Phil English was hired and
20 came to work, what was the largest number of
21 properties any appraiser had; do you know? I'm
22 talking about in your division.
23 A. An individual appraiser.
24 Q. Right.
25 A. The parcel count.

Page 27

1  Q. Right.
2  A. It was probably one of the condominium
3  appraisers.
4  Q. Do you have any idea of the scale that
5  we'd be talking about?
6  A. I believe some of the other condominium
7  appraisers were handling over 20,000 parcels.
8  Q. When you say some of the other
9  appraisers, some of the other versus who?
10 A. Compared to Mr. English.
11 Q. Do you know how many parcels Mr. English
12 handled?
13     MR. LORUSSO: At what point in time?
14     MR. MOSELEY: At the time he started.
15 Well, let's back that up a little bit.
16     When Mr. English started, he wasn't
17 immediately put into the Waikiki condominium area,
18 was he?
19     THE WITNESS: I can't remember when he
20 was put in, but it was probably shortly after his
21 employment.
22 Q. BY MR. MOSELEY: Near the beginning,
23 right?
24 A. Somewhere around there.
25 Q. And then he was assigned to condominiums

Page 28

1  in Waikiki; is that right?
2  A. Yes.
3  Q. At the time he was assigned to
4  condominiums in Waikiki, do you have any idea of
5  the parcel count at that time?
6  A. Offhand, I don't remember. I would have
7  to get back to you on that.
8  Q. Does 20,000 sound about right?
9      MR. LORUSSO: Objection, calls for
10 speculation.
11     THE WITNESS: It may be less.
12 Q. BY MR. MOSELEY: Do you think it would
13 have been less than that?
14     MR. LORUSSO: Objection, speculation.
15     THE WITNESS: I would probably have to
16 check on that.
17 Q. BY MR. MOSELEY: You know, I'm not trying
18 to get an exact number from you, I'm trying to get
19 an idea of the scale from you. You do have an idea
20 of the scale, don't you?
21 A. It's probably somewhere around 20,000,
22 maybe less.
23 Q. Were you aware at some point that there
24 were additional condominium units added to the area
25 that Mr. English was responsible for?

Page 29

1  Specifically, I'm talking about the Gold Coast.
2  Were you aware that at some point the Gold Coast
3  was added to that group of condominiums?
4  A. At that time?
5  Q. Yes.
6  A. I don't recall. I don't think I was
7  aware of that.
8  Q. Who would have made a decision to put the
9  Gold Coast into Mr. English's area?
10 A. His immediate supervisor.
11 Q. Who would have been?
12 A. Ms. Ann Gima.
13 Q. That was actually Phil's second
14 supervisor, right, he was briefly assigned to
15 somebody else, right, Mike Okamoto?
16 A. Yes, that's correct.
17 Q. And then he went from Mike Okamoto to Ann
18 Gima; is that right?
19 A. Yes.
20 Q. Mike Okamoto wasn't in charge of the
21 group that handled the Waikiki condominium, was he?
22 A. No, he was not involved with the Waikiki
23 condominiums.
24 Q. But it would have been Ann Gima that
25 added the Gold Coast, if it was added, to that

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 30

1  group of condos that Phil was responsible for?
2      A.  I think so.
3      Q.  When did you become the assistant
4  administrator versus the assessor?
5      A.  Roughly, around October 2003.
6      Q.  Did your day-to-day duties really change
7  a lot when you became assistant administrator
8  versus the assessor?
9      A.  Yes, some of the responsibilities did
10 change.
11     Q.  Like what responsibilities?
12     A.  As the assessor, the clerical section was
13 directly under me, now they're a separate branch.
14 I still dealt with them.  I was overseeing more of
15 the branch, on the branch level.
16     Q.  When you were the assessor, were you
17 responsible for hiring and training of appraisers?
18     A.  When you say hiring, can you be more
19 specific?
20     Q.  Well, who did the hiring of appraisers at
21 the time you were the assessor?
22     A.  You mean like sitting on the interview
23 panel or...
24     Q.  Who made the decision to hire Phil, for
25 example?

Page 31

1      A.  It would be the administrator, who would
2  base it on the recommendations of the interview
3  panel, and, of course, it would have to be approved
4  by everyone else up the chain.
5      Q.  The human resources people?
6      A.  The director, everything else.  So the
7  director also has to sign off, so it goes up the
8  ladder.
9      Q.  For example, in the case of Phil's hire,
10 would you have had like sort of a veto of the hire
11 if you didn't think it was a good hire?
12     A.  I left it up to the interview panel and
13 the -- again, it would have to go also to the
14 administrator.
15     Q.  But if you had interviewed a person at
16 that time when you were the assessor and you
17 thought this person's really not qualified, would
18 you have been able to say to the administrator,
19 Look, I think it's a no on this guy or this gal?
20     A.  Well, I don't think it would be that easy
21 because when we talk about an interview panel of,
22 let's say, three panelists, you know, their scores,
23 their opinions played a major role.
24     Q.  Were you on the interview panel that
25 hired Phil?

Page 32

1      A.  No.
2      Q.  Who was on that panel?
3      A.  I don't remember.  I don't know.
4      Q.  A little bit more on the mechanics of it.
5  The way it worked, the interview panel would
6  interview, and they would score and make a
7  recommendation; is that right?
8      A.  Yes.
9      Q.  And who did the recommendation go to?
10     A.  It would go up.
11     Q.  It went to you, then, as the assessor?
12     A.  In Phil's case, I believe it went to the
13 administrator.
14     Q.  At that time, Gary Kurokawa?
15     A.  Yes.  I don't recall seeing any scores or
16 results for his interview.
17     Q.  Did you review his employment application
18 at all?
19     A.  At that time.
20     Q.  Yes.
21     A.  When he was hired.
22     Q.  Right.
23     A.  No.
24     Q.  Have you reviewed any documents in
25 preparation for your deposition here today?

