Page 74

1    A.   Normally, it's when a person is first
2  hired.
3    Q.   What is the initial probation?
4    A.   Six months, at least for the positions we
5  have in our office, I'm aware of.
6    Q.   So does that mean, if this is a true and
7  correct document, does that mean this is an
8  indication that he was placed on a six month
9  probation beginning on June 1st, 2000?
10   A.   Yes.
11       (Exhibit Number 24 was marked for
12  identification.)
13   Q.   BY MR. MOSELEY:  I'll show you what's
14  been marked as Exhibit 24.  Have you seen this
15  document before?
16   A.   Yes, it does look familiar.
17   Q.   In what context would you have seen this
18  document?
19   A.   It was one of the documents that you
20  submitted.
21   Q.   Did you see this in any context before
22  the documents that I submitted and the Request for
23  Admission?
24   A.   I may have, I'm not sure.
25   Q.   In what context would you have seen it,

Page 75

1  if you did see it?
2       MR. LORUSSO:  Let me object, to the
3  extent it calls for speculation.
4       THE WITNESS:  If this was contained in
5  his personnel file when I was also looking at that
6  file for other purposes, like the workers' comp
7  case.
8       (Exhibit Number 25 was marked for
9  identification.)
10   Q.   BY MR. MOSELEY:  This is Exhibit 25.
11  Have you seen this before?
12   A.   It looks familiar.
13   Q.   And in what context would you have seen
14  this?
15   A.   Like I said, it looks familiar, and then
16  when I was looking at his personnel file for the
17  workers' comp case.
18   Q.   Were you generally aware of Phil's
19  performance in the first six months of his
20  employment with the city?
21   A.   Yes.
22   Q.   And what was your understanding of his
23  performance?
24   A.   His performance was satisfactory.  He was
25  enthusiastic.

Page 76

1    Q.   If you read the comments on this
2  probationary performance evaluation report that's
3  marked as Exhibit 25, do they generally reflect
4  your understanding of Phil's performance in the
5  first six months of his employment with the city?
6    A.   Yes.
7    Q.   Now, how would you have gotten such an
8  understanding?
9    A.   Speaking to the supervisor.
10   Q.   Is that basically where you got most of
11  your information, is speaking to the supervisor?
12       MR. LORUSSO:  Objection, vague and
13  ambiguous, lacks foundation.
14       THE WITNESS:  Information meaning?
15       MR. MOSELEY:  With respect to Phil's
16  performance.
17       MR. LORUSSO:  Same objection, vague and
18  ambiguous as to time.
19       THE WITNESS:  Yes.
20       MR. MOSELEY:  Let's make it during his
21  employment with the city.
22       MR. LORUSSO:  Same objection, over-broad.
23       THE WITNESS:  Yes, I relied on his
24  supervisors.
25       Q.   BY MR. MOSELEY:  Did you have much

Page 77

1  individual personal experience with Phil at any
2  time during his employment with the city?
3    A.   When you say experience.
4    Q.   I mean, did you work with him on
5  anything?
6    A.   Did I what?
7    Q.   Work with him on anything.
8    A.   Briefly.
9    Q.   On what?
10   A.   I believe it was -- I think, Waikiki
11  Shore tax appeal court case.
12   Q.   And what did you do with him on that
13  case?
14   A.   We had a discussion.
15   Q.   About what?
16   A.   Some just some of the material in there,
17  I believe.
18   Q.   Was that in preparation for your
19  deposition, that case?
20   A.   No, I think it was just preparation of
21  the expert's report.  I don't recall talking about
22  the deposition discussion with him on that.
23   Q.   Who prepared the expert's report in that
24  case?
25   A.   Mr. English.

Page 78

1    Q.    Was he an Appraiser IV at the time?
2    A.    I don't think so.
3    Q.    Was it the assessment division's policy
4    to allow anybody but Appraiser IVs to do expert
5    witness reports?
6    A.    You mean a written policy or any kind of
7    policy?
8    Q.    Any kind of policy.
9    A.    I don't think there was any set policy,
10    you know, if a person has good capabilities and
11    knowledge, they can be involved in preparation for
12    court.
13    Q.    How about in terms of testifying as an
14    expert?
15    A.    I don't see any restriction.
16    Q.    As a matter of practice, did it ever
17    happen that expert reports from the assessment
18    division of appraisers were ever given except by
19    Appraiser IVs?
20    A.    I'm not sure.
21    Q.    Do you know of any exceptions?
22    A.    Offhand, I'm not sure.
23    Q.    When you say offhand you're not sure, I
24    asked you if you know of any exceptions.  You're
25    not sure if you know of any?

Page 79

1    A.    Yeah, I'm not sure if I know of any.
2    Q.    So you might know of one or two or three?
3    A.    I would have to think about it.
4    Q.    As you're sitting right now, do you
5    know of any exception to that?
6    A.    Not at this point, no.
7    Q.    As you're sitting right now, is it
8    your basic understanding that at least usually such
9    expert witness reports and expert testimony is
10    given by Appraiser IVs?
11    A.    Typically.
12         (Exhibit Number 26 was marked for
13    identification.)
14    Q.    BY MR. MOSELEY:  Was there any other time
15    you worked with Phil English on any matter in the
16    assessment division?  When I say any other time,
17    other than the expert witness report for Waikiki
18    Shore?
19    A.    On any matter.
20    Q.    On any matter.
21    A.    I don't recall.
22    Q.    Was your office in the same area of the
23    building as Phil's at any time during his
24    employment there?
25    A.    My office is in the same building.

Page 80

1    Q.    I understand it's the same building, is
2    it in the same area of the building?
3    A.    At the beginning of his employment?
4    Q.    Right.
5    A.    I believe at the beginning of his
6    employment it may have been on another side of the
7    same floor.
8    Q.    And nearing the end of his employment?
9    A.    He was in a room adjoining mine.
10    Q.    Adjoining yours.
11    A.    Or the next room over, should I say.
12    Q.    So did you see him on a daily basis?
13    A.    I would see him, I would say, pretty
14    close to daily because we were in adjoining rooms,
15    yes.
16    Q.    Other than the report of his
17    supervisors -- and, actually, while he was working
18    at the assessment division he really only had two
19    supervisors, right?
20    A.    I'm sorry, what's that?
21    Q.    Mike Okamoto, briefly, at the beginning,
22    and then Ann Gima?
23    A.    Yes.
24    Q.    Other than information you received from
25    his supervisors, was there any other method by

Page 81

1    which you were able to obtain information about how
2    Phil was doing, either professionally or socially
3    within the assessment division?
4    A.    I think you said two things,
5    professionally and socially.
6    Q.    I presume there's social interaction not
7    outside the group, but social interaction within
8    the division, right?
9    A.    Socially, he's, over time, made a few
10    friends in the office.
11    Q.    How did you learn that?
12    A.    Well, actually, when Phil first started,
13    I used to have long talks with him, go into his
14    personal life, and I used to invite him over for
15    holidays, things like that.  So, socially, I was
16    interacting with Phil in the beginning.
17    Q.    Did you talk to Phil about your personal
18    life?
19    A.    Yes.
20    Q.    What kinds of things did you tell Phil
21    about your personal life?
22    A.    Just family things.
23    Q.    Like about your wife's cancer?
24    A.    Yes.
25    Q.    Did you ever tell Phil that you were

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 82

1  thinking of leaving your wife as a result of, maybe
2  indirectly, of her cancer?
3      A.   No.
4          MR. LORUSSO:  Objection, lacks
5  foundation, relevancy.
6          THE WITNESS:  Did I hear you right?  Can
7  you repeat that, please.
8          (The requested portion of the record was
9  read.)
10         MR. LORUSSO:  Same objections.
11         THE WITNESS:  Absolutely not.
12     Q.   BY MR. MOSELEY:  Did you talk to Phil
13 about problems with your relationship with your
14 wife that arose out of the fact that she had had
15 cancer?
16         MR. LORUSSO:  Objection, relevancy.
17         THE WITNESS:  No.
18     Q.   BY MR. MOSELEY:  What kinds of things
19 about your personal life did you share with Phil?
20     A.   We just talked about the family.  It was
21 more he would talk to me about his situation, his
22 problems.
23     Q.   And what did you understand his problems
24 to be?
25     A.   From the beginning of his employment,

Page 83

1  when we got to know each other, he was very bitter
2  about his second divorce, he was concerned about
3  his financial problems, concerned about the
4  well-being of his son, things along those lines.
5      Q.   Did he talk to you about how he
6  discovered he had cancer?
7      A.   Taking a step back, before Phil started
8  working with our office, he called me several
9  months before the interview, and that's when he
10 told me about his cancer, and I told him about my
11 wife's cancer, this is before he started working or
12 even interviewing with our office, and he was
13 concerned about passing a city physical.  And I
14 told him he should be okay, if it's in remission,
15 and things like that, so I was trying to reassure
16 him that.
17     Q.   Did Phil tell you anything about how he
18 discovered he had cancer?
19     A.   He told me he fell out of a tree.
20     Q.   And what else did he say?
21     A.   Something about injuring his ribs, and
22 when he went to the doctor, that's when they
23 discovered it.  And that was about the time that,
24 roughly about the time that his second wife served
25 him with divorce papers.

Page 84

1      Q.   When did all this occur?  This occurred
2  early in your relationship with Phil?
3      A.   During the first several months of his
4  employment.  I would say the first six months.
5      Q.   Did you form an opinion about Phil's
6  emotional status at that point in time?
7          MR. LORUSSO:  Objection, vague and
8  ambiguous, lacks foundation.
9          THE WITNESS:  An opinion I had of him was
10 Phil had gone through some very difficult times,
11 and, hopefully, things would change and turn around
12 for him, so I had a positive outlook on Phil.
13     Q.   BY MR. MOSELEY:  I guess maybe I didn't
14 make the question clear.  I don't know if I'm going
15 to be able to actually rephrase it.
16         What I meant to ask is, Did you form an
17 opinion, based on your discussions with him, of his
18 emotional status?
19         MR. LORUSSO:  Same objection, asked and
20 answered.
21         THE WITNESS:  My initial opinion of Phil
22 was he had a lot of problems, but he seemed
23 sincere, and that the least I could do is offer
24 some moral support so he could get through some of
25 these problems.

