IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII


PHILIP E. ENGLISH,            )CIVIL NO. 04-00108
                             )
            Plaintiff,        )
                             )
vs.                          )
                             )
CITY AND COUNTY OF           )
HONOLULU; GARY T.            )
KUROKAWA; ROBERT O.          )
MAGOTA; ANN C. GIMA; and     )
GK APPRAISALS, INC.; JOHN    )
DOES 1-10; JANE DOES 1-10;   )
DOE PARTNERSHIPS; DOE        )
CORPORATIONS 1-10; AND DOE   )
ENTITIES 1-10,               )
                             )
            Defendants.       )
                             )


DEPOSITION OF ROBERT MAGOTA

VOLUME II

Taken on June 8, 2006, commencing at 10:15 a.m. at

the Law Offices of Moseley Biehl Tsugawa Lau &

Muzzi, Alakea Corporate Tower, 1100 Alakea Street,

23rd Floor, Honolulu, Hawaii, before Rita King, a

Certified Court Reporter in the State of Hawaii.


Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

EXHIBIT B

Page 171

```
1   COUNSEL APPEARING:
2
3   Attorney for Plaintiff:
4       ROGER S. MOSELEY, ESQ.
        Moseley Biehl Tsugawa Lau & Muzzi
5       Alakea Corporate Tower
        1100 Alakea Street, 23rd Floor
6       Honolulu, Hawaii  96813
        808.531.0490
7
8   Attorney for Defendants City & County of
    Honolulu, Gary T. Kurokawa, Robert O. Magota and
9   Ann C. Gima:
10      MICHAEL L. LORUSSO, ESQ.
        Kawashima Lorusso & Tom, LLP
11      Topa Financial Center
        745 Fort Street, 5th Floor
12      Honolulu, Hawaii  96813
        808.275.0300
13
14  Attorney for Defendant GK Appraisals, Inc.:
15      ANTHONY L. WONG, ESQ.
        Sumida & Tsuchiyama
16      735 Bishop Street, Suite 411
        Honolulu, Hawaii  96813
17      808.356.2600
18
    Also present:
19
        Philip English
20      Chelsea Moseley
        Brian Steinwascher
21
22
23
24
25
```

Page 172

```
1              I N D E X
2
    WITNESS                        PAGE
3
4   ROBERT MAGOTA
5       Examination by Mr. Moseley      173
6
7            E X H I B I T S
8
    Deposition
9   Exhibits   Description          Marked
10  46    Letter - 3-13-03          246
11  47    Email - 3-18-03           249
12  48    Letter - 4-9-03           251
13  49    Letter - 4-16-03          260
14  50    Email - 4-17-03           261
15  51    Letter - 4-17-03          267
16  52    Letter - 4-17-03          271
17  53    Letter - 4-18-03          272
18  54    Letter - 4-20-03          273
19  55    Email - 4-21-03           277
20  56    Performance Evaluation Report
              9-22-03               283
21
    57    Letter - 4-30-03          311
22
23
24
25
```

Page 173

```
1              ROBERT MAGOTA,
2   a witness herein, having been first duly sworn by
3   the Notary Public, was examined and testified as
4   follows:
5              EXAMINATION
6   BY MR. MOSELEY:
7       Q.  Good morning, Bob.
8       A.  Good morning.
9       Q.  How are you this morning?  I just want to
10  remind you you're still under oath.  You understand
11  that, right?
12      A.  Yes.
13      Q.  Perfect.  I hope you had a nice respite
14  in the last few days between the sections of your
15  deposition.
16          When we left off, I think the very last
17  thing I was asking you about was a memo in which
18  Ann Gima was communicating directly with Gary
19  Kurokawa, that was Exhibit 45, and the implication
20  in there was that you weren't to know about this
21  meeting and you weren't to be involved, that's the
22  last thing I was talking to you about.  I will get
23  back to that a little later, but I want to shift
24  gears just a bit here.
25          Does the city and county offer any
```

Page 174

```
1   training with respect to ethics towards employees?
2       A.  I believe Chuck Totto does, yes.
3       Q.  Have you ever attended any of those
4   training sessions?
5       A.  Yes, I did.  I can't recall when.
6       Q.  What kinds of things do they talk about?
7       A.  I guess, basically, things you can and
8   cannot do while employed by the city.
9       Q.  How many of those things have you gone
10  to?
11      A.  Offhand, I can't remember, at least one
12  or two.
13      Q.  Sometimes I'll ask you questions like
14  that that appear to be speculation, but what I
15  would like you to give me is your best estimate,
16  you know, I mean, oftentimes people can remember
17  whether it was half a dozen, that kind of thing,
18  but when you do that it's legitimate to, and I want
19  you to tell me that you're giving me your best
20  estimate, and that kind of stuff, because later on
21  your attorney will blanch if you don't do
22  otherwise.  Because later on he's afraid I'll say,
23  well, you said six times when it's only three or
24  one or something, so you need to make sure that you
25  let me know that you're giving me an estimate, if
```

2 (Pages 171 to 174)

Page 175

1    you don't mind.
2        A.  I'm not really sure.  I can possibly
3    think of at least two occasions.
4        Q.  Is this something like you go over to the
5    ethics commission shop and you meet in their
6    conference room, or is it where the ethics
7    commission people come to you?
8        A.  No, it's normally held in the civil
9    service building, the red brick building.
10        Q.   Between the municipal office building and
11    the Honolulu Hale?
12        A.  Yes.
13        Q.  How many people are usually there?
14        A.  I don't know, they probably have several
15    of these.
16        Q.  Is it usually supervisory personnel or is
17    it all types of city employees or what?
18        A.  I'm not sure about the other employees, I
19    know the ones I've attended were primarily
20    management.
21        Q.  And Chuck Totto, you said he does these
22    sessions?
23        A.  At least the ones I've attended, yes.
24        Q.  Do you know what his official position
25    is?  I think he's the executive director and

Page 176

1    counsel for the ethics commission, I'm not a
2    hundred percent certain of that, though.  Do you
3    know --
4        A.  I'm not sure what his official title is.
5        Q.  And that's probably outside your purview.
6            In these things, does he talk about
7    specific ethics commission decisions or advisory
8    opinions or anything?
9        A.  I don't recall him talking about advisory
10    opinions, it's just kind of an overview, I think.
11        Q.  In the sessions that you've attended, do
12    you recall any of the kinds of things that he said
13    you could or couldn't do as city employees?
14        A.  Offhand, I can't recall.  It's been a
15    couple years.
16        Q.  Is this something that happens every year
17    or two or how often does this occur?
18        A.  I thought it was annually, but I'm not
19    sure.
20        Q.  Did Chuck ever refer to -- well, you told
21    me you weren't sure he referred to advisory
22    opinions, right?
23        A.  I'm sorry, repeat that.
24        Q.  You said that Chuck did not refer to any
25    specific advisory opinions, in your memory.

Page 177

1        A.  I can't recall.
2        Q.  I'm going to ask you about some opinions,
3    and my guess is that you're going to say, I don't
4    remember that, but I'll maybe tell you enough about
5    the opinion to jog your recollection, if possible.
6            There's an advisory opinion number 115 in
7    which there were concerns about a business venture
8    in which a city employee was involved, and the
9    commission's advisory opinion said the commission's
10    concern is whether or not he used the city time,
11    equipment or materials to service applications for
12    the tour -- apparently, the guy was running tours
13    on the side -- that is, does he have to respond to
14    telephone calls during working hours made by the
15    tour agency or prospective tourists.  Similarly,
16    does he make use of city equipment or material in
17    the fulfillment of his tour guide role.  Examples
18    of city equipment would be the telephone, the city
19    typewriter, city papers or stationery to correspond
20    with the tour agency or prospective tourists.
21            Does that sound at all familiar to you?
22        A.  No.
23        Q.  So do you remember any reference to any
24    ethics opinion in which Chuck Totto advised the
25    group that you couldn't use a city telephone or

Page 178

1    respond to telephone calls during working hours or
2    use city equipment?
3        A.  I don't recall.
4        Q.  That doesn't sound familiar to you?
5        A.  No.
6        Q.  Did he refer to something called advisory
7    opinion number 307, and in this case there was an
8    employee who was an excluded manager and division
9    head, and the complaint was that the employee was
10    using city time, his own, and that of a division
11    staff were typing and copying research to prepare
12    for steps in his grievance process.
13            Does that ring a bell to you at all?
14        A.  No, it doesn't.
15        Q.  Were you advised by Chuck Totto that the
16    finding in that case was that the employee has no
17    more right than every other person, and every other
18    person is in quotes, to use city resources because
19    the average person may not use the city resources
20    in question, the employee may not do so, therefore,
21    the employee's use of these resources violates RCH
22    Section 11-04 as an unwarranted or special
23    treatment and should cease immediately?
24            Does that ring any bells?
25        A.  I don't recall that.

3 (Pages 175 to 178)

Page 179

1    Q.   Was that your understanding, though, even
2  if that wasn't the subject matter of one of these
3  ethics opinion classes or training programs?
4        MR. LORUSSO:  Objection, vague and
5  ambiguous.
6        THE WITNESS:  Can you repeat the
7  question?
8    Q.  BY MR. MOSELEY:  Well, was that your
9  understanding, that the employees don't have any
10 right to use city time or resources to defend
11 themselves or to prosecute things like grievances,
12 was that your understanding?
13   A.   Related to this advisory opinion?
14   Q.   At all.  I mean, I guess you didn't --
15   A.   Yeah, I don't recall.  This doesn't sound
16 familiar.
17   Q.   Well, let's do a "for example."  For
18 example, if the ethics commission was investigating
19 Gary Kurokawa and Gary Kurokawa used city resources
20 to help defend himself in that investigation, would
21 it be your understanding, under the parameters
22 about what you know about city ethics law, that
23 that would be improper?
24       MR. LORUSSO:  Objection, lacks
25 foundation, vague and ambiguous, calls for

Page 180

1  speculation.
2        MR. MOSELEY:  I'm asking just for his
3  understanding.
4        You know, Bob, I'm not expecting you to
5  be a lawyer, and I'm not expecting you to spout
6  forth what you're sure are the state of alarm, I'm
7  just asking for what your understanding would be.
8        MR. LORUSSO:  Same objections.
9        THE WITNESS:  Using city resources to --
10   Q.  BY MR. MOSELEY:  Defend himself against
11 an ethics commission investigation.
12   A.   Yeah, I really don't know if it's
13 appropriate or not.
14   Q.   If you found out that was occurring,
15 would you ask somebody if that was appropriate?
16   A.   If it was brought up, I could ask
17 someone, yes.
18   Q.   Well, no, I'm asking you if you would.
19       MR. LORUSSO:  Objection, calls for
20 speculation.
21   Q.  BY MR. MOSELEY:  That's a little bit of
22 an unfair question, Bob, because, actually, the
23 last time you testified that Gary Kurokawa told you
24 that he had had Mike Lorusso help him somewhere,
25 although I'm not sure at this point what the extent

Page 181

1  of that was, with respect to the ethics commission.
2  Remember, you told me that Gary said something like
3  that?
4    A.   I'm trying to think.
5    Q.   Well, presuming that that is what you
6  said in the transcript last time, did that raise a
7  question in your mind of whether that was proper to
8  use an attorney that was being paid by city
9  resources to defend him with an ethics commission
10 proceeding?
11       MR. LORUSSO:  Objection, lacks
12 foundation, calls for speculation, also, a legal
13 conclusion.
14       THE WITNESS:  I really don't know if it's
15 right or wrong.  I'm not familiar with that kind of
16 legal.
17   Q.  BY MR. MOSELEY:  But it is an ethical
18 question that would be of some concern to yours,
19 right?
20       MR. LORUSSO:  Objection, argumentative.
21       THE WITNESS:  I'm not really sure if it's
22 proper or not.
23   Q.  BY MR. MOSELEY:  But, I mean, would you
24 be concerned enough if -- okay, again, that's not
25 fair.

