```
 1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

 2                        STATE OF HAWAII

 3    PHILIP E. ENGLISH,              )
                                      )
 4              Plaintiff,            )
                                      )
 5         vs.                        )  Civil No. 04-00108 JMS/KSC
                                      )
 6    CITY AND COUNTY OF HONOLULU;    )
      GARY T. KUROKAWA; ROBERT O.     )
 7    MAGOTA; ANN C. GIMA; and GK     )
      APPRAISALS, INC.; JOHN DOES     )
 8    1-10; JANE DOES 1-10; DOE       )
      PARTNERSHIPS; DOE CORPORATIONS  )
 9    1-10; and DOE ENTITIES 1-10     )
                                      )
10              Defendants.           )
                                      )
11

12

13

14

15

16

17

18              DEPOSITION OF DAVID MATSUNAMI

19         Taken on behalf of the Plaintiff at the offices of

20    Moseley Biehl Tsugawa Lau & Muzzi, 1100 Alakea Street, 23rd

21    Floor, Honolulu, Hawaii, commencing at 9:37 a.m. on November

22    9, 2005, pursuant to Notice.

23

24    BEFORE:        JESSICA R. PERRY, CSR NO. 404

25                   Certified Shorthand Reporter
```

EXHIBIT G

Page 2

1   APPEARANCES:
2   For the Plaintiff:     ROGER S. MOSELEY, ESQ.
3                          Moseley Biehl Tsugawa Lau & Muzzi
4                          Alakea Corporate Tower
5                          1100 Alakea Street, 23rd Floor
6                          Honolulu, Hawaii 96813
7
8   For the Defendant GK Appraisals, Inc.:
9                          ANTHONY L. WONG, ESQ.
10                         Matsui Chung Sumida & Tsuchiya
11                         Suite 1400, Mauka Tower
12                         737 Bishop Street
13                         Honolulu, Hawaii 96813
14
15  For the Defendants City & County of Honolulu, Gary T.
16  Kurokawa, Robert O. Magota, and Ann C. Gima:
17                         MICHAEL L. LORUSSO, ESQ.
18                         Kawashima Lorusso & Tom
19                         Topa Financial Center
20                         Fort Street Tower
21                         745 Fort Street, Suite 500
22                         Honolulu, Hawaii 96813
23
24
25

Page 3

1              I N D E X
2
3   EXAMINATION BY:                        Page
4       Mr. Moseley                        4
5       Mr. Lorusso                        129
6       Mr. Wong                           135
7       Mr. Moseley                        139
8       Mr. Lorusso                        147
9
10          EXHIBITS FOR IDENTIFICATION
11
12  13.  Professional Qualifications of David Matsunami  · 14
13  14.  3/24/05 handwritten notes                  28
14  15.  Handwritten Post-it note                   65
15  16.  1999-2003 job/client listings              70
16  17.  Hawaiian Monarch Parking appraisal         72
17  18.  Kilauea Avenue appraisal                    143
18  19.  Furneaux Street appraisal                   143
19  20.  Basque Subdivision appraisal               143
20
21
22
23
24
25

Page 4

1                DAVID MATSUNAMI,
2   the witness hereinbefore named, being first duly cautioned
3   and sworn to testify the truth, the whole truth, and nothing
4   but the truth, testified under oath as follows:
5                EXAMINATION
6   BY MR. MOSELEY:
7       Q.  Good morning, David.  Do you mind if I call you
8   David?
9       A.  No, not a problem.
10      Q.  Please call me Roger.  My name is Roger Moseley,
11  and I represent Phil English, who is a plaintiff in this
12  case.  He has filed a lawsuit against GK Appraisals, Inc.,
13  the City and County of Honolulu, Gary Kurokawa, Robert
14  Magota, and Ann Gima.  The basic gravamen of this lawsuit is
15  sort of a whistle blower type action that includes various
16  federal and state causes of action, which I don't know that I
17  can really explain to you in a short period of time that
18  would be understandable, but in a sense Mr. English is
19  alleging -- that was for you, Tony -- that he had complained
20  about certain activities within the city and then he was
21  retaliated against by various means and certain other things
22  arose from that complaint.  He's seeking compensation from
23  the court -- or from the defendants through the process of
24  the litigation.
25          Have you ever had your deposition taken before?

Page 5

1       A.  No.
2       Q.  And your full name is?
3       A.  David Kazuto Matsunami.
4       Q.  And you gave me your business card.  CGA is
5   Certified General Appraiser?
6       A.  Yes.
7       Q.  And that's a state license, right?
8       A.  Uh-huh.
9       Q.  Do you have any designations from the professional
10  societies?
11      A.  No, I don't.
12      Q.  Have you ever?
13      A.  I was a candidate for the MAI, but I decided not to
14  go through with that.
15      Q.  Have you ever had your deposition taken before?
16      A.  No.
17      Q.  You're a lucky man.  I'll try not to make this too
18  unpleasant.  Listen, what is going to happen here is I will
19  be asking you a series of questions and you're required to
20  answer them.  When I ask the question, one of the other two
21  gentlemen here -- and Tony Wong is the attorney for GK
22  Appraisals, Inc. and Mike Lorusso is the attorney for all of
23  the other defendants.  They're entitled to interpose certain
24  kinds of objections.  Generally it's to the form of the
25  question, but they don't instruct you not to answer because

RALPH ROSENBERG COURT REPORTERS
OFC:  (808) 524-2090     FAX:  (808) 524-2596

Page 6

1  neither one of them is your attorney, right?
2      A.  No.
3      Q.  Okay, you have to be careful.  If I say none of
4  those -- neither of them is your attorney and you say no,
5  it's -- when it gets recorded on the paper, it's going to
6  look like you're saying no, one of them is my attorney.
7      A.  Oh, no, because you said, none of them is your
8  attorney, right?  And I said, no, that they're not.
9      Q.  Well, that's -- that's the thing you have to
10  consider -- keep in mind at all times that they're going to
11  write down -- the court reporter is going to write down
12  exactly what you say.  So what you have to do -- and I'll try
13  to pick it up if you do something like that.  So the question
14  is:  Is either one of them your attorney?
15      A.  No.
16      Q.  And, you know, it was an inartful question that
17  caused that response.  So at any rate, I'll be asking you
18  questions.  You'll be giving me answers.  I'd like to make
19  certain that your answers are verbal, and the reason I want
20  you to do that is although the court reporter sometimes will
21  be able to take down yeah, Mr. Matsunami nodded his head up
22  and down, she may be able to get stuff like that down
23  occasionally, but that's not the usual case.  So if you don't
24  say yes or no or give a verbal answer, she may -- she may
25  fail to note that.  So --

Page 7

1          (Off the record.)
2      Q.  Sorry for that interruption.  We're going to assume
3  you understand the question unless you tell me you don't.
4      A.  Okay.
5      Q.  So if I ask you a question -- and this is pretty
6  likely, David, that I'll ask you a question and you'll go,
7  what on earth is the guy talking about?  Because I'm actually
8  not the brightest guy in the room.  Tony and Mike are much
9  smarter than I am.  But if I ask you a question and you have
10  no idea what I'm talking about or there's even any confusion
11  of what I'm talking about, I want you to ask me to clarify
12  it.  Because if you don't, you're going to be giving me a
13  response and you may not be responding to the question that I
14  thought I had asked and then we don't really have a good
15  record.
16      A.  Okay.
17      Q.  So we're going to assume -- or I'm going to assume
18  that you understand the question unless you tell me you
19  don't.
20      A.  Okay.
21      Q.  A deposition can be used for basically three
22  purposes.  One, God for bid, that you walk out of this
23  building or drive out of this building and get hit by a bus
24  and killed, your deposition transcript could be used at trial
25  in place of your testimony, so it's to preserve your

Page 8

1  testimony.  Another purpose would be if it does go to trial
2  and we call you as a witness and we put you on the stand and
3  I've asked you question A and you've given me answer B in the
4  deposition, and I ask you question A at trial and you give me
5  answer C, I'm going to say, Mr. Matsunami, when I asked you
6  the question in the deposition, you said A.  Now I'm asking
7  you the same question you're saying C -- I confused the
8  letters, didn't I?  But in any case, I'll point out -- or
9  they will point out any differences in your testimony, and
10  that's -- that's generally called impeachment, to try to call
11  into question your credibility or that kind of thing or
12  straighten out your testimony at trial.  So that's another
13  reason you have to be very careful that your answers are
14  correct.
15      And when we're pau with the deposition, the court
16  reporter is going to type it up in a little booklet and you
17  will have the opportunity to review that and make any
18  corrections on some correction sheets that they'll provide.
19  Because oftentimes when you look at it afterwards you'll
20  think, wow, that really isn't that clear.  I must have
21  misunderstood the question, or I've even -- excuse me,
22  Ms. Court Reporter -- but I've even had court reporters write
23  down the wrong thing.  That happens very rarely.  But you'll
24  get a chance to do that, and the court reporter will ask you
25  in the end if you want to waive your signature.  And if you

Page 9

1  say you want to waive your signature, then it will just go up
2  without your reviewing it.  So if you want to the opportunity
3  to review it, you know, you need to ask to be able to review
4  it.
5      A.  Okay.
6      Q.  And then the third way these things get used is
7  actually for something called discovery.  We want to find out
8  what you know about the subject matter, and in this case
9  we've sent you a subpoena so we find out what kind of
10  documents you have with respect to the subject matter.  And
11  that's just so that we know the facts that are out there.
12  We're actually digging around looking for facts, and that's
13  why it's called discovery.  We're sort of like Christopher
14  Columbus out there, you know, looking for the passage to
15  India, or whatever he was doing.  That's the third purpose.
16  Is there anything that I've said that you have any questions
17  about?
18      A.  No.
19      Q.  You can take a break any time you want.
20      A.  Okay.
21      Q.  If you have to go to the bathroom, if you want a
22  glass of water, if you just get tired and you want to stand
23  up and stretch, let us know.  None of the attorneys in this
24  room are particularly nasty people, and the object is not to
25  make you suffer.

3 (Pages 6 to 9)

Page 10

1    A.   Okay.

2    Q.   I do want you to avoid terms like uh-huh and

3  huh-uh.

4    A.   Okay.

5    Q.   Because those kinds of things are very difficult

6  for the reporter to write down.  All right, you should also

7  know that the oath you took subjects you to the penalty of

8  perjury, if you should happen to intentionally, you know, say

9  some mistruth -- untruth in this deposition.  I'm only

10  telling you that because I feel obligated to do it, not

11  because I have any feeling at all that you would.  In fact,

12  it's just the opposite.  You strike me as being an honest and

13  straightforward guy, but I do want you to know that even

14  though this is a fairly informal appearing ceremony here, you

15  are under oath and you are under court subpoena, and that

16  does mean something under the law and there are criminal

17  sanctions for not telling the truth.

18      So that being said, what I'd like to do first is

19  you brought -- and thank you very much for doing this, and I

20  realize the subpoena I sent you was pretty broad and all

21  encompassing, but you brought a number of records and files.

22  If I could describe it, you brought a number of your copies

23  of appraisal reports that you've done, and the copies go back

24  all the way to 1992; is that correct?

