Page 82

1   A.  I believe both of those were cancelled as well.
2   Q.  Okay, Chris did not help you on those?
3   A.  No.
4   Q.  Okay, the next one below that is UH Hilo Extension?
5   A.  Yes.
6   Q.  And that's a fee of $3,600?
7   A.  Yes.
8   Q.  Did Chris help you on that one?
9   A.  No.
10  Q.  You remember the job?
11  A.  Yes, I do.
12  Q.  And you did all the work?
13  A.  Yes, I did.
14  Q.  And the next one below that is 1114 -- I'm sorry,
15  114 Anderton, A-N-D-E-R-T-O-N, Road.
16  A.  Yes.
17  Q.  And that's a residential one?
18  A.  Yes.
19  Q.  For $210?
20  A.  Yes.
21  Q.  And did Chris help you on that?
22  A.  No.
23  Q.  Okay, the next one down is Hawaiian Host
24  Arbitration for $2,100 fee.
25  A.  Yes.

Page 83

1   Q.  That job cancel?
2   A.  No, it didn't.  Wait.  It may have proceeded for a
3   little while and then cancelled.  I'm not sure.
4   Q.  Did you actually get paid for that one?
5   A.  I may not have.
6   Q.  Did Chris help you on that one?
7   A.  No, he didn't.
8   Q.  Okay, what --
9   A.  I think the hard thing for me going through
10  individually like this, it's hard to remember.  Some of the
11  addresses don't mean a whole lot after all these years.  And
12  as I was going through these reports that are on the table,
13  those are the ones that popped up in my mind.  Other than
14  that, it's really a guess.
15  Q.  You're doing pretty good at remembering some of
16  these things.
17  A.  Okay.
18  Q.  I mean, Yamashita Medical Building, you remember
19  doing it by yourself and that kind of thing.
20  A.  Yeah.
21  Q.  And I think if we just ask about each individual
22  thing -- and I'll try to do it real quickly.  There seems to
23  be --
24  A.  Yeah, there isn't a whole lot.
25  Q.  It seems to be either triggering a yes or no.  I

Page 84

1   mean, you're -- when you say, you know, UH Hilo Extension, he
2   didn't work on that, you seem pretty certain he didn't,
3   right?
4   A.  Okay.
5   Q.  I mean, you're confident of the answers you've been
6   giving me so far?
7   A.  Yes.
8   Q.  But Hawaiian Host Arbitration, that was about a
9   property on the Big Island?
10  A.  Yes.
11  Q.  All right, on the next page, it's 750 Ainaola
12  Drive?
13  A.  Yes.  Cancelled.
14  Q.  Cancelled?
15  A.  Yes.
16  Q.  Did Chris help you on that?
17  A.  No.
18  Q.  And then the next one down is 136 Kinoole,
19  K-I-N-O-O-L-E.
20  A.  Yes.
21  Q.  That's also commercial appraisal?
22  A.  Yes.
23  Q.  Did Chris help you on that?
24  A.  He may have.  He may have.
25  Q.  What about that job makes you think he may have

Page 85

1   helped?
2   A.  I'm not sure which building that this exact --
3   exactly is, but if it was this one that they -- it was a
4   proposed building that ended up being an insurance agent and
5   a foot doctor, he may have helped me with the research on
6   that.
7   Q.  Do you have any more specific recollection of the
8   kind of research he may have helped you with on that?
9   A.  Bureau confirmation.
10  Q.  Is that typically the kind of research he did was
11  to go to the bureau and confirm document numbers?
12  A.  Yeah, a lot of that.
13  Q.  Was there any other thing he was doing for you?
14  A.  Every once in a while I would ask him to call up
15  some rents, maybe that -- you know, that I had, and once
16  again, that was done on his cell on off time.
17  Q.  What's -- when you say call up some rents, what
18  does that involve physically?
19  A.  I guess one of the things we do on our site
20  inspection is we drive around the neighborhood and we look
21  for any kind of signs, and usually it's kind of a shot in the
22  dark just to say, hey, what's this thing renting for?  And
23  then they'll tell us, but we usually don't use that.  We may
24  write it down as an asking rent, but what we really want is
25  we want them to say, oh, yeah, by the way, did you have

Page 86

1  anything else recently that you may have leased out? And
2  then they'll say, we had one at this building or whatever and
3  they'll give us information on what those were.
4     Q.  So you're basically researching brokers to find out
5  what their --
6     A.  Just calling the signs, yeah.
7     Q.  And that involves driving around in a neighborhood?
8     A.  Yeah, well, I do all the driving and then I would
9  just give him the number, can you call these two guys.
10 Because there's not a whole lot.
11    Q.  Anything else that -- other kind of research you
12 might have had him do other than Bureau of Conveyances and
13 calling up rents?
14    A.  No, that's all.
15    Q.  Back to the 2000 printout. The next one down is
16 labeled Kinoole Plaza.
17    A.  Yes.
18    Q.  And that's a $600 fee?
19    A.  That was a commercial space. It was a bar that we
20 did on the form. That's the reason why it's 600.
21    Q.  Did Chris help you on that?
22    A.  No.
23    Q.  The next one down is Waimea Vacant Land, $1,800, do
24 you see that?
25    A.  Yes.

Page 87

1     Q.  Did Chris help you on that?
2     A.  I've done several jobs in Waimea and Chris probably
3  helped me on it -- on one. So I'm not sure which job this
4  is.
5     Q.  You're not sure which job this is, but can you
6  recall what he did to help you?
7     A.  Same thing, research. This is land, so it would
8  just be bureau research.
9     Q.  Okay, the next page is labeled 2001 at the bottom,
10 and it's Kohala Well Site.
11    A.  Yes.
12    Q.  The fee looks like $1,680?
13    A.  Yes.
14    Q.  Did Chris help you on this one?
15    A.  Yes, he did.
16    Q.  And what did he do on that job?
17    A.  Research. And this is a land job, so, once again,
18 that would be --
19    Q.  Bureau?
20    A.  -- bureau. He may have helped me with some of the
21 write-up of the individual lots. I think this was like 20 --
22 20 lots or something, and he may have helped me with just the
23 description portion.
24    Q.  So you would give him your notes and he would do
25 the write-up?

Page 88

1     A.  Uh-huh. You know what, actually, no, he didn't on
2  this one. I remember writing. I remember writing this one.
3     Q.  So he didn't do the write-up on this one?
4     A.  No, but he may have done the research. I'm sure he
5  did.
6     Q.  And this is not --
7     A.  You know, I don't -- once again, I apologize, I
8  wasn't able to find everything.
9     Q.  I understand. Actually, no, I thought I saw Kohala
10 Well Sites in one of these piles. That's all right. We'll
11 look at it at the next break. The next page shows -- looks
12 like Hirose Nursery Update.
13    A.  Hirose.
14    Q.  I'm sorry, Hirose. I've been here forever and I
15 mispronounced that. He didn't help that, right?
16    A.  No.
17    Q.  The next one down is Kawaihae Center, $900. Do you
18 know if he helped on that?
19    A.  He may have helped with that. That was also an
20 update of an appraisal that we had done years before. So he
21 may have helped research on that one.
22    Q.  Bureau research?
23    A.  Yes.
24    Q.  Did he do any write-up on that one?
25    A.  No, it was already done.

Page 89

1     Q.  The next one down is Kay's Lunch Center for $2,100.
2  I'm going on all the yellowed out ones, and that's Kay's
3  Lunch Center?
4     A.  Yeah, he did.
5     Q.  He helped you on Kay's Lunch Center?
6     A.  Yeah, research and write-up of the improvements.
7     Q.  What kind of research did he do?
8     A.  Bureau. He may have called for some rents just to
9  update what I had.
10    Q.  And what did he do on the write-up?
11    A.  Describe the improvements.
12    Q.  Would he have done that from your notes or did he
13 go there and look?
14    A.  My notes.
15    Q.  The next one down is Hilo Termite and Pest Company.
16    A.  Uh-huh.
17    Q.  Yes?
18    A.  He may have assisted with a write-up, the
19 description of improvements.
20    Q.  As we've been looking at these things in 2001, are
21 there any that we've gone through so far that you could
22 identify as being probably paid on your list on Exhibit 15?
23    A.  No. I'm sorry, I have no idea.
24    Q.  No, that's all right. I'm -- if I don't ask the
25 question, you know, I don't know if you did or not. On the

23 (Pages 86 to 89)

Page 90

1  next page there's -- my eyes are getting so bad. 16-186
2  Mikihala Place for $1,500. Do you know if he helped on that?
3      A.  I don't believe he did.
4      Q.  And you remember that appraisal?
5      A.  I do.
6      Q.  And you did it yourself?
7      A.  I did.
8      Q.  You know, on any of these things that we've gone
9  through from 1999 through -- and that was the end of 2001,
10 are there any things that he helped you on that weren't for
11 GK Appraisals?
12     A.  He may have helped me with a couple of Matsunami
13 Appraisal jobs that I had over there on the Big Island.
14     Q.  And on the Big Island?
15     A.  Yes. And I believe there was one job in Maui that
16 he helped me with some of the write-up stuff on that also.
17     Q.  So you actually hired him for other things other
18 than GK Appraisals' work?
19     A.  Yes.
20     Q.  How would you get a job for, for example, Matsunami
21 on the Big Island? Was that your Big Island connection or
22 GK's?
23     A.  It's -- I guess it's friends of family and people
24 that I guess are friends with, you know, my dad and mom and
25 stuff. Then after a while, because I was -- I was doing a

Page 91

1  lot for GK, you know, some people would come to me and they
2  would ask after I went out. So if it was Big Island, I would
3  say, you know, I usually don't want to take it, send it to
4  GK, but there were instances where GK was swamped too.
5      Q.  Did they ever just refer you stuff and say I'm
6  swamped, can you just do this?
7      A.  No, no.
8      Q.  Can we start looking at 2002 now?
9      A.  I believe he did that already.
10     Q.  Oh, yeah, we did. I'm sorry. Did we do the one on
11 page 2, 165 East Kawili Street?
12     A.  No, we didn't.
13     Q.  Did he help on that one?
14     A.  I don't recall.
15     Q.  You just don't remember the job or --
16     A.  Yeah, I don't remember the job.
17     Q.  And is that --
18     A.  I think that's it.
19     Q.  That's it for 2002. And there were no jobs you did
20 for GK Appraisals in 2003?
21     A.  Yeah, none.
22     Q.  Did GK Appraisals know that you were having Chris
23 Graff help you with appraisal assignments you were doing for
24 them?
25     A.  I can't say for certain. I don't know.

