Page 1

IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,                  )CIVIL NO. 04-00108
                                    )
             Plaintiff,             )
                                    )
vs.                                 )
                                    )
CITY AND COUNTY OF                  )
HONOLULU; GARY T.                   )
KUROKAWA; ROBERT O.                 )
MAGOTA; ANN C. GIMA; and            )
GK APPRAISALS, INC.; JOHN           )
DOES 1-10; JANE DOES 1-10;          )
DOE PARTNERSHIPS; DOE               )
CORPORATIONS 1-10; AND DOE          )
ENTITIES 1-10,                      )
                                    )
             Defendants.            )
                                    )

DEPOSITION OF CHARLES TOTTO

Taken on June 23, 2006, commencing at 9:15 a.m. at

the Law Offices of Moseley Biehl Tsugawa Lau &

Muzzi, Alakea Corporate Tower, 1100 Alakea Street,

23rd Floor, Honolulu, Hawaii, before Rita King, a

Certified Court Reporter in the State of Hawaii.

Ralph Rosenberg Court Reporters, Inc.

Ofc: 808.524.2090  Fax: 808.524.2596


EXHIBIT B

Page 2

1  COUNSEL APPEARING:
2
3  Attorney for Plaintiff:
4      ROGER S. MOSELEY, ESQ.
       CHRISTOPHER J. MUZZI, ESQ.
5      Moseley Biehl Tsugawa Lau & Muzzi
       Alakea Corporate Tower
6      1100 Alakea Street, 23rd Floor
       Honolulu, Hawaii 96813
7      808.531.0490
8
   Attorney for Defendants City & County of
9  Honolulu, Gary T. Kurokawa, Robert O. Magota and
   Ann C. Gima:
10
       MICHAEL L. LORUSSO, ESQ.
11     Kawashima Lorusso & Tom, LLP
       Topa Financial Center
12     745 Fort Street, 5th Floor
       Honolulu, Hawaii 96813
13     808.275.0300
14
   Attorney for Defendant GK Appraisals, Inc.:
15
       ANTHONY L. WONG, ESQ.
16     Sumida & Tsuchiyama
       735 Bishop Street, Suite 411
17     Honolulu, Hawaii 96813
       808.356.2600
18
19 Attorney for Deponent Charles Totto:
20     GORDON D. NELSON, ESQ.
       Deputy Corporation Counsel
21     530 South King Street, Room 110
       Honolulu, Hawaii 96813
22     808.523.4832
23
   Also present:
24
       Philip English
25

Page 3

1          I N D E X
2
   WITNESS                      PAGE
3
   CHARLES TOTTO
4
       Examination by Mr. Moseley    4,165
5      Examination by Mr. Wong       157
6
          E X H I B I T S
7
8  Deposition
   Exhibits   Description         Marked
9
   82    Subpoena                 8
10
   83    Letter - 6-15-06         10
11
   84    Memo - 5-5-06 with attached Advisory
12        Opinion No. 2006-2       47
13 85    Memo - 1-25-06 with attached Draft
          Confidential Advisory Opinion
14        No. 2006-               49
15 86    Text of the revised ordinances having
          to do with the Ethics Commission   52
16
   87    Advisory Opinion No. 307   83
17
   88    Email - 2-5-03           86
18
   89    Email - 2-5-03           86
19
   90    Email - 2-5-03           86
20
   91    Email - 2-10-03          86
21
   92    Email - 2-27-03          86
22
   93    Phone discussion with Chuck Totto of
23        The Ethics Commission on 2-28-03   86
24 94    Email - 2-28-03          104
25 95    Email - 10-31-02         160

Page 4

1              CHARLES TOTTO,
2  a witness herein, having been first duly sworn by
3  the Notary Public, was examined and testified as
4  follows:
5              EXAMINATION
6  BY MR. MOSELEY:
7      Q.  Can you tell us your name for the record,
8  please.
9      A.  Charles, Totto, T-o-t-t-o.
10     Q.  And I don't actually need your residence
11 address, but what's your working address?
12     A.  715 South King Street, number 211.
13     Q.  And what do you want me to call you?  I'm
14 probably going to call you Chuck.
15     A.  That's fine with me.  I respond to Chuck.
16     Q.  Thank you.  By calling you Chuck I don't
17 want to be disrespectful, I've known you for a
18 number of years, and I could lapse into that, but
19 if that offends anybody, I won't call him Chuck.
20 And you may call me Roger, and I've been called a
21 lot worse names than that.
22     A.  But you're allowed to call me whatever
23 you want.
24     Q.  Chuck, have you ever had your deposition
25 taken before?

Page 5

1      A.  No.
2      Q.  Really?  Wow.  Well, have you taken
3  depositions before?
4      A.  Yes.
5      Q.  On how many occasions?
6      A.  Dozens.
7      Q.  Well, at the risk of instructing you
8  where you don't need to be instructed, let me go
9  over a few things with respect to depositions.
10 Basically, this deposition is being taken for three
11 major types of purposes.  The first is, basically,
12 what is called discovery, we want to find out what
13 you know about the case in which the deposition is
14 being taken, which is a case in which Phil English
15 has made a claim against the City and County of
16 Honolulu, Ann Gima, Bob Magota and Gary Kurokawa.
17 The second general purpose for a deposition is
18 essentially to preserve your testimony.  If you
19 left here on the way out of our parking garage and
20 you find that you can't see right when you turn
21 left from our driveway, and you get hit by a city
22 bus or something, we want to be able to have your
23 testimony preserved for trial in case you can't be
24 here.
25     A.  That's a cheery thought.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 6

1    Q.  Well, I'm sorry, but it's there.
2         The third possible use of a deposition,
3    and there are others besides these three, but the
4    third major use is that if you testify differently
5    at trial at any time than you do here today,
6    somebody will certainly point that out, that's, as
7    you know, called impeachment, and you'll be asked
8    to explain why your testimony is different.
9         During the course of the deposition, I'm
10   going to ask you questions, and I would like you to
11   respond verbally with responses that the court
12   reporter is capable of writing down without
13   confusion.  Please avoid "um-hum" and "uh-uh", say
14   yes or no, if possible, because that's often
15   confusing in a transcript.  You understand that?
16       A.  Yes.
17       Q.  And you know, normally when people talk
18   in a conversation one person would start before the
19   other person has concluded, because they know what
20   the rest of the sentence or question is going to
21   be.  We have to try, and I'm guilty of this, we
22   have to try not to do this in this case, so that
23   the court reporter doesn't have an overlapping
24   testimony or speaking.  It makes it easier to
25   record.  I'm sure I'm going to be guilty of that, I

Page 7

1    don't know if you'll be guilty of that, but I'd
2    just like to try to avoid that.
3         Another thing that we should understand
4    is that if I ask you a question and you don't
5    understand the question, I need you to ask me what
6    I'm talking about.  I'm not very good at this, I
7    oftentimes ask really ham-handed questions that,
8    after I think about them, I don't even understand
9    what they are, but if you answer a question without
10   asking me for clarification, I'm going to assume
11   that you understood it and that your answer is
12   responsive.  Do you understand that?
13       A.  Yes.
14       Q.  So you will tell me if you don't
15   understand the question, right?
16       A.  I'll do my best.
17       Q.  We don't want you to speculate here.  If
18   I ask you a question and you give me your best
19   understanding of something or your best
20   recollection of something, I want you to clearly
21   label it as your best understanding or your best
22   recollection.  There may well be questions like
23   that, and Mr. Lorusso is especially concerned about
24   those kinds of issues, so you need -- while you can
25   give me your best recollection or your best

