Page 118

1  that, I did ask him what the purpose of his seeking
2  the information was.
3      Q.   And what did he say?
4      A.   As I recall, it had to do with whether
5  Phil -- unfortunately this is very vague, I can't
6  remember if it had to do with him going to an
7  independent medical examination, whether it had to
8  do with workers' comp, or -- as mentioned in '79,
9  Exhibit 79, the allegations by Chris against Phil,
10  all those kind of roll together for me.
11      Q.   Exhibit 79, at the top it says, I am
12  conducting an investigation concerning allegations
13  of possible workplace violence.  Do you see that?
14      A.   Yes.
15      Q.   Is there anything in that exhibit that
16  indicates to you that there's a workers' comp claim
17  going on?
18      A.   I don't see anything.
19      Q.   When Mike Golojuch asked you a question
20  When did Phil English formally file an ethics
21  complaint and you provided a response, Phil filed
22  his complaint with the Commission on January 22nd,
23  2003, did you consider that Mike Golojuch or
24  anybody else in the city might use that information
25  to cover up a pattern of harassment?

Page 119

1          MR. LORUSSO:  Objection; vague and
2  ambiguous, lacks foundation, calls for speculation.
3          MR. NELSON:  Join in that.
4          THE WITNESS:  I did not consider that.
5      Q.   BY MR. MOSELEY:  Isn't that information
6  which you normally would not disclose to anybody,
7  when the complaint was filed?
8          MR. WONG:  Objection; argumentative.
9          MR. NELSON:  Join in that.
10          THE WITNESS:  No.  Again, under the
11  circumstances in this matter, where another part of
12  the city is trying to conduct an investigation and
13  seem to understand the underlying or at least some
14  of the underlying issues in the complaint, I
15  believed it was appropriate to do that.
16      Q.   BY MR. MOSELEY:  But you were aware, as
17  of this email, that Mike Golojuch was conducting
18  investigations of workplace violence; is that
19  right?
20      A.   Of allegations of that, yes.
21      Q.   Did you ever see the allegation of
22  workplace violence that was produced by Christopher
23  Graff or anybody else?
24      A.   No.
25      Q.   So you wouldn't know whether or not they

Page 120

1  changed dates on their reports, based upon the
2  information you provided them about when Phil
3  formally filed the complaint, would you?
4          MR. LORUSSO:  Objection; lacks
5  foundation.
6          THE WITNESS:  No, I would not.
7      Q.   BY MR. MOSELEY:  And that was not a
8  concern of yours that somebody would doctor
9  documents or change the record to reflect a
10  different date of certain actions, based on the
11  date of his complaint with the Ethics Commission?
12          MR. NELSON:  Objection; lack of
13  foundation.
14          THE WITNESS:  That was not a concern of
15  mine.
16      Q.   BY MR. MOSELEY:  Is that your standard
17  practice to tell people, third parties that
18  inquire, the dates that complaints are filed?
19      A.   We rarely get requests from other
20  branches of city government for whether or not a
21  complaint has been filed or requesting the date, so
22  I don't know if we've had enough times to say there
23  is a --
24      Q.   Is the date that a complaint was filed,
25  is that some of the information that you believe is

Page 121

1  subject to the prohibition against disclosure that
2  you operate under?
3      A.   I don't know.  If the party who is asking
4  is confirming that a complaint has been filed, I
5  don't know that the date would be something that we
6  would withhold or not based on that.  I hadn't
7  thought of that.
8      Q.   Maybe I've asked this already, but you
9  didn't ask Mike Golojuch why he wanted to know that
10  date, did you?
11      A.   Not that I recall.
12      Q.   Did you ever ask Mike Golojuch when the
13  workplace violence reports or report were filed
14  against Phil English?
15      A.   I don't remember if I did or not.
16      Q.   Did you ever learn if and when such
17  things had been filed?
18      A.   I don't believe so, but I'm not sure.
19  Oh, if they had been filed or when they had been
20  filed?
21      Q.   If or when, either one.
22      A.   Not that I recall.
23      Q.   Is an allegation of harassment in
24  violation of state whistleblower laws part of a
25  continuing investigation that you have against Gary

31 (Pages 118 to 121)

1  Kurokawa or any other employee of the city?
2       MR. NELSON: Objection; instruct not to
3  answer.
4       Q. BY MR. MOSELEY: I'd like you to take a
5  look at Exhibit 76 in the book of exhibits that I
6  have in front of you. Have you ever seen this
7  exhibit before?
8       A. No.
9       Q. I'd like you to look at the upper
10 right-hand portion of this exhibit. It says there,
11 date of incident, and the first thing, apparently,
12 says 1-3-03 and the second one says 1-8-03, do you
13 see that, and they appear to be crossed out, and
14 then it says 1-17-03 and 1-22-03 written above it?
15      A. I see that.
16      Q. Do you know anything about the change in
17 the date of this incident, as reflected in this
18 workplace violence report?
19      A. Let me read the report.
20      No.
21      Q. The date of 1-3-03, does that correspond,
22 at least roughly, to the first date that you met
23 with Phil English?
24      MR. LORUSSO: Objection; vague and
25 ambiguous, "at least roughly."

1       Q. BY MR. MOSELEY: Well, I think he
2  testified earlier he doesn't have a specific
3  recollection.
4       Do you now have a specify recollection of
5  that date?
6       A. I don't, but I know it was early January.
7       Q. That's why I used the term roughly.
8       MR. LORUSSO: I understand.
9       Q. BY MR. MOSELEY: And the date which
10 appears to be substituted for the next date which
11 is 1-22-03, is it your understanding that that's
12 the date the formal complaint was filed by Phil
13 English?
14      A. That is my understanding.
15      Q. But this is the first time you've ever
16 seen this workplace violence report?
17      A. Yes.
18      Q. Is that because you didn't request this
19 information from anybody else at the city, or you
20 requested it and it wasn't provided?
21      A. I don't recall requesting it.
22      Q. If a city employee makes a, generally,
23 makes a complaint to the Ethics Commission saying
24 he's been subject to harassment for reporting
25 improper or illegal activities at the city and

1  you're conducting an investigation of that sort of
2  thing, don't you ask the agencies for various kinds
3  of disciplinary actions or proceedings against the
4  person who is making the report?
5       A. I have to confer with Gordon.
6       Q. I'm talking about just in general, not
7  necessarily with this.
8       A. Maybe, maybe not.
9       Q. Under what circumstances would you
10 request those kinds of things?
11      A. It depends. As I understood your
12 question, you're focusing on retaliation. We may
13 or may not look at retaliation claims because
14 that's not necessarily -- it's arguable whether
15 that's necessarily in the jurisdiction of the
16 Ethics Commission.
17      Q. So retaliation against an employee for
18 reporting violations of city laws or requirements
19 is not an ethical violation?
20      A. It may or may not be.
21      Q. Under what circumstances would it be an
22 ethical violation to do that, to retaliate against
23 an employee?
24      MR. WONG: Over-broad, vague and
25 ambiguous, and incomplete hypothetical.

