Page 1

IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH, | ) CIVIL NO. 04-00108 |
| Plaintiff, | ) |
| vs. | ) |
| CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10, | ) |
| Defendants. | ) |

DEPOSITION OF CHARLES TOTTO

Taken on June 23, 2006, commencing at 9:15 a.m. at the Law Offices of Moseley Biehl Tsugawa Lau & Muzzi, Alakea Corporate Tower, 1100 Alakea Street, 23rd Floor, Honolulu, Hawaii, before Rita King, a Certified Court Reporter in the State of Hawaii.

Ralph Rosenberg Court Reporters, Inc.

Ofc: 808.524.2090   Fax: 808.524.2596

**EXHIBIT H**

Page 2

COUNSEL APPEARING:

Attorney for Plaintiff:
    ROGER S. MOSELEY, ESQ.
    CHRISTOPHER J. MUZZI, ESQ.
    Moseley Biehl Tsugawa Lau & Muzzi
    Alakea Corporate Tower
    1100 Alakea Street, 23rd Floor
    Honolulu, Hawaii 96813
    808.531.0490

Attorney for Defendants City & County of Honolulu, Gary T. Kurokawa, Robert O. Magota and Ann C. Gima:

    MICHAEL L. LORUSSO, ESQ.
    Kawashima Lorusso & Tom, LLP
    Topa Financial Center
    745 Fort Street, 5th Floor
    Honolulu, Hawaii 96813
    808.275.0300

Attorney for Defendant GK Appraisals, Inc.:

    ANTHONY L. WONG, ESQ.
    Sumida & Tsuchiyama
    735 Bishop Street, Suite 411
    Honolulu, Hawaii 96813
    808.356.2600

Attorney for Deponent Charles Totto:
    GORDON D. NELSON, ESQ.
    Deputy Corporation Counsel
    530 South King Street, Room 110
    Honolulu, Hawaii 96813
    808.523.4832

Also present:

    Philip English

Page 3

INDEX

WITNESS                             PAGE

CHARLES TOTTO

    Examination by Mr. Moseley     4,165
    Examination by Mr. Wong        157

EXHIBITS

Deposition
Exhibits  Description               Marked

82   Subpoena                       8
83   Letter - 6-15-06               10
84   Memo - 5-5-06 with attached Advisory
     Opinion No. 2006-2             47
85   Memo - 1-25-06 with attached Draft
     Confidential Advisory Opinion
     No. 2006-                      49
86   Text of the revised ordinances having
     to do with the Ethics Commission   52
87   Advisory Opinion No. 307       83
88   Email - 2-5-03                 86
89   Email - 2-5-03                 86
90   Email - 2-5-03                 86
91   Email - 2-10-03                86
92   Email - 2-27-03                86
93   Phone discussion with Chuck Totto of
     The Ethics Commission on 2-28-03   86
94   Email - 2-28-03                104
95   Email - 10-31-02               160

Page 4

    CHARLES TOTTO,
a witness herein, having been first duly sworn by
the Notary Public, was examined and testified as
follows:
        EXAMINATION
BY MR. MOSELEY:
    Q.  Can you tell us your name for the record, please.
    A.  Charles, Totto, T-o-t-t-o.
    Q.  And I don't actually need your residence address, but what's your working address?
    A.  715 South King Street, number 211.
    Q.  And what do you want me to call you?  I'm probably going to call you Chuck.
    A.  That's fine with me.  I respond to Chuck.
    Q.  Thank you.  By calling you Chuck I don't want to be disrespectful, I've known you for a number of years, and I could lapse into that, but if that offends anybody, I won't call him Chuck.  And you may call me Roger, and I've been called a lot worse names than that.
    A.  But you're allowed to call me whatever you want.
    Q.  Chuck, have you ever had your deposition taken before?

Page 5

    A.  No.
    Q.  Really?  Wow.  Well, have you taken depositions before?
    A.  Yes.
    Q.  On how many occasions?
    A.  Dozens.
    Q.  Well, at the risk of instructing you where you don't need to be instructed, let me go over a few things with respect to depositions.  Basically, this deposition is being taken for three major types of purposes.  The first is, basically, what is called discovery, we want to find out what you know about the case in which the deposition is being taken, which is a case in which Phil English has made a claim against the City and County of Honolulu, Ann Gima, Bob Magota and Gary Kurokawa.  The second general purpose for a deposition is essentially to preserve your testimony.  If you left here on the way out of our parking garage and you find that you can't see right when you turn left from our driveway, and you get hit by a city bus or something, we want to be able to have your testimony preserved for trial in case you can't be here.
    A.  That's a cheery thought.

