1  this.
2      A.   Can we go off the record for a minute?
3      MR. MOSELEY:  Sure.
4      (A discussion was held off the record.)
5      Q.   BY MR. MOSELEY:  Chuck, you're an
6  attorney, right?
7      A.   That's correct.
8      Q.   Are you licensed in the state of Hawaii?
9      A.   Yes.
10     Q.   And when did you first become licensed in
11 the state of Hawaii?
12     A.   1980.
13     Q.   Can you give me a very brief, I mean very
14 brief, rundown of your employment history since you
15 became an attorney.
16     A.   Let's see, I was in private practice for
17 seven years, then I worked as the senior attorney
18 at the Office of Consumer Protection in the
19 department of commerce and consumer affairs for a
20 year or two, then I was the Executive Director of
21 the department, or excuse me, the division of
22 consumer advocacy in the same department, left
23 there in '98 after about 10 years, and for about
24 two years was in private practice again, and then
25 came back to government in the capacity as an

1  acting Executive Director and legal counsel for the
2  city Ethics Commission, in April of 2006, and then
3  in November became the non-acting --
4      Q.   April of 2000.
5      A.   2000, excuse me.
6      Q.   And then in November 2002 you became the
7  actual permanent -- well, actual official, as
8  nothing is permanent.
9      A.   That's right.
10     Q.   Now, you did say that some of the
11 documents you're withholding included witness
12 statements; is that right?
13     A.   There are tapes.
14     Q.   Do some of the documents you're
15 withholding contain names of persons that may
16 potentially have further information about these
17 issues?
18     MR. NELSON:  I'm going to object and
19 instruct not to answer.
20     Q.   BY MR. MOSELEY:  Okay.  Do some of the
21 documents you're withholding contain factual
22 compilations of your investigations?
23     A.   Yes.
24     (A discussion was held off the record.)
25     Q.   BY MR. MOSELEY:  Are you the person at

1  the Ethics Commission responsible for determining
2  whether or not to claim a privilege in matters such
3  as this?
4      A.   Yes, with advice of Corporation Counsel.
5      Q.   What's the relationship between your
6  office and that of Corporation Counsel, you
7  described yourself as the attorney for the Ethics
8  Commission, right?
9      A.   Right.
10     Q.   What's the relationship between those two
11 offices?
12     A.   We are what's called -- the Ethics
13 Commission is what's called "administratively
14 attached" to Corporation Counsel, that means the
15 Corporation Counsel helps us do, if you will, the
16 day-to-day administrative aspects, making sure our
17 paychecks get to us, taking leave of absence forms,
18 working with us to present a budget to the
19 department of budget and fiscal services.
20     They are not -- I should say Corporation
21 Counsel does not have the ability to review what
22 the Commission does in its substantive role, in its
23 decision-making role, investigative role, and so
24 on.  And just to add a clarification, if there is a
25 conflict between -- let's say I have a conflict of

1  interest in a matter, we would ask Corporation
2  Counsel to handle that if either Matt or I were
3  conflicted out, or both of us were conflicted out,
4  and then also we -- the Corporation Counsel, it is
5  my understanding, represents all city entities, so
6  in matters not dealing with ethics, we ask for
7  their advice.
8      Q.   In this present situation where I
9  subpoenaed you, does that mean that Corporation
10 Counsel is essentially automatically your attorney?
11     A.   This is the first time I've had this
12 situation, but that's my understanding.
13     Q.   If I had subpoenaed directly a member of
14 the Ethics Commission, would you as the Ethics
15 Commission attorney have been the one to deal with
16 objecting, that kind of thing?
17     A.   I don't think so, I think again we rely
18 on Corporation Counsel to do that because in my
19 view it's worthwhile to keep the two roles
20 distinct, one is that the Ethics Commission and its
21 staff focus on ethics investigations, the ethics
22 laws and so on, but when you get beyond that, and a
23 subpoena, I would think, would be beyond that, as
24 asking for documents or a witness in a particular
25 case.  It's more appropriate to go to Corporation

1 Counsel because they do represent all city
2 agencies.
3    Q.   You know, I should have told you at the
4 beginning, as well, but if you ever want to take a
5 break for any reason, not only to talk to your
6 counsel, but if you just get tired of sitting, want
7 to visit the man or get a glass of water, just let
8 me know, this is not an endurance contest on
9 purpose.
10    A.   Thank you.
11    Q.   Did you personally review any of the
12 documents that are being withheld as privileged,
13 and when I say personally review, I mean in
14 conjunction with the subpoena we sent you.  I'm
15 sure you've looked at the documents personally in
16 other respects, but in conjunction with the
17 subpoena, did you look at any of the subpoenaed
18 documents?
19    A.   I looked at some.
20    Q.   What documents did you look at?
21       MR. NELSON:  Objection; instruct not to
22 answer.
23       It goes into the specifics of the
24 investigation.
25    Q.   BY MR. MOSELEY:  How many documents did

