Page 78

1 request question or an out-and-out complaint that
2 questions whether or not a city officer or employee
3 has violated the ethics law in their conduct.
4    Q.  In the case of the advisory opinion
5 number 2006-2, what was the precipitating event in
6 that, was it a request or a complaint?
7    A.  I would call that a complaint.
8    Q.  In 2002, I'm not speaking of -- I'm
9 sorry, 2006-2, and this is the one in which we were
10 just talking about the proposed decision for that
11 kind of thing.
12    A.  And in fact, we have something called an
13 EC number, if you look at the first page of Exhibit
14 85, under the subject title it says
15 EC No. 05-159(w).
16    Q.  I'm sorry, where is that?
17    A.  Here.
18    Q.  Okay.  I gotcha.
19    A.  That helps for identification purposes
20 later, and that's the one that led -- that case
21 number led to advisory number 2006-2.  I would
22 consider that to be a request for advice, not a
23 complaint.
24    Q.  With respect to the letter which was
25 submitted to the Ethics Commission by Phil English

Page 79

1 on January 22nd 2003, would that have been a
2 complaint or a request?
3    A.  A complaint.
4    Q.  And the distinction is, in one case
5 somebody was asking for advice with respect to
6 whether or not they could or could not do
7 something?
8    A.  That's right.
9    Q.  And the other case, somebody was saying
10 Hey, Joe Blow was doing something I don't like?
11    A.  Yeah, the tenor of documents we get, let
12 me just call them, generically, requests that we
13 get, may be simply, as you point out, Roger, they
14 want to know, I'm planning to do this and that, is
15 it okay?  We also get requests for advice that
16 simply say, Mr. Third Party is doing something, is
17 that okay?  And so, we refer to complaints and
18 third party requests kind of interchangeably.
19       So you could call Phil's either a third
20 party request because he was focusing on other
21 parties or a complaint.  I kind of use the generic
22 complaint because it helps the commissioners
23 understand the difference between -- you know, we
24 have enough bureaucrat-ese to deal with.
25    Q.  Are you aware of any other complaints in

Page 80

1 your entire tenure of the Ethics Commission, at the
2 Ethics Commission, and I'm not talking about
3 requests now, I'm limiting it to complaints, which
4 have taken up to three-and-a-half years to resolve?
5       MR. WONG:  I want to object to that as
6 assuming facts not in evidence.  And an incomplete
7 hypothetical and vague and ambiguous.  Do you want
8 me to clarify or will that be a speaking objection?
9       MR. MOSELEY:  I want you to stop right
10 there, and we're going to have to do a speaking
11 objection.
12       MR. LORUSSO:  Join in the objection.
13       MR. NELSON:  Do you understand the
14 question?
15       THE WITNESS:  I think so.  You're asking
16 if there has been --
17    Q.  BY MR. MOSELEY:  Any other complaint
18 since you've been at the Ethics Commission, which
19 has taken as much as three-and-a-half years to
20 resolve.
21    A.  I'd have to go back and check for sure,
22 nothing strikes my memory right now.
23    Q.  Do you have an understanding of what sort
24 of a normal time period for processing a complaint
25 is at the Ethics Commission?

Page 81

1       MR. NELSON:  Objection, I think that's
2 been asked and answered.
3       THE WITNESS:  No, not a normal -- I
4 haven't gone back to study statistics on what the
5 average would be or the mean or that kind of thing.
6    Q.  BY MR. MOSELEY:  At any time during the
7 course of dealing with a complaint filed with the
8 Ethics Commission on January 22nd, 2003, did you
9 ever have occasion to discuss the complaint with
10 Michael Lorusso, sitting down here at the end of
11 the table?
12       MR. NELSON:  Objection, that gets into
13 the deliberations and dealing with the complaint,
14 and I'm going to instruct Mr. Totto not to answer.
15       MR. MOSELEY:  Are you saying, counsel,
16 that talking with Mike Lorusso is --
17       MR. NELSON:  If it's part of their
18 investigation in the matter, yes.
19    Q.  BY MR. MOSELEY:  Other than being part of
20 the investigation of the matter, did you ever have
21 occasion to speak with Mike Lorusso about the
22 complaint filed January 22nd, 2003?
23    A.  No, other than -- no.
24    Q.  Other than part of your investigation?
25    A.  Well, I use investigation very broadly,

21 (Pages 78 to 81)

Page 82

1  anything we do while a case is pending, so I don't
2  know if that helps or not.
3      Q.  Did you ever understand, during the
4  course of any processing of this complaint that was
5  filed January 22nd 2003, that Mike Lorusso
6  represented Gary Kurokawa or any other subject of
7  the complaint?
8      MR. LORUSSO:  Let me object as lack of
9  foundation, calls for speculation.
10     THE WITNESS:  Did you ask if I had an
11 understanding of whether he was counsel?
12     MR. MOSELEY:  Yes.
13     THE WITNESS:  Yes.
14     Q.  BY MR. MOSELEY:  And your understanding
15 was that he was counsel for some subject in that
16 complaint; is that right?
17     A.  That's right.  I didn't know, and don't
18 know, whether he's counsel for the city or Gary or
19 both.
20     Q.  Did you understand that in the course of
21 this procedure, arising out of the complaint
22 January 2nd, 2003, that Mr. Lorusso's legal
23 services were being paid for by the City and County
24 of Honolulu?
25     MR. LORUSSO:  Objection; lacks

