Page 118

1  that, I did ask him what the purpose of his seeking
2  the information was.
3      Q.   And what did he say?
4      A.   As I recall, it had to do with whether
5  Phil -- unfortunately this is very vague, I can't
6  remember if it had to do with him going to an
7  independent medical examination, whether it had to
8  do with workers' comp, or -- as mentioned in '79,
9  Exhibit 79, the allegations by Chris against Phil,
10  all those kind of roll together for me.
11     Q.   Exhibit 79, at the top it says, I am
12  conducting an investigation concerning allegations
13  of possible workplace violence.  Do you see that?
14     A.   Yes.
15     Q.   Is there anything in that exhibit that
16  indicates to you that there's a workers' comp claim
17  going on?
18     A.   I don't see anything.
19     Q.   When Mike Golojuch asked you a question
20  When did Phil English formally file an ethics
21  complaint and you provided a response, Phil filed
22  his complaint with the Commission on January 22nd,
23  2003, did you consider that Mike Golojuch or
24  anybody else in the city might use that information
25  to cover up a pattern of harassment?

Page 119

1      MR. LORUSSO:  Objection; vague and
2  ambiguous, lacks foundation, calls for speculation.
3      MR. NELSON:  Join in that.
4      THE WITNESS:  I did not consider that.
5      Q.   BY MR. MOSELEY:  Isn't that information
6  which you normally would not disclose to anybody,
7  when the complaint was filed?
8      MR. WONG:  Objection; argumentative.
9      MR. NELSON:  Join in that.
10     THE WITNESS:  No.  Again, under the
11  circumstances in this matter, where another part of
12  the city is trying to conduct an investigation and
13  seem to understand the underlying or at least some
14  of the underlying issues in the complaint, I
15  believed it was appropriate to do that.
16     Q.   BY MR. MOSELEY:  But you were aware, as
17  of this email, that Mike Golojuch was conducting
18  investigations of workplace violence; is that
19  right?
20     A.   Of allegations of that, yes.
21     Q.   Did you ever see the allegation of
22  workplace violence that was produced by Christopher
23  Graff or anybody else?
24     A.   No.
25     Q.   So you wouldn't know whether or not they

Page 120

1  changed dates on their reports, based upon the
2  information you provided them about when Phil
3  formally filed the complaint, would you?
4      MR. LORUSSO:  Objection; lacks
5  foundation.
6      THE WITNESS:  No, I would not.
7      Q.   BY MR. MOSELEY:  And that was not a
8  concern of yours that somebody would doctor
9  documents or change the record to reflect a
10  different date of certain actions, based on the
11  date of his complaint with the Ethics Commission?
12     MR. NELSON:  Objection; lack of
13  foundation.
14     THE WITNESS:  That was not a concern of
15  mine.
16     Q.   BY MR. MOSELEY:  Is that your standard
17  practice to tell people, third parties that
18  inquire, the dates that complaints are filed?
19     A.   We rarely get requests from other
20  branches of city government for whether or not a
21  complaint has been filed or requesting the date, so
22  I don't know if we've had enough times to say there
23  is a --
24     Q.   Is the date that a complaint was filed,
25  is that some of the information that you believe is

Page 121

1  subject to the prohibition against disclosure that
2  you operate under?
3      A.   I don't know.  If the party who is asking
4  is confirming that a complaint has been filed, I
5  don't know that the date would be something that we
6  would withhold or not based on that.  I hadn't
7  thought of that.
8      Q.   Maybe I've asked this already, but you
9  didn't ask Mike Golojuch why he wanted to know that
10  date, did you?
11     A.   Not that I recall.
12     Q.   Did you ever ask Mike Golojuch when the
13  workplace violence reports or report were filed
14  against Phil English?
15     A.   I don't remember if I did or not.
16     Q.   Did you ever learn if and when such
17  things had been filed?
18     A.   I don't believe so, but I'm not sure.
19  Oh, if they had been filed or when they had been
20  filed?
21     Q.   If or when, either one.
22     A.   Not that I recall.
23     Q.   Is an allegation of harassment in
24  violation of state whistleblower laws part of a
25  continuing investigation that you have against Gary

31 (Pages 118 to 121)

Page 122

1   Kurokawa or any other employee of the city?
2        MR. NELSON:  Objection; instruct not to
3   answer.
4        Q.   BY MR. MOSELEY:  I'd like you to take a
5   look at Exhibit 76 in the book of exhibits that I
6   have in front of you.  Have you ever seen this
7   exhibit before?
8        A.   No.
9        Q.   I'd like you to look at the upper
10  right-hand portion of this exhibit.  It says there,
11  date of incident, and the first thing, apparently,
12  says 1-3-03 and the second one says 1-8-03, do you
13  see that, and they appear to be crossed out, and
14  then it says 1-17-03 and 1-22-03 written above it?
15       A.   I see that.
16       Q.   Do you know anything about the change in
17  the date of this incident, as reflected in this
18  workplace violence report?
19       A.   Let me read the report.
20            No.
21       Q.   The date of 1-3-03, does that correspond,
22  at least roughly, to the first date that you met
23  with Phil English?
24            MR. LORUSSO:  Objection; vague and
25  ambiguous, "at least roughly."

