may give rise to the possibility of unethical conduct under this article. Any officer or employee also may request an opinion from the commission relating to the solicitation, acceptance, or receipt of a gift.
(b)  The request shall be in writing, shall set forth the pertinent facts and shall be signed by the officer or employee making the request.
(c)  The request shall be held in confidence and no disclosure thereof shall be made, except as provided herein.
(Sec. 3-2.6, R.O. 1978 (1987 Supp. to 1983 Ed.); Am. Ord. 93-113, 94-49, 02-15)

Sec. 3-6.7    Requests by third parties.
(a)  A request for an advisory opinion submitted by a person other than the officer or employee involved in the request shall be in writing and shall be signed by the person making the request; provided, that the name of the person making the request shall not be disclosed. Such request shall relate to an actual situation and shall set forth the pertinent facts, including the names of those involved.
(b)  Where the employee or officer involved in the request is not the person making the request, such employee or officer shall have an opportunity to respond in writing within 15 days after receipt of a copy of the request. The response may include a request for a hearing before the commission.
(c)  Where no hearing is requested by the officer or employee involved, the commission shall render its opinion on the basis of the information available; provided, that the commission may request for additional information when deemed necessary.
(d)  The commission shall, upon receipt of a request for a hearing within the period above referred to by the officer or employee involved, set a time and place for the hearing for the purpose of determining the facts. The person making the allegation and the employee or officer involved shall have the opportunity to appear at the hearing, alone or by counsel, and to present any and all evidence, including testimony and exhibits, which are relevant to the issue involved. No testimony shall be excluded, except for irrelevancy.
(e)  All hearings before the commission involving an alleged conflict of interest of any employee or officer shall be held in executive session, provided that a public hearing may be held where such officer or employee, alleged to have a conflict of interest, consents thereto.
(Sec. 3-2.7, R.O. 1978 (1987 Supp. to 1983 Ed.))

Sec. 3-6.8    Applicability.
   The provisions herein shall be applicable to officers and employees of the City and County of Honolulu and the terms "officers" and "employees" shall be given the meanings provided in Revised Charter Section 13-101.3, relative to "employees", and Revised Charter Section 13-101.4, relative to "officers"; provided, that the term "officers and employees" as used herein shall also include officers or employees under a personal service contract as prescribed in Revised Charter Sections 6-1103(f) and (g) and 6-1104(f), but excludes independent contractors. (Sec. 3-2.8, R.O. 1978 (1987 Supp. to 1983 Ed.); Am. Ord. 96-58)

Sec. 3-6.9    Prohibiting political management or activity or candidacy to an elective political office.
(a)  Except for exercising the right to vote or making a campaign contribution to a candidate for elective public office, no member of the ethics commission shall support, advocate or aid in, or manage, the election or defeat of any candidate for public office.
   No member of the ethics commission shall be a candidate for any elective public office nor engage in campaigning for such office.
(b)  Any member of the ethics commission who violates the provisions of this section shall be removed by the mayor forthwith since such person serves at the pleasure of the mayor.
(Sec. 3-2.9, R.O. 1978 (1987 Supp. to 1983 Ed.); Am. Ord. 01-51)

Sec. 3-6.10    Training of management or supervisory officer or employee on standards of conduct.
(a)  Each management or supervisory officer or employee shall complete a training program on the standards of conduct established under Article XI of the charter and Article 8 of this chapter.
   For this section only, "management officer" includes a person who is an "officer" due to membership on a board or commission. The term does not include a member of an advisory committee established under the executive branch pursuant to Section 4-103 of the charter or under the council pursuant to council rule or resolution.

