MOSELEY BIEHL TSUGAWA LAU & MUZZI
a Hawaii limited liability law company
ROGER S. MOSELEY               2060
CHRISTOPHER J. MUZZI    6939
RENEE M. FURUTA               7593
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii  96813
Telephone:  (808) 531-0490
Facsimile:  (808) 534-0202
Email:  rmoseley@hilaw.us
        cmuzzi@hilaw.us
        rfuruta@hilaw.us

Attorneys for Plaintiff
PHILIP E. ENGLISH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH,<br><br>        Plaintiff,<br><br>   vs.<br><br>CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1 –10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10,<br><br>        Defendants. | Civil No.  04-00108 SOM/KSC<br><br>PLAINTIFF PHILIP E. ENGLISH'S PRETRIAL STATEMENT; EXHIBIT A; CERTIFICATE OF SERVICE |

10010/2/57292

## PLAINTIFF PHILIP E. ENGLISH'S PRETRIAL STATEMENT

Plaintiff Philip E. English ("Plaintiff"), by and through his counsel, Moseley Biehl Tsugawa Lau & Muzzi, hereby submits his Final Pretrial Statement pursuant to the Hawaii Local Rules of the U.S. District Court Rule 16.6.

I.     Party

Plaintiff Philip E. English.  Plaintiff English was a licensed real estate appraiser in the employment of the City.

II.    Jurisdiction and Venue

Federal question jurisdiction exists under 28 U.S.C. §1331 and §1343, by virtue of the claims of deprivation of constitutional rights and other conduct arising under 42 U.S.C. §1981 and § 1983, as alleged herein.  This Court has pendant jurisdiction, under 28 U.S.C. §1367(a), over Plaintiff's state law claims herein.

Venue is proper in this court pursuant to 28 U.S.C. §1391, because this is the judicial district in which Plaintiff resides in which all Defendants reside and all acts and omission complained of occurred within the City and County of Honolulu, State of Hawaii.

III.   Substance of Action

The essence of this case is that Plaintiff English, is a whistleblower who was subjected to retaliation because he complained about certain

10010/2/57292                                    2

practices, which were occurring at the Assessment Division of the Department of Budget and Fiscal Services of the City and County of Honolulu ("City").    One of Plaintiff English's complaints was that a co-employee of his was doing work for a private appraisal company on City time and with City equipment.    The head of the Assessment Division, Defendant Gary Kurokawa, was a substantial shareholder, a director, and an officer of the private appraisal company in question, Defendant GK Appraisals.

After Plaintiff English complained to the FBI and the Ethics commission of the City and County of Honolulu, the City, its employees and GK Appraisals (remembering that the head of the Assessment Division, was also another director and shareholder of Defendant GK Appraisals) retaliated against Plaintiff English in all of the traditional ways that whistleblowers are punished.    Plaintiff English has, for example been labeled a "troublemaker", accused of being a "back stabber", and accused of having preexisting mental and emotional problems – even to the extent of likening him to the Xerox murderer Byron Uesugi.    One of his superiors called Plaintiff English a "Wacko" at a meeting of his fellow employees.

There was also a <u>mandatory</u> training session, which all of the appraisers at the City (included Plaintiff English) were <u>required</u> to attend. At this training session the attendees were told that even though bad things

may be occurring in the work place, they had no obligation to step forward and report.  Further, at least two of Plaintiff English's fellow appraisers mocked Plaintiff English's report to the Ethics Commission and then suggested, by implying that Plaintiff English may be wearing a recording device.

Plaintiff English's employment reviews were excellent before he engaged in whistleblowing, but afterwards they deteriorated quickly downwards to the point that his performance was called unsatisfactory. Plaintiff English was shunned by his co-workers, one of whom was an attorney for the City, who advised Plaintiff English that she could not talk to him anymore.  After his whistleblowing there were a series of workplace violence reports filed against him and there was a substantial investigation of him, in which his co-workers were encouraged to report negative things about Plaintiff English (reading these interviews, it seems apparent that they were coached).  One of Plaintiff English's superiors told him not even to think about filing lawsuit because it was his word against theirs and others have tried it and failed.  There were constant complaints about his work performance and attempts of disciplinary action and he was not allowed to take leave to go to the doctor.

The retaliation was so vigorous and pervasive that Plaintiff English eventually required medical help.  Within approximately two months after

Plaintiff English went to the Ethics Commission, his doctors had advised him not to go to work again, because of the state of his physical and emotional health.  Plaintiff English's last day actually at work was February 27, 2003.

