response was that the appraiser involved would be disciplined if it was found that he was doing outside work. Plaintiff then advised Defendant Magota that there were not just one, but two individuals involved and that Plaintiff was especially concerned because the work was being done for the Assessment Division Administrator, Defendant Kurokawa, under the Administrator's direct orders. Defendant Magota then advised Plaintiff that he would talk with Defendant Kurokawa about the matter, but that Plaintiff should not continue to pursue the issue because, in any dispute, it would be Plaintiff's word against the word of the appraiser and Defendant Kurokawa. Defendant Magota also admonished Plaintiff that other former employees had tried to file lawsuits against the Assessment Division and that those suits had failed, and that any suit by Plaintiff would also fail. Plaintiff regarded these statements of Defendant Magota as threatening and intimidating.

29. The appraiser involved later described, to Plaintiff, a meeting with Defendant Kurokawa, the appraiser involved and the former City employee (and possibly others, but Plaintiff is not presently aware of their identities), in which Defendant Kurokawa had advised the appraiser that it was okay to continue doing the private work, but that the appraiser should be more "discrete".

30. It continued to appear that nothing would be done to put an

end to the conducting of private business on City time with City equipment, only that the activity would become less visible by being more "discrete". Because of this, on February 15, 2002, Plaintiff sent a written complaint via email to Defendant Magota outlining the complaint made verbally, that the appraiser involved was still doing private work on City time and with City equipment for GK Appraisals, Inc., a company believed by Plaintiff to be owned and controlled by Defendant Kurokawa, the Administrator of the Division.

31. Plaintiff consulted a union representative about this matter and the union representative concurred with Plaintiff's opinion that this activity should stop. This initial contact with the union representative occurred at about the time Plaintiff first informed Defendant Gima of the situation.

32. In approximately this same time period of 2001, Plaintiff witnessed Defendant Gima going through files and folders. When Plaintiff inquired as to what Defendant Gima was doing, Defendant Gima replied that she was "sanitizing" the files before they were to be produced in the ongoing Waikiki Shore litigation, and that (in reference to a particular document) "We don't want him seeing that." When Plaintiff inquired as to whether this was proper, Plaintiff was advised by Defendant Gima that she had attended a meeting with Corporation

Counsel wherein the employees of the Assessment Division were instructed to "sanitize" files before they were produced in litigation.

33. In approximately this same time period of the last half of 2001, Plaintiff received increasingly and significantly conflicting instructions on what he should be doing. For example, Defendant Magota instructed everyone, including Plaintiff to work on incorporating building permit information, while Defendant Gima specifically instructed Plaintiff to ignore the building permit information for his assigned area, which had not been incorporated since prior to 2000. Had this information been placed in a single stack, it would have been more than three feet tall.

34. In the time period approaching October of 2001, Defendant Magota came up with the idea to send a letter to certain condominium associations in Waikiki and require that they gather information and submit information, with respect to the use of each condominium unit. The associations would be given two weeks in which to reply. The consequence of failure to reply would be to change the classification of the condominium units to "Hotel and resort", which had a tax rate more than two times that of the "Apartment" classification. Over Plaintiff's objection to Defendant Gima, at minimum, that the time frame was too short for proper response and the matter should be more carefully studied and resolved, Plaintiff was required to sign this letter, which was then

mailed out to the affected condominium associations.

35. After mailing out the initial letter, the Assessment Division received limited substantive responses and a great number of complaints from the condominium associations. Upon this development, Defendant Kurokawa, over Plaintiff's strenuous objection as to the propriety of doing so, caused the Assessment Division, in early December of 2001, to send out a second letter, signed by Defendant Magota, stating that due to failure of response to the first letter, the affected condominium units were being reclassified to "Hotel and resort" if there were no additional responses. This letter gave only three weeks for additional response. Neither letter reflected any past practice of the Assessment Division of which Plaintiff was aware, nor was Plaintiff aware of any rule or regulation which permitted such a practice.

36. The number of appeals for the tax year, which had been the subject of these letters, was very heavy, with Plaintiff's assigned area accounting for approximately one fourth of all appeals filed. Many of the appeals appeared to be the result of the reclassifications due to the letters. Plaintiff requested additional help be assigned to deal with the appeals, but Defendant Gima refused, stating that whatever appraiser was free could help. As a practical matter Defendant Gima knew that there were generally no appraisers with any significant free time and that

lack of familiarity with the issues would severely diminish the value of such help.

