MOSELEY BIEHL TSUGAWA LAU & MUZZI
A Hawaii Limited Liability Law Company

Michael L. Biehl
Alan K. Lau
Roger S. Moseley
Christopher J. Muzzi
Eric H. Tsugawa

ALAKEA CORPORATE TOWER
1100 ALAKEA STREET, 23RD FLOOR
HONOLULU, HAWAII 96813

TELEPHONE: (808) 531-0490
FACSIMILE: (808) 534-0202

Joanna B. K. Fong
Renee M. Furuta

September 2, 2006

**BY FAX AND HAND DELIVERY**

Michael A. Lorusso, Esq.
Fort Street Tower
745 Fort Street, 5th Floor
Honolulu, Hawaii 96813

Anthony L. Wong, Esq.
Dillingham Transportation Building
735 Bishop Street, Ste. 411
Honolulu, Hawaii 96813

        Re:    Philip E. English v. City and County of Honolulu et al.
               Civil No.:  04-00108

Mike and Tony,

        We respectfully suggest that Mike's client Suzanne Foumai has violated the law and may now be subjected to criminal penalties under HRS§92F-17(b), by the theft of the personal records of Phil English. As you well know, Ms. Foumai, had no authority to make copies of the Assessment Division's records relating to Phil English and then take them home for her own "protection", or for any other reason.

        Mike and Ms. Foumai both asserted that she is Mike's client. The City and County of Honolulu, is also Mike's client. Mike has permitted, without objection, Ms. Foumai's testimony that she took these records home. Presumably Mike advised Ms. Foumai, prior to the deposition, about her right to assert her protection under the Fifth Amendment, and to refuse to testify to these matters or to produce the documents. Also presumably Mike advised his City client that Ms. Foumai may have committed acts in violation of the law and in violations of the rules and regulations of the City, and that a conflict may now have arisen which would prevent Mike from representing either Ms. Foumai or the City. Presumably, if Mike fully disclosed these potential issues and conflicts, he received a full waiver from both of his clients (Foumai and the City). These issues do not, of course, directly affect my client, regardless of whether or not they affect Mike's ability to continue to represent the alleged wrongdoers, the City itself, and all of the City employees who are witnesses in this case.

10010\3\57648

# EXHIBIT E

Michael A. Lorusso, Esq.
Anthony L. Wong, Esq.
September 2, 2006
Page 2


However, you are on notice that we will oppose any effort to continue the trial date based upon any withdrawal of counsel for the City in this case. We have communicated with you on a substantial number of occasions with respect to potential conflict issues raised by Mike's representation of the City and the three individual defendants. We have also questioned the propriety of Mike's representing the lower level employees of the City as their counsel. Whether or not it has been resolved by a full disclosure and waiver, a clear conflict has arisen, not just a potential or speculative conflict, between the City and Ms. Foumai.

We will also vigorously oppose any assertion of the Fifth Amendment by Ms. Foumai at trial. Our position is that she was represented by counsel and that she knowingly waived any Fifth Amendment rights by testifying at the deposition.

You are advised that HRS §92F-17(b) states:

*"A person who intentionally gains access to or obtains a copy of a government record by false pretense, bribery, or theft, with actual knowledge that access is prohibited, or who intentionally obtains any confidential information by false pretense, bribery, or theft, with actual knowledge that it is prohibited [by]a confidentiality statute, shall be guilty of a misdemeanor."*

Ms. Foumai had to know that the taking of the records she took was a prohibited act. HRS §92F-18 requires:

*(a) Each agency shall:*
*(1) Issue instructions and guidelines necessary to effectuate this chapter; and*
*(2) Take steps to assure that all its employees and officers responsible for the collection, maintenance, use, and dissemination of government records are informed of the requirements of this chapter.*

The City, therefore, had the responsibility to, and presumptively did, assure that Ms. Foumai was informed of the requirements of HRS Chapter 92F. Further, we believe that Ms. Foumai presumptively knew of the requirements of the law.

The City also had the authority to: "adopt rules, pursuant to chapter 91, to protect its records from theft...." HRS §92F-11(e).     The City, of course, has promulgated rules with respect to the type of records now in question:


*CONFIDENTIAL RECORDS DEFINED*

*a.   Records which if made accessible to the public would invade the right of privacy of an individual, shall be considered confidential records. An invasion of*

*the right of privacy of an individual shall be deemed to result from, but shall not be limited to the granting of access to:*

*....*

*3.   Personnel and employment records, employment examinations and personal references*

*....*

*6.   Information of a personal nature when disclosure would result in economic or personal hardship to the subject party which outweighs the public's fundamental right of access to information concerning the conduct of City agencies.   (RULES AND REGULATIONS OF THE MANAGING DIRECTOR, CITY AND COUNTY OF HONOLULU, STATE OF HAWAII, RULES AND REGULATIONS GOVERNING THE ACCESSIBILITY, MAINTENANCE   AND STORAGE OF PUBLIC AND CONFIDENTIAL RECORDS OF ALL CITY AGENCIES, Rule 3-1)*

The City's rules go on to provide for certification of confidential records and for the maintenance and security of confidential records.

Under the provisions of HRS Chapter 92F, a "Personal record" (of which the City was charged with assuring that Ms. Foumai was informed) *"means any item, collection, or grouping of information about an individual that is maintained by an agency.   It includes, but is not limited to, the individual's education, financial, medical, or employment history, or items that contain or make reference to the individual's name, identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."*   While Mike objected to the question of whether or not Ms. Foumai was aware that the information she had taken was a "personal record", **the law is quite clear that the City had an affirmative duty to inform Ms. Foumai that the records in question were "personal records" of Phil English**.

In addition to the potential conflict posed by the potential of criminal sanctions against Ms. Foumai, there is also clearly a conflict between the City and Ms. Foumai, with respect to her apparent violation of the City's own rules relating to the confidentiality of personnel records.   Again, for all we know, that issue (for attorney-client purposes) may have been properly disposed of by a full disclosure to both of Mike's clients and the receipt of a waiver from both.   We regard the City's support of this malfeasance, however, as being further evidence of the City's ongoing policy and practice of retaliation against whistleblowers.

In a related issue, Ms. Foumai was asked if she were paying for her legal representation by Mike.   Mike instructed Ms. Foumai not to answer on the basis of attorney-client privilege.   While you both can do your own research to determine that there was no proper basis for asserting the privilege and instructing Ms. Foumai not to answer, the real issue here is a larger one.   It is patently improper for the City to be providing something of value to a witness scheduled to testify in a case against it.

10010\3\57648

Michael A. Lorusso, Esq.
Anthony L. Wong, Esq.
September 2, 2006
Page 4

Providing Ms. Foumai with free legal service, which we now presume is related to her apparent theft of City personnel records of Phil English, is clearly something of value and arguably may color her testimony.  Further, is there some agreement between the City and Ms. Foumai that the City will take no action against her for her violation of the City's rules?

Because of the circumstances set forth above, we would respectfully request that Mike reconsider his instruction to Ms. Foumai not to answer questions about his conversations with her and whether or not she is paying his bill.  (Such questioning may also be outside the privilege under the crime-fraud exception, HRE Rule 503(d)(1))  We would respectfully suggest that, at the very least, Ms. Foumai should be fully informed of this letter and given the opportunity to obtain separate counsel and/or to waive any attorney-client privilege which may arguably have existed with Mike.

We wish to depose Ms. Foumai further with respect to this issue.  Please advise us of your decision on this issue at your earliest opportunity.

On an additional and related issue, it was apparent from the workplace violence interview reports that Phil's confidential personnel information was a matter of common discussion among the staff of the Assessment Division.  You are reminded that Robert Magota made a commitment to follow-up on how Phil's personnel information became common knowledge among the staff.  (Ms. Foumai testified, in essence, that she was not the source of that information.)  During the deposition of Mr. Magota on June 16, 2006 (pages 470-472) Mr. Magota testified as follows:

*Q.  Did you act to determine how Linda Knowles would have found out that Phil had been reprimanded by anybody?*
*A.  No.*
*....*
*Q.  Now that you've read this statement, are you planning to investigate how Linda Knowles might have found out that Phil English had been reprimanded by his bosses?*
*....*
*A.  I think it's something we would look into.*
*....*
*Q.  Just in case there's any confusion, Bob, there's a question on the table.*
*A.  Yes, it's something to be looked into.*

*Q.  The question was, Are you now planning to do it?*
*....*
*Q.  Did you say you are going to look into it?*
*A.  Yes*

10010\3\57648

Michael A. Lorusso, Esq.
Anthony L. Wong, Esq.
September 2, 2006
Page 5


In his follow-up deposition, several weeks later, Mr. Magota stated that he had done nothing to investigate and actually seemed to forget the commitment he had made to investigate. Apparently the disparate treatment of Phil extends to permitting an "open season" on Phil's personnel information with no investigation or repercussions whatsoever? Phil was entitled to the preservation of the confidentiality of his personnel information and this was plainly violated in the defendants' haste to "make a case" against Phil for whatever they could. Is or is not Mr. Magota planning to follow up on this issue?

Thank you very much.

