ORIGINAL

CC:KSC

MOSELEY BIEHL TSUGAWA LAU & MUZZI
a Hawaii limited liability law company
ROGER S. MOSELEY          2060
CHRISTOPHER J. MUZZI    6939
RENEE M. FURUTA          7593
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii  96813
Telephone:  (808) 531-0490
Facsimile:  (808) 534-0202
Email:  rmoseley@hilaw.us
          cmuzzi@hilaw.us
          rfuruta@hilaw.us

Attorneys for Plaintiff
PHILIP E. ENGLISH

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF

SEP 0 6 2006

at  o'clock and  min.  M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH,<br><br>    Plaintiff,<br><br>    vs.<br><br>CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1 –10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10,<br><br>    Defendants. | Civil No.  04-00108 KSC/KSC<br><br>PLAINTIFF PHILIP E. ENGLISH'S FIRST AMENDED PRETRIAL STATEMENT;  EXHIBIT A; CERTIFICATE OF SERVICE |

10010\3\57688

<u>**PLAINTIFF PHILIP E. ENGLISH'S**</u>
<u>**FIRST AMENDED PRETRIAL STATEMENT**</u>

Plaintiff Philip E. English ("Plaintiff"), by and through his counsel, Moseley Biehl Tsugawa Lau & Muzzi, hereby submits his First Amended Pretrial Statement pursuant to the Hawaii Local Rules of the U.S. District Court Rule 16.6.   Plaintiff's Pretrial Statement is amended to include additional witnesses and revisions to the Exhibit list.   As there will be further discovery conducted, this Pretrial Statement may be further amended.

I.    <u>Party</u>

Plaintiff Philip E. English.   Beginning in June 2000, Plaintiff English was a licensed real estate appraiser in the employment of the City.

II.    <u>Jurisdiction and Venue</u>

Federal question jurisdiction exists under 28 U.S.C. §1331 and §1343, by virtue of the claims of deprivation of constitutional rights and other conduct arising under 42 U.S.C. §1981 and § 1983, as alleged herein.   This Court has pendant jurisdiction, under 28 U.S.C. §1367(a), over Plaintiff's state law claims herein.

Venue is proper in this court pursuant to 28 U.S.C. §1391, because this is the judicial district in which Plaintiff resides in which all Defendants reside and all acts and omission complained of occurred within the City and

County of Honolulu, State of Hawaii.

III.    Substance of Action

The essence of this case is that Plaintiff English, is a whistleblower who was subjected to retaliation because he complained about certain practices, which were occurring at the Assessment Division of the Department of Budget and Fiscal Services of the City and County of Honolulu ("City").   One of Plaintiff English's complaints was that a co-employee of his was doing work for a private appraisal company on City time and with City equipment.   The head of the Assessment Division, Defendant Gary Kurokawa, was a substantial shareholder, a director, and an officer of the private appraisal company in question, Defendant GK Appraisals.

After Plaintiff English complained to the FBI and the Ethics Commission of the City and County of Honolulu, the City, its employees and GK Appraisals (remembering that the head of the Assessment Division, was also an officer, director and shareholder of Defendant GK Appraisals) retaliated against Plaintiff English in all of the traditional ways that whistleblowers are punished.  Plaintiff English has, for example been labeled a "troublemaker", accused of being a "back stabber", and accused of having preexisting mental and emotional problems – even to the extent

of likening him to the Xerox murderer Byron Uesugi. One of his superiors called Plaintiff English a "Wacko" at a meeting of his fellow employees.

There was also a <u>mandatory</u> training session, which all of the appraisers at the City (included Plaintiff English) were <u>required</u> to attend. At this training session the attendees were told that even though bad things may be occurring in the work place, they had no obligation to step forward and report. Further, at least two of Plaintiff English's fellow appraisers mocked Plaintiff English's report to the Ethics Commission and then suggested, by implication, that Plaintiff English may be wearing a recording device.

