Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3   ----------------------------------      )
     PHILIP E. ENGLISH,                      )
 4                                           )
                Plaintiff,                   )
 5                                           )
        v.                                   )Civil No.
 6                                           )04-00108 JMS/KSC
     CITY AND COUNTY OF HONOLULU; GARY       )
 7   T. KUROKAWA; ROBERT O. MAGOTA; ANN      )
     C. GIMA; and GK APPRAISALS, INC.;       )
 8   JOHN DOES 1-10; JANE DOES 1-10; DOE     )
     PARTNERSHIPS 1-10; DOE CORPORATIONS     )
 9   1-10; AND DOE ENTITIES 1-10,            )
                                             )
10              Defendant.                   )
                                             )
11   ----------------------------------      )

12

13

14

15

16              DEPOSITION OF SUZANNE FOUMAI

17   Taken on behalf of the Plaintiff, at 1100 Alakea Street, 23rd

18   Floor, commencing at 1:48 p.m., on August 4, 2006, pursuant

19   to Notice.

20

21

22

23

24   BEFORE:   JESSICA R. PERRY, CSR NO. 404

25             Registered Professional Reporter
```

EXHIBIT ___A___

Page 2

APPEARANCES

1
2  For the Plaintiff:
3        ROGER S. MOSELEY, ESQ.
4        Moseley Biehl Tsugawa Lau & Muzzi
5        Alakea Corporate Tower
6        1100 Alakea Street, 23rd Floor
7        Honolulu, Hawaii  96813
8
9  For the Defendant GK Appraisals, Inc.:
10       ANTHONY L. WONG, ESQ.
11       Matsui Chung
12       735 Bishop Street
13       Suite 411
14       Honolulu, Hawaii  96813
15
16 For the Defendants City & County of Honolulu, Gary T.
17 Kurokawa, Robert O. Magota, and Ann C. Gima:
18       MICHAEL L. LORUSSO, ESQ.
19       Kawashima Lorusso & Tom, LLP
20       Fort Street Tower
21       745 Fort Street, 5th Floor
22       Honolulu, Hawaii  96813
23
24
25

Page 3

I N D E X

1
2  EXAMINATION BY:                          PAGE
3        Mr. Moseley                          4
4
5
6
7        EXHIBITS MARKED FOR IDENTIFICATION
8  102. Documents produced (10 pages)        12
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        SUZANNE FOUMAI,
2  the witness hereinbefore named, being first duly cautioned
3  and sworn to testify the truth, the whole truth, and nothing
4  but the truth, testified under oath as follows:
5
6        EXAMINATION
7  BY MR. MOSELEY:
8        Q.  Good afternoon.  How are you?  I'm Roger Moseley.
9  I'm Phil English's attorney in this case.
10       Can you state your full name and address for the
11 record?
12       A.  Suzanne Mary Foumai, 1631 Liholiho Street,
13 Apartment 203, Honolulu, Hawaii 96822.
14       Q.  I used to live on Liholiho Street.  Down in
15 Makiki, right?
16       A.  (Nodding head.)
17       Q.  It's so convenient living down there, I'm telling
18 you.  It's just great.
19       Do you mind if I call you Sue?
20       A.  I don't mind.  Everybody calls me that.
21       Q.  Oh, good, because I didn't want to insult you or
22 anything if you didn't like to be called by Sue.  You can
23 call me Roger.  People have called me much worse.  Whatever
24 you like.
25       Anyway, Sue, have you ever had your deposition

Page 5

1  taken before?
2        A.  No.
3        Q.  Okay, well, let me sort of explain the process,
4  why, give you some hints and ground rules so it will make it
5  a little bit more comfortable and useful for all of us.
6        This part of a lawsuit is called discovery, and it
7  really is mostly what it says it is.  In this deposition
8  process here, I'll be asking you questions and the court
9  reporter will record my question, and then you'll give me an
10 answer and the court reporter will record the answer.  When
11 the thing is all pau and probably it's like ten days or more
12 or less, it will all be typed up in a little booklet and
13 you'll get a chance to see it and go over and make
14 corrections to make sure that the court reporter has written
15 everything down properly.  Every once in a while there will
16 be maybe a question that once you see it in writing, you
17 realize you didn't understand it, so you might want to make a
18 correction there, too, but you'll get a chance to do that
19 before everything is all finalized.
20       So there are three major purposes for a
21 deposition.  One is, as I said, discovery, to find out what
22 you know, and that's usually a primary purpose for these
23 things.
24       Another purpose is when this case goes to trial,
25 if for some reason you're unavailable as a witness, this

Page 6

1  could be used in place of your testimony at trial.
2  Generally, the court will have somebody read the deposition
3  questions and answers and then the jury will actually hear it
4  orally.
5       And the third reason is that if the case goes to
6  trial or when the case goes to trial, if you testify
7  differently than you testify today, somebody will almost
8  certainly point that out.  If I say, well, isn't it true that
9  X, and you say yes, it's true that X today, and then at trial
10 I say isn't it true that X, and you say no, no, no, Y, then
11 I'll point that out.  And that's called impeachment.  So
12 you'll have to explain why you're testifying differently at
13 trial than you are today.
14      Do you understand that?
15      A.  Yes.
16      Q.  And actually this brings us to another piece of
17 information.  The court reporter has a hard time copying down
18 properly things like uh-huh and huh-uh, and so if you would
19 avoid doing things like that that are sort of confusing when
20 they get into print, that will be great.  So if the
21 question -- if you can answer the question yes or no, if you
22 would say yes or no or okay or something along that line, it
23 would be much better than uh-huh or huh-uh.
24      The other thing is in normal conversation
25 oftentimes when people are talking, if they ask a question

Page 7

1  and the other person knows the end of the question before the
2  question is paw, and they already start answering because
3  they know what the question is.  That -- I mean you and I
4  will understand that perfectly well, but for the court
5  reporter, she's going to be taking down two people talking at
6  once, and it makes it very, very difficult.
7       So if you would wait until I'm finished talking
8  before you start answering, that would help the court
9  reporter out, and I'll try to did the same.  I'm just as
10 guilty as anybody else of doing that.  I get into the flow
11 and then I'm talking over everybody else.
12      So then the other thing that will happen is that
13 if you wait a half a beat until I'm finished -- I mean, after
14 I'm finished asking my question, and then the other attorneys
15 have actually the ability to insert objections and that will
16 give them an opportunity to object before you answer.
17      There may be things that I ask you that you're not
18 quite certain of.  I generally want you to avoid just pure
19 speculation, but if, for example, I say, well, you know, what
20 time was it, and you think, well, I think it was 11:00
21 o'clock, but it might have been 10:00, it might have been
22 9:00, it might have been 12:30, tell me what you think the
23 answer is and explain to me that you're not quite certain of
24 that.  So I would like your best response in those cases
25 where you actually think there's a response appropriate

Page 8

1  rather than just guessing.  But I don't want you to just say,
2  for example, well, it's 11:00 o'clock and then don't qualify
3  that when you think it might be 9:30.  I want to make sure
4  you qualify your responses if you think there's a question.
5       Do you understand that?
6       A.  Yes.
7       Q.  Is Mr. Lorusso your attorney today?
8       A.  Yes.
9       Q.  Have you retained Mr. Lorusso as your attorney?
10      A.  The day I was served.
11      Q.  And you have an attorney-client relationship with
12 Mr. Lorusso?
13      A.  Yes.
14      Q.  And that was formed on the day you were served
15 with the subpoena?
16      A.  Yes.
17      Q.  Have you met with Mr. Lorusso before your
18 deposition today?
19      A.  Yes, today.
20      Q.  You met today?
21      A.  Uh-huh.
22      Q.  Is that the only time you've met with him?
23      A.  Today was the only day.
24      Q.  The only time you've met with him?
25      A.  Yeah.

Page 9

1       Q.  And how long did you meet with him today?
2       A.  About half an hour.
3       Q.  About a half an hour.  Immediately before the
4  deposition today?
5       A.  Yes.
6       Q.  And did you discuss your testimony with
7  Mr. Lorusso?
8            MR. LORUSSO:  Let me object to the extent
9  that it calls for attorney-client privilege.  Any
10 communications or things that we talked about, I'll instruct
11 you not to answer.
12 BY MR. MOSELEY:
13      Q.  Okay, I'm asking you if you talked about your
14 testimony, not what you talked about, not the specifics of
15 the conversation.
16           MR. LORUSSO:  Same objection.  You can answer
17 if you understand the question.
18 BY MR. MOSELEY:
19      Q.  You know, in the relationship as your attorney, if
20 he thinks you're going to say something that's violative of
21 the attorney-client privilege, he is within his rights --
22 actually, it's probably his obligation to instruct you not to
23 answer, and then it's your choice to answer or not, but
24 Mr. Lorusso will say, "I instruct you not to answer."
25      So even though the attorneys are making

Page 10

1  objections, unless Mr. Lorusso says, "I'm instructing you not
2  to answer," then you should answer the question. And a point
3  of fact, even if Mr. Lorusso says, "I instruct you not to
4  answer," if you choose to waive the privilege, which I'm sure
5  Mr. Lorusso has explained to you, you can still do that,
6  although I'm sure he would advise you not to do that.
7       Do you understand that?
8    A.  Yes.
9    Q.  The question was: Did you discuss your testimony
10 today with Mr. Lorusso?
11      MR. LORUSSO:  Same objections. And also to
12 the extent it's vague and ambiguous. You can answer.
13      THE WITNESS:  What was -- can you repeat
14 that?
15 BY MR. MOSELEY:
16   Q.  Did you discuss your testimony today with
17 Mr. Lorusso?
18   A.  Yes.
19   Q.  And did you spend the whole half an hour
20 discussing your testimony?
21      MR. LORUSSO:  I'm going to object. Vague and
22 ambiguous, and to the extent it calls for attorney-client
23 privilege. Go ahead. You can answer if you understand. If
24 you understand the question.
25      THE WITNESS:  We talked about --

Page 11

1       MR. Lorusso:  Don't say what we did discuss
2  specifically.
3       THE WITNESS:  Okay.
4  BY MR. MOSELEY:
5    Q.  Let me tell you one other thing, too. At any time
6  during the course of this deposition you're entitled to take
7  a break if you want to use the restroom or get up and stretch
8  your feet or get a drink of water. That also includes if you
9  want to consult with your attorney. If you have -- if you
10 have a response that you're not sure whether you should be
11 giving in the sense of the privilege, you are certainly
12 within your rights to consult with Mr. Lorusso and get his
13 advice and counsel as to whether that's an appropriate
14 answer.
15      MR. LORUSSO:  In other words, don't talk
16 about the specific content. In other words, I said X, you
17 said Y, or anything. That's what I mean by asserting the
18 attorney-client privilege.
19      THE WITNESS:  Okay.
20      MR. MOSELEY:  Can you read back my last
21 question?
22      (Record read.)
23      MR. LORUSSO:  Same objections. Vague and
24 ambiguous.
25      THE WITNESS:  Yes.

Page 12

1  BY MR. MOSELEY:
2    Q.  Were you served with a subpoena for your
3  deposition here today?
4    A.  Yes.
5    Q.  I don't see any documents. Did you bring any
6  documents?
7    A.  Yes, I did.
8    Q.  Oh, may I see the documents you brought?
9       MR. MOSELEY:  Let's go off the record for a
10 minute.
11      (Off the record.)
12      (Exhibit No. 102 marked.)
13 BY MR. MOSELEY:
14   Q.  I'm going to show you what's been marked Exhibit
15 102. Are these the documents that you found which you
16 thought were responsive to my subpoena?
17   A.  Yes.
18   Q.  Did you look for documents in every category of my
19 subpoena? There were a lot of categories. There were 32
20 categories.
21      MR. LORUSSO:  By "categories" he means each
22 of the questions.
23      THE WITNESS:  I cannot retain -- get those
24 copies because I'm no longer with real property.
25 BY MR. MOSELEY:

Page 13

1    Q.  Where are you now?
2    A.  I'm at transportation services.
3    Q.  Oh, I see. So you obtained all the copies that
4  were in your personal possession?
5    A.  Yes.
6    Q.  And the copies that you have given us in Exhibit
7  102 are the only ones you had in your personal possession
8  that were responsive to any category in the subpoena; is that
9  right?
10   A.  Yes.
11   Q.  When did you move to -- the Department of
12 Transportation Services, right?
13   A.  Yes.
14   Q.  Okay, when did you move to the Department of
15 Transportation Services?
16   A.  April 1st was my last day at real property, so --
17   Q.  Of this year, '06?
18   A.  No, '05. So the first Monday, April 4th, was my
19 first day at DTS.
20   Q.  And what do you do at DTS?
21   A.  I'm the secretary for the traffic engineering
22 division.
23   Q.  Is that a promotion or a higher job category than
24 what you had at the assessment division?
25   A.  Yes.

4 (Pages 10 to 13)

Page 14

1  Q.  How did you come to transfer to DTS?  Is that
2  something you sought out?
3      A.  No.  I put my application in several years for
4  Secretary 3 within the City, and they selected my name from
5  the list just about the time in January or February of '05,
6  and I was called in for an interview.
7      Q.  Were you a Secretary 2 at the assessment division?
8      A.  Yes.
9      Q.  What's the difference between a Secretary 2 and a
10  Secretary 3?
11      A.  Secretary 2 is an SR 14 pay and a Secretary 3 is
12  SR 16.
13      Q.  Are the job qualifications significantly
14  different?
15      A.  Yes, a little bit more higher level with
16  department directing -- with the director and with the branch
17  chiefs.  My duties were more on a managerial level.
18      Q.  As an SR 16?
19      A.  Yes.
20      Q.  I hope they gave you a significant raise as well?
21      A.  They did.
22      Q.  Good.
23          How long have you worked for the City and County
24  of Honolulu?
25      A.  Close to 13 years now.

Page 15

1      Q.  13 years.  All right, were there no Secretary 3
2  positions open in the assessment division?
3      A.  Yes.
4      Q.  Okay, so you were just looking throughout the City
5  for whatever Secretary 3 position would come up?
6      A.  Yes.
7      Q.  Are there any Secretary 3 positions in the
8  assessment division?  Not open ones, but are there any
9  positions even if they're filled?
10      A.  There's one.
11      Q.  One, and who is that?
12      A.  Donnie Wong.
13      Q.  That's Gary's secretary?
14      A.  Yes.
15          MR. LORUSSO:  Let him finish his question,
16  even though you can anticipate what he's going to ask.
17  That's okay.
18  BY MR. MOSELEY:
19      Q.  I'll do that, too.  We'll catch you if we think
20  about it, but oftentimes I have to confess, we let it slide,
21  too, and the court reporter just does the best she can, and
22  she's very good, by the way, but -- okay.
23          Any other reason for wanting to transfer out of
24  the assessment division?
25      A.  No.

Page 16

1      Q.  You were happy there?
2      A.  Yes.
3      Q.  You had no concerns about your job there at all?
4      A.  No.
5      Q.  Are you familiar with Phil English?
6      A.  Yes.
7      Q.  That's the gentleman sitting here to my left?
8      A.  (Nodding head.)
9      Q.  You were working in the assessment division when
10  Phil worked there, weren't you?
11      A.  Yes.
12      Q.  Were you there when he started?
13      A.  Yes.
14      Q.  And you were there when he no longer came to work?
15      A.  Yes.
16      Q.  Did you, as the -- you were a Secretary 2, but who
17  was your boss there at the assessment division?
18      A.  Robert Magota.
19      Q.  As Robert Magota's secretary, did you have any
20  specific duties with respect to personnel?
21      A.  Yes.
22      Q.  And what were those duties?
23      A.  Do payroll, keep attendance of all the leaves, of
24  sick and vacation, of all the employees -- appraisal
25  employees.

Page 17

1      Q.  But not clerical?
2      A.  Clerical, budget, and clerical work.
3      Q.  Okay, what I meant was clerical, you didn't keep
4  attendance and keep track of sick leave and vacation for the
5  clerical employees?
6      A.  Yes, I did.
7      Q.  How about PTO?
8      A.  No, PTO took care of their own.
9      Q.  So you took care of the appraisers and the
10  clerical.  That would include appraisal assistants?
11      A.  Yes.
12      Q.  Okay, so were you responsible for telling people
13  whether or not they had sick leave or vacation time or other
14  types of time and leave available to them?
15      A.  Yes.
16      Q.  Wasn't -- was there also a printout of that stuff
17  that came in the -- was there something that attached to the
18  paycheck that showed that kind of stuff as well?
19      A.  The paycheck itself showed the balance at a
20  certain period of time, but it didn't show the actual
21  vacation or sick leave for the accrual, because the accrual
22  was maybe two months not put on, but that was the only time
23  you would see the balance, is on the pay stub.
24      Q.  But that was sort of behind the times by about two
25  months?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 18

1    A. Uh-huh, yes.
2    Q. But you were the person that would know in the
3  division what you had coming, if you wanted to know what it
4  was, right?
5    A. Yes.
6    Q. Okay. All right, so you were there when Phil
7  started?
8    A. Yes.
9    Q. I notice in Exhibit 102, the first page of this,
10  actually, the first -- looks like the first three pages of
11  this, cover a specific subject, and that's an orientation
12  meeting; is that right?
13    A. Yes.
14    Q. And the orientation meeting was to start on
15  Wednesday, July 26th, 2000 at 8:00 a.m.; is that right?
16    A. Yes.
17    Q. Was this essentially your first contact with Phil
18  English, was with respect to this meeting?
19    A. Can you clarify that?
20    Q. Well, did you have any formal contact with Phil
21  English before this meeting?
22    A. Can you clarify "meeting"?
23    Q. Before the meeting that is referred to in Exhibit
24  102 on the first three pages.
25    A. Well, this is my first incident.

Page 19

1    Q. Okay, did you meet him earlier than this, though,
2  did he come in, for example, and sign up paperwork with you
3  or something?
4    A. No.
5    Q. So you hadn't actually dealt with him before this
6  incident?
7    A. Oh.
8    Q. Is that right?
9    A. No, I dealt with him when he first came to real
10  property.
11    Q. And what did that dealing consist of?
12    A. Paperwork, signing his -- keeping track of -- not
13  keeping track, an address of the employees, address,
14  telephone number, emergency information, paper that -- filing
15  for his beneficiary forms, mainly personnel.
16    Q. So you were responsible for doing all those sort
17  of initial personnel things?
18    A. Yes.
19    Q. Contact information, benefit forms, Social
20  Security information, health insurance, what have you; is
21  that right?
22    A. Yes.
23    Q. So that was your first contact with Phil, right?
24    A. Yes.
25    Q. And was the incident described in the first three

Page 20

1  pages of Exhibit 102, was that your next contact with Phil?
2    A. No.
3    Q. You had a contact in between?
4    A. We would talk about -- just say hi, good morning.
5    Q. I guess I should have limited it to in terms of
6  actually doing business rather than social pleasantries.
7    A. This is the first -- this is actually the first --
8  I would say important incident that I considered, I felt,
9  that was necessary to bring it up.
10    Q. Okay. Taking a look at the first page of Exhibit
11  102, on the second paragraph there it says beginning with
12  "Violet Lee," do you see that paragraph?
13    A. Yes.
14    Q. First of all, is this an email to somebody?
15    A. Yes, this email is to Philip and to Wilfred.
16    Q. On this first page?
17    A. Yes, it's to Philip.
18    Q. How can you tell it's to Philip?
19    A. It has his name on there.
20    Q. As required attendees?
21    A. Yes.
22    Q. This is not just a note to the file to explain
23  what happened?
24    A. Yes, it's a file to explain what happened, why he
25  was not there at the orientation when he was supposed to be

Page 21

1  there.
