```
                                                              Page 1
1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,            ) CIVIL NO. 04-00108 JMS/KSC
                                   )
5              Plaintiff,          )
                                   )
6         vs.                      )
                                   )
7    CITY AND COUNTY OF HONOLULU;  )
     GARY T. KUROKAWA; ROBERT O.   )
8    MAGOTA; ANN C. GIMA; and GK   )
     APPRAISALS, INC.; JOHN DOES   )
9    1-10; JANE DOES 1-10; DOE     )
     PARTNERSHIPS; DOE             )
10   CORPORATIONS 1-10; AND DOE    )
     ENTITIES 1-10,                )
11                                 )
               Defendants.         )
12   _____)

13

14            DEPOSITION OF GARY T. KUROKAWA

15   Taken on behalf of the Plaintiff PHILIP E. ENGLISH, at

16   the law offices of Moseley, Biehl, Tsugawa, Lau & Muzzi,

17   Alakea Corporate Tower, 23rd Floor, 1100 Alakea Street,

18   Honolulu, Hawaii 96813, commencing at 9:07 a.m., on

19   Tuesday, August 22, 2006 pursuant to Notice.

20

21         BEFORE:  MYRLA R. SEGAWA, CSR No. 397

22         Notary Public, State of Hawaii

23

24

25
                          EXHIBIT "D"
```

Page 134

1  A   Yes, yes.
2  Q   Well, can you explain to me in your words
3  or in the words you used what happened in both those
4  instances?
5      MR. YAMAMOTO: Well, let me object
6  that that assumes facts not in evidence that there
7  were two instances. You said both.
8      MR. MOSELEY: Well, with respect to
9  those two questions.
10     MR. YAMAMOTO: Okay.
11     THE WITNESS: I think that, you know,
12 we had options of moving to different supervisors if
13 Phil felt that he wanted to be transferred there were
14 options available in the office. And, you know, that
15 was offered to him.
16 BY MR. MOSELEY:
17 Q   One of those included a move to Kapolei?
18 A   That was available. The group out in
19 Kapolei is available. The group that Bob Magota was
20 supervising was available.
21 Q   Bob Magota was actually supervising a
22 separate group at the time?
23 A   Well, he was overseeing that it was a
24 vacancy and he was making sure that that group was
25 still, you know, operating.

Page 135

1  Q   Okay. What group was that?
2  A   I don't know the exact -- the number of the
3  group. It's a residential group.
4  Q   And when did you offer those things to
5  Phil?
6  A   My recollection is that at the meeting with
7  Waylon Toma.
8  Q   Okay. And what was Phil's response to that
9  offer?
10 A   I don't recall.
11 Q   Did you offer him any other alternatives
12 other than those two alternatives?
13 A   No, I believe under my control that was the
14 options that I had for him.
15 Q   Why were you offering him options?
16 A   I felt that if he and his supervisor were,
17 you know, seeing eye to eye or you know these were
18 other options available in the office.
19 Q   Okay. I'd like you to take a look at
20 Exhibit 68. This is also titled at the top workplace
21 violence checklist and it's dated February 26, 2003.
22 Can you tell me if you've ever seen this before?
23 A   I don't recall seeing this.
24 Q   Can you take just a couple of minutes to
25 take a look at actually the contents. What I'd like

Page 136

1  to know is if there's anything contained in here that
2  Bob Magota ever discussed with you before this date.
3  A   It doesn't -- I don't have any recollection
4  of it.
5  Q   Can you take a look at Exhibit 69, please.
6  This also is entitled at the top workplace violence
7  checklist and it's dated February 10, 2003. Have you
8  ever seen this document before?
9  A   No.
10 Q   Do you know where these interviews were
11 conducted?
12 A   No, I don't.
13 Q   Do you know by whom they were conducted?
14 A   No, I don't.
15 Q   Were you told that they were going to be
16 conducted? I mean, before they were conducted, were
17 you told they were going to be conducted?
18 A   No, no knowledge of that.
19 Q   Did anybody interview you?
20 A   No.
21 Q   Did anybody ask to interview you?
22 A   No.
23 Q   Have you been interviewed by the ethics
24 commission staff?
25 A   Yes.

