# Transcript of the Testimony of
# **PHILIP ENGLISH**

## VOLUME II
## **Date:** October 4, 2005
## **Case No.:** CV04-00108
## **Case:** ENGLISH v. CITY & COUNTY OF HONOLULU

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

**EXHIBIT A**

Tony

## Page 85

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,                ) CIVIL NO. CV04-00108 JMS/KSC
                                  )
            Plaintiff,            )
                                  )
      vs.                         )
                                  )
CITY AND COUNTY OF HONOLULU;      ) VOLUME II
GARY T. KUROKAWA; ROBERT          ) PAGES 85 THROUGH 242
MAGAOTA; ANN C. GIMA; and         )
GK APPRAISALS, INC.; et al.,      )
                                  )
            Defendants.           )
                                  )
                                  )

DEPOSITION OF PHILIP E. ENGLISH

Taken on behalf of Defendants City & County of Honolulu,
Gary T. Kurokawa, Robert Magota and Ann C. Gima, at the
law offices of Watanabe Ing Kawashima & Komeiji, 5th
Floor, Hawaii Tower, 745 Fort Street, Honolulu, Hawaii
96813, commencing at 10:29 a.m., on Tuesday, October 4,
2005, pursuant to Notice.


BEFORE:

      Donna Kohls, CSR 146
      Notary Public, State of Hawaii

## Page 86

```
 1  APPEARANCES:
 2  For Plaintiff:    ROGER S. MOSELEY, ESQ.
                      2300 Alakea Corporate Tower Corporate
 3                    1100 Alakea Street
                      Honolulu, Hawaii 96813
 4
    For Defendant
 5  GK APPRAISALS,
    INC.:             ANTHONY L. WONG, ESQ.
 6                    Matsui Chung
                      1400 Mauka Tower
 7                    737 Bishop Street
                      Honolulu, Hawaii 96813
 8
    For Defendant
 9  City & County of
    Honolulu; Gary T.
10  Kurokawa; Robert
    O. Magota; and
11  Ann C. Gima:      MICHAEL A. LORUSSO, ESQ.
                      Watanabe Ing Kawashima & Komeiji
12                    23rd Floor, First Hawaiian Center
                      999 Bishop Street
13                    Honolulu, Hawaii 96813
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 87

```
 1                   I N D E X
 2
    EXAMINATION RESUMED BY:                PAGE
 3
    Mr. Lorusso                      88
 4
 5
    EXHIBITS MARKED FOR IDENTIFICATION:
 6
 7  3   Employment application       97
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 88

```
 1            (Disclosure presented to counsel)
 2                   PHILIP E. ENGLISH
 3  recalled as a witness by and on behalf of Defendant City
 4  and County of Honolulu, having been first duly sworn to
 5  tell the truth, the whole truth, and nothing but the
 6  truth, was examined and testified further as follows:
 7                EXAMINATION (Resumed)
 8  BY MR. LORUSSO:
 9  Q   Good morning, Mr. English.
10  A   Good morning.
11  Q   Do you understand that this is the continuation of
12  your deposition that we begun on September 30th, 2005?
13  A   Yes.
14  Q   You do understand that you are still under oath
15  correct?
16  A   Yes, I do.
17  Q   You understand that the same rules that I gave you on
18  September 30th, 2005 apply here today?  Do you understand
19  that?
20  A   Yes.
21  Q   Between the end of your deposition last week Friday,
22  September 30th, 2005, until this morning, did you review
23  any additional documents in preparation for today's
24  deposition?
25  A   No, I didn't.
```

CV04-00108                                    ENGLISH v. CITY & COUNTY OF HONOLULU

| Page 89 | Page 91 |
|---------|---------|

**Page 89**

1  Q   Did you meet with your counsel with regard to further
2  preparation for the continuation of your deposition?
3  A   No, I didn't.
4  Q   With regard to Exhibit 2, which was that rough draft
5  chronology that you had indicated that you prepared, did
6  you make any additional changes, corrections or
7  modification to that document?
8  A   I didn't even look at it.
9  Q   Mr. English, you had indicated in your deposition on
10  Friday that you had met with an individual by the name of
11  Stan on the Big Island, is that correct?
12  A   Yes.
13  Q   Would that be Stan Sitko, S-i-t-k-o, if you remember?
14  A   I don't remember. I think so, but I don't remember.
15  Q   With regard to any position on the Big Island, you
16  had indicated that you had considered that merely as a
17  potential possibility, is that correct?
18  A   That's correct.
19  Q   At any point in time, either before you began working
20  for the City & County of Honolulu or since the time you
21  were working for the City & County of Honolulu, did you
22  ever formally apply to work as a real estate appraiser on
23  the Big Island?
24  A   I did.
25  Q   When did you do that?

**Page 90**

1  A   Prior to any application I made at the City & County
2  of Honolulu, and I believe it was for the administrator
3  position on the Big Island. I believe that is what it was
4  for.
5  Q   When was that that you had made that application?
6  A   It was maybe, again, maybe a year prior to my
7  application for the City & County of Honolulu.
8  Q   And with regard to your application to the City &
9  County of Honolulu, approximately when was that? Do you
10  recall?
11  A   I believe it was in May of 1999, April, May,
12  somewhere around that time frame.
13  Q   So approximately sometime in 1998 you had applied for
14  work on the Big Island, correct?
15  A   It would have been maybe late 1998. And, yeah, again
16  it was one of those go ahead and apply and see what
17  happens, just kind of exploring what is out there.
18  Q   With regard to your application to be an
19  administrator doing real property work on the Big Island
20  for the County of Hawaii, what became of that application?
21  A   They denied it because I didn't send a photocopy of
22  my driver's license.
23  Q   And did you ever send a photocopy of your driver's
24  license?
25  A   I don't recall if I did or not.

**Page 91**

1  Q   And is that--
2  A   I'm sorry. I believe what happened was, the denial
3  came that they basically threw my application out and I
4  wasn't even considered because I didn't submit it with a
5  copy of my driver's license. I believe that is what it
6  was.
7  Q   And was that something that was told to you verbally
8  or something in writing or both?
9  A   They sent me something in writing. I may have
10  communicated with somebody over there, but I'm not really
11  sure. I think I spoke to a woman over there about that.
12  Q   And did you ever reapply to the County of Hawaii?
13  A   No, I never did.
14  Q   And why was that?
15  A   Well, they didn't have any positions open. I think
16  the one that I applied for was a position that they were
17  advertising. So I didn't apply for any positions. That
18  maybe was my initial thought about-- as I mentioned
19  before, I was reconsidering, reevaluating my life and
20  trying to think about what kind of career I would do. I
21  had done lots of appraisal work on the Big Island just on
22  my own practice.
23      So I was familiar with the Big Island. And so it was
24  one of those things where they had an opening, they
25  advertised for it, and I applied just to see what would

**Page 92**

1  happen.
2  Q   When you say you applied just to see what would
3  happen, you were applying to obtain a job, correct?
4  A   Well, I had no idea what it was, what they were
5  offering. You know, it was-- I don't even remember how I
6  became aware of the job. It might have been a little line
7  in the paper or something. So I really didn't know about
8  the job. And in fact I had never worked in assessment
9  before. So this was a new area of real estate appraising
10  and I was interested in it but I really didn't know about
11  it.
12  Q   With regard to applying for the job on the Big
13  Island, would it be fair to say that what you did is, you
14  submitted an application for an administrator position
15  with the intention then of working if you were accepted
16  for that job on the Big Island?
17  A   My intention was to explore the position and find out
18  what it was about. They didn't know about me. I didn't
19  know about them. That is what it was about. Certainly I
20  filled out the application and I would have-- if they had
21  wanted to interview me, I would have shown up for the
22  interview.
23      I don't know how other people interview. But when I
24  interview for a job, I'm not having people interview me.
25  I interview them, as well. I want to know what the job is

2 (Pages 89 to 92)

Page 93

1  about and who the people are and so on. I have always
2  done it that way.
3  Q   So with regard to the Big Island job, as I understand
4  it, you wanted to explore more with regard to what that
5  job would entail by virtue of your submitting an
6  application, correct?
7  A   That's correct.
8  Q   Was that your only intention, was to explore more
9  with regard to the position or was it also to accept the
10  job if it was offered to you?
11  A   I can't answer that because I don't-- I didn't know
12  what the job was about. So I have to leave it that way. I
13  can't really answer that. There were other considerations
14  for me, as well. My son is here on Oahu and I would have
15  to make arrangements about that. So there is a whole lot
16  of things that go into considering a job.
17     They had a window. You had to apply for a job at a
18  certain time. I tried to meet that in an effort to
19  explore what that was all about.
20  Q   And was it your intention to live or work in the Hilo
21  area on the Big Island?
22  A   If that was what the job entailed.
23  Q   You had indicated that doing assessments would be a
24  new area for you, is that correct?
25  A   That's correct.

Page 94

1  Q   In terms of assessments, can you please define that
2  for me. What you mean by that?
3  A   Well, the assessment process is, it's a real estate
4  appraisal process where you apply mass appraisal
5  techniques. And it's certainly a government function.
6  It's really a policing function whereby government taxes
7  your property based on, in these cases, is the fair
8  market value.
9  Q   In terms of doing assessments, when you were hired by
10  the City, it was as an assessor?
11  A   No.
12  Q   It was as an appraiser, correct?
13  A   That's correct.
14  Q   You had told me, in your private practice, you had
15  already described for me the number of people that you had
16  supervised, correct?
17  A   Yes.
18  Q   Did you ever have any training in supervising
19  individuals?
20  A   I don't think I did. I think I just had a natural
21  ability for it.
22  Q   When you say natural ability, what do you mean?
23  A   I think it entails some leadership ability. You need
24  to be able to assign tasks to people and help them to
25  achieve those tasks. You need to be, I think, somewhat of

Page 95

1  an educator as a supervisor. You are training people how
2  to do things, maybe how you want them done. I think just
3  personnel issues as far as people getting along and being
4  able to maintain a positive environment where people get
5  along.
6  Q   Anything else?
7  A   In terms of being a supervisor?
8  Q   Yes.
9  A   I think that is pretty much it. I think encouraging
10  people to do the best that they can in teaching them about
11  their job. I think those are the things that are very
12  important about supervisory type roles, kind of a
13  leadership role.
14  Q   As a non supervisor, would you agree that some of the
15  same qualities are as important for those who are being
16  supervised? In other words, having a positive
17  environment, people getting along?
18  A   Absolutely.
19  Q   Also, with regard to education, that the supervisor
20  has to be an educator and, by the same token, the employee
21  has to be a good student?
22  A   Absolutely.
23  Q   Now, with regard to your application to the City, you
24  had indicated that was some time approximately in April or
25  May of 1999, correct?

Page 96

1  A   That is what I recall.
2  Q   With regard to that application, as we already talked
3  about, you indicated that, on your application, you tried
4  to be as honest as you could, correct?
5  A   Yes.
6  Q   And part of that honesty would be filing out and
7  providing whatever job information that was required of
8  you when you were submitting your application, correct?
9  In other words, if the application required you to list
10  all of your previous employment, that is what you did,
11  correct?
12  A   I believe that, if that is what the application
13  required. But I believe I provided all of my previous
14  employment relative to real estate appraising.
15  Q   But if the application said provide us all of your
16  previous employment not relative to the position, you
17  would have done that also, correct?
18  A   If I understood that is what they were looking for, yes.
19  yes.
20  Q   And that is what you did here with the City, correct?
21  A   What I did was, I provided them information that I
22  thought would be relevant to the position. And I believe
23  that is what they were looking for.
24  Q   With regard to your application, let me have you
25  please take a look at a four-page document. It's dated

3 (Pages 93 to 96)

Page 97

1   May 18, 1999.
2   A   I forgot my glasses. I can just hold it a little
3   further away maybe. Sorry about that.
4           MR. WONG: You can try these.
5   Q   (By Mr. Lorusso) Let me go back. I'm going to hand
6   you a four-page document dated May 18, 1999 and ask you if
7   you have seen that document before.
8       Let's go off the record.
9       (Recess)
10  Q   (By Mr. Lorusso) As I indicated to you, I handed you
11  a four-page document. On the bottom of the first page,
12  it's dated May 18, 1999, as well as on the fourth page.
13  Do you see that?
14  A   Yes, I do.
15  Q   And while there was some discussion off the record of
16  whether or not this was your first application or there
17  may have been other applications, let me be very clear.
18      First of all, we'll have this marked as Exhibit 3 to
19  the deposition. And I will also note that even though it
20  says Exhibit 16, that was Exhibit 16 with regard to
21  documents that were produced by your counsel.
22      (Exhibit 3 marked for identification.)
23  Q   (By Mr. Lorusso) Having said that, looking at
24  Exhibit No. 3--
25          MR. MOSELEY: I'm not sure that is correct. I

Page 98

1   think Exhibit 16 is actually part of an exhibit from a
2   motion that one of you guys filed.
3           MR. WONG: We can just say Exhibit 16 to
4   something else.
5           MR. MOSELEY: Okay.
6   Q   (By Mr. Lorusso) Looking at Exhibit 3, this
7   employment application, is this in fact an employment
8   application that you had submitted to the City as of May
9   18, 1999?
10  A   It appears to be, yes.
11  Q   Is that your signature that appears on this
12  application?
13  A   Yes.
14  Q   And that is both on the first page as well as the
15  fourth page of this document, correct?
16  A   Yes.
17  Q   And with regard to the position or positions that you
18  were applying for, it would be real property appraiser II
19  III, and IV, is that correct?
20  A   That's correct.
21  Q   And with regard to Question No. 9 on page one of this
22  four-page document, it indicates, "I hereby certify that
23  all statements made on or in connection with this
24  application, including those regarding my education and
25  employment record, are true and correct to the best of my

Page 99

1   knowledge." Did I read that correctly?
2   A   Yes.
3   Q   And you then signed the document on page one,
4   correct?
5   A   That's correct.
6   Q   And if you look at page two, there is a question with
7   regard to your educational background, correct?
8   A   Yes.
9   Q   And you provided your educational background,
10  correct?
11  A   Right.
12  Q   And then there is also a question with regard to your
13  employment record, correct?
14  A   Yes.
15  Q   And it states, "include all previous work experience
16  full time, part time, volunteer and military experience.
17  Begin with your present or last job held. Describe in
18  detail nature of work personally performed by you. Also
19  give dates and explain unemployed periods. If your duties
20  and responsibilities changed while working for the same
21  employer, list each separately."
22      First of all, did I read that correctly?
23  A   Yes, you did.
24  Q   With regards to the jobs you have listed, you list
25  Philip English & Associates, correct?

Page 100

1   A   Yes.
2   Q   First Nationwide Bank, correct?
3   A   Correct.
4   Q   Appraisal Resource?
5   A   Yes.
6   Q   And First Interstate Mortgage, correct?
7   A   Yes.
8   Q   What is not on the application is your job with City
9   Mill, is that correct?
10  A   No, it's not.
11  Q   When you say no, it's not, with regard to my
12  question, the position that you held with City Mill is not
13  on the application, correct?
14  A   Correct, it is not on the application.
15  Q   And in addition to City Mill, before you began your
16  work with the City, you had also worked at Electrolux, is
17  that correct?
18  A   I worked at-- I'm not even sure if I was an employee.
19  That was actually an issue. I had a friend who worked
20  there. I went to help them and there was an issue with how
21  they-- you know, what kind of employment status it was.
22  But essentially I was helping a friend of mine there.
23  Q   And Electrolux, what type of job is that?
24  A   What I was doing?
25  Q   Yes, what were you doing?

10-4-2005                                    PHILIP ENGLISH

Page 101

1  A   I was helping my friend who you had a carpet cleaning
2  business.
3  Q   Did you ever receive any monies from helping or
4  assisting your friend at Electrolux?
5  A   He paid me out of his money.  But I don't know that I
6  received payment from Electrolux.  I'm unclear about
7  that.  Maybe they did something where I got some kind of
8  commission or something from one of the jobs they were
9  doing and they decided to pay me somehow through that.
10  But it was awkward and something was wrong with it and
11  ultimately I did not stay there because of those issues,
12  frankly.
13  Q   Were you paid in cash?
14  A   I was paid in cash.  Again, I was helping my friend.
15  It was an extremely part-time type of work.  Yes.
16  Q   What is the your friends name?
17  A   John Ahuna.
18  Q   A-h-u-n-a?
19  A   Yes.
20  Q   And does he still reside in Honolulu?
21  A   As far as I know.  I haven't spoken to him almost
22  hardly ever since that time.
23  Q   And for how long did you assist Mr. Ahuna at
24  Electrolux?
25  A   Off and on for maybe three months.

Page 102

1  Q   Now, as indicated--
2  A   That is my recollection of that.  I believe that is
3  what it was.
4  Q   Again, Mr. English, as I told you on Friday, I am
5  just asking you for your best recollection of things,
6  estimates, approximations, without you guessing.  Do you
7  understand that?
8  A   Yes.  That is my approximation.
9  Q   With regard to-- I should have asked you at the
10  beginning of today's deposition.  Did you take any kind of
11  medication today?
12  A   No, I didn't.
13  Q   Any reason why we cannot continue with the
14  deposition?
15  A   No, there is no reason.
16  Q   Now, as I indicated before, there was some discussion
17  off the record as to whether or not this was your first
18  employment application with the City or if there had been
19  some other employment application with the City.  As you
20  sit here today, do you have a memory if this was in fact
21  your first employment application with the City & County
22  of Honolulu?
23  A   I believe it was.  As far as the administrator
24  position, what I recall is, I turned in this application
25  and then they called me for the administrator position, or

Page 103

1  something to that effect.  Something similar happened with
2  the assessor position.  But that one I remember more
3  clearly because I questioned Eileen Tengan at the time why
4  they were calling me, if they were serious about me or am
5  I just filling their docket, the number of people they
6  need to interview before they assign someone.  And she
7  said no, they were absolutely considering someone like me
8  for the position.
9     But I never applied for that position, for the
10  administrator position.  I don't know-- because actually
11  what happened, when I went in, I went in to fill out this
12  application and I remember handing it to the lady and she
13  said to me, "No.  You want to fill out or you want to
14  apply for the administrator position."  And I said--
15     See, what happened is, I obtained information that
16  they were looking for positions off of the Internet.
17  These appraisers II, III and IV were on continuous
18  recruitment .  That is how I became aware that they were
19  looking for appraisers.  When I went in and applied, the
20  person at human resources told me, no, you want to apply
21  for the administrative position.  So that is kind of the
22  history of how it came about.  Whether I filled out
23  another application or not, I don't recall.
24  Q   And just to be clear for the record, a number of
25  times when you referred to this application, you were

Page 104

1  referring to Exhibit 3, the employment application in
2  front of you, correct?
3  A   Yes.
4  Q   And when you had filled out Exhibit 3, you spoke with
5  someone in and around May of 1999 at human resources, is
6  that correct?
7  A   I'm not sure if it was earlier.  There may have been
8  an earlier time that I contacted them.  I'm not sure of
9  the time frame.
10  Q   Let's be clear.  You fill out the employment
11  application and someone says to you that you don't want
12  the appraisal position, you want the administrative
13  position?
14  A   Yes, I do remember that clearly.
15  Q   And do you remember the name of that person?
16  A   I don't.  It was somebody that was sitting right
17  behind the desk.
18  Q   Man or woman?
19  A   It was a woman.
20  Q   And is there any documents or anything that would
21  help your recollection or refresh your recollection as to
22  who that individual is?
23  A   Whoever was working behind the counter at that time
24  frame would have been that individual.
25  Q   That is not my question.  I'm just asking if there is

5 (Pages 101 to 104)

Page 105

1  a document that would help your recollection as to who
2  that individual was. And your answer is you don't recall,
3  is that correct?
4  A    If there is a document, I'm unaware of it.
5  Q    Other than that individual stating to you that you
6  should be applying for the administrative position, did
7  that individual say anything else to you?
8  A    This is where I don't know if they gave me another
9  piece of paper and said, you know, essentially fill out
10 another application. I don't recall.
11 Q    Did you in fact apply for the administrator position
12 with the City?
13 A    Yes, I did. But I don't know if it was via this
14 application or another application. I don't recall.
15 Q    Even though you don't recall if you had filled out a
16 written piece of paper in terms of an application or not,
17 please tell me approximately when it was that you had
18 applied for this administrator position.
19 A    You know, I'm not really clear. I'm not really sure
20 when I did. I'm not sure if it was at this point or a
21 previous time. For some reason, I'm thinking there was a
22 previous time that I went there, and I'm not clear about
23 that in my memory.
24 Q    And by previous time, you mean before May 18th of
25 1999, correct?