Page 33

1      A.  I did review, I think, some of the -- I
2  think there were several hundred exhibits, I think.
3  I did look at some.
4      Q.  How many do you think you looked at?
5      A.  Probably less than, maybe about 10
6  percent.
7      Q.  What kinds of documents did you look at?
8      A.  Some of the emails.
9      Q.  Are these primarily emails that you had
10 either been, had either apparently received or that
11 you had initiated?
12     A.  I believe some of them were emails, some
13 of Ann Gima's emails.  I may have looked at some
14 other documents, too.
15         MR. LORUSSO:  Counsel, if you're done
16 with the line of questioning with regard to what
17 was reviewed, I'd like to go back to the question.
18 I don't think the witness finished his answer, in
19 terms of the hiring process as to Mr. English.  In
20 other words, we got to the administrator reviewed
21 it, but there's more to that.
22         MR. MOSELEY:  You really want me to ask
23 that question, don't you?
24         MR. LORUSSO:  No, I'm simply saying the
25 answer wasn't finished.

Page 34

1  Q. BY MR. MOSELEY: Was your answer
2  finished? There's more to the process, right?
3  What was the rest of the process, then?
4  A. The results are reviewed.
5  Q. By whom?
6  A. Human resources, but also the director --
7  Q. Of budget and fiscal services?
8  A. Yes, had the final approval, too.
9  Q. As a matter of course, does the
10 administrator have the ability to say, no, we're
11 not hiring Mr. X?
12 A. Can you repeat that one more time.
13 Q. Well, the way the process you described
14 to me was that there would be an interview panel,
15 but we don't know who it was in Phil's case, but in
16 Phil's case it went from the interview panel to,
17 apparently, the administrator, Gary Kurokawa,
18 right?
19 A. Yes.
20 Q. And you think that bypassed you in the
21 process, right, you don't remember seeing his job
22 application stuff, at that time.
23 A. Take a step back. Normally, the results
24 of the interview panel goes to the administrator.
25 Q. And bipasses the assessor, at that time.

Page 35

1  A. Yes.
2  Q. And so from the administrator it would go
3  where?
4  A. Personnel.
5  Q. And from personnel it would go?
6  A. I believe, the director.
7  Q. Of budget and finance.
8  A. Yes.
9  Q. Does it go anyplace beyond that?
10 A. Once a selection process is made, again,
11 it goes back to human resources.
12 Q. But human resources, then, dictated just
13 hire this guy, right?
14 A. Repeat that, I'm sorry.
15 Q. Well, I'm talking about the review
16 process. Once it gets to the director of budget
17 and finance, is there a further review process?
18 A. That's pretty much the last step.
19 Q. And then you said it goes back to human
20 resources. And the reason it goes back to human
21 resources, I'm guessing, you can confirm, is that
22 the director says, okay, hire this guy, and tells
23 human resources to implement the hiring; is that
24 right?
25 A. Yes.

Page 36

1  Q. In this process for Phil, you were not
2  involved; is that right?
3  A. I was not involved.
4  Q. Would Gary Kurokawa as the administrator
5  at the time had the ability to veto the hiring
6  process when it came to him?
7  A. It would be very difficult, given the
8  fact that, you know, these are recommendations from
9  three other people because I don't --
10 Q. Difficult or impossible? Did he have the
11 authority to say no?
12    MR. LORUSSO: Objection, vague and
13 ambiguous, lacks foundation, calls for speculation.
14    THE WITNESS: Like I said, it would be
15 very, very difficult when you have the
16 recommendation of a separate panel.
17 Q. BY MR. MOSELEY: No, I understand. This
18 is an authority question. Do you understand he
19 would have had the authority to say no if he had
20 chosen to do so?
21    Bob, if you don't know the answer to a
22 question, that's --
23 A. Yeah, I don't know.
24 Q. -- a legitimate response. If you know,
25 answer. And although I don't want you to

Page 37

1  speculate, if you have an educated guess based upon
2  your other knowledge, you could give me that, and
3  tell me it's an educated guess and tell me what
4  it's based on and qualify it like that. That's
5  what I would appreciate, if you don't mind.
6    Yes?
7  A. I don't know.
8  Q. Okay. The way it works now, with you as
9  the assistant administrator, do you review hiring
10 process, the recommendations or whatever it is?
11 A. You mean being part of the interview, the
12 whole process?
13 Q. Right. Instead of going directly to
14 Gary, does it go to you now as the assistant
15 administrator?
16 A. It depends. The final stuff within our
17 division would be Gary. The reason I say that is
18 because at times when I am sitting on the interview
19 panel, I am directly involved. Other times, there
20 may be other people involved besides me on the
21 interview panel.
22 Q. But it's not like you're separately
23 involved in the review process just because of your
24 position as the assistant administrator.
25 A. Yeah, as the assistant administrator, a

Page 38

1  panel's recommendation would go to the
2  administrator. The exception would be, of course,
3  if the administrator was unavailable, and I would
4  be in his place.
5      Q.  So even though you're now the assistant
6  administrator, the process actually remains the
7  same as it was when Phil was hired; is that right?
8      A.  Yes, the recommendations from the panel
9  would go to the administrator.
10     Q.  Who handles disciplinary -- back up.
11         During the whole time Phil was there you
12 were always the assessor, right?
13     A.  Yes.
14     Q.  So when I'm asking you questions about
15 Phil, I'm asking you questions about your
16 activities as administrator; is that right?
17         MR. LORUSSO:  Assessor.
18     Q.  BY MR. MOSELEY:  I'm sorry, as the
19 assessor. There might be exceptions to that. You
20 do understand that you're being sued personally and
21 individually in this case, right?
22     A.  Yes.
23     Q.  Do you have an indemnification agreement
24 from the city? I mean, if there's a judgment
25 entered against you for a bunch of money, has the