Page 85

1      Q.   BY MR. MOSELEY:  What kind of moral
2  support do you think you offered him?
3      A.   Well, I know he had concerns about his
4  son, and I would always wish him the best regarding
5  his son.  It turns out his son also knew my nephew.
6  During the holidays, Thanksgiving, New Year's,
7  things like that, I would invite him, his wife, his
8  third wife, and his son to my parents' house for
9  the holidays.
10         Financially, he told me that he was
11 having difficulty.  I believe I had given him a
12 ride and dropped him off at his apartment, and I
13 told him that, you know, if he wanted to borrow
14 some money, you know, I would try to help him.
15     Q.   Anything else?
16     A.   We used to talk about church, religion,
17 so I would invite him to our church on special
18 occasions, like Christmas Eve.
19     Q.   And did he go?
20     A.   Yes.  And then we'd go out to dinner
21 afterwards.
22     Q.   Did there come a time when you stopped
23 inviting him on these kinds of occasions with your
24 family or to church, that kind of thing?
25     A.   I believe it was the following year that

22 (Pages 82 to 85)

Page 86

1  I had invited him over to my parents' house for
2  Thanksgiving, but at the last minute I told him
3  that we were pretty much going to cancel the
4  festivities due to my mother's health.
5      Q.  When you said following year, what year
6  were you talking about?
7      A.  I believe probably around, towards the
8  end of 2001.
9      Q.  2001 or 2002?
10     A.  I believe it was around 2001 because he
11 did come to my parents' house for Thanksgiving the
12 first time.  Then the following year my mother's
13 health was declining, so the family felt that we
14 should cut back on the festivities and, you know,
15 that's when I told Phil the gathering is off
16 because of my mom's health.  She's Alzheimer's.
17     Q.  So after that point you didn't socialize
18 with Phil anymore?
19     A.  No, I think -- I'm trying to recall.  I
20 think in 2001, also, we had gotten together, I
21 believe it was either Easter, Easter at our church
22 and then have lunch after, that kind of thing.
23     Q.  So you think Phil had Thanksgiving at
24 your parents' house in November of 2000?
25     A.  Yes.

Page 87

1      Q.  But not in 2001.
2      A.  Yeah, I recall there was a year when we
3  had to cancel the plans due to my mother's health,
4  so I'm thinking it may have been around there.
5      Q.  Did you invite him to those kind of
6  gatherings in 2002?
7      A.  You know, I'm not sure about New Year's.
8  One thing that did occur, though, is he had become
9  close friends with Chris Graff, and they started
10 spending time together, not only at the office but
11 outside the office.  So knowing that he was also
12 socializing with other people, you know, I felt
13 good about that, you know, he was interacting with
14 others, but he only interacted with me at least in
15 the first few months.
16     Q.  So did you socialize with him on these
17 family occasions in 2002?
18     A.  You know, I don't think so.  I think he
19 was already socializing with Chris Graff.
20     Q.  So, basically, you spent one Thanksgiving
21 and one Christmas at church with him?
22     A.  Well, Thanksgiving and the following
23 Easter, I believe.
24     Q.  It wasn't like two Thanksgivings.
25     A.  I'm not sure, but I recall there was a

Page 88

1  problem with my mother at the time.
2      Q.  Did your mother eventually die?
3      A.  No, she's still alive.
4      Q.  So she felt better?
5      A.  No, my mother with Alzheimer's just keeps
6  going downhill.
7      Q.  Can you take a look at what I've marked
8  as Exhibit 26.
9      A.  Yes.
10     Q.  Have you seen this before?
11     A.  I might have.  I cannot be sure.
12     Q.  What is it?
13     A.  Again, this is a Notice of Personnel
14 Action.  It says here Appointment Type, Permanent,
15 but I don't see an ending date.  The begin date, of
16 course, is when he started with the city.
17     Q.  Well, there's an effective date
18 12-1-2000, do you see that?
19     A.  I'm sorry, I'm missing that.  Oh, up
20 there, okay.  Here we go.  Completion of probation,
21 okay.
22     Q.  Is that what this notice is for, to
23 indicate that he had completed his six-month
24 probation?
25     A.  That's what this appears to be.

Page 89

1      Q.  And you don't know if you've seen this in
2  any other context?
3      A.  I can't be sure.  Like I said, it would
4  normally be in his personnel file.
5          (Exhibit Number 27 was marked for
6  identification.)
7      Q.  BY MR. MOSELEY:  Take a look at what's
8  been marked as Exhibit 27.  Have you seen this
9  before?
10     A.  I'm not sure.  This is in the director's
11 office, it looks like.
12     Q.  Are you familiar with forms like this?
13     A.  Yes.
14     Q.  Do you typically review them at all?
15     A.  Actually, the original request, let's
16 say, for something, a relocation, would be
17 generated from our office.
18     Q.  When you say our office --
19     A.  Real property assessment division.
20     Q.  You particularly, though?
21     A.  In some cases I have prepared these
22 forms, yes, for reallocation.
23     Q.  This shows a reallocation from Appraiser
24 II to a Appraiser III, does it not?
25     A.  Yes.

23 (Pages 86 to 89)

Page 90

1   Q.   This is, basically, eight months after he
2   started; is that right?
3   A.   Approximately, I think, yeah.
4   Q.   He started June 1st, until the end of the
5   year would have been seven full months, and it's
6   effective February 1st, so that's eight months,
7   essentially, to the day, right?
8   A.   Approximately, eight months, yes.
9   Q.   Is that common for people to be promoted
10  that rapidly in the assessment division?
11  A.   It's occurred before.
12  Q.   Is it common?
13  MR. LORUSSO:  Objection, asked and
14  answered, vague and ambiguous.
15  THE WITNESS:  No, it's occurred before.
16  Q.   BY MR. MOSELEY:  Is it common?
17  MR. LORUSSO:  Same objection, asked and
18  answered.
19  THE WITNESS:  To go from Appraiser II to
20  Appraiser III in eight months?
21  MR. MOSELEY:  Right.
22  THE WITNESS:  I would say it's pretty
23  common.
24  (Exhibit Number 28 was marked for
25  identification.)

Page 91

1   Q.   BY MR. MOSELEY:  Have you seen this form
2   before, what's marked as Exhibit 28?
3   MR. LORUSSO:  The form or the actual
4   document?
5   MR. MOSELEY:  Well, this document.
6   THE WITNESS:  I'm not sure about the
7   document.
8   Q.   BY MR. MOSELEY:  The form you're familiar
9   with.
10  A.   The form looks familiar, yes.
11  Q.   What does this document purport to do?
12  A.   This one, basically, states that
13  Mr. English is on new probation, a new class,
14  Appraiser II to Appraiser III.  It shows the
15  effective date and the salary, and the changes are
16  underlined.
17  Q.   What does a new probation mean?
18  A.   He's starting, in this case, in a new
19  position, and the probation would be a six month
20  probation.
21  Q.   And if he didn't pass that probation,
22  what would the result be?
23  A.   There are options.  Option is you can
24  extend the probation.  If they don't pass
25  probation, they can always go back to their prior

Page 92

1   position.
2   Q.   Can they be terminated if they don't pass
3   probation?
4   A.   For a promotion?
5   Q.   Well, on this type of probation.
6   A.   This is like a promotion from an
7   Appraiser II to Appraiser III.
8   Q.   Right.  So if he didn't pass this
9   probation, could he be terminated?
10  A.   No.
11  (Exhibit Number 29 was marked for
12  identification.)
13  Q.   BY MR. MOSELEY:  I'll show you what's
14  been marked as Exhibit 29 to this deposition.  Have
15  you seen this document before?
16  A.   It looks familiar.
17  Q.   When might you have seen it?
18  A.   I believe it may have been during when I
19  was looking at his workers' comp case initially,
20  and, then again, one of the documents submitted for
21  this case.
22  Q.   Any other times?
23  A.   I can't recall, no.
24  Q.   This document, Exhibit 29, purports to be
25  a probationary performance evaluation report.

Page 93

1   What's the difference between that with respect to
2   a regular performance evaluation report?
3   A.   Well, this is an evaluation if the
4   employee's on probation, let's say, there will be a
5   report at three months and one at six, whereas a
6   regular evaluation report, that is done annually.
7   You know, if he's not on probation -- let's say he
8   just got promoted or something, he's going on a new
9   probation, otherwise they're subject to an annual
10  evaluation, which is a requirement.
11  Q.   Now, take a look at the comments section
12  on this Exhibit 29.  Does that reflect your
13  understanding at the time of how Phil was doing?
14  A.   Do I agree with these comments is what
15  you're asking.
16  Q.   At the time, was that your understanding
17  of how he was doing?
18  A.   Well, his supervisor would know how he
19  was doing.  I had heard, you know, positive
20  comments about his...
21  Q.   So in or around April 5th, 2001, this is
22  what you understood was going on with Phil?
23  A.   That is my understanding, yes.
24  Q.   There's a series of checked boxes on the
25  left-hand side of this form, and in each one,

24 (Pages 90 to 93)

Page 94

1  except for number five, it says Exceeds
2  Requirements. Do you see that?
3      A. Yes.
4      Q. The X in the box, does that signify that
5  whoever prepared the report believes that he
6  exceeded requirements?
7      A. Yes.
8      Q. And in the fifth box down there it says
9  Supervision of Employees, there's no X at all. Is
10  there a reason for that; do you know?
11     A. Yeah, the fifth box is for supervisors.
12     Q. And Phil was not a supervisor?
13     A. Correct.
14     I think I got to use the restroom.
15     (The deposition was at recess.)
16     (Exhibit Number 30 was marked for
17  identification.)
18     Q. BY MR. MOSELEY: I'd like you to take a
19  look at what's been marked as Exhibit 30. Do you
20  know what this document is?
21     A. Another one of Mr. English's performance
22  evaluation report.
23     Q. Have you ever seen this document before?
24     A. Yes, I might have.
25     Q. In what context?