Page 182

1        I believe your testimony was that that
2  information came to you and you actually didn't do
3  anything about it, so I guess I wasn't really
4  asking you to speculate since you didn't do
5  anything about it.
6        Have you done anything about it since the
7  last deposition, have you raised it with anybody,
8  for example, have you sought an ethics opinion?
9    A.   Regarding?
10   Q.   Regarding whether Gary could use Mike
11 Lorusso to help in his proceeding with the ethics
12 commission.
13       MR. LORUSSO:  Objection, lacks
14 foundation.
15       THE WITNESS:  No, I did not raise any
16 question about that.
17   Q.  BY MR. MOSELEY:  In the meantime, you
18 haven't raised a question?
19   A.   No.
20   Q.   Does that concept bother you at all?
21       MR. LORUSSO:  Objection, vague and
22 ambiguous, argumentative.
23       THE WITNESS:  Doesn't bother me.
24   Q.  BY MR. MOSELEY:  Would it bother you to
25 know that an employee of the assessment division

4 (Pages 179 to 182)

Page 183

1  was using a city telephone to conduct private
2  business?
3      A.   When you say private business, personal
4  business or?
5      Q.   I meant broader than that, but let's
6  restrict it now to some business interest, in other
7  words, some activity conducted for profit outside
8  the city.
9          I mean, as in the example of the first
10  example I read you of the guy who was conducting a
11  tourist business and was using the city's telephone
12  to conduct business, would that bother you?
13     A.   Actually conducting business.
14     Q.   Right.
15     A.   Yes, that would bother me.
16     Q.   Is that the kind of thing that would rise
17  to the level of your concern that you would talk to
18  Mike Golojuch about it?
19         MR. LORUSSO:  Objection, calls for
20  speculation, incomplete hypothetical.
21         THE WITNESS:  If they were actually
22  conducting business, that would be something I
23  would probably refer to the administrative services
24  officer.
25     Q.   BY MR. MOSELEY:  Are you aware that in

Page 184

1  the deposition of David Matsunami, David Matsunami
2  testified that 70 percent of his contact with GK
3  Appraisals was through Gary Kurokawa and that that
4  consisted of calling Gary at his office on his city
5  phone and leaving messages with his city secretary,
6  or were you aware that that was David Matsunami's
7  testimony?
8          MR. LORUSSO:  Objection, lacks
9  foundation.
10         THE WITNESS:  I don't think I read the
11  entire deposition.  I don't recall reading that.
12     Q.   BY MR. MOSELEY:  Were you aware that was
13  his testimony, those particular items of testimony?
14         MR. LORUSSO:  Same objection.
15         Go ahead.
16         THE WITNESS:  I wasn't aware of that.
17     Q.   BY MR. MOSELEY:  If you were specifically
18  made aware of that, would you be seeking the input
19  of the ethics commission or of Mike Golojuch to try
20  to determine how to deal with the problem?
21         MR. LORUSSO:  Objection, calls for
22  speculation.
23         THE WITNESS:  I'd probably refer to the
24  administrative services officer.
25     Q.   BY MR. MOSELEY:  And that would be, at

Page 185

1  this point, Mike Golojuch, right?
2      A.   Yes.
3      Q.   That guy has the weirdest spelling of his
4  name.  Sorry Mike Golojuch, I'm sure you'll read
5  this transcript sometime.  Apologize to you.
6          What exactly is your understanding with
7  respect to the propriety of conducting your private
8  business using city time, equipment or materials,
9  what is your understanding of that?  I'm not asking
10  you to tell me as a lawyer, I just want to know
11  what your understanding is.
12     A.   It is not allowed.
13     Q.   At all.
14     A.   Yes.
15     Q.   Have you had as your tenure, first as the
16  assessor -- well, actually, you started as an
17  appraiser, right, with the city?
18     A.   Yes.
19     Q.   So in your tenure as an appraiser and
20  then you became a supervisor; is that right?
21     A.   Yes.
22     Q.   And then you became the assessor?
23     A.   Yes.
24     Q.   Or acting assessor, and now you're the
25  assistant administrator, right?

Page 186

1      A.   Yes.
2      Q.   In your experience in those roles, have
3  you ever been made aware of or come across
4  instances other than Phil English's allegations of
5  the use of city time, equipment or materials for
6  conducting private business?
7      A.   I had one employee who may have.
8      Q.   Is that Clinton Wang?
9      A.   I'd rather not say at this point.
10     Q.   I'm sorry you'd rather not say, but was
11  that Clinton Wang?
12     A.   Well, you know, the employee still works
13  with us so I don't know if it's --
14     Q.   Well, you do understand that one of the
15  issues in this case is desperate treatment of Phil
16  and his complaints versus other people, you do
17  understand that, right?
18     A.   Yes.
19         MR. LORUSSO:  Can we take a short break?
20         MR. MOSELEY:  Sure.
21         MR. LORUSSO:  At this time, Mr. Magota
22  will provide you with the name that you had
23  requested.
24     Q.   BY MR. MOSELEY:  Okay.  And that employee
25  is?

Page 187

1      A.   Clinton Wang.
2      Q.   I'm sorry, I was under the impression he
3  wasn't still there with the city.
4      A.   No, he's still there.
5      Q.   Is this the circumstance under which
6  Clinton Wang was managing real property during city
7  time and using a city car for that purpose?
8      A.   What I recall is he had come back
9  literally from lunch, and I was waiting for him to
10 discuss some work related matters, when I asked him
11 why he was late from lunch, he said he was taking
12 care of some business where he lived.  That's when
13 I asked him, you know, if he was working another
14 job, and he said yes, that he was a resident
15 manager who was on call, meaning, you know, he had
16 no set working hours.
17     Q.   And what did you do with respect to that
18 information?
19     A.   Well, I gave him a warning that, first of
20 all, you know, he does have set hours, but my
21 biggest concern was having a job that requires him
22 to be on call may interfere with his city job, and
23 I told him that it would be best if he picked one
24 job over the other because there may be a conflict.
25     Q.   And what was the result of that?

Page 188

1      A.   We received a letter from his employer
2  that he had resigned.
3      Q.   Was Clinton using a city vehicle to go
4  back and forth between the condo, or the building,
5  and the city job?
6      A.   I don't know.  Not to my knowledge.
7      Q.   Are you aware of any other time Clinton
8  was using a city vehicle for any other purpose?
9      A.   No.
10     Q.   Are you aware of any time when Clinton
11 used a city vehicle, got into an accident and was
12 later accused of hit and run?
13     A.   That incident, it may have been during
14 the lunch period near the city and county credit
15 union.  I received a phone call, the person would
16 not identify themself, so the person told me that a
17 city car had bumped their vehicle while -- I can't
18 recall whether they were parking or if they were
19 leaving the city credit union.  When I asked the
20 person would they like to file a complaint, they
21 said no.  I asked them, you know, if it's serious,
22 you should contact the police department, and they
23 didn't want to.  Like I said earlier, I asked them
24 for their name, and they wouldn't give it to me.
25 It appears that -- I believe he was backing up and

Page 189

1  may have tapped bumpers with the other car.
2      Q.   Where was this, in the parking lot of the
3  credit union?
4      A.   It was either on the street or they do
5  have a parking lot, and, you know, a lot of city
6  employees during their lunch hour or break, they
7  may stop by their credit union.
8      Q.   Did you ask Clinton what he was doing
9  when that incident occurred?
10     A.   I did ask him about the incident, yes.
11     Q.   And what did he say?
12     A.   He said he had stopped by the credit
13 union, I believe it was during the lunch hour, on
14 his way back to the motor pool, and he doesn't
15 recall bumping into any other cars.
16     Q.   Where is the city motor pool?
17     A.   About a block away from the credit union.
18     Q.   Where is that?
19     A.   Well, the credit union is next to the --
20     Q.   I know where the credit union is, I'm
21 talking about where is the motor pool.
22     A.   The motor pool is next to the municipal
23 building, you know, there's a grassy area where
24 there's a preschool, it's underneath, so it's about
25 a block away.

Page 190

1      Q.   And do you know where Clinton was coming
2  from when he stopped by the credit union?
3      A.   Probably --
4           MR. LORUSSO:  Don't guess.
5           THE WITNESS:  I don't know.
6      Q.   BY MR. MOSELEY:  Did you ask?
7      A.   I don't recall.
8      Q.   Did you counsel Clinton about using a
9  city vehicle to conduct his private business at the
10 credit union?
11     A.   I don't recall.  I was more concerned
12 about this alleged accident.
13     Q.   Have you ever received any complaints
14 that Clinton Wang was using a city vehicle to go
15 visit his girlfriend during the workday?
16     A.   You'll have to excuse me, I've never
17 heard that one, I'm sorry.
18     Q.   You never received any complaints from a
19 building manager that Clinton Wang's city vehicle
20 was parked in a manager's stall at some condo in
21 front of the building?
22     A.   And visiting his girlfriend?
23     Q.   I'm asking you specifically.
24     A.   I've never heard that one.
25     Q.   Did you talk to Mike Golojuch or any

6 (Pages 187 to 190)

Page 191

1  other person about these activities of Clinton
2  Wang?
3      A.  No.
4      Q.  And all that was done was that you
5  counseled him; is that right?
6          MR. LORUSSO:  Object to the form.
7      Go ahead.
8          THE WITNESS:  Yes, I did lecture him.  As
9  far as the auto accident, that could not be
10 confirmed since the person did not want to file a
11 complaint nor did the person want to identify
12 themselves.  So it was hard to take action against
13 Clinton.
14     Q.  BY MR. MOSELEY:  But it was plain he was
15 using a city vehicle to conduct his private
16 business, wasn't it?
17     A.  During the lunch hour, yeah, he did stop
18 by the credit union, I believe.
19     Q.  Well, is it your understanding that city
20 employees are able to use city equipment during
21 their breaks and lunch hours?
22     A.  Well, when people go on, let's say, field
23 inspections --
24     Q.  I'm just talking about in general.  Is it
25 your understanding that, in general, as long as

Page 192

1  they're on the lunch hour breaks they can use city
2  equipment for their private business?
3      A.  When you say private business -- because
4  I'm thinking along the lines that, you know, if
5  they use a city car to stop off to get coffee or to
6  get lunch or things like that.
7      Q.  Let's make a distinction.  Let's say a
8  personal errand.
9      A.  It's difficult because I believe a lot of
10 city employees on their break or lunch will stop by
11 the credit union.
12     Q.  Using city vehicles?
13     A.  I have seen city vehicles there.
14     Q.  And it's your understanding that that's
15 permissible?
16     A.  Well, it's more, you know, I would say
17 more equal treatment.
18     Q.  Is it your understanding that that's
19 permissible under the city's code of ethics?
20         MR. WONG:  Objection, incomplete
21 hypothetical.
22         MR. LORUSSO:  Join.
23         THE WITNESS:  Repeat the question again,
24 I'm sorry.
25     Q.  BY MR. MOSELEY:  Is it your understanding

Page 193

1  that using city equipment, such as a vehicle on a
2  city employee's lunch hour or breaks is permissible
3  under the city's -- I think it's called standards
4  of conduct.
5          MR. LORUSSO:  Are you done?  Same
6  objection, also, lacks foundation and to the extent
7  it calls for a legal conclusion.
8          THE WITNESS:  I would tend to discourage
9  those kind of activities.
10     Q.  BY MR. MOSELEY:  Well, I understand you
11 would discourage those activities, I'm just asking
12 you if your understanding is that those activities
13 are permissible under the city's code of conduct or
14 standards of conduct.
15         MR. LORUSSO:  Same objections.
16     Q.  BY MR. MOSELEY:  If you don't know,
17 Bob --
18     A.  Yeah, I don't know.
19     Q.  Have you ever sought advice from the
20 ethics commission or any other city agency with
21 respect to those kinds of issues?
22     A.  No.
23     Q.  Do you remember an incident where Phil
24 English asked you if he could use a city copy
25 machine or was it a fax machine, I'm sorry?

Page 194

1      A.  Yes.
2      Q.  And can you describe that incident.
3      A.  Phil English came to my office requesting
4  to use the fax machine.  He had told me that he was
5  trying to work out a settlement with the Internal
6  Revenue Service and if he could use the fax
7  machine, and I told him that the fax machine should
8  be used for city related business only.  And I had
9  mentioned to him it probably would be better to go
10 down the street to one of the local copying
11 companies and use their fax machine, and the reason
12 for that is, you know, I didn't feel that it was
13 appropriate to use the fax machine for that kind of
14 personal business.
15     Q.  Is Phil the only one that's ever asked
16 you if he could use the fax machine for personal
17 business?
18     A.  To my knowledge, yes.
19     Q.  Is Phil the only one who's ever asked you
20 if they could use city equipment for any personal
21 purpose?
22     A.  I'm sorry, repeat that.
23     Q.  Is Phil the only one that's ever asked
24 you if they could use city equipment for any or any
25 kind of city equipment for any kind of personal

7 (Pages 191 to 194)

Page 195

1  purpose?
2      A.  I can't recall anyone asking me, besides
3  Phil.
4      Q.  But your understanding was that the use
5  of the city equipment for a personal purpose like
6  that was improper; is that right?
7      A.  Yes.
8      Q.  How does that differ from the use of a
9  city car to go to the credit union during your
10  lunch hour?
11          MR. LORUSSO:  Objection, vague and
12  ambiguous, calling for speculation.
13          THE WITNESS:  I believe Clinton was on
14  his way back.  Like in Clinton's case, he was on
15  his way back to the motor pool so he stopped off,
16  went to the credit union, then returned the car, so
17  it was more like he was on his way back.
18      Q.  BY MR. MOSELEY:  So --
19      A.  And it was during his lunch hour.  And,
20  like I said, I have seen other people, you know,
21  city vehicles stop by the credit union since it's
22  so close by.
23      Q.  At the time Phil English asked you if he
24  could use the fax machine to fax something to the
25  IRS, was the fax machine attached to a telephone

Page 196

1  line?
2      A.  I believe it is.  I'm not sure.
3      Q.  Does it cost the city anything extra to
4  send a fax on the fax machine?
5      A.  I don't know.
6      Q.  Is the phone line or the fax machine
7  charged by page or something along that line?
8      A.  That I don't know.
9      Q.  Do you know if at the time Phil was
10  asking you if he could use the fax machine whether
11  this was during a break or during his lunch hour?
12      A.  I don't know.  I believe it was in the
13  afternoon, though.
14      Q.  He's entitled to break or was entitled to
15  a break in the afternoon, though, right?
16      A.  Yes.
17      Q.  Generally, city employees are entitled to
18  a 15-minute break in the morning, some lunch
19  period, and a 15-minute break in the afternoon; is
20  that correct?
21      A.  Yes.
22      Q.  What's the length of a lunch period?
23      A.  I believe, normally, it's 45 minutes.
24      Q.  So during the course of a workday they're
25  entitled to about an hour and 15 minutes total

Page 197

1  break; is that right?
2      A.  Yes.
3      Q.  Is there any other time that you
4  understood that Phil English was using -- strike
5  that.  Are you aware of any circumstance under
6  which any employees, and I'm talking about from the
7  time you started to work at the city until now,
8  have you been aware of any employees that used the
9  city telephone for their personal business, not
10  just some economic activity that's being conducted
11  on the outside but for their personal business?
12      A.  Just any personal business.
13      Q.  Correct.
14      A.  I believe I have.
15      Q.  Are you the only person that you're aware
16  of that's done that?
17      A.  Well, when I say I have, I've called my
18  wife at work, called my family, things like that.
19      Q.  Anything else?
20      A.  I'm sure other employees have probably
21  talked to friends or --
22          MR. LORUSSO:  Don't speculate.
23      Q.  BY MR. MOSELEY:  We were talking at that
24  point about your use of the city phone for personal
25  business.