25    A.   Yes.

Page 11

1    Q.   And are these all of the appraisal reports you did

2  for GK Appraisals?

3    A.   No.  I did residential reports as well, but this

4  was all of the commercial things that I've -- that I've done.

5  The residential things, it's just -- actually, there's a lot

6  of them, and I may not even be able to get them because

7  they're so old already.

8    Q.   Do you keep copies of all that?

9    A.   It's all electronic, and then I do have copies, but

10  it's -- I don't believe that it was anything to do with the

11  case.  When I was working the residential things for GK, it

12  was prior to -- actually it was when I was working for the

13  city that I was doing the bulk of it, which was back in '92

14  and '93.

15    Q.   At this moment I'm not -- I'm personally not

16  thinking it's going to be necessary to try to get those, but

17  it is -- it is actually physically possible to get those?  I

18  mean, it might be a big hassle to get those, but it is

19  physically possible to get those?

20    A.   Yeah.

21    Q.   The first item on the subpoena, I just -- I'm not

22  going to make this an exhibit, but I'm going to show you

23  Exhibit A.  Do you remember seeing this on the back of the

24  subpoena?

25    A.   Yes.

Page 12

1    Q.   Having ten different categories.

2    A.   Yes.

3    Q.   The first item was basically all documents you had

4  in any way, connection with GK Appraisals, right?

5    A.   Uh-huh.  Oh, I'm sorry.  Yes.

6    Q.   Pretty good stink eye, yeah?  Have you -- you've

7  apparently not brought all those documents, right?

8    A.   That's correct.

9    Q.   Is that correct?  Are there any other documents,

10  aside from the residential appraisals, that you haven't

11  brought?  For example, is there correspondence you had with

12  GK?

13    A.   No.

14    Q.   Did you have an agreement with GK?

15    A.   No.

16    Q.   Did you bring copies of checks or anything like

17  that from GK?

18    A.   No.

19    Q.   But you've essentially brought everything that you

20  could readily --

21    A.   Yes.

22    Q.   -- locate?  Okay.  And Item No. 2 is any documents

23  related to Christopher Graff; is that right?

24    A.   Yes.

25    Q.   Have you brought, to your knowledge, everything

Page 13

1  that is related to Christopher Graff?

2    A.   Yes.

3    Q.   Did he ever work on any of the residential

4  appraisals --

5    A.   No.

6    Q.   -- that you talked about?

7    A.   No, he didn't.

8    Q.   Let me tell you one more rule, and it's a rule I

9  break all the time.  If you wait until I stop talking before

10  you answer, the court reporter won't kick you in the shins.

11  Because, you know, in normal conversation, I mean, I start

12  asking you a question, you actually know before the end what

13  it is, and the tendency in a conversation is to just answer

14  it, but it drives the court reporter nuts and she may never

15  come back and work for us again.

16      The third item is all documents related to your

17  employment with the City and County.  Have you brought any of

18  that stuff?

19    A.   No.  I don't have anything.

20    Q.   Okay.  And you worked for the City and County when?

21    A.   From '87 through '92, as on the qualifications.

22  That's all that I had.

23    Q.   Okay, so let's -- I gave you guys copies of this

24  already, right, the CV?

25        MR. LORUSSO:  Yes.

4 (Pages 10 to 13)

Page 14

1    THE WITNESS:  Can I have mine back?
2    MR. MOSELEY:  Yes.  This is actually the one
3  you brought, but what I'd like to do is I'd like to have the
4  court reporter mark this exhibit next in order, which I think
5  is 13.
6    MR. LORUSSO:  Could we go off the record.
7    MR. MOSELEY:  Sure.
8    (Off the record.)
9    (Exhibit No. 13 marked.)
10    Q.  I'm showing you this, what's been marked as Exhibit
11  13.  Is this your curriculum vitae or resume, David?
12    A.  Yes.
13    Q.  And in this CV you describe your employment with
14  the city, on the second page, as being between -- as a Real
15  Property Appraiser IV between 1987 and 1993?
16    A.  Yes.
17    Q.  All right, and essentially you have no documents?
18    A.  No.
19    Q.  Actually, you know, that was a very bad question.
20  Yes, I have no bananas.  Do you have any documents other than
21  this CV with respect to your employment with the city?
22    A.  No, I don't.
23    Q.  Okay.  See, you're making me actually be much more
24  precise.  Item 4 is any and all documents in any way related
25  to work referred by GK Appraisals.  Actually, I see a typo in

Page 15

1  there.  Appraisalas.  GK Appraisalas.  I suppose that's the
2  Hispanic version of GK Appraisals.  Anyway, there was no
3  confusion in your mind, was there, about it being GK
4  Appraisals?
5    A.  No.
6    Q.  Now, the documents you brought, the appraisals you
7  brought were documents and appraisals that you actually did
8  for or through GK Appraisals, right?
9    A.  Yes.
10    Q.  Were there any appraisal assignments that you ever
11  got that were just referred by GK Appraisals?
12    A.  No.
13    Q.  So all of the appraisal documents that we have
14  here, plus the residential appraisals, you actually got paid
15  through GK for your services?
16    A.  Yes.
17    Q.  The fifth item here is a document showing or
18  concerning any payments from or to GK Appraisals, and you
19  already said you don't -- you didn't bring any of that,
20  right?
21    A.  The job log listing has the check numbers or
22  whatever as best as I could do it, and please understand I'm
23  not the greatest bookkeeper.
24    Q.  All right.  I understand.  Other than that, were
25  you able to find anything?  I mean, you didn't pull out

Page 16

1  copies of deposit slips and that kind of stuff, right?
2    A.  No, I don't have that.
3    Q.  Okay.  The sixth item is documents related to
4  payments from Chris Graff, and you did bring us a list -- a
5  handwritten list on a Post-it of four -- apparently four
6  payments you made in 2002.  Were there other payments that
7  were made to Chris Graff?
8    A.  There maybe have been a few others, less than --
9  less than ten that I just gave him cash.
10    Q.  All right.  So you wouldn't have any record of
11  those?
12    A.  No, I don't.
13    Q.  Is there any way -- well, let's go on that a little
14  bit more.  When you had Chris Graff doing some work for you,
15  is there any way of looking at the appraisal report and
16  determining whether Chris Graff was involved?
17    A.  No.  The only way is like we were doing earlier, if
18  I look at the report and I remember, yeah, Chris helped me on
19  this one or he didn't help me.  And a lot of times it's been
20  years, so I remember as best I can.
21    Q.  Okay.  So it's -- you know, this list of payments
22  you gave me, those were checks, right?
23    A.  Yes.
24    Q.  Do you think if we actually had the copy of the
25  check there would be a notation on it that said this is for X

Page 17

1  job?
2    A.  No.  I just would write the check to him, payable
3  to him.
4    Q.  Item No. 7 asks for payments of any other person
5  who was an employee of the City and County of Honolulu in
6  connection with the appraisal work.  Did you bring any
7  documents like that?
8    A.  There's nothing.
9    Q.  Were there any other employees of the City and
10  County that did work for you?
11    A.  No.
12    Q.  Were there any others that you knew of that did
13  work for GK Appraisals?
14    A.  No, not that I know of.
15    Q.  Number 8 is -- that's asking you for all the
16  appraisal work done by you for the previous 15 years.  That
17  was pretty onerous, but you did a really stand-up job in
18  trying to pull this out, and I appreciate it.  Is there
19  anything else other than what you've described that might be
20  out there?  And that's the commercial type appraisals that
21  you've brought in and then the series of residential ones
22  that, you know, are available, if necessary, electronically,
23  right?
24    A.  Yes, and Chris had nothing to do with any of those.
25    Q.  Are there any other -- are there any other records

Page 18

1  of those kinds of things that fall without -- that were not
2  described in -- by you just now or with respect to what
3  you've brought?
4     A.  I didn't understand the question.
5     Q.  Okay.  Other than the things that are on the
6  computer records and the booklets that are here, is there any
7  other documentation talking about the appraisal work done by
8  you for the last 15 years?
9     A.  No.
10    Q.  Item 9 is asking about appraisal work in which
11 you -- done by a person that you paid compensation to or who
12 you supervised in 15 years.  Who -- how many people have done
13 work for you?
14    A.  Nobody really.  It's just myself.
15    Q.  And Chris Graff?
16    A.  Yeah, Chris would help me to do research and
17 writing up the front-ends.
18    Q.  Is there anybody else that did work for you?
19    A.  No.
20    Q.  And Item No. 10 is communications you've had with
21 Gary Kurokawa or any other officer, director, of GK
22 Appraisals, Inc.
23    A.  I didn't have anything.
24    Q.  You don't have any letters back and forth from --
25    A.  No, none.

Page 19

1     Q.  Thank you.  Thank you very much for the effort on
2  this.  Before you had your deposition taken here today, did
3  you confer with anybody else about this deposition?
4     A.  No.  Well, actually, I saw Gary Kurokawa, it just
5  so happened, this weekend at a baseball game.  I haven't seen
6  him in years.
7     Q.  And did you talk about this deposition?
8     A.  A little bit.
9     Q.  And what was said by -- who initiated the
10 conversation?
11    A.  Well, we saw each other at the baseball game, and
12 then he told me, oh, I guess you got a deposition coming up,
13 and I said, yeah.  So then I didn't know anything that it was
14 about, so I just asked, hey, what is it all about anyway?
15    Q.  And what did he say?
16    A.  Exactly what you folks described about.
17    Q.  Can you recall as best you can his words?
18    A.  He just told me that it was -- it was about Phil
19 and then the termination of him.  And then I told him, hey,
20 you know what, the bottom line is that whatever I have,
21 they're telling me I need to produce, so I'm going to
22 produce.  And that's about it.
23    Q.  Did he ask you not to produce anything?
24    A.  No.
25    Q.  How long did this conversation with Gary last?

Page 20

1     A.  Three or four minutes.  It was as we were on our
2  way to the potluck, just saw him.  So it was more in passing.
3     Q.  Did you see him at the potluck too?
4     A.  No, no, his son plays on a different team.  They're
5  on a different field.  So we just walked by.
6     Q.  Did he say anything of the nature that would
7  indicate to you how he felt about the lawsuit?
8     A.  No.
9     Q.  Did he say anything about Phil personally?
10    A.  No.
11    Q.  And what did he say about the termination?
12    A.  He didn't tell me anything.  He just said that this
13 is what the case is about.
14    Q.  Did he tell you that GK Appraisals was involved?
15    A.  Yes.
16    Q.  And what did he say about that?
17    A.  He didn't say anything about that, just that -- and
18 I saw also, because it was on the list.
19    Q.  Okay.
20    A.  On that thing that you sent me.
21    Q.  But he confirmed to you that GK Appraisals was
22 involved?
23    A.  Uh-huh.
24    Q.  Yes?
25    A.  Yes.