Page 92

1      Q.  You did discuss, though, that -- you did discuss
2  with Gary Kurokawa that you were having Chris work for you,
3  right?
4      A.  Yes.
5      Q.  So they knew generally that he was doing jobs for
6  them --
7      A.  Helping me.
8      Q.  -- through you?
9      A.  Can you say that again?
10     Q.  They knew that as a general --
11     A.  Generally speaking.
12     Q.  That there were some jobs that they had given to
13 you that he was helping?
14     A.  Yes, he was helping.
15     Q.  But they didn't know which specific ones?
16     A.  Yeah, they didn't.
17     Q.  Are you aware of any direct contact by GK to Chris
18 Graff with respect to any of these jobs?
19     A.  Not that I know of. Not that I know of.
20     Q.  When you would give Chris an assignment, did you
21 ever give him assignments that would have required him to
22 sort of review the information that was available and
23 potentially to ask you if there was more to be known about
24 something? Like go do this research and then he comes back
25 to you and says I need to know X, Y, and Z before I can do

Page 93

1  this research?
2      A.  Possibly -- possibly he may have seen something
3  that I didn't see as far as a comp that, oh, Dave, why does
4  this one stick way out? You know, you told me to check this
5  out, but does that make sense? Is that something that I need
6  to check into? And then that would be my call from there,
7  yes or no, oh, I didn't realize that, yeah.
8      Q.  So he would see the comps that you were using as
9  well?
10     A.  Because that's what I'm giving him to check the
11 information at the tax office.
12     Q.  At the tax office or at the bureau?
13     A.  I'm sorry, the bureau. We call it -- in the old
14 days we used to call it tax office research because before we
15 used to have to go through to the tax office and go through
16 the field books and that's how we would do it before
17 computers.
18     Q.  Kind of miss the field books myself.
19     A.  I don't. Standing there three hours.
20     Q.  Don't you find the computerized stuff is not maybe
21 quite as comprehensive?
22     A.  But there was nothing like flipping pages for
23 hours.
24     Q.  I guess I'd have to agree with that.
25     A.  Looking for a needle in a haystack.

Page 94

1  Q. And basically I think you testified that Chris
2  never helped you with the smaller jobs like residential
3  appraisals?
4  A. No, not that I remember.
5  Q. I'm going to show you what we've marked as Exhibit
6  17. This job -- this is the Hawaiian Monarch Parking Garage,
7  and it's done for Edwin Fong, CPA.
8  A. Yes. Can I get my copy of this one later? I guess
9  this was mine, but --
10 Q. Oh, I'm sorry, we marked the original. Certainly,
11 I've got an extra one here. I'm sorry.
12     So you think the owner of the property is
13 identified on this?
14 A. It is.
15 Q. I'm sorry, where?
16 A. It would be under ownership.
17 Q. And that's Randy Spears or something, right?
18 A. Yes. It's on page 13, and this is a typo here too,
19 according to County of Hawaii tax records. City and County
20 of Honolulu. Subject -- fee simple interest is owned by
21 S. N. K. Partners, Inc., Mary L. Spear, Trust (66 percent),
22 and Ana June Alvaro (33.33) currently own the leasehold
23 interest.
24 Q. But somehow you understood that Randy Spears was
25 involved in this?

Page 95

1  A. It was on page 3, date of death of Mary L. Spear.
2  Q. Does this -- I need to look. Does this appraisal
3  appear in the list of --
4  A. You know, I don't know why. I looked through my
5  things and I don't see it.
6  Q. So --
7  A. And that was an oversight on my part. I'm sorry.
8  Q. This is -- what we're talking about is Exhibit 16?
9  A. Yes.
10 Q. And you're saying that it doesn't appear in 2002 on
11 Exhibit 16?
12 A. No.
13 Q. I guess, then, I'll raise the question, do you
14 think there could possibly be other things that weren't on
15 your printout?
16     MR. WONG: Objection, calls for speculation.
17     THE WITNESS: Yeah, I don't know. Like I said
18 earlier, I've switched computers numerous times and, you
19 know, the list may have gotten crossed up or -- I'm not sure.
20 I don't know.
21 Q. In terms of a level of confidence in the
22 completeness of this list in Exhibit 16, how would you
23 describe your level of confidence in that completeness?
24 A. 95 percent.
25 Q. Fair enough. Fair enough. Bet you that's a whole

Page 96

1  heck of a lot better than if I had to list my tasks for you.
2  Now, you testified earlier that when Gary Kurokawa started GK
3  Appraisals, that a request was made to the City and County
4  for permission to conduct this business?
5  A. Yes.
6  Q. And that what came back was a ruling that you could
7  conduct the business as long as it wasn't within the
8  jurisdiction?
9  A. Yes.
10 Q. And did you understand that that's because the
11 Ethics Commission, or whoever it was that gave you the
12 opinion, didn't feel it was appropriate for a city employee
13 working at the assessment division to be doing appraisals --
14 A. Yes.
15 Q. -- of property --
16 A. Things in the county.
17 Q. -- in the county. This Exhibit 17 appraisal
18 violates that precept, doesn't it?
19 A. Yes.
20 Q. Okay, so did you discuss with Chris Graff that as a
21 city employee he could not be involved in this appraisal?
22 A. That wasn't for me to say, but it was for me to say
23 that I wouldn't do it if I was you, and that's why I turned
24 it away. And he convinced me otherwise, against my better
25 judgment. I'm sorry.

Page 97

1  Q. How did he convince you otherwise? I mean, what --
2  A. I guess just saying that he -- you know, it's just
3  to help out Randy. We're going to call it just the way that
4  it is, and that's exactly what was done, that the value is
5  the value. And I guess through my almost 20 years now in
6  appraisal, that's always been what I've said. It doesn't
7  matter who it's for, what it's for. Value is value. Because
8  the minute you get away from that, then you get into all kind
9  of trouble. So I've been consistent with that through the
10 years. So I wanted to make it very clear to Chris that no
11 matter what any relationship, you know, this is the only
12 reason -- I guess he needed somebody to take it quick. It
13 was super busy at the time. Everybody was running around
14 crazy with their fee stuff, and I shouldn't have taken it.
15 Q. Did you -- did you say to Chris, listen, you can't
16 work on this because you're a city appraiser and this is
17 within the city jurisdiction?
18 A. I said if it was me, I wouldn't do it, and I never
19 did.
20 Q. Did you tell him why?
21 A. Yes.
22 Q. And you said that this is property within the
23 city's jurisdiction --
24 A. Yeah.
25 Q. -- and you are a city employee --

Page 98

1    A.  Yeah, and I told him --
2    Q.  Wait, you did say that, or something along that
3  line?
4    A.  Yes, I did.
5    Q.  And then what else were you going to say?
6    A.  And I did let him know that, hey, you know what, if
7  anything happens from this, you know what, it could cost you
8  your job.  And is it worth it?  I don't think so.  So I did
9  tell him.  So he knew the -- I guess the severity of it.  And
10 once again, I apologize, I made the wrong call.  I should
11 have just turned it away, because I didn't make anything on
12 it.
13   Q.  And at this period of time in 2002, you were still
14 working for GK Appraisals, right?
15   A.  Of 2002?  My guess would be probably not, because
16 that -- where are those jobs that I had turned back?  That
17 was in February of 2002.  So that may have been when the job
18 came in, and went out in March, but those big jobs kind of
19 drag along, so I guess -- my guess would be that I wasn't
20 already.
21   Q.  Did you still maintain contact with Gary Kurokawa
22 and GK Appraisals?
23        MR. LORUSSO:  Objection, vague and ambiguous
24 as to maintaining contact.
25        THE WITNESS:  Can you reword that and that?

Page 99

1         MR. LORUSSO:  Just so you know, Mr. Matsunami,
2  I'm simply making an objection for the record based on the
3  question that's asked.  In other words, in my opinion it's --
4  I may be right.  I may be wrong.  But it may be for a judge
5  to decide at a later point in time whether or not the
6  question that was asked or being asked by Mr. Moseley is a
7  proper question.  So I'm saying that the words maintaining
8  contact is vague and ambiguous.
9         THE WITNESS:  Oh, I see.  Okay.
10        MR. LORUSSO:  But the main thing is that you
11 understand the question before you answer the question.
12        THE WITNESS:  So could you rephrase that
13 question, please?
14   Q.  Did you -- after -- at this period of time -- well,
15 after you stopped -- let's start it this way.  So what you're
16 saying now is you don't understand my question when I asked
17 if after you started turning back jobs, whether you continued
18 to maintain contact with him?  You don't understand that
19 question?
20   A.  On a social basis, very minimally.  Not on a
21 professional basis.
22   Q.  So you didn't basically have telephone
23 conversations or --
24   A.  No.
25   Q.  Because --

Page 100

1    A.  I would say that the limit to all of that would
2  be -- as all appraisers know, we all get hard ones sometimes
3  that may come up that somebody else may know something, a
4  different approach or a different way to look at it, so I
5  think that I do that with a lot of appraisers, we bounce
6  things off of each other and just, you know, see if we can
7  figure it out.  And Gary, at that time, I believe was on my
8  list of people that I used to call, but since that time for
9  the last -- I mean shortly thereafter, he hasn't been.
10   Q.  If you look at your 2002 printout, which is Exhibit
11 16, the last one you've yellowed is -- in a column called in,
12 it's April 26th, 2002.  Does that mean that's when you got
13 that assignment?
14   A.  I'm sorry, where is it, again?
15   Q.  I'm sorry.
16   A.  Oh, I see, East Kawili.
17   Q.  Yeah, East Kawili.
18   A.  Yeah, it probably means that that's when it did
19 come in, but, see, once again, that's the one that I said I
20 don't know what it is.  It could be that -- that -- it looks
21 like I completed it, but I don't remember it.
22   Q.  Okay.  But on your printout it looks like there
23 were no more assignments after that date from GK Appraisals;
24 is that correct?
25   A.  Yeah, that's correct.

Page 101

1    Q.  And you don't remember there being any after that
2  date, do you?
3    A.  No.
4    Q.  Do you remember -- did you call them up and say,
5  hey, look I'm just too busy.  I can't do this for you
6  anymore?
7    A.  I felt bad having to tell them, hey, you know, I'm
8  sorry, I've got to turn these two jobs back because I just
9  cannot do it.
10   Q.  Those were the earlier two jobs, Off Kuakini
11 Highway and Palekoki Ranch?
12   A.  Yes.
13   Q.  Those are the two you turned back.  You took jobs
14 after that, right?
15   A.  I'm not -- see, I'm not sure how -- oh, I know what
16 it is.  It came in in March, but it was long and drawn out.
17 So it's like, it was -- it was probably like June that it was
18 still ongoing and I said, you know what, this isn't right.
19 I'm not going to be able to work on this any time soon.  I've
20 got to turn it back.  So I'm sure they weren't thrilled with
21 me about that, but I needed to take care of my own company,
22 because it was going crazy.
23   Q.  So did you call them up and tell them that?
24   A.  Yeah.
25   Q.  Did you talk to Gary?

**Page 102**

1  A. I spoke with Gary, I believe.
2  Q. And then Gary handled it from there?
3  A. Yes.
4  Q. Would Gary typically be the one to communicate
5  assignments to you?
6  A. Gary or the mom, Mrs. Kurokawa.
7  Q. So Gary had a fairly active role in the
8  relationship with you; is that right?
9      MR. LORUSSO: Object to the form of the
10 question, vague and ambiguous, lacks foundation.
11     THE WITNESS: Gary and I, I guess that's where
12 my contact was, because I was friends with Gary, not friends
13 with the mom.
14 Q. So most of your contact -- how would you
15 characterize in terms of percentage of your contact with GK
16 Appraisals was with Gary?
17 A. 70 percent, maybe 30 percent with the mom.
18 Q. Did you have any contact with anyone else at GK
19 Appraisals?
20 A. Actually, on this -- on this job, the -- oh,
21 actually, no, it wasn't that one. It was Kohala Well Site.
22 I went out with the dad. Because I flew in and then I didn't
23 have a four-wheel drive over there already. So he picked me
24 up at the airport and we drove out in his car.
25 Q. So basically your contact with GK was like 70

**Page 103**

1  percent through Gary and 30 percent through the mom?
2  A. Yeah, very little with the dad.
3  Q. Okay. And so was Gary the person you told that you
4  wouldn't be able to help with their appraisals anymore?
5  A. Yes.
6  Q. And that was sometime after April of 2002, and you
7  thought it might have been like June when you had to turn
8  these two jobs back that you hadn't worked on?
9  A. Yeah. I did -- I did work on it. I mean, I ran
10 comps, but I didn't get much beyond that.
11     MR. MOSELEY: It's 12:20. I may not have a
12 whole lot more to go. Maybe we should go off the record
13 here.
14     (Recess taken.)
15 Q. I think just before we went off the record I was
16 asking you about contact with GK Appraisals after, say, April
17 through June of 2002, after you told them you couldn't do any
18 more work. Did you -- and, frankly, this appraisal that
19 we've got marked as Exhibit 17 was done after that date when
20 you told them. This is done in May of 2002, right?
21 A. Uh-huh.
22     MR. LORUSSO: Is that a yes?
23     THE WITNESS: Yes.
24     MR. LORUSSO: Thank you.
25     THE WITNESS: Sorry.