Page 8

1    understanding, I do want you to label those things
2    so we're not just in a position of saying, hey,
3    this was his testimony, this is what he understands
4    and remembers.  Do you understand that?
5        A.  Yes.
6        Q.  Is there something we have left out with
7    respect to your--
8            MR. LORUSSO:  No, thank you.
9            MR. MOSELEY:  Do you want to add or
10   subtract?
11           MR. LORUSSO:  No, I don't.  Thank you
12   very much.
13           MR. MOSELEY:  I don't necessarily always
14   cover Mike's concerns in this prologue.
15       Q.  In any case, are you here today pursuant
16   to a subpoena?
17       A.  That's correct.
18       Q.  Did you bring -- well, let's do this.
19   One of the things we've been doing is we have been
20   marking the exhibits just numerically in this case
21   from one to whatever it turns out to be in the end,
22   regardless of the deposition.  So what I'm going to
23   do now is have this one marked next in order, I
24   believe it's 82.
25           (Exhibit Number 82 was marked for

Page 9

1    identification.)
2        Q.  BY MR. MOSELEY:  Is Exhibit 82 a copy of
3    the subpoena you were served to attend this
4    deposition?
5        A.  Yes.
6        Q.  Actually, probably you didn't see the
7    proof of service part, but it's the second page of
8    this; is that right?
9        A.  That's correct.
10       Q.  In the middle of the first page of
11   Exhibit 82, it says "You are commanded to produce
12   and permit inspection and copying of the following
13   documents or objects at the place, date and time
14   specified below."
15           Do you see that section?
16       A.  Yes, I do.
17       Q.  And there's a wonderful check mark in the
18   box right there next to that, right?
19       A.  Correct.
20       Q.  Did you bring any documents described in
21   that section?
22       A.  No, I did not.
23       Q.  And do you have in your possession, or
24   under your control, any documents that are
25   described in that section?

3 (Pages 6 to 9)

Page 10

1    A.  Yes.
2        (Exhibit Number 83 was marked for
3    identification.)
4        Q.  BY MR. MOSELEY:  Showing you now what's
5    been marked as Exhibit 83, have you seen this
6    document before?
7        A.  I think I saw a fax copy.
8        Q.  And it's marked, on the second page it
9    shows a cc to you.  Do you see that?
10       A.  Yes.
11       Q.  This purports to be a letter written to
12   me from your attorney, Gordon Nelson, who is a
13   Deputy Corporation Counsel, does it not?
14       A.  Correct.
15       Q.  Is that your understanding of what this
16   document is?
17       A.  Yes.
18       MR. MOSELEY:  Gordon, would you stipulate
19   that this is your letter?
20       MR. NELSON:  Yes.
21       Q.  BY MR. MOSELEY:  In this letter it says
22   pursuant to FRCP Rule 45(c) et cetera, that you
23   object to the production of documents, of any
24   documents at your deposition.  Did you see that?
25       A.  Yes.

Page 11

1        Q.  Are you raising that objection?
2        A.  I'll let me attorney respond.
3        MR. NELSON:  Yes.
4        Q.  BY MR. MOSELEY:  You're relying on your
5    counsel to raise the proper objections; is that
6    right?
7        A.  That's correct.
8        Q.  Do you have an independent understanding
9    of what those objections are?
10       A.  I do.
11       Q.  Are they correctly stated in the next
12   paragraph below that, pursuant to FRCP paragraph?
13       A.  I'm going to read it first, okay?
14       Q.  Okay.
15       A.  Yes, I've read them.  If you could repeat
16   your question.
17       (The requested portion of the record was
18   read.)
19       THE WITNESS:  Yes, they are.
20       Q.  BY MR. MOSELEY:  Are there any other
21   objections you would have to producing those
22   documents?
23       A.  I don't know, I'd have to confer with
24   counsel.
25       MR. NELSON:  I think we might.  We did

Page 12

1    have a discussion on this letter and on the
2    subpoena, briefly on Tuesday morning.  We talked
3    about whether we should go forward with the
4    deposition, you indicated you wanted to, although
5    the documents were not going to be produced.  The
6    indication from you was that there would be a
7    motion with the judge and the magistrate, so I
8    think we may be coming forward with other
9    objections as we research the matter.
10       MR. MOSELEY:  At this point, you don't
11   have an understanding of what they might be.
12       MR. NELSON:  I stated what I have so far,
13   yes.
14       MR. MOSELEY:  Okay, thank you.
15       Q.  Sorry, I had to do the paperwork.
16       A.  I understand.
17       Q.  So, at this point, you are claiming
18   privilege of the attorney-client privilege, the
19   attorney -- and I'm referencing the paragraph on
20   Exhibit 83 -- the attorney-client privilege, the
21   attorney work-product doctrine and the deliberative
22   process privilege; is that right?
23       A.  At least those.
24       Q.  And then it says "Release of the
25   subpoenaed documents is further objectionable as

Page 13

1    violative of applicable provisions of the City
2    Charter, of the City ordinances and of the Rules of
3    the City Ethics Commission"; is that right?
4        A.  Correct, it does say that.
5        Q.  And you understand that there are
6    provisions in all of those things, the charter, the
7    ordinances and the rules, which require you to
8    maintain the confidentiality of the documents we
9    requested; is that right?
10       A.  Yes.
11       MR. NELSON:  If I may interject
12   something, I believe the Uniform Information
13   Practices Act may also have some bearing on these
14   issues.
15       MR. MOSELEY:  Thank you.
16       Q.  Did you bring a privilege log with you
17   today?
18       A.  No, I'm not aware of what a privilege log
19   is.
20       Q.  Did you bring any log of the documents
21   you actually have and the basis for the privilege
22   you're claiming for each document?
23       A.  No.
24       Q.  Do you know the documents you actually
25   have?

4 (Pages 10 to 13)

Page 14

1    A.  I can't say I know each document,
2  offhand, but I know generally what the files
3  include.
4    Q.  Did you undertake a review of your files
5  to determine if each particular document that you
6  have in your files was subject to one of the
7  applicable privileges or some other privilege which
8  you haven't even thought of yet?
9    A.  Not each document.
10    Q.  Do you know if anybody else undertook
11  such a review?
12    A.  I don't know.
13    Q.  Did you produce your files to Mr. Nelson
14  or any other counsel for such a review?
15    A.  Yes.
16    Q.  You produced all of your files to
17  Mr. Nelson?
18    A.  Yes.
19    Q.  And have you ever seen a log of all the
20  documents in those files and a statement of what
21  privilege would apply to each document?
22    A.  No.
23    MR. MOSELEY:  For the record, are you
24  planning to produce a privilege log?
25    MR. NELSON:  Well, if we're going to be