1       MR. NELSON: Join in that.
2       Q. BY MR. MOSELEY: You said it may or may
3  not be. I'm trying to figure out what, at least
4  what the general parameters would be that would
5  cause it to be or not cause it to be. I have no
6  way of making that more specific because I'm asking
7  you about your testimony.
8       A. Could I have the question again.
9       (The requested portion of the record was
10 read.)
11      MR. LORUSSO: Join in the earlier
12 objections.
13      THE WITNESS: I'm trying to figure out
14 how to pull together kind of a generic answer to
15 that. If someone stole money from the city, and an
16 employee witnessed it and files an ethics complaint
17 that the person stole money, and we reported that,
18 the Ethics Commission could either take on that
19 or because -- I'm trying to use the word steal for
20 a criminal manner, it might go to HPD.
21      If there was retaliation based on that, a
22 complaint to us, I don't know whether or not the
23 Ethics Commission would find that within its
24 jurisdiction to handle, or whether it would assume
25 that either civil lawsuit or some other

Page 126

1 discrimination approach, I'm not sure if the equal
2 employment office or the city might look at that,
3 also.
4     Q.   BY MR. MOSELEY:  So as you sit here
5 today, you don't know whether, if an employee
6 reports something to you, to the Ethics Commission,
7 and then is retaliated against by co-employees or
8 supervisors, you don't know whether that in and of
9 itself is an ethics violation of the city and
10 county?
11         MR. NELSON:  Objection; misstates the
12 testimony, calls for speculation, lack of
13 foundation.
14         THE WITNESS:  Yeah, I don't know.
15     Q.   BY MR. MOSELEY:  Would you not consider
16 such activity interference with the processes of
17 the Ethics Commission?
18         MR. LORUSSO:  Objection; lacks
19 foundation, vague and ambiguous, over-broad,
20 incomplete hypothetical.
21         MR. WONG:  And argumentative.
22         MR. NELSON:  Join in those.
23         THE WITNESS:  It could be.  That's a
24 consideration.
25     Q.   BY MR. MOSELEY:  If one employee

Page 127

1 interferes with the processes of the Ethics
2 Commission that are instituted by another employee,
3 is that an ethics violation?
4         MR. LORUSSO:  Same objections.
5         MR. NELSON:  Same objection.
6         THE WITNESS:  I don't know.  It's not an
7 issue that we've had or that the commission's ruled
8 on.
9     Q.   BY MR. MOSELEY:  Do you know of any
10 statutory prohibition which would prevent or which
11 would make it an ethical violation for that to
12 occur, that is the interference with the processes
13 of the Ethics Commission?
14         MR. LORUSSO:  Same objections.
15         MR. NELSON:  Same.
16         THE WITNESS:  If I understand you
17 correctly, you're asking is there an ordinance or
18 charter provision that you could argue that that
19 was, that such a retaliation would be a violation
20 of the ethics laws?
21         MR. MOSELEY:  Right.
22         THE WITNESS:  It would be 11-104 which
23 basically says you may not use an officer or
24 employee of a city may not use their position in
25 order to gain special treatment for anyone.  It's a

Page 128

1 very broad --
2     Q.   BY MR. MOSELEY:  How would that apply to
3 this situation that I was positing?
4     A.   It could apply by saying, well, it would
5 render either unwarranted benefit or an unwarranted
6 disadvantage for the reporting employee for someone
7 else to use their position to try to thwart --
8 that's my word, interfere with the Ethics
9 Commission process, I think you mentioned.
10     Q.   And, to your knowledge, you've never had
11 any complaints like that.
12     A.   Well, complaints I'm not sure.  I mean, I
13 think that's part and parcel of -- we've had
14 complaints like that.
15     Q.   Have there been any Ethics Commission
16 advisories?
17     A.   Yeah, I don't think there have been any
18 opinions on that.  When I say, That, I'm talking
19 about this as kind of a general issue.
20     Q.   I understand.
21     A.   Not that I'm aware of, and I think I
22 would know if there had been.
23     Q.   Getting back to Exhibit 94, you say, "I
24 have had one extended meeting with Phil in this
25 case and he showed none of the indicators you ask

Page 129

1 about and was calm about the case."
2         Do you see that?
3     A.   I do.
4     Q.   Why did you tell Mike Golojuch this
5 information?
6     A.   I think, again, it was in response to his
7 question in Exhibit 79 whether in any discussion I
8 had with Phil English has he ever become obnoxious,
9 belligerent, yells and/or any physical aggression
10 such as throwing items down.
11     Q.   So you felt on the basis of that question
12 that you were appropriately describing Phil's
13 demeanor in your interview and response?
14         Maybe I should rephrase that.  I'm not
15 questioning that your description of Phil's
16 demeanor is inaccurate, when I say appropriate, I
17 mean that it was appropriate for you to actually
18 describe the demeanor in response to Mike
19 Golojuch's.
20     A.   Yes, I did, again, for the reasons I
21 stated earlier because it appeared that there was a
22 general understanding of the underlying ethics
23 complaint.
24     Q.   If there's a general understanding by
25 people of the nature of the ethics complaint, is it

33 (Pages 126 to 129)

Page 130

1  then appropriate to talk about it and disclose
2  things?
3      A.  Not people generally, but it may be
4  appropriate for another government agency.
5      Q.  When you're talking about ethics
6  complaints within the City and County of Honolulu,
7  though, you're essentially talking about complaints
8  with respect to another government agency, aren't
9  you?
10      A.  I don't understand.
11      Q.  Well, do you get any ethics complaints in
12  your job which don't involve another governmental
13  agency?
14      A.  Well, often the -- well, they involve
15  city employees and officers, not necessarily the
16  agency itself.
17      Q.  But the allegation is that people in
18  other agencies are doing X or Y or Z; is that
19  right?
20      A.  Yes.
21      Q.  Every governmental employer or officer is
22  in some city agency, right?
23      A.  Right.
24      Q.  So I guess what I'm asking you is, you
25  seem to indicate that if another governmental

Page 131

1  agency seems to know about the complaint, it might
2  be appropriate to talk to them about it, is that
3  your testimony?
4      A.  Well, I think I tried to describe
5  earlier, but they're carrying on their own
6  investigation, and I tried to balance their need
7  for information and my ability to give information
8  and to be helpful without responding, without
9  getting too specific.
10      Q.  And did you understand what governmental
11  agency Mike Golojuch was in?
12      A.  Yes.
13      Q.  And what agency was he within?
14      A.  Budget and fiscal services.
15      Q.  Isn't that the same agency that Phil was
16  in?
17      A.  He's, as I understand it, is the
18  administrative services officer of that agency.
19      Q.  I'm asking if that's the same agency that
20  Phil English was in.
21      A.  The same department.
22      Q.  And that's the same department that Gary
23  Kurokawa was in, right?
24      A.  Yes.
25      Q.  Did you understand what an administrative

Page 132

1  services officer was when you received this fax of
2  February 26, 2003, Exhibit 79?
3      MR. LORUSSO:  You mean email as opposed
4  to fax.
5      MR. MOSELEY:  I mean email, I didn't mean
6  fax.
7      THE WITNESS:  Generally, yes.
8      Q.  BY MR. MOSELEY:  What was your
9  understanding an administrative services officer
10  is?
11      A.  They deal with some personnel issues,
12  they deal with budget planning, ordering the
13  products and services needed by the department,
14  those types of things.
15      Q.  As of February 26, 2003, had Mike
16  Golojuch made you aware of any meeting he had on
17  January 15th, 2003, with Bob Magota?
18      A.  Not that I remember.
19      MR. NELSON:  I'm just looking at the
20  date, 26th, is that the date we're using?
21      Q.  BY MR. MOSELEY:  Didn't I say February
22  26th, 2003?
23      A.  The date of the email of 79.
24      MR. NELSON:  Oh, I'm looking at the wrong
25  email, sorry.