Page 6

1  Q. Well, I'm sorry, but it's there.
2       The third possible use of a deposition,
3  and there are others besides these three, but the
4  third major use is that if you testify differently
5  at trial at any time than you do here today,
6  somebody will certainly point that out, that's, as
7  you know, called impeachment, and you'll be asked
8  to explain why your testimony is different.
9       During the course of the deposition, I'm
10 going to ask you questions, and I would like you to
11 respond verbally with responses that the court
12 reporter is capable of writing down without
13 confusion. Please avoid "um-hum" and "uh-uh", say
14 yes or no, if possible, because that's often
15 confusing in a transcript. You understand that?
16    A. Yes.
17    Q. And you know, normally when people talk
18 in a conversation one person would start before the
19 other person has concluded, because they know what
20 the rest of the sentence or question is going to
21 be. We have to try, and I'm guilty of this, we
22 have to try not to do this in this case, so that
23 the court reporter doesn't have an overlapping
24 testimony or speaking. It makes it easier to
25 record. I'm sure I'm going to be guilty of that, I

Page 7

1  don't know if you'll be guilty of that, but I'd
2  just like to try to avoid that.
3       Another thing that we should understand
4  is that if I ask you a question and you don't
5  understand the question, I need you to ask me what
6  I'm talking about. I'm not very good at this, I
7  oftentimes ask really ham-handed questions that,
8  after I think about them, I don't even understand
9  what they are, but if you answer a question without
10 asking me for clarification, I'm going to assume
11 that you understood it and that your answer is
12 responsive. Do you understand that?
13    A. Yes.
14    Q. So you will tell me if you don't
15 understand the question, right?
16    A. I'll do my best.
17    Q. We don't want you to speculate here. If
18 I ask you a question and you give me your best
19 understanding of something or your best
20 recollection of something, I want you to clearly
21 label it as your best understanding or your best
22 recollection. There may well be questions like
23 that, and Mr. Lorusso is especially concerned about
24 those kinds of issues, so you need -- while you can
25 give me your best recollection or your best

Page 8

1  understanding, I do want you to label those things
2  so we're not just in a position of saying, hey,
3  this was his testimony, this is what he understands
4  and remembers. Do you understand that?
5     A. Yes.
6     Q. Is there something we have left out with
7  respect to your--
8        MR. LORUSSO: No, thank you.
9        MR. MOSELEY: Do you want to add or
10 subtract?
11       MR. LORUSSO: No, I don't. Thank you
12 very much.
13       MR. MOSELEY: I don't necessarily always
14 cover Mike's concerns in this prologue.
15    Q. In any case, are you here today pursuant
16 to a subpoena?
17    A. That's correct.
18    Q. Did you bring -- well, let's do this.
19 One of the things we've been doing is we have been
20 marking the exhibits just numerically in this case
21 from one to whatever it turns out to be in the end,
22 regardless of the deposition. So what I'm going to
23 do now is have this one marked next in order, I
24 believe it's 82.
25       (Exhibit Number 82 was marked for

Page 9

1  identification.)
2     Q. BY MR. MOSELEY: Is Exhibit 82 a copy of
3  the subpoena you were served to attend this
4  deposition?
5     A. Yes.
6     Q. Actually, probably you didn't see the
7  proof of service part, but it's the second page of
8  this; is that right?
9     A. That's correct.
10    Q. In the middle of the first page of
11 Exhibit 82, it says "You are commanded to produce
12 and permit inspection and copying of the following
13 documents or objects at the place, date and time
14 specified below."
15       Do you see that section?
16    A. Yes, I do.
17    Q. And there's a wonderful check mark in the
18 box right there next to that, right?
19    A. Correct.
20    Q. Did you bring any documents described in
21 that section?
22    A. No, I did not.
23    Q. And do you have in your possession, or
24 under your control, any documents that are
25 described in that section?

Page 10

1   A.   Yes.
2       (Exhibit Number 83 was marked for
3   identification.)
4   Q.   BY MR. MOSELEY: Showing you now what's
5   been marked as Exhibit 83, have you seen this
6   document before?
7   A.   I think I saw a fax copy.
8   Q.   And it's marked, on the second page it
9   shows a cc to you. Do you see that?
10   A.   Yes.
11   Q.   This purports to be a letter written to
12   me from your attorney, Gordon Nelson, who is a
13   Deputy Corporation Counsel, does it not?
14   A.   Correct.
15   Q.   Is that your understanding of what this
16   document is?
17   A.   Yes.
18       MR. MOSELEY: Gordon, would you stipulate
19   that this is your letter?
20       MR. NELSON: Yes.
21   Q.   BY MR. MOSELEY: In this letter it says
22   pursuant to FRCP Rule 45(c) et cetera, that you
23   object to the production of documents, of any
24   documents at your deposition. Did you see that?
25   A.   Yes.