1 you look at?
2    A.   I think I read maybe five or six.
3 Others, I may have just thumbed through a file to
4 see what, again, kind of generically what type of
5 information was there.
6    Q.   And I'm going to ask you, this is a
7 general question referring to anytime disclosures
8 have been made by you personally, which may or may
9 not include this, but I'm going to ask you, are you
10 aware of ever disclosing a document to -- what do
11 you call them, the target of the investigation?
12    A.   We call them the subject because target
13 sounds so nasty, subject's not much better.
14    Q.   Are you aware any time of disclosing a
15 complaint document to the subject of an
16 investigation or to a witness that you're
17 interviewing for an investigation in which
18 identifying information, such as the letterhead of
19 the law firm that wrote the complaint or the name
20 of the individual involved, would have been
21 disclosed?
22       MR. NELSON:  For clarification, this is a
23 generic question --
24       MR. MOSELEY:  Yes, it is.
25       MR. NELSON:  -- in any case --

1       THE WITNESS:  We are not talking about
2 your folk's case?
3    Q.   BY MR. MOSELEY:  Including this, not
4 including this, are you aware of any time -- and
5 I'm presuming that there are times when you get
6 complaints on a law firm's letterhead or other
7 kinds of letterhead or containing names of
8 complaining witnesses --
9    A.   I understand that.
10    Q.   Are you aware of any time in which you've
11 disclosed that information, you personally, Chuck
12 Totto, disclosed that information to either the
13 subject of the investigation or to a witness on
14 such an investigation?
15    A.   Yes, I have.
16    Q.   You have.
17    A.   Yes.
18    Q.   Under what circumstances would you do
19 that?
20    A.   Again, after seeking a waiver from the
21 complainant, if we can use that generic term, the
22 person who writes the complaint letter, that
23 they're okay with having the identification made.
24    Q.   Are there any other circumstances?
25    A.   Not that I could think of, offhand.  Not

1 that jumps to mind.
2    Q.   And with respect to any complaint which
3 may or may not have been made by Phil English
4 dealing with Gary Kurokawa or Chris Graff, and you
5 said you don't remember whether or not there's been
6 a waiver of Phil English, with respect to such a
7 disclosure, right?
8       MR. NELSON:  Do you understand the
9 question?
10       THE WITNESS:  I do, and that's my best
11 recollection right now, I don't recall
12 specifically.
13    Q.   BY MR. MOSELEY:  Have you made a
14 determination, personally, that all of the
15 documents referenced in the subpoena duces tecum
16 that was Exhibit 82 are privileged?
17       MR. NELSON:  I'm going to object.  I
18 think we're getting into what may have been
19 discussed between Mr. Totto and I about the
20 subpoena, and it's attorney-client privilege, and
21 instruct not to answer.
22    Q.   BY MR. MOSELEY:  Are you aware of
23 documents that reference Phillip English that are
24 in the possession of the Ethics Commission on which
25 an advisory opinion has already been issued,

Page 46

1  specifically advisory opinion 2006-2?
2      A.  Yes.
3      Q.   Did you produce any of those documents
4  today?
5      A.  No.
6      Q.   Why not?
7          Do you guys want to take a quick break
8  here?
9      A.  I can answer if you want, but it's up to
10  you.
11          My assumption was that we were focusing
12  on the documents related to Phil's January 2003
13  complaint.
14      Q.   Which may or may not have existed.
15      A.  I think I said that I received a
16  complaint.
17      Q.   Are there other documents, which don't
18  necessarily arise out of that January 22nd, 2003
19  complaint, which do relate to Phil English?
20      A.  Yes.
21      Q.   And essentially you didn't produce them
22  today because you didn't think they were what the
23  subpoena was calling for?
24      A.  That's partly so, and also I wouldn't
25  want to say more because it does touch on

Page 47

1  attorney-client privilege information.
2      Q.   Did you specifically consider the
3  production of those documents in terms of your
4  response to the subpoena, or did you just not even
5  think about them?
6      MR. NELSON:  Well, I'm going to object
7  and instruct not to answer, we're getting into what
8  he may have discussed with his attorney.
9  Attorney-client privilege.
10      Q.   BY MR. MOSELEY:  Did you personally
11  consider whether or not those documents should be
12  produced or was that something that just didn't
13  even cross your mind, I'm not talking about any
14  communication you had with counsel.
15      A.  I think it crossed my mind, but I
16  dismissed it as not relevant to the particular
17  case, you know.
18      Q.   You answered the question I asked, that's
19  fair enough.
20          (Exhibit Number 84 was marked for
21  identification.)
22      Q.   BY MR. MOSELEY:  I'm showing you what's
23  been marked for identification as Exhibit 84.  I
24  should tell you the front page of this purports to
25  be a cover letter transmitting an advisory opinion

Page 48

1  specifically 2006-2.  The second page is actually
2  an advisory opinion taken off of the internet site
3  and is not a document, to my knowledge, that was
4  actually transmitted, but do you recognize the
5  first page of Exhibit 84?
6          I also should say at the top there's the
7  written word English, which is a mark made by our
8  office, but other than that, do you recognize the
9  first page of Exhibit 84?
10      A.  Not specifically, but it looks like
11  something that, as a regular course of business,
12  could come from our office.
13      Q.   This isn't something you generated?
14      A.  It may have come from Norm Fisher, my
15  legal assistant.
16      Q.   Is this just the type of letter that is
17  generated in the course of business to transmit
18  opinions?
19      A.  Yes.
20      Q.   And you may or may not have actually seen
21  it, right?
22      A.  That's right.
23      Q.   The second page of Exhibit 84, do you
24  recognize this as being advisor opinion 2006-2?
25      A.  It appears to be.  It looks like it's