Page 83

1  foundation.
2      THE WITNESS:  I did not and don't know.
3      (Exhibit Number 87 was marked for
4  identification.)
5      Q.  BY MR. MOSELEY:  I'm showing you what's
6  been marked as Exhibit 87.  Have you ever seen this
7  exhibit before or the subject matter of this
8  exhibit before?
9      A.  Yeah, I have.  It's one of the
10 Commission's advisory opinions -- for the city
11 Ethics Commission's advisory opinions.
12     Q.  Does this advisory opinion deal with the
13 subject matter of a city employee using city time
14 and resources for the purpose of a grievance
15 process?
16     A.  I need to read it.
17     (A discussion was held off the record.)
18     THE WITNESS:  It appears to do that, yes.
19     Q.  BY MR. MOSELEY:  Is it your understanding
20 that the Ethics Commission has adopted an
21 interpretation of the law that if an employee has
22 no more right to use a city resources in any
23 proceeding than a member of the general public, or,
24 I'm sorry, than every other person, that the
25 employee may not do so?

Page 84

1      MR. NELSON:  Objection; speaks for
2  itself.
3      THE WITNESS:  Generally speaking, that's
4  my understanding, again it's all fact dependent.
5      Q.  BY MR. MOSELEY:  Have you ever run into a
6  situation in which a subject of a complaint was
7  being defended by an attorney that was provided him
8  by the city?
9      A.  The reason I'm hesitating is there's a
10 couple of cases that I have to go back -- there
11 were a number of attorneys -- I just want to make
12 sure I answer correctly.  I don't recall now that
13 I've had a case like that.
14     Q.  Is it your understanding that advisory
15 opinion 307 would prohibit a city employee to use a
16 city paid attorney to defend him before a
17 proceeding with respect to the Ethics Commission?
18     MR. NELSON:  Objection; lack of
19 foundation, calls for speculation.
20     MR. LORUSSO:  Join.
21     THE WITNESS:  I don't think it would be
22 appropriate for me to answer that, also, because
23 it's a matter that the Commission has pending
24 before it now.
25     Q.  BY MR. MOSELEY:  And that's as a result

Page 85

1  of -- never mind.  Okay.  Fair enough.
2      We're going to come back at 1:30, try to
3  accommodate Chuck's -- actually, doing his city
4  business and, as well, we had talked off the record
5  beforehand, I'm intending to validate Chuck's
6  parking ticket in this building which, as you all
7  know, is a very substantial amount of money.  I
8  have no objections being made by opposing counsel
9  and I did check.  And, secondly, I would like to
10 make the record reflect that it is our policy at
11 this firm, when we subpoena somebody as a witness
12 to attend depositions that we, in fact, validate
13 their parking, that Mr. Totto was not an exception,
14 and I would not think of making an exception for
15 him on this basis.
16     Do you have any problems with this?
17     MR. NELSON:  No.
18     MR. MOSELEY:  I just want to make sure
19 that the record is very clear, I've known Chuck for
20 a number of years, and I wanted to make certain
21 that it is not ever to be said that he received
22 anything of any value that benefited him in any way
23 from any transaction, any official transaction he
24 had with me.  And with that, let's come back at
25 1:30.

Page 86

1    (The deposition was at lunch recess.)
2    Q.  BY MR. MOSELEY: In this morning's
3  session -- are we still okay going until like 4:15
4  or 4 o'clock?
5    A.  It's fine with me.
6    Q.  In this morning's session, I asked you a
7  number of questions with respect to what was going
8  on in follow-up to a complaint that had been filed
9  by Mr. English on January 22nd, 2003. What I'd
10  like to do now is, before I ask you any questions
11  on this stuff.
12    (Exhibit Numbers 88, 89, 90, 91, 92, 93
13  were marked for identification.)
14    (A discussion was held off the record.)
15    Q.  BY MR. MOSELEY: Have you had a chance to
16  look at these?
17    A.  Yes, I have.
18    Q.  I've just shown you documents marked 88
19  through 92. It appears to me -- 93 I'm sorry.
20  You're right, it's 88 to 93. It appears to me that
21  88, 89 and 90 are roughly the same as near as I can
22  tell, in terms of the documents. 88 and 89 are the
23  same, except for a number down in the lower
24  right-hand corner, one says PE 00299, the other
25  says CC 000394, and Exhibit 90 is the same, except

Page 87

1  on the upper left hand corner it says Gary Kurokawa
2  instead of Kathleen Chrismer and the document
3  number on the lower right-hand side is CC 000548,
4  but as I've compared them, the text seems to be the
5  same, and it appears that the differences are
6  differences in the route in which these documents
7  got into the record in this case.
8    Have you seen, and I'm only going to
9  refer to document 88 rather than 88, 89, and 90,
10  and when I ask you questions I'm going to ask you
11  to ignore the number in the lower right-hand side
12  and the person who is listed on the upper left-hand
13  side, so just look at the substance beginning from
14  Charles, from Totto, Charles W., down to the
15  website address.
16    A.  Yes.
17    Q.  Have you ever seen Exhibit 88 before?
18    A.  I believe so. Well, in its electronic
19  form.
20    Q.  What is Exhibit 88?
21    A.  Looks to be a copy of an email from me to
22  Gary Kurokawa in response to a question he had
23  about Phil English, using you as an attorney and
24  then Phil being involved in cases on appeal or tax
25  appeals, where you may be involved, also.