Page 123

1        Q.   BY MR. MOSELEY:  Well, I think he
2   testified earlier he doesn't have a specific
3   recollection.
4            Do you now have a specify recollection of
5   that date?
6        A.   I don't, but I know it was early January.
7        Q.   That's why I used the term roughly.
8            MR. LORUSSO:  I understand.
9        Q.   BY MR. MOSELEY:  And the date which
10  appears to be substituted for the next date which
11  is 1-22-03, is it your understanding that that's
12  the date the formal complaint was filed by Phil
13  English?
14       A.   That is my understanding.
15       Q.   But this is the first time you've ever
16  seen this workplace violence report?
17       A.   Yes.
18       Q.   Is that because you didn't request this
19  information from anybody else at the city, or you
20  requested it and it wasn't provided?
21       A.   I don't recall requesting it.
22       Q.   If a city employee makes a, generally,
23  makes a complaint to the Ethics Commission saying
24  he's been subject to harassment for reporting
25  improper or illegal activities at the city and

Page 124

1   you're conducting an investigation of that sort of
2   thing, don't you ask the agencies for various kinds
3   of disciplinary actions or proceedings against the
4   person who is making the report?
5        A.   I have to confer with Gordon.
6        Q.   I'm talking about just in general, not
7   necessarily with this.
8        A.   Maybe, maybe not.
9        Q.   Under what circumstances would you
10  request those kinds of things?
11       A.   It depends.  As I understood your
12  question, you're focusing on retaliation.  We may
13  or may not look at retaliation claims because
14  that's not necessarily -- it's arguable whether
15  that's necessarily in the jurisdiction of the
16  Ethics Commission.
17       Q.   So retaliation against an employee for
18  reporting violations of city laws or requirements
19  is not an ethical violation?
20       A.   It may or may not be.
21       Q.   Under what circumstances would it be an
22  ethical violation to do that, to retaliate against
23  an employee?
24            MR. WONG:  Over-broad, vague and
25  ambiguous, and incomplete hypothetical.

Page 125

1            MR. NELSON:  Join in that.
2        Q.   BY MR. MOSELEY:  You said it may or may
3   not be.  I'm trying to figure out what, at least
4   what the general parameters would be that would
5   cause it to be or not cause it to be.  I have no
6   way of making that more specific because I'm asking
7   you about your testimony.
8        A.   Could I have the question again.
9            (The requested portion of the record was
10  read.)
11            MR. LORUSSO:  Join in the earlier
12  objections.
13            THE WITNESS:  I'm trying to figure out
14  how to pull together kind of a generic answer to
15  that.  If someone stole money from the city, and an
16  employee witnessed it and files an ethics complaint
17  that the person stole money, and we reported that,
18  the Ethics Commission could either take on that
19  or because -- I'm trying to use the word steal for
20  a criminal manner, it might go to HPD.
21            If there was retaliation based on that, a
22  complaint to us, I don't know whether or not the
23  Ethics Commission would find that within its
24  jurisdiction to handle, or whether it would assume
25  that either civil lawsuit or some other

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 126

1  discrimination approach, I'm not sure if the equal
2  employment office or the city might look at that,
3  also.
4      Q.  BY MR. MOSELEY:  So as you sit here
5  today, you don't know whether, if an employee
6  reports something to you, to the Ethics Commission,
7  and then is retaliated against by co-employees or
8  supervisors, you don't know whether that in and of
9  itself is an ethics violation of the city and
10  county?
11          MR. NELSON:  Objection; misstates the
12  testimony, calls for speculation, lack of
13  foundation.
14          THE WITNESS:  Yeah, I don't know.
15      Q.  BY MR. MOSELEY:  Would you not consider
16  such activity interference with the processes of
17  the Ethics Commission?
18          MR. LORUSSO:  Objection; lacks
19  foundation, vague and ambiguous, over-broad,
20  incomplete hypothetical.
21          MR. WONG:  And argumentative.
22          MR. NELSON:  Join in those.
23          THE WITNESS:  It could be.  That's a
24  consideration.
25      Q.  BY MR. MOSELEY:  If one employee

Page 127

1  interferes with the processes of the Ethics
2  Commission that are instituted by another employee,
3  is that an ethics violation?
4          MR. LORUSSO:  Same objections.
5          MR. NELSON:  Same objection.
6          THE WITNESS:  I don't know.  It's not an
7  issue that we've had or that the commission's ruled
8  on.
9      Q.  BY MR. MOSELEY:  Do you know of any
10  statutory prohibition which would prevent or which
11  would make it an ethical violation for that to
12  occur, that is the interference with the processes
13  of the Ethics Commission?
14          MR. LORUSSO:  Same objections.
15          MR. NELSON:  Same.
16          THE WITNESS:  If I understand you
17  correctly, you're asking is there an ordinance or
18  charter provision that you could argue that that
19  was, that such a retaliation would be a violation
20  of the ethics laws?
21          MR. MOSELEY:  Right.
22          THE WITNESS:  It would be 11-104 which
23  basically says you may not use an officer or
24  employee of a city may not use their position in
25  order to gain special treatment for anyone.  It's a