The program shall provide training and information which gives the management or supervisory officer or employee knowledge of at least the following:
  - (1) The various standards of conduct applicable to the management or supervisory officer or employee, subordinate officers or employees, and former officers or employees who appear before the management or supervisory officer's or employee's agency;
  - (2) Actions which the management or supervisory officer or employee or a subordinate officer or employee must or may take to avoid a violation of a standard of conduct;
  - (3) Actions which the management or supervisory officer or employee may take when ordered or requested by a superior officer or employee to violate a standard of conduct;
  - (4) Remedies which may be sought by the management or supervisory officer or employee when knowing or suspecting that another person has violated a standard of conduct; and
  - (5) Requirements concerning the filing of financial disclosures by the management or supervisory officer or employee and subordinate officers or employees.
- (b) The management or supervisory officers or employees required to complete the training program of this section shall be the same as those required to complete the sexual harassment training program pursuant to Section 1-17.11 and board and commission members who are "management officers" under subsection (a).
- (c) The ethics commission shall formulate the training program and provide it to management or supervisory officers or employees according to the following timetable:
  - (1) For a management or supervisory officer or employee who occupies the management or supervisory position on July 1, 2001, the ethics commission shall provide the training program within two years of that date; and
  - (2) For a management or supervisory officer or employee who is elected or appointed to the management or supervisory position after July 1, 2001, the ethics commission shall provide the training program within six months of the election or appointment to the position. The ethics commission, however, may exempt such a management or supervisory officer or employee from the training program if the officer or employee previously completed the program while occupying a former management or supervisory position.
- (d) The ethics commission shall determine the time interval at which the management or supervisory officers or employees shall receive retraining on the standards of conduct.
- (e) The ethics commission may request the department of human resources to assist in formulating, providing, and scheduling the training program. The department may provide the assistance if able and willing to do so.

(Added by Ord. 01-35; Am. Ord. 02-15)

Government | Kama'aina | Business | Visitors | Kids World | Seniors World | On-Line Services | Economic Development

Quick Find: Select One:        Search: _____ GO

You are here: Main / Ethics Commission / Advisory Opinions / Advisory Opinion No. 307

## Advisory Opinion No. 307

On May 16, 2000 a department director (Director) sought the opinion of the Ethics Commission (Commission) regarding the use of city resources by a department employee (Employee) in support of his position in several grievances involving his department and the Department of Human Resources (DHR).

The Director also transmitted a copy of a memorandum from DHR, dated May 24, 2000, stating the applicable city policy on the use of city resources in preparing for grievance procedures. The Employee responded to the request letter and the DHR memorandum on July 12, 2000. He also submitted other documents describing the history of the grievances on July 18, 2000. The Commission examined and deliberated the matter at its August 29, 2000 meeting. Because neither the Director nor the Employee requested a hearing, the Commission determined the case based upon the information available to it. See, Sec. 3-6.7(a), Revised Ordinances of the City and County of Honolulu.

### I. Facts

The Employee is an excluded manager and division head within the department. The Director states that the Employee is using city time (his own and that of division staff for typing, copying and research) and equipment to prepare for steps in his grievance process. At the time of the request, there were sixteen grievances involved that have been or will be heard by the Civil Service Commission. Generally, six of the grievances are based upon the Employee's concern that he is unable to properly discharge his duties because of threats of harm made against him by an individual in his division. Eight other grievances relate to alleged procedural failures by his department or DHR arising from the grievance process. Two others relate to a reprimand, again flowing from the perceived harm arising from the alleged workplace threat.

In his July 12, 2000 response, the Employee does not deny his use of city time and resources for the purpose of the grievance process. He contends, however, that the grievances will not result in a personal benefit to him, but are for the purpose of developing and maintaining a safe work environment. He believes that this is one of his duties as a division head and cites city administration memoranda (attached to his response) declaring a zero tolerance policy for workplace violence. He also presents a statement by the assistant division chief that the Director authorized the Employee's use of city resources for the grievance process.

In its May 24, 2000 memorandum, DHR informed the Director that there is no provision allowing an excluded manager (such as the Employee) the right to use any city resources to prepare for steps in the grievance process.

### II. Ethics Issue



EXHIBIT NO. 87
TOTTO
6-23-06
RITA KING,  RPR, CSR

The question presented is whether the use of city resources by an excluded managerial employee pursuing a grievance through appropriate channels violates the standards of conduct.

### III. Analysis

Section 11-104, Revised Charter of the City and County of Honolulu (RCH), states the fair and equal treatment policy. It reads: Elected or appointed officers or employees shall not use their official positions to secure or grant special consideration, treatment, advantage, privilege, or exemption to themselves or any person beyond that which is available to every other person.

It is undisputed that the Employee used city resources in the course of preparing his grievances. Thus, the underlying issue is whether an employee pursuing the grievance process is securing "special treatment" for himself when he uses city time and resources to prepare his case.

The Employee contends that his grievances arise from the city policy against workplace harassment and violence. His conclusion is that his use of the resources does not amount to "special treatment" because he is using the city resources in support of the city's policy against workplace harassment and violence. To put it another way, because it is within his authority to promote a violence-free work place and because he is doing so through the grievance process, the use of city resources is justified.