Subsequently, even after the City had received notice of Plaintiff English's condition, and even though Plaintiff English was no longer going to work, Defendants continued to issue negative employment reviews and harass him.  They continued to do this even though they had received advice from their own consulting psychologist that they should not issue the specific further employment review in question.  Further, when Plaintiff English applied for worker's compensation benefits, the City conditioned his receipt of a lump sum benefit on his resignation from employment. Apparently they agreed that Plaintiff English was entitled under the law to benefits, but determined that even though he was entitled to the benefits, they would force him to resign.

Throughout this whole affair there has been little, if anything, done by the City to investigate or take action with respect to any of Plaintiff English's allegations against the head of the division for which he worked, or with respect to any of the other practices about which Plaintiff English complained, or for the complicity of the Defendants in the improper activities, or for the Defendants' retaliation against Plaintiff English.

One of the Defendants received a notice from the Ethics Commission more than two years after the conduct was reported on January 22, 2003 – that there may be reason to believe that ethics provisions had been violated. The "suggested" time for action on such complaints is 30 days, and it is now more than 3 ½ years after Plaintiff English filed his complaint with the Ethics Commission, without action!

Plaintiff English's complaints about the activity in the Assessment Division were of two basic kinds. The first was a series of complaints, questions, and suggestions about the "professional" conduct and methodology of the Assessment Division in appraising real property. The second, was something that even the most uninformed layman could understand: Plaintiff English complained that another of the employees of the Assessment Division was doing private appraisal work on City time and with City equipment. This private work was being done for Defendant GK Appraisals, a private appraisal firm based in Hilo and partially owned (90,000 shares) by Defendant Kurokawa. Defendant Kurokawa also was an officer (vice president) and director of Defendant GK Appraisals from the date of its incorporation to the present date.

Plaintiff English's first complaint was made to the employee doing the work, Christopher Graff. Mr. Graff said that there was no problem because it had all been worked out. He explained that he technically worked for

another appraiser, David Matsunami, who, in turn, worked for GK Appraisals. David Matsunami, however, had since testified that 70% of his contacts with Defendant GK Appraisals were through Defendant Kurokawa and that he contacted Defendant Kurokawa on his City phone and left messages with Defendant Kurokawa's City secretary. Mr. Graff refused to stop the activities about which Plaintiff English was complaining.

Plaintiff English next complained to Defendant Gima, whose response was essentially that she did not know anything about it and that Plaintiff English should mind his own business. Next Plaintiff English complained to Defendant Magota, who was the number two man at the Assessment Division. Defendant Magota essentially responded that, if Mr. Graff was doing anything like that he would be dealt with severely. Plaintiff English expressed his concern stating that it was not Mr. Graff who was the problem, but that it was Defendant Kurokawa, who needed to be dealt with. Defendant Magota responded that in any dispute it would be Plaintiff English's word against theirs and not even to think about suing because others had tried it and failed. Defendant Magota apparently did talk to Mr. Graff, who later reported to Plaintiff English that he could continue, as long as he was "more discrete". Plaintiff English took this to mean that Mr. Graff was told that he could continue to steal from the City as long as he hid his activities and did not get caught.

Plaintiff English also observed on at least one occasion, what appeared to be direct instructions of Mr. Graff by Defendant Kurokawa with respect to the private appraisal work that Mr. Graff was doing on City tine and with City equipment for Defendant Kurokawa's private appraisal company, Defendant GK Appraisals.

Plaintiff English continued to observe Mr. Graff doing private work for GK Appraisers.  Plaintiff English was uncertain as to what he should do next, but after much prayer, he put his complaint in writing to Defendant Magota in February of 2002.  Plaintiff English's work environment deteriorated very rapidly from February 2002 on.  In April of 2002 Plaintiff English received a performance review which had substantially declined from his earlier reviews.  All further performance reviews continued to decline.  At one point Plaintiff English was put on "extended probation", which was allegedly rescinded, after the additional probationary period had passed.

David Matsunami testified that Mr. Graff had come to him and advised him that Plaintiff English had complained about the work Mr. Graff was doing for GK Appraisals.  Between February of 2002 and June of 2002, partially because of Plaintiff English's complaints about Mr. Graff, David Matsunami told Defendant Kurokawa that David would no longer be doing work for GK Appraisals.  He expressed that he did not want to be in

the middle and that out of "respect" for Plaintiff English and Mr. Graff, he could not continue.    Thus, because of Plaintiff English's complaints, Defendant GK Appraisals lost the services of David Matsunami.    This occurred at exactly the same time period in which Plaintiff English's work environment at the City was deteriorating rapidly.