37.   Files were set up to handle the resulting appeals, but because of unfamiliarity, many mistakes were made and much misinformation was given to taxpayers.  The end result was that Plaintiff's workload was dramatically increased and many taxpayers were likely assessed taxes they did not owe.

38.   After Plaintiff had made the verbal report to Defendant Magota, but before Plaintiff made the written report on February 15, 2002, in approximately December of 2001, a Deputy Corporation Counsel asked Plaintiff to begin preparation of an expert report for the Waikiki Shore litigation.  Defendant Gima then instructed Plaintiff to merely copy some maps and floor plans from the file and that this would be enough.  The Deputy Corporation Counsel then insisted that this was not what was required for an expert report.  Plaintiff began to work on the expert report, but was stopped by Defendant Gima.  Plaintiff was then called into Defendant Kurokawa's office for an "after hours" meeting and was told by Defendant Kurokawa, that Plaintiff should work within the confines of his job, and that Plaintiff should "not take too much initiative."  Plaintiff inquired of Defendant Kurokawa as to who would do the report, to which Defendant Kurokawa replied that Plaintiff should not worry about it.  An

additional concern was raised that Plaintiff was not an Appraiser IV and therefore was not qualified to give expert opinion in court.

39. In approximately this same time period, Defendant Magota had a meeting of the appraisers to explain the "new" way of classification of properties. Most of the appraisers in attendance did not seem to fully understand the classification process being explained by Defendant Magota.

40. In early 2002 Plaintiff became aware that the Assessment Division was going to attempt to promulgate a rule, which would, and was intended to, substantially undermine the claims being made against the City in the Waikiki Shore litigation. Plaintiff understood that counsel for the Waikiki Shore taxpayers was being avoided to prevent his knowledge of the process, including the public hearing. Plaintiff, Corporation Counsel, and Plaintiff's supervisors all understood that Waikiki Shore's counsel had expressed a specific interest in participating in any such rule making process. Plaintiff later learned that from April 1, 2002 to April 10, 2002, the Deputy Corporation Counsel assigned to the Waikiki Shore litigation did not even return the telephone calls of the counsel for the Waikiki Shore. The hearing for this rule was held on April 10, 2002 and no one from the public attended. Subsequent to the hearing, additional material changes were made to the rule before it was sent to the City

Clerk in its final form.

41. By mid-2002 Plaintiff was effectively deprived of further authority to handle any matter dealing with the Waikiki Shore litigation and appeals of Waikiki Shore assessments.

42. In or about October 2002 Plaintiff became aware of an error in the appraisal of units in the Hawaiian Monarch condominium project, which resulted in studio units being assessed at greater values than the one-bedroom units in the same project for the 2003 tax year. Plaintiff brought this obvious error to the attention of Defendant Gima and requested permission to work on the correction of the problem before the erroneous assessments were mailed out. Defendant GIMA denied permission and ordered that the erroneous assessments be processed so they would be mailed out to taxpayers as is. Defendant Gima and/or Defendant Magota stated to Plaintiff that if the taxpayers didn't like the assessments, they could file appeals.

43. During the course of Plaintiff's employment with the City, he received periodic performance evaluation reports all of which described his performance factors as "Exceeds Requirements", until February 15, 2002, which was the date Plaintiff sent a written complaint to Defendant Magota stating that a fellow appraiser was doing private work on City time and with City equipment for GK Appraisals, Inc., a company believed by

Plaintiff to be owned and controlled by Defendant Kurokawa, the Administrator of the Assessment Division. After February 15, 2002, the subsequent periodic performance evaluation reports immediately declined to "Meets Requirements" (on April 22, 2002) and the same on a May 16, 2002 "Probationary Performance Evaluation Report. Plaintiff's evaluations declined further on the next performance report, where one performance factor was rated "Below Requirements" and the rest "Meets Requirements" (Probationary Performance Evaluation Report dated August 23, 2002).

44. After February 15, 2002 Plaintiff became clearly aware of a substantial change in attitude toward him by supervisory and other personnel of the Assessment Division and Plaintiff began to experience numerous occurrences of retaliation.

45. In or about March of 2002 Plaintiff was promoted to Appraiser IV, a promotion for which he had applied much earlier, prior to October 2001, and for which he had been informed that he had been approved. This promotion had been substantially delayed and the explanation for the delay was that the "paperwork" had been lost twice in the processing of the promotion.

46. On or about May 31, 2002 one of Plaintiff's coworkers informed Plaintiff that she had been told that Plaintiff was being "watched"

by Defendant Magota.