Very truly yours,

Roger S. Moseley


RSM\vsy
Enclosure
(records produced by Ms. Foumai at deposition)


10010\3\57648

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3      ------------------------------------   )
       PHILIP E. ENGLISH,                     )
4                                             )
                  Plaintiff,                  )
5                                             )
            v.                                )Civil No.
6                                             )04-00108 JMS/KSC
       CITY AND COUNTY OF HONOLULU; GARY      )
7      T. KUROKAWA; ROBERT O. MAGOTA; ANN     )
       C. GIMA; and GK APPRAISALS, INC.;      )
8      JOHN DOES 1-10; JANE DOES 1-10; DOE    )
       PARTNERSHIPS 1-10; DOE CORPORATIONS    )
9      1-10; AND DOE ENTITIES 1-10,           )
                                              )
10                Defendant.                  )
                                              )
11     ------------------------------------   )

12

13

14

15

16                  DEPOSITION OF SUZANNE FOUMAI

17     Taken on behalf of the Plaintiff, at 1100 Alakea Street, 23rd

18     Floor, commencing at 1:48 p.m., on August 4, 2006, pursuant

19     to Notice.

20

21

22

23

24     BEFORE:     JESSICA R. PERRY, CSR NO. 404

25                 Registered Professional Reporter

Page 2

1   APPEARANCES
2   For the Plaintiff:
3           ROGER S. MOSELEY, ESQ.
4           Moseley Biehl Tsugawa Lau & Muzzi
5           Alakea Corporate Tower
6           1100 Alakea Street, 23rd Floor
7           Honolulu, Hawaii 96813
8
9   For the Defendant GK Appraisals, Inc.:
10          ANTHONY L. WONG, ESQ.
11          Matsui Chung
12          735 Bishop Street
13          Suite 411
14          Honolulu, Hawaii 96813
15
16  For the Defendants City & County of Honolulu, Gary T.
17  Kurokawa, Robert O. Magota, and Ann C. Gima:
18          MICHAEL L. LORUSSO, ESQ.
19          Kawashima Lorusso & Tom, LLP
20          Fort Street Tower
21          745 Fort Street, 5th Floor
22          Honolulu, Hawaii 96813
23
24
25

Page 3

1                I N D E X
2   EXAMINATION BY:                       PAGE
3       Mr. Moseley                    4
4
5
6
7         EXHIBITS MARKED FOR IDENTIFICATION
8   102.  Documents produced (10 pages)      12
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   SUZANNE FOUMAI,
2   the witness hereinbefore named, being first duly cautioned
3   and sworn to testify the truth, the whole truth, and nothing
4   but the truth, testified under oath as follows:
5
6                  EXAMINATION
7   BY MR. MOSELEY:
8       Q.  Good afternoon.  How are you?  I'm Roger Moseley.
9   I'm Phil English's attorney in this case.
10          Can you state your full name and address for the
11  record?
12      A.  Suzanne Mary Foumai, 1631 Liholiho Street,
13  Apartment 203, Honolulu, Hawaii 96822.
14      Q.  I used to live on Liholiho Street.  Down in
15  Makiki, right?
16      A.  (Nodding head.)
17      Q.  It's so convenient living down there, I'm telling
18  you.  It's just great.
19          Do you mind if I call you Sue?
20      A.  I don't mind.  Everybody calls me that.
21      Q.  Oh, good, because I didn't want to insult you or
22  anything if you didn't like to be called by Sue.  You can
23  call me Roger.  People have called me much worse.  Whatever
24  you like.
25          Anyway, Sue, have you ever had your deposition

Page 5

1   taken before?
2       A.  No.
3       Q.  Okay, well, let me sort of explain the process,
4   why, give you some hints and ground rules so it will make it
5   a little bit more comfortable and useful for all of us.
6           This part of a lawsuit is called discovery, and it
7   really is mostly what it says it is.  In this deposition
8   process here, I'll be asking you questions and the court
9   reporter will record my question, and then you'll give me an
10  answer and the court reporter will record the answer.  When
11  the thing is all pau and probably it's like ten days or more
12  or less, it will all be typed up in a little booklet and
13  you'll get a chance to see it and go over and make
14  corrections to make sure that the court reporter has written
15  everything down properly.  Every once in a while there will
16  be maybe a question that once you see it in writing, you
17  realize you didn't understand it, so you might want to make a
18  correction there, too, but you'll get a chance to do that
19  before everything is all finalized.
20          So there are three major purposes for a
21  deposition.  One is, as I said, discovery, to find out what
22  you know, and that's usually a primary purpose for these
23  things.
24          Another purpose is when this case goes to trial,
25  if for some reason you're unavailable as a witness, this

2 (Pages 2 to 5)

Page 6

1  could be used in place of your testimony at trial.
2  Generally, the court will have somebody read the deposition
3  questions and answers and then the jury will actually hear it
4  orally.
5        And the third reason is that if the case goes to
6  trial or when the case goes to trial, if you testify
7  differently than you testify today, somebody will almost
8  certainly point that out. If I say, well, isn't it true that
9  X, and you say yes, it's true that X today, and then at trial
10  I say isn't it true that X, and you say no, no, no, Y, then
11  I'll point that out. And that's called impeachment. So
12  you'll have to explain why you're testifying differently at
13  trial than you are today.
14        Do you understand that?
15        A.  Yes.
16        Q.  And actually this brings us to another piece of
17  information. The court reporter has a hard time copying down
18  properly things like uh-huh and huh-uh, and so if you would
19  avoid doing things like that that are sort of confusing when
20  they get into print, that will be great. So if the
21  question -- if you can answer the question yes or no, if you
22  would say yes or no or okay or something along that line, it
23  would be much better than uh-huh or huh-uh.
24        The other thing is in normal conversation
25  oftentimes when people are talking, if they ask a question

Page 7

1  and the other person knows the end of the question before the
2  question is pau, and they already start answering because
3  they know what the question is. That -- I mean you and I
4  will understand that perfectly well, but for the court
5  reporter, she's going to be taking down two people talking at
6  once, and it makes it very, very difficult.
7        So if you would wait until I'm finished talking
8  before you start answering, that would help the court
9  reporter out, and I'll try to do the same. I'm just as
10  guilty as anybody else of doing that. I get into the flow
11  and then I'm talking over everybody else.
12        So then the other thing that will happen is that
13  if you wait a half a beat until I'm finished -- I mean, after
14  I'm finished asking my question, and then the other attorneys
15  have actually the ability to insert objections and that will
16  give them an opportunity to object before you answer.
17        There may be things that I ask you that you're not
18  quite certain of. I generally want you to avoid just pure
19  speculation, but if, for example, I say, well, you know, what
20  time was it, and you think, well, I think it was 11:00
21  o'clock, but it might have been 10:00, it might have been
22  9:00, it might have been 12:30, tell me what you think the
23  answer is and explain to me that you're not quite certain of
24  that. So I would like your best response in those cases
25  where you actually think there's a response appropriate

Page 8

1  rather than just guessing. But I don't want you to just say,
2  for example, well, it's 11:00 o'clock and then don't qualify
3  that when you think it might be 9:30. I want to make sure
4  you qualify your responses if you think there's a question.
5        Do you understand that?
6        A.  Yes.
7        Q.  Is Mr. Lorusso your attorney today?
8        A.  Yes.
9        Q.  Have you retained Mr. Lorusso as your attorney?
10        A.  The day I was served.
11        Q.  And you have an attorney-client relationship with
12  Mr. Lorusso?
13        A.  Yes.
14        Q.  And that was formed on the day you were served
15  with the subpoena?
16        A.  Yes.
17        Q.  Have you met with Mr. Lorusso before your
18  deposition today?
19        A.  Yes, today.
20        Q.  You met today?
21        A.  Uh-huh.
22        Q.  Is that the only time you've met with him?
23        A.  Today was the only day.
24        Q.  The only time you've met with him?
25        A.  Yeah.

Page 9

1        Q.  And how long did you meet with him today?
2        A.  About half an hour.
3        Q.  About a half an hour. Immediately before the
4  deposition today?
5        A.  Yes.
6        Q.  And did you discuss your testimony with
7  Mr. Lorusso?
8             MR. LORUSSO:  Let me object to the extent
9  that it calls for attorney-client privilege. Any
10  communications or things that we talked about, I'll instruct
11  you not to answer.
12  BY MR. MOSELEY:
13        Q.  Okay, I'm asking you if you talked about your
14  testimony, not what you talked about, not the specifics of
15  the conversation.
16             MR. LORUSSO:  Same objection. You can answer
17  if you understand the question.
18  BY MR. MOSELEY:
19        Q.  You know, in the relationship as your attorney, if
20  he thinks you're going to say something that's violative of
21  the attorney-client privilege, he is within his rights --
22  actually, it's probably his obligation to instruct you not to
23  answer, and then it's your choice to answer or not, but
24  Mr. Lorusso will say, "I instruct you not to answer."
25        So even though the attorneys are making

3 (Pages 6 to 9)

Page 10

1  objections, unless Mr. Lorusso says, "I'm instructing you not
2  to answer," then you should answer the question.  And a point
3  of fact, even if Mr. Lorusso says, "I instruct you not to
4  answer," if you choose to waive the privilege, which I'm sure
5  Mr. Lorusso has explained to you, you can still do that,
6  although I'm sure he would advise you not to do that.
7       Do you understand that?
8       A.  Yes.
9       Q.  The question was:  Did you discuss your testimony
10  today with Mr. Lorusso?
11       MR. LORUSSO:  Same objections.  And also to
12  the extent it's vague and ambiguous.  You can answer.
13       THE WITNESS:  What was -- can you repeat
14  that?
15  BY MR. MOSELEY:
16       Q.  Did you discuss your testimony today with
17  Mr. Lorusso?
18       A.  Yes.
19       Q.  And did you spend the whole half an hour
20  discussing your testimony?
21       MR. LORUSSO:  I'm going to object.  Vague and
22  ambiguous, and to the extent it calls for attorney-client
23  privilege.  Go ahead.  You can answer if you understand.  If
24  you understand the question.
25       THE WITNESS:  We talked about --

Page 11

1       MR. Lorusso:  Don't say what we did discuss
2  specifically.
3       THE WITNESS:  Okay.
4  BY MR. MOSELEY:
5       Q.  Let me tell you one other thing, too.  At any time
6  during the course of this deposition you're entitled to take
7  a break if you want to use the restroom or get up and stretch
8  your feet or get a drink of water.  That also includes if you
9  want to consult with your attorney.  If you have -- if you
10  have a response that you're not sure whether you should be
11  giving in the sense of the privilege, you are certainly
12  within your rights to consult with Mr. Lorusso and get his
13  advice and counsel as to whether that's an appropriate
14  answer.
15       MR. LORUSSO:  In other words, don't talk
16  about the specific content.  In other words, I said X, you
17  said Y, or anything.  That's what I mean by asserting the
18  attorney-client privilege.
19       THE WITNESS:  Okay.
20       MR. MOSELEY:  Can you read back my last
21  question?
22       (Record read.)
23       MR. LORUSSO:  Same objections.  Vague and
24  ambiguous.
25       THE WITNESS:  Yes.