Plaintiff English's employment reviews were excellent before he engaged in whistleblowing, but afterwards they deteriorated quickly downwards to the point that his performance was called unsatisfactory, and he was advised that he could be terminated. Plaintiff English was shunned by his co-workers, one of whom was an attorney for the City, who advised Plaintiff English that she could not talk to him anymore, because he might be wearing a wire. After his whistleblowing to the Ethics Commission there were a series of workplace violence reports filed against him and there was a substantial investigation of him, in which his co-workers were encouraged to report negative things about Plaintiff English (reading these interviews, it seems apparent that they were coached). One of Plaintiff English's

superiors earlier told him not even to think about filing lawsuit because it was his word against theirs and others have tried it and failed. There were constant complaints about Plaintiff English's work performance and an attempt at disciplinary action for an incident which had occurred months earlier when he took leave to go to the doctor.

The retaliation was so vigorous and pervasive that Plaintiff English eventually required medical help. Within approximately two months after Plaintiff English first went to the Ethics Commission, his doctors had advised him not to go to work again, because of the state of his physical and emotional health. Plaintiff English's last day actually at work was February 27, 2003.

Subsequently, even after the City had received notice of Plaintiff English's condition, and even though Plaintiff English was no longer going to work, Defendants continued to issue increasingly negative employment reviews and harass him. They continued to do this even though they had received advice from their own consulting psychologist that they should not issue the specific further employment review in question. Further, when Plaintiff English applied for worker's compensation benefits, the City conditioned his receipt of a lump sum benefit on his resignation from employment. Apparently they agreed that Plaintiff English was entitled

under the law to benefits, but determined that even though he was entitled to the benefits, they would force him to resign.

Throughout this whole affair there has been little, if anything, done by the City to timely complete its investigation or to take action with respect to any of Plaintiff English's allegations against the head of the division for which he worked, or with respect to any of the other practices about which Plaintiff English complained, or for the complicity of the Defendants in the improper activities, or for the Defendants' retaliation against Plaintiff English.

One of the Defendants received a notice from the Ethics Commission more than two years after the conduct was reported on January 22, 2003 – that there may be reason to believe that ethics provisions had been violated. The "suggested" time for action on such complaints is 30 days, and it is now more than 3 ½ years after Plaintiff English filed his complaint with the Ethics Commission, without action!

Plaintiff English's complaints about the activity in the Assessment Division were of two basic kinds. The first was a series of complaints, questions, and suggestions about the "professional" conduct and methodology of the Assessment Division in appraising real property. The second, was something that even the most uninformed layman could understand: Plaintiff English complained that another of the employees of

the Assessment Division was doing private appraisal work on City time and with City equipment.  This private work was being done for Defendant GK Appraisals, a private appraisal firm based in Hilo and partially owned (90,000 shares) by Defendant Kurokawa.  Defendant Kurokawa also was an officer (vice president) and director of Defendant GK Appraisals from the date of its incorporation to the present date.

Plaintiff English's first complaint was made to the employee doing the work, Christopher Graff.  Mr. Graff said that there was no problem because it had all been worked out.  He explained that he technically worked for another appraiser, David Matsunami, who, in turn, worked for GK Appraisals.  David Matsunami, however, had since  testified that 70% of his contacts with Defendant GK Appraisals were through Defendant Kurokawa and that he contacted Defendant Kurokawa on his City phone and left messages with Defendant Kurokawa's City secretary.  Mr. Graff refused to stop the activities about which Plaintiff English was complaining.

Plaintiff English next complained to Defendant Gima, whose response was essentially that she did not know anything about it and that Plaintiff English should mind his own business.  Next Plaintiff English complained to Defendant Magota, who was the number two man at the Assessment Division.  Defendant Magota essentially responded that, if Mr. Graff was doing anything like that he would be dealt with severely.  Plaintiff

English expressed his concern stating that it was not Mr. Graff who was the problem, but that it was Defendant Kurokawa, who needed to be dealt with. Defendant Magota responded that in any dispute it would be Plaintiff English's word against theirs and not even to think about suing because others had tried it and failed.   Defendant Magota apparently did talk to Mr. Graff, who later reported to Plaintiff English that he could continue, as long as he was "more discrete".  Plaintiff English took this to mean that Mr. Graff was told that he could continue to steal from the City as long as he hid his activities and did not get caught.