2    Q. Basically it says that you received a call from
3  Violet Lee, and you went to Phil's desk and saw him there at
4  around 9:30, and then he opened his task on the Outlook and
5  pulled up an email that you sent him and he pointed his
6  finger at start time and showed you a different time, later
7  than what I originally sent him. Do you see that?
8    A. Yes.
9    Q. What time did he show you?
10    A. 11:00 o'clock, 11:30. 11:00 or 11:30. I remember
11  it was something.
12    Q. What happened is you went over there to find out
13  why he wasn't at the meeting?
14    A. Yes, because Violet Lee wanted me to find out
15  where he was and to go to the director's office because they
16  were all waiting for him.
17    Q. And so he -- what, did he say you -- I thought it
18  was later?
19    A. He told me that I sent him an email task that
20  showed 11:00 o'clock instead of 8:00 o'clock.
21    Q. Did he pull it up for you and show it to you?
22    A. It was already open. His monitor was there and I
23  saw it.
24    Q. And it said 11:00 o'clock on it?
25    A. Yeah.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 22

1    Q.  Other than that time, did it look like something
2  you had sent him?
3    A.  No.  I sent him the original email that I have
4  here that says 8:00 o'clock.
5    Q.  Okay, other than the difference in time, is what
6  he had on his screen the same as your original email?
7    A.  Can you rephrase that?
8    Q.  What was it he had on his screen that said 11:00
9  o'clock?
10    A.  The time that he had to be there.
11    Q.  Okay, but what -- what was the document that he
12  was showing you?
13    A.  The task document that I sent him, this email.
14    Q.  The --
15    A.  This one right here.
16    Q.  Page 2 of this exhibit?
17    A.  Page 3.
18    Q.  Page 3.  So he showed you something that looked
19  like page 3 but instead of 8:00 a.m. it said 11:00 a.m.?
20    A.  Yes.
21    Q.  But other than that, it looked exactly like page 3
22  did?
23    A.  Yes.
24        MR. WONG:  When you're referring to page 3,
25  you're referring to --

Page 23

1        MR. MOSELEY:  Page 3 of Exhibit 102, the
2  third page of Exhibit 102.  Actually, maybe we should
3  identify it further.  It says, "Subject:  New employment
4  departmental orientation," and then two lines below it says,
5  "Start, Wednesday, 7/26/2000 at 8:00 a.m."
6        MR. LORUSSO:  I'm sorry, counsel, that's very
7  similar to the way the front starts.
8        MR. MOSELEY:  Okay, how do we differentiate?
9        MR. LORUSSO:  May I suggest going 102 A, B,
10  C?
11        MR. MOSELEY:  Okay, we'll mark them A for the
12  first page, B for the second page, C for the third page, D
13  for the fourth page, E for the fifth page, F for the sixth
14  page, G for the seventh page, H for the eighth page, I for
15  the ninth page, and J for the tenth page.
16  BY MR. MOSELEY:
17    Q.  So what I'm talking about and what you're talking
18  about is 102 C; is that correct?
19    A.  Correct.
20    Q.  Did -- when Phil showed you that page, did you
21  make any comments or ask him any questions about it?
22    A.  Yes.
23    Q.  What did you say or ask?
24    A.  I told him that I sent him the email that showed
25  8:00 o'clock a.m., that he had to be at the department of --

Page 24

1  BFS director's office at 8:00 o'clock, but he said that he
2  was -- he showed me 11:00 o'clock and I thought that was odd.
3    Q.  Are these emails in a format that you can change
4  them --
5    A.  Yes.
6    Q.  -- after you receive them?
7    A.  Yes.
8    Q.  Okay.  And what was the end time that was shown on
9  his email?
10    A.  I don't know.
11    Q.  You say in -- on page A of 102 that you went back
12  to your desk and showed him your printed email you sent him
13  and pointed out that he must have changed the time on his
14  task reminder.  Do you see that?
15    A.  Yes.
16    Q.  And so you believe that he had changed the time on
17  his task reminder?
18    A.  Yes.
19    Q.  Okay, you further say:  "He then said if I could
20  call Violet and let her know it wasn't his fault for being
21  late and stated to me, 'I'm not a flake.'"
22        Is that what he said to you, "I'm not a flake"?
23    A.  Yes.
24    Q.  And he asked you to call Violet and tell her it
25  wasn't his fault?

Page 25

1    A.  Yes.
2    Q.  And you didn't call Violet?
3    A.  I called Violet and I told her that Phil was
4  leaving the office to go to the meeting.
5    Q.  But you didn't say anything further to Violet?
6    A.  No.
7    Q.  What is page B of Exhibit 102?
8    A.  That was the email I sent to Wilfred Martin.  He
9  responded to my email.
10    Q.  That was on July 19th, 2000?
11    A.  Yes.
12    Q.  What is the sentence on the bottom?  "Therefore,
13  just to confirm that the orientation was set for 8:00 a.m.,
14  Wilfred Martin sent me an acknowledgment that he will go
15  directly to city hall to attend the orientation as
16  scheduled."
17        What does that mean?
18    A.  This is the acknowledgment right here that he
19  responded to my email.
20    Q.  Wilfred Martin did?
21    A.  Yes.
22    Q.  Which email did he respond to?
23    A.  This one right here, B.
24        MR. LORUSSO:  You're pointing to -- is the
25  middle of the page where it says under original appointment;

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 26

1  is that correct?
2         THE WITNESS:  Correct.
3  BY MR. MOSELEY:
4      Q.   Does this mean that there was a change in the
5  time?
6      A.   No.  It just states that he responded to me and
7  confirmed that he read my email and was -- put it on his
8  calendar and would go to the meeting.
9      Q.   He would go directly to city hall?
10     A.   Yes.
11     Q.   What does that mean?
12     A.   He would go directly to city hall for the meeting
13  with the director.
14     Q.   Rather than showing up for work?
15     A.   Yes.
16     Q.   Did you send Phil English an email similar to that
17  set forth in 102 B?
18     A.   Yes.
19     Q.   And did he respond to you?
20     A.   No.  It states not yet responded as of July 26th.
21     Q.   I'm sorry, where does it say not yet responded as
22  of July 26th?
23     A.   Meeting status.
24         MR. LORUSSO:  On A.
25         MR. MOSELEY:  Oh, on A.

Page 27

1         MR. LORUSSO:  Can we go off the record or are
2  you fine?
3         MR. MOSELEY:  Sure.
4         (Recess taken.)
5  BY MR. MOSELEY:
6      Q.   Off the record an explanation has been proffered
7  to me that essentially what appears on 102 B was the original
8  email you sent to both Wilfred Martin and Phil English.  Then
9  apparently the Outlook calendar, when the person accepts the
10  email, it sends a message back to you that the person has
11  accepted it.  Is that right?
12     A.   Yes.
13     Q.   And then this note, "just to confirm," that was
14  your note to the file basically saying that he -- Wilfred
15  Martin acknowledged it and he would go directly; is that
16  right?
17     A.   Yes.
18     Q.   And if you look at page 102 A, as of the date of
19  102 A, which I guess is July 26th, '07, I mean July 26th,
20  2000, Philip English had not yet responded?
21     A.   Yes.
22     Q.   So what -- what does C show?  Is that just like A
23  except without the note on the bottom?
24     A.   Yes, it still shows that he did not respond.  This
25  is from my computer.

Page 28

1      Q.   On both A and C it says:  "Show time as
2  tentative."  What does that mean?
3      A.   It was part of a default on the Outlook.
4      Q.   Okay.
5      A.   It's a default title that's used.
6      Q.   And what do you have to do to take care of that
7  show time as tentative?
8      A.   You can go in and say that it's a tentative time,
9  but as for attendance purposes, they have to be there at 8:00
10  o'clock.  That's -- because I did payroll.  I had to make
11  sure that for attendance purposes, if they didn't show up to
12  work, I know that they were there at this meeting.  That's
13  what tentative means, because they may not go because they're
14  sick.
15     Q.   Okay.  So when this message went to Phil, did it
16  say show time as tentative?
17     A.   Yes.
18     Q.   And this -- when did he start working there?
19     A.   I can't recall.
20     Q.   Well, if this was an initial orientation, it was
21  not too long before then, was it?
22     A.   Correct.
23     Q.   And you're thinking is that Phil changed the time
24  somehow to 11:00 a.m. from 8:00 a.m.; is that right?
25     A.   Yes.

Page 29

1      Q.   I did not know you could do that on incoming
2  emails.  And the system you use is Microsoft Outlook?
3      A.   Yes.
4      Q.   And the recipient can modify the message sent to
5  the recipient on that system; is that right?
6      A.   Yes.
7      Q.   What is shown on -- let's go back to the first
8  three pages.  Did Phil offer any other explanation other than
9  to show you the original time as 11:00 a.m.?
10         MR. LORUSSO:  Objection.  Asked and answered
11  and to the extent that the document speaks for itself.
12         THE WITNESS:  It states right there.  It's
13  stated right here.
14  BY MR. MOSELEY:
15     Q.   That's the only explanation he offered you was
16  just to show you that the original start time on his was
17  11:00 a.m.?
18     A.   Yes.
19     Q.   Did you say to him you must have changed it?
20     A.   Yes.
21     Q.   And what did he say when you said that to him?
22     A.   He didn't say anything.  And then he said can you
23  please call Violet and let her know that it wasn't his fault
24  for being late and that I'm not a flake.
25     Q.   Anything else he said to you?

8 (Pages 26 to 29)

Page 30

1     A.  No.
2     Q.  Did this ever come up at some later date?
3     A.  No.
4     Q.  So after this exchange, this was the last bit of
5  controversy about this particular incident?
6     A.  Correct.
7     Q.  Taking a look at page D, as in dog, of Exhibit
8  102, can you tell me what we're looking at here?
9     A.  It's the first day that, Friday, 2/28/03, I came
10  to work, all the appraisers were at training, at an IAAO
11  training, and there was a note on my chair and it said call
12  him ASAP.  So I called Phil.  He asked me -- he wanted to
13  fill out a form for someone who was sick, and I had to ask
14  him if it's a workman's compensation form that he's referring
15  to and he said yes.
16     Q.  And then what happened?  He gave you a doctor's
17  note?
18     A.  Yes, he gave me a note to look at, and I -- it
19  said D-E-F, and I didn't understand what that meant, and he
20  said it means deferred, meaning it's confidential.  And so I
21  explained to him the process of filing a workman's comp.  It
22  needs to have the signature of the supervisor as to how
23  the -- when the sickness started, and it needed to go to the
24  personnel department, too, for processing, because if there's
25  no supervisor's note or signature, the workman's comp form

Page 31

1  will be sent back to our department to fill it out, and it
2  will just only delay the process.
3        So I explained that to him, that you needed to
4  have all that information done with the note and it goes to
5  personnel to process for workman's comp.
6     Q.  So what happened then?
7     A.  Then he came back and he said he wanted to -- I
8  think he went down there.  He came back and he said he called
9  up the workman's comp, and I'm not sure if he even called
10  that man, Adam Kupau.  He may not have been at the office.
11  But he said he's going to go down there and speak with
12  somebody, because someone at the workman's comp told him that
13  it's okay, as long as he had a supervisor's -- from, I guess,
14  just to sign, a statement, just a statement.  But I asked him
15  if he was going to leave the office, he needed to, you know,
16  contact his supervisor and let him know that he was leaving
17  the office because he was supposed to have gone to a
18  mandatory training.
19     Q.  And then what happened?
20     A.  So then I went back downstairs to collect the
21  sign-in sheets, and I was surprised to see Phil sitting down
22  at Julie's desk talking to Carole, and I asked if -- when he
23  was leaving.  He said he was waiting.  So I just walked away.
24        I went downstairs to the basement to collect the
25  other sign-in sheets and I saw Gary.  He asked why Phil was

Page 32

1  not at the meeting, and I told Gary that -- exactly what
2  happened here.
3     Q.  Did Gary ask you why Phil was not at the meeting,
4  or did he ask you why Phil was still in the office?
5     A.  He was -- he was still -- why he was still in the
6  office and wasn't at the training.
7     Q.  So did Gary indicate that he had seen Phil in the
8  office?
9     A.  I don't know.
10     Q.  When did you make this note?
11     A.  That same day.
12     Q.  At around 8:05 a.m.?
13     A.  Correct.
14     Q.  Did somebody ask you to make this note?
15     A.  I did it myself.
16     Q.  And then the second note on here, Monday, 3/3/03,
17  did you also do that yourself?
18     A.  Yes.
19     Q.  And did anybody ask you to make that note?
20     A.  Can you repeat that again?
21     Q.  Did somebody ask you to make that note?
22     A.  No, I did it myself.
23     Q.  Are these notes you put in Phil's file?
24     A.  Yes.
25     Q.  What -- can you explain the first paragraph under

Page 33

1  Monday, 3/3/03?
2        MR. LORUSSO:  This one.
3  BY MR. MOSELEY:
4     Q.  It says you collected time sheets Monday.
5        MR. LORUSSO:  Sign-in sheets.
6  BY MR. MOSELEY:
7     Q.  I'm sorry, sign-in sheets on Monday?
8     A.  Correct.
9     Q.  These were the sign-in sheets for Friday?
10     A.  Yes.  He didn't sign out.
11     Q.  He did not sign in or he did not --
12     A.  He did not sign in.  So I had to find out how I
13  was going to complete the pay time and attendance for Phil
14  for the entire division because it will be held back, and we
15  had a deadline.  Wednesday is the deadline.
16     Q.  And how did you check on that?
17     A.  I had to call -- I spoke with Annie.
18     Q.  That's Ann Gima?
19     A.  Yes.  She advised me to call Violet.  Violet
20  advised me to talk to Mike Golojuch.
21     Q.  Since he was taking care of this case; is that
22  right?
23     A.  Yes.
24     Q.  Did you know what she was talking about when she
25  said Mike Golojuch is taking care of this case?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 34

1    A.  I don't know.
2    Q.  Do you know what case they were talking about?
3    A.  No.
4    Q.  You have it also listed here Monday, 3/03/03, 8:30
5  a.m.: "Called Mike Golojuch at 8:30 and left message for him
6  to call me back."
7       Do you see that?
8    A.  Yes.
9    Q.  Did you just ask him to call you back, or did you
10 leave any further messages?
11   A.  I just left a message for him to call me back.
12   Q.  Did Mike Golojuch call you back?
13   A.  Yes, he did, at 1:00 o'clock.
14   Q.  Okay, let's go down to the next entry on page D,
15 as in dog. "Monday, 3/3/03 at 10:30 a.m., Bob called me to
16 his office."
17       Did you write this note?
18   A.  Yes.
19   Q.  And, again, you were just documenting your
20 activities for the file?
21   A.  Yes.
22   Q.  What -- what happened that you're documenting
23 here?
24   A.  Can you clarify that?
25   Q.  Sure.  Tell me what happened.

Page 35

1    A.  I'm sitting in here trying -- they called me in
2  basically to discuss the attendance, and they wanted my --
3  they wanted me there so that I can understand how the
4  attendance would go into the PT&A, so I needed direction,
5  because I couldn't just put in anything without
6  authorization.
7    Q.  And eventually they said to put in that you
8  authorized him to go see Tom Riddle?
9    A.  No.  That was a note to myself that I needed to
10 confirm from Bob, Gary, Annie that the day that Phil left
11 they had to have at least authorized him from leaving the
12 office, because I don't want them telling me that he left the
13 office because you told him to leave.  Because I'm not his
14 supervisor.  Bob was his supervisor -- Annie was his
15 supervisor.
16   Q.  What does this mean: "Bob, Annie and Gary agreed
17 that Phil would say Sue allowed him to go see Tom Riddle"?
18       Were they speculating about what Phil was going to
19 say about who authorized him to go?
20   A.  Correct.
21   Q.  So in other words, they were saying that Phil was
22 going to blame you for that; is that right?
23   A.  Correct.
24   Q.  And then apparently -- so what was determined in
25 terms of who authorized him to go see Tom Riddle?

Page 36

1    A.  I don't know.
2    Q.  And then Bob directed you to deduct vacation pay
3  starting 2/28/03?
4    A.  Correct.
5    Q.  Until it's depleted, and then if he's not in
6  office, leave without pay?
7    A.  Yes.
8    Q.  That's what LWOP means?
9    A.  Correct.  That's the usual procedure we all use in
10 the City payroll system procedure.
11   Q.  Is that eventually what you did?
12   A.  Correct.
13   Q.  On the next page, E, it says "Monday, 03/03/03 at
14 1:00 p.m.," is this the note with respect to Mike Golojuch
15 calling you back?
16   A.  Yes.
17   Q.  And what did Mike Golojuch say when he called you
18 back?
19   A.  He advised me to discuss with Bob and Gary to
20 contact Phil by the end of the week or a couple of days of
21 the projected vacation it will run out.  So I had to Phil
22 informed that his vacation is running out.  Basically
23 payroll -- payroll has the last say.  I'm just doing the
24 attendance.  I'm just keeping attendance.
25   Q.  Basically, it looks like Mike told you to discuss

Page 37

1  it with Bob and Gary; is that right?
2    A.  Yes.
3    Q.  What did they want Bob and Gary to discuss with
4  you?
5    A.  To contact Phil and send him the balance of
6  what -- I had a -- I created a running -- a leave report that
7  showed all the entries, and it gave you a detailed amount of
8  how much he would have left if he were to use up all his
9  vacation and at what point in time it would go into leave
10 without pay.  So I sent that to Phil by letter to keep him
11 informed.
12   Q.  And then at the bottom of that paragraph it says:
13 "See email I sent to Bob outlining what Mike Golojuch
14 advised."
15   A.  Yes, this is exactly what he told me.  I don't
16 have the email.
17   Q.  Was there a separate email?
18   A.  I can't remember.
19   Q.  Would you have referred to a separate email if you
20 didn't have one?
21   A.  Yes.
22   Q.  If somebody who's not familiar with your process
23 reads "see email I sent to Bob outlining what Mike Golojuch
24 advised," doesn't that seem to suggest there's an email you
25 sent to Bob outlining what Mike Golojuch advised?

10 (Pages 34 to 37)

Page 38

1    A. Yes.
2    Q. But there wasn't one?
3    A. There was one.
4    Q. Oh, there was one?
5    A. I didn't print it out. I don't know what happened
6  to it.
7    Q. When did you print all this stuff up?
8    A. Daily. It's a daily entry.
9    Q. When did you print this -- these entries out?
10    A. That was back in -- must have been '04, '03?  '03.
11  I would present it out as each week came, I would print it
12  out, put it in, and as it'd be updated, I typed it in,
13  reprint it and put it back in to show the sequence of what
14  has been happening.
15    Q. So it says Monday 03/03/03 at 3:13 p.m., "See
16  email." What's that reference to, the "see email"?
17    A. That was about a leave that was taken on 10/25/02
18  for four hours of vacation, because it was unauthorized
19  leave, and I had to find out if that four hours was going to
20  be deducted or as a late entry on the pay time and
21  attendance.
22    Q. And did you deduct that?
23    A. Yes.
24    Q. So who approved that leave?
25    A. Bob did.

Page 39

1    Q. And Bob also instructed you to deduct four hours
2  of vacation?
3    A. Correct.
4    Q. Was it, in fact, a four-hour absence on 10/25/02?
5    A. It was vacation.
6    Q. Was it a four-hour absence?
7    A. Yes.
8    Q. Do you know what time he started?
9    A. I can't recall.
10    Q. But you calculated it to be four hours; is that
11  right?
12    A. On the pay -- on the sign-in sheet it showed four
13  hours that was unaccounted for.
14    Q. So he signed out and he signed out four hours
15  early; is that right?
16    A. Correct.
17    Q. What late entry was made on 3/4/03 on the time and
18  attendance of 2/23/03?
19    A. The 10/25/02.
20    Q. But you're writing this on 3/3/03 that says see
21  late entry made on the following day?