Page 137

1  Q   Okay. When was that?
2  A   I don't recall the date.
3  Q   Okay. Who interviewed you?
4  A   I believe it was Matt Viola.
5  Q   And what did Matt ask you about?
6      MR. YAMAMOTO: I'm going to instruct
7  the witness not to answer on the basis of privilege
8  privacy, and that a motion, as I understand it, is
9  still pending before the Court, your Motion to
10 Compel.
11     MR. MOSELEY: That was a Motion to
12 Compel. The ethics commission produced the
13 information.
14     MR. YAMAMOTO: Right. And I think
15 they took the position that it's private, and we take
16 the same position that it is private. So I'm
17 instructing the witness not answer on that basis.
18     MR. MOSELEY: Okay. Are you going to
19 instruct the witness not to answer any questions with
20 respect to any information that was transmitted to
21 the ethics commission?
22     MR. YAMAMOTO: Yes.
23     MR. WONG: Actually, can we take a
24 short break. I'd like to confer with Mr. Yamamoto on
25 this claim of privilege.

35 (Pages 134 to 137)

Page 142

1  reference to serve as a yelling match or anything?
2      MR. YAMAMOTO: Can you refer him to
3  where it is? I mean, it says on the first page but.
4      MR. MOSELEY: I think it's the second
5  or it's the third paragraph under No. 7.
6      MR. YAMAMOTO: Beginning this
7  happened?
8      MR. MOSELEY: Right. And I think it
9  goes into the following paragraph.
10 BY MR. MOSELEY:
11     Q  I was just wondering if that sounds like
12 the incident for which you received some at least
13 abbreviated report?
14     A  I'm not sure.
15     Q  Okay. Fair enough. Referring to the last
16 page of this exhibit, and I'm not 100 percent sure of
17 why it's attached to this exhibit, but were you aware
18 of the date on which Chris Graff was interviewed by
19 Chuck Totto?
20     A  No.
21     Q  Take a look at Exhibit 77, please. This
22 one is labeled at the top confidential workplace
23 violence incident report. I mean, disregarding
24 what's written in there, do you recognize this form
25 as a form available for people to file reports on?

Page 143

1      A  No.
2      Q  Had you ever seen this form before?
3      A  No.
4      Q  Okay. Taking a look at the top, at the top
5  page of this report on the first page of this report
6  upper right, there's a place that says date of
7  incident, and it's written 1/3/03 and then 1/8/03.
8  Both of those are crossed out and it says 1/17/03 and
9  1/22/03. Do you see that?
10     A  Yes.
11     Q  Do any of those dates have any significance
12 to you?
13     A  No.
14     Q  Take a look at the second page of this
15 exhibit. At the very bottom there's a line that says
16 supervisor notified by Chris Graff. Do you see that
17 line?
18     A  Yes.
19     Q  It says Tuesday, 1/7/03 and Friday,
20 1/10/03. Do you see that?
21     A  Yes.
22     Q  Were you notified of anything on Tuesday,
23 1/7/03 or Friday, 1/10/03?
24     A  I don't recall.
25     Q  Is it possible you were notified of

Page 144

1  something on those dates?
2      A  It's possible, but I don't recall. I
3  wouldn't think this would be me because the
4  supervisor would be Ann Gima.
5      Q  Okay. And that's your understanding is
6  that his supervisor was Ann Gima?
7      A  (Witness nods head.)
8      Q  Did Ann Gima ever tell you she was notified
9  of anything by Chris Graff on the 7th of January,
10 2003 or the 10th of January, 2003?
11     A  I don't recall that.
12     Q  Okay. On the next page -- actually, it's
13 the next one-and-a-half pages, and at the bottom
14 they're labeled 365 and 366. Can you take a quick
15 look at the contents of this because I'm going to ask
16 you if any of this is familiar to you?
17     A  Okay. I reviewed it.
18     Q  Does any of this sound familiar to you?
19     A  No.
20     Q  You weren't told any of this by any other
21 person?
22     A  No.
23     Q  I'm assuming that in your answer you're not
24 including any communications you had with the ethics
25 commission, right?

Page 145

1      MR. YAMAMOTO: Let me object and
2  instruct the witness not to answer.
3      MR. MOSELEY: Well.
4      MR. YAMAMOTO: That's kind of a
5  roundabout way to get to --
6      MR. MOSELEY: No, no, no. When I said
7  nobody ever talked to me about this or I never had
8  any information, I'm assuming that he's not
9  testifying that he didn't get this information from
10 the ethics commission or that he did. He's just
11 excluding those people all together.
12     THE WITNESS: Yes.
13 BY MR. MOSELEY:
14     Q  Is that right?
15     A  That's right.
16     MR. MOSELEY: I just don't want to be
17 precluded from asking that later in the sense of oh,
18 well, he told you he didn't say the ethics
19 commission.
20     MR. YAMAMOTO: Okay. I misunderstood
21 your question.
22     MR. MOSELEY: No, no, that's fair
23 enough.
24 BY MR. MOSELEY:
25     Q  Can you please take a look at -- well,