Page 106

1  A    Right.
2  Q    With regard to that process of applying for the
3  administrator position, please explain to me or tell me
4  what process you went through for that position?
5  A    Upon submitting this application or another one,
6  which I don't recall, I received communication from Roy
7  Amemiya's office, and they called me in for an interview.
8  I interviewed with Roy Amemiya, Eileen Tengan and Chris.
9  I don't know his last name. Chris something.
10 Q    And when did this interview take place,
11 approximately?
12 A    Actually I don't recall. I don't recall.
13 Q    And where did the interview take place?
14 A    It took place at Honolulu Hale on the second floor in
15 the director's offices area.
16 Q    And what was your understanding of what the
17 administrative position was?
18 A    That it would be a position that would be responsible
19 for the Real Property Assessment Division, all of its
20 employees and carrying out the assessments for the City &
21 County of Honolulu.
22 Q    After you had interviewed, what was the outcome of
23 that interview?
24 A    Well, during the interview, again, I interviewed then
25 to find out what the position was about, and I revealed to

Page 107

1  them that I had no experience in assessment. And they
2  told me that Gary Kurokawa was the acting administrator.
3  And I told the panel that I thought he was a good guy and
4  that, you know, if he is the acting guy, he probably would
5  be the best candidate.
6     The interview went very well. And they responded by
7  saying that they did select Gary Kurokawa. They responded
8  in writing. I can't remember the exact verbiage, but they
9  asked me to continue to apply for positions at the City &
10 County.
11 Q    In terms of your indicating to the people
12 interviewing you that Gary Kurokawa is a good guy and he
13 would be the best candidate for that position, when was
14 the first time that you had met Gary Kurokawa?
15 A    Gary and I took a real estate appraisal class
16 together. We sat right next to each other.
17 Q    Other than taking the class together, did you have
18 any other interaction social or professional with Mr.
19 Kurokawa before your interview for the administrative
20 position?
21 A    Just seeing him around town or at professional
22 meetings, trainings, whatever.
23 Q    And why was it that you had indicated to the City
24 that he was the best candidate?
25 A    Because he was an acting administrator, that he had

Page 108

1  worked at the Assessment Division for a number of years,
2  that from what I knew of Gary, he seemed to be a decent
3  fellow, and that was the reason.
4  Q    In terms of that class that you took together, was it
5  one time class or was it over a series of days?
6  A    It was over a series of days.
7  Q    When you went to submit your application on May 18th,
8  1999 and the individual said to you but you want the
9  administrator position, did you already say to that person
10 or tell that person well, I have already gone through that
11 process?
12 A    As I mentioned before, I'm unclear about the timing,
13 whether it was this application or another application.
14 I'm really not clear about that. My recollection just
15 isn't clear about that, Mike, so I don't know. I'm not
16 sure if I did two applications at one time or I did this
17 application. I just don't remember. I'm sorry.
18 Q    That's fine. After you submit the application on May
19 18, 1999, what is the next thing that happened with regard
20 to your employment or seeking employment with the City?
21 A    The next thing that happened was Eileen Tengan
22 telephoned me and asked me to interview for the assessor's
23 position. As I described before, I asked her, you know,
24 because I knew that they had an acting assessor and I had
25 already interviewed. So I asked them are you really

Page 109

1  considering me or is it you are just filling up your
2  docket. I apologized for being so frank with her, but I
3  just wanted to know. And she said absolutely, that they
4  are absolutely considering me for that position, that they
5  are looking for people with my qualifications. That is
6  what she told me.
7  Q    So that was the second interview or did you have two
8  interviews then with Eileen Tengan or just one?
9  A    There was an interview with Gary Kurokawa. I'm not
10 sure if Eileen Tengan was there or who the other persons
11 that were there. But I remember Gary was there and that
12 was the first opportunity that I had to really talk with
13 Gary and find out what is going on with the Assessment
14 Division and what their future plans were and so on.
15     This was an interview where he told me that they were
16 looking for outside appraisers, that they are actively
17 pursuing, their goal is to professionalize the division,
18 and that it would be a really exciting time to be at the
19 division, there were lots of changes coming. And I
20 basically told him I would like to be a part of that.
21 Q    During the course of and after that initial interview
22 with Gary Kurokawa, did you still consider him to be a
23 good guy?
24 A    Yes.
25 Q    And what was the outcome of that particular

Page 110

1  interview?
2  A    Again, they had an acting assessor, Bob Magota, and
3  he was selected to be the assessor, which wasn't a
4  surprise to me and it seemed like a logical choice as it
5  was with Gary. Someone who is already active in the
6  position seems to be the logical choice.
7  Q    At that time, did you know Bob Magota?
8  A    I did not.
9  Q    After your interview with Gary Kurokawa, what is the
10 next thing that happened in your application or the
11 process of being hired by the City?
12 A    Well, this application was in and I communicated with
13 Gary by telephone, following up maybe once a month or
14 something trying to find out what the status was. And he
15 informed me that they were trying to get either funding
16 for the position, something to that effect. And
17 eventually I started to communicate with Bob Magota in
18 that process, as well. And they knew I was interested in
19 working for the City and they seemed to be interested in
20 having me apply and be considered for the positions and
21 work for them.
22     But I wasn't getting any response from human
23 resources, and that became an issue where Bob even told me
24 they are setting up interviews, how come you haven't been
25 contacted. And I said I don't know. It turned out, I

Page 111

1  found out the reason was that the funding they received
2  was only for an appraiser II position, which is a trainee
3  position. And my lowest rating was for that position,
4  whereas the highest rating was for the appraiser IV
5  position.
6      So then the communication began well, would you be
7  willing to take an appraiser II position, and because of
8  the nature of the changes at the division, that I would
9  have lots of opportunity to move up. And it seemed like a
10 workable thing because I knew I really didn't know about
11 assessments. I had never done that type of appraising
12 before. I know about real estate appraising. And of
13 course mass appraisal is a methodology within the body of
14 real estate appraising. But I have never done it or been
15 trained in that sort of thing. So it was a logical sort
16 of thing to say yeah, I will be a trainee. That would
17 make sense.
18 Q    In terms of the conversation of asking you if you
19 were willing to take the appraiser II position, who said
20 that to you?
21 A    Bob Magota.
22 Q    And when did he say that to you?
23 A    It would have been during the course of our
24 conversations that I was calling in following up. I think
25 this whole thing took about a year by the time they

Page 112

1  advertised and I applied and got the position. But I
2  think when it comes down to those conversations, it was
3  very shortly before I interviewed. And I guess by that
4  time they had determined that they were only going to have
5  funding for the appraiser II position and they didn't know
6  if I would be interested in it, and I told them that I
7  was.
8  Q    You were eventually hired by the City and with your
9  first date of employment being June 1, 2000, correct?
10 A    That's correct.
11 Q    From the time of Exhibit 3, the application of May
12 18, 1999, up until June 1, 2000, as far as any
13 conversations with Bob Magota, did he make any type of
14 representations or promises to you?
15 A    Yes.
16 Q    What representations or promises did he make to you?
17 A    Well, he represented to me that there would be lots
18 of changes at the Assessment Division, that somebody like
19 me could enter in as an appraiser trainee and move up very
20 quickly, and that there would be a number of supervisory
21 positions that were going to be opening up and somebody
22 with my experience and background would be somebody who
23 would be ideal for those kinds of positions.
24     He didn't offer that immediately. But as we
25 continued to talk and we became more friendly over the

Page 113

1  telephone, those were the types of representations that he
2  made to him.
3  Q    In terms of the representations that you had just
4  indicated, was it your understanding that before an
5  appraiser III, IV or any other position would be made
6  available, that there would have to be funding for those
7  positions?
8  A    No.
9  Q    As far as any supervisory positions, was it your
10 understanding that, again, the City would have to have
11 funding for a supervisory position before it could be
12 offered to someone?
13 A    Let me maybe be clear about that.  Of course all of
14 positions have to be, I guess, authorized by the City.
15 For example, if a supervisor retired, which was the case,
16 there were supervisors retiring and they needed to replace
17 those people, that those positions, they would already be
18 funded and a person who is qualified would just take over
19 that position. That's my understanding.
20 Q    Did Bob Magota ever represent to you between May 18,
21 1999 and June 1, 2000 that any supervisory position, if it
22 became available, would be your position, would be given
23 to you?
24 A    No.  What he said was that they are looking for
25 people like me to fill those kinds of positions.

Page 114

1  Q    In other words, one would still have to be qualified
2  for the position and show that they were capable of
3  handling the position before determination would be made
4  whether or not the job would be offered to someone, is
5  that a fair statement?
6  A    That is not what Bob Magota said.  What Bob Magota
7  said was that those positions would be opening up and that
8  they were looking for people with my kind of experience to
9  fill those kinds of positions.
10 Q    No guarantees, though, is that correct?
11 A    No, there was no guarantee.  It was just implied that
12 they were looking for people just like me for those kind
13 of positions.
14 Q    Was it implied or was it stated?
15 A    It was implied.  He didn't say that you are the guy
16 we want in that position.  He never made a promise like
17 that.  But he certainly on a number of occasions even
18 after I started made those representations to me and in
19 fact encouraged me when the time came to apply for those
20 positions.
21 Q    Between May of 1999 and June 1 of 2000, what was your
22 understanding of what Bob Magota's position was at the
23 City?
24 A    That he was the assessor and that he was essentially
25 in charge of the appraisal functions of the assessment

Page 115

1  division.
2  Q    Approximately how many telephone conversations would
3  you have had with Bob Magota between May of 1999 and June
4  1 of 2000, if you know?
5  A    I don't know offhand.  I just know they became more
6  frequently towards the end because there was some
7  confusion why I wasn't getting called by human resources
8  and they wanted me-- I wanted the job and nothing was
9  happening.
10 Q    Can you give me an estimate in terms of the number of
11 conversations that you had with Bob Magota?
12 A    Well, they would have been-- at that point, they
13 would have been weekly or more frequently trying to figure
14 out what was going on.  Prior to that, I was calling
15 approximately once a month.  I was calling Gary.  I think
16 maybe I called Gary maybe three, four times.  Then I
17 started talking to Bob Magota.  And then, again, towards
18 the end, the frequency picked up quite a bit.
19 Q    With regard to any of the conversations that you had
20 with Bob Magota between May of 1999 and June 1 of 2000,
21 did you keep any kind of notes or records of those
22 conversations?
23 A    No, I didn't.
24 Q    Between May of 1999 and June 1 of 2000, of course you
25 have indicated that you have interviewed with Gary

Page 116

1  Kurokawa, correct?
2  A    Yes.
3  Q    Did you have other face to face meetings with him
4  between May of 1999 and June 1 of 2000?
5  A    Only that one interview.
6  Q    Did you have telephone conversations with Gary
7  Kurokawa?
8  A    As I mentioned, I called him, starting with Gary,
9  about following up on the positions that might be opening
10 up.  At the time, I didn't know what positions they were.
11 But I spoke to him three or four times and then I started
12 to speak to Bob Magota more directly.
13 Q    With regard to three or four conversations that
14 you had with Gary Kurokawa, did you make any notes or keep
15 any writings with regard to any of those conversations?
16 A    No, I didn't.
17 Q    And in those approximately three or four
18 conversations and also including your interview with Gary
19 Kurokawa between May of 1999 and June 1 of 2000, did he
20 make any representations to you?
21 A    Yes, he did.
22 Q    What representations did he make to you?
23 A    He represented during the interview that the
24 Assessment Division was seeking people, outside appraisers
25 with my type of experience and that there were going to be

Page 117

1  many changes at the Assessment Division, that they were in
2  the process of trying to make it a more professional
3  organization and that it would be an exciting time to be
4  at the Assessment Division.
5  Q   Anything else other than what you just testified to?
6  A   That is pretty much what he said.
7  Q   And did he make you any guarantees with regard to any
8  changes in your positions if you were hired?  In other
9  words, that you would receive a supervisory position or
10 that you would move up from an appraiser II to an
11 appraiser III, IV, V or any specific time period for doing
12 that?
13 A   No, other than the fact that he was indicating,
14 implying that there would be a lot of opportunity at the
15 Assessment Division.
16 Q   When you say implying, did he say to you that there
17 would be opportunity or it's something that you
18 interpreted to mean?
19 A   It's something that I interpreted based upon his
20 representation that they are professionalizing the
21 organization, that there is going to be lots of changes in
22 the organization and that they were looking for people
23 like me with my type of experience.
24 Q   And with regard to the many changes that you have
25 indicated both Gary Kurokawa as well as Bob Magota had

Page 118

1  indicated, have you already testified as to what those
2  many changes are or what your understanding of those
3  changes were?
4  A   I'm not sure I understand what those changes were.
5  Q   You indicated or have indicated that you were told
6  that there would be changes at the Assessment Division,
7  correct?
8  A   Yes.
9  Q   Were you told specifically what those changes were
10 going to be?
11 A   By Gary?
12 Q   Why don't we start with Gary.
13 A   As I just testified, those things, that the division
14 would be-- there would be many changes, that the changes
15 would be that they were professionalizing the
16 organization, that they were looking for outside
17 appraisers, people with my type of experience, and that it
18 would be an exciting time to be at the Assessment
19 Division.  He was very clear about those things.
20 Q   With regard to Bob Magota, did he tell you anything
21 differently in terms of the changes?
22 A   Specifically Bob Magota told me that supervisors
23 would be retiring and that there would be opportunities
24 for me, somebody like me or me, implied clearly for me, to
25 move up in the division very quickly.  I think the reason

Page 119

1  that representation was made was clearly I was coming in
2  an appraiser trainee and they were trying to represent to
3  me there was opportunity for me to move up very quickly.
4      Once I started working--I know I'm getting a little
5  ahead of you, but it goes in line.  Bob told me that there
6  is no restriction between an appraiser-- that an appraiser
7  trainee and appraiser II could not advance directly to an
8  Appraiser VI.
9  Q   In terms of moving up very quickly, were you told by
10 Bob Magota that you could jump from an appraiser II
11 directly to an appraiser VI?
12 A   Yes, more than once.
13 Q   Did he tell you that you would in fact be moving or
14 changing from an appraiser II to an appraiser VI?
15 A   What he told me was that he wanted me to apply for
16 those positions because they needed people with my
17 experience and background in those kinds of positions.
18 Q   But that is not my question.  My question was, did
19 Bob Magota say to you, you specifically, Phil English,
20 that you will go from an appraiser II to an appraiser VI?
21 A   That I would?
22 Q   Yes.
23 A   No.  What he told me was, they needed people like me
24 in those positions and they wanted me-- even though I was
25 an appraiser II, they wanted me to apply for those

Page 120

1  positions.
2  Q   And you understood that even if you applied, there
3  was no guarantee you would get that position, is that
4  correct?
5  A   Of course.  There would be other applicants and that
6  all of them would be, I suppose, reviewed and so on.
7  Q   In terms of Bob Magota saying to you that there was
8  opportunity to advance very quickly, was a time frame
9  given?
10 A   Just quickly, very quickly.
11 Q   And did you have an understanding what that meant?
12 A   I did, because there were supervisors that were
13 retiring and everybody knew who they were, so those
14 positions were opening up.  So it was relative to those
15 positions opening up, that is the time frame.  So it
16 certainly would have been within the first couple years of
17 my employment there.
18 Q   By first couple of years, first two to three years?
19 A   That is when the individuals retired.  That was the
20 time frame in which they retired.
21 Q   Go ahead.  Don't let me cut you off.
22 A   I'm only telling you what Bob Magota told me.
23 Q   And with regard to your understanding of the
24 supervisory positions opening up, again, you understood
25 that there may be in fact other applicants for the

9  (Pages 117 to 120)

Page 121

1   positions, correct?
2   A   Absolutely.
3   Q   And you understood that you might not be selected for
4   those positions?
5   A   Absolutely.
6       MR. LORUSSO:   Why don't we take a short break.
7       (Recess)
8   Q   (By Mr. Lorusso)   Mr. English, just digressing for
9   the moment.  Besides this lawsuit, as well as the three
10  divorces that you have had, have you been involved in any
11  other litigation?
12  A   Not that I'm aware of.
13  Q   And obviously, with regard to the worker's
14  compensation claim that you made with regard to the City,
15  have you ever made any other claims for worker's
16  compensation?
17  A   No, I haven't.
18  Q   At some point, you were obviously told that you would
19  be hired by the City, correct?
20  A   Yes.
21  Q   And approximately when is it?  When were you told and
22  who was it that told you that you would be hired by the
23  City?
24  A   I don't remember.
25  Q   Do you know if it was verbally or in writing that you

Page 122

1   were informed that you would become an employee of the
2   City?
3   A   I'm sure I received it in writing, but I don't know
4   if I was told verbally or not.  I don't recall.
5   Q   And when you were hired and began your employment on
6   June 1, 2000, other than the information that you have
7   already testified to, was there any other representations
8   made to you by anyone at the City with regard to your
9   employment for the City?
10  A   Prior to June 1, 2000?
11  Q   Correct.
12  A   Everything that I have said, yes.
13  Q   But my question is, anything else other than that?
14  A   I don't recall anything else other than that right
15  now.
16  Q   Any documents to help refresh your recollection if
17  there was anything else other than what you have already
18  testified to?
19  A   I don't recall.  So I don't recall if there is any
20  documents.
21  Q   Between May 18th, 1999 and June 1, 2000, did you have
22  any contact with Ann Gima?
23  A   Yes.
24  Q   And approximately when was it that you had contact
25  with Ann Gima?

Page 123

1   A   I believe it was shortly before I started working.
2   But there was an interview for the appraiser II position.
3   Q   And who was that interview with?
4   A   Ann Gima.  There was three individuals.  It was Ann
5   Gima, Bruce Polansky, for some reason I cannot remember
6   the third person.
7   Q   And who did you understand Bruce Polansky to be?
8   A   He was one of the appraisers in the division.  I'm
9   not sure why or how they selected Bruce.  Ann was a
10  supervisor.  But at any rate, I guess it doesn't matter.
11  Q   Did you have an understanding in terms of Mr.
12  Polansky, whether or not he was an appraiser II, III, IV,
13  what his designation was?
14  A   They maybe told me at that time at the interview, but
15  I don't really-- I think he was an appraiser IV, but I'm
16  not sure.
17  Q   With regard to that interview, was it just one
18  interview or more than one interview for the real estate
19  appraiser II position?
20  A   One interview.
21  Q   And during the course of that interview, were any
22  representations made to you by Ann Gima?
23  A   None.
24  Q   Any guarantees made to you by Ann Gima?
25  A   None.

Page 124

1   Q   How about by Bruce Polansky?
2   A   No.
3   Q   And how about by the other individual whose name you
4   cannot recall?
5   A   No.
6   Q   After the interview for the appraiser II position,
7   was there anything else along the lines of the employment
8   process that occurred before your being told you have the
9   job?
10  A   No.  I just want to say, during the interview, it was
11  an unusual interview.  The interview process simply was
12  primarily them asking me why did I want to work at the
13  division and why would someone of my experience take the
14  appraiser II position.  I think they were curious
15  themselves about that.
16      But other than that, there was no other
17  communication.  Other than I got the job-- I guess I had
18  some kind of orientation that they have for all City
19  employees coming on line.  And it was a very general,
20  broad kind of thing where they hand out material about
21  being a City employee.  And it was a real extraordinarily
22  broad orientation for City employees in general.
23  Q   And in terms of why you would want to work in the
24  division as a real estate appraiser II, the reason that
25  was raised or your understanding of it was because a real

10-4-2005                                              PHILIP ENGLISH

Page 125

1 estate appraiser II was a beginning or trainee position?
2 A   Yeah.  They were wondering why I wanted to come in as
3 an appraiser II.
4 Q   And what was your response?
5 A   That I had not performed assessment functions before,
6 that this was a career move for me, and that I was very
7 interested in being trained in the position.  I didn't
8 really discuss with them any representations made by Bob
9 Magota to me at that time.  But that was pretty much my
10 response.
11 Q   So as a trainee, again, this was a learning process
12 for you, correct?
13 A   Absolutely.
14 Q   You then begin your employment June 1, 2000, correct?
15 A   Yes.
16 Q   And from the time you begin your employment until the
17 time you are no longer working with the City, which
18 formally I believe we had indicated in the last session
19 was January 31, 2004, correct?
20 A   No.  I stopped working at the City on February 28th.
21 I left on a medical leave, but I was technically an
22 employee until that date.
23 Q   February 28th, 2003, correct?
24 A   That's right.
25 Q   And as you just indicated, your last employment date

Page 126

1 was January 31, 2004, correct?
2 A   That's right.
3 Q   Now, from June 1, 2000 up until the time of your last
4 employment, formal employment with the City, January 31,
5 2004, did you receive increases in your salary?
6 A   Yes.
7 Q   At any point, was your salary ever decreased?
8 A   No.  Well, when I left the City on a medical leave, I
9 didn't receive any salary at all for a period of time.
10 There was some confusion about TDI or-- anyway, there was
11 a period of time.  So I'm not sure if that is maybe a
12 different issue.  But as far as my salary and my grade was
13 never diminished.
14 Q   So just to be clear, since you mixed a few things
15 together, as far as your salary, you obviously had a
16 beginning salary with the City, correct?
17 A   Yes.
18 Q   That was a real estate appraiser II, correct?
19 A   Yes.
20 Q   And in the course of your employment with the City,
21 you moved up to a real estate appraiser III and then real
22 estate appraiser IV, correct?
23 A   Correct.
24 Q   And with those increases, you had already received
25 increases in your salary, correct?