Page 39

1  city agreed to indemnify you for that?
2      A.  I don't think so. I would have to check,
3  but I don't think so.
4      Q.  You're not aware of any.
5      A.  I'm not aware of any.
6      Q.  If there's a judgment entered against you
7  for a whole bunch of money, has Gary Kurokawa
8  agreed to indemnify you for that?
9      A.  No.
10     Q.  Do you have separate counsel at all
11 besides Mr. Lorusso?
12     A.  No.
13     Q.  You have no outside counsel other than
14 Mr. Lorusso?
15     A.  That's correct.
16     Q.  Do you have insurance coverage for these
17 claims?
18     A.  No.
19     Q.  And did you check for insurance coverage
20 for these claims?
21     A.  Yes.
22     Q.  What did you do to check?
23     A.  The carrier for, I guess, my homeowner's
24 policy.
25     Q.  At the time, and I've been calling him

Page 40

1  Phil, and maybe I'm doing this all too informally,
2  but you know who I'm talking about when I talk
3  about Phil, right?
4      A.  Yes.
5      Q.  At the time Phil was working for the
6  assessment division, who was in charge of
7  discipline of appraisers in the division?
8         MR. LORUSSO:  Objection, vague and
9  ambiguous, lacks foundation, calls for speculation.
10        THE WITNESS:  When you say discipline...
11     Q.  BY MR. MOSELEY:  Do you know what the
12 word discipline means?
13     A.  Well, I'm trying to picture this.
14     Q.  Say an appraiser misbehaves, what's done
15 about it?
16        MR. LORUSSO:  Objection, vague and
17 ambiguous.
18     Q.  BY MR. MOSELEY:  Do you understand my
19 question?
20     A.  Okay. Repeat the question one more time,
21 please.
22     Q.  Basically, I asked, at the time Phil
23 English worked for the assessment division, who was
24 in charge of discipline for appraisers that worked
25 for the division?

Page 41

1         MR. LORUSSO:  Objection, vague and
2  ambiguous, lacks foundation.
3         THE WITNESS:  Well, the immediate
4  supervisor, followed by myself as the assessor.
5      Q.  BY MR. MOSELEY:  Would Gary Kurokawa be
6  involved in such a process?
7      A.  It depended on, I guess, the seriousness,
8  if it could be handled on my level or the
9  supervisor's level, again, depending on the
10 seriousness of whatever was done wrong.
11     Q.  Just generally speaking, when Phil
12 English was an appraiser in the assessment
13 division, did you become at any time aware of
14 problems which might necessitate some sort of
15 disciplinary procedure or action against
16 Mr. English?
17        MR. LORUSSO:  Objection, over-broad,
18 vague and ambiguous, lacks foundation.
19        THE WITNESS:  Repeat that one more time.
20        (The requested portion of the record was
21 read.)
22        MR. LORUSSO:  Same objection.
23        THE WITNESS:  I'm just making sure I got
24 the question correct. If there were problems and
25 it was brought to my attention by the supervisor, I

Page 42

1  would get involved, also.
2     Q.  BY MR. MOSELEY:  Were there problems with
3  Mr. English that were brought to your attention by
4  the supervisor?
5     A.  Yes.
6     Q.  And did the action taken to address those
7  problems go through you?
8     A.  Yes.
9     Q.  At all times?
10    A.  When you say all times, every little
11 infraction or?
12    Q.  Was there any action, that you're aware
13 of, taken by anybody -- how about taken by Gary
14 Kurokawa -- that didn't have your involvement?
15       MR. LORUSSO:  Object, to the extent that
16 it assumes facts not in evidence.
17       THE WITNESS:  Can you repeat that one
18 more time, I'm sorry.
19    Q.  BY MR. MOSELEY:  Do you know if Gary
20 Kurokawa got involved in any action or process to
21 address any perceived disciplinary problems of Phil
22 English?
23    A.  When you say discipline, are you
24 referring to like penalized for wrongdoing, or are
25 we looking at something along the lines of a

Page 43

1  performance evaluation or?
2     Q.  How about either of those things.
3     A.  Mr. Kurokawa was involved in some of the
4  performance evaluations.  When problems are brought
5  to my attention by Ms. Ann Gima, I was directly
6  involved, the exception being, of course, one of
7  his performance evaluations I was involved.
8     Q.  So, generally, performance evaluations
9  were written by his supervisor, Ann Gima, and
10 approved by Gary Kurokawa; is that right?
11    A.  Yes.
12    Q.  In terms of performance problems, were
13 you always involved if it was brought to your
14 attention by Ann Gima?
15    A.  Yes.
16    Q.  Were there ever times when Ann Gima went
17 directly to Gary Kurokawa and left you out of the
18 loop?
19       MR. LORUSSO:  Objection, calls for
20 speculation.
21    Q.  BY MR. MOSELEY:  That you know of.
22    A.  I don't know.  If you're asking about Ann
23 Gima's actions -- when you say out of the loop...
24    Q.  BY MR. MOSELEY:  To your knowledge, did
25 Ann Gima ever deal directly with Gary Kurokawa, not

Page 44

1  consulting you, for performance or some other kind
2  of disciplinary problem with Phil English, to your
3  knowledge?
4     A.  As far as what Ann Gima did, I don't
5  know.
6     Q.  So the answer is, no, to my knowledge,
7  Ann Gima didn't do that?
8        MR. LORUSSO:  Objection, misstates his
9  testimony.
10    Q.  BY MR. MOSELEY:  What is your testimony?
11 I asked you if, to your knowledge, she ever did
12 that.
13    A.  I don't know if she initiated it.  I was
14 told that Phil had met with Ann Gima, Gary Kurokawa
15 and the union agent, I'm not sure if it was one or
16 two occasions.
17    Q.  When did you find out about that?
18    A.  Oh, probably after those meetings
19 occurred.
20    Q.  How long after the meetings occurred?
21    A.  Not much longer after they occurred, like
22 I cannot pinpoint the time.
23    Q.  What were you told about those meetings?
24    A.  I was just told that those individuals
25 would be meeting.