Page 95

1      A. Well, it would be in his personnel file,
2  plus the workers' comp and also for this particular
3  case, too.
4      Q. Did you review Phil's personnel file at
5  any time for any other reason other than for this
6  case?
7      A. Workers' comp.
8      Q. Other than this case and workers' comp.
9      A. No.
10     Q. Take a look at the comments section of
11  this page. It says received April 23rd, 2001. Is
12  the description in the comment section, does that
13  reflect your understanding of Phil's performance as
14  of April 23rd, 2001?
15     A. I'm sorry, you said April 3rd?
16     Q. April 23rd.
17     A. That is my understanding, yes.
18     Q. And the boxes in the checked box area on
19  the left are essentially the same as the prior
20  exhibit, right?
21     A. Right.
22     Q. Do they also reflect your understanding
23  of his performance as of that date?
24     A. Yes.
25     (Exhibit Number 31 was marked for

Page 96

1  identification.)
2      Q. BY MR. MOSELEY: I'll show you what's
3  been marked as Exhibit 31. Have you ever seen this
4  document before?
5      A. Yes, I may have.
6      Q. And was that in the same context as this
7  litigation or the workers' comp claim?
8      A. Yes.
9      Q. In the comment section it says, Please
10  see attached. Do you see that?
11     A. Yes.
12     Q. Can you take a look at the attachment.
13     A. Yes.
14     Q. Does that reflect your understanding of
15  Phil's performance as of June 26th, 2001?
16     A. Yes.
17     Q. And, again, it's the checked box form on
18  the left, all of the X's are in the Exceeds
19  Requirements column, right?
20     A. Yes.
21     Q. And does that also reflect your
22  understanding of his performance as of that date?
23     A. Yes.
24     Q. When did you first hear about Phil
25  English's allegations that Chris Graff was doing

Page 97

1  work for Gary Kurokawa on company time and with
2  company equipment?
3      A. Phil brought it to my attention in early
4  2002.
5      Q. How early in 2002?
6      A. Around February of 2002.
7      Q. That's the first you heard about it?
8      A. Yes.
9      Q. It wasn't in October of 2001?
10     A. No.
11     Q. Is Phil the first person that brought
12  that allegation to your attention?
13     A. Regarding?
14     Q. Regarding Chris doing work for Gary
15  Kurokawa's company on city time and with city
16  equipment.
17     A. Phil was the first. Yes, correct.
18     Q. Ann Gima didn't bring that to your
19  attention?
20     A. No.
21     Q. And was this a meeting in which Phil
22  brought this to your attention or was it by email
23  or phone conversation or how did that occur?
24     A. Initially, he came to my office.
25     Q. And what happened at that meeting?

25 (Pages 94 to 97)

Page 98

1      A.  He came to my office and sat down, and he
2  told me that he'd overheard a phone call and that
3  Chris Graff was doing outside work on city time per
4  Gary Kurokawa's instructions, something to that
5  effect.
6      Q.  And what did you tell Phil at that time?
7      A.  I told Phil I would -- well, at first I
8  said I'd look into it.  That's pretty much what I
9  told him, I'd look into it.
10     Q.  That's all you told him?
11     A.  I may have said something else, but I
12  cannot recall.
13         (Exhibit Number 32 was marked for
14  identification.)
15     Q.  BY MR. MOSELEY:  I'm going to show you
16  what's marked as Exhibit 32.
17     A.  Yes.
18     Q.  Do you recognize this exhibit?
19     A.  This one I'm not sure.
20     Q.  It's addressed to you.
21     A.  Yes, it is.
22     Q.  Do you know if you received it?
23     A.  Again, I don't recall this.  I may have
24  received it, but I'm not sure.
25     Q.  Do you know what the reference is when he

Page 99

1  says, Bob, I need to talk with you when you have a
2  moment?
3      A.  During this time, it appears to have
4  something to do with his son.
5      Q.  With his son?
6      A.  Yes.
7      Q.  And what did it have to do with his son?
8      A.  He was concerned about his son around
9  this time.
10     Q.  What was his concern about his son around
11  this time?
12     A.  He had come to my office and had
13  mentioned that he may have to take some time off to
14  address some problems that his son was having at
15  school.
16     Q.  Did you ever have the meeting with him
17  that he requested in this Exhibit 32?
18     A.  If the time frame, if that's what I'm
19  thinking of -- actually, what happened is Phil,
20  again, came to my office right around this time
21  period and told me that he needed to take some time
22  off, possibly take some time off from work to
23  address a problem that his son was having, and then
24  he started talking about this problem.
25     Q.  And that's what you think this meeting

Page 100

1  was about.
2      A.  It's around the same time frame, yes.
3      Q.  Is there anything else that you could --
4  do you remember distinctly that was what the
5  meeting was about?
6      A.  Well, as far as the time frame, it's
7  approximate.  As far as the discussion, that was
8  pretty detailed, what we talked about.
9         (Exhibit Number 33 was marked for
10  identification.)
11     Q.  BY MR. MOSELEY:  I'd like you to take a
12  look at what I've marked as Exhibit 33.  This is
13  actually on the same day as the prior Exhibit 32,
14  about 12 minutes later.  Do you see that?
15     A.  Yes.
16     Q.  Do you remember seeing this email?
17     A.  I can't be certain.
18     Q.  Did you have any discussions with Phil
19  about what might be upsetting Ann?
20     A.  As far as the discussion regarding Ann, I
21  don't recall a conversation with him.  I'm not
22  absolutely sure, but I don't recall.
23         (Exhibit Number 34 was marked for
24  identification.)
25     Q.  BY MR. MOSELEY:  Have you ever seen

Page 101

1  Exhibit 34 before?
2      A.  I'm not sure.
3      Q.  In each of these cases where the email is
4  addressed to you, do you have any reason to believe
5  you would not have received them for some reason?
6      A.  I may have received them, I just don't
7  recall these emails.
8      Q.  Is there any reason you would not have
9  received an email addressed to you?
10        MR. LORUSSO:  Objection, calls for
11  speculation.
12        THE WITNESS:  Why I would not have
13  received an email?
14     Q.  BY MR. MOSELEY:  Right.  Did you have
15  problems with your email system?
16     A.  Yeah, sometimes it backs up, it doesn't
17  work, you know.
18     Q.  So it's possible you didn't receive some
19  of these emails?
20     A.  There's a possibility.  I'm not sure if
21  it occurred at this time.
22     Q.  You don't remember this particular email
23  or you said you don't remember?
24        MR. LORUSSO:  Objection, asked and
25  answered.

26 (Pages 98 to 101)

Page 102

1      THE WITNESS:  Yeah, I don't recall this.
2      Q.   BY MR. MOSELEY:  This is one day later,
3   after the previous two exhibits.  Do you have any
4   idea why he wanted to see you?
5      MR. LORUSSO:  Objection, asked and
6   answered.
7      THE WITNESS:  I don't know what the
8   reason was.
9      (Exhibit Number 35 was marked for
10   identification.)
11      Q.   BY MR. MOSELEY:  I'd like you to look at
12   what's been marked Exhibit 35.  Do you recognize
13   this document?
14      A.   I'm not really sure.
15      Q.   Have you seen it before?
16      A.   The document or the form?
17      Q.   Document.
18      A.   I may have.
19      Q.   It purports to be completion of
20   probation, does it not?
21      A.   Yes.
22      Q.   And this would be the probation after
23   Phil's promotion from Appraiser II to Appraiser
24   III; is that correct?
25      A.   It appears to be, yes.

Page 103

1      Q.   And if you'd seen this document before,
2   in what context would you have seen it?
3      A.   If it was contained in his personnel
4   file.
5      Q.   And you would have reviewed that in the
6   workers' comp proceeding and in the present
7   proceeding; is that right?
8      A.   Yes.
9      Q.   And any other time you might have
10   reviewed that?
11      A.   No.
12      (Exhibit Number 36 was marked for
13   identification.)
14      Q.   BY MR. MOSELEY:  I'm showing you what's
15   marked as Exhibit 36 for this deposition.  Do you
16   know what this is?
17      A.   This is a salary adjustment.  It says
18   Notification of Personnel Action.
19      Q.   And what is a salary adjustment?
20      A.   It may be due to collective bargaining,
21   based on the date, the beginning date.
22      (Exhibit Number 37 was marked for
23   identification.)
24      Q.   BY MR. MOSELEY:  Showing you what's been
25   marked as Exhibit 37.  Do you know what this is?

Page 104

1      A.   Yes, I've seen this one.
2      Q.   What is this?
3      A.   It's a reminder from Ann Gima, reminding
4   me about the reallocation.
5      Q.   What reallocation is being discussed
6   here?
7      A.   From the Appraiser III to the Appraiser
8   IV.
9      Q.   So the discussion last month, being July
10   of 2001 -- is that right?
11      A.   Somewhere around there, I think, yeah.
12      Q.   -- was that Phil was going to be promoted
13   from Appraiser III to Appraiser IV?
14      A.   The discussion, yeah, there was a
15   discussion, it appears, yes.
16      Q.   Was there an agreement that he was ready
17   to be reallocated?
18      A.   Yes.
19      Q.   Did you feel that reallocation was
20   appropriate for Phil as of August 22, 2001?
21      A.   During that time, yes.
22      Q.   The message from you says, and, actually,
23   I got a kick out of this, it says, He has to give
24   me one year's salary and his first born child.
25   Bob.

Page 105

1   Do you see that?
2      A.   Yes.
3      Q.   Did you write that?
4      A.   Yes, I did.
5      Q.   That was sort of --
6      A.   Tongue-in-cheek.
7      Q.   Tongue-in-cheek, good-natured chiding?
8      A.   Yes.
9      Q.   Well, I take it at that point in time you
10   were still pretty good pals with Phil and still had
11   warm aloha for him?
12      A.   Yep.
13      Q.   Now, this exhibit is essentially more
14   than a month before the Exhibits 32, 33 and 34 in
15   which Phil emailed you, saying he needed to talk
16   with you and that Ann seemed to be upset about
17   something.
18   Oh, by the way, on Exhibit 33, the Ann
19   that is being referenced there, do you know which
20   Ann that is?
21      A.   Actually, we have two Anns.  I can only
22   assume it is Ann Gima, but, again, we have another
23   Anne.
24      Q.   Is that Kabasawa?
25      A.   Yes.