Page 198

1      A.  So we're talking about outside of any
2  like work related or second job.
3      Q.  Exactly.
4      A.  I've used the telephone for personal
5  business, like I said, my family, my wife.
6      Q.  Refinancing your house, various things
7  like that, is that the kind of an example that
8  might work?
9      A.  Various reasons.
10      Q.  Are you aware of anybody that's used the
11  telephone, a city telephone to conduct an outside
12  business?
13      A.  Not to my knowledge.
14      Q.  And if you became aware of that, what's
15  your understanding of what you should do about it?
16      A.  Investigate it.
17      Q.  And how would you go about investigating
18  that?
19      A.  Well, are we just talking in general
20  terms?
21      Q.  Well, maybe we should establish a little
22  bit of foundation here.  Is that part of your job,
23  is to deal with those kinds of things?
24      A.  As management, yes.
25      Q.  And, specifically, as between you and

8 (Pages 195 to 198)

Page 199

1  Gary Kurokawa, is that more your job or more his
2  job?
3      A.  More my job.
4      Q.  So do you have a set way that you go
5  about investigating those sorts of complaints?
6      A.  I guess it depends on the circumstances,
7  type of complaint.
8      Q.  Can you tell me what different types of
9  complaints there might be.
10     A.  Sometimes we have complaints between
11 employees or problems between employees, and I will
12 discuss it with the employees and see where the
13 problem is, see if it can be resolved, depending on
14 the seriousness.
15     Q.  What other types of complaints are there?
16     A.  There was a sexual harassment complaint.
17     Q.  And I asked you about that last time.
18 Have you since decided whether or not you're going
19 to give me that person's name?
20     A.  I think at this point I'd rather not,
21 since the person is still employed.  It was a very
22 serious complaint.
23     Q.  I understand you'd rather not, but are
24 you refusing to give me that person's name?
25     A.  Yes, at this time.

Page 200

1      Q.  I notice your counsel hasn't instructed
2  you not to answer that question, so this is just
3  your personal decision not to give me the name.
4      A.  Yes.
5          MR. LORUSSO:  Just for the record, I'll
6  instruct him not to answer.  And, obviously, this
7  is something that, if it's appropriate, we'll make
8  him available for you to ask questions with regard
9  to.
10     Q.  BY MR. MOSELEY:  Any other types of
11 complaints that you're charged with handling?
12     A.  Anything that's brought to my attention,
13 be it employee disputes, disagreements.
14     Q.  In the case of employee disputes, what's
15 your practice, in terms of investigating such
16 disputes?
17     A.  Discuss it with the parties involved,
18 first of all.
19     Q.  Do you do anything beyond that?
20     A.  Again, it depends on the seriousness.  If
21 it's something that can be resolved or if it's a
22 miscommunication, things like that.  The main thing
23 is we just want to make sure that people are able
24 to work with each other.
25     Q.  In the case of somebody like Clinton Wang

Page 201

1  using a city vehicle to conduct his personal
2  errand, that doesn't rise to the point of doing
3  anything.
4      A.  As I mentioned earlier, he told me -- I
5  believe he told me, again, he was on his way back
6  to the motor pool, and the credit union is along
7  the way so he stopped off.  I believe it was during
8  his lunch hour, lunch period.
9      Q.  So that didn't rise to the level where
10 you would do any further investigation.
11     A.  It would have if the person did file a
12 complaint against him.  As I mentioned, I did
13 receive an anonymous phone call.
14     Q.  So you're saying the hit and run thing
15 concerned you but not the use of the city vehicle,
16 right?
17     A.  Well, in his case, he was on his way back
18 to the motor pool.
19     Q.  What did you do to investigate that to
20 determine whether he was telling the truth, did you
21 try to determine what time he actually was at the
22 credit union?
23     A.  I asked him about the incident.
24     Q.  Did you do anything to verify that he was
25 doing it on his lunchtime?

Page 202

1      A.  No, he told me that.
2      Q.  But you did nothing to verify it.
3      A.  No.
4          MR. LORUSSO:  Objection, asked and
5  answered.
6      Q.  BY MR. MOSELEY:  Did you do anything to
7  determine that, in point of fact, the credit union
8  was actually, physically on the way back to the
9  motor pool from wherever he was?
10     A.  I'm sorry, repeat that question.
11     Q.  Did you do anything to determine that, in
12 fact, the credit union was actually, physically on
13 the way back from wherever he was to the motor
14 pool?
15         MR. LORUSSO:  Objection, vague and
16 ambiguous.
17         THE WITNESS:  The credit union is on the
18 way to the motor pool.
19     Q.  BY MR. MOSELEY:  From where?
20     A.  South Beretania.  South Beretania is one
21 way.
22     Q.  Do you know where he was coming from?
23     A.  I don't recall.
24     Q.  Did you ask him where he was coming from?
25     A.  I believe I did.  He was coming back from

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 203

1 field work.
2    Q.   But you don't know where the field work
3 was.
4    A.   I don't recall asking him that.
5    Q.   At that point in time, to what part of
6 the island was he assigned?
7    A.   I don't recall.  This incident occurred a
8 few years ago, so I don't recall what his
9 assignment is.
10    Q.   Or was.
11    A.   Was, excuse me.
12    Q.   Does he generally do single family
13 residences?
14    A.   Yes, he does residential.
15    Q.   Do you know where he's assigned right
16 now?
17    A.   I believe it's the -- currently, I'm not
18 sure.  I believe it's in the east Oahu area,
19 possibly windward side.
20    Q.   In which case you would expect him
21 presently to be going up and down over the Pali
22 Highway?
23    A.   No, I think there may have been times he
24 could have been coming from east Oahu side.
25    Q.   What did you do to confirm, if anything,

Page 204

1 where he was coming from when this incident was
2 reported to you?
3    A.   I just took his word for it that he was
4 coming back from field work.  I was more concerned
5 about this supposed hit-and-run incident and
6 complaint that was filed.
7    Q.   At what stage does an occurrence rise to
8 the level where you feel necessary to contact Mike
9 Golojuch?
10       MR. LORUSSO:  Objection, over-broad,
11 vague and ambiguous, calls for speculation.
12    Q.   BY MR. MOSELEY:  I'm talking about in
13 your general practice.  I think you said that you
14 have different practices depending on what the
15 complaint is?
16       MR. LORUSSO:  Same objections.
17       THE WITNESS:  If I felt it could be
18 handled on my level, I'll try to resolve it, but
19 anything beyond that I'll refer to the
20 administrative services officer.
21    Q.   BY MR. MOSELEY:  How do you determine
22 whether you can handle it on your level?
23    A.   Part of it would be based on the
24 seriousness.
25    Q.   Do you think theft of city services or

Page 205

1 theft of the use of the city equipment or materials
2 is a serious violation?
3       MR. LORUSSO:  Objection, over-broad,
4 lacks foundation.
5    Q.   BY MR. MOSELEY:  What you talked about
6 depends on the seriousness, I'm asking you if that
7 would be a serious problem.
8    A.   I would look at that as serious after --
9 well, to give you an example, in the incident with
10 sexual harassment, I did the initial investigation
11 to determine if something had occurred, it appeared
12 that something did occur, after speaking with
13 several employees, and that's when I contacted
14 administrative services officer.
15    Q.   Were the two people involved formerly
16 married?
17    A.   I'm sorry, what's that?
18    Q.   In the sexual harassment claim, were the
19 two people involved in the claim formerly married?
20    A.   I don't recall.
21    Q.   Were they in different branches of the
22 assessment division?
23    A.   Yes.
24    Q.   Is one in PTO and one in the assessment
25 side?

Page 206

1    A.   No.
2    Q.   Is one in clerical and one in the
3 assessment side?
4    A.   Yes.
5    Q.   How long ago did this occur?
6    A.   It's been a number of years.  All I can
7 remember is we had a different administrative
8 services officer at the time.
9    Q.   It was Eileen Tengan?
10    A.   Yes.
11    Q.   So, actually, back to my question.  With
12 the theft of city services or the use of city
13 equipment or materials, would that be serious
14 enough for you to, under your practice of dealing
15 with this stuff, rise to the level of getting
16 involved with Mike Golojuch, at the present time,
17 in that office?
18       MR. LORUSSO:  Objection.
19       THE WITNESS:  Repeat that one more time,
20 I'm sorry.
21       MR. WONG:  And I'd like to add incomplete
22 hypothetical.
23       MR. LORUSSO:  Join.
24       MR. MOSELEY:  Is there anything else you
25 guys want to add?

10 (Pages 203 to 206)

Page 207

1    (The requested portion of the record was
2  read.)
3    MR. LORUSSO:  Same objections.
4    THE WITNESS:  If after looking into this
5  matter it warranted it, then I would contact
6  administrative services officer.
7    Q.  BY MR. MOSELEY:  I'm sorry, but I really
8  don't understand that answer.
9    A.  I will look at the complaint, and I will
10  start, let's say, an initial investigation to see
11  if there is something warranted or if there is an
12  indication of wrongdoing, and then I would refer to
13  the administrative services officer.
14    Q.  I'm only trying to determine your level
15  of when it warrants it and when it's not.  What if
16  the use of city equipment was the use of a fax
17  machine for personal reasons, would that warrant
18  going to the office of Mike Golojuch?
19    MR. LORUSSO:  Objection, calls for
20  speculation.
21    THE WITNESS:  Using the fax machine.
22    MR. MOSELEY:  Right.
23    THE WITNESS:  Going to Mike Golojuch.
24    MR. MOSELEY:  Right.
25    THE WITNESS:  No.

Page 208

1    Q.  BY MR. MOSELEY:  So can you give me at
2  least some kind of criterion or some example so
3  that I can understand at what level you think it
4  warrants going higher to Mike Golojuch's office?
5    MR. LORUSSO:  Objection, over-broad,
6  incomplete hypothetical, vague and ambiguous.
7    THE WITNESS:  Well, like I said earlier,
8  I think you have to look at it from the standpoint
9  of the seriousness.
10    Q.  BY MR. MOSELEY:  Is that like a dollar
11  value?
12    A.  I don't think you can assign a dollar
13  value.  Whereas, in the case of someone using a fax
14  machine, I would discourage the use of it for
15  non-city business.  And if someone was using a fax
16  machine, I think a verbal warning would be
17  sufficient for the first time.
18    Q.  I'm still trying to -- I know the
19  questions I'm asking you are vague, but I'm trying
20  to determine what kind of standard you use to
21  determine when it warrants going to Mike Golojuch
22  and when it doesn't.  Can you give me any
23  indication of how you're using that word, warrant?
24  I mean, I need to know the standard.
25    A.  To me, it's a judgment call, based on the

Page 209

1  seriousness.
2    Q.  Can you give me some examples, I mean,
3  how am I going to find that line?
4    MR. LORUSSO:  Objection, vague and
5  ambiguous, calls for speculation.
6    THE WITNESS:  Well, I believe there's
7  various types of complaints or things of that
8  nature, so I would look at it more on a
9  case-by-case basis.
10    Q.  BY MR. MOSELEY:  How about
11  insubordination.
12    A.  Insubordination, between an employee and
13  a supervisor?
14    Q.  Yes.
15    A.  I would give a verbal warning.
16    Q.  Before you would bring Mike Golojuch into
17  the picture?
18    A.  Well, insubordination -- if it's
19  insubordination, I believe that if it's a common
20  occurrence, if it's something that's ongoing or is
21  it something that can be corrected.
22    Q.  Well, what if it's the first time you've
23  dealt with the problem?
24    A.  Insubordination.
25    Q.  Right.