Page 21

1     Q.  Did he tell you that anybody else was involved?
2     A.  No.
3     Q.  Did he tell you about anything that he expected to
4  be the outcome of this case?
5     A.  No.
6     Q.  Did he tell you anything about how he wanted you to
7  testify?
8     A.  No.  Well, I take that back.  He did say just tell
9  the truth.  That's the main thing, is tell the truth.  And I
10 said, well, I appreciate that.  As a Christian, I'm going to
11 tell the truth no matter what.
12    Q.  Great.  I appreciate that also.  Is there anything
13 else about that conversation that you can remember at this
14 time?
15    A.  No, that's all.
16    Q.  And what's the date of that conversation?
17    A.  Saturday.  What was the date?
18    Q.  It was the 5th.  Is that right?
19         MR. WONG:  Saturday's the 5th.
20    Q.  We have a panel of experts that confirmed Saturday
21 was the 5th.  I knew you were good for something.  I got that
22 on the record, right?
23         Is there anybody else you talked to about this
24 deposition?
25    A.  No.

RALPH ROSENBERG COURT REPORTERS
OFC:  (808) 524-2090     FAX:  (808) 524-2596

Page 22

1    Q.   Well, actually you talked to me about scheduling,
2 right?
3    A.   Yes.
4    Q.   On the telephone.
5    A.   Oh, okay.  And I believe I spoke with Tony a month
6 ago or three weeks ago, around there.
7    Q.   And what was the nature of that conversation?
8    A.   I don't recall everything that went on.  Can he
9 say?
10   Q.   No.  I need to know what you say.  I can call him
11 as a witness a little later on, but at this point in time I
12 need to know what you -- did he initiate the phone call?
13   A.   Yes.
14   Q.   Do you remember -- it was about a month ago or
15 three weeks ago?
16   A.   Yeah.  I'm sorry, I'm drawing a blank.  I didn't
17 write it down.
18   Q.   Okay, but he initiated the phone call?
19   A.   Yes.
20   Q.   Was it in the morning or afternoon?
21   A.   I don't recall and --
22   Q.   Did he ask you anything?
23   A.   I don't recall.  I'm drawing a blank.  I'm sorry.
24   Q.   How long was this phone call?
25   A.   Five minutes maybe, ten minutes.  I'm not sure.

Page 23

1    Q.   Did he tell you anything about the nature of the
2 case?
3    A.   Not that I recall right now.
4    Q.   You recall nothing about the phone conversation
5 except that he called?
6    A.   Okay, I think that -- well, it was about that I may
7 be called as a witness in February, and he was saying that if
8 you can stay in town, because I was going to be going to a
9 convention.  That's what it was.
10   Q.   Did you tell him you were going to a convention or
11 did he already know?
12   A.   No, he didn't know.  I told him.  But it ends up
13 that the convention was in January.
14   Q.   And that was the sum total of it?
15   A.   Yeah.
16   Q.   That he just wanted you to know that he would like
17 you to stay in town?
18   A.   Yeah.
19   Q.   Were you even aware of this lawsuit before he
20 called?
21   A.   I was called on March 24th.  This one -- this guy
22 Matt called me and he said that I think that he was -- he was
23 just calling for the city or something.
24   Q.   Matt Viola?
25   A.   Yes.

Page 24

1    Q.   So let's continue with Tony first and then we'll go
2 back to this.
3    A.   Okay.
4    Q.   But you already knew this lawsuit was going on at
5 the time Tony Wong called you?
6    A.   I knew it was going on, but I didn't know what -- I
7 thought it settled or whatever.  I didn't know what was going
8 on.
9    Q.   And the sum total of what you can remember right
10 now is that Tony basically said to you, hey, this is going to
11 trial in February.  Will you please stay in town, is that
12 right, or will you be available as a witness?
13   A.   Yes.
14   Q.   Is there anything else that you remember?
15   A.   That's about it.  And I'm pretty sure he told me
16 who he was representing.
17   Q.   Is there anybody else you talked to about this
18 lawsuit?
19   A.   No.
20   Q.   Up to now I've been asking you about people you
21 talk to about this deposition.
22   A.   Uh-huh.
23   Q.   Okay.  But I presume that Tony didn't talk to you
24 about this deposition, right?
25   A.   No, no.

Page 25

1    Q.   That's right, that he did not talk to you?
2    A.   He did not talk to me about this deposition.
3    Q.   Is there anybody else you talked to about the
4 lawsuit?
5    A.   Chris Graff, a long time ago when he was still
6 employed by the city, he said -- he had called me, and I said
7 you know what, I don't want to talk about it.  Because I
8 don't want to have anything to do with it.  So that's what I
9 told him.  And then since then I haven't spoken to him or
10 Gary about it.
11   Q.   Okay, so what happened is Chris Graff called you
12 and you said I don't want to talk about it?
13   A.   Yes.
14   Q.   Okay.  Do you know when Chris Graff called you?
15   A.   I don't know.  It was when he was employed by the
16 city.  I don't know what the date was.
17   Q.   Where is he employed now?
18   A.   He works for an appraisal company.
19   Q.   Do you know which one?
20   A.   I think it's called Pacific Valuations or something
21 like that.
22   Q.   They have on office like out in Aiea or something?
23   A.   I think they're in town some place.
24   Q.   They're in town?
25   A.   Yes.

RALPH ROSENBERG COURT REPORTERS
OFC:  (808) 524-2090    FAX:  (808) 524-2596

Page 26

1    Q.   But you no longer work with Chris Graff?
2    A.   No.
3    Q.   I'm sorry.  Do you any longer work with Chris
4  Graff?
5    A.   No.
6    Q.   See, you're making me ask my questions right.
7    A.   You're making me answer right.
8    Q.   All right, and you did have a conversation on March
9  24th of this year, March 24th, 2005 with Matt Viola?
10   A.   No.  It was 2004.
11   Q.   Okay, are you referring to a calendar or a log or
12  something?
13   A.   No, no, I just have the notes that I took when he
14  was talking to me.
15   Q.   Okay, in my opinion, those are also subject to the
16  subpoena.
17   A.   Okay.
18   Q.   Do you have a whole lot of notes there?
19   A.   No.  Just this, and then I have this.
20   Q.   And what is that?
21   A.   It's the subpoena.
22       MR. MOSELEY:  Can we get five copies of that.
23   Q.   Okay, is there any -- now, when you talked with
24  Matt Viola -- well, maybe I'll wait until we get back with
25  the notes.  We'll ask questions about what Matt talked to you

Page 27

1  about.  Is there anybody else you talked to about the
2  lawsuit?
3    A.   No.
4    Q.   Is there anybody else that you talked to about the
5  underlying claims that Chris Graff was doing work on city
6  time and that kind of stuff?
7    A.   No.
8    Q.   Nobody else you talked to?
9    A.   No.
10   Q.   You never talked to Gary Kurokawa about that?
11   A.   No.  I've been pretty much trying to stay clear of
12  the whole thing.
13   Q.   When did you first learn that there was some kind
14  of controversy about this?
15   A.   Whenever the thing was filed.  That's when I found
16  out about it.
17   Q.   Oh, you know, off the record before the deposition
18  we talked about the confidential nature of some of the
19  information that you've provided, and I assured you that I
20  would agree that we wouldn't use the information provided
21  inconsistent with the objectives of this lawsuit and we would
22  make your information subject to the same protective order
23  that either Tony Wong and I negotiate or is ordered by the
24  court for Tony's documents.  I just want to -- I just want to
25  put that on the record that I'm in agreement with that.

Page 28

1    A.   Okay.
2    Q.   And that we will do that.
3    A.   Okay.
4    Q.   Sorry I left that off.  Let me give you back your
5  original notes here.
6    A.   Thank you.  I'm going to grab some water.
7    Q.   I'd like you to hang onto those original notes, if
8  you would.
9        MR. MOSELEY:  Let's mark your notes as exhibit
10  next in order, which I think is Exhibit 14,
11       (Exhibit No. 14 marked.)
12   Q.   I'm handing you what's been marked by the court
13  reporter as Exhibit 14.  This is a two-page exhibit in your
14  handwriting, I presume?
15   A.   Yes.
16   Q.   And this is notes of your conversation with Matt
17  Viola on March 24th, 2004?
18   A.   Yes.
19   Q.   Do you know who Matt Viola is?
20   A.   No.
21   Q.   Did he identify -- this was a phone call he
22  initiated?
23   A.   Yes.  I think that he told me that he works for the
24  city or he's an attorney for the city.
25   Q.   Okay.  And this -- these are your notes of the

Page 29

1  conversation?
2    A.   Oh, here, right here.  Matt, private attorney,
3  contracted.
4    Q.   Contracted by the city?
5    A.   I don't know.  I assumed.
6    Q.   Can you sort of go through your notes and tell me
7  what they mean, starting at the top?
8    A.   That a complaint was filed -- well, Matt is a
9  private attorney and that he was contracted, and a complaint
10  was against Chris and he's calling me for information
11  purposes.  And he asked me if I worked with Gary and Chris,
12  and I said at one time or another I did.  He asked me when I
13  worked for the city, and I said between 1987 and '92.  He
14  asked me how I met Gary, so I told him I met him at work.
15  And then I told him that I was doing appraisals with GK
16  Appraisals between 1988 and either 2001, 2002, to the best of
17  my knowledge.  And that Chris is doing work for GK
18  Appraisals, and, I don't know, I put allegations.  Some of
19  this stuff -- I was looking through this earlier -- and I
20  don't know exactly what I meant either.
21   Q.   Well, do the best you can.  At least you can sort
22  of read your handwriting.  I can't even read mine.
23   A.   I don't think you can read mine either.  Then the
24  next one says -- I think he asked me what was it that Chris
25  did, and I said that he would write up the improvement

8 (Pages 26 to 29)

Page 30

1  section, he would help me with that, he would do research at
2  the bureau getting the document numbers. And then he said do
3  you -- did Chris sign anything? And I said, I don't recall,
4  but then I don't think he ever did. And then I don't know
5  what this BI Prop means.
6         And then he said some -- I don't know what this
7  means either, some D. Matsunami '99-2001. And then the last
8  time that Chris worked with me was two years ago, and it was
9  approximately ten jobs plus or minus that Chris had done.
10 And it wasn't Gary's idea to use Chris. And I'm friends with
11 Chris and Gary. So -- and actually, I know Phil real well
12 too, so it's kind of a tough position. And what is this?
13 No -- no provision on moonlighting. I don't know what that
14 means. I think he must have said that, but that's something
15 else that you guys will probably get into later about the
16 whole city thing and what Gary and I had gotten approval from
17 the city for.
18        And then this was my understanding, anything that
19 Chris does for me, it would not be at work. And then he
20 asked how did the thing -- the data was transported, and we
21 would just pass the disks to each other. And I don't know
22 what that means, sent comp to client. I don't know what that
23 means.
24 Q.  Copies? Does that say copies or comps?
25 A.  It could be copy or comp. I don't know. It could