**Page 104**

1  Q. And it looks like it was billed in August. In May
2  of 2002 you had already told them you couldn't do the work
3  anymore; is that right?
4  A. To the best of my recollection.
5  Q. Did you have any occasion to tell Gary Kurokawa
6  that Chris Graff was doing appraisal work on a property
7  within the jurisdiction of the City and County of Honolulu?
8  A. No.
9  Q. Why didn't you tell him?
10 A. I wasn't talking to him at that time, and I
11 didn't -- yeah, there was no opportunity for me to -- say,
12 other than call him up, I guess.
13 Q. Weren't you still friends?
14 A. Yeah, we were.
15 Q. Didn't that concern you that one of his employees
16 was breaking the rules and you specifically knew what the
17 rule was?
18     MR. LORUSSO: Objection, argumentative and
19 relevancy as to any obligation on Mr. Matsunami's part to
20 have to tell Mr. Kurokawa.
21     MR. MOSELEY: I didn't ask if it was an
22 obligation. I said, didn't it concern you?
23     THE WITNESS: It did concern me, but I guess I
24 wasn't wise enough to do that.
25 Q. When you were describing the research at the Bureau

**Page 105**

1  of Conveyances that was occurring from I guess the 1999
2  period through sort of mid 2002, you were describing that you
3  would have Chris Graff do research at the Bureau of
4  Conveyances?
5  A. Uh-huh.
6  Q. Yes?
7  A. Yes.
8  Q. Were you aware of a computer program or a site at
9  which this information could be obtained --
10 A. Yes.
11 Q. -- over the computer?
12 A. Yes.
13 Q. And did you have access to that?
14 A. I didn't. I didn't have access to that information
15 on the individual sales. I would have all of those from the
16 computer on the Hawaii TMK Service, and that's what -- that's
17 the ones that didn't have the grantor or the grantee, I would
18 have Chris research that.
19 Q. And that's because you would actually have to go
20 down to the Bureau of Conveyances and look at the original --
21 or the document on file?
22 A. Microfilm.
23 Q. Right?
24 A. Yes.
25 Q. You'd have to actually see the document or the copy

27 (Pages 102 to 105)

Page 106

1  of the document to see who the parties were?
2     A.  Grantor and grantee, yes.
3     Q.  And that didn't always appear on the TMK?
4     A.  No. And in the olden days, once again, they always
5  used to teach us go one or two before or one or two after
6  just to see if there's any kind of related things, you know,
7  going on with the properties. That's the reason why Bureau
8  of Conveyances is always a good source.
9     Q.  So what you're saying is on the microfilm you find
10 document number whatever it is, 00593 or something, and you
11 would look at 592, 591, 594, 595? Been there done that.
12 That's what you would do, right?
13    A.  Yes.
14    Q.  Because oftentimes you'll find there's a loan
15 guarantee --
16    A.  Or purchase money mortgage.
17    Q.  -- or purchase money mortgage that either precedes
18 or follows it?
19    A.  Yes.
20    Q.  And that's what you were expecting Chris to do?
21    A.  Yes.
22    Q.  And you were expecting him to do that either on his
23 lunch break or other breaks he would have?
24    A.  Yes.
25    Q.  And you had -- during this whole period of time,

Page 107

1  you had subscribed to the TMK service so that you could get
2  the other information off the TMK service, right?
3     A.  I would get that information. GK was subscribing
4  and I would use their account.
5     Q.  You would use their account?
6     A.  Yes.
7     Q.  Did you ever have Chris use the city account to
8  obtain those kinds of information?
9     A.  No.
10    Q.  Were you aware the city had an account and was able
11 to do that?
12    A.  I was aware that they did have the account, because
13 when I was there they had it also, the TMK.
14    Q.  Are you aware of whether or not those -- there's a
15 record of those access points from the city's account? For
16 example, if an appraiser at the assessment division used that
17 service and accessed it to look up, you know, a particular
18 TMK number, are you aware of whether or not there was a
19 record of that access point?
20    A.  That Hawaii TMK kept a record of that?
21    Q.  Right.
22    A.  I'm not aware of it.
23    Q.  Okay.
24    A.  But I would -- it would stand to reason that they
25 could because you're logging in.

Page 108

1     Q.  Were you aware of whether or not the same documents
2  that were available at the Bureau of Conveyances were also
3  available directly at the city?
4     A.  Yeah, I was made aware of that later, that they
5  were getting a copy of it, but I guess I don't --
6     Q.  Let's -- when were you made aware of that?
7     A.  I don't know. Probably later.
8     Q.  Later than what?
9     A.  I don't what year it came out that they were able
10 to get that information. My -- I wouldn't have thought -- I
11 wouldn't have known anything about it prior to 2000.
12    Q.  But in 2000 you might have known that, for example,
13 Chris Graff could get those documents without going to the
14 Bureau of Conveyances?
15    A.  Yes.
16    Q.  But it was still your expectation that he would
17 actually physically go down there rather than use the
18 documents that were available through the city?
19    A.  Yes, yes, on his own time.
20    Q.  Did you ever learn whether or not he actually did
21 that on his own time?
22    A.  I'm not sure. I don't know what he does on his own
23 time.
24    Q.  Okay, did you ever speak with him about not using
25 the city's resources, like those documents, for your private

Page 109

1  work?
2     A.  No, I didn't.
3     Q.  Did you ever talk with Gary Kurokawa about the use
4  of those city's resources in terms of research materials?
5     A.  No.
6     Q.  Did you ever talk with any other city employee
7  about that?
8     A.  No.
9     Q.  Did you talk with Matt Viola about that?
10    A.  I don't -- I don't believe I did, but it's been a
11 while, once again, so I don't --
12    Q.  Okay. Did you ever have any email contact with
13 Chris Graff through his city email address?
14    A.  No.
15    Q.  And you're certain of that?
16    A.  I'm not certain, but not to my recollection.
17    Q.  Okay. Did you ever email him any information with
18 respect to the projects you wanted him to work on?
19    A.  I did, but I believe that was his personal email
20 address that he had, or, you know what, I take that back. It
21 was his -- it was his neighbor's email address in Hawaii Kai.
22    Q.  Do you have records or copies of your emails to
23 Chris Graff?
24    A.  No, I don't. The kind of thing that would be
25 emailed would be like a comp sheet, you know, or a land

Page 110

1  adjustment sheet. Usually they're pretty small files, just
2  as an attachment.
3     Q.  Would you be surprised if these things appeared on
4  Chris's city email account?
5     A.  I -- I don't know. I don't recall. I don't
6  recall. If -- there may have been, you know, individual
7  instances. It wasn't something that I was doing as a matter
8  of record, though, normal -- in the normal course of
9  business.
10    Q.  When you told Gary Kurokawa that you were not going
11 to any longer be able to do work for GK Appraisals, did Gary
12 tell you what they were going to do instead, I mean, to
13 substitute for you?
14    A.  No.
15    Q.  What was his reaction?
16    A.  He said, oh, okay, I understand. Because I guess
17 he's known me for a long time too and we became friends, and
18 it's like I have to take care of my family, so that's what I
19 needed to do. And I guess the payments, they weren't, you
20 know, making a whole lot of difference to me.
21    Q.  In mid 2002 when you told Gary you were not longer
22 going to be able to do any work for GK Appraisals, Chris had
23 already told you that he -- that there were complaints being
24 made against him for doing GK work on city time, right?
25    A.  I'm not sure what the dates was. I'm -- I don't

Page 111

1  know even the date, you know, that Phil left or any of that
2  stuff. I'm not sure. All I know is based on my workload --
3  that's kind of how I'm judging things is just on the workload
4  and when it got unmanageable. So to nail down a date, it's
5  really tough.
6     Q.  But when Chris told you he was getting complaints
7  about his doing work for GK Appraisals, he was actually at
8  that time continuing to do work through you for GK
9  Appraisals, wasn't he?
10    A.  I know that when I found out that it was a problem,
11 I said, no, enough already. Because out of respect for you,
12 you know, and everybody else, I don't -- I know how it is
13 over there and it's so much of, you know, everybody's getting
14 into everybody else's business, and it's like, you know what,
15 it's just not worth it. I don't -- out of respect for Phil,
16 but also out of respect for Chris. You know, I wouldn't want
17 anything to happen and, you know, his daughter can't eat or
18 something, so...
19    Q.  Well, that -- I guess, then, the question is was
20 that -- the fact that you had found out that people were
21 complaining -- specifically Phil was complaining about Chris
22 doing work for GK Appraisals, did that tie into your
23 telling -- was that one of the factors in telling Gary I
24 can't do any more work for GK?
25    A.  The main reason was because of the business,

Page 112

1  because it was just slamming over here. And if you look at
2  the economics to get paid $1,500 for two weeks of work,
3  doesn't make sense when I can make 475 a pop off of a
4  residential and, you know, doing five, six a day. So, you
5  know, it doesn't equate. So regardless of my friendship with
6  Gary or whatever, it just --
7     Q.  Well, you said the main reason. What I asked you
8  is was this one of the reasons?
9     A.  Yeah.
10    Q.  Was it one of the factors?
11    A.  Yes, one.
12    Q.  So it just came up all around the same time?
13    A.  Yeah.
14    Q.  Sometime sort of mid 2002?
15    A.  Yes.
16    Q.  That's probably when you found out about this with
17 Chris and your business was booming and it was humbug anyway.
18 Am I describing it accurately?
19    A.  I guess not so much humbug. It's I don't think I
20 ever, you know, tried to deceive anybody. It's I was only
21 trying to help people and it's like it got to the point where
22 it's like I'm not helping anybody so -- and I'm going without
23 sleep and it's just crazy, so, you know, what can I do to be
24 able to be there for my kids long term, and I needed to move
25 on.

Page 113

1     Q.  After that period of time, did you ever hire Chris
2  Graff to help you on anything?
3     A.  No. No.
4     Q.  And I want to try to accurately get this on the
5  record, because honestly, David, I think you're -- in my
6  opinion, and I don't want to harass you, you're not answering
7  this question directly.
8     A.  Uh-huh.
9     Q.  One of the reasons you told Gary --
10    A.  Uh-huh.
11    Q.  -- that you couldn't do any more work for GK
12 Appraisals was the fact that Phil English had complained
13 about Chris Graff doing the work and you, out of respect for
14 Phil and for Chris and for Gary, didn't want to be part of
15 the problem anymore; is that right?
16        MR. LORUSSO:  Objection to the prefatory
17 statements. It's argumentative. It lacks foundation.
18 Misstates the prior testimony, and it's also incomplete in
19 terms of what the allegations are by Mr. English.
20    Q.  Did I accurately describe --
21    A.  Could you say that one more time, repeat it again?
22        MR. MOSELEY:  Could you read that back.
23        (Record read.)
24        MR. LORUSSO:  Same objections.
25        THE WITNESS:  That's what I had said earlier.