Page 15

1  in front of the judge, I didn't think it would be
2  necessary.
3    MR. MOSELEY:  Well, it's a little
4  difficult for us to conduct discovery with respect
5  to the privilege of each of those documents without
6  such a log.  When are you planning to produce such
7  a log?
8    MR. NELSON:  We'll be working on it next
9  week.
10    Q.  BY MR. MOSELEY:  Can you describe any of
11  the particular documents for which you're claiming
12  a privilege, Chuck?
13    A.  Specific documents or generic types?
14    Q.  Listen, let's start with specific
15  documents, first.  Can you think of any specific
16  documents that you're claiming a privilege for?
17    MR. NELSON:  Well, I'm going to object to
18  the extent that specification of documents is going
19  to, basically, convey the contents of the documents
20  or the status of the proceedings.
21    MR. MOSELEY:  Are you directing him not
22  to answer?
23    MR. NELSON:  Well, no, I'm not, on that.
24    Q.  BY MR. MOSELEY:  You know, I'm asking you
25  to -- I know it's a difficult task, I'm asking you

Page 16

1  to think about your files, and if you can think of
2  any specific documents you can tell us are there,
3  if you can identify those, then we can potentially
4  explore the basis of the privilege.
5    A.  I think that there are memoranda between
6  Matt Viola and myself regarding the activities in
7  the case, as well as legal research.  There are
8  notes by myself and Matt.  If you don't mind, I'll
9  refer to Matt Viola as Matt.
10    Q.  Just for clarification, Matt is a
11  part-time person hired by the Ethics Commission?
12    A.  He's a contract attorney, he's not an
13  employee of the city.  He's an independent
14  contractor, who we hire for sub-cases.  Notes of
15  legal research, witness interviews, tapes of
16  witness interviews.  I'm trying to go through the
17  Rolodex of this thing to see if there's anything --
18    Q.  I understand, Chuck, and what I've asked
19  you is a very difficult question to respond to, and
20  I will stipulate on the record that I recognize the
21  difficulty, and I am not planning to at some point
22  raise the issue that, hey, this wasn't identified
23  by Chuck at this deposition because, honestly, I
24  wouldn't be able to do that with respect to my
25  files, I'm just looking for things you --

Page 17

1    A.  I'm trying to give you the best I can, at
2  this point, for these, admittedly, generic
3  categories.  At this point, that's the best I can
4  do.
5    Q.  Do you specifically remember a letter of
6  complaint which was submitted to you by or on
7  behalf of Phil English in January of 2003?
8    A.  I do.
9    Q.  Is that one of the documents you're not
10  disclosing?
11    A.  I'd have to confer with counsel whether
12  that's something we produced or not.
13    MR. NELSON:  We object to -- we
14  understand that the ordinance and the Uniform
15  Information Practices Act extend even to
16  acknowledging the existence of a complaint.
17    MR. MOSELEY:  Are you instructing your
18  witness not to answer that question?
19    MR. NELSON:  Could you restate the
20  question, please.
21    (The requested portion of the record was
22  read.)
23    MR. NELSON:  You can answer that
24  question.
25    THE WITNESS:  We haven't brought it with

5 (Pages 14 to 17)

Page 18

1  us. We have received that document.
2      Q.   BY MR. MOSELEY:  But that's one of the
3  documents that -- let me just ask counsel, is that
4  one of the documents covered by your objection?
5      MR. NELSON:  Yes.
6      Q.   BY MR. MOSELEY:  You said there are tapes
7  of witness interviews; is that correct?
8      A.   That's correct.
9      Q.   Can you tell me the names of the
10 witnesses interviewed.
11     MR. NELSON:  Objection; instruct not to
12 answer.
13     Q.   BY MR. MOSELEY:  Can you tell me how many
14 witnesses have been interviewed?
15     A.   About a half dozen.
16     Q.   Was Chris Graff interviewed by you on
17 January 24th, 2003?
18     MR. NELSON:  Objection; instruct not to
19 answer.
20     Q.   BY MR. MOSELEY:  Did you make a tape of a
21 witness interview with Christopher Graff?
22     MR. NELSON:  Objection; instruct not to
23 answer.
24     Q.   BY MR. MOSELEY:  Did you interview Gary
25 Kurokawa in this matter?

Page 19

1      MR. NELSON:  Objection; instruct not to
2  answer.
3      Q.   BY MR. MOSELEY:  Did you make a tape of
4  such an interview?
5      MR. NELSON:  Objection; instruct not to
6  answer.
7      Q.   BY MR. MOSELEY:  When I say you, let me
8  say that I am referring to you in the generic
9  sense, not necessarily Chuck Totto, but any
10 assistant or, potentially, Matt Viola.
11     A.   I understand that.
12     Q.   Did you do a witness interview of Ann
13 Gima?
14     MR. NELSON:  Objection; same objection
15 and instruction.
16     Q.   BY MR. MOSELEY:  Did you make a tape of
17 an interview with Ann Gima?
18     MR. NELSON:  Same objection; instruct not
19 to answer.
20     Q.   BY MR. MOSELEY:  Did you interview Bob
21 Magota?
22     MR. NELSON:  Same objection; instruct not
23 to answer.
24     Q.   BY MR. MOSELEY:  Did you make a tape of
25 an interview with Bob Magota?

Page 20

1      MR. NELSON:  Object; instruct not to
2  answer.
3      MR. MOSELEY:  Did I already cover Gary
4  Kurokawa on that?
5      MR. NELSON:  I think so.
6      Q.   BY MR. MOSELEY:  Did you interview Phil
7  English in conjunction with this matter?
8      MR. NELSON:  Objection; instruct not to
9  answer.
10     Q.   BY MR. MOSELEY:  Did you make a tape of
11 any interview with Phil English?
12     MR. NELSON:  Object; instruct not to
13 answer.
14     Q.   BY MR. MOSELEY:  Has any decision been
15 rendered in any investigation that you may or may
16 not have been conducting with respect to Phil
17 English's complaints with respect to Gary Kurokawa?
18     MR. NELSON:  Can I confer with Mr. Totto
19 for a moment?
20     MR. MOSELEY:  Sure.
21     (A discussion was held off the record.)
22     Q.   BY MR. MOSELEY:  And the answer is?
23     MR. NELSON:  And the question is?
24     (The requested portion of the record was
25 read.)

Page 21

1      MR. WONG:  I'll object to that question
2  as vague, ambiguous and unintelligible.
3      THE WITNESS:  No.  May I ask for a
4  clarification?
5      MR. MOSELEY:  Certainly.
6      THE WITNESS:  Are you including the
7  confidentiality issue that came before the
8  Commission and resulted in advisory opinion 2006-2?
9      MR. MOSELEY:  No, I'm not including.
10     THE WITNESS:  Okay.
11     Q.   BY MR. MOSELEY:  Is it your understanding
12 that -- well, let me ask you this.  When the Ethics
13 Commission receives a complaint of any sort, what
14 is the process that goes on and what is the final
15 result, this is just generic.
16     A.   The complaint is taken in by staff,
17 that's me.  I review the complaint initially to see
18 if there's sufficient information there to make a
19 determination whether the allegations would truly
20 result in an ethics violation.  The next step,
21 assuming that's correct, the next step is to
22 conduct investigation, that can be done any number
23 of ways, and talk to witnesses, review documents,
24 that type of thing.
25     Assuming that I find, in my opinion, that

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 22

1  there's probable cause that an ethics violation
2  occurred and a misconduct was carried out by the
3  individual complained of, then I would bring that
4  question to the Ethics Commission itself, we have a
5  short probable cause hearing.  If there's probable
6  cause, then a notice of possible violation is sent
7  to the subject of the complaint.  They may or may
8  not at that point already know that we're
9  investigating, depends on the case.  The subject of
10  the complaint, then, has a 15-day period in which
11  to respond in writing, if they want, to the
12  allegations in the notice, and the notice also
13  includes the complaint letter, except we try to
14  redact any identifying information from the
15  complaint letter that's required under the
16  ordinance unless the complainant waives their
17  identification.
18        The respondent, besides actually
19  submitting something in writing, can request a
20  hearing, either an informal hearing or a contested
21  case hearing before the Commission.  And if they
22  don't respond at all, then the Commission can enter
23  or render an opinion based on the information
24  before it, or actually conduct further discovery if
25  the Commission feels it needs to.