Page 133

1      THE WITNESS:  Not that I remember.
2      Q.  BY MR. MOSELEY:  Do you remember Mike
3  Golojuch telling you anything about the subject
4  matter of any meetings that he may have had with
5  anybody from the assessment division as of February
6  26th, 2003?
7      A.  All that I recall is what's stated in
8  Exhibit 79 regarding Chris Graff's complaint.
9      Q.  And you don't remember whether there was
10  a follow-up phone call with respect to any of this
11  information?
12      A.  Follow up to me.
13      Q.  Either from you or to you from Mike
14  Golojuch.
15      A.  I don't remember.
16      Q.  Is that something you might have taken
17  notes on?
18      A.  I might have.
19      Q.  Did you or anybody review your file to
20  see if there were notes on such a phone call?
21      A.  I don't believe so.
22      Q.  Is that something that you would be
23  contending would be subject to one or more of the
24  various privileges that have been asserted today?
25      A.  I don't know.

34 (Pages 130 to 133)

Page 134

1    MR. NELSON:  Well, I think as we
2  indicated, if we're talking about Mr. Golojuch's
3  investigation and we're not getting into
4  Mr. Totto's investigation, and there are probably
5  some that are mixed up, but if it's clearly
6  relating only to Mr. Golojuch's investigation, I
7  think that's something you could turn over.
8    Q.  BY MR. MOSELEY:  Further down in Exhibit
9  94 you say, "I will add that Chris's interview was
10  taped."
11    Do you see that?
12    A.  Yes.
13    Q.  And you wouldn't tell me today whether
14  Chris's interview was taped.
15    A.  I don't recall whether I did or not.
16    Q.  Was Chris's interview taped?
17    A.  I believe it was.
18    Q.  Did you have any interviews with anybody
19  else besides Chris?
20    MR. LORUSSO:  Objection; already asked
21  and answered.
22    MR. NELSON:  Asked and answered.
23    MR. MOSELEY:  And the answer was?
24    THE WITNESS:  I'm not sure that I was
25  allowed to answer that before.

Page 135

1    MR. NELSON:  I believe you stated there
2  were a number of interviews without stating names.
3    THE WITNESS:  That's right.  I may have.
4    Q.  BY MR. MOSELEY:  What was the date that
5  you met with Gary Kurokawa?
6    MR. LORUSSO:  Objection; assumes facts
7  not in evidence, lacks foundation.
8    MR. NELSON:  Same objection and
9  objections on the deliberative process, privilege,
10  confidentiality, under the ordinance and the
11  charter.  Instruct not to answer.
12    Q.  BY MR. MOSELEY:  And you're taking that
13  position, are you, despite the fact Mike Golojuch
14  asked, I would like to know the date that you met
15  with Mr. Graff, and you responded to Mike Golojuch,
16  I interviewed Chris on January 24th, and that's --
17  despite the fact that you did that with respect to
18  Chris Graff's interview on Mike Golojuch's inquiry,
19  you're not going to tell me the date you
20  interviewed Gary Kurokawa; is that right?
21    MR. LORUSSO:  Objection; argumentative,
22  lacks foundation.
23    MR. NELSON:  Same objections.  Instruct
24  not to answer.
25    Q.  BY MR. MOSELEY:  What date did you

Page 136

1  interview Ann Gima?
2    MR. NELSON:  Same objections, same
3  instructions.
4    MR. LORUSSO:  Just for the record,
5  objection, lacks foundation, assumes facts not in
6  evidence.
7    Q.  BY MR. MOSELEY:  Did you record your
8  interview with Gary Kurokawa?
9    MR. NELSON:  Same objection, same
10  instructions.
11    MR. LORUSSO:  Lacks foundation, assumes
12  facts not in evidence.
13    Q.  BY MR. MOSELEY:  Did you disclose to Mike
14  Golojuch that you had recorded your interview with
15  Chris Graff?
16    MR. NELSON:  I think the document,
17  Exhibit 94, speaks for itself on that point.
18    Q.  BY MR. MOSELEY:  Did you disclose to Mike
19  Golojuch that you had recorded the interview with
20  any other specific person?
21    MR. NELSON:  Objection.  Same objections,
22  same instruction.
23    MR. MOSELEY:  You're instructing him not
24  to answer that?
25    MR. NELSON:  Yes.

Page 137

1    Q.  BY MR. MOSELEY:  Will you identify for me
2  the dates upon which you interviewed anybody else
3  without disclosing the identity of the person you
4  interviewed?
5    MR. NELSON:  Objection; instruct the
6  witness not to answer.
7    MR. MOSELEY:  And that's on the basis of?
8    MR. NELSON:  The deliberative process
9  privilege, the confidentiality requirements with
10  respect to Ethics Commission files and records.
11    Q.  BY MR. MOSELEY:  Would you explain to me
12  why that prohibition would apply to the question I
13  just asked, and it didn't apply to Mike Golojuch's
14  inquiry about the interview with Chris Graff?
15    MR. WONG:  I guess I'd object to that as
16  calling for a legal conclusion and calling for a
17  speaking objection.
18    THE WITNESS:  I think I'd have to talk
19  with counsel about that.
20    MR. MOSELEY:  Do you want to do that?
21    MR. NELSON:  Before we break, could you
22  read back the question, please.
23    (The requested portion of the record was
24  read.)
25    MR. LORUSSO:  Before we take a break, may

35 (Pages 134 to 137)

Page 138

1  I just inquire, counsel, is that question addressed
2  to the witness or addressed to his counsel?
3      MR. MOSELEY: It's addressed to the
4  witness. The witness is the Executive Director and
5  legal counsel for the Ethics Commission.
6      MR. LORUSSO: Thank you. I just wanted
7  the record clear.
8      (The deposition was at recess.)
9      (The requested portion of the record was
10 read.)
11     MR. NELSON: I just want to object, that
12 it calls for legal conclusions by Mr. Totto.
13     THE WITNESS: As I tried to articulate
14 before, I think part of this was because Golojuch
15 had some information about the complaint, had asked
16 some questions in order to conduct his
17 investigation, that the information that I was
18 disclosing was most, I believe of a general nature,
19 and that, as I think we had mentioned, and I can't
20 remember if it was this morning or earlier this
21 afternoon, that UIPA does allow for one agency to
22 ask another agency for information, and in my
23 experience at that time and now, usually the
24 administrative service officers are the ones who do
25 conduct workplace issue investigations.