Page 11

1   Q.   Are you raising that objection?
2   A.   I'll let me attorney respond.
3       MR. NELSON: Yes.
4   Q.   BY MR. MOSELEY: You're relying on your
5   counsel to raise the proper objections; is that
6   right?
7   A.   That's correct.
8   Q.   Do you have an independent understanding
9   of what those objections are?
10   A.   I do.
11   Q.   Are they correctly stated in the next
12   paragraph below that, pursuant to FRCP paragraph?
13   A.   I'm going to read it first, okay?
14   Q.   Okay.
15   A.   Yes, I've read them. If you could repeat
16   your question.
17       (The requested portion of the record was
18   read.)
19       THE WITNESS: Yes, they are.
20   Q.   BY MR. MOSELEY: Are there any other
21   objections you would have to producing those
22   documents?
23   A.   I don't know, I'd have to confer with
24   counsel.
25       MR. NELSON: I think we might. We did

Page 12

1   have a discussion on this letter and on the
2   subpoena, briefly on Tuesday morning. We talked
3   about whether we should go forward with the
4   deposition, you indicated you wanted to, although
5   the documents were not going to be produced. The
6   indication from you was that there would be a
7   motion with the judge and the magistrate, so I
8   think we may be coming forward with other
9   objections as we research the matter.
10       MR. MOSELEY: At this point, you don't
11   have an understanding of what they might be.
12       MR. NELSON: I stated what I have so far,
13   yes.
14       MR. MOSELEY: Okay, thank you.
15   Q.   Sorry, I had to do the paperwork.
16   A.   I understand.
17   Q.   So, at this point, you are claiming
18   privilege of the attorney-client privilege, the
19   attorney -- and I'm referencing the paragraph on
20   Exhibit 83 -- the attorney-client privilege, the
21   attorney work-product doctrine and the deliberative
22   process privilege; is that right?
23   A.   At least those.
24   Q.   And then it says "Release of the
25   subpoenaed documents is further objectionable as

Page 13

1   violative of applicable provisions of the City
2   Charter, of the City ordinances and of the Rules of
3   the City Ethics Commission"; is that right?
4   A.   Correct, it does say that.
5   Q.   And you understand that there are
6   provisions in all of those things, the charter, the
7   ordinances and the rules, which require you to
8   maintain the confidentiality of the documents we
9   requested; is that right?
10   A.   Yes.
11       MR. NELSON: If I may interject
12   something, I believe the Uniform Information
13   Practices Act may also have some bearing on these
14   issues.
15       MR. MOSELEY: Thank you.
16   Q.   Did you bring a privilege log with you
17   today?
18   A.   No, I'm not aware of what a privilege log
19   is.
20   Q.   Did you bring any log of the documents
21   you actually have and the basis for the privilege
22   you're claiming for each document?
23   A.   No.
24   Q.   Do you know the documents you actually
25   have?

Page 14

1  A. I can't say I know each document,
2  offhand, but I know generally what the files
3  include.
4  Q. Did you undertake a review of your files
5  to determine if each particular document that you
6  have in your files was subject to one of the
7  applicable privileges or some other privilege which
8  you haven't even thought of yet?
9  A. Not each document.
10  Q. Do you know if anybody else undertook
11  such a review?
12  A. I don't know.
13  Q. Did you produce your files to Mr. Nelson
14  or any other counsel for such a review?
15  A. Yes.
16  Q. You produced all of your files to
17  Mr. Nelson?
18  A. Yes.
19  Q. And have you ever seen a log of all the
20  documents in those files and a statement of what
21  privilege would apply to each document?
22  A. No.
23      MR. MOSELEY: For the record, are you
24  planning to produce a privilege log?
25      MR. NELSON: Well, if we're going to be

Page 15

1  in front of the judge, I didn't think it would be
2  necessary.
3      MR. MOSELEY: Well, it's a little
4  difficult for us to conduct discovery with respect
5  to the privilege of each of those documents without
6  such a log. When are you planning to produce such
7  a log?
8      MR. NELSON: We'll be working on it next
9  week.
10  Q. BY MR. MOSELEY: Can you describe any of
11  the particular documents for which you're claiming
12  a privilege, Chuck?
13  A. Specific documents or generic types?
14  Q. Listen, let's start with specific
15  documents, first. Can you think of any specific
16  documents that you're claiming a privilege for?
17      MR. NELSON: Well, I'm going to object to
18  the extent that specification of documents is going
19  to, basically, convey the contents of the documents
20  or the status of the proceedings.
21      MR. MOSELEY: Are you directing him not
22  to answer?
23      MR. NELSON: Well, no, I'm not, on that.
24  Q. BY MR. MOSELEY: You know, I'm asking you
25  to -- I know it's a difficult task, I'm asking you