Page 49

1  been printed off of our website, the Ethics
2  Commission website.  It doesn't contain the
3  signature of the chair, but I don't think those are
4  contained on the website.
5          (Exhibit Number 85 was marked for
6  identification.)
7      Q.   BY MR. MOSELEY:  I'm showing you what's
8  been marked as Exhibit 85 for purposes of this
9  deposition.  Also, there's some extraneous writing
10  at the upper portion, which I don't even know what
11  it all says except for English, but do you
12  recognize this exhibit?
13      A.  Yes, I do.
14      Q.   Is it your understanding that because
15  advisory opinion 2006-2 has been issued that you
16  are no longer precluded from discussing the matters
17  contained in Exhibit 85?
18      A.  No, that's not my understanding.
19      Q.   What is your understanding?
20      A.  I think that there are other aspects
21  regarding Exhibit 85 that could fall into other
22  privileges or protections or potential violations
23  of the UIPA.
24      Q.   Are you willing to answer questions with
25  respect to Exhibit 85 of this deposition?

13 (Pages 46 to 49)

Page 50

1    MR. NELSON: Can we take a quick break to
2 look over this one?
3    MR. MOSELEY: Yes, any time you want,
4 Gordon.
5    Off the record.
6    (A discussion was held off the record.)
7    MR. MOSELEY: I have no idea what the
8 question I asked you before you left, so, counsel,
9 can we have the court reporter repeat it or was
10 there even a question on board.
11    (The requested portion of the record was
12 read.)
13    MR. NELSON: Well, we're going to object,
14 and I'm going to instruct him not to answer --
15 beyond the four corners of the document, I mean, to
16 the extent that the questions will go into the
17 deliberations that went in behind this letter, we
18 would have an objection, but let's go forward and
19 see what we can do.
20    Q. BY MR. MOSELEY: So the answer is that
21 you might be willing to answer some questions, but --
22 but --
23    A. Depends on the question.
24    Q. Okay. And I'm presuming that counsel
25 will object and instruct you not to answer when

Page 51

1 appropriate.
2    Can you tell me what the attachment to
3 the first page of Exhibit 85 is.
4    A. It's a draft advisory opinion.
5    Q. And who drafted this?
6    MR. NELSON: Objection; instruct not to
7 answer.
8    Q. BY MR. MOSELEY: Did someone in your
9 office draft this?
10    MR. NELSON: I think you can answer that.
11    THE WITNESS: Yes.
12    Q. BY MR. MOSELEY: Did the Department of
13 Corporation Counsel give you any objections to the
14 draft opinion in Exhibit 85 in response to your
15 January 25th, 2006 letter?
16    MR. NELSON: Objection; attorney-client
17 privilege, deliberative process privilege.
18 Instruct not to answer.
19    MR. MOSELEY: Attorney-client privilege?
20    MR. NELSON: Yeah.
21    MR. MOSELEY: Okay. Who would the
22 attorney be in this case?
23    MR. NELSON: Well, I don't know, the
24 letter is addressed to Ms. Okinaga. I don't know
25 who may have been in communication with Mr. Totto

Page 52

1 or the Commission.
2    Q. BY MR. MOSELEY: When you sent this
3 letter to Ms. Okinaga, Chuck, were you sending this
4 letter seeking legal advice from Corporation
5 Counsel?
6    A. It's kind of hard to answer. Sorry, need
7 to talk.
8    MR. MOSELEY: You know, don't apologize.
9 You need to talk any time, you're welcome to do it.
10    (The deposition was at recess.)
11    (Exhibit Number 86 was marked for
12 identification.)
13    Q. BY MR. MOSELEY: While we were off the
14 record, I received a request from Mr. Lorusso that
15 we mark the document that I had you reviewing that
16 purported to be the text of the revised ordinances
17 having to do with the Ethics Commission. We've
18 since marked that as Exhibit 86, and we made a
19 color copy so that the yellowed out portion, that
20 was on the document provided to you, was also
21 visible. I don't think I'm going to ask you any
22 more questions, I just wanted to indicate for the
23 record --
24    A. Could I clarify something on this?
25    Q. Sure.