Page 88

1    Q.  Are you sure that was in response to a
2  question from Gary Kurokawa or do you think that
3  was a response based on a request by Phil English
4  to you to have this addressed?
5    A.  I'm not sure. Do one of these point it
6  out, because I can't remember.
7    Q.  I could show you a document which we've
8  all decided is confidential, at least for the
9  moment. I don't know if that would help you.
10    A.  Well, I know that one or the other or
11  both had a concern.
12    Q.  Let me ask you this. Did you have a
13  meeting on January 3rd, 2003 with Phil English?
14    A.  I believe so. I'm not sure of the date,
15  but I know it was early January.
16    Q.  And subsequent to that, did you receive a
17  written complaint by Phil English on January 22nd,
18  2003?
19    A.  Yes.
20    Q.  In the course of those meetings, do you
21  remember being advised that I represented parties
22  with cases against the city in which Phil was
23  assigned to the cases?
24    A.  I just don't recall, sorry.
25    Q.  Do you recall a request by Phil English

Page 89

1  or myself that you would contact the assessment
2  division and make sure that Phil was removed from
3  those cases?
4    A.  I don't recall.
5    MR. MOSELEY: Would you guys object if I
6  showed him something to refresh his recollection
7  without giving it to you.
8    MR. LORUSSO: Then I would object, yes.
9    MR. WONG: I would.
10    Q.  BY MR. MOSELEY: Does this sound familiar
11  to you, Finally, as you are aware, this firm also
12  represents more than 100 taxpayers with appeals
13  before the Board of Review. In this context,
14  Mr. English is technically assigned to most of
15  these cases. His authority to act in these cases
16  has apparently been mostly or completely removed,
17  and he now functions and has functioned for quite
18  some time merely as a conduit for instructions from
19  higher up with essentially no discretionary powers.
20    However, now that we have an
21  attorney-client relationship with Mr. English, he
22  and we believe that further communications on
23  substantive matters in these cases may not have the
24  appearance of propriety. For this reason, we would
25  request that you inform the assessment division

23 (Pages 86 to 89)

Page 90

1  that Mr. English should be removed from any duties
2  working on appeals in which this firm represents
3  the taxpayers.  Care needs to be taken, however,
4  that the assessment division does not use this as
5  an excuse to reassign Mr. English in some
6  retaliatory manner.
7       Does that group of sentences sound
8  familiar to you at all?
9       MR. LORUSSO:  Objection; vague and
10 ambiguous.  Just for the record, just note
11 counselor reading from a document.
12      Q.  BY MR. MOSELEY:  I did read that from a
13 document.
14      Does that paragraph sound familiar to you
15 at all?
16      A.  It does.
17      Q.  Does that help refresh your recollection
18 of whether or not you were requested to inform the
19 assessment division of Phil's retention of me as
20 counsel?
21      A.  I believe I was by either you or Phil.
22 And just to clarify, I'm not sure, Gary might have
23 asked the same question or if I'm just mixing that
24 together.
25      Q.  Actually, one of the later documents

Page 91

1  we'll talk about if Gary appears to raise that
2  question, so I'm not going to sandbag you on this.
3       So in terms of Exhibit 88, do you now
4  have an idea of why you wrote this email to Gary
5  Kurokawa?
6       A.  Yes, I do.  I believe it was in response
7  to a request from you or Mr. English to notify the
8  division.
9       Q.  Okay, Thank you.
10      I direct your attention to Exhibit number
11 91.
12      A.  Yes, I have it.
13      Q.  And as I said, I felt there was an
14 exhibit later on in which it was apparent that Gary
15 was raising the same thing.
16      Do you recognize Exhibit 91?
17      A.  Yes, I do.
18      Q.  And what is Exhibit 91?
19      A.  It appears to be a copy of an email from
20 Gary Kurokawa to me and a response back to Gary.
21      Q.  The original message was apparently dated
22 February 7th, 2003, do you see that?
23      A.  Yes, I do.
24      Q.  And your response was dated February
25 10th, 2003?