Page 128

1  very broad --
2      Q.  BY MR. MOSELEY:  How would that apply to
3  this situation that I was positing?
4      A.  It could apply by saying, well, it would
5  render either unwarranted benefit or an unwarranted
6  disadvantage to the reporting employee for someone
7  else to use their position to try to thwart --
8  that's my word, interfere with the Ethics
9  Commission process, I think you mentioned.
10      Q.  And, to your knowledge, you've never had
11  any complaints like that?
12      A.  Well, complaints I'm not sure.  I mean, I
13  think that's part and parcel of -- we've had
14  complaints like that.
15      Q.  Have there been any Ethics Commission
16  advisories?
17      A.  Yeah, I don't think there have been any
18  opinions on that.  When I say, That, I'm talking
19  about this as kind of a general issue.
20      Q.  I understand.
21      A.  Not that I'm aware of, and I think I
22  would know if there had been.
23      Q.  Getting back to Exhibit 94, you say, "I
24  have had one extended meeting with Phil in this
25  case and he showed none of the indicators you ask

Page 129

1  about and was calm about the case."
2      Do you see that?
3      A.  I do.
4      Q.  Why did you tell Mike Golojuch this
5  information?
6      A.  I think, again, it was in response to his
7  question in Exhibit 79 whether in any discussion I
8  had with Phil English has he ever become obnoxious,
9  belligerent, yells and/or any physical aggression
10  such as throwing items down.
11      Q.  So you felt on the basis of that question
12  that you were appropriately describing Phil's
13  demeanor in your interview and response?
14      Maybe I should rephrase that.  I'm not
15  questioning that your description of Phil's
16  demeanor is inaccurate, when I say appropriate, I
17  mean that it was appropriate for you to actually
18  describe the demeanor in response to Mike
19  Golojuch's.
20      A.  Yes, I did, again, for the reasons I
21  stated earlier because it appeared that there was a
22  general understanding of the underlying ethics
23  complaint.
24      Q.  If there's a general understanding by
25  people of the nature of the ethics complaint, is it

33 (Pages 126 to 129)

Page 130

1  then appropriate to talk about it and disclose
2  things?
3      A.   Not people generally, but it may be
4  appropriate for another government agency.
5      Q.   When you're talking about ethics
6  complaints within the City and County of Honolulu,
7  though, you're essentially talking about complaints
8  with respect to another government agency, aren't
9  you?
10     A.   I don't understand.
11     Q.   Well, do you get any ethics complaints in
12 your job which don't involve another governmental
13 agency?
14     A.   Well, often the -- well, they involve
15 city employees and officers, not necessarily the
16 agency itself.
17     Q.   But the allegation is that people in
18 other agencies are doing X or Y or Z; is that
19 right?
20     A.   Yes.
21     Q.   Every governmental employer or officer is
22 in some city agency, right?
23     A.   Right.
24     Q.   So I guess what I'm asking you is, you
25 seem to indicate that if another governmental

Page 131

1  agency seems to know about the complaint, it might
2  be appropriate to talk to them about it, is that
3  your testimony?
4      A.   Well, I think I tried to describe
5  earlier, but they're carrying on their own
6  investigation, and I tried to balance their need
7  for information and my ability to give information
8  and to be helpful without responding, without
9  getting too specific.
10     Q.   And did you understand what governmental
11 agency Mike Golojuch was in?
12     A.   Yes.
13     Q.   And what agency was he within?
14     A.   Budget and fiscal services.
15     Q.   Isn't that the same agency that Phil was
16 in?
17     A.   He's, as I understand it, is the
18 administrative services officer of that agency.
19     Q.   I'm asking if that's the same agency that
20 Phil English was in.
21     A.   The same department.
22     Q.   And that's the same department that Gary
23 Kurokawa was in, right?
24     A.   Yes.
25     Q.   Did you understand what an administrative

Page 132

1  services officer was when you received this fax of
2  February 26, 2003, Exhibit 79?
3      MR. LORUSSO:   You mean email as opposed
4  to fax.
5      MR. MOSELEY:   I mean email, I didn't mean
6  fax.
7      THE WITNESS:   Generally, yes.
8      Q.   BY MR. MOSELEY:   What was your
9  understanding an administrative services officer
10 is?
11     A.   They deal with some personnel issues,
12 they deal with budget planning, ordering the
13 products and services needed by the department,
14 those types of things.
15     Q.   As of February 26, 2003, had Mike
16 Golojuch made you aware of any meeting he had on
17 January 15th, 2003, with Bob Magota?
18     A.   Not that I remember.
19     MR. NELSON:   I'm just looking at the
20 date, 26th, is that the date we're using?
21     Q.   BY MR. MOSELEY:   Didn't I say February
22 26th, 2003?
23     A.   The date of the email of 79.
24     MR. NELSON:   Oh, I'm looking at the wrong
25 email, sorry.