Interpreting the applicable personnel laws and policies is beyond the scope of the Commission's authority, but rests with DHR. It is within the authority of DHR to conclude on these issues on behalf of the city. See, Secs. 6-1105(5) and 6-1111(2), RCH. DHR states that an excluded managerial employee has no right to use city time or resources to prepare for the steps in the grievance process.

Applying the opinion of DHR to the fair and equal treatment policy, the Commission finds that the Employee is securing special treatment for himself because he is not entitled to use city resources in the employment grievance process. In this case, the employee has no more right than "every other person" to use city resources. Because the average person may not use the city resources in question, the Employee may not do so. Therefore, the Employee's use of these resources violates RCH Sec. 11-104 as an unwarranted or special treatment and should cease immediately. Should DHR, the Civil Service Commission or other appropriate authority modify DHR's conclusion on this issue, the parties would be free to ask the Commission to revisit its opinion.

### IV. Recommendation

The Commission recommends that the Director require the Employee and other affected employees to cease using city resources for purposes related to the grievance process. Although we find a violation of the ethics code, we do not believe discipline is required because, based upon the information before us, it appears the Employee believed he had been authorized by the Director, at least to some extent, to use city resources for preparation of the grievances.

Pursuant to Sec. 3-6.5(e), Revised Ordinances of the City and County of Honolulu, within

fifteen days of receipt of this opinion the Director is required to report to the Commission the corrective action taken in response to the Commission's recommendation.

Dated: September 14, 2000

LINDA A. REVILLA, Chair
Ethics Commission

Wednesday, March 06, 2002

© Copyright 2002-2006 City and County of Honolulu, Hawaii
Privacy Statement | Technical Support | Customer Service | Policy | Accessibility | Diversity Statement

**KATHLEEN CHRISMER - Ethics complaint**

| | |
|---|---|
| From: | "Totto, Charles W." <ctotto@co.honolulu.hi.us> |
| To: | "Kurokawa, Gary" <gkurokawa@co.honolulu.hi.us> |
| Date: | 2/5/2003 3:54 PM |
| Subject: | Ethics complaint |

Hi Gary:

I tried calling you about this, but were in a meeting. We have received a complaint involving the alleged use of city resources for non-city purposes by you and Chris Graff. I will contact you shortly to discuss the matter. At this time we are only investigating the allegations.

I am contacting you today because I have been informed that Phil English has hired Roger Moseley as his attorney on issues related to the matter under investigation. As a result of the relationship between Mr. English and Mr. Moseley, I am requesting that you do not permit Mr. English to work on any matter in which Mr. Moseley or his clients are involved. This will help assure that there is no appearance of conflict of interest or impropriety on the part of the persons concerned or the division.

Of course, should you have any questions, please contact me.

Thanks,
Chuck

CHARLES W. TOTTO
Executive Director and Legal Counsel
Honolulu Ethics Commission
715 South King Street, Suite 211, Honolulu, HI 96813-3091
Office (808) 527-5573  Fax (808) 527-6936
Email: ctotto@co.honolulu.hi.us
Website: www.co.honolulu.hi.us/ethics

EXHIBIT NO. 88
TOTTO
6-23-06
RITA KING, RPR, CSR

PE 00299

file://C:\Documents%20and%20Settings\kmc\Local%20Settings\Temp\GW}00014.HTM     2/5/2003

KATHLEEN CHRISMER - Ethics complaint

From: "Totto, Charles W." <ctotto@co.honolulu.hi.us>
To: "Kurokawa, Gary" <gkurokawa@co.honolulu.hi.us>
Date: 2/5/2003 3:54 PM
Subject: Ethics complaint

Hi Gary:

I tried calling you about this, but were in a meeting. We have received a complaint involving the alleged use of city resources for non-city purposes by you and Chris Graff. I will contact you shortly to discuss the matter. At this time we are only investigating the allegations.

I am contacting you today because I have been informed that Phil English has hired Roger Moseley as his attorney on issues related to the matter under investigation. As a result of the relationship between Mr. English and Mr. Moseley, I am requesting that you do not permit Mr. English to work on any matter in which Mr. Moseley or his clients are involved. This will help assure that there is no appearance of conflict of interest or impropriety on the part of the persons concerned or the division.