By August of 2002 Plaintiff English was experiencing further and further retaliation, and the outside work being done by Mr. Graff did not cease.  Plaintiff English contacted the FBI.

In late 2002, Charles Totto at the Ethics Commission received documents from Plaintiff English regarding the situation.  On December 31, 2002 Mr. Totto stated that he would like to meet with Plaintiff English.  This meeting occurred on January 3, 2003 and on January 22, 2003 a formal complaint with the Ethics Commission was filed by Plaintiff English.

On January 7 and 10, 2003 Plaintiff English met with Mr. Graff and advised him that he had reported everything to the FBI and to the Ethics Commission.  Plaintiff English told Mr. Graff to contact Mr. Totto and to tell the truth about everything.   Mr. Graff apparently immediately (also on January 7 and 10) told his supervisors about the contents of his meetings with Plaintiff English.

By mid-January 2003, Plaintiff English was being required to answer a complaint of "insubordination" allegedly for an incident in October of the

prior year, in which he had gone to his doctor for a follow-up visit.  Near the end of February 2003, Plaintiff English was advised by an investigator from the City that he was investigating "workplace violence complaints" about Plaintiff English.  This incident could fairly be considered one of the last straws and an incident which resulted in the doctor's advice for him not to return to work.

IV.   Undisputed Facts

1.   City and County of Honolulu is a municipal corporation organized and existing under the laws of the State of Hawaii.

2.   Plaintiff English was employed by the City and County of Honolulu and is a resident of the City and County of Honolulu.

3.   Defendants Robert O. Magota, Gary Kurokawa, Ann Gima are residents of the City and County of Honolulu and are employed by the City and County of Honolulu.

4.   Defendant GK Appraisals, Inc. is a Hawaii corporation doing business as a real estate appraisal firm in the State of Hawaii.

V.   Disputed Factual Issues

In essence all other facts are disputed.  However, without limitation, Plaintiff English believes the following facts are specifically disputed.

1.   Defendant Gary Kurokawa is the Administrator of the Assessment Division and an employee of the City.

2.     As the Administrator of the Assessment Division, Defendant Kurokawa is responsible for directing, administering, overseeing, and coordinating all functions and activities within the division, including, but not limited to, enforcing policies and operating procedures within the division.

3.     Without limitation, as the Administrator of the Assessment Division, Defendant Kurokawa exercised power and authority over personnel functions regarding City employees.   Defendant Kurokawa exercised his power over personnel functions by signing off on all employee performance reports for employees within his agency, including probationary performance reports, attempting to extend Plaintiff's probationary period, and expressing his ability to transfer employees in the presence of subordinates.

4.     Defendant Kurokawa's exercise of authority over personnel matters was ratified, accepted, supported, and sanctioned by the City by other executive officers within the City, including the Director of Budget and Fiscal Services.

5.     Defendant Kurokawa, at all times herein relevant, supervisory authority over Plaintiff, over Defendant Magota and over Defendant Gima

6.     Defendant Magota had at all times herein relevant, supervisory authority over Plaintiff and over Defendant Gima.

7.     Defendant Gima had, at all relevant times herein, direct supervisory authority over Plaintiff.

8.     The acts of Defendants herein, related to retaliation against Plaintiff, for his complaint that work was being done for GK Appraisals, were done by officers and/or directors and/or agents of GK Appraisals, or at the direction of such individuals, for the purpose of advancing or preserving the economic benefit to GK Appraisals derived from having City employees do work for GK Appraisals on City time and with City equipment.

9.     Generally, for the initial period of his employment at the Assessment Division, Plaintiff spent his time trying to discern the differences between the private appraisal practice, with which he was familiar, and the appraisal practice in the Assessment Division.  Soon, Plaintiff began asking questions, making comments, and making suggestions, as well as requests for practice changes.    Plaintiff questioned, commented upon, and/or made suggestions or requests for change of all of the practices and inappropriate actions described herein. While it eventually became apparent that Plaintiff's questions, comments, requests and suggestions were unwelcome, the harassment and retaliation that resulted was difficult to identify and/or define at first. However, when Plaintiff complained in writing about specific clearly illegal

activity, in which both the Administrator of the Assessment Division and another appraiser were involved, the situation changed dramatically for the worse and the harassment became so overt, pervasive, and oppressive that Plaintiff eventually had to stop going to work, on his doctor's orders, because of the resulting stress.  The harassment to which Plaintiff was subjected was in retaliation not only for the specific complaints about illegal activity, but also for his prior and continuing attempts to correct improper practices and to improve the assessment process at the City.