47.  No later than May of 2002, as a result of the retaliation Plaintiff began experiencing, Plaintiff contacted the union representative to assist him in putting an end to the retaliatory actions of the supervisory personnel of the Assessment Division, but the union was not able to resolve the problem and the retaliation continued.

48.  On or about May of 2002, as well as subsequent to that date and specifically on August 14, 2002, Defendant Magota made threats on Plaintiff's employment, such as: "You don't seem to care about your job."

49.  Sometime on or after August 14, 2002, Plaintiff contacted an FBI Agent to complain of the illegal activities occurring at the Assessment Division.  At this contact, Plaintiff was informed that unless there was some evidence of illegal campaign contributions, Plaintiff would have to go to the City Prosecutor with his complaint, and that the FBI was essentially too busy with illegal campaign contribution investigations to investigate Plaintiff's complaints.

50.  On August 15, 2002 at 5:57 P.M., Plaintiff was notified by Defendant Kurokawa that Plaintiff's "probationary period" was being extended three months.  Plaintiff contacted the union about this development but there was essentially no action until a November of 2002.

51. In or about August or September of 2002, Defendant Magota, in a meeting of some of the staff of the Assessment Division, told the attendees, that Plaintiff was "Wacko".

52. In approximately the same time period, Defendant Magota in a lunch meeting with an outside private appraiser, advised that appraiser that Plaintiff was causing all kinds of trouble at the Assessment Division.

53. In or about October 2002 Defendant Gima denied Plaintiff leave for scheduled appointments with physicians for a broken foot and for kidney cancer follow-up. While Plaintiff was forced to reschedule the follow-up appointment for his kidney cancer, he did keep the appointment for the broken foot, as he understood that this appointment should not be changed and he misunderstood Defendant Gima's directions. This was the incident for which disciplinary action was threatened in February of 2003, after Defendants learned of Plaintiff's contact with the Ethics Commission.

54. On or about November 22, 2002, a meeting was held in which Defendant Kurokawa, Defendant Gima, the union agent, and Plaintiff were in attendance. At this meeting Defendant Kurokawa stated that that the negative actions in Plaintiff's file could have been much worse, that Plaintiff owed his job to Defendant Kurokawa, that everyone should just "forget about" the whole situation, that he could have Plaintiff transferred

to another jurisdiction (Big Island), and that Plaintiff may be assigned to work directly for Defendant Magota, or transferred to the Kapolei office (which Defendant Kurokawa knew would be a substantial hardship because Plaintiff bicycled to work). Plaintiff regarded these comments as intimidating and exceedingly threatening and as intended to be a display of Defendant Kurokawa's power over Plaintiff, not just in the sense of his employment, but also in a more general "political" sense. At this meeting Plaintiff was not allowed to inquire about the reason for and motivation behind the retaliatory actions against him, despite repeated attempts to do so.

55. Immediately after this November 2002, meeting, the union agent met with Plaintiff and advised Plaintiff that he was a friend of Defendant Kurokawa's and that he would testify against Plaintiff if the matter were litigated.

56. On January 3, 2003, Plaintiff met with the Executive Director and Legal Counsel for the Ethics Commission of the City and described many of the activities set forth in this complaint, including, but not limited to, the fact that a City employee was doing work for Defendant Kurokawa's private appraisal firm, on City time and with City equipment.

57. On or about January 17, 2003, Plaintiff applied for a supervisory position and went through the interview process. Much

earlier, Plaintiff had been encouraged by Defendant Magota to apply for the position and was told that there was a need for supervisors and that Plaintiff was qualified. After the interview process, Plaintiff was informed, by a Deputy Corporation Counsel assigned to the Assessment Division that no other applicant even came close to Plaintiff's qualifications for the supervisor job. However, another applicant was selected for the job.

58. On or about January 7 and 10, 2003 Plaintiff spoke with the City appraiser who had been doing the private work for Defendant Kurokawa and advised him of Plaintiff's visit with the Executive Director of the Ethics Commission and advised the employee to go talk to the Ethics Commission and to tell the truth.

59. On or about January 21, 2003 Plaintiff was advised by a Deputy Corporation Counsel that the "word is out" not to talk to Plaintiff because he might be "wearing a wire".