Page 12

1  BY MR. MOSELEY:
2       Q.  Were you served with a subpoena for your
3  deposition here today?
4       A.  Yes.
5       Q.  I don't see any documents.  Did you bring any
6  documents?
7       A.  Yes, I did.
8       Q.  Oh, may I see the documents you brought?
9       MR. MOSELEY:  Let's go off the record for a
10  minute.
11       (Off the record.)
12       (Exhibit No. 102 marked.)
13  BY MR. MOSELEY:
14       Q.  I'm going to show you what's been marked Exhibit
15  102.  Are these the documents that you found which you
16  thought were responsive to my subpoena?
17       A.  Yes.
18       Q.  Did you look for documents in every category of my
19  subpoena?  There were a lot of categories.  There were 32
20  categories.
21       MR. LORUSSO:  By "categories" he means each
22  of the questions.
23       THE WITNESS:  I cannot retain -- get those
24  copies because I'm no longer with real property.
25  BY MR. MOSELEY:

Page 13

1       Q.  Where are you now?
2       A.  I'm at transportation services.
3       Q.  Oh, I see.  So you obtained all the copies that
4  were in your personal possession?
5       A.  Yes.
6       Q.  And the copies that you have given us in Exhibit
7  102 are the only ones you had in your personal possession
8  that were responsive to any category in the subpoena; is that
9  right?
10       A.  Yes.
11       Q.  When did you move to -- the Department of
12  Transportation Services, right?
13       A.  Yes.
14       Q.  Okay, when did you move to the Department of
15  Transportation Services?
16       A.  April 1st was my last day at real property, so --
17       Q.  Of this year, '06?
18       A.  No, '05.  So the first Monday, April 4th, was my
19  first day at DTS.
20       Q.  And what do you do at DTS?
21       A.  I'm the secretary for the traffic engineering
22  division.
23       Q.  Is that a promotion or a higher job category than
24  what you had at the assessment division?
25       A.  Yes.

4 (Pages 10 to 13)

Page 14

1    Q.   How did you come to transfer to DTS?  Is that
2  something you sought out?
3    A.   No.  I put my application in several years for
4  Secretary 3 within the City, and they selected my name from
5  the list just about the time in January or February of '05,
6  and I was called in for an interview.
7    Q.   Were you a Secretary 2 at the assessment division?
8    A.   Yes.
9    Q.   What's the difference between a Secretary 2 and a
10  Secretary 3?
11    A.   Secretary 2 is an SR 14 pay and a Secretary 3 is
12  SR 16.
13    Q.   Are the job qualifications significantly
14  different?
15    A.   Yes, a little bit more higher level with
16  department directing -- with the director and with the branch
17  chiefs.  My duties were more on a managerial level.
18    Q.   As an SR 16?
19    A.   Yes.
20    Q.   I hope they gave you a significant raise as well?
21    A.   They did.
22    Q.   Good.
23         How long have you worked for the City and County
24  of Honolulu?
25    A.   Close to 13 years now.

Page 15

1    Q.   13 years.  All right, were there no Secretary 3
2  positions open in the assessment division?
3    A.   Yes.
4    Q.   Okay, so you were just looking throughout the City
5  for whatever Secretary 3 position would come up?
6    A.   Yes.
7    Q.   Are there any Secretary 3 positions in the
8  assessment division?  Not open ones, but are there any
9  positions even if they're filled?
10    A.   There's one.
11    Q.   One, and who is that?
12    A.   Donnie Wong.
13    Q.   That's Gary's secretary?
14    A.   Yes.
15         MR. LORUSSO:  Let him finish his question,
16  even though you can anticipate what he's going to ask.
17  That's okay.
18  BY MR. MOSELEY:
19    Q.   I'll do that, too.  We'll catch you if we think
20  about it, but oftentimes I have to confess, we let it slide,
21  too, and the court reporter just does the best she can, and
22  she's very good, by the way, but -- okay.
23         Any other reason for wanting to transfer out of
24  the assessment division?
25    A.   No.

Page 16

1    Q.   You were happy there?
2    A.   Yes.
3    Q.   You had no concerns about your job there at all?
4    A.   No.
5    Q.   Are you familiar with Phil English?
6    A.   Yes.
7    Q.   That's the gentleman sitting here to my left?
8    A.   (Nodding head.)
9    Q.   You were working in the assessment division when
10  Phil worked there, weren't you?
11    A.   Yes.
12    Q.   Were you there when he started?
13    A.   Yes.
14    Q.   And you were there when he no longer came to work?
15    A.   Yes.
16    Q.   Did you, as the -- you were a Secretary 2, but who
17  was your boss there at the assessment division?
18    A.   Robert Magota.
19    Q.   As Robert Magota's secretary, did you have any
20  specific duties with respect to personnel?
21    A.   Yes.
22    Q.   And what were those duties?
23    A.   Do payroll, keep attendance of all the leaves, of
24  sick and vacation, of all the employees -- appraisal
25  employees.

Page 17

1    Q.   But not clerical?
2    A.   Clerical, budget, and clerical work.
3    Q.   Okay, what I meant was clerical, you didn't keep
4  attendance and keep track of sick leave and vacation for the
5  clerical employees?
6    A.   Yes, I did.
7    Q.   How about PTO?
8    A.   No, PTO took care of their own.
9    Q.   So you took care of the appraisers and the
10  clerical.  That would include appraisal assistants?
11    A.   Yes.
12    Q.   Okay, so were you responsible for telling people
13  whether or not they had sick leave or vacation time or other
14  types of time and leave available to them?
15    A.   Yes.
16    Q.   Wasn't -- was there also a printout of that stuff
17  that came in the -- was there something that attached to the
18  paycheck that showed that kind of stuff as well?
19    A.   The paycheck itself showed the balance at a
20  certain period of time, but it didn't show the actual
21  vacation or sick leave for the accrual, because the accrual
22  was maybe two months not put on, but that was the only time
23  you would see the balance, is on the pay stub.
24    Q.   But that was sort of behind the times by about two
25  months?

Page 18

1    A.   Uh-huh, yes.
2    Q.   But you were the person that would know in the
3   division what you had coming, if you wanted to know what it
4   was, right?
5    A.   Yes.
6    Q.   Okay.  All right, so you were there when Phil
7   started?
8    A.   Yes.
9    Q.   I notice in Exhibit 102, the first page of this,
10   actually, the first -- looks like the first three pages of
11   this, cover a specific subject, and that's an orientation
12   meeting; is that right?
13    A.   Yes.
14    Q.   And the orientation meeting was to start on
15   Wednesday, July 26th, 2000 at 8:00 a.m.; is that right?
16    A.   Yes.
17    Q.   Was this essentially your first contact with Phil
18   English, was with respect to this meeting?
19    A.   Can you clarify that?
20    Q.   Well, did you have any formal contact with Phil
21   English before this meeting?
22    A.   Can you clarify "meeting"?
23    Q.   Before the meeting that is referred to in Exhibit
24   102 on the first three pages.
25    A.   Well, this is my first incident.