Plaintiff English also observed, on at least one occasion, what appeared to be direct instructions of Mr. Graff by Defendant Kurokawa with respect to the private appraisal work that Mr. Graff was doing on City tine and with City equipment for Defendant Kurokawa's private appraisal company, Defendant GK Appraisals.

Plaintiff English continued to observe Mr. Graff doing private work for GK Appraisers.  Plaintiff English was uncertain as to what he should do next, but after much prayer, he put his complaint in writing to Defendant Magota on February 15, 2002. Plaintiff English's work environment deteriorated very rapidly from February 15, 2002 on.   In April of 2002 Plaintiff English received his very next performance review, which had substantially declined from his earlier reviews.  All further performance

reviews continued to decline.  At one point Plaintiff English was put on "extended probation", which was then allegedly rescinded (without advising Plaintiff English), after the additional probationary period had passed.

David Matsunami testified that Mr. Graff had come to him and advised him that Plaintiff English had complained about the work Mr. Graff was doing for GK Appraisals.  Between February of 2002 and June of 2002, partially because of Plaintiff English's complaints about Mr. Graff, David Matsunami told Defendant Kurokawa that David would no longer be doing work for GK Appraisals.  He expressed that he did not want to be in the middle and that, out of "respect" for Plaintiff English and Mr. Graff, he could not continue.  Thus, because of Plaintiff English's complaints, Defendant GK Appraisals lost the services of David Matsunami.  This occurred at exactly the same time period in which Plaintiff English's work environment at the City was deteriorating rapidly, and during which period Defendant Gary Kurokawa simultaneously wore the two hats of the Administrator of the Assessment Division and as an officer and director of Defendant GK Appraisals.

By August of 2002 Plaintiff English was experiencing further and further retaliation, and the outside work being done by Mr. Graff did not cease.  Plaintiff English contacted the FBI.

In late 2002, Charles Totto at the Ethics Commission received documents from Plaintiff English regarding the situation.  On December 31, 2002 Mr. Totto stated that he would like to meet with Plaintiff English.  This meeting occurred on January 3, 2003 and on January 22, 2003 a formal complaint with the Ethics Commission was filed by Plaintiff English.

On January 7 and 10, 2003 Plaintiff English met with Mr. Graff and advised him that he had reported everything to the FBI and to the Ethics Commission.  Plaintiff English told Mr. Graff to contact Mr. Totto and to tell the truth about everything.   Mr. Graff apparently immediately (also on January 7 and 10) told his supervisors about the contents of his meetings with Plaintiff English.

By mid-January 2003, Plaintiff English was being required to answer a complaint of "insubordination" allegedly for an incident in October of the prior year, in which he had gone to his doctor for a follow-up visit.   On February 21, 2003 Plaintiff English was being mocked by his co-workers and the trainer of a mandatory training session. Near the end of February 2003, Plaintiff English was advised by an investigator from the City that he was investigating "workplace violence complaints" about Plaintiff English. This incident could fairly be considered one of the last straws and an incident which resulted in the doctor's advice for him not to return to work.

IV.    Undisputed Facts

1.    City and County of Honolulu is a municipal corporation organized and existing under the laws of the State of Hawaii.

2.    Plaintiff English was employed by the City and County of Honolulu and is a resident of the City and County of Honolulu.

3.    Defendants Robert O. Magota, Gary Kurokawa, Ann Gima are residents of the City and County of Honolulu and are employed by the City and County of Honolulu.

4.    Defendant GK Appraisals, Inc. is a Hawaii corporation doing business as a real estate appraisal firm in the State of Hawaii.

V.    Disputed Factual Issues

In essence all other facts are disputed.  However, without limitation, Plaintiff English believes the following facts are specifically disputed.

1.    Defendant Gary Kurokawa is the Administrator of the Assessment Division and an employee of the City.

2.    As the Administrator of the Assessment Division, Defendant Kurokawa is responsible for directing, administering, overseeing, and coordinating all functions and activities within the division, including, but not limited to, enforcing policies and operating procedures within the division.