22    A. Yes.
23    Q. So you intended to make that late entry; is that
24  right?
25    A. No.

Page 40

1    Q. You had already made the late entry?
2    A. No.
3    Q. Okay, I don't understand the reference to the
4  following day, then. How can you refer to something that
5  happened on the following day when the following day hasn't
6  come yet?
7    A. I made the late entry on 3/4/03 to deduct the four
8  hours for 10/25/02.
9    Q. And you wrote that down on 3/3/03?
10    A. No, that was the day he approved it.
11    Q. He approved it on 3/3/03?
12    A. Yes.
13    Q. So these days and times are not necessarily
14  reflective of the time you're writing down this note?
15    A. No, this is what happened. The day he -- 3/3
16  represents the day that he approved the leave to be deducted
17  from the payroll.
18    Q. And when did you write this note?
19    A. 3/3.
20    Q. I submit to you, you didn't write it on 3/3 if you
21  said see late entry made on 3/4.
22        MR. LORUSSO: Object to the form.
23  Argumentative.
24        THE WITNESS: The next day I made the late
25  entry, 3/4.

Page 41

1  BY MR. MOSELEY:
2    Q. But you didn't write this particular note on 3/3,
3  did you?
4    A. I did.
5    Q. So it should have said see late entry I will make
6  on 3/4?
7        MR. LORUSSO: Objection. Argumentative. Do
8  you understand his question?
9  BY MR. MOSELEY:
10    Q. How can you write a note on 3/3 about something
11  that you did in the past tense on 3/4?
12        MR. LORUSSO: Object to the form.
13  Argumentative. Document speaks for itself.
14        THE WITNESS: See the bottom where it says
15  "since Joyce was on vacation 3/3"?
16  BY MR. MOSELEY:
17    Q. Yes.
18    A. Only Joyce could make that late entry.
19    Q. Okay.
20    A. So that's why the next day it was made by Joyce.
21    Q. Well, then --
22    A. See, Joyce is the payroll clerk.
23    Q. Did you -- this entry that's described 03/03/03 at
24  3:13 p.m., when did you make this note?
25    A. I made that note that day, because you see we can

11 (Pages 38 to 41)

Page 42

1  go into the payroll and make a late entry the next day. I
2  think I might have made this 3/4. I made a mistake maybe.
3      Q. Okay, so you created this note on 3/4 describing
4  things that happened on 3/3; is that right?
5      A. Correct.
6      Q. You see the problem now that I'm having
7  understanding this, yes?
8      A. Okay.
9      Q. Yes? Okay. How do you know that you didn't make
10  it -- or how can I tell that you didn't make this entry a
11  significant time later?
12      A. Because I documented it that time. I was typing
13  it at that hour.
14      Q. But you weren't typing it on 3/3/03 at 3:13 p.m.,
15  were you?
16      A. I was.
17      Q. Okay. If you were typing it at 3/3 -- on March
18  3rd of 2003 at 3:13 p.m., how could you possibly know a late
19  entry was made on March 4th of '03?
20      A. Because if Bob approved it, then I would know it
21  would be the next day I would put it in.
22      Q. It would be made?
23      A. It would be made.
24      Q. Not that it had been made?
25      A. It would be made.

Page 43

1      Q. So your note here is not saying that it was made,
2  but that instead it would be made?
3      A. Yes.
4      Q. The next date says Tuesday, March 3rd -- or March
5  4th of '03, "Joyce responds to my email."
6      Do you see that?
7      A. Yes.
8      Q. What are you explaining here?
9      A. I'm explaining his low leaves for the days of
10  10/25/02, 2/28/03, and I'm asking Joyce to -- we were going
11  over, back and forth, to explain to me how many hours does he
12  have left. That's basically what was discussed here and
13  explained here.
14          MR. LORUSSO: Can we take a short break,
15  please?
16          MR. MOSELEY: Sure.
17          (Recess taken.)
18          MR. MOSELEY: Okay, let's go back on the
19  record.
20  BY MR. MOSELEY:
21      Q. Now, I'm not sure it's going to be worthwhile to
22  get into detail about each one of these entries. Basically,
23  the rest of this log details your conversations with various
24  people on how to deal with Phil's payroll, vacation, and
25  leave without pay; is that right?

Page 44

1      A. Yes.
2      Q. And when we were talking about the last item, you
3  talked about Joyce and you discussing the non-accrual of 14
4  hours for February; is that right?
5      A. Yes.
6      Q. Eventually, was there an accrual of 14 hours for
7  February?
8      A. Eventually there was given hours back to him
9  because the workman's comp was approved and he -- Joyce had
10  to adjust the entries so that he could get back the accrual.
11      Q. There is a note here on Thursday, March 6th of '03
12  that Bob called you into his office, and you didn't go to see
13  him until 2:00 p.m.; is that right?
14      A. Yes.
15      Q. And Gary Kurokawa and Ann Gima were there?
16      A. Yes.
17      Q. Did either one of them say anything to you?
18      A. No.
19      Q. But Bob handed you a letter and said just send
20  this to Philip?
21      A. Yes.
22      Q. What did the letter say?
23      A. I can't remember.
24      Q. Did it deal with his sick leave and vacation pay
25  and things like that?

Page 45

1          MR. LORUSSO: Objection to the extent it
2  calls for speculation.
3          THE WITNESS: I'm not sure.
4  BY MR. MOSELEY:
5      Q. Okay. Again on Monday, March 10th of 2003, it
6  says Bob called you into his office and Gary Kurokawa was
7  present; is that right?
8      A. Yes.
9      Q. And Bob gave an overview of what he learned from
10  Tom Riddle; is that right?
11      A. Yes.
12      Q. And what did Tom Riddle say -- what did Bob report
13  that Tom Riddle said?
14      A. I can't recall.
15      Q. Did it discuss Philip's condition at all?
16      A. Can't recall.
17      Q. How long was this discussion?
18      A. I can't recall.
19      Q. Do you know why you were called into this
20  discussion?
21      A. No.
22      Q. Did you find it odd that you were there?
23          MR. LORUSSO: Objection. Vague and
24  ambiguous.
25          THE WITNESS: Well, I'm the secretary.

12 (Pages 42 to 45)

Page 46

1   BY MR. MOSELEY:
2       Q.  Did you take notes?
3       A.  No.
4       Q.  Did you have any idea what the purpose of your
5   attendance at that meeting was?
6       A.  To discuss his attendance, because of workman's
7   comp.
8       Q.  Were you asked about his attendance?
9       A.  Yes.
10      Q.  What were you asked?
11      A.  Regarding the leave without pay.
12      Q.  What did they ask you about the leave without pay?
13      A.  I can't remember.
14      Q.  And then on Monday, March 17th, you found a letter
15  from Bob on your chair?
16      A.  Yes.
17      Q.  And do you know what that letter said?
18      A.  I can't remember.
19      Q.  You don't have any idea of the subject matter at
20  all?
21      A.  It had to do with his leaves.
22      Q.  And then also on Monday, March 17th, you actually
23  talked with Phil on the phone?
24      A.  Yes, he called me.
25      Q.  Okay.  And you advised him that his check had been

Page 47

1   deposited?
2       A.  Yes.
3       Q.  Is that right?
4           When you say:  "I assess to help him by referring
5   him to the Hawaii Food Bank," what did you mean by that?
6       A.  I meant to offer some sort of help if he needed
7   food.  I said to call the Hawaii Food Bank if he needed food,
8   because he didn't -- he wasn't sure about his check being
9   deposited.
10      Q.  Okay.  Then Phil called again on March 21st, did
11  he?
12      A.  Yes.
13      Q.  And he asked about his medical premiums?
14      A.  Yes.
15      Q.  And what did you tell him?
16      A.  Well, I explained to him that the -- breakdown
17  for the premiums and the change of address form he needed to
18  fill out because it would only delay the check from getting
19  to him if I didn't have his correct address.
20      Q.  When you saw Phil on February 28th of 2003, did he
21  look normal to you?
22          MR. LORUSSO:  Objection.  Vague and
23  ambiguous.
24  BY MR. MOSELEY:
25      Q.  Or did he look sick?

Page 48

1       A.  I can't recall.
2       Q.  On Wednesday, April 9th, 2003, you say there was a
3   later dated -- a letter dated 4/9/03 that was sent to Phil
4   requesting his presence to discuss his annual job performance
5   evaluation.  Do you see that?
6       A.  Yes.
7       Q.  Who told you to that send that letter, or did you
8   send that letter?
9       A.  Mr. Magota.
10      Q.  Were you the one that actually sent the letter?
11      A.  Yes.
12      Q.  It says "we request a meeting on 4/17/03," who is
13  the "we" referring to?
14      A.  Bob and Annie.
15      Q.  Did Bob tell you anything about that letter other
16  than send it?
17      A.  He didn't tell me anything, just to send a letter.
18      Q.  Did you draft the letter?
19      A.  No.  He drafted it.
20      Q.  He drafted it.  Did you type it up?
21      A.  Bob had a tendency to type his own letters and I
22  would just send it out.
23      Q.  What does this note on April 28th of 2003 mean?
24  This is on page F of Exhibit 102.
25      A.  He wanted to cancel Pim from his insurance, and

Page 49

1   because it was -- the open enrollment is only between a
2   certain window of time beginning April 1st and May 1st, and I
3   told him that he doesn't have to worry about not putting --
4   not taking Pim off because it's a new open enrollment, and so
5   whatever he applies, he just applies for himself, then that's
6   just it, he just applies for himself.
7           But I needed to have him send back to me this PCP
8   form, which is a premium conversion plan form, which skims
9   off the medical from your pay so it lowers your net for tax
10  purposes, and I needed to have him sign that form and return
11  it to me as soon as he could.  That's why I told him I
12  enclosed the stamped envelope that I enclosed for him to use.
13      Q.  Did he tell you why he wanted Pim cancelled from
14  his insurance?
15      A.  No.
16      Q.  Take a look at page G of Exhibit 102.  Can you
17  explain what this is?
18      A.  This is from Joyce, telling me what she's doing to
19  adjust Phil's leave pay -- relief records, and to use a
20  coding is used for the pay time and attendance.  W7
21  represents workman's comp.
22      Q.  I see.  So as of April 7th, you changed the time
23  and attendance to workman's comp?
24      A.  Yes.
25      Q.  And what -- what is the --

13 (Pages 46 to 49)

Page 50

1    A.   Joyce --
2    Q.   -- the effect of that to Phil?
3    A.   It gives him -- I can't -- I don't know.  I'm not
4  the payroll clerk.
5    Q.   I think there was something else you were going to
6  say.  I think I interrupted part of your answer.  Did I?
7    A.   No.
8    Q.   And page H, what does this mean?
9    A.   I was asking Joyce to fax me Phil's leave record
10  because when a person goes on low leave, the payroll at city
11  hall keeps a card separate from other people, it's a low
12  leave card, and I wanted to -- just to verify what Joyce is
13  doing is correct on my side.  That's all.
14    Q.   And she emailed you that card?
15    A.   Yes.
16    Q.   There was also a late entry for sick leave on
17  February 4th of 2003?
18    A.   Yes.
19    Q.   What is a C-H-R-M-S?
20    A.   CHRMS.  CHRMS is the City's -- City's -- it's a
21  system, it's a -- that's how -- it's a newer version of this
22  payroll system that they had, but it's no longer in use
23  anymore.  It was an increment -- an acronym, I mean, for that
24  program.
25    Q.   Okay.  And exhibit -- I mean page J of Exhibit 102

Page 51

1  is a further explanation of the sick leave of February 4th,
2  2003?
3    A.   Yes.
4    Q.   And you looked through your files and you found no
5  other documents responsive to our subpoena request?
6        MR. LORUSSO:  Objection.  Asked and answered.
7        THE WITNESS:  Yes.
8  BY MR. MOSELEY:
9    Q.   And where did you find these documents that are in
10  Exhibit 102?
11    A.   These were from my computer.  It was in the file,
12  Phil's file.
13    Q.   Okay.  I thought you said that when you looked for
14  these documents, you didn't have access to that?
15    A.   I didn't say that.
16    Q.   What did you say?
17    A.   I said I got this from the email.  I printed it
18  out.
19    Q.   So you still have access to your old email files?
20    A.   No.  It was deleted when I went over to
21  transportation, everything was wiped out.
22    Q.   When did you print out the documents that are in
23  Exhibit 102?
24    A.   As each day came by, I printed it out.
25    Q.   And where did you keep the hard copies?

Page 52

1    A.   In the file, Phil's personnel file.
2    Q.   Did you just recently look in Phil's personnel
3  file for these documents?
4    A.   No, I had -- I had these.
5    Q.   Where?
6    A.   At home.
7    Q.   You took Phil's personnel information home?
8        MR. LORUSSO:  Objection.  Misstates the
9  testimony.
10       THE WITNESS:  Just -- just these.
11  BY MR. MOSELEY:
12    Q.   You had these files that are in Exhibit 102, you
13  had these at your house?
14    A.   No, they were at the office.
15    Q.   When you just looked for them, did you just look
16  for them in response to our subpoena?
17    A.   I had them with me, these, just this.
18    Q.   Okay.  Where did you have them?
19    A.   In my file.
20    Q.   What file?
21    A.   My home file.
22    Q.   Your home file?
23    A.   Uh-huh.
24    Q.   So you had these documents that are in Exhibit
25  102 --

Page 53

1    A.   Yeah.
2    Q.   -- you had them in your file at home?
3    A.   And it's also in Phil's personnel file.
4    Q.   These particular documents here, though, you had
5  these documents in a file at your house; is that right?
6    A.   Correct.
7    Q.   Why did you have Phil's personnel information in a
8  file at your house?
9        MR. LORUSSO:  Just for the record, I'll
10  object to the characterization, as opposed to Exhibit 102.
11       THE WITNESS:  Well, because I felt that this
12  was pertinent to protect myself, because I was a payroll
13  clerk and I was a secretary.
14  BY MR. MOSELEY:
15    Q.   So you took these pieces of information home to
16  protect yourself?
17       MR. LORUSSO:  Objection.  Asked and answered.
18  BY MR. MOSELEY:
19    Q.   Is that right?
20    A.   For my information in case -- in case --
21    Q.   I want to be really clear about this.  The pieces
22  of paper from A through J --
23    A.   Because --
24       MR. LORUSSO:  Let him ask his question.
25  BY MR. MOSELEY:

14 (Pages 50 to 53)

1      Q.   The pieces of paper from A through J on Exhibit
2  102 are pieces of paper you brought in today pursuant to
3  subpoena, correct?
4      A.   Correct.
5      Q.   And you got these pieces of paper from a file that
6  you kept at your house; is that right?
7      A.   Yes.
8      Q.   Is there anything else in that file that you kept
9  at your house?
10     A.   No.
11     Q.   Did you believe that you had the right to take
12  this information home with you and keep it in a file in your
13  house?
14          MR. LORUSSO:  Objection to the extent it asks
15  for a legal conclusion.
16  BY MR. MOSELEY:
17     Q.   I'm asking for your belief.
18          MR. LORUSSO:  And argumentative.
19  BY MR. MOSELEY:
20     Q.   I'm asking for your belief.  Did you believe that
21  you had the right to take this information home and put it in
22  a file in your house?
23          MR. LORUSSO:  Same objection.
24          THE WITNESS:  I didn't feel that there was
25  anything wrong with keeping this, because this is my notes.

1  BY MR. MOSELEY:
2      Q.   Isn't this personal information concerning Phil
3  English?
4          MR. LORUSSO:  Objection.
5          MR. WONG:  Argumentative.
6          MR. LORUSSO:  Same, join in the objection.
7  Vague and ambiguous.  The documents speak for themselves.
8  BY MR. MOSELEY:
9      Q.   Do you want the question read back to you again?
10     A.   Yes.
11          MR. MOSELEY:  Would you please read the
12  question back?
13          MR. WONG:  Also vague and ambiguous as to the
14  definition of "personal."
15          (Record read.)
16          MR. LORUSSO:  Same objections and join.
17          THE WITNESS:  Because he was a City employee,
18  and I had all this information here, I took this home as --
19  just for my -- just to keep it, just in case if this ever
20  came to this day.
21  BY MR. MOSELEY:
22     Q.   I asked you if this is personal information?
23          MR. LORUSSO:  Objection.  Vague and
24  ambiguous, argumentative, documents speak for themselves.
25          THE WITNESS:  This is all --

1  BY MR. MOSELEY:
2      Q.   I'm asking for your opinion.  Do you think this is
3  personal information --
4      A.   No.
5      Q.   -- with respect to Phil English?
6      A.   No.
7      Q.   You don't think this is personal information?
8          MR. LORUSSO:  Objection.  Asked and answered.
9  She just answered the question.
10          MR. MOSELEY:  That's true.  I was being
11  argumentative.
12  BY MR. MOSELEY:
13     Q.   Do you have any similar kind of information about
14  any other employee of the assessment division at your house?
15     A.   No.
16     Q.   Why would you just take Phil's information?
17          MR. LORUSSO:  Objection.  Asked and answered.
18  Or to the extent it's been asked and answered.
19  BY MR. MOSELEY:
20     Q.   Where did you keep this information at your house?
21     A.   In my file.
22     Q.   Where's your file?  In some kind of a filing
23  cabinet?
24     A.   Yes.
25     Q.   And who has access to that filing cabinet?

1      A.   Just me.
2      Q.   Just you.  Is it locked?
3      A.   Yes.
4      Q.   And there is nothing else in there of any import
5  with respect to any other personnel issues of any other
6  employee of the assessment division?
7          MR. LORUSSO:  Objection.  Asked and answered.
8  You've answered it.  You can tell him again.
9          THE WITNESS:  I can tell you that all this
10  information --
11          MR. LORUSSO:  No, no, it's just -- his
12  question is, is there -- as you've answered --
13          MR. MOSELEY:  Can you let her answer the way
14  she's going to answer?
15          MR. LORUSSO:  But she wasn't answering your
16  question.
17          MR. MOSELEY:  She was answering.  She started
18  to say "all I can tell you is."
19          THE WITNESS:  Can you say it -- can you give
20  me the question again?
21  BY MR. MOSELEY:
22     Q.   Why don't you just give me the answer you were --
23     A.   No, give me the question again.
24          MR. MOSELEY:  Can you read the question back,
25  please?

Page 58

1      (Record read.)
2      THE WITNESS:  No.
3      MR. LORUSSO:  Let's take a short break,
4  please.
5      (Recess taken.)
6  BY MR. MOSELEY:
7      Q.  Okay, Sue, I'm going to show you what we marked
8  previously as exhibit -- you have it already?  Oh, good --
9  previously as Exhibit 72 in depositions in this case.  It's a
10  two-page document.  It's entitled "Workplace Violence
11  Checklist, February 10th, 2003."
12      Have you seen this document before?
13      A.  Yes.
14      Q.  Can you tell me what it is?
15      A.  It's just questions; my comments.
16      Q.  Did you -- did somebody interview you on or about
17  February 10th, 2003?
18      A.  Yes.
19      Q.  And who interviewed you?
20      A.  Michael Golojuch.
21      Q.  And where did he interview you?
22      A.  On the third floor of 842 Bethel Street.
23      Q.  At the assessment division?
24      A.  Yes.
25      Q.  Did he interview you on February 10th, 2003, or

Page 59

1  was it later?
2      A.  February 10th?
3      Q.  Do you remember specifically that it was February
4  10th?
5      A.  It was February 10th.
6      Q.  How do you remember it being February 10th?
7      A.  I don't know.  It says February 10th on the paper.
8      Q.  Other than it saying February 10th on the paper,
9  do you have an independent recollection of it being February
10  10th?
11      A.  No.
12      Q.  Could it have been in March?
13      MR. LORUSSO:  Objection.  Calls for
14  speculation.