Page 127

1 A   Yes.
2 Q   At no time was your salary ever decreased, correct?
3 A   With the exception to the TDI thing.  I guess that is
4 based on your salary, right?
5 Q   I want to set aside the TDI thing for a moment.
6 A   Setting it aside, yes, you are correct.
7 Q   And as you indicated with regard to grade, what you
8 were referring to is your title being a real estate
9 appraiser II and then a III and then a IV.  Is that what
10 you mean by a grade?
11 A   Yes.
12 Q   And as you indicated, throughout the course of your
13 employment with the City from January 1, 2000 until your
14 last date of employment January 31, 2004, your grade was
15 never diminished in any way, correct?
16 A   No.  It was threatened at different times, but it
17 never did diminish.
18 Q   That is not my question.  My question is simply, from
19 June 1, 2000 until January 31, 2004, the grade was never
20 diminished, correct?
21 A   It never actually was diminished, no.
22 Q   When you first began your employment January 1, 2000
23 with the City, you had indicated that you had a--
24      MR. MOSELEY: I object.  You misstated his
25 testimony.  It's June 1, 2000.

Page 128

1 Q   (By Mr. Lorusso) I'm sorry.  Thank you.  June 1,
2 2000, you begin your employment with the City, correct?
3 A   Yes.
4 Q   June 1, 2000, if you could refresh my recollection,
5 your immediate supervisor was who?
6 A   Michael Okamoto.
7 Q   Then shortly thereafter you had indicated it had
8 became Ann Gima, correct?
9 A   Approximately two months later.
10 Q   With regard to other appraisers that were working
11 within your division, who else was working within your
12 division?
13 A   When I started?
14 Q   Yes, if you recall.
15      MR. MOSELEY: If you can answer.
16      THE WITNESS: Well, there was Jody Chung.
17      MR. MOSELEY: Actually, I am going to object.
18 Your question is ambiguous.  You want to know all the
19 appraisers in the assessment division at the time he
20 started?
21 Q   (By Mr. Lorusso) What I'm trying to find out is,
22 with regard to individuals that you were working with.
23 A   In my group?
24 Q   In your group.
25 A   They were divided up into six groups.  So when I

Page 129

1  started and I was working with Mike Okamoto, the people
2  that I recall are Jody Chung, Bruce Polansky, Kathy
3  Morimoto. And I'm sorry, I don't recall the others.
4  Q   And did the people in your group change at some point
5  in time?
6  A   No, that group didn't change. But I was taken out of
7  that group and placed into Ann Gima's group two months
8  later.
9  Q   When you go into Ann Gima's group, who was in that
10 group?
11 A   Dwight Ishigura, Don Kim, Wilfred Martin, Christopher
12 Graff and myself.
13 Q   Did that group ever change while you were still
14 physically there working with the City?
15 A   Yes, it did.
16 Q   What were the changes?
17 A   We became strictly a condominium group. Actually, we
18 weren't strictly condominium, but I think that was the
19 identification of the group. I think some people did
20 single family. That group was Linda Knolls, Ann Kabasawa
21 Ryan Fujitani, Christopher Graff, Don Kim for a short
22 period of time, Marvin Aben (phonetic) and Julie Tomayori.
23 Q   As far as the group that you have identified as
24 primarily being the condominium group, although some of
25 the appraisers might do other type of activities,

Page 130

1  approximately when was it that you became part of that
2  group?
3  A   I'm thinking March of 2002. We actually physically
4  moved to a different location. Ann's group moved to
5  another location and reconfigured as far as personnel
6  goes.
7  Q   While in this condominium group, was Ann Gima still
8  your immediate supervisor?
9  A   Yes, she was.
10 Q   As far as Ms. Gima being your immediate supervisor,
11 did that change at any time from the point in time when
12 she first became your supervisor until the end date of
13 your employment?
14 A   No.
15 Q   In terms of being selected to be in the group, how
16 was it that it came about that you were in the group or
17 that the group was formed? I know there is two different
18 questions in there.
19 A   Well, I really don't know the answer to that. That
20 happened-- those decisions were made above and beyond me.
21 I was in Mike Okamoto's group. Other than that, I would
22 be speculating or things that I heard, and I don't know if
23 you want to go there.
24 Q   No, I don't want you to guess or speculate. You
25 don't have an understanding one way or the other how you

Page 131

1  became part of this condominium group?
2  A   Those decisions were made by somebody else.
3  Q   And so for approximately August, September of 2000,
4  you were working in the initial group that you had talked
5  about as far as Dwight Ishigura, Don Kim when you are
6  under Ann Gima, up until it becomes more concentrated on a
7  condominium group, correct?
8  A   Correct.
9  Q   Was that viewed in terms of changing groups or
10 becoming part of that group? Was that considered like
11 being a special group or a specialized group or anything
12 significant with regard to being in that group versus any
13 other group?
14 A   Only in terms of its focus was on condominiums. By
15 the way, it might be helpful, I think the first group with
16 Ann Gima was called group two and I think the last group
17 they changed to group three, I believe. That is what I
18 recall.
19 Q   So the condominium type group was the group three,
20 correct?
21 A   That is what I recall, yes.
22 Q   As far as all the individuals that you named, they
23 were all appraisers, correct?
24 A   The individuals I have named are all appraisers.
25 There is certainly other individuals within the group.

Page 132

1  Q   And those other individuals, say, in group two, would
2  be clerical, secretarial staff?
3  A   They are what they call appraiser aides. There is
4  only one appraiser aide for that group. And for both of
5  them, it was the same person, and that is Carol Kamisato.
6  Q   So in addition to the appraisers, the appraisal aide,
7  there was also clerical, secretarial staff, is that
8  correct, or not at all?
9  A   Not at all.
10 Q   And that is for group two and group three?
11 A   Right. Carol Kamisato was our only appraiser aide.
12 I'm trying to think of the configuration. I'm fairly
13 certain that is the case. The only other person would
14 have been the supervisor, Ann Gima. And that would be the
15 entire group.
16 Q   As far as being an appraiser aide, what was her job
17 duties, generally speaking?
18 A   Actually I don't know because I never used her, had
19 an opportunity to use her as an assistant. I know Ann at
20 one point had her go through and organize some filings
21 that I was working on. But she never worked for me in any
22 capacity. So I don't really know.
23 Q   While you were in private practice, did you have a
24 clerical, secretarial staff?
25 A   Yes, I did.

10-4-2005                                           PHILIP ENGLISH

Page 133

1  Q   That was something that you were used to, correct,
2  before your employment with the City?
3  A   Absolutely. I don't know how you can get along
4  without them.
5  Q   As far as government functions as far as a City
6  entity, that was a different setting for you in terms of
7  not having clerical, secretarial staff, correct?
8  A   Certainly I didn't have access to that kind of
9  support. In that regard, that is true.
10  Q   Now, Mr. English, with regard to your employment with
11  the City, at some point in time you indicate that there is
12  an individual or individuals who are doing work that is
13  not City work on City time, correct?
14  A   That's correct.
15  Q   And when was that?
16  A   When did I first observe it?
17  Q   Yes.
18  A   It would have been sometime in early 2001.
19  Q   By early 2001, what do you mean by that?
20  A   Sometime in the first quarter, maybe, of 2001.
21  Q   By first quarter, January, February, March of 2001,
22  correct?
23  A   That's correct. That is approximately. Could have
24  been in the first six months. But sometime in the first
25  half of 2001 I observed this activity.

Page 134

1  Q   So as you are indicating, it was either between
2  January and March or January and June of 2001, correct?
3  A   It's definitely within the first six months.
4  Q   And what did you observe and who did you observe?
5  A   I observed Christopher performing appraisal
6  assignments that I of course later learned were for GK
7  Appraisals. He was doing narrative write-up on commercial
8  properties, and that is what I observed. In fact, he and
9  I discussed it to some degree.
10  Q   Just for the record, when you said that he was doing
11  narrative write-up, what do you mean?
12  A   In the appraisal work, there is a certain amount of
13  analysis that goes into it. That would be the
14  mathematics, the spreadsheets and that sort of thing,
15  income. In fact, he was primarily involved in the income
16  approach to these appraisal assignments.
17      So he would do an income analysis, a cash flow
18  analysis, and then he would do the narrative portion of
19  the appraisal, which could be the description of the
20  property, the area, the market, as well as in the income
21  narrative, which would be the written portion of
22  explaining the analysis and conclusions.
23  Q   How is it that you observed him doing these narrative
24  write-ups?
25  A   In every case, wherever we were located, it's an open

Page 135

1  office space, at least at that time it was. At the end,
2  we actually did get partitions that were-- but for most of
3  the time, it was an open office space. So we could
4  observe what people are doing on their desk and on their
5  computers. But it wasn't just an observation. Where I
6  was sitting, I could see Chris's computer. But it was
7  more than that. It was conversations that we had.
8  Q   Before any type of conversation with Chris Graff, you
9  indicated that you observed him performing a narrative
10  write-up, correct?
11  A   That's correct.
12  Q   And where were you at the point in time when you
13  first observed that Chris Graff was performing a narrative
14  write-up?
15  A   In my physical location, I would have been across
16  from him.
17  Q   And was your desk immediately or directly across from
18  him?
19  A   At an angle.
20  Q   And when you first observed Chris Graff doing a
21  narrative write-up, I take it he was there?
22  A   Yes. He was sitting on his computer doing the
23  narrative write-up.
24  Q   And you were able to what, see his computer?
25  A   Well, I don't think the first time I saw him I was

Page 136

1  sitting at my desk looking at his computer. I was
2  probably standing next to his desk talking to him and he
3  was doing it. And the next thing was a conversation about
4  what he was doing.
5  Q   Let's go back. You had indicated, Mr. English, and I
6  don't want you to talk about probablys or possiblys. I
7  want to know, the very first time that you had observed
8  Chris Graff performing this narrative write-up, where were
9  you?
10  A   The very first time I'm not sure I can recall exactly
11  what was happening. But I believe it would have been I
12  was standing next to his desk talking to him, you know,
13  going by and he would have been writing something up and
14  that would have been the first time that I would have
15  become aware of it. And it was in conjunction with a
16  conversation, but I'm fairly certain with that activity.
17  Q   And what did you observe?
18  A   I observed him writing up a narrative portion of an
19  appraisal report. And I can't say if it was the income
20  approach or not, I don't recall. But I know that we had
21  some conversation about what he was doing.
22  Q   At that point in time when you first observed Chris
23  Graff performing this narrative write-up?
24      MR. MOSELEY: Is there a question?
25  Q   (By Mr. Lorusso) Yes. Let me go back. You see

13 (Pages 133 to 136)

Page 137

1  Chris Graff performing a narrative write-up, correct?
2  A  Correct.
3  Q  Then do you immediately have a conversation with
4  Chris Graff about what it is that he is doing?
5  A  That is correct. I just want to be clear. I may
6  have observed him doing it prior to having a conversation.
7  You are asking when is the very first time. I'm not
8  saying-- I don't know if I can pin it down to the very
9  first time. But I knew that he was doing some other kinds
10 of appraisal work. That was apparent to me.
11     It was also apparent because there was a gentleman by
12 the name of David Matsunami who was coming into the office
13 into the second floor area, which is not a public area,
14 and he was handing Chris envelopes, Chris was handing him
15 stuff and they were exchanging things. And so I knew
16 there was some activity. It may be I observed those
17 things first. And then, on another occasion, when I went
18 up to Chris's desk, we actually engaged in a conversation
19 about what he was doing.
20     So I'm trying to answer your question. But I don't
21 know if I can say this was the exact first time I saw it
22 because there were these other activities. There were
23 things I didn't understand. And at some point in time, I
24 did go to him-- or I was standing at his desk and we
25 working on one of these reports and we engaged in

Page 138

1  conversation about it and he told me what it was about.
2  Q  What I'm trying to find out, Mr. English, is when you
3  became aware for the first time that Chris Graff was doing
4  work that was not City work while he was employed by the
5  City & County of Honolulu. That is what I'm trying to
6  focus on.
7  A  Well, what I could probably say is I observed these
8  activities and then, when I spoke with him about it is
9  maybe the first time that I was aware exactly what it was
10 that he was doing. Does that answer your question?
11 Q  No. I'm not talking about maybes. I'm not talking
12 about possiblys. What I'm asking is, my initial question
13 to you was, when was the first time that you observed
14 anyone, and you identified as being Chris Graff, doing
15 outside City work on City time?
16 A  Okay. Then to be as clear as I can be about that, I
17 became aware of it as I observed the activity of Chris
18 doing write-ups on his computer, and David Matsunami
19 coming in exchanging paperwork, that I became aware that
20 something else was going on other than City & County work.
21 Q  Over what period of time was this that you had
22 observed Chris Graff doing something that was other than
23 City work and David Matsunami coming into the office and
24 handing or exchanging envelopes before you had your first
25 conversation with Chris Graff as to what he was doing?

Page 139

1  A  I can't give you specific amounts of time. But I can
2  tell you it may have been a couple of months. And when I
3  went to Chris's desk, it wasn't actually to talk to him
4  about doing any particular activity. We may have had
5  another conversation which then, you know, kind of changed
6  and he was telling me about what he was doing.
7  Q  By a couple months, you mean what, two to three
8  months?
9  A  Yes.
10 Q  And so for this two to three-month period of time,
11 you were aware that Chris Graff was doing outside work on
12 City time, correct?
13 A  That's correct.
14 Q  During this two to three-month period of time before
15 you spoke to Chris Graff specifically about what he was
16 doing or not doing, did you ever inform Ann Gima that you
17 knew that Chris Graff was doing outside City work on City
18 time?
19 A  Not at that time I didn't. And the reason I didn't
20 is it's an open office space and everyone was pretty much
21 aware of what was going on. For me, I was still
22 learning and trying to figure out what was going on in the
23 office. Since it's an open office space, I didn't go to
24 my supervisor because I was certain that she knew what was
25 going on.

Page 140

1  Q  I move to strike as being nonresponsive. Mr.
2  English, please just listen to my question. You will have
3  an opportunity and I will ask you questions in order to
4  fully explore what it is that you are alleging against the
5  City as well as the individuals. But I would request that
6  you listen to my question and just answer the question
7  that's being asked of you.
8  A  I'm sorry. But if I answered it, it might have been
9  misleading and I didn't want to do that.
10 Q  If you don't understand my question, just tell me you
11 don't understand my question. And my question to you was
12 simply, in this two to three-month period of time when you
13 knew that Chris Graff was doing outside City work on City
14 time, my question was, did you inform Ann Gima? And your
15 answer was no, correct?
16 A  My answer is no, because I thought she was aware of
17 it.
18 Q  That is not my question. My question is, you did not
19 tell Ann Gima, correct?
20 A  Because I thought she was aware of it.
21 Q  That is not my question. It's a simple yes or no
22 question. Did you tell Ann Gima in that two to
23 three-month period of time when you knew that Chris Graff
24 was doing outside City work on City time that he was
25 performing that work? Yes or no?

**Page 141**

1  A  My answer remains the same.  I didn't tell her
2  because I thought she was aware of it.
3  Q  Did anyone tell you that Ann Gima was aware that
4  Chris Graff was performing outside City work during this
5  two to three-month period of time?
6  A  No.
7  Q  That was your assumption, correct?
8  A  That's correct, based on the work environment and the
9  fact that other people seemed to be aware of what was
10 going on.  Again, I'm trying to figure out what is going
11 on here at the Assessment Division.  That's correct.
12 Q  Did other people tell you during this two to
13 three-month period of time that they knew Chris Graff was
14 doing outside City work?
15 A  I had no conversation with anybody else other than
16 Chris.
17 Q  During this two to three-month period of time when
18 you knew that Chris Graff-- this is before you spoke to
19 Chris Graff-- was doing outside work on City time, did you
20 tell Gary Kurokawa?
21 A  No, I didn't.
22 Q  And during this two to three-month period of time
23 when you knew that Chris Graff was doing outside City work
24 on City time, did you tell or notify Bob Magota?
25 A  No, I didn't.

**Page 142**

1  Q  As you indicated you, you end up talking to Chris
2  Graff about his outside City work, correct?
3  A  Yes.
4  Q  And is that at his desk?
5  A  So I can be clear, we had conversations that were
6  something like, "I'm doing this appraisal assignment on
7  this commercial property on the Big Island and I'm
8  applying this particular approach."  So our initial
9  conversations are about that.  I'm not going to Chris and
10 confronting him in any way about it.  We are just having
11 conversations and I'm becoming aware that he is performing
12 these types of assignments.
13 Q  At any point in time, do you have a conversation with
14 Chris Graff where you say to him, "Are you doing work
15 outside or outside work on City time"?
16 A  My initial conversation questioning it was, "How can
17 you do this sort of thing?"  And that was my initial
18 conversation, "How can you do this sort of thing?"
19 Q  When you say, "How can you do this sort of thing,"
20 what sort of thing are you talking about, the approach or
21 doing outside City work?
22 A  Doing outside City work, the appraisals that he was
23 performing or parts of the appraisals.
24 Q  And where were you when you had that conversation
25 with him?

**Page 143**

1  A  I believe we were right there at his desk.
2  Q  Was anyone else around?
3  A  I don't know.  It may have been at lunchtime.  It may
4  have been-- I'm not sure.  I was talking to Chris and I'm
5  not sure if anybody else was around.
6  Q  So even though it may have been at lunchtime, in
7  other words, you don't know what time of the day it was
8  you had this conversation, correct?
9  A  My guess is--
10 Q  I don't want you to guess, Mr. English.
11 A  I don't know what time of day it was.  Midday,
12 something around that time.
13 Q  And you don't remember if it is lunchtime or not
14 lunchtime, correct?
15 A  Mid morning, midday, somewhere around that time.
16 Q  And as you sit here, you are not aware of anyone else
17 being in proximity to you of this conversation that you
18 are having with Chris Graff, correct?
19 A  I wasn't aware.  There may have been people there,
20 but I was talking to Chris and focused on that and I
21 wasn't aware of what other people were doing.
22 Q  When you said that to Chris, this is the first time
23 that you are questioning him about the type of work he is
24 doing, correct?
25 A  That's correct.

**Page 144**

1  Q  What was his response?
2  A  His response to me was that he could do this type of
3  work because Gary and David and Chris or Gary, they had
4  worked out this scheme whereby the appraisal assignments
5  that would come to GK Appraisal, that Gary in turn would
6  assign them to David Magota who would in turn assign work
7  to Chris Graff.  And because of that, there was no direct
8  connection between Chris Graff and Gary Kurokawa and that
9  somehow made it all okay.
10 Q  In terms of the timing of this conversation, you have
11 given yourself a six-month period of time.  Do you have a
12 more specific time in terms of when you had this
13 conversation?
14 A  It was pretty much right around August 1st.
15 Q  Of 2001?
16 A  Of 2001.
17 Q  And is there any particular reason why you remember
18 around August 1st of 2001?
19 A  Yes.
20 Q  Why is that?
21 A  Because shortly after that, when I became aware that
22 there was some scheme-- and by the way, I did tell Chris
23 that I thought that was a very thin veil of a scheme and
24 that they needed to be careful that they were doing
25 something that may not be legal.  It bothered me, and the

10-4-2005                                                    PHILIP ENGLISH

Page 145

1   activity was open.  And in a conversation I did have with
2   my supervisor, I mentioned it to her.  And I do remember
3   that was maybe right around-- pretty much around the end
4   of August.
5       So it bothered me for a month.  I didn't know what to
6   do.  You have to remember I'm still a new guy in the
7   division and I'm trying to figure out things, I'm being
8   trained and so on.  I'm trying to fit in with fellow
9   employees and so on.  So for a month, I'm thinking what
10  should I do.
11  Q   At the time that you have this conversation with
12  Chris Graff, you are working for the City for a little
13  over a year now, correct?
14  A   That's correct.
15  Q   And you said to Chris Graff be careful, because what
16  you thought they were doing as far as that scheme might be
17  illegal, correct?
18  A   I told him that I thought it was a thin veil and
19  that-- I don't know if I was so specific to say it might
20  be illegal.  I think actually what I suggested to him was
21  that I believe Rene Mancho had just gone to jail for
22  something somewhat similar to that.  So that, I think,
23  is-- that's pretty much what I said to him.  So
24  essentially, "I don't know if this is right.  I think Rene
25  Mancho just went to jail for something similar to this.