Page 45

1     Q.  Would be.  You said you heard about it
2  afterwards.
3     A.  Well, yeah, I mean -- I was -- let me
4  back up.  I was told afterwards that, you know,
5  they had met.
6     Q.  And what were you told about that
7  meeting?  Were you told there was more than one
8  meeting?
9     A.  I don't know.  What was discussed at that
10 meeting was basically performance issues, as I
11 recall.
12    Q.  Do you know why you weren't included in
13 that meeting?
14    A.  No, I don't.
15    Q.  Nobody ever told you why?
16    A.  No.
17    Q.  Was that an unusual thing to happen, that
18 you would not be included in that sort of a
19 process?
20       MR. LORUSSO:  Objection, vague and
21 ambiguous.
22       THE WITNESS:  I didn't think it was
23 unusual.
24    Q.  BY MR. MOSELEY:  Did it happen in any
25 other cases?

Page 46

1  A.  Meaning?
2  Q.  Meaning some other appraiser, Ann Gima or
3  any other supervisor, were talking with Gary
4  without your presence or without your involvement.
5  A.  I believe it goes on where if I'm not
6  available, they can go to Gary or vice versa, or if
7  one of us wants to handle a certain situation. So
8  as far as letting me know, I don't think it's
9  necessary.
10 Q.  So you were told nothing about what
11 transpired at the meeting that you've described?
12     MR. LORUSSO:  Hang on.  Objection,
13 misstates the testimony.
14     THE WITNESS:  I was told after the
15 meeting they discussed performance issues.
16 Q.  BY MR. MOSELEY:  Were you told anything
17 more specific than that?
18 A.  No.
19 Q.  Were you told about the result of the
20 meeting?
21 A.  As far as exactly what transpired, no.
22 Q.  Did you later learn what transpired at
23 the meeting?
24 A.  Later on I did.
25 Q.  And what did you learn later?

Page 47

1  A.  Just in general terms that they had
2  discussed things that they expected of, you know,
3  Mr. English, but it was very general terms.
4  Q.  Who did you understand attended that
5  meeting?
6  A.  That was Ann Gima, Gary Kurokawa and the
7  union agent.
8  Q.  What was his name?
9  A.  Waylon Toma, I believe it was.
10 Q.  Do you know how many times they met?
11 A.  No.
12 Q.  At that time, did you have a good working
13 relationship with Waylon Toma?
14 A.  I do not really know Waylon Toma. I know
15 who he is, but I really never dealt with him.
16 Q.  Did you ever have an incident with Waylon
17 Toma before the meetings that you're describing in
18 which you had some kind of a dispute with Waylon
19 Toma?
20 A.  No.
21 Q.  So as far as you knew, Waylon Toma was
22 just a fine person?
23 A.  I really did not know Waylon Toma, except
24 that he worked for the union.
25     MR. LORUSSO:  We've been going about an

Page 48

1  hour.  Can we take a break?
2      MR. MOSELEY:  Actually, why don't we go
3  for another 15 minutes and then -- are you going to
4  be hungry for lunch?
5      MR. LORUSSO:  I didn't even realize it
6  was quarter to twelve.
7      MR. MOSELEY:  Can we go for another 15
8  minutes?
9      MR. LORUSSO:  Okay.
10 Q.  BY MR. MOSELEY:  You testified earlier,
11 you said you didn't review any of Phil's
12 application documents and weren't involved in that
13 process, right?
14 A.  At what time again?
15 Q.  When Phil was hired.
16 A.  When Phil was hired.
17 Q.  Right.
18 A.  I had not seen his application.
19 Q.  Did you deal with his application
20 documents or review the application and hiring
21 process at some later time?
22 A.  When you say reviewing the hiring
23 process.
24 Q.  The hiring documents.  For example, did
25 you see his employment application, ever, at a

Page 49

1  later time?
2  A.  Yes.
3  Q.  And when was that?
4  A.  And this is for the initial hiring, I
5  believe.
6  Q.  Right.  Now, I'm showing you what I'll
7  represent is his employment application, but I
8  don't know whether I want to talk to you about it
9  if you've never dealt with this in any context.
10     I think we've already established you
11 didn't look at it at the time he was hired; is that
12 right?
13 A.  Correct.
14 Q.  But you did look at it at a later time?
15 A.  Yes.
16 Q.  When was that?
17 A.  In connection with the workers' comp
18 case, I think.
19 Q.  And how in connection with the workers'
20 comp was the employment application brought to your
21 attention or did you look at it?
22 A.  I looked at it.
23 Q.  For what reason?
24 A.  For the workers' comp case.
25 Q.  Why would that have been involved in the

Page 50

1  workers' comp case?
2      A.  I believe it was checking on some his
3  background information.
4      Q.  Why would it have been necessary to check
5  on his background information in the workers' comp
6  case?
7      A.  It's because what he had told me and
8  other individuals, as far as his background, didn't
9  seem to match up or...
10     Q.  How is that relevant to a workers' comp
11 claim?
12         MR. LORUSSO:  Let me object, to the
13 extent that it calls for a legal conclusion.
14         THE WITNESS:  Credibility.
15     Q.  BY MR. MOSELEY:  Were you asked to look
16 at Phil's employment application in connection with
17 the workers' comp case?
18     A.  No.
19     Q.  You just did it on your own?
20     A.  Yes.
21     Q.  Why would you have just done that on your
22 own?
23         MR. LORUSSO:  Objection, asked and
24 answered.
25         THE WITNESS:  Can you repeat that