27 (Pages 102 to 105)

Page 106

```
 1     Q.   Did she work with Phil?
 2     A.   Work with Phil -- well, they work in the
 3  same group.
 4     Q.   Was Anne Kabasawa usually referred to as
 5  A-n-n-e or was that usually in reference to Ann
 6  Gima?
 7     A.   I'm not sure.
 8     Q.   Going back to Exhibit 37, did you do
 9  anything after this reminder to sort of push the
10  promotion for Phil from Appraiser III to Appraiser
11  IV?
12     A.   I believe in September I started some of
13  the paperwork on that.
14     Q.   Did that promotion just go through kind
15  of smoothly or what happened?
16     A.   I believe I submitted some paperwork
17  right around, I would say, end of September,
18  beginning of October, and I remember there was a
19  time when Phil brought it to my attention what the
20  status was, and it appeared that either the
21  paperwork got lost or had not gone in, so to be on
22  the safe side, and this is toward the end of
23  October, beginning of November, I decided it
24  wouldn't hurt to resubmit the paperwork again, so
25  there was a delay.
```

Page 107

```
 1     Q.   And the paperwork was resubmitted?
 2     A.   Yes.
 3     Q.   Was there a push to get this done because
 4  Phil was scheduled to be an expert witness in the
 5  Waikiki Shore case?
 6     A.   No, I think it was more that, you know,
 7  he had fulfilled his probation, and both Ann Gima
 8  and I felt that it was appropriate.
 9     Q.   That he be promoted?
10     A.   Yes.
11     Q.   Up to this point in time, had -- Phil's
12  latest performance reviews had all said that he had
13  exceeded requirements, right?
14     A.   Pretty much, yes.
15         MR. LORUSSO:  I object, it misstates the
16  evidence.
17         MR. MOSELEY:  Can you read that question
18  back.
19         (The requested portion of the record was
20  read.)
21     Q.   BY MR. MOSELEY:  And I guess I didn't
22  really frame that very well.
23         The most recent performance reviews at
24  this time had said he had exceeded requirements,
25  right?
```

Page 108

```
 1         MR. WONG:  Objection, vague and
 2  ambiguous.
 3         THE WITNESS:  Recent, up to this point,
 4  this time period.
 5         MR. MOSELEY:  Right.
 6         When did Phil get promoted to -- did Phil
 7  get promoted to an Appraiser IV, as you had
 8  requested.
 9         THE WITNESS:  I believe it was in
10  February 2002, effective, I think, end of February.
11     Q.   BY MR. MOSELEY:  But he did get promoted?
12     A.   Yes.
13     Q.   I actually don't think you're correct on
14  the date, but what you're giving me is your best
15  recollection right now, right?  I mean, I think
16  I'll have a document that'll show --
17     A.   There is a document, I believe, signed by
18  the director, as far as the effective date.  It's
19  right around there, mid-February, end of February.
20         (Exhibit Number 38 was marked for
21  identification.)
22     Q.   BY MR. MOSELEY:  I'd like to show you
23  what's marked as Exhibit 38.  Do you know what this
24  is?
25     A.   Yes, I've seen it before.
```

Page 109

```
 1     Q.   What is it?
 2     A.   Initially, this was a follow-up to a
 3  complaint that he'd made earlier.
 4     Q.   How much earlier?
 5     A.   Roughly, about a week or so.
 6     Q.   This date, February 15th, 2002, was not
 7  the first date that you heard of Phil's allegations
 8  against Gary Kurokawa, right?
 9     A.   Yeah, the first time he brought it to my
10  attention, verbally.
11     Q.   And he'd only done that once before?
12     A.   Yes.
13     Q.   About a week prior to this?
14     A.   Roughly about a week, yeah.
15     Q.   Did you respond to this email?
16     A.   No, I did not respond to the email, I did
17  request that he come to my office.
18     Q.   And what happened then?
19         MR. LORUSSO:  I'm sorry, counsel, it's
20  just this three emails all on one page.
21     Q.   BY MR. MOSELEY:  This series of emails,
22  then.
23     A.   Yeah, I see here that the middle one,
24  yeah.  I'm sorry, I did respond.
25         MR. LORUSSO:  That was my point.
```

28 (Pages 106 to 109)

Page 110

1    Q.  BY MR. MOSELEY:  When you received this
2  email, did you have any concern that the allegation
3  was made against your boss?
4    A.  My main concern was Chris Graff, if there
5  was any outside work being done on city time, that
6  was my first concern.
7    Q.  Why would that have been your main
8  concern?
9    A.  Because we'd be best to establish if
10  anything was being done and then look at if Gary
11  was involved, because I wanted to look at Chris
12  Graff first since Phil mentioned that it was Chris
13  who was doing the work.  So it's two-fold, one is
14  determining if Chris had done something wrong, and,
15  if so, then, you know, it's something that would
16  have to be taken further.
17    Q.  Where would you have taken it further if
18  you had determined Chris had done something wrong?
19    A.  To the administrative service office.
20    Q.  Which would have been?
21    A.  At that time, Mike Golojuch.
22    Q.  And prior to Mike Golojuch it was?
23    A.  Eileen Tengan.
24    Q.  So if you had determined that Chris had
25  done something and that Gary was involved, you

Page 111

1  wouldn't have gone to Gary, you would have gone to
2  Mike Golojuch?
3    A.  Yes.
4    Q.  And that is for what reason?
5    A.  Because it's in-house and because of the
6  people involved.  I had a similar situation, not so
7  much working on the job, but previous to this I had
8  a sexual harassment complaint, and I initially
9  looked at it, and it appeared that something had
10  happened after talking with two people who
11  witnessed this alleged incident.  Because of that I
12  determined that, yeah, it needed to be looked at
13  further, so I referred it to the administrative
14  services officer.
15    Q.  Who was involved in that complaint?
16    A.  That was Eileen Tengan.
17    Q.  Who was involved in the complaint, I
18  mean, who was the perpetrator and who was the
19  person complaining?
20    A.  For the sexual harassment?
21    Q.  Right.
22    A.  I'd rather not say because some of these
23  people still work with us.
24    MR. MOSELEY:  I don't think that's
25  privileged.

Page 112

1    MR. WONG:  Actually, it might be.
2    MR. MOSELEY:  Are you objecting?
3    MR. LORUSSO:  Just for the record, let me
4  do this.  Let me object.  Obviously, if it's
5  information that there is a need to provide to you,
6  I will provide to you.  For right now, since it's
7  an unknown, so that we're not disclosing anything
8  we're not supposed to, let me instruct him not to
9  answer with regard to that.
10    Q.  BY MR. MOSELEY:  When did that complaint
11  occur?
12    A.  This one occurred -- I'm trying to
13  remember when Eileen Tengan retired and Mike
14  Golojuch came in.  I know it was prior to Mike
15  Golojuch coming in.  I'm trying to pinpoint the
16  year, though.
17    Q.  Did it involve one of your supervisors,
18  somebody above you in the chain of command?
19    A.  In that one, no.
20    Q.  So when you investigated Chris as a
21  result of Exhibit 38 and the prior week's contact,
22  did you go talk to Gary about it?
23    A.  Initially, I spoke to Chris and not to
24  Gary, initially.
25    MR. LORUSSO:  His question was, Did you

Page 113

1  talk to Gary about it.
2    THE WITNESS:  I did mention it to him.
3    Q.  BY MR. MOSELEY:  When did you mention it
4  to Gary?
5    A.  When Phil brought it to my attention, I
6  called -- again, when Phil brought it to my
7  attention, he said he had overheard a phone call.
8  Soon after that, I called Chris to my office and
9  asked him, you know, if he was doing any work on
10  city time, and he said no.  I can't recall if it
11  was right after but soon thereafter I spoke to
12  Gary, also.
13    Q.  Did you ask Chris if he was doing any
14  work for private people on city equipment?
15    A.  I'm not sure if I mentioned equipment,
16  but the assumption was, you know, are you doing
17  anything on city time.  See, again --
18    Q.  Is it your understanding that you can use
19  city equipment for private use?
20    MR. LORUSSO:  Before you finish with your
21  last answer.
22    THE WITNESS:  Can you go back a step, I'm
23  sorry.
24    MR. LORUSSO:  Sorry to interrupt you,
25  counsel.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 114

1    Q.   BY MR. MOSELEY:  Is it your opinion that
2  if it's not on city time, employees can use city
3  equipment for their private use or to conduct
4  private business?
5    A.   I discourage any private work on city
6  equipment.
7    Q.   Is it your understanding that that is not
8  permitted?
9    A.   That is my understanding.
10    Q.   By law.
11    A.   I'm not sure by law, but as far as
12  outside work on city equipment, not permitted.
13    Q.   Did you check with anybody at that time
14  to see if it was permitted?
15    MR. LORUSSO:  Actually, vague and
16  ambiguous, argumentative.
17    THE WITNESS:  Did I check with anyone.
18    Q.   BY MR. MOSELEY:  Yeah, at that time,
19  meaning around the time of this February 15th, 2002
20  email.
21    A.   No, my assumption is doing outside work
22  is not permitted.
23    Q.   On city equipment.
24    A.   Yes.
25    Q.   Has anybody ever told you that Gary

Page 115

1  Kurokawa used his city office and his city
2  telephone and his city secretary to conduct his
3  private GK Appraisal work?
4    A.   Has anyone told me that.
5    Q.   Right.
6    A.   No.
7    Q.   Did you conduct any investigation at all
8  into any of Gary Kurokawa's activities with respect
9  to doing private work on city time or with city
10  equipment?
11    A.   No, the only thing I did was look at
12  Chris.
13    Q.   That's the only thing you did.
14    A.   Yes, because Phil said it was Chris doing
15  the work, initially.
16    Q.   And when you talked to Gary Kurokawa
17  about it, you said this was fairly quickly after
18  you talked to Chris, what did you say to Gary?
19    A.   No, I asked him, you know, it was brought
20  to my attention that Chris might be doing work on
21  city time, and that I asked him if he had anything
22  to do with it or had instructed Chris to do things
23  along those lines.
24    Q.   And what was his answer?
25    A.   He said no.