Page 210

1    A.  I would sit down with the employee and
2  the supervisor to find out what happened and see if
3  it's something that can be corrected.
4    Q.  Would you do that before you went to Mike
5  Golojuch?
6    A.  An incident of insubordination like that,
7  it's probably something I could handle on my level.
8    Q.  What would cause you to go to Mike
9  Golojuch first before you would sit down with an
10  employee?
11    MR. LORUSSO:  Objection, vague and
12  ambiguous, calls for speculation.
13    Q.  BY MR. MOSELEY:  Let's put this in
14  specifics.  There was an incident that was reported
15  to you that purportedly occurred in October of
16  2002 --
17    (Interruption)
18    MR. MOSELEY:  Off the record.
19    (A discussion was held off the record.)
20    Q.  BY MR. MOSELEY:  Are you aware of an
21  incident in October of 2002 in which Phil English
22  was alleged to have engaged in the act of
23  insubordination with Ann Gima?
24    A.  Yes.
25    Q.  And before you talked to Phil English

11 (Pages 207 to 210)

Page 211

1    about that, you went to Mike Golojuch and talked
2    with him about that; isn't that right?
3        A.   I'm sorry, repeat the question again.
4        Q.   Before you talked to Phil English about
5    this incident you spoke to Mike Golojuch about the
6    incident, didn't you?
7        A.   I did speak to Mike Golojuch, in January.
8        Q.   In January, and it was before you spoke
9    to Phil English about it, was that not right?
10       A.   Yes.
11       Q.   Why on earth would you talk to Mike
12   Golojuch before you spoke to Phil English about
13   this allegation of insubordination?
14           MR. LORUSSO:  Object to the form,
15   argumentative.
16           THE WITNESS:  As far as -- this incident
17   actually consisted of several things, one was
18   insubordination.  Mr. English, prior to this
19   incident, was not following directions, following
20   through on assignments, not following his
21   supervisor's instructions.  It was also the
22   situation where, according to Ann Gima and other
23   people who were present, that he started yelling at
24   Ms. Gima to a point where other employees became
25   frightened and worried about his behavior, and it

Page 212

1    appeared very serious at the time.
2        Q.   Had you heard of any of these other acts
3    of not following through on his assignments, and
4    the other things you listed, before you heard about
5    the insubordination incident?
6        A.   Yes.
7        Q.   And when did you hear about those things?
8        A.   Ann Gima was keeping me informed of
9    Mr. English's failure to follow instructions, to
10   complete assignments, so it had been ongoing.
11       Q.   Did you counsel Mr. English with respect
12   to any of these other ongoing things prior to, I
13   think it was, January 22nd of 2002?
14       A.   I'm sorry --
15           MR. LORUSSO:  2003, I think, is what you
16   want to say.
17       Q.   BY MR. MOSELEY:  You're right.
18           So it was January 22nd of 2003 when you
19   counseled Mr. English about the insubordination,
20   right?
21           MR. ENGLISH:  It was February 5th.
22       Q.   BY MR. MOSELEY:  I'm sorry, February 5th,
23   2003.
24       A.   Repeat the question.
25       Q.   Did you counsel Mr. English about the

Page 213

1    insubordination and other instances on or about
2    February 5th of 2003?  The answer to that is yes,
3    but --
4        A.   I'm trying to think what February 5th,
5    2003.  I know we did meet with Mr. English and the
6    union representative.  I'm not sure if it was on
7    February 5th, but it was sometime in February 2003,
8    yes.
9        Q.   And the subject matter of that meeting
10   was the insubordination and these related items
11   you're talking about.
12       A.   Yes, the shouting incident.
13       Q.   Failure to follow instructions, failure
14   to get his work done on time, that sort of thing?
15       A.   That was amongst the things we were
16   looking at, but it was primarily, also -- the
17   incident in October, Ms. Gima had instructed
18   Mr. English that certain assignments had to be
19   completed, and Mr. English had told her that he had
20   upcoming physician appointments, doctor
21   appointments, and it was my understanding that they
22   agreed that he would be granted this leave if the
23   assignments were completed by a certain date.  And,
24   according to Ms. Gima, the assignments were not
25   completed.  And when he returned to the office, I

Page 214

1    guess she had notified him or let him know that the
2    vacation or the -- I'm not sure if it was vacation
3    or sick leave he was using, but that, you know, the
4    leave was not granted, but there was supposedly an
5    understanding that he was supposed to finish his
6    assignments and leave would be granted.
7        Q.   The question is, When you counseled
8    Mr. English in February of 2003 with respect to
9    that incident, did you also counsel him with
10   respect to the other panoply of complaints that Ann
11   Gima had been making to you and keeping you abreast
12   of, you listed several, but I don't know if that
13   was the whole list, but did you counsel him with
14   respect to whatever Ms. Gima had been complaining
15   about?
16       A.   Actually, we had been counseling
17   Mr. English pretty much throughout the year 2002,
18   leading up to 2003.
19       Q.   When was the first time you counseled
20   Mr. English?
21       A.   I believe it was early 2002.  Actually, I
22   take that back.  There was an incident in January
23   of 2002 where Mr. English was supposed to be
24   working at our public service counter, and this is
25   when the assessment notices go out and the appeals

12 (Pages 211 to 214)

Page 215

1 filing period begins, the appraisers take turns
2 manning the public service counter and they're
3 assigned certain dates. And on these days, because
4 our office hours are 7:45 to 4:30, that's the work
5 hours they have to be there, even though they may
6 have earlier or later starting times the rest of
7 the week, when they are assigned to the public
8 counter, they are to be there from 7:45 to 4:30,
9 plus breaks and lunch.
10       The supervisor in charge, Ken Goto, had
11 notified Ms. Gima that Mr. English did not appear
12 or show up for the public counter, and there was a
13 concern that even though he knew about it, he, I
14 guess, felt he had other things to do. My
15 instructions to the staff is if there's any changes
16 to the public counter schedule, they have to clear
17 it with the supervisor, either with their
18 supervisor or the supervisor on duty at the
19 counter. Not only did he not show up initially to
20 assist taxpayers at the public counter, it was
21 brought to my attention that he also had left work
22 early instead of staying until 4:30, which is our
23 closing time. That's probably one of the earliest
24 incidents where he was not following instructions.
25       Q.  And you counseled Phil English about

Page 216

1 that.
2       A.  I believe Ann Gima may have.
3       Q.  I'm asking you about times when you
4 counseled Phil English about any shortcoming, in
5 terms of his performance. I mean, you, Bob Magota,
6 did the counseling.
7       A.  There were probably several times
8 throughout that year, 2002.
9       Q.  Can you remember any of them?
10       A.  I know one time, again, Ann Gima was
11 concerned about him following directions, carrying
12 through on assignments, the three of us were in my
13 office discussing it. And I know one of the
14 earlier meetings we had, you know, Phil English was
15 very receptive to our concerns, that he was going
16 to try his best to work with Ann Gima and follow
17 through on her directions. I believe there was an
18 email between Ann Gima and Phil English around that
19 time where they were both trying to reconcile their
20 differences.
21       Q.  Do you remember when that was?
22       A.  I think it was a May 2002 email where
23 Phil was also mentioning he also had a lot of
24 personal problems. On the other hand, Ann Gima was
25 trying to express herself, that she would try her

Page 217

1 best to try to improve communications.
2       Q.  And you personally counseled Phil English
3 on that incident?
4       A.  I believe I did talk to him.
5       Q.  You remember talking to him or you just
6 think you might have talked to him?
7       A.  Well, we've had several meetings
8 regarding him following directions but also trying
9 to work with Ann Gima. So it was pretty much
10 ongoing throughout the year.
11       Q.  I'm trying to, as best I can, identify
12 when those meetings occurred and what the subject
13 matter was. So the one you were just describing,
14 do you know when that was?
15       A.  Offhand, I can't remember the day, but it
16 was --
17       Q.  Do you remember you personally counseling
18 Phil English at that meeting?
19       A.  I believe I did, yes.
20       Q.  Did you counsel Ann Gima with respect to
21 her management style at that same meeting?
22       A.  No.
23       Q.  But you said you thought there was an
24 exchange of emails in which they were both being
25 sort of conciliatory on trying to reconcile their

Page 218

1 differences; is that right?
2       A.  Well, there was an email in May of 2002
3 between the two.
4       Q.  And you know that because you've reviewed
5 the records before your deposition here today?
6       A.  Like I said, we've had ongoing meetings
7 with Mr. English, too.
8       Q.  Did you review the records to determine
9 that the email that you're describing occurred in
10 May 2002 before your deposition here today?
11       A.  I did review the records, yes.
12       Q.  And that's how you know there was an
13 email?
14       A.  Actually -- I believe in that email Phil
15 mentions that he'd spoken to me earlier and that he
16 was going to try to learn market modeling and try
17 to do a better job. And I recall meeting with him
18 several times about work and learning about the
19 market modeling process, along with other meetings
20 with Ann Gima about deadlines and things like that.
21       MR. LORUSSO:  Counsel, I know we're very
22 close to a 12 o'clock lunch hour, but just a
23 minute, please.
24       (The deposition was at recess.)
25       Q.  BY MR. MOSELEY:  I guess I'm still trying

13 (Pages 215 to 218)

Page 219

1    to determine, you know, what the standard is that
2    you use in dealing with personnel problems before
3    you determine that you need to bring in the level
4    of Mike Golojuch, and I'm not at all confident that
5    I have the answer.
6         But as I understand your testimony, is
7    that in the case that occurred when you counseled
8    Phil in February of 2003, that you had contacted
9    Mike Golojuch prior to that because there had been
10   several earlier contacts with Phil and counsels
11   with Phil with respect to other personal problems.
12   Is that a correct characterization?
13       A.   Not completely.
14       Q.   Well, how is it incorrect?
15       A.   Because it was continuing on some of
16   these problems, I met with Mike Golojuch and Violet
17   Lee just to explain to them what I was planning on
18   doing.  Mike Golojuch, I was not asking him to get
19   involved, this was the meeting on January 15th,
20   2003.  I just explained to Mike Golojuch and Violet
21   Lee that we were having an ongoing problem with
22   insubordination, not getting along with his
23   supervisor, and I just explained to them that
24   because it had been ongoing that I was planning on
25   doing the written reprimand.  But Mike Golojuch was

Page 220

1    not involved, I was just discussing it with Mike
2    Golojuch and Violet Lee.
3        Q.   Were you seeking their advice?
4        A.   Yes.
5        Q.   And what advice did they give you?
6        A.   Well, they felt that it was appropriate,
7    since it had occurred many times before.
8        Q.   Insubordination had occurred before?
9        A.   Not following directions, things like
10   that.
11       Q.   Arising to the level of insubordination?
12       A.   I think in this case we were trying to
13   give Mr. English as much chance as possible in the
14   past, but it reached the point where we felt a
15   written reprimand may be appropriate.
16       Q.   Were you a little bit more cautious, in
17   terms of this reprimand, because February 15th, the
18   year before, he had issued a complaint to you about
19   Gary Kurokawa's conducting business on city time?
20       A.   That had no bearing on it.  All we were
21   looking at was trying to get Phil to do his work
22   and be productive.
23       Q.   Was there a time when Clinton Wang failed
24   to attend a board of review hearing because he was
25   hung over?

Page 221

1        A.   I don't know if he was hung over.
2        Q.   Was there a time when Clinton Wang didn't
3    attend a board of review hearing?
4        A.   I can recall one incident.
5        Q.   Did you counsel him on that?
6        A.   He had told me that his car had broken
7    down, and --
8             MR. LORUSSO:  He just asked you did you
9    counsel him.
10       Q.   BY MR. MOSELEY:  Did you counsel him on
11   that?
12       A.   Yes, I did.
13       Q.   Were there any other times you counseled
14   Clinton Wang, other than the resident manager
15   incident, the complaint of hit-and-run and the
16   board of review incident?
17       A.   Yes.
18       Q.   And what other incidents did you counsel
19   Clinton Wang about?
20       A.   He was having problems with tardiness.
21       Q.   You counseled him on that?
22       A.   Not only counseled him, he was required
23   to email me and his supervisor when he came to
24   work, and email me and his supervisor when he left
25   work, and that is something to insure that he came

Page 222

1    to work on time and left on time.
2        Q.   Any other times you counseled Clinton
3    Wang?
4        A.   Besides the tardiness problem, I can't
5    recall any more.
6        Q.   Did you ever consult with Mike Golojuch
7    or his predecessor, Eileen Tengan, about Clinton
8    Wang?
9        A.   No.
10       Q.   Even though there were multiple
11   instances, you never talked to him about that?
12            MR. LORUSSO:  Objection, argumentative.
13            THE WITNESS:  I looked at it regarding
14   the seriousness.  Now as far as the tardiness goes,
15   I felt that we could handle that on our level.
16   Just like in Mr. English's case, when he was not
17   reporting on time or if he was leaving early, we
18   lectured him, but we did not put him on the same
19   requirement as Clinton Wang, where he had to email
20   in and out as he left the office.
21       Q.   BY MR. MOSELEY:  I think the question I
22   asked was if you had ever consulted either Mike
23   Golojuch or his predecessor, Eileen Tengan, about
24   Clinton Wang.
25       A.   No.

14 (Pages 219 to 222)

Page 223

1  Q.  Are there any other employees or
2  instances, except for the sexual harassment
3  complaint and the problems with Phil English, in
4  which you consulted either Mike Golojuch or his
5  predecessor, Eileen Tengan?
6  A.  I can't recall.
7  Q.  Do you remember any?
8  A.  Offhand, I don't remember.
9  Q.  Did you ever counsel Ann Gima about her
10 management style or practices?
11 A.  No.
12 Q.  Have you ever attended a training program
13 with the City and County of Honolulu with respect
14 to whistleblowers?
15 A.  I'm sorry, repeat that question again.
16 (The requested portion of the record was
17 read.)
18 THE WITNESS:  I don't remember.
19 Q.  BY MR. MOSELEY:  Is it possible you've
20 attended such a training program and you just don't
21 remember?
22 MR. LORUSSO:  Objection.
23 MR. MOSELEY:  Or you don't remember
24 anything about it at all.
25 MR. LORUSSO:  Objection, calls for

Page 224

1  speculation.
2  THE WITNESS:  Again, I'm not sure.
3  Q.  BY MR. MOSELEY:  Is there a place in the
4  work area or within the division, the assessment
5  division, in which there's information posted about
6  the rights of whistleblowers and other employee's
7  obligations with respect to whistleblowers?
8  A.  There might be.
9  Q.  Do you know?
10 A.  I believe it would probably be human
11 resources and personnel.
12 Q.  Where is human resources and personnel?
13 A.  Well, actually, what I'm referring to is
14 there may be guidelines on that with human
15 resources.
16 MR. LORUSSO:  That's not what he's
17 asking.
18 Q.  BY MR. MOSELEY:  I'm asking if there's
19 anything posted for everybody to see.
20 A.  Posted.
21 Q.  Yeah.
22 A.  I don't recall.
23 Q.  You don't recall seeing anything like
24 that?
25 A.  Not in my office.