Page 31

1  be -- you know the comp write-ups. It could be that. I'm
2  not sure.
3  Q.  Okay.
4  A.  Gary didn't talk to -- he asked me if I knew of
5  Gary talking to Chris, and I didn't know anything about that,
6  that I had seen. And this work -- work from home, he was
7  asking me about how I do it, I guess. And then it was my
8  call to ask Chris for help. And Gary knew that Chris was
9  helping me. No meetings with three of us, so I guess that
10 would be Gary, Chris, and myself. And then no rush. I guess
11 he asked, oh, did Gary try to rush Chris to do something?
12 And I said, no. I guess full valuations done by David,
13 important, and yeah, that's the whole nature of all of the
14 appraisals that I was doing. Whatever Chris was helping me
15 with was the smaller things.
16        And the reason why I was doing it is because at
17 that time, and Phil knows, I guess Chris was having a really
18 hard time. And I've been his friend for a while and I was
19 feeling for him, and I know what kind of a guy he is, and
20 basically he's a nice guy. He just had a baby, so I was
21 trying to help him out. And I don't know what this no
22 complaints about pay means. And then GK to David to Chris,
23 he said that that's what -- something about what -- I don't
24 know, about what maybe an allegation is. And then no
25 discussions with Gary. That's same question you asked, I

Page 32

1  haven't talked to Gary. Don't recall talking about as -- I
2  don't know what that means. Need it -- meet at convenience
3  of Chris to drop off whatever I needed to drop off. So like
4  I'm out in Ewa Beach, so if I need to drop something off and
5  I'm in town and I say, hey, can I drop something off to you,
6  he'd say, yeah, okay. So then I would drop it off to him.
7         Call about one year ago with Chris. That's the one
8  that Chris tried to contact me, and I said no. And then
9  little contact with Chris. And Gary for number. I don't
10 know what that means. City resource -- city resources. I
11 always assumed that Chris wasn't doing it during work time.
12 To complete - no assignment too large to do elsewhere. Oh,
13 because he asked me, but weren't the jobs that you gave Chris
14 too big for him to finish in his outside time? And I said
15 no. Discussed with Gary or Chris about work or not doing
16 work. I think that -- what was that about? I think that I
17 was once again just telling him that I didn't talk to either
18 of them. And then I knew Phil, and I never worked with Chris
19 and Phil. So I think he was asking me what's the
20 relationship with Chris and Phil, and I said I don't know.
21        Then think through. I don't know what that means.
22 And late 2002 -- oh, that's what it means, think -- I had to
23 think through when it was that we were last doing a job, so I
24 said probably like late 2002 or six months back when Chris
25 didn't work or something. When Chris did do the work, I'm

Page 33

1  sorry, it was six months back.
2  Q.  Did Matt Viola tell you he was recording the phone
3  conversation?
4  A.  He may have. He may have. I'm not sure.
5  Q.  Is it your present recollection that you think he
6  was recording it?
7  A.  I don't know.
8         MR. LORUSSO:  Counsel, can I interject, if you
9  don't mind. Off the record before the deposition started,
10 Mr. Matsunami, one of the things that I had said to you and
11 asked and that all the attorneys here do not want you to do
12 is guess at anything. Do you understand that?
13        THE WITNESS:  Yes.
14        MR. LORUSSO:  Thank you. If you don't know
15 something, it's okay to say you don't know. If you do not
16 recall something, it's acceptable to say you do not recall
17 something. Do you understand that?
18        THE WITNESS:  Yes. That's why I said I don't
19 know.
20        MR. LORUSSO:  Thank you.
21 Q.  But it is proper for me to ask and it's proper for
22 you to answer with respect to your best recollection of
23 things.
24 A.  Okay.
25        MR. WONG:  Right, but if I could just add to

RALPH ROSENBERG COURT REPORTERS
OFC:  (808) 524-2090    FAX:  (808) 524-2596

Page 34

1  what Mr. Lorusso said, I think what he's getting at is we
2  don't want you to guess or speculate about something.
3       THE WITNESS: Okay.
4       MR. WONG: For example, if I talk to somebody
5  on the phone and, you know, of course they may have recorded
6  it, but unless I have some reason to know, then any opinion I
7  would give about whether it's recorded or not would be just
8  guess or speculation.
9       THE WITNESS: Okay. In which case an I don't
10 know would be the best answer.
11      Q. Well, you know, I'm going to instruct you that when
12 I ask if you have an opinion or your best recollection or
13 something along that line, you know, if it's clearly
14 identified like that, I do want you to tell me what your best
15 recollection is or what you think, regardless of whether or
16 not you have a clear recollection of it.
17      A. Okay.
18      Q. Do you understand that?
19      A. I understand.
20      Q. And I agree with them. I don't want anything on
21 the record that is surely speculation or guesswork, that
22 isn't clearly identified as, you know, being your best
23 estimate or your best recollection or what you think but
24 perhaps you can't remember why you think it, that kind of
25 thing.

Page 35

1       A. Okay.
2       Q. Was there anything else other than what's on your
3  notes here on Exhibit 14 that you can remember about your
4  conversation with Matt Viola?
5       A. No.
6       Q. Did you have a conversation with anybody else with
7  respect to this whole issue?
8       A. No.
9       Q. If we took a look at your resume or curriculum
10 vitae, does that basically set forth all of your education
11 and job experience?
12      A. Yes.
13      Q. And when I talk about job experience, I'm actually
14 talking about appraisal experience, right?
15      A. Yes.
16      Q. You had other jobs besides the appraisal jobs that
17 you've listed here?
18      A. Yes.
19      Q. You worked for Appraisal Resource Corporation for
20 one year in 1987?
21      A. Yes.
22      Q. And who was your boss there?
23      A. John Yamaguchi and John Turner.
24      Q. You did residential, condominium, and vacant land;
25 is that correct?

Page 36

1       A. Yes.
2       Q. So you reported primarily to John Yamaguchi?
3       A. Lillian Izumi, she was the supervisor.
4       Q. And why did you leave there to go to the City and
5  County of Honolulu?
6       A. We all got laid off. The market slowed down, so it
7  was unfortunate, and soon thereafter the company folded.
8       Q. When you were working at The Hallstrom Group, is
9  that where you met Chris Graff?
10      A. No.
11      Q. When did you meet Chris Graff?
12      A. When I worked for the city, Chris worked there and
13 then he went to work for The Hallstrom Group after that.
14      Q. He was working there in '87 through '93?
15      A. I don't know. I don't know what the year was that
16 he stopped, but I know that I started in '87 and Chris
17 worked -- probably about a year later he started.
18      Q. Okay. And then at some point before '93 he quit
19 and went to The Hallstrom Group?
20      A. Yes.
21      Q. And that's where you met him, was at the city?
22      A. Yes.
23      Q. When you went to work for The Hallstrom Group, was
24 Chris Graff still at The Hallstrom Group?
25      A. No.

Page 37

1       Q. And actually in 1991 you were actually employed by
2  GK Appraisals?
3       A. I was an independent contractor doing work for
4  them.
5       Q. Okay, that's 1991 through 2002?
6       A. Yes.
7       Q. How did you get that job?
8       A. From Gary, just -- Gary and I had just met and
9  became friends.
10      Q. At the city?
11      A. Yeah, at the city, and Gary knew that I was from
12 the Big Island too, and so they were starting their company
13 at that time, so he asked me if I wanted to work with them.
14      Q. And this was on a moonlighting type basis?
15      A. On the weekends, yes.
16      Q. From '91 to I guess '93 you were doing it on the --
17 on sort of a moonlighting basis on the weekends; is that
18 right?
19      A. Yes. And then after that, while I was working for
20 Michael Chun & Company, I would still go back here and there
21 on the weekends, but it got to where it wasn't economically
22 feasible to do that, so I stopped.
23      Q. What kind of work did you do for GK Appraisals
24 between 1991 and 1993?
25      A. Majority residential and some commercials.

10 (Pages 34 to 37)

Page 38

1    Q.   The appraisal reports that you brought in from
2  1992, those were done by you while you were at the City and
3  County of Honolulu?
4    A.   Yes.
5    Q.   And those were done for GK Appraisals, right?
6    A.   Yes.
7    Q.   Did you do any -- and those -- the ones you brought
8  in were a number of booklets, they were all commercial type
9  appraisals, right?
10   A.   Yes.
11   Q.   And there were also residential appraisals you did
12 during that period of time?
13   A.   Yes.
14   Q.   Did GK Appraisals do work just on the Big Island or
15 did they do work on Maui?
16   A.   Just on the Big Island.
17   Q.   Just on the Big Island?
18   A.   Yes.
19   Q.   That was at the beginning?
20   A.   I don't know.  Well, yeah, back when I was working
21 with them it was only the Big Island.
22   Q.   Well, I do see at least one appraisal report here
23 that's for a property in Ewa Beach.
24   A.   No, that property is --
25   Q.   I'm sorry.  I take that back.  Hawaiian Monarch

Page 39

1  Parking?
2    A.   But that's through my company, Matsunami, so that's
3  the only one that's not GK.  That had to do with Chris Graff,
4  though, so that's why I brought that in.
5    Q.   Okay, this had nothing to do with GK?
6    A.   No.  That was through Matsunami.
7    Q.   So, to your knowledge, you never did any appraisals
8  for GK Appraisals on anything but the Big Island?
9    A.   Yes.
10   Q.   Are there any of the other documents that you've
11 brought in that were done by David Matsunami Appraisers and
12 not done through GK Appraisals?
13   A.   No.
14   Q.   Okay.  It's just -- I'm sorry, employing Chris
15 Graff?
16   A.   Yes.
17   Q.   So the one that we've talked about here, the
18 appraisal -- the narrative appraisal of the leasehold
19 interests in a commercial parking unit for tax map key
20 2-6-14-32 CPR 152 is the only one of which you're aware that
21 Chris Graff worked on something for you --
22   A.   Yes.
23   Q.   -- that was on your own?
24   A.   Yes.
25   Q.   Getting back to your employment history, in 1993

Page 40

1  you actually quit your full-time job at the city and went to
2  Michael Chun & Company?
3    A.   Yes.
4    Q.   And what kind of work did you do there?
5    A.   Real estate appraisals, residential and commercial.
6    Q.   And you did commercial as well?
7    A.   Yes.
8    Q.   And then in 1991 you formed your own company,
9  right?
10   A.   Yes.
11   Q.   And in 1999 you stopped working at Michael Chun and
12 concentrated your full efforts on your own company; is that
13 right?
14   A.   Yes, that's right.
15   Q.   And you were doing the same kinds of appraisals,
16 right?
17   A.   Yes.
18   Q.   Commercial, industrial?
19   A.   Yes.
20   Q.   Is there anything else about your employment
21 history here that -- in terms of your professional experience
22 as an appraiser that doesn't appear on your resume?
23   A.   No.
24   Q.   That's basically a complete list?
25   A.   Yes.

Page 41

1    Q.   When you worked for the City and County of
2  Honolulu, what was your assignment?
3    A.   I was Real Property Appraiser IV, and I was
4  responsible for -- varied, but Waimanalo, Kailua, Lanikai,
5  and Keolu, that area, was the majority of the time.  I had
6  Kahala for a short while.
7    Q.   Did you start with the city as an Appraiser IV?
8    A.   I started as an Appraiser III.
9    Q.   And, I'm sorry, but when you started, Gary Kurokawa
10 was already there?
11   A.   I believe he was there for about six months prior
12 to me.
13   Q.   And that's the first time you had ever met him?
14   A.   Yes.
15   Q.   And when you left, do you know what his level was,
16 like was he an Appraiser IV or V?
17   A.   I believe that when I left he was a supervisor.
18   Q.   Should have been Appraiser VI?
19   A.   I'm not sure what the classifications are.  I know
20 that the Appraiser V is a journeyman.  No, he was a
21 journeyman at that time, and I think he was getting temporary
22 assignments here and there as supervisor.
23   Q.   So he was probably in an Appraiser V and
24 temporary --
25   A.   Probably, yeah.