Page 114

1  If you look at the testimony, I did say that.
2     Q.  And another reason, of course, was that it didn't
3  make any economic sense for you?
4     A.  That was the second reason, and then the third
5  reason, it was just overwhelmingly busy.  To get -- for one
6  man to get 45 to 60 jobs a month, that's huge, and that's
7  what I was up against.  And I didn't know where the end was
8  coming.
9     Q.  I understand.  And you basically had a wife and
10 kids and the workload was affecting your home life?
11    A.  Well, yeah.  I got divorced in 1996, and I'm sure
12 that, you know, going neighbor islands every weekend didn't
13 help anything, and that was -- that was a mistake on my part
14 as well.
15    Q.  In 1996 you got a divorce?
16    A.  Yeah, and then -- yeah.
17    Q.  And so at the time in mid 2002, did you have
18 custody of your kids or something as well?
19    A.  Well, in mid 2002 -- my son plays baseball and it
20 just takes a lot of time.  I was coaching.  And that was all
21 my free time.
22    Q.  So if I can summarize the reasons, it was the
23 problem with the complaints that Phil made about Chris Graff,
24 it was the economics of the thing, and it was the work was so
25 overwhelming it was actually --

Page 115

1     A.  My work, Matsunami.
2     Q.  -- Matsunami business was so overwhelming you
3  couldn't do that consistently with, you know, spending time
4  with your son and those kinds of things; is that right?
5     A.  Yes.
6     Q.  Were there any other reasons that you told him you
7  couldn't do the work anymore?
8     A.  No, and not in that order.
9     Q.  I understand that, and I would hesitate to ask you
10 to prioritize those, because how do you say, well, it was
11 economic.  That's more important than my son.  You know, I
12 can't picture any dad doing that.
13        So did -- was another reason you didn't want to be
14 involved with GK Appraisals, and specifically having Chris
15 Graff do work for GK through you, was the Randy Spears
16 appraisal that got marked as Exhibit 17?
17    A.  No.
18    Q.  You didn't --
19    A.  I didn't know -- I didn't know about it, that that
20 was a problem.
21    Q.  Well, didn't you have -- didn't you have sort of a
22 conflict with Chris and --
23    A.  Yeah, and that's where I need to ask myself too,
24 the question is, you know, what is a friend?  And that's --
25 that's just all I'll say on that, I guess.

Page 116

1     Q.  This appraisal, Exhibit 17, occurred at about the
2  same time that you said --
3     A.  All of the other stuff was going on.
4     Q.  All of the other stuff.  Here's Phil English, who's
5  a friend, complaining about Chris doing work for GK for your
6  friend Gary, and then Chris is sort of -- Chris sort of
7  pushed you into doing this appraise for Spears, right?
8         MR. WONG:  I'll object, misstating the
9  witness's prior testimony.
10    Q.  Did I misstate any of your testimony?
11    A.  It may -- it may have.  I guess --
12    Q.  Well, if I did, would you sort of -- how did the
13 Exhibit 17 appraisal figure into all of this?
14    A.  I think that the thing that I didn't necessarily
15 say was that I was coerced to do it.  It was a bad move on my
16 part, no doubt.
17    Q.  Weren't you pressured by Chris to do this?
18        MR. WONG:  Objection, argumentative.
19        THE WITNESS:  I guess, what is pressure?  You
20 know, I -- to me, it's like friendship and that's where I was
21 trying to do both, and that's where I should have separated,
22 you know, friendship from business from everything else.  And
23 I guess, as Phil knows, a lot of things, especially over
24 there, blur -- blur the edges.  Because, you know, you spend
25 a lot of time with people and then you become friends and

Page 117

1  they know about your kids and everything, so it's not
2  where -- yeah, it's just that's just how it is.
3     Q.  When you say a lot of things over there, are you
4  talking about the assessment division?
5     A.  Yeah, just the office as a whole because it's huge,
6  you know, and everybody's always getting involved in
7  everybody else's business over there, so...
8     Q.  So Exhibit 17, this appraisal, did you feel that --
9  well, didn't Chris Graff sort of insist that you do this to
10 help him out?
11    A.  He asked me to do it to help him out.
12    Q.  But was it like, will you help me out, and you said
13 yes, or was there some resistance on your part, no, I don't
14 want to do this?
15    A.  I think that's what my testimony was prior, that I
16 had told him, you know, this isn't -- this isn't worth it
17 and, you know, I'm super busy.  I don't want to do it.
18    Q.  And would it be fair to say that this appraisal on
19 Exhibit 17, the friendship pushed the professional
20 relationship too far?
21    A.  Yes.
22    Q.  And is that one of the factors -- and this occurred
23 at about the same time as the other stuff.  Is this one of
24 the factors that you decided not to do any more work for GK
25 and let Chris do work for GK through you?  Is this one of the

30 (Pages 114 to 117)

Page 118

1 factors as well?
2         MR. WONG: Objection. I'll object to the
3 question as misstating the prior testimony and also vague and
4 ambiguous.
5         MR. LORUSSO: Join.
6         MR. WONG: The question's vague and ambiguous
7 as to the statement about the prior time, or about the same
8 time. I think the witness earlier testified that that was
9 done after the relationship with GK had terminated.
10    Q.  Was this appraisal, Exhibit 17, done after the
11 relationship with GK had terminated?
12    A.  I believe it was.
13    Q.  On the front it says David Matsunami Appraisals,
14 May 2002. The bottom is dated June 14th, 2002. And your
15 last -- you said your last assignment was received in April
16 of 2002 from -- April 26th, 2002 you have the end date, and
17 the inspection date you have 5/2/2002 and out 6/1/2002. Now,
18 this appraisal, Exhibit 17, on the front of the cover, that's
19 on page 2, says May 2002. Isn't this all at about the same
20 time or is it after?
21    A.  We're splitting --
22         MR. LORUSSO: Objection, vague and ambiguous,
23 argumentative.
24         THE WITNESS: We're really beginning to split
25 hairs here. On assignments like these, they're ongoing, and

Page 119

1 you may do a little bit on it and then it sits on the burner
2 for a while, you need -- somebody needs to get back to you.
3 So the dates -- you know, it could be that -- well, the date
4 of value is always the date of inspection, but then the date
5 that I put on the report, it may be -- it may be the date
6 that I worked on the file when I typed on it on that title
7 page and maybe it didn't go out until June. So I'm not sure
8 the exact dates.
9    Q.  Well, earlier you said that this Exhibit 17 was
10 after you told Gary that you didn't want to do any more work.
11    A.  I'm pretty sure that it was.
12    Q.  Okay. When did you get the assignment to do the
13 appraisal in Exhibit 17?
14    A.  It's not on here.
15    Q.  It's not on your list?
16    A.  Yeah, so I don't know. I don't know.
17    Q.  Was it before May of 2002?
18         MR. LORUSSO: Objection, calls for
19 speculation.
20         THE WITNESS: I don't know. I don't know.
21    Q.  Was it before June 14th, 2002?
22    A.  I don't know.
23         MR. LORUSSO: Same objection.
24    Q.  Actually, you do know, don't you?
25    A.  No, I don't.

Page 120

1    Q.  What's the date on the lower right-hand corner of
2 the first page?
3    A.  June 14th, 2002, and I don't know what that is.
4    Q.  And you don't know what the date above that, May
5 2002, is?
6    A.  That's the date probably that the thing was typed.
7 So I guess as I was reviewing it --
8    Q.  Which is the date the thing was typed?
9    A.  I don't know. I don't know. Like I said earlier,
10 Chris did a lot of this report and I proofed over it, and I
11 don't even have a hard copy of this. What I have is I have
12 the -- I have the electronic copy, and that's what I printed
13 for you folks so at least we'd have something today. So I
14 don't know what the date was. I don't. I'm sorry. I don't
15 know what this means, and I'm being totally honest with you.
16    Q.  Okay, on your computer record did you have a date
17 on which that record was made?
18    A.  I may, but then that date -- that date may or may
19 not show the actual. I'm not sure. Would it show the date
20 that I printed it up, which was --
21    Q.  I don't know. I'm asking you.
22    A.  Which was a couple nights ago.
23    Q.  I'm asking you if your computer record would show
24 you when the file was originally opened for this appraisal,
25 Exhibit 17?

Page 121

1    A.  I don't know. I don't know. I'm not sure. I'm
2 not sure.
3    Q.  I think you just testified that the valuation would
4 be the date of the appraisal; is that right?
5    A.  The date of inspection. The date of value on that
6 one was a back-dated date because it was a date of death.
7    Q.  Because it's November 20th, 2001, right?
8    A.  I don't know. Yes. You know what I bet happened?
9 This June 14th --
10         MR. WONG: You know, if you're testifying
11 about what you remember, that's fine, but if you're guessing
12 or speculating --
13         THE WITNESS: I know this happened. This June
14 14th, 2002, there should be a hard page here, and that date
15 is up here. That's the date the transmittal letter was
16 written.
17    Q.  Is that the letter you would have written?
18    A.  I reviewed it.
19    Q.  So actually what you're saying is the -- on the
20 cover sheet, which is actually the second page of the
21 exhibit, that June 14th date actually should have been on the
22 following page which says page 1; is that right?
23    A.  Yes.
24    Q.  And you don't know when you reviewed that?
25    A.  I would -- I would assume that it would be right at

31 (Pages 118 to 121)

Page 122

1  that date or slightly thereafter.
2      Q.  And that means that you would have gotten this
3  assignment before that date; is that right?
4      A.  Yes.
5      Q.  So that means that you would have gotten this
6  assignment in May or April or sometime before June 1st?
7      A.  I don't know.
8      Q.  I'm sorry, June 14, so either earlier in June --
9      A.  I don't remember exactly, but I do remember it was
10 a rush rush.
11     Q.  And your recollection is that it was possibly in
12 June that you told Gary Kurokawa you could no longer work for
13 GK Appraisals?
14          MR. LORUSSO:  Objection, misstates his earlier
15 testimony, also calls for speculation.
16          THE WITNESS:  I don't know what the date was.
17     Q.  Didn't you say that the two jobs you turned back
18 that you had received in February of that year, you felt that
19 you had probably turned back in June?
20     A.  I don't know what the thing says.  I don't recall.
21     Q.  Did you turn back those two jobs before April 26th,
22 2002?  I'm referring to Exhibit 16, the job labeled Off
23 Kuakini Highway and Palekoki Ranch.
24     A.  I'm not sure.  It would stand in line around that
25 time, because I know that it sat for a couple of months.