Page 23

1        The next stage would be, after the
2  response period, more discovery, if necessary, then
3  finally either go to hearing or work out a
4  settlement, if possible, with the subject of the
5  complaint.  If a settlement agreement can't be
6  worked out, then we go to hearing.  In either case,
7  the Commission would render an advisory opinion
8  once they either have a settlement statement,
9  settlement agreement or the facts from the hearing.
10  The advisory opinion, then, generally if there's no
11  finding of a violation, the advisory opinion is
12  published with the information identifying the
13  subject and the witnesses redacted.  If there is a
14  violation, we're waiting for OIP to help us, give
15  us some guidance on whether or not we can publish
16  the name of the subject of the complaint.  That's
17  kind of a generic view.
18        Q.  What happens then after an advisory
19  opinion -- the advisory opinion advises who?
20        A.  It advises the appointing authority, and
21  that would be -- for an employee that would be the
22  department director, for an appointee by the mayor,
23  that would be the mayor, for a council member, it's
24  the counsel, but we use the generic bureaucratic
25  term appointing authority, and they have 15 days in

Page 24

1  which to respond to the recommendations stated in
2  the advisory opinion.  So the point of the advisory
3  opinion is to lay out the facts, the legal analysis
4  regarding the ethics laws and violations, if there
5  are any, and then recommend discipline if there's a
6  violation.  And then the appointing authority has
7  that 15-day window in which to respond as to what
8  it deems necessary, in terms of discipline.
9  There's no obligation for them to file, to follow
10  our recommendation.
11        Q.  But there is an obligation to, within 15
12  days, respond somehow to the recommendation?
13        A.  Yes, that's right.
14        Q.  And what if they don't respond within the
15  15 days?
16        A.  We try to get a response out of them
17  after that.  We have had situations where we've had
18  no response whatsoever.
19        Q.  And what happens then?
20        A.  We haven't had that while I've been
21  there, so I don't know what tact the Commission
22  could take, I don't know that it's -- you don't
23  want me to speculate, I don't know what the
24  Commission would do in a situation like that.
25        Q.  To your understanding, does the

Page 25

1  Commission actually have any power to do anything
2  to anybody?
3        A.  Other than me?  They're my boss.
4        Q.  Other than you.
5        A.  No.  Well, they do have the power to
6  subpoena, but they have no disciplinary power, no
7  independent disciplinary power, no power to fine.
8  There are other remedies that can be carried out,
9  but they have to be carried out by different parts
10  of government.  Would you like me to tell you what
11  those are?
12        Q.  Yes, please.
13        A.  If anyone benefits from an ethics
14  violation, Corporation Counsel can institute a
15  civil suit to collect that benefit.  Then if there
16  is an ethics violation that results in the
17  formation of a contract with the city, that's
18  voidable, the contract is then voidable on the
19  decision of the city.
20        Q.  Can you recommend criminal prosecution?
21        A.  Yes.  Sometimes we get cases in that
22  appear, at least on the allegations, if the facts
23  are true as stated, that it would be a criminal
24  case, and we send that over to HPD or the
25  prosecutors.

7 (Pages 22 to 25)

Page 26

1    Q.  When you say we send that over, is that a
2 decision the Ethics Commission itself has to make
3 or can you -- well, let me clarify.  What's your
4 title?
5    A.  I'm the Executive Director and legal
6 counsel for the Ethics Commission.
7    Q.  So in that capacity, would you have the
8 authority to refer any matter to criminal
9 prosecution?
10    A.  I believe so, although I've done it --
11 as I recall we've done it both ways, where I've
12 simply sent -- it has to be done under a certain
13 way under the UIPA, and I'll get to that in a
14 second, if you like, but I have done it where I've
15 initiated it, or I've made the decision to send the
16 matter over, and I've also done it where I brought
17 it to the Commission, and they've decided to send
18 it over.  And I think the practice before I came
19 onboard, which was 2000, was that the Commission
20 would usually make a determination.  The problem is
21 in some of these areas, we constantly have to
22 balance the Commission as a citizen panel that
23 meets only once a month, and sometimes you may --
24 we had one case where there was some exigent
25 circumstances that things needed to be done much

Page 27

1 more quickly than that.  We had two cases like that
2 that I can think of offhand, so I made the decision
3 that, using the UIPA process, we would see if HPD
4 was interested in the case.
5    Q.  UIPA is Uniform Information Practices
6 Act; is that right?
7    A.  That's right.
8    Q.  What is the UIPA process you're talking
9 about?
10    A.  If I recall, and it might be under
11 92(f)14, I'm not quite sure, but there's --
12 agencies cannot simply disclose information,
13 willy-nilly, that's brought to them in
14 confidentiality.  Our concern is then when someone
15 brings us a complaint, and I believe that if the
16 facts are true, it could be a criminal matter, then
17 I send what I would probably describe as probably a
18 generic memorandum to HPD saying are you interested
19 in a case where so and so -- actually, I don't name
20 names -- where this type of conduct occurred, and
21 then they would respond back saying, yes, and if
22 that's the case, then I would send the file over.
23    The reason for that is under the UIPA,
24 the requirement is that the requesting agency ask
25 for the information, as opposed to just somebody

Page 28

1 volunteers it over, and this is the best way I
2 could figure to get the ball rolling because
3 catch-22, of course, that is the requesting agency
4 is not going to know these facts are occurring
5 unless somebody says generically there's a problem
6 here.
7    The other aspect to that is -- let me
8 see.  It has to be -- the disclosure to the other
9 governmental agency has to be consistent with the
10 reason that the information was first brought to my
11 agency, to the Ethics Commission.
12    Q.  Okay.  In your description of the process
13 that goes on in the offices of the Ethics
14 Commission, you talked about a disclosure of the
15 complaint letter to the person accused; is that
16 right?
17    A.  That's right.
18    Q.  Can you go over that again, how much of
19 the complaint letter do you disclose?
20    A.  We have to remove information that would
21 reasonably identify the complainant, unless the
22 complainant agrees to have that information
23 included.  Sometimes what we'll get is a situation
24 where it's so fact specific that the complaint
25 letter, even if you took out the person's name and

Page 29

1 so on, is going to, it's going to be obvious to the
2 subject of the complaint who is filing the
3 complaint, the facts are so specific, and it may
4 just be something that occurred between two people.
5    Q.  Does that mean you would have to disclose
6 a complaint or does that mean if you couldn't
7 redact it, that you just can't disclose a
8 complaint?
9    A.  I think in that situation I usually ask
10 the complainant, I tell them what the issue is, and
11 sometimes they say okay and sometimes they don't.
12    Q.  Have you ever received permission from
13 Phil English to disclose the contents of a
14 complaint made on January 22nd, 2003 to anyone?
15    A.  I can't remember.
16    Q.  Have you ever disclosed the contents of a
17 complaint letter written by or on behalf of Phil
18 English January 22nd, 2003 to anyone?
19    THE WITNESS:  Yes.
20    MR. LORUSSO:  Just for the record, let me
21 say I object to the extent for purposes of this
22 deposition that it lacks foundation that there's
23 been established that a complaint's even been
24 filed, for purposes of this deposition, by
25 Mr. English.