Page 139

1      Q.  BY MR. MOSELEY: Is it your understanding
2  that UIPA prohibits you from disclosing such
3  information in a proceeding such as this, in which
4  you've been subpoenaed by a Federal Court?
5      A.  I don't have any understanding either
6  way.
7      Q.  Are you aware of any opinion which says
8  it doesn't apply to this sort of a situation?
9      A.  That UIPA does not apply?
10     Q.  Yes, in the context of litigation and
11 discovery proceedings.
12     A.  I'm not aware either way. I know there
13 are some cases that, or a case that talks to that,
14 but I am not familiar with it.
15     Q.  So let me see if I summarize this
16 correctly. The distinction between Mike Golojuch's
17 questions to you about these things and my
18 questions to you about these things is that one,
19 he's a governmental agency and I'm not, and two,
20 that the UIPA allows for disclosure to him as a
21 governmental agency but it does not allow for
22 disclosure to me under these circumstances. Have I
23 properly summarized?
24     MR. LORUSSO: Objection; vague and
25 ambiguous, over-broad as to "these things."

Page 140

1      MR. NELSON: I join in that.
2      THE WITNESS: I think I've given other
3  reasons, also, as stated before, regarding the
4  request from Golojuch.
5      Q.  BY MR. MOSELEY: One of them was that he
6  had familiarity with the case, right?
7      A.  Um-hum.
8      Q.  Yes?
9      A.  Yes.
10     Q.  Do you believe that I have familiarity
11 with this case?
12     MR. LORUSSO: Objection, calls for
13 speculation.
14     MR. WONG: And vague and ambiguous as to
15 "this case."
16     MR. NELSON: Join in those.
17     Q.  BY MR. MOSELEY: Let's put it this way.
18 I think you said he had familiarity with the
19 underlying complaint to the Ethics Commission,
20 that's what you said, right?
21     A.  Yes.
22     Q.  When I said "this case," that probably
23 wasn't proper because this lawsuit wasn't in
24 existence. Do you believe that I have familiarity
25 with the underlying complaint to the Ethics

Page 141

1  Commission?
2      A.  I believe so.
3      Q.  Do you believe that my familiarity is
4  equal to that of Mike Golojuch's?
5      A.  I have no idea.
6      MR. NELSON: Objection; calls for
7  speculation.
8      Q.  BY MR. MOSELEY: Is there any other
9  distinction between me and Mike Golojuch that would
10 be material to a decision, whether or not you could
11 tell Mike Golojuch something but you couldn't tell
12 me?
13     A.  Other than what I've stated so far and
14 the objections that have been raised, not that I
15 know of. Well, I mean, to be fair, we've gone
16 through several different levels of objections,
17 several explanations on the same document, so I'm
18 trying to incorporate all those, so that I don't
19 get sandbagged at a later time. Oh, we didn't
20 raise that.
21     Q.  I understand that, and I will promise you
22 I won't sandbag you on that, I have no intention of
23 doing that, but I will tell you that my -- I'm
24 actually somewhat incredulous that I'm not being
25 allowed to get the information under the subpoena

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090   Fax: 808.524.2596

Page 142

1   that you were brought here on and yet Mike Golojuch
2   only had to email you and receive similar kind of
3   information without really seemingly any question
4   or any objection.  And my questions have been
5   directed that, and if you have anything else, other
6   than what you've stated which might explain that
7   distinction, I'd appreciate hearing it, but I --
8       A.   Sure.  Well, I guess that's the crux of
9   it, you've asked for a very generic, broad, bring
10  everything related to, and Golojuch asked for
11  focused information, and we've all understood that
12  we'll have to have some decision-making by a
13  magistrate or judge to help us determine what is
14  appropriate for us to disclose, what isn't.
15      Q.   But you would admit, would you not, that
16  I've asked for focused information as in the dates
17  you interviewed Gary Kurokawa, the dates you
18  interviewed other people, that kind of thing?
19      A.   You've asked for both general and
20  focused, specifically.
21      Q.   And, again, I understand the position,
22  and I've maintained all along that this -- let's go
23  to the court, the court will decide, and I have no
24  problem with that concept at all.
25           MR. NELSON:  I want to point out that it

Page 143

1   was your choice to go forward with the deposition
2   before we did that.
3            MR. MOSELEY:  And I would like to point
4   out that there was no way the court could have
5   actually known the kinds of questions that wouldn't
6   be responded to unless we tried to ask them.
7            MR. NELSON:  I agree, it's probably more
8   useful to the court, in that sense.
9       Q.   BY MR. MOSELEY:  Have you had any
10  interference with anybody in your investigation of
11  the complaint which Phil English lodged with the
12  Ethics Commission on January 22nd, 2003?
13      A.   I don't know what you mean by
14  interference.
15      Q.   Has anybody tried to stymie your
16  investigation, or tried to prolong the
17  investigation, or tried to prevent any proceeding
18  from going forward, that kind of thing?
19      A.   I'm going to have to confer with counsel,
20  sorry.
21           MR. MOSELEY:  No, no apology necessary,
22  it's just cutting into Tony's questioning time.
23           (The deposition was at recess.)
24           (The requested portion of the record was
25  read.)

Page 144

1            THE WITNESS:  No.
2       Q.   BY MR. MOSELEY:  Have you received any
3   instruction from any member of the Ethics
4   Commission that this investigation and/or the
5   resolution of Phil's January 22nd, 2003 complaint
6   is what you should do?
7            MR. WONG:  I'd object to it as assuming
8   facts not in evidence.
9            MR. NELSON:  I'm sorry, I didn't
10  understand the last part of the question.
11           THE WITNESS:  I got confused.
12           (The requested portion of the record was
13  read.)
14      Q.   BY MR. MOSELEY:  I'm sorry.  That you
15  should delay.
16      A.   That I should delay it?
17      Q.   Yes.
18      A.   No.
19      Q.   Have you received any instructions from
20  outside the Ethics Commission with respect to this
21  case at all?
22      A.   No.
23      Q.   Have you received instruction from Tom
24  Riddle or his agency?
25      A.   No instruction.  You know, based on your

Page 145

1   representation on Exhibit 93, we had a
2   conversation, but I don't believe there was any
3   instruction at all.
4       Q.   Have you received any instruction from
5   Mike Golojuch or his agency?
6       A.   No.
7       Q.   Have you received any instruction from
8   the office of the Mayor?
9       A.   No.
10      Q.   Have you received any instruction from
11  Corp. Counsel other than maybe legal advice from
12  the deputy who is sitting here with you today?
13      A.   No.
14      Q.   Have you received any instruction from
15  anybody at the assessment division?
16      A.   No.
17      Q.   Have you received any instruction from
18  anybody else at Department of Budget and Fiscal
19  Services?
20      A.   No.
21      Q.   Why did you hesitate when I asked you the
22  original question about whether you had had any
23  interference?
24           MR. LORUSSO:  Objection; argumentative.
25           MR. NELSON:  And I object because he

Page 146

1  recessed to confer with his attorney, so I think
2  you're getting into attorney-client privilege.
3      Q.  BY MR. MOSELEY:  Was there a legal issue
4  that you felt you had to address before you could
5  answer that question?
6      A.  Yes.  And, also, I paused, I think, to
7  ask you what you meant by interference.
8      Q.  But we did take a break so you could
9  consult your counsel.
10     A.  That's right.
11     Q.  Have you ever had occasion, in your
12  service with the Ethics Commission, to deal with
13  any other whistleblower cases?
14     A.  Yeah, what we generically call a
15  whistleblower case, yeah.
16     Q.  And how many of those have you dealt
17  with?
18     A.  I'd have to say maybe six, just ballpark.
19     Q.  Were advisory opinions issued on any of
20  those cases?
21     A.  I can think of one right offhand, but I'm
22  trying to think of the others.  Some are, I can't
23  remember if all of them ended up in formal advisory
24  opinions.
25     Q.  Can you tell me the names of the ones