Page 16

1  to think about your files, and if you can think of
2  any specific documents you can tell us are there,
3  if you can identify those, then we can potentially
4  explore the basis of the privilege.
5  A. I think that there are memoranda between
6  Matt Viola and myself regarding the activities in
7  the case, as well as legal research. There are
8  notes by myself and Matt. If you don't mind, I'll
9  refer to Matt Viola as Matt.
10  Q. Just for clarification, Matt is a
11  part-time person hired by the Ethics Commission?
12  A. He's a contract attorney, he's not an
13  employee of the city. He's an independent
14  contractor, who we hire for sub-cases. Notes of
15  legal research, witness interviews, tapes of
16  witness interviews. I'm trying to go through the
17  Rolodex of this thing to see if there's anything --
18  Q. I understand, Chuck, and what I've asked
19  you is a very difficult question to respond to, and
20  I will stipulate on the record that I recognize the
21  difficulty, and I am not planning to at some point
22  raise the issue that, hey, this wasn't identified
23  by Chuck at this deposition because, honestly, I
24  wouldn't be able to do that with respect to my
25  files, I'm just looking for things you --

Page 17

1  A. I'm trying to give you the best I can, at
2  this point, for these, admittedly, generic
3  categories. At this point, that's the best I can
4  do.
5  Q. Do you specifically remember a letter of
6  complaint which was submitted to you by or on
7  behalf of Phil English in January of 2003?
8  A. I do.
9  Q. Is that one of the documents you're not
10  disclosing?
11  A. I'd have to confer with counsel whether
12  that's something we produced or not.
13      MR. NELSON: We object to -- we
14  understand that the ordinance and the Uniform
15  Information Practices Act extend even to
16  acknowledging the existence of a complaint.
17      MR. MOSELEY: Are you instructing your
18  witness not to answer that question?
19      MR. NELSON: Could you restate the
20  question, please.
21      (The requested portion of the record was
22  read.)
23      MR. NELSON: You can answer that
24  question.
25      THE WITNESS: We haven't brought it with

5 (Pages 14 to 17)

Page 18

1  us. We have received that document.
2     Q.   BY MR. MOSELEY: But that's one of the
3  documents that -- let me just ask counsel, is that
4  one of the documents covered by your objection?
5     MR. NELSON: Yes.
6     Q.   BY MR. MOSELEY: You said there are tapes
7  of witness interviews; is that correct?
8     A.   That's correct.
9     Q.   Can you tell me the names of the
10 witnesses interviewed.
11    MR. NELSON: Objection; instruct not to
12 answer.
13    Q.   BY MR. MOSELEY: Can you tell me how many
14 witnesses have been interviewed?
15    A.   About a half dozen.
16    Q.   Was Chris Graff interviewed by you on
17 January 24th, 2003?
18    MR. NELSON: Objection; instruct not to
19 answer.
20    Q.   BY MR. MOSELEY: Did you make a tape of a
21 witness interview with Christopher Graff?
22    MR. NELSON: Objection; instruct not to
23 answer.
24    Q.   BY MR. MOSELEY: Did you interview Gary
25 Kurokawa in this matter?

Page 19

1     MR. NELSON: Objection; instruct not to
2  answer.
3     Q.   BY MR. MOSELEY: Did you make a tape of
4  such an interview?
5     MR. NELSON: Objection; instruct not to
6  answer.
7     Q.   BY MR. MOSELEY: When I say you, let me
8  say that I am referring to you in the generic
9  sense, not necessarily Chuck Totto, but any
10 assistant or, potentially, Matt Viola.
11    A.   I understand that.
12    Q.   Did you do a witness interview of Ann
13 Gima?
14    MR. NELSON: Objection; same objection
15 and instruction.
16    Q.   BY MR. MOSELEY: Did you make a tape of
17 an interview with Ann Gima?
18    MR. NELSON: Same objection; instruct not
19 to answer.
20    Q.   BY MR. MOSELEY: Did you interview Bob
21 Magota?
22    MR. NELSON: Same objection; instruct not
23 to answer.
24    Q.   BY MR. MOSELEY: Did you make a tape of
25 an interview with Bob Magota?