Page 53

1    A. This is the administrative and operating
2 ordinance section. The substantive section is
3 3-8.1 ad, sec.
4    Q. But Exhibit 86 is the document that we
5 were referencing earlier, right?
6    A. Correct.
7    Q. You know, Mr. Lorusso made a good point,
8 we asked you a lot of questions about it, and it
9 wasn't in the record, so I think it's a good idea.
10    Now, back to Exhibit 85 -- can you read
11 back the last question I asked.
12    (The requested portion of the record was
13 read.)
14    THE WITNESS: Yes, but let me explain in
15 the same vein we were asking for legal advice from
16 you. It was asking for input from both parties.
17    Q. BY MR. MOSELEY: But you were seeking
18 input from Carrie Okinaga not as your attorney, but
19 as a party in this proceeding.
20    A. Technically, she wasn't a party, the
21 Corporation Counsel wasn't a party, but, yeah --
22 but not as an attorney for the Commission.
23    Q. Did Carrie Okinaga or someone on her
24 behalf from the department of Corporation Counsel
25 submit any objection to this proposed, well this

14 (Pages 50 to 53)

Page 54

1  draft advisory opinion that's shown in Exhibit 85?
2      A.  I believe we received written comments.
3      Q.  Did they object to the draft advisory
4  opinion?
5      A.  You know, I'd have to look at the letter
6  again.  I don't mean to haggle over the terms.
7  They had things they wanted the Ethics Commission
8  to consider, I don't know -- I don't know whether
9  it would be an objection or not.
10      Q.  Was the draft advisory opinion that's
11  shown in Exhibit 85, was that ever adopted by the
12  Ethics Commission as its opinion?
13      MR. NELSON:  Well, I'm going to object
14  and instruct not to answer.  The deliberations of
15  the Commission after the receipt of comments, and
16  even before of the receipt of comments, are subject
17  to the deliberative process privilege, and
18  Mr. Totto is subject to the confidentiality
19  requirements of the ordinance and the rules and the
20  charter with respect to what the Commission did or
21  didn't do.
22      Q.  BY MR. MOSELEY:  Maybe I didn't make
23  myself clear.  Has the draft, which appears in
24  Exhibit 85, has that ever been adopted as an
25  advisory opinion by the Ethics Commission?

Page 55

1      A.  I've got to wait for Gordon to
2  contemplate for a minute.
3      (Whereupon, a discussion was held between
4  Mr. Nelson and the witness.)
5      THE WITNESS:  The advisory -- let me find
6  the exhibit.
7      MR. MOSELEY:  84.
8      THE WITNESS:  The second page of 84 was
9  adopted advisory opinion number 2006-2.
10      Q.  BY MR. MOSELEY:  And that was adopted in
11  the same proceeding in which this draft appeared;
12  is that right?
13      A.  That's correct.
14      Q.  So I take it what you're telling me is
15  the draft wasn't adopted, and instead the opinion
16  2006-2 was adopted; is that right?
17      MR. NELSON:  Objection.  I think
18  Mr. Totto answered the question that Exhibit 84 was
19  adopted -- page 2 of Exhibit 84 was adopted as the
20  advisory opinion.
21      Q.  BY MR. MOSELEY:  Does the draft opinion
22  that is shown on Exhibit 85, does that appear
23  anywhere in the city's records as an official
24  advisory opinion of the Ethics Commission?
25      MR. NELSON:  Well, objection.  I think

Page 56

1  you're trying to get into the confidential records
2  of the Commission relative to the matter, and
3  Mr. Totto can't disclose that under the ordinance.
4      MR. MOSELEY:  You know, I have to tell
5  you, counselor, if this is an official advisory
6  opinion, then there's no confidentiality.
7      MR. NELSON:  If it is.
8      MR. MOSELEY:  If it is.  So are you
9  testifying that it is not an official opinion, it's
10  never been adopted as an official opinion?
11      MR. NELSON:  Counsel, we've told you what
12  has been adopted as an advisory opinion.
13      MR. MOSELEY:  And I'm checking to make
14  sure the converse is true, that this opinion has
15  not been adopted as an official advisory opinion.
16      (Whereupon, a discussion between the
17  witness and Mr. Nelson.)
18      THE WITNESS:  If it clarifies, there's
19  only one advisory opinion in this particular case,
20  in this particular matter, and that's 2006-2, the
21  second page of Exhibit 84.
22      MR. LORUSSO:  Excuse me, Mr. Totto, when
23  you say "in this particular case", what you're
24  referring to is just with regard to the opinions
25  being asked as to Exhibit 84 and 85, correct?

Page 57

1      THE WITNESS:  Correct.
2      MR. LORUSSO:  Thank you.
3      Q.  BY MR. MOSELEY:  Does the contents of
4  Exhibit 85, at least insofar as the advisory
5  opinion, draft advisory opinion which is attached
6  thereto, does that constitute legal advice that you
7  gave to the Ethics Commission, or does it
8  constitute work-product, or does it constitute part
9  of the deliberative process to your understanding?
10      A.  To my understanding, it would be all
11  three.
12      Q.  In the event that it were attorney-client
13  privilege, would you agree that the privilege has
14  been waived by your sending a copy of the draft
15  opinion to both Roger Moseley and Carrie Okinaga?
16      MR. NELSON:  Objection; calls for a legal
17  conclusion.
18      THE WITNESS:  Only to the degree as to
19  what's written in the four corners of the document.
20      Q.  BY MR. MOSELEY:  How about with respect
21  to work-product, was this draft prepared in
22  anticipation of litigation?
23      A.  Probably, and I don't know whether this
24  fits the definition of litigation, but in terms of
25  contested positions by Corporation Counsel and

15 (Pages 54 to 57)