Page 92

1       A.  Yes.
2       Q.  The February 7th, 2003 email was actually
3  later in time than the email evidenced by Exhibit
4  88, is that not the case?
5       A.  Yes.  88 is February 5 and February 7 is
6  the date of the email from Gary Kurokawa to me.
7       Q.  So do you know on what date Gary Kurokawa
8  actually received your email of February 5, which
9  is in Exhibit 88?
10      A.  No, I don't know the exact date.
11      Q.  And Exhibit 91, the original message
12 says, "Chuck, received your email yesterday and
13 tried to contact you by phone."
14      Was there any other email, other than the
15 February 5th, 2003 email that you may have sent to
16 Gary in this period of time?
17      A.  I don't know.
18      Q.  Do you remember any other email?
19      A.  I don't remember any others.
20      Q.  Did you ever have a subsequent discussion
21 with Gary Kurokawa, with respect to this email
22 that's in Exhibit 91?
23      A.  Don't recall.
24      Q.  Do you have a recollection of having a
25 discussion with Gary Kurokawa about his reference

Page 93

1  "several questions regarding the issue of
2  Mr. Moseley representing Mr. English and the
3  implications of the relationship with the
4  operations of the Division"?
5       A.  I don't remember.
6       Q.  Would you have any notes of such
7  discussions if you had them?
8       A.  I might or might not.  I don't know.
9       MR. NELSON:  Well, I think your question
10 is pretty broadly worded.  So to the extent that
11 the notes might relate to this, how are we going to
12 handle Mr. English's assignments during the
13 litigation and the investigation, then, okay, but I
14 think your question was broader than that.
15      MR. MOSELEY:  I'm specifically asking
16 about notes with respect to any discussions that
17 Chuck may have had with Gary Kurokawa on this
18 issue, and the issue is raised in Exhibit 91.
19      MR. NELSON:  Okay.
20      Q.  BY MR. MOSELEY:  Did you look for any
21 notes before you came here today?
22      A.  I did not.
23      Q.  Are you contending that those notes would
24 be privileged?
25      A.  I don't know.  I'd have to confer with

Page 94

1  counsel.
2       MR. NELSON: We will have to look into
3  that matter.
4     Q.  BY MR. MOSELEY: But in fact, you did
5  email back and forth with Gary, in which Gary
6  expressed concerns to you in Exhibit 91; is that
7  right?
8       MR. LORUSSO: Objection to the form of
9  the question and the characterization, the document
10 speaks for itself.
11      THE WITNESS: I responded to his email of
12 the 7th with my email of the 10th, which says that
13 I'll try to give him a call.
14    Q.  BY MR. MOSELEY: And you don't know
15 whether you gave him a call.
16    A.  Don't recall.
17    Q.  But if you gave him a call, would you
18 have notes?
19    A.  I may or I may not.
20    Q.  Is that the kind of thing you normally
21 would have logged somewhere in your records?
22    A.  It would depend. Generally, it's going
23 to depend on the nature of the call, whether I'm
24 actually giving advice or listening or there's some
25 important facts or whatever.

Page 95

1     Q.  In the context of this sort of a thing
2  and an ongoing investigation or proceeding, would
3  you have kept notes of that?
4     A.  I don't know. Sometimes I do and
5  sometimes -- it really depends on what's discussed.
6     Q.  I'd like to direct your attention to
7  Exhibit 92. Have you ever seen Exhibit 92 before?
8     A.  No.
9     Q.  The bottom part says original message,
10 and it says from Phillip English to Ann Gima, and
11 it's February 27th, 2003. Do you see that?
12    A.  Yes, I do.
13    Q.  One of the things it says there, and this
14 is apparently Phil speaking, "To date I have not
15 received any instructions as to where or whom I
16 should re-direct these appeals."
17      Had you spoken with Gary Kurokawa or
18 anybody else as of February 27th, 2003 about what
19 should happen with respect to Phil working on cases
20 in which I represented the appellants?
21    A.  I don't recall.
22    Q.  The top part of that says, and this
23 appears to be from Ann Gima to Gary Kurokawa and
24 Robert Magota, it says, "Charles Totto has
25 requested that Mr. English not work on any matter

Page 96

1  relating to Mr. Moseley or his clients. I have
2  requested from Mr. Totto a list of clients from Mr.
3  Moseley."
4       Do you recall talking with Ann Gima about
5  a list of my clients?
6     A.  I don't remember.
7     Q.  Would you have taken any notes with
8  respect to that, any such conversation?
9     A.  I may have.
10    Q.  Did you ever request from me a list of
11 clients?
12    A.  Not that I recall.
13    Q.  Further on in that paragraph it says,
14 "Mr. Totto is requesting and only requesting that
15 this be accommodated and is not authorized to
16 mandate any changes in work assignments."
17      Do you see that?
18    A.  Yes.
19    Q.  Did you have a discussion with Ann Gima
20 about that?
21    A.  Not that I recall.
22    Q.  The next sentence says, Corp. Counsel is
23 actively looking into this matter and will be
24 advising us.
25      Do you know anything about Corp. Counsel

Page 97

1  looking into this matter?
2     A.  By this time, I'm confused as to what
3  matter she's -- I guess she's talking about the
4  work assignments, but I wasn't aware one way or the
5  other.
6     Q.  The last sentence says, "In the meantime
7  any known appeals namely Waikiki Shores should be
8  put on hold and not reassigned until this matter is
9  resolved."
10      Do you see that?
11    A.  Yes.
12    Q.  Is that something that you were aware of?
13    A.  No.
14    Q.  And nobody discussed that with you?
15    A.  Not that I remember.
16    Q.  I'd like to direct your attention to
17 Exhibit 93. Let's back up on that, briefly. I'm
18 going to show you what's already been marked as
19 Exhibit 79 in the course of these depositions.
20      You know, Gordon, I'll be happy to get
21 you a copy of this later.
22      Do you recognize Exhibit 79?
23    A.  Okay, I've had a chance to look at it.
24    Q.  Do you remember this email?
25    A.  I think so.