Page 133

1      THE WITNESS:   Not that I remember.
2      Q.   BY MR. MOSELEY:   Do you remember Mike
3  Golojuch telling you anything about the subject
4  matter of any meetings that he may have had with
5  anybody from the assessment division as of February
6  26th, 2003?
7      A.   All that I recall is what's stated in
8  Exhibit 79 regarding Chris Graff's complaint.
9      Q.   And you don't remember whether there was
10 a follow-up phone call with respect to any of this
11 information?
12     A.   Follow up to me.
13     Q.   Either from you or to you from Mike
14 Golojuch.
15     A.   I don't remember.
16     Q.   Is that something you might have taken
17 notes on?
18     A.   I might have.
19     Q.   Did you or anybody review your file to
20 see if there were notes on such a phone call?
21     A.   I don't believe so.
22     Q.   Is that something that you would be
23 contending would be subject to one or more of the
24 various privileges that have been asserted today?
25     A.   I don't know.

34 (Pages 130 to 133)

1        MR. NELSON: Well, I think as we
2    indicated, if we're talking about Mr. Golojuch's
3    investigation and we're not getting into
4    Mr. Totto's investigation, and there are probably
5    some that are mixed up, but if it's clearly
6    relating only to Mr. Golojuch's investigation, I
7    think that's something you could turn over.
8        Q.  BY MR. MOSELEY: Further down in Exhibit
9    94 you say, "I will add that Chris's interview was
10   taped."
11       Do you see that?
12       A.  Yes.
13       Q.  And you wouldn't tell me today whether
14   Chris's interview was taped.
15       A.  I don't recall whether I did or not.
16       Q.  Was Chris's interview taped?
17       A.  I believe it was.
18       Q.  Did you have any interviews with anybody
19   else besides Chris?
20       MR. LORUSSO: Objection; already asked
21   and answered.
22       MR. NELSON: Asked and answered.
23       MR. MOSELEY: And the answer was?
24       THE WITNESS: I'm not sure that I was
25   allowed to answer that before.

1    interview Ann Gima?
2        MR. NELSON: Same objections, same
3    instructions.
4        MR. LORUSSO: Just for the record,
5    objection, lacks foundation, assumes facts not in
6    evidence.
7        Q.  BY MR. MOSELEY: Did you record your
8    interview with Gary Kurokawa?
9        MR. NELSON: Same objection, same
10   instructions.
11       MR. LORUSSO: Lacks foundation, assumes
12   facts not in evidence.
13       Q.  BY MR. MOSELEY: Did you disclose to Mike
14   Golojuch that you had recorded your interview with
15   Chris Graff?
16       MR. NELSON: I think the document,
17   Exhibit 94, speaks for itself on that point.
18       Q.  BY MR. MOSELEY: Did you disclose to Mike
19   Golojuch that you had recorded the interview with
20   any other specific person?
21       MR. NELSON: Objection. Same objections,
22   same instruction.
23       MR. MOSELEY: You're instructing him not
24   to answer that?
25       MR. NELSON: Yes.

1        MR. NELSON: I believe you stated there
2    were a number of interviews without stating names.
3        THE WITNESS: That's right. I may have.
4        Q.  BY MR. MOSELEY: What was the date that
5    you met with Gary Kurokawa?
6        MR. LORUSSO: Objection; assumes facts
7    not in evidence, lacks foundation.
8        MR. NELSON: Same objection and
9    objections on the deliberative process, privilege,
10   confidentiality, under the ordinance and the
11   charter. Instruct not to answer.
12       Q.  BY MR. MOSELEY: And you're taking that
13   position, are you, despite the fact Mike Golojuch
14   asked, I would like to know the date that you met
15   with Mr. Graff, and you responded to Mike Golojuch,
16   I interviewed Chris on January 24th, and that's --
17   despite the fact that you did that with respect to
18   Chris Graff's interview on Mike Golojuch's inquiry,
19   you're not going to tell me the date you
20   interviewed Gary Kurokawa; is that right?
21       MR. LORUSSO: Objection; argumentative,
22   lacks foundation.
23       MR. NELSON: Same objections. Instruct
24   not to answer.
25       Q.  BY MR. MOSELEY: What date did you

1        Q.  BY MR. MOSELEY: Will you identify for me
2    the dates upon which you interviewed anybody else
3    without disclosing the identity of the person you
4    interviewed?
5        MR. NELSON: Objection; instruct the
6    witness not to answer.
7        MR. MOSELEY: And that's on the basis of?
8        MR. NELSON: The deliberative process
9    privilege, the confidentiality requirements with
10   respect to Ethics Commission files and records.
11       Q.  BY MR. MOSELEY: Would you explain to me
12   why that prohibition would apply to the question I
13   just asked, and it didn't apply to Mike Golojuch's
14   inquiry about the interview with Chris Graff?
15       MR. WONG: I guess I'd object to that as
16   calling for a legal conclusion and calling for a
17   speaking objection.
18       THE WITNESS: I think I'd have to talk
19   with counsel about that.
20       MR. MOSELEY: Do you want to do that?
21       MR. NELSON: Before we break, could you
22   read back the question, please.
23       (The requested portion of the record was
24   read.)
25       MR. LORUSSO: Before we take a break, may