Of course, should you have any questions, please contact me.

Thanks,
Chuck

CHARLES W. TOTTO
Executive Director and Legal Counsel
Honolulu Ethics Commission
715 South King Street, Suite 211, Honolulu, HI 96813-3091
Office (808) 527-5573  Fax (808) 527-6936
Email: ctotto@co.honolulu.hi.us
Website: www.co.honolulu.hi.us/ethics

EXHIBIT NO. 89
TOTTO
6-23-06
RITA KING, RPR, CSR

CC 000394

## Kurokawa, Gary

**From:** Totto, Charles W.
**Sent:** Wednesday, February 05, 2003 3:50 PM
**To:** Kurokawa, Gary
**Subject:** Ethics complaint

Hi Gary:

I tried calling you about this, but were in a meeting. We have received a complaint involving the alleged use of city resources for non-city purposes by you and Chris Graff. I will contact you shortly to discuss the matter. At this time we are only investigating the allegations.

I am contacting you today because I have been informed that Phil English has hired Roger Moseley as his attorney on issues related to the matter under investigation. As a result of the relationship between Mr. English and Mr. Moseley, I am requesting that you do not permit Mr. English to work on any matter in which Mr. Moseley or his clients are involved. This will help assure that there is no appearance of conflict of interest or impropriety on the part of the persons concerned or the division.

Of course, should you have any questions, please contact me.

Thanks,
Chuck

CHARLES W. TOTTO
Executive Director and Legal Counsel
Honolulu Ethics Commission
715 South King Street, Suite 211, Honolulu, HI 96813-3091
Office (808) 527-5573  Fax (808) 527-6936
Email: ctotto@co.honolulu.hi.us
Website: www.co.honolulu.hi.us/ethics

EXHIBIT NO. 90
TOTTO
6-23-06
RITA KING,    RPR, CSR

CC 000548

1

## Kurokawa, Gary

**From:** Totto, Charles W.
**Sent:** Monday, February 10, 2003 9:28 AM
**To:** Kurokawa, Gary
**Subject:** RE:

Gary:

Sorry I didn't get back to you sooner. I was out sick Thursday and Friday. I will give you a call as soon as I settle back in.

Chuck

>-----Original Message-----
>**From:** Kurokawa, Gary
>**Sent:** Friday, February 07, 2003 8:50 AM
>**To:** Totto, Charles W.
>**Subject:**
>
>Chuck,
>
>Received your email yesterday and tried to contact you by phone and left a message for you to contact me. I have several questions regarding the issue of Mr. Mosley representing Mr. English and the implications of that relationship with the operations of the Division. I would like to discuss this issue with you at your earliest convenience before any action on your request is taken by the Division.
>
>Thanks
>
>
>Gary Kurokawa, Administrator
>Real Property Assessment Division
>842 Bethel Street
>Honolulu, Hawaii 96813
>(808) 527-5502
>gkurokawa@co.honolulu.hi.us

EXHIBIT NO. 91
TOTTO
6-23-06
RITA KING, RPR, CSR

CC 000552

04/16/2004

## Gima, Ann

**From:** Kurokawa, Gary
**Sent:** Thursday, February 27, 2003 10:31 AM
**To:** Gima, Ann
**Subject:** FW:

-----Original Message-----
**From:** Gima, Ann
**Sent:** Thursday, February 27, 2003 10:00 AM
**To:** Kurokawa, Gary; Magota, Robert
**Subject:** FW:

Charles Totto has requested that Mr. English not work on any matter relating to Mr. Mosley or his clients. I have requested from Mr. Totto a list of clients from Mr. Moseley. Mr. Totto is requesting and only requesting that this be accomodated and is not authorized to mandate any changes in work assignments. Corporation Counsel is actively looking into this matter and will be advising us. In the meantime any known appeals namely Waikiki Shores should be put on hold and not reassigned until this matter is resolved.

Annie

-----Original Message-----
**From:** English, Philip E.
**Sent:** Thursday, February 27, 2003 9:51 AM
**To:** Gima, Ann
**Subject:**

Ann,

Charles Totto, Ethics Commissioner for the City and County, has advised this office that work being done by me on the Waikiki Shore appeals should be re-directed due to the fact that I am being represented by Mr. Roger Mosely of Case, Bigelow, and Lombardi in a pending Ethics Commission investigation into unethical activities within the RPA. To date I have not received any instructions as to where or whom I should re-direct these appeals. There are 2003 appeals now in the office that are from the Waikiki Shore project.