10.    Prior to and immediately after the inception of his employment with the Assessment Division, Plaintiff was advised by Defendants Kurokawa and Magota their plan was to make the Assessment Division more professional and that they needed people with outside experience to do so.    However, during the course of Plaintiff's employment, Defendant Gima constantly instructed Plaintiff that things must be done according to "prior practices" and that Plaintiff would have to be "patient" about any change.

11.    During the first week of Plaintiff's employment, Plaintiff was called into a meeting with his then supervisor, who proceeded to ask about Plaintiff's background and experience and then he advised Plaintiff that the supervisor had no time to train Plaintiff and would not do so.

12.    On or about August 3, 2000, Plaintiff was assigned to the appraiser group headed by Defendant Gima, as supervisor, and Plaintiff was assigned to work on certain condominium, cooperative, and timeshare projects in Waikiki and adjacent areas.

13.    Defendant Gima advised Plaintiff that his initial job was to "validate" sales for condominiums in Waikiki and that there had been no sales input since the at least the beginning of June, when the prior appraiser assigned to this area had left the Assessment Division.

14.    Defendant Gima advised Plaintiff that there was "no time" for any verification of sales, and that the only thing he should do was to determine if the sales were "closed". When Plaintiff questioned whether this process was sufficient to determine whether the sales were truly valid, he was directed by Defendant Gima that there was no time to check and to just "plug them in".

15.    Immediately prior to the time Plaintiff was assigned the Waikiki condominium assessments, in approximately August or September of 2000, the "Gold Coast" area, at the foot of Diamond Head, was added to the waterfront Waikiki condominium model, later known as "Model 42". Plaintiff was not consulted prior to the decision to add this area to the Waikiki model. The "Gold Coast" data had numerous errors and was not properly set up for market modeling.

16.    Despite the known errors and problems, and the knowledge that erroneous assessments would result, the Gold Coast area was inserted into Model 42 and the erroneous assessments it produced for tax year 2001 were mailed out to taxpayers.  Plaintiff did not learn of the problems with the Gold Coast data until after the assessments for that year were mailed out.  The following year Plaintiff tried to remedy the problems with the Gold Coast data, but was not given adequate time to fully evaluate and correct the obvious problems with Model 42.

17.    On numerous occasions throughout Plaintiff's tenure at the Assessment Division, Plaintiff raised the issue of ethical and professional standards, including, but not limited to:

> (a)    the application of Uniform Standards of Professional Appraisal Practice ("USPAP") standards, to which he was told, by Defendant KUROKAWA that there was a "blanket" exception and that the Assessment Division did not have to follow USPAP standards;

> (b)    the number of properties assigned to appraisers far exceeded the recommendations of professional associations;

> (c)    the Assessment Division appraisers were accepting assignments which could not properly be done with the resources at hand, which, at minimum should have required public disclosure that the assessments produced by the Assessment Division may not be reliable;

> (d)    the Assessment Division used methodology which was not generally recognized by the appraisal profession to be proper, for example the depreciation methodology, which was introduced to the system by Defendant MAGOTA, and

produced large and improper fluctuations in valuations, and which was not consistent with the vendor recommendations of the new Computer Automated Mass Appraisal System ("CAMA") system; and

(e)    the almost complete lack of any comprehensive training program, especially with respect to internal policies and procedures.

18.    In response to some of Plaintiff's comments and questions with respect to ethical and professional standards, Plaintiff was advised by Defendant Magota that the Division had had trouble with guys like Plaintiff before (meaning appraisers with outside professional experience) and that Plaintiff would just have to learn to cut corners.    In fact, Defendant Magota specifically dressed Plaintiff down in front of a group of his colleagues in the Assessment Division, stating that "I've seen this kind of thing before where an outside appraiser cannot make the transition to mass appraising."    Further, in front of the same group Defendant Magota described Plaintiff as having "just the fundamentals" of appraising, implying that Plaintiff's professional abilities were suspect.