60. On or about January 22, 2003, Plaintiff caused a formal complaint to be filed with the Ethics Commission. This formal complaint included, inter alia, allegations regarding:

    (a)   the use of City employees, on City time, with City equipment, for outside private business;

    (b)   the granting of improper property tax exemptions to the Assessment Division Administrator;

(c) the rewarding of a high level supervisor for his role in keeping the theft of City time and services quiet;

(d) the retaliation against Plaintiff and the tarnishing of Plaintiff's reputation in the community, because of his questioning the improper use of City personnel and equipment and because of his questioning the propriety and reliability of the methodology and systems used by the Assessment Division; and

(e) the mailing out of assessment notices, which are known to be false, and which result in the collection of taxes that taxpayers do not owe, in violation of Federal mail fraud and racketeering laws.

61. On or about February 5, 2003, the Executive Director and Legal Counsel for the Ethics Commission informed Defendant Kurokawa, by email, that Plaintiff had made a complaint against Defendant Kurokawa, as well as against the City employee doing the work for Defendant Kurokawa, that than investigation was being conducted, and that Plaintiff should be removed from any cases upon which Plaintiff's counsel represented taxpayers (this included the Waikiki Shore litigation).

62. On or about February 5, 2003, Defendant Magota requested a meeting with Plaintiff and, at that meeting, Plaintiff was informed by Defendant Magota that there was a pending disciplinary action against Plaintiff for taking "unauthorized leave" in October of 2002.

63. On or about February 6, 2003, Defendant Gima requested that Plaintiff write a letter to taxpayers making it appear that the

Assessment Division had done nothing wrong, in an instance where the Assessment Division had used a faulty basis for establishing fee simple valuations in certain condominiums. Plaintiff refused to write the letter in such a misleading fashion.

64. On or about February 7, 2003, Defendant Kurokawa emailed Plaintiff with questions about his "serious allegations of ethical misconduct". Plaintiff viewed this email as hostile and as a threat. Plaintiff felt extremely threatened and intimidated and did not respond to this email.

65. On or about February 10, 2003, a co-worker of Plaintiff filed a "Confidential Workplace Violence Report" against Plaintiff, alleging that Plaintiff was "back stabbing" the appraiser who was the subject of Plaintiff's complaint of illegal activities and that Plaintiff's co-workers were "scared" of him.

66. On or about February 12, 2003, the employee who had been doing the private work for Defendant Kurokawa filed a "Confidential Workplace Violence Report" against Plaintiff, alleging that Plaintiff verbally threatened him and intimidated him on January 17, 2003 and January 22, 2003.

67. On or about mid-February, 2003, Defendant Gima, to the best of Plaintiff's information and belief, also filed "Confidential Workplace

Violence Report" against Plaintiff.

68. To Plaintiff's knowledge the complaint to the Ethics Commission is still being investigated, but the City has not provided enough funding or resources for the Ethics Commission to actually conduct a through and complete investigation of this and other matters. The funding to the Ethics Commission is intentionally calculated by the City to make it ineffective in the execution of its duties of investigating complaints, reporting its findings, and recommending appropriate disciplinary actions.

69. The personal and official treatment accorded Plaintiff after he made the written complaint on February 15, 2002, was harsh and substantially different from the treatment accorded others in the Assessment Division. For example, some appraisers were allowed to take vacation leave during the height of the busy season, some appraisers were apparently not disciplined for activities such as leaving work during business hours to watch sporting events on television at a neighboring bar, or not disciplined for hit and run auto accidents with City vehicles, or not disciplined for failing to appear for Board of Review hearings due to hangover, or not disciplined for having a second, outside job, during City work hours. Plaintiff was shunned by supervisors and other employees in the Assessment Division; physically threatening

remarks were made, such as "I hope you have an escape plan if your boat sinks". Some supervisors and others refused to help Plaintiff with any problems or questions and refused to provide information and direction. Defendant Gima instructed Plaintiff not to call her by her nickname, as only her friends were allowed to do that, even though Defendant Gima appeared to be commonly addressed by her nickname by all others in the Assessment Division.

70. As a direct result of the harassment/retaliation, and the other actions of Defendants described herein, to which Plaintiff was subjected, Plaintiff suffered actual physical injury, such as the inability to sleep, lack of energy, and weight loss, and Plaintiff first sought medical treatment for this injury on January 30, 2003.

71. On or about February 27, 2003, Plaintiff was advised by a City official of an investigation of Plaintiff concerning reported violation of the City workplace violence policy.

72. As a direct result of the harassment/retaliation, and the other actions of Defendants described herein, to which Plaintiff was subjected, Plaintiff suffered severe emotional and mental distress and injury, and Plaintiff first sought medical treatment for this injury on February 27, 2003.

73. On February 27, 2003, Plaintiff was advised by his physician