Page 19

1    Q.   Okay, did you meet him earlier than this, though,
2   did he come in, for example, and sign up paperwork with you
3   or something?
4    A.   No.
5    Q.   So you hadn't actually dealt with him before this
6   incident?
7    A.   Oh.
8    Q.   Is that right?
9    A.   No, I dealt with him when he first came to real
10   property.
11    Q.   And what did that dealing consist of?
12    A.   Paperwork, signing his -- keeping track of -- not
13   keeping track, an address of the employees, address,
14   telephone number, emergency information, paper that -- filing
15   for his beneficiary forms, mainly personnel.
16    Q.   So you were responsible for doing all those sort
17   of initial personnel things?
18    A.   Yes.
19    Q.   Contact information, benefit forms, Social
20   Security information, health insurance, what have you; is
21   that right?
22    A.   Yes.
23    Q.   So that was your first contact with Phil, right?
24    A.   Yes.
25    Q.   And was the incident described in the first three

Page 20

1   pages of Exhibit 102, was that your next contact with Phil?
2    A.   No.
3    Q.   You had a contact in between?
4    A.   We would talk about -- just say hi, good morning.
5    Q.   I guess I should have limited it to in terms of
6   actually doing business rather than social pleasantries.
7    A.   This is the first -- this is actually the first --
8   I would say important incident that I considered, I felt,
9   that was necessary to bring it up.
10    Q.   Okay.  Taking a look at the first page of Exhibit
11   102, on the second paragraph there it says beginning with
12   "Violet Lee," do you see that paragraph?
13    A.   Yes.
14    Q.   First of all, is this an email to somebody?
15    A.   Yes, this email is to Philip and to Wilfred.
16    Q.   On this first page?
17    A.   Yes, it's to Philip.
18    Q.   How can you tell it's to Philip?
19    A.   It has his name on there.
20    Q.   As required attendees?
21    A.   Yes.
22    Q.   This is not just a note to the file to explain
23   what happened?
24    A.   Yes, it's a file to explain what happened, why he
25   was not there at the orientation when he was supposed to be

Page 21

1   there.
2    Q.   Basically it says that you received a call from
3   Violet Lee, and you went to Phil's desk and saw him there at
4   around 9:30, and then he opened his task on the Outlook and
5   pulled up an email that you sent him and he pointed his
6   finger at start time and showed you a different time, later
7   than what I originally sent him.  Do you see that?
8    A.   Yes.
9    Q.   What time did he show you?
10    A.   11:00 o'clock, 11:30.  11:00 or 11:30.  I remember
11   it was something.
12    Q.   What happened is you went over there to find out
13   why he wasn't at the meeting?
14    A.   Yes, because Violet Lee wanted me to find out
15   where he was and to go to the director's office because they
16   were all waiting for him.
17    Q.   And so he -- what, did he say you -- I thought it
18   was later?
19    A.   He told me that I sent him an email task that
20   showed 11:00 o'clock instead of 8:00 o'clock.
21    Q.   Did he pull it up for you and show it to you?
22    A.   It was already open.  His monitor was there and I
23   saw it.
24    Q.   And it said 11:00 o'clock on it?
25    A.   Yeah.

6 (Pages 18 to 21)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 22

1    Q.   Other than that time, did it look like something
2  you had sent him?
3    A.   No.  I sent him the original email that I have
4  here that says 8:00 o'clock.
5    Q.   Okay, other than the difference in time, is what
6  he had on his screen the same as your original email?
7    A.   Can you rephrase that?
8    Q.   What was it he had on his screen that said 11:00
9  o'clock?
10   A.   The time that he had to be there.
11   Q.   Okay, but what -- what was the document that he
12 was showing you?
13   A.   The task document that I sent him, this email.
14   Q.   The --
15   A.   This one right here.
16   Q.   Page 2 of this exhibit?
17   A.   Page 3.
18   Q.   Page 3.  So he showed you something that looked
19 like page 3 but instead of 8:00 a.m. it said 11:00 a.m.?
20   A.   Yes.
21   Q.   But other than that, it looked exactly like page 3
22 did?
23   A.   Yes.
24       MR. WONG:  When you're referring to page 3,
25 you're referring to --

Page 23

1       MR. MOSELEY:  Page 3 of Exhibit 102, the
2  third page of Exhibit 102.  Actually, maybe we should
3  identify it further.  It says, "Subject:  New employment
4  departmental orientation," and then two lines below it says,
5  "Start, Wednesday, 7/26/2000 at 8:00 a.m."
6       MR. LORUSSO:  I'm sorry, counsel, that's very
7  similar to the way the front starts.
8       MR. MOSELEY:  Okay, how do we differentiate?
9       MR. LORUSSO:  May I suggest going 102 A, B,
10 C?
11      MR. MOSELEY:  Okay, we'll mark them A for the
12 first page, B for the second page, C for the third page, D
13 for the fourth page, E for the fifth page, F for the sixth
14 page, G for the seventh page, H for the eighth page, I for
15 the ninth page, and J for the tenth page.
16 BY MR. MOSELEY:
17   Q.   So what I'm talking about and what you're talking
18 about is 102 C; is that correct?
19   A.   Correct.
20   Q.   Did -- when Phil showed you that page, did you
21 make any comments or ask him any questions about it?
22   A.   Yes.
23   Q.   What did you say or ask?
24   A.   I told him that I sent him the email that showed
25 8:00 o'clock a.m., that he had to be at the department of --

Page 24

1  BFS director's office at 8:00 o'clock, but he said that he
2  was -- he showed me 11:00 o'clock and I thought that was odd.
3    Q.   Are these emails in a format that you can change
4  them --
5    A.   Yes.
6    Q.   -- after you receive them?
7    A.   Yes.
8    Q.   Okay.  And what was the end time that was shown on
9  his email?
10   A.   I don't know.
11   Q.   You say in -- on page A of 102 that you went back
12 to your desk and showed him your printed email you sent him
13 and pointed out that he must have changed the time on his
14 task reminder.  Do you see that?
15   A.   Yes.
16   Q.   And so you believe that he had changed the time on
17 his task reminder?
18   A.   Yes.
19   Q.   Okay, you further say:  "He then said if I could
20 call Violet and let her know it wasn't his fault for being
21 late and stated to me, 'I'm not a flake.'"
22       Is that what he said to you, "I'm not a flake"?
23   A.   Yes.
24   Q.   And he asked you to call Violet and tell her it
25 wasn't his fault?

Page 25

1    A.   Yes.
2    Q.   And you didn't call Violet?
3    A.   I called Violet and I told her that Phil was
4  leaving the office to go to the meeting.
5    Q.   But you didn't say anything further to Violet?
6    A.   No.
7    Q.   What is page B of Exhibit 102?
8    A.   That was the email I sent to Wilfred Martin.  He
9  responded to my email.
10   Q.   That was on July 19th, 2000?
11   A.   Yes.
12   Q.   What is the sentence on the bottom?  "Therefore,
13 just to confirm that the orientation was set for 8:00 a.m.,
14 Wilfred Martin sent me an acknowledgment that he will go
15 directly to city hall to attend the orientation as
16 scheduled."
17       What does that mean?
18   A.   This is the acknowledgment right here that he
19 responded to my email.
20   Q.   Wilfred Martin did?
21   A.   Yes.
22   Q.   Which email did he respond to?
23   A.   This one right here, B.
24       MR. LORUSSO:  You're pointing to -- is the
25 middle of the page where it says under original appointment;

Page 30

1    A.  No.
2    Q.  Did this ever come up at some later date?
3    A.  No.
4    Q.  So after this exchange, this was the last bit of
5  controversy about this particular incident?
6    A.  Correct.
7    Q.  Taking a look at page D, as in dog, of Exhibit
8  102, can you tell me what we're looking at here?
9    A.  It's the first day that, Friday, 2/28/03, I came
10 to work, all the appraisers were at training, at an IAAO
11 training, and there was a note on my chair and it said call
12 him ASAP.  So I called Phil.  He asked me -- he wanted to
13 fill out a form for someone who was sick, and I had to ask
14 him if it's a workman's compensation form that he's referring
15 to and he said yes.
16   Q.  And then what happened?  He gave you a doctor's
17 note?
18   A.  Yes, he gave me a note to look at, and I -- it
19 said D-E-F, and I didn't understand what that meant, and he
20 said it means deferred, meaning it's confidential.  And so I
21 explained to him the process of filing a workman's comp.  It
22 needs to have the signature of the supervisor as to how
23 the -- when the sickness started, and it needed to go to the
24 personnel department, too, for processing, because if there's
25 no supervisor's note or signature, the workman's comp form

Page 31

1  will be sent back to our department to fill it out, and it
2  will just only delay the process.
3        So I explained that to him, that you needed to
4  have all that information done with the note and it goes to
5  personnel to process for workman's comp.
6    Q.  So what happened then?
7    A.  Then he came back and he said he wanted to -- I
8  think he went down there.  He came back and he said he called
9  up the workman's comp, and I'm not sure if he even called
10 that man, Adam Kupau.  He may not have been at the office.
11 But he said he's going to go down there and speak with
12 somebody, because someone at the workman's comp told him that
13 it's okay, as long as he had a supervisor's -- from, I guess,
14 just to sign, a statement, just a statement.  But I asked him
15 if he was going to leave the office, he needed to, you know,
16 contact his supervisor and let him know that he was leaving
17 the office because he was supposed to have gone to a
18 mandatory training.
19   Q.  And then what happened?
20   A.  So then I went back downstairs to collect the
21 sign-in sheets, and I was surprised to see Phil sitting down
22 at Julie's desk talking to Carole, and I asked if -- when he
23 was leaving.  He said he was waiting.  So I just walked away.
24       I went downstairs to the basement to collect the
25 other sign-in sheets and I saw Gary.  He asked why Phil was

Page 32

1  not at the meeting, and I told Gary that -- exactly what
2  happened here.
3    Q.  Did Gary ask you why Phil was not at the meeting,
4  or did he ask you why Phil was still in the office?
5    A.  He was -- he was still -- why he was still in the
6  office and wasn't at the training.
7    Q.  So did Gary indicate that he had seen Phil in the
8  office?
9    A.  I don't know.
10   Q.  When did you make this note?
11   A.  That same day.
12   Q.  At around 8:05 a.m.?
13   A.  Correct.
14   Q.  Did somebody ask you to make this note?
15   A.  I did it myself.
16   Q.  And then the second note on here, Monday, 3/3/03,
17 did you also do that yourself?
18   A.  Yes.
19   Q.  And did anybody ask you to make that note?
20   A.  Can you repeat that again?
21   Q.  Did somebody ask you to make that note?
22   A.  No, I did it myself.
23   Q.  Are these notes you put in Phil's file?
24   A.  Yes.
25   Q.  What -- can you explain the first paragraph under

Page 33

1  Monday, 3/3/03?
2        MR. LORUSSO:  This one.
3  BY MR. MOSELEY:
4    Q.  It says you collected time sheets Monday.
5        MR. LORUSSO:  Sign-in sheets.
6  BY MR. MOSELEY:
7    Q.  I'm sorry, sign-in sheets on Monday?
8    A.  Correct.
9    Q.  These were the sign-in sheets for Friday?
10   A.  Yes.  He didn't sign out.
11   Q.  He did not sign in or he did not --
12   A.  He did not sign in.  So I had to find out how I
13 was going to complete the pay time and attendance for Phil
14 for the entire division because it will be held back, and we
15 had a deadline.  Wednesday is the deadline.
16   Q.  And how did you check on that?
17   A.  I had to call -- I spoke with Annie.
18   Q.  That's Ann Gima?
19   A.  Yes.  She advised me to call Violet.  Violet
20 advised me to talk to Mike Golojuch.
21   Q.  Since he was taking care of this case; is that
22 right?
23   A.  Yes.
24   Q.  Did you know what she was talking about when she
25 said Mike Golojuch is taking care of this case?