3.    Defendant City had a policy against whistleblowing and a clear pattern of practice and conduct in retaliation against whistleblowers.

4.     Without limitation, as the Administrator of the Assessment Division, Defendant Kurokawa exercised power and authority over personnel functions regarding City employees.    Defendant Kurokawa exercised his power over personnel functions by signing off on all employee performance reports for employees within his agency, including probationary performance reports, attempting to extend Plaintiff's probationary period, and expressing his ability to transfer employees in the presence of subordinates.

5.     Defendant Kurokawa's exercise of authority over personnel matters was ratified, accepted, supported, and sanctioned by the City by other executive officers within the City, including the Director of Budget and Fiscal Services.

6.     Defendant Kurokawa, at all times herein relevant, supervisory authority over Plaintiff, over Defendant Magota and over Defendant Gima

7.     Defendant Magota had at all times herein relevant, supervisory authority over Plaintiff and over Defendant Gima.

8.     Defendant Gima had, at all relevant times herein, direct supervisory authority over Plaintiff.

9.     The acts of Defendants herein, related to retaliation against Plaintiff, for his complaint that work was being done for GK Appraisals, were done by officers and/or directors and/or agents of GK Appraisals, or

at the direction of such individuals, for the purpose of advancing or preserving the economic benefit to GK Appraisals derived from having City employees do work for GK Appraisals on City time and with City equipment.

10. Generally, for the initial period of his employment at the Assessment Division, Plaintiff spent his time trying to discern the differences between the private appraisal practice, with which he was familiar, and the appraisal practice in the Assessment Division. Soon, Plaintiff began asking questions, making comments, and making suggestions, as well as requests for practice changes. Plaintiff questioned, commented upon, and/or made suggestions or requests for change of all of the practices and inappropriate actions described herein. While it eventually became apparent that Plaintiff's questions, comments, requests and suggestions were unwelcome, the harassment and retaliation that resulted was difficult to identify and/or define at first. However, when Plaintiff complained in writing about specific clearly illegal activity, in which both the Administrator of the Assessment Division and another appraiser were involved, the situation changed dramatically for the worse and the harassment became so overt, pervasive, and oppressive that Plaintiff eventually had to stop going to work, on his doctor's orders, because of the resulting stress. The harassment to which Plaintiff was subjected was in

retaliation not only for the specific complaints about illegal activity, but also for his prior and continuing attempts to correct improper practices and to improve the assessment process at the City.

11.    Prior to and immediately after the inception of his employment with the Assessment Division, Plaintiff was advised by Defendants Kurokawa and Magota their plan was to make the Assessment Division more professional and that they needed people with outside experience to do so.  However, during the course of Plaintiff's employment, Defendant Gima constantly instructed Plaintiff that things must be done according to "prior practices" and that Plaintiff would have to be "patient" about any change.

12.    During the first week of Plaintiff's employment, Plaintiff was called into a meeting with his then supervisor, who proceeded to ask about Plaintiff's background and experience and then he advised Plaintiff that the supervisor had no time to train Plaintiff and would not do so.

13.    On or about August 3, 2000, Plaintiff was assigned to the appraiser group headed by Defendant Gima, as supervisor, and Plaintiff was assigned to work on certain condominium, cooperative, and timeshare projects in Waikiki and adjacent areas.

14.    Defendant Gima advised Plaintiff that his initial job was to "validate" sales for condominiums in Waikiki and that there had been no

sales input since the at least the beginning of June, when the prior appraiser assigned to this area had left the Assessment Division.

15.   Defendant Gima advised Plaintiff that there was "no time" for any verification of sales, and that the only thing he should do was to determine if the sales were "closed".  When Plaintiff questioned whether this process was sufficient to determine whether the sales were truly valid, he was directed by Defendant Gima that there was no time to check and to just "plug them in".

16.   Immediately prior to the time Plaintiff was assigned the Waikiki condominium assessments, in approximately August or September of 2000, the "Gold Coast" area, at the foot of Diamond Head, was added to the waterfront Waikiki condominium model, later known as "Model 42". Plaintiff was not consulted prior to the decision to add this area to the Waikiki model.  The "Gold Coast" data had numerous errors and was not properly set up for market modeling.