15      THE WITNESS:  I don't know.  It states on the
16  paper.
17  BY MR. MOSELEY:
18      Q.  Does this reflect a series of questions that were
19  asked to you and your answers to those questions?
20      A.  Yes.
21      Q.  Okay.  And question numbered 7 on the first page,
22  you said:  "Within the first two weeks Phil had some
23  mandatory training with Roy, director.  Suzanne had sent an
24  email to Phil and Willy giving them the date and time of
25  training."

Page 60

1      Do you see that?
2      A.  Yes.
3      Q.  Is that what's referenced in Exhibit 102 A, B, and
4  C?
5      A.  Yes.
6      Q.  Okay.  So what you're saying is that within two
7  weeks of June 1st, 2000, Phil missed a training session; is
8  that right?
9      A.  No, he went.  He was late.
10      Q.  So do you mean that by June 15th he went to the
11  training session late with Roy?
12      A.  Can you restate that?
13      MR. MOSELEY:  Can you read that question
14  back, please?
15      (Record read.)
16      THE WITNESS:  Where does it say June 15?
17  BY MR. MOSELEY:
18      Q.  Well, it says Phil English started on June 1st,
19  and within the first two weeks, which is -- two weeks is 14
20  days, is it not?
21      A.  Uh-huh.
22      Q.  If you add 14 days to June 1st, then you get June
23  15th, do you not?
24      A.  That's correct.
25      Q.  So what you're saying here is that sometime

Page 61

1  between June 1st and June 15th Phil had a mandatory training
2  with Roy; is that right?
3      A.  Correct.
4      Q.  And that you had sent an email to Phil and Willy
5  giving the date and time of training, correct?
6      A.  Correct.
7      Q.  And Sue was called and asked where is Phil,
8  correct?
9      A.  Correct.
10      Q.  And Phil was at his desk at approximately 9:30
11  a.m., right?
12      A.  Correct.
13      Q.  And the training start time was 8:30 a.m., right?
14      A.  Correct.
15      Q.  Actually, all that is not correct, is it?
16      MR. LORUSSO:  Correct that you just read it?
17  BY MR. MOSELEY:
18      Q.  It's correct that I just read it, but it's not
19  correct that it happened that way, is it?
20      MR. LORUSSO:  Do you understand the question?
21      THE WITNESS:  No.
22  BY MR. MOSELEY:
23      Q.  Did Phil have a mandatory training session with
24  Roy within the first two weeks of his start?  Did he have a
25  training session with Roy, the director, within the first two

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 62

1 weeks of his start date?
2    A.  Yes.
3    Q.  So when was the date of the training session?
4        MR. LORUSSO:  What are you pointing to?  102?
5        THE WITNESS:  I'm not sure if -- I didn't
6 write this.
7 BY MR. MOSELEY:
8    Q.  Did you review this?  And when I say "this," I'm
9 referring to Exhibit 72.
10   A.  I looked at it.
11   Q.  Did you approve this?
12   A.  I think there was other training besides that one.
13   Q.  So on multiple occasions Phil was late for
14 training; is that right?
15   A.  I don't know.
16   Q.  You don't know?
17   A.  Just that one.
18   Q.  You're pointing to Exhibit 102?
19   A.  Yes, that's the only one I know.
20   Q.  This Exhibit 72, after you interviewed with Mike
21 Golojuch, did he send you a draft of the interview notes?
22   A.  Yes.
23   Q.  Did you review those notes?
24   A.  Yes.
25   Q.  And did you approve them as correct?

Page 63

1    A.  I didn't respond to him.  I just looked at it.
2    Q.  Then you didn't respond, yes, these are correct or
3 not?
4    A.  Yeah.
5    Q.  Did he send them to you via email?
6    A.  Yes. --
7    Q.  Did he ask you to see if they were okay?
8    A.  I can't remember.
9    Q.  When you reviewed this, did you determine that the
10 things that you -- that were said in paragraph numbered 7
11 were incorrect?
12   A.  Maybe the date is incorrect.
13   Q.  And the times are incorrect, right?
14   A.  The times are incorrect.
15   Q.  And the date is incorrect?
16   A.  The date is incorrect.
17   Q.  Okay.  Did you tell -- but are these times and
18 dates that you gave to Mike Golojuch when he
19 interviewed you?
20   A.  I can't remember.  It's been so long.  But
21 whatever --
22   Q.  Sue --
23        MR. LORUSSO:  Would you please let her finish
24 her answer.
25        THE WITNESS:  Whatever I have on here, if I

Page 64

1 talked to him that day, maybe the time, the dates were --
2 because there was a lot of training that new employees have
3 to go to, but I believe this date -- I believe this whole
4 thing was the dates were not correct.
5 BY MR. MOSELEY:
6    Q.  But at the time you had this interview with Mike
7 Golojuch --
8    A.  It was --
9    Q.  -- you had all the information available to you,
10 did you not?
11       MR. LORUSSO:  Objection.  Vague and
12 ambiguous.
13 BY MR. MOSELEY:
14   Q.  All the stuff that you've given to me in Exhibit
15 102, you had available to you when you interviewed with Mike
16 Golojuch, did you not?
17   A.  Yes.
18   Q.  Well, why did you get all the dates and times
19 wrong?
20       MR. LORUSSO:  Object to the form of the
21 question.  Argumentative, overbroad, and misstates the
22 document.
23       THE WITNESS:  I don't know.
24 BY MR. MOSELEY:
25   Q.  Sue, did you create the documents in Exhibit 102,

Page 65

1 did you create these later to protect yourself?
2    A.  No.
3    Q.  Okay.  There are numerous references here to the
4 start of the training time at 8:30, do you see that?  And I'm
5 referring to Exhibit 72, paragraph 7.  Do you see that?  It's
6 referred -- the start time is referred to at least four times
7 as 8:30, do you see that?
8    A.  Yes.
9    Q.  In your Exhibit 102, you're very clear that the
10 start time is 8:00 o'clock, aren't you?
11   A.  8:00 o'clock, meaning they had to be there by
12 8:30.  That's what the 8:00 o'clock is, get there before
13 8:30.
14   Q.  So 8:00 o'clock means get there before 8:30?
15   A.  Right.
16   Q.  Okay.  And then you say that Phil showed you a
17 start time at 11:30, do you see that?
18   A.  Right.
19   Q.  Of course in your record here you say the start
20 time was different, but you don't say a start time.  Do you
21 see that?
22   A.  Yes.
23   Q.  I think when you testified a little earlier you
24 said the start time he showed you on his email was 11:00; is
25 that right?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 66

1    A.   Yes.
2    Q.   Do you now still say the start time he showed you
3  was 11:00 or 11:30?
4    A.   It was 11:00.
5    Q.   Further down in paragraph 7 on Exhibit 72 it says:
6  "Another time Sue was explaining a process to Phil."
7         Do you see that?
8    A.   Yes.
9    Q.   What is that about?
10    A.   Okay, I can't remember the date, but we were
11  getting new computers, Dell Dimension computers, we were
12  going to be getting OptiPlex computers and the IT, which is
13  the department of technology, informed our division to have
14  all the groups, by sections, download all their files onto
15  diskettes because they're going to be coming in and they're
16  going to be installing the new computers.
17         So what I did was I emailed the groups to please
18  clean out your files on your computer and download it to a
19  diskette because if the IT comes, they will -- all your
20  information will be wiped out.
21         So I had to explain that to him.  And what
22  happened was Phil was the only one that emailed me back, and
23  he told me that, "I can't do that."  And I said to him -- I
24  remember talking to him, and I said, "You have to, because if
25  you don't download or save all your files, everything is

Page 67

1  going to be wiped out."
2    Q.   When did this occur?
3    A.   I can't remember.
4    Q.   Was it near the end of Phil's tenure there?
5    A.   No, it was sometime in the middle.
6    Q.   How many times did you guys get new computers
7  during the time Phil was there?
8    A.   Just once.
9    Q.   And then you got new computers again once after he
10  left?
11    A.   No, we still had the same OptiPlex when I left.
12  When I left, we still had the same ones.
13    Q.   Do you know if they've -- and you left in when in
14  '05?
15    A.   '05, April 1st, I left.
16    Q.   And do you know if the division got new computers
17  after you left?
18    A.   I think they did get new computers.
19    Q.   Again?
20    A.   Yes.
21    Q.   Did Phil tell you why he couldn't clean and save
22  the files?
23    A.   No.
24    Q.   Did he tell you that you had to do it or lose the
25  files?

Page 68

1    A.   I don't know.
2    Q.   Did he want an explanation of why it was done?
3    A.   Yes.  I had to explain to him.
4    Q.   Why it was done?
5    A.   Why it was done.  Why he needs to clean up his
6  files.
7    Q.   What was his objection?  He just said he couldn't
8  do it, or he had some objection to doing it?
9    A.   He just said, "I can't do that."
10    Q.   You mean he was unable to do it?
11    A.   I don't know.
12    Q.   Do you know if he eventually did it?
13    A.   I don't know.
14    Q.   Did you do it?
15    A.   No.
16    Q.   On paragraph number 11 it says:  "Do you feel
17  threatened?"  Do you see that?
18    A.   Uh-huh.
19    Q.   Yes?
20    A.   Yes.
21    Q.   Did you feel threatened by Phil?
22    A.   No.
23    Q.   On number 12 it says:  "Do you feel that physical
24  harm is possible?"  And you said:  "Physical, maybe."
25         Do you see that?

Page 69

1    A.   Yes.
2    Q.   Was that your response?
3    A.   Yes.
4    Q.   You felt that Phil could physically harm somebody?
5    A.   Physically harm himself.
6    Q.   Okay.  How about harming anybody else?
7    A.   No.
8    Q.   Did you ever see Phil do anything violent?
9    A.   No.
10    Q.   Did you ever see Phil lose his temper?
11    A.   No.
12    Q.   Did Phil treat you any way other than nicely?
13    A.   No, Phil was very nice to me.
14    Q.   In paragraph numbered 13 on the second page of
15  Exhibit 72 you say:  "Have any of his patterns of behavior
16  changed before this incident occurred?"  You say:  "Still the
17  same"; is that right?
18    A.   Yes.
19    Q.   So from your perspective, Phil behaved the same
20  way the whole time you knew him?
21    A.   Yes.
22    Q.   Actually, you didn't have a lot of contact with
23  Phil, though, did you?
24    A.   No.
25    Q.   Did you see Phil daily, do you think?

18 (Pages 66 to 69)

Page 70

1    A.  No.
2    Q.  You were kind of in a different section of the
3  building, right?
4    A.  Yes.
5    Q.  In paragraph 15 it says:  "Do others feel
6  threatened?"  And you said:  "Yes, in group 3."
7       Do you see that?
8    A.  Yes.
9    Q.  Did anybody in group 3 tell you that they felt
10  threatened?
11    A.  Yes.
12    Q.  And when did they tell you that?
13    A.  I can't remember.
14    Q.  Did you have lunch with the people in group 3
15  pretty often?
16    A.  No.
17    Q.  What was your lunchtime?
18    A.  I ate lunch at my desk.
19    Q.  What was your lunchtime?
20    A.  12:00 o'clock.
21    Q.  12:00 o'clock.  And in number 17 it says:  "Do you
22  feel safe at work?"  You said:  "Yes"?
23    A.  Yes.
24    Q.  Did you tell Phil on the last day you saw him that
25  you actually feared for your job because of some things that

Page 71

1  Bob Magota was doing with respect to the way he handled
2  employees?
3    A.  I can't remember.  I don't know.
4    Q.  Did you have concerns about the way Bob Magota
5  handled employees?
6    A.  No.
7    Q.  You felt that he did everything properly with
8  respect to handling employees?
9    A.  Yes.
10    Q.  On paragraph 18 it says:  "What would you
11  recommend to prevent similar incidents?"
12       Do you see that paragraph?
13    A.  Yes.
14    Q.  And it says:  "Anger management to control
15  temper."
16       Do you see that?
17    A.  Yes.
18    Q.  Was that your response?
19    A.  Yes.
20    Q.  Did any of the incidents described in your
21  interview constitute some sort of an anger or an angry
22  interchange?
23    A.  No.
24    Q.  And did he exhibit a bad temper in any of those
25  incidents?

Page 72

1    A.  No.
2    Q.  Why would you suggest that he get anger management
3  to control his temper?
4    A.  Well, I figured that because he was having
5  whatever was happening in the office with the computer
6  problem, he said, "I can't do that," I figured he was angry.
7  So I thought maybe he can take some -- take anger management
8  to learn something from it, because I took an anger
9  management class myself and it's good to learn.
10    Q.  Did he speak to you in an angry manner when he
11  said he couldn't do the computer thing?
12    A.  No, it was an email.
13    Q.  Was it an angry email or was it --
14    A.  Very abrupt.  It was:  "I can't do that."
15  Exactly.  "I can't do that."
16    Q.  Okay, on paragraph number 21 you say:  "Is there
17  anything else that you would like to add?"
18       Do you see that?
19    A.  Yes.
20    Q.  And then it says:  "Everyone is happy when Phil
21  doesn't come to work because he is out on sick or on
22  vacation."
23       Do you see that?
24    A.  Yes.
25    Q.  On what basis did you make that statement?

Page 73

1    A.  I don't understand what you're saying.
2    Q.  Well, I mean, did you observe that when he wasn't
3  there everybody was happy?
4    A.  It's basically what I heard.
5    Q.  From whom?
6    A.  I don't know.  I can't talk for them.  It's just
7  basically the atmosphere that I -- when I went downstairs, I
8  saw the girls just talking, working, and that's about it.
9  That was my observation.
10    Q.  And so when you went downstairs, you saw the girls
11  talking and working; is that right?
12    A.  Yes.
13    Q.  And on that basis you determined that everybody is
14  happy when Phil doesn't come to work?
15    A.  I can't talk for them.  I don't know.
16    Q.  No, I'm asking about your determination?
17    A.  I feel -- it didn't bother me.  I was okay.
18    Q.  What is the -- why did you say everyone is happy
19  when Phil doesn't come to work?
20       MR. WONG:  I think that's been asked and
21  answered.
22  BY MR. MOSELEY:
23    Q.  What did you base that on?
24    A.  I already answered.
25    Q.  Okay, answer it again then.  What did you base

Page 74

1  that on? Let's be clear on this.
2         MR. LORUSSO: Objection. Asked and answered.
3         THE WITNESS: I saw the girls laughing,
4  talking. It's a comfortable atmosphere.
5  BY MR. MOSELEY:
6     Q.  And then when he was there you went down and they
7  weren't laughing and talking?
8     A.  Yes.
9     Q.  Was this the case during the entire time Phil
10 worked there?
11    A.  I can't remember.
12    Q.  Did you notice a period of time in which things
13 changed with respect to what everybody felt when Phil was not
14 there?
15    A.  When Phil was there working, he was a very good
16 appraiser. He took care of the customers on the telephone
17 and he did his work. Once -- I don't know when it happened,
18 but this whole thing, the problems with the girls feeling --
19 it's by my observation.
20    Q.  Okay.
21    A.  No one else told me anything. It's what I felt,
22 what I heard -- just the overall feeling, but a lot of us
23 like Phil. Phil did his job. He was very cordial in the
24 office. I had no problems with Phil. He's very nice.
25        But there are times I went -- when I would pick up

Page 75

1  my sign-in sheets, and I would walk around, and I noticed
2  that it's very quiet, very, you know, quiet.
3     Q.  Sort of like a distant feeling when you walked in
4  the room or what?
5     A.  No, everybody just was working. We were very
6  busy. Because during the real property -- during appeal
7  time. It's very, very busy and everybody is working.
8     Q.  But was there a difference between when Phil was
9  there and when he wasn't there?
10    A.  No.
11    Q.  I mean, when you walked, say, into group 3, which
12 is Ann Gima's group, right, when you walked into group 3 and
13 Phil wasn't there, were people happy?
14    A.  People were always happy. Group 3 was -- in fact,
15 the whole group was happy.
16    Q.  Okay. Were they happy because he was out sick or
17 on vacation?
18    A.  I can't answer for that.
19    Q.  Well, isn't that what you told Mike Golojuch, that
20 everyone was happy when Phil doesn't come to work because
21 he's out sick or on vacation? Did you not tell Mike Golojuch
22 that?
23    A.  Yes, I told him that.
24    Q.  Is that true, that people were happy when he
25 didn't come to work because he was out sick?

Page 76

1     A.  Maybe it was happening at that time, that day,
2  maybe something that day when I was picking up papers.
3     Q.  Well, let me ask, were you tying to convey to Mike
4  Golojuch that at some point in time Phil's presence changed
5  the mood of group 3?
6     A.  I think the stress of what was happening.
7     Q.  Changed the mood for group 3?
8     A.  Group 3 had the bulk of the Waikiki appeals, and
9  it was a stressful time, and I think as time went on with
10 what was happening in here, with the workload, the pressure
11 of trying to get everything out, the mood started to change.
12    Q.  Okay. And when the mood changed and Phil didn't
13 show up for work because he was sick or on vacation, people
14 were happier when he wasn't there?
15    A.  Not really.
16    Q.  Well, I don't understand, then, what you're saying
17 everybody is happy when Phil doesn't come to work because he
18 is out sick or on vacation. It seems to imply to me that
19 when he's out sick or on vacation everybody is happier, and
20 when he's not out sick or on vacation and he's attending work
21 people are less happy. Isn't that what that means?
22        MR. LORUSSO: Object to the extent the
23 document speaks for itself.
24 BY MR. MOSELEY:
25    Q.  Are you going to answer the question?

Page 77

1     A.  I'm thinking.
2     Q.  Okay. Just checking.
3     A.  Well, when Phil came to work, it was -- I can't
4  talk for other people, because I was way on the other end.
5  It's what I felt.
6     Q.  Okay.
7     A.  Yeah.
8     Q.  Well, when you -- does this mean when you -- that
9  you felt everyone was happy when he didn't come to work; is
10 that what you felt?
11    A.  I felt that, yes.
12    Q.  Did you feel that people were not as happy when he
13 did come to work?
14    A.  Yes, because Phil would talk to certain
15 individuals and you never know what he was going to -- he was
16 sharing his personal feelings of -- like for me, he would
17 stop me when I was Xeroxing and he would talk to me about the
18 problems that he was feeling. And I didn't want to hear it.
19 I didn't want to get involved. I just didn't want to hear
20 it. So that's why people were feeling stressed by that. So
21 when he wasn't there --
22    Q.  So when he wasn't there, people were less
23 stressed?
24    A.  Yes.
25    Q.  And what did you observe that made you feel that

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 78

1   way about group 3? Aside from your own personal dealings
2   with Phil, you talk about everyone, let's just start with
3   group 3, did you -- you said earlier that you would go
4   downstairs and when Phil wasn't there people would be happy
5   and talking; is that right?
6       A.  Yes.
7       Q.  And when Phil was there, people were generally
8   just working and not talking?
9       A.  You had people talking. You had to talk because
10  of the work that they were involved in.
11      Q.  I understand, but it wasn't the same happy,
12  congenial feeling; is that right?
13      A.  Yes.
14      Q.  Let me move on to the next sentence. It says:
15  "Others seem to get upset with Phil in the background because
16  something might happen."
17          How did you come to that conclusion?
18      A.  I'm referring it to myself, because if I were to
19  tell Phil something, he would take it out of context.
20      Q.  So this -- when you say others seem to get upset
21  with Phil, you mean yourself?
22      A.  I saw other people get upset.
23      Q.  Okay. And what did you see them get upset with
24  Phil about?
25      A.  He would -- he would stop them and talk to them.

Page 79

1       Q.  Is that the "something" they thought might happen?
2       A.  I don't know.
3       Q.  Well, I'm trying to find out what you meant. What
4   did you mean when you said: "Others seem to get upset with
5   Phil in the background because something might happen." What
6   did you mean by that?