Page 146

1   That you guys need to be careful about doing these kinds
2   of things."  I was trying to indicate to him it sounds to
3   me like it's not legal.
4   Q   Did you say anything else to him other than what you
5   already testified to?
6   A   No.
7   Q   Did Chris Graff say anything to you other than what
8   you have just testified to in that particular
9   conversation?
10  A   That he felt that what they were doing was okay
11  because Gary told them it was okay to have this scheme,
12  and it was okay, and he felt comfortable and confident
13  about that.
14  Q   In-between the point in time when you had this
15  conversation in and around August 1 of 2001 and to the
16  point in time when you said you spoke to your supervisor,
17  which would have been Ann Gima, correct?
18  A   Yes.
19  Q   And that conversation would have been at the end of
20  August of 2001, correct?
21  A   That's right.
22  Q   In-between August 1 and the end of August when you
23  spoke to Ann Gima, did you have any further conversations
24  with Chris Graff about what he was doing?
25  A   No, I didn't.

Page 147

1   Q   Did you have any conversations with David Magota
2   in-between August 1, 2001 and the end of August when you
3   spoke to Ann Gima about this scheme that you have
4   indicated?
5   A   No, I didn't.
6   Q   Before August 1 of 2001, had you had any
7   conversations with David Magota?
8   A   I met him one time.  He came into the office and
9   Chris introduced me to him.  And that was the extent of my
10  communications with David Magota.
11  Q   Any time since that one introduction have you had any
12  conversations with David Magota?
13  A   No, I did not.
14  Q   Between August 1, 2001 and the end of August of 2001
15  when you spoke with Ann Gima, did you speak with Bob
16  Magota regarding the information that you had learned in
17  your conversation with Chris Graff?
18  A   No, I did not.
19  Q   Did you speak with Gary Kurokawa in that interim
20  period?
21  A   No, I did not.
22  Q   You then meet with Ann Gima, correct?
23  A   Yes.
24  Q   Is that one on one?
25  A   Her desk was directly to my right.  And it was not

Page 148

1   like a meeting that we set up.  I think she just came,
2   walked up to her desk and I mentioned it to her.  I can't
3   think of what prompted it.  Maybe I just saw Chris doing
4   the work.  I'm not sure.  But I just inquired.  I said,
5   "Ann, you know Chris is doing work for Gary?  You know
6   that, don't you?"  That is basically what I said.
7   Q   What was the response?
8   A   She said, "I don't know what you are talking about."
9   Something maybe she never saw it, and that I should mind
10  my own business and just do the work on my desk.
11  Q   Did she say anything else in that conversation?
12  A   She said nothing else in that conversation.
13  Q   Did you say anything else to Ann Gima during the
14  course of that conversation at the end of August 2001?
15  A   No, I think I pretty much got the message.
16  Q   After that conversation the end of August 2001, did
17  you ever have further conversations with Ann Gima about
18  your allegation that Chris Graff was having or was
19  performing outside City work on City time?
20  A   No, I didn't.
21  Q   To your knowledge, did Ann Gima ever speak with
22  anyone else with regard to the allegation that Chris Graff
23  was performing City work or outside work on City time?
24  A   Not to my actual knowledge, no.
25  Q   After the end of August of 2001 when you had the

                                    16 (Pages 145 to 148)

Page 149

1  conversation with Ann Gima, did you then speak with
2  someone else about the allegation that Chris Graff was
3  performing outside work on City time?
4  A  Yes, I did.
5  Q  Who did you speak with?
6  A  I spoke to Bob Magota.
7  Q  When did you speak with Bob Magota?
8  A  Approximately the first part of October.
9  Q  Of 2001?
10  A  Yes.
11  Q  So between the end of August 2001 and October 2001,
12  conversations with anyone else?
13  A  Yes.
14  Q  Who else?
15  A  With my pastor.
16  Q  And what is your pastor's name?
17  A  Frank Ramil.
18  Q  And which church?
19  A  Fellowship Bible Church.
20  Q  Where is that located?
21  A  They worship at Nimitz Elementary School.
22  Q  How long have you been a member of this church?
23  A  Five years.
24  Q  Approximately how many conversations did you have
25  with your pastor about these allegations regarding Chris

Page 150

1  Graff?
2  A  Two or three.  I was consulting with him about what I
3  should do about it and he gave me-- his typical response
4  was pray about it.
5  Q  And the two or three conversations, were they in
6  person, over the telephone?
7  A  They were in person.  We were meeting at lunchtime at
8  that time, I think, once a week or something.
9  Q  Again, other than your pastor, between the end of
10  August 2001 and October of 2001 when you meet with Bob
11  Magota, did you speak with anyone else about allegations
12  as far as Chris Graff?
13  A  I may have mentioned it to my wife, of course.  But
14  within the office, it's a possibility that Dwight Ishiguro
15  and I were already talking about it.  Certainly he was
16  aware of it and we may have had some conversations.  We
17  had many conversations after work.
18  Q  How about anyone in a supervisory position?
19  A  No.  Ann Gima was my supervisor.  The next person up
20  in the chain of command is Bob Magota.  And I was trying
21  to honor those types of issues.
22  Q  How about with regard to any outside agencies, such
23  as the police, the Prosecutor's Office, Ethics Commission,
24  U. S. Attorney, did you have any conversation from the end
25  of August 2001 up until October 2001?

Page 151

1  A  No, not at that time.
2  Q  You then meet with Bob Magota, correct?
3  A  Yes.
4  Q  And where did that meeting take place?
5  A  In Bob's office.
6  Q  Was anyone else present?
7  A  No.
8  Q  Do you recall approximately what time of day that
9  conversation took place?
10  A  I believe it was mid morning.
11  Q  And approximately how long was that conversation?
12  A  20 minutes.
13  Q  And what did you tell Bob Magota?
14  A  I told him that Chris Graff was doing appraisal work
15  for Gary Kurokawa.  And the reason-- should I go on?
16  Q  What did you tell him, that is my question.
17  A  I told him that I was at Chris's desk and the
18  telephone rang, Chris took the call, and then a
19  conversation about you got to do something.  He hung up
20  the phone and said, "Phil, Gary just called me.  I got to
21  finish up this report and deliver to the client by 5:00
22  o'clock this afternoon."  That is what prompted me to go
23  talk to Bob.  And I explained that to Bob.  So he was very
24  clear about what was going on.
25  Q  What else did you tell Bob Magota?

Page 152

1  A  That is what I told him.
2  Q  What did Bob Magota tell you during this October 2001
3  meeting?
4  A  Bob told me that he was upset with Chris if it's
5  found that Chris is doing outside work and that Chris
6  would get into big trouble.  I explained to Bob that Bob
7  needed to be clear that Gary was the one directing Chris's
8  work and that somebody needed to talk to Gary about it.
9  Bob told me at that point that it's just my word against
10  theirs and not to pursue it any further than that.
11  Q  Anything else said by Bob Magota to you?
12  A  I believe he said he will talk to Gary and talk to
13  Chris.
14  Q  Anything else said?
15  A  No.
16  Q  In terms of the statement not to pursue it, did you
17  have an understanding as to what that meant?
18  A  Yes.
19  Q  What was your understanding?
20  A  Not to take it any further, to drop it.  I think he
21  even indicated that other people have tried to bring up
22  lawsuits against the division and have failed and that I
23  should just drop it.
24     And the reason he even mentioned a lawsuit, frankly,
25  at that time is peculiar to me, because that wasn't even a

Page 153

1  thought in my mind. My whole desire was that they would
2  stop and, by virtue of stopping, protect themselves and
3  the division and me and the citizens of the community from
4  any further harm.
5  Q   Now, to be clear, because I had asked you if anything
6  else was said in the conversation and you told me no, and
7  now you indicated there was additional information stated,
8  correct?
9  A   Can you maybe go back and have the record read back,
10  because I'm not sure exactly what you mean. I'm not sure
11  exactly what you mean. So you are going to have to go
12  back and read the record.
13  Q   Let me be clear about this. You told me what you
14  informed Bob Magota in the October 2001 meeting, correct?
15  A   Yes.
16  Q   And you have also told me what Bob Magota said to
17  you, correct?
18  A   Yes.
19  Q   Other than what you have testified to, was anything
20  else stated in that meeting?
21  A   That is what was stated in the meeting.
22  Q   Anything else stated in that meeting other than what
23  you have testified to?
24  A   There was nothing else stated in that meeting.
25  Q   Did Bob Magota threaten you in any way during the

Page 154

1  course of that meeting?
2  A   By virtue of the fact that he told me to not pursue
3  it, it was very clearly-- I understood what he was saying
4  was to drop it.
5  Q   That was your interpretation of it, correct?
6  A   Yes.
7  Q   Did he say to you, if in fact you do pursue it, you
8  will be demoted, lose a grade, your salary will be
9  affected in any way, shape or form?
10  A   No, he didn't say those things. But he told me to
11  drop it. He emphasized drop it.
12  Q   Following your meeting with Bob Magota in October of
13  2001, did you have any meetings with Bob Magota again to
14  discuss this matter?
15  A   I don't believe we met any other time after that.
16  Q   Did you ever meet with Ann Gima after October of 2001
17  to discuss allegations regarding Chris Graff and the
18  scheme that you have testified to?
19  A   I had meetings with Ann Gima, Gary Kurokawa and
20  Waylen Toma where I attempted to bring up these issues but
21  I was told that I could not. So I have had other meetings
22  with Ann Gima where the issue was brought up but was
23  quickly, you know, we are not going to go there,
24  basically.
25        MR. LORUSSO: Why don't we take a break. It's

Page 155

1  about 12:30.
2        (Noon Recess)
3        A F T E R N O O N   S E S S I O N
4        EXAMINATION (Resumed)
5  BY MR. LORUSSO:
6  Q   Mr. English, we are back on the record again. During
7  the lunch break, did you review any materials to assist
8  you in further preparation for today's deposition?
9  A   No, I didn't.
10  Q   Now, you had indicated that Chris Graff had gotten a
11  phone call from Gary and that an assignment had to be
12  completed by 5:00 o'clock?
13  A   That's correct.
14  Q   And with regard to that particular assignment, do you
15  know if it was in fact for Gary Kurokawa?
16  A   Yes. Chris had indicated that Gary had called, and
17  the implication was it was Gary Kurokawa, that he was
18  working on an assignment for Gary for GK Appraisals.
19  Q   Is that what Chris specifically stated, that it was
20  for Gary Kurokawa and that it was for GK Appraisals?
21  A   He didn't specifically state it, but clearly that is
22  what it was all about.
23  Q   When you say clearly that is what it was all about,
24  that is what your assumption was, correct?
25  A   I'm hesitating because it seems like it was somehow

Page 156

1  more than my assumption. There was evidence that he
2  stopped doing what he was doing and then went to work on
3  this other assignment. And he was clear in his
4  communication to me that it was Gary, meaning Gary
5  Kurokawa that called.
6        So I don't know how to answer that other than to say
7  that what I observed and what I believed to be true was
8  that it was Gary Kurokawa that called Chris and that he
9  began to work on this other assignment.
10  Q   My question to you is, did Chris Graff specifically
11  use the name Gary Kurokawa?
12  A   No, he didn't. He didn't need to, actually.
13  Q   That is not my question. Mr. English, please just
14  listen to my question and just answer my question.
15  A   He didn't need to.
16  Q   My question to you is, he never said the name Gary
17  Kurokawa, yes or no?
18  A   My answer is the same.
19  Q   But that is not my question to you, that he didn't
20  need to or whether he needed to or didn't need to. The
21  question is simply, he did not say Gary Kurokawa, is that
22  correct?
23  A   My answer remains the same.
24  Q   You are not answering my question, then, Mr.
25  English.

Page 157

1    MR. MOSELEY: I object. I think he did answer
2  the question. He explained his answer, as well, but he
3  answered your question. And at this point, you are
4  badgering the witness.
5    MR. LORUSSO: Just for the record, I believe I'm
6  badgering the witness only from the standpoint that I
7  don't believe I'm not getting an answer to my question,
8  which is a simple yes or no answer.
9  Q  (By Mr. Lorusso) Mr. English, did Chris Graff say to
10  you it was Gary Kurokawa who called him? Yes or no?
11  A  He did not say that it was Gary Kurokawa because he
12  didn't need to because it was implied. I knew who he was
13  talking about.
14  Q  By implied, that was your assumption, correct?
15  A  Based on our previous conversations, based on what I
16  saw of the activity that he did from that moment forward,
17  I believed that he was talking about Gary Kurokawa and I
18  believe that today. That is what I believe.
19  Q  With regard to that particular assignment that you
20  are referring to, did Mr. Graff do anything with that
21  particular assignment, to your knowledge?
22  A  Yeah. He immediately pulled the paperwork, got the
23  computer going and started working on that assignment. In
24  fact, I observed him that particular day. This was mid
25  morning maybe or late in the morning and he worked on that

Page 158

1  assignment for the remainder of the day.
2  Q  And you watched him throughout the rest of the day?
3  A  Not constantly, but certainly I worked in the area
4  and I could see what he was doing, yes. In fact, I think
5  he even put it in an envelope and walked it over to the
6  client. It must have been some lender or client downtown,
7  because at the end of the day, he actually physically did
8  that. I mean, it was an important deal. He had to get it
9  out, you know, and that is what he did.
10  Q  And as far as walking it to the client, did you go
11  with Mr. Graff?
12  A  No. But I saw him leave late in the afternoon and I
13  think he even maybe said something to the effect that he
14  is proud he got it done and I think Gary did the
15  appropriate signatures and everything is going. It's one
16  of these kind of got to go quick, got to get it out, that
17  sort of thing.
18  Q  Did Mr. Graff in fact say that Gary did the
19  appropriate signatures?
20  A  He did say that Gary did sign it. He did say there
21  were signatures and I believe that Gary signed it. I'm
22  fairly certain that is what he said.
23  Q  Is that your testimony?
24  A  That is my testimony.
25  Q  With regard to Chris Graff delivering it to a client,

Page 159

1  you know for a fact that Chris Graff delivered it to a
2  client of GK Appraisals?
3  A  That particular assignment, I believe, I didn't go
4  with him, but it seemed to be what he indicated was his
5  intent, that it was something that he had to do that day
6  and that he was the one who was walking it and delivering
7  it to the client.
8  Q  That is not my question.
9  A  I'm sorry. I didn't understand.
10  Q  My question is, you know for a fact and you have
11  facts that Chris Graff delivered that particular
12  assignment that we have been talking about to a client
13  that day? Not your assumption, not your belief, but you
14  know for a fact that that is what Chris Graff did?
15    MR. MOSELEY: I object. That question is
16  ambiguous. How do you prove a fact? Are you saying that
17  he couldn't prove the fact by saying anything other than
18  saying I observed him take it to X? The question can't be
19  answered the way you are asking it.
20  Q  (By Mr. Lorusso) Let me ask it this way, Mr. English.
21  Did Chris Graff tell you where he was going?
22  A  No, he didn't.
23  Q  Did you follow Chris Graff out the door?
24  A  No, I didn't.
25  Q  Did you see Chris Graff deliver it to somebody?

Page 160

1  A  No, I didn't.
2  Q  So in terms of Chris Graff delivering it to a client,
3  that is your assumption, correct?
4  A  I know that was his intent when he left the door.
5  When he was going out of the area-- I didn't even see him
6  go out the door. But when he left the area, I know that
7  was his intent because he indicated that.
8  Q  What did he specifically say to you?
9  A  I'm not sure I can recollect his exact wording. But
10  he had all of the stuff put together in an envelope and he
11  had to rush out the door to deliver it to the client.
12  Q  Did he say something to you as he was rushing out the
13  door?
14  A  Something to the effect that, "I got all my stuff
15  and I have got to get this to the client." And I think it had
16  to be there by 5:00 o'clock, or something to that effect.
17  So he was rushing out the door to make sure he got it to
18  the client on time.
19  Q  Did he say anything else to you?
20  A  No.
21  Q  And he specifically turned and said words to the
22  effect that you just stated to you, correct?
23    MR. MOSELEY: Objection. You are misstating the
24  testimony. I don't think there was any testimony that he
25  turned to Phil.

19 (Pages 157 to 160)

CV04-00108                                    ENGLISH v. CITY & COUNTY OF HONOLULU

Page 161

1   Q   (By Mr. Lorusso)  The words that you just said that
2   Chris Graff spoke, were they spoken directly to you?
3   A   Yes, if not to me, but maybe even others in the
4   area.  When someone is leaving the area, you kind of tell
5   them where you are going so people know where you are
6   going, why you are not at your desk.  And he was kind of
7   indicating this is where I'm going, this is what I'm
8   doing.
9   Q   So Chris Graff indicated to those in the area that he
10  was going to deliver something to a client, correct?
11  A   That's correct.
12  Q   Who else was in the area?
13  A   It would have been-- at that particular moment, I
14  didn't take a head count, so I can't say for sure who was
15  there.  But it would have been in the area of his desk.
16  Carol Kamisato was sitting right in front of him at the
17  time.  Wilfred Martin was sitting in proximity to him at
18  the time.  Dwight Ishigura would have been in proximity.
19     Whether those people were actually there at that
20  moment, I don't recall.  But those are the people that sat
21  in the proximity.  So really anybody in the group could
22  have overheard that, but I definitely did.
23  Q   At any time, did Ann Gima ever say to you that she
24  was aware of this scheme that you have alleged was taking
25  place?

Page 162

1   A   No, she never talked to me about it at all.
2   Q   Did Ann Gima ever inform you that she was aware that
3   Chris Graff was doing outside work on City time?
4   A   She never indicated that to me, no.
5   Q   Now, did Bob Magota at any time ever say to you that
6   he was aware that this alleged scheme was taking place?
7   A   No, he never said that to me.  In both cases, I
8   reported it to Ann and I reported it to Bob.
9   Q   And understanding that you reported it to them, then
10  after having been told that information, did Bob Magota
11  say to you, "I already knew that" or "I was aware of
12  that"?
13  A   No, he didn't say that.
14  Q   Did Bob Magota ever tell you at any time that he knew
15  that Chris Graff was performing outside work on City time?
16  A   No, he never said that to me.
17  Q   Now, as far as your testimony that Bob Magota had
18  informed you that others had filed lawsuits and failed
19  against the division, did Bob Magota ever say anything
20  more to you about what kind of lawsuits they were?
21  A   No, he didn't.
22  Q   Did you have an understanding what that meant in
23  terms of the other lawsuits against the division?
24  A   You mean specifically the type of lawsuits?
25  Q   What was your understanding, if any, that you had

Page 163

1   when Bob Magota said that?
2   A   My understanding was don't pursue anything more, that
3   if anybody attempted to pursue anything more, they would
4   not prevail, that was my understanding.
5   Q   I thought you had indicated, though, that Bob Magota
6   said that other people had filed lawsuits against the
7   division and that they had failed, correct?
8   A   Correct.
9   Q   Now, in terms of those other lawsuits or the type of
10  lawsuits that had been filed, did you have an
11  understanding one way or the other what those lawsuits
12  were about or the type of lawsuits that they were?
13  A   I don't think he indicated specifically what type of
14  lawsuits that they were other than that pursuing anything
15  more, you wouldn't prevail.  In other words, his main
16  point was-- this is what his main thrust of what he was
17  saying was.  It's your word against theirs, don't pursue
18  it.  And people have tried to pursue lawsuits before and
19  they haven't prevailed, so don't do it.
20  Q   Now, in terms of lawsuits, though, did you have an
21  understanding as to what, if any, lawsuits had ever been
22  filed against the division and had failed?
23  A   I didn't really-- no, I didn't, because I wasn't
24  really focusing on that part.  I was focusing on the part
25  that is don't pursue anything, just drop it.  So that is

Page 164

1   where I was with that.
2   Q   At that point, had you told Bob Magota that you were
3   thinking about filing a lawsuit?
4   A   No, I didn't.
5   Q   At any time, did you tell Bob Magota that you were
6   thinking about filing a lawsuit?
7   A   No, I didn't.
8   Q   Did you tell Ann Gima that you were thinking about
9   filing a lawsuit?
10  A   No, I did not.
11  Q   Did you tell Gary Kurokawa that you were thinking
12  about filing a lawsuit?
13  A   Never.
14  Q   Did you ever tell anyone at the City that you were
15  considering or thinking about filing a lawsuit?
16  A   Never.
17  Q   In addition to Bob Magota telling you about others
18  filing lawsuits, he also told you that he would speak with
19  Gary Kurokawa and to Chris Graff, correct?
20  A   That's correct.
21  Q   Did Bob Magota also tell you that if in fact Chris
22  Graff was doing outside City work on City time, that he
23  would be disciplined?
24  A   He did.
25  Q   Did he say anything else to you in that meeting?