Page 51

1  question again.
2      Q.  BY MR. MOSELEY:  Why would you have just
3  done that on your own in connection with the
4  workers' comp case?
5          MR. LORUSSO:  Same objection.
6          THE WITNESS:  I'm sorry.  Repeat that one
7  more time.
8      Q.  BY MR. MOSELEY:  Why would you have taken
9  it upon yourself to review Phil's employment
10 application in the context of a workers' comp case?
11         MR. LORUSSO:  Same objection.
12         THE WITNESS:  I was trying to look at the
13 credibility of his workers' comp claim, and also
14 look at his background in relation to that.
15         (Exhibit Number 21 was marked for
16 identification.)
17     Q.  BY MR. MOSELEY:  I'm showing you what's
18 been marked as Exhibit 21, and we're continuing
19 with our convention of numbering all exhibits
20 consecutively from the first exhibit, there might
21 be a repeat of this in one of the earlier
22 depositions, I don't know.
23         Is this the employment application that
24 you reviewed?
25     A.  Yes, it appears to be.

Page 52

1      Q.  Had you spoken to Mike Golojuch about
2  Phil English before you reviewed this employment
3  application in conjunction with the workers' comp
4  claim?
5      A.  No.
6      Q.  When did you review this application in
7  conjunction with the workers' comp claim?
8      A.  When?
9      Q.  Yes.
10     A.  Probably shortly after the claim was
11 filed.
12     Q.  And your first contact with Mike Golojuch
13 was January 15th, 2003 or before, wasn't it?
14     A.  Regarding?
15     Q.  Regarding Phil English.
16     A.  In what capacity?
17     Q.  With respect to Phil English.  Did you
18 meet with Mike Golojuch on or before January 15th,
19 2003 with respect to Phil English?
20     A.  Yes.
21     Q.  And that was after the workers' comp
22 claim had been filed?
23     A.  No, the workers' comp claim was filed, I
24 believe, at the end of February.
25     Q.  So when I asked you earlier if you had

Page 53

1  met with Mike Golojuch before you reviewed this
2  application in connection with the workers' comp
3  claim, you answered no, that you had not.  Do you
4  remember testifying that way?
5      A.  Repeat that one more time.  I'm getting a
6  little confused.
7      Q.  I specifically asked you if you had met
8  with Mike Golojuch before you reviewed Exhibit 21,
9  the employment application of Phil English,
10 before -- I'm sorry, I can't even ask a question
11 now.
12         I asked you if you had talked to Mike
13 Golojuch before you reviewed this employment
14 application in conjunction with the workers'
15 compensation case.  Do you remember that question?
16     A.  If I had met with Mike Golojuch prior to
17 reviewing this application.
18     Q.  Right.
19     A.  Yes, I met with Mike Golojuch prior to
20 reviewing this application.
21     Q.  Do you remember your earlier answer was
22 that you had not met with Mike Golojuch prior to
23 reviewing this application.
24     A.  Now I'm kind of confusing because the
25 reason for meeting with Mike Golojuch was for

14 (Pages 50 to 53)

**Page 54**

1  another reason, so I'm getting a little bit
2  confused right now.
3       MR. MOSELEY: Miss Court Reporter, can
4  you go back and find that question.
5       (The requested portion of the record was
6  read.)
7       THE WITNESS: I have to correct myself.
8   Q.  BY MR. MOSELEY: So the answer was yes.
9   A.  I met with Mike Golojuch prior to
10  reviewing this application for the workers' comp
11  case.
12  Q.  Now, when was the first time you met with
13  Mike Golojuch?
14  A.  Regarding?
15  Q.  Phil English.
16  A.  Can you be a little more -- because --
17  Q.  When did you first meet with Mike
18  Golojuch regarding Phil English?
19  A.  In regards to a particular incident?
20  Q.  I don't care what. In regards to Phil
21  English, when is the first time you met with Mike
22  Golojuch?
23  A.  Regarding Phil English. That would have
24  to be the January 15th, 2003, and that's in regard
25  to an incident that occurred in October of 2002.

**Page 55**

1   Q.  Who was at that meeting?
2   A.  Mike Golojuch and Violet Lee.
3   Q.  And you.
4   A.  And myself.
5   Q.  Anybody else?
6   A.  No.
7   Q.  Did you speak with Mike Golojuch on the
8  telephone before that meeting?
9   A.  You know, I may have called him to just
10  set up the meeting.
11  Q.  Did you tell him what it was about?
12  A.  I'm not sure. I may have. I may have
13  told him, yeah, what the reason was, now that I
14  think about it.
15  Q.  What transpired at that meeting?
16  A.  At the January 15th meeting, I wanted to
17  discuss with him an incident that occurred prior to
18  that, in regards to Mr. English.
19  Q.  This was an October incident of the prior
20  year you're saying?
21  A.  Yes.
22  Q.  And what was that incident?
23  A.  There was an argument, a very loud
24  argument, between Mr. English and Ms. Gima.
25  Q.  When did that occur?