Page 116

1    Q.   Why did you go to Gary directly instead
2  of going to either Golojuch or -- at this time was
3  Golojuch in place or was it Eileen Tengan?
4    A.   Golojuch was in place.
5    Q.   Why did you go directly to Gary rather
6  than going to Golojuch?
7    A.   Like in the sexual harassment one, before
8  doing I wanted to determine if there was something
9  there that happened.
10    In this case, it was difficult because
11  all Phil said was there was a phone call, and that
12  was it.  So it made it very difficult, so I decided
13  to look into Chris's, you know, the possibility
14  that Chris may have done something.
15    Q.   In this email, Exhibit 38, it says, I
16  brought this to your attention because it has been
17  an ongoing situation for the past 18 months or so
18  since I have worked here.  It seems obvious that it
19  has been going on for longer than that.
20    Do you see that?
21    A.   That's Phil's statement.
22    Q.   So he said to you more than, gee, I
23  witnessed one phone call, correct?
24    A.   In his statement.
25    MR. LORUSSO:  Objection, misstates his

Page 117

1  testimony.
2    THE WITNESS:  He claims it's been going
3  on for 18 months.
4    Q.   BY MR. MOSELEY:  Didn't you just testify
5  that all Phil had done was come to you and say he
6  had witnessed one phone call?
7    A.   Yes.
8    Q.   That isn't all he had complained to you
9  about, is it?
10    MR. LORUSSO:  Objection, misstates the
11  testimony.
12    MR. MOSELEY:  Can you read back his
13  answer in which he talks about the phone call?
14    (A discussion was held off the record.)
15    THE WITNESS:  May I read this email one
16  more time?
17    MR. MOSELEY:  Sure.  I'm not trying to
18  sandbag you, Bob.
19    THE WITNESS:  I just wanted to make sure
20  I understood this because --
21    MR. LORUSSO:  There's no question.
22    Q.   BY MR. MOSELEY:  Have you had a chance to
23  review it again?
24    A.   Yes.
25    Q.   In the bottom of Exhibit 38, all in

1  capital letters, basically, in the second paragraph
2  he says, or in the first paragraph, he says, I
3  brought this to your attention because it has been
4  an ongoing situation for the past 18 months or so
5  since I have worked here. It seems obvious that it
6  has been going on for longer than that.
7      Do you see that?
8   A.  Yes.
9   Q.  Did that seem to you to be more than
10  just, hey, I witnessed one phone call?
11     MR. LORUSSO:  Objection, vague and
12  ambiguous.
13  Q.  BY MR. MOSELEY:  Does that rise to a more
14  important level than I witnessed just one phone
15  call?
16     MR. LORUSSO:  Same objection.
17     THE WITNESS:  If he'd been witnessing
18  this for the past 18 months, he would have been
19  able to tell me about what he'd observed. When he
20  came to my office, all he said was, I just heard a
21  phone call. So this is why he may say that it's
22  been going on for 18 months, but the only thing he
23  told me was, I overheard a phone call.
24  Q.  BY MR. MOSELEY:  Are you sure he didn't
25  complain to you about this kind of stuff earlier,

1  and then he came to you a week before this Exhibit
2  38?
3   A.  No.
4   Q.  You're not sure?
5   A.  No, what I'm saying is he did not, he did
6  not come previously.
7   Q.  When you got this email that said it's
8  been an ongoing situation for the past 18 months or
9  so since I worked here, did you ask Phil about the
10  details?
11  A.  Did I ask Phil about the details. When I
12  talked to Phil a second time, and I told him that
13  besides the phone call, is there anything you saw,
14  you heard besides this one phone call incident, and
15  he told me no. And I was asking him several times,
16  was there anything else that you observed or you
17  saw besides this phone call or overhearing this
18  phone call, and, again, he said no.
19  Q.  That was after you received this email?
20  A.  Yeah.
21  Q.  So, basically, he said, well, I was
22  wrong, it hasn't been ongoing for 18 months, all
23  I've seen is a phone call.
24     MR. LORUSSO:  Objection, argumentative.
25     THE WITNESS:  That's all he told me. I

1  was asking him, that's all he told me, just the
2  phone call.
3   Q.  BY MR. MOSELEY:  As of February 15th,
4  2002, had you already talked to Chris Graff?
5   A.  Yes.
6   Q.  When did you talk to Chris Graff the
7  first time about this question?
8   A.  Probably right after Phil brought it to
9  my attention, initially.
10  Q.  Do you have any record that shows a
11  meeting with Chris Graff?
12  A.  Written record.
13  Q.  Yes.
14  A.  No.
15  Q.  Why wouldn't you keep a record of
16  something like that?
17     MR. LORUSSO:  Objection, argumentative.
18     THE WITNESS:  I wanted to just discuss
19  with him and find out if anything was going on. At
20  the time he said no, and that's when I decided to
21  also look at his computer. As far as notes, I
22  don't have --
23  Q.  BY MR. MOSELEY:  He said to look at his
24  computer?
25  A.  No, I do that on my own.

1   Q.  Between the time Phil came to talk to you
2  first and the time of this February 15th, 2002
3  exhibit.
4   A.  Yeah, I started to look at some of his
5  files.
6   Q.  What kind of appraisals was Chris doing
7  at the time for the city?
8   A.  I'm not sure what his responsibility was
9  at this time.
10  Q.  What did you tell Chris when you had your
11  meeting with Chris?
12  A.  I told him that it was brought to my
13  attention that you might be doing outside work on
14  city time, and I asked him, flat-out, Are you doing
15  any work? and he said, No.
16  Q.  Do you know David Matsunami?
17  A.  Yes, I do. He used to work with our
18  office.
19  Q.  Do you know about any of David
20  Matsunami's activities with respect to GK
21  Appraisers?
22  A.  I didn't know, as far as David Matsunami
23  doing work for GK or -- I'm sorry.
24  Q.  Did you know that there was a
25  relationship between David Matsunami and GK

1  Appraisers?
2      A.  At this time?
3      Q.  Yes, as of February 15th, 2002.
4      A.  No.
5      Q.  Did you know at that time that David
6  Matsunami was doing any work for GK Appraisers?
7      A.  No.
8      Q.  Did David Matsunami's name come up either
9  with your discussions with Chris or with Phil
10 around February 15th, 2002?
11     A.  No.
12     Q.  So as a result of your investigation
13 after receiving the oral complaint from Phil and
14 the February 15th email, did you determine that
15 Gary Kurokawa was not involved in the improper
16 activities?
17     A.  That was my determination based on I
18 could not find anything regarding Chris doing
19 outside work.  That's about the time when I was
20 reaching that conclusion, that's when I met with
21 Phil a second time.
22     Q.  Is it your understanding today that Chris
23 was doing outside work for GK Appraisers using city
24 equipment?
25     A.  I'm sorry.  Repeat that.

1      Q.  Is it your understanding, today, that
2  Chris was doing outside work for GK Appraisers
3  using city equipment?
4      MR. LORUSSO:  Object to form, lacks
5  foundation, assumes facts not in evidence.
6      THE WITNESS:  I don't know.
7      Q.  BY MR. MOSELEY:  Does Chris Graff still
8  work for the city?
9      A.  No, he left the city.
10     Q.  When?
11     A.  Possibly, 2004.
12     Q.  Why?
13     A.  Got a job offer.
14     Q.  Where?
15     A.  I don't know what the company's name is.
16     Q.  Do you know what kind of job it was?
17     A.  Appraisal.
18     Q.  Was it a mortgage brokerage?
19     A.  I'm not sure.
20     Q.  Were you personally ever involved in any
21 disciplinary action against Chris Graff for
22 anything?
23     A.  I have taken some disciplinary action
24 with Chris Graff.
25     Q.  And what was that in conjunction with?

1      A.  There was a period where he was coming to
2  work whenever he wanted and leaving whenever he
3  wanted, coming and going as he pleases.
4      Q.  And what kind of disciplinary action was
5  taken against him for that?
6      A.  He was given a verbal warning, and
7  because it persisted after that he was required to
8  email his supervisor and myself each time he came
9  to work and email his supervisor and myself at the
10 end of the day.
11     Q.  And when was that period of time that he
12 was required to do that?
13     A.  It may have been about the time that Phil
14 had started working with us, maybe prior, but
15 somewhere around there.
16     Q.  Was he given a written reprimand?
17     A.  What's that?
18     Q.  Was he given a written reprimand?
19     A.  There may have been something in his
20 performance evaluation.  As far as a written
21 reprimand, as far as his coming and going, I don't
22 recall, there may be something in his performance
23 evaluation, though.
24     Q.  Did you consult with Eileen Tengan or
25 Mike Golojuch about that problem you were having

1  with Chris?
2      A.  That one I felt we could handle in-house.
3      Q.  Did you ever reprimand or take any action
4  against Chris Graff for having an altercation with
5  Wilfred Martin?
6      A.  You know, I'm not aware of that
7  altercation.
8      Q.  Was there ever a time that you knew that
9  Chris Graff was required to go seek counseling from
10 Anna Horne?
11     A.  I'm the one who recommended the
12 counseling.
13     Q.  For what purpose?
14     A.  He was not being productive.  There were
15 times when he was being irresponsible, as far as
16 assignments, and I made a recommendation to him
17 that he seek counseling with our Employee
18 Assistance Program, the city's Employee Assistance
19 Program, and the counselor there is Anna Horne.
20     Q.  And when did that occur?
21     A.  I can't be sure, but I know it's before
22 the time when I also recommended counseling to
23 Mr. English.
24     Q.  Was it before the time you were requiring
25 Chris to email when he came in and when he left

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 126

1  work?
2      A.  It may have been around the same time,
3  I'm not sure.
4      Q.  Were you ever aware of any substance
5  abuse problems that Chris Graff had?
6      A.  Not to my knowledge.
7      Q.  Do you understand that Chris Graff worked
8  for the assessment division more than once?
9      A.  Yes.
10     Q.  Were you working for the city at the time
11 of his first employment period with the assessment
12 division?
13     A.  Yes.
14     Q.  Were you his supervisor at any time
15 during that period?
16     A.  Yes.
17     Q.  Were you his direct supervisor?
18     A.  For a short period, yes.
19     Q.  Do you recall any disciplinary or other
20 type problems with Chris, at that point in time?
21     A.  No, at that time, I believe he was pretty
22 responsible.
23     Q.  That's the same time that David Matsunami
24 was working there, right?
25     A.  Chris was with us a very short period,

Page 127

1  initially.  He'd received a job offer in the
2  private sector.  After Chris left, David was still
3  with us, I believe.
4      Q.  Are you aware of any letter from the
5  ethics commission or any determination by the
6  ethics commission or its staff that it was
7  appropriate for Gary Kurokawa to be active in the
8  involvement of GK Appraisals and that it would be
9  all right for David Matsunami and Chris Graff to do
10 so as well?
11     MR. LORUSSO:  Objection, over-broad,
12 compound, vague and ambiguous, lacks foundation,
13 calls for speculation.
14     THE WITNESS:  Could you repeat that one
15 more time.
16     MR. MOSELEY:  Could you read that back to
17 the witness.
18     (The requested portion of the record was
19 read.)
20     MR. LORUSSO:  Same objection, also
21 assumes facts not in evidence.
22     Q.  BY MR. MOSELEY:  At any time.
23     A.  At any time.
24     Q.  Right.
25     MR. LORUSSO:  Same objections.