Page 225

1  Q.  When you say in your office, do you mean
2  in the assessment division?
3  A.  In the assessment division, yes.
4  Q.  Are you the person in charge of
5  conducting training programs or information
6  programs for the employees of the assessment
7  division?
8  A.  I do some training, yes.
9  Q.  Have you ever conducted training with
10 respect to the rights and obligations of
11 whistleblowers and other employees and management?
12 A.  Anything to do with employees along those
13 lines would be handled by human resources, I just
14 do training related to assessments.
15 Q.  Are you aware of any training session at
16 all conducting for anybody in the assessment
17 division with respect to what to do if you want to
18 report something or what management's obligations
19 are with respect to whistleblowers?
20 A.  I'm not sure about the whistleblower
21 part, but we have had training on workplace
22 violence --
23 MR. LORUSSO:  He's only talking about
24 whistleblowers.  Just answer his question.
25 THE WITNESS:  I don't recall any training

Page 226

1  on whistleblowers.
2  Q.  BY MR. MOSELEY:  So do you have any idea
3  if the city has any policy with respect to what
4  management's supposed to do in a case that they
5  determine there's a whistleblower in their midst?
6  A.  There is to be no retaliation.
7  Q.  Is that the city's policy?
8  A.  I believe that's the law.
9  Q.  Well, I'm asking if there's a city
10 policy.
11 MR. LORUSSO:  Let me just object, in
12 terms of lacking foundation.
13 Go ahead.
14 THE WITNESS:  As far as city policy.
15 MR. MOSELEY:  Right.
16 THE WITNESS:  I can't be sure.
17 Q.  BY MR. MOSELEY:  In terms of -- you know,
18 maybe there was a lack of foundation.
19 In terms of my understanding of you, I
20 think you have a management position in the city;
21 is that right?
22 A.  Yes.
23 Q.  Now, as having a management position in
24 the city, does the city do anything to make you
25 aware of their policies with respect to various

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 227

1  types of issues, in terms of dealing with
2  employees?
3      A.  Yes, they provide training.
4      Q.  Well, you've never had any whistleblower
5  training.
6      A.  I do not recall any training on
7  whistleblowers.
8      Q.  What's your understanding of your
9  obligations with respect to whistleblowers, other
10  than no retaliation?
11      A.  Basically, that's it, there is to be no
12  retaliation.
13      Q.  What's your personnel policy with respect
14  to when you run across a whistleblower incident?
15      MR. LORUSSO:  Objection, vague and
16  ambiguous, lacks foundation, calls for speculation.
17      Q.  BY MR. MOSELEY:  Do you have a personnel
18  policy?
19      A.  There is to be no retaliation.
20      Q.  What do you do when a whistleblower
21  incident comes to your attention?
22      MR. LORUSSO:  Objection, lacks
23  foundation, calls for speculation.
24      THE WITNESS:  I'm not sure I understand
25  your question.

Page 228

1      Q.  BY MR. MOSELEY:  Well, for example, does
2  that sort of an incident rise to the level of where
3  you call Mike Golojuch or had called his
4  predecessor, Eileen Tengan?
5      MR. LORUSSO:  Objection, vague and
6  ambiguous.
7      THE WITNESS:  Yeah, I'm not sure if I
8  understand your question.
9      Q.  BY MR. MOSELEY:  So you don't have a
10  particular thing that you do when you learn of a
11  whistleblower incident; is that right?
12      MR. LORUSSO:  Objection, misstates the
13  testimony, calls for speculation.
14      THE WITNESS:  Are you saying if a
15  whistleblower brings it to my attention that he's
16  being picked on or something along those lines?
17      MR. MOSELEY:  Right.
18      THE WITNESS:  Well, if a whistleblower
19  did come to me and said I'm being picked on, I'm
20  being harassed because of whatever, I would step in
21  and try to put a stop to it.
22      Q.  BY MR. MOSELEY:  In the course of your
23  dealing with Phil English, did you ever learn that
24  he was being harassed as a whistleblower?
25      A.  He never told me.

Page 229

1      Q.  He never advised you of that?
2      A.  As far as -- I'm trying to think.  Hold
3  on.  I don't recall him saying to me that he had
4  been harassed based on whistle blowing, offhand.
5      Q.  Do you recall him ever expressing a
6  concern to you that he was being retaliated against
7  because he was a whistleblower, and he may not have
8  used those words, whistleblower, but because he had
9  turned in the big boss of the assessment division?
10      MR. LORUSSO:  Just for the record, object
11  to the form of the question and also lacks
12  foundation that Mr. English was quote, unquote a
13  whistleblower.
14      THE WITNESS:  I don't recall him telling
15  me that he was being harassed because he was a
16  whistleblower.  I think conversations with him were
17  all related to his job performance, things like
18  that.
19      Q.  BY MR. MOSELEY:  Were you aware of any
20  other instance with any other employee who was
21  complaining about discrimination during any time of
22  your tenure at the assessment division?
23      A.  When you say discrimination --
24      Q.  Of any sort.
25      A.  Offhand, I don't remember any.

Page 230

1      Q.  Do you remember any complaints or any
2  litigation during your tenure at the assessment
3  division of discrimination or harassment of any
4  kind?
5      MR. LORUSSO:  Objection, compound, asked
6  and answered.
7      THE WITNESS:  Except for that sexual
8  harassment complaint -- you said litigation, also,
9  right?
10      MR. MOSELEY:  Yeah, claims or litigation.
11      THE WITNESS:  I don't recall any.
12      Q.  BY MR. MOSELEY:  Do you recall any person
13  or people of Canadian national origin that made
14  such complaints on any basis?
15      A.  There may have been a grievance, but I
16  don't know what the details are.
17      Q.  A grievance involving somebody of
18  Canadian national origin?
19      A.  I may have heard something about that,
20  but I don't know the details.
21      Q.  What did you hear about that?
22      A.  The only thing I heard was there was a
23  grievance related to a promotional opportunity,
24  that's pretty much it.
25      Q.  And what was your understanding of the

16 (Pages 227 to 230)

Page 231

1  outcome of that grievance?
2      A.  I don't know.  I was not involved.
3      Q.  Was that before your tenure at the
4  assessment division?
5      A.  No, I was at the assessment division.
6      Q.  Do you remember who that was?
7      A.  I recall there was an appraiser who was
8  hired --
9          MR. LORUSSO:  He's just asking who it
10  was.
11         THE WITNESS:  I believe it may be Ken
12  Lines.
13     Q.  BY MR. MOSELEY:  How do you spell that?
14     A.  L-i-n-e-s.
15     Q.  And is he still there at the assessment
16  division?
17     A.  No, he retired.
18     Q.  Is he in town; do you know?
19     A.  I have no idea.
20     Q.  Was he from Canada?
21     A.  I believe so, yes.
22     Q.  Any other instances of complaints of
23  discrimination or harassment, other than the sexual
24  harassment and Mr. Lines' incident, that you know
25  of?

Page 232

1      A.  No, not to my knowledge.
2          MR. MOSELEY:  Let's go off the record
3  here.
4          (The deposition was at lunch recess.)
5      Q.  BY MR. MOSELEY:  Hi Bob.  You're still
6  under oath.  Remember?
7      A.  Yes.
8      Q.  And you're being very good about making
9  sure your answers are "yes" and "no," I mean,
10  you're very trainable as a witness in that way.
11  Thank you.
12         A couple of little follow-up questions
13  before we move on to another area.  Are you aware
14  of anybody conducting a business in the lunchroom
15  at the assessment division at any time during your
16  tenure there?
17     A.  A business.
18     Q.  Yeah, somebody who essentially ran a
19  canteen.  His name is Wayne.  Sold, I guess, snack
20  foods, coffee, things like that.  Were you aware
21  that?
22     A.  I don't know if you would call it a
23  business.  I was under the impression that we had a
24  coffee club, that people would donate money to, and
25  soda.  As far as a business, I really don't know.

Page 233

1      Q.  How much did a cup of coffee cost?
2      A.  I don't know.  I pay by the month.
3      Q.  What do you pay a month?
4      A.  Maybe five or $6.00.
5      Q.  Do you just drink coffee?
6      A.  Yes.
7      Q.  Do you know what a soda costs?
8      A.  Currently, I don't think he purchases
9  soda or offers soda.
10     Q.  Do you know what it cost at any time in
11  the past?
12     A.  I don't recall.
13     Q.  Does he sell any other things in the
14  coffee club?  What's Wayne's last name, by the way?
15     A.  Kaneko.
16     Q.  Does he still sell stuff?
17     A.  I think we just have a coffee club right
18  now.
19     Q.  What's the difference between that and
20  Wayne Kaneko's operation?
21     A.  Well, he runs the coffee club, meaning
22  people who want to drink coffee put in so much per
23  month.  As far as him making a profit, I really
24  don't know.
25     Q.  Have you ever checked into that?

Page 234

1      A.  No.
2      Q.  Did it ever cross your mind that you
3  should check into that?
4      A.  No.
5      Q.  Why not?
6          MR. LORUSSO:  Objection, argumentative,
7  calls for speculation.
8          THE WITNESS:  I thought it was just to
9  cover the cost of the beverages and other things.
10     Q.  BY MR. MOSELEY:  But you never checked to
11  see if somebody was actually making a profit on it?
12     A.  No.
13     Q.  But there was, plainly, somebody was
14  providing -- what all was provided, soft drinks,
15  coffee, anything else, snack foods?
16     A.  I don't recall any snack foods.
17     Q.  Anything else, though, besides soft
18  drinks and coffee?
19     A.  I think that's about it.
20     Q.  And it never crossed your mind to check
21  to see if that person was making a profit; is that
22  right?
23         MR. LORUSSO:  Objection, asked and
24  answered, argumentative.
25         THE WITNESS:  I never checked.

17 (Pages 231 to 234)

Page 235

1    Q.  BY MR. MOSELEY: If, in fact, that person
2 was making a profit on that enterprise, what would
3 you, under your responsibilities for personnel
4 matters, what would your responsibilities be?
5    A.  I really don't think he should be making
6 a profit.
7    Q.  I'm asking you what your responsibilities
8 would be --
9    A.  If he was making a profit?
10    Q.  Right.
11    A.  I would have to look into it.
12    Q.  How would you look into it?
13    A.  Well, I think I would try to stop it.
14    Q.  Would you go to Mike Golojuch?
15    MR. LORUSSO:  Objection, calls for
16 speculation.
17    THE WITNESS:  If it could be handled on
18 my level, no.
19    Q.  BY MR. MOSELEY:  If it could be handled
20 on your level, you wouldn't call Mike Golojuch or
21 what, what are you saying?
22    A.  I would make him stop.
23    Q.  What about any profits he had collected
24 over -- what is it -- years?
25    MR. LORUSSO:  Objection, calls for

Page 236

1 speculation.
2    THE WITNESS:  Yeah, I believe it's over
3 years.
4    Q.  BY MR. MOSELEY:  Would you do anything
5 about the profits that were made in the past?  I'm
6 looking for your understanding of your
7 responsibilities if you came into that kind of a
8 situation.
9    MR. LORUSSO:  Objection, speculation.
10    MR. WONG:  Incomplete hypothetical and
11 assumes facts not in evidence.
12    MR. LORUSSO:  Join.
13    THE WITNESS:  Can you repeat the
14 question, again, I'm sorry.
15    Q.  BY MR. MOSELEY:  I'll drop that.
16    Has there been like a football or
17 basketball pool that's been conducted in the
18 assessment division?
19    A.  I cannot recall any football or
20 basketball pool.
21    Q.  Baseball?
22    A.  Not to my knowledge.
23    Q.  Any other kind of a sporting event type
24 of a pool that goes on in your office or has gone
25 on in your office?

Page 237

1    A.  I can't recall any.
2    Q.  Are you aware of anybody's involvement in
3 any activity like that in the assessment division?
4    A.  Not to my knowledge.
5    Q.  And nobody's ever asked you if you wanted
6 to participate in such a pool?
7    A.  No, because I don't gamble.  I'm not a
8 gambler.
9    Q.  So you're not aware of any employees that
10 participate in that sort of activity within the
11 assessment division; is that right?
12    A.  That's correct.
13    Q.  Are you aware of any people in the
14 assessment division or the corporation counsel's
15 office that take time off of work to go across the
16 street to Murphy's to watch sporting events?
17    A.  No, not to my knowledge.
18    Q.  At your last deposition we talked about
19 the fact that you were acting assessor for a while.
20 Do you remember that line of questioning?
21    A.  Yes.
22    Q.  Who appointed you to be acting assessor?
23    A.  Mr. Kurokawa.  Actually, he asked me,
24 yes.
25    Q.  But he had the authority to appoint you

Page 238

1 or was it the director of the department of budget
2 and fiscal services that appointed you?
3    A.  I believe he had to get an approval from
4 the director.
5    Q.  So you think it was the director that
6 actually made the appointment.
7    A.  I believe so.  I'm not sure.
8    Q.  But the director just followed Gary
9 Kurokawa's recommendation, to your knowledge?
10    MR. LORUSSO:  Objection, lacks
11 foundation, calls for speculation.
12    THE WITNESS:  I think it was subject to
13 approval by the director because when you're in an
14 acting position, I believe it's for only so many
15 months or length of period, and to continue would
16 need the director's approval.
17    Q.  BY MR. MOSELEY:  Because in your job
18 right now you're the assistant administrator?
19    A.  Yes.
20    Q.  I don't want to make this sound like a
21 beauty contest, but is one of your duties in the
22 event that the administrator can't fulfill his
23 duties that you would step up and be the
24 administrator for whatever time it takes to get a
25 new administrator?