11 (Pages 38 to 41)

Page 42

1    Q.   Did you know Ann Gima at the time you worked for
2  the city in '87 through '93?
3    A.   Yes.
4    Q.   How about Bob Magota?
5    A.   Yes.
6    Q.   Did you meet all of these people while you were an
7  employee of the city?
8    A.   Yes.
9    Q.   Do you know if Ann Gima ever helped with GK
10  Appraisals' work?
11    A.   No, I don't know of anything.
12    Q.   How about Bob Magota?
13    A.   No.
14    Q.   You don't know that?
15    A.   I don't know of anything.
16    Q.   I think when you were testifying earlier you talked
17  about you had some discussion where there had been a
18  disclosure made to the city and permission given to undertake
19  employment with GK Appraisals; is that right?
20    A.   Uh-huh, yes.
21    Q.   Can you describe that to me a little bit better,
22  because I'm not sure I --
23    A.   Prior to -- prior to doing any work, Gary and I
24  both put -- what is that called -- I guess a request for them
25  to determine whether or not it was a conflict of interest to

Page 43

1  do work on the Big Island, and they came back and they sent
2  us a letter that said as long as it's out of jurisdiction,
3  it's okay.
4    Q.   Was that in writing that you made the request?
5    A.   It was.  And I apologize, when I left the city, I
6  just threw everything away.
7    Q.   Was their response in writing as well?
8    A.   Yes, it was.
9    Q.   Can you describe what you submitted to the city?
10    A.   Just I think it was like a handwritten letter
11  probably.  I'm not sure.  It's been such a long time ago, but
12  I know that I did make a request in writing and we gave it to
13  the people at our personnel office, and then it came back
14  from the Ethics Commission on city letterhead.
15    Q.   When you say you gave it to the people at your
16  personnel office, is that the general city personnel office
17  or is there a personnel office in the assessment division?
18    A.   I don't recall.  I don't recall.
19    Q.   Do you recall a name, face, or location of wherever
20  it was that you submitted this?
21    A.   No, I don't.  We may have just given it to the
22  division secretary and she probably pouched it to City Hall.
23  I don't know.  I don't know.
24    Q.   But what came back was something on city letterhead
25  saying -- did it say anything more than -- other than if it's

Page 44

1  not within the jurisdiction, you can do it?
2    A.   Yes, to the best of my knowledge, that's what it
3  said.
4    Q.   I understand, and you don't recall anything else
5  that it said?
6    A.   No.
7    Q.   Where were you when Gary Kurokawa first told you
8  that he was forming this GK Appraisals company?
9    A.   Where?  I don't understand the question.
10    Q.   Where physically were you when he first told you
11  that?
12    A.   Actually, I remember.  I was -- we were downstairs
13  in the basement area, which is where Gary's group that he was
14  in was working.  I was upstairs.  So I think it was probably
15  like lunchtime or something and I went down there and ate
16  lunch with them.
17    Q.   And do you remember what he told you at the time?
18    A.   Just that his dad and his brother were going to
19  be -- you know, and himself were going to be starting
20  something, and that -- that I guess that they were going to
21  be doing appraisals and would I be interested.  And so I
22  said, yeah.
23    Q.   And did this involve travel to the Big Island?
24    A.   Yes.
25    Q.   Do you remember the next time you talked with Gary

Page 45

1  about the whole subject matter of GK Appraisals?
2    A.   It probably was an ongoing kind of thing, that, you
3  know, he said, okay, if we're going to do this, we need to do
4  it the right way.  So let's apply to the Ethics Commission
5  and do whatever else things, and so we did all of that.
6    Q.   Do you remember your first appraisal assignment,
7  appraisal assignment for GK Appraisals?
8    A.   I don't.  I don't.
9    Q.   So that doesn't stand out in your mind, the first
10  time you were actually --
11    A.   It was a residential job, though.  Please
12  understand we do thousands.
13    Q.   I understand.  How do you know it was a residential
14  job?
15    A.   I remember it wasn't a commercial job because if it
16  was a commercial job, it probably would have stuck in my mind
17  that that was -- and from my records, I don't have any record
18  of a job in '91.
19    Q.   Okay.  With respect to a residential job, what
20  typically would you do for GK Appraisals back then in '91
21  through '93?
22    A.   The entire appraisal, the site inspection, all the
23  way through to valuation.
24    Q.   So you actually would fly over to the Big Island
25  for a site inspection?

12 (Pages 42 to 45)

Page 46

1    A.   Yes.
2    Q.   How often do you think you did that between '91 and
3  '93?
4    A.   I was flying -- it was crazy. I was flying once a
5  week, at least once a week, and then there were times --
6  because my wife at the time, she didn't drive, and we had two
7  young kids, so I used to come back at the end of the day and
8  if there was enough work, I would fly back the next morning.
9    Q.   Okay. And was this all on weekends?
10   A.   Yes, only on weekends.
11   Q.   So you would fly over on Friday night or Saturday
12  and --
13   A.   No, I would fly -- my yearly thing is the first
14  flight, Hawaiian Air, out in the morning and I'd coming back
15  by about -- I'd try to get on the 3:00 o'clock flight so that
16  I can take her wherever she needs to go.
17   Q.   That would be on Saturday?
18   A.   Usually on Saturday.
19   Q.   And then if necessary you would go again on Sunday?
20   A.   Yeah, if I couldn't finish the whole thing.
21   Q.   Did there ever come a time when you had to take
22  vacation or leave from the city?
23   A.   No, no. I couldn't do that because my wife, once
24  again, didn't drive, so I had to drive her to work. So I
25  couldn't do that.

Page 47

1    Q.   And where did you type up or prepare the appraisal
2  reports?
3    A.   My house. My home.
4    Q.   Did you have basically a form on the word
5  processor?
6    A.   I had the appraisal software, which I bought
7  myself.
8    Q.   And that sort of gave you a form you could just
9  fill in the blanks?
10   A.   That's how the residential software is.
11   Q.   Okay. When did you start doing -- did anybody
12  assist you with that stuff at all?
13   A.   No.
14   Q.   When did you start doing the commercial type
15  appraisals, the type that end up in a booklet form?
16   A.   '92.
17   Q.   In '92?
18   A.   To the best of my recollection.
19   Q.   Okay. And do you remember the first one of those
20  you did for GK Appraisals?
21   A.   I don't.
22   Q.   Again, you did that on the weekends?
23   A.   Yes. It would be with the residential stuff that
24  I'd go back.
25   Q.   Was there any research that you needed to access

Page 48

1  databases on the Big Island, that you needed to do that for
2  your appraisals?
3    A.   Well, yeah, always to do the research on the sales
4  and things. Yeah, we need to do that.
5    Q.   And where did -- what database did you access to do
6  that?
7    A.   The Hawaii TMK Service. They handled the MLS for
8  the Big Island.
9    Q.   And you did that from your home as well?
10   A.   Yes.
11   Q.   Did you ever utilize any city records for your
12  research in these appraisals, any City and County of Honolulu
13  records?
14   A.   About the only thing that I can think of is before
15  the tax maps weren't all on line, so they had the tax maps up
16  on the fourth floor. So during lunch hour sometimes I would
17  go up there and I would get the legal description off of
18  that, but that's just like two minutes. It's real quick.
19   Q.   When you say the tax maps were up on the fourth
20  floor, are those the same tax maps that are now down in the
21  basement?
22   A.   Yeah, before -- that was before you started, I
23  think, Phil, the tax map section over here used to handle the
24  maps for all of the islands. And then after -- I don't know
25  what year it was they stopped doing that and that was no

Page 49

1  longer there. So it would just be those books. I had a copy
2  at my home also.
3    Q.   Okay. Any other sources of research material you
4  used to either do the commercial appraisals or the
5  residential appraisals for GK Appraisals?
6    A.   I didn't understand the question.
7    Q.   Were there any other research materials that you
8  used in preparing these appraisals?
9    A.   No, not that I can think of.
10   Q.   So you basically used the MLS service for
11  comparable sales and the tax maps for descriptions; is that
12  right?
13   A.   Yes.
14   Q.   And there were no other --
15   A.   Zoning and all that, that kind of stuff, of course,
16  you know, we could get all that information.
17   Q.   And where would you get that?
18   A.   From the planning department.
19   Q.   And did you do -- did you do that on line?
20   A.   No, no, no, my dad used to work at the planning
21  department many years ago, so at that -- that's around that
22  time.
23   Q.   Okay.
24   A.   So I would call him and he would just check it for
25  me and then he would call me up at night and then let me

13 (Pages 46 to 49)

Page 50

1  know.
2      Q.  Any other research materials that you would use in
3  the preparation of these appraisals?
4      A.  No.  The MLS books, there were the MLS books, but
5  that was part of Hawaii TMK Service.
6      Q.  Your dad worked in the planning department where?
7      A.  Big Island.
8      Q.  When you first started using Chris Graff to help
9  you on appraisals, how did you convey the assignment to him?
10     A.  I would tell him that, you know, I need help with
11  this, can you help me with this, like can you help me do the
12  write-up?  He's a good writer, so especially like description
13  of the building and things, you know, I would take all of the
14  notes down and he would look at my inspection sheet and then
15  he would write it up from there.  So that would -- that would
16  help me, so he would do that.
17     Q.  How would you -- for example, if you have an
18  appraisal on building A, how would he know that you wanted
19  him to help you?  Did you call him or stop by and see him or
20  what happened?
21         MR. LORUSSO:  Let me just object.  Vague and
22  ambiguous as to time.
23         MR. MOSELEY:  I said when he first started.
24         MR. LORUSSO:  I'm sorry.
25         MR. MOSELEY:  Same time period.

Page 51

1      A.  I'm sorry, I'm totally confused.
2      Q.  When you first started using Chris Graff, how would
3  you convey to him that you wanted him to help you on
4  something?  Did you call him on the phone?
5      A.  I would call him on the phone.  He had a cell phone
6  and I would call him on the cell phone.
7      Q.  Did you ever call him at -- using his city phone
8  number?
9      A.  I may have a couple of times, but generally
10  speaking I wanted to keep everything separate.
11     Q.  Did you ever go down to the city and drop stuff off
12  to him?
13     A.  Not in the office, not in the office.
14     Q.  Okay.
15     A.  But I did go down there and drop things off, like,
16  you know, the disks or whatever.  You know, I would stop by
17  on the road and tell him, hey, meet me outside because
18  there's no parking and I didn't want to pay for parking.
19     Q.  You never went up into the building and into
20  Chris's work area and gave him stuff or exchanged stuff with
21  him?
22     A.  I don't recall.  I don't recall doing that.
23     Q.  If there were people that said they had seen you
24  doing that --
25     A.  Uh-huh.