Page 123

1      Q.  But you took another job in -- on around or about
2  April 26th, 2002 that you completed, right?
3      A.  April 26th.
4      Q.  You have to look at the next page.
5      A.  I'm not sure what that job was, and I think that on
6  the decision, whatever the decision was to take the job, was
7  if I had recently done something and I had all the data in
8  house, then I could -- I could work on that and get that out.
9  Whereas Palekoki Ranch, it was like 20 properties all over
10 the Hamakua Coast.  It was really, really difficult, and the
11 same thing I'm pretty sure with this Kuakini Highway, I think
12 that that was part of it out in Kona side.
13     Q.  You turned these two jobs back at the same time you
14 told Gary that you were not going to be able to do any more
15 work for GK Appraisals, right?
16     A.  I don't know.  I don't know.  Like this one right
17 here is 4/26, I'm showing it as in, inspected in May, and it
18 went out in June.  So it may have been after that date.
19     Q.  After the April date?
20     A.  I don't have any record as to when I spoke with
21 Gary.
22     Q.  Did you speak with him in person or on the
23 telephone?
24     A.  I spoke with him on the phone.
25     Q.  Did you have a bunch of physical materials on the

Page 124

1  two jobs you turned back?
2      A.  I did.
3      Q.  And you would have transmitted those?
4      A.  I believe I dropped it off to Gary.
5      Q.  Downtown at his office, the office downtown?
6      A.  Yes.
7      Q.  Did he come out on the street and pick them up?
8      A.  Probably.
9      Q.  In terms of volume of material, I mean, are we
10 talking a four-inch high stack of stuff or --
11     A.  No.  A folder like this.  A folder like this.
12     Q.  Maybe a quarter-inch thick at the most?
13     A.  Yeah, because I didn't do a whole lot on it.
14 Probably my inspection notes and then whatever TMK runs that
15 I had run to determine that this is going to be a bear.
16     Q.  If you do some, what did you say, computer runs on
17 some stuff?
18     A.  Uh-huh.
19     Q.  Yes?
20     A.  Yes.
21     Q.  And you turned those back, those computer runs
22 would have dates on them, right?
23     A.  They may or may not, because I'm not sure if the
24 date prints out on the bottom.  I know that the date that
25 would show is on the search when you -- when you enter sold

Page 125

1  between this date and this date, which would probably be --
2  in this case wouldn't be applicable because the appraisal
3  date was also another date of death on the Palekoki Ranch.
4  So those dates probably are not going to line up.  So if I
5  put down 2000 or 2001, that would be the date of death of --
6  I think it was Mr. Ramos on Palekoki Ranch.
7      Q.  But you don't know whether the computer run itself
8  would have a separate date saying it was run on this date?
9      A.  I'm pretty sure it doesn't.  What's going to come
10 out is just the sales, and it's going to be, you know,
11 individually pieced out.  That's the way the Big Island one
12 works.
13     Q.  On what service did you run this?
14     A.  Hawaii TMK.
15     Q.  And do you remember whether you used GK Appraisals'
16 pass code to do that run or whether that was your own?
17     A.  No, that was GK Appraisals'.
18     Q.  During the course of the time when you were doing
19 work for GK Appraisals and you were contacting Gary
20 apparently 70 percent of the contacting, were you calling him
21 at the office at the assessment division?
22     A.  Yes.
23     Q.  Do you remember what his secretary's name or
24 whoever the gal was that answered the phone?
25     A.  I think they have two, Dottie and Debbie.

32 (Pages 122 to 125)

RALPH ROSENBERG COURT REPORTERS
OFC:  (808) 524-2090    FAX:  (808) 524-2596

Page 126

1  Q. Dottie and Debbie?
2  A. Yes.
3  Q. Did you generally talk to them first?
4  A. Usually, yeah.
5  Q. Did you ever leave messages for him saying, you
6  know, David called, call me back?
7  A. Yes.
8  Q. Do you know -- I mean, you worked at the assessment
9  division. Do you know if there was a system where they
10 logged the messages in like a message book or something like
11 that?
12 A. I don't know how they were doing it at that time,
13 but when I worked there it was just those pink papers and
14 then they would just put it on that, and you would do
15 whatever and throw it away. So I don't think there was
16 something that -- but that's when I was there, and they
17 weren't the head secretary back then when I worked there.
18 Q. But there were times when you called, you weren't
19 able to talk to Gary, and you left messages for him to call
20 back?
21 A. Yes.
22 Q. And you don't know whether or not there is some
23 physical record that was kept of those calls?
24 A. I have no idea.
25 Q. So you, then, I presume wouldn't know whether we

Page 127

1  could determine whether some of these dates -- what some of
2  these dates were by message books and things like that?
3  A. I have no idea.
4  Q. Okay. Did you ever email Gary any information with
5  respect to your work for GK?
6  A. I may have. I may have for him to have -- to
7  review. I'm pretty sure that that was done using his regular
8  hawaii.rr. whatever address, that GK Appraisals one, but I'm
9  not sure.
10 Q. Is your testimony kind of similar to the testimony
11 about Chris, that you might -- I mean you're not sure --
12 A. Yeah, I'm not sure. I'm not sure.
13 Q. There might be some emails there in his city
14 account from you?
15 A. There may. I'm not sure.
16 Q. Did you ever speak with Robert Magota at any time
17 with respect to your work for GK Appraisals?
18 A. No.
19 Q. On no subject whatsoever --
20 A. No.
21 Q. -- dealing with that?
22 A. No.
23 Q. How about with same question with respect to Ann
24 Gima?
25 A. No.

Page 128

1  Q. I think you testified that you met Ann Gima at the
2  city, right?
3  A. Yes.
4  Q. Did you have any contact with her after you left
5  the city?
6  A. No. I guess it would just be running into them at
7  the store or something and just say hi, bye, but we have no
8  relationship at all.
9  Q. And I suppose before 9/11, when you were making
10 social visits up there, you would see her and say hi as well?
11 A. Yes.
12 Q. How often before 9/11 did you have occasion to sort
13 of be down there at the assessment office?
14 A. Not a whole lot. I would say not more than a
15 couple times in a year, you know, maybe five times or six
16 times in a year.
17 Q. Would those occasions be occasions that you had
18 arranged in advance to go to lunch with somebody and you were
19 showing up for a lunch date with them or --
20 A. It could be, and then a lot of times I would go to
21 the -- I would go over there and do research and then I'd see
22 somebody and they'd say, hey, come back, so and so wants to
23 see you, and that's pretty much how things would go over
24 there.
25 Q. And you would go over there and pal around, how are

Page 129

1  things going, what have you been up to?
2  A. Yeah.
3      MR. MOSELEY: Actually I don't think I have
4  any more questions at this time.
5           EXAMINATION
6  BY MR. LORUSSO:
7  Q. Mr. Matsunami, are you okay to continue?
8  A. Sure, sure.
9  Q. And, Mr. Matsunami, as I had introduced myself at
10 the beginning of the deposition, my name is Michael Lorusso.
11 I represent the City and County of Honolulu, Gary Kurokawa,
12 Ann Gima, and Robert Magota. I do have some follow-up
13 questions, maybe some additional areas also, but just to be
14 very clear, just as far as your background, at the time you
15 were with Michael Chun & Company Real Estate Appraisers, that
16 you list as your professional experience, was that also as an
17 independent contractor?
18 A. No. I worked for Mike as an employee for a number
19 of years, and then at the end -- no, actually I was the whole
20 time.
21 Q. And with regard to a lot of the questions that were
22 asked about Exhibit 17, that appraisal that was done and its
23 entitled David Matsunami Appraisers, again, David Matsunami
24 is your own independent appraising company, correct?
25 A. Yes.

Page 130

1  Q. Does Gary Kurokawa have any interest in David
2  Matsunami Appraisers?
3  A. No.
4  Q. Does GK Appraisals have any interest in David
5  Matsunami Appraisers?
6  A. No.
7  Q. And in fact would it be fair to say that David
8  Matsunami Appraisers is a competitor of GK Appraisals?
9  A. Yeah.
10 Q. And with regard to any of the work that was
11 performed by Chris Graff with regard to Exhibit 17, the
12 appraisal for the Hawaiian Monarch Parking that Chris Graff
13 performed, that was between Matsunami Appraisers and Chris
14 Graff, correct?
15 A. Yes.
16 Q. And Gary Kurokawa had no involvement in that,
17 correct?
18 A. Correct.
19 Q. And GK Appraisals had no involvement in that,
20 correct?
21 A. Correct.
22 Q. I take it, since this is the first time that you've
23 been involved in a deposition, have you been involved in any
24 type of litigation at all?
25 A. I have.

Page 131

1  Q. Okay.
2  A. My divorce case, obviously, right, and then a
3  couple of arbitrations.
4  Q. Okay. And I don't want to get into those types of
5  things, but would you agree or understand that with regard
6  to, say, for example, things in your divorce -- and I don't
7  know if it was contested or not contested -- that just
8  because someone makes an allegation, that those allegations
9  aren't true?
10     MR. MOSELEY: I've got to object. That's
11 argumentative and you're asking him to speculate.
12     THE WITNESS: Could you say that again?
13 Q. Sure. Just because someone files a lawsuit, makes
14 a complaint, makes certain allegations, that doesn't
15 necessarily mean the allegations are true?
16 A. Based on my personal experience with the divorce,
17 yeah.
18 Q. And as you previously had testified, as I
19 understand it, that whenever you went to the city to the
20 property assessment division before September 11th of 2001,
21 that was just social occasions, correct?
22 A. To the best of my knowledge, yes.
23 Q. You had also indicated that -- or it's clear to me
24 that you either had a friendship or some type of relationship
25 with Mr. English; is that correct?

Page 132

1  A. Not real good friends, but we've known each other
2  and of each other, and he used to be real good friends with
3  Mike Chun, so I respect him from that because they're one
4  generation up from us appraisers.
5  Q. And are you -- strike that.
6     Have you socialized with Mr. English?
7  A. No, no more than when I go to the tax office, hey,
8  Phil, how's it going? How's things? And I'd see him every
9  once in a while, and I remember one occasion we walked down
10 from Block J together. It was nice.
11 Q. Do you know that Mr. English has at least inferred
12 or implied that you were part of a scheme by -- with
13 yourself, Mr. Graff, and Mr. Kurokawa to -- to have Mr. Graff
14 do work on city time for GK Appraisals? Were you aware of
15 that?
16     MR. MOSELEY: I've got to raise an objection.
17 I think you're mischaracterizing the allegations in the
18 complaint and/or testimony of Mr. English in deposition, and
19 I think that you're implying that Mr. English was making some
20 allegation that Mr. Matsunami was engaged in some --
21 consciously engaged in some wrongdoing. I don't think
22 there's anything anywhere that indicates that Mr. English is
23 making that allegation.
24     THE WITNESS: Yeah, you know, I don't know
25 what went on, but as far as I'm concerned, Phil is a good

Page 133

1  guy, you know.
2  Q. But the bottom line also is that you never asked
3  anyone, and in particular Mr. Graff, to do any work on city
4  time, correct?
5  A. No.
6  Q. That is correct?
7  A. Yes.
8  Q. And to your knowledge -- strike that.
9     Equally would you say Mr. Kurokawa was a good guy?
10 A. Definitely.
11 Q. Looking at the Exhibit 14, which were your
12 handwritten notes, as far as Matt Viola, did you have an
13 understanding one way or the other that he was with the city
14 Ethics Commission?
15 A. He may have mentioned that. I didn't write it
16 down, so...
17 Q. There's a note here about complaint -- no
18 complaints about pay. Do you see that towards the bottom?
19 A. What -- how many lines up is that? Oh, I see,
20 right above GK/David. Yeah, no complaints about pay.
21 Q. Is your understanding that your note referred to
22 that Chris Graff was complaining about -- or there was an
23 allegation, I should say, that Chris Graff was complaining
24 about any pay that he had received from you?
25 A. Can you say that again?