8 (Pages 26 to 29)

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 30
1    Q.  BY MR. MOSELEY:  So, to whom have you
2  disclosed -- did you disclose the whole complaint
3  letter?
4        (Whereupon, a discussion was held between
5  Mr. Nelson and the witness.)
6        (The deposition was at recess.)
7        MR. NELSON:  Here's the concern.  I think
8  your line of questioning is starting to get into
9  the specifics of the investigation, and until the
10  judge rules one way or the other on the extent to
11  which we can talk about that, I'm going to have to
12  instruct the witness not to answer.
13        MR. MOSELEY:  I'm not going to let you
14  just object to the line of questioning, so I'll
15  have to make you --
16        MR. NELSON:  I understand, but I just
17  wanted you to understand where we're coming from.
18        MR. MOSELEY:  So you're objecting to the
19  question I just asked and instructing the witness
20  not to answer the question I just asked, which the
21  question was, as I remember it, whether or not
22  Mr. Totto, or that Chuck, or the Ethics Commission,
23  generically, has given any part of a complaint
24  letter written by or on behalf of Phil English
25  January 22nd, 2002, to anyone else.

Page 31
1        MR. NELSON:  Okay.  And I'm going to
2  object and instruct the witness not to answer.
3    Q.  BY MR. MOSELEY:  With respect to the
4  complaint letter I just referenced, did you
5  personally ever show any part of that letter to
6  Christopher Graff?
7        MR. NELSON:  Same objection; instruct him
8  not to answer.
9    Q.  BY MR. MOSELEY:  I will tell you that in
10  a deposition two days ago Christopher Graff said
11  that you did.
12        I'm going to ask the question again.  Did
13  you ever show any part of that letter to
14  Christopher Graff?
15        MR. NELSON:  Objection; instruct not to
16  answer.
17    Q.  BY MR. MOSELEY:  What documents, either
18  specific documents or kinds of documents in your
19  possession, generically, your possession, the
20  Ethics Commission, do you contend are privileged
21  under the attorney-client privilege?
22    A.  I'd have to leave that to counsel.
23        MR. NELSON:  And we'll put together a
24  privilege log next week for you.
25        MR. MOSELEY:  That tells me which type of

Page 32
1  documents -- the privilege log, is it going to list
2  the documents?
3        MR. NELSON:  It'll describe them
4  generically or in a form that doesn't contravene
5  the privilege.
6    Q.  BY MR. MOSELEY:  What documents or types
7  of documents are you claiming are privileged under
8  the attorney work-product, actually, it's not a
9  privilege but let's call it a privilege for now.
10    A.  Protection.  I leave that to counsel to
11  respond.
12        MR. NELSON:  Again, we'll prepare a log
13  next week for you and the court.
14    Q.  BY MR. MOSELEY:  What documents or types
15  of documents are you claiming are privileged under
16  the deliberative process privilege?
17    A.  Same response, that I would defer to
18  counsel.
19        MR. NELSON:  Again, we will include that
20  in the log as well.
21    Q.  BY MR. MOSELEY:  What documents or type
22  of documents do you contend are privileged or are
23  prohibited from disclosure under the Uniform
24  Information Practices Act?
25    A.  Defer to counsel.

Page 33
1        MR. NELSON:  Same response.
2    Q.  BY MR. MOSELEY:  When you, in your
3  understanding, said that you understood that
4  ordinances of the City and County of Honolulu
5  prohibited disclosure of certain information, do
6  you have in mind a specific part of the ordinances?
7    A.  Defer to counsel.
8        MR. NELSON:  There is a specific --
9        MR. MOSELEY:  I presume this is updated,
10  but I'm not going to make this an exhibit.
11        MR. LORUSSO:  Just for the record, the
12  witness is reviewing --
13        MR. MOSELEY:  The witness is reviewing a
14  copy of a section of the revised ordinances of City
15  and County of Honolulu that I have handed him and,
16  of course, neither the witness nor his counsel has
17  had an opportunity to confirm, in fact, whether
18  that's a true and accurate copy of the actual
19  ordinances.
20        MR. LORUSSO:  Thank you.
21        THE WITNESS:  The 3-6.3(g) and 3-6.6(c)
22  are the two sections that I'm most familiar with.
23  I'm not sure that there might be others that
24  reference other limitations on disclosure of
25  investigative material.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 34

1    Q.  BY MR. MOSELEY:  Now, again, recognizing
2   that you haven't had a chance to confirm the copy I
3   gave you was specifically a true and accurate copy
4   of the ordinances, is it your understanding that
5   any Commission member or Commission staff who
6   divulges information concerning the allegation
7   prior to the issuance of an advisory opinion by the
8   Commission, or if the investigation discloses that
9   the advisory opinion should not be issued by the
10  Commission, any Commission member or Commission
11  staff, who at any time divulges any information
12  concerning the original allegation or divulges the
13  contents of disclosures except as permitted by this
14  article shall, if found guilty, be subject to the
15  applicable provisions of Section 11-106 of the
16  revised charter.
17        Does that accurately reflect your
18  understanding of what the ordinance provides?
19    A.  That section, yes.
20    Q.  And recognize that I may not have read it
21  properly either.  And the other section, aside from
22  (g) was -- what was the other section?
23        (A discussion was held off the record.)
24    Q.  BY MR. MOSELEY:  And it's your
25  understanding that Section 3-6.6(c) also requires

Page 35

1   that requests shall be held in confidence and no
2   disclosure thereof shall be made except as provided
3   in the ordinance?
4     A.  That's correct.
5     Q.  What, to your understanding, are the
6   exceptions in the ordinance that, the exceptions to
7   confidence and disclosure requirements?
8         MR. LORUSSO:  Object to the extent being
9   asked for a legal conclusion.
10        THE WITNESS:  I'd have to go -- I mean,
11  rather than try to shoot from the hip, I'd be more
12  comfortable going through the ordinance, but having
13  said that, I think that inherent in the ordinance
14  is -- actually, Roger, can I have you refine that
15  question?  See, under 3-6.6 it talks about requests
16  for opinions by officers or employees, and then
17  generally under 3-6.3, it's the powers, duties
18  functions of the Commission, and that's where we
19  talked about that limitation about not disclosing
20  information prior to an advisory opinion being
21  issued.
22        MR. MOSELEY:  Yes.
23        THE WITNESS:  You're asking me for the
24  exception to which?
25        MR. MOSELEY:  Well, let's start with

Page 36

1   3-6.3(g).
2         THE WITNESS:  I think inherent in the
3   ordinances is the ability of a Commission staff
4   member to make reasonable disclosure in order to
5   conduct an investigation, although that's not --
6   I'm not sure that that's stated anywhere here or in
7   the Commission rules, but it's an operating thing
8   we've had to use because, obviously, it could be
9   difficult to try to gather information without
10  disclosing certain information to a witness or to
11  the subject, so on.
12        Q.  BY MR. MOSELEY:  How about with respect
13  to 3-6.6(c)?
14    A.  I think that specifically, there's also
15  the -- we're talking now about a request as opposed
16  to just about general investigative information,
17  and so I believe that -- let me clarify this
18  because this Section, 3-6.6, focuses on a request
19  from a city employee or officer without asking for,
20  without bearing to any other city officer or
21  employee.
22        So in this particular case, I would have
23  to fall back on that same implicit exception that I
24  mentioned, but with requests generally we don't
25  need to disclose much to other people, I mean, it's