Page 147

1  that ended up in formal advisory opinions?
2      A.  Well, they would go by number.
3      Q.  Can you tell me the names of any of the
4  parties?
5      A.  I can tell you one because it was -- if
6  you were to -- well, 98-2 --
7      MR. NELSON:  Do you have to look at it to
8  know?
9      THE WITNESS:  There's a OIP opinion 98-2
10  that seems to have -- require that if someone asks,
11  Oh, is there an advisory opinion on a particular
12  employee or officer of the city, that we're not
13  supposed to state yes or no.  To me, it's --
14  personally, doesn't make a lot of sense but that's
15  my concern at this point.
16     If you were to look on our website at
17  advisory opinions, I think you could see a couple.
18  Now, for clarification purposes, I don't believe
19  any of these are whistleblower -- I'm trying to
20  think if any of them were where an employee raised
21  an ethics issue to a supervisor or something like
22  that, I can't remember.  I don't think so, I think
23  they may have been direct complaints over to our
24  office.
25     Q.  BY MR. MOSELEY:  Unless the court rules

Page 148

1  that we're not going to be allowed to obtain
2  certain kind of information with you, then my
3  inclination is to tell you that this deposition is
4  not over, and in that case I'm going to ask you
5  when you come next time to bring information with
6  respect to the five or six whistleblower cases that
7  you referenced.  Okay?
8      MR. NELSON:  For clarification, you're
9  talking about information that would be on the
10  public record or you're asking for information on
11  the underlying cases?
12     MR. MOSELEY:  Well, my understanding is
13  that once an advisory opinion is issued, that the
14  prohibition about disclosure is no longer in place.
15     MR. NELSON:  Well, that's not my
16  understanding, and I don't know if Mr. Totto --
17     MR. MOSELEY:  We'll put it on the record
18  that I'm requesting to be provided with information
19  on other whistleblower cases in which the Ethics
20  Commission, or Chuck Totto, has actually dealt
21  with.  And I think I'm going to be entitled to get
22  that, and I'll tell you right now, on the basis
23  that we're alleging that this is a pattern and
24  practice of the city to retaliate against
25  whistleblowers to discourage this activity in

Page 149

1  violation of the state law and violation of their
2  first amendment rights.
3      THE WITNESS:  I hate to ask this
4  question, how far back do you want to go?
5      MR. MOSELEY:  Let's go back only as far
6  as you've been involved with the Ethics Commission.
7      Q.  In your capacity at the Ethics
8  Commission, have you ever conducted seminars for
9  employees or managers or supervisory personnel
10  about the requirements of the city ethics law?
11     A.  Yes.
12     Q.  Have you ever done that for the
13  assessment division?
14     A.  Not specifically the assessment division,
15  but there is a mandatory training, ethics training
16  for, among others, all supervisors and managers of
17  the city.
18     Q.  And do you have a course syllabus or some
19  outline that you follow each time?
20     A.  Yeah, and this is on our website, it's
21  the -- I can provide you with a packet if you'd
22  like, because we do pull a few of our forms
23  together, but basically the meat of our training
24  comes from the plain language guide that's on our
25  website.

38 (Pages 146 to 149)

Page 150

1    Q.   Is part of your training -- this is just
2    for management supervisory personnel; is that
3    right?
4    A.   And Commission members, elected officials
5    cabinet members, they're included in the managers
6    and supervisors.
7    Q.   Is there any part of that training that
8    deals with their obligations with respect to
9    whistleblowers?
10    A.   No.
11    Q.   Do you know of any?
12    A.   Can I correct?
13    Q.   Sure.
14    A.   I get a lot of questions during the
15    training and so from time-to-time somebody might
16    raise questions.  I know it's been raised in
17    various training sessions, but not as a regular
18    course do I talk about whistleblowers.
19    Q.   Are you aware of any other training
20    program in the city that deals with the rights and
21    obligations of management or supervisory personnel
22    in whistleblower situations?
23    A.   I'm not aware of any.
24    Q.   Are you aware of any training in the city
25    with respect to whistleblowers?

Page 151

1        MR. NELSON:  Objection; asked and
2    answered this morning, I think.
3        THE WITNESS:  Not that I know of.  I
4    haven't necessarily looked, but not that I know of.
5    Q.   BY MR. MOSELEY:  That's fair enough.
6        I'm almost pau, actually.  I'd like to
7    direct your attention to Exhibit 93.
8        Have you ever seen this exhibit before?
9    A.   No.
10    Q.   I will tell you that it purports to be a
11    note made by Tom Riddle, although his name doesn't
12    appear on it anyplace, do you remember having a
13    phone discussion with Tom Riddle on or about
14    February 28th, 2003?
15        MR. LORUSSO:  Object to the form and
16    lacks foundation as to this document.
17        THE WITNESS:  I had a discussion with Tom
18    Riddle at some point, I don't know if it was about
19    Phil's, any matter dealing with Phil, I only
20    remember Tom Riddle, because I think at that point
21    I had either recently read or taken my son to see
22    one of the Harry Potter books where Tom Riddle is
23    the villain.
24    Q.   BY MR. MOSELEY:  Well, I'm not saying
25    that Tom Riddle is a villain in this case.

Page 152

1    A.   Let me read it one more time.  You know,
2    none of this -- it just doesn't help refresh my
3    memory.
4    Q.   Well, did you at any time tell Tom Riddle
5    that something in your investigation so far had
6    found any of English's complaints to be true?
7    A.   I don't remember.
8    Q.   As of February 28, 2003, was there
9    anything in your investigation to that date that
10    had found any of Phil's complaints to be true?
11        MR. NELSON:  Objection; instruct the
12    witness not to answer.
13    Q.   BY MR. MOSELEY:  Did you tell Tom Riddle
14    that?
15    A.   I don't remember.
16        Roger, I'm sorry, did you say that he
17    called, or we had a communication regarding a
18    workers' comp claim?
19    Q.   Tom Riddle handled the workers' comp
20    claim.
21    A.   As to your prior questions, no change.
22    The only thing that jogs my memory is with someone
23    on behalf of the city, they called and asked some
24    questions about workers' comp, that's all, and I
25    can't remember if it was Tom or not.

Page 153

1    Q.   But did they ask about your
2    investigation, finding any of Phil's complaints to
3    be true?
4    A.   Not that I remember.
5    Q.   Did they ask you if any part of your
6    investigation had found any of Phil's complaints to
7    be false?
8    A.   Don't recall.
9    Q.   As of February 28th, 2003, did any part
10    of your investigation to that date find any of Phil
11    English's complaints to be false?
12        MR. NELSON:  Objection; same instruction,
13    not to answer.
14        THE WITNESS:  Following counsel's
15    instruction.
16    Q.   BY MR. MOSELEY:  If Tom Riddle or anybody
17    else had called you as of February 28th, 2003,
18    would you have felt it appropriate to tell them
19    that your investigation so far had found some parts
20    of Phil's complaint to be true?
21        MR. NELSON:  Objection; calls for
22    speculation, lack of foundation.
23        THE WITNESS:  The wording in 93 is kind
24    of odd, I don't think I'd say, Part of the
25    complaint's true or part of the complaint's false.