Page 20

1     MR. NELSON: Object; instruct not to
2  answer.
3     MR. MOSELEY: Did I already cover Gary
4  Kurokawa on that?
5     MR. NELSON: I think so.
6     Q.   BY MR. MOSELEY: Did you interview Phil
7  English in conjunction with this matter?
8     MR. NELSON: Objection; instruct not to
9  answer.
10    Q.   BY MR. MOSELEY: Did you make a tape of
11 any interview with Phil English?
12    MR. NELSON: Object; instruct not to
13 answer.
14    Q.   BY MR. MOSELEY: Has any decision been
15 rendered in any investigation that you may or may
16 not have been conducting with respect to Phil
17 English's complaints with respect to Gary Kurokawa?
18    MR. NELSON: Can I confer with Mr. Totto
19 for a moment?
20    MR. MOSELEY: Sure.
21    (A discussion was held off the record.)
22    Q.   BY MR. MOSELEY: And the answer is?
23    MR. NELSON: And the question is?
24    (The requested portion of the record was
25 read.)

Page 21

1     MR. WONG: I'll object to that question
2  as vague, ambiguous and unintelligible.
3     THE WITNESS: No. May I ask for a
4  clarification?
5     MR. MOSELEY: Certainly.
6     THE WITNESS: Are you including the
7  confidentiality issue that came before the
8  Commission and resulted in advisory opinion 2006-2?
9     MR. MOSELEY: No, I'm not including.
10    THE WITNESS: Okay.
11    Q.   BY MR. MOSELEY: Is it your understanding
12 that -- well, let me ask you this. When the Ethics
13 Commission receives a complaint of any sort, what
14 is the process that goes on and what is the final
15 result, this is just generic.
16    A.   The complaint is taken in by staff,
17 that's me. I review the complaint initially to see
18 if there's sufficient information there to make a
19 determination whether the allegations would truly
20 result in an ethics violation. The next step,
21 assuming that's correct, the next step is to
22 conduct investigation, that can be done any number
23 of ways, and talk to witnesses, review documents,
24 that type of thing.
25    Assuming that I find, in my opinion, that

Page 22

1  there's probable cause that an ethics violation
2  occurred and a misconduct was carried out by the
3  individual complained of, then I would bring that
4  question to the Ethics Commission itself, we have a
5  short probable cause hearing. If there's probable
6  cause, then a notice of possible violation is sent
7  to the subject of the complaint. They may or may
8  not at that point already know that we're
9  investigating, depends on the case. The subject of
10 the complaint, then, has a 15-day period in which
11 to respond in writing, if they want, to the
12 allegations in the notice, and the notice also
13 includes the complaint letter, except we try to
14 redact any identifying information from the
15 complaint letter that's required under the
16 ordinance unless the complainant waives their
17 identification.
18         The respondent, besides actually
19 submitting something in writing, can request a
20 hearing, either an informal hearing or a contested
21 case hearing before the Commission. And if they
22 don't respond at all, then the Commission can enter
23 or render an opinion based on the information
24 before it, or actually conduct further discovery if
25 the Commission feels it needs to.

Page 23

1          The next stage would be, after the
2  response period, more discovery, if necessary, then
3  finally either go to hearing or work out a
4  settlement, if possible, with the subject of the
5  complaint. If a settlement agreement can't be
6  worked out, then we go to hearing. In either case,
7  the Commission would render an advisory opinion
8  once they either have a settlement statement,
9  settlement agreement or the facts from the hearing.
10 The advisory opinion, then, generally if there's no
11 finding of a violation, the advisory opinion is
12 published with the information identifying the
13 subject and the witnesses redacted. If there is a
14 violation, we're waiting for OIP to help us, give
15 us some guidance on whether or not we can publish
16 the name of the subject of the complaint. That's
17 kind of a generic view.
18    Q.  What happens then after an advisory
19 opinion -- the advisory opinion advises who?
20    A.  It advises the appointing authority, and
21 that would be -- for an employee that would be the
22 department director, for an appointee by the mayor,
23 that would be the mayor, for a council member, it's
24 the counsel, but we use the generic bureaucratic
25 term appointing authority, and they have 15 days in

Page 24

1  which to respond to the recommendations stated in
2  the advisory opinion. So the point of the advisory
3  opinion is to lay out the facts, the legal analysis
4  regarding the ethics laws and violations, if there
5  are any, and then recommend discipline if there's a
6  violation. And then the appointing authority has
7  that 15-day window in which to respond as to what
8  it deems necessary, in terms of discipline.
9  There's no obligation for them to file, to follow
10 our recommendation.
11    Q.  But there is an obligation to, within 15
12 days, respond somehow to the recommendation?
13    A.  Yes, that's right.
14    Q.  And what if they don't respond within the
15 15 days?
16    A.  We try to get a response out of them
17 after that. We have had situations where we've had
18 no response whatsoever.
19    Q.  And what happens then?
20    A.  We haven't had that while I've been
21 there, so I don't know what tact the Commission
22 could take, I don't know that it's -- you don't
23 want me to speculate, I don't know what the
24 Commission would do in a situation like that.
25    Q.  To your understanding, does the