Page 58

1  yourself and your client, in that sense, but not a
2  traditional civil trial or criminal trial.
3      Q.  But, in fact, the document was disclosed
4  to both Carrie Okinaga and myself; is that right?
5      A.  That's right.
6      Q.  Are you maintaining the position that
7  even though this document was disclosed to both
8  Carrie Okinaga and myself, that it continues to be
9  subject to the work-product doctrine?
10     A.  I don't know.
11     Q.  With respect to the contention that it's
12 privileged under the deliberative process, does
13 this document continue to maintain that privilege
14 if you've disclosed it to the parties before the
15 Ethics Commission?
16     A.  I'm not sure.  I don't know.
17     Q.  Take a look at page 2 of the draft
18 opinion, there's a section Roman numeral four that
19 says Analysis, so you can key yourself to that.
20 And then under applicable ethics provisions, it
21 says "Our analysis starts with RCH Section
22 11-102(b)," that's a reference to the revised
23 charter of Honolulu, right?
24     A.  Correct.
25     Q.  And the section referred to there says

Page 59

1  "Disclosure of confidential information gained by
2  reason of an elected or appointed officer or
3  employee's office or position or the use of such
4  information for the personal gain or benefit of
5  anyone."
6      Do you see that?
7      A.  Yes.
8      Q.  And is it your understanding that that's
9  information which is prohibited by the charter?
10     A.  Yes.
11     Q.  Did the reasoning set forth in this draft
12 opinion conclude that the information in question,
13 with respect to this proceeding, was confidential
14 under that charter provision?
15     MR. LORUSSO:  Object to the form, the
16 document speaks for itself, vague and ambiguous as
17 to this proceeding.
18     MR. NELSON:  Do you need to read it?
19     THE WITNESS:  Yeah, I need to read it.
20     (A discussion was held off the record.)
21     Q.  BY MR. MOSELEY:  You've had a chance to
22 take a look at it?
23     A.  Yeah.
24     MR. MOSELEY:  Could you read my last
25 question back.

Page 60

1      (The requested portion of the record was
2  read.)
3      THE WITNESS:  I guess I just have to
4  refer to what the -- on page 2, lines 38 to 41 say
5  and then page 3, lines 1 through 5.
6      Q.  BY MR. MOSELEY:  So what you're saying is
7  the opinion says, in the referenced section, if you
8  are to analyze the matter without reference to any
9  other laws or precedent and the plain language of
10 the reference charter provision, the conclusion
11 would be that he would be in violation, that
12 Mr. English would be in violation were he to
13 disclose the information in question; is that
14 right?  I mean, just in the vacuum considering
15 those things --
16     A.  That's what the draft says.
17     Q.  And the information that was being
18 referenced is the information which appears on the
19 first page of the draft opinion, Background Facts,
20 the second paragraph from the bottom.
21 Specifically, "Mr. English observed one of his
22 former supervisors sanitizing files, including
23 removing relevant documents that were to be
24 produced in the course of the litigation."
25     Do you see that?

Page 61

1      A.  I see that.
2      Q.  And that this former supervisor told
3  Mr. English that she was doing so at the direction
4  of a Corporation Counsel deputy attorney.
5      Do you see that?
6      A.  Yes, I see it.
7      Q.  So is that the activity that's in
8  question here?
9      MR. LORUSSO:  Objection; the document
10 speaks for itself, lacks foundation.
11     Q.  BY MR. MOSELEY:  In this document, is
12 that the referenced activity?
13     A.  As far as I read in the document, that
14 appears to be the referenced activity on page 2,
15 refers to the background facts.
16     Q.  And is it your understanding that the
17 provisions of the revised charter, the City and
18 County of Honolulu, are the basic and controlling
19 law and established policies of the City and County
20 of Honolulu?
21     MR. NELSON:  Do you understand the
22 question?
23     THE WITNESS:  No.
24     Q.  BY MR. MOSELEY:  Let's break it up.  Is
25 it your understanding that the revised charter of

16 (Pages 58 to 61)

Page 62

1    the City and County of Honolulu is the controlling
2    law in the City and County of Honolulu, controlling
3    municipal law?
4         MR. LORUSSO:  Objection; vague and
5    ambiguous, lacks foundation.
6         THE WITNESS:  I don't think you could
7    simply read a charter provision alone, you'd need
8    to take a look at any case decisions, any relevant
9    state or federal law, and the ordinances.  So, I
10   guess as a cautious attorney, I wouldn't just say
11   it's in the charter, therefore it is so because
12   there may be other things that modify it or are
13   inconsistent with the charter provision.
14        Q.  BY MR. MOSELEY:  Could there be
15   ordinances that modify the charter provisions?
16        A.  My understanding, as long as they're not
17   inconsistent with the charter, yeah, it's a generic
18   rule.
19        Q.  Essentially amplifying the charter, but
20   not changing the charter; is that right?
21        A.  That's my general understanding.
22        Q.  And it's also your understanding that
23   there could be some case law which could interpret
24   charter provisions?
25        A.  That's right.