Page 98

1  Q. Did you receive it on or about February
2  26th of 2003?
3  A. I'm not sure. That's the date on the
4  email.
5  Q. Prior to the date of this email, had you
6  been playing telephone tag with Mike Golojuch?
7  A. That strikes a bell, I'm not sure,
8  though.
9  Q. By telephone tag, what I mean is that I
10 call you, you call me back, I'm not there, we keep
11 leaving messages back and forth until one of us
12 finally gets ahold of the other. Is that your
13 understanding of that term?
14 A. That's right.
15 Q. When you say, It strikes a bell, is Mike
16 Golojuch somebody you have initiated a call to?
17 A. I don't believe so. I'm not sure.
18 Q. In his first paragraph there, he says I'm
19 conducting an investigation concerning allegations
20 of possible workplace violence via harassment and
21 threats by Phil English.
22    Do you see that?
23 A. Yes.
24 Q. Prior to your receipt of this email, were
25 you aware of any allegations of workplace violence

Page 99

1  against Phil English?
2  A. Not that I remember.
3  Q. Did you ever come to learn anymore about
4  those allegations at any later date?
5     MR. NELSON: Well, I'm going to object to
6  the question to the extent that it goes into your
7  investigation on behalf of the Ethics Commission,
8  but if you can answer the question, go ahead.
9     THE WITNESS: I don't recall receiving
10 anything more, I do believe I responded to some of
11 the issues raised by Mr. Golojuch, and I can't
12 remember if I did that by email or telephone.
13 Q. BY MR. MOSELEY: Do you know how many
14 contacts you might have had with Mr. Golojuch after
15 the date of Exhibit 79?
16 A. No.
17 Q. Do you recall any of the other substance
18 of those phone calls or communications?
19 A. No, I don't. I don't recall anything
20 other than the types of matters raised in the email
21 of the 26th.
22 Q. When you received this email of February
23 26, 2003, did the question of whether or not
24 Mr. English was being subject to harassment cross
25 your mind?

Page 100

1     MR. LORUSSO: Objection; vague and
2  ambiguous, misstates the document.
3     THE WITNESS: No, not necessarily. As I
4  recall, I was trying to determine how I could
5  respond narrowly.
6  Q. BY MR. MOSELEY: Prior to February 26th,
7  2003, had the issue of possible harassment of
8  Mr. English been raised to you?
9     (Whereupon, a discussion between the
10 witness and Mr. Nelson ensued.)
11    MR. NELSON: Well, again, to the extent
12 that you're seeking to elicit information about
13 Mr. Totto's investigation as opposed to
14 Mr. Golojuch's investigation, I would object and
15 instruct not to answer, but to the extent you can
16 answer, go ahead.
17    THE WITNESS: I'm unable to answer
18 without going into the Ethics Commission
19 investigation.
20 Q. BY MR. MOSELEY: Was the question of
21 harassment actually part of the investigation?
22    MR. LORUSSO: Which investigation?
23 Q. BY MR. MOSELEY: The ethics investigation
24 that you're just referring to.
25    MR. NELSON: Well, objection; instruct

Page 101

1  the witness not to answer.
2  Q. BY MR. MOSELEY: Did you ever respond to
3  the assertion in there that Mike Golojuch was
4  conducting an investigation concerning allegations
5  of possible workplace violence by harassment and
6  threats?
7  A. I believe I responded.
8  Q. Do you know how you responded?
9  A. My recollection is email, but I'm not
10 sure.
11 Q. It looks like the second full paragraph
12 there, it says, The reason for contacting you,
13 that's the way it begins, do you see that paragraph
14 there?
15 A. Yes.
16 Q. Basically, it says that Christopher Graff
17 states in his complaint that Phillip English is
18 verbal, intimidating and making threats against
19 him.
20    Do you see that?
21 A. I see it.
22 Q. Were you aware of any verbal intimidation
23 or threats by Phillip English against Christopher
24 Graff as of February 26th, 2003?
25 A. I can't respond without going into the

Page 102

1  ethics investigation.
2     Q.  Do you remember the meeting you had with
3  Phil English early in January of 2003, I believe
4  the date was January 3rd, but do you recall that
5  meeting?
6     A.  Generally, yes.
7     Q.  Do you recall asking Phil English if he'd
8  be willing to wear a wire?
9        MR. NELSON:  Well, I'm going to object
10 and instruct not to answer, this gets into
11 Mr. Totto's investigation.
12    Q.  BY MR. MOSELEY:  Do you recall asking
13 Mr. English to see if he could get Chris Graff in
14 to talk to you about Mr. English's allegations?
15       MR. NELSON:  Asking Mr. Totto -- could
16 you restate that, I'm sorry.
17       MR. MOSELEY:  Could you just read the
18 question back.
19       (The requested portion of the record was
20 read.)
21       MR. NELSON:  I'm going to make the same
22 objections, same instruction.
23       MR. MOSELEY:  And the instruction is not
24 to answer.
25       MR. NELSON:  Yes.