35 (Pages 134 to 137)

1  I just inquire, counsel, is that question addressed
2  to the witness or addressed to his counsel?
3      MR. MOSELEY:  It's addressed to the
4  witness.  The witness is the Executive Director and
5  legal counsel for the Ethics Commission.
6      MR. LORUSSO:  Thank you.  I just wanted
7  the record clear.
8          (The deposition was at recess.)
9          (The requested portion of the record was
10 read.)
11     MR. NELSON:  I just want to object, that
12 it calls for legal conclusions by Mr. Totto.
13     THE WITNESS:  As I tried to articulate
14 before, I think part of this was because Golojuch
15 had some information about the complaint, had asked
16 some questions in order to conduct his
17 investigation, that the information that I was
18 disclosing was most, I believe of a general nature,
19 and that, as I think we had mentioned, and I can't
20 remember if it was this morning or earlier this
21 afternoon, that UIPA does allow for one agency to
22 ask another agency for information, and in my
23 experience at that time and now, usually the
24 administrative service officers are the ones who do
25 conduct workplace issue investigations.

1      Q.   BY MR. MOSELEY:  Is it your understanding
2  that UIPA prohibits you from disclosing such
3  information in a proceeding such as this, in which
4  you've been subpoenaed by a Federal Court?
5      A.   I don't have any understanding either
6  way.
7      Q.   Are you aware of any opinion which says
8  it doesn't apply to this sort of a situation?
9      A.   That UIPA does not apply?
10     Q.   Yes, in the context of litigation and
11 discovery proceedings.
12     A.   I'm not aware either way.  I know there
13 are some cases that, or a case that talks to that,
14 but I am not familiar with it.
15     Q.   So let me see if I summarize this
16 correctly.  The distinction between Mike Golojuch's
17 questions to you about these things and my
18 questions to you about these things is that one,
19 he's a governmental agency and I'm not, and two,
20 that the UIPA allows for disclosure to him as a
21 governmental agency but it does not allow for
22 disclosure to me under these circumstances.  Have I
23 properly summarized?
24     MR. LORUSSO:  Objection; vague and
25 ambiguous, over-broad as to "these things."

1      MR. NELSON:  I join in that.
2      THE WITNESS:  I think I've given other
3  reasons, also, as stated before, regarding the
4  request from Golojuch.
5      Q.   BY MR. MOSELEY:  One of them was that he
6  had familiarity with the case, right?
7      A.   Um-hum.
8      Q.   Yes?
9      A.   Yes.
10     Q.   Do you believe that I have familiarity
11 with this case?
12     MR. LORUSSO:  Objection, calls for
13 speculation.
14     MR. WONG:  And vague and ambiguous as to
15 "this case."
16     MR. NELSON:  Join in those.
17     Q.   BY MR. MOSELEY:  Let's put it this way.
18 I think you said he had familiarity with the
19 underlying complaint to the Ethics Commission,
20 that's what you said, right?
21     A.   Yes.
22     Q.   When I said "this case," that probably
23 wasn't proper because this lawsuit wasn't in
24 existence.  Do you believe that I have familiarity
25 with the underlying complaint to the Ethics

1  Commission?
2      A.   I believe so.
3      Q.   Do you believe that my familiarity is
4  equal to that of Mike Golojuch's?
5      A.   I have no idea.
6      MR. NELSON:  Objection; calls for
7  speculation.
8      Q.   BY MR. MOSELEY:  Is there any other
9  distinction between me and Mike Golojuch that would
10 be material to a decision, whether or not you could
11 tell Mike Golojuch something but you couldn't tell
12 me?
13     A.   Other than what I've stated so far and
14 the objections that have been raised, not that I
15 know of.  Well, I mean, to be fair, we've gone
16 through several different levels of objections,
17 several explanations on the same document, so I'm
18 trying to incorporate all those, so that I don't
19 get sandbagged at a later time.  Oh, we didn't
20 raise that.
21     Q.   I understand that, and I will promise you
22 I won't sandbag you on that, I have no intention of
23 doing that, but I will tell you that my -- I'm
24 actually somewhat incredulous that I'm not being
25 allowed to get the information under the subpoena

Page 142

1 that you were brought here on and yet Mike Golojuch
2 only had to email you and receive similar kind of
3 information without really seemingly any question
4 or any objection. And my questions have been
5 directed that, and if you have anything else, other
6 than what you've stated which might explain that
7 distinction, I'd appreciate hearing it, but I --
8    A.  Sure.  Well, I guess that's the crux of
9 it, you've asked for a very generic, broad, bring
10 everything related to, and Golojuch asked for
11 focused information, and we've all understood that
12 we'll have to have some decision-making by a
13 magistrate or judge to help us determine what is
14 appropriate for us to disclose, what isn't.
15    Q.  But you would admit, would you not, that
16 I've asked for focused information as in the dates
17 you interviewed Gary Kurokawa, the dates you
18 interviewed other people, that kind of thing?
19    A.  You've asked for both general and
20 focused, specifically.
21    Q.  And, again, I understand the position,
22 and I've maintained all along that this -- let's go
23 to the court, the court will decide, and I have no
24 problem with that concept at all.
25       MR. NELSON:  I want to point out that it