Please advise me as to where or to whom I should re-direct these appeals and files. I believe the request from the Ethics Commissioner came in a few weeks ago so I am anxious to get some direction.

Thank you,

Phil

EXHIBIT NO. 92
TOTTO
6-23-06
RITA KING,    RPR, CSR

1

CC 000392

Phone discussion with Chuck Totto of the Ethics Commission on 02/28/2003.

After meeting with English, I called Totto of the Ethics Commission to verify whether English had filed a complaint with them. Totto indicated that he had and that they were investigating his complaint. Although Totto could not discuss the details of the complaint or his investigation, he seemed to be supportive of English (just my opinion from his tone of voice). I did ask him if anything in his investigation so far had found any of English's complaints to be true. He acknowledged yes. I also ask if his investigation so far had found any of English's complaints to be false, and he answered no. So, it appears there is an element of truth to what English is alleging.

EXHIBIT NO. 93
TOTTO
6-23-06
RITA KING, RPR, CSR

RENEAU KENNEDY RE PHILIP ENGLISH          317

Golojuch, Michael

**From:** Totto, Charles W.
**Sent:** Friday, February 28, 2003 3:29 PM
**To:** Golojuch, Michael
**Subject:** RE: Investigation

**Sensitivity:** Confidential

Hi Mike:

Because Phil's complaint to the Ethics Commission is under investigation, I am not at liberty to answer all your questions thoroughly. State and city law prevent the disclosure of information obtained while an investigation is pending in our office. Having said that, let me respond whether the statements attributed to me are accurate without going into the nature of the discussion of the complaint.

I told Phil that, assuming the information provided by Phil directly or through his attorney was accurate, Chris and Gary may have violated the ethics laws regarding the use of city resources to benefit private businesses. I added that I would have to conduct an investigation to determine whether a violation may have occurred.

I also mentioned to Phil and his attorney that there is a means by which DIT can review a city employee's computer files and data bases.

I do not recall saying anything about a "bad list" and would not characterize subjects of an investigation in that manner. I talked with Phil and his attorney about strategic approaches to the witnesses in the investigation, but I can not say more about that at this time.

I did not say anything to the effect that Gary should resign.

was not privy to any discussion between Chris and Phil about going to the Ethics Commission. In interviewing Chris, I emphasized the need for him to tell the truth. Failure to tell the truth can result in more serious discipline being recommended by the Commission to the employee's appointing authority. Chris asked about issues dealing with "whistle blowing" and about penalties associated with ethics violations. Chris also discussed his feelings toward Phil and the nature of some of their past discussions about the issues stated in the complaint.

Phil filed his complaint with the Commission on January 22, 2003.

I interviewed Chris on January 24.

We do not take a position on whether an employee should or should not talk to others about a ethics complaint unless the employee's actions would undermine our ability to investigate the case.

I have had one (extended) meeting with Phil in person in this case and he showed none of the indicators you ask about and was calm about the case.

I hope this information helps. I will add that Chris's interview was taped, but my interview with Phil was not. I am not able to release the tape to you while the investigation is pending.

Chuck

-----Original Message-----
**From:** Golojuch, Michael
**Sent:** Wednesday, February 26, 2003 4:12 PM
**To:** Totto, Charles W.
**Subject:** Investigation
**Sensitivity:** Confidential

EXHIBIT NO. 94
TOTTO
6-23-06
RITA KING, RPR, CSR

Confidential message
Chuck,
I know we have been playing telephone tag so I thought I would e-mail you. I am conducting an investigation concerning allegations of possible workplace violence via harassment and threats by Phillip English, Real Property Appraiser, Real Property Assessment Division, BFS.

1

**English, Philip E.**
**From:** Ishiguro, Dwight
**Sent:** Thursday, October 31, 2002 8:25 AM
**To:** English, Philip E.
**Subject:** RE: Leave requests

Phil:
I talked to Waylen for just a bit yesterday. He is in charge of the rally and was part of the security detail so we just chatted for a second. He will be following up on this in a few days. I will keep on his tail till this is resolved.
Mahalo
dwight

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 2:48 PM
**To:** Ishiguro, Dwight
**Subject:** RE: Leave requests

Dwight,

In every case I have tried to comply with their wishes. This has been my desire from the beginning. I have stated so and have made every effort. I get frustrated when I try to do what they say and then they change the rules. That is disconcerting to say the least. Worse yet we have meetings, things are said, and then the next meeting they say they never said those things. I have tried to comply and it has been my desire. But they seem to be able to say anything with impunity like Bob yelling at me that I don't seem to care about my job in my JPR meeting! They can say what they want unless someone makes them stop. If Gary doesn't do it then it must and "will" go to another venue.