19.    In or about October of 2000, Plaintiff became aware of multiple appeals with respect to the Waikiki Shore condominium.  During that time Plaintiff became aware that there was substantial internal discussion and confusion about the classification system, which had resulted in the classification of the Waikiki Shore condominium units in

question as "Hotel and resort", and that apparently such classifications had been done differently by different appraisers and supervisors. Plaintiff began to realize that this and many other important decisions and determinations were being done on an ad hoc basis with no consistency and not necessarily with any relationship to proper appraisal practice. Plaintiff began to question these practices and to offer comments and suggestions in various forums, from meetings to individual encounters. Sometime later, Plaintiff was advised by either Defendant Gima or Defendant Magota, or both, that Plaintiff asked too many questions.

20.     In or about January of 2001, Plaintiff began to handle real property tax appeals and, in conjunction with those appeals, and throughout approximately the following year, Plaintiff became aware of multiple inconsistencies and failures in the assessment system, including but not limited to:

(a)     project groupings were not appropriate and the valuations were inconsistent;

(b)     leasehold sales were being used for some valuations;

(c)     there were multiple instances of questionable classification;

(d)     the sales "validation" system was questionable on a widespread basis;

(e)     land valuations had not changed in years, despite significant moves in the market;

(f)    when the new computer system and mass appraisal system was put in place, no provision had been made to clean up the database before the conversion took place, and in fact there were numerous and serious actual discrepancies in the database.    This was against the specific advice and instruction of the vendor of the new system.;

(g)    there were numerous problems with the appeal process, including but not limited to: instances in which the Board of Review did not act in an impartial manner, including, but not limited to, ex parte communications with the Assessment Division, requesting that the decisions be prepared before the hearings so that the BoR could sign them immediately after the hearings, and requesting that Plaintiff act more as an advocate for the Assessment Division's position, rather than trying to achieve the proper assessment; and appraisers actively and improperly discouraging taxpayers from filing appeals and refusing to assist taxpayers in obtaining information relevant to their appeals.

21.    Plaintiff's questions and comments on these issues were ignored or Plaintiff was consistently instructed that nothing could or would be done.

22.    At about the same time period (approximately 2001-2002), Plaintiff began to observe that there was general confusion and lack of understanding in the Assessment Division as to basic appraisal concepts, such as "as of" a specific date, as opposed to "on" a specific date.  With respect to this specific issue, Defendant Gima responded to Plaintiff's concerns by rallying the other supervisors to support her own position that assessments were to be made "on" October 1 of the year preceding

the tax year, rather than "as of" that date, as required in the ordinance (and as would be required by proper appraisal practice as understood by Plaintiff). In the process of rallying the support against Plaintiff's position on this issue, Defendant Gima substantially undermined and damaged Plaintiff's reputation and respect among the other appraisers and supervisors in the Assessment Division.

23.   In response to Plaintiff's questioning procedures which did not appear to be proper appraisal practice, at least one other appraiser in the Assessment Division related to Plaintiff that Defendant Magota had described the mission of the Assessment Division appraisers as to get the "highest value" possible on property and maximize taxes.

24.   In or about January of 2001 Plaintiff began to observe that one of the appraisers in Defendant Gima's group was doing outside appraisal work on City equipment and during City time.

25.   Plaintiff initially approached the appraiser involved and advised him that this sort of activity was not proper and should cease. The appraiser involved advised Plaintiff that a scheme had been worked out, which made the activity permissible. The scheme was then described to Plaintiff as that the work was being done for a former employee of the City, who, in turn, did work for Defendant Kurokawa, so that Defendant Kurokawa was not directly involved, therefore making the

activity permissible. Plaintiff advised the appraiser involved that this scheme did not resolve the issue.  In the period following, Plaintiff observed that this communication with the appraiser had no effect, as the activity continued.

26.    Plaintiff also observed that the former employee involved continued to come in and out of the private work area of the City appraisers, at will, to deal with the appraiser involved.  Plaintiff also was, on one morning, standing near the appraiser's desk when the appraiser received a telephone call.  The appraiser immediately stopped working on his City work and began to work on his private work, stating that "Gary" had called and told him the private assignment he was working on was urgent and had to be delivered by 5:00 P.M.  That same afternoon the appraiser left the office in a hurry to deliver the private assignment.

27.    When the activity continued, apparently undiminished, Plaintiff approached the appraiser's supervisor, Defendant Gima, and advised her of the illegal activity.  Defendant Gima's response to Plaintiff was that he should do his own work and not to be concerned with the business of others and, in any case, she had not observed the activity.

28.    When no additional response was heard from Defendant Gima, in late 2001, or early 2002, Plaintiff spoke with Defendant Magota directly about the continuing illegal activity.  Defendant Magota's initial