9 (Pages 30 to 33)

Page 50

1    A. Joyce --
2    Q. -- the effect of that to Phil?
3    A. It gives him -- I can't -- I don't know. I'm not
4    the payroll clerk.
5    Q. I think there was something else you were going to
6    say. I think I interrupted part of your answer. Did I?
7    A. No.
8    Q. And page H, what does this mean?
9    A. I was asking Joyce to fax me Phil's leave record
10   because when a person goes on low leave, the payroll at city
11   hall keeps a card separate from other people, it's a low
12   leave card, and I wanted to -- just to verify that Joyce is
13   doing is correct on my side. That's all.
14   Q. And she emailed you that card?
15   A. Yes.
16   Q. There was also a late entry for sick leave on
17   February 4th of 2003?
18   A. Yes.
19   Q. What is a C-H-R-M-S?
20   A. CHRMS. CHRMS is the City's -- City's -- it's a
21   system, it's a -- that's how -- it's a newer version of this
22   payroll system that they had, but it's no longer in use
23   anymore. It was an increment -- an acronym, I mean, for that
24   program.
25   Q. Okay. And exhibit -- I mean page J of Exhibit 102

Page 51

1    is a further explanation of the sick leave of February 4th,
2    2003?
3    A. Yes.
4    Q. And you looked through your files and you found no
5    other documents responsive to our subpoena request?
6       MR. LORUSSO: Objection. Asked and answered.
7       THE WITNESS: Yes.
8    BY MR. MOSELEY:
9    Q. And where did you find these documents that are in
10   Exhibit 102?
11   A. These were from my computer. It was in the file,
12   Phil's file.
13   Q. Okay. I thought you said that when you looked for
14   these documents, you didn't have access to that?
15   A. I didn't say that.
16   Q. What did you say?
17   A. I said I got this from the email. I printed it
18   out.
19   Q. So you still have access to your old email files?
20   A. No. It was deleted when I went over to
21   transportation, everything was wiped out.
22   Q. When did you print out the documents that are in
23   Exhibit 102?
24   A. As each day came by, I printed it out.
25   Q. And where did you keep the hard copies?

Page 52

1    A. In the file, Phil's personnel file.
2    Q. Did you just recently look in Phil's personnel
3    file for these documents?
4    A. No, I had -- I had these.
5    Q. Where?
6    A. At home.
7    Q. You took Phil's personnel information home?
8       MR. LORUSSO: Objection. Misstates the
9    testimony.
10      THE WITNESS: Just -- just these.
11   BY MR. MOSELEY:
12   Q. You had these files that are in Exhibit 102, you
13   had these at your house?
14   A. No, they were at the office.
15   Q. When you just looked for them, did you just look
16   for them in response to our subpoena?
17   A. I had them with me, these, just this.
18   Q. Okay. Where did you have them?
19   A. In my file.
20   Q. What file?
21   A. My home file.
22   Q. Your home file?
23   A. Uh-huh.
24   Q. So you had these documents that are in Exhibit
25   102 --

Page 53

1    A. Yeah.
2    Q. -- you had them in your file at home?
3    A. And it's also in Phil's personnel file.
4    Q. These particular documents here, though, you had
5    these documents in a file at your house; is that right?
6    A. Correct.
7    Q. Why did you have Phil's personnel information in a
8    file at your house?
9       MR. LORUSSO: Just for the record, I'll
10   object to the characterization, as opposed to Exhibit 102.
11      THE WITNESS: Well, because I felt that this
12   was pertinent to protect myself, because I was a payroll
13   clerk and I was a secretary.
14   BY MR. MOSELEY:
15   Q. So you took these pieces of information home to
16   protect yourself?
17      MR. LORUSSO: Objection. Asked and answered.
18   BY MR. MOSELEY:
19   Q. Is that right?
20   A. For my information in case -- in case --
21   Q. I want to be really clear about this. The pieces
22   of paper from A through J --
23   A. Because --
24      MR. LORUSSO: Let him ask his question.
25   BY MR. MOSELEY:

14 (Pages 50 to 53)

Page 54

1    Q.  The pieces of paper from A through J on Exhibit
2    102 are pieces of paper you brought in today pursuant to
3    subpoena, correct?
4    A.  Correct.
5    Q.  And you got these pieces of paper from a file that
6    you kept at your house; is that right?
7    A.  Yes.
8    Q.  Is there anything else in that file that you kept
9    at your house?
10   A.  No.
11   Q.  Did you believe that you had the right to take
12   this information home with you and keep it in a file in your
13   house?
14       MR. LORUSSO:  Objection to the extent it asks
15   for a legal conclusion.
16   BY MR. MOSELEY:
17   Q.  I'm asking for your belief.
18       MR. LORUSSO:  And argumentative.
19   BY MR. MOSELEY:
20   Q.  I'm asking for your belief.  Did you believe that
21   you had the right to take this information home and put it in
22   a file in your house?
23       MR. LORUSSO:  Same objection.
24       THE WITNESS:  I didn't feel that there was
25   anything wrong with keeping this, because this is my notes.

Page 55

1    BY MR. MOSELEY:
2    Q.  Isn't this personal information concerning Phil
3    English?
4        MR. LORUSSO:  Objection.
5        MR. WONG:  Argumentative.
6        MR. LORUSSO:  Same, join in the objection.
7    Vague and ambiguous.  The documents speak for themselves.
8    BY MR. MOSELEY:
9    Q.  Do you want the question read back to you again?
10   A.  Yes.
11       MR. MOSELEY:  Would you please read the
12   question back?
13       MR. WONG:  Also vague and ambiguous as to the
14   definition of "personal."
15       (Record read.)
16       MR. LORUSSO:  Same objections and join.
17       THE WITNESS:  Because he was a City employee,
18   and I had all this information here, I took this home as --
19   just for my -- just to keep it, just in case if this ever
20   came to this day.
21   BY MR. MOSELEY:
22   Q.  I asked you if this is personal information?
23       MR. LORUSSO:  Objection.  Vague and
24   ambiguous, argumentative, documents speak for themselves.
25       THE WITNESS:  This is all --

Page 56

1    BY MR. MOSELEY:
2    Q.  I'm asking for your opinion.  Do you think this is
3    personal information --
4    A.  No.
5    Q.  -- with respect to Phil English?
6    A.  No.
7    Q.  You don't think this is personal information?
8        MR. LORUSSO:  Objection.  Asked and answered.
9    She just answered the question.
10       MR. MOSELEY:  That's true.  I was being
11   argumentative.
12   BY MR. MOSELEY:
13   Q.  Do you have any similar kind of information about
14   any other employee of the assessment division at your house?
15   A.  No.
16   Q.  Why would you just take Phil's information?
17       MR. LORUSSO:  Objection.  Asked and answered.
18   Or to the extent it's been asked and answered.
19   BY MR. MOSELEY:
20   Q.  Where did you keep this information at your house?
21   A.  In my file.
22   Q.  Where's your file?  In some kind of a filing
23   cabinet?
24   A.  Yes.
25   Q.  And who has access to that filing cabinet?

Page 57

1    A.  Just me.
2    Q.  Just you.  Is it locked?
3    A.  Yes.
4    Q.  And there is nothing else in there of any import
5    with respect to any other personnel issues of any other
6    employee of the assessment division?
7        MR. LORUSSO:  Objection.  Asked and answered.
8    You've answered it.  You can tell him again.
9        THE WITNESS:  I can tell you that all this
10   information --
11       MR. LORUSSO:  No, no, it's just -- his
12   question is, is there -- as you've answered --
13       MR. MOSELEY:  Can you let her answer the way
14   she's going to answer?
15       MR. LORUSSO:  But she wasn't answering your
16   question.
17       MR. MOSELEY:  She was answering.  She started
18   to say "all I can tell you is."
19       THE WITNESS:  Can you say it -- can you give
20   me the question again?
21   BY MR. MOSELEY:
22   Q.  Why don't you just give me the answer you were --
23   A.  No, give me the question again.
24       MR. MOSELEY:  Can you read the question back,
25   please?