17.   Despite the known errors and problems, and the knowledge that erroneous assessments would result, the Gold Coast area was inserted into Model 42 and the erroneous assessments it produced for tax year 2001 were mailed out to taxpayers.  Plaintiff did not learn of the problems with the Gold Coast data until after the assessments for that year were mailed out.  The following year Plaintiff tried to remedy the problems

with the Gold Coast data, but was not given adequate time to fully evaluate and correct the obvious problems with Model 42.

18.    On numerous occasions throughout Plaintiff's tenure at the Assessment Division, Plaintiff raised the issue of ethical and professional standards, including, but not limited to:

(a)    the application of Uniform Standards of Professional Appraisal Practice ("USPAP") standards, to which he was told, by Defendant KUROKAWA that there was a "blanket" exception and that the Assessment Division did not have to follow USPAP standards;

(b)    the number of properties assigned to appraisers far exceeded the recommendations of professional associations;

(c)    the Assessment Division appraisers were accepting assignments which could not properly be done with the resources at hand, which, at minimum should have required public disclosure that the assessments produced by the Assessment Division may not be reliable;

(d)    the Assessment Division used methodology which was not generally recognized by the appraisal profession to be proper, for example the depreciation methodology, which was introduced to the system by Defendant MAGOTA, and produced large and improper fluctuations in valuations, and which was not consistent with the vendor recommendations of the new Computer Automated Mass Appraisal System ("CAMA") system; and

(e)    the almost complete lack of any comprehensive training program, especially with respect to internal policies and procedures.

19.    In response to some of Plaintiff's comments and questions with respect to ethical and professional standards, Plaintiff was advised by

Defendant Magota that the Division had had trouble with guys like Plaintiff before (meaning appraisers with outside professional experience) and that Plaintiff would just have to learn to cut corners. In fact, Defendant Magota specifically dressed Plaintiff down in front of a group of his colleagues in the Assessment Division, stating that "I've seen this kind of thing before where an outside appraiser cannot make the transition to mass appraising." Further, in front of the same group Defendant Magota described Plaintiff as having "just the fundamentals" of appraising, implying that Plaintiff's professional abilities were suspect.

20.    In or about October of 2000, Plaintiff became aware of multiple appeals with respect to the Waikiki Shore condominium. During that time Plaintiff became aware that there was substantial internal discussion and confusion about the classification system, which had resulted in the classification of the Waikiki Shore condominium units in question as "Hotel and resort", and that apparently such classifications had been done differently by different appraisers and supervisors. Plaintiff began to realize that this and many other important decisions and determinations were being done on an ad hoc basis with no consistency and not necessarily with any relationship to proper appraisal practice. Plaintiff began to question these practices and to offer comments and suggestions in various forums, from meetings to individual encounters. Sometime later, Plaintiff

was advised by either Defendant Gima or Defendant Magota, or both, that Plaintiff asked too many questions.

21. In or about January of 2001, Plaintiff began to handle real property tax appeals and, in conjunction with those appeals, and throughout approximately the following year, Plaintiff became aware of multiple inconsistencies and failures in the assessment system, including but not limited to:

(a) project groupings were not appropriate and the valuations were inconsistent;

(b) leasehold sales were being used for some valuations;

(c) there were multiple instances of questionable classification;

(d) the sales "validation" system was questionable on a widespread basis;

(e) land valuations had not changed in years, despite significant moves in the market;

(f) when the new computer system and mass appraisal system was put in place, no provision had been made to clean up the database before the conversion took place, and in fact there were numerous and serious actual discrepancies in the database. This was against the specific advice and instruction of the vendor of the new system.;

(g) there were numerous problems with the appeal process, including but not limited to: instances in which the Board of Review did not act in an impartial manner, including, but not limited to, ex parte communications with the Assessment Division, requesting that the decisions be prepared before the hearings so that the BoR could sign them immediately after the

hearings, and requesting that Plaintiff act more as an advocate for the Assessment Division's position, rather than trying to achieve the proper assessment; and appraisers actively and improperly discouraging taxpayers from filing appeals and refusing to assist taxpayers in obtaining information relevant to their appeals.