7       A.  Well, I -- they were afraid that Phil would get
8   violent.
9       Q.  Who was afraid?
10      A.  In general, it was everyone.
11      Q.  You weren't afraid, though?
12      A.  I wasn't afraid.
13      Q.  Who told you they were afraid? Did anybody tell
14  you they were afraid?
15      A.  No.
16      Q.  How did you know they were afraid?
17      A.  I could sense it.
18      Q.  Did you sense that they were more cautious in
19  their dealings with Phil?
20      A.  Yes.
21      Q.  A little bit standoffish maybe?
22          MR. LORUSSO: Objection. Vague and
23  ambiguous.
24  BY MR. MOSELEY:
25      Q.  I'm searching for the right words to describe what

Page 80

1   this is. I don't know what they are, but...
2       A.  Well, you had to be careful how you interact with
3   him.
4       Q.  What kind of --
5       A.  It was -- your day-to-day conversations, he --
6   that's it.
7       Q.  You say: "Phil looks innocent and quiet."
8           Was he -- does that mean that his looks are
9   deceiving, or do you think he is innocent and quiet?
10      A.  Well, I -- he is -- he looks quiet. He's innocent
11  and quiet.
12      Q.  Then below that you say: "When things happen,
13  it's always someone else's fault."
14          Do you -- what's the reference there? What things
15  are you talking about?
16      A.  First of all, I'm referring back to my email.
17      Q.  Okay.
18      A.  He -- in a way he was saying that I sent him an
19  email that stated it was 11:00 o'clock.
20      Q.  Is there any other things that happened that
21  were -- essentially you're saying things happen that are his
22  fault but he blames on other people; is that right?
23      A.  Yes.
24      Q.  Is there anything else that you knew of that was
25  his fault that he blamed on anybody else?

Page 81

1       A.  I can't remember.
2       Q.  Did anybody ever tell you of anything like that?
3       A.  No.
4       Q.  The next sentence there says: "He has been
5   scolded for not doing his work."
6           Do you see that?
7       A.  Yes.
8       Q.  How did you know he had been scolded for not doing
9   his work?
10      A.  Because I heard.
11      Q.  From whom?
12      A.  I actually saw him -- the supervisor was talking
13  to him.
14      Q.  What supervisor?
15      A.  Annie.
16      Q.  And when was this?
17      A.  I don't know.
18      Q.  And what was it about?
19      A.  It was about his benchmarks.
20      Q.  And what did Annie say about his benchmarks?
21      A.  I don't know. All I saw is I saw the two of them
22  standing there, and she was telling him that he had to do his
23  work.
24      Q.  She was scolding him?
25      A.  Just reprimanding him, just as a supervisor is

21 (Pages 78 to 81)

Page 82

1  telling his -- his staff to do the work.
2      Q.  Is that the only time you ever saw him scolded?
3      A.  That was the only time.
4      Q.  Do you know of any other time he's been scolded?
5      A.  No, I don't know.
6      Q.  "He applies for supervisor jobs but says he
7  doesn't understand."
8          Do you see that?
9      A.  Yes.
10     Q.  Did you know he applied for supervisor jobs?
11     A.  Yes.
12     Q.  How did you know that?
13     A.  I saw the application.  His name came up when the
14  administrator's position was being TAed by Gary after Richard
15  Nathaniel passed away.  There was a certified list of
16  applicants and I saw his name on the list.
17     Q.  Is that a supervisor job?
18     A.  That is an administrator's job and another
19  position opened up.  I remember that one.  He applied for an
20  Appraiser 4, I believe.
21     Q.  Is that a supervisor job?
22     A.  Appraiser 6.  No, it was Appraiser 6, I'm sorry,
23  Appraiser 6 position, he applied.
24     Q.  How do you know he applied?
25     A.  Because I process the applications.

Page 83

1      Q.  Anything else he applied for in terms of a
2  supervisor job?
3      A.  That was the only one I can remember.
4      Q.  What do you mean, "but says he doesn't
5  understand"?
6      A.  He said he doesn't understand why he didn't get
7  the supervisor job.  He doesn't understand why he was not
8  selected.
9      Q.  Did you have -- why would you tell Michael
10  Golojuch that Phil didn't understand why he wasn't selected?
11     A.  Because Mike was asking me about that.
12     Q.  Mike asked you if Phil understood why he wasn't
13  selected?
14     A.  Yes.
15     Q.  What else did Mike ask you?
16     A.  That's it.
17     Q.  Okay, did you ever tell anybody else in the
18  assessment division that Phil had applied for supervisor
19  jobs?
20     A.  It was common knowledge.
21     Q.  How would that get to be common knowledge?
22     A.  Everybody would know -- everybody would try and
23  tell each other, well, apply for the job, go apply for it.
24     Q.  Well, how would anybody know that Phil actually
25  applied for it?

Page 84

1          MR. LORUSSO:  Objection to the extent it
2  calls for speculation.
3          THE WITNESS:  I didn't know.  No one would
4  know.
5  BY MR. MOSELEY:
6      Q.  But you said it was common knowledge?
7      A.  Well, I'm sorry, I have to take that back.
8      Q.  Okay.
9      A.  We would always tell the lower level appraisers to
10  try out, to apply, put their application in.  That's what I
11  meant.
12     Q.  But did anybody know that Phil had applied for
13  supervisor jobs?
14         MR. LORUSSO:  Objection.  Calls for
15  speculation.
16         THE WITNESS:  No.
17  BY MR. MOSELEY:
18     Q.  So as far as your understanding was, you knew that
19  he had applied because you were processing the application?
20     A.  Yes, and I didn't say anything.
21     Q.  You didn't say anything and you didn't know that
22  anybody else knew that?
23     A.  No.
24     Q.  Under that you says -- you said:  "He has had
25  problems with his first and second wives."

Page 85

1          Do you see that?
2      A.  Yes.
3      Q.  Did he tell you about those problems?
4      A.  Yes.
5      Q.  And those were the problems that you didn't want
6  to hear about?
7      A.  Yes.
8      Q.  And also there have been situations with his son?
9      A.  Yes.
10     Q.  And you didn't want to hear about that?
11     A.  (Nods head.)
12         MR. LORUSSO:  You have to answer out loud.
13         THE WITNESS:  Yes.
14  BY MR. MOSELEY:
15     Q.  Did you -- from January -- your desk was not
16  anywhere near Bob Magota's; is that right?
17     A.  Yes, it was far.  I was on --
18     Q.  You were on the other side of the building, right?
19     A.  Correct.
20     Q.  So did you know who was coming in and out of Bob
21  Magota's office?
22     A.  No.
23     Q.  Did people make appointments with you to come and
24  see Bob Magota?
25     A.  No.

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 86

1    Q.  So they just made appointments with him directly?
2    A.  Yes.
3    Q.  You didn't run his calendar at all?
4    A.  No.
5    Q.  So were you aware of Mike Golojuch coming and
6 speaking with Bob Magota at any time during this period, say,
7 from January 1st, 2003 to March 1st, 2003?
8    A.  No.
9    Q.  Did you see Mike Golojuch at any time during that
10 period with the exception of the interview you had?
11    A.  No.
12    Q.  Did you fill out a workplace violence report
13 against Phil?
14    A.  No.
15    Q.  Did anybody give you a workplace violence report
16 that they had filled out against Phil?
17    A.  I can't remember.
18    Q.  Were you the person designated to accept those
19 things? I'm going to show you a form here. This is Exhibit
20 76. This is a form that is filled out by --
21        MR. WONG:  Excuse me, are we starting a new
22 area?
23        MR. MOSELEY:  Yeah, but I'm almost pau,
24 actually.
25        MR. WONG:  Okay.

Page 87

1 BY MR. MOSELEY:
2    Q.  This is a form that's filled out by Chris Graff,
3 but I don't care about that. What I'm wanting to do is have
4 you take a look at the form. Are you familiar with this
5 form?
6    A.  I can't remember.
7    Q.  Not this particular one, but just the form.
8    A.  I don't remember.
9    Q.  Were you the one designated to receive forms like
10 this?
11    A.  No, because it was either -- either Mike Golojuch
12 would collect that. I don't know. I have no knowledge of
13 that.
14    Q.  You wouldn't collect that?
15    A.  No.
16    Q.  Did you ever receive a form like that from any of
17 the other employees in the assessment division?
18    A.  Maybe I did and I gave it to -- how did the
19 process go? I would -- if they gave it to me, I would give
20 it to Mike Golojuch himself.
21    Q.  Do you remember ever collecting a form like this
22 from anybody in the assessment division at any time?
23    A.  I can't remember. I can't remember.
24    Q.  Let me see if I can make sure the record is clear.
25 You can't remember whether you did or not, or you don't

Page 88

1 remember ever collecting such a form?
2    A.  I don't remember collecting such a form.
3    Q.  Did you collect such a form from Chris Graff?
4    A.  No.
5        MR. MOSELEY:  All right, let's take a quick
6 break, and I'm going to just sort of review my notes, talk
7 with Phil, and we may be pau, and I know that will be a good
8 piece of news.
9        THE WITNESS:  Great.
10        MR. MOSELEY:  Let's go off the record.
11        (Off the record.)
12        MR. MOSELEY:  I only have a couple more
13 questions.
14 BY MR. MOSELEY:
15    Q.  Are you paying for Mr. Lorusso's services as your
16 attorney?
17        MR. LORUSSO:  Objection. Not relevant.
18 Instruct you not to answer. It's not relevant. The terms,
19 of my employment.
20        MR. MOSELEY:  Are you saying that's
21 privileged and instructing her not to answer?
22        MR. LORUSSO:  Yes.
23        MR. MOSELEY:  That's privileged?
24        MR. LORUSSO:  Yes, and I'll take the risk,
25 counsel, if I'm wrong.

Page 89

1        MR. MOSELEY:  Okay. That's all.
2        Oh, do you have any questions?
3        MR. WONG:  No.
4        MR. MOSELEY:  Okay, pau. Thank you very
5 much.
6        THE WITNESS:  Thank you.
7        (The deposition concluded at 4:18 p.m.)

23 (Pages 86 to 89)

Page 90

1    I, SUZANNE FOUMAI, hereby certify that I have read the
2  foregoing typewritten pages 1 through 89, inclusive, and
3  corrections, if any, were noted by me and the same is a true
4  and correct transcript of my testimony.
5
6
7
8
9  SUZANNE FOUMAI
10
11
12
13
14    Signed before me this    day of
15       , 20   .
16
17
18
19
20    English vs. City & County of Honolulu, U. S.
21  District, Civil No. 04-00108, taken on August 4, 2006, by
22  Jessica R. Perry, CSR.
23
24
25

Page 91

1  STATE OF HAWAII         )
2                ) ss:
3  CITY & COUNTY OF HONOLULU    )
4
5       I, JESSICA R. PERRY, do herby certify:
6       That on August 4, 2006, at 1:48 p.m. appeared
7  before me SUZANNE FOUMAI, the witness whose deposition is
8  contained herein; that prior to being examined he was by me
9  duly sworn;
10       That the deposition was taken down by me in
11  machine shorthand and was thereafter reduced to typewritten
12  form by computer-aided transcription; that the foregoing
13  represents, to the best of my ability, a full, true and
14  correct transcript of said deposition.
15       I further certify that I am not attorney for
16  any of the parties hereto, nor in any way concerned with the
17  cause.
18       DATED this 24th day of August, 2006, in
19  Honolulu, Hawaii.
20
21
22
   Jessica R. Perry, CSR 404
23 Notary Public, State of Hawaii
   My commission expires:  5/11/09
24
25

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

**A**

ability 7:15 91:13
about 9:2,3,10,13,14
   10:25 11:16 14:5
   15:20 16:3 17:7,24
   20:4 23:17,18,21
   30:5 33:24 34:2
   35:18,19 38:17 41:10
   43:22 44:2,3 46:8,12
   47:8,13 48:15 49:3
   53:21 56:13 58:16
   66:9 69:6 71:4 73:8
   73:16 77:17 78:1,2
   78:24 80:15 81:18,19
   81:20 83:11 85:3,6
   85:10 87:3
abrupt 72:14
absence 39:4,6
accept 86:18
accepted 27:11
accepts 27:9
access 51:14,19 56:25
accrual 17:21,21 44:6
   44:10
acknowledged 27:15
acknowledgment 25:14
   25:18
acronym 50:23
activities 34:20
actual 17:20
actually 6:3,16 7:15,25
   9:22 18:10 19:5 20:6
   20:7 23:2 46:22
   48:10 61:15 69:22
   70:25 81:12 83:24
   86:24
Adam 31:10
add 60:22 72:17
address 4:10 19:13,13
   47:17,19
adjust 44:10 49:19
administrator's 82:14
   82:18
advice 11:13
advise 10:6
advised 33:19,20 36:19
   37:14,24,25 46:25
afraid 79:7,9,11,12,13
   79:14,16
after 7:13 24:6 30:4
   62:20 67:9,17 82:14
afternoon 4:8
again 32:20 34:19 45:5
   47:10 55:9 57:8,20
   57:23 67:9,19 73:25
against 86:13,16
agreed 35:16
ahead 10:23
Alakea 1:17 2:5,6
allowed 35:17
almost 6:7 86:23

along 6:22
already 7:2 21:22 40:1
   58:8 73:24
although 10:6
always 75:14 80:13
   84:9
ambiguous 10:12,22
   11:24 45:24 47:23
   55:7,13,24 64:12
   79:23
amount 37:7
anger 71:14,21 72:2,7
   72:8
angry 71:21 72:6,10,13
Ann 1:7 2:17 33:18
   44:15 75:12
Annie 33:17 35:10,14
   35:16 48:17 81:15,20
annual 48:4
another 5:24 6:16 66:6
   82:18
answer 5:10,10 6:21
   7:16,23 9:11,16,23
   9:23,24 10:2,2,4,12
   10:23 11:14 50:6
   57:13,14,22 63:24
   73:25 75:18 76:25
   85:12 88:18,21
answered 29:10 51:6
   53:17 56:8,9,17,18
   57:7,8,12 73:21,24
   74:2
answering 7:2,8 57:15
   57:17
answers 6:3 59:19
ANTHONY 2:10
anticipate 15:16
anybody 7:10 32:19
   69:6 70:9 79:13
   80:25 81:2 83:17,24
   84:12,22 86:15 87:22
anymore 50:23