                                        20  (Pages 161 to 164)

Page 165

1  A   He said he would talk to Gary.
2  Q   And do you have any knowledge if in fact Bob Magota
3  spoke with Chris Graff about the allegations that you had
4  raised with Bob Magota?
5  A   No.
6  Q   And do you know or have any facts if Bob Magota spoke
7  with Gary Kurokawa about the allegations that you had
8  raised with Bob Magota?
9  A   Yes.
10  Q   And how do you know that he spoke with Gary Kurokawa?
11  A   Subsequently Chris Graff came to me and said, "I know
12  you spoke to Bob."  And the reason he knew that I spoke
13  to Bob was because Gary called a meeting with all of the
14  participates, all of the people that were doing appraisal
15  work for him. I don't know who those other people are. I
16  only know about Chris Graff. Chris reported to me that
17  Gary told them that they could continue doing what they
18  were doing, but that they should try and do it during
19  their lunch break or breaks, but most of all to be more
20  discreet about it.
21  Q   When was it that you had this conversation with Chris
22  Graff where he said, "I know you spoke with Bob"?
23  A   It had to be sometime after I spoke with Bob. I'm
24  not sure of the time frame, whether it was a week. I
25  think it was in relative proximity to that time.

Page 166

1  Q   Your relative proximity and mine may be different,
2  Mr. English. So what does that mean in terms of any
3  estimation of time?
4  A   Within two weeks.
5  Q   And was it just yourself and Chris Graff?
6  A   Chris was talking to me. Again, it was in the office
7  right in the area of the group, but he was talking to me.
8  Q   Was there anyone else present?
9  A   I don't know. I presume somebody was there because
10  it was in our area. But I didn't take a head count at
11  that particular moment.
12  Q   Again, Mr. English, I'm not asking you to guess. I'm
13  not asking you to speculate. So do you recall anyone else
14  being present while you were having this conversation with
15  Chris Graff?
16  A   I don't know who was in the area or who wasn't in the
17  area. I didn't take a head count at that particular
18  moment.
19  Q   And how long did this conversation with Chris Graff
20  last, approximately?
21  A   It was a brief conversation. As you might
22  understand, Chris probably-- my feeling was that he wasn't
23  real happy about the fact that I had talked to Bob. So it
24  was somewhat of a brief conversation. But he just wanted
25  to let me know that they had a conversation and that it

Page 167

1  was okay for him to continue doing what he was doing.
2  Q   And when you say brief, what do you mean by that?
3  A   A minute.
4  Q   Did you initiate the conversation or did Chris Graff
5  initiate the conversation?
6  A   Chris Graff initiated it.
7  Q   And he said to you, "I know you spoke with Bob
8  Magota," correct?
9  A   Correct.
10  Q   And as far as the part about calling a meeting, Chris
11  Graff told you that he called a meeting with the people
12  involved?
13  A   No. Let me be really clear. He said that Gary
14  Kurokawa called a meeting of the people that were
15  involved.
16  Q   And that Gary said to be more discreet and do it on
17  your lunch breaks or other breaks and that it could
18  continue, correct?
19  A   That is correct.
20  Q   Did Chris Graff saying anything else?
21  A   No.
22  Q   Did you have a response to Chris Graff?
23  A   No, I didn't.
24  Q   After you had this meeting with Chris Graff, what is
25  the next thing that you did with regard to this alleged

Page 168

1  scheme that you had learned of?
2  A   My hope from the beginning would be by speaking up
3  that the activity would stop. And even after my meeting
4  with Chris, even though they had said that they-- or Gary
5  had told them they could continue but to be more discreet,
6  I was hoping that it would stop or at least I wouldn't
7  know about it because, in effect, it would have stopped as
8  far as I knew.
9  But the activity continued. And in fact it wasn't
10  even discreet. It continued as it was essentially before.
11  So I think it was right around the middle of February,
12  again, it was burdening me and, I wrote an email to Bob
13  Magota essentially spelling out what was going on and
14  asking them if they would please let me know what they are
15  going to do about it.
16  Q   In terms of it being in the middle of February that
17  you wrote this email, this would be February of 2002,
18  correct?
19  A   That's correct.
20  Q   Between October 2001 and until you wrote this email
21  in the middle of February 2002, did you speak with anyone
22  else about your concerns?
23  A   My pastor again. I continued to speak to him about
24  it.
25  Q   Anyone else?

21 (Pages 165 to 168)

Page 169

1  A  No.
2  Q  And on February 1, 2001, you had received a promotion
3  to real estate appraiser III, is that correct?
4  A  That is the previous year, correct?
5  Q  Correct.
6  A  I'm not sure of the exact time, but it sounds about
7  right.
8  Q  But there had been a promotion from appraiser II to
9  appraiser III, correct?
10 A  Correct.
11 Q  And at some point in time, you had already received a
12 promotion to appraiser IV, is that correct?
13 A  That's correct.
14 Q  And when was that?
15 A  I believe it was in March of 2002.
16 Q  So it was after you had your initial conversations
17 with Ann Gima, your meeting with Bob Magota, after you had
18 the conversations with Chris Graff and after you now have
19 sent an email to Bob Magota in February of 2002, correct?
20 A  The promotion actually to appraiser IV was discussed
21 even before August 1st.  And there seemed to be some kind
22 of confusion, at a minimum, or delay in accomplishing the
23 promotion to appraiser IV.  But I believe the ball was
24 rolling, so to speak, prior to me having a discussion with
25 Ann Gima.

Page 170

1  Q  Going back to my question, which was, you had the
2  conversation with Ann Gima, you had the conversation with
3  Bob Magota, you had the conversation that you described
4  with Chris Graff and you have sent an email to Bob Magota
5  about the continuing activity, correct?
6  A  Correct.
7  Q  And after that point in time, in March of 2002, you
8  receive a promotion, correct?
9  A  The promotion of which the ball was rolling prior to
10 all of those events, that's correct.  And again, there
11 seemed to be some confusion or delay in the interim of
12 that period, which I don't know what happened exactly, but
13 something happened.
14 Q  In terms of any type of delay for your promotion, is
15 it your testimony that Ann Gima was the cause of any of
16 the delay in your promotion from real estate appraiser III
17 to IV?
18 A  No.
19 Q  Is it your testimony that Bob Magota had any role in
20 any delay in your promotion from real estate appraiser III
21 to IV?
22 A  It's not my testimony because I don't know what
23 happened.
24 Q  And with regard to Gary Kurokawa, is it your
25 testimony that he delayed your promotion from real estate

Page 171

1  appraiser III to classification IV?
2  A  Again, my answer is, that is not my testimony because
3  I do not know what was happening.
4  Q  Is it your testimony that anyone else at the City
5  delayed your promotion from III to IV?
6  A  I am not testifying to that because I do not know
7  what happened.
8  Q  You sent the email to Bob Magota sometime in February
9  2002, as you just testified to, correct?
10 A  Yes.
11 Q  Did you get a response from Bob Magota?
12 A  Yes, I did.
13 Q  And what was that response?
14 A  Again, Bob said that he would talk to Gary and talk
15 to Chris.
16 Q  Was that by way of email or was that in person or
17 some other means?
18 A  I believe it would have been by email at that time,
19 but I'm not sure.
20 Q  The response was Bob Magota would talk to Gary and
21 talk to Chris Graff.  Any other response other than that?
22 A  No.  At that point, it was very brief.
23 Q  And was it an immediate response to your email?
24 A  Yes.
25 Q  And by immediate, I mean either the same day or

Page 172

1  within a day or two?
2  A  Yes.
3  Q  Do you know if in fact at that point in time Bob
4  Magota spoke with Gary Kurokawa?
5  A  I don't know if did he or not.
6  Q  And do you know if Bob Magota spoke with Chris Graff
7  at that point in time?
8  A  I don't know if he did or not.
9  Q  During this period of time that we have been talking
10 about, which is now leading us up to mid February 2002,
11 had you spoken with any counsel with regard to your
12 concerns or allegations?
13 A  Nobody.  I believe that this was an internal matter
14 that would be handled internally and that it would stop.
15 Q  What is the next thing that happened in terms of your
16 concerns and allegations after you had gotten the email
17 response from Bob Magota?
18 A  The next thing that happened to me would have been
19 that I believe, at some point, and I don't know if it's in
20 March or April, but I was called into a meeting with Bob
21 Magota and Ann Gima.  And in the meeting, Bob would say
22 things to me.  The very first thing he would say was
23 something to the effect, "You must not like your job very
24 much." And then the next thing they started to say things
25 like, "You are coming and going as you please," you are

22 (Pages 169 to 172)

Page 173

1  doing this, you are doing that.
2      And it was really shocking to me because, first of
3  all, I did like the job a lot. And I'm trying everything
4  that I know to do to comply with what I know to be the
5  things that I'm to comply with. So at that point, that is
6  the very first thing that I notice, that something doesn't
7  seem right, what's going on.
8  Q   So this is in March or April of 2002, correct?
9  A   I believe that is the time frame. I'm not sure.
10 Q   As far as the meeting, is this something that you
11 were told about the meeting by someone in order to show up
12 at the meeting?
13 A   Yeah. I would usually get a call from Bob Magota and
14 he would say I want you to come to my office right now.
15 Q   Did this meeting take place in Bob Magota's office?
16 A   Yes.
17 Q   It was just the three of you, yourself, Bob Magota
18 and Ann Gima, correct?
19 A   Right.
20 Q   Anyone else there?
21 A   No.
22 Q   Other than what you have testified to, did Bob Magota
23 say anything else to you? You testified that he said you
24 must not like your job.
25 A   I think, at one of the very first meetings, he asked

Page 174

1  me if I would like to seek counseling, which also
2  surprised me quite a bit. And I told him, "No. I don't
3  know why you should be asking me that question."
4  Q   What else was said by Bob Magota at the meeting?
5  A   I think he made again these assertions that I was
6  coming and going as I please, and that I was placing leave
7  papers on Ann Gima's desk at times when they felt it
8  wasn't appropriate. And that when-- actually this is Ann
9  Gima, not Bob Magota. Ann Gima had made some comments, as
10 well. So that's about it for Bob.
11 Q   I want to be very clear in terms of who said what.
12 Bob Magota said, "You must not like your job" correct?
13 A   "You must not like your job very much."
14 Q   And he also said you were placing papers on Ann
15 Gima's desk at times that it was not appropriate, or words
16 to that effect?
17 A   Well, I think what he was saying, these are leave
18 papers, and he was saying that I was placing them on her
19 desk when she wasn't around. And so there was some kind
20 of accusation associated with that, that I was doing
21 something inappropriate.
22 Q   And did Bob Magota say anything else to you?
23 A   Not anything other than what I have already stated.
24 Q   And then Ann Gima also said things to you, correct?
25 A   Correct.

Page 175

1  Q   What did she say to you?
2  A   She told me that she didn't want me asking any
3  questions of her that I should already know the answers
4  to, in her view. And that I should go ask the other
5  appraisers if I needed instructions on how to do things or
6  how office procedures are being handled.
7      And I asked her, "Is it okay if I ask sometimes a
8  stupid question." Because I'm trying to learn, I'm trying
9  to do what they want me to do. And she said, "No, go ask
10 somebody else."
11 Q   Did she say anything else?
12 A   No.
13 Q   Did you say anything else other than what you have
14 already testified to?
15 A   No. Let me go back. I did say something else.
16 Q   What else did you say?
17 A   I said I would try my very best to comply with
18 everything they have said and that I didn't believe I was
19 doing anything wrong. That as far as putting papers down
20 on a desk for leave and that sort of thing, I was doing
21 everything that I thought was appropriate.
22     And also, of course I told Bob and Ann that I did
23 like my job very much and that I didn't really understand what
24 was going on, why I was called in.
25 Q   And then the meeting ended?

Page 176

1  A   Well, they gave me instructions not to leave
2  papers on Ann's desk when she wasn't there. And of course
3  the instruction that Ann had given me about seeking help
4  from other appraisers, that I would do that. There may be
5  something else that I'm not recalling at the moment. So
6  when ask you me is there anything else, this is what I
7  recall at this particular moment.
8  Q   As you sit here today, are there any documents that
9  you are aware of that would help refresh your memory to
10 anything else that was said in this meeting in
11 approximately March or April of 2002 other than what you
12 have testified to?
13 A   I don't think there were any documents.
14 Q   When you would have these various conversations, be
15 it with Ann Gima, Bob Magota, would you document those
16 conversations anywhere?
17 A   I began to document them, but after this meeting.
18 This was the first meeting I had where it was odd to me
19 that Bob would say something to me like, "You must not
20 like your job very much." So at this point, I'm a little
21 bit bewildered and wondering why did this happen, why is
22 this going on. Later I began to document things.
23 Q   In terms of documenting things, how did you document
24 them?
25 A   I documented them in two ways. One way was I

23  (Pages 173 to 176)

Page 177

1    communicated with Dwight Ishigura, who is a union
2    steward. Initially he sat right in front of me. So we
3    had become acquaintances. And so I documented via
4    communications with Dwight.
5        And I think towards, going further on, I started to
6    make handwritten notes or typewritten notes and that sort
7    of thing. Actually Dwight told me to do that at one
8    point. I don't know exactly when. I think it was maybe
9    around May he said, "Phil, start documenting everything."
10   So I did.
11   Q    May of?
12   A    2002. Maybe it was in March or April. I don't
13   remember. But right around there. Certainly by May I'm
14   certain he told me to do that.
15   Q    And in terms of the way that you would document
16   things with Dwight Ishigura, you were doing that in his
17   capacity as a union steward, correct?
18   A    No, not really. I was doing it because I had a lot
19   of respect for Dwight. We sat next to each other. We
20   were acquaintances. I knew that he basically knows how
21   the City and the real property assessment runs. He had
22   lots of conversations with me about Gary, for example.
23   And I just-- it was a matter of trust and advice.
24       He has been there a long time. "What do I do about
25   this?" And he would give me his advice. And of course

Page 178

1    the only way I could ask his advice was to document the
2    things that were going on. So I didn't really approach
3    him as a union steward necessarily. But I know, as a
4    union steward, he had a lot of experience and insights as
5    to how the City and the Real Property Assessment Division
6    worked.
7    Q    In terms of documenting the information to Dwight
8    Ishigura, in what form or manner did you document things
9    to him?
10   A    I emailed to him.
11   Q    Any other manner? In other words, a handwritten
12   note, a memo?
13   A    Pretty much the emails.
14   Q    And when you would email Dwight Ishigura, would he
15   respond to any of the emails?
16   A    Regularly.
17   Q    Did he ever perform any functions for you in his
18   capacity as a union steward?
19   A    No, never really-- what happened was, when it got to
20   a certain point, when the activities got to a certain
21   point, I asked him, "What should I do? Should I go to a
22   union agent?"
23       At that point, he said, "Yes, you should to go to a
24   union agent." So if he is acting as a steward or friend,
25   I don't know. But at that point, that is what happened.

Page 179

1    Q    Approximately when was it that you went to the union
2    agent?
3    A    In August.
4    Q    Of 2002?
5    A    Yes.
6    Q    And what union agent did you go to?
7    A    Waylen Toma.
8    Q    As far as the handwritten notes that you kept, you
9    testified you began approximately in May of 2002. Again,
10   that was at the direction of Dwight Ishigura, correct?
11   A    I'm not sure whether they started in May of 2002. I'm
12   saying they started sometime later than March or April,
13   but I'm not sure when. I just want to be clear about
14   that. But all of documentation, the emails to Dwight and
15   then subsequently the handwritten notes, I did that
16   because Dwight told me to do that. Actually more than
17   once he said document, document, in more than one
18   correspondence.
19   Q    And with regard to any handwritten notes or any
20   email, obviously, with regard to that information, you
21   were truthful in that information, correct?
22   A    Absolutely, to the best of my ability.
23   Q    When Bob Magota said to you you apparently do not
24   like your job very much, what was your understanding as to
25   that?

Page 180

1    A    I did not understand what he was talking about. I
2    didn't understand why he made the comment and I was
3    really-- actually he was staring me down while he was
4    doing it, and I didn't understand what was going on at
5    that time.
6    Q    In the context of that statement, was it a statement
7    standing alone or had you been discussing other things?
8    A    It was the very first thing that he said to me when I
9    walked into that meeting with Bob and Ann, and it wasn't
10   the last time that he said that, either.
11   Q    Approximately how many times did he say that to you?
12   A    Twice.
13   Q    And with regard to the statement that we are
14   referring to, the first time that he tells you in this
15   March or April 2002 meeting, did you feel threatened by
16   this statement?
17   A    I did.
18   Q    How were you threatened by this statement?
19   A    I was threatened because I didn't understand why I
20   was being called in because I didn't know that I had done
21   anything wrong. As a supervisor or a manager, I would
22   hope that an employee, if you want to tell them that they
23   were doing something wrong, that you would come to them
24   and say, "Oh, Phil, by the way, you shouldn't be doing
25   this way. This is the correct way to do it." I never had

24 (Pages 177 to 180)

Page 181

1  anything like that. It just came at me out of left field
2  and it really surprised me.
3  Q   During that March/April 2002 meeting, was there ever
4  any mention made of Chris Graff doing outside City work?
5  A   I don't believe there was.
6  Q   And was there any discussion during the March/April
7  2002 meeting of Gary Kurokawa either permitting or doing
8  outside City work?
9  A   No.
10 Q   The other time in which the statement was made to you
11 by Bob Magota, "You must not like your job very much,"
12 when was that meeting?
13 A   I think in May.
14 Q   Of 2002?
15 A   Yes, May or June.
16 Q   And was anyone else present?
17 A   Ann Gima.
18 Q   Anyone else?
19 A   No.
20 Q   And where was that meeting?
21 A   In Bob's office.
22 Q   And what else was said to you by Bob Magota?
23 A   These same things were mentioned again. The same
24 types of issues came up again. And this, for me, anyway,
25 was even more confusing because they had already talked to

Page 182

1  me about it and I was attempting to comply with what they
2  had asked me to do. So I was really puzzled the second
3  time. More than puzzled, I was concerned.
4  Q   When you say these same issues came up again, one
5  having to do with leave papers, correct?
6  A   Yes.
7  Q   And an issue with regard to asking questions,
8  correct?
9  A   Yes.
10 Q   Any other issues?
11 A   Yes.
12 Q   What other issue?
13 A   Bob stated that I was coming and going as I please.
14 Q   Any other issues?
15 A   Those were the same issues from the previous
16 meeting. I mean, there is more to that meeting. Do you
17 want me to...
18 Q   Sure. What else happened in that meeting?
19 A   They are related to those issues. For example, for
20 some time, from 2001, Ann and I had an agreement that on
21 Wednesdays and Fridays that I would come in a half hour
22 early and leave a half hour early because those were days
23 when I would see my son. And that was a standing
24 agreement we had.
25     And we subsequently had a meeting about that, I

Page 183

1  think, in September of 2001 where she wanted to be sure
2  that I was sticking to that. And I told her I was
3  sticking to that, there was no problem there at all. I
4  think actually in that September meeting, I think Chris--
5  I had already talked to Chris. But Chris told Ann that I
6  was coming and going whenever I please, or something to
7  that effect. So I just assured her this is the schedule I
8  was keeping.
9      And I had kept that schedule all the way even through
10 the March or April meeting because this was my
11 understanding of my start time and finish time. And it
12 was in the May meeting when they said you cannot come in
13 early and leave early on Wednesdays and Fridays. And
14 there is actually a correspondence between Ann and I where
15 I agree to a new time. And they, I guess, were claiming
16 that was me coming and going whenever I wanted to. But it
17 was standing agreement that Ann and I had for, I don't
18 know, a year, many months, anyway, more than a year.
19 Q   When you were first hired in June of 2000, what were
20 your hours?
21 A   I think they were 7:45 to 4:00 o'clock, or something
22 like that, or 8:00 o'clock to 4:15. I'm not really sure.
23 Q   And were those the same hours that applied to
24 everyone else in your group, that group two?
25 A   No. Everybody had different times when they would

Page 184

1  start. Some people come as late as 8:30 and leave at 5:00
2  o'clock. So people had different start times and finish
3  times.
4  Q   And with regard to this standing agreement that you
5  had with Ann Gima, at what point in time did that start
6  for the Wednesday and Friday?
7  A   I think it was the summer of 2001, somewhere in that,
8  I think.
9  Q   So on Wednesday and Friday, you would come in a half
10 hour earlier and then also leave a half hour earlier,
11 correct?
12 A   Exactly.
13 Q   And that was going on at least through approximately
14 the summer of 2002, correct?
15 A   Correct.
16 Q   And then, when you had the initial meeting in March
17 or April of 2002, the issue about your coming and going is
18 brought up, correct?
19 A   Coming and going as I please, correct.
20 Q   Were you specifically told on Wednesdays and Fridays
21 you cannot come in a half hour early and leave a half hour
22 early?
23 A   I was not.
24 Q   Was there any discussion in terms of your schedule
25 for Wednesday and Friday in that March or April 2002

25  (Pages 181 to 184)

Page 185

1 meeting?
2 A   No. There was only a claim that I was coming and
3 going as I pleased.  And I never got anything more
4 specific out of Bob and Ann than that.
5 Q   Did you ask?
6 A   Yes, I did.
7 Q   What were you told?
8 A   Nothing. I asked them and they told me nothing.
9 Q   So you looked at Ann and Bob and said, "What do you
10 mean by my coming and going as I please," and there was no
11 response at all?
12 A   No. They said that, "You are coming and going as you
13 please." They said-- they went through the whole thing.
14 And I asked them can you give me an instance where I did
15 those things, and they said no, we can't.  No, we can't or
16 no, we don't want to, something to that effect.
17    But I told them at that point that they can be
18 assured that I am coming and going on the agreed time, and
19 that I will comply with whatever else they ask me to do.
20 That is what I wanted to do.
21 Q   As far as the agreed time, what was the agreed time
22 that you were referring to?
23 A   Well, my understanding was the time that I had agreed
24 to with Ann previously, and that is what I continued to
25 believe was appropriate and agreed to and I continued to

Page 186

1 come in and leave at that time.
2 Q   And between this approximately March/April 2002
3 meeting and this May/June approximately 2002 meeting where
4 the same issues are discussed, did Ann Gima or anyone else
5 from the City ever provide you information that it was not
6 acceptable for you to come in that half hour early and
7 leave a half hour early?
8 A   No.
9 Q   You then have that May/June 2002 meeting, the same
10 issues of your coming and going as you please is brought
11 up. Is there a specific discussion with regard to your
12 time?
13 A   Yes, this time there is a specific discussion about
14 it.
15 Q   And what were you told?
16 A   I was told that I couldn't come in early on
17 Wednesdays and Fridays and leave early on Wednesdays and
18 Fridays, that there would be a set time and that Ann and I
19 would have a discussion about it and agree to it.  That
20 was fine with me.
21 Q   Was it your understanding that those same rules
22 applied to everyone else in the group, that there would be
23 set times that they were required to show up at work as
24 well as set times that their day would finish?
25 A   Was it my understanding that everybody-- I'm sorry.