**Page 56**

1   A.  End of October, right around there.
2   Q.  It was a loud argument?
3   A.  Yes, what I've been told.
4   Q.  About what?
5   A.  The argument.
6   Q.  What was the argument about?
7   A.  The argument centered around Mr. English
8  completing an assignment and also about him taking
9  leave time.
10  Q.  Do you know anymore details than that?
11  A.  Mr. English was told that his leave would
12  be approved pending his completion of an
13  assignment.
14  Q.  Anything further?
15  A.  I believe that's the basis of the
16  argument.
17  Q.  What was your understanding that Mike
18  Golojuch's position was at that time?
19  A.  I'm sorry.
20  Q.  What was your understanding that Mike
21  Golojuch's position was at that time?
22  A.  Well, he's the administrative services
23  officer.
24  Q.  What does that person do?
25  A.  Deals with personnel matters.

**Page 57**

1   Q.  And this was a personnel matter that was
2  significant enough that you needed to involve Mike
3  Golojuch?
4   A.  I needed their opinion.
5   Q.  On what?
6   A.  I wanted to get their feedback on
7  disciplinary action.
8   Q.  Why?
9   A.  Just as a check.
10  Q.  What were you contemplating?
11  A.  At the time, I was contemplating a
12  written reprimand.
13  Q.  And Mike Golojuch doesn't work for the
14  assessment division, does he?
15  A.  No, but he works for the department, he
16  oversees things dealing with the department.
17  Q.  The department of budget and finance?
18  A.  Fiscal services.
19  Q.  I'm sorry, budget and fiscal services?
20  A.  Yes.
21  Q.  You can tell what that dates me.
22       Did you often consult with Mike Golojuch
23  on this sort of matter?
24       MR. LORUSSO: Objection, vague and
25  ambiguous.

Page 58

1  THE WITNESS: On disciplinary matters?
2  MR. MOSELEY: Yes.
3  THE WITNESS: If I felt it was warranted.
4  Q. BY MR. MOSELEY: How often did you
5  consult with Mike Golojuch before the January 15th,
6  2003 meeting you had with him, on any matter?
7  A. On any matter? Any matter, you said.
8  Actually, several times on personnel related
9  matters.
10 Q. Do you remember any of the personnel
11 involved?
12 A. Not offhand. I believe I did meet with
13 him regarding the reorg, that's one thing I do
14 remember.
15 Q. Did you meet with him about the complaint
16 that Chris Graff was doing outside work for the
17 administrator on city time?
18 A. Did I meet with him?
19 Q. Yeah, did you meet with Mike Golojuch on
20 that, did you consult with him or meet with him?
21 A. No, I was interviewed by him.
22 Q. Prior to your January 15th meeting with
23 Mike Golojuch, did you talk with him, either in
24 person or on the phone or through email, about
25 Chris Graff doing work on city time, with city

Page 59

1  equipment, for the administrator's outside
2  appraisal firm?
3  A. No.
4  Q. Why not?
5  A. Are we talking about the ethics complaint
6  or the initial incident?
7  Q. At some point in time you received a
8  report that Chris Graff was doing work for Gary
9  Kurokawa, your boss, on city time with city
10 equipment, didn't you?
11 A. Yes.
12 Q. Who did you consult with when you got
13 that report?
14 A. I took it upon my own responsibility.
15 Q. Did you consult with Mike Golojuch at
16 that time?
17 A. Not at that time.
18 Q. Wasn't that potentially a pretty serious
19 infraction?
20 MR. LORUSSO: Objection, argumentative,
21 assumes facts not in evidence, lacks foundation.
22 THE WITNESS: When I looked into the
23 matter, if it appeared that something had happened,
24 then I would have referred it to Mr. Golojuch.
25 Q. BY MR. MOSELEY: And you looked into the

Page 60

1  matter and found out it didn't happen; is that
2  right?
3  A. At least from what I could see or in my
4  discussions, yes, with Phil and the other parties.
5  Q. Chris Graff told you that it didn't
6  happen?
7  A. Yes, I spoke to Mr. Graff.
8  Q. And he told you it didn't happen.
9  A. He said he was not doing any work on city
10 time.
11 Q. And Gary Kurokawa told you he was not
12 having Chris Graff do any work on city time; is
13 that right?
14 A. That's correct.
15 Q. Did you do anything else to investigate?
16 A. Well, let me take a step back. When
17 Mr. English brought it to my attention, I asked him
18 what transpired, and he had mentioned to me that he
19 had overheard a phone call, a phone call that
20 was -- a Chris Graff phone call. So I asked him
21 was there anything else that he had saw or, you
22 know, and he said no, it was just a phone call that
23 he had overheard, and that Gary Kurokawa was having
24 Chris Graff do outside work on city time.
25 So I spoke to Mr. Graff first, and I

Page 61

1  asked him if he was doing outside work on city
2  time, and he said no. I decided then to look at
3  Mr. Graff's computer to see if there was anything
4  to indicate that there was being outside work done,
5  and I saw a lot of old spreadsheets that he had on
6  his computer, but nothing to indicate anything, as
7  far as current or outside work.
8  Q. Old spreadsheets?
9  A. Yes.
10 Q. What kind of spreadsheets?
11 A. Analysis type.
12 Q. Of what?
13 A. When I asked Mr. Graff about these
14 spreadsheets, he told me that they were part of a
15 database, that he collected market and sales
16 information, not only old appraisals but in from
17 other sources, outside sources, appraisers, things
18 like that.
19 Q. To your knowledge, did Chris Graff's job
20 as an appraiser utilize or require the utilization
21 of spreadsheets?
22 A. Yes.
23 Q. Is that common for people in the
24 assessment division to have done that?
25 A. To use spreadsheets?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 62

1   Q.  Yes.
2   A.  Yes, I think the appraisers all use
3   spreadsheets, to one extent or another.
4   Q.  What was particularly different about
5   these, then?
6   A.  Well, for Chris, he told me that this was
7   a database of just a collection of sales and market
8   data, information he would share freely with other
9   appraisers within our office and outside of our
10  office.  Again, he told me that, you know, if
11  appraisers needed help, you know, if he had
12  information or if they asked him for help, like do
13  one of his, you know, outside sources, gaining
14  information, so people would come, you know, to
15  talk to him about it.
16  Q.  Did you see the properties that were on
17  the spreadsheets, did you identify any of them?
18  A.  As I recall -- I can't recall specific
19  properties.  Some of these spreadsheets -- I
20  believe some of the spreadsheets looked like they
21  were from his former employer.
22  Q.  Who was who?
23  A.  The Hallstrom Group.  So, you know, he
24  carried some old files over.  I saw some old GK
25  spreadsheets, appraisal spreadsheets.