Page 128

1      THE WITNESS:  Actually, at the time that
2  Phil brought it to my attention regarding Chris
3  Graff and Gary Kurokawa, at that time or prior to
4  that I was unaware of David Matsunami or Chris
5  Graff doing any work.  I just never asked them.  So
6  as far as any involvement...
7      Q.  BY MR. MOSELEY:  Were you aware that Gary
8  Kurokawa was involved in GK Appraisals?
9      A.  All I know is Gary did some appraising on
10 the outer islands.  As far as his relationship to
11 the company or his involvement, I have no knowledge
12 of that.  And, like I said, I didn't even know
13 David Matsunami or Chris Graff had done any work
14 with them.
15     Q.  Have you since learned that anybody else
16 in the assessment division has worked for GK
17 Appraisals?
18     MR. LORUSSO:  Object to the form, assumes
19 facts not in evidence, lacks foundation.
20     THE WITNESS:  Not to my knowledge.
21     Q.  Did there ever come a
22 time when you spoke with anybody else higher up
23 about further investigating the allegations made in
24 the February 2nd, 2002?
25     A.  No, the only other person I spoke with

Page 129

1  was Ann Gima.
2      Q.  And what did you say to Ann Gima?
3      A.  I asked Ann Gima if she had noticed
4  anything regarding Chris Graff, the possibility of
5  him doing any outside work.  She said no.  I asked
6  Ann Gima, also, about this database that Chris had,
7  and she was aware of it, that he was collecting
8  information, sharing information, both with
9  appraisers in-house and outside, spreadsheets that
10 he had -- and, you know, these were various types
11 of spreadsheets, some of the appraisers in-house
12 would use them.  So as far as his database and
13 things like that, it was fairly well-known.
14     MR. LORUSSO:  Excuse me for interrupting,
15 counsel.  Just going back a moment to a question.
16 I believe you used the date, unless I misheard, of
17 February 2nd, 2002, I'm not sure where you got that
18 from.
19     MR. MOSELEY:  It should have been
20 February 15th, if it was the 2nd.
21     MR. LORUSSO:  Thank you.
22     Q.  BY MR. MOSELEY:  Are you aware of any
23 other investigation the city has conducted into the
24 allegations Phil made in his February 15th, 2002
25 email to you?

33 (Pages 126 to 129)

1    A.   The ethics investigation, I believe.
2    Q.   Have you been called to give testimony or
3  be interviewed in that investigation?
4    A.   No.
5    Q.   Nobody's called you to talk about that at
6  all from the ethics commission?
7         MR. LORUSSO:  Objection, asked and
8  answered.
9         Answer it again.
10   Q.   BY MR. MOSELEY:  Do you know of anybody
11  else in the assessments division that has been
12  interviewed by the ethics commission with respect
13  to that allegation?
14   A.   There may have been some other employees,
15  but as far as recalling who, I'm not sure.
16   Q.   Do you mean you recall other employees
17  having been interviewed by the ethics commission?
18   A.   I do recall something like that.  As far
19  as who it was, I can't recall.
20   Q.   Do you recall Chris Graff having been
21  interviewed by the ethics commission?
22   A.   Yes.  He told me, that's why.
23   Q.   He told you?
24   A.   Yes.
25   Q.   Did you discuss that with Mike Golojuch

1  at all?
2    A.   The --
3    Q.   Chris's comments with respect to being
4  interviewed by the ethics commission.
5    A.   Chris's comments regarding ethics
6  commission and if I discussed it with Mike
7  Golojuch.
8    Q.   Right.
9    A.   No, I don't recall.
10   Q.   What did Chris tell you about his being
11  interviewed by the ethics commission?
12   A.   He had asked -- excuse me.  He had said
13  that he had met with Chuck Totto, and I'm not sure
14  who else, there may have been others, and that
15  something about things that Phil had said to Chris
16  had turned out to be false.
17   Q.   Is there anything else he said?
18   A.   He had said something about that Phil had
19  told Chris the FBI was involved, and when Chris
20  checked with Chuck Totto, Chuck Totto told Chris
21  there was no involvement, at least to his
22  knowledge.  I guess it was more a conflict, as far
23  as what Phil had told Chris and then what Chris had
24  asked Chuck Totto, the stories weren't matching.
25   Q.   Are you aware of any negotiation going on

1  between Gary Kurokawa and the ethics commission
2  with respect to -- I don't know how I would
3  describe it, except it sounded like similar to a
4  plea agreement to me, it's some sort of an
5  admission of wrongdoing.
6         MR. LORUSSO:  Object to the form, lacks
7  foundation, assumes facts not in evidence,
8  argumentative.
9         THE WITNESS:  As far as a settlement or
10  negotiation, you said?
11   Q.   BY MR. MOSELEY:  Between Gary Kurokawa
12  and the ethics commission.
13        MR. LORUSSO:  Same objection.
14        THE WITNESS:  As far as Gary Kurokawa and
15  the ethics commission, I'm not sure what's going on
16  with the status.
17   Q.   BY MR. MOSELEY:  Have you heard that
18  there is something going on?
19        MR. LORUSSO:  Objection, vague and
20  ambiguous.
21        THE WITNESS:  The only thing I heard was
22  Gary has an attorney.
23   Q.   BY MR. MOSELEY:  Who is Gary's attorney?
24   A.   I'm not sure.
25        MR. LORUSSO:  Herbert Takahashi.

1    Q.   BY MR. MOSELEY:  Have you ever been told
2  that your attorney here is somehow involved with
3  that proceeding?
4    A.   I think Gary may have mentioned it.
5    Q.   So you've spoken to Gary about that
6  proceeding?
7    A.   Not very much.
8    Q.   But you have spoken with him.
9    A.   As far as just ethics in general, this
10  particular proceeding.
11   Q.   Proceeding with the ethics commission.
12   A.   You know, I don't think we've had much
13  discussion about it.  He did mention Mike Lorusso's
14  name at one point.
15   Q.   That Mike Lorusso was assisting him in
16  that proceeding?
17   A.   I don't know about assisting or
18  involvement.
19   Q.   But somehow Mike Lorusso was involved?
20        MR. LORUSSO:  Object, lacks foundation,
21  calls for speculation.
22        THE WITNESS:  He did mention Mike's name.
23   Q.   BY MR. MOSELEY:  In what context did he
24  mention Mike's name, what did he say about what
25  Mike was doing?

Page 134

1    A.   He didn't say what Mike was doing.
2    Q.   What did he say about Mike when you
3  mentioned Mike's name?
4    A.   That he accompanied Gary, I believe, to
5  meet with the ethics commission or something.
6    Q.   When did he tell you that?
7    A.   Gee, I don't recall, it's been awhile.
8    Q.   Have you consulted outside counsel about
9  this at all?
10    A.   No.
11    Q.   Not even after that revelation you didn't
12  consult outside counsel?
13    MR. LORUSSO:  Objection, argumentative.
14    THE WITNESS:  Regarding the ethics.
15    Q.   BY MR. MOSELEY:  Do you know who Mike
16  Lorusso represents in this case?  Do you know who
17  Mike Lorusso represents in the present litigation?
18    A.   Gary, Ann Gima and myself and the city.
19    Q.   And the city.
20    A.   Yes.
21    Q.   So when Gary told you that Mike Lorusso
22  had accompanied him to some sort of a proceeding
23  with the ethics commission, you didn't consult
24  outside counsel about whether that was proper for
25  Mike Lorusso to be representing the city and then

Page 135

1  representing another defendant in a proceeding that
2  was being had by the city investigating the very
3  underlying parts of this complaint, that didn't
4  bother you?
5    MR. LORUSSO:  Objection, relevancy, lacks
6  foundation, argumentative.
7    THE WITNESS:  I didn't give it much
8  thought at the time.
9    Q.   BY MR. MOSELEY:  Have you given it any
10  thought since then?
11    MR. LORUSSO:  Same objection.
12    THE WITNESS:  Not at this point.
13    Q.   BY MR. MOSELEY:  What do you really know
14  about the allegations made by Phil English and
15  about the performance problems that have been
16  claimed against Phil English, do you really know
17  anything from your own direct evidence?
18    MR. LORUSSO:  Objection, over-broad,
19  vague and ambiguous, argumentative.
20    THE WITNESS:  Regarding the ethics
21  complaint.
22    MR. MOSELEY:  Right.
23    THE WITNESS:  And regarding -- what was
24  the second part?
25    MR. MOSELEY:  And any allegations of

Page 136

1  Phil's problems, you know, in terms of his, I don't
2  know, performance problems.
3    MR. LORUSSO:  Same objections.
4    THE WITNESS:  When his performance
5  started going or becoming less productive, it was
6  brought to my attention, and we had tried to talk
7  to Phil about it.
8    Q.   BY MR. MOSELEY:  Who brought it to your
9  attention?
10    A.   Ann Gima.  And it appeared that, for some
11  reason, he wasn't performing his position or
12  performing his duties or following her
13  instructions.  There are several concerns about
14  things like that.
15    Q.   But the information came from Ann Gima.
16    A.   Yes.
17    Q.   It wasn't your direct observation.
18    A.   It came from Ann Gima.
19    Q.   And with respect to your investigation of
20  Phil's allegations about Chris Graff and Gary
21  Kurokawa, your information came from Chris Graff,
22  Gary Kurokawa and Ann Gima; is that right?
23    MR. LORUSSO:  And Phil English.
24    THE WITNESS:  And Phil English.
25    MR. MOSELEY:  No, in terms of your