18 (Pages 235 to 238)

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 239

1    A.   Yes, well, it would be subject to the
2  director's approval.
3    Q.   That's not a specific thing that's
4  contemplated in your job position, that you would
5  sort of automatically step forward and do the job
6  if the administrator wasn't available?
7    A.   When you say wasn't available --
8    A.   Well, I don't know, say, God forbid, the
9  administrator got into an auto accident and was
10  incapacitated for a while, is one of your duties as
11  the assistant administrator to take over in
12  situations like that?
13        MR. LORUSSO:  Objection, calls for
14  speculation.
15        Go ahead.
16        THE WITNESS:  Yes.
17    Q.   BY MR. MOSELEY:  Your attorney just
18  objected and said it calls for speculation.  Do you
19  know what your duties are as the assistant
20  administrator?
21    A.   Yes.
22    Q.   And that is one of them?
23    A.   If Mr. Kurokawa, let's say, is sick or on
24  vacation, yes, I will.
25    Q.   Can you, and I'm not going to hold you to

Page 240

1  it if you can't name them all, can you enumerate
2  your other duties.
3    A.   Primarily, I oversee the three branches,
4  and the three branch chiefs are under me.
5    Q.   Any other duties?
6    A.   Pretty much the day-to-day operations of
7  the branches.
8    Q.   Do you have any budgetary type
9  responsibilities?
10    A.   Some, yes.
11    Q.   And what are those?
12    A.   Well, we have to monitor our budget, our
13  expenses.  I get involved in the budgetary process
14  each year.
15    Q.   Do you allocate over time and things like
16  that?
17    A.   Either get Mr. Kurokawa or myself can
18  allocate overtime, depending if there's money in
19  the budget.
20    Q.   And you said in case where Mr. Kurokawa
21  was ill or for some reason unable to fulfill his
22  duties, you would fill in at least temporary; is
23  that right?
24    A.   Yes.
25    Q.   Is there anything in your duties or job

Page 241

1  description that talks about a vacancy in
2  Mr. Kurokawa's office?
3    A.   I'm sorry, I don't understand the
4  question.
5    Q.   A vacancy in the office, like if he
6  quit --
7    A.   If he quits.
8    Q.   Right, Mr. Kurokawa quits or do you have
9  responsibilities under your job description?
10    A.   I would fill in for that position until
11  it was filled permanently.
12    Q.   And that's what you believe is in your
13  job description?
14    A.   Yes.
15    Q.   Does that fill-in activity happen
16  automatically or is it fill in subject to the
17  director's approval?
18    A.   Do you mean to temporarily fulfill his
19  duties?
20    Q.   Right.
21    A.   I would be the one to step up.
22    Q.   So if Gary decided to move to the Big
23  Island and quit his job here, then you would be
24  temporarily, until they found a replacement, the
25  administrator?

Page 242

1    A.   Yes.
2    Q.   Maybe you wouldn't be the administrator,
3  but you'd be doing that job, right?
4    A.   Yes, temporary assignment.
5    Q.   So you would actually be temporarily
6  assigned to be the administrator.
7    A.   Yes.
8    Q.   So it's like, you know, as they say, a
9  heartbeat away from the presidency, you're sort of
10  a heartbeat away from being the administrator; is
11  that right?
12        MR. LORUSSO:  Let me object.  I think
13  that misstates the testimony.
14    Q.   BY MR. MOSELEY:  Do you know what I'm
15  asking?
16    A.   I'm not sure.
17    Q.   Well, actually, it was probably a stupid
18  question so I'll pass on that.
19        In your experience in the city, has the
20  city ever provided you with any sort of management
21  training?
22    A.   We do have management forum meetings.
23    Q.   What is that?
24    A.   City managers will meet periodically to
25  cover various topics.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

1    Q.   How often?
2    A.   It tends to vary. I don't believe it's
3   monthly, though. It tends to vary.
4    Q.   Do you go to most of those?
5    A.   Yes.
6    Q.   What kind of topics do they cover?
7    A.   Things related to personnel. Primarily,
8   personnel matters.
9    Q.   That's kind of a broad subject matter.
10  Do you remember any of the actual topics with
11  respect to personnel?
12   A.   I can't remember offhand, but I have
13  attended various forums.
14   Q.   Can you think of any examples at all?
15   A.   Sexual harassment. We did have some
16  attorneys from the private sector talk about labor
17  law.
18   Q.   Do you remember the subject matter of
19  those discussions?
20   A.   I cannot recall all the topics, it's been
21  a couple years, I believe.
22   Q.   Do they generally have outside speakers
23  coming in or how is that handled?
24   A.   Both in-house, human resources and, on
25  occasion, people from the outside.

1    Q.   And what's the format, does somebody come
2   in and do a speech and then there's a
3   question-and-answer session or how does that work?
4    A.   Sometimes, yeah, there is a presentation
5   with question and answers.
6    Q.   At other times how does it work?
7    A.   Well, I believe all the forums have a
8   question and answer period.
9    Q.   Do they all have some sort of a speaker,
10  though?
11   A.   Usually there is a speaker, yes.
12   Q.   Are there exceptions?
13   A.   I believe, pretty much of them have
14  speakers.
15   Q.   Is everybody told what the topic is
16  before they go to these things?
17   A.   Yes.
18   Q.   So you have a chance to sort of figure
19  out whether you have any questions on that area
20  before you go?
21   A.   Yeah, usually they have some kind of
22  set -- I don't know if you call it a program or
23  agenda or something.
24   Q.   Has Mike Golojuch ever been the speaker
25  at any of those things?

1    A.   I'm not sure.
2    Q.   How about Eileen Tengan?
3    A.   I'm not sure. I don't recall.
4    Q.   Have any of those forums ever covered
5   whistleblowers?
6    A.   I'm not sure.
7    Q.   When you had your January 15th, 2003
8   meeting with Mike Golojuch, who was in attendance?
9        MR. LORUSSO:  Off the record.
10       (A discussion was held off the record.)
11   Q.   BY MR. MOSELEY:  Who else was in
12  attendance at the January 15th, 2003 meeting?
13   A.   Mike Golojuch and Violet Lee.
14   Q.   Did Gary Kurokawa attend that meeting?
15   A.   No.
16   Q.   Were you aware of whether Gary Kurokawa
17  attended a separate meeting with Mike Golojuch on
18  that day?
19   A.   I don't know.
20   Q.   Either before or after?
21   A.   I don't know.
22   Q.   Did anybody ever report to you that on or
23  about that day that Mike Golojuch and Gary Kurokawa
24  were having some sort of a conference in the
25  basement of your building?

1    A.   I didn't know about that.
2    Q.   Did you ever hear of Mike Golojuch and
3   Gary Kurokawa meeting separately with respect to
4   Phil English's situation?
5    A.   I really don't know.
6    Q.   You don't know if anybody ever told you
7   that?
8    A.   Well, if they did, I don't remember.
9        MR. LORUSSO:  Don't guess.
10       THE WITNESS:  I really don't know.
11   Q.   BY MR. MOSELEY:  Well, I think that was
12  an appropriate answer, If they did tell me, I don't
13  remember. You know, all we can get you to say is
14  what you remember, right?
15       Do you remember a point in time at which
16  Phil English quit coming to work at the assessment
17  division?
18   A.   Yes.
19   Q.   Do you remember when that was?
20   A.   End of February 2003.
21       (Exhibit Number 46 was marked for
22  identification.)
23   Q.   BY MR. MOSELEY:  I pass you what's been
24  marked Exhibit 46 to this deposition. Have you
25  ever seen this letter?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 247

1    A.   Yes.
2    Q.   And that's your signature on the letter,
3 right?
4    A.   Yes.
5    Q.   How did you come to send this letter?
6 You sent this letter to Phil English?
7    A.   Yes.
8    Q.   How did you come to send this letter to
9 Phil English?
10    A.   I believe he had contacted our office
11 regarding his leave time and that -- yeah, it does
12 mention here, "As of this date you will have no
13 vacation leave and sick leave balance," and I
14 believe the letter is because he tried to contact
15 our office regarding his leave balance.
16    Q.   And so this was basically an official
17 response that says you haven't got any leave, sick
18 leave or otherwise, as of March 11th; is that
19 right?
20    A.   Yes.
21    Q.   So did you understand why he was absent
22 from work as of -- I mean, this letter is dated
23 March 13th.  Did you write it about that date?
24    A.   I'm sorry, what's that?
25    Q.   This letter was dated March 13th, did you

Page 248

1 write it on that date?
2    A.   Yes.
3    Q.   Did you understand as of March 15th why
4 he had been absent from work?
5    MR. LORUSSO:  March 13th?  You said 15th.
6    MR. MOSELEY:  I meant 13th.
7    THE WITNESS:  He filed for workers' comp
8 end of February 2003.
9    Q.   BY MR. MOSELEY:  So what was your
10 understanding as to why he was absent from work?
11    A.   Can you repeat that again.
12    Q.   What was your understanding as to why he
13 was absent from work?
14    A.   He had filed a workers' comp claim.
15    Q.   What was the basis of the claim?  If you
16 file a workers' comp claim, does that mean you're
17 absent from work?
18    A.   Well, in his case he stopped showing up
19 for work after he filed.
20    Q.   But did you understand why he was not
21 showing up for work?
22    MR. LORUSSO:  No guessing or speculating.
23    MR. WONG:  I guess I'll add my objection
24 as vague and ambiguous, as to point in time.
25    Q.   BY MR. MOSELEY:  I think I made the point

Page 249

1 in time very clear, March 13th, 2003.  I think I
2 was even corrected on the date.
3    I want to know as of March 13th, 2003,
4 what your understanding was that the reason Phil
5 was absent from work.
6    A.   I don't know what the real reason was.  I
7 know he had claimed stress in his workers' comp
8 claim.
9    Q.   So that was your understanding of what
10 his claim was as of March 13th, 2003.
11    A.   Yes.
12    Q.   Did you have any other understanding of
13 why Phil was not going to work, as of March 13th,
14 2003?
15    A.   No.
16    (Exhibit Number 47 was marked for
17 identification.)
18    Q.   BY MR. MOSELEY:  I'm showing you what's
19 been marked as Exhibit 47.  Do you recognize this
20 exhibit?
21    A.   Yes.
22    Q.   Have you seen this before?
23    A.   Yes.
24    Q.   Did you receive it on or about March
25 18th, 2003?

Page 250

1    A.   Probably around there, yes.
2    Q.   Did you understand that Phil was
3 undergoing a psychological evaluation, essentially
4 one month from the date of this email?
5    A.   In April.
6    Q.   Right.
7    A.   You're saying one month.
8    Q.   The email's dated March 18th, the first
9 sentence says that a psychological evaluation has
10 been arranged for April 18th.
11    A.   Yes.
12    Q.   That was your understanding?
13    A.   Yes.
14    Q.   Did you understand the purpose for the --
15 let's back up.  What was your understanding, if
16 any, as of March 18th, 2003, the purpose was for
17 the psychological evaluation?
18    A.   My understanding was it was related to
19 the workers' comp claim.
20    Q.   Again, referencing back to the stress
21 claim?
22    A.   Well, yes, he claimed stress, yes.
23    Q.   Did you have any other understanding as
24 to the purpose of the reference to psychological
25 evaluation?

21 (Pages 247 to 250)

Page 251

1      A.   Repeat that one more time, sorry.
2      Q.   Did you have any other understanding with
3  respect to the purpose of the reference to
4  psychological evaluation?
5      A.   No.
6      Q.   But you were basically on notice that
7  that evaluation, at least as of that time, was
8  scheduled for April 18th, 2003?
9      A.   Yes.
10         (Exhibit Number 48 was marked for
11  identification.)
12      Q.   BY MR. MOSELEY:  I'm showing you what's
13  marked as Exhibit 48.  Do you recognize this
14  exhibit?
15      A.   Yes.
16      Q.   Is this a letter you wrote?
17      A.   Yes.
18      Q.   And did you send this letter or cause it
19  to be sent April 9th, 2003 to Phil English?
20      A.   Yes.
21      Q.   And it says, Subject:  Annual Performance
22  Evaluation Review, right?
23      A.   Yes.
24      Q.   The letter says that, "We are requesting
25  your attendance at a meeting to discuss your annual

Page 252

1  performance evaluation report."  Do you see that?
2      A.   Yes.
3      Q.   Did you schedule that meeting?
4      A.   I scheduled the meeting, yes.
5      Q.   Why?
6      A.   We were notified by personnel that his
7  annual performance evaluation needed to be done.  I
8  mentioned to personnel that he had not been coming
9  to work.
10      Q.   Who at personnel did you discuss this
11  with?
12      A.   Violet Lee.  And she said that the
13  performance evaluation under civil service has to
14  be done.
15      Q.   Did you explain to Violet Lee that
16  Mr. English had made a stress related workers' comp
17  claim?
18      A.   Yes.
19      Q.   Did you explain to Violet Lee that,
20  essentially, nine days after this letter he was
21  scheduled to have a psychological evaluation?
22      A.   I don't recall if I said that, but I did
23  mention that he had filed a workers' comp claim.
24      Q.   And did you tell her it was for stress?
25      A.   I don't recall if I mentioned stress.