Page 52

1      Q.  -- would that surprise you?
2          MR. LORUSSO:  Objection, vague and ambiguous.
3  Calls for speculation.
4          THE WITNESS:  I'm not sure what I'm supposed
5  to do.
6      Q.  Well, I'm asking you if there were people that said
7  that they saw you up in the offices giving stuff to Chris
8  Graff -- I mean you said you don't recall whether you did
9  that, and I'm saying if there were people that said you did
10  that, would you be surprised that somebody would say that?
11     A.  They may have -- they may have maybe misinterpreted
12  the reason.  We were all friends, and, you know, I would go
13  up there occasionally and have lunch with them, or else
14  just -- you know, just stop by to say hello if I was in town.
15  And this is not in the early period.  That's probably in the
16  latter period.
17     Q.  When you say the latter period, what do you mean?
18     A.  After 2000, after 2000, because I already had left
19  Mike's office.
20     Q.  I understand that.  Okay.
21     A.  And I was out in Ewa.
22     Q.  So there were times when you went up into the work
23  area of the appraisers -- of the city appraisers but it
24  was -- what you're saying is it was likely a social occasion?
25     A.  It could have been -- very well have been, yes.

Page 53

1      Q.  And you don't recall whether you actually
2  transacted some kind of business with Chris when you dealt
3  with him?
4      A.  No.  I always made it a point not to.  That was
5  what my thing was.
6      Q.  Okay.  Was the area in -- after 2000, was the area
7  in which you would go up and socialize with the appraisers up
8  there, was that a restricted area to the public?
9      A.  That's when it all stopped, after 9/11, then they
10  locked up the area so I couldn't go back there anymore.  So,
11  yeah, after that, I haven't been back there since.
12     Q.  That was 9/11/2001 you stopped?
13     A.  Yeah, that's -- yeah.
14     Q.  And were you the one that always dropped stuff off
15  to Chris Graff or was there somebody else that would drop
16  stuff off?
17     A.  It was usually me.
18     Q.  Was there anybody else?
19     A.  It may have been my friend, if she was out --
20  because she lives in town, so I may have told her.
21     Q.  Who's your friend?
22     A.  Joy.
23     Q.  Joy?
24     A.  Minaai.
25     Q.  How do you spell it?

14 (Pages 50 to 53)

Page 54

1    A.  M-I-N-A-A-I.
2    Q.  I'm sorry, again?
3    A.  M-I-N-A-A-I.
4    Q.  For some reason I thought you said Aminaai, but it
5    was, uh, Minaai.  Is she also an appraiser?
6    A.  No.
7    Q.  Did she function as your secretary?
8    A.  She used to help me.
9    Q.  More like an assistant?
10   A.  Yeah.  She's not an appraiser, so she's still
11   working with me.
12   Q.  Were you ever told by anybody in the assessment
13   division that they thought she was kind of a pretty girl?
14   A.  I assume everybody knows that.  It's pretty obvious
15   that she is.
16   Q.  And how often did she -- when did she start --
17   A.  She never went -- she never went into the building
18   for anything that I asked her to do, because she was
19   roommates with another lady that worked over there as well.
20   Q.  And who is that?
21   A.  Jody.
22   Q.  I'm sorry, Jody?
23   A.  Yeah, her name at that time was Lum.  She's gotten
24   married since.
25   Q.  And you don't know her new name?

Page 55

1    A.  Chun.
2    Q.  Was she also an appraiser?
3    A.  Yes.  So I think what Joy used to do is if she went
4    to have lunch with Jody, but that was before she started
5    working with me.
6    Q.  Okay.  And did Joy actually drop stuff off to Chris
7    and pick stuff up from him or did she --
8    A.  Maybe one time or two times.
9    Q.  Was this after 9/11?
10   A.  Yeah, probably, because it was on the street.
11   Q.  Okay.  You didn't stop going up to the office
12   because of some conversation with Gary Kurokawa, did you?
13   A.  No.  We couldn't go.  I think that's when it was,
14   9/11, right, Phil, they locked everything up?
15   Q.  Actually, was there -- was there ever a time that
16   Gary Kurokawa talked to you and explained to you that there
17   had been some kind of complaint about Chris Graff doing work
18   for GK Appraisals on city time?
19   A.  I -- I don't recall the exact incident, no.
20   Q.  Did he ever discuss that with you?  Other than the
21   meeting at the baseball game recently, I mean, was there --
22   in the 2000 to 2002 or '3 period was there ever a time when
23   Gary said, look, got this compliant Chris is doing work
24   on -- GK Appraisals' work on the city time?  Did a
25   conversation like that ever happen?

Page 56

1    A.  No.  No.
2    Q.  Did you ever have a conversation like that or
3    anything related to that subject matter with Gary Kurokawa?
4         MR. LORUSSO:  Objection, vague and ambiguous
5    as to anything related to that.
6    Q.  Well, I mean related to that subject matter.
7    Because I had sort of made up some words sort of describing
8    the general complaint, and I have no idea whether those words
9    were said or anything close.
10   A.  I don't recall talking to Gary about it, but like I
11   said earlier, Chris did mention it.
12   Q.  And when did he first mention it?
13   A.  That probably was -- I don't know.  I don't know
14   what the year is, what the year was.  I guess when --
15   whenever things were happening.
16   Q.  That wasn't the phone call in which you said I
17   don't want to talk about it?
18   A.  It may have been.  It may have been.  Because I
19   didn't talk to him more than once or maybe twice about it.
20   Yeah, I don't -- I don't -- I don't think so.
21   Q.  So nobody -- nobody ever advised you that there was
22   a complaint that Chris Graff was doing work for GK Appraisals
23   on city time?
24   A.  I'm sorry, I don't understand the question.
25   Q.  Did anybody ever advise you that there was a

Page 57

1    complaint that Chris Graff was doing work for GK Appraisals
2    on city time?
3         MR. LORUSSO:  Objection.
4         THE WITNESS:  Chris, I believe Chris did.
5    Q.  Other than Chris?
6    A.  No.  It was Chris.
7    Q.  And you don't remember whether that was one or two
8    conversations?
9    A.  Yeah, it wasn't more than that, though.  I don't
10   recall.
11   Q.  Do you recall anything more about the conversation
12   or conversations?
13   A.  No, no.
14   Q.  Did you know whether Chris maintained files on his
15   computer or on the city computer that he used that had
16   anything to do with the appraisals he was --
17   A.  No.
18   Q.  Did Chris ever tell you where he did the work?
19   A.  No.  I assumed it was at his home, though.
20   Q.  Did you know if he had a computer?
21   A.  Yeah, he did.
22   Q.  Did you ever see it?
23   A.  No, because I've never been to his home, so I don't
24   know.
25   Q.  How do you know he had a computer, though?

15 (Pages 54 to 57)

Page 58

1    A.  He said.
2        MR. MOSELEY:  Do you want to take a quick
3    break?
4        (Recess taken.)
5    Q.  In the time that Chris Graff was -- you know, I
6    keep saying Chris Graff was doing work for GK Appraisals, but
7    that may not be technically correct.  Can you describe that
8    arrangement a little bit more clearly?  Is that correct that
9    he was doing work for GK Appraisals?
10   A.  He was helping me and I was doing work for GK
11   Appraisals.  So for anything that he did with me, he wouldn't
12   get a check from GK Appraisals.
13   Q.  Okay.  He got a check from you or cash payment from
14   you?
15   A.  Yeah.
16   Q.  Were you aware of him actually doing any work
17   directly for GK Appraisals ever?
18   A.  I wasn't.  I don't know.  I don't know what he did.
19   Q.  And you said when you -- when you worked for the
20   city in '91 through -- I'm sorry, '87 through '93, at some
21   point in time Chris worked there as well?
22   A.  Yes.
23   Q.  I'm probably just getting older, but did you give
24   me a time period in that time when you thought he was working
25   for the city?  Do you know when he started?

Page 59

1    A.  I know that he started about a year after me, so
2    that would probably make it 1988, give or take.  And I don't
3    know how long he worked there, but I know it couldn't have
4    been more than two, three years.
5    Q.  So at that point in time, then, he quit and went to
6    work for, I'm sorry, Hallstrom Group you said?
7    A.  Uh-huh.
8    Q.  You don't know if Chris Graff was doing any work
9    for GK Appraisals from, say, '91 to '93, right?
10   A.  I have no knowledge of that.
11   Q.  Did Gary Kurokawa ever tell you that he was asking
12   other employees of the City and County of Honolulu to work
13   for GK Appraisals besides yourself?
14   A.  No.
15       MR. LORUSSO:  Object to the form.
16   Q.  And the answer is no?
17   A.  No.
18   Q.  And did Chris Graff help you on any of the
19   appraisal projects you had in the period of -- I guess it
20   would be '91 through '93 while you worked at the city?
21   A.  No.
22   Q.  That was all you?
23   A.  That was all me.
24   Q.  Was there anybody that assisted you at all on
25   those?

Page 60

1    A.  No.
2    Q.  This gal Joy Minaai did not assist you at that
3    time?
4    A.  Huh-uh.  No, she did not.  I'm sorry.
5    Q.  Did you ever have a conversation with Chris Graff
6    in which you gave Chris Graff any instructions about doing
7    work on city time --
8    A.  Yes.
9    Q.  -- or with city equipment?
10   A.  Yes.
11   Q.  And when did you have such a conversation?
12   A.  Before I ever gave him anything, and I would remind
13   him of it, that, you know, it needs to be done -- everything
14   needs to be done separately.  You know, you shouldn't do
15   anything on city time is what I told him.
16   Q.  And you told him that more than once?
17   A.  Yes.
18   Q.  Did you caution him about working with city
19   equipment?
20   A.  I didn't -- I didn't know of -- that he was doing
21   that.
22   Q.  Have you since learned that he was doing that?
23   A.  I've heard some things that he
24   might have been, but I'm not -- I'm not certain.
25   Q.  Who did you hear that from?

Page 61

1    A.  It could have been Chris, because that's the only
2    person that I've ever talked to about it.
3    Q.  And what would he have said that made you think
4    that he might have been doing work with city equipment?
5    A.  You know what, it could have been in this too.
6    Q.  You're referring to Exhibit 14?
7    A.  Yeah, Matt.
8    Q.  Matt Viola?
9    A.  Uh-huh.
10   Q.  Was there anything -- was there any discussion with
11   Chris in which you thought Chris indicated he had been doing
12   work with city equipment?
13   A.  No.
14   Q.  Did Chris ever tell you he was doing work with city
15   equipment on his break time?
16   A.  No, I didn't know of it.
17   Q.  Did you ever discuss with Chris -- you said you had
18   a discussion with Chris before he even started working for
19   you, that he shouldn't be doing this on city time, right?
20   A.  Uh-huh.
21   Q.  Did you ever have a discussion -- similar
22   discussion with him about using city equipment?
23   A.  I don't recall.  I would assume that he would have
24   assumed that if I told him don't do anything on city time,
25   that -- I would think that it would have gone without saying.