Page 134

1    Q.  Sure.  When you were speaking with Matt Viola, I
2  take it that Mr. Viola was asking you for certain
3  information, but he was essentially indicating to you that
4  there may be allegations that certain -- someone said this or
5  someone said that; is that correct?
6    A.  I don't recall.
7    Q.  Was it your understanding or do you have a memory
8  as you sit here today that what Matt Viola was doing was
9  saying these are all facts that I'm giving you, or was it
10 more along the lines of, as I say, that it's I'm
11 investigating certain complaints that --
12   A.  I think that's what he said.  He said that he's
13 doing an investigation.
14   Q.  At any time did Chris Graff ever complain to you
15 that the monies or pay that he had received, that either he
16 wasn't getting paid or it wasn't enough money?
17   A.  I think that what had come out before was that it
18 takes a long time to get paid, and what I would do in some
19 instances is just advance it.
20        MR. LORUSSO:  Thank you.  I have no further
21 questions.
22        MR. WONG:  I just have a few, and it will be
23 quite brief.
24              EXAMINATION
25 BY MR. WONG:

Page 135

1    Q.  Mr. Matsunami, you mentioned your relationship with
2  Phil English.  How much do you know about his background and
3  history?
4    A.  Not much.  In the industry?
5    Q.  Well, in general.
6    A.  I know that he's an SRA, and when -- SRAs was the
7  thing to do.  It was the only way you could get work.  And I
8  know that he's friends with Mike, and Mike's a great guy.
9  And I know -- I've always known him to be a straight and
10 solid individual.
11   Q.  When you say Mike, you mean who?
12   A.  Mike Chun.
13   Q.  Do you know anything about his financial history?
14   A.  No, I don't.
15   Q.  Do you know anything about his habits of paying or
16 not paying his obligations on time?
17   A.  I don't.
18   Q.  Do you know anything about his marital history?
19   A.  No, I don't.  I know that he got divorced a few
20 years back too.  That's about all I know.
21   Q.  Do you know about how many times he's been
22 divorced?
23   A.  I don't.
24   Q.  Do you know anything about his medical history?
25   A.  No, I don't.

Page 136

1    Q.  Do you know anything about his psychiatric history?
2    A.  No, I don't.
3    Q.  So when you say he's a good guy, you just mean in
4  your personal interaction was him?
5    A.  Whenever I see him he's always very cordial, very
6  polite, and he's always been kind to me.
7    Q.  Okay.  Earlier when you were talking about
8  appraisals, you said value is value.  And what I understood
9  this to mean, and I just want to make sure that I'm
10 understanding this correctly, is that when you do an
11 appraisal, you do your best to come out with a true value.
12 You don't shoot for anything or try to achieve some kind of
13 predetermined value; is that what you're saying?
14   A.  Exactly, and that's what we need to do as
15 appraisers.  I guess, for me, I take it a step forward,
16 saying I don't want to know anything.  I'm just going to do
17 all my research, do everything, and I'm going to run the
18 number, and then that's what it comes out at.  A lot of
19 times, the reason why I said that, is a lot of people have
20 misconceptions as to what appraisers do, and I guess we see
21 that a lot.
22   Q.  Is it necessary for an appraiser to compromise his
23 integrity and shoot for fixed numbers in order to be
24 successful in the appraisal business?
25   A.  No.

Page 137

1    Q.  Earlier you were talking about how many appraisals
2  you can do in a day, and you said some kind of figure.  Was
3  it eight residential appraisals?
4    A.  No, I mean, four or five maxing out, and that's
5  working long hours.
6    Q.  And how much per residential appraisal is the going
7  rate?
8    A.  Right now?  The current rate is 475, but we just
9  had a form change, so that's gone up from 450.  And they were
10 as low as 375, depending on the form.
11   Q.  If you're not maxing out, what would be a
12 comfortable pace to do residential appraisals?
13   A.  One a day.
14   Q.  And that's at the rate of roughly $500 a shot?
15   A.  I'd say before, average of about $400 a shot.
16   Q.  And how about now?
17   A.  So maybe now, 450, because you're going to get
18 some, you know, that are going to be easier, you're going to
19 get some that are harder, but generally speaking I would say
20 it would average out less than what the actual fee is right
21 now for a typical residential.
22   Q.  What kind of equipment do you need to do a
23 residential appraisal like the ones we've been talking about?
24   A.  You need the appraisal software and a camera and I
25 guess the knowledge to do the site inspection correctly, car,

Page 138

1  gas.
2  Q. How much does the software cost?
3  A. Software costs about 1,200 to 2,000 a year,
4  depending on the maintenance.
5  Q. And then can that run on your average PC that you
6  have at home?
7  A. Yeah.
8  Q. How is the appraisal business now?
9  A. It's slowed down a little bit, but it's real
10 spotty. It gets busy.
11 Q. Is it a kind of market where you have to go looking
12 for work or does it pretty much come to you?
13 A. I don't -- I've never advertised. It's always --
14 it just comes.
15 Q. Do you know if other appraisers are having to go to
16 work or it goes to them?
17 A. I think there's some people that are the newer
18 appraisers that get licensed and move -- set up their own
19 shops, they do advertise or they go out, you know, really
20 pounding the pavement. I've been really, really blessed
21 that, you know, the clients that I've had have moved on to
22 other places and then that place becomes a client of mine.
23      MR. WONG: Okay, thank you. I don't have any
24 more questions.
25      MR. MOSELEY: I have a couple of follow-up

Page 139

1  questions.
2           EXAMINATION
3  BY MR. MOSELEY:
4  Q. Mike Lorusso asked you if the times that you
5  visited the assessment division before 9/11 were social
6  occasions, and you said to the best of your knowledge; is
7  that right?
8  A. Uh-huh.
9  Q. Yes?
10 A. Yes. I'm sorry. Yes.
11 Q. Is it also possible that you conducted some
12 business for GK Appraisals on those occasions?
13 A. No.
14      MR. LORUSSO: Objection, calls for
15 speculation.
16      THE WITNESS: No, because it was -- all the GK
17 Appraisal things were on the Big Island. So if anything,
18 that I would go over there would be to go downstairs to the
19 basement to see the field sheets of the properties over here
20 on properties that were hard to figure out from my inspection
21 or that I wanted the old sketch that they had.
22 Q. Okay, so there would be -- it would be no
23 possibility that you could have run into Gary and talked to
24 him about an assignment for GK or no possibility that you
25 could have run into Chris and talked to him about an

Page 140

1  assignment for GK?
2       MR. LORUSSO: Object to the form of the
3  question with regard to the word possibility as being
4  ambiguous and calls for speculation. Anything is possible.
5       MR. WONG: Join.
6       THE WITNESS: Yeah, that's -- I agree that it
7  was -- you know, anything is possible on that one.
8  Q. Well, why did you use the term to the best of your
9  knowledge that they were social occasions before 9/11?
10 A. Because when the question was originally asked I --
11 it's like I guess it's tough for me to be over here, you guys
12 asking me all these questions, and my brain is starting to
13 get tired too, so, I mean, to the best of my knowledge,
14 that's what I said. I meant what I said, you know, and after
15 I thought about it, yeah, you know, I go there and get field
16 sheets and things every once in a while.
17 Q. Mr. Lorusso asked you questions about the
18 complaints of pay. And you did testify that Chris sort of
19 poormouthed you, like I really need the money and that kind
20 of stuff, so you ended up over paying him, right?
21      MR. LORUSSO: Objection, misstates his
22 testimony that it was poormouthing.
23      THE WITNESS: Yeah, I said that I knew that
24 Chris was having hard times financially.
25 Q. But he would actually tell you he needed the money

Page 141

1  and --
2  A. Yes, if that's what you mean by the poormouthing,
3  he would tell me his situation.
4  Q. So was he asking you essentially for more money,
5  then?
6  A. No, I don't believe he was. I think that it was
7  something that I did on my own.
8  Q. Okay. You said also value is value, and Tony Wong
9  was asking you questions about that comment. Do you recall
10 that testimony?
11 A. Yes.
12 Q. Okay. Isn't it true that in the appraisal
13 business, with relative frequency, you have people asking you
14 to come up with a certain value?
15 A. Yes.
16 Q. And is that what you meant by a lot of people don't
17 understand their job?
18 A. Yes.
19 Q. The process?
20 A. Yes.
21 Q. And what do you do when people ask you to come up
22 with a certain value?
23 A. I say the same words, value is value, and the way
24 that it comes out -- a lot of people, as attorneys you folks
25 know, they'll say, oh, but this is a probate appraisal or

Page 142

1  this is for estate purposes or this is for this, and I just
2  say, it doesn't matter what it is. What the date of
3  valuation is is the determining thing of my research, and all
4  that.
5      Q.  Would it be fair to say that there's a fair amount
6  of pressure to come up with certain values in your job?
7          MR. LORUSSO: Objection, vague and ambiguous.
8          THE WITNESS: In -- there's pressure from a
9  lot of different sources, and it's all on how you deal with
10 the pressure on whether they keep it up or they stop. If
11 they know that they're not going to get anywhere, they
12 usually respect that.
13     Q.  Have you ever lost clients because you didn't cave
14 into the pressure?
15     A.  Yes.
16     Q.  Has that been fairly often?
17     A.  No. I've been blessed in that the clients that I
18 have, they're -- they're -- they become friends and it's not
19 a situation where they would pressure me.
20     Q.  You know what we didn't do, what I would like to
21 do, there are three booklets here that you have provided that
22 you identified as some things that probably Chris Graff has
23 worked on. What I'd like to do, with your permission, and I
24 don't know, maybe you guys -- do you want me to make copies
25 of these three things now and make them exhibits or can I

Page 143

1  have the court reporter do it and would you consent that if
2  we use these as exhibits now -- the originals now and then
3  the court reporter made copies of the exhibits and returned
4  the originals to you, would that be all right?
5      A.  With the understanding, like what you were saying
6  to Tony, that it's going to be privileged information or
7  whatever, right?
8      Q.  Yes, all of the documents that you've produced --
9      A.  I appreciate that. Thank you.
10         MR. MOSELEY: What I'd like to do, then, is
11 I'd like to mark these things next in order.
12             (Exhibit Nos. 18-20 marked.)
13     Q.  I'm going to show you what's been marked as Exhibit
14 18. This is one of these -- actually, it appears to me as
15 though you may have brought as many as 30 or more narrative
16 type bound appraisal reports, but these -- of all the ones
17 you brought, these are the ones that you looked through and
18 identified as probably Chris helped you on them -- Chris
19 Graff helped you on them; is that correct?
20     A.  Yes.
21     Q.  Can you take a look at Exhibit 18 and tell me what
22 you think Chris's participation in that report might have
23 been?
24         MR. LORUSSO: Can you just identify for the
25 record the first page, what maybe the property is or the

Page 144

1  year.
2          MR. MOSELEY: That's a good idea.
3          THE WITNESS: The year is December 2001, the
4  date of the report, 684 and 692 Kilauea Avenue. And on this
5  job he helped me with comps and rent.
6      Q.  So when you say he helped me with comps, I'm sorry,
7  what do you mean he helped you with comps?
8      A.  Bureau of Conveyance, the research on that, and
9  also he may have called on a couple of rents.
10     Q.  But when you say Bureau of Conveyance research, he
11 was --
12     A.  Document numbers, grantor/grantees.
13     Q.  Background documents on the comparable properties?
14     A.  Yes.
15     Q.  Anything else you think he did on that?
16     A.  I'm sorry. Real quick.
17     Q.  Can you recognize his writing style versus yours?
18     A.  No, it's pretty -- it's pretty --
19     Q.  It's pretty uniform, right?
20     A.  Bland.
21     Q.  Professional --
22     A.  Just description. I'm pretty sure I wrote this
23 description myself.
24     Q.  Let me show you Exhibit 19, which on the face of it
25 says 55 Furneaux Street, F-U-R-N-E-A-U-X, and that's dated

Page 145

1  November 1998. And that's for a law firm.
2      A.  He helped me with the property description and then
3  rent -- may have called a couple of rents, and then, once
4  again, the bureau information, document number,
5  grantor/grantee.
6      Q.  Let me show you what's been -- well, let me --
7  Exhibit 20 is the Basque Subdivision thing, and we may have
8  already covered this. It's dated May 1999, but can you
9  reconfirm what it is you think Chris did on that one?
10     A.  Possibly comp research on the -- for the bureau
11 information only. A lot of this is done on the form, and I
12 know that Chris never had the form. And Gary had worked on
13 these ones with -- the improved ones, so possibly Bureau of
14 Conveyance information on the land transaction adjustments.
15     Q.  I'm sorry, I didn't quite understand what you said
16 about Gary. You said Gary had worked on the approved ones?
17     A.  On the improved.
18     Q.  On the improved ones?
19     A.  Yeah. There's the residential appraisal reports.
20     Q.  Right, so what would he have -- what would Gary
21 have done? This is Gary Kurokawa, right?
22     A.  Gary worked on the appraisal of the improved lots.
23     Q.  In -- there was some improved and some not improved
24 lots?
25     A.  Yeah, as I recall.