Page 37

1   usually they'll give us the facts, we'll ask for
2   specific facts, and because it doesn't affect other
3   folks or, I should say, it doesn't rely on
4   information from other people, we can offer advice
5   based on that.
6         So it's different than 3-6.7, which is
7   request by third parties, which is when any third
8   party asks or complains, whether or not the conduct
9   of an officer or employee is a violation of the
10  ethics law.
11    Q.  And is there a confidentiality provision
12  with respect to request by third parties?
13    A.  I think that 3-6.3(g) applies.  Excuse
14  me, let me just take a second to review.  Under
15  3-6.7(a), it says that the request shall be in
16  writing and shall be signed by the person making
17  the request, provided that the name of the person
18  making the request shall not be disclosed.  That's
19  just part of that section, and I think that's the
20  pertinent section.
21    Q.  Well, upon your review of the ordinance,
22  it's not a question.  I'm presuming you don't have
23  an ulcer, and I'm darn surprised you don't.
24    A.  Don't have a what?
25    Q.  An ulcer.  I don't know how you implement

10 (Pages 34 to 37)

Page 38

1  this.
2      A.   Can we go off the record for a minute?
3          MR. MOSELEY:  Sure.
4          (A discussion was held off the record.)
5      Q.   BY MR. MOSELEY:  Chuck, you're an
6  attorney, right?
7      A.   That's correct.
8      Q.   Are you licensed in the state of Hawaii?
9      A.   Yes.
10     Q.   And when did you first become licensed in
11 the state of Hawaii?
12     A.   1980.
13     Q.   Can you give me a very brief, I mean very
14 brief, rundown of your employment history since you
15 became an attorney.
16     A.   Let's see, I was in private practice for
17 seven years, then I worked as the senior attorney
18 at the Office of Consumer Protection in the
19 department of commerce and consumer affairs for a
20 year or two, then I was the Executive Director of
21 the department, or excuse me, of the division of
22 consumer advocacy in the same department, left
23 there in '98 after about 10 years, and for about
24 two years was in private practice again, and then
25 came back to government in the capacity as an

Page 39

1  acting Executive Director and legal counsel for the
2  city Ethics Commission, in April of 2006, and then
3  in November became the non-acting --
4      Q.   April of 2000.
5      A.   2000, excuse me.
6      Q.   And then in November 2002 you became the
7  actual permanent -- well, actual official, as
8  nothing is permanent.
9      A.   That's right.
10     Q.   Now, you did say that some of the
11 documents you're withholding included witness
12 statements; is that right?
13     A.   There are tapes.
14     Q.   Do some of the documents you're
15 withholding contain names of persons that may
16 potentially have further information about these
17 issues?
18         MR. NELSON:  I'm going to object and
19 instruct not to answer.
20     Q.   BY MR. MOSELEY:  Okay.  Do some of the
21 documents you're withholding contain factual
22 compilations of your investigations?
23     A.   Yes.
24         (A discussion was held off the record.)
25     Q.   BY MR. MOSELEY:  Are you the person at

Page 40

1  the Ethics Commission responsible for determining
2  whether or not to claim a privilege in matters such
3  as this?
4      A.   Yes, with advice of Corporation Counsel.
5      Q.   What's the relationship between your
6  office and that of Corporation Counsel, you
7  described yourself as the attorney for the Ethics
8  Commission, right?
9      A.   Right.
10     Q.   What's the relationship between those two
11 offices?
12     A.   We are what's called -- the Ethics
13 Commission is what's called "administratively
14 attached" to Corporation Counsel, that means the
15 Corporation Counsel helps us do, if you will, the
16 day-to-day administrative aspects, making sure our
17 paychecks get to us, taking leave of absence forms,
18 working with us to present a budget to the
19 department of budget and fiscal services.
20         They are not -- I should say Corporation
21 Counsel does not have the ability to review what
22 the Commission does in its substantive role, in its
23 decision-making role, investigative role, and so
24 on.  And just to add a clarification, if there is a
25 conflict between -- let's say I have a conflict of

Page 41

1  interest in a matter, we would ask Corporation
2  Counsel to handle that if either Matt or I were
3  conflicted out, or both of us were conflicted out,
4  and then also we -- the Corporation Counsel, it is
5  my understanding, represents all city entities, so
6  in matters not dealing with ethics, we ask for
7  their advice.
8      Q.   In this present situation where I
9  subpoenaed you, does that mean that Corporation
10 Counsel is essentially automatically your attorney?
11     A.   This is the first time I've had this
12 situation, but that's my understanding.
13     Q.   If I had subpoenaed directly a member of
14 the Ethics Commission, would you as the Ethics
15 Commission attorney have been the one to deal with
16 objecting, that kind of thing?
17     A.   I don't think so, I think again we rely
18 on Corporation Counsel to do that because in my
19 view it's worthwhile to keep the two roles
20 distinct, one is that the Ethics Commission and its
21 staff focus on ethics investigations, the ethics
22 laws and so on, but when you get beyond that, and a
23 subpoena, I would think, would be beyond that, as
24 asking for documents or a witness in a particular
25 case.  It's more appropriate to go to Corporation

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 42

1  Counsel because they do represent all city
2  agencies.
3      Q.   You know, I should have told you at the
4  beginning, as well, but if you ever want to take a
5  break for any reason, not only to talk to your
6  counsel, but if you just get tired of sitting, want
7  to visit the man or get a glass of water, just let
8  me know, this is not an endurance contest on
9  purpose.
10     A.   Thank you.
11     Q.   Did you personally review any of the
12 documents that are being withheld as privileged,
13 and when I say personally review, I mean in
14 conjunction with the subpoena we sent you.  I'm
15 sure you've looked at the documents personally in
16 other respects, but in conjunction with the
17 subpoena, did you look at any of the subpoenaed
18 documents?
19     A.   I looked at some.
20     Q.   What documents did you look at?
21         MR. NELSON:  Objection; instruct not to
22 answer.
23         It goes into the specifics of the
24 investigation.
25     Q.   BY MR. MOSELEY:  How many documents did

Page 43

1  you look at?
2      A.   I think I read maybe five or six.
3  Others, I may have just thumbed through a file to
4  see what, again, kind of generically what type of
5  information was there.
6      Q.   And I'm going to ask you, this is a
7  general question referring to anytime disclosures
8  have been made by you personally, which may or may
9  not include this, but I'm going to ask you, are you
10 aware of ever disclosing a document to -- what do
11 you call them, the target of the investigation?
12     A.   We call them the subject because target
13 sounds so nasty, subject's not much better.
14     Q.   Are you aware any time of disclosing a
15 complaint document to the subject of an
16 investigation or to a witness that you're
17 interviewing for an investigation in which
18 identifying information, such as the letterhead of
19 the law firm that wrote the complaint or the name
20 of the individual involved, would have been
21 disclosed?
22         MR. NELSON:  For clarification, this is a
23 generic question --
24         MR. MOSELEY:  Yes, it is.
25         MR. NELSON:  -- in any case --