Page 154

1  That's not an approach I would take, especially
2  with Tom Riddle or someone outside of the
3  investigation.  I think that's one of the reasons
4  the summary doesn't seem to jog my recollection.
5       Q.  BY MR. MOSELEY:  Fair enough.
6       If you receive a court order in this case
7  to produce the documents that you haven't produced
8  and to answer the questions you haven't answered,
9  is it your intent to follow the instruction of the
10 court order?
11      MR. NELSON:  Well, I mean, that gets into
12 our decisions on whether it would be necessary to
13 seek an appeal, so I don't think we can answer that
14 question at this point.
15      MR. MOSELEY:  Are you instructing him not
16 to answer that question?
17      MR. NELSON:  You can answer it, if you
18 can.
19      THE WITNESS:  What he said.
20      Q.  BY MR. MOSELEY:  He was pointing to his
21 counsel, for the record.
22      Is any Ethics Commission investigation,
23 with respect to Phil English's January 22nd, 2003
24 complaint, a criminal investigation?
25      A.  We don't have jurisdiction to do a

Page 155

1  criminal investigation.
2       Q.  Can the Ethics Commission prosecute
3  someone criminally?
4       A.  No.
5       Q.  The best you could do is refer to the
6  police department, as you described earlier?
7       A.  That's right.
8       Q.  I'm just going to ask you if the Ethics
9  Commission has concluded its investigation with
10 respect to Phil's complaint, but you're actually
11 not even going to admit that there is an
12 investigation; is that right?
13      MR. NELSON:  Well, I think we did say
14 earlier in the deposition that the investigation
15 hadn't been concluded.
16      MR. MOSELEY:  Hadn't been concluded.
17      MR. NELSON:  Right.
18      THE WITNESS:  It has not been concluded.
19      Q.  BY MR. MOSELEY:  So whatever is there is
20 ongoing; is that right?
21      A.  Right.
22      Q.  Is Phil English the subject of any Ethics
23 Commission investigation?
24      A.  The subject.
25      Q.  You know, I used the word target earlier,

Page 156

1  and you said you used the word subject, which I
2  actually think is a better word.
3       A.  I'd have to confer with Gordon because
4  the shoe goes on the other foot, right?
5       Q.  Exactly.
6       A.  I don't know whether I can respond to
7  that, based on the Office of Information Practices
8  opinion letter 98-2.
9       Q.  If Phil authorizes you to disclose that,
10 can you disclose it?
11      A.  If there were a complaint against Phil,
12 it wouldn't be -- I don't know that he would be the
13 one that would allow me to disclose that.
14      Q.  Under the Information Practices Act?
15      A.  Maybe.  I don't know, if it gets into all
16 the other objections, too.
17      MR. NELSON:  I'm not sure I understand
18 the question.
19      Do you understand the question?
20      MR. MOSELEY:  Well, I asked if there was
21 an ethics investigation against Phil, and he raised
22 the Information Practices Act as being a
23 prohibition, a possible prohibition against
24 disclosing it, and I'm asking if Phil would
25 authorize that, if that would obviate the question

Page 157

1  with respect to the Information Practices Act.
2       THE WITNESS:  I don't know.
3       MR. MOSELEY:  I think I may be pau for
4  now, but let me just check.
5       Actually, I'll stop for now and turn the
6  floor over to Tony.
7              EXAMINATION
8  BY MR. WONG:
9       Q.  Hi, Mr. Totto, my name is Anthony Wong,
10 and I represent GK Appraisals in this case.  I have
11 a few follow-up questions to Mr. Moseley's.
12      First, I wanted to explore a little bit
13 about the boundaries on what kind of information
14 you can disclose.  For example, if there is an
15 investigation concerning a particular subject and
16 the complainant asks about the status of that
17 investigation, are you at liberty to disclose the
18 status to the complainant?
19      A.  The practice of the office would be to
20 disclose the status but not get into details,
21 unless we had to -- we're using the complainant as
22 a source of information.
23      Q.  When you say you can disclose the status,
24 can you go into a little bit greater detail, for
25 example, do you just say it's ongoing or it's

40 (Pages 154 to 157)

Page 158

1 concluded or do you give them more?
2    A.   Usually, it would be ongoing, concluded
3 or generally what the next steps would be.
4    Q.   Did you ever receive any such inquiries
5 from Mr. English or his attorney regarding your
6 investigation in which Mr. English was the
7 complainant?
8        MR. MOSELEY:  Just for clarity, Tony, are
9 you talking about other than today's deposition?
10       MR. WONG:  Right, other than in today's
11 deposition.
12       MR. NELSON:  I'm going to have to object
13 to that one and instruct the witness not to answer.
14    Q.   BY MR. WONG:  In terms of the
15 confidentiality that you consider yourself subject
16 to, if you're in a meeting with other individuals,
17 for example, Mr. English and Mr. Moseley, is it
18 only you that's bound by the confidentiality, or
19 are all of the parties bound by the confidentiality
20 requirements regardless of whether they're employed
21 by the city or an agent of the city?
22    A.   I guess the best way to answer that is,
23 normally, I assume I'm bound.  The state Commission
24 used to have a gag order, I think, in their rules,
25 and that was ruled unconstitutional by the Federal

Page 159

1 Court, and it would prevent a complainant from
2 telling the media that they filed a complaint or
3 something like that.  So I look at it as, it's a
4 limitation on me.
5        As I mentioned earlier, sometimes I will
6 ask witnesses not to disclose what I've asked them
7 and so on, but I'm not sure that we could actually
8 prevent them from doing that.
9    Q.   Exhibit 93, you don't remember this
10 conversation, if there was one, with whoever the
11 author is here, but the author seems to indicate
12 that they gathered from you that there is -- how
13 can I say it -- a finding of ethical violation from
14 Mr. English's complaint.
15       Would that be a misconstruction of the
16 status of your investigation at this point,
17 February 22nd, 2003?
18       MR. LORUSSO:  With regard to the
19 document, let me object that the document speaks
20 for itself, and that may be a mischaracterization
21 of the document.
22       MR. NELSON:  Well, I'll join in that
23 objection.  I'll object to the extent that you're
24 seeking specific information about Mr. Totto's
25 investigation.  Instruct not to answer.

Page 160

1        (Exhibit 95 was marked for
2 identification.)
3    Q.   BY MR. WONG:  Mr. Totto, can you take a
4 look at what's been marked as Exhibit 95 and look
5 it over, and my question is going to be whether the
6 use reflected in Exhibit 95 would be an appropriate
7 use of city equipment and city time.
8        (A discussion was held off the record.)
9        THE WITNESS:  Mr. Wong, I'd be happy to
10 read this and to give you, if what you want is a
11 shoot from the hip answer, but I'd want to find out
12 who -- I mean, I know who Phil English is, and I
13 assume that in 2002 he was working for the city.
14 I'd want to find out who Dwight is, I'm trying to
15 see if there's any other information that I'd need
16 to -- so I don't know how you would like me to
17 proceed.  For right now, I'll just keep reading.
18    Q.   BY MR. WONG:  Can you assume that Dwight
19 is some sort of a union representative, a shop
20 steward.
21    A.   Okay.  We seem to have different pages.
22 I'm missing 232 and 233.
23       MR. MOSELEY:  I don't have a 232 either.
24       MR. NELSON:  I've got that one but not
25 234 or 233.