Page 25

1  Commission actually have any power to do anything
2  to anybody?
3     A.  Other than me? They're my boss.
4     Q.  Other than you.
5     A.  No. Well, they do have the power to
6  subpoena, but they have no disciplinary power, no
7  independent disciplinary power, no power to fine.
8  There are other remedies that can be carried out,
9  but they have to be carried out by different parts
10 of government. Would you like me to tell you what
11 those are?
12    Q.  Yes, please.
13    A.  If anyone benefits from an ethics
14 violation, Corporation Counsel can institute a
15 civil suit to collect that benefit. Then if there
16 is an ethics violation that results in the
17 formation of a contract with the city, that's
18 voidable, the contract is then voidable on the
19 decision of the city.
20    Q.  Can you recommend criminal prosecution?
21    A.  Yes. Sometimes we get cases in that
22 appear, at least on the allegations, if the facts
23 are true as stated, that it would be a criminal
24 case, and we send that over to HPD or the
25 prosecutors.

Page 26

1    Q. When you say we send that over, is that a
2  decision the Ethics Commission itself has to make
3  or can you -- well, let me clarify. What's your
4  title?
5    A. I'm the Executive Director and legal
6  counsel for the Ethics Commission.
7    Q. So in that capacity, would you have the
8  authority to refer any matter to criminal
9  prosecution?
10   A. I believe so, although I've done it --
11 as I recall we've done it both ways, where I've
12 simply sent -- it has to be done under a certain
13 way under the UIPA, and I'll get to that in a
14 second, if you like, but I have done it where I've
15 initiated it, or I've made the decision to send the
16 matter over, and I've also done it where I brought
17 it to the Commission, and they've decided to send
18 it over. And I think the practice before I came
19 onboard, which was 2000, was that the Commission
20 would usually make a determination. The problem is
21 in some of these areas, we constantly have to
22 balance the Commission as a citizen panel that
23 meets only once a month, and sometimes you may --
24 we had one case where there was some exigent
25 circumstances that things needed to be done much

Page 27

1  more quickly than that. We had two cases like that
2  that I can think of offhand, so I made the decision
3  that, using the UIPA process, we would see if HPD
4  was interested in the case.
5    Q. UIPA is Uniform Information Practices
6  Act; is that right?
7    A. That's right.
8    Q. What is the UIPA process you're talking
9  about?
10   A. If I recall, and it might be under
11 92(f)14, I'm not quite sure, but there's --
12 agencies cannot simply disclose information,
13 willy-nilly, that's brought to them in
14 confidentiality. Our concern is then when someone
15 brings us a complaint, and I believe that if the
16 facts are true, it could be a criminal matter, then
17 I send what I would probably describe as probably a
18 generic memorandum to HPD saying are you interested
19 in a case where so and so -- actually, I don't name
20 names -- where this type of conduct occurred, and
21 then they would respond back saying, yes, and if
22 that's the case, then I would send the file over.
23       The reason for that is under the UIPA,
24 the requirement is that the requesting agency ask
25 for the information, as opposed to just somebody

Page 28

1  volunteers it over, and this is the best way I
2  could figure to get the ball rolling because
3  catch-22, of course, that is the requesting agency
4  is not going to know these facts are occurring
5  unless somebody says generically there's a problem
6  here.
7        The other aspect to that is -- let me
8  see. It has to be -- the disclosure to the other
9  governmental agency has to be consistent with the
10 reason that the information was first brought to my
11 agency, to the Ethics Commission.
12   Q. Okay. In your description of the process
13 that goes on in the offices of the Ethics
14 Commission, you talked about a disclosure of the
15 complaint letter to the person accused; is that
16 right?
17   A. That's right.
18   Q. Can you go over that again, how much of
19 the complaint letter do you disclose?
20   A. We have to remove information that would
21 reasonably identify the complainant, unless the
22 complainant agrees to have that information
23 included. Sometimes what we'll get is a situation
24 where it's so fact specific that the complaint
25 letter, even if you took out the person's name and