Page 63

1         Q.  Footnote on the bottom of page 2,
2    footnote one, it's the bottom of not page 2 of the
3    exhibit but page 2 of the draft advisory opinion,
4    says "Mr. English no longer works for the city.
5    Nevertheless, because Mr. English requested an
6    opinion before he left the city and because his
7    request raises an important issue that the
8    Commission has not addressed, the Commission will
9    respond to his request as if he were still a city
10   employee."
11        Do you see that?
12        A.  I see it.
13        Q.  Is it your understanding that this means
14   that the question of whether the charter provision
15   applied to the specified activities had not been
16   previously addressed by the Ethics Commission?
17        A.  I'm not sure if they're a prior -- you
18   mean specific to this case or other cases of this
19   topic?
20        Q.  Other cases, I mean, the issue.  It says
21   "An important issue that the Commission has not
22   addressed."  Is that a general issue or the
23   specific issue with respect to this specific case?
24        A.  I have an opinion, but I don't think you
25   necessarily want me to give it.

Page 64

1         MR. NELSON:  Well, do you want to talk
2    about it?
3         THE WITNESS:  Yeah.
4         (The deposition was at recess.)
5         (The requested portion of the record was
6    read.)
7         THE WITNESS:  I don't know what this
8    necessarily means, the important issue.  I can say
9    that in my recollection now, I can't recall any
10   other cases that deal with the confidentiality
11   prohibition, and on the other hand we have had
12   some, I believe at least one, and again, this is
13   kind of on the general level, I think we had one
14   prior case dealing with an employee's right to free
15   speech, but it was in the context of political
16   activity, wearing a political button.
17        Q.  BY MR. MOSELEY:  So, to your
18   understanding, there have been no Ethics Commission
19   advisory opinions dealing with, for example, the
20   rights of whistleblowers to disclose to outside
21   agencies, activities that they feel are in
22   violation of law?
23        MR. LORUSSO:  Object; lacks foundation as
24   to the line of questioning.
25        THE WITNESS:  I can't think of any

Page 65

1    offhand.
2         Q.  BY MR. MOSELEY:  But what you're saying
3    to me is you don't know if that's the reference in
4    footnote one?
5         A.  I'm not quite sure, you could read it
6    either way, whether it's specific to this case or
7    whether there's any precedent type of thing.
8         MR. LORUSSO:  For the record, let me note
9    that footnote one refers specifically to Section 3
10   on page 2, Specific Request for Advice.
11        (A discussion was held off the record.)
12        Q.  BY MR. MOSELEY:  Maybe I can sort of
13   shortcut this, although I'm pretty certain people
14   are going to prevent me from doing that.
15        This draft advisory opinion seems to me
16   to say that in the case of a city employee who
17   observes illegal or improper activity in the course
18   of his employment, and that's not activity that
19   would be a matter of general public knowledge, that
20   charter provision 11-102(b) without any more would
21   prohibit the disclosure of such activity to any
22   outside agencies, is that your understanding?
23        MR. LORUSSO:  Objection; the document
24   speaks for itself.
25        THE WITNESS:  Did you say that the

17 (Pages 62 to 65)

Page 66

1  information was confidential information?  I
2  apologize.
3      Q.  BY MR. MOSELEY:  What I said was that it
4  was not available, generally, to people outside the
5  city.
6      A.  Well, you know, I don't know.  I hate to
7  read a decision and stop at the bottom of page 2.
8  That appears to be where it's headed at the bottom
9  of page 2, but, of course, ultimately the draft
10 opinion goes into many other things.
11     Q.  Well, I understand, and that's why I said
12 without more the charter provision would prohibit
13 the disclosure of such information, without more.
14     MR. NELSON:  Mr. Lorusso's objection is
15 well taken, the document speaks for itself.
16     THE WITNESS:  I don't know how else to
17 answer except as I have, and each case is going to
18 depend on its own facts, also.
19     Q.  BY MR. MOSELEY:  This particular draft
20 opinion actually proceeded down to the bottom of
21 page 2 and then it said, basically, if we were
22 going to analyze this without reference to any
23 other laws or precedent and the plain language of
24 the charter would lead us to conclude that he'd be
25 in violation were he to disclose the information;

Page 67

1  is that right?
2      So at that point a decision, whoever
3  wrote this is basically saying if you don't look at
4  anything else and you just look at the charter
5  provision, Mr. English's intended disclosures would
6  violate it, isn't that what it says?
7      A.  It says what it says.
8      Q.  That's what it means, too, though, right?
9      A.  I'm not sure that's what it means.
10     Q.  We'll drop that.  Fair enough.  That was
11 a very bad question, and I don't know how you would
12 have possibly answered it.
13     It goes on, this Exhibit 85 goes on and
14 on page 3 to discuss first amendment rights and
15 also on page 5 the Whistleblowers' Protection Act,
16 and then on -- okay, and the Whistleblowers'
17 Protection Act.
18     With respect to the Whistleblowers'
19 Protection Act, is it your understanding that the
20 Whistleblowers' Protection Act would have to be
21 considered in terms of the construction of the
22 language in charter provision 11-102(b)?
23     A.  Generally speaking?
24     Q.  Yes.
25     A.  It would depend on whether it's pertinent