Page 103

1     Q.  BY MR. MOSELEY:  Did you respond to
2  Mr. Golojuch's statements about Phil English
3  intimidating Christopher Graff?
4     A.  I don't know.
5     Q.  Do you see the next paragraph that says
6  Mr. English warned Christopher, that's the way it
7  begins?
8     A.  Yes.
9     Q.  It says, If he lied to them (Ethics),
10 they would know and hang him out to dry.
11       Do you see that?
12    A.  Yes, I do.
13    Q.  Did you respond to Michael Golojuch about
14 that assertion?
15    A.  I don't know.
16       MR. MOSELEY:  Gordon, you're going to
17 object and instruct him not to answer in terms of
18 all questions that I ask him about his instructions
19 to Phil English in that meeting?
20       MR. NELSON:  Once the investigation is
21 underway, I think Mr. Totto is subject to the
22 ordinance on all of these things, and, you know,
23 we'll get this sorted out by the judge.
24       MR. MOSELEY:  No, I understand, I'm
25 trying to make a record that's clear.

Page 104

1     Q.  In your understanding of this, when did
2  the investigation get underway?
3     A.  Once I sat down to talk to Mr. English,
4  the January 3rd date.
5     Q.  So it got underway before the formal
6  written complaint came in?
7     A.  I believe so.
8     Q.  Did you ever inform Mike Golojuch, Bob
9  Magota, Gary Kurokawa, Ann Gima or anybody else in
10 the Department of Budget and Fiscal Services when
11 the Ethics Commission investigation got underway?
12       MR. LORUSSO:  Objection; vague and
13 ambiguous, over-broad as to time, compound.
14       THE WITNESS:  I'm not sure I can respond
15 without talking about what the Ethics Commission
16 investigation entailed.
17    Q.  BY MR. MOSELEY:  I'm asking if you ever
18 informed anybody of the date that investigation
19 began.
20    A.  Not that I recall.
21       (Exhibit Number 94 was marked for
22 identification.)
23    Q.  BY MR. MOSELEY:  I'd like to show you
24 what's been marked as Exhibit 94.  Do you want to
25 take a couple minutes to look at that?

Page 105

1     A.  Sure, I will take a look at it.
2        Okay.  I've read it.
3     Q.  Is Exhibit 94 your response to Exhibit
4  79?
5     A.  Yes, it is.
6     Q.  In Exhibit 94, in the first paragraph you
7  basically say that you're going to respond to
8  whether or not the statements attributed to you are
9  accurate without going into the nature of the
10 discussion of the complaint; is that right?
11    A.  Right.
12    Q.  Did you feel you had the ability to do
13 that under the confidentiality laws?
14    A.  To a limited extent.
15    Q.  And you say in the second paragraph that
16 you told Phil, "assuming the information provided
17 by Phil directly or through his attorney was
18 accurate, Chris and Gary may have violated the
19 ethics laws regarding the use of city resources to
20 benefit private businesses."
21       Is that right?
22    A.  Yes, I see that.
23    Q.  Why did you believe you could tell Mike
24 Golojuch that information?
25    A.  He appeared to, as I recall, understand

Page 106

1  the underlying facts or at least some of the facts
2  of Phil's complaint, and I felt that it would be
3  appropriate to inform him as to what I said in
4  response to what I understand as being, at the
5  time, and I know it's not in either of the emails,
6  but I think he was talking about having Phil --
7  responding to a claim for workers' comp for Phil, I
8  could be wrong, but I thought that's part of what
9  it was. So I was trying to be as helpful as I
10 could without getting into specific disclosures,
11 and he did seem to have the basic allegations.
12     Q.  Did you understand what the source of his
13 understanding was, the basic allegations?
14     A.  No, I don't recall.
15     Q.  This was after you conducted your
16 interview with Chris Graff, though, wasn't it?
17     A.  Yes.
18     Q.  Had you conducted any interviews with
19 anybody else between your meeting in early January
20 3rd, 2003 and the date of this email, February 28,
21 2003?
22     A.  I don't know.
23     Q.  With respect to the statements that Mike
24 Golojuch had attributed to you in Exhibit 79, what
25 was your understanding about the source of those

Page 107

1  attributions?
2     A.  That they came from Chris Graff, if I'm
3  understanding your question correctly.
4     Q.  Well, actually, is your understanding not
5  that you had made some sort of a statement, you may
6  or may not have made some sort of a statement, it
7  was alleged that Phil reported that statement to
8  Chris Graff, Chris Graff subsequently reported the
9  statement to Mike Golojuch at least, and then Mike
10 Golojuch was reporting the statement to you.
11     A.  That's my general understanding.
12     Q.  Did you express to Mike Golojuch any
13 opinions you might have had about the reliability
14 of statements relayed through such a daisy chain?
15     A.  If I did, it would be in here, and I
16 don't recall seeing anything in Exhibit 94.
17     Q.  Was it your opinion as of -- off the
18 record.
19         (A discussion was held off the record.)
20     Q.  BY MR. MOSELEY: Was it your
21 understanding as of February 28, 2003, that the use
22 of city resources to benefit a private business was
23 improper?
24     A.  Generally, yes, and the reason I use
25 generally is because it's going to depend on facts.