Page 143

1 was your choice to go forward with the deposition
2 before we did that.
3       MR. MOSELEY:  And I would like to point
4 out that there was no way the court could have
5 actually known the kinds of questions that wouldn't
6 be responded to unless we tried to ask them.
7       MR. NELSON:  I agree, it's probably more
8 useful to the court, in that sense.
9    Q.  BY MR. MOSELEY:  Have you had any
10 interference with anybody in your investigation of
11 the complaint which Phil English lodged with the
12 Ethics Commission on January 22nd, 2003?
13    A.  I don't know what you mean by
14 interference.
15    Q.  Has anybody tried to stymie your
16 investigation, or tried to prolong the
17 investigation, or tried to prevent any proceeding
18 from going forward, that kind of thing?
19    A.  I'm going to have to confer with counsel,
20 sorry.
21       MR. MOSELEY:  No, no apology necessary,
22 it's just cutting into Tony's questioning time.
23       (The deposition was at recess.)
24       (The requested portion of the record was
25 read.)

Page 144

1       THE WITNESS:  No.
2    Q.  BY MR. MOSELEY:  Have you received any
3 instruction from any member of the Ethics
4 Commission that this investigation and/or the
5 resolution of Phil's January 22nd, 2003 complaint
6 is what you should do?
7       MR. WONG:  I'd object to it as assuming
8 facts not in evidence.
9       MR. NELSON:  I'm sorry, I didn't
10 understand the last part of the question.
11       THE WITNESS:  I got confused.
12       (The requested portion of the record was
13 read.)
14    Q.  BY MR. MOSELEY:  I'm sorry.  That you
15 should delay.
16    A.  That I should delay it?
17    Q.  Yes.
18    A.  No.
19    Q.  Have you received any instructions from
20 outside the Ethics Commission with respect to this
21 case at all?
22    A.  No.
23    Q.  Have you received instruction from Tom
24 Riddle or his agency?
25    A.  No instruction.  You know, based on your

Page 145

1 representation on Exhibit 93, we had a
2 conversation, but I don't believe there was any
3 instruction at all.
4    Q.  Have you received any instruction from
5 Mike Golojuch or his agency?
6    A.  No.
7    Q.  Have you received any instruction from
8 the office of the Mayor?
9    A.  No.
10    Q.  Have you received any instruction from
11 Corp. Counsel other than maybe legal advice from
12 the deputy who is sitting here with you today?
13    A.  No.
14    Q.  Have you received any instruction from
15 anybody at the assessment division?
16    A.  No.
17    Q.  Have you received any instruction from
18 anybody else at Department of Budget and Fiscal
19 Services?
20    A.  No.
21    Q.  Why did you hesitate when I asked you the
22 original question about whether you had had any
23 interference?
24       MR. LORUSSO:  Objection; argumentative.
25       MR. NELSON:  And I object because he

37 (Pages 142 to 145)

Page 146

1  recessed to confer with his attorney, so I think
2  you're getting into attorney-client privilege.
3      Q.  BY MR. MOSELEY:  Was there a legal issue
4  that you felt you had to address before you could
5  answer that question?
6      A.  Yes.  And, also, I paused, I think, to
7  ask you what you meant by interference.
8      Q.  But we did take a break so you could
9  consult your counsel.
10     A.  That's right.
11     Q.  Have you ever had occasion, in your
12 service with the Ethics Commission, to deal with
13 any other whistleblower cases?
14     A.  Yeah, what we generically call a
15 whistleblower case, yeah.
16     Q.  And how many of those have you dealt
17 with?
18     A.  I'd have to say maybe six, just ballpark.
19     Q.  Were advisory opinions issued on any of
20 those cases?
21     A.  I can think of one right offhand, but I'm
22 trying to think of the others.  Some are, I can't
23 remember if all of them ended up in formal advisory
24 opinions.
25     Q.  Can you tell me the names of the ones

Page 147

1  that ended up in formal advisory opinions?
2      A.  Well, they would go by number.
3      Q.  Can you tell me the names of any of the
4  parties?
5      A.  I can tell you one because it was -- if
6  you were to -- well, 98-2 --
7      MR. NELSON:  Do you have to look at it to
8  know?
9      THE WITNESS:  There's a OIP opinion 98-2
10 that seems to have -- require that if someone asks,
11 Oh, is there an advisory opinion on a particular
12 employee or officer of the city, that we're not
13 supposed to state yes or no.  To me, it's --
14 personally, doesn't make a lot of sense but that's
15 my concern at this point.
16     If you were to look on our website at
17 advisory opinions, I think you could see a couple.
18 Now, for clarification purposes, I don't believe
19 any of these are whistleblower -- I'm trying to
20 think if any of them were where an employee raised
21 an ethics issue to a supervisor or something like
22 that, I can't remember.  I don't think so, I think
23 they may have been direct complaints over to our
24 office.
25     Q.  BY MR. MOSELEY:  Unless the court rules