Phil

-----Original Message-----
**From:** Ishiguro, Dwight
**Sent:** Wednesday, October 30, 2002 2:42 PM
**To:** English, Philip E.
**Subject:** RE: Leave requests

Ok....I'll talk with him today and hopefully after this afternoon's event he can move on this....Remember the number one rule....Do it..then grieve it! We will not let insubordination ruin our case.
dwight

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 2:39 PM
**To:** Ishiguro, Dwight
**Subject:** RE: Leave requests

Please wait for Waylen. I am not sure who to trust anymore. I wanted to be able to trust Gary but he has proven so far on many occasions that he is not to be trusted and that his ethics and integrity is suspect. He is very likable but he doesn't seem to exercise good judgement.

Phil

-----Original Message-----
**From:** Ishiguro, Dwight

EXHIBIT NO. 95
TOTTO
6-23-06
RITA KING,    RPR, CSR

RENEAU KENNEDY RE PHILIP ENGLISH                228

> Sent: Wednesday, October 30, 2002 2:36 PM
> To: English, Philip E.
> Subject: RE: Leave requests

Phil:
We will not be able to determine if that is the case. We do know that something is amiss here but till we can make that determination we can't make assumptions. In time things will come together and a pattern will develop. Information will present it's self and we will need to gather it. May I intervene with Gary or do you think we should wait for Waylen?
Mahalo
dwight

-----Original Message-----
From: English, Philip E.
Sent: Wednesday, October 30, 2002 2:31 PM
To: Ishiguro, Dwight
Subject: RE: Leave requests

Dwight,

From the beginning when I spoke out about Gary using Chris to do work for his private company while on City and County time things have gone steadily and more rapidly down hill for me. I can not say if all of these things are related for sure or not. But it seems to me at this point that it is pretty clear Gary is letting them (meaning Bob and Ann) have there way with me, justified or not. Why is he doing that? If he is supporting his management team then he is just as much involved in the harassment as Ann and Bob. If he is just letting them have their way with me knowing that it is wrong then that too is wrong. Something's not right about this.

Phil

> -----Original Message-----
> From: Ishiguro, Dwight
> Sent: Wednesday, October 30, 2002 2:24 PM
> To: English, Philip E.
> Subject: RE: Leave requests

Phil:
We are covered by a contract. We will take issue with management if the contract is violated. In this situation I feel that harassment is not warranted and I have expressed my thoughts to Waylen on this. I was under the impression that Gary was supposed to talk with Ann and she was supposed to make a list of objectives and goals that was supposed to outline everything. Waylen is supposed to meet with Ann and get some agreement going on this issue. I'm going to see him today and will ask him to meet with you first.

I think I have answered your question on the "reasonableness" of Ann's directive. It is impossible even if you had more time. To gather information of the nature that is required will take much time per sale to; get phone numbers, talk to buyers or sellers, to talk with realtors, and to do a physical inspection. A lot of the necessary info. to do a thorough check is not in our computers. If

exemptions have been filed, we may be able to get phone numbers to contact owners but often times they are not on file yet. I do know the problems with our sales program, especially the inspection part.

It seems that Ann would like to see results that meet with the sales you have to work with. If things are a bit out of line than an explanation of why it's so is something you and she will need to get together on so it's explainable/defendable. Like if it was a low sale based on the average, was it in bad condition, etc..
The outliers will be the ones what will be questioned first so those are the ones that need to be concentrated on. Hopefully you don't have that much to work on. If you get those in order, it may satisfy her. By deleting bad sales or outliers it may clean up the report results. Something needs to be done with them. Not all will meet with the criteria for deleting a sale, some will be good transactions that just sold low but we need to make that determination.

The main thing here is that no action is taken. If and when they do then we will have to react. We try to solve problems before they occur but management can and do act on their own.
May I talk with Gary? I'm not sure he is being updated on this situation. If he is I would like to get his views on this.
Maybe after talking with him I would be better able to advise you on whether outside representation is necessary. We have Federal, State and contract language that may assist in this situation. We need to find out where it stands. Waylen might have had assurances that nothing would be done at this point. I know that things have been happening daily, by your communications with me and really would like to see this put to bed.