15 (Pages 54 to 57)

1          (Record read.)
2          THE WITNESS:  No.
3          MR. LORUSSO:  Let's take a short break,
4    please.
5          (Recess taken.)
6    BY MR. MOSELEY:
7     Q.   Okay, Sue, I'm going to show you what we marked
8    previously as exhibit -- you have it already?  Oh, good --
9    previously as Exhibit 72 in depositions in this case.  It's a
10   two-page document.  It's entitled "Workplace Violence
11   Checklist, February 10th, 2003."
12         Have you seen this document before?
13    A.   Yes.
14    Q.   Can you tell me what it is?
15    A.   It's just questions; my comments.
16    Q.   Did you -- did somebody interview you on or about
17   February 10th, 2003?
18    A.   Yes.
19    Q.   And who interviewed you?
20    A.   Michael Golojuch.
21    Q.   And where did he interview you?
22    A.   On the third floor of 842 Bethel Street.
23    Q.   At the assessment division?
24    A.   Yes.
25    Q.   Did he interview you on February 10th, 2003, or

1    was it later?
2     A.   February 10th.
3     Q.   Do you remember specifically that it was February
4    10th?
5     A.   It was February 10th.
6     Q.   How do you remember it being February 10th?
7     A.   I don't know.  It says February 10th on the paper.
8     Q.   Other than it saying February 10th on the paper,
9    do you have an independent recollection of it being February
10   10th?
11    A.   No.
12    Q.   Could it have been in March?
13         MR. LORUSSO:  Objection.  Calls for
14   speculation.
15         THE WITNESS:  I don't know.  It states on the
16   paper.
17   BY MR. MOSELEY:
18    Q.   Does this reflect a series of questions that were
19   asked to you and your answers to those questions?
20    A.   Yes.
21    Q.   Okay.  And question numbered 7 on the first page,
22   you said:  "Within the first two weeks Phil had some
23   mandatory training with Roy, director.  Suzanne had sent an
24   email to Phil and Willy giving them the date and time of
25   training."

1          Do you see that?
2     A.   Yes.
3     Q.   Is that what's referenced in Exhibit 102 A, B, and
4    C?
5     A.   Yes.
6     Q.   Okay.  So what you're saying is that within two
7    weeks of June 1st, 2000, Phil missed a training session; is
8    that right?
9     A.   No, he went.  He was late.
10    Q.   So do you mean that by June 15th he went to the
11   training session late with Roy?
12    A.   Can you restate that?
13         MR. MOSELEY:  Can you read that question
14   back, please?
15         (Record read.)
16         THE WITNESS:  Where does it say June 15?
17   BY MR. MOSELEY:
18    Q.   Well, it says Phil English started on June 1st,
19   and within the first two weeks, which is -- two weeks is 14
20   days, is it not?
21    A.   Uh-huh.
22    Q.   If you add 14 days to June 1st, then you get June
23   15th, do you not?
24    A.   That's correct.
25    Q.   So what you're saying here is that sometime

1    between June 1st and June 15th Phil had a mandatory training
2    with Roy; is that right?
3     A.   Correct.
4     Q.   And that you had sent an email to Phil and Willy
5    giving them the date and time of training, correct?
6     A.   Correct.
7     Q.   And Sue was called and asked where is Phil,
8    correct?
9     A.   Correct.
10    Q.   And Phil was at his desk at approximately 9:30
11   a.m., right?
12    A.   Correct.
13    Q.   And the training start time was 8:30 a.m., right?
14    A.   Correct.
15    Q.   Actually, all that is not correct, is it?
16         MR. LORUSSO:  Correct that you just read it?
17   BY MR. MOSELEY:
18    Q.   It's correct that I just read it, but it's not
19   correct that it happened that way, is it?
20         MR. LORUSSO:  Do you understand the question?
21         THE WITNESS:  No.
22   BY MR. MOSELEY:
23    Q.   Did Phil have a mandatory training session with
24   Roy within the first two weeks of his start?  Did he have a
25   training session with Roy, the director, within the first two

16 (Pages 58 to 61)

Page 86

1    Q.  So they just made appointments with him directly?
2    A.  Yes.
3    Q.  You didn't run his calendar at all?
4    A.  No.
5    Q.  So were you aware of Mike Golojuch coming and
6  speaking with Bob Magota at any time during this period, say,
7  from January 1st, 2003 to March 1st, 2003?
8    A.  No.
9    Q.  Did you see Mike Golojuch at any time during that
10  period with the exception of the interview you had?
11    A.  No.
12    Q.  Did you fill out a workplace violence report
13  against Phil?
14    A.  No.
15    Q.  Did anybody give you a workplace violence report
16  that they had filled out against Phil?
17    A.  I can't remember.
18    Q.  Were you the person designated to accept those
19  things?  I'm going to show you a form here.  This is Exhibit
20  76.  This is a form that is filled out by --
21           MR. WONG:  Excuse me, are we starting a new
22  area?
23           MR. MOSELEY:  Yeah, but I'm almost pau,
24  actually.
25           MR. WONG:  Okay.

Page 87

1  BY MR. MOSELEY:
2    Q.  This is a form that's filled out by Chris Graff,
3  but I don't care about that.  What I'm wanting to do is have
4  you take a look at the form.  Are you familiar with this
5  form?
6    A.  I can't remember.
7    Q.  Not this particular one, but just the form.
8    A.  I don't remember.
9    Q.  Were you the one designated to receive forms like
10  this?
11    A.  No, because it was either -- either Mike Golojuch
12  would collect that.  I don't know.  I have no knowledge of
13  that.
14    Q.  You wouldn't collect that?
15    A.  No.
16    Q.  Did you ever receive a form like that from any of
17  the other employees in the assessment division?
18    A.  Maybe I did and I gave it to -- how did the
19  process go?  I would -- if they gave it to me, I would give
20  it to Mike Golojuch himself.
21    Q.  Do you remember ever collecting a form like this
22  from anybody in the assessment division at any time?
23    A.  I can't remember.  I can't remember.
24    Q.  Let me see if I can make sure the record is clear.
25  You can't remember whether you did or not, or you don't

Page 88

1  remember ever collecting such a form?
2    A.  I don't remember collecting such a form.
3    Q.  Did you collect such a form from Chris Graff?
4    A.  No.
5           MR. MOSELEY:  All right, let's take a quick
6  break, and I'm going to just sort of review my notes, talk
7  with Phil, and we may be pau, and I know that will be a good
8  piece of news.
9           THE WITNESS:  Great.
10           MR. MOSELEY:  Let's go off the record.
11           (Off the record.)
12           MR. MOSELEY:  I only have a couple more
13  questions.
14  BY MR. MOSELEY:
15    Q.  Are you paying for Mr. Lorusso's services as your
16  attorney?
17           MR. LORUSSO:  Objection.  Not relevant.
18  Instruct you not to answer.  It's not relevant.  The terms,
19  of my employment.
20           MR. MOSELEY:  Are you saying that's
21  privileged and instructing her not to answer?
22           MR. LORUSSO:  Yes.
23           MR. MOSELEY:  That's privileged?
24           MR. LORUSSO:  Yes, and I'll take the risk,
25  counsel, if I'm wrong.

Page 89

1           MR. MOSELEY:  Okay.  That's all.
2           Oh, do you have any questions?
3           MR. WONG:  No.
4           MR. MOSELEY:  Okay, pau.  Thank you very
5  much.
6           THE WITNESS:  Thank you.
7           (The deposition concluded at 4:18 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

23 (Pages 86 to 89)

```
1   STATE OF HAWAII                    )

2                                      )  ss:

3   CITY & COUNTY OF HONOLULU          )

4

5           I, JESSICA R. PERRY, do herby certify:

6           That on August 4, 2006, at 1:48 p.m. appeared

7   before me SUZANNE FOUMAI, the witness whose deposition is

8   contained herein; that prior to being examined he was by me

9   duly sworn;

10          That the deposition was taken down by me in

11  machine shorthand and was thereafter reduced to typewritten

12  form by computer-aided transcription; that the foregoing

13  represents, to the best of my ability, a full, true and

14  correct transcript of said deposition.

15          I further certify that I am not attorney for

16  any of the parties hereto, nor in any way concerned with the

17  cause.

18          DATED this 24th day of August, 2006, in

19  Honolulu, Hawaii.

20

21

22  _____
    Jessica R. Perry, CSR 404
23  Notary Public, State of Hawaii
    My commission expires:  5/11/09
24

25
```

**RALPH ROSENBERG COURT REPORTERS, INC.**
**(808) 524-2090**

Foumai, Suzanne

---

| | |
|---|---|
| Subject: | New Employee Departmental Orientation |
| Location: | BFS - Conference Room |
| | |
| Start: | Wed 7/26/2000 8:00 AM |
| End: | Wed 7/26/2000 10:30 AM |
| Show Time As: | Tentative |
| | |
| Recurrence: | (none) |
| | |
| Meeting Status: | Not yet responded |
| | |
| Required Attendees: | English, Philip E.; Martin, Wilfred |

**Orientation will cover more specific information on a departmental level: vacation/sick leave, payroll, open enrollment, and other departmental matters.**

Sent email task reminder to English, Philip on 7/19/00 for a mandatory orientation with the Director of Budget & Fiscal Services and to report to City Hall before 8:00 a.m.

Violet Lee called me on 7/26/00 that Mr. English was not at the orientation. I went over to Phil's desk and saw him there at around 9:30 a.m. I told him that he was suppose to have gone directly to City Hall for the mandatory orientation. He then opened his task on the Microsoft Outlook and pulled up the email I sent him. He pointed his finger at the "Start Time" and showed me a different time (later than what I originally sent him.) I went back to my desk and opened my task and printed out what I sent him. It showed 8:00 a.m. I went back to his desk and showed him my printed email I sent him and pointed out to him that he must have changed the time on his task reminder because I did not put in a time other than 8:00 a.m. He then said, if I could call Violet and let her know it wasn't his fault for being late and stated to me, "I'm not a flake."