22.    Plaintiff's questions and comments on these issues were ignored or Plaintiff was consistently instructed that nothing could or would be done.

23.    At about the same time period (approximately 2001-2002), Plaintiff began to observe that there was general confusion and lack of understanding in the Assessment Division as to basic appraisal concepts, such as " as of" a specific date, as opposed to "on" a specific date.  With respect to this specific issue, Defendant Gima responded to Plaintiff's concerns by rallying the other supervisors to support her own position that assessments were to be made "on" October 1 of the year preceding the tax year, rather than "as of" that date, as required in the ordinance (and as would be required by proper appraisal practice as understood by Plaintiff). In the process of rallying the support against Plaintiff's position on this issue, Defendant Gima substantially undermined and damaged Plaintiff's reputation and respect among the other appraisers and supervisors in the Assessment Division.

24.    In response to Plaintiff's questioning procedures which did not appear to be proper appraisal practice, at least one other appraiser in the Assessment Division related to Plaintiff that Defendant Magota had described the mission of the Assessment Division appraisers as to get the "highest value" possible on property and maximize taxes.

25.    In or about January of 2001 Plaintiff began to observe that one of the appraisers in Defendant Gima's group was doing outside appraisal work on City equipment and during City time.

26.    Plaintiff initially approached the appraiser involved and advised him that this sort of activity was not proper and should cease.    The appraiser involved advised Plaintiff that a scheme had been worked out, which made the activity permissible.   The scheme was then described to Plaintiff as that the work was being done for a former employee of the City, who, in turn, did work for Defendant Kurokawa, so that Defendant Kurokawa was not directly involved, therefore making the activity permissible. Plaintiff advised the appraiser involved that this scheme did not resolve the issue.   In the period following, Plaintiff observed that this communication with the appraiser had no effect, as the activity continued.

27.    Plaintiff also observed that the former employee involved continued to come in and out of the private work area of the City appraisers, at will, to deal with the appraiser involved.  Plaintiff also was, on

one morning, standing near the appraiser's desk when the appraiser received a telephone call. The appraiser immediately stopped working on his City work and began to work on his private work, stating that "Gary" had called and told him the private assignment he was working on was urgent and had to be delivered by 5:00 P.M. That same afternoon the appraiser left the office in a hurry to deliver the private assignment.

28. When the activity continued, apparently undiminished, Plaintiff approached the appraiser's supervisor, Defendant Gima, and advised her of the illegal activity. Defendant Gima's response to Plaintiff was that he should do his own work and not to be concerned with the business of others and, in any case, she had not observed the activity.

29. When no additional response was heard from Defendant Gima, in late 2001, or early 2002, Plaintiff spoke with Defendant Magota directly about the continuing illegal activity. Defendant Magota's initial response was that the appraiser involved would be disciplined if it was found that he was doing outside work. Plaintiff then advised Defendant Magota that there were not just one, but two individuals involved and that Plaintiff was especially concerned because the work was being done for the Assessment Division Administrator, Defendant Kurokawa, under the Administrator's direct orders. Defendant Magota then advised Plaintiff that he would talk with Defendant Kurokawa about the matter, but that Plaintiff

should not continue to pursue the issue because, in any dispute, it would be Plaintiff's word against the word of the appraiser and Defendant Kurokawa. Defendant Magota also admonished Plaintiff that other former employees had tried to file lawsuits against the Assessment Division and that those suits had failed, and that any suit by Plaintiff would also fail. Plaintiff regarded these statements of Defendant Magota as threatening and intimidating.

30.    The appraiser involved later described, to Plaintiff, a meeting with Defendant Kurokawa, the appraiser involved and the former City employee (and possibly others, but Plaintiff is not presently aware of their identities), in which Defendant Kurokawa had advised the appraiser that it was okay to continue doing the private work, but that the appraiser should be more "discrete".