anything 4:22 11:17
   25:5 29:22,25 35:5
   44:17 48:15,17 54:8
   54:25 69:8 72:17
   74:21 80:24 81:2
   83:1 84:20,21
Anyway 4:25
anywhere 85:16
Apartment 4:13
apparently 27:9 35:24
appeal 75:6
appeals 76:8
APPEARANCES 2:1
appeared 91:6
appears 27:7
applicants 82:16
application 14:3 82:13
   84:10,19
applications 82:25

applied 82:10,19,23,24
   83:1,18,25 84:12,19
applies 49:5,5,6 82:6
apply 83:23,23 84:10
appointment 25:25
appointments 85:23
   86:1
appraisal 16:24 17:10
Appraisals 1:7 2:9
appraiser 74:16 82:20
   82:22,22,23
appraisers 17:9 30:10
   84:9
appropriate 7:25 11:13
approve 62:11,25
approved 38:24 40:10
   40:11,16 42:20 44:9
approximately 61:10
April 13:16,18 48:2,23
   49:2,22 67:15
area 86:22
argumentative 40:23
   41:7,13 54:18 55:5
   55:24 56:11 64:21
around 21:4 32:12 75:1
ASAP 30:12
Aside 78:1
asked 24:24 29:10
   30:12 31:14,22,25
   46:8,10 47:13 51:6
   53:17 55:22 56:8,17
   56:18 57:7 59:19
   61:7 73:20 74:2
   83:12
asking 5:8 7:14 9:13
   43:10 50:9 54:17,20
   56:2 73:16 83:11
asks 54:14
asserting 11:17
assess 47:4
assessment 13:24 14:7
   15:2,8,24 16:9,17
   56:14 57:6 58:23
   83:18 87:17,22
assistants 17:10
ate 70:18
atmosphere 73:7 74:4
attached 17:17
attend 25:15
attendance 16:23 17:4
   28:9,11 33:13 35:2,4
   36:24,24 38:21 39:18
   46:5,6,8 49:20,23
attendees 20:20
attending 76:20
attorney 4:9 8:7,9 9:19
   11:9 88:16 91:15
attorneys 7:14 9:25
attorney-client 8:11
   9:9,21 10:22 11:18
August 1:18 90:21 91:6

91:18
authorization 35:6
authorized 35:8,11,19
   35:25
available 17:14 64:9,15
avoid 6:19 7:18
aware 86:5
away 31:23 82:15
a.m 18:15 22:19,19
   23:5,25 25:13 28:24
   28:24 29:9,17 32:12
   34:5,15 61:11,13

**B**

B 23:9,12 25:7,23
   26:17 27:7 60:3
back 11:20 24:11 27:10
   29:7 31:1,7,8,20
   33:14 34:6,9,11,12
   36:15,18 38:10,13
   43:11,18 44:8,10
   49:7 55:9,12 57:24
   60:14 66:22 80:16
   84:7
background 78:15 79:5
bad 71:24
balance 17:19,23 37:5
Bank 47:5,7
base 73:23,25
basement 31:24
basically 21:2 27:14
   35:2 36:22,25 43:12
   43:22 73:4,7
basis 72:25 73:13
beat 7:13
before 1:24 5:1,19 7:1
   7:8,16 8:17 9:3 18:21
   18:23 19:5 28:21
   58:12 65:12,14 69:16
   90:14 91:7
beginning 20:11 49:2
behalf 1:17
behaved 69:19
behavior 69:15
behind 17:24
being 4:2 24:20 29:24
   47:8 56:10 59:6,9
   82:14 91:8
belief 54:17,20
believe 24:16 54:11,20
   64:3,3 82:20
below 23:4 80:12
benchmarks 81:19,20
beneficiary 19:15
benefit 19:19
besides 30:18
best 7:24 15:21 91:13
Bethel 58:22
better 6:23
between 14:9 20:3 49:1
   61:1 75:8

BFS 24:1
Biehl 2:4
Bishop 2:12
bit 5:5 14:15 30:4
   79:21
blame 35:22
blamed 80:25
blames 80:22
Bob 34:15 35:10,14,16
   36:2,19 37:1,3,13,23
   37:25 38:25 39:1
   42:20 44:12,19 45:6
   45:9,12 46:15 48:14
   48:15,21 71:1,4
   85:16,20,24 86:6
booklet 5:12
boss 16:17
both 27:8 28:1
bother 73:17
bottom 25:12 27:23
   37:12 41:14
branch 31:24
break 11:7 43:14 58:3
   88:6
breakdown 47:16
bring 12:5 20:9
brings 6:16
brought 12:8 54:2
budget 17:2
building 70:3 85:18
bulk 76:8
business 20:6
busy 75:6,7

**C**

C 1:7 2:17 23:10,12,18
   27:22 28:1 60:4
cabinet 56:23,25
calculated 39:10
calendar 26:8 27:9
   86:3
call 4:19,23 21:2 24:20
   24:24 25:2 29:23
   30:11 33:17,19 34:6
   34:9,11,12 47:7
called 4:22,23 5:6 6:11
   14:6 25:3 30:12 31:8
   31:9 34:5,15 35:1
   36:17 44:12 45:6,19
   46:24 47:10 61:7
calling 36:15
calls 4:20 9:9 10:22
   45:2 59:13 84:2,14
came 16:14 17:17 19:9
   30:9 31:7,8 38:11
   51:24 55:20 77:3
   82:13
cancel 48:25
cancelled 49:13
card 50:11,12,14
care 17:8,9 28:6 33:21

33:25 74:16 87:3
careful 80:2
Carole 31:22
case 4:9 5:24 6:5,6
  33:21,25 34:2 53:20
  53:20 55:19 58:9
  74:9
cases 7:24
catch 15:19
categories 12:19,20,21
category 12:18 13:8,23
cause 91:21
cautioned 4:2
cautious 79:18
certain 7:18,23 17:20
  49:2 77:14
certainly 6:8 11:11
certified 82:15
certify 90:1 91:5,15
chair 30:11 46:15
chance 5:13,18
change 24:3 26:4 47:17
  76:11
changed 24:11,16
  28:23 29:19 49:22
  69:16 74:13 76:4,7
  76:12
characterization 53:10
check 33:16 46:25 47:8
  47:18
checking 77:2
Checklist 58:11
chiefs 14:17
choice 9:23
choose 10:4
Chris 87:2 88:3
CHRMS 50:20,20
Chung 2:11
city 1:6 2:16 14:4,23
  15:4 25:15 26:9,12
  36:10 50:10 55:17
  90:20 91:3
City's 50:20,20
Civil 1:5 90:21
clarify 18:19,22 34:24
class 72:9
clean 66:18 67:21 68:5
clear 53:21 65:9 74:1
  87:24
clerical 17:1,2,2,3,5,10
clerk 41:22 50:4 53:13
Close 14:25
coding 49:20
collect 31:20,24 87:12
  87:14 88:3
collected 33:4
collecting 87:21 88:1,2
come 14:1 15:5 19:2
  30:2 40:6 72:21
  73:14,19 75:20,25
  76:17 77:9,13 78:17

85:23
comes 66:19
comfortable 5:5 74:4
coming 18:3 66:15
  85:20 86:5
commencing 1:18
comments 23:21 58:15
commission 91:23
common 83:20,21 84:6
communications 9:10
comp 30:21,25 31:5,9
  31:12 44:9 46:7
  49:21,23
compensation 30:14
complete 33:13
computer 27:25 51:11
  66:18 72:5,11
computers 66:11,11,12
  66:16 67:6,9,16,18
computer-aided 91:12
concerned 91:21
concerning 55:2
concerns 16:3 71:4
concluded 89:7
conclusion 54:15 78:11
condition 45:15
confess 15:20
confidential 30:20
confirm 25:13 27:13
  35:10
confirmed 26:7
confusing 6:19
congenial 78:12
considered 20:8
consist 19:11
constitute 71:21
consult 11:9,12
contact 18:17,20 19:19
  19:23 20:1,3 31:16
  36:20 37:5 69:22
contained 91:8
content 11:16
context 78:19
control 71:14 72:3
controversy 30:5
convenient 4:17
conversation 6:24 9:15
conversations 43:23
  80:5
conversion 49:8
convey 76:3
copies 12:24 13:3,6
  51:25
copying 6:17
cordial 74:23
Corporate 2:5
CORPORATIONS 1:8
correct 23:18,19 26:1,2
  28:22 30:6 32:13
  33:8 35:20,23 36:4,9
  36:12 39:3,16 42:5

47:19 50:13 53:6
  54:3,4 60:24 61:3,5,6
  61:8,9,12,14,15,16
  61:18,19 62:25 63:2
  64:4 85:19 90:4
  91:14
correction 5:18
corrections 5:14 90:3
counsel 11:13 23:6
  88:25
County 1:6 2:16 14:23
  90:20 91:3
couple 36:20 88:12
course 11:6 65:19
court 1:1 5:8,10,14 6:2
  6:17 7:4,8 15:21
cover 18:11
create 64:25 65:1
created 37:6 42:3
CSR 1:24 90:22 91:22
customers 74:16
C-H-R-M-S 50:19

D
D 3:1 23:12 30:7 34:14
daily 38:8,8 69:25
date 27:18 30:2 43:4
  59:24 61:5 62:1,3
  63:12,15,16 64:3
  66:10
dated 48:3,3 91:18
dates 63:18,18 64:1,4
  64:18
day 8:10,14,23 13:16
  13:19 30:9 32:11
  35:10 39:21 40:4,5,5
  40:10,15,16,24 41:20
  41:25 42:1,21 51:24
  55:20 64:1 70:24
  76:1,2 90:14 91:18
days 5:11 36:20 40:13
  43:9 60:20,22
day-to-day 80:5
deadline 33:15,15
deal 43:24 44:24
dealing 19:11
dealings 78:1 79:19
dealt 19:5,9
deceiving 80:9
deduct 36:2 38:22 39:1
  40:7
deducted 38:20 40:16
default 28:3,5
Defendant 1:10 2:9
Defendants 2:16
deferred 30:20
definition 55:14
delay 31:2 47:18
deleted 51:20
Dell 66:11
department 13:11,14

14:16 23:25 30:24
  31:1 66:13
departmental 23:4
depleted 36:5
deposited 47:1,9
deposition 1:16 4:25
  5:7,21 6:2 8:18 9:4
  11:6 12:3 89:7 91:7
  91:10,14
depositions 58:9
describe 79:25
described 19:25 41:23
  71:20
describing 42:3
designated 86:18 87:9
desk 21:3 24:12 31:22
  61:10 70:18 85:15
detail 43:22
detailed 37:7
details 43:23
determination 73:16
determine 63:9
determined 35:24
  73:13
difference 14:9 22:5
  75:8
different 14:14 21:6
  65:20 70:2
differentiate 23:8
differently 6:7,12
difficult 7:6
Dimension 66:11
directed 36:2
directing 14:16
direction 35:4
directly 25:15 26:9,12
  27:15 86:1
director 14:16 26:13
  59:23 61:25
director's 21:15 24:1
discovery 5:6,21
discuss 9:6 10:9,16
  11:1 35:2 36:19,25
  37:3 45:15 46:6 48:4
discussed 43:12
discussing 10:20 44:3
discussion 45:17,20
diskette 66:15
diskettes 66:15
distant 75:3
District 1:1,2 90:21
division 13:22,24 14:7
  15:2,8,24 16:9,17
  18:3 33:14 56:14
  57:6 58:23 66:13
  67:16 83:18 87:17,22
doctor's 30:16
document 22:11,13
  29:11 41:13 58:10,12
  64:22 76:23
documented 42:12

documenting 34:19,22
documents 3:8 12:5,6,8
  12:15,18 51:5,9,14
  51:22 52:3,24 53:4,5
  55:7,24 64:25
DOE 1:8,8,9
dog 30:7 34:15
doing 6:19 7:10 19:16
  20:6 36:23 49:18
  50:13 68:8 71:1 81:5
  81:8
done 31:4 68:2,4,5
Donnie 15:12
down 4:14,17 5:15 6:17
  7:5 31:8,11,21 34:14
  40:9,14 66:5 74:6
  91:10
download 66:14,18,25
downstairs 31:20,24
  73:7,10 78:4
draft 48:18 62:21
drafted 48:19,20
drink 11:8
DTS 13:19,20 14:1
duly 4:2 91:9
during 11:6 67:7 74:9
  75:6,6 86:6,9
duties 14:17 16:20,22
D-E-F 30:19

E
E 1:3 3:1 23:13 36:13
each 12:21 38:11 43:22
  51:24 83:23
earlier 19:1 65:23 78:3
early 39:15
effect 50:2
eighth 23:14
either 44:17 87:11,11
else's 80:13
email 20:14,15 21:5,19
  22:3,6,13 23:24 24:9
  24:12 25:8,9,19,22
  26:7,16 27:8,10
  37:13,16,17,19,23,24
  38:16,16 43:5 51:17
  51:19 59:24 61:4
  63:5 65:24 72:12,13
  80:16,19
emailed 50:14 66:17,22
emails 24:3 29:2
emergency 19:14
employee 55:17 56:14
  57:6
employees 16:24,25
  17:5 19:13 64:2 71:2
  71:5,8 87:17
employment 23:3
  88:19
enclosed 49:12,12
end 7:1 24:8 36:20 67:4

77:4
engineering 13:21
English 1:3 16:5 18:18
  18:21 26:16 27:8,20
  55:3 56:5 60:18
  90:20
English's 4:9
enrollment 49:1,4
entire 33:14 74:9
ENTITIES 1:9
entitled 11:6 58:10
entries 37:7 38:9 43:22
  44:10
entry 34:14 38:8,20
  39:17,21,23 40:1,7
  40:21,25 41:5,18,23
  42:1,10,19 50:16
envelope 49:12
ESQ 2:3,10,18
essentially 18:17 27:7
  80:21
evaluation 48:5
even 9:25 10:3 15:9,16
  31:9
eventually 35:7 36:11
  44:6,8 68:12
ever 4:25 30:2 55:19
  69:8,10 81:2 82:2
  83:17 87:16,21 88:1
every 5:15 12:18
everybody 4:20 7:11
  73:3,13 74:13 75:5,7
  76:17,19 83:22,22
everyone 72:20 73:18
  75:20 77:9 78:2
  79:10
everything 5:15,19
  51:21 66:25 71:7
  76:11
exactly 22:21 32:1
  37:15 72:15
EXAMINATION 3:2
  4:6
examined 91:8
example 7:19 8:2 19:2
except 27:23
exception 86:10
exchange 30:4
Excuse 86:21
exhibit 12:12,14 13:6
  18:9,23 20:1,10
  22:16 23:1,2 25:7
  30:7 48:24 49:16
  50:25,25 51:10,23
  52:12,24 53:10 54:1
  58:8,9 60:3 62:9,18
  62:20 64:14,25 65:5
  65:9 66:5 69:15
  71:24 86:19
EXHIBITS 3:7
expires 91:23

explain 5:3 6:12 7:23
  20:22,24 32:25 43:11
  49:17 66:21 68:3
explained 10:5 30:21
  31:3 43:13 47:16
explaining 43:8,9 66:6
explanation 27:6 29:8
  29:15 51:1 68:2
extent 9:8 10:12,22
  29:11 45:1 54:14
  56:18 76:22 84:1

                F

F 23:13 48:24
fact 10:3 39:4 75:14
familiar 16:5 37:22
  87:4
far 84:18 85:17
fault 54:20,25 29:23
  80:13,22,25
fax 50:9
feared 70:25
February 14:5 44:4,7
  47:20 50:17 51:1
  58:11,17,25 59:2,3,5
  59:6,7,8,9
feel 54:24 68:16,21,23
  70:5,22 73:17 77:12
  77:25
feeling 74:18,22 75:3
  77:18,20 78:12
feelings 77:16
feet 11:8
felt 20:8 53:11 69:4
  70:9 71:7 74:13,21
  77:5,9,10,11
fifth 23:13
figured 72:4,6
file 20:22,24 27:14
  32:23 34:20 51:11,12
  52:1,1,3,19,20,21,22
  53:2,3,5,8 54:5,8,12
  54:22 56:21,22
files 51:4,19 52:12
  66:14,18,25 67:22,25
  68:6
filing 19:14 30:21
  56:22,25
fill 30:13 31:1 47:18
  86:12
filled 15:9 86:16,20
  87:2
finalized 5:19
find 5:21 21:12,14
  33:12 38:19 45:22
  51:9 79:3
fine 27:2
finger 21:6
finish 15:15 63:23
finished 7:7,13,14
first 4:2 13:18,19 18:9

18:10,10,17,24,25
  19:9,23,25 20:7,7,10
  20:14,16 23:12 29:7
  30:9 32:25 59:21,22
  60:19 61:24,25 80:16
  84:25
flake 24:21,22 29:24
floor 1:18 2:6,21 58:22
flow 7:10
following 39:21 40:4,5
  40:5
follows 4:4
food 47:5,7,7,7
foregoing 90:2 91:12
form 30:13,14,25 40:22
  41:12 47:17 49:8,8
  49:10 64:20 86:19,20
  87:2,4,5,7,16,21 88:1
  88:2,3 91:12
formal 18:20
format 24:3
formed 8:14
forms 19:15,19 87:9
Fort 2:20,21
forth 26:17 43:11
Foumai 1:16 4:1,12
  90:1,9 91:7
found 12:15 46:14 51:4
four 38:18,19 39:1,10
  39:12,14 40:7 65:6
fourth 23:13
four-hour 39:4,6
Friday 30:9 33:9
from 14:4 21:2 27:25
  28:24 31:13 35:10,11
  40:17 45:9 46:15
  47:18 48:25 49:9,13
  49:18 50:11 51:11,17
  53:22 54:1,5 69:19
  72:8 73:5 78:1 81:11
  85:15 86:7 87:16,22
  88:3
front 23:7
full 4:10 91:13
further 23:3 24:19 25:5
  34:10 51:1 66:5
  91:15

                G

G 23:14 49:16
Gary 1:6 2:16 31:25
  32:1,3,7 35:10,16
  36:19 37:1,3 44:15
  45:6 82:14
Gary's 15:13
gave 14:20 30:16,18
  37:7 45:9 63:18
  87:18,19
general 79:10
generally 6:2 7:18 78:7
gentleman 16:7

getting 47:18 66:11,12
Gima 1:7 2:17 33:18
  44:15
Gima's 75:12
girls 73:8,10 74:3,18
give 5:4,9 7:16 57:19
  57:22,23 86:15 87:19
given 13:6 44:8 64:14
gives 50:3
giving 11:11 59:24 61:5
GK 1:7 2:9
go 5:13 10:23 12:9
  21:15 25:4,14 26:8,9
  26:12 27:1,15 28:8
  28:13 29:7 30:23
  31:11 34:14 35:4,8
  35:17,19,25 37:9
  42:1 43:18 44:12
  64:3 78:3 83:23
  87:19 88:10
goes 5:24 6:5,6 31:4
  50:10
going 7:5 9:20 10:21
  12:14 15:16 23:9
  31:11,15 33:13 35:18
  35:22 38:19 43:10,21
  50:5 57:14 58:7
  66:12,15,16 67:1
  76:25 77:15 86:19
  88:6
Golojuch 33:20,25
  34:5,12 36:14,17
  37:13,23,25 58:20
  62:21 63:18 64:7,16
  75:19,21 76:4 83:10
  86:5,9 87:11,20
gone 31:17
good 4:8,21 14:22
  15:22 20:4 58:8 72:9
  74:15 88:7
Graff 87:2 88:3
great 4:18 6:20 88:9
ground 5:4
group 70:6,9,14 75:11
  75:12,12,14,15 76:5
  76:7,8 78:1,3
groups 66:14,17
guess 20:5 27:19 31:13
guessing 8:1
guilty 7:10
guys 67:6

                H

H 23:14 50:8
half 7:13 9:2,3 10:19
hall 25:15 26:9,12
  50:11
handed 44:19
handled 71:1,5
handling 71:8
happen 7:12 78:16

79:1,5 80:12,21
happened 20:23,24
  21:12 30:16 31:6,19
  32:2 34:22,25 38:5
  40:5,15 42:4 61:19
  66:22 74:17 80:20
happening 38:14 72:5
  76:1,6,10
happier 76:14,19
happy 16:1 72:20 73:3
  73:14,18 75:13,14,15
  75:16,20,24 76:17,21
  77:9,12 78:4,11
hard 6:17 51:25
harm 68:24 69:4,5
harming 69:6
having 42:6 72:4
Hawaii 1:2 2:7,14,22
  4:13 47:5,7 91:1,19
  91:23
head 4:16 16:8 85:11
health 19:20
hear 6:3 77:18,19 85:6
  85:10
heard 73:4 74:22 81:10
held 33:14
help 7:8 47:4,6
her 24:20,24 25:3
  29:23 57:13 63:23,24
  88:21
herby 91:5