Page 187

1 Could you say it again?
2 Q   Sure. Was it your understanding that others in your
3 group-- because you are in group three at this point,
4 correct?
5 A   I was in group two when Ann and I began the
6 agreement, but it shifted to group three.
7 Q   With regard to everyone in group two, that the people
8 in group two, including yourself, had scheduled times or
9 set times in which they were supposed to start work and
10 which they were supposed to finish work?  Is that your
11 understanding?
12 A   There was agreed times, right.
13 Q   And with regard to when you were in group three, that
14 again there would be set times for everyone in the group
15 that they were scheduled to begin work and which they were
16 scheduled to finish work?
17 A   There were individually agreed times.  Everyone had
18 their own agreed time within our group.
19 Q   So in other words, just having the set times wasn't
20 something that only applied to you?
21 A   Having--
22 Q   Let me withdraw the question.  Let me say it this
23 way.  In other words, you weren't the only one that was
24 required to have a set time to start work and to finish
25 work.  Even if the times varied between yourself and

Page 188

1 others in your group, everyone had a start time and
2 everyone had a finish time?
3 A   Whatever was agreed to, that is what they did, yeah.
4 There is parameters.  You can't come in at 5:00 a.m. and
5 so on.  I think 6:30 was the earliest that it was possible
6 for someone to come in.
7 Q   Did you have an understanding that if you didn't
8 agree with what your supervisor was indicating to you as
9 far as, say, starting times and ending times or any other
10 problems or concerns that you had, that you could go to a
11 union representative and discuss those matters with them?
12 A   Did I know about that?
13 Q   Did you have that understanding?
14 A   I never really thought about it.
15 Q   Were there occasions where-- strike that.  As you
16 indicated, you did go to a union agent at some point,
17 correct?
18 A   Yes.
19 Q   What was the purpose of going to the union agent?
20 A   This was in August of 2002?
21 Q   Yes.
22 A   So by that time, I had had these two meetings with
23 Bob and Ann.  I had had now two JPRs, or performance
24 evaluations, that had some negative aspect and they seemed
25 to be getting even more negative.  And I was being told

Page 189

1  that I was going to be put on an extended probation.
2     And the things that they were telling me in-- well,
3  it appeared to me that the JPR didn't make sense and I
4  didn't have anything specific that they said that I did
5  wrong or specifically that they wanted me to work on. So
6  I told them that I disagreed with the JPR and I contacted
7  Dwight. Something didn't seem right about the whole
8  thing. And I was suspecting at this point that there may
9  be something more to it.
10    MR. LORUSSO: We have gone about an hour. Let's
11 take a break.
12    (Recess)
13 Q   (By Mr. Lorusso) Mr. English, you had testified that
14 Chris Graff had informed Ann Gima that you were coming and
15 going as you pleased, correct?
16 A   That was my understanding. Ann had a meeting with me
17 in September, and I think she was meeting with everyone in
18 the group, but that Chris had made a complaint that, the
19 way I understood it, that some appraisers were coming and
20 going as they please. But Ann was implying that, Phil, he
21 is making a complaint about you.
22 Q   Did Ann Gima say that Chris Graff was making a
23 complaint about you?
24 A   No.
25 Q   It was just a general statement that some appraisers

Page 190

1  were coming and going as they please, correct?
2  A   Somehow I think there was more of an implication that
3  it was directed towards me. But I can't really
4  specifically recall her saying that.
5  Q   Just to be clear, in other words, Ann Gima never said
6  to you, "Chris Graff has made an allegation or complaint
7  against you directly, Phil"?
8  A   She never said that, no.
9  Q   Or words though that effect?
10 A   I don't know exactly what words. But I just remember
11 that the implication was that Chris had made a complaint
12 that-- I think what she told me was, "Phil you need to be
13 particularly careful because Chris was indicating that he
14 had made the complaint because of me."
15 Q   So you were specifically mentioned by Chris Graff to
16 Ann Gima based on what Ann Gima was telling you, that is
17 your testimony?
18 A   I don't know if she specifically said Chris Graff is
19 the person. I believe it was implied, though, somehow.
20 I'm not sure, but I believe it was implied. That is how
21 certainly I perceived it. But I don't think she
22 specifically said that.
23 Q   Let's be clear, Mr. English. Is it that Ann Gima in
24 the September 2001 conversation said that or used Chris
25 Graff's name that Chris Graff made a complaint? Let's

Page 191

1  take it in steps.
2  A   I don't remember.
3  Q   And in that conversation with Ann Gima, did Ann Gima
4  say to you that Chris Graff had made a complaint about you
5  specifically, Phil English, coming and going?
6  A   I don't remember her specifically making that kind of
7  complaint or stating that.
8  Q   And it's your testimony that you felt that she had
9  implied that the complaint was about you, correct?
10 A   The complaint was directed towards me by Chris Graff.
11 Q   And as far as employment, the status, you and Chris
12 Graff were on the same level, correct? You were both real
13 estate appraisers, correct?
14 A   Yeah. I think he was an appraiser IV and I was an
15 appraiser III. Chris and I were friends. I wouldn't say
16 we were best buddies, but we were friendly with each
17 other. We would go out to lunch occasionally. And I
18 can't really explain it.
19 Q   Let me make it simple. He was not your supervisor,
20 correct?
21 A   No, he wasn't.
22 Q   And he was never in a supervisory position to you,
23 correct?
24 A   No, he never was.
25 Q   We will, of course, talk about the performance

Page 192

1  reviews. But before we get to that, as far as this issue
2  about the set time or having a set time, were you informed
3  by Ann Gima that, as far as anyone's schedule, that there
4  could not be staggered schedules any further as to any
5  appraiser, not just you?
6  A   Subsequent to the meetings, yes.
7  Q   Approximately when was that?
8  A   In May or June of 2002.
9  Q   And that applied to everyone, correct, all the
10 appraisers in the groups?
11 A   That is what she said, yes. I'm not sure that in
12 practice it did, but that is what she said, yes.
13 Q   When you say you are not sure in practice, were there
14 appraisers who were coming and going as they pleased?
15 A   Most definitely.
16 Q   And which appraisers were those?
17 A   There is a lot of appraisers. There is 30-some-odd
18 appraisers that are spread out all over the place. But
19 appraisers-- well, I'll give you an example. There was a
20 gentleman by the name of Clinton Wang who would come into
21 the office and then leave. And the reason he left was
22 because he had a second job. During the day, he was a
23 resident manager. So he would come into the office, make
24 an appearance and leave and go do his resident manager job
25 and then come back to the office.

27 (Pages 189 to 192)

Page 193

1  Q   With regard for Mr. Wang doing that, was he informed
2  that he could not keep his second job?
3  A   When it was discovered, he was informed that he
4  couldn't keep a second job.
5  Q   In terms, though, of your testimony that while the
6  appraisers were told they could not come and go as they
7  pleased and they had to have a set schedule, you testified
8  that that was merely a statement, in essence, but it
9  wasn't really the practice, is that a correct statement?
10 A   Generally people kept a set schedule.
11 Q   Were there appraisers who after being informed that
12 they had to be on a set schedule did not keep that set
13 schedule?
14 A   I don't know any other appraisers who were informed
15 of that.
16 Q   Is it your testimony that the keeping of a set
17 schedule only applied to you?
18 A   I would say that I was held to a different standard
19 than other appraisers.
20 Q   What was the different standard that you were held
21 to?
22 A   That other appraisers had the ability to maybe come
23 in late, maybe they were stuck in traffic, they couldn't
24 catch their bus, something to that effect.  But I was held
25 to a standard where that was considered some kind of

Page 194

1  violation.
2  Q   Who were these other appraisers?
3  A   Again, generally that was the practice in the office,
4  that if there was a lot of traffic or if you missed your
5  bus, it wasn't a big deal to come in a little bit late.
6  Q   Were there ever circumstances where you-- strike
7  that.  In terms of you getting back and forth to work, did
8  you take a bus?
9  A   Yes.
10 Q   Were there ever circumstances that because the bus
11 was late, you were late?
12 A   Yes.
13 Q   And were you reprimanded in any way for that?
14 A   I wasn't reprimanded, but I was told to deduct that
15 time from my time sheet.
16 Q   Were others also told to deduct that time from their
17 time sheet, if you know?
18 A   I don't know.  But I know a lot of people came and
19 went freely without, as far as I know, having this kind of
20 issue.
21 Q   But you don't know if others were told to deduct
22 time, correct?
23 A   I'm unaware of it.
24 Q   And in terms of being stuck in traffic, again, it's
25 your testimony that that standard only applied to you,

Page 195

1  that even if you were stuck in traffic, that that was not
2  acceptable?
3  A   The part about being unacceptable applied to me where
4  it did not appear to apply to others.
5  Q   When you say it did not appear, do you know if in
6  fact others had to follow the same standard as you?
7  A   You mean did they have to mark out their time that
8  they came in ten minutes late or something to that
9  effect?
10 Q   Right.
11 A   I'm not aware of anybody ever having to do that.  It
12 was more or less acceptable that if you got stuck in
13 traffic, you missed your bus, it's not a big deal, it's an
14 occasional thing, don't worry about it, except in my case.
15 Q   When you say that you don't know if it applies to
16 others, do you know if in fact there were circumstances
17 where someone had either missed their bus or that they
18 were stuck in traffic and they were told that's okay, you
19 don't need to deduct any time?
20 A   I don't know the specific instance.  But I know that
21 was generally what was accepted in the office.  As a
22 general rule, that is how people operated.
23 Q   And how do you know that was the general rule?
24 A   Because you can observe people.  I worked there for a
25 period of time and you know people come in late sometimes

Page 196

1  or, you know, they miss their bus, whatever.  They had to
2  pick up their car at the mechanic and it caused them to be
3  delayed and it didn't seem to be an issue.
4  Q   You know that those incidents or instances occurred
5  where people may be late or delayed or had to pick up
6  their car, but you don't know what the outcome of them
7  doing that was with regard to their keeping of time, is
8  that correct?
9  A   My understanding of the outcome is that it was not an
10 issue.
11 Q   And when you say it's not an issue, was there anyone
12 in particular that you are aware of where those instances
13 occurred and they were told by anyone at the City not a
14 problem, not an issue?
15 A   Yes.
16 Q   And who?
17 A   Bob Magota told me that it's okay if you come in ten
18 minutes late or 15 minutes late, don't worry about it.
19 And that was generally what was the standard acceptable in
20 the office.  And that was the standard that I believed to
21 be the case.  You have to understand, if I can say it.  I
22 usually came to work at least a half hour early.  But
23 there was a couple of instances where I did come in late
24 and I was told that I had to mark that time off.  This
25 happened subsequent to right around the time frame of the

28  (Pages 193 to 196)

Page 197

1  May and June meetings-- no, I'm sorry. It actually
2  happened in August of 2002.
3     But other than that, I'm not aware of anybody who
4  ever had to mark off 10 or 15 minutes of their time
5  because they were delayed for some reason. It may have
6  happened but I'm certainly not aware of it.
7  Q    Were there any other conversations other than the
8  ones you have already testified to with Ann Gima with
9  regard to your allegation that Chris Graff was performing
10  outside work on City time, other than what you have
11  already told me about?
12  A    No.
13  Q    Were there any other instances when you had a
14  conversation with Bob Magota about Chris Graff performing
15  outside City work on City time, other than what you have
16  already testified to?
17  A    Well, the answer is no. But I attempted to bring it
18  up a couple times and was told that I could not.
19  Q    And by a couple, how many times are you talking
20  about?
21  A    Two times that I can think of.
22  Q    And one of them you had started to tell me about
23  before. You were in a meeting, it was yourself and Bob
24  Magota, correct?
25  A    Yes.

Page 198

1  Q    And who else was there?
2  A    Ann Gima. This would have been the second of these
3  meetings that we had. And I indicated to Bob that they
4  started making these assertions about me coming and going
5  and these kinds of things only after I had come forward
6  and said that Chris was doing work for Gary. And Bob just
7  shut off that conversation completely.
8  Q    How did he shut off that conversation?
9  A    He said, "This has nothing to do with it and we are
10  not going to talk about that."
11  Q    So in terms of this has nothing to do with it, in
12  other words, there were other issues being discussed,
13  correct?
14  A    The issues regarding you must not like your job very
15  much, you are coming and going as you please, et cetera.
16  And I was trying to raise the point that I don't
17  understand why these things are-- why you are making these
18  claims, because I am trying to do what you asked me to
19  do. And I only started to have these meetings with Bob
20  and Ann after I had stepped forward.
21  Q    And then, in another meeting, who was present?
22  A    Waylen Toma.
23  Q    And that was your union representative, correct?
24  A    He was a union agent.
25  Q    I'm sorry, union agent. But he was there on your

Page 199

1  behalf?
2  A    That was my understanding at the time.
3  Q    And who else was there?
4  A    Gary Kurokawa.
5  Q    And who else?
6  A    Ann Gima.
7  Q    Anyone else?
8  A    No.
9  Q    And I assume you had notified Waylen Toma about the
10  meeting or did he arrange a meeting?
11  A    It was arranged between Gary and Waylen.
12  Q    And in terms of the meeting being arranged, what was
13  to be the purpose of the meeting?
14  A    It was a discussion of whether or not my probation
15  would be extended.
16  Q    That was as an appraiser IV, correct?
17  A    That's correct.
18  Q    When did this meeting take place?
19  A    November.
20  Q    Of 2002?
21  A    Yes.
22  Q    When you say that Waylen Toma and Gary had arranged
23  the meeting, do you mean simply from the standpoint of the
24  scheduling, when it would be scheduled, like the date and
25  time?

Page 200

1  A    It was my understanding that Waylen and Gary had a
2  few meetings to discuss the issue and that, when I heard
3  about it, I heard there was some sort of deal made between
4  Waylen and Gary and that there would be a meeting the next
5  day.
6  Q    When did you hear that there would be-- strike that.
7  When did you hear that there was a deal made?
8  A    Actually Dwight Ishigura emailed me that there was
9  some dealing, I think that is the term he used, deal, made
10  between Gary and Waylen.
11  Q    And before you went into the meeting, did you have an
12  understanding what that deal was?
13  A    None whatsoever.
14  Q    Did you contact Dwight and ask him what that deal
15  was?
16  A    Just to give some perspective on this, I met with
17  Waylen in August about this JPR, this performance
18  evaluation, once for about an hour. Waylen told me there
19  is something wrong, it doesn't look right. I got an email
20  from Gary Kurokawa that said your probation is going
21  forward. This is in August. That is, in effect, why I
22  contacted Waylen.
23     Now we are already in November and, as far as I'm
24  concerned, I'm on probation. Between August and November,
25  apparently there were a number of meetings between Gary

29 (Pages 197 to 200)

Page 201

1  and Waylen and Gary, Waylen and Ann Gima. And during the
2  course-- I didn't know that, of course. But I
3  corresponded to Dwight, actually complaining to Dwight, "I
4  haven't heard from Waylen, I don't know what is going on,
5  can you let me know."
6      And Dwight says, "I will try to talk to Waylen." And
7  he tries to communicate to Waylen. It wasn't until the
8  day before that Dwight emailed me and said there is some
9  deal between Waylen and Gary.
10 Q   Going back to my question, before you went to the
11 meeting, did you inquire of Dwight Ishigura what the deal
12 was?
13 A   Dwight didn't know what the deal was.
14 Q   You made that inquiry of him?
15 A   I think Dwight told me that, at some point, that he
16 didn't-- he wasn't involved in any communications between
17 Waylen and administration, I think is the way he put it.
18 Q   But my question is, did you ask Dwight what is the
19 deal, or words to that effect?
20 A   I think the words that I used, "Do you know what is
21 going on? Do you know what is happening?"
22 Q   And his response was he didn't know?
23 A   He didn't have any communications with Waylen with
24 regards to what was going on between Waylen and the
25 administration.

Page 202

1  Q   Before the meeting, did you speak with Waylen Toma
2  and say, "I heard that there is a deal. What is the
3  deal," or words though that effect?
4  A   No, I wasn't even given an opportunity. I showed up
5  at the meeting and everybody was already there.
6  Q   When you say you weren't given an opportunity, did
7  anyone from the City prevent you from contacting your
8  union agent, Waylen Toma?
9  A   I was attempting to get information about what was
10 going on primarily through Dwight. And I don't think that
11 I ever directly tried to call Waylen to ask him. But the
12 reason being is that Dwight was a union guy and he was in
13 relative contact with Waylen. And for me, it seemed like
14 a simple avenue to say, "Hey, Dwight, can you talk to the
15 guy because you see him periodically." So I never
16 attempted to contact him directly. I just went to Dwight
17 and said, "Hey, can you ask him." That is what happened.
18 Q   Going back to my question. Was there anyone in the
19 City who prevented you from contacting your union agent,
20 Waylen Toma?
21 A   No.
22 Q   Did anyone from the City at any time prevent you from
23 contacting any representative from the union?
24 A   Not that I'm aware of.
25 Q   You then go into this meeting with Waylen Toma, Ann

Page 203

1  Gima, Gary Kurokawa, correct?
2  A   Correct.
3  Q   What happens in the meeting?
4  A   The meeting is primarily conducted by Waylen. Waylen
5  apparently has specific issues that he wants to have
6  discussed at the meeting. He tells them that he doesn't
7  believe that they should go forward with the probation,
8  albeit this is the end of my probation that he is telling
9  them that, but that my probation should not go forward.
10     And I attempt to ask the question, "What I would like
11 to know is why are these things happening to begin with?"
12 And Waylen literally puts his arm across my chest and
13 says, "No, we are not going to talk about that." So I
14 think Gary-- should I continue?
15 Q   Please.
16 A   Gary started to communicate at that point. And Gary
17 said to me that, "Phil, we should get a fresh start. We
18 should forget about everything that happened before." He
19 went on to say that, if it wasn't for Gary, that I would
20 not have gotten the job.
21     And then the next thing he said was, "We could have
22 come up with other things in your JPR." Essentially they
23 were holding back. The discussion went from there to
24 holding back. The discussion went from there to where we
25 are going to go from here. And the discussion was that

Page 204

1  they would-- they wrote down all of the requirements of an
2  appraiser IV and they said I have to be able to do all of
3  these things.
4      One of the things that Gary said I should be able to
5  do is that I should have initiative. That was peculiar to
6  me because I had a meeting with him in January before
7  where he said I was taking too much initiative.
8      I was also told that Ann Gima did not like my emails
9  to her because I signed off my emails as, "Is there
10 anything else that you would like me to do?" And she felt
11 that was obnoxious. And I asked them, "How should I do
12 it? How would you want me to?" And they said, "We don't
13 know. That is your problem. You got to figure that out
14 on your own."
15     There was some discussion about the fact that they
16 had changed the JPR after I had signed it. They gave me
17 the JPR, I reviewed it, I responded. It came back to me,
18 I signed it. Then the next day I got a different JPR with
19 Ann Gima and Gary Kurokawa's signature on it. There was a
20 discussion about removing portions of the language, which
21 I didn't really follow what they were talking about or
22 understand what they were getting at about that.
23     And they told me that this whole discussion of what
24 is going to happen next is up to me. And Waylen repeated
25 that a number of times, "Phil, it's up to what is going to

Page 205

1    happen in the future." And I pretty much got all of the
2    signals and knew what they were talking about at that
3    point, which was essentially not to bring up anything
4    about any kind of retaliation, not to bring up anything
5    about Gary and Chris's activities at the office, and that
6    would be the possibility for a fresh start.
7        They also talked about, which I perceived as threats,
8    about they could move me to Kapolei. They knew I was
9    taking the time, or actually I was riding my bike to work
10   at the time, and they were going to move me to Kapolei.
11       They said they could put me under Bob Magota, which
12   everyone else in the room agreed would be a really bad
13   thing, although I didn't really understand that exactly
14   myself.
15       And the other thing they talked about, actually this
16   was a meeting between Waylen and I after the meeting, that
17   Gary would be willing to move me to another jurisdiction,
18   which I though was rather bizarre because I don't know how
19   he would have the authority to do that. But that was
20   discussed.
21       Actually what happened was, once the meeting
22   concluded, I asked Waylen if he could please stay back.
23   This was only my second meeting with Waylen. And because
24   of the way the meeting went, I simply asked him, "What is
25   your relationship with these folks here?" And he told me

Page 206

1    that, "I am a personal friend of Gary Kurokawa's." And he
2    said, "If this goes to trial, I will testify against you."
3        I think the issue that he was talking about
4    testifying against me had to do with something to do with
5    the wording of the JPR, or I'm not really sure. I don't
6    know for sure, but that is what he told me.
7        And that meeting was concluded. And that was in
8    November. Actually that was late November. And I believe
9    that afternoon I called Roger Moseley.
10       MR. MOSELEY: I think we need to take a little
11   break here.
12       MR. LORUSSO: Okay. Let's take about five
13   minutes.
14       (Recess)
15   Q   (By Mr. Lorusso) Mr. English, you are okay to
16   continue? Are you okay to continue?
17   A   Do you have an aspirin? Is it possible to get an
18   aspirin?
19       MR. LORUSSO: Let's take a break.
20       (Recess)
21   Q   (By Mr. Lorusso) Mr. English, given the fact that
22   you had requested aspirin and took two aspirin, are you
23   able to continue with the deposition?
24   A   Yes.
25   Q   It will not affect your ability to tell the truth?