Page 63

1   Q.  GK being what?
2   A.  GK Appraisals.
3   Q.  Did you know who the principals were in
4   GK Appraisals at that time?
5   A.  No.
6   Q.  Do you now?
7   A.  Yes.
8   Q.  Did you inquire at that time when you saw
9   GK Appraisal's information, on spreadsheets in
10  Chris's computer, who it was?
11  A.  Initially, when I saw the spreadsheets, I
12  was concerned, that's when I spoke to Chris about
13  the spreadsheets, and he said it was part of his
14  database.  I also checked with Ann Gima and asked
15  her if she knew about this database and how he
16  shares information and spreadsheets with, you know,
17  other appraisers.  And she said she was aware of
18  the database, that, you know, it was something that
19  he shared, not only the information but the
20  spreadsheets, used them as templates, you know, for
21  analysis purposes.
22  Q.  Do you know, as you sit here today, do
23  you know who GK Appraisals is?
24  A.  Now I do, yes.
25  Q.  And who is it?

Page 64

1   A.  It's the Kurokawa family.
2   Q.  Do you know if Gary Kurokawa is part of
3   that?
4   A.  Yes.
5   Q.  If you had known at the time that those
6   were spreadsheets from Gary Kurokawa's company,
7   would that have raised your level of suspicion at
8   that time?
9       MR. LORUSSO:  Objection, calls for
10  speculation, lacks foundation, assumes facts not in
11  evidence.
12      THE WITNESS:  When I looked at the
13  spreadsheets, these were old spreadsheets dated
14  late 1990s or something, and as far as appraisers
15  sharing spreadsheets, using them as templates,
16  sharing information, that's very common.  And, like
17  I said, there was also, I believe, some
18  spreadsheets from the Hallstrom Group on there,
19  too.
20      MR. LORUSSO:  Do you want to take a
21  break?
22      (The deposition was at lunch recess.)
23  Q.  BY MR. MOSELEY:  Bob, you're still under
24  oath.
25  A.  Yes.

Page 65

1   Q.  We got off track a little bit, but I had
2   asked you about any time you had reviewed Exhibit
3   21, which is the employment application of Phil
4   English.
5   A.  Yes.
6   Q.  Did you review this at any other time,
7   except for in conjunction with the workers' comp
8   claim?
9   A.  I believe this was also an exhibit for
10  this current legal action, and we had to admit or
11  deny.
12  Q.  So it was called a Request for
13  Admission --
14  A.  Yes, Request for Admission.
15  Q.  -- a huge stack of documents.  Were you
16  involved in going through to determine whether the
17  documents were authentic?
18  A.  I was one of the persons, yes.
19  Q.  Was there any other time you reviewed
20  this employment application?
21  A.  No.
22  Q.  In conjunction with your review for the
23  workers' comp claim, did you arrive at any
24  conclusions with respect to the application,
25  Exhibit 21?

Page 66

1  A. When I looked at the application, the
2  conclusion I had come up with, that maybe there was
3  a period when he was working in the private sector,
4  that he may not have been working, meaning his
5  application didn't really match up with other
6  information I had received.
7  Q. What part of Exhibit 21 are you
8  referencing?
9  A. Where it says Employer, Phil English &
10 Associates.
11 Q. Is this on page 2?
12 A. Yes, page 2. He said he had his business
13 from 1989 to present, or 1999.
14 Q. Right.
15 A. And other information that I've reviewed
16 appeared that this was not matching up or correct.
17 Q. What other information do you have?
18 A. In the workers' comp report, I looked at
19 his divorce papers, also his bankruptcy papers, and
20 they indicated that there was a period where he was
21 not working.
22 Q. And what period was that?
23 A. Roughly, between '96 and 1998.
24 Q. And did you determine what he was doing
25 in that period?

Page 67

1  A. According to other employees, they stated
2  that he had a import-export business, I believe
3  that was also mentioned in his bankruptcy papers.
4  Q. And was there any other place that you
5  thought there was a problem with this job
6  application?
7  A. I checked the DCCA website, Department of
8  Commerce and Consumer Affairs, State of Hawaii,
9  just to see if his company was registered, and
10 according to their information on their website,
11 his business had not filed, I guess, the annual or
12 filed annually for '96 and '97 and '98 and had been
13 involuntarily dissolved by DCCA.
14 Q. When was it involuntarily dissolved?
15 A. '99, I believe.
16 Q. Do you know when in '99?
17 A. I don't have the exact month, no.
18 Q. Is there anything else that you found,
19 what, inaccurate in this employment application?
20 A. I believe that's about it.
21 Q. And what did you do with that information
22 you found?
23 A. I believe I mentioned it or stated some
24 of that information in the workers' comp report.
25 Q. That's a report you did?