Page 137

1  investigation, what you did after getting the stuff
2  from Phil English.
3    MR. LORUSSO:  Objection, that misstates
4  the testimony.
5    THE WITNESS:  Are you saying that what I
6  got from Chris Graff?
7    Q.   BY MR. MOSELEY:  Phil comes to you and he
8  makes a complaint --
9    A.   Yes.
10    Q.   -- that Chris Graff is working on Gary
11  Kurokawa's private work on city time with city
12  equipment.  Your investigation consists of going to
13  Chris Graff, Gary Kurokawa and Ann Gima.
14    A.   No, mine also included going into Chris'
15  computer.  Like I said, all I heard was Phil
16  claimed he heard a phone call, and that was it.
17    Q.   You did that in the week just prior to
18  February 15th --
19    A.   I started looking into those things, yes.
20    Q.   2002.
21    A.   Yeah.  What happened was when I came
22  across some of these old spreadsheets, it just
23  didn't appear that there was anything recent,
24  that's when I asked Phil a second time, Is there
25  anything else you saw or observed to indicate that

Page 138

1  Chris is doing some outside work? and he said, No.
2  So I was, in essence, asking Phil, you know, what
3  else is there out there.
4        (Exhibit Number 39 was marked for
5  identification.)
6     Q.  BY MR. MOSELEY:  I'd like you to take a
7  look at what's been marked Exhibit 39.
8     MR. LORUSSO:  And before we do that, it's
9  been about an hour, could we take a break?
10       (The deposition was at recess.)
11    Q.  BY MR. MOSELEY:  Let me show you what's
12  been marked as Exhibit 39.  Are you familiar with
13  this exhibit?
14    A.  I'm sorry, what's that?
15    Q.  Are you familiar with this document?
16    A.  It's a performance evaluation.  I don't
17  see signatures, though, I only see Mr. English's
18  signature.  There may be a duplicate of this
19  someplace.
20    Q.  Have you seen the document before,
21  though?
22    A.  Looks familiar, but, like I said, this
23  one doesn't have signatures.
24    Q.  This is not a document that Phil would
25  have signed, I mean, Phil would have prepared, is

Page 139

1  it?
2     A.  No.
3     Q.  I'll tell you, before your next
4  deposition we'll find the signed one, the one
5  signed by the supervisor and the administrator.
6        In the comment section it says, Please
7  see attached, and then there are several pages of
8  attachments.  I think the first two look like
9  they're the same, I put them both there because I'm
10  not sure if there are any differences, and then the
11  last two of the attachments appear to be comments
12  by Phil English.  Would you agree with that?
13       Have you had a chance to look at that
14  yet?
15    A.  Yes.
16    Q.  Presuming that this form of this document
17  was, in fact, signed by Ann Gima and the real
18  property administrator, take a look at the first
19  attachment.  Was that your understanding of Phil's
20  performance around April 12th of 2002?
21    A.  Repeat the question again, I'm sorry.
22    MR. MOSELEY:  Can you read the question
23  back, please.
24       (The requested portion of the record was
25  read.)

Page 140

1     THE WITNESS:  Yes.
2     Q.  BY MR. MOSELEY:  And was it your
3  understanding that his Performance Factors had gone
4  down since the prior evaluation from Exceeds
5  Requirements to Meets Requirements in all of the
6  first four listed categories in the checked box?
7     A.  Yeah, the ratings from Exceeds
8  Requirements to Meets Requirements, and the
9  performance rating is satisfactory.
10    Q.  His prior performance evaluation report
11  was done before he made the complaint to you about
12  Chris Graff doing work for Gary Kurokawa, is that
13  not correct?
14    A.  Which one are you referring to?  You said
15  prior.
16    Q.  Well, the report immediately prior to
17  this report.
18    MR. LORUSSO:  31.
19    Q.  BY MR. MOSELEY:  June 26th, 2001, is, to
20  your knowledge, before Phil English complained to
21  you about Chris Graff and Gary Kurokawa, is it not?
22    A.  Excuse me, I'm just looking at this
23  Exhibit 39, and I'm just trying to make sure
24  because it still says Appraiser III.  I thought he
25  had moved up to the four by then.  Again, let me

Page 141

1  just take a look at this.
2     Q.  Well, let me suggest if you take a look
3  at the interior.  If you look at his response,
4  which is the second to the last page, he talks
5  about during the year he was at the Appraiser III
6  level, and then he was reallocated to Appraiser IV,
7  and he was only working in the Appraiser IV
8  category for a short period of time.  Do you see
9  that?  That's also in the comment section.
10    A.  Okay.  I was looking at the wrong page.
11    MR. LORUSSO:  No, you weren't.  I'm just
12  pointing out to you to assist, the second page
13  where it talks about the three to a four.
14    Q.  BY MR. MOSELEY:  It actually talks about
15  that in Phil's statement as well.
16       So when you're saying it says Appraiser
17  III on the top, that's your explanation to that.
18    A.  Yes.
19    Q.  So the question is on Exhibit 31, Exhibit
20  31 was done before Phil complained to you about
21  Gary and Chris, is that not right?
22    A.  Yes.
23    Q.  And on the facing page of Exhibit 31, in
24  all categories he exceeds requirements, right?
25    A.  On Exhibit 31.

36 (Pages 138 to 141)

Page 142

1  Q.  Yeah, and on Exhibit 31 on the comments
2  part, essentially every comment is positive, is it
3  not?
4     A.  And you're saying these comments are
5  positive; is that correct?
6     Q.  Are they not all positive on Exhibit 31?
7     A.  Yeah, he has some positive comments in
8  here.
9     Q.  Are there any negative comments on
10  Exhibit 31, at all, of any nature?
11     A.  I don't see any negative comments.
12     Q.  Is there any suggestion for improvement
13  in his work on Exhibit 31?
14     A.  No.
15     Q.  Now, take a look at Exhibit 39.  Exhibit
16  39, versus Exhibit 31, in every single one of the
17  checked box categories on the facing page his
18  evaluation has dropped from Exceeds Requirements to
19  Meets Requirements.  Do you see that?
20     A.  Yes.
21     Q.  Now, Exhibit 39, is that the very first
22  performance evaluation of Phil after he told you on
23  February 15th, or thereabouts, of his complaints
24  about Chris Graff and Gary Kurokawa?
25     A.  I'm not sure.  You're asking if this is

Page 143

1  the last performance evaluation after --
2     Q.  After February 15th, 2002, was there
3  another performance evaluation report between
4  February 15th, 2002 and April 22nd, 2002 or April
5  12th, 2002?
6     A.  I'm not sure.  The reason why I say that
7  is because if we say, let's say, promoted in
8  February, March, there should be a three month
9  evaluation for his four position, so I'm not sure.
10     Q.  When you look at the comments page of
11  Exhibit 39, for the first time in all these
12  performance reports that you've looked at today you
13  see sort of negative comments, don't you?  For
14  example, on the second paragraph, "While he has
15  continued to progress in his learning of office
16  procedures, he seems to be having some difficulties
17  in organizing and prioritizing."  Then, "He often
18  disagrees," things like that.
19        Do you see that?
20        MR. LORUSSO:  Object to the
21  characterization and to form.
22     Q.  BY MR. MOSELEY:  How would you
23  characterize those?  Don't answer the previous
24  question.  How would you characterize those
25  comments?

Page 144

1     A.  Constructive.
2     Q.  Constructive.
3     A.  Yes.
4     Q.  Certainly different from the comments on
5  Exhibit 31, right?
6     A.  They're different, yes.
7     Q.  Different in that there were no, as you
8  would say, constructive comments in Exhibit 31,
9  right?
10        MR. LORUSSO:  Objection, to the extent
11  the document speaks for itself.
12     Q.  BY MR. MOSELEY:  Are there any
13  constructive criticisms in Exhibit 31?
14     A.  Doesn't appear to be.
15        (Exhibit Number 40 was marked for
16  identification.)
17     Q.  BY MR. MOSELEY:  And you would agree,
18  wouldn't you, that between Exhibit 31 and Exhibit
19  39 is the time in which Phil made the allegations
20  to you about Chris Graff and Gary Kurokawa?
21     A.  Yes.
22     Q.  I'm showing you what's marked as Exhibit
23  40.  This is stamped Received, May 16th, 2002.  Do
24  you see this?
25     A.  May 17th --

Page 145

1     Q.  Are you familiar with this document?
2     A.  (No audible response.)
3     Q.  Have you seen this document before?
4     A.  It looks familiar.
5     Q.  And in what context does it look
6  familiar?
7     A.  It was in his personnel file.
8     Q.  And you reviewed this again in
9  conjunction with this case and with the workers'
10  comp claim; is that right?
11     A.  Yes.
12     Q.  Did you review it in any other context?
13     A.  No.
14     Q.  The checked boxes in this Probationary
15  Performance Evaluation Report are the same as the
16  checked boxes in Exhibit 39, right, Meets
17  Requirements, right?
18     A.  Yes.
19     Q.  Take a look at the comment section in
20  Exhibit 40.  Does that reflect your understanding
21  of Phil's performance at or around May 16th, 2002?
22     A.  (No audible response.)
23     Q.  Take a look at Exhibit 40, first, I'll
24  ask you to compare the two in a minute.  I'm just
25  asking you at this point whether the comments, as

37 (Pages 142 to 145)

1  reflected in Exhibit 40, reflect your understanding
2  at the time of Phil's performance.
3      A.  It's reflective of.
4      Q.  That is reflective of your understanding
5  of his performance at or around May 16th, 2002.
6      A.  When I read this, yes.
7      Q.  And your understanding of his performance
8  has come from communications from Ann Gima; is that
9  correct?
10     A.  Yes.
11     Q.  Any other source of your understanding of
12 Phil's performance at about this time?
13     A.  No.
14     Q.  In Exhibit 40 there are some additional,
15 as I believed you characterized it earlier,
16 constructive comments that weren't in Exhibit 39.
17 Do you see that?
18     A.  Which constructive comments are you
19 talking about?
20     Q.  Well, it talks about in the first
21 paragraph, "He will need to manage his time well."
22 Do you see that?
23     A.  Yes.
24     Q.  And in the next paragraph, it says, "He
25 will benefit from review and familiarization of the