Page 253

1      Q.   Did Violet Lee ask you what it was for?
2      A.   That I don't recall.
3      Q.   Did Violet Lee tell you there are
4  absolutely no exceptions to this policy, you have
5  to do that evaluation?
6      A.   Pretty much so.
7      Q.   When you say pretty much so?
8      A.   She said yes, it had to be done.
9      Q.   Did you ask her if there were any
10  exceptions?
11      A.   I don't recall if I asked her if there
12  were any exceptions, but my understanding was the
13  performance evaluation had to be done.
14      Q.   And that there were no exceptions; is
15  that right?
16      A.   I would assume so, yes.
17      Q.   Did you assume so at the time?
18      A.   Yes.
19      Q.   Did you speak with Michael Golojuch about
20  this letter at around April 9th, 2003?
21      A.   No.
22      Q.   Why not?
23      A.   I had spoken to Violet Lee.
24      Q.   Why didn't you send Violet Lee a copy of
25  the letter?

Page 254

1      A.   Well, she works with Mike Golojuch, so,
2  again, we may have forgot to put her name on there,
3  but they work together.  She's like an assistant to
4  Mike Golojuch.
5      Q.   Maybe I need to establish a little bit
6  more foundation.  On the lower left-hand corner of
7  this letter it says cc Ms. Ann Gima and Mr. Michael
8  Golojuch.  Do you see that?
9      A.   Yes.
10      Q.   Is that who you sent the cc's to?
11      A.   Yes.
12      Q.   Actually, you didn't do it, right, your
13  secretary did it --
14      A.   Correct.
15      Q.   -- but that was your instruction and you
16  presume it was done?
17      A.   Yes.
18      Q.   Is there anybody else you think you sent
19  copies to?
20      A.   I think that's it.
21      Q.   Did Gary Kurokawa know about this letter?
22         MR. LORUSSO:  Objection, vague and
23  ambiguous as to time, calls for speculation.
24      Q.   BY MR. MOSELEY:  Fair enough.
25         As of April 9th, 2003, did Gary Kurokawa

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 255

1  know about this letter?
2      A.  I don't recall mentioning it to him.
3      Q.  Do you know whether at any time
4  subsequent to that he was made aware of this
5  letter?
6      A.  As far as the letter, I don't know, but I
7  did tell him, basically, that the performance
8  evaluation had to be done.
9      Q.  When did you tell him that?
10     A.  I cannot recall.
11     Q.  Was it around this time frame?
12     A.  It may have been after.
13         MR. LORUSSO:  Don't guess.
14     Q.  BY MR. MOSELEY:  Did Gary Kurokawa come
15  and say why did you do this and you explained that
16  it had to be done, was it that context or some
17  other context?
18     A.  On this performance evaluation I was
19  working primarily with Ann Gima.  Like I said, we
20  were notified by personnel that the performance
21  evaluation had to be done, so I had worked with Ann
22  Gima and Violet Lee.
23     Q.  Normally, as you explained the
24  performance evaluation process, Ann Gima would do
25  it, and it would go directly to Gary Kurokawa,

Page 256

1  right?
2      A.  Let me clarify that.  On a performance
3  evaluation, the supervisor, immediate supervisor,
4  prepares a draft.  Once a draft gets typed up on
5  the form, the supervisor will meet with the
6  employee to discuss the evaluation.  From there, it
7  passes by my desk for review, and then from there
8  it goes to, in our situation, it would go to the
9  administrator for a final review and signature.
10     Q.  This is somewhat different from your
11  testimony last time that you were uninvolved.
12     A.  I was a little bit confused about my
13  current duties.  My current duties, I'm not really
14  much involved with the performance evaluations, I
15  had to think about the progression.  But,
16  basically, it's the supervisor prepares or submits
17  a draft of the performance evaluation, and, at
18  times, if they want to discuss it before it's typed
19  up, you know, that does occur.  The supervisor then
20  meets with the employee.  So up to that point it's
21  just supervisor and employee, they sign off on it,
22  it passes by my desk, and then it goes to the
23  administrator's.
24     Q.  So what you're telling me now is that
25  each and every single one of Phil English's

Page 257

1  performance evaluation reports passed by your desk;
2  is that right?
3      A.  Yes.  What you have to understand,
4  though, is when I see it, it does not have
5  Mr. Kurokawa's signature on it.  What happens is,
6  like I said, the employee, the supervisor signs off
7  on it, it passes my desk, it goes to Mr. Kurokawa
8  for final, for review and signature.  So I don't
9  see the final with his signature, it goes from
10  there to personnel.  Personnel will send a copy
11  back to the employee of the performance evaluation.
12     Q.  But in each and every case --
13         (Interruption)
14         MR. MOSELEY:  Can we go off the record.
15         (A discussion was held off the record.)
16     Q.  BY MR. MOSELEY:  Since you've had a
17  chance to think about your deposition testimony
18  last time, are there any other areas that you've
19  decided you were confused about and you'd like to
20  change your testimony?
21         MR. LORUSSO:  Let me just object to the
22  form of the question, misstates the testimony, but
23  go ahead.
24         THE WITNESS:  I can't think of any right
25  now.

Page 258

1      Q.  BY MR. MOSELEY:  So at this moment what
2  you're saying is you were confused about the
3  process for the performance evaluation reports?
4      A.  Well, my duties have changed.
5      Q.  I think I was asking questions
6  specifically about whether you had an opportunity
7  to review those things, did I or did I not?
8         MR. LORUSSO:  Let me object, it's
9  overbroad, and we're going back to something that
10  occurred last week.  So to that extent, it's unfair
11  to the witness to recall what was said in the five,
12  six hours of the deposition last week.
13         THE WITNESS:  I do not see the completed
14  performance evaluation with Mr. Kurokawa's
15  signature.  I can review it when it comes back from
16  personnel, but Mr. Kurokawa, after he reviews it,
17  it goes straight to personnel.
18     Q.  BY MR. MOSELEY:  Actually, I do have
19  another question for you.  Referring you back to
20  Exhibit 48, did you have any communication with Tom
21  Riddle about your intention to require an annual
22  performance evaluation review of Phil English?
23     A.  Did you say direct communication?
24     Q.  Any communication with Tom Riddle?
25     A.  I believe Tom Riddle sent me an email

23 (Pages 255 to 258)

Page 259

1  regarding the performance evaluation.
2      Q.   How about as of the time of this Exhibit
3  48 letter, April 9th, 2003, did you have any
4  communication with Tom Riddle about this annual
5  performance evaluation review before you sent out
6  this letter?
7      A.   No.
8      Q.   Did you seek any input from Dr. Reneau
9  Kennedy with respect to the annual performance
10  evaluation review?
11      A.   No.
12      Q.   But you had received this email in
13  Exhibit 47 saying that Phil was scheduled for a
14  psychological evaluation by Dr. Kennedy on April
15  18th, right?
16          MR. LORUSSO:  Objection to form.
17          THE WITNESS:  Yes.
18      Q.   BY MR. MOSELEY:  And in that same email
19  that's in Exhibit 47 it basically says, Tom Riddle
20  is saying, "I told Dr. Kennedy she may wish to
21  speak with you concerning Mr. English and gave her
22  your phone number"?
23      A.   May I see that, you're referring to --
24      Q.   Exhibit 47.
25      A.   Can you repeat the question again.

Page 260

1      Q.   Look at the second sentence there.  Do
2  you remember seeing that sentence when you got this
3  email?
4      A.   Yes.
5      Q.   I'd like for you to take a look at what's
6  been marked as Exhibit 49.
7          (Exhibit Number 49 was marked for
8  identification.)
9      Q.   BY MR. MOSELEY:  Have you ever seen this
10  exhibit before?
11      A.   Only when it was submitted as an exhibit.
12      Q.   I'd like you to look at the fifth
13  paragraph on the second page, paragraph numbered
14  five on the second page.
15      A.   I'm sorry, what number?
16      Q.   Number five.  It says, "Mr. English
17  received a notice from Robert Magota requesting his
18  attendance at a meeting to discuss an annual
19  performance evaluation report on April 17th."
20          Do you see that?
21      A.   Yes.
22      Q.   It basically says, it asks Mr. Riddle to
23  advise you of the status of the claim and the
24  impropriety of continuing this activity in light of
25  the present circumstances.  Do you see that?

Page 261

1      A.   Yes.
2      Q.   Did Mr. Riddle ever communicate the
3  contents of this letter to you?
4      A.   The only thing I received from
5  Mr. Riddle, I believe, was an email.
6      Q.   Did Mr. Riddle ever communicate the
7  contents of this letter to you?
8      A.   This entire letter.
9      Q.   Well, let's just limit it to paragraph
10  number five.
11      A.   I believe in the email he did mention a
12  performance evaluation.
13      Q.   Was there anything else in paragraph
14  number five that Mr. Riddle communicated to you?
15      A.   I don't recall.  Like I said, I only
16  received the email.
17          MR. LORUSSO:  Just for the record,
18  Exhibit 49 is a letter dated April 16th, 2003 from
19  Roger Moseley, the attorney for plaintiff.
20          MR. MOSELEY:  The addressee is Thomas
21  Riddle, R-i-d-d-l-e.
22          MR. LORUSSO:  Thank you.
23          (Exhibit Number 50 was marked for
24  identification.)
25      Q.   BY MR. MOSELEY:  Real quickly, back to

Page 262

1  Exhibit 49.  On or about April 16th, were you aware
2  that there was a concern that a performance
3  evaluation review would exacerbate Phil's
4  condition?
5          MR. LORUSSO:  Objection, lacks
6  foundation, calls for speculation.
7          THE WITNESS:  I don't recall the date of
8  Mr. Riddle's email, but I think it was mentioned in
9  there.
10      Q.   BY MR. MOSELEY:  The email you got, was
11  that before or after you sent out the performance
12  evaluation notice?
13      A.   When you say performance evaluation
14  notice, April 9th letter?
15      Q.   I'll withdraw that question.
16          Take a look at Exhibit 50.  Do you know
17  what this is?
18      A.   This is an email from Ann Gima to me.
19      Q.   And what is the subject matter?
20      A.   Substandard performance notice.
21      Q.   For whom?
22      A.   Mr. Phil English.
23      Q.   Did you receive this email?
24      A.   Yes.
25      Q.   And it's dated April 17th, 2003?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 263

1    A.   Yes.
2    Q.   Did you receive this email on or about
3 that date?
4    A.   I believe so, yes.
5    Q.   It says, "Bob, Sue sent me the Notice and
6 I made some revisions." Sue is Sue Fomi?
7    A.   Yes.
8    Q.   What is the notice that's referenced
9 there?
10    A.   I believe it's a draft of the performance
11 evaluation.
12    Q.   Is it a performance evaluation or is it
13 called a substandard performance notice?
14    A.   I can't recall.  Yeah, offhand, I can't
15 recall.
16    Q.   There are two different kinds of things?
17    A.   I believe we did send out a -- I would
18 have to look at that document just to be sure.
19    Q.   Is it your understanding that a
20 performance evaluation and a substandard
21 performance notice are two different things?
22    A.   You know, I'm not sure what document this
23 is referring to, offhand.
24    Q.   Do you have an understanding of what a
25 substandard performance notice is?

Page 264

1    A.   I believe that might be something from
2 the director.
3    Q.   Do you know what it is?
4    A.   I would have to see the document.
5    Q.   Did you prepare one of these for Phil?
6    A.   I don't recall preparing this.
7    Q.   Did Sue Fomi prepare a substandard
8 performance notice?
9    A.   I'm not sure.  I would have to see the
10 document.
11    Q.   Were you involved in the preparation of a
12 performance evaluation for Phil in the middle of
13 April 2003?
14    A.   With Ann Gima, yes.
15    Q.   So you actually were involved in the
16 preparation of one?
17    A.   We discussed his performance, yes.
18    Q.   Did you ever see a performance evaluation
19 of Phil English in the middle of April 2003?
20    A.   Yes.
21    Q.   Was a performance evaluation issued to
22 Phil English in the middle of April 2003?
23    A.   I do recall seeing a performance
24 evaluation for Phil English.  The performance
25 evaluation, as I recall, also had a notation on

Page 265

1 there, To be discussed upon your return.
2    Q.   Is that different from a substandard
3 performance notice?
4    A.   I'm trying to recall this document.
5 We're going back a few years.  I'm trying to recall
6 it.  I would have to see the document.
7    Q.   You actually don't know the difference,
8 as you're sitting here today, between a substandard
9 performance notice and a performance evaluation; is
10 that right?
11    A.   Well, again, I would have to see the
12 document, maybe I would recognize it.
13    Q.   Okay.  I'd like you to take a look at,
14 for example, Exhibit 30.  Can you tell me what that
15 is.
16    A.   It's a performance evaluation report.
17    Q.   Is that what the product of a performance
18 evaluation looks like, to your understanding?
19    A.   Yes.
20    Q.   And these are the things that came by
21 your desk as a matter of course, is that right, in
22 the process?
23    A.   Yes.
24    Q.   These performance evaluation reports.
25    A.   Yes.