16 (Pages 58 to 61)

Page 62

1   Q. Okay. And earlier you testified that you would
2   call Chris on his cell phone because you didn't want to call
3   him on the city line, right?
4   A. Uh-huh.
5       MR. LORUSSO: Was that a yes?
6       THE WITNESS: Yes.
7       MR. LORUSSO: Thank you.
8   Q. And is that because you were conscious of not using
9   city equipment?
10  A. Yes.
11  Q. And you were -- you tried to be pretty careful of
12  that; is that a correct characterization?
13  A. Yes.
14  Q. And how many times do you think you discussed with
15  Chris the concept of not working on these appraisals during
16  city time?
17  A. I don't know. More than a few.
18  Q. Did you discuss that with him virtually every time
19  you gave him an assignment?
20  A. No, but probably every few, every few.
21  Q. How many assignments do you think that you gave
22  Chris to help you with?
23  A. I think over the years it may have been around ten.
24  Q. Okay.
25  A. In various capacities.

Page 63

1   Q. And did you ever note in any of the appraisal
2   reports that you had obtained Chris's assistance?
3   A. No, I didn't.
4   Q. Isn't that a requirement?
5   A. I guess the way that I was interpreting it, and
6   maybe I'm wrong, was that it wasn't significant and he wasn't
7   responsible for the valuation, and that's why I didn't report
8   it.
9   Q. Okay. And that's why we can't take a look at the
10  appraisal reports and figure out which ones he did?
11  A. Yeah, and see Chris Graff's signature on it. And,
12  yeah, I'm not sure on that.
13  Q. Okay. And did he do anything -- for example, did
14  he write up the income approach to valuation ever?
15  A. No. I would do that. I would do that.
16  Q. Did he ever do the calculations for you?
17  A. No.
18  Q. Did he ever do spreadsheets for you?
19  A. He may have done like land spread sheets, but then
20  I always would -- would review it and go through it and then
21  come up with my own call on the value.
22  Q. Is it possible that Chris Graff was doing work for
23  GK Appraisals that you didn't know about?
24      MR. LORUSSO: Objection, calls for
25  speculation, lacks foundation, already asked and answered.

Page 64

1       MR. WONG: I'm going to join that objection to
2   the extent it calls for possibility.
3       You can go ahead and answer. We're just -- later
4   on, if Mr. Moseley tries to use it, you know, if you die or
5   something, our objection is on the record and it's asking for
6   a possibility rather than what you know.
7       THE WITNESS: Yeah, I don't know. I said that
8   before.
9   Q. Okay. Were you ever told by anybody at GK
10  Appraisals that the only work Chris was doing for them was
11  through you?
12  A. No.
13  Q. And you're pretty certain that Chris never worked
14  on an income approach to valuation for you?
15  A. Not to my knowledge.
16  Q. When you talk about a land spread sheet, what is a
17  land spread sheet?
18  A. Putting down the characteristics of the lot, and
19  then I guess coming up with adjustments to determine what the
20  value of the land is. And the land is one component in one
21  approach, the cost approach.
22  Q. Cost approach or market?
23  A. The cost approach. Well, it's a market value of
24  the land that's used in the cost approach. It's a component.
25  Q. And none of that would have had an income approach

Page 65

1   component or something that looked like an income approach;
2   is that right?
3   A. Yeah, no.
4       MR. MOSELEY: I'm going to mark this exhibit
5   next in order, which is 15.
6       (Exhibit No. 15 marked.)
7   Q. I'm showing you what's marked as Exhibit 15.
8   This -- you agree that this is a Xerox copy of a yellow
9   Post-it on which you wrote down four little lines having to
10  do with Chris Graff?
11  A. Yes.
12  Q. Can you explain what this is, what this means, what
13  your writing here means?
14  A. On 9/18/2002 I wrote Chris a check for $500, check
15  number 942. On 10/5/2002 I wrote him a check for $200, check
16  number 961. 11/2/2002 I wrote him a check for $400, check
17  977. And on 11/14/2002 I wrote him a check for $1,500, check
18  number 229.
19  Q. Do you have any recollection at all of what these
20  checks were for?
21  A. The only one that I know is the one 1,500.
22  Q. And what was that for?
23  A. That's for that Hawaiian Monarch Parking Garage.
24  Q. Okay.
25  A. And that was Matsunami Appraisals.

17 (Pages 62 to 65)

Page 66

1   Q.  Is this -- is this your only copy of that?
2   A.  I just printed it up.  I don't -- yeah.
3   Q.  Do you need this one back?
4   A.  I'd like it back, if I could.
5   Q.  And in conjunction with the Hawaiian Monarch
6   Parking Garage, what did you have Chris do on that appraisal
7   report?
8   A.  On that one there -- and this is my bad judgment in
9   everything -- is I allowed him to do more.  He did -- he did
10  come up with an income approach and all that.  I double
11  checked everything, and I made sure that everything was
12  reasonable.  I double checked his research and all that.  I
13  think that -- I guess what is important to note here is if
14  you look at the income, and then just the way that the cycle
15  was going, in 2002 we started getting slammed.  And I -- you
16  know, I got to the point where I couldn't -- I couldn't do
17  work for GK Appraisals because it was too busy in my own
18  practice that I was just swamped.  And I'm a one-man
19  operation.  I'm trying to -- I'm trying to stay afloat, and
20  this was a favor that Chris asked.
21  Q.  That Chris asked you for?
22  A.  Me, yes.
23  Q.  And the favor he asked you for was if he could do
24  more on this report?
25  A.  What he asked me was, oh, this is -- this is my

Page 67

1   buddy's thing.  Can you help me out with this and take this
2   job on.  And I said no.  And then he said, well, you know
3   what I can help -- I can help out more.  And I said, well,
4   you know what, it doesn't matter because I still need to see
5   everything.  And he said you know what, don't worry, Dave,
6   I'll take care of it, and that was my mistake.
7   Q.  Who was his buddy?
8   A.  The guy who owns that -- his name is Randy.
9   Q.  Do you know his last name?
10  A.  Same last name as on the report.  I think it's
11  Sharp, I think.
12  Q.  Do you know if that fellow ever went to jail?
13  A.  I don't know.  I met him once or twice.  I met him
14  once or twice.
15  Q.  So in conjunction with this report, 11/4/2002,
16  Chris essentially did the whole thing?
17  A.  He did and I checked it through.
18  Q.  Does his name appear anywhere in that report?
19  A.  No, that was my -- that's my mistake, and I'll take
20  responsibility for that.
21  Q.  And Chris was working for the city at that time?
22  A.  I'm not sure if he was.  He may have.  He may have.
23  Q.  Do you remember --
24  A.  He was.  He was.
25  Q.  Okay.  Do you remember where it was that he -- did

Page 68

1   he bring this business to you?
2   A.  He called me with it.
3   Q.  Do you remember was that on a weekday?
4   A.  I don't recall.  I don't recall when it was.
5   Q.  Did you make any money on this job?  I'm referring
6   to this -- we'll get the appraisal report back in a minute,
7   but the Hawaiian Monarch Parking Garage?
8   A.  The total fee was 2,500, and I wrote him that check
9   for 1,500 and I paid tax on the entire thing.  So, you know,
10  I didn't really make anything.  And, you know, I'm sorry,
11  Phil, I'm really sorry about that.  I did something as a
12  friend, and that was a mistake.  You know, I shouldn't have.
13  I didn't make anything.  I didn't come out.
14  Q.  David, you know, I understand the kind of person
15  you are, and I understand the sentiment, but there's really
16  no -- there's no need to apologize to Phil for anything.
17  A.  I do feel bad, you know, for whatever, you know,
18  it's caused.
19  Q.  Do you have any information that that particular
20  appraisal assignment for which you paid $1,500 to Chris Graff
21  caused any problems ever?
22  A.  I don't know.  I think that while I was talking to
23  some of the other -- this guy Matt.
24  Q.  Matt Viola?
25  A.  That may have come up, and that's why I brought

Page 69

1   that today.
2   Q.  He also did some work for you that you paid him
3   earlier in November of 2002 for?
4   A.  Yeah.  And once again, if you look at the history,
5   that's when I was -- I was really slammed on my residential
6   stuff.  So I would ask him to do, you know, small things here
7   and there.  Because being out in Ewa, it's hard, because at
8   that time we couldn't get any of the document numbers or any
9   of that stuff, you know, through -- through regular sources
10  like they have on the Internet now.  So I may have called him
11  said, hey, can you get me a doc number on this, on these
12  sales.
13  Q.  So how would he do that?
14  A.  I was always under the assumption that it would be
15  during his lunch hour.
16  Q.  But what would be the physical --
17  A.  Walk over to the bureau and then get that.  And
18  then once again, you know, I mean whatever I was paying him,
19  it probably was a lot when you consider that the overall
20  job -- I'm not making a mint from GK Appraisals.  I'm having
21  to fly over there, pay for my airfare and rent a car if I
22  needed to, and I'm giving Chris -- you know, it was really to
23  help him out.
24  Q.  So with Exhibit 15, with respect to check numbers
25  942, 961, and 977, do you think that was three separate jobs?

18 (Pages 66 to 69)

Page 70

1    A.  I'm sure it was.
2    Q.  Okay, because you would write him a check at the
3  end of each job; is that right?
4    A.  Yes.
5    Q.  Did you wait until you got paid before you wrote
6  him a check?
7    A.  Yes.
8    Q.  Were there any -- for example, the 9/18 check,
9  number 942, typically how -- when would that job have
10  actually occurred that you would pay in September?
11    A.  That's the tough thing too, because sometimes,
12  especially on these ones, we don't get paid for a long time
13  after, but I would probably guess that if you look back into
14  the -- into the record, if there were -- was a flurry of
15  stuff that was going on, it probably would be around the same
16  time as those three checks came in at the same time, you
17  know, like September through November.
18    MR. MOSELEY:  What I'd like to do is -- this
19  is a packet of materials that I would like to have marked as
20  Exhibit 16.
21    (Exhibit No. 16 marked.)
22    A.  Am I going to be getting that one back?
23    Q.  Is that the original?
24    A.  Yeah, that's the original.
25    Q.  No, you thought it was the original because we have

Page 71

1  such an excellent color copier.  This is paper clipped
2  together right now, and this is -- this is a series of
3  printouts from your computerized records, right?
4    A.  Uh-huh.  Yes.
5    Q.  And in the lower right-hand corner of all or most
6  of the pages, at least the front pages of each portion, there
7  is a pencil mark year written, 1999, 2000.  Does that
8  correspond with the Post-its you had placed on the
9  originals -- the original printouts that you brought in?  I
10  guess the -- I guess it didn't printout when we printed it
11  out.
12    A.  Yes.
13    Q.  So, then, the first one marked 1999 is essentially
14  information with respect to 1999 --
15    A.  Yes.
16    Q.  -- appraisals?  And are these -- are these all
17  printouts of business -- and there's things marked in yellow.
18    A.  Uh-huh.
19    Q.  And these are -- these are -- and the answer was
20  yes, right?
21    A.  Yes.
22    Q.  And these are items that you identified as having
23  been done involving GK Appraisals, right?
24    A.  Yes.
25    MR. MOSELEY:  Just while I'm at it, I didn't

Page 72

1  mark that.  I'm going to mark this one Exhibit 17.  This is
2  the appraisal of the Hawaiian Monarch appraisal that we
3  discussed earlier, and maybe we'll come back to that, but
4  just so we don't lose it, I'd like to mark it Exhibit 17.
5    (Exhibit No. 17 marked.)
6    Q.  But now I'd like to direct you back to Exhibit 16.
7  Can you take a look at the 2002 section.  And is there a way
8  of -- in reference to Exhibit 15, is there a way of figuring
9  out which appraisals these payments were for by looking at
10  these exhibits together?
11    A.  No.
12    Q.  When I'm looking at 2002, as you've marked it, this
13  is all in chronological order, right?
14    A.  Yes.
15    Q.  And the first one that I see that you've marked
16  is -- there's something called a due date.  Do you see your
17  column that says due?
18    A.  Uh-huh.
19    Q.  What does that mean?
20    A.  That's the date that the client wanted the job in.
21    Q.  Okay.  So the first one I see is -- looks like job
22  number 220, and it's due 3/11/2002, am I correct?
23    A.  Yes.
24    Q.  And that's marked with a yellow on that first page
25  marked 2002.