Page 146

1  Q. What did Gary do on the improved lots?
2  A. The valuation.
3  Q. Did you discuss Gary's work with him on the
4  improved lots?
5  A. I'm sure I did.
6  Q. What would you have discussed with him?
7  A. The value, conclusions that he's coming out with.
8  Q. Do you remember whether or not you had some
9  question about the value that he came out with?
10 A. No.
11 Q. How many improved lots are there in this? Is it
12 just like three of them?
13 A. Looks like three.
14 Q. And that's out of like 20 or more?
15 A. I don't know how many lots total.
16 Q. There are some pictures of residents in here.
17 A. Yes.
18 Q. And that subject property photo, in terms of the
19 improved, these would be some of the improved lots --
20 A. Yes.
21 Q. -- that Gary worked on?
22 A. Yes.
23 Q. Would Gary have taken the pictures and made the
24 site visits?
25 A. Yes, and I also inspected the site.

Page 147

1        MR. MOSELEY: You know, this is going to come
2  as a surprise to you, David, but I don't think I have any
3  more questions.
4        THE WITNESS: Thank you, sir.
5              EXAMINATION
6  BY MR. LORUSSO:
7  Q. Mr. Matsunami, just one follow-up question with
8  regard to Exhibit 18, which I believe you identified as
9  the -- as the Kilauea Avenue property?
10 A. Yes.
11 Q. And again, I recognize that you had indicated
12 Exhibit 16, to your best estimate, is approximately 95
13 percent complete. Does that particular appraisal show up in
14 this listing?
15       MR. MOSELEY: What year is that? I can't
16 remember?
17       MR. LORUSSO: 2001.
18       THE WITNESS: Yes. It's -- it's job number
19 01142, Kay's Lunch Center.
20       MR. LORUSSO: Okay. I see. Okay, thank you.
21 I have nothing further.
22       MR. MOSELEY: Thank you very much.
23       MR. LORUSSO: Mr. Matsunami, now that your
24 deposition has been concluded, the court reporter will
25 prepare a booklet with all the questions that were asked and

Page 148

1  all of your answers, and you will have an opportunity to
2  review that booklet and make any changes or corrections to
3  your answers, or, again, you can choose to not make any
4  changes or corrections. You can also choose not to review
5  it. It's entirely up to you. But I do need to tell you that
6  if you do make any changes or corrections and this matter
7  proceeds to trial, at the time of trial the attorneys can
8  comment on any changes or corrections that you have made. Do
9  you understand that?
10       THE WITNESS: I understand.
11       MR. LORUSSO: Okay, thank you. And I'll leave
12 it to you to work out with the court reporter whether or not
13 you will or will not review it.
14       (The deposition concluded at 1:45 p.m.)

Page 149

1        I, DAVID MATSUNAMI, hereby certify that I have
2  read the foregoing typewritten pages 1 through 148,
3  inclusive, and corrections, if any, were noted by me and the
4  same is a true and correct transcript of my testimony.

9  DAVID MATSUNAMI

11 Signed before me this        day of
13           , 20   .

23 English vs. City and County of Honolulu, Circuit Court of the
24 First Circuit, Civil No. 04-00108 JMS/KSC, taken on November
25 9, 2005, by Jessica R. Perry, CSR.

Page 150

```
 1  STATE OF HAWAII          )
 2                           ) ss:
 3  CITY & COUNTY OF HONOLULU )
 4
 5          I, JESSICA R. PERRY, do hereby certify:
 6          That on November 9, 2005, at 9:37 a.m.
 7  appeared before me DAVID MATSUNAMI, the witness whose
 8  deposition is contained herein; that prior to being examined
 9  he was by me duly sworn;
10          That the deposition was taken down by me in
11  machine shorthand and was thereafter reduced to typewritten
12  form by computer-aided transcription; that the foregoing
13  represents, to the best of my ability, a full, true and
14  correct transcript of said deposition.
15          I further certify that I am not attorney for
16  any of the parties hereto, nor in any way concerned with the
17  cause.
18
19          DATED this 16th day of November 2005, in
20  Honolulu, Hawaii.
21
22
23  Jessica R. Perry, CSR 404
    Notary Public, State of Hawaii
24  My commission expires: 5/11/06
25
```

RALPH ROSENBERG COURT REPORTERS
OFC: (808) 524-2090   FAX: (808) 524-2596

**A**

ability 150:13
able 6:21,22 9:3 11:6
    15:25 88:8 101:19
    103:4 107:10 108:9
    110:11,22 112:24
    123:14 126:19
about 4:20 7:7,10,11
    9:8,17 13:6 15:3 18:7
    18:10 19:3,7,14,14
    19:16,18,22 20:7,9
    20:11,13,16,17 21:3
    21:6,13,23 22:1,14
    23:1,4,6 24:15,17,20
    24:21,24 25:2,3,7,10
    25:12 26:25 27:1,1,4
    27:10,14,16,18 30:15
    31:5,7,22,23,24 32:1
    32:7,15,16 34:2,7
    35:3,13,14 36:17
    39:17 40:20 41:11
    42:4,12,17 45:1
    46:15 48:14 55:17
    56:10,17,19 57:11
    59:1 60:6,18 61:2,22
    63:23 64:16 68:11
    79:12 81:24 83:21
    84:8,25 92:23 95:8
    101:21 103:16
    108:11,24 109:3,7,9
    111:7,21 112:16
    113:13 114:23
    115:19 116:1,5 117:1
    117:4,23 118:7,7,19
    121:11 123:1 127:11
    127:23 129:22
    133:17,18,20,22,24
    135:2,13,15,18,20,21
    135:24 136:1,7 137:1
    137:15,16,23 138:3
    139:24,25 140:15,17
    141:9 145:16 146:9
above 120:4 133:20
acceptable 33:16
accepted 81:6
access 47:25 48:5
    105:13,14 107:15,19
accessed 107:17
according 94:19
account 107:4,5,7,10
    107:12,15 110:4
    127:14
accurately 112:18
    113:4,20
achieve 136:12
action 4:15,16
active 102:7
activities 4:20
actual 120:19 137:20
actually 7:7 9:7,12 11:5
    11:12,17 13:12 14:2

14:19,23,25 15:7,14
16:24 19:4 22:1
30:11 35:13 37:1,1
40:1 44:12 45:10,24
53:1 55:6,15 58:16
70:10 75:5 77:22
78:4 81:15,22 83:4
88:1,9 90:17 102:20
102:21 105:19,25
108:17,20 111:7
114:25 119:24
121:19,20,21 129:3
129:19 140:25
143:14
add 33:25
additional 79:16
    129:13
address 109:13,20,21
    127:8
addresses 83:11
adjustment 110:1
adjustments 64:19
    145:14
advance 128:18 134:19
advertise 138:19
advertised 138:13
advise 56:25
advised 56:21
affecting 114:10
afloat 66:19
after 36:13 37:19 48:24
    52:18,18 53:6,9,11
    55:9 59:1 70:13
    83:11 90:25 91:2
    99:14,15,17 100:23
    101:1,14 103:6,16,17
    103:19 106:5 113:1
    118:9,10,20 119:10
    123:18,19 128:4
    140:14
afternoon 22:20
afterwards 8:19
again 13:15 32:17
    46:19,24 47:22 54:2
    69:4,18 78:21 79:14
    80:16 85:16 87:17
    88:7 92:9 98:10
    100:14,19 106:4
    109:11 113:21
    129:23 131:12
    133:25 145:4 147:11
    148:3
against 4:12,21 29:10
    96:24 110:24 114:7
agency 75:25
agent 85:4
ago 22:6,6,14,15 25:5
    30:8 32:7 43:11
    49:21 120:22
agree 27:20 34:20 65:8
    93:24 131:5 140:6

agreement 12:14 27:25
Agricultural 77:19
ahead 64:3
Aiea 25:22
Ainaola 84:11
Air 46:14
airfare 69:21 79:9
airport 102:24
Alakea 1:20 2:4,5
allegation 31:24 131:8
    132:20,23 133:23
allegations 29:18
    113:19 131:8,14,15
    132:17 134:4
alleging 4:19
allowed 66:9
almost 97:5
along 34:13 98:2,19
    134:10
already 11:7 13:24
    15:19 23:11 24:4
    41:10 52:18 63:25
    88:25 91:9 98:20
    102:23 104:2 110:23
    111:11 145:8
although 6:20
Alvaro 94:22
always 32:11 48:3 53:4
    53:14 63:20 69:14
    97:6 106:3,4,8 117:6
    119:4 135:9 136:5,6
    138:13
ambiguous 50:22 52:2
    56:4 98:23 99:8
    102:10 118:4,6,22
    140:4 142:7
Aminaai 54:4
amount 78:12 142:5
Ana 94:22
Anderton 82:15
and/or 132:18
Ann 1:7 2:16 4:14 42:1
    42:9 127:23 128:1
    129:12
another 8:1,12 29:12
    54:19 114:2 115:13
    123:1 125:3
answer 5:20,25 6:24
    8:3,5 13:10,13 26:7
    33:22 34:10 59:16
    64:3 71:19 99:11
answered 63:25 125:24
answering 113:6
answers 6:18,19 8:13
    84:5 148:1,3
ANTHONY 2:9
anybody 18:18 19:3
    21:1,23 24:17 25:3
    27:1,4 35:6 47:11
    53:18 54:12 56:25
    59:24 64:9 112:20,22