Page 44

1         THE WITNESS:  We are not talking about
2  your folk's case?
3      Q.   BY MR. MOSELEY:  Including this, not
4  including this, are you aware of any time -- and
5  I'm presuming that there are times when you get
6  complaints on a law firm's letterhead or other
7  kinds of letterhead or containing names of
8  complaining witnesses --
9      A.   I understand that.
10     Q.   Are you aware of any time in which you've
11 disclosed that information, you personally, Chuck
12 Totto, disclosed that information to either the
13 subject of the investigation or to a witness on
14 such an investigation?
15     A.   Yes, I have.
16     Q.   You have.
17     A.   Yes.
18     Q.   Under what circumstances would you do
19 that?
20     A.   Again, after seeking a waiver from the
21 complainant, if we can use that generic term, the
22 person who writes the complaint letter, that
23 they're okay with having the identification made.
24     Q.   Are there any other circumstances?
25     A.   Not that I could think of, offhand.  Not

Page 45

1  that jumps to mind.
2      Q.   And with respect to any complaint which
3  may or may not have been made by Phil English
4  dealing with Gary Kurokawa or Chris Graff, and you
5  said you don't remember whether or not there's been
6  a waiver of Phil English, with respect to such a
7  disclosure, right?
8         MR. NELSON:  Do you understand the
9  question?
10        THE WITNESS:  I do, and that's my best
11 recollection right now, I don't recall
12 specifically.
13     Q.   BY MR. MOSELEY:  Have you made a
14 determination, personally, that all of the
15 documents referenced in the subpoena duces tecum
16 that was Exhibit 82 are privileged?
17        MR. NELSON:  I'm going to object.  I
18 think we're getting into what may have been
19 discussed between Mr. Totto and I about the
20 subpoena, and it's attorney-client privilege, and
21 instruct not to answer.
22     Q.   BY MR. MOSELEY:  Are you aware of
23 documents that reference Phillip English that are
24 in the possession of the Ethics Commission on which
25 an advisory opinion has already been issued,

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 46
1  specifically advisory opinion 2006-2?
2      A.  Yes.
3      Q.  Did you produce any of those documents
4  today?
5      A.  No.
6      Q.  Why not?
7          Do you guys want to take a quick break
8  here?
9      A.  I can answer if you want, but it's up to
10  you.
11         My assumption was that we were focusing
12  on the documents related to Phil's January 2003
13  complaint.
14     Q.  Which may or may not have existed.
15     A.  I think I said that I received a
16  complaint.
17     Q.  Are there other documents, which don't
18  necessarily arise out of that January 22nd, 2003
19  complaint, which do relate to Phil English?
20     A.  Yes.
21     Q.  And essentially you didn't produce them
22  today because you didn't think they were what the
23  subpoena was calling for?
24     A.  That's partly so, and also I wouldn't
25  want to say more because it does touch on

Page 47
1  attorney-client privilege information.
2      Q.  Did you specifically consider the
3  production of those documents in terms of your
4  response to the subpoena, or did you just not even
5  think about them?
6          MR. NELSON:  Well, I'm going to object
7  and instruct not to answer, we're getting into what
8  he may have discussed with his attorney.
9  Attorney-client privilege.
10     Q.  BY MR. MOSELEY:  Did you personally
11  consider whether or not those documents should be
12  produced or was that something that just didn't
13  even cross your mind, I'm not talking about any
14  communication you had with counsel.
15     A.  I think it crossed my mind, but I
16  dismissed it as not relevant to the particular
17  case, you know.
18     Q.  You answered the question I asked, that's
19  fair enough.
20         (Exhibit Number 84 was marked for
21  identification.)
22     Q.  BY MR. MOSELEY:  I'm showing you what's
23  been marked for identification as Exhibit 84.  I
24  should tell you the front page of this purports to
25  be a cover letter transmitting an advisory opinion

Page 48
1  specifically 2006-2.  The second page is actually
2  an advisory opinion taken off of the internet site
3  and is not a document, to my knowledge, that was
4  actually transmitted, but do you recognize the
5  first page of Exhibit 84?
6          I also should say at the top there's the
7  written word English, which is a mark made by our
8  office, but other than that, do you recognize the
9  first page of Exhibit 84?
10     A.  Not specifically, but it looks like
11  something that, as a regular course of business,
12  could come from our office.
13     Q.  This isn't something you generated?
14     A.  It may have come from Norm Fisher, my
15  legal assistant.
16     Q.  Is this just the type of letter that is
17  generated in the course of business to transmit
18  opinions?
19     A.  Yes.
20     Q.  And you may or may not have actually seen
21  it, right?
22     A.  That's right.
23     Q.  The second page of Exhibit 84, do you
24  recognize this as being advisor opinion 2006-2?
25     A.  It appears to be.  It looks like it's

Page 49
1  been printed off of our website, the Ethics
2  Commission website.  It doesn't contain the
3  signature of the chair, but I don't think those are
4  contained on the website.
5          (Exhibit Number 85 was marked for
6  identification.)
7      Q.  BY MR. MOSELEY:  I'm showing you what's
8  been marked as Exhibit 85 for purposes of this
9  deposition.  Also, there's some extraneous writing
10  at the upper portion, which I don't even know what
11  it all says except for English, but do you
12  recognize this exhibit?
13     A.  Yes, I do.
14     Q.  Is it your understanding that because
15  advisory opinion 2006-2 has been issued that you
16  are no longer precluded from discussing the matters
17  contained in Exhibit 85?
18     A.  No, that's not my understanding.
19     Q.  What is your understanding?
20     A.  I think that there are other aspects
21  regarding Exhibit 85 that could fall into other
22  privileges or protections or potential violations
23  of the UIPA.
24     Q.  Are you willing to answer questions with
25  respect to Exhibit 85 of this deposition?

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 50

1    MR. NELSON:  Can we take a quick break to
2  look over this one?
3    MR. MOSELEY:  Yes, any time you want,
4  Gordon.
5    Off the record.
6    (A discussion was held off the record.)
7    MR. MOSELEY:  I have no idea what the
8  question I asked you before you left, so, counsel,
9  can we have the court reporter repeat it or was
10  there even a question on board.
11    (The requested portion of the record was
12  read.)
13    MR. NELSON:  Well, we're going to object,
14  and I'm going to instruct him not to answer --
15  beyond the four corners of the document, I mean, to
16  the extent that the questions will go into the
17  deliberations that went in behind this letter, we
18  would have an objection, but let's go forward and
19  see what we can do.
20    Q.  BY MR. MOSELEY:  So the answer is that
21  you might be willing to answer some questions,
22  but --
23    A.  Depends on the question.
24    Q.  Okay.  And I'm presuming that counsel
25  will object and instruct you not to answer when