Page 161

1        (A discussion was held off the record.)
2        THE WITNESS:  I've read over the Exhibit
3 95.  I'm reluctant to give an advisory, you know,
4 an informal opinion on this just because it's so
5 fact-intensive, and I have a couple of questions.
6 We're assuming Dwight is union steward?
7    Q.   BY MR. WONG:  Is it too factually
8 complicated for you to give a --
9    A.   Off-the-cuff.  If a city employee called
10 up and asked, I'd want to look at it, read it more
11 carefully.
12    Q.   But generally, it would be improper for a
13 city employee to use city time and equipment for a
14 grievance process; is that correct?
15    A.   Well, based on that opinion 307, that we
16 looked at earlier, I'm not sure that this has the
17 same import, though.  It appears, at least on first
18 read, that Phil's trying to get information about
19 what his rights are, and there is also a fair
20 amount of discussion about -- well, there's at
21 least some discussion about, if I understand this
22 properly, the methods used for conducting the
23 appraisals by the city.  So there seems to be work
24 relationship and also trying to find out what his
25 union rights are.  I think I would have to be

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 162

1  pretty careful not to tell him he couldn't use the
2  city email to talk to his union steward.
3      Q.  Let me shift gears for a moment.  You
4  talked to at least Mike Golojuch about Phil's
5  complaint, and you didn't remember talking to Tom
6  Riddle or not; is that right?
7      A.  That's right.
8      Q.  Whoever you talked to, did you ever
9  intend to communicate to them that there had been
10  any Commission finding of violation with respect to
11  Phil's complaint?
12      MR. NELSON:  Objection, calls for --
13  well, lack of foundation.
14      THE WITNESS:  That would not be my normal
15  approach.
16      Q.  BY MR. WONG:  Well, I'm just asking you,
17  in any of your conversations, did you intend to
18  communicate that the Commission had found a
19  violation?
20      A.  No.
21      Q.  In any of your conversations with Mike
22  Golojuch or anyone else, did you intend to
23  communicate that the Commission had rendered an
24  advisory opinion with respect to Phil's complaint?
25      A.  No.

Page 163

1      Q.  In any of your conversations with Mike
2  Golojuch or others, did you ever intend to
3  communicate that the Commission had found probable
4  cause with respect to Phil's complaint?
5      MR. NELSON:  Objection.  I think
6  Mr. Totto has testified that the investigation is
7  ongoing.
8      MR. WONG:  I know, I'm not inquiring into
9  the status of the investigation, I'm only asking if
10  he intended to communicate that the Commission had
11  found probable cause.
12      MR. NELSON:  And I will object on lack of
13  foundation.
14      THE WITNESS:  I need to ask counsel.
15      (Whereupon, a discussion between the
16  witness and Mr. Nelson.)
17      MR. NELSON:  Could you read back the last
18  question.
19      (The requested portion of the record was
20  read.)
21      (The deposition was at recess.)
22      MR. NELSON:  I'm going to object to that
23  question and instruct the witness not to answer.
24      Q.  BY MR. WONG:  Did you ever intend to
25  communicate to Mike Golojuch that the Commission

Page 164

1  had found probable cause with respect to Phil's
2  complaint?
3      I'm just rephrasing the question a little
4  bit.  Before, I think I phrased it in terms of
5  anyone, now I'm phrasing it in terms of Mike
6  Golojuch, specifically.
7      MR. NELSON:  Object, same instruction.
8      Q.  BY MR. WONG:  Same question with respect
9  to Mr. Riddle, did you ever intend to communicate
10  to Mr. Riddle that the Commission had found
11  probable cause with respect to Phil's complaint?
12      MR. NELSON:  Same objection, same
13  instruction.
14      Q.  BY MR. WONG:  Was Mr. Moseley present
15  when you had your first meeting with Phil English,
16  with respect to his ethics complaint?
17      A.  I don't recall.
18      Q.  Would your records indicate those present
19  when you first interviewed Phil English with
20  respect to his ethics complaint?
21      A.  Probably.
22      Q.  Did Mr. Moseley have any input with
23  respect to formulating or assembling Phil English's
24  ethics complaint?
25      MR. NELSON:  Object and instruct the

Page 165

1  witness not to answer.
2      MR. WONG:  Thank you, I don't have any
3  more questions right now.
4      MR. LORUSSO:  I do have some questions,
5  it's going to take more than a few minutes to do,
6  and by agreement, we indicated we were going to
7  stop at 4:20 or so, in and around this time period.
8  I realize we may or may not be back for further
9  deposition, I would reserve my questions at that
10  time, and if necessary, obviously on a separate
11  occasion to continue with the deposition, even if
12  the court doesn't order certain questions to be
13  answered.
14      MR. MOSELEY:  I have a couple of very
15  brief follow-ups.  Do you mind if I ask them at
16  this point?
17      MR. LORUSSO:  Okay.
18      FURTHER EXAMINATION
19  BY MR. MOSELEY:
20      Q.  With respect to the complaint at the
21  Ethics Commission that Phil English made on January
22  22, 2003, what is the current status?
23      MR. NELSON:  Objection, instruct the
24  witness not to answer, except I believe he stated
25  it's ongoing.

42 (Pages 162 to 165)

Page 166

1    THE WITNESS: Yes.
2    Q.   BY MR. MOSELEY: And I'm doing this on
3  behalf of Mr. English who is sitting here with us
4  right today.
5        What is the next step in the processing
6  of that complaint?
7    A.   In this particular complaint, because of
8  the unusual circumstance of the Federal Court
9  proceeding, we will probably, if there's no ability
10  to work on a settlement at this point, we will
11  probably look to see how the Federal Court case
12  goes and then decide at that point.
13    Q.   When you say work on a settlement, work
14  on a settlement with who?
15        MR. NELSON: Objection; instruct not to
16  answer.
17    Q.   BY MR. MOSELEY: Other than for the
18  litigation in the Federal Court, is the next step
19  in this complaint to work on a settlement with Gary
20  Kurokawa?
21    A.   I'll take it back. I'll say the next
22  step is most likely, given, you know, who knows
23  what may happen, but most likely it will be to
24  await the Federal Court trial and the result from
25  the Federal Court trial.

Page 167

1    Q.   How long has that been the next step in
2  the proceeding, since the Federal Court trials, I
3  mean, since the lawsuit's been filed?
4    A.   I don't know. I'm not sure.
5    Q.   At some point in January 22nd of 2003,
6  Phil English formally complained to the Ethics
7  Commission, presumably there was some investigation
8  that went on, there were various steps which you
9  would have disclosed had you been asked; is that
10  right?
11    A.   Yes.
12    Q.   And then sometime in 2004, essentially a
13  year later, the federal lawsuit was filed; do you
14  understand that?
15    A.   I'll take your word for it that that's
16  when it was filed.
17    Q.   Is the next step the same now as it was
18  right before the federal lawsuit had been filed or
19  have you taken other steps between, say, the end of
20  2003 and now?
21        MR. NELSON: I'll object to other steps,
22  instruct the witness not to answer.
23    Q.   BY MR. MOSELEY: Is Phil English not
24  entitled to know the next step in the Ethics
25  Commission proceeding?