Page 29

1  so on, is going to, it's going to be obvious to the
2  subject of the complaint who is filing the
3  complaint, the facts are so specific, and it may
4  just be something that occurred between two people.
5    Q. Does that mean you would have to disclose
6  a complaint or does that mean if you couldn't
7  redact it, that you just can't disclose a
8  complaint?
9    A. I think in that situation I usually ask
10 the complainant, I tell them what the issue is, and
11 sometimes they say okay and sometimes they don't.
12   Q. Have you ever received permission from
13 Phil English to disclose the contents of a
14 complaint made on January 22nd, 2003 to anyone?
15   A. I can't remember.
16   Q. Have you ever disclosed the contents of a
17 complaint letter written by or on behalf of Phil
18 English January 22nd, 2003 to anyone?
19       THE WITNESS: Yes.
20       MR. LORUSSO: Just for the record, let me
21 say I object to the extent for purposes of this
22 deposition that it lacks foundation that there's
23 been established that a complaint's even been
24 filed, for purposes of this deposition, by
25 Mr. English.

Page 30

1   Q.  BY MR. MOSELEY:  So, to whom have you
2   disclosed -- did you disclose the whole complaint
3   letter?
4       (Whereupon, a discussion was held between
5   Mr. Nelson and the witness.)
6       (The deposition was at recess.)
7       MR. NELSON:  Here's the concern.  I think
8   your line of questioning is starting to get into
9   the specifics of the investigation, and until the
10  judge rules one way or the other on the extent to
11  which we can talk about that, I'm going to have to
12  instruct the witness not to answer.
13      MR. MOSELEY:  I'm not going to let you
14  just object to the line of questioning, so I'll
15  have to make you --
16      MR. NELSON:  I understand, but I just
17  wanted you to understand where we're coming from.
18      MR. MOSELEY:  So you're objecting to the
19  question I just asked and instructing the witness
20  not to answer the question I just asked, which the
21  question was, as I remember it, whether or not
22  Mr. Totto, or that Chuck, or the Ethics Commission,
23  generically, has given any part of a complaint
24  letter written by or on behalf of Phil English
25  January 22nd, 2002, to anyone else.

Page 31

1       MR. NELSON:  Okay.  And I'm going to
2   object and instruct the witness not to answer.
3   Q.  BY MR. MOSELEY:  With respect to the
4   complaint letter I just referenced, did you
5   personally ever show any part of that letter to
6   Christopher Graff?
7       MR. NELSON:  Same objection; instruct him
8   not to answer.
9   Q.  BY MR. MOSELEY:  I will tell you that in
10  a deposition two days ago Christopher Graff said
11  that you did.
12      I'm going to ask the question again.  Did
13  you ever show any part of that letter to
14  Christopher Graff?
15      MR. NELSON:  Objection; instruct not to
16  answer.
17  Q.  BY MR. MOSELEY:  What documents, either
18  specific documents or kinds of documents in your
19  possession, generically, your possession, the
20  Ethics Commission, do you contend are privileged
21  under the attorney-client privilege?
22  A.  I'd have to leave that to counsel.
23      MR. NELSON:  And we'll put together a
24  privilege log next week for you.
25      MR. MOSELEY:  That tells me which type of

Page 32

1   documents -- the privilege log, is it going to list
2   the documents?
3       MR. NELSON:  It'll describe them
4   generically or in a form that doesn't contravene
5   the privilege.
6   Q.  BY MR. MOSELEY:  What documents or types
7   of documents are you claiming are privileged under
8   the attorney work-product, actually, it's not a
9   privilege but let's call it a privilege for now.
10  A.  Protection.  I leave that to counsel to
11  respond.
12      MR. NELSON:  Again, we'll prepare a log
13  next week for you and the court.
14  Q.  BY MR. MOSELEY:  What documents or types
15  of documents are you claiming are privileged under
16  the deliberative process privilege?
17  A.  Same response, that I would defer to
18  counsel.
19      MR. NELSON:  Again, we will include that
20  in the log as well.
21  Q.  BY MR. MOSELEY:  What documents or type
22  of documents do you contend are privileged or are
23  prohibited from disclosure under the Uniform
24  Information Practices Act?
25  A.  Defer to counsel.

Page 33

1       MR. NELSON:  Same response.
2   Q.  BY MR. MOSELEY:  When you, in your
3   understanding, said that you understood that
4   ordinances of the City and County of Honolulu
5   prohibited disclosure of certain information, do
6   you have in mind a specific part of the ordinances?
7   A.  Defer to counsel.
8       MR. NELSON:  There is a specific --
9       MR. MOSELEY:  I presume this is updated,
10  but I'm not going to make this an exhibit.
11      MR. LORUSSO:  Just for the record, the
12  witness is reviewing --
13      MR. MOSELEY:  The witness is reviewing a
14  copy of a section of the revised ordinances of City
15  and County of Honolulu that I have handed him and,
16  of course, neither the witness nor his counsel has
17  had an opportunity to confirm, in fact, whether
18  that's a true and accurate copy of the actual
19  ordinances.
20      MR. LORUSSO:  Thank you.
21      THE WITNESS:  The 3-6.3(g) and 3-6.6(c)
22  are the two sections that I'm most familiar with.
23  I'm not sure that there might be others that
24  reference other limitations on disclosure of
25  investigative material.