Page 68

1  or relevant to the facts.
2      Q.  How about the facts that are being
3  considered in this particular case?
4      A.  In this opinion?
5      Q.  Yes.
6      A.  Do you have to do it?  No, I don't know
7  that you have to -- let me back up and say I don't
8  understand the question.
9      Q.  On page 2, we had a paragraph which
10 basically said if we were to analyze the charter
11 provision in a vacuum, with respect to the issues
12 or the facts that are raised in this request, we'd
13 have to conclude that he'd be in violation were
14 Mr. English to disclose that information.  Then it
15 goes on to analyze first amendment rights and the
16 whistleblowers' act.
17     Isn't it true that, under these
18 circumstances, this opinion seems to say that in
19 order to analyze this you have to read the charter
20 provision in question, in light of the provisions
21 of the whistleblower act?
22     MR. NELSON:  Objection; the document
23 speaks for itself.
24     THE WITNESS:  It does.  It says we are
25 also concerned that finding Mr. English violated

Page 69

1  RCH Section 11-102(b) might run counter to the
2  state Whistleblowers' Protection Act.  So I don't
3  know that it's mandatory, this draft opinion seems
4  to be looking at it in terms of a concern.
5      Q.  BY MR. MOSELEY:  Is it your opinion
6  that -- strike that.
7      Did you read this draft opinion before it
8  was sent out?
9      MR. NELSON:  Objection; instruct not to
10 answer.
11     I'll withdraw that objection.
12     Q.  BY MR. MOSELEY:  Did you read this draft
13 opinion before it was sent out?
14     A.  Yes.
15     Q.  I'm presuming, since you sent it out that
16 you approved of it before you sent it out?
17     A.  It was what we wanted comments on.
18     Q.  At the time you sent it out, were you of
19 the opinion that the conclusions and
20 recommendations set forth in this draft advisory
21 opinion were the conclusions and recommendations
22 that would be appropriate for the Ethics Commission
23 to adopt?
24     MR. NELSON:  Objection; instruct the
25 client not to answer.

18 (Pages 66 to 69)

Page 70

1    Q.   BY MR. MOSELEY:  Did you have any opinion
2    at all as to the conclusion and recommendation
3    section of this draft opinion, at the time you sent
4    it out?
5         MR. NELSON:  Same objection and
6    instruction.
7         MR. MOSELEY:  I asked him if he had an
8    opinion, I didn't ask him what it was.
9         MR. NELSON:  Okay.  Fair enough.
10   Q.   BY MR. MOSELEY:  Did you have any opinion
11   at all, with respect to the conclusion of these
12   recommendations, at the time you sent it out?
13   A.   Any opinion.
14   Q.   Yeah.
15   A.   Yes.
16   Q.   Now, I'm going to ask.  What was that
17   opinion at the time you sent it out?
18        MR. NELSON:  And now, I'm going to object
19   and instruct him not to answer.
20   Q.   BY MR. MOSELEY:  Is it your understanding
21   that the city has any policy with respect to what
22   information whistleblowers may or may not disclose,
23   and by whistleblowers I mean employees in the City
24   and County of Honolulu?
25        MR. LORUSSO:  Objection; overly broad,

Page 71

1    vague and ambiguous, lacks foundation.
2         THE WITNESS:  I don't have a general
3    understanding one way or the other.  I don't even
4    know if there is a position of the city, so I don't
5    have an understanding of what that position is.
6         MR. MOSELEY:  I think what I asked you
7    was if you knew there was a policy, but read back
8    the question.
9         Never mind.  Is it your understanding
10   that the city has any policy with respect to what
11   information whistleblowers may or may not disclose?
12        MR. LORUSSO:  Same objections.
13        THE WITNESS:  A policy.  Outside of
14   what's in the law and the legal interpretations
15   based on that, I don't have any understanding of
16   what the policy is or know what the policy is.
17   Q.   BY MR. MOSELEY:  When you reference the
18   law, are you talking about statutory provisions,
19   ordinances?
20   A.   Ordinances, charters, relevant statute,
21   constitutional amendments, legal precedent, et
22   cetera.
23   Q.   So other than what's in those sources you
24   just talked about, you're unaware of any particular
25   policy with the city, again, with respect to

Page 72

1    information whistleblowers may or may not --
2    A.   I am unaware.
3    Q.   When you were talking about the process
4    of dealing with requests to the Ethics Commission,
5    you referred to the possibility of a contested case
6    hearing.  Do you remember?
7    A.   Yes.
8    Q.   Is a contested case hearing something
9    that would be requested by the subject of a
10   complaint?
11   A.   Normally, that's where we would think it
12   would come from.
13   Q.   Could it be requested by anybody else?
14   A.   I'm not sure.  I don't know.  I'd have to
15   check the rules to see if it's allowed or even if
16   under HAPA it may be appropriate to do that, I'd
17   have to check.
18   Q.   That's the Hawaii Administrative
19   Procedures Act?
20   A.   Yes.
21        (A discussion was held off the record.)
22   Q.   BY MR. MOSELEY:  Listen, in this
23   particular case with respect to any complaint you
24   received from Mr. English on January 22nd, 2002,
25   has anybody requested a contested case hearing?