Page 108

1     Q.  Under what kinds of circumstances would
2  the use of city resources to benefit a private
3  business be acceptable?
4         MR. WONG: I'll object to that question,
5  it's overly broad, vague, ambiguous and an
6  incomplete hypothetical.
7         MR. LORUSSO: Join.
8         MR. NELSON: Join.
9         THE WITNESS: From time to time we run
10 into a case where there's an incidental benefit to
11 a private business by the expenditure or use of a
12 city resource, and sometimes we have to take a look
13 at whether or not there's an ethics violation
14 included in that.
15     Q.  BY MR. MOSELEY: I understand.
16        The next paragraph says, "I also
17 mentioned to Phil and his attorney that there is a
18 means by which DIT can review city employee's
19 computer files and data bases."
20        Do you see that?
21     A.  Yes.
22     Q.  Was that, in fact, your understanding as
23 of February 28th, 2003?
24     A.  That I had mentioned that to Phil and his
25 attorney?

Page 109

1     Q.  No, was it your understanding that DIT
2  had that capability?
3     A.  Yes, to some degree. At that time, I
4  wasn't well-versed in what they could or could not
5  do.
6     Q.  Have you subsequently become better
7  versed in what DIT can and cannot do?
8     A.  Just generally, yes.
9     Q.  Did you instruct DIT to seize any
10 computers or to save or recover the contents of any
11 computers or databases in the assessment division
12 or with any of the people involved in the
13 complaint?
14        MR. NELSON: Objection; that gets into
15 Mr. Totto's investigation. I'll instruct him not
16 to answer.
17     Q.  BY MR. MOSELEY: Are you aware that DIT
18 took Phil English's computer and apparently still
19 has it?
20     A.  I wasn't aware of that.
21     Q.  Are you aware that DIT took essentially
22 all of the computers out of the assessment division
23 in a swap-over of new computer systems?
24     A.  No, I was not aware of that.
25     Q.  Are you aware of whether or not DIT

28 (Pages 106 to 109)

Page 110

1  preserved any of the contents of any of those
2  computers?
3      A. No, I'm not.
4      Q. The next paragraph down says, in the
5  middle of it, "I talked with Phil and his attorney
6  about strategic approaches to the witnesses in the
7  investigation, but I cannot say more about that at
8  this time."
9      A. I see that.
10     Q. It starts, "I do not recall saying."
11         What is the reference that you're making
12  in that statement?
13     A. I'm not sure what you mean, I'm referring
14  to a discussion with Phil and you, I believe.
15     Q. About how to approach witnesses?
16     A. I don't think the term approach means how
17  to -- I'm not sure exactly -- I tried to keep this
18  very broad so as not to disclose things. Strategic
19  approaches, to me at this point, would mean
20  different ways that you, he or someone from the
21  Ethics Commission could collect information from
22  witnesses.
23     Q. And I'm presuming your attorney's going
24  to tell you not to answer any questions about the
25  specifics of those discussions?

Page 111

1      MR. NELSON: Yes.
2      Q. BY MR. MOSELEY: You know, what, it looks
3  like a hole was punched there, but it probably says
4  I was not privy to discussion between Chris and
5  Phil. Do you see that?
6      A. Yes, I do.
7      Q. It says, "In interviewing Chris, I
8  emphasized the need for him to tell the truth."
9         Is that correct, that when you
10  interviewed Chris you emphasized the need for him
11  to tell the truth?
12     MR. NELSON: Well, objection; gets into
13  his investigation of the complaint.
14     MR. MOSELEY: On what basis? But you're
15  not instructing him not to answer.
16     MR. NELSON: I'll instruct him not to
17  answer. Also, the document speaks for itself.
18     Q. BY MR. MOSELEY: Did you instruct Chris
19  Graff to tell the truth or did you emphasize for
20  Chris Graff the need to tell the truth?
21     MR. NELSON: Objection; instruct him not
22  to answer.
23     Q. BY MR. MOSELEY: Was that statement in
24  this email that you already sent to Mike Golojuch,
25  was that statement correct?

Page 112

1      MR. NELSON: Could we take a break.
2      MR. MOSELEY: Okay. Let's take a break.
3      (The deposition was at recess.)
4      (The requested portion of the record was
5  read.)
6      Q. BY MR. MOSELEY: Which was the statement
7  about emphasizing in the interview, and "Chris, I
8  emphasized the need for him to tell the truth."
9      A. Yes.
10     Q. In the interview with Chris Graff, did
11  you tell him anything else of a general nature,
12  essentially not substantive kinds of stuff, and
13  what I'm saying, I mean, telling him, emphasizing
14  the need to tell the truth is sort of a general
15  instruction, but if you said listen, or if you
16  asked him did you do X, I'm not asking that kind of
17  thing, I'm talking about like general instructions
18  to him in the interview.
19     A. Generally, with a witness or somebody who
20  is potentially a subject of an investigation or is
21  a subject of the investigation, I would talk about
22  the process, probably a little bit more briefly
23  than I did this morning with you, about how the
24  process works, they will have a chance to respond,
25  and those types of things.