Page 148

1  that we're not going to be allowed to obtain
2  certain kind of information with you, then my
3  inclination is to tell you that this deposition is
4  not over, and in that case I'm going to ask you
5  when you come next time to bring information with
6  respect to the five or six whistleblower cases that
7  you referenced.  Okay?
8      MR. NELSON:  For clarification, you're
9  talking about information that would be on the
10 public record or you're asking for information on
11 the underlying cases?
12     MR. MOSELEY:  Well, my understanding is
13 that once an advisory opinion is issued, that the
14 prohibition about disclosure is no longer in place.
15     MR. NELSON:  Well, that's not my
16 understanding, and I don't know if Mr. Totto --
17     MR. MOSELEY:  We'll put it on the record
18 that I'm requesting to be provided with information
19 on other whistleblower cases in which the Ethics
20 Commission, or Chuck Totto, has actually dealt
21 with.  And I think I'm going to be entitled to get
22 that, and I'll tell you right now, on the basis
23 that we're alleging that this is a pattern and
24 practice of the city to retaliate against
25 whistleblowers to discourage this activity in

Page 149

1  violation of the state law and violation of their
2  first amendment rights.
3      THE WITNESS:  I hate to ask this
4  question, how far back do you want to go?
5      MR. MOSELEY:  Let's go back only as far
6  as you've been involved with the Ethics Commission.
7      Q.  In your capacity at the Ethics
8  Commission, have you ever conducted seminars for
9  employees or managers or supervisory personnel
10 about the requirements of the city ethics law?
11     A.  Yes.
12     Q.  Have you ever done that for the
13 assessment division?
14     A.  Not specifically the assessment division,
15 but there is a mandatory training, ethics training
16 for, among others, all supervisors and managers of
17 the city.
18     Q.  And do you have a course syllabus or some
19 outline that you follow each time?
20     A.  Yeah, and this is on our website, it's
21 the -- I can provide you with a packet if you'd
22 like, because we do pull a few of our forms
23 together, but basically the meat of our training
24 comes from the plain language guide that's on our
25 website.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596

Page 150

1    Q.   Is part of your training -- this is just
2  for management supervisory personnel; is that
3  right?
4    A.   And Commission members, elected officials
5  cabinet members, they're included in the managers
6  and supervisors.
7    Q.   Is there any part of that training that
8  deals with their obligations with respect to
9  whistleblowers?
10    A.   No.
11    Q.   Do you know of any?
12    A.   Can I correct?
13    Q.   Sure.
14    A.   I get a lot of questions during the
15  training and so from time-to-time somebody might
16  raise questions.  I know it's been raised in
17  various training sessions, but not as a regular
18  course do I talk about whistleblowers.
19    Q.   Are you aware of any other training
20  program in the city that deals with the rights and
21  obligations of management or supervisory personnel
22  in whistleblower situations?
23    A.   I'm not aware of any.
24    Q.   Are you aware of any training in the city
25  with respect to whistleblowers?

Page 151

1         MR. NELSON:  Objection; asked and
2  answered this morning, I think.
3         THE WITNESS:  Not that I know of.  I
4  haven't necessarily looked, but not that I know of.
5    Q.   BY MR. MOSELEY:  That's fair enough.
6  I'm almost pau, actually.  I'd like to
7  direct your attention to Exhibit 93.
8         Have you ever seen this exhibit before?
9    A.   No.
10    Q.   I will tell you that it purports to be a
11  note made by Tom Riddle, although his name doesn't
12  appear on it anyplace, do you remember having a
13  phone discussion with Tom Riddle on or about
14  February 28th, 2003?
15         MR. LORUSSO:  Object to the form and
16  lacks foundation as to this document.
17         THE WITNESS:  I had a discussion with Tom
18  Riddle at some point, I don't know if it was about
19  Phil's, any matter dealing with Phil, I only
20  remember Tom Riddle, because I think at that point
21  I had either recently read or taken my son to see
22  one of the Harry Potter books where Tom Riddle is
23  the villain.
24    Q.   BY MR. MOSELEY:  Well, I'm not saying
25  that Tom Riddle is a villain in this case.

Page 152

1    A.   Let me read it one more time.  You know,
2  none of this -- it just doesn't help refresh my
3  memory.
4    Q.   Well, did you at any time tell Tom Riddle
5  that something in your investigation so far had
6  found any of English's complaints to be true?
7    A.   I don't remember.
8    Q.   As of February 28, 2003, was there
9  anything in your investigation to that date that
10  had found any of Phil's complaints to be true?
11         MR. NELSON:  Objection; instruct the
12  witness not to answer.
13    Q.   BY MR. MOSELEY:  Did you tell Tom Riddle
14  that?
15    A.   I don't remember.
16         Roger, I'm sorry, did you say that he
17  called, or we had a communication regarding a
18  workers' comp claim?
19    Q.   Tom Riddle handled the workers' comp
20  claim.
21    A.   As to your prior questions, no change.
22  The only thing that jogs my memory is with someone
23  on behalf of the city, they called and asked some
24  questions about workers' comp, that's all, and I
25  can't remember if it was Tom or not.