I'll get back to you tomorrow after I talk with Waylen.
Hang in there.
dwight

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 1:48 PM
**To:** Ishiguro, Dwight
**Subject:** RE: Leave requests

Dwight,

Unfortunately I do not know what is going on with Gary. From my perspective I am being singled out and asked to accomplish things that con not be accomplished. I being asked to do thing that others clearly are not being asked to do under these circumstances. In fact I have been told to do the opposite in the past and that is to not worry about condition because there is not enough time to do so.

I have also been told by Pauline and others that it is OK if you have a project whereby all of the estimates are high or low even by 20% or more because they will adjust in the process. Now I am being told that I need to justify all of these sales and to do it

in a day and half. I asked you before if you thought that was reasonable and you have not answered. You have said it won't be possible but you have not stated whether you think it is a reasonable request or not.

I guess Dwight I am trying to figure out who is on my side and who I can trust. This is so obvious. In the City and County I do not feel that there are many that I can trust. That is one reason why I went to the union. Now I have not heard anything from the union. Not a peep.

Things are getting worse and not better. I am being more and more harassed. If you talk to Gary about anything please tell him to get these guys off of my back.

If you do not believe the union is going to support me in this issue I need to know so that I can get with it and get a lawyer. What is going on is not right. You might guess that I am beginning to feel a great deal of hostility from both Ann and Bob. You know the history of this thing. I have spoken up and there seems to be no doubt that they are out to get me.

I am not sure what the union is doing. I hoped that I would be protected. So far things have gotten worse! Can you help me?

Phil

-----Original Message-----
**From:** **Ishiguro, Dwight**
**Sent:** Wednesday, October 30, 2002 1:37 PM
**To:** English, Philip E.
**Subject:** RE: Leave requests

Phil:
It is obvious that it won't be possible to check on the condition of the sale. If property inspection is what is being asked for, we hardly do any inspection because the nature of condos. Appointments need to be made and I know this is not efficient. I hope this is not what Ann is asking for. We go through this exercise every year and I don't think we should be doing it every year. I don't know what the solution is but till then we will need to improvise.
Again, the leave request is for health related reasons and because of a lack of sick leave time, vacation time can be substituted. Do you want me to query Gary on this? I'd be willing to.
Mahalo
dwight

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 1:29 PM
**To:** Ishiguro, Dwight
**Subject:** RE: Leave requests

Dwight,

RENEAU KENNEDY RE PHILIP ENGLISH                231

All of what you have said is kind of ideal even for this office. The reason Ann validated those sales is the process. She looked at the sale and it was close to last years assessment and validated it. That is the process I was told to use last year because there was not enough time. Just go through the list and do the best you can. Not enough time to check everything out so just go through the list and if it looks close validate.

But today I am being asked to do something quite different. Even to go back and check condition on sales. I wish I had time to do that! I just ran the MK45 screens and totaled 420 sales that I have to review prior to Thursday afternoon. Again I ask you is this reasonable? You seem to not want to answer that. Is it right they should be checked out? I agree they should. But they are now asking me to do this whoever validated it and to be responsible to do it in less than two days. Furthermore, my request for leave will not be approved unless I complete this task which seems to be impossible to complete. I hoped that you would step forward and agree with me that it is not reasonable. But it is simply obvious.

So Dwight what's up?

-----Original Message-----
**From:** Ishiguro, Dwight
**Sent:** Wednesday, October 30, 2002 1:04 PM
**To:** English, Philip E.
**Subject:** RE: Leave requests

Phil:
We do validation similar to that. When we get the P64, it usually is to late to do research on it. Most of the time we just get a print out of sales inputted that haven't been validated. P64 follows later. We check CV17 for the names of who transferred to who. If is seems unrelated, we validate. We also use MLS and Maestro records. It makes the sales gathering and validation process difficult but the reason wee get is that mapping is not able to keep up due to some problems they had earlier with the system. There are a lot of things not working properly but it is being addressed.
To try and clean up data at this time with the amount you have would be very difficult to complete by tomorrow. I'm not sure why leasehold are being validated unless the opinion is that they are close to fee simple?????
Outliers will change every time you make coefficient changes or other adjustment to the models. You will not be able to correct all the problems in a model and that should not be expected. The idea is to get it as "clean" as possible. The "cleaning" should be something we do all year. Every time we validate something it should be checked as best we can. Most times we don' get info in a timely manner. That causes us to cut corners. You have to or you won't be able to keep up.
Keep plugging.
dwight