I did not call Violet and explain this to her. However, I told Phil to go to City Hall as soon as possible, and he did go.

1

Exhibit
102
A
Foumai

Foumai, Suzanne

| | |
|---|---|
| From: | Martin, Wilfred |
| Sent: | Wednesday, July 19, 2000 4:02 PM |
| To: | Foumai, Suzanne |
| Subject: | RE: New Employee Departmental Orientation |

-----Original Appointment-----

| | |
|---|---|
| From: | Foumai, Suzanne |
| Sent: | Wednesday, July 19, 2000 1:30 PM |
| To: | English, Philip E.; Martin, Wilfred |
| Subject: | New Employee Departmental Orientation |
| When: | Wednesday, July 26, 2000 8:00 AM-10:30 AM (GMT-10:00) Hawaii. |
| Where: | BFS - Conference Room |

**Orientation will cover more specific information on a departmental level: vacation/sick leave, payroll, open enrollment, and other departmental matters.**

Just to confirm that the orientation was set for 8:00 a.m., Wilfred Martin sent me an acknowledgement that he will go directly to City Hall to attend the orientation as scheduled.

1

Foumai, Suzanne

| | |
|---|---|
| **Subject:** | New Employee Departmental Orientation |
| **Location:** | BFS - Conference Room |
| | |
| **Start:** | Wed 7/26/2000 8:00 AM |
| **End:** | Wed 7/26/2000 10:30 AM |
| **Show Time As:** | Tentative |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Not yet responded |
| | |
| **Required Attendees:** | English, Philip E.; Martin, Wilfred |

**Orientation will cover more specific information on a departmental level: vacation/sick leave, payroll, open enrollment, and other departmental matters.**

1

**Friday, 02/28/03.  8:05 a.m.**
I came to work and found a "While You Were Out" message on my chair from Phil English to call him 'ASAP!'.  I called him and Phil wanted me to come and see him right away.  He met me near the recycled bins and asked me about filing a form when someone is sick for a long time.  I asked him if he was referring to Workman's Compensation.  He said yes.  He handed me the doctor's note from Kaiser Permamente showing the date and doctor's name, but the note didn't state what the injury or diagnosis was for.  It simply stated "DEF"  I asked Phil what kind of sickness that was and he said it means deferred meaning 'confidential'.  I explained to Phil the process of how sick and vacation is used until the claim is approved and credited back later.  Also I pointed out how important it is to complete the form to avoid any delays.  He stated he did not want management or administration to see or sign it.  I explained that the process must be according to OSHA rules because the data compiled yearly for the Dept of Labor to review and report to the State and County.     I gave him the telephone number with Workman's Compensation Division and speak with Adam Kupau.  He wanted a form anyway, and we went over to the copier and I made several copies because I only had one original on file.  About 15 minutes later, he came back to my desk and said he spoke with someone else and that person told him all he needed was a supervisor's signature.  I said to have that in writing from Workman's Comp because that was going against the policy.  He stated that he will go and get a statement meaning he'll go over there.  I mentioned to him that he will have to get approval from his supervisor to leave since he was suppose to have attended a mandatory training for the appraisers.  At around 9:00 a.m. I went down to collect the sign in sheets for Group 3 and saw Phil sitting in Julie's desk talking to Carole.  I ask him how when he was leaving, and he said that he was waiting.   I went down stairs to collect the sign in sheets and Gary Kurokawa approached me asked me about why Phil was still in the office and wasn't at the training.  I told him why.


**Monday, 3/3/03**
I collected the sign in sheets Monday, noting Phil did not sign in on Friday 02/28/03 but he was in the office as reported above -  pending workman's comp claim.  Unauthorized leave notice due to mandatory training.  Phil was in the office but left for a meeting with the director for the Workman's Comp Division.

I went to speak with Annie, and she advised me to check with Violet Lee.  Violet advised me to talk with Mike Golojuch since he is taking care of this case.

**Monday, 3/3/03,  8:30 a.m.**
Called Mike Golojuch at 8:30 a.m. and left a message for him to call me back.


**Monday, 03/03/03, 10:30 a.m.**
Bob called me to his office.  Gary, Annie, and Bob were discussing about Phil's attendance.  Since there was no supervisor here on Friday to let Phil go off to see the Workman's Comp, Bob, Annie, and Gary agreed that Phil would say Sue allowed him to go see Tom Riddle, Director for Workman's Comp Division.  As per Bob's directive - deduct vacation starting 2/28/03 until it is depleted and if Phil still is not in the office, LWOP.

D

**Monday, 03/03/03 1:00 p.m.**
Mike called me back at 1:00 p.m. - I asked Mike what to do since Phil's leave is low and didn't know how long Phil would be out on leave awaiting the approval of the W/C. I explained to Mike Golojuch that Phil's vacation will soon be depleted, but Mike advised me to discuss with Bob and Gary to contact Phil by the end of the week or a couple of days of the projected vacation will run out.  Must be upfront with him and get him to answer the question if he was on sick leave 2/28/03.  If Phil brings up the topic of W/C being approved, explain that only the W/C division can make that determination.  (See email I sent to Bob outlining what Mike Golojuch advised).

**Monday, 03/03/03 3:13 p.m. – see email**
Bob called me to see him about Mike Golojuch's advice.  He approves the 10/25/02 4.00 vacation leave paper (held back to determine whether it was unauthorized leave for 4.00 hours.) Bob instructs me to deduct the 4.00 hours.  I explained the late entry process.  See late entry made on 3/04/03 on Pay Time and Attendance 02/23/03.   He requests when Phil will go on LWOP.  Since Joyce was on vacation 3/3, I emailed her .(see email)

**Tuesday, 03/04/03**
Joyce responds to my email.  But I called Joyce Fujii, BFS- Payroll explaining the general overview of Phil's low leave, late entry for 10/25/02, 2/28/03 8 hours of vacation and until vacation is depleted, and LWOP.  Joyce and I reviewed three times over a matter of 2 or 3 phone calls about the deductions and non-accrual of 14 hours for February since Phil's return to work was not established or confirmed.  As of 3/11/03, LWOP 7.75 will begin and his 3/15/03 paycheck will be $941.92.

**Thursday, 03/06/03**
Bob called me to his office at 11:59 p.m. – but I went to see him at 2:00 p.m..  There present were Gary Kurokawa and Annie Gima.  Bob handed me the letter to send out to Philip.  He said to send out immediately and to have one sent to Mike Golojuch and one for the Personnel File.

I mailed the letter to the address I have on file:
 720 South Street PMB 170 Honolulu, HI  96813

**Friday, 03/07/03**
Workman's Compensation form returned from Tom Riddle with attached W/C form filed by Phil English.   Phil put down a different address as the one I have on file.

1741 Ala Moana Blvd. Unit 22, Honolulu, HI  96815.

**Monday, 03/10/03 10:15 a.m.**
Bob called me in to his office at around 10:15 a.m. – present was Gary Kurokawa.  Bob gave an overview of what he learned from Tom Riddle.  Tom Riddle referred the case to Corporation Counsel to have Phil sent to mandatory psychiatric evaluation.

**Monday, 03/17/03 8:00 a.m.**
Found the letter from Bob on my chair to send out to Phil English addressed to 1741 Ala Moana Blvd. Unit 22.   I sent the letter Certified Mail/Return Receipt.

**Monday, 03/17/03 10:20 a.m.**

Phil called and asked why he didn't get a paycheck. I explained to him that his pay stub showed his check was deposited into his bank account on 03/14/03. His voice was shaky. He stated that maybe he will have to talk to his bank to find out why there was no money deposited. I asked him how he was doing and he said, "No so well." I assessed to help him by referring him to the Hawaii Food Bank to get food and also to receive food stamps if he doesn't have any money to buy food. I also asked if he is renting and how he can discuss the matter with his landlord. Then, sounding a bit hesitant voiced that he doesn't want to discuss it. I asked him if he received the letter that was mailed to 720 South Street PMB 170. and his reply was, "no" because he moved. He confirmed that he now lives at 1741 Ala Moana Blvd. Unit 22. I told him I would send him an address change form with a stamped self-addressed envelope for him to return the change form. We went over his leaves and explained at what point in date he went into LWOP on 03/11/03. He asked if I could send the breakdown showing his leaves. He mentioned that Tom Riddle told him he could use two weeks of vacation until his W/C is approved. This I confirmed that what Tom Riddle is stating is correct stating all his vacation leave has been depleted on 3/11/03.


**Friday, 03/21/03, 11:15 a.m.**

Phil called asking about his medical premiums if he doesn't get a paycheck. I explained to him that payroll would produce a breakdown for amount of the premium he will have to pay it on his own. I asked him if he received the letter and his leave breakdown and change of address form that I both sent by certified/return receipt. He said, no. I explained to him to check the mail because of the importance of having the address change form filled out and returned to me for payroll and the Personnel Office to update his information.

**Tuesday, April 01, 2003**

Called Phil English at 9:08 a.m. to confirm that he is still living at 1741 Ala Moana Blvd. Unit 22. He answered the phone and said he mailed out the change of address form on Tuesday (which he meant today). I asked him how he was doing and he paused then said "he's working on it".