31.    It continued to appear that nothing would be done to put an end to the conducting of private business on City time with City equipment, only that the activity would become less visible by being more " discrete". Because of this, on February 15, 2002, Plaintiff sent a written complaint via email to Defendant Magota outlining the complaint made verbally, that the appraiser involved was still doing private work on City time and with City equipment for GK Appraisals, Inc., a company believed by Plaintiff to be

owned and controlled by Defendant Kurokawa, the Administrator of the Division.

32.    Plaintiff consulted a union representative about this matter and the union representative concurred with Plaintiff's opinion that this activity should stop.  This initial contact with the union representative occurred at about the time Plaintiff first informed Defendant Gima of the situation.

33.    In approximately this same time period of 2001, Plaintiff witnessed Defendant Gima going through files and folders.  When Plaintiff inquired as to what Defendant Gima was doing, Defendant Gima replied that she was "sanitizing" the files before they were to be produced in the ongoing Waikiki Shore litigation, and that (in reference to a particular document) " We don't want him seeing that."  When Plaintiff inquired as to whether this was proper, Plaintiff was advised by Defendant Gima that she had attended a meeting with Corporation Counsel wherein the employees of the Assessment Division were instructed to "sanitize" files before they were produced in litigation.

34.    In approximately this same time period of the last half of 2001, Plaintiff received increasingly and significantly conflicting instructions on what he should be doing.  For example, Defendant Magota instructed everyone, including Plaintiff to work on incorporating building permit information, while Defendant Gima specifically instructed Plaintiff to ignore

the building permit information for his assigned area, which had not been incorporated since prior to 2000. Had this information been placed in a single stack, it would have been more than three feet tall.

35.    In the time period approaching October of 2001, Defendant Magota came up with the idea to send a letter to certain condominium associations in Waikiki and require that they gather information and submit information, with respect to the use of each condominium unit. The associations would be given two weeks in which to reply. The consequence of failure to reply would be to change the classification of the condominium units to "Hotel and resort", which had a tax rate more than two times that of the "Apartment" classification. Over Plaintiff's objection to Defendant Gima, at minimum, that the time frame was too short for proper response and the matter should be more carefully studied and resolved, Plaintiff was required to sign this letter, which was then mailed out to the affected condominium associations.

36.    After mailing out the initial letter, the Assessment Division received limited substantive responses and a great number of complaints from the condominium associations. Upon this development, Defendant Kurokawa, over Plaintiff's strenuous objection as to the propriety of doing so, caused the Assessment Division, in early December of 2001, to send out a second letter, signed by Defendant Magota, stating that due to failure

of response to the first letter, the affected condominium units were being reclassified to "Hotel and resort" if there were no additional responses. This letter gave only three weeks for additional response. Neither letter reflected any past practice of the Assessment Division of which Plaintiff was aware, nor was Plaintiff aware of any rule or regulation which permitted such a practice.

37.    The number of appeals for the tax year, which had been the subject of these letters, was very heavy, with Plaintiff's assigned area accounting for approximately one fourth of all appeals filed. Many of the appeals appeared to be the result of the reclassifications due to the letters. Plaintiff requested additional help be assigned to deal with the appeals, but Defendant Gima refused, stating that whatever appraiser was free could help. As a practical matter Defendant Gima knew that there were generally no appraisers with any significant free time and that lack of familiarity with the issues would severely diminish the value of such help.

38.    Files were set up to handle the resulting appeals, but because of unfamiliarity, many mistakes were made and much misinformation was given to taxpayers. The end result was that Plaintiff 's workload was dramatically increased and many taxpayers were likely assessed taxes they did not owe.

39.    After Plaintiff had made the verbal report to Defendant Magota, but before Plaintiff made the written report on February 15, 2002, in approximately December of 2001, a Deputy Corporation Counsel asked Plaintiff to begin preparation of an expert report for the Waikiki Shore litigation.  Defendant Gima then instructed Plaintiff to merely copy some maps and floor plans from the file and that this would be enough.  The Deputy Corporation Counsel then insisted that this was not what was required for an expert report.  Plaintiff began to work on the expert report, but was stopped by Defendant Gima.  Plaintiff was then called into Defendant Kurokawa's office for an "after hours" meeting and was told by Defendant Kurokawa, that Plaintiff should work within the confines of his job, and that Plaintiff should "not take too much initiative."  Plaintiff inquired of Defendant Kurokawa as to who would do the report, to which Defendant Kurokawa replied that Plaintiff should not worry about it.  An additional concern was raised that Plaintiff was not an Appraiser IV and therefore was not qualified to give expert opinion in court.