hereinbefore 4:2
hereto 91:16
hi 20:4
higher 13:23 14:15
him 8:22,24 9:1 15:15
  19:1,5,9 21:3,5,7,16
  21:19 22:2,3,13
  23:21,24,24 24:12,12
  29:19,21 30:12,14,21
  31:3,12,14,16 34:5,9
  34:11 35:8,11,13,17
  35:19,25 37:5,10
  44:8,13 46:25 47:4,5
  47:15,16,19 49:3,7
  49:10,11,12 50:3
  53:24 57:8 63:1 64:1
  66:21,23,24 68:3
  69:20 70:24 75:23
  80:3,18 81:12,13,22
  81:24,25 82:2 86:1
himself 49:5,6 69:5
  87:20
hints 5:4
home 52:6,7,21,22 53:2
  53:15 54:12,21 55:18
Honolulu 1:6 2:7,14,16
  2:22 4:13 14:24
  90:20 91:3,19
hope 14:20
hour 9:2,3 10:19 42:13

hours 38:18,19 39:1,10
  39:13,14 40:8 43:11
  44:4,6,8
house 52:13 53:5,8
  54:6,9,13,22 56:14
  56:20
huh-uh 6:18,23

**I**

IAAO 30:10
idea 46:4,19
IDENTIFICATION
  3:7
identify 23:3
Immediately 9:3
impeachment 6:11
imply 76:18
import 57:4
important 20:8
Inc 1:7 2:9
incident 18:25 19:6,25
  20:8 30:5 69:16
incidents 71:11,20,25
include 17:10
includes 11:8
inclusive 90:2
incoming 29:1
incorrect 63:11,12,13
  63:14,15,16
increment 50:23
independent 59:9
indicate 32:7
individuals 77:15
information 6:17 19:14
  19:19,20 31:4 52:7
  53:7,15,20 54:12,21
  55:2,18,22 56:3,7,13
  56:16,20 57:10 64:9
  66:20
informed 36:22 37:11
  66:13
initial 19:17 28:20
innocent 80:7,9,10
insert 7:15
installing 66:16
instead 21:20 22:19
  43:2
instruct 9:10,22,24
  10:3 88:18
instructed 39:1
instructing 10:1 88:21
insult 4:21
insurance 19:20 48:25
  49:14
intended 39:23
interact 80:2
interchange 71:22
interrupted 50:6
interview 14:6 58:16
  58:21,25 62:21 64:6
  71:21 86:10

interviewed 58:19
  62:20 63:19 64:15
involved 77:19 78:10
issues 57:5
item 44:2
it'd 38:12

**J**

J 23:15 50:25 53:22
  54:1
JANE 1:8
January 14:5 85:15
  86:7
Jessica 1:24 90:22 91:5
  91:22
JMS/KSC 1:6
job 13:23 14:13 16:3
  48:4 70:25 74:23
  82:17,18,21 83:2,7
  83:23
jobs 82:6,10 83:19
  84:13
JOHN 1:8
join 55:6,16
Joyce 41:15,18,20,22
  43:5,10 44:3,9 49:18
  50:1,9,12
Julie's 31:22
July 18:15 25:10 26:20
  26:22 27:19,19
June 60:7,10,16,18,22
  60:22 61:1,1
jury 6:3
just 4:18 7:9,18 8:1,1
  14:5 15:4,21 20:4,22
  25:13 26:6 27:13,22
  29:16 31:2,14,14,23
  34:9,11,19 35:5
  36:23,24 44:19 48:17
  48:22 49:5,6,6 50:12
  52:2,10,10,15,15,17
  53:9 55:19,19,19
  56:9,16 57:1,2,11,22
  58:15 61:16,18 62:17
  63:1 67:8 68:7,9 73:6
  73:8 74:22 75:5 77:2
  77:19 78:2,8 81:25
  81:25 86:1 87:7 88:6

**K**

Kawashima 2:19
keep 16:23 17:3,4
  37:10 51:25 54:12
  55:19 56:20
keeping 19:12,13 36:24
  54:25
keeps 50:11
kept 54:6,8
kind 17:18 56:13,22
  70:2 80:4
knew 69:20 80:24

84:18,22
know 5:22 7:3,19 9:19
  18:2,3 24:10,20
  28:12 29:1,23 31:15
  31:16 32:9 33:24
  34:1,2 36:1 38:5 39:8
  42:9,18,20 45:19
  46:17 50:3 59:7,15
  62:15,16,19 64:23
  67:13,16 68:1,11,12
  68:13 71:3 73:6,15
  74:17 75:2 77:15
  79:2,16 80:1 81:8,17
  81:21 82:4,5,10,12
  82:24 83:22,24 84:3
  84:4,12,21 85:20
  87:12 88:7
knowledge 83:20,21
  84:6 87:12
knows 7:1
Kupau 31:10
Kurokawa 1:7 2:17
  44:15 45:6

**L**

L 2:10,18
last 11:20 13:16 30:4
  36:23 44:2 70:24
  late 24:21 29:24 38:20
  39:17,21,23 40:1,7
  40:21,24 41:5,18
  42:1,18 50:16 60:9
  60:11 62:13
later 21:6,18 30:2
  42:11 48:3 59:1 65:1
Lau 2:4
laughing 74:3,7
lawsuit 5:6
learn 72:8,9
learned 45:9
least 35:11 65:6
leave 17:4,13,14,21
  31:15 34:10 35:13
  36:6 37:6,9 38:17,19
  38:24 40:16 43:25
  44:24 46:11,12 49:19
  50:9,10,12,16 51:1
leaves 16:23 43:9 46:21
leaving 25:4 31:16,23
  35:11
Lee 20:12 21:3,14
left 16:7 34:5,11 35:10
  35:12 37:8 43:12
  67:10,11,12,13,15,17
legal 54:15
less 5:12 76:21 77:22
let 5:3 9:8 11:5 15:15
  15:20 24:20 29:23
  31:16 53:24 57:13
  63:23 76:3 78:14
  87:24

letter 37:10 44:19,22
  46:14,17 48:3,7,8,10
  48:15,17,18
letters 48:21
let's 12:9 29:7 34:14
  43:18 58:3 74:1 78:2
  88:5,10
level 14:15,17 84:9
Liholiho 4:12,14
like 4:22,24 5:11 6:18
  6:19 7:24 18:10 22:1
  22:19,21 27:22 36:25
  44:25 72:17 74:23
  75:3 77:16 81:2 87:9
  87:16,21
limited 20:5
line 6:22
lines 23:4
list 14:5 82:15,16
listed 34:4
little 5:5,12 14:15
  65:23 79:21
live 4:14
living 4:17
LLP 2:19
locked 57:2
log 43:23
long 9:1 14:23 28:21
  31:13 45:17 63:20
longer 12:24 16:14
  50:22
look 12:18 20:10 22:1
  27:18 30:7,18 47:21
  47:25 49:16 52:2,15
  87:4
looked 22:18,21 51:4
  51:13 52:15 62:10
  63:1
looking 15:4 30:8
looks 18:10 36:25 80:7
  80:8,10
Lorusso 2:18,19 8:7,9
  8:12,17 9:7,8,16,24
  10:1,3,5,10,11,17,21
  11:1,12,15,23 12:21
  15:15 23:6,9 25:24
  26:24 27:1 29:10
  33:2,5 40:22 41:7,12
  43:14 45:1,23 47:22
  51:6 52:8 53:9,17,24
  54:14,18,23 55:4,6
  55:16,23 56:8,17
  57:7,11,15 58:3
  59:13 61:16,20 62:4
  63:23 64:11,20 74:2
  76:22 79:22 84:1,14
  85:12 88:17,22,24
Lorusso's 88:15
lose 67:24 69:10
lot 12:19 64:2 69:22
  74:22

loud 85:12
low 43:9 50:10,11
lower 84:9
lowers 49:9
lunch 70:14,18
lunchtime 70:17,19
LWOP 36:8

**M**

machine 91:11
made 39:17,21 40:1,7
  40:21,24 41:20,25
  42:2,2,19,22,23,24
  42:25 43:1,2 77:25
  86:1
Magota 1:7 2:17 16:18
  48:9 71:1,4 85:24
  86:6
Magota's 16:19 85:16
  85:21
mainly 19:15
major 5:20
make 5:4,13,14,17 8:3
  23:21 28:10 32:10,14
  32:19,21 39:23 41:5
  41:18,24 42:1,9,10
  72:25 85:23 87:24
makes 7:6
Makiki 4:15
making 9:25
man 31:10
management 71:14
  72:2,7,9
managerial 14:17
mandatory 31:18
  59:23 61:1,23
manner 72:10
many 43:11 67:6
March 42:17,19 43:4,4
  44:11 45:5 46:14,22
  47:10 59:12 86:7
mark 23:11
marked 3:7 12:12,14
  58:7
Martin 25:8,14,20 27:8
  27:15
Mary 4:12
Matsui 2:11
matter 46:19
may 7:17 12:8 23:9
  28:13 31:10 49:2
  88:7
maybe 5:16 17:22 23:2
  42:2 63:12 64:1
  68:24 72:7 76:1,2
  79:21 87:18
mean 7:3,13 11:17
  25:17 26:4,11 27:19
  28:2 35:16 47:5
  48:23 50:8,23,25
  60:10 68:10 73:2

75:11 77:8 78:21
  79:4,6 80:8 83:4
meaning 30:20 65:11
means 12:21 28:13
  30:20 36:8 65:14
  76:21
meant 17:3 30:19 47:6
  79:3 84:11
medical 47:13 49:9
meet 9:1 19:1
meeting 3:18,12,14,18,21
  18:22,23 21:13 25:4
  26:8,12,23 28:12
  32:1,3 46:5 48:12
message 27:10 28:15
  29:4 34:5,11
messages 34:10
met 8:17,20,22,24
Michael 2:18 58:20
  83:9
Microsoft 29:2
middle 25:25 67:5
might 5:17 7:21,21,22
  8:3 42:2 78:16 79:1,5
Mike 33:20,25 34:5,12
  36:14,17,25 37:13,23
  37:25 62:20 63:18
  64:6,15 75:19,21
  76:3 83:11,12,15
  86:5,9 87:11,20
mind 4:19,20
minute 12:10
missed 60:7
misstates 52:8 64:21
mistake 42:2
modify 29:4
Monday 13:18 32:16
  33:1,4,7 34:4,15
  36:13 38:15 45:5
  46:14,22
monitor 21:22
months 17:22,25
mood 76:5,7,11,12
more 5:5,11 14:15,17
  79:18 88:12
morning 20:4
Moseley 2:3,4 3:3 4:7,8
  9:12,18 10:15 11:4
  11:20 12:1,9,13,25
  15:18 23:1,8,11,16
  26:3,25 27:3,5 29:14
  33:3,6 41:1,9,16
  43:16,18,20 45:4
  46:1 47:24 51:8
  52:1 53:14,18,25
  54:16,19 55:1,8,11
  55:21 56:1,10,12,19
  57:13,17,21,24 58:6
  59:17 60:13,17 61:17
  61:22 62:7 64:5,13
  64:24 73:22 74:5

76:24 79:24 84:5,17
  85:14 86:23 87:1
  88:5,10,12,14,20,23
  89:1,4
mostly 5:7
move 13:11,14 78:14
much 4:23 6:23 37:8
  89:5
multiple 62:13
must 24:13 29:19 38:10
Muzzi 2:4
myself 32:15,22 35:9
  53:12 72:9 78:18

_____ N _____

N 3:1
name 4:10 14:4 20:19
  82:13,16
named 4:2
Nathaniel 82:15
near 67:4 85:16
necessarily 40:13
necessary 20:9
needed 30:23 31:3,15
  35:4,9 47:6,7,17 49:7
  49:10
needs 30:22 68:5
net 49:9
never 77:15
new 23:3 49:4 64:2
  66:11,16 67:6,9,16
  67:18 86:21
newer 50:21
news 88:8
next 20:1 34:14 36:13
  40:24 41:20 42:1,21
  43:4 78:14 81:4
nice 69:13 74:24
nicely 69:12
ninth 23:15
Nodding 4:16 16:8
Nods 85:11
non-accrual 44:3
normal 6:24 47:21
Notary 91:23
note 20:22 27:13,14,23
  30:11,17,18,25 31:4
  32:10,14,16,19,21
  34:17 35:9 36:14
  40:14,18 41:2,10,24
  41:25 42:3 43:1
  44:11 48:23
noted 90:3
notes 32:23 46:2 54:25
  62:21,23 88:6
nothing 4:3 57:4
notice 1:19 18:9 74:12
noticed 75:1
number 19:14 68:16,23
  70:21 72:16
numbered 59:21 63:10

69:14
numerous 65:3

_____ O _____

O 1:7 2:17
oath 4:4
object 7:16 9:8 10:21
  40:22 41:12 53:10
  64:20 76:22
objection 9:16 29:10
  41:7 45:1,23 47:22
  51:6 52:8 53:17
  54:14,23 55:4,6,23
  56:8,17 57:7 59:13
  64:11 68:7,8 74:2
  79:22 84:1,14 88:17
objections 7:15 10:1,11
  11:23 55:16
obligation 9:22
observation 73:9 74:19
observe 73:2 77:25
obtained 13:3
occasions 62:13
occur 67:2
occurred 69:16
odd 24:2 45:22
off 12:9,11 27:1,6 49:4
  49:9 88:10,11
offer 29:8 47:6
offered 29:15
office 21:15 24:1 25:4
  31:10,15,17 32:4,6,8
  34:16 35:12,13 36:6
  44:12 45:6 52:14
  72:5 74:24 85:21
often 70:15
oftentimes 6:25 15:20
Oh 4:21 12:8 13:3 19:7
  26:25 38:4 58:8 89:2
okay 5:3 6:22 9:13 11:3
  11:19 13:14 15:4,17
  15:22 17:3,12 18:6
  19:1 20:10 22:5,11
  23:8,11 24:8,19 28:4
  28:15 31:13 34:14
  40:3 41:19 42:3,8,9
  42:17 43:18 45:5
  46:25 47:10 50:25
  51:13 52:18 58:7
  59:21 60:6 63:7,17
  65:3,16 66:10 69:6
  72:16 73:17,25 74:20
  75:16 76:12 77:2,6
  78:23 80:17 83:17
  84:8 86:25 89:1,4
old 51:19
once 5:15,16 7:6 67:8,9
  74:17
one 5:21 11:5 15:10,11
  22:15 25:23 33:2
  37:20 38:2,3,4 43:22

44:17 48:10 62:12,17
  62:19 66:22 74:21
  82:19 83:3 84:3 87:7
  87:9
ones 13:7 15:8 67:12
only 8:22,23,24 13:7
  17:22 29:15 31:2
  41:18 47:18 49:1
  62:19 66:22 82:2,3
  83:3 88:12
onto 66:14
open 15:2,8 21:22 49:1
  49:4
opened 21:4 82:19
opinion 56:2
opportunity 7:16
opposed 53:10
OptiPlex 66:12 67:11
orally 6:4
orientation 18:11,14
  20:25 23:4 25:13,15
  28:20
original 22:3,6 25:25
  27:7 29:9,16
originally 21:7
other 6:24 7:1,12,14
  11:5,15,16 15:23
  17:13 22:1,5,21 29:8
  29:8 31:25 35:21
  48:15 50:11 51:5
  56:14 57:5,5 59:8
  62:12 69:12 77:4,4
  78:22 80:20,22 82:4
  83:23 85:18 87:17
  others 70:5 78:15,20
  79:4
out 5:21 6:8,11 7:9
  14:2 15:23 21:12,14
  24:13 30:13 31:1
  33:10,12 36:21,22
  38:5,9,11,12,19
  39:14,14 47:18 48:22
  51:18,21,22,24 66:18
  66:20 67:1 72:21
  75:16,21,25 76:11,18
  76:19,20 78:19 79:3
  84:10 85:12,20 86:12
  86:16,20 87:2
outlining 37:13,23,25
Outlook 21:4 27:9 28:3
  29:2
over 5:13 7:11 21:12
  43:11 51:20
overall 74:22
overbroad 64:21
overview 45:9
own 17:8 48:21 78:1
o'clock 7:21 8:2 21:10
  21:20,20,24 22:4,9
  23:25 24:1,2 28:10
  34:13 65:10,11,12,14

70:20,21 80:19

_____ P _____

page 3:2 18:9 20:10,16
  22:16,17,18,19,21,24
  23:1,2,12,12,13
  23:13,14,14,14,15,15
  23:20 24:11 25:7,25
  27:18 30:7 34:14
  36:13 48:24 49:16
  50:8,25 59:21 69:14
pages 3:8 18:10,24 20:1
  29:8 90:2
paper 19:14 53:22 54:1
  54:2,5 59:7,8,16
papers 76:2
paperwork 19:2,12
paragraph 20:11,12
  32:25 37:12 63:10
  65:5 66:5 68:16
  69:14 70:5 71:10,12
  72:16
part 5:6 28:3 50:6
particular 30:5 41:2
  53:4 87:7
parties 91:16
PARTNERSHIPS 1:8
passed 82:15
past 41:11
patterns 69:15
pau 5:11 7:2 86:23 88:7
  89:4
pay 14:11 17:23 33:13
  36:2,6 37:10 38:20
  39:12 43:25 44:24
  46:11,12 49:9,19,20
paycheck 17:18,19
paying 88:15
payroll 16:23 28:10
  36:10,23,23 40:17
  41:22 42:1 43:24
  50:4,10,22 53:12
PCP 49:7
people 4:23 6:25 7:5
  17:12 43:24 50:11
  70:14 75:13,14,24
  76:13,21 77:4,12,20
  77:22 78:4,7,9,22
  80:22 85:23
perfectly 7:4
performance 48:4
period 17:20 74:12
  86:6,10
Perry 1:24 90:22 91:5
  91:22
person 7:1 18:2 27:9,10
  50:10 86:18
personal 13:4,7 55:2,14
  55:22 56:3,7 77:16
  78:1
personnel 16:20 19:15

19:17 30:24 31:5
52:1,2,7 53:3,7 57:5
perspective 69:19
pertinent 53:12
Phil 4:9 16:5,10 18:6
18:17,20 19:23 20:1
23:20 25:3 26:16
27:8 28:15,23 29:8
30:12 31:21,25 32:3
32:4,7 33:13 35:10
35:17,18,21 36:20,21
37:5,10 46:23 47:10
47:20 48:3 50:2 55:2
56:5 59:22,24 60:7
60:18 61:1,4,7,10,23
62:13 65:16 66:6,22
67:7,21 68:21 69:4,8
69:10,12,13,19,23,25
70:24 72:20 73:14,19
74:9,13,15,23,23,24
75:8,13,20 76:12,17
77:3,14 78:2,4,7,15
78:19,21,24 79:5,7
79:19 80:7 83:10,12
83:18,24 84:12 86:13
86:16 88:7
Philip 1:3 20:15,17,18
27:20 44:20
Philip's 45:15
Phil's 21:3 32:23 43:24
49:19 50:9 51:12
52:1,2,7 53:3,7 56:16
67:4 76:4
phone 46:23
physical 68:23,24
physically 69:4,5
pick 74:25
picking 76:2
piece 6:16 88:8
pieces 53:15,21 54:1,2
54:5
Pim 48:25 49:4,13
place 6:1
Plaintiff 1:4,17 2:2
plan 49:8
pleasantries 20:6
please 29:23 43:15
55:11 57:25 58:4
60:14 63:23 66:17
point 6:8,11 10:2 37:9
76:4
pointed 21:5 24:13
pointing 25:24 62:4,18
position 15:5 82:14,19
82:23
positions 15:2,7,9
possession 13:4,7
possible 68:24
possibly 42:18
premium 49:8
premiums 47:13,17

presence 48:4 76:4
present 38:11 45:7
pressure 76:10
pretty 70:15
prevent 71:11
previously 58:8,9
primary 5:22
print 6:20 38:5,7,9,11
51:22
printed 24:12 51:17,24
printout 17:16
prior 91:8
privilege 9:9,21 10:4
10:23 11:11,18
privileged 88:21,23
probably 5:11 9:22
problem 42:6 72:6
problems 74:18,24
77:18 84:25 85:3,5
procedure 36:9,10
process 5:3,8 30:21
31:2,5 37:22 66:6
82:25 87:19
processing 30:24 84:19
produced 3:8
Professional 1:25
proffered 27:6
program 50:24
projected 36:21
promotion 13:23
properly 5:15 6:18
71:7
property 12:24 13:16
19:10 75:6
protect 53:12,16 65:1
PTO 17:7,8
PT&A 35:4
Public 91:23
pull 21:21
pulled 21:5
pure 7:18
purpose 5:22,24 46:4
purposes 5:20 28:9,11
49:10
pursuant 1:18 54:2
put 14:3 17:22 26:7
32:23 35:5,7 38:12
38:13 42:21 54:21
84:10
putting 49:3
p.m 1:18 36:14 38:15
41:24 42:14,18 44:13
89:7 91:6

—— Q ——
qualifications 14:13
qualify 8:2,4
question 5:9,16 6:21,21
6:25 7:1,2,3,14 8:4
9:17 10:2,9,24 11:21
15:15 41:8 53:24

55:9,12 56:9 57:12
57:16,20,23,24 59:21
60:13 61:20 64:21
76:25
questions 5:8 6:3 12:22
23:21 58:15 59:18,19
88:13 89:2
quick 88:5
quiet 75:2,2 80:7,9,10
80:11
quite 7:18,23

—— R ——
R 1:24 90:22 91:5,22
raise 14:20
rather 8:1 20:6 26:14
read 6:2 11:20,22 26:7
55:9,11,15 57:24
58:1 60:13,15 61:16
61:18 90:1
reads 37:23
real 12:24 13:16 19:9
75:6
realize 5:17
really 5:7 53:21 76:15
reason 5:25 6:5 15:23
recall 28:19 39:9 45:14