Page 207

1    A   No, it will not.
2        MR. MOSELEY: Actually we had a little
3    discussion off the record while you were out of the room
4    getting the aspirin. I asked him if it was going to
5    affect anything and what he told me was he would like to
6    try to continue on as long as he could and at least give
7    the aspirin a shot at working.
8        MR. LORUSSO: While we are still on the record,
9    I know I had said initially or this morning we should stop
10   at 4:30 and you had indicated a longer time. But also given
11   the representation that I had made about stopping at 4:30,
12   other plans had been made by the reporter. So why don't
13   we do this. Let's stop at 4:30, or if we stop before
14   then, we'll do that, too, but let's keep plowing ahead.
15       MR. MOSELEY: That's fine. As I said to you
16   before, we are going to try and accommodate enough time to
17   give you both a full shot at your deposition.
18       MR. LORUSSO: We appreciate that.
19   Q   (By Mr. Lorusso) Mr. English, with regard to this
20   November 2002 meeting where Waylen Toma, your union
21   representative or union agent was there, I take it that
22   you were not happy with Waylen Toma at that point, is that
23   a fair statement?
24   A   I didn't understand the representation during the
25   meeting because, when we had our meeting initially in

Page 208

1    August, it was different. I had explained to him that I
2    was concerned about retaliation. And he told me that,
3    when he looked at the reviews, this doesn't look right,
4    things don't add up, something is wrong here. And then I
5    didn't hear from him until November.
6        So during the November meeting, I didn't understand
7    why he wouldn't let that issue be brought up. And I
8    didn't understand how the meeting was conducted because it
9    seemed to be as if they-- well, there was an agreement or
10   something because it just seemed to railroad one
11   particular way and that was it. There was no-- Waylen
12   conducted the meeting, Gary had his say and Ann a little
13   bit. I tried to ask a few questions, but it was pretty
14   much a done deal, so to speak.
15       So if you are asking me, I was probably at that point
16   believing that Waylen maybe wasn't really representing me,
17   frankly.
18   Q   So going back to my question, my question was simple.
19   At that point in time, you were not happy with Waylen Toma
20   as your union agent, correct?
21   A   That's correct.
22   Q   As a result of you not being happy with the
23   representation that you had received by Waylen Toma as
24   your union agent at that meeting, did you go back to the
25   union and complain about Waylen Toma's actions at the time

Page 209

1  of the meeting?
2  A   No.  And the reason I didn't was because, at that
3  point, I was getting concerned about who, if anybody, I
4  could trust at the City or at the union.
5  Q   Did anyone at the City prevent you from going to your
6  union to complain about Waylen Toma?
7  A   No one at the City prevented me from doing it, yet I
8  didn't know who at the union I could trust.  You
9  understand that Ann Gima was a union steward and she was
10 friends with Waylen, as well.
11 Q   Were you a union steward?
12 A   I was a union steward.
13 Q   When did you become a union steward?
14 A   In 2001.
15 Q   At the time of the meeting in November of 2002, were
16 you still a union steward?
17 A   Yes, I guess I was.  I don't know if I was-- I had
18 attended meetings and so on, but no one told me you are no
19 longer a union steward.
20 Q   And by your mention of Ann Gima being a union
21 steward, is it your testimony that Ann Gima did something
22 or didn't do something with regard to the union with
23 regard to you?
24 A   No.  My testimony is that there were personal
25 relationships that go above and beyond things that are

Page 210

1  what people are supposed to be doing.
2  Q   And do you know in this instance that any personal
3  relationship, if any, that Ann Gima had with anyone at
4  the union decided the outcome of the particular meeting in
5  November of 2002?
6  A   Do I know that?
7  Q   Yes.
8  A   I don't know that.  But I do know that Waylen and Ann
9  and Gary had meetings and the result of those meetings was
10 this November meeting.  And I wasn't asked to attend any
11 of those meetings.  They had more than one.  They a few of
12 them.
13 Q   Again, there is lot of information that you are
14 giving, Mr. English, and we can, of course, talk about
15 these meetings if you felt that that in some way affected
16 your employment at the City.
17     At the union, did you also have personal
18 relationships with anyone?
19 A   The only person that I really knew was Dwight.
20 Dwight encouraged me to become a steward.  And I was
21 interested finding out how the union operated and what
22 they were about.  And really the only effective way to do
23 that is to become a steward.
24 Q   What is a union steward?
25 A   Basically you are the union's representative in the

Page 211

1  office.  So if the union is trying to get information out
2  to employees, you would be the conduit.  If employees want
3  to get information about what is going on with the union,
4  again you are conduit for that.
5  Q   With regard to following any types of policies or
6  practices or procedures, if someone that belonged to the
7  union came to a union steward, they would ask them those
8  types of questions so that the union steward could point
9  them in the right direction, is that one of the jobs of a
10 union steward?
11 A   Yes, exactly.
12 Q   So in terms of any type of grievance or any problems
13 either with the employer or with regard to the union
14 itself, the union steward would have the knowledge of
15 where to point that individual in the proper direction,
16 correct?
17 A   At some point, they would gain that knowledge,
18 correct.
19 Q   As a union steward, you had that knowledge, correct?
20 A   No, I did not.
21 Q   And the reason you didn't have that knowledge was
22 why?
23 A   I was a union steward for a very short period of
24 time.  And although I did attend a seminar training, which
25 was an all day training, essentially the morning part was

Page 212

1  a few speeches by various people and the afternoon part.
2  was how to be a political action group for the union.  So
3  I didn't really attain the type of training that you are
4  talking about.
5      I did get some handouts and that sort of thing, but
6  it wasn't-- you really need to get more training.
7  Q   And that training was available to you, correct?
8  A   If you would attend the meetings.  I think the
9  meetings were on Wednesday nights, which was actually the
10 evening that I spent with my son and that was one of the
11 issues why I could not attend a lot of training or
12 meetings.
13 Q   But again, if you change your schedule or do things
14 to accommodate your situation so that the information or
15 training would be available to you, you could have availed
16 yourself of that information, correct?
17 A   If I could have changed my schedule, yes.
18 Q   Now, when you spoke with Waylen Toma after the
19 meeting, you testified that Waylen Toma said to you that
20 Gary Kurokawa could have you transferred to another
21 jurisdiction or moved to another jurisdiction, correct?
22 A   That's correct.
23 Q   Did Gary Kurokawa ever say to you, "I can transfer
24 you" or "I will transfer you to a different jurisdiction"?
25 A   No, he didn't.  What Waylen said was that Gary heard

Page 213

1  that I might be interested in moving to another
2  jurisdiction and that he could make the arrangements so
3  that that can happen.
4  Q    And that point in time is when you had been making
5  inquiries on the Big Island as to whether or not you were
6  considering the potential of moving over there, correct?
7  A    I had gone and met with Stan in June and I was making
8  inquiries about that.
9  Q    And in terms of any type of accommodation, did you
10  take that as a threat, that Gary Kurokawa was threatening
11  you in some way by moving you?
12  A    I took it as-- well, I took the other issues as a
13  threat, certainly.  I took that issue as this is your
14  opportunity to get out of here if you want.  That is how I
15  took it.  In other words, if you want out of here, we'll
16  see if we can make a way for you to get out.
17  Q    In other words, that is an end result but not in and
18  of itself a threat, is that correct?
19  A    That was a way out for me that was being offered.
20  Q    But it was not a threat, correct?
21  A    If they are offering you a way out of something,
22  Mike, then indirectly that is a threat.  You know, in
23  other words, that there is some issue, there is some
24  problem.  There is some trouble if they are saying, "We'll
25  give you a way out if you want to take it."

Page 214

1  Q    My question to you is, when Waylen Toma, not Gary
2  Kurokawa, but when Waylen Toma said that accommodations
3  could be made for you to move to a different jurisdiction,
4  did you take that as a threat?  Again, yes or no?
5  A    In context of the whole thing that was happening, it
6  was part of a threat.
7  Q    When you say it was part of a threat, those
8  particular words or the ability to accommodate you, you
9  took that as part of a threat?
10  A    In context of everything else that was said and
11  everything else that was going on, yes.
12  Q    In terms of the other part, what is the other part of
13  the threat?
14  A    The other part was they would move me to Kapolei.
15  The other part was they would put me under Bob Magota,
16  which I mentioned everybody in the room agreed that would
17  be a really terrible thing.  I don't know why.  And
18  really, at the end of the meeting, I recognized that
19  basically I was in trouble.  They essentially said, you
20  have to be a perfect appraiser IV, and if you fall short
21  of that, then you are not going to pass your probation.
22  Actually, at that point, they are saying they were going
23  to pass the probation.  But subsequently now I know
24  something I didn't know then, which they were already
25  planning on putting me on a special probation, which under

Page 215

1  special probation could lead to termination if you don't
2  pass the special probation.  That is what the meetings
3  were with Ann and Gary and Waylen, that's when they made
4  that determination.
5      Ann said in one of the meetings-- well, we know this
6  now from written documentation that is part of everything
7  else provided--"That this probation isn't going to fly
8  anyway, so what do we do next?"  Waylen says what you
9  should do next is this special probation.  So basically
10  that November meeting was setting up the special
11  probation.  They were setting me up for that.
12  Q    So in terms of the threat, it was moving you to
13  Kapolei, working for Bob Magota or making an accommodation
14  for you to move to another jurisdiction, correct?
15  A    Getting me out of the environment, right.
16  Q    As you have testified, as far as working for Bob
17  Magota, you personally didn't feel that that was a bad
18  thing, correct?
19  A    I didn't understand why they felt it was such a
20  threat.  Actually I don't understand.  I know that-- I
21  didn't see that as much of a threat as the other things, I
22  guess is what I'm trying to say.  I don't know what would
23  have happened if I would have been directly under Bob.  I
24  don't know what would happen.
25  Q    When you say you didn't see that as much of a threat,

Page 216

1  do you consider working for Bob Magota to have been a
2  threat?
3  A    I didn't consider that in and of itself to be a
4  threat.  But I didn't understand everything that was going
5  on with all of these individuals.  I knew that, for
6  example, Bob wasn't in that meeting.  Why wasn't Bob in
7  that meeting?  Now I know from the other written document
8  Bob wasn't invited to other meetings.  And in fact Ann
9  says to Gary, "What are we going to tell Bob why we are
10  having this meeting?"  And then he is asking questions
11  about it, "What are we going to tell Bob?"
12      So I guess I don't know what the conclusion of all of
13  that is.  I don't know what all of these people knew or
14  what they were doing.  But at that time, I didn't perceive
15  working directly under Bob as much of a threat to me
16  personally as having to move to Kapolei or you, know,
17  offered a job on another island.
18  Q    Now, Mr. English, I'm not asking you in terms of what
19  level of a threat.  I'm asking you if you consider it to
20  be a threat, one way or the other.  So going back to my
21  question, because, in my mind, you keep switching as to
22  whether or not it's a threat versus it's a different level
23  of a threat.  So was working for Bob Magota, did you
24  consider to be a threat?
25  A    Yes, because I didn't know who he was or what kind of

33 (Pages 213 to 216)

Page 217

1  player he was in this whole thing.
2  Q   And you did consider having to move to Kapolei to be
3  a threat?
4  A   A greater threat.
5  Q   And moving to another island you considered to
6  being-- strike that. Accommodating you to move to another
7  island you considered to be a threat, correct?
8  A   Yes, I did. And in context with everything else,
9  being a perfect appraiser and all of those things, yes.
10 Q   First of all, did anyone at that meeting say to you
11 you have to be a perfect appraiser?
12 A   In effect, that is what they said.
13 Q   That is not my question, Mr. English.
14 A   They never said--
15 Q   Hang on. My question is very simple. Did anyone at
16 the meeting say you have to be a perfect appraiser?
17 A   They never used those words, Mike.
18 Q   Did they ever use words other than that to indicate
19 that you had to be a perfect appraiser?
20 A   Yes.
21 Q   What did they say to you?
22 A   They listed all of the requirements of an appraiser
23 IV and said that you must do all of these things.
24 Q   When you were an appraiser II, were there certain
25 requirements?

Page 218

1  A   Yes.
2  Q   Did you have to meet all of those requirements?
3  A   I'm not sure that I met all of the requirements of an
4  appraiser II or an appraiser III. I may not have been
5  asked to do some of the things that an appraiser II did or
6  an appraiser III did. So I may not have met all of those
7  requirements.
8  Q   Would you agree with me that as an appraiser II there
9  are certain requirements?
10 A   Yes.
11 Q   As you testified, you don't know one way or the other
12 whether you met those requirements, correct?
13 A   If I met all of them perfectly as we are talking
14 about?
15 Q   Yes.
16 A   I don't know that I could have.
17 Q   Do you know if you met all of the requirements of an
18 appraiser II?
19 A   I don't-- if you are asking me the question if I met
20 all of the requirements, I'm not sure I fully understand
21 the question. In the context of the conversation, because
22 we are talking about whether or not someone can do it
23 perfectly or not or whether or not they can do everything
24 that is spelled out A, B, C, and D, if they can do or they
25 did do all of those things. I cannot say for sure that I

Page 219

1  can or did all of those things.
2  Q   Mr. English, if you don't understand one of my
3  questions, you just have to tell me I don't understand
4  your question. Okay?
5  A   Okay.
6  Q   Appraiser II has certain requirements, correct?
7  A   Yes.
8  Q   And those requirements, they may be, I'm just using
9  as an example, from one through ten. Okay?
10 A   Okay.
11 Q   And with regard to the requirements of an appraiser
12 II, you don't know if you met all of those requirements that
13 were necessary for an appraiser II, is that your
14 testimony?
15 A   My testimony is that if there is requirements one
16 through ten and I only did one through eight because I was
17 never asked to do nine and ten, then I guess I didn't meet
18 all of the requirements of an appraiser II.
19 Q   Okay. But with regard to the requirements that you
20 were asked to meet-- strike that. With regard to the
21 requirements that you were asked to meet as an appraiser
22 II, is it your testimony that you met those requirements?
23 A   To the best of my ability, I did everything that they
24 asked me to do.
25 Q   And likewise, as an appraiser III, that has certain

Page 220

1  requirements, correct?
2  A   Correct.
3  Q   And with regard to the requirements that you were
4  requested to do, do you know if you met those
5  requirements?
6  A   To the best of my ability, I did everything they
7  asked me to do.
8  Q   And with regard to things being to the best of your
9  ability, if you meet the expectations, you would have met
10 the requirements, correct?
11 A   It depends if the expectations are reasonable or not.
12 Q   Did anyone at the City tell you while you were an
13 appraiser II that as far as the expectations, that you had
14 to do things that were above meeting the expectations?
15 A   Yes.
16 Q   And what types of things were you told that had to be
17 above meeting the expectations?
18 A   Maybe I misunderstood the question. They were asking
19 me to do things that were above the expectations of an
20 appraiser II. So I didn't understand the question. I'm
21 sorry, Mike.
22 Q   That's okay. That is fine. With regard to the
23 requirements, and we are using an example of one through
24 ten, but whether or not you were asked to do all ten
25 things that an appraiser II has to do, of the things that

34 (Pages 217 to 220)

10-4-2005                                          PHILIP ENGLISH

Page 221

1  you were required to do, did anyone ever tell you that, of
2  the requirements that you were asked to do, that it had to
3  be anything more than meeting the expectations in a
4  certain area?
5  A   Did they ever ask me if I had to do something more
6  than those expectations?
7  Q   Let's go back.  You were given job performance
8  evaluations or reviews, correct?
9  A   Yes.
10 Q   And were you ever told that with regard to your
11 performance evaluations or reviews, that in terms of
12 meeting your job requirements, that it's not good enough
13 to just meet the expectations.  What we expect from you,
14 Phil English, is that it has to go beyond meeting the
15 expectations?
16 A   No.
17 Q   And would that be the same with regard to when you
18 were an appraiser III, that you had certain requirements
19 of the things that you were asked to do, that it was
20 acceptable to meet the expectations, that Phil English was
21 not required to go beyond simply meeting expectations in
22 whatever you were required to do?
23 A   When I was an appraiser, at that time I was assigned
24 a particular area to work in.  And the work that was given
25 to me to complete in an annual cycle was more than the

Page 222

1  work that could be done in an annual cycle.  In that
2  regard, they didn't say here is an appraiser III
3  requirement, that you must meet that, or they never said
4  you have to exceed that.  But the work that they gave me
5  exceeded that.  So it's kind of-- you know, they are
6  giving you work that would exceed those, not just the
7  requirements but your ability to successfully complete it.
8  Q   And were you told with regard to a performance
9  evaluation when you were an appraiser III that it was not
10 acceptable for you to meet the requirements but that in
11 fact had to be, only as to you, something greater than
12 meeting the requirements or meeting the expectations?
13 A   I was never told that I had to only meet or-- I was
14 never told I had to exceed it.  But the workload that I
15 was given would clearly exceed those expectations.
16 Q   As an appraiser IV, were you told by anyone at the
17 City that it was not acceptable for you to simply, again,
18 meet whatever expectations there were of you with regard
19 to any jobs or requirements that you were requested to do
20 but that in fact you had to exceed the expectations?
21 A   No.
22 Q   With regard to the three areas that you considered to
23 be a threat at that November 2002 meeting, working for Bob
24 Magota, being transferred to Kapolei, being assisted to go
25 to an outside jurisdiction, did anyone tell you that that

Page 223

1  was related to your having informed anyone at the City
2  that Chris Graff was doing outside work for Gary Kurokawa?
3  A   In that meeting, they wouldn't allow that question to
4  be asked.
5  Q   The question was, did anyone ever tell you?  I wasn't
6  limiting it to that meeting.  Did anyone ever tell you
7  that that is why those three things that you considered to
8  be a threat, that they were all related to the fact that
9  you had informed someone that Chris Graff was performing
10 outside work on City time?
11 A   Did they tell me they were making a threat against
12 those things?
13 Q   Did anyone ever say to you the reason that we are
14 giving those options to you of working for Bob Magota,
15 going to work in Kapolei, assisting you in moving to an
16 outside jurisdiction, was because you had informed people
17 at the City that someone was doing outside work on City
18 time?
19 A   Did they specifically use those words?
20 Q   Did anyone ever tell you words to that effect.
21 A   In a meeting with Gary and Waylen and Ann, Gary used
22 the words, "Let's start new.  Let's forget about
23 everything before."  Gary used the types of words that
24 said, "Phil, I'm the one, if it wasn't for me, you would
25 not have this job," something to that effect.