Page 68

1  A. Yes.
2  Q. And who did you present that report to?
3  A. The report was going to go to
4  Dr. Kennedy, I'm not sure if it went straight to
5  her via Mr. Tom Riddle for workers' comp.
6  Q. Do you still have a copy that report?
7  A. I would have to go back to my office and
8  check. A portion of the report was one of the
9  exhibits, but I don't think all the pages were
10 there. The information that, you know, the big
11 stack of documents for admission, so I would have
12 to -- when I did check it, when it was first
13 produced by you, some pages may have been missing.
14 Q. And did you make any comments about your
15 findings?
16 A. I did mention that it appeared his claim
17 for workers' comp was unfounded, that his claim was
18 based on stress due to work related or retaliatory
19 or something along those lines. The conclusion I
20 came up with was basically that a lot of this was
21 brought on by a lot of his personal problems,
22 financial problems that he was having during his
23 employment with the city.
24 Q. I'm talking about the investigation you
25 did with respect to his employment application,

Page 69

1  Exhibit 21. That's what drew you to the conclusion
2  that his claim was unfounded?
3  A. No, that was just information that was
4  included. There was also an application for an
5  Appraiser VI position that he applied for in
6  January of 2003, so there was more than one
7  application. There was also an application for an
8  Appraiser VI position that he applied for in March
9  of -- I think March or April of 2001, so there are
10 actually, maybe, I believe, three applications that
11 I looked at.
12 Q. Did you look at anything else in respect
13 to the workers' comp claim?
14 A. I'm sorry.
15 Q. Did you look at anything else with
16 respect to the workers' comp claim?
17 A. I did look at the, in addition to the
18 bankruptcy --
19 MR. LORUSSO: Other than the documents
20 you've already referred to, I assume.
21 MR. MOSELEY: Yes.
22 THE WITNESS: I'm not sure. That might
23 be most of it, though.
24 Q. BY MR. MOSELEY: And on what did you base
25 your conclusion that his workers' comp claim was

Page 70

1  unfounded?
2      A.  Well, Mr. English seemed to blame a lot
3  of things on others, other people or things were
4  always creating his personal problems or problems
5  at work.  During his employment we tried to help
6  him, we tried to work with him, and it just seemed
7  like he blamed us for everything.
8      Q.  When you say everything, what are you
9  talking about?
10     A.  Well, when I say blame, I'm also
11 including things like problems with his marriage,
12 he was having financial problems throughout his
13 stay with the city.  As far as retaliation, you
14 know, that's referencing the ethics complaint, you
15 know, I felt that was unfounded.
16     Q.  Why?
17     A.  He was welcome to file an ethics
18 complaint, I mean, that's anyone's right, but to
19 blame, you know, our office, you know, for all
20 these undoings, distress and everything, it just
21 didn't seem justified.
22     Q.  Didn't you meet with Mike Golojuch on
23 January 15th of 2002 to discuss some sort of
24 disciplinary action against Phil?
25     A.  I think that was January 15th, 2003.

Page 71

1      Q.  I'm sorry, 2003, you're right.  Wrong
2  year.
3      A.  I said met with Mike --
4          MR. LORUSSO:  His question is, Did you
5  meet with him on January 15th, 2003, that's the
6  question.
7          THE WITNESS:  Yes.
8      Q.  BY MR. MOSELEY:  And wasn't that meeting
9  after Mr. English first went to the ethics
10 commission?
11     A.  The January 15th meeting was after he
12 went to the ethics commission.
13     Q.  Is that an answer?
14     A.  I'm not sure when he went to the ethics
15 commission.
16     Q.  How did you find out he went to the
17 ethics commission?
18         MR. LORUSSO:  Finish your answer.  And
19 then answer his second question, please.
20         THE WITNESS:  On January 17th, 2003,
21 that's when I heard that there was some kind of
22 ethics complaint, this is two days after the
23 meeting with Mike Golojuch and Violet Lee.
24     Q.  BY MR. MOSELEY:  Would it surprise you
25 that Mike Golojuch's report basically says that you

Page 72

1  were told on January 7th and 10th that Mr. English
2  had gone to the ethics commission?
3          MR. LORUSSO:  Objection, assumes facts
4  not in evidence, lacks foundation.
5          THE WITNESS:  Wait, January 7th.  Now,
6  can you explain that a little bit more, as far as
7  his report.
8      Q.  BY MR. MOSELEY:  Would it surprise you if
9  Mike Golojuch's report said that you knew, as of
10 January 7th and 10th, that Phil English had already
11 gone to the ethics commission?
12         MR. LORUSSO:  Objection, lacks
13 foundation, assumes facts not in evidence.
14         THE WITNESS:  That's incorrect.
15     Q.  BY MR. MOSELEY:  I'm asking if that would
16 surprise you.
17     A.  It would surprise me.
18         (Exhibit Number 22 was marked for
19 identification.)
20     Q.  BY MR. MOSELEY:  Have you ever seen
21 Exhibit 22 before?
22     A.  I did come across it in his personnel
23 file.
24     Q.  When did you first see it?
25     A.  I believe these were with his -- or in

Page 73

1  the same binder as his job applications, and I
2  looked at that for the workers' comp.
3      Q.  For workers' comp.
4      A.  Yeah.
5      Q.  Did you see this document in any other
6  context?
7      A.  I'm not sure if this was included in the
8  documents you had sent us earlier.
9      Q.  I'm going to show you what's going to be
10 marked as Exhibit 23.
11         (Exhibit Number 23 was marked for
12 identification.)
13     Q.  BY MR. MOSELEY:  Are you familiar with
14 this document?
15     A.  I'm not sure if I've seen this one.  I
16 cannot be sure.
17     Q.  Does this look like a typical kind of a
18 form that the city issues?
19     A.  Yes.
20     Q.  Can you explain to me, right in the
21 middle here it says Appointment Type, A-p-p-t Type,
22 and then it says Initial Probation.  Do you see
23 that?
24     A.  Yes.
25     Q.  What does that mean?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596