1  IAS/CAMA system and materials and other
2  instructional handouts."  Do you see that?
3      A.  Yes.
4      Q.  That's slightly different from the
5  Exhibit 39 comments, right?
6          MR. LORUSSO:  Object to the form, vague
7  and ambiguous, the documents speak for themselves.
8          THE WITNESS:  (No audible response.)
9      Q.  BY MR. MOSELEY:  Do you have an answer to
10 that?
11     A.  Yeah, I'd like to clarify something.  You
12 mentioned that this is a reflection of this
13 particular date, May 13th.
14     Q.  You're speaking of Exhibit 40.
15     A.  Yes.  And in Exhibit 39 you're saying
16 this is your understanding as of April 12th, yeah?
17     Q.  Right.
18     A.  See, one is a annual evaluation and one
19 is a three month evaluation, so when you take this
20 into account, Exhibit 39, you know, we're talking
21 about a 12-month period that's under review.
22 Exhibit 40, again, is just a three-month period, so
23 there could be some constructive criticism,
24 positive things, negative things, so the time
25 periods are not really -- there's a slight overlap

1  that appears but one is a annual.
2          So you'd have to go back to -- let's say,
3  if you go back to Exhibit 39 it says June 1st,
4  whereas the Exhibit 40 only goes back to March 1st,
5  '02, so I think that can explain some of the
6  differences in the notations, too.
7      Q.  But there are differences.
8      A.  Yes, there are differences.
9      Q.  And in none of the other performance
10 evaluation reports that I've shown to you, except
11 for these two, did you find any constructive
12 comments, right?
13         MR. LORUSSO:  Objection, misstates the
14 testimony.  Actually, let me withdraw that.  I'm
15 just going say lacks foundation, assumes facts not
16 in evidence.  He didn't look at every performance
17 evaluation.
18         MR. MOSELEY:  Well, he's looked at every
19 one I gave him today.  That's the question.
20         With respect to the performance
21 evaluations you've taken a look at today, these are
22 the first two that have any constructive comments;
23 is that right?
24         THE WITNESS:  It appears to be, yes.
25     Q.  BY MR. MOSELEY:  With respect to Exhibit

1  39, did you know before Phil received this report
2  that it was going to contain negative comments or
3  constructive comments?
4          MR. LORUSSO:  Objection, compound.
5      Q.  BY MR. MOSELEY:  Did you know before Phil
6  received this report that this report was going to
7  contain constructive comments?
8      A.  Did I know.
9      Q.  Yeah.
10     A.  Did I know before Phil received this
11 document that it contained constructive comments.
12     Q.  Right, Exhibit 39.
13     A.  No, I didn't.
14     Q.  I'd like to mark Exhibit 41.
15         (Exhibit Number 41 was marked for
16 identification.)
17     Q.  BY MR. MOSELEY:  Can you tell me what
18 this is.
19     A.  This is an email from Ann Gima to me.
20     Q.  Basically, this is email from Ann Gima
21 warning you that Phil is going to be dissatisfied
22 with the performance review.
23     A.  She's anticipating it.
24     Q.  Is that in reference to Exhibit 39?  This
25 is dated April 12th, 2002, and it says, "I am

Page 150

1  anticipating there will be dissatisfaction with the
2  recent JPR that was written and just delivered to
3  Phil for his review."
4        Do you see that? Do you see that
5  passage?
6      A.  So you're asking if 41 refers to 39.
7        MR. LORUSSO:  No, he asking --
8      Q.  BY MR. MOSELEY:  I'm asking if you see
9  that passage. Do you see that passage in there?
10     A.  Okay.
11     Q.  Is that right?
12     A.  When you say it's right, meaning?
13     Q.  Did I read it correctly, that she says,
14 "I am anticipating that there will be
15 dissatisfaction with the recent JPR that was
16 written and just delivered to Phil for his review."
17       You see that sentence, right?
18     A.  Yes.
19     Q.  Is that sentence referring to the JPR
20 that's exhibited in Exhibit 39?
21     A.  It appears so.
22     Q.  Why would Ann Gima be telling you that
23 there would be dissatisfaction with that JPR?
24       MR. LORUSSO:  Objection, calls for
25 speculation.

Page 151

1        THE WITNESS:  I don't know, because the
2  performance evaluation says satisfactory.
3      Q.  BY MR. MOSELEY:  So that's not a
4  reduction?
5      A.  Here.
6      Q.  No, I understand. So the Exhibit 39
7  wasn't a lesser quality performance evaluation than
8  prior ones?
9      A.  No, I'm talking about the overall rating
10 is still satisfactory. The individual ratings.
11 This is the overall final rating is what's
12 important.
13     Q.  The internal guts of it and the comments
14 aren't important?
15     A.  Well, the comments are important in the
16 sense that if there's areas that need improvement,
17 work on. There's also positive comments,
18 exceptional work, things like that, so the comments
19 are important. What I'm saying here is when you
20 look at the overall rating, that hasn't changed, it
21 may be somewhat individual ratings for one reason
22 or the other.
23     Q.  Did you receive Exhibit 41?
24     A.  It does look familiar.
25     Q.  It looks like there's a response, "OK.

Page 152

1  Bob"; is that right?
2      A.  Yes.
3      Q.  Did you write that response?
4      A.  Fairly certain, yes.
5      Q.  Did you ask Ann Gima why she was
6  anticipating dissatisfaction with the JPR?
7      A.  I don't recall asking her or I can
8  remember.
9        (Exhibit Number 42 was marked for
10 identification.)
11     Q.  BY MR. MOSELEY:  I'd like you to take a
12 look at what's been marked as Exhibit 42. Do you
13 know what this is?
14     A.  (No audible response.)
15     Q.  Bob, do you know what this document is,
16 Exhibit 42?
17     A.  Performance Evaluation Report.
18     Q.  And it's stamped, Received August 26th,
19 2002; do you see that?
20     A.  Yes, August 26th, 2002.
21     Q.  In the checked boxes on the left-hand
22 side, items one, two and four are checked off with
23 Meets Requirements, but item three Attitude Toward
24 Work is checked off as Below Requirements. Do you
25 see that?

Page 153

1      A.  Yes.
2      Q.  As of August 26th, 2002 was that your
3  opinion of Phil's performance as of that date?
4      A.  Yes, covering the period from, I guess,
5  June 1st to August 31st.
6      Q.  So you felt his attitude toward work had
7  fallen to below requirements; is that right?
8      A.  Well, according to --
9      Q.  I'm asking you about the first page.
10     A.  The first page.
11     Q.  Yes.
12     A.  I'm sorry, repeat the question again.
13     Q.  So you felt his attitude toward work had
14 fallen to below requirements; is that right?
15     A.  That's what I see on this form, yes.
16     Q.  And that was your opinion as of that
17 date, as of August 26th -- actually, there are
18 several dates on here, August 14th, 2002, it's
19 supposedly to the period ending August 31st, 2002,
20 and then there's a received date, August 26th,
21 2002.
22       So in that time period was it your
23 opinion that his attitude toward work had dropped
24 to below requirements?
25     A.  Yes.

39 (Pages 150 to 153)

Page 154

1    Q.   On the second page in, these are the
2  comments that are referenced on the first page as
3  Please see attached; is that right?
4    A.   Yes.
5    Q.   Do the comments reflect your views about
6  Phil's performance as of that date?
7    A.   Yes.
8    Q.   The second paragraph there says that,
9  "Over the course of the past two months, Philip has
10  been encountering some difficulties in
11  independently performing all of the
12  responsibilities of the Appraiser IV position."
13       Do you see that?
14    A.   Yes.
15    Q.   Was that your opinion at that time?
16    A.   Yes.
17    Q.   And did you form that opinion by
18  independent observation or was this just from Ann
19  Gima's reports?
20    A.   Not only with discussions with Ann Gima
21  but also discussions with Phil.  When instructions
22  were not being followed or assignments were not
23  being completed in time, she brought it to my
24  attention.  We had met with Phil a few times
25  regarding areas that could be improved, things like

Page 155

1  that.
2    Q.   And some of the items that were a problem
3  had been work hours, timely submission and prior
4  approval of leaves from work, directions for
5  processing various job tasks.  Do you see that?
6    A.   Yes.
7    Q.   Was that your understanding of the
8  problems?
9    A.   Yes.
10    Q.   Did you draft this?
11    A.   No.
12    Q.   Did you have a hand in drafting this?
13    A.   No, not this.
14    Q.   The third paragraph down it says, "Phil
15  will benefit from an additional three month
16  probationary period of review for further training
17  and instruction." Do you see that?
18    A.   Yes.
19    Q.   Was that your idea, to have another three
20  month probationary period?
21    A.   I don't recall if it was my idea.  I knew
22  there was a concern about performance, though.
23    Q.   Did you discuss this one with anybody?
24       MR. LORUSSO: At what point in time?
25       MR. MOSELEY: At around the time this

Page 156

1  evaluation was written.
2       MR. LORUSSO:  Objection, vague and
3  ambiguous.
4       THE WITNESS:  I'm not sure, but I recall
5  meeting with Annie during this rating period about
6  some of the shortfalls and other problems.
7       (Exhibit Number 43 was marked for
8  identification.)
9    Q.   BY MR. MOSELEY:  I'm showing you what's
10  been marked as Exhibit 43.  This appears to be an
11  email from you to Ann Gima saying, "When you have
12  time, I need to meet with you regarding Phil's
13  JPR."
14       Do you see that?
15    A.   Yes.
16    Q.   Did you write that?
17    A.   This looks like my email, yes.
18    Q.   Do you remember writing that?
19    A.   I really don't remember this one.  I may
20  have.
21    Q.   This email was sent before Phil got
22  Exhibit 42; is that right?
23    A.   Yes.
24    Q.   What did you need to discuss with Ann
25  about Phil's JPR?

Page 157

1    A.   I don't recall.
2       (Exhibit Number 43 was marked for
3  identification.)
4    Q.   BY MR. MOSELEY:  Take a look at what's
5  been marked as Exhibit 43.  Do you know what this
6  is?
7    A.   Yes.
8    Q.   What is this?
9    A.   These are Ann Gima's notes.
10    Q.   And on the second page it says "Draft
11  submitted to Bob week of 8-5."
12    A.   Yeah.
13    Q.   Do you want to change your testimony
14  about assisting in the comments for Exhibit 42?
15  You said you didn't assist in drafting those
16  comments.
17    A.   (No audible response.)
18    Q.   Do you want to change your testimony on
19  whether you assisted in drafting the comments on
20  Exhibit 42?
21    A.   I may have had a part in it, but I can't
22  be sure.  Some parts do look familiar.
23    Q.   Exhibit 43 notes a meeting with,
24  apparently, Ann Gima -- that's Ann Gima's
25  handwriting, right, at the bottom of Exhibit 43?

40 (Pages 154 to 157)