Page 266

1    Q.   And, actually, the way you guys refer to
2 it is a PER, right, isn't that the common way you
3 guys refer to it?
4    A.   JPR.
5    Q.   What does the J stand for?
6    A.   Job performance.
7    Q.   So it's a job performance report?
8    A.   It's just a nickname, yes.
9    Q.   So a reference to a JPR is a reference to
10 what's technically called a performance evaluation
11 report; is that right?
12    A.   Yes.
13    Q.   Are you aware of any performance
14 evaluation report that was prepared for Phil
15 English in April of 2003?
16    A.   Yes.
17    Q.   You saw one.
18    A.   Yes.
19    Q.   And, to your knowledge, was it sent out
20 to Phil?
21    A.   To the best of my knowledge, yes.
22    Q.   And referring back to Exhibit 48, which
23 is the April 9th letter to Phil English that you
24 wrote, the product of the performance evaluation
25 review, that is the subject matter, would be a JPR,

25 (Pages 263 to 266)

Page 267

1  or a performance evaluation report; is that right?
2      A.  Yes.
3      Q.  So that's what you were talking about in
4  this letter; is that right?
5      A.  Yes.
6      Q.  And that's what you quizzed Mike
7  Golojuch's assistant on in terms of whether or not
8  it was required?
9      A.  Yes.
10     Q.  Did anybody ever tell you that a
11  substandard performance notice was also required?
12     A.  I don't recall.
13     Q.  So this Exhibit 50, this email from Ann
14  Gima, you don't know what the document is that's
15  referenced there, do you?
16     A.  I would have to see the document.  I'm
17  not sure.
18     Q.  As you're looking at it right now, you
19  don't know what the document is.
20     A.  I cannot be certain.
21     (Exhibit Number 51 was marked for
22  identification.)
23     Q.  BY MR. MOSELEY:  I'm showing you what's
24  been marked as Exhibit 51 to this proceeding.  Are
25  you familiar with this letter?

Page 268

1      A.  When you submitted it as an exhibit.
2      Q.  Have you ever seen this letter before we
3  submitted it as an exhibit?
4      A.  No.
5      Q.  When you say when we submitted it as an
6  exhibit, we've used that term several times, and I
7  understand what you mean, but just to clarify it
8  for the record, you're talking about the number of
9  binders that we sent you in the request for
10  admission, in terms of the authenticity of
11  documents.
12     A.  Yes.
13     Q.  Just make sure our terminology is
14  correct.
15     Okay.  I'd like you to take a look at the
16  second page of this.  Well, actually, this is
17  addressed to me, it's dated April 17th, 2003, the
18  second page, it says it's signed by Thomas Riddle.
19  Do you see that?
20     A.  Yes.
21     Q.  Do you recognize his signature?
22     A.  I don't know if I recognize it.
23     Q.  Do you have any reason to believe that
24  wouldn't be his signature on the second page?
25     MR. LORUSSO:  Objection, calls for

Page 269

1  speculation.
2      THE WITNESS:  I cannot be sure if it's
3  his signature.
4      Q.  BY MR. MOSELEY:  On the second page
5  there's a paragraph number five, it says, "I spoke
6  with Robert Magota regarding the annual performance
7  evaluation.  He will put this on hold until after
8  workers' compensation matter is addressed."
9      Do you see that?
10     A.  Yes.
11     Q.  As of April 17th, had you spoken with
12  Thomas Riddle about the annual performance
13  evaluation?
14     A.  No.
15     Q.  Did you assure Mr. Riddle that you would
16  put this on hold until after the workers'
17  compensation matter is addressed?
18     A.  I never spoke with Mr. Riddle, no.
19     Q.  Did you tell anybody you would put this
20  on hold until after the workers' compensation
21  matter is addressed?
22     A.  No.
23     Q.  Has anybody ever told you why paragraph 5
24  of this exhibit says that Thomas Riddle spoke with
25  you about the annual performance evaluation?

Page 270

1      A.  No.  The only thing I received was an
2  email from him.
3      Q.  Which was later than this letter?
4      A.  It was roughly around this time, I
5  believe.
6      Q.  And you didn't get a copy of this letter?
7      A.  No.
8      Q.  When did you first see paragraph 5?
9      A.  When you submitted it.
10     Q.  Were you surprised to see the contents of
11  paragraph 5 of this letter?
12     MR. LORUSSO:  Objection, vague and
13  ambiguous.  Repeat that again, I'm sorry.
14     Q.  BY MR. MOSELEY:  Were you surprised to
15  see the contents of paragraph 5 of this letter?
16     MR. LORUSSO:  Same objection.
17     THE WITNESS:  Yes.
18     Q.  BY MR. MOSELEY:  Why were you surprised?
19     A.  He never spoke to me.
20     Q.  And up to this time, you hadn't seen the
21  contents of the earlier letter that I had written
22  to Mr. Riddle expressing concern about the conduct
23  of this performance evaluation report, right?
24     A.  I have not seen that letter.
25     MR. LORUSSO:  And by that, counsel,

26 (Pages 267 to 270)

Page 271

1  you're referring to Exhibit 49, correct?
2      MR. MOSELEY:  Exactly.
3      MR. LORUSSO:  Thank you.
4      MR. MOSELEY:  Thank you for helping keep
5  the record straight.
6      (Exhibit Number 52 was marked for
7  identification.)
8      Q.  BY MR. MOSELEY:  I'm showing you what's
9  marked as Exhibit 52.  Do you see this?
10     A.  Yes.
11     Q.  Do you recognize this?
12     A.  I don't recall this letter.  This
13  letterhead has the director's name on the second
14  page.  I'm not sure.
15     Q.  This exhibit doesn't have a signature of
16  Ivan Lui-Kwan, but do you recall ever seeing this
17  letter with a signature?
18     A.  I don't remember.
19     Q.  Did you have anything to do with the
20  input of this letter?
21     MR. LORUSSO:  Objection, vague and
22  ambiguous, over-broad.
23     THE WITNESS:  It appears the contents of
24  this letter were the comments of Ann Gima and
25  reviewed by me.

Page 272

1      Q.  BY MR. MOSELEY:  Is this Exhibit 52 the
2  letter or the notice that was referred to in
3  Exhibit 50?
4      A.  I'm not sure, but I do recognize the last
5  page, the last page is a draft of the comments for
6  the performance evaluation.  But this letter with
7  Mr. Kwan's signature, I don't recall or I'm not
8  sure.
9      (Exhibit Number 53 was marked for
10  identification.)
11     Q.  BY MR. MOSELEY:  I'm showing you what's
12  been marked as Exhibit 53.  Have you ever seen this
13  letter before?
14     A.  No.
15     Q.  It's addressed to Thomas Riddle, it's
16  dated 18th, 2003, and it's signed by me.  Do you
17  see that?
18     A.  Yes.
19     Q.  Fourth paragraph down, it's not numbered,
20  but the fourth paragraph down says, "An additional
21  thank you is merited for your contact with
22  Mr. Magota.  Your effort is appreciated.
23  Mr. Magota's actions were bewildering in light of
24  the retaliation Mr. English has already endured on
25  Mr. Magota's watch and at his hand.  It appears

Page 273

1  that your effort has forestalled at least some
2  further damage to Mr. English."
3      Do you see that?
4      A.  Yes.
5      Q.  Before today, has anybody ever shared the
6  contents of that paragraph with you?
7      A.  No.
8      (Exhibit Number 54 was marked for
9  identification.)
10     Q.  BY MR. MOSELEY:  If you had known that
11  Thomas Riddle was instructing Phil English's
12  attorney that the performance evaluation report was
13  not being done, would you have stopped it from
14  being done?
15     MR. LORUSSO:  Objection, calls for
16  speculation.
17     THE WITNESS:  Can you repeat the question
18  again.
19     Q.  BY MR. MOSELEY:  If you had known that
20  Thomas Riddle was instructing Phil English's
21  attorney that the performance evaluation report was
22  not being done, would you have stopped it from
23  being done?
24     MR. LORUSSO:  Same objection.
25     THE WITNESS:  I would check with our

Page 274

1  personnel section to see if it should go forward or
2  not.
3      Q.  BY MR. MOSELEY:  And then you would have
4  followed their instructions?
5      A.  Yes.
6      Can we take a -- I've got to use the
7  restroom.
8      (The deposition was at recess.)
9      Q.  BY MR. MOSELEY:  I'm showing you what's
10  been marked as Exhibit 54.  Have you ever seen this
11  before?
12     A.  No.
13     Q.  This is a letter dated April 20th, 2003,
14  it's a two-page letter, it's addressed to Thomas
15  Riddle, Workers' Compensation Administrator, and
16  the signature on there purports to be Reneau
17  Kennedy, she calls herself a Clinical and Forensic
18  Psychologist.  On the third paragraph down on the
19  first page, it says, "I am of the opinion that
20  Mr. English is in current severe mental distress.
21  His condition warrants immediate attention and
22  relief from your office.  I have ruled out his
23  malingering of these symptoms for secondary gain at
24  this point.  Mr. English is in acute need of
25  assistance, both psychiatrically and financially."

27 (Pages 271 to 274)

Page 275

1      Do you see that?
2      A.  Yes.
3      Q.  I read it correctly, right?
4      A.  Yes.
5      Q.  Did anybody ever share the contents of
6   that paragraph with you?
7      MR. LORUSSO:  Objection, vague and
8   ambiguous as to time.
9      Q.  BY MR. MOSELEY:  Well, the time I
10   specified was ever.
11      A.  No.
12      Q.  Is this the first time you've ever read
13   that paragraph?
14      A.  Yes.
15      Q.  Looking back to Exhibit Number 52, which
16   is the Notice of Substandard Performance Evaluation
17   with Ivan Lui-Kwan's name at the bottom, do you
18   have any knowledge of whether or not this was
19   actually sent?
20      A.  I really don't know if it was sent with
21   Mr. Kwan's signature.
22      Q.  And if it had been sent, do you have any
23   knowledge of when it was sent?
24      A.  No.
25      Q.  Presuming that the paragraph I read you

Page 276

1   out of Exhibit 4 is the actual opinion of Reneau
2   Kennedy on or about April 20th, 2003, do you, as a
3   manager, have any opinion about the propriety of
4   sending out a substandard performance evaluation or
5   performance notice to Mr. English?
6      MR. LORUSSO:  Objection, lacks
7   foundation, calls for speculation, incomplete
8   hypothetical.  And just for purposes of the record,
9   it was paragraph 3, not four.
10      MR. MOSELEY:  Oh, I'm sorry, paragraph 3,
11   you're right.
12      THE WITNESS:  Can you repeat the question
13   again.
14      Q.  BY MR. MOSELEY:  The question is,
15   Presuming that paragraph 3 of Exhibit 54 is
16   actually Dr. Reneau Kennedy's evaluation as of
17   April 20th, 2003, as a manager, do you have any
18   opinion about the propriety of sending out a notice
19   of substandard performance to Mr. English?
20      MR. WONG:  I'll add to Mr. Lorusso's
21   objection as vague and ambiguous and calling for
22   either a legal or a medical opinion.
23      MR. LORUSSO:  Join.
24      Q.  BY MR. MOSELEY:  I'm talking about your
25   opinion as a manager.

Page 277

1      MR. LORUSSO:  Same objections.
2      THE WITNESS:  My opinion would be that I
3   would consult with personnel regarding this.
4      Q.  BY MR. MOSELEY:  So you have no opinion
5   about whether or not it would be advisable or
6   improper to send out such a notice in the face
7   of --
8      A.  I have no opinion.
9      MR. LORUSSO:  Let him finish his
10   question.
11      Q.  BY MR. MOSELEY:  He said he has no
12   opinion.  That's fine.
13      (Exhibit Number 55 was marked for
14   identification.)
15      Q.  BY MR. MOSELEY:  Showing you what's been
16   marked as Exhibit 55, have you seen this exhibit
17   before?
18      A.  Yes.
19      Q.  Is this the email that Thomas Riddle sent
20   you?
21      A.  Yes.
22      Q.  And the email is dated Thursday,
23   September 17th, 2003?
24      A.  Yes.
25      Q.  Did you see this email on or about

Page 278

1   Thursday, April 17th, 2003?
2      MR. LORUSSO:  Objection, vague and
3   ambiguous.
4      THE WITNESS:  I don't recall if I saw it
5   on that particular day, it may have been the
6   following working day.
7      Q.  BY MR. MOSELEY:  And when you finally saw
8   it, did you read it?
9      A.  Yes.
10      Q.  Did you read the third paragraph in this
11   exhibit?
12      A.  Yes.
13      Q.  And the third paragraph, "He was
14   concerned about a recent communication from your
15   office about coming in to discuss his annual
16   performance evaluation.  I told his attorney I
17   would speak with you regarding this, but when I
18   called today you were not available.  I feel we
19   should place this on hold until after this workers'
20   compensation matter is settled.  As I said above, I
21   don't think he will be returning to work there
22   anyway."
23      Do you see that?
24      A.  Yes.
25      Q.  When you read that paragraph, did you do

28 (Pages 275 to 278)