Page 73

1    A.  Uh-huh.
2    Q.  And on that first page there are three jobs.  One
3  says Off Kuakini Highway.
4    A.  Yes.
5    Q.  One says Palekoki Ranch.
6    A.  Yes.
7    Q.  One says Jack's Tours.
8    A.  Yes.
9    Q.  On the Palekoki Ranch there's no due date.  Do you
10  see that?
11    A.  Yeah.  Yes.  On both of those jobs --
12    Q.  This is Off Kuakini Highway and Palekoki Ranch?
13    A.  Yes.  I believe that I turned them back to GK
14  Appraisals saying that I couldn't do it.
15    Q.  You were too busy?
16    A.  Yes.
17    Q.  Did Chris work on either of those jobs?
18    A.  I don't know.
19    Q.  On the Jack's Tour job, which is the next yellow
20  mark down --
21    A.  Yes.
22    Q.  -- is that one that you completed?
23    A.  Yes.
24    Q.  And you received a check --
25    A.  Yes.

Page 74

1    Q.  -- for $4,373?
2    A.  No.
3    Q.  How do I read this?
4    A.  It's the fee.  You're looking at the check number.
5    Q.  Okay, I'm sorry, the fee is $2,100?
6    A.  Yes.
7    Q.  Is it possible that one of the three -- one of the
8    three -- top three listed on Exhibit 15 has to do with that
9    job?
10            MR. LORUSSO:  Objection, calls for
11   speculation.
12            THE WITNESS:  I don't understand the question.
13   Q.  Well, I'm trying to figure out if we can -- the
14   payments you've listed in Exhibit 15, I'm trying to figure
15   out if we can identify which job the payments were for or
16   likely for.
17   A.  It could have been back in 2001 that, you know, I
18   got paid on something and that's something that Chris may
19   have been involved in and because of that --
20   Q.  2001 and then nine months later get paid for it?
21   A.  That's not unusual, unfortunately.
22   Q.  Let's start at the beginning of Exhibit 16, 1999.
23   The Basque Subdivision, which is the first yellow line there
24   listed -- well, it has a tax map key number and a due date of
25   6/8/1999.

Page 75

1    A.  Yes.
2    Q.  Is that one Chris Graff worked on?
3    A.  It may have been, yes.  I believe he helped me with
4    research on that.
5    Q.  And we actually have a copy of that report here, do
6    we?
7    A.  Yes.
8    Q.  Can you -- I won't mark this as an exhibit yet, but
9    can you take a look at that.  Can you tell me what part of
10   that report he worked on?
11   A.  It wouldn't even be in here.  What I was having
12   Chris do is get this information on the document number, the
13   date of sale, and just the grantor/grantee from the Bureau of
14   Conveyances.  That -- and not necessarily on all of them,
15   because some of them would show up under the TMK under the
16   computer run, but it's the ones that didn't that I would ask
17   him to help me with that.  And this one I did all the
18   write-up myself.  So, yeah, if anything, just confirming that
19   bureau information.
20   Q.  Okay.  To physically go over to the Bureau of
21   Conveyances -- are you familiar with the Bureau of
22   Conveyances here?
23   A.  Yes.
24   Q.  What are their hours of operation?
25   A.  I believe same as any city agency, 7:45 till 4:30.

Page 76

1    Q.  Okay.  So in order for Chris to go over to the
2    Bureau of Conveyances, he would have to go while they were
3    open, right?
4    A.  Correct.
5    Q.  And you're assuming he would do that either on his
6    break or lunchtime?
7    A.  Yes.
8    Q.  Did he ever tell you that that's when he was doing
9    it?
10   A.  No, but I assumed that he was, because I had
11   mentioned that.  And also, I think -- I'm not sure, but Chris
12   would finish work earlier also, because they were all on
13   these staggered kind of work schedules, so that could have
14   been also.
15   Q.  Did he tell you he was on a staggered work schedule
16   and finished work earlier?
17   A.  I don't recall, but that was my understanding.
18   Q.  From where would you have gotten that
19   understanding?
20   A.  From him, but I can't say for sure that I remember
21   this was a date that he told me that he's on a staggered
22   schedule.
23   Q.  And with respect to the -- how do you pronounce
24   that Basque or Basque?
25   A.  Basque.

Page 77

1    Q.  B-A-S-Q-U-E Subdivision, you don't know what you
2    paid him or when you paid him for that?
3    A.  I don't know.
4    Q.  Is this one of the ones that you might have just
5    paid him in cash?
6    A.  Yeah, it may be.  It may be.
7    Q.  Did you keep track of the cash payments you made to
8    Chris?
9    A.  No, I didn't.
10   Q.  Did you report those payments on your tax returns?
11   A.  No, I didn't.
12   Q.  Do you know if Chris had a business license?
13   A.  I don't know.  I assume that he did.  I assumed he
14   did.
15   Q.  And when you made out the checks to Chris, did you
16   make out the checks to him directly?
17   A.  Yeah, Christopher Graff.
18   Q.  The next one in the 1999 sheet of Exhibit 16 is
19   Leong Kona Agricultural.  Do you see that?
20   A.  Uh-huh.
21   Q.  Is that something Chris worked on?
22   A.  I don't believe it was.  That was actually a --
23   it's a vacant land appraisal that I did on the form.
24   Q.  And the total fee you received for that was $450?
25   A.  Yes.

20 (Pages 74 to 77)

Page 78

1    Q.   Back to the Basque Subdivision thing, you received
2    a fee of $1,500 for that?
3    A.   Yes.
4    Q.   And you actually flew over, saw the property, and
5    inspected it, right?
6    A.   Yes.
7    Q.   On May 30th, 1999; is that right?
8    A.   I believe.  That's my best guess.  I wasn't really
9    being real critical on those things.  I had just set this
10   thing up at one time, said, oh, this looks this pretty good.
11   I may have filled it in, I may not have.
12   Q.   So with respect to the amount you would have paid
13   to Chris for going over and checking things at the Bureau of
14   Conveyances, do you have any idea how much that would have
15   been on a $1,500 job?
16   A.   Sometimes I would give him like -- if it's
17   something that I just think, oh, it's pretty quick for him to
18   just run over there, I would say, oh, I'll give you 40 bucks
19   or 50 bucks or something.  And then, you know, other times I
20   hear, oh, Dave, oh, it's really tight, man.  I gotta be
21   eating saimen again, and all this stuff, and then it's like,
22   hey, you know what, here, couple hundred dollars.  That's
23   really what it was for me.
24   Q.   So you kind of overpaid him?
25   A.   I did.  And that's why I guess in the end, for me,

Page 79

1    it just didn't make sense because I'm -- I'm assuming
2    liability on a lot -- all of this stuff under my errors and
3    omissions insurance policy, and it just didn't make sense
4    anymore.  I'm going to take the fee.  So now on a commercial
5    job, I'm charging five grand, you know, 6,000.  The fees on
6    Big Island at that time, they were really low and people were
7    just willing to take the jobs.  And it got to a point where,
8    you know, if we're splitting the fee between GK Appraisals
9    and myself, and it got to where it's not worth it when airfare is
10   costing me 200 bucks.
11   Q.   Okay.  So Chris Graff didn't like saimen?
12   A.   I don't know about that, but...
13   Q.   That's a little joke because to me, I'm eating
14   saimen again, I mean, there could be worse things, right?
15   Sorry, that was an aside, but the idea was he was kind of
16   complaining and poormouthing that he needed some additional
17   help; is that right?
18   A.   Yeah.
19   Q.   Can you take a look at the next one down that
20   you've yellowed on Exhibit 16, still on the first page.  This
21   is 51 Kalakaua Street, right?
22   A.   Uh-huh.
23   Q.   Did Chris Graff help you on that one?
24   A.   I don't believe he did.
25   Q.   Can you tell from the fee whether this was just a

Page 80

1    residential or whether --
2    A.   This was a commercial.
3    Q.   What makes you think you don't believe he helped
4    you on that one?
5    A.   I remember the -- I remember the job and I remember
6    doing everything myself.  I don't recall bringing him in.
7    Q.   Can we go to the next page, which is labeled 2000,
8    and the first yellowed part there is GK Appraisals, Yamashita
9    Medical Building.  Do you see that?
10   A.   Yes.
11   Q.   That's -- from the fee, am I to assume that's a
12   commercial appraisal?
13   A.   Yes.
14   Q.   Did Chris Graff help you on that one?
15   A.   No.
16   Q.   Again, you remember the job?
17   A.   Yes, I do.
18   Q.   And do you remember doing it all yourself?
19   A.   Yes, I do.
20   Q.   The next yellowed one down is 514 Kalanikoa Street.
21   A.   Uh-huh.
22   Q.   Yes?
23   A.   Yes.
24   Q.   Okay, and the fee there is $210?
25   A.   Yes.

Page 81

1    Q.   Did Chris Graff help you on that?
2    A.   No.
3    Q.   Is that a residential appraisal?
4    A.   Yes.  Anything in the 200s, less than a thousand
5    dollars is going to be a residential job.  I believe there
6    was only one instance in all of this where I accepted a fee
7    less than a thousand on a commercial job.
8    Q.   The next one right below that is 19-3876 Elepaio,
9    E-L-E-P-A-I-O, Street.
10   A.   Yes.
11   Q.   That was also a residential job?
12   A.   Yes.
13   Q.   Did Chris help you on that one?
14   A.   No, he didn't.
15   Q.   Actually, the next one right below that is not
16   yellowed, but it's also labeled GK Appraisals.  Red Road -
17   Kalapana?
18   A.   Yes.
19   Q.   What happened with that job?
20   A.   We ended up -- it ended up cancelling.
21   Q.   So did Chris help you on that one?
22   A.   No.  Actually, there's two more right here.
23   Q.   Below that, I was going to remark, there's two,
24   about five below that, entitled Wung Ranch, W-U-N-G, separate
25   word Ranch.  Do you see that?

21 (Pages 78 to 81)