anymore 53:10 79:4
    101:6 103:4 104:3
    113:15 115:7
anyone 102:18 133:3
anything 9:16 11:10
    12:16 13:19 15:25
    17:19 18:23 19:13,23
    20:6,9,12,17 21:3,6
    21:12 22:22 23:1
    24:14 25:8 30:3,18
    31:5 33:12 34:20
    35:2 39:8 40:20
    42:11,15 43:25 44:4
    54:18 56:3,5,9 57:11
    57:16 58:11 60:12,15
    61:10,24 63:13 68:10
    68:13,16 75:18 81:4
    86:1,11 98:7,11
    108:11 111:17 113:2
    114:13 132:22
    135:13,15,18,24
    136:1,12,16 139:17
    140:4,7 144:15
anyway 15:2 19:14
    112:17
anywhere 67:18 132:22
    142:11
apologize 43:5 68:16
    88:7 98:10
apparently 12:7 16:5
    125:20
appear 40:22 67:18
    95:3,10 106:3
APPEARANCES 2:1
appeared 110:3 150:7
appearing 10:14
appears 143:14
applicable 125:2
apply 45:4
appraisal 3:16,17,18
    3:19 10:23 11:1
    15:10,13 16:15 17:6
    17:16 18:7,10 25:18
    35:14,16,19 38:1,22
    39:18,18 45:6,7,22
    47:1,6 50:18 59:19
    63:1,10 66:6 68:6,20
    72:2,2 77:23 80:12
    81:3 84:21 88:20
    90:4,13 91:23 95:2
    96:17,21 97:6 103:18
    104:6 115:16 116:1
    116:13 117:8,18
    118:10,18 119:13
    120:24 121:4 125:2
    129:22 130:12
    136:11,24 137:6,23
    137:24 138:8 139:17
    141:12,25 143:16
    145:19,22 147:13
Appraisalas 15:1,1

appraisals 1:7 2:8 4:12
    5:22 11:2 12:4,10
    13:4 14:25 15:2,4,6,7
    15:8,11,14,18 17:13
    17:20 18:22 20:14,21
    29:15,16,18 31:14
    37:2,23 38:5,9,11,14
    39:7,8,12 40:5,15
    42:10,19 44:8,21
    45:1,7,20 47:15,20
    48:2,12 49:4,5,5,8
    50:3,9 55:18,24
    56:22 57:1,16 58:6,9
    58:11,12,17 59:9,13
    62:15 63:23 64:10
    65:25 66:17 69:20
    71:16,23 72:9 73:14
    79:8 80:8 81:16
    90:11,18 91:20,22
    94:3 96:3,13 98:14
    98:22 100:23 102:16
    102:19 103:4,16
    110:11,22 111:7,9,22
    113:12 115:14
    118:13 122:13
    123:15 125:15,17,19
    127:8,17 130:4,8,19
    132:14 136:8 137:1,3
    137:12 139:12
appraise 116:7
appraiser 5:5 14:15
    40:22 41:3,7,8,16,18
    41:20,23 54:5,10
    55:2 97:16 107:16
    136:22
appraisers 39:11 52:23
    52:23 53:7 100:2,5
    129:15,23 130:2,5,8
    130:13 132:4 136:15
    136:20 138:15,18
appraising 129:24
appreciate 17:18 21:10
    21:12 143:9
approach 63:14 64:14
    64:21,21,22,23,24,25
    65:1 66:10 100:4
appropriate 96:12
approval 30:16
approved 145:16
approximately 30:9
    147:12
April 100:12 103:6,16
    118:15,16 122:6,21
    123:2,3,19
Arbitration 82:24 84:8
arbitrations 131:3
area 41:5 44:13 51:20
    52:23 53:6,6,8,10
areas 129:13
argumentative 104:18
    113:17 116:18

118:23 131:11
arose 4:22
around 9:12 22:6 49:21
    62:23 70:15 85:20
    86:7 97:13 112:12
    122:24 123:1 128:25
arranged 128:18
arrangement 58:8
aside 12:10 79:15
asked 7:14 8:3,5 19:14
    29:11,12,14,24 30:20
    31:4,11,25 32:13
    33:11 37:13 54:18
    63:25 66:20,21,23,25
    99:3,6,6,16 112:7
    117:11 129:22 133:2
    139:4 140:10,17
    147:25
asking 5:19 6:17 8:6
    13:12 17:15 18:10
    24:20 31:7 32:19
    52:6 59:11 64:5
    85:24 103:16 120:21
    120:23 131:11 134:2
    140:12 141:4,9,13
asks 17:4
assessment 43:17 54:12
    96:13 107:16 117:4
    125:21 126:8 128:13
    131:20 139:5
assignment 32:12 41:2
    45:6,7 50:9 62:19
    68:20 92:20 100:13
    118:15 119:12 122:3
    122:6 139:24 140:1
assignments 15:10
    41:22 62:21 91:23
    92:21 100:23 102:5
    118:25
assist 47:12 60:2
assistance 63:2
assistant 54:9
assisted 59:24 89:18
assume 7:2,17,17 54:14
    61:23 77:13 80:11
    121:25
assumed 29:5 32:11
    57:19 61:24 76:10
    77:13
assuming 76:5 79:1
assumption 69:14
assured 27:19
ate 44:15
attachment 110:2
attorney 5:21,22 6:1,4
    6:6,8,14 28:24 29:2,9
    150:15
attorneys 9:23 33:11
    141:24 148:7
August 104:1
available 17:22 24:12

92:22 108:2,3,18
Avenue 3:17 144:4
    147:9
average 137:15,20
    138:5
avoid 10:2
aware 23:19 39:20
    58:16 92:17 105:8
    107:10,12,14,18,22
    108:1,4,6 132:14
away 43:6 96:24 97:8
    98:11 126:15
A-N-D-E-R-T-O-N
    82:15
a.m 1:21 150:6

           B
B 8:3
baby 31:20
back 10:23 11:13,23
    13:15 14:1 18:24
    21:8 24:2 26:24 28:4
    32:24 33:1 37:20
    38:20,25 39:25 43:1
    43:13,24 45:20 46:7
    46:8,14 47:24 53:10
    53:11 66:3,4 68:6
    70:13,22 72:3,6
    73:13 74:17 78:1
    86:15 92:24 96:6
    98:16 99:17 101:8,13
    101:20 103:8 109:20
    113:22 119:2 122:17
    122:19,21 123:13
    124:1,21 126:6,17,20
    128:22 135:20
background 129:14
    135:2 144:13
back-dated 121:6
bad 14:19 66:8 68:17
    90:1 101:7 116:15
bananas 14:20
bar 86:19
baseball 19:5,11 55:21
    114:19
based 99:2 111:2
    131:16
basement 44:13 48:21
    139:19
basic 4:14
basically 7:21 12:3
    24:10 31:20 35:10
    40:24 47:4 49:10
    86:4 94:1 99:22
    102:25 114:9
basis 37:14,17 99:20,21
Basque 3:19 74:23
    76:24,24,25 78:1
    145:7
bathroom 9:21
Beach 32:4 38:23

bear 124:15
became 37:9 110:17
become 116:25 142:18
becomes 138:22
before 1:24 4:25 5:15
    13:9,12 19:2 23:19
    27:17 33:9 36:18
    48:14,22,22 55:4
    60:12 61:18 64:8
    70:5 88:20 92:25
    93:14,16 99:11
    103:15 106:5 119:17
    119:21 122:3,6,21
    128:9,12 131:20
    134:17 137:15 139:5
    140:9 149:11 150:7
beginning 38:19 74:22
    118:24 129:10
behalf 1:19
being 4:2 10:12,18
    14:14 15:3 34:22
    69:7 78:9 85:4 89:22
    99:6 101:1 110:23
    120:15 140:3 150:8
believe 11:10 22:5
    41:11,17 57:4 73:13
    75:3,25 77:22 78:8
    79:24 80:3 81:5 82:1
    90:3,15 91:9 100:7
    102:1 109:10,19
    118:12 124:4 141:6
    147:8
below 81:8,15,23,24
    82:4,14
besides 35:16 59:13
best 15:22 16:20 19:17
    29:16,21 33:22 34:10
    34:12,14,22,23 44:2
    47:18 78:8 104:4
    131:22 136:11 139:6
    140:8,13 147:12
    150:13
bet 95:25 121:8
better 42:21 96:1,24
between 14:14,15
    29:13,16 37:24 46:2
    79:8 125:1 130:13
beyond 103:10
BI 30:5
bid 7:22
Biehl 1:20 2:3
big 11:18 32:14 37:12
    38:14,16,17,21 39:8
    43:1 44:23 45:24
    48:1,8 50:7 79:6 84:9
    90:13,14,21,21 91:2
    98:18 125:11 139:17
billed 104:1
Bishop 2:12
bit 16:14 19:8 42:21
    58:8 119:1 138:9

Bland 144:20
blank 22:16,23
blanks 47:9
blessed 138:20 142:17
Block 132:10
blower 4:15
blur 116:24,24
Bob 42:4,12
book 126:10
bookkeeper 15:23
booklet 8:16 47:15
    147:25 148:2
booklets 18:6 38:8
    142:21
books 49:1 50:4,4
    93:16,18 127:2
booming 112:17
boss 35:22
both 42:24 73:11 82:1
    116:21
bottom 19:20 87:9
    118:14 124:24 133:2
    133:18
bought 47:6
bounce 100:5
bound 143:16
brain 140:12
break 9:19 13:9 58:3
    61:15 76:6 88:11
    106:23
breaking 104:16
breaks 106:23
brief 134:23
brightest 7:8
bring 12:16 15:19 16:4
    17:6 68:1
bringing 80:6
broad 10:20
brokers 86:4
brother 44:18
brought 10:19,21,22
    12:7,11,19,25 13:17
    14:3 15:6,7 17:21
    18:3 38:1,7 39:4,11
    68:25 71:9 143:15,17
bucks 78:18,19 79:10
buddy 67:7
buddy's 67:1
building 7:23,23 50:13
    50:18 51:19 54:17
    80:9 83:18 85:2,4
    86:2
bulk 11:13
bunch 123:25
bureau 30:2 69:17
    75:13,19,20,21 76:2
    78:13 85:9,11 86:12
    87:8,19,20 88:22
    89:8 93:12,13 104:25
    105:3,20 106:7 108:2
    108:14 144:8,10

145:4,10,13
burner 119:1
bus 7:23
business 5:4 53:2 68:1
    71:17 77:12 96:4,7
    110:9 111:14,25
    112:17 115:2 116:22
    117:7 136:24 138:8
    139:12 141:13
busy 66:17 73:15 97:13
    101:5 114:5 117:17
    138:10
bye 128:7
B-A-S-Q-U-E 77:1

           C
C 1:7 2:16 8:5,7
calculations 63:16
calendar 26:11
call 4:7,10 8:2,10 22:10
    22:12,18,24 28:21
    31:8 32:7 49:24,25
    50:19 51:4,5,6,7
    56:16 62:2,2 63:21
    85:14,17 86:9 93:6
    93:13,14 97:3 98:10
    100:8 101:4,23
    104:12 126:6,19
called 8:10 9:7,13 23:5
    23:7,20,21,22 24:5
    25:6,11,14,20 42:24
    68:2 69:10 72:16
    89:8 100:11 126:6,18
    144:9 145:3
calling 23:23 29:10
    86:6,13 125:20
calls 52:3 63:24 64:2
    74:10 95:16 119:18
    122:15 126:23
    139:14 140:4
came 43:1,13,24 70:16
    96:6 98:18 101:16
    108:9 112:12 146:9
camera 137:24
cancel 83:1
cancelled 82:1 83:3
    84:13,14
cancelling 81:20
candidate 5:13
capacities 62:25
car 69:21 102:24
    137:25
card 5:4
care 67:6 101:21
    110:18
careful 6:3 8:13 62:11
case 4:12 6:23 8:8 9:8
    11:11 20:13 21:4
    23:2 34:9 125:2
    131:2
cash 16:9 58:13 77:5,7