Page 51

1  appropriate.
2    Can you tell me what the attachment to
3  the first page of Exhibit 85 is.
4    A.  It's a draft advisory opinion.
5    Q.  And who drafted this?
6    MR. NELSON:  Objection; instruct not to
7  answer.
8    Q.  BY MR. MOSELEY:  Did someone in your
9  office draft this?
10    MR. NELSON:  I think you can answer that.
11    THE WITNESS:  Yes.
12    Q.  BY MR. MOSELEY:  Did the Department of
13  Corporation Counsel give you any objections to the
14  draft opinion in Exhibit 85 in response to your
15  January 25th, 2006 letter?
16    MR. NELSON:  Objection; attorney-client
17  privilege, deliberative process privilege.
18  Instruct not to answer.
19    MR. MOSELEY:  Attorney-client privilege?
20    MR. NELSON:  Yeah.
21    MR. MOSELEY:  Okay.  Who would the
22  attorney be in this case?
23    MR. NELSON:  Well, I don't know, the
24  letter is addressed to Ms. Okinaga.  I don't know
25  who may have been in communication with Mr. Totto

Page 52

1  or the Commission.
2    Q.  BY MR. MOSELEY:  When you sent this
3  letter to Ms. Okinaga, Chuck, were you sending this
4  letter seeking legal advice from Corporation
5  Counsel?
6    A.  It's kind of hard to answer.  Sorry, need
7  to talk.
8    MR. MOSELEY:  You know, don't apologize.
9  You need to talk any time, you're welcome to do it.
10    (The deposition was at recess.)
11    (Exhibit Number 86 was marked for
12  identification.)
13    Q.  BY MR. MOSELEY:  While we were off the
14  record, I received a request from Mr. Lorusso that
15  we mark the document that I had you reviewing that
16  purported to be the text of the revised ordinances
17  having to do with the Ethics Commission.  We've
18  since marked that as Exhibit 86, and we made a
19  color copy so that the yellowed out portion, that
20  was on the document provided to you, was also
21  visible.  I don't think I'm going to ask you any
22  more questions, I just wanted to indicate for the
23  record --
24    A.  Could I clarify something on this?
25    Q.  Sure.

Page 53

1    A.  This is the administrative and operating
2  ordinance section.  The substantive section is
3  3-8.1 ad, sec.
4    Q.  But Exhibit 86 is the document that we
5  were referencing earlier, right?
6    A.  Correct.
7    Q.  You know, Mr. Lorusso made a good point,
8  we asked you a lot of questions about it, and it
9  wasn't in the record, so I think it's a good idea.
10    Now, back to Exhibit 85 -- can you read
11  back the last question I asked.
12    (The requested portion of the record was
13  read.)
14    THE WITNESS:  Yes, but let me explain in
15  the same vein we were asking for legal advice from
16  you.  It was asking for input from both parties.
17    Q.  BY MR. MOSELEY:  But you were seeking
18  input from Carrie Okinaga not as your attorney, but
19  as a party in this proceeding.
20    A.  Technically, she wasn't a party, the
21  Corporation Counsel wasn't a party, but, yeah --
22  but not as an attorney for the Commission.
23    Q.  Did Carrie Okinaga or someone on her
24  behalf from the department of Corporation Counsel
25  submit any objection to this proposed, well this

14 (Pages 50 to 53)

Page 54

1 draft advisory opinion that's shown in Exhibit 85?
2    A.   I believe we received written comments.
3    Q.   Did they object to the draft advisory
4 opinion?
5    A.   You know, I'd have to look at the letter
6 again. I don't mean to haggle over the terms.
7 They had things they wanted the Ethics Commission
8 to consider, I don't know -- I don't know whether
9 it would be an objection or not.
10    Q.   Was the draft advisory opinion that's
11 shown in Exhibit 85, was that ever adopted by the
12 Ethics Commission as its opinion?
13       MR. NELSON:  Well, I'm going to object
14 and instruct not to answer. The deliberations of
15 the Commission after the receipt of comments, and
16 even before of the receipt of comments, are subject
17 to the deliberative process privilege, and
18 Mr. Totto is subject to the confidentiality
19 requirements of the ordinance and the rules and the
20 charter with respect to what the Commission did or
21 didn't do.
22    Q.   BY MR. MOSELEY:  Maybe I didn't make
23 myself clear. Has the draft, which appears in
24 Exhibit 85, has that ever been adopted as an
25 advisory opinion by the Ethics Commission?

Page 55

1    A.   I've got to wait for Gordon to
2 contemplate for a minute.
3       (Whereupon, a discussion was held between
4 Mr. Nelson and the witness.)
5       THE WITNESS:  The advisory -- let me find
6 the exhibit.
7       MR. MOSELEY:  84.
8       THE WITNESS:  The second page of 84 was
9 adopted advisory opinion number 2006-2.
10    Q.   BY MR. MOSELEY:  And that was adopted in
11 the same proceeding in which this draft appeared;
12 is that right?
13    A.   That's correct.
14    Q.   So I take it what you're telling me is
15 the draft wasn't adopted, and instead the opinion
16 2006-2 was adopted; is that right?
17       MR. NELSON:  Objection. I think
18 Mr. Totto answered the question that Exhibit 84 was
19 adopted -- page 2 of Exhibit 84 was adopted as the
20 advisory opinion.
21    Q.   BY MR. MOSELEY:  Does the draft opinion
22 that is shown on Exhibit 85, does that appear
23 anywhere in the city's records as an official
24 advisory opinion of the Ethics Commission?
25       MR. NELSON:  Well, objection. I think

Page 56

1 you're trying to get into the confidential records
2 of the Commission relative to the matter, and
3 Mr. Totto can't disclose that under the ordinance.
4       MR. MOSELEY:  You know, I have to tell
5 you, counselor, if this is an official advisory
6 opinion, then there's no confidentiality.
7       MR. NELSON:  If it is.
8       MR. MOSELEY:  If it is. So are you
9 testifying that it is not an official opinion, it's
10 never been adopted as an official opinion?
11       MR. NELSON:  Counsel, we've told you what
12 has been adopted as an advisory opinion.
13       MR. MOSELEY:  And I'm checking to make
14 sure the converse is true, that this opinion has
15 not been adopted as an official advisory opinion.
16       (Whereupon, a discussion between the
17 witness and Mr. Nelson.)
18       THE WITNESS:  If it clarifies, there's
19 only one advisory opinion in this particular case,
20 in this particular matter, and that's 2006-2, the
21 second page of Exhibit 84.
22       MR. LORUSSO:  Excuse me, Mr. Totto, when
23 you say "in this particular case", what you're
24 referring to is just with regard to the opinions
25 being asked as to Exhibit 84 and 85, correct?

Page 57

1       THE WITNESS:  Correct.
2       MR. LORUSSO:  Thank you.
3    Q.   BY MR. MOSELEY:  Does the contents of
4 Exhibit 85, at least insofar as the advisory
5 opinion, draft advisory opinion which is attached
6 thereto, does that constitute legal advice that you
7 gave to the Ethics Commission, or does it
8 constitute work-product, or does it constitute part
9 of the deliberative process to your understanding?
10    A.   To my understanding, it would be all
11 three.
12    Q.   In the event that it were attorney-client
13 privilege, would you agree that the privilege has
14 been waived by your sending a copy of the draft
15 opinion to both Roger Moseley and Carrie Okinaga?
16       MR. NELSON:  Objection; calls for a legal
17 conclusion.
18       THE WITNESS:  Only to the degree as to
19 what's written in the four corners of the document.
20    Q.   BY MR. MOSELEY:  How about with respect
21 to work-product, was this draft prepared in
22 anticipation of litigation?
23    A.   Probably, and I don't know whether this
24 fits the definition of litigation, but in terms of
25 contested positions by Corporation Counsel and

15 (Pages 54 to 57)