Page 168

1    A.   I thought I just said what that would be.
2    Q.   What you said was you're going to await
3  the outcome of the federal lawsuit; is that right?
4    A.   That's one of our options at this point.
5    Q.   Is that the next step?
6    A.   I'd have to confer with counsel about
7  that, actually. Not Gordon but other counsel.
8    Q.   What other counsel would you confer with?
9    A.   Matt Viola.
10    Q.   Well, one of the next steps would be
11  awaiting the outcome of the federal lawsuit?
12    A.   That's one option, yeah.
13    Q.   How long has that been one of the next
14  steps available?
15    A.   One of the options?
16    Q.   Right.
17    A.   Because that's the phrasing I use.
18        I assume, since we knew it was filed, the
19  Federal Court case was filed.
20    Q.   Have any other steps been taken between
21  the time you found out the lawsuit had been filed
22  and today?
23        MR. NELSON: Objection; instruct not to
24  answer.
25    Q.   BY MR. MOSELEY: I guess I'm bothered by

Page 169

1  the fact that you say, Well, the next step would
2  be, one of the options is to wait the outcome of
3  the litigation, but we're not entitled to know what
4  the other options are? Have you not been involved
5  in the step that you described earlier of a
6  settlement with Gary Kurokawa?
7        MR. LORUSSO: Objection; lacks
8  foundation, mischaracterizes the testimony, also
9  argumentative.
10    Q.   BY MR. MOSELEY: Have you not been
11  involved in that step?
12        MR. NELSON: I'm going to object and
13  instruct the witness not to answer.
14    Q.   BY MR. MOSELEY: Is that not a step that
15  the Ethics Commission and its staff was taking in
16  this case?
17        MR. NELSON: Same objections, same
18  instruction.
19    Q.   BY MR. MOSELEY: Is there any time limit
20  under which complaints to the Ethics Commission
21  must be resolved?
22    A.   There is -- I think one of the ordinances
23  says a complaint, and I'd have to look if it's a
24  complaint or request, whatever, has to be completed
25  within 30 days of its submission to the Commission,

43 (Pages 166 to 169)

Page 170

1  and the Commission, one of its opinions stated that
2  they don't read that as mandatory but rather as
3  discretionary, the shall, I'll say shall.  At some
4  point, I can supply you with the advisory opinion
5  where they say that, I can't remember the number
6  offhand.
7      Q.   Is there any statutory or regulatory
8  requirement that requires the Ethics Commission to
9  resolve this complaint, complete its investigation,
10  determine whether or not it's going to issue an
11  advisory opinion with any time at all?
12     A.   Not that I'm aware of.  I mean, I assume
13  that we would work under the reasonable, under the
14  circumstances approach, but I'm not aware of any
15  specific statutory law or case law.
16     Q.   Why would the Ethics Commission complaint
17  await the resolution of Phil English's lawsuit?
18     MR. NELSON:  Objection; instruct the
19  client not to answer.
20     MR. MOSELEY:  Okay.  I don't have any
21  more questions for now.
22     MR. LORUSSO:  Again, I want to reserve
23  questioning at this point in time.  I'm not waiving
24  questioning.
25     MR. MOSELEY:  Let's put on the record

Page 171

1  then, our intent is whether or not the court rules
2  that additional documents have to be provided or
3  whether or not additional testimony has to be
4  provided, apparently we're not all finished with
5  our questioning here today, so I'm not concluding
6  this deposition at this point, and we will
7  reconvene the deposition for the purposes of at
8  least allowing Mike Lorusso to ask his follow-up
9  questions and any additional follow-up questions we
10  would have, based on the cross.
11     Thank you very much.  And, again, did you
12  park in the building again, Chuck?
13     THE WITNESS:  I did.
14     MR. MOSELEY:  Okay, I want to make the
15  record clear, I'm going to validate Chuck's
16  parking, again.  I validate parking for all
17  witnesses we subpoena for depositions in this firm.
18     MR. LORUSSO:  I certainly have no
19  objection.
20     (The deposition adjourned at 4:30 p.m.)
21
22
23
24
25

Page 172

1      SIGNATURE OF THE WITNESS
2      I, CHARLES TOTTO, the witness in the above
3  deposition, do hereby certify that I have read the
4  foregoing deposition taken on June 23, 2006, and
5  that the said deposition is a true and correct
6  record of my testimony, with such corrections and
7  changes, if necessary, attached.
8
9
10  _____   _____
11  CHARLES TOTTO            Date
12
13
14
15
16  Signed before me this _____
17  day of _____, 2006
18
19  _____
20
21
22
23
24
25

Page 173

1  STATE OF HAWAII      )
                        ) ss.
2  COUNTY OF HONOLULU  )
3
4      BE IT KNOWN that the foregoing deposition
5  was taken before me, RITA KING, a Certified
6  Shorthand Reporter for the State of Hawaii; that
7  the witness before testifying was duly sworn by me
8  to testify to the whole truth; that the questions
9  propounded to the witness and the answers of the
10  witness thereto were taken down by me in shorthand
11  and thereafter reduced to print by computer-aided
12  transcription under my direction; that the witness
13  elected to read and sign; that the foregoing pages
14  are a full, true and accurate transcript of all
15  proceedings and testimony had and adduced upon the
16  taking of said deposition, all done to the best of
17  my skill and ability.
18     I FURTHER CERTIFY that I am in no way
19  related to nor employed by any of the parties
20  hereto nor am I in any way interested in the
21  outcome hereof.
22     DATED at Honolulu, Hawaii, this 26th day of
23  June, 2006.
24  _____
25     RITA KING, RPR, CSR No. 373

44 (Pages 170 to 173)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH, | Civil No.  04-00108 SOM/KSC |
| Plaintiff, | CERTIFICATE OF SERVICE |
| vs. | |
| CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1 –10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

The undersigned herby certifies that a true and correct copy of the foregoing was duly served upon the parties listed below by the United States mail, postage pre-paid at their respective address on July 5, 2006.

10010/2/56579.2

MICHAEL L. LARUSSO, ESQ.
Kawashima Lorusso & Tom, LLP
Fort Street Tower
745 Fort Street, 5th Floor
Honolulu, Hawaii  96813

       Attorneys for Defendants
       City & County of Honolulu,
       Gary T. Kurokawa, Robert O. Magota,
       and Ann C. Gima


KEVIN P. H. SUMIDA, ESQ.
ANTHONY L. WONG, ESQ.
Suite 1400, Mauka Tower
737 Bishop Street
Honolulu, Hawaii  96813

       Attorneys for Defendant
       GK APPRAISALS, INC.


GORDON D. NELSON, ESQ.
Department of The Corporation Counsel
City and County of Honolulu
530 South King Street, Room 110
Honolulu, Hawaii 96813

       Attorney for Charles Totto

DATED:  Honolulu, Hawaii, July 5, 2006.


               /s/Roger S. Moseley
               ROGER S. MOSELEY
               ALAN K. LAU
               CHRISTOPHER J. MUZZI
               RENEE M. FURUTA
               Attorneys for Plaintiff
               PHILIP E. ENGLISH