Page 34

1    Q.  BY MR. MOSELEY: Now, again, recognizing
2   that you haven't had a chance to confirm the copy I
3   gave you was specifically a true and accurate copy
4   of the ordinances, is it your understanding that
5   any Commission member or Commission staff who
6   divulges information concerning the allegation
7   prior to the issuance of an advisory opinion by the
8   Commission, or if the investigation discloses that
9   the advisory opinion should not be issued by the
10  Commission, any Commission member or Commission
11  staff, who at any time divulges any information
12  concerning the original allegation or divulges the
13  contents of disclosures except as permitted by this
14  article shall, if found guilty, be subject to the
15  applicable provisions of Section 11-106 of the
16  revised charter.
17         Does that accurately reflect your
18  understanding of what the ordinance provides?
19    A.  That section, yes.
20    Q.  And recognize that I may not have read it
21  properly either. And the other section, aside from
22  (g) was -- what was the other section?
23         (A discussion was held off the record.)
24    Q.  BY MR. MOSELEY: And it's your
25  understanding that Section 3-6.6(c) also requires

Page 35

1   that requests shall be held in confidence and no
2   disclosure thereof shall be made except as provided
3   in the ordinance?
4     A.  That's correct.
5     Q.  What, to your understanding, are the
6   exceptions in the ordinance that, the exceptions to
7   confidence and disclosure requirements?
8         MR. LORUSSO: Object to the extent being
9   asked for a legal conclusion.
10        THE WITNESS: I'd have to go -- I mean,
11  rather than try to shoot from the hip, I'd be more
12  comfortable going through the ordinance, but having
13  said that, I think that inherent in the ordinance
14  is -- actually, Roger, can I have you refine that
15  question? See, under 3-6.6 it talks about requests
16  for opinions by officers or employees, and then
17  generally under 3-6.3, it's the powers, duties
18  functions of the Commission, and that's where we
19  talked about that limitation about not disclosing
20  information prior to an advisory opinion being
21  issued.
22        MR. MOSELEY: Yes.
23        THE WITNESS: You're asking me for the
24  exception to which?
25        MR. MOSELEY: Well, let's start with

Page 36

1   3-6.3(g).
2         THE WITNESS: I think inherent in the
3   ordinances is the ability of a Commission staff
4   member to make reasonable disclosure in order to
5   conduct an investigation, although that's not --
6   I'm not sure that that's stated anywhere here or in
7   the Commission rules, but it's an operating thing
8   we've had to use because, obviously, it could be
9   difficult to try to gather information without
10  disclosing certain information to a witness or to
11  the subject, so on.
12    Q.  BY MR. MOSELEY: How about with respect
13  to 3-6.6(c)?
14    A.  I think that specifically, there's also
15  the -- we're talking now about a request as opposed
16  to just about general investigative information,
17  and so I believe that -- let me clarify this
18  because this Section, 3-6.6, focuses on a request
19  from a city employee or officer without asking for,
20  without bearing to any other city officer or
21  employee.
22        So in this particular case, I would have
23  to fall back on that same implicit exception that I
24  mentioned, but with requests generally we don't
25  need to disclose much to other people, I mean, it's

Page 37

1   usually they'll give us the facts, we'll ask for
2   specific facts, and because it doesn't affect other
3   folks or, I should say, it doesn't rely on
4   information from other people, we can offer advice
5   based on that.
6         So it's different than 3-6.7, which is
7   request by third parties, which is when any third
8   party asks or complains, whether or not the conduct
9   of an officer or employee is a violation of the
10  ethics law.
11    Q.  And is there a confidentiality provision
12  with respect to request by third parties?
13    A.  I think that 3-6.3(g) applies. Excuse
14  me, let me just take a second to review. Under
15  3-6.7(a), it says that the request shall be in
16  writing and shall be signed by the person making
17  the request, provided that the name of the person
18  making the request shall not be disclosed. That's
19  just part of that section, and I think that's the
20  pertinent section.
21    Q.  Well, upon your review of the ordinance,
22  it's not a question. I'm presuming you don't have
23  an ulcer, and I'm darn surprised you don't.
24    A.  Don't have a what?
25    Q.  An ulcer. I don't know how you implement