Page 73

1         MR. NELSON:  Objection --
2         MR. MOSELEY:  I'm sorry, 2003.
3         MR. NELSON:  It goes into the status of
4    the proceedings, I'm going to instruct him not to
5    answer.
6    Q.   BY MR. MOSELEY:  Is your understanding
7    that a contested case hearing is an event to which
8    the public can attend?
9    A.   My general understanding is that, no, it
10   would not be unless the subject of the complaint
11   waives their, basically, privacy right to that.
12   There may be a charter ordinance section, I think
13   there's also maybe a section in HAPA or the UIPA,
14   and I can't remember which, that if it's a
15   personnel proceeding it's closed to the public
16   unless the individual, who is the subject of the
17   proceeding, requests to have it open to the public.
18   Q.   Would it be your understanding that a
19   contested case hearing in such a case would be
20   available for the -- now what do you call the
21   person --
22   A.   Complainant.
23   Q.   Would that be open to that person?
24   A.   I don't know, and you're probably
25   wondering why I wouldn't know.  We haven't had a

19 (Pages 70 to 73)

Page 74

1   contested case for a long time, not while I've been
2   there.
3       Q.   How long does it typically take for the
4   Ethics Commission to resolve complaints?
5       A.   I've never tried to do timelines on
6   complaint cases, so it would depend on a number of
7   things.
8       Q.   Do you have many cases that take as long
9   as three-and-a-half years to resolve?
10      A.   No.
11      Q.   Do you have any cases that have taken
12  three-and-a-half years to resolve?
13      A.   Complaint cases.
14      Q.   Yes.
15      A.   I don't think so, other than Phil's.
16      Q.   Is there any reason that Phil's case has
17  gone three-and-a-half years without resolution?
18          MR. NELSON:  Objection.  I think that
19  gets into the status of the proceedings.  Instruct
20  not to answer.
21          MR. WONG:  And I'll add my objection as
22  vague and ambiguous in terms of which Phil's case
23  you're referring to, if there are, in fact, more
24  than one.
25      Q.   BY MR. MOSELEY:  I was referring to the

Page 75

1   case arising out of the January 22nd, 2003
2   complaint.
3       A.   Okay.
4       Q.   Is the Ethics Commission funded to the
5   level that you believe is necessary to properly
6   investigate and process complaints?
7           MR. LORUSSO:  Objection; lacks
8   foundation, vague and ambiguous.
9           THE WITNESS:  As most government agencies
10  can use more resources, I think the Ethics
11  Commission for the city is one of those agencies.
12  With more resources, in most cases, we'd be able to
13  conclude cases more quickly, whether it's a request
14  for advice or a complaint.
15      Q.   BY MR. MOSELEY:  Who drafts the budget
16  request for the Ethics Commission?
17      A.   It goes -- initially, I draft it, and it
18  goes through a number of stages.  The budget
19  request would be usually reviewed by the
20  Commission, although I think there might have been
21  a year or two where they didn't get involved in
22  specifics, but after that it goes to the
23  administrative services officer of Corporation
24  Counsel, and then it's also reviewed by the
25  Department of Budget and Fiscal Services, and, I

Page 76

1   don't know, the mayor's office can, I don't know if
2   they ever have, reviewed the budget.
3       Q.   And then it goes to the City Council; is
4   that right?
5       A.   Well, it depends on what happens to it
6   when it goes to Corporation Counsel, budget and
7   fiscal services and so on.  Ultimately, the budget
8   comes out from the mayor to the City Council, but
9   there may be iterations of the budget during the
10  budget forming process.
11      Q.   Since you have been the Executive
12  Director of the Ethics Commission, have you ever
13  had a budget that you proposed eventually adopted,
14  I was going to say in toto, but that sounds --
15  completely adopted without change?
16      A.   Yes.
17      Q.   More than once?
18      A.   Let me go through my Rolodex for a
19  second.  Perhaps, just once.
20      Q.   Was that the first year you prepared the
21  budget?
22      A.   No.
23      Q.   On other occasions, has your budget, the
24  budget that you prepared, been increased since
25  you've been there?

Page 77

1       A.   One time, based on a request from myself
2   and the Commission to the council.
3       Q.   So you prepared a budget, it got all the
4   way up to the council, and then you went to the
5   council and said, look, we actually want more
6   money?
7       A.   Yes.
8       Q.   You were going to explain that a little
9   more closely, but --
10      A.   That's essentially what it was.
11      Q.   What do you call them cases or matters,
12  what's your --
13      A.   We call them requests and complaints.  We
14  get between -- I think our busiest year we had 675
15  and it's tapered off a little bit, I think now
16  we're down to an average of around 550.  I have not
17  gone back and tried to detail how many are requests
18  and how many are complaints.
19      Q.   Can you tell me the difference between a
20  request and a complaint?
21      A.   Sure.  A request for advice, I consider
22  to be simply somebody calling up or writing, asking
23  for advice as to whether something they propose
24  would be ethical or not under the city ethics laws.
25  A complaint would be when a third party submits a