Page 113

1         Similarly, to your prologue before the
2  deposition, I talked to them some general things
3  about that, they can take a break at any time and
4  so on. I don't recall, I probably mentioned that
5  he could have an attorney there if he wanted, or if
6  he wanted anybody else to represent him. That's
7  about all I recall, and these are kind of --
8  actually, I'm not sure that's from specifically
9  recalling my conversation with Chris as much as it
10  is this is the normal approach.
11     Q. Do you remember giving Chris Graff any
12  instruction about whether or not he could tell
13  others about the subject matter of the
14  investigation?
15     A. I don't recall. As a general rule, I ask
16  people if they could not talk to other people about
17  an investigation, but, you know, we don't have
18  anything to bind them to that.
19     Q. How about, and I'm not wanting to sandbag
20  you, a little bit later on, you say, "We do not
21  take a position on whether an employee should or
22  should" -- I presume that meant could or should --
23  "not talk to others about a ethics complaint unless
24  the employee's actions would undermine our ability
25  to investigate the case."

29 (Pages 110 to 113)

Page 114

1  Was that your position at the time?
2  A.  Yeah, I'm sure it was.
3  Q.  Did you believe that if Chris Graff
4  talked to anybody else about the ethics complaint
5  that it might undermine your ability to investigate
6  the case?
7       MR. NELSON:  Objection; he's already
8  stated the general position on these matters and
9  now we're getting into more specifics.  Instruct
10 not to answer.
11 Q.  BY MR. MOSELEY:  In the same paragraph in
12 which it says, "In interviewing Chris, I emphasized
13 the need for him to tell the truth."  It also says
14 that "Chris asked about issues dealing with whistle
15 blowing and about penalties associated with ethics
16 violations."
17      Do you see that?
18 A.  Yes, I do.
19 Q.  What did Chris ask about the issues with
20 respect to whistle blowing?
21      MR. NELSON:  Objection, the document
22 speaks for itself and now we're seeking an
23 elaboration from him about the investigation.
24      MR. MOSELEY:  Are you instructing him not
25 to answer?

Page 115

1       MR. NELSON:  Yes.
2       MR. MOSELEY:  So you're instructing him
3  not to elaborate on the statement already made to
4  Mike Golojuch, that Chris asked about issues
5  dealing with whistle blowing.
6       MR. NELSON:  Yes.
7       MR. MOSELEY:  Off the record.
8       (A discussion was held off the record.)
9  Q.  BY MR. MOSELEY:  What did Chris ask you
10 about penalties associated with ethics violations?
11      MR. NELSON:  Same objection, same
12 instruction.
13 Q.  BY MR. MOSELEY:  It says, "Chris also
14 discussed his feelings toward Phil."  What did he
15 say about his feelings toward Phil?
16      MR. NELSON:  Same objection, same
17 instruction.
18 Q.  BY MR. MOSELEY:  "And the nature of some
19 of their past discussions about the issues stated
20 in the complaint."
21      MR. NELSON:  Same objections.
22 Q.  BY MR. MOSELEY:  I hadn't asked the
23 question yet.
24      What was the nature of the past
25 discussions and about the issues stated in the

Page 116

1  complaint that Chris discussed?
2       MR. NELSON:  Same objection, same
3  instruction.
4       MR. MOSELEY:  And when you say, Same
5  instruction, you're instructing him not to answer
6  the question.
7       MR. NELSON:  Yes.
8  Q.  BY MR. MOSELEY:  Further down, it says,
9  "Phil filed his complaint with the Commission on
10 January 22, 2003."
11      Do you see that?
12 A.  Yes.
13 Q.  Did you tell Chris Graff that your first
14 interview with Phil was on January 3rd, 2003?
15 A.  Did I tell Chris that?
16 Q.  Yes.
17 A.  I don't recall.
18 Q.  Did you tell Mike Golojuch that your
19 first contact with, I'm sorry, your first interview
20 with Phil English was on January 3, 2003?
21 A.  I'm sorry, is there a reference on the
22 document here?
23 Q.  No, there isn't.  It says, "Phil filed
24 his complaint with the Commission on January 22,
25 2003."  I'm asking questions about whether you

Page 117

1  informed either Chris Graff or Mike Golojuch that
2  the first interview with Phil was on January 3rd,
3  2003.
4  A.  Not that I recall.  I don't recall
5  telling either of them that.
6  Q.  It says further down, "I interviewed
7  Chris on January 24th."  Do you see that?
8  A.  Yes.
9  Q.  Is that January 24th, 2003?
10 A.  That's correct.
11 Q.  The response above, Phil filed his
12 response with the Commission on January 2, 2003, is
13 that a response to Exhibit 79 in which Mike
14 Golojuch said when did Phil English formally file
15 an ethics complaint?
16      MR. WONG:  I think you may have
17 misspoken, you said January 2, 2003.
18      MR. MOSELEY:  Oh, I'm sorry, January 22,
19 2003.
20      THE WITNESS:  Yes, I believe so.
21 Q.  BY MR. MOSELEY:  Did you question Mike
22 Golojuch about why he wanted to know when Phil
23 English formally filed an ethics complaint?
24 A.  I think I may have asked -- I don't know
25 if it was that specific question, if I asked him