Page 153

1    Q.   But did they ask about your
2  investigation, finding any of Phil's complaints to
3  be true?
4    A.   Not that I remember.
5    Q.   Did they ask you if any part of your
6  investigation had found any of Phil's complaints to
7  be false?
8    A.   Don't recall.
9    Q.   As of February 28th, 2003, did any part
10  of your investigation to that date find any of Phil
11  English's complaints to be false?
12         MR. NELSON:  Objection; same instruction,
13  not to answer.
14         THE WITNESS:  Following counsel's
15  instruction.
16    Q.   BY MR. MOSELEY:  If Tom Riddle or anybody
17  else had called you as of February 28th, 2003,
18  would you have felt it appropriate to tell them
19  that your investigation so far had found some parts
20  of Phil's complaint to be true?
21         MR. NELSON:  Objection; calls for
22  speculation, lack of foundation.
23         THE WITNESS:  The wording in 93 is kind
24  of odd, I don't think I'd say, Part of the
25  complaint's true or part of the complaint's false.

39 (Pages 150 to 153)

Page 154

1  That's not an approach I would take, especially
2  with Tom Riddle or someone outside of the
3  investigation. I think that's one of the reasons
4  the summary doesn't seem to jog my recollection.
5     Q.  BY MR. MOSELEY: Fair enough.
6        If you receive a court order in this case
7  to produce the documents that you haven't produced
8  and to answer the questions you haven't answered,
9  is it your intent to follow the instruction of the
10 court order?
11       MR. NELSON: Well, I mean, that gets into
12 our decisions on whether it would be necessary to
13 seek an appeal, so I don't think we can answer that
14 question at this point.
15       MR. MOSELEY: Are you instructing him not
16 to answer that question?
17       MR. NELSON: You can answer it, if you
18 can.
19       THE WITNESS: What he said.
20    Q.  BY MR. MOSELEY: He was pointing to his
21 counsel, for the record.
22       Is any Ethics Commission investigation,
23 with respect to Phil English's January 22nd, 2003
24 complaint, a criminal investigation?
25    A.  We don't have jurisdiction to do a

Page 155

1  criminal investigation.
2     Q.  Can the Ethics Commission prosecute
3  someone criminally?
4     A.  No.
5     Q.  The best you could do is refer to the
6  police department, as you described earlier?
7     A.  That's right.
8     Q.  I'm just going to ask you if the Ethics
9  Commission has concluded its investigation with
10 respect to Phil's complaint, but you're actually
11 not even going to admit that there is an
12 investigation; is that right?
13       MR. NELSON: Well, I think we did say
14 earlier in the deposition that the investigation
15 hadn't been concluded.
16       MR. MOSELEY: Hadn't been concluded.
17       MR. NELSON: Right.
18       THE WITNESS: It has not been concluded.
19    Q.  BY MR. MOSELEY: So whatever is there is
20 ongoing; is that right?
21    A.  Right.
22    Q.  Is Phil English the subject of any Ethics
23 Commission investigation?
24    A.  The subject.
25    Q.  You know, I used the word target earlier,

Page 156

1  and you said you used the word subject, which I
2  actually think is a better word.
3     A.  I'd have to confer with Gordon because
4  the shoe goes on the other foot, right?
5     Q.  Exactly.
6     A.  I don't know whether I can respond to
7  that, based on the Office of Information Practices
8  opinion letter 98-2.
9     Q.  If Phil authorizes you to disclose that,
10 can you disclose it?
11    A.  If there were a complaint against Phil,
12 it wouldn't be -- I don't know that he would be the
13 one that would allow me to disclose that.
14    Q.  Under the Information Practices Act?
15    A.  Maybe. I don't know, if it gets into all
16 the other objections, too.
17       MR. NELSON: I'm not sure I understand
18 the question.
19       Do you understand the question?
20       MR. MOSELEY: Well, I asked if there was
21 an ethics investigation against Phil, and he raised
22 the Information Practices Act as being a
23 prohibition, a possible prohibition against
24 disclosing it, and I'm asking if Phil would
25 authorize that, if that would obviate the question

Page 157

1  with respect to the Information Practices Act.
2       THE WITNESS: I don't know.
3       MR. MOSELEY: I think I may be pau for
4  now, but let me just check.
5       Actually, I'll stop for now and turn the
6  floor over to Tony.
7       EXAMINATION
8  BY MR. WONG:
9     Q.  Hi, Mr. Totto, my name is Anthony Wong,
10 and I represent GK Appraisals in this case. I have
11 a few follow-up questions to Mr. Moseley's.
12       First, I wanted to explore a little bit
13 about the boundaries on what kind of information
14 you can disclose. For example, if there is an
15 investigation concerning a particular subject and
16 the complainant asks about the status of that
17 investigation, are you at liberty to disclose the
18 status to the complainant?
19    A.  The practice of the office would be to
20 disclose the status but not get into details,
21 unless we had to -- we're using the complainant as
22 a source of information.
23    Q.  When you say you can disclose the status,
24 can you go into a little bit greater detail, for
25 example, do you just say it's ongoing or it's

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090  Fax: 808.524.2596