-----Original Message-----

| | |
|---|---|
| From: | English, Philip E. |
| Sent: | Wednesday, October 30, 2002 12:28 PM |
| To: | Ishiguro, Dwight |
| Subject: | RE: Leave requests |

Dwight,

Is it reasonable to expect these things be done by Thursday afternoon? This is Wednesday morning. Maybe you are unaware of the process of validating sales. Ann Gima herself validated hundreds by simply going through a list and if they looked close enough, validating them. I know because I have been going through the dated and fixing them. Many that she validated were leasehold transactions. She didn't even check tenure let alone "condition!" Now I am being asked to clean all of that up in a day and half? There are thousands of sales. The truth is I have no idea what is good and what is bad. I know what I validated but there is plenty of dated that is validated by others. Again I have tried to correct that already.

My question remains is it reasonable. Am I being set up here to fail? To me it does not appear reasonable and that I am being set up to fail.

Dwight I will break my butt to do what they have asked. There may not be as many outliers anyway. But something appears wrong. I need to know what the union will do. I am already asking around for names of legal counsel to represent me. I told myself that I would proceed carefully and systematically with this hoping that things might be resolved. But rather they seem to be escalating. At this point it may be foolish of me not to have some legal advice. Any ideas.

Phil

-----Original Message-----

| | |
|---|---|
| From: | **Ishiguro, Dwight** |
| Sent: | Wednesday, October 30, 2002 11:48 AM |
| To: | English, Philip E. |
| Subject: | RE: Leave requests |

Phil:
When you look at your sar and stuff like that, you should be able to identify the outliers. They are the sales that fall in the 80% and below and 120% and above sar. These may be because of specific reasons. Those need to be addressed. Have they been remodeled, non arms length transactions, financing, physical condition etc. If we can identify why the ratios are coming out as such we can defend our use or non use of them.
With thousands of sales, it will be difficult to look at each and research everyone of them. So we need to rely on the sar reports to help us id the problem sales. We need to check those out and by doing that, we can manage our sales file more easily and have a explanation for them.
Gary stated that it will probably take about three years to get familiar with IAS and market modeling. Some of us will take a little longer. That's why support from Norman and supervisors

RENEAU KENNEDY RE PHILIP ENGLISH                        233

are critical for us. I tell Norman that I will be asking him the same question over and over again till I get comfortable and the picture forms for me. (I blame it on Alzheimer's) He seems to be ok with that..so far. I'm not sure when he will give up on me....
I know that Annie did good work in her area of responsibility when she was on line. Not sure about the other one. His former sup. did not think so. The models need not be perfect but the results that come out should be reasonable and explainable though.
Keep consulting with Norman. Keep on plugging!

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 10:45 AM
**To:** Ishiguro, Dwight
**Subject:** FW: Leave requests

Dwight,

Follow-up question. Are these request reasonable? What I mean is that they are somewhat broad in that she is asking me to address things like condition of the units at sale and as you know this is something that we simply do not have the time or resources to do on all sales. Furthermore she asks for "satisfactory/explainable" results. The problem with these models is that it will take at least another year to get them to that point (if I don't have TAC or to many appeals). Does she expect me to do it by Thursday? Even Gary K. said it would take me three years to get things to that point.

Is this the same standard that they are applying to all appraisers and all models?

I agree that these things would be great to address. Under the circumstances of having nearly 20,000 units to value and thousands of sales to review in one of the most complex real estate markets in the world, I think it might be asking too much. Could Ann or Bob live up to the same standard they are imposing on me?

Please give me your thoughts and ideas. The question remains, what is going on here?

Phil

-----Original Message-----
**From:** English, Philip E.
**Sent:** Wednesday, October 30, 2002 10:31 AM
**To:** Ishiguro, Dwight
**Subject:** FW: Leave requests

Dwight,

I have rescheduled leave for doctor appointments. The following is what I received from Ann just this morning. It is relatively clear. However, is this the same thing that she is asking other appraisers to do? And if not is she restricting their leave? I don't