**Wednesday, 04/09/03**

Letter dated 04/09/03 was sent to Phil requesting his presence to discuss his annual job performance evaluation. We request a meeting on 04/17/03.


**Monday, April 28, 2003**

Phil called at 8:30 a.m. inquiring about open enrollment, which I earlier quoted April 1st. I explained to him that the new EUTF Employer Union Trust Fund will commence on May 1st. His main concern was canceling Pim from his insurance. I explained that since 6/30 all insurance with the Union Royal State will be cancelled he doesn't have worry about it. So when he applies for his medical with EUTF, he just has to apply himself only. He confirmed that he received the PCP form and will return the white and yellow form to me via the stamped envelope. He was satisfied with what I discussed with him.

F

**Foumai, Suzanne**

**From:** Fujii, Joyce
**Sent:** Friday, May 02, 2003 3:14 PM
**To:** Foumai, Suzanne



Hi Sue,


Regarding Philip English pta -- you need to amend from 2/27 to 4/5/03.  I emailed you his leave card.

2/27  one day waiting period

2/28 to 4/4/03 is lwop W7

From 4/7 on I already changed the pta to lwop w7.

G

**Foumai, Suzanne**

| | |
|---|---|
| **From:** | Fujii, Joyce |
| **Sent:** | Wednesday, May 21, 2003 7:53 AM |
| **To:** | Foumai, Suzanne |
| **Subject:** | RE: |

Good Morning Sue,

I just emailed you Phil's card.

-----Original Message-----
**From:** Foumai, Suzanne
**Sent:** Tuesday, May 20, 2003 4:17 PM
**To:** Fujii, Joyce
**Subject:** RE:

Joyce,

Could you fax me Phil's leave card with the adjustments including the late entry for 8.00 hrs sick on 02/04/03.
Just to make sure I don't make any errors in the late entries.

Sue

-----Original Message-----
**From:** Fujii, Joyce
**Sent:** Friday, May 02, 2003 3:14 PM
**To:** Foumai, Suzanne
**Subject:**



Hi Sue,

Regarding Philip English pta -- you need to amend from 2/27 to 4/5/03.  I emailed you his leave card.

2/27  one day waiting period

2/28 to 4/4/03 is lwop W7

From 4/7 on I already changed the pta to lwop w7.

07/06/2004

*H*

Citrus Pouch

**Foumai, Suzanne**

| | |
|---|---|
| **From:** | Fujii, Joyce |
| **Sent:** | Monday, May 12, 2003 10:58 AM |
| **To:** | Foumai, Suzanne |
| **Subject:** RE: | |

Good Morning Sue,

Sorry for not answering, I was on vac the last 3 days last week.

You can do late entries on the new pta system for Philip Engish.

Have a nice day.

-----Original Message-----
**From:** Foumai, Suzanne
**Sent:** Wednesday, May 07, 2003 4:00 PM
**To:** Fujii, Joyce
**Subject:** RE:

Hi Joyce,

Do you mean to amend my records for Phil or do late entries on the CHRMS?  Sue

-----Original Message-----
**From:** Fujii, Joyce
**Sent:** Friday, May 02, 2003 3:14 PM
**To:** Foumai, Suzanne
**Subject:**



Hi Sue,

Regarding Philip English pta -- you need to amend from 2/27 to 4/5/03.  I emailed you his leave card.

2/27  one day waiting period

2/28 to 4/4/03 is lwop W7

From 4/7 on I already changed the pta to lwop w7.

07/06/2004

**Foumai, Suzanne**

| | |
|---|---|
| **From:** | Fujii, Joyce |
| **Sent:** | Tuesday, May 13, 2003 10:35 AM |
| **To:** | Foumai, Suzanne |
| **Subject:** | RE: English, Philip E. |

okay

-----Original Message-----
**From:** Foumai, Suzanne
**Sent:** Tuesday, May 13, 2003 10:12 AM
**To:** Fujii, Joyce
**Subject:** English, Philip E.
**Importance:** High

Joyce,

As I was going over Phil English's leave record you faxed over, I rechecked his attendance for February. On 02/04/03, Phil signed out for 8.00 sick. However, this never was posted on the CHRMS because but I only updated his leave card and didn't post it on the CHRMS because I waiting for him to turn in a leave paper, which he didn't.

02/04/03 8.00 SCK will go in as a late entry on 05/04/03 PTA. Please let me know what changes will be made to the W7 changes you asked me to change on my side from 02/27/03 through 04/05/03

*Sue Foumai*
*Real Property Assessment*
*842 Bethel Street, 2nd Floor*
*Honolulu, HI 96813*
*(808) 527-5507*
*(808) 521-7647 Fax*

*LORUSSO*

# hp LaserJet *3380*

HP LASERJET FAX

Sep-2-2006    12:02PM

| Fax Call Report |
| --- |

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 359 | 9/ 2/2006 | 11:54:53AM | Send | 2750399 | 7:42 | 28 | OK |

MOSELEY BIEHL TSUGAWA LAU & MUZZI
A Hawaii Limited Liability Law Company

Michael L. Biehl
Alan K. Lau
Roger S. Moseley
Christopher J. Muzzi
Eric K. Tsugawa

ALAKEA CORPORATE TOWER
1100 ALAKEA STREET, 23RD FLOOR
HONOLULU, HAWAII 96813

TELEPHONE: (808) 531-0490
FACSIMILE: (808) 534-0202

Joanna B. K. Fong
Renee M. Furuta

September 2, 2006

**BY FAX AND HAND DELIVERY**

Michael A. Lorusso, Esq.
Fort Street Tower
745 Fort Street, 5th Floor
Honolulu, Hawaii 96813

Anthony L. Wong, Esq.
Dillingham Transportation Building
735 Bishop Street, Ste. 411
Honolulu, Hawaii 96813

Re:    Philip E. English v. City and County of Honolulu et al.
       Civil No.: 04-00108

Mike and Tony,

    We respectfully suggest that Mike's client Suzanne Foumai has violated the law and may now be subjected to criminal penalties under HRS§92F-17(b), by the theft of the personal records of Phil English. As you well know, Ms. Foumai, had no authority to make copies of the Assessment Division's records relating to Phil English and then take them home for her own "protection", or for any other reason.

    Mike and Ms. Foumai both asserted that she is Mike's client. The City and County of Honolulu, is also Mike's client. Mike has permitted, without objection, Ms. Foumai's testimony that she took these records home. Presumably Mike advised Ms. Foumai, prior to the deposition, about her right to assert her protection under the Fifth Amendment, and to refuse to testify to these matters or to produce the documents. Also presumably Mike advised his City client that Ms. Foumai may have committed acts in violation of the law and in violations of the rules and regulations of the City, and that a conflict may now have arisen which would prevent Mike from representing either Ms. Foumai or the City.  Presumably, if Mike fully disclosed these potential issues and conflicts, he received a full waiver from both of his clients (Foumai and the City).  These issues do not, of course, directly affect my client, regardless of whether or not they affect Mike's ability to continue to represent the alleged wrongdoers, the City itself, and all of the City employees who are witnesses in this case.

10010\357648

# hp LaserJet *3380*



HP LASERJET FAX

Sep-2-2006   12:25PM

---

## Fax Call Report

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 360 | 9/ 2/2006 | 12:03:05PM | Send | 3562609 | 22:43 | 28 | OK |

---

MOSELEY BIEHL TSUGAWA LAU & MUZZI

A Hawaii Limited Liability Law Company

Michael L. Biehl
Alan K. Lau
Roger S. Moseley
Christopher J. Muzzi
Eric H. Tsugawa

ALAKEA CORPORATE TOWER
1100 ALAKEA STREET, 23RD FLOOR
HONOLULU, HAWAII 96813

TELEPHONE: (808) 531-0490
FACSIMILE: (808) 534-0202

Joanne B. K. Fong
Renee M. Furuta

September 2, 2006

**BY FAX AND HAND DELIVERY**

Michael A. Lorusso, Esq.
Fort Street Tower
745 Fort Street, 5th Floor
Honolulu, Hawaii 96813

Anthony L. Wong, Esq.
Dillingham Transportation Building
735 Bishop Street, Ste. 411
Honolulu, Hawaii 96813

Re:   Philip E. English v. City and County of Honolulu et al.
      Civil No.: 04-00108

Mike and Tony,

    We respectfully suggest that Mike's client Suzanne Foumai has violated the law and may now be subjected to criminal penalties under HRS§92F-17(b), by the theft of the personal records of Phil English. As you well know, Mrs. Foumai, had no authority to make copies of the Assessment Division's records relating to Phil English and then take them home for her own "protection", or for any other reason.

    Mike and Ms. Foumai both asserted that she is Mike's client. The City and County of Honolulu, is also Mike's client. Mike has permitted, without objection, Ms. Foumai's testimony that she took these records home. Presumably Mike advised Ms. Foumai, prior to the deposition, about her right to assert her protection under the Fifth Amendment, and to refuse to testify to these matters or to produce the documents. Also presumably Mike advised his City client that Ms. Foumai may have committed acts in violation of the law and in violations of the rules and regulations of the City, and that a conflict may now have arisen which would prevent Mike from representing either Ms. Foumai or the City.  Presumably, if Mike fully disclosed these potential issues and conflicts, he received a full waiver from both of his clients (Foumai and the City). These issues do not, of course, directly affect my client, regardless of whether or not they affect Mike's ability to continue to represent the alleged wrongdoers, the City itself, and all of the City employees who are witnesses in this case.

100103.57849