40.    In approximately this same time period, Defendant Magota had a meeting of the appraisers to explain the "new" way of classification of properties.  Most of the appraisers in attendance did not seem to fully understand the classification process being explained by Defendant Magota.

41.    In early 2002 Plaintiff became aware that the Assessment Division was going to attempt to promulgate a rule, which would, and was intended to, substantially undermine the claims being made against the City in the Waikiki Shore litigation.  Plaintiff understood that counsel for the Waikiki Shore taxpayers was being avoided to prevent his knowledge of the process, including the public hearing.  Plaintiff, Corporation Counsel, and Plaintiff's supervisors all understood that Waikiki Shore's counsel had expressed a specific interest in participating in any such rule making process.  Plaintiff later learned that from April 1, 2002 to April 10, 2002, the Deputy Corporation Counsel assigned to the Waikiki Shore litigation did not even return the telephone calls of the counsel for the Waikiki Shore.  The hearing for this rule was held on April 10, 2002 and no one from the public attended.  Subsequent to the hearing, additional material changes were made to the rule before it was sent to the City Clerk in its final form.

42.    By mid-2002 Plaintiff was effectively deprived of further authority to handle any matter dealing with the Waikiki Shore litigation and appeals of Waikiki Shore assessments.

43.    In or about October 2002 Plaintiff became aware of an error in the appraisal of units in the Hawaiian Monarch condominium project, which resulted in studio units being assessed at greater values than the one-bedroom units in the same project for the 2003 tax year.  Plaintiff brought

this obvious error to the attention of Defendant Gima and requested permission to work on the correction of the problem before the erroneous assessments were mailed out.   Defendant GIMA denied permission and ordered that the erroneous assessments be processed so they would be mailed out to taxpayers as is.   Defendant Gima and/or Defendant Magota stated to Plaintiff that if the taxpayers didn't like the assessments, they could file appeals.

44.   During the course of Plaintiff's employment with the City, he received periodic performance evaluation reports all of which described his performance factors as "Exceeds Requirements", until February 15, 2002, which was the date Plaintiff sent a written complaint to Defendant Magota stating that a fellow appraiser was doing private work on City time and with City equipment for GK Appraisals, Inc., a company believed by Plaintiff to be owned and controlled by Defendant Kurokawa, the Administrator of the Assessment Division.   After February 15, 2002, the subsequent periodic performance evaluation reports immediately declined to "Meets Requirements" (on April 22, 2002) and the same on a May 16, 2002 "Probationary Performance Evaluation Report.    Plaintiff's evaluations declined further on the next performance report, where one performance factor was rated "Below Requirements" and the rest "Meets Requirements" (Probationary Performance Evaluation Report dated August 23, 2002).

45.     After February 15, 2002 Plaintiff became clearly aware of a substantial change in attitude toward him by supervisory and other personnel of the Assessment Division and Plaintiff began to experience numerous occurrences of retaliation.

46.     In or about March of 2002 Plaintiff was promoted to Appraiser IV, a promotion for which he had applied much earlier, prior to October 2001, and for which he had been informed that he had been approved. This promotion had been substantially delayed and the explanation for the delay was that the "paperwork" had been lost twice in the processing of the promotion.

47.     On or about May 31, 2002 one of Plaintiff's coworkers informed Plaintiff that she had been told that Plaintiff was being "watched" by Defendant Magota.

48.     No later than May of 2002, as a result of the retaliation Plaintiff began experiencing, Plaintiff contacted the union representative to assist him in putting an end to the retaliatory actions of the supervisory personnel of the Assessment Division, but the union was not able to resolve the problem and the retaliation continued.

49.     On or about May of 2002, as well as subsequent to that date and specifically on August 14, 2002, Defendant Magota made threats on Plaintiff's employment, such as: "You don't seem to care about your job."