45:16,18 48:1
receive 24:6 87:9,16
received 21:2
recently 52:2
Recess 27:4 43:17 58:5
recipient 29:4,5
recollection 59:9
recommend 71:11
record 4:11 5:9,10
11:22 12:9,11 27:1,6
43:19 50:9 53:9
55:15 58:1 60:15
65:19 87:24 88:10,11
records 49:19
reduced 91:11
refer 40:4
reference 38:16 40:3
80:14
referenced 60:3
references 65:3
referred 18:23 37:19
65:6,6
referring 22:24,25
30:14 47:4 48:13
62:9 65:5 78:18
80:16
reflect 59:18
reflective 40:14
Regarding 46:11
Registered 1:25
relationship 8:11 9:19
relevant 88:17,18
relief 49:19
remember 21:10 37:18

44:23 46:13,18 59:3
59:6 63:8,20 66:10
66:24 67:3 70:13
71:3 74:11 81:1
82:19 83:3 86:17
87:6,8,21,23,23,25
88:1,2
reminder 24:14,17
repeat 10:13 32:20
rephrase 22:7
report 37:6 45:12
86:12,15
reporter 1:25 5:9,10,14
6:17 7:5,9 15:21
represents 40:16 49:21
91:13
reprimanding 81:25
reprint 38:13
request 48:12 51:5
requesting 48:4
required 20:20
respect 16:20 18:18
36:14 56:5 57:5 71:1
71:8 74:13
respond 25:22 26:19
27:24 63:1,2
responded 25:9,19 26:6
26:20,21 27:20
responds 43:5
response 7:24,25 11:10
52:16 69:2 71:18
responses 8:4
responsible 17:12
19:16
responsive 12:16 13:8
51:5
rest 43:23
restate 60:12
restroom 11:7
retain 12:23
retained 8:9
return 49:10
review 62:8,23 88:6
reviewed 63:9
Richard 82:14
Riddle 35:8,17,25
45:10,12,13
right 4:15 13:9,12 15:1
18:4,6,12,15 19:8,21
19:23 22:15 25:18,23
27:11,16 28:24 29:5
29:12,13 33:22 35:22
37:1 39:11,15,24
42:4 43:25 44:4,13
45:7,10 47:3 53:5,19
54:6,11,21 60:8 61:2
61:11,13 62:14 63:13
65:15,18,25 69:17
70:3 73:11 75:12
78:5,12 79:25 80:22
85:16,18 88:5

rights 9:21 11:12
risk 88:24
Robert 1:7 2:17 16:18
16:19
Roger 2:3 4:8,23
room 75:4
Roy 59:23 60:11 61:2
61:24,25
rules 5:4
run 36:21 86:3
running 36:22 37:6

—— S ——
S 2:3 90:20
safe 70:22
same 7:9 9:16 10:11
11:23 22:6 32:11
54:23 55:6,16 67:11
67:12 69:17,19 78:11
90:3
save 66:25 67:21
saw 21:3,23 31:25
47:20 70:24 73:8,10
74:3 78:22 81:1,21
81:21 82:2,13,16
saying 27:14 35:21
43:1 59:8 60:6,25
73:1 76:16 80:18,21
88:20
says 5:7 10:1,3 20:11
21:2 22:4 23:3,4
25:25 28:1 33:4
36:13 37:12 38:15
39:20 41:14 43:4
45:6 48:12 59:7
60:18 66:5 68:16,23
70:5,21 71:10,14
72:20 78:14 81:4
82:6 83:4 84:24
scheduled 25:16
scolded 81:5,8 82:2,4
scolding 81:24
screen 22:6,8
searching 79:25
second 20:11 23:12
32:16 69:14 84:25
secretary 13:21 14:4,7
14:9,10,11,11 15:1,5
15:7,13 16:16,19
45:25 53:13
section 70:2
sections 66:14
Security 19:20
see 5:13,16 12:5,8 13:3
17:23 20:12 21:7
24:14 31:21 34:7
35:8,17,25 37:13,23
38:15,16 39:20 40:21
41:5,14,22,25 42:6
43:6 44:12 48:5
49:22 60:1 63:7 65:4

65:5,7,17,21 66:7
68:17,25 69:8,10,25
70:7 71:12,16 72:18
72:23 78:23 81:6
82:8 85:1,24 86:9
87:24
seem 37:24 78:15,20
79:4
seems 76:18
seen 32:7 58:12
selected 14:4 83:8,10
83:13
send 26:16 37:5 44:19
48:7,8,16,17,22 49:7
62:21 63:5
sends 27:10
sense 11:11 79:17,18
sent 21:5,7,19 22:2,3
22:13 23:24 24:12
25:8,14 27:8 29:4
31:1 37:10,13,23,25
48:3,10 59:23 61:4
80:18
sentence 25:12 78:14
81:4
separate 37:17,19
50:11
sequence 38:13
series 59:18
served 8:10,14 12:2
services 13:2,12,15
88:15
session 60:7,11 61:23
61:25 62:3
set 25:13 26:17
seventh 23:14
several 14:3
sharing 77:16
sheet 39:12
sheets 31:21,25 33:4,5
33:7,9 75:1
short 43:14 58:3
shorthand 91:11
show 12:14 17:20 21:9
21:21 27:22 28:1,7
28:11,16 29:9,16
38:13 58:7 76:13
86:19
showed 17:18,19 21:6
21:20 22:18 23:20,24
24:2,12 37:7 39:12
65:16,24 66:2
showing 22:12 26:14
shown 24:8 29:7
shows 27:24
sick 16:24 17:4,13,21
28:14 30:13 44:24
47:25 50:16 51:1
72:21 75:16,21,25
76:13,18,19,20
sickness 30:23

side 50:13 85:18
sign 19:2 31:14 33:10
33:11,12 49:10
signature 30:22,25
signed 39:14,14 90:14
significant 14:20 42:11
significantly 14:13
signing 19:12
sign-in 31:21,25 33:5,7
33:9 39:12 75:1
similar 23:7 26:16
56:13 71:11
since 33:21 41:15
sitting 16:7 31:21 35:1
situations 85:8
sixth 23:13
skims 49:8
slide 15:20
social 19:19 20:6
some 5:4,25 30:2 47:6
56:22 59:22 68:8
70:25 71:21 72:7
76:4
somebody 6:2,7 20:14
31:12 32:14,21 37:22
58:16 69:4
somehow 28:24
someone 30:13 31:12
80:13
something 6:22 9:20
14:2 17:17 19:3
21:11 22:1,18 40:4
41:10 50:5 72:8 76:2
78:16,19 79:1,5
sometime 60:25 67:5
son 85:8
soon 49:11
sorry 23:6 26:21 33:7
82:22 84:7
sort 5:3 6:19 17:24
19:16 47:6 71:21
75:3 88:6
sought 14:2
speak 31:11 55:7,24
72:10
speaking 86:6
speaks 29:11 41:13
76:23
specific 11:16 16:20
18:11
specifically 11:2 59:3
specifics 9:14
speculating 35:18
speculation 7:19 45:2
59:14 84:2,15
spend 10:19
spoke 33:17
SR 14:11,12,18
ss 91:2
staff 82:1
stamped 49:12

standing 81:22
standoffish 79:21
start 7:2,8 18:14 21:6
23:5 28:18 29:16
61:13,24 62:1 65:4,6
65:10,17,19,20,24
66:2 78:2
started 16:12 18:7
30:23 39:8 57:17
60:18 76:11
starting 36:3 86:21
starts 23:7
state 4:10 91:1,23
stated 24:21 29:13
80:19
statement 31:14,14
72:25
states 1:1 26:6,20 29:12
59:15
status 26:23
still 10:5 27:24 32:4,5,5
51:19 66:2 67:11,12
69:16
stop 77:17 78:25
Street 1:17 2:6,12,20
2:21 4:12,14 58:22
stress 76:6
stressed 77:20,23
stressful 76:9
stretch 11:7
stub 17:23
stuff 17:16,18 38:7
64:14
subject 18:11 23:3
46:19
submit 40:20
subpoena 8:15 12:2,16
12:19 13:8 51:5
52:16 54:3
Sue 4:19,22,25 35:17
58:7 61:7 63:22
64:25 66:6
suggest 23:9 37:24 72:2
Suite 2:13
supervisor 30:22 31:16
35:14,14,15 81:12,14
81:25 82:6,10,17,21
83:2,7,18 84:13
supervisor's 30:25
31:13
supposed 20:25 31:17
sure 5:14 8:3 10:4,6
11:10 27:3 28:11
31:9 34:25 43:16,21
45:3 47:8 62:5 87:24
surprised 31:21
Suzanne 1:16 4:1,12
59:23 90:1,9 91:7
sworn 4:3 91:9
system 29:2,5 36:10
50:21,22

T
T 1:7 2:16
TAed 82:14
take 11:6 28:6 43:14
46:2 49:16 54:11,21
56:16 58:3 72:7,7
78:19 84:7 87:4 88:5
88:24
taken 1:17 5:1 27:4
38:17 43:17 58:5
90:21 91:10
taking 7:5 20:10 30:7
33:21,25 49:4
talk 11:15 20:4 33:20
73:6,15 77:4,14,17
78:2,9,25 88:6
talked 9:10,13,14 10:25
44:3 46:23 64:1
talking 6:25 7:5,7,11
23:17,17 31:22 33:24
34:2 44:2 66:24 73:8
73:11 74:4,7 78:5,8,9
80:15 81:12
task 21:4,19 22:13
24:14,17
tax 49:9
technology 66:13
telephone 19:14 74:16
tell 7:22 11:5 20:18
24:24 30:8 34:25
42:10 47:15 48:15,17
49:13 57:8,9,18
58:14 63:17 67:21,24
70:9,12,24 75:21
78:19 79:13 81:2
83:9,17,23 84:9 85:3
telling 4:17 17:12
35:12 49:18 81:22
82:1
temper 69:10 71:15,24
72:3
ten 5:11
tendency 48:21
tense 41:11
tentative 28:2,7,8,13
28:16
tenth 23:15
tenure 67:4
terms 20:5 35:25 83:1
88:18
testified 4:4 65:23
testify 4:3 6:6,7
testifying 6:12
testimony 6:1 9:6,14
10:9,16,20 52:9 90:4
Thank 89:4,6
their 17:8 66:14 79:19
84:10
themselves 55:7,24
thing 5:11 6:24 7:12
11:5 64:4 72:11

74:18
things 5:23 6:18,19
7:17 9:10 19:17 42:4
44:25 63:10 70:25
74:12 80:12,14,20,21
86:19
think 7:20,20,22,25 8:3
8:4 15:19 31:8 42:2
50:5,6 56:2,7 62:12
65:23 67:18 69:25
73:20 76:6,9 80:9
thinking 28:23 77:1
thinks 9:20
third 6:5 23:2,12 58:22
though 9:25 15:16 19:1
53:4 69:23 79:11
thought 12:16 21:17
24:2 51:13 72:7 79:1
threatened 68:17,21
70:6,10
three 5:20 18:10,24
19:25 29:8
through 51:4 53:22
54:1 90:2
throughout 15:4
Thursday 44:11
time 6:17 7:20 8:22,24
11:5 14:5 17:13,14
17:20,22 21:6,6,9
22:1,5,10 24:8,13,16
26:5 28:1,7,8,16,23
29:9,16 33:4,13 37:9
38:20 39:8,17 40:14
42:11,12 49:2,20,22
59:24 61:5,13 64:1,6
65:4,6,10,17,20,20
65:24 66:2,6 67:7
69:20 74:9,12 75:7
76:1,4,9,9 82:2,3,4
86:6,9 87:22
times 17:24 40:13
63:13,14,17 64:18
65:6 67:6 74:25
title 28:5
today 6:7,9,13 8:7,18
8:19,20,23 9:1,4
10:10,16 12:3 54:2
told 21:19 23:24 25:3
31:12 32:1 35:13
36:25 37:15 48:7
49:3,11 66:23 74:21
75:19,23 79:13
Tom 2:19 35:8,17,25
45:10,12,13
Tower 2:5,20
track 17:4 19:12,13
traffic 13:21
training 30:10,11
31:18 32:6 59:23,25
60:7,11 61:1,5,13,23
61:25 62:3,12,14

64:2 65:4
transcript 90:4 91:14
transcription 91:12
transfer 14:1 15:23
transportation 13:2,12 13:15 51:21
treat 69:12
trial 5:24 6:1,6,6,9,13
true 6:8,9,10 56:10 75:24 90:3 91:13
truth 4:3,3,4
try 7:9 83:22 84:10
trying 35:1 76:11 79:3
Tsugawa 2:4
Tuesday 43:4
two 7:5 17:22,24 23:4 59:22 60:6,19,19 61:24,25 81:21
two-page 58:10
tying 76:3
type 48:20,21
typed 5:12 38:12
types 17:14
typewritten 90:2 91:11
typing 42:12,14,17

_____

U

U 90:20
uh-huh 6:18,23 8:21 18:1 52:23 60:21 68:18
unable 68:10
unaccounted 39:13
unauthorized 38:18
unavailable 5:25
under 4:4 25:25 32:25 84:24
understand 5:17 6:14 7:4 8:5 9:17 10:7,23 10:24 30:19 35:3 40:3 41:8 61:20 73:1 76:16 78:11 82:7 83:5,6,7,10
understanding 42:7 84:18
understood 83:12
UNITED 1:1
unless 10:1
until 7:7,13 36:5 44:13
updated 38:12
upset 78:15,20,22,23 79:4
use 11:7 29:2 36:9 37:8 49:12,19 50:22
used 4:14 6:1 28:5 49:20
useful 5:5
usual 36:9
usually 5:22

_____

V

v 1:5
vacation 16:24 17:4,13 17:21 36:2,21,22 37:9 38:18 39:2,5 41:15 43:24 44:24 72:22 75:17,21 76:13 76:18,19,20
vague 10:12,21 11:23 45:23 47:22 55:7,13 55:23 64:11 79:22
various 43:23
verify 50:12
version 50:21
very 7:6,6 15:22 23:6 65:9 69:13 72:14 74:15,23,24 75:2,2,5 75:7,7 89:4
via 63:5
violative 9:20
violence 58:10 86:12 86:15
violent 69:8 79:8
Violet 20:12 21:3,14 24:20,24 25:2,3,5 29:23 33:19,19
vs 90:20

_____

W

Waikiki 76:8
wait 7:7,13
waiting 21:16 31:23
waive 10:4
walk 75:1
walked 31:23 75:3,11 75:12
want 4:21 5:17 7:18 8:1,3 11:7,9 35:12 37:3 53:21 55:9 68:2 77:18,19,19 85:5,10
wanted 18:3 21:14 30:12 31:7 35:2,3 48:25 49:13 50:12
wanting 15:23 87:3
wasn't 17:16 21:13 24:20,25 29:23 32:6 38:2 47:8 57:15 73:2 75:9,13 76:14 77:21 77:22 78:4,11 79:12 83:10,12
water 11:8
way 15:22 23:7 57:13 61:19 69:12,20 71:1 71:4 77:4 78:1 80:18 91:16
Wednesday 18:15 23:5 33:15 48:2
week 36:20 38:11
weeks 59:22 60:7,19,19 61:24 62:1
well 5:3 6:8 7:4,19,20 8:2 14:20 17:18

18:20,25 28:20 41:21 45:25 47:16 53:11 60:18 64:18 72:4 73:2 75:19 76:3,16 77:3,8 79:3,7 80:2,10 83:23,24 84:7
went 21:3,12 24:11 28:15 31:8,20,24 51:20 60:9,10 73:7 73:10 74:6,25 76:9
were 8:14 12:2,16,19 12:19 13:4,8 14:7,17 15:1,4 16:1,9,12,14 16:16,22 17:12 18:2 18:6 19:16 21:16 28:12 30:10 33:9 34:2,19 35:18,21 37:8 42:15,17 43:10 44:2,15 45:19,22 46:8,10 48:10 50:5 51:11 52:14 57:22 59:18 63:7,10,11 64:1,4 66:10,11 70:2 75:5,13,14,16,24 76:3,14 77:12,20,22 78:7,10,18 79:7,13 79:14,16,18 80:21 84:19 85:5,18 86:5 86:18 87:9 90:3
weren't 16:10 42:14 74:7 79:11
we'll 15:19 23:11
we're 30:8
while 5:15
whole 4:3 10:19 64:3 69:20 74:18 75:15
Wilfred 20:15 25:8,14 25:20 27:8,14
Willy 59:24 61:4
window 49:2
wiped 51:21 66:20 67:1
witness 4:2 5:25 10:13 10:25 11:3,19,25 12:23 26:2 29:12 40:24 41:14 45:3,25 51:7 52:10 53:11 54:24 55:17,25 57:9 57:19 58:2 59:15 60:16 61:21 62:5 63:25 64:23 74:3 84:3,16 85:13 88:9 89:6 91:7
wives 84:25
Wong 2:10 15:12 22:24 55:5,13 73:20 86:21 86:25 89:3
words 11:15,16 35:21 79:25
work 16:14 17:2 26:14 28:12 30:10 70:22 72:21 73:14,19 74:17

75:20,25 76:13,17,20 77:3,9,13 78:10 81:5 81:9,23 82:1
worked 14:23 16:10 74:10
working 16:9 28:18 73:8,11 74:15 75:5,7 78:8
workload 76:10
workman's 30:14,21 30:25 31:5,9,12 44:9 46:6 49:21,23
workplace 58:10 86:12 86:15
worry 49:3
worse 4:23
worthwhile 43:21
wouldn't 87:14
write 34:17 40:18,20 41:2,10 62:6
writing 5:16 39:20 40:14
written 5:14
wrong 54:25 64:19 88:25
wrote 40:9
W7 49:20

_____

X

X 3:1 6:9,9,10 11:16
Xeroxing 77:17

_____

Y

Y 6:10 11:17
Yeah 8:25 21:25 53:1 63:4 77:7 86:23
year 13:17
years 14:3,25 15:1

_____

0

03 38:10,10 42:19 43:5 44:11
03/03/03 36:13 38:15 41:23
04 38:10
04-00108 1:6 90:21
05 13:18 14:5 67:14,15
06 13:17
07 27:19

_____

1

1 90:2
1st 13:16 49:2,2 60:7 60:18,22 61:1 67:15 86:7,7
1-10 1:8,8,8,9,9
1:00 34:13 36:14
1:48 1:18 91:6
10 3:8
10th 45:5 58:11,17,25 59:2,4,5,6,7,8,10

10/25/02 38:17 39:4,19 40:8 43:10
10:00 7:21
10:30 34:15
102 3:8 12:12,15 13:7 18:9,24 20:1,11 23:1 23:2,9,18 24:11 25:7 26:17 27:7,18,19 30:8 48:24 49:16 50:25 51:10,23 52:12 52:25 53:10 54:2 60:3 62:4,18 64:15 64:25 65:9
11 68:16
11:00 7:20 8:2 21:10,10 21:20,24 22:8,19 24:2 28:24 29:9,17 65:24 66:3,4 80:19
11:30 21:10,10 65:17 66:3
1100 1:17 2:6
12 3:8 68:23
12:00 70:20,21
12:30 7:22
13 14:25 15:1 69:14
14 14:11 44:3,6 60:19 60:22
15 60:16 70:5
15th 60:10,23 61:1
16 14:12,18
1631 4:12
17 70:21
17th 46:14,22
18 71:10
19th 25:10

_____

2

2 14:7,9,11 16:16 22:16
2/23/03 39:18
2/28/03 30:9 36:3 43:10
2:00 44:13
20 90:15
2000 18:15 25:10 27:20 60:7
2003 42:18 45:5 47:20 48:2,23 50:17 51:2 58:11,17,25 86:7,7
2006 1:18 90:21 91:6 91:18
203 4:13
21 72:16
21st 47:10
23rd 1:17 2:6
24th 91:18
26th 18:15 26:20,22 27:19,19
28th 47:20 48:23

_____

3

3 14:4,10,11 15:1,5,7 22:17,18,19,21,24

| | 96822 4:13 | | | | |
|---|---|---|---|---|---|
| 23:1 70:6,9,14 75:11<br>75:12,14 76:5,7,8<br>78:1,3<br>**3rd** 42:18 43:4<br>**3/03/03** 34:4<br>**3/3** 40:15,19,20 41:2,10<br>41:15 42:4,17<br>**3/3/03** 32:16 33:1 34:15<br>39:20 40:9,11 42:14<br>**3/4** 40:21,25 41:6,11<br>42:2,3<br>**3/4/03** 39:17 40:7<br>**3:13** 38:15 41:24 42:14<br>42:18<br>**32** 12:19<br><br>——————— **4** ———————<br>**4** 1:18 3:3 82:20 90:21<br>91:6<br>**4th** 13:18 42:19 43:5<br>50:17 51:1<br>**4/17/03** 48:12<br>**4/9/03** 48:3<br>**4:18** 89:7<br>**404** 1:24 91:22<br>**411** 2:13<br><br>——————— **5** ———————<br>**5th** 2:21<br>**5/11/09** 91:23<br><br>——————— **6** ———————<br>**6** 82:22,22,23<br>**6th** 44:11<br><br>——————— **7** ———————<br>**7** 59:21 63:10 65:5 66:5<br>**7th** 49:22<br>**7/26/2000** 23:5<br>**72** 58:9 62:9,20 65:5<br>66:5 69:15<br>**735** 2:12<br>**745** 2:21<br>**76** 86:20<br><br>——————— **8** ———————<br>**8:00** 18:15 21:20 22:4<br>22:19 23:5,25 24:1<br>25:13 28:9,24 65:10<br>65:11,12,14<br>**8:05** 32:12<br>**8:30** 34:4,5 61:13 65:4<br>65:7,12,13,14<br>**842** 58:22<br>**89** 90:2<br><br>——————— **9** ———————<br>**9th** 48:2<br>**9:00** 7:22<br>**9:30** 8:3 21:4 61:10<br>**96813** 2:7,14,22 | | | | | |