Page 224

1      I attempted to ask the question about whether or not
2  this was associated, and I was forcefully told you cannot
3  ask that question.
4  Q   And that was by your union agent, correct?
5  A   Gary--
6  Q   No.  That was your by your union agent, Waylen Toma,
7  correct?
8  A   At that time, I didn't feel that he was representing
9  me.  So if you are asking me if he is my union agent, I
10 wasn't sure that he was acting on my behalf.
11 Q   That is not my question.  My question was, you were
12 forcibly physically restrained, based on your testimony,
13 from asking a question by Waylen Toma, correct?
14 A   Waylen put his arm across my chest--
15 Q   Mr. English, would you just answer my question.  It
16 would make this process go a lot faster.
17 A   Waylen put his arm across my chest--
18 Q   Hang on.  I simply asked, was it Waylen Toma who had
19 physically forcefully prevented you from speaking?  Yes or
20 no?
21      MR. MOSELEY:  I have got to interpose an
22 objection.  The form of the question is such that I don't
23 think-- are you asking him if he physically prevented him,
24 like put his hand over his mouth, prevented him from
25 speaking physically?  I mean, your question could be

35 (Pages 221 to 224)

Page 225

1   interpreted that way.
2   Q    (By Mr. Lorusso)  Let met ask it this way, Mr.
3   English.  You are talking about, and you used the words
4   that you were physically prevented from asking a question
5   at the meeting, correct?
6   A    That is what I'm trying to explain so you understand.
7   Q    Mr. English, please just listen to my question.  You
8   said that you were physically stopped from asking a
9   question, correct?
10  A    What I said was Waylen put his hand across in front
11  of me like this (gesturing) to prevent--
12       MR. WONG:  Let the record reflect that the
13  witness is using two arms to his right.
14       THE WITNESS:  In front of me in a motion.  He
15  didn't grab me.  He didn't physically restrain me, I think
16  you said.  But he put his arms across me in front of me
17  and said, "We are not going to ask those questions?"
18  Q    (By Mr. Lorusso)  And the person who did that, which
19  was my question, was Waylen Toma, correct?
20  A    You asked me if he was my--
21  Q    Mr. English, listen to my question.  And the person
22  who did was Waylen Toma, correct?
23  A    Yes.
24  Q    And did Waylen Toma actually put his hand on you?
25  A    No, he did not.

Page 226

1   Q    So when you say it was across your chest, it was in
2   front of your chest, correct?
3   A    That's correct.
4   Q    That is all I was asking, Mr. English, that it was
5   Waylen Toma.
6   A    But my answer was that I didn't know if he was acting
7   as my agent at that time.
8   Q    And that wasn't my question.  And while you were in
9   the meeting, did you say to him, you know what, Waylen or
10  Mr. Toma, I don't know if you are acting as my agent.  I'm
11  out of here?
12  A    No, I didn't because I didn't know what was going
13  on.  I was observing as I was sitting there somewhat in
14  awe of the things that were being said and the activity
15  that was going on.
16  Q    Mr. English, Gary Kurokawa said to you, "Let's start
17  ne"?
18  A    Right.
19  Q    And you interpreted that to mean that he was talking
20  about your having made allegations that Chris Graff was
21  doing outside work on City time, correct?
22  A    Gary said, "Let's start fresh and let's forget about
23  everything that happened before."  And he said it
24  forcefully enough that I think I understood what he was
25  talking about.

Page 227

1   Q    Is it let's starts fresh or let's start new, which
2   one is it?
3   A    I think he said let's start fresh.
4   Q    Now, when he said let's start fresh, you interpreted
5   that to mean that because you had made allegations about
6   someone doing outside work on City time, that that's what
7   Gary Kurokawa was talking about, correct?
8   A    In the context of what he said, let's start fresh or
9   new, whatever it was, that in the context of it, he said
10  let's forget about everything that happened before, I
11  absolutely understood what Gary was talking about.
12  Q    When Mr. Kurokawa said let's start fresh, and your
13  testimony now, let's start new and forget everything that
14  happened before, you interpreted that to mean that he was
15  referring to Chris Graff doing outside work and which you
16  had informed others at the City about, correct?
17  A    That Chris Graff was doing work for Gary Kurokawa,
18  yes.
19  Q    And when Gary Kurokawa said you would not have your
20  job but for Gary, did he also interpret that to be mean
21  because you had made others aware that Chris Graff was
22  doing outside work for Gary on City time?
23  A    I believe that Gary was indicating to me that perhaps
24  I owed him something, and that is how I took it.  That is
25  what he said and that is how I took it.

Page 228

1   Q    And so it wasn't the way I first said it in the first
2   part of my question.  It was your interpretation that you
3   just gave.  That you felt that when Gary Kurokawa said you
4   would not have the job but for Gary, that he was saying to
5   you, what you interpreted to mean, you owed Gary Kurokawa
6   something, correct?
7   A    That is correct.
8   Q    Was there anything else that was said in that meeting
9   that you interpreted to mean that the reason you were
10  being told certain information was because you had
11  informed others at the City that Chris Graff was doing
12  outside work on City time for Gary Kurokawa other than
13  what you have already testified to?
14  A    I can't remember anything at this time.
15  Q    Are there any documents or anything else to help
16  refresh your memory?
17  A    I am sure I have some written notes from the meeting.
18  I'm sure I wrote to Dwight Ishigura about the meeting and
19  perhaps there is some other things in those documents.
20  But I don't recall at the time, at the moment.
21  Q    By the way, if you feel or an employee feels that the
22  union agent is not properly or adequately representing
23  them, is there a grievance process for that?
24  A    I have no idea.
25  Q    Did you ever look into that?

10-4-2005                                   PHILIP ENGLISH

Page 229

1  A   No, I didn't.  At that time, I wasn't really feeling
2  confident about the union and I certainly wasn't feeling
3  confident about the City & County, at least with the Real
4  Property Assessment Division at that time.
5  Q   With regard to the prior meetings that you had been
6  referring to, that there had been meetings between Gary
7  Kurokawa and Waylen Toma, was there anyone else that you
8  knew that was also involved in those meetings before your
9  November 2002 meeting?
10  A   I know now.  At the time, I didn't know about it.
11  Ann Gima would be the other person.
12  Q   In terms of what you know, that is based on reviewing
13  documents that have been produced in this lawsuit?
14  A   That's right.
15  Q   And with regard to those documents, any particular
16  document that, as you sit here today that you are aware
17  of, that says there is a deal being made or references
18  that you would work for Bob Magota, that you would be
19  moved to Kapolei or that an accommodation would be made
20  for you to go to an outside jurisdiction?
21  A   I don't know of any written document that describes
22  those things.  I do know, though, that there is a written
23  note that talks about this probation isn't going to go
24  forward because human resources isn't going to buy it,
25  something to that effect, and that Waylen has come up with

Page 230

1  this other idea that we can put this guy on a special
2  probation.  And this is all happening in September and
3  October when I'm on what I believe to be a performance
4  review.  It's all happening prior to this meeting where
5  Gary is saying let's start fresh or new and these types of
6  things.  They were already planning on putting me on a
7  special probation.
8  Q   With regard to this statement let's start fresh or
9  new, that, in your mind, was not referring to any part of
10  your job performance up to that point in time, is that
11  correct?
12  A   In my view, Gary was being very clear.  In the
13  context of his conversation, he was saying let's start
14  fresh and new.  Let's forget about everything that
15  happened before.  And he went on to say, "We could have
16  made things worse for you.  We could have found other
17  things."
18      So in the context of the whole conversation, I don't
19  think-- I couldn't take it any other way.  I will just say
20  that.  I understood, I believe, very clearly what Gary was
21  talking about.
22  Q   Which is what you have already testified to, correct?
23  A   That's correct.
24  Q   And in terms of could have made things worse for you,
25  did you have an understanding of what that meant?

Page 231

1  A   Well, he said they could have put worse things on my
2  performance review, that they could go back and double
3  check all of my work and, you know-- I don't know what
4  they were getting at about that.  Pull every piece of paper
5  out and see if I did something wrong.  And then, of
6  course, the other threats of moving me to Kapolei and
7  putting me under Bob Magota and so on.  And then having to
8  work with Ann Gima and make sure that I send emails to her
9  in a nonthreatening-- that I shouldn't say, "Is there
10  anything else you want me to do?"  They were very specific
11  about that, I shouldn't put that on my emails.  And that I
12  had to find some other wording, but that was up to me to
13  figure that out.
14  Q   Again, in your mind, that only had to do with outside
15  work performed by Chris Graff, no other-- nothing else
16  related to your job, correct?
17  A   I believe that meeting was specifically set up to set
18  me up for the special probation coming up.  So they were
19  notifying me, Mike, that I had to live perfectly as an
20  appraiser IV.  And if I didn't, I would be on the special
21  probation, which ultimately could lead to my termination.
22  Q   And as we have already covered, you were never
23  terminated, correct?
24  A   As we already talked about, it was a forced
25  resignation.

Page 232

1  Q   No.  As we already talked about, you had indicated in
2  Exhibit No. 1 that you had voluntarily resigned that you
3  signed under oath, correct?
4  A   Mike, as I indicated in our previous deposition
5  meeting, that was a settlement agreement.  The City
6  basically said we agree to settle with you but only if you
7  quit.  So I don't think, you know, I really-- the choices,
8  my options at that time were very limited and I wasn't
9  really given reasonable choices to make at that time.
10      I was in a very serious way.  I needed financial aid
11  as well as continued medical help.  And I had to make a
12  decision and I made that decision voluntarily.  I agreed
13  to do it, but it was because I didn't have any other
14  option.
15  Q   Again, we have already covered this.  I'm not going
16  to rehash it in terms of that, Mr. English.  And of course
17  the documents speak for itself.
18      With regard to the probation, what was your
19  understanding of the probation, not the special probation
20  but the probation that you were on?
21  A   That I was on an extended probation and that they
22  would continue to monitor the work that I was doing, and
23  if I-- I didn't even know what would happen at the end if
24  I fell short of what they were attempting to do.  But I
25  didn't understand why I was placed on probation to begin

Page 233

1  with. Because as I had meetings with Bob and Ann and
2  meetings again, I told them that I would do everything
3  that they tell me to do, just tell me what it is.
4      For example, I was-- I won't go off. Maybe I'm
5  getting to far afield.
6  Q  Mr. English, as you just testified to with regard to
7  probation, you didn't know what the outcome would be of
8  being on probation, is that correct?
9  A  I didn't understand why I was on probation and I
10 didn't understand ultimately what the outcome would be.
11 Q  And as far as the special probation, was that defined
12 for you?
13 A  Special probation was something I didn't even know
14 about until months later, until I think February maybe or
15 January.
16 Q  Of what year?
17 A  2003.
18 Q  And were you ever placed on special probation?
19 A  After I was on medical leave, I was placed on, I
20 believe that was, special probation.
21 Q  Who told you that was special probation?
22 A  I received a letter in the mail from Bob-- no, from
23 Ivan Lui Kwan, actually, and that letter says that I had
24 substandard work in just about every category except I
25 think using the coping machine and the computer. And the

Page 234

1  result, if I didn't-- I was on medical leave. The result
2  was, if I didn't pass the special probation, which was
3  applied because of substandard performance, that I could
4  be terminated.
5  Q  And with regard to that letter from Ivan Lui Kwan, it
6  specifically references special probation?
7  A  I believe it does. It's a letter informing me of
8  substandard work and I believe it says that you are placed
9  on a special probation and so on.
10 Q  When Waylen Toma had placed his hands in the area
11 across your chest without touching your chest when you
12 started to talk about the outside work, did you in fact
13 stop talking at that time?
14 A  I not only stopped talking but I actually sat back in
15 my chair and my mood actually was what is going on here,
16 what is happening. And as I mentioned, I didn't know if
17 Waylen Toma at that point was actually representing me or
18 if something else was occurring. I had not met with him
19 except one time months before and I didn't really
20 understand what was going on. So I did sit back in my
21 chair and I guess I was wondering what is happening here.
22 Q  And when you say your mood was what is happening
23 here, did you ever say what is happening here or words to
24 that effect?
25 A  I didn't, because I was more in a mode of observation

Page 235

1  than really talking too much partly because, frankly, I
2  couldn't believe what I was hearing.
3  Q  Did you say anything at this meeting other than what
4  you already testified to, that you started to talk, you
5  then stopped? Did you say anything else after that?
6  A  I think there was some communication that, again,
7  Gary said we could have checked your records to see what
8  kind of work you were doing. And I said, "Gary, you can
9  check my record. I have been working. Please check my
10 record."
11     When they told me you cannot write an email to Ann
12 Gima that says "Is there anything else that I can do," I
13 asked them how is it you want me to correspond with her?
14 Can you give me an example of the things that you want me
15 to say?" And they said, "No, we cannot. That is up to
16 you. You got to figure it out." Maybe there was some
17 brief discussion about some examples. But I think they
18 said basically it's up to you and you have to figure it
19 out.
20 Q  In terms of your testimony that you had to follow a
21 certain standard as to when your shift began and when it
22 ended, which was a change from your earlier understanding,
23 did you consider that to be retaliation?
24 A  In the context of everything that was going on and
25 the fact that generally other people weren't being held to

Page 236

1  the same standard with regards to being watched about
2  those things, I felt there was something related to that,
3  yes. It didn't bother me, by the way. If they wanted me
4  to come in at a certain time, I even offered to them, if
5  you want me to log in on my computer when I get in, log
6  out when I leave, just let me know and I will be happy to
7  do it.
8  Q  When you say others not being watched, is it your
9  testimony that others didn't have to account for their
10 time in terms of when they started and ended?
11 A  Not in the same manner that I had to, no.
12 Q  And in the manner that you had to, that was if you
13 were late, you had to deduct time, correct?
14 A  That is one of the things, right.
15 Q  What other way or manner applied to you that didn't
16 apply to anyone else?
17 A  Essentially that I was being watched. Specifically
18 the other people weren't being watched the same way that I
19 was being watched. I was actually warned by one of my
20 fellow workers who told me, "Phil, be careful, you are
21 being watched." I don't know what I had to be careful
22 about, but that is what they told me. And I subsequently
23 corresponded to Ann and I asked her, "Is something going
24 on? Am I being watched? Let me know if I'm doing
25 something wrong because I want to comply with everything

Page 237

1  you ask me to do."
2  Q   What was her response, if any?
3  A   Her response was that I wasn't being watched. And
4  she gave an explanation, because the person that told me I
5  was being watched heard it from Ann, actually. She
6  informed me, she said, "You are being watched. Ann just
7  told me you are being watched."
8       That is why I asked Ann, "Ann, am I being watched?"
9  And Ann says, "No, you are not being watched. I don't know
10 why Julie told you that," other than she said she made
11 some comment and her answer really doesn't make sense in
12 terms of the context of timing and so on. But, you know,
13 that can be figured out by other people.
14      But anyway, she claims that I'm not being watched,
15 that Bob just happened to be going through and checking
16 things or some other explanation. In fact, other
17 employees knew that I was being watched because Ann had
18 told them that I was being watched.
19 Q   Let's start with accounting for time. Is it your
20 testimony that others at the appraisal division did not
21 have to account for their time the way that you did?
22 A   Yes.
23 Q   And that was in the context that you indicated of
24 having time deducted, correct?
25 A   That is one of the issues, right.

Page 238

1  Q   And the second or third issue is what? What other
2  differences were there between yourself and anyone else as
3  far as simply accounting for your time? By that I mean
4  starting and ending time.
5  A   Sure. Lunch hour would be another example. Some
6  people had a lunch hour between 12:00 and 1:00 or 1:00 and
7  2:00, something like that. And by the way, I didn't mind
8  having a lunch hour between 12:00 and 1:00. I don't mind
9  that at all. I was usually at my work eating lunch
10 anyway. But other people didn't have to comply with that.
11 They could take lunch between 12:00 and 2:00, depending on
12 if they left at 12:00, they would be back at 1:00. If they
13 left at 1:00, they could be back at 2:00. It wasn't as
14 rigid for them as it was for me.
15 Q   So if I understand you correctly, and please correct
16 me if I'm wrong, everyone had one hour for lunch, correct?
17 A   I think technically it's 45 minutes, but I think it
18 went about an hour.
19 Q   There is a set time for lunch, correct?
20 A   Correct.
21 Q   In that set time, whether it's 45 minutes or one
22 hour, that applied across the board to everyone, right?
23 A   Right, they had a set time.
24 Q   And when a person could take that set time, whether
25 it's 45 minutes or one hour, what you are testifying to is

Page 239

1  that you were limited, that it had to start at 12:00 and
2  you had to be back at 12:45 or 1:00 o'clock, whatever the
3  amount of time was, whereas others could take it either
4  beginning at 12:00 or they could take it at 12:30 or they
5  could start at 1:00, is that the difference?
6  A   No, not really. That may be kind of a difference,
7  but really they might leave at 12:00 and come back at 1:30
8  or they might leave at 12:30 and come back at 2:00. There
9  was a great deal of flexibility that people had. They may
10 be making up the time.
11 Q   But you don't know that, correct?
12 A   I don't know that. But most of the people there are
13 honest folks and they want to do the right thing. So if
14 they took extra time here or there, they would maybe try
15 to work a little bit longer, whatever. That is my belief.
16      But what I'm trying to say is, what I observed, there
17 wasn't this rigid 12:00 to 1:00, 1:00 to 2:00 type thing.
18 Q   I just want to find out in terms of the rigid, was it
19 that you were required to start lunch at 12:00 o'clock and
20 no one else was required to start lunch at 12:00, it was
21 just you?
22 A   No. Other people had that requirement. But for me,
23 I was being watched. So that from 12:00 to 1:00 was very
24 rigidly my time. I couldn't deviate in the same manner as
25 other people did, for whatever reason.

Page 240

1  Q   In terms of the deviation, and that is what I'm
2  trying to find out, is it that you, as far as the
3  standards set for you, that whatever the allotted time
4  was, be it 45 minutes or one hour, you, Phil English, were
5  not allowed to go beyond the allotted time whereas others
6  were allowed to go beyond the allotted time, is that what
7  you are saying?
8  A   What I'm saying is, in both cases, people were
9  assigned 12:00 to 1:00, 1:00 to 2:00, whatever it is, but
10 that there was much greater flexibility with other
11 employees where there wasn't with me.
12 Q   And that flexibility was that other people would take
13 more than the allotted time for lunch as well as that they
14 didn't have to start at the time that they were assigned
15 to?
16 A   On occasion, that is correct.
17 Q   And you said that other employees told you that you
18 were being watched, is that correct?
19 A   Yes, that's right.
20 Q   What are the names of these other employees?
21 A   Specifically Julie Tomayori, but also Chris Graff.
22 Q   Anyone else?
23 A   No one else that I can think of.
24      MR. LORUSSO: With that, let's stop and go off
25 the record.
        (At 4:10 p.m., the deposition was adjourned)

CV04-00108                                      ENGLISH v. CITY & COUNTY OF HONOLULU

Page 241

1     I, PHILIP ENGLISH, do hereby certify that I have read
2  the foregoing typewritten pages 135 through 240,
3  inclusive, and corrections, if any, were noted by me; and
4  that same is now a true and correct transcript of my
5  testimony.
6
7     Dated
8
9
10
11
12
13
14  Signed before me this
15  day of          , 2005.
16
17
18
19
20
21
22
23
24
25

Page 242

1  STATE OF HAWAII          )
                            )
2     I, DONNA KOHLS, C.S.R., a Notary Public in and for
3  the State of Hawaii, do hereby certify:
4     That on October 4, 2005, at 10:29 a.m., appeared
5  before me PHILIP E. ENGLISH, the witness whose testimony
6  is contained herein, that prior to being examined, the
7  witness was by me duly sworn; that the proceedings were
8  taken in computerized machine shorthand by me and were
9  reduced to print; that the foregoing represents to the
10  best of my ability, a correct transcript of the
11  proceedings had in the foregoing matter;
12     That the witness, if applicable, was notified through
13  counsel, by mail or by telephone to appear and sign; that
14  if the transcript is not signed, either the reading and
15  signing were waived by the witness and all parties, or the
16  witness failed to appear and the original is therefore
17  kept on file without signature pursuant to Court Rules.
18     I further certify that I am not counsel for any of
19  the parties hereto, nor in any way interested in the
20  outcome of the cause named in the caption.
21     Dated:
22
23
        Donna Kohls, C.S.R., No. 146
24      Notary Public, State of Hawaii
        My commission expires: 7-21-2010
25

10-4-2005                                            PHILIP ENGLISH