

# Transcript of the Testimony of
# **THOMAS UENO**

**Date:** July 26, 2006
**Case No.:** CV04-00108 SOM KSC
**Case:** ENGLISH v. CITY & COUNTY OF HONOLULU

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

EXHIBIT A

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT CIRCUIT
 2                    STATE OF HAWAII
 3                    ---:---
 4   PHILIP E. ENGLISH,        ) CIVIL NO.CV04-00108 SOM KSC
                               )
 5              Plaintiff,     )
                               )
 6        vs.                  ) TRIAL DATE: 10/02/2006
                               )
 7   CITY AND COUNTY OF HONOLULU; )
     GARY T. KUROKAWA;         )
 8   ROBERT O. MAGOTA;         )
     ANN C. GIMA; and          )
 9   GK APPRAISALS, INC.;      )
     JOHN DOES 1-10;           )
10   JANE DOES 1-10;           )
     DOE PARTNERSHIPS;         )
11   DOE CORPORATIONS 1-10;    )
     AND DOE ENTITIES 1-10,    )
12                             )
              Defendants.      )
13   _____)
14
15        DEPOSITION OF THOMAS UENO, C.P.A.
16   Taken on behalf of the Defendant GK Appraisals, Inc., at
17   the law offices of Sumida & Tsuchiyama, Dillingham
18   Transportation Building, 735 Bishop Street, Suite 411,
19   Honolulu, Hawai`i 96813 commencing at 9:05 a.m., on
20   Wednesday, July 26, 2006, pursuant to Notice.
21
22   BEFORE:
              Valerie Mariano, CSR No. 353
23            Notary Public, State of Hawai`i
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:    ROGER S. MOSELEY, ESQ.
                           Moseley Biehl Tsugawa Lau & Muzzi
 4                         Alakea Corporate Tower
                           1100 Alakea Street, 23rd Floor
 5                         Honolulu, Hawai`i 96813
 6
 7   For the Defendant GK Appraisals, Inc.:
                           ANTHONY L. WONG, ESQ.
 8                         Sumida & Tsuchiyama
                           Dillingham Transportation Building
 9                         735 Bishop Street, Suite 411
                           Honolulu, Hawai`i 96813
10
11
     For the Defendants City and County of Honolulu; Gary T.
12   Kurokawa; robert O. Magota; and Ann C. Gima:
                           MICHAEL A. LORUSSO, ESQ.
13                         Kawashima Lorusso & Tom LLP
                           Topa Financial Center
14                         Fort Street Tower
                           745 Fort Street, Suite 500
15                         Honolulu, Hawai`i 96813
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                       INDEX
 2   EXAMINATION BY:                    PAGE
 3   Mr. Wong                       4, 124
     Mr. Lorusso                    62, 125
 4
 5   EXHIBITS FOR IDENTIFICATION:         PAGE
 6   95 - Letter report dated August 15,
        2005 to Roger S. Moseley,
 7      Esquire from Thomas T. Ueno,
        CPA; 21 pages.                  6
 8
     96 - Supplemental letter report
 9      dated July 21, 2006 to Roger
        S. Moseley, Esquire from
10      Thomas T. Ueno, CPA; 4 pages.    6
11   97 - Income Tax Returns.           46
12   98 - Case file of Thomas T. Ueno,
        CPA.                            46
13
     99 - Tax Effect of a One Time
14      Settlement.                    112
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        (Whereupon, disclosure was made available to counsel.)
 2             THOMAS UENO, CPA,
 3   called as a witness on behalf of the Defendant GK
 4   Appraisals, Inc., being first duly sworn, was examined and
 5   testified as follows:
 6             EXAMINATION
 7   BY MR. WONG:
 8   Q.  Can you tell us your full name for the record, please?
 9   A.  It's Thomas T. Ueno, U-E-N-O.
10   Q.  Mr. Ueno, we're here to take your deposition.  Have
11   you had your deposition taken on other occasions?
12   A.  Yes, I have.
13   Q.  About how many times?
14   A.  Twenty, thirty times.
15   Q.  So you're familiar with the procedures we follow; for
16   example, not talking at the same time and so forth?
17   A.  Yes.
18   Q.  And you're also of the understanding that your
19   testimony here today is under oath just like in a courtroom
20   in front of a judge and jury?
21   A.  Yes.
22   Q.  Now can you tell us -- first of all, have you been
23   retained to render any opinions in this case?
24   A.  Yes, I have.
25   Q.  What were you retained to do?
```

1 (Pages 1 to 4)

Page 5

1  A.  I was retained to render opinions as to the damages
2  incurred by Phil English.
3  Q.  When you say "damages incurred," can you be more
4  specific?
5  A.  Well, damages incurred as a result of the -- I guess,
6  the act or the wrongdoing and looking at things such as --
7  well, damages incurred from that, which would be things
8  such as his loss of earnings and benefits and things like
9  that.
10  Q.  Anything else besides that; for example, medical
11  expenses?
12  A.  We did not submit the expenses in this case.
13  Q.  So your opinion is limited to calculating lost wages
14  and lost benefits from Mr. English's job at the City?
15  A.  We looked at the lost wages and related -- yeah, it's
16  the lost wages and the benefits, whatever related, taxes
17  and things like that.
18  Q.  Can you take a look at the two documents in front of
19  you?  One's a letter bearing what appears to be your
20  letterhead dated August 15, 2005.  The other's a letter
21  also bearing your letterhead, appears to be dated
22  July 21st, 2006.  Do you recognize what those are?
23  MR. WONG:  I guess we're off the record while Mr. Ueno
24  is referring to this.
25  (Discussion off the record.)

Page 6

1  MR. WONG:  Okay.  We're back on the record.
2  THE WITNESS:  Yes.
3  Q.  (By Mr. Wong)  What are those, Mr. Ueno?
4  A.  These are reports which I have rendered that contain
5  my opinions on this matter.
6  Q.  Okay.  Are your opinions now final and complete?
7  A.  I believe these are.  The only thing I have done
8  subsequent to this was a computation of taxes, and that was
9  a computation of taxes assuming that there was a onetime
10  payment.
11  Q.  Okay.  Is your entire opinion set forth in those two
12  documents, the letters of August 15th, 2005, and July 21st,
13  2006, aside from what you mentioned, the taxes in
14  connection with a single lump sum payment?
15  A.  I believe they are.
16  Q.  Can we mark those as Exhibits --
17  MR. LORUSSO:  Why don't you say --
18  MR. MOSELEY:  Wait.
19  MR. WONG:  95 and 96, which we believe to be the next
20  in order.  The August 15th can be 95, and the July 21st can
21  be 96.
22  (Deposition Exhibits Number 95 and Number 96 were
23  marked for identification.)
24  MR. WONG:  You're with me on this; right?
25  MR. MOSELEY:  No, sort of an internal bet.

Page 7

1  Tony's a maverick.
2  Q.  (By Mr. Wong)  Did you your opinion include any kind
3  of determination whether any kind of wrong had in fact
4  taken place?
5  A.  No, it did not.
6  Q.  Okay.  Can you tell us what you reviewed in connection
7  with arriving at the opinions set forth in Exhibits 95 and
8  96?
9  A.  Well, the items I reviewed are contained in Attachment
10  A-1, Information Considered.  And it's also contained in
11  the body of the report.  You're gonna see a whole bunch of
12  footnotes.
13  MR. MOSELEY:  It's a reference to Exhibit 95.
14  THE WITNESS:  And for the tax information that we
15  looked at, I've looked at the tax returns for 2005 for
16  Mr. English.
17  Q.  (By Mr. Wong)  Okay.  Looking at Exhibit 95, and more
18  specifically, Attachment A, you have a section called
19  background.
20  UNIDENTIFIED WOMAN:  Mr. English is here.
21  MR. MOSELEY:  Oh, here.
22  UNIDENTIFIED WOMAN:  Here you go.
23  MR. ENGLISH:  Okay.  Sorry I'm late.
24  Q.  (By Mr. Wong)  You have a section called background.
25  What's the importance of that section, if any?

Page 8

1  A.  Well, the background merely lays out some of the
2  things to give us an understanding, give the reader an
3  understanding of the matter.  And the -- laid out some of
4  the key -- the key issues as we saw them.
5  Q.  You mentioned under background that Mr. English has 25
6  years' experience in the real estate appraisal field.
7  A.  That's correct.
8  Q.  Is that statement of any importance in your ultimate
9  conclusion?
10  A.  Of any importance?  Well, the fact that he has -- you
11  know, he's an experienced appraiser.  That's -- that's what
12  we're saying.
13  Q.  How did that play into your ultimate conclusion?
14  A.  In the ultimate conclusion?  Well, the fact that he's
15  an experienced appraiser means that not only does he have
16  the experience, but probably has the expertise in that
17  area to be able to -- you know, to gain that many years and
18  work that many years in that field.
19  Q.  You know what kind of success he had in that field?
20  A.  I've seen some of the tax returns -- in fact, I was
21  just given that yesterday -- of his -- his company, and
22  seemed to have done very well.
23  Q.  Is that Philip English & Associates?
24  A.  That's correct.
25  Q.  What years were you given the tax returns for that

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 9

1  company?
2  A.  Says here 1993 'til 2004.
3      MR. MOSELEY:  I think 97 is missing, too.  This is
4  the -- just for the record, this is the recent conveyance
5  made of those documents, Tony.  And in addition to these
6  documents, Tom has in a separate folder -- I think in front
7  of you -- all of the other documents that he reviewed in
8  connection with his report.  I don't know if you want to
9  make copies of those or what.
10     MR. LORUSSO:  I do.
11     For the record, I would ask that the documents that
12 Mr. Ueno just referenced in the one binder with regard to
13 Mr. English's tax returns for the years that were noted as
14 well as the binder that is in front of him with regard to
15 any documents he may have used in preparation of his
16 report --
17     THE WITNESS:  Sure.
18     MR. LORUSSO:  -- be made part of the record.
19     MR. MOSELEY:  I have no objection to that, and
20 actually, that's why we brought them, if you want to do
21 that.
22     MR. WONG:  Do you want to have the taxes years 1993 to
23 2004 with 1997 missing be attached as Exhibit 97?
24     MR. LORUSSO:  Yeah.  Yes.
25     THE WITNESS:  You're gonna label it as 98 then?  That

Page 10

1  what you want to do?
2      MR. WONG:  And then the mass of other records,
3  Exhibit 98.
4      MR. LORUSSO:  Yes.
5      THE WITNESS:  Okay.
6      MR. LORUSSO:  Thank you.
7  Q.  (By Mr. Wong)  Having reviewed Mr. English's tax
8  returns for the years 1993 through the years 2004, with
9  1997 missing, did that change your opinions in any way?
10 A.  No, it did not.
11 Q.  You mentioned in your report under background that
12 Mr. English was president of Philip English & Associates,
13 Inc.  What's the significance of that to your ultimate
14 conclusion?
15 A.  That he directed it.  He was president of it.  He's
16 the chief officer in that organization.
17 Q.  And what's the importance of that?
18 A.  Well, it shows that he certainly has the ability to
19 lead a company in terms of not only doing the business from
20 the technical side but also administratively, things like
21 training people, getting work, marketing, the
22 administration side.
23 Q.  What do you know about the profitability or lack of
24 profitability of Philip English & Associates?
25 A.  Well, it made some money.  It, you know, started off

Page 11

1  with a bang.  It started off very well.  Then it petered
2  out.
3  Q.  When you say "petered out," what do you mean?
4  A.  It -- you know, the volume of business dropped.
5  Q.  Do you know what the volume of business in terms of
6  gross revenue was in 1993?
7  A.  Yes, I do.
8      The gross business as reported on the tax return is
9  $429,000.
10 Q.  And in 1994?
11 A.  In 1994 is $249,000.
12 Q.  And 1995?
13 A.  1995 is $71,000.
14 Q.  And 1996?
15 A.  Let's see.  Now in 19 -- 1996 I don't know.  And the
16 reason is that in the 1996 return, although it's under
17 Philip English & Associates -- the business activity has
18 changed, and we have commission sales in there now.  Okay.
19 Q.  Of what amount?
20 A.  I don't know.
21 Q.  How about 1997?
22 A.  I do not have a return for 1997.
23 Q.  '98?
24 A.  In 1998 the -- I guess a request was made from the
25 Internal Revenue Service for the returns, and it does not

Page 12

1  show the gross amounts.  It's just showing me the adjusted
2  gross income, and AGI at that stage was $130,000.
3  Q.  Looking at 1996, doesn't it show 19,000 in revenue?
4  A.  It does.  And this shows 19,000 in revenue, but I'm
5  not sure what the source is.
6  Q.  Okay.  But compared to 71,000 in '95, '96 is 19,000;
7  correct?
8  A.  Well, that's what I'm saying, that you're correct that
9  the gross sales numbers -- one is 71,000 in 1995; and there
10 was 19,000 in 1996.  All I'm saying is that the business
11 activity has changed from appraisal to commission sales.
12 Q.  Okay.
13 A.  That's all I'm saying.
14 Q.  Is it fair to say over those years from 1993 to 1996
15 the revenue of Philip English & Associates did nothing but
16 go down --
17 A.  The revenue went down.
18 Q.  -- and did not go up during any of those years?
19 A.  The revenue went down in all those years.
20 Q.  Do you know whether Mr. English was supported from any
21 other source during those years; for example, by his wife?
22 A.  Well, this -- these are the tax returns of Philip
23 English & Associates, so they would not show, you know,
24 income from his wife's his personal income.  Okay.  That's
25 up until 1996.  Is that your question?

3 (Pages 9 to 12)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 13

1  Q.  Yes.  I was asking if you knew whether he had any
2  income support from any other sources?
3  A.  What I'm saying is that these income tax returns are
4  income tax returns of Philip English & Associates, so they
5  would not reflect that.
6  Q.  So the answer is no?
7  A.  That's correct.
8  Q.  Do you know anything about Mr. English's prior
9  employment before Philip English & Associates, where he
10 worked?
11 A.  Yes, I do.
12 Q.  Tell me in summary form what you know about that.
13 A.  Well, that he had worked with that First Nationwide
14 Bank and First Interstate Mortgage.
15 Q.  Do you know how long he worked at First Nationwide
16 Bank?
17 A.  I'm not sure.  First Nationwide Bank, approximately
18 two years.
19 Q.  Do you know anything about the circumstances of his
20 departure from that company?
21 A.  No, I don't.
22 Q.  For all you know, he could have been fired?
23 A.  I -- I don't know, so, you know, I have --
24 Q.  No idea?
25 A.  No, no idea.

Page 14

1  Q.  How about First Interstate Mortgage, do you know how
2  long he worked there?
3  A.  About seven years.
4  Q.  You know anything about the circumstances of his
5  departure from that company?
6  A.  Excuse me.  Maybe I can -- I just read this thing.  It
7  says that the reasons for leaving was start own business,
8  and that's the same as for First Nationwide Bank.
9  Q.  And that information is solely derived from Philip
10 English?
11 A.  I guess it is.
12     MR. LORUSSO:  If I can interject, Mr. Ueno, what is it
13 that you just read or you're referring to that provided
14 your last -- the statement that you just testified to?
15     THE WITNESS:  This apparently is part of the
16 application sheets that goes into the City, I guess.  And
17 so this is a record of all of his employment history.
18 Q.  (By Mr. Wong) It's an employment application for the
19 City.
20 A.  I believe it's -- it must be part of that.
21 Q.  So aside from that information on the application
22 derived from Mr. English, for all you know, he could have
23 been fired from First Interstate Mortgage?
24 A.  Well, that's -- well, I don't know.  I'm just saying
25 the reasons that's stated is start his own business.

Page 15

1  Q.  When you, in the background section, mention that
2  Mr. English's corporation employed 12 appraisers and staff,
3  what's the significance of that statement, if any?
4  A.  Well, the significance is that he was -- well, he had
5  a group of about a dozen people, and he managed them.
6  Q.  Does that mean 12 of -- does that mean 12 appraisers
7  plus staff or 12 including appraiser and staff?
8  A.  I had -- I had -- when we asked Mr. English about this
9  and he said he had 12 appraisers and staff, I assumed that
10 there were 12 appraisers and staff combined.
11 Q.  Was that in some kind of a personal interview with
12 Mr. English?
13 A.  Yes, it is.  We talked to him about this.
14 Q.  When you say 12 appraisers and staff, do you know how
15 that figure was distributed over the time of Philip English
16 & Associates doing business?  For example, did it start
17 with 12 and end with 12; start with 12, dwindle to one;
18 start with one, go up to 12; or some other combination, if
19 you know at all?
20 A.  Okay.
21 Q.  The record reflects that you're referring to
22 Mr. English's tax returns or, actually, the tax returns of
23 Philip English & Associates which we've marked as
24 Exhibit --
25     MR. MOSELEY:  97.

Page 16

1      MR. WONG:  97.
2      THE WITNESS:  Well, when you look at the income tax
3  returns, you look for salaries and wages.  In 1993 it's
4  202,000.  And then in 1994 it's 96,000.  So what I can tell
5  you is that it decreased, you know, by a little more than
6  half.
7      MR. WONG:  Okay.
8      THE WITNESS:  Okay.
9  Q.  (By Mr. Wong) What do you infer from that?
10 A.  That staff decreased by -- you know, proportionately.
11 Q.  About half.
12     How about 1995?
13 A.  In 1995 we show no staff.  We show no salaries and
14 wages.
15 Q.  So what do you infer from that?
16 A.  Well, that there was no salaries and wages.  That's
17 all I can tell you.
18 Q.  And therefore, no employees in 1995?
19 A.  That's correct, no -- no paid employees.
20 Q.  What do you infer about the success of a company that
21 goes from 202,000 in wages in 1993 to zero wages in 1995?
22     MR. MOSELEY:  I got to object.  You know, this is not
23 an opinion that has been offered by Mr. Ueno in this case.
24     You can answer, Tom.
25     THE WITNESS:  Okay.  In 1993 his ordinary income was

4  (Pages 13 to 16)

Page 17

1  8,000 -- $8,000. In 1994 he had a loss of $6,000. In 1995
2  he has a profit of $7,800.
3  Q.  (By Mr. Wong) Okay. Can you infer that the staff, if
4  it ever had 12, went from 12 to zero from the years 1993 to
5  1995?
6  A.  Again, I -- I don't know. All I'm saying is that it
7  just shows that the wages, the salaries, went from
8  two-hundred-some-odd-thousand and is showing none in 1995.
9  Q.  Okay. So again, what's the significance of your
10  mentioning that Mr. English's corporation employed 12
11  appraisers and staff?
12  A.  Okay. I think, as I said, that it shows that he was
13  able to, I guess, direct, you know, people and to, you
14  know, operate a company.
15  Q.  Why is that?
16  A.  Why is that? Because he had that many people.
17  Q.  Does it impact upon your inference there that the
18  wages went from 202,000 in 1993 to zero in 1995?
19  A.  I don't understand your question.
20  Q.  Well, you said the fact that he had 12 appraisers and
21  staff means he can manage that many people.
22  A.  That's correct.
23  Q.  Superimpose upon that the apparently undisputed fact
24  that the wages of that company paid to employees went from
25  202,000 in 1993 to zero in 1995.

Page 18

1  A.  That's correct.
2  Q.  Being that whatever number of employees that he ever
3  had, he had none in 1995.
4  A.  That's correct.
5  Q.  Does that affect your inference that he was able to
6  manage 12 people successfully?
7      MR. MOSELEY: I've got to object. I think that
8  misstates the testimony. I don't think his testimony was
9  that he was able to mismanage -- or manage people -- 12
10  people successfully. I think he said he was able to manage
11  12 people.
12      MR. WONG: You started to say "mismanage."
13      MR. MOSELEY: Because that was your inference, Tony.
14  I thought I'd help you out there.
15      THE WITNESS: Okay. Let me say that the fact that
16  he's able to manage his payroll, okay, with a declining
17  business I think explains that he's able to manage a
18  business well.
19  Q.  (By Mr. Wong) Do you believe Mr. English's skill in
20  managing Philip English & Associates is any indication of
21  the success he might enjoy in public service, more
22  specifically, at the City and county?
23  A.  His skill? Well, you know, based on my experiences
24  and work that I've done, you know, the skills that I've
25  gained through learning, from managing my group and

Page 19

1  everything else, has certainly helped me to manage my own
2  company.
3  Q.  Okay. Well, I'm asking more specifically about Philip
4  English. Do you think that the skills reflected in
5  managing his own company are any indication of the success
6  he would have enjoyed at the City and county?
7  A.  You know, we don't -- I don't get into that area.
8  That's not my area of expertise in terms of determining --
9  you know, assessing skills, okay, and to get into that. I
10  can only relate to you what my experiences are.
11  Q.  So in arriving at your ultimate conclusion in terms of
12  lost earnings and benefits, are you saying you did not take
13  into account at all Mr. English's skill levels?
14  A.  Would I take into account his skill levels? No, we
15  just took it as a fact that he had these skills.
16  Q.  You assumed he had a certain level of skill?
17  A.  Well, we -- again, what we've done is we've looked at
18  his experience, and he has experience, you know, in
19  managing a company and in the appraisal business. That was
20  what he did.
21  Q.  What level of skill did you assume in coming to your
22  ultimate conclusion?
23  A.  What level of skill? Let's see. I guess the level of
24  skill is not based on what, you know, we determine because
25  we don't determine that. I can tell you that by looking at

Page 20

1  the evaluations that he had or looking at the test scores
2  that he had with the City --
3  Q.  Let me stop you there. You said you don't determine
4  that. You mean you didn't make any determination of what
5  skill level Mr. English has --
6  A.  That's --
7  Q.  -- in trying to predict his future income?
8  A.  We do not make any assessment as to his skill levels.
9  Q.  None whatsoever?
10  A.  We do not do an independent assessment, no.
11  Q.  You don't do an independent assessment. Do you do any
12  other kind of assessment of his skill level?
13  A.  Well, we read, read what we have in front of us, and
14  whatever that states or -- you know, that's what we take.
15  We don't, you know, determine -- we don't check it out to
16  see whether that's right or wrong.
17  Q.  What do you mean, you take what's in front of you?
18  A.  As I was saying, that we look at his background; for
19  example, the records that we looked at earlier which you
20  had asked me about in terms of his background. We looked
21  at the -- the test scores, for example, the evaluations
22  that he had gotten through the City. And we look at the --
23  his applications, what the City said about him, and just
24  accepted that, and we moved -- we moved with that.
25  Q.  Okay. So do you or do you not project any level of

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 21

1  skill from that material?
2  A.  We do not use that to make an assessment of his
3  skills.
4  Q.  Why do you look at it then?
5  A.  Why do we look at it.  Well, we look at it to gain
6  understanding of what he does and, you know, to gain an
7  understanding that he's an appraiser, that he obviously,
8  you know, was -- is -- what I'm saying -- maybe what I'm
9  looking at is I'm looking at to see from the standpoint of
10  was it consistent with what the various things that
11  happened to him over the period of time with the City.
12  Q.  Are you aware of any other employment besides what's
13  mentioned on that employment application you referred to
14  earlier?  For example, are you aware of any employment at
15  any hardware stores?
16  A.  Yes, I am.
17  Q.  What can you tell me about that?
18  A.  Very little.  I've read the report by Dirk von
19  Guenther.  Excuse me.  And he mentioned, I think,
20  City Mill.
21  Q.  And what do you know about Mr. English's employment at
22  City Mill?
23  A.  Not very much.
24  Q.  Do you know anything about the circumstances of his
25  departure from employment at City Mill?

Page 22

1  A.  No, I don't.
2  Q.  When you had your personal interview with Mr. English,
3  did you discuss with him at all his employment at
4  City Mill?
5  A.  I don't recall.  I don't recall talking about that.
6  Q.  How about any other employment that Mr. English had?
7  A.  You mean all the other things?
8  Q.  Well, besides what we've mentioned so far.
9  A.  I think I saw one at some restaurant.
10  Q.  What restaurant was that?
11  A.  I don't recall.
12  Q.  Do you know when he was employed at the restaurant?
13  A.  I do, but I don't have it offhand.  It's -- I have his
14  W-2s from that; that's why.
15  Q.  Do you remember what restaurant it was?
16  A.  No, I don't.
17  Q.  Do you want to look for it quickly and see if you can
18  find it?
19  A.  W-2.  I know I have a W-2 on that, and I just don't
20  know where it is.
21  Q.  That's all right.  We can move on for now.  Perhaps --
22  A.  Okay.
23  Q.  -- we can return to that later if you come across it.
24  A.  Okay.
25  Q.  Do you know anything about Mr. English working for

Page 23

1  Electrolux?
2  A.  No.
3  Q.  Did you even know that he worked for Electrolux?
4  A.  No.
5  Q.  And accordingly, you wouldn't know how long he worked
6  for Electrolux or the circumstances of his termination from
7  Electrolux?
8  A.  That's right.
9  Q.  Would it affect your ultimate opinion, say, if the
10  subject of your calculations had an erratic or sporadic job
11  history versus someone who had held the same job for years
12  and years and years?
13  A.  Would it affect it?  Maybe you can give me an example
14  what you --
15  Q.  Well, my question isn't all that specific.  I'm just
16  talking generally.  Is there any scenario where someone's
17  job history perhaps being less consistent or more spotty
18  versus someone who's job history is very consistent, been
19  with the same employer for a number of years --
20  A.  Hmm.
21  Q.  -- is there any scenario where that would affect your
22  calculation?
23      MR. MOSELEY:  I've got to object.  You're being kind
24  of vague.  You mean with respect to the specific opinions
25  that he rendered in this case?

Page 24

1      MR. WONG:  No, just generally in terms of the
2  methodology you follow.
3      MR. MOSELEY:  With respect to kinds of opinions he
4  rendered in this case?
5      MR. WONG:  Right, with respect to calculation of
6  future income stream.
7      THE WITNESS:  Well, if he had not worked, you know,
8  previously and had no working experience in the appraisal
9  area, had not gotten his education in that area and learned
10  about it, and saying that he's doing a brand new job, okay,
11  that certainly would impact, you know, our -- what we would
12  do in terms of where he starts and various things like
13  that.
14  Q.  (By Mr. Wong)  That's one extreme, someone who has
15  little or no experience in the field.
16  A.  Well, then the methodology basically remains the same as to
17  how we go about doing the calculations.  The -- but it's
18  the assumptions that may differ.
19  Q.  Correct.  And you're giving me a hypothetical that
20  someone who has little or no experience or training in a
21  particular field.  How would that affect your assumptions?
22  A.  Well, number of years of schooling and
23  that -- those things get into play.  Perhaps work life
24  would not be as long, you know, in any particular segment.
25  This again is based on various studies.  Things like that

6  (Pages 21 to 24)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 25

1  would happen.
2  Q.  Now take the other extreme, someone who's been in the
3  same job for 20 or 30 years with a steady history of
4  increases and promotions.  How does that affect your
5  opinions or the assumptions upon which you base those
6  opinions?
7  A.  Yeah, again, the methodology remains the same as to
8  how we do the calculations, but the assumptions do change.
9  And the assumptions -- I guess in this case when we see
10  that he has a steady work history in the same field
11  indicates that, you know, the -- he would continue in that
12  field.
13  Q.  So taking my hypothetical where someone's in the same
14  job and the same field with steady increases and promotions
15  for 20 or 30 years, you would have a higher degree of
16  confidence that your assumptions would be correct in the
17  future; is that accurate?
18  A.  Not necessarily.  Okay.  What we -- that alone is not
19  sufficient to make that statement.  I think that what
20  you're looking at is you're looking at the total picture.
21  Okay.
22  Q.  What else?
23  A.  What else do you look at?  Besides -- no, the total
24  picture is what you look at.
25  Q.  Okay.  The job history I just described, would that

Page 26

1  impinge on your assumptions at all?
2  A.  Well, job history, we'll certainly consider that.
3  We'll also look at things happening more -- you know, more
4  recently.
5  Q.  Is it fair to say that the hypothetical job history I
6  described where someone's in the same field for 20 or 30
7  years with increases and promotions -- would that give you
8  a higher degree of confidence in your assumptions about the
9  future stream of income or not?
10  A.  See, and -- you know, I hate to give an answer like
11  this.  Really the answer is it depends.  When you say
12  "future stream," it's -- where?  If it's, you know, based
13  on his past and he's gonna be in the same position going
14  into the future, it certainly is a basis for us to, you
15  know -- to form our assumption.
16  Q.  What's the method you used to form your assumptions
17  upon which you base your ultimate conclusions?
18  A.  The method that we used is -- first of all, we -- we
19  talk to the attorney, and he's given us certain information
20  about the -- the person.  We talked to Mr. English.  We
21  looked at the various documents.  And that helps us form
22  our assumptions.
23  Q.  Is there any known or tested rate of error for this
24  method whereby you form your assumptions upon which you
25  base your ultimate conclusion?

Page 27

1  A.  You know, I'm not sure whether there have been studies
2  as to the --
3  Q.  Accuracy of assumptions from that method?
4  A.  Well, not the accuracy of the assumptions, but as to
5  the rate of error.  This is -- the methodology that we use
6  is one that's commonly used.  You know, it's published and
7  everything else.  It's commonly used by CPAs in doing our
8  work in this particular area.  I have not seen --
9  Q.  Are you referring to the method of drawing assumptions
10  from materials given to you by attorneys and from the
11  subject --
12  A.  That's correct.
13  Q.  -- and the records provided to you?
14  A.  That's correct.
15  Q.  But there's no known rate of error for those
16  assumptions drawn from those sources?
17  A.  Well, it's a -- again, it's a commonly used
18  methodology.  It's something that's --
19  Q.  Right.
20  A.  -- you know, taught to us in school --
21  Q.  But my --
22  A.  -- on how to do it.
23  Q.  -- question is, is there any known rate of error?
24  A.  And my answer to you is I don't know.
25        MR. MOSELEY:  Tony, at this point I would like to make

Page 28

1  the record clear that the information provided by me to
2  Mr. Ueno is the information in that book.  It's not like
3  there were two different sets of information.  That -- he's
4  brought that information with him today.  That's the
5  information on which he relied to make his assumptions that
6  he plugged into his formula to do the calculations.
7  Q.  (By Mr. Wong)  This method that you're using, can it
8  be tested?  And if so, how?
9  A.  Hmm.  Well, the answer is yes, it can be tested.  You
10  can -- and the method of testing it is just to eliminate
11  some of the things that we looked at.  You can eliminate
12  the documents, for example, and you can see whether you can
13  come up with the same assumptions.  Okay.  I don't -- I
14  don't know of any tests that have been done.  This is --
15  again, this is a commonly used -- you know, we use it in
16  auditing.  Okay.  In all of the other work that we do, we
17  use this methodology as to how we actually get our
18  information on which we rely upon.
19  Q.  Well, what we're talking about here is trying to
20  project a future income based on whatever kind of method it
21  is you're following.
22  A.  That's not the question you asked me.
23  Q.  I'm sorry.  Let me ask you that question.
24        In terms of trying to project a future income --
25  A.  Uh-huh.

7  (Pages 25 to 28)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 29

1  Q.  -- from materials such as you have in front of you,
2  has the accuracy of the method you're following been tested
3  to determine if it --
4  A.  Well --
5  Q.  -- can predict the future?
6  A.  -- as -- has it been tested?
7  Q.  Yes.
8  A.  I don't know of any tests, specific tests that have
9  been done on the methodology.  The methodology
10  incorporates, you know, sound specific methods, okay, such
11  as present valuing, such as looking at historical
12  information, okay, and using -- and again, on the
13  assumptions, all the sources that we mentioned.  Okay.  It
14  incorporates all of that.  I don't know of any specific
15  tests that have been made on this methodology.  It's
16  commonly used.  It's accepted by the courts.  You know,
17  we've testified using this methodology many, many times.
18  It's published.
19  Q.  Okay.  For example, you're not aware of any studies, I
20  take it, where people have done projections such as the one
21  you've done here and then later on as the future evolves
22  compared the projections to what actually transpires?
23  A.  I'm not aware of any of those type of studies.
24  Q.  You said that this method that you're following has been
25  been published.

Page 30

1  A.  Yes, it has been.
2  Q.  Can you tell me what articles and by whom?
3  A.  It's under the -- we call it the Practitioners -- call
4  it PPC.  Okay.  It's a -- a service that we subscribe to.
5  It's probably -- it's used -- widely used by CPAs.
6  Q.  Who's the author of this publication that you're
7  referring to?
8  A.  I don't know.  It's publish -- Publishers Clearing
9  House, publisher.
10  Q.  How many times has the method -- how many times has
11  the method that you're using been published?
12  A.  Probably thousands and thousands of times.
13  Q.  You say "probably."  But how about insofar as your
14  personal knowledge goes, how many times has it been
15  published?
16  A.  All I remember -- well, I don't know.  All I can say
17  is thousands and thousands of times because it's been in
18  existence for years and years and years.  And it's
19  something that is widely used by CPAs all over the country.
20  So that's all I can tell you.  I don't know what their --
21  you know, the number of their sales are.
22  Q.  Okay.  Well, I don't mean to disparage your
23  profession, but let me just put it this way:  One could say
24  that voodoo's been in existence for thousands of years and
25  been used a lot, but that doesn't necessarily mean it's

Page 31

1  reliable or accurate.  What I'm specifically asking you is
2  how many publications are you aware of evaluating the
3  system that you're using?  Not speculation about how many
4  times it probably has, but how many times you actually
5  know?
6  A.  That this methodology has been used?
7  Q.  That it's been subject to peer review in publication.
8    MR. MOSELEY:  I object.  What is peer review?  What
9  are you talking about?
10  Q.  (By Mr. Wong)  Mr. Ueno, do you have any understanding
11  what peer review means?
12  A.  I assume what you're talking about is as it applies to
13  CPAs?
14  Q.  As it applies to the field that you work in.
15  A.  That's correct.
16  Q.  Your area of expertise.
17  A.  That's correct.
18  Q.  Okay.  What does it mean to you?
19  A.  Reviewed by your peers.
20  Q.  Okay.  Using that definition, do you know if the
21  method you're using to project Mr. English's future income
22  has been subjected to peer review?
23  A.  It has been reviewed by the American Institute of
24  CPAs; that's correct.
25  Q.  Any other bodies that have reviewed it?

Page 32

1  A.  I don't know.
2  Q.  Do you know the date of publication for the peer
3  review that you refer to?
4  A.  No, I don't.
5  Q.  Do you know where it was published?
6  A.  I don't know.  Well, where it probably -- when you
7  look at the American Institute, you know, they're out of
8  New Jersey.
9  Q.  Well, now you say "probably."  Do you know, or are you
10  speculating where it was published?
11  A.  No, well, I'm saying that if you're looking at the
12  American Institute of CPAs, their head office is in
13  New Jersey.
14  Q.  Let me rephrase my question.
15    Do you know what publication the peer review you're
16  referring to was published in?
17  A.  No, I don't.
18  Q.  Do you know how many pages it was?
19  A.  No, I don't.
20  Q.  Do you know what the conclusion of the peer review
21  you're referring to was?
22  A.  I know that the -- I have not read the peer reviews.
23  Okay.
24  Q.  Okay.  So any conclusion or understanding you might
25  have isn't firsthand as far as what the conclusion of the

8  (Pages 29 to 32)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 33

1  peer review was?
2  A.  That's correct.
3  Q.  Do you know what the most successful year that Philip
4  English ever had was in terms of income to him?
5  A.  No, I don't.
6  Q.  Of the information you have available to you, what was
7  the most successful year that Philip English ever had in
8  terms of income to him?
9  A.  I -- I don't know.
10  Q.  Well, you do have information regarding his income
11  from 1993 up to -- is it 2000 -- 2004.  Of that information
12  there, what's the most successful year that he's had in
13  terms of income?
14  A.  Again, my answer is I don't know because the income
15  tax returns are the income tax returns of Philip English &
16  Associates.  And then we get that mixed together with his
17  personal returns, you know, from the IRS, so that's why I
18  don't know.
19  Q.  Based on the information you have, what's the most
20  successful year he had?
21  A.  Well, if I -- if I look -- okay.  When you say "he,"
22  who do you mean?
23  Q.  Mr. English.
24  A.  Okay.  It doesn't tell me that.
25  Q.  So based upon the information you have, you have no

Page 34

1  idea what his best year was in terms of income to him?  Is
2  that an accurate statement?
3  A.  Income to him from what source?
4  Q.  From any source.
5  A.  His best year?  For all his years?  I don't know.  I
6  don't have information on all of his years, so that's why I
7  can't tell you what his best year was.
8  Q.  Okay.  And my question most recently was, in terms of
9  the years for which you do have information, you are
10  similarly unable to tell us what his best year was in terms
11  of income to him; is that correct?
12  A.  No.  I'm saying that if you look at, for example,
13  1998, there's $130,000 of income.
14  Q.  Okay.
15  A.  Okay.  That's a pretty good year.
16  Q.  Do you know if that's his income or his wife's income
17  A.  That's why I said I don't know.
18  Q.  Okay.  Do you know how much money his wife was making
19  in 1998?
20  A.  I do not have that information in this, with these
21  returns.
22  Q.  Did you review Mr. English's divorce records?
23  A.  I don't recall.
24      Excuse me.  You asked me about the information on the
25  restaurant.  We have here Thai Restaurant, Inc. in 2001.

Page 35

1  Q.  Is that for Mr. English?
2  A.  Well, it's with his tax return, so I assume it is.
3  Q.  And that is -- can we get a reference for that?
4  A.  First name -- no, maybe it's not.  It's Sathiporn S.
5  English.
6  Q.  You're referring to page what?
7  A.  98.  So this would be page 100.  I take it back.  It's
8  for the -- employee's name is Sathiporn English.
9  Q.  So that's page 100 of --
10  A.  Right.
11  Q.  -- Exhibit --
12  A.  Ooh, I don't know.
13  Q.  -- 90 --
14  A.  Whatever this was, the tax returns.
15      MR. MOSELEY:  97.
16      MR. WONG:  97.
17      THE WITNESS:  Yeah.  That shows for -- that's for his
18  wife.
19  Q.  (By Mr. Wong)  So contrary to your earlier testimony,
20  the restaurant documentation was for Mr. English's wife and
21  not for him?
22  A.  That's wife; that's correct.
23  Q.  Turning back to your report, Exhibit 95, the
24  August 15th letter --
25  A.  Yes.

Page 36

1  Q.  -- you say, I do not believe that Mr. English is able
2  to return to his usual and customary duties in the same
3  workplace either full-time or part-time, quoting
4  Dr. Kennedy there.  How did that affect your assumptions or
5  your ultimate conclusion?
6  A.  Well, it affected it from the standpoint that we
7  accepted his mitigated earnings.
8  Q.  Well, did you assume from Dr. Kennedy's statement that
9  he would not return to any kind of employment as an
10  appraiser or just not return to employment in the Real
11  Property Assessment Division of the City and County, or did
12  you assume something else from that?
13  A.  We assumed something else from that.
14  Q.  What did you assume?
15  A.  We assumed that his mitigated earnings was his
16  mitigated earnings.
17  Q.  What do you mean by that?
18  A.  That what he earned was what he got.  That's what he
19  would be getting in the future also.
20  Q.  So you're assuming that Mr. English will work as a
21  security guard for the rest of his life working one day a
22  week; is that true?
23  A.  Basically -- well, a little bit more than one -- he
24  would be working as a security guard, a little bit more
25  than one day a week though.

9  (Pages 33 to 36)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 37

1  Q.  How many days per week?
2  A.  Gee, I don't -- I don't have the exact number on that
3  because we used his 2005.  This is the report subsequent to
4  this, our July 21st report.  We then used a 2005 tax
5  return, and that had a higher number in there.
6  Q.  Working as a security guard?
7  A.  Yes, it is.
8  Q.  Now do you have any -- let me rephrase my question.
9     What's the basis for your assumption that he will
10  never work at anything other than a security guard for the
11  rest of his life?  Is there any medical opinion to that
12  effect or medical records stating that?
13  A.  Well, basically, we read the -- I guess the reports
14  from Mr. Ken -- Dr. Kennedy.  Okay.  And we looked at his
15  W-2s, and that's what it's based on.
16  Q.  So if we depose Dr. Kennedy and she says, I don't
17  think he needs to work as a security guard for the rest of
18  his life.  I just meant he couldn't go back to work at the
19  City and County.  He can work as an appraiser someplace
20  else, how would that affect your ultimate conclusions?
21  A.  Well, I guess if you -- this is a hypothetical.  On a
22  hypothetical basis, if you've gotten that opinion from
23  Dr. Kennedy, and you also have a voc rehab specialist or
24  whatever that says that, you know, he can perform these,
25  this type of work, and he actually then gets that type of

Page 38

1  work, it may affect our mitigation calculation.
2  Q.  In what way?
3  A.  By the wages that he would get from that work.
4  Q.  How would that affect your ultimate conclusion?
5  A.  Well, it would increase the mitigation earnings.
6  Q.  And how would it affect your ultimate conclusion?
7  A.  Well, if it changes the mitigation earnings, it
8  changes our conclusion.  It may go up or down depending on
9  what he earns from that mitigation earnings.
10  Q.  If he in fact were to go back to work as an appraiser,
11  although not at the Real Property Division of the City and
12  County, how would that affect your ultimate conclusion?
13  A.  Okay.  It's more than one "if."  You're saying that if
14  he went back as an appraiser and he -- it depends how much
15  he earned.  If he -- if he got paid more, then the
16  mitigation earnings would increase; and therefore, the
17  amount of damages would decrease.  If he earned less, then
18  the mitigation earnings would decrease, and the amount of
19  the damage would increase.
20  Q.  Did you do any calculations for what your ultimate
21  conclusion would be if Mr. English returned to work as an
22  appraiser?
23  A.  No, we did not.
24  Q.  So if in fact he were to return to work as an
25  appraiser, the ultimate conclusions contained in your

Page 39

1  reports would be affected how?
2  A.  Again, it's the same answer.  Okay.  It's not only him
3  returning as an appraiser, it's ultimately how much he gets
4  paid and how much he earns in that position.
5  Q.  Did you --
6  A.  If he -- again, if he makes -- does well in that
7  position and makes more money, it would increase the
8  mitigation earnings and, therefore, decrease the amount of
9  damages.  If, on the other hand, he gets in that position
10  and earns less, then it would increase his damages.
11  Q.  And I take it you didn't do any calculations for those
12  other scenarios where he would earn more or less?
13  A.  Those are purely hypotheticals that we have not made
14  that type of calculations.
15  Q.  The only calculation you made was assuming that he
16  would work as a security guard at the same wage level that
17  he reflected in his 2005 tax returns?
18  A.  That's correct.  The calculation we made was based on
19  the facts that we had.
20  Q.  Did you review a report by Dr. Sbordone?
21  A.  Yes, I did.
22  Q.  Dr. Sbordone thinks -- seems to think that Mr. English
23  will return to work --
24     MR. MOSELEY:  I've got to object.  That's misstating
25  the conclusion of Dr. Sbordone, and I think it's

Page 40

1  inappropriate to misstate that conclusion at this point.
2  You can misstate that in argument if you want.
3  Q.  (By Mr. Wong)  Mr. Ueno, did you -- do you have a copy
4  of Dr. Sbordone's report?
5  A.  I have one that's stamped here received November 2nd,
6  2005, if that is the report.
7  Q.  What's the conclusion of that report in terms of
8  Mr. English returning to work?
9  A.  Well, there's a whole bunch of conclusions that he
10  has, and I can't articulate all of them.  I know one of
11  them it says that he made those assumptions about
12  Mr. English, and he says, assuming that this is accurate,
13  Mr. English should be compensated for the emotional pain
14  and suffering he experienced which he claims lead to
15  serious financial and marital difficulties.
16  Q.  Did you take Dr. Sbordone's opinions into account in
17  formulating your assumptions underlying your reports?
18  A.  Formulating our assumptions?  I guess we read
19  everybody's, you know -- all the studies that were done
20  that we have available to us.  We've read those.
21     MR. MOSELEY:  I know this is a late objection, but
22  I've got to interpose it.  In a sense you are unclear on
23  the timing of the report that you're referring to.  The
24  earlier report that he did is plainly before the Sbordone
25  report.  The later report is plainly afterwards.  I don't

10  (Pages 37 to 40)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 41

1  know which report are you referring to.
2  Q.  (By Mr. Wong)  Did you take Dr. Sbordone's opinions
3  into account in any of your reports?
4  A.  Well, obviously it wasn't taken into account in the
5  initial report that we issued on August 15th, 2005 because
6  that report was received later.  We have seen this report,
7  and I can tell you that the information, you know, doesn't
8  change our opinions.
9  Q.  It's not mentioned in the July 21st, 2006 report.  Why
10  is that?
11  A.  Because it didn't change our opinions.
12  Q.  How do you decide which reports or medical opinions to
13  quote in your reports?  For example, you do quote Reneau
14  Kennedy, but you do not quote any portion of Dr. Sbordone's
15  report.
16  A.  Well, I guess the main reason is that when we did the
17  report in August of 2005, we had Dr. Kennedy's report.
18  Q.  But in July of 2006 you did have Dr. Sbordone's
19  report, and you don't mention it at all there.  What -- how
20  did you decide to quote --
21  A.  Not to mention --
22  Q.  -- Dr. Kennedy but not Dr. Sbordone?
23  A.  Okay.  Again, what we did is -- the purpose of the
24  August 2005 report sets forth all of our opinions.  In the
25  2006, what we're doing here is we're making some technical

Page 42

1  corrections to our report, and we're updating it for new
2  information that came available for the 2005 tax return.
3  Q.  But again, my question is, why don't you mention
4  Dr. Sbordone's report at all?
5  A.  Again, because it didn't affect us.
6  Q.  How do you decide whether or not it affects your
7  assumptions or affects your opinions?
8  A.  How do I?  From my professional judgment.
9  Q.  What was it about your professional judgment that made
10  you decide to rely on Dr. Kennedy versus Dr. Sbordone?
11  A.  Well, basically reading the -- that conclusion which I
12  just read to you earlier from Dr. Sbordone and reviewing
13  what Dr. Kennedy had stated, we then -- all we've done is
14  we've followed then -- you know, we said that his
15  mitigating damages were based on the facts of what he's now
16  doing.
17  Q.  If you'll excuse me, I'd like to go over there and
18  point out a part of Dr. Sbordone's report to you.
19  A.  Sure.
20  Q.  You quoted a portion of Dr. Sbordone's report that
21  says if the retaliation claim is in fact in place, he
22  should be compensated.
23      MR. MOSELEY:  I've got to object.  That wasn't the
24  full thing he quoted.  That was --
25  Q.  (By Mr. Wong)  Did you read this part of

Page 43

1  Dr. Sbordone's report that says his ability to engage in
2  competitive employment does not appear to have been
3  compromised?
4  A.  His ability to engage in competitive employment does
5  not appear to have been compromised since he is currently
6  working as a security guard.
7  Q.  And he goes on, I suspect that he will work in this
8  capacity again after the lawsuit is settled, referring to
9  what?
10      MR. MOSELEY:  Let me interpose an objection.  I think
11  you're basically implying --
12      MR. WONG:  You're speaking objection.  Make your
13  objection.
14      MR. MOSELEY:  Okay.  I am making a speaking objection
15  only in the sense that you're misquoting or you're
16  misrepresenting the import of what Dr. Sbordone has
17  written.  Dr. Sbordone does not make -- does not render an
18  opinion in that sentence that you're quoting.  He talks
19  about being cynical, and he says he suspects, but that is
20  not an opinion.  So if you are representing to this witness
21  that that's an opinion of Dr. Sbordone, that's improper.
22  The document speaks for itself.  Mr. Ueno can read the
23  document.
24  Q.  (By Mr. Wong)  Well, Mr. Ueno, can you read that
25  paragraph that you've been -- we've been referring to?

Page 44

1  A.  Okay.  This is from a paragraph on page 47 of 47.  And
2  it is the first paragraph on that page, and it says,
3          His ability to engage in competitive
4      employment does not appear to have been
5      compromised since he is currently working as a
6      security guard.  While he claims that he took
7      this job to avoid people, I am puzzled at why
8      he continues to work at this job when it does
9      not allow him to work full-time or receive
10     medical benefits.  Since he has a real estate
11     appraiser's license and has over 25 years of
12     experience, I have a difficult time
13     understanding why he has not sought work in
14     this area.  His argument that he would have to
15     compromise his integrity to work in this area
16     again makes little sense since he had worked as
17     an appraiser for most of his life.  At the risk
18     of sounding cynical, I suspect that he will
19     work in this capacity again after his lawsuit
20     is settled.
21  Q.  What do you gather from that paragraph in terms of
22  Dr. Sbordone's opinion about Mr. English's ability to work
23  as an appraiser in the future?
24  A.  Well --
25      MR. MOSELEY:  I've got to object.  You're calling for

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 45

1  speculation.
2      THE WITNESS: Okay. First of all, we do not offer
3  opinions in this area at all. This is something beyond our
4  area of expertise. We are the -- computing the damages
5  here. All I can tell you is what he said. And, you know,
6  he's -- he says that it has appeared to be compromised. He
7  says he's puzzled as to why he continues to work, that he
8  has a difficult time understanding why he has not sought
9  work elsewhere. And he says his argument makes little
10  sense to him and that he suspects that he will work again
11  as an appraiser.
12  Q.  (By Mr. Wong) And again, my question is, what do you
13  gather Dr. Sbordone's opinion to be as far as what Mr. --
14  whether Mr. English will work as an appraiser again in the
15  future?
16  A.  Well, he's saying that -- he's saying that he guesses
17  that he probably will work as an appraiser. That's his
18  guess.
19  Q.  If he says it's not a guess but it's an opinion, would
20  that change your assumptions underlying your report?
21  A.  That's not what he's saying. He's saying that, you
22  know, he's puzzled; that, you know -- and he says I suspect
23  that that's what he's -- I'm only saying you told me to
24  read, and I'm reading it. To go beyond what I'm reading
25  is -- I don't want to give you an opinion on something that

Page 46

1  I'm not qualified to give an opinion on.
2  Q.  What is it that you're not qualified to give an
3  opinion on?
4  A.  As to whether he is right or wrong.
5  Q.  As to whether he's right or wrong about what?
6  A.  Whether -- to evaluate Dr. Sbordone's ability to
7  render opinions.
8  Q.  So you're not qualified to say whether Dr. Sbordone is
9  right or wrong?
10  A.  That's correct.
11  Q.  Are you similarly not qualified to say whether
12  Dr. Kennedy is right or wrong?
13  A.  That's correct.
14  Q.  You're similarly unable to say whether any of the
15  medical opinions rendered with respect to Mr. English are
16  right or wrong?
17  A.  That's correct.
18      MR. LORUSSO: Can we take a short break?
19      THE WITNESS: That's good.
20      MR. WONG: Sure.
21      (Whereupon, a recess was taken from 10:15 a.m. to
22      10:24 a.m. Deposition Exhibits Number 97 and
23      98 were marked for identification.)
24      MR. WONG: We're back from our break.
25  Q.  (By Mr. Wong) Mr. Ueno, if you could look at page --

Page 47

1  Exhibit 95, again turning to Attachment A, does the nature,
2  quality of the 25 years of experience referenced under
3  background matter at all to you formulating your
4  assumptions or your ultimate opinions in this case?
5  A.  Well, the nature and what he did, you know, gives us a
6  basis for -- part of our basis for performing our
7  assumptions.
8  Q.  Does the quality of that experience matter to you?
9  A.  To me it did because he did the appraisal work and he
10  ran his own company.
11  Q.  So the quality of the 25 years' experience is
12  important to you?
13  A.  As to what he did, yes.
14  Q.  How about as to the expertise with which he did it?
15  A.  I don't know.
16  Q.  You don't know whether it mattered to you or not?
17  A.  No, I know that it matters to me, but I do not have
18  any opinions to his expertise in the manner that he did it.
19  Q.  Okay. For example, I know some lawyers with 25 years
20  of experience are very good, and other lawyers with 25
21  years of experience are very bad. I would expect that that
22  would also apply to appraisers with 25 years of experience.
23  Did you take that into account in formulating your
24  assumptions?
25      MR. MOSELEY: You're being kind of vague and

Page 48

1  ambiguous. Are you asking if he took your opinion into
2  account of his -- when he rendered his opinion?
3  Q.  (By Mr. Wong) Do you understand my question?
4  A.  I guess your question is that does his 25 years of
5  experience, Mr. English's 25 years experience, the quality
6  of that experience -- is that what you're asking about?
7  Q.  Yes.
8  A.  Do we take this into consideration?
9  Q.  Yes.
10  A.  I guess if we knew about, you know, all of those
11  things, I would probably consider it.
12  Q.  But you didn't know, so you didn't; is that correct?
13  A.  I don't know the quality of his experience.
14  Q.  And therefore, you didn't take it into consideration?
15  A.  All I can say is what we took into consideration was
16  what I told you earlier.
17  Q.  Which was what?
18  A.  That he has 25 years of experience in the area of the
19  appraisal as -- as -- in the appraisal field, that he had
20  his own company. He was fairly successful in his company.
21  Q.  And what you didn't know about, you obviously did not
22  take into consideration; correct?
23  A.  That's correct. What we don't know, we don't know.
24  Q.  And you don't know the quality of those 25 years of
25  experience; is that correct?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

Page 49

1  A.  The quality?  Well, all I can -- all I know is what I
2  told you.
3  Q.  Page 2 of Attachment A, the second paragraph under
4  lost earnings, you mentioned -- I'm picking up mid sentence
5  here -- and the fact that he had already been considered
6  qualified for the position by the City in 1999.  How did
7  you intend to use the word qualified as in that sentence
8  within those quote marks?
9  A.  Well, that when he was, I guess, first hired, he had
10 received this letter from the City and County of Honolulu,
11 Roy Amemiya, dated April 28th, 1999, saying he's qualified
12 for the real property assessment administrator position.
13 Q.  Do you have any understanding as to what that means to
14 have, quote, qualified for that position?
15 A.  I just took it for its face value.  It says qualified
16 for our real property assessment administrator position.
17 Q.  Do you have any understanding about what it means to
18 qualify as used within the Real Property Division, City and
19 County of Honolulu?
20 A.  No, I'm just reading it for what it says.  It just
21 says he qualifies for the real property assessment
22 administrator position.  I --
23 Q.  Continuing on under the third paragraph, you say,
24 since his departure from the City, Mr. English has searched
25 for comparable alternative employment with little

Page 50

1  success.  Do you find that portion?
2  A.  Yes.
3  Q.  First, when was his departure from the City?
4  A.  I think we used the date of February 28th, 2003.
5  Q.  Now what comparable alternative employment did he
6  search for?
7  A.  I don't know who he talked to or what he, you know,
8  did in terms of a specific search.
9  Q.  Do you know how many companies or potential employers
10 he contacted?
11 A.  No, I don't.
12 Q.  Do you know what potential employers or companies he
13 contacted?
14 A.  No, I don't.
15 Q.  Do you know what fields he looked in searching for
16 comparable alternative employment?
17 A.  I do not know.
18 Q.  Do you know whether he searched in the private sector
19 or the public sector for comparable alternative employment?
20 A.  I do not know.
21 Q.  Where did you derive the information upon which you
22 base this statement that Mr. English has searched for
23 comparable alternative employment but with little success?
24 A.  I guess the discussions with Mr. English.
25 Q.  From Mr. English himself?  He told you he searched for

Page 51

1  comparable alternative employment but with little success?
2  A.  I believe so.
3  Q.  Can you tell me what he told you?
4  A.  Right what we have stated here.
5  Q.  Do you recall anything more detailed about his
6  statements to you in this regard?
7  A.  No.
8  Q.  Your entire recollection of your conversation with
9  Mr. English about searching for comparable alternative
10 employment is embodied in this paragraph here, that he
11 searched with little success?
12 A.  I believe it is.
13 Q.  Under back pay, at the bottom of the page and
14 continuing on to the top of the next page, page 3, you
15 assumed certain incremental promotions and accompanying
16 increases in pay; is that correct?
17 A.  That's correct.
18 Q.  How did you arrive at your assumptions regarding the
19 date of promotion for each of these increments and the
20 level of promotion?
21 A.  What we did was we looked at what he -- what had
22 happened historically and basically projected the
23 historical pattern.
24 Q.  Do you know how the promotion system works at the City
25 and County Real Property Assessment Division?

Page 52

1  A.  Well, I was gonna complete my answer before you asked
2  your question, if I could; and that is that we looked at
3  historical promotion pattern, and then we basically took a
4  little bit more conservative estimate, and we added in a
5  year.
6  Q.  What do you know about when promotions become
7  available at the Real Property Assessment Division of the
8  City and County of Honolulu?
9  A.  I don't.
10 Q.  Do you know whether the promotions become available
11 based on some kind of timetable or schedule or whether it's
12 based on vacancies as they appear?
13 A.  I don't know.
14 Q.  Did you do any kind of study of the persons holding
15 the jobs to which you're anticipating that Mr. English will
16 be promoted, their age, their expected retirement date, and
17 when their positions might be vacated?
18 A.  No study of the assessment division was made.
19 Q.  Again, moving to the bottom of page 3, you say,
20 Mr. English would receive a retirement package from the
21 City.
22     Do you know how long he'd have to work for the City in
23 order to qualify for the retirement package you're
24 referring to there?
25 A.  I don't recall the specifics of that.

13 (Pages 49 to 52)

Page 53

1   Q.  Do you have any recollection of the generalities of
2   it?
3   A.  No, I'd be guessing.
4   Q.  Did you do any evaluation of how long Mr. English
5   typically held positions in the past versus whether that
6   would meet the minimum requirements of employment with the
7   City to qualify for the retirement package?
8   A.  No, I did not.
9   Q.  Moving on to page 4, you talk about retirement age,
10  and you refer to data from the Bureau of Labor Statistics
11  with a footnote to life work -- Work Life Estimates,
12  Effects of Race and Education.  Why do you mention that?
13  A.  That is a typical source used in the methodology for
14  the compu -- for the estimating of the work life.
15  Q.  And from that you draw the assumption that Mr. English
16  would work another 16.3 years?
17  A.  From it, that's correct.
18  Q.  In arriving at that assumption, did you take into
19  account any of Mr. English's medical history?
20  A.  His specific medical -- the -- okay.  Estimate of the
21  work life in itself looks at people in general, and so
22  people in general have, you know, various ailments or
23  whatever and medical histories and whatever, and all of
24  that is put together, and you come up with an overall
25  estimate.  And so this is an overall estimate that does

Page 54

1   consider some of those.  But if your question is
2   specifically as to himself, no, it's not.
3   Q.  So this figure is basically an average for the
4   population given his age and ethnicity?
5   A.  Age, ethnicity, years of schooling.
6   Q.  If someone had heart disease, severe in nature, would
7   this 16.3 years change for that individual?
8   A.  It may.
9   Q.  Why is that?
10  A.  He might die before then or --
11  Q.  How about if someone had heart disease, was a heavy
12  smoker, and had a history of cancer in the family, would
13  this 16.3 years change for that individual?
14  A.  I don't know.
15  Q.  How about if somebody had a history of -- a specific
16  history of cancer, heart disease, and was a heavy smoker,
17  would this 16.3 years expected work life change for that
18  hypothetical individual?
19  A.  See, you're asking me to give you a medical opinion,
20  and I -- I can't give you one.  I'm not qualified to do
21  that.
22  Q.  Okay.  Moving to Mr. English's specific situation, did
23  you take into account in projecting this 16.3 years of work
24  life that he had a personal history of cancer?
25  A.  We took into account that the -- that the studies

Page 55

1   themselves, okay, take all these things into account on --
2   on average, and so it's the average.  It is the average.
3   Q.  Did you take into account whether Mr. English's
4   personal history of cancer might put him above the
5   average or below the average in terms of work life
6   expectancy?
7   A.  You're asking me for a medical opinion, and we have
8   not rendered one.
9   Q.  How about Mr. English's history of depression and
10  suicide attempts, did you take that into account in
11  determining whether that might place him below or above the
12  average 16.3 years work life expectancy?
13  A.  And again, I say that, you know, these -- these
14  statistics are general in nature, and they take all
15  of these things into account.  Specifically as to
16  Mr. English, that's a medical opinion, and we have not
17  rendered one.
18  Q.  So the answer is no?
19  A.  I'm saying I have not rendered any medical opinions.
20  Q.  You didn't take into account whether his history of
21  suicide and -- suicide attempts and depression might place
22  him above or below the average 16.3 years that you used in
23  this projection?
24  A.  I wouldn't know how to do that, again, because it's a
25  medical opinion, and we don't render one.

Page 56

1   Q.  So the answer is no, you didn't take it into account?
2   A.  Other than what the BLS does in its study where they
3   take all these things in general into account, we have not
4   done anything specifically for Mr. English.
5   Q.  You agree that --
6       MR. LORUSSO:  I'm sorry.  Just for the record, when
7   you referenced BLS, you're talking about the Bureau of
8   Labor Statistics; is that correct?
9       THE WITNESS:  That's correct.
10      MR. LORUSSO:  Thank you.
11      Sorry for interrupting you, counsel.
12  Q.  (By Mr. Wong)  That figure you're using is average,
13  and some people fall well above and well below that average
14  depending on their personal circumstance?
15  A.  That's correct.
16  Q.  Does a history of bankruptcy affect the projected work
17  life expectancy?
18  A.  I don't believe so.
19  Q.  Now I've asked you, you know, individually whether
20  Mr. English's history of cancer and depression and suicide
21  attempts might place him above or below that average 16.3
22  years life expectancy.  How about if I ask you all
23  together, Mr. English's collective history of kidney
24  cancer, depression, and suicide attempts, all together
25  would that place him above or below the average 16.3 years

Page 57

1 work life expectancy?
2 A. And again, I have to tell you that that's a medical
3 opinion, and we don't -- we haven't rendered one.
4 Q. In formulating your opinion, did you take into account
5 Mr. English's change in income between 2004 and 2005?
6 A. Yes, we have.
7 Q. How so?
8 A. We used the 2005 income as his mitigating income.
9 Q. Did you do any kind of analysis of the trend between
10 2004 and 2005?
11 A. No, we did not.
12 Q. Why not?
13 A. Well --
14     MR. MOSELEY: No.
15     THE WITNESS: First thing is that when we did our
16 initial study, which was done on the August 15th, 2005
17 report, we were using a much lower estimate of his hours.
18 We were looking at about 12 hours a week. Then in the --
19 in 2005 we see that his -- he's working more hours, and so
20 we used that as the actual hours going forward.
21 Q. (By Mr. Wong) How did that affect your original
22 opinion?
23 A. Well, it reduces to some extent because it increases
24 mitigated earnings that would reduce the amount of damages.
25 Q. So the change in Mr. English's income between 2004 and

Page 58

1 2005 made the figures set forth in your August 15th, 2005
2 opinion letter unreliable?
3 A. No, it doesn't do that. What it does is that it
4 changes the -- our calculation because one -- because we
5 changed the mitigating earnings and also did -- the
6 mitigating benefits would also be affected.
7 Q. Did you do any kind of trend analysis of Mr. English's
8 lifetime income?
9     MR. MOSELEY: I've got to say that's vague and
10 ambiguous. You mean over those two years or of all the
11 income he earned in his lifetime?
12 Q. (By Mr. Wong) Mr. Ueno, what does lifetime income
13 mean to you?
14 A. Income one earns over his lifetime.
15 Q. Using that definition, did you do any analysis of
16 Mr. English's lifetime income?
17 A. Yes, we have.
18 Q. What was that?
19 A. Well, we looked at it from -- the lifetime that we
20 looked at is basically the period of our damage
21 calculation, and so we carried it from the date of the
22 injury all the way 'til and including the date of death.
23 Q. Oh, you're referring to future projected lifetime
24 income?
25 A. That's correct.

Page 59

1 Q. Did you do any kind of trend analysis of his
2 historical lifetime income?
3 A. Historical lifetime income. Well, that to me is a --
4 is a strange term because you're assuming his life ended
5 when you say "historical." Okay. And I know semantics,
6 but -- so if you're saying we he done -- is your question
7 have we done any analysis of his income up until the date
8 of the termination? Is that your question?
9 Q. Yes. Did you do any kind of income of the trends?
10 A. Trends? And trends, you're talking about doing
11 regression analyses and things like that?
12 Q. What does trends mean to you?
13 A. That's why I'm asking you. Basically when you use the
14 term trends, since you're asking the question -- I'm
15 basically trying to understand the question.
16 Q. Well, what does the word trends mean to you?
17 A. Patterns.
18 Q. Okay. Using that definition.
19 A. Were there any income patterns? I would say no, we
20 haven't, because I don't have all the historical
21 information.
22 Q. Is that at all important in projecting future income?
23 A. Not necessarily.
24 Q. Why is that?
25 A. Because generally when we look at -- we do our

Page 60

1 analyses, we do look at historical information, but the
2 most current information -- the more current information is
3 probably more important to look at.
4 Q. Did you obtain any opinions from any medical doctors
5 about what Mr. English's life expectancy would be given his
6 various health histories and so forth, the history of
7 cancer, the history of depression, the history of suicide
8 attempts?
9 A. I don't believe so. I just don't recall receiving any
10 of those.
11 Q. Did you receive any information from anyone about his
12 expected work life -- expected life expectancy given his
13 medical and psychiatric conditions?
14 A. Other than the information that we used, no.
15 Q. I'm going to change my question a little bit. It's
16 going to sound quite similar. But did you obtain any
17 opinions from any medical doctors or anyone with expertise
18 in the field what Mr. English's work life capacity would be
19 given his various health conditions? And I'm not trying to
20 be comprehensive, but generally I'm referring to the
21 history of cancer, the history of depression, the history
22 of suicide attempts.
23 A. And again, my answer is the same though. Other than
24 what we have in here, we didn't specifically ask for
25 anything.

15 (Pages 57 to 60)

Page 61

1    Q.  Now in response to both sets of questions, you said
2    "except for what we have in here."  Do you have anything in
3    there giving you expected life expectancy or expected work
4    life expectancy taking into account his various health
5    conditions?
6    A.  I guess -- you know, I read all of this stuff, and I
7    don't recall any discussions of that.
8    Q.  Nobody gave a number?
9    A.  I don't recall any discussions of that.
10   Q.  And accordingly, you didn't take any such opinions, if
11   they do exist, into account in your opinions --
12   A.  Well --
13   Q.  -- and reports?
14   A.  -- the only thing -- what we did take into account was
15   the general averages given to us by the BLS.
16   Q.  So with respect to any specific opinions with respect
17   to Mr. English, those were not taken into account in your
18   report; is that correct or not correct?
19   A.  That's -- there were no specific studies that we
20   requested, let me say, medical, in terms of his work life,
21   and so none were taken into account, except for what we --
22   again, except for what's in --
23       MR. WONG:  Okay.  I think I'll turn this over to
24   Mr. Lorusso.  I don't have any more questions right now,
25   but I may have a few follow-ups once he's done.

Page 62

1            EXAMINATION
2    BY MR. LORUSSO:
3    Q.  Good morning, Mr. Ueno.  My name is Michael Lorusso.  I
4    introduced myself --
5    A.  Good morning.
6    Q.  -- to you earlier.  And I do have some follow-up
7    questions as well as some additional questions.
8        Just at the beginning, if there's anything that I ask
9    of you or say to you that you do not understand, will you
10   please stop me and tell me?
11   A.  Yes.
12   Q.  And I would also ask that you not speculate or guess
13   at anything.  Do you understand that?
14   A.  That's correct.
15   Q.  And if you don't know, will you please just tell me
16   you don't know?
17   A.  Yes.
18   Q.  Okay.  And if you cannot recall something, will you
19   please just tell me you cannot recall something?
20   A.  Yes.
21   Q.  Okay.  And as you've indicated at the beginning of the
22   deposition, you've been through this process at least 20 or
23   30 times, you had indicated, I believe?
24   A.  That's correct.
25   Q.  Okay.  And, of course, you understand that you're

Page 63

1    under oath here today; correct?
2    A.  That's correct.
3    Q.  Okay.  Now with regard to -- let me talk about your
4    background first before I get more into some of the
5    opinions that you rendered here today.
6        In terms of your background, you are a certified
7    public accountant; correct?
8    A.  That's correct.
9    Q.  And with regard to your educational background, where
10   did you attend college?
11   A.  I went to University of Hawaii.
12   Q.  And any further education after that?
13   A.  No.
14   Q.  What year did you graduate?
15   A.  Oh, I'm sorry.  The answer is yes, because we're
16   required to obtain our continuing education requirements.
17   Q.  Going back for a moment, as far as the University of
18   Hawaii, what year did you graduate?
19   A.  I have my masters in, I think, 1969 and my
20   undergraduate degree in 1967.
21   Q.  And both from UH?
22   A.  That's correct.
23   Q.  As far as your undergraduate degree, what was it in?
24   A.  Accounting.
25   Q.  And your masters degree?

Page 64

1    A.  Masters in business, M.B.A.
2    Q.  All right.  And as far as your continuing education,
3    how often are you required to take any type of continuing
4    education courses?
5    A.  We're required to take courses -- currently, we're
6    required to have 80 hours every two years.
7    Q.  And have you done that?
8    A.  I've taken probably about 60 hours a year.
9    Q.  So have you met the qualifications that are necessary?
10   A.  Yes, I have.
11   Q.  With regard to a license, you need a license to do
12   accounting work in the state of Hawai`i?
13   A.  That's correct.
14   Q.  And you have such a license; correct?
15   A.  I have a -- I have my CPA license.
16   Q.  Okay.  Has it ever been suspended or revoked?
17   A.  No, it has not.
18   Q.  And are you licensed in any other state other than the
19   state of Hawai`i?
20   A.  Yes, I am.
21   Q.  What other states?
22   A.  California.
23   Q.  Okay.  And when did you receive that license,
24   approximately?
25   A.  Gee.  Two or three years ago.

16  (Pages 61 to 64)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 65

1  Q.  So approximately 2002, 2003, 2004?
2  A.  Yeah, around there.  I don't know exactly.
3  Q.  Any particular reason why you received or obtained a
4  license in California in the last two to three years?
5  A.  Yes.
6  Q.  What is the reason?
7  A.  Well, I was doing some cases.  I was asked to do some
8  cases in California.
9  Q.  With regard to your license that you obtained in
10  Hawai`i, when were you first licensed?
11  A.  Oh.
12  Q.  Approximately.
13  A.  Probably, I'm guessing, 1970.
14  Q.  That's your best estimate; correct?
15  A.  That's my best estimate.
16  Q.  All right.  Now as far as your practice as a CPA,
17  first of all, how many individuals, if any, do you have
18  working at your CPA office?
19  A.  My office now?
20  Q.  Yes.
21  A.  I have a total of four people including myself.
22  Q.  And are the other individuals all licensed CPAs?
23  A.  One is.
24  Q.  And what are the other two?
25  A.  The other two are basically financial analysts.

Page 66

1  Q.  You also have a staff?
2  A.  That is my staff.
3  Q.  Okay.  As far as your work performing CPA duties, is
4  it primarily for businesses, primarily for individuals, or
5  how would you describe your practice?
6  A.  Our practice principally focuses on the forensic
7  accounting and damage analyses.
8  Q.  Can you define forensic accounting and damage
9  analysis?
10  A.  Forensic accounting work involves, I guess, detailed
11  audits of embezzlement situations, fraud situations.  In
12  the damage analyses, we do both commercial damages and
13  damages to individuals.
14  Q.  For how long a period of time have you been doing
15  forensic accounting, approximately?
16  A.  It combines -- forensic accounting and the damage
17  analyses work is combined.  And I've been doing this since
18  1992.
19  Q.  In terms of your practice, how much of your practice
20  is geared toward litigation practice?
21  A.  About 95 percent of that.
22  Q.  And that's since 1982 until the present time?
23  A.  No.  In 1982 I was a partner with Grant Thornton, and
24  I directed its litigation support practice here in Hawai`i.
25  So the percentages are different in terms of --

Page 67

1  Q.  With regards to since you started Thomas T. Ueno,
2  CPA -- that's the name OF your business; correct?
3  A.  That's correct.
4  Q.  And you started that in approximately 1990?
5  A.  That's correct.
6  Q.  From 1990 until the present time, how much of your
7  practice has been with regard to litigation practice?
8  A.  I don't -- over all?  If you're looking at the entire
9  period, at least half.
10  Q.  And with regard to that practice, how much of that
11  practice has been on behalf of plaintiffs; how much has
12  been on behalf of defendants?
13  A.  I think it's about even, half/half.
14  Q.  And you had given as part of Exhibit 95 a
15  representative sample in Attachment C of some reports or
16  deposition testimony that had been prepared within the last
17  four years; is that correct?
18  A.  That's correct.
19  Q.  And was that supposed to be a complete representation
20  of work that you had performed or just a few cases?
21  A.  Oh, it's -- it's supposed to be all of the cases.
22  Q.  Okay.  And with regard to the cases that are listed --
23  and there's approximately -- well, strike that.
24     With regard to the cases that are listed on
25  Attachment C, it's four pages; is that correct?

Page 68

1  A.  That's correct.
2  Q.  All right.  And with regards to those four pages,
3  without going through each and every case, but are you able
4  to say in how many of those cases were on behalf of
5  plaintiffs and how many were on behalf of defendants?
6  A.  Not offhand.
7  Q.  You would have to go through each?
8  A.  But I would say generally it's about half/half.
9  Q.  And with regard to the cases that are listed here,
10  were there any cases at all in which you actually provided
11  trial testimony?
12  A.  Yes, there are.
13  Q.  Okay.  And of those cases, are you able to state which
14  cases?
15  A.  Gee.  We don't have very many trial testimony.  Yes,
16  about eight of them.
17  Q.  And in terms of the eight, were they on behalf of
18  plaintiffs or on behalf of defendants?
19  A.  I don't recall.  Let's see.
20  Q.  Can you just tell me which eight you're referring to,
21  please?
22  A.  Yeah I'm just going through them again.  The first
23  page, Allen Guastavino, okay, that was the plaintiff
24  action.
25     Okay.  I think that Doran v. Au, that was a defendant

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 69

1  action.
2      Finance Enterprise was a plaintiff's action.
3  Q.  What page are you looking at?
4  A.  The second page.
5      Hawaii Microfilm is a defense action.
6      Hilo Fish is a defense action.
7  Q.  Which one?  There's two listed there.
8  A.  Prob -- I don't know which one.  Probably the second.
9      OTM v. State of Hawaii, that is a plaintiff action.
10     Pancakes of Hawaii/Sofos Realty is a plaintiff's
11  action.
12     Ruth Koga v. Standard Sales, that's a plaintiff
13  action.
14     Josselin v. Josselin, I don't know how you define.
15  It's a marital thing.
16  Q.  Who did you testify on behalf of?
17  A.  Of the wife.
18  Q.  And which one was the wife, Jean Marie or Sophronia?
19  A.  Sophie was the wife.
20     That Stanford Carr Development is a defense action.
21     I think that's -- I think, if I recall, that's about
22  it.
23  Q.  With regard to the case that you had just noted where
24  you actually testified at court, were you testifying as an
25  expert?

Page 70

1  A.  Yes, I was.
2  Q.  And in terms of your area of expertise, don't mean to
3  ask you the obvious, but in what area were you qualified as
4  an expert?
5  A.  Finance and accounting.
6  Q.  Any other area?
7  A.  No, I think it's finance and accounting.
8  Q.  Okay.  I just want to ask -- just for example, I'm
9  looking at the first page where you have a case listed, and
10  then you have the court in which the case is listed.  For
11  example, the Duran, et al. v. Aus, et al., you have the
12  civil number, and you have things listed that that's the
13  Second Circuit Court, but was that a federal court case?
14  A.  No, I didn't think so.
15  Q.  Okay.  And the same thing with Dotson v. Roscoe Moss,
16  you have it listed as a First Circuit Court.  Was that a
17  Second Circuit Court?
18  A.  No, that was a personal injury.  This is wrongful
19  death case.
20  Q.  In front of Judge Cardoza?
21  A.  Cardoza; correct.
22  Q.  Okay.  On Maui?
23  A.  Right.
24  Q.  Thank you.  I'll move on from there.
25     Now today you've indicated that you brought with you

Page 71

1  two binders that had been marked as Exhibits 97 and 98;
2  correct?
3  A.  That's correct.
4  Q.  Okay.  Now is -- strike that.
5      Other than the binders that you brought with you
6  today, do you have any other material, whether notes,
7  documents, memos, anything, other than what you've brought
8  with you here today?
9  A.  I do have time sheets and billings.
10  Q.  Okay.  Other than your time sheets, any other notes,
11  documents, papers at all, obviously related to this case?
12  A.  No.
13  Q.  Now when were you first retained in this matter?
14  A.  Let's see.  In July 2005.
15  Q.  And as far as any contact with Mr. Moseley, have you
16  spoken with Mr. Moseley both over the phone and in person
17  with regard to any information about this case?
18  A.  Yes, I have.
19  Q.  Okay.  How many times on the phone; how many times in
20  person?
21  A.  I don't know.
22  Q.  Can you give me an estimate?
23  A.  In total, maybe half a dozen times.
24  Q.  And of that, do you know how many times were on the
25  phone and how many times were in person?

Page 72

1  A.  Phone -- okay.  On phone conversations, maybe about
2  half of those.
3  Q.  With regard to any of the times that you spoke with
4  Mr. Moseley about this case, did you take any notes?
5  A.  We do.  We take notes when we talk about things.
6  Q.  I'm asking if you did, not we.
7  A.  Oh.
8  Q.  Did you take notes with regard to this case when you
9  spoke to Mr. Moseley?
10  A.  Sometimes.
11  Q.  And are those notes here today?
12  A.  I'll transcribe those into my report.  They're
13  basically in my report.
14  Q.  Okay.  But my question was, did you take notes?
15  A.  And my answer is, yes, we do.
16  Q.  Okay.  And where are those notes?
17  A.  No, we just took -- transcribe them to our reports,
18  and that's it.  We don't keep our notes on those kind of
19  stuff.
20  Q.  Okay.  Mr. Ueno, you keep referring to "we."  I'm
21  talking about --
22  A.  I'm sorry.  That's true.
23  Q.  I'm talking about you for right now.
24  A.  I'm sorry.  I'm sorry.
25  Q.  That's all right.

18  (Pages 69 to 72)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 73

1   Now with regard to yourself, you took written notes
2 when you spoke to Mr. Moseley; is that correct?
3 A. I do take some notes.
4 Q. And you did in this case?
5 A. That's correct.
6 Q. And with regard to your notes, is it your testimony
7 that those notes, those handwritten notes, no longer exist?
8 A. See, what I do is I take my notes. I put it down into
9 my computer plus all the things that I remember happened in
10 that discussion, and then that -- that record goes into my
11 report.
12 Q. Okay. But with regard to the notes that you took,
13 what happened to them?
14 A. We don't keep those.
15 Q. Okay. Did you throw out the notes that you had with
16 regard to any discussions that you had with Mr. Moseley?
17 A. We never keep those.
18 Q. Okay. So is your answer --
19 A. I never keep them. I'm sorry.
20 Q. -- yes?
21   So is your answer yes, you threw away the notes that
22 you had with regard to your discussions with Mr. Moseley?
23 A. Once I transcribed them into my computer, okay, which
24 is generally that day, I don't keep those.
25 Q. So you threw them away; correct?

Page 74

1 A. That's correct.
2 Q. Are there any folders, files, anything, any materials
3 back at your office with regard to this case?
4 A. I think this is everything.
5 Q. Okay. I'm not asking if -- quote/unquote, if you
6 think that's everything. Are there any folders, materials
7 that are at your office with regard to this case?
8 A. Other than this? No.
9 Q. When you say "other than this," what you're pointing
10 to is the binder, Exhibit 96; correct?
11 A. That's correct.
12 Q. Or 97; correct?
13 A. 96 and -- no, I'm sorry. 97 and 98.
14 Q. I'm sorry. Just to be clear, with regard to any other
15 materials, do you have any other materials related to this
16 case back at your office?
17 A. Specifically to this case, the answer is no. The
18 reason I say "specifically" is because when --
19 methodologies, for example, and everything else are in
20 separate binders and things.
21 Q. All right. With regard to any conversations that you
22 had with Mr. English, how many times did you meet with
23 Mr. English, first, in person and then also on the phone,
24 if such conversations took place?
25 A. Maybe twice.

Page 75

1 Q. Both times in person?
2 A. Well, once in person, once on the telephone.
3 Q. Okay. And when was the in-person meeting, and when
4 was the telephone conference?
5 A. I do not recall.
6 Q. Do you have any records, notes, anything to indicate
7 when you would have met with Mr. Moseley?
8   MR. MOSELEY: Mr. Moseley?
9   MR. LORUSSO: Thank you.
10 Q. (By Mr. Lorusso) Do you have any notes or materials
11 with regard to when you met with Mr. English?
12   MR. LORUSSO: Thank you, counsel.
13   THE WITNESS: No, I don't have.
14 Q. (By Mr. Lorusso) Did you take notes when you met with
15 Mr. English?
16 A. I do not have notes on those meetings.
17 Q. My question is, did you take notes when you met with
18 Mr. English?
19 A. I don't believe so.
20 Q. How long did you meet with Mr. English when you met
21 with him in person?
22 A. It was done with my staff person, and I think my staff
23 person is the one that personally met with him.
24 Q. Who is your staff person?
25 A. Garret Hoe.

Page 76

1 Q. Can you spell Garret's first name?
2 A. G-A-R-R-E and one T.
3 Q. And Ho, H-O?
4 A. E.
5 Q. And in terms of Mr. Hoe, what is his title at your
6 company?
7 A. Professional, staff.
8 Q. I mean, is he in an administrative position,
9 secretarial position?
10 A. No, professional.
11 Q. What does he do?
12 A. He's -- basically he specializes in doing the damages
13 for individuals. He does also work with us on the -- in
14 everything else that we do in forensics.
15 Q. Now you said that Mr. Hoe met with Mr. English. Were
16 you also present, or was it only Mr. Hoe meeting with
17 Mr. English?
18 A. I believe Mr. -- okay. Mr. Hoe met Mr. English.
19 Q. How many times did Mr. Hoe meet with Mr. English?
20 A. I believe one time.
21 Q. And did Mr. Hoe take notes of his meeting with
22 Mr. English?
23 A. I don't know.
24 Q. Did you ever see any notes or a memorandum indicating
25 this was what was discussed in Mr. Hoe's meeting with

19 (Pages 73 to 76)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 77

1  Mr. English?
2  A.  Other than what is put into our report, no.
3  Q.  With regard to your meeting with Mr. English, did you
4  in fact have an in-person meeting with Mr. English before
5  you wrote your August 15, 2005 report or your July 21, 2006
6  report?
7  A.  Yes.
8  Q.  Okay.  How many times did you meet with Mr. English?
9  A.  Once.
10  Q.  Okay.  And when was that?
11  A.  Several months ago.
12  Q.  And by "several months," what do you mean?
13  A.  Think about three months ago, around there.
14  Q.  So sometime in 2006; correct?
15  A.  I would guess.  Yeah, I would guess.
16  Q.  Sometime in April of 2006?
17  A.  I don't know the specific time.
18  Q.  Okay.  But when you said approximately three months
19  ago --
20  A.  Yeah, it's March, April, May, around that period.
21  Q.  And any particular reason why you met with Mr. English
22  in March, April, May of 2006?
23  A.  We were reviewing the financial damages.
24  Q.  Any other reason?
25  A.  No, that's what I talked about.

Page 78

1  Q.  Did you take any notes?
2  A.  No.
3  Q.  Was it just yourself and Mr. English, or was there
4  someone else present?
5  A.  Someone else was present.
6  Q.  Who else was present?
7  A.  Mr. Moseley was present.
8  Q.  Anyone else?
9  A.  I don't think so.  No.
10  Q.  And approximately how long was that meeting?
11  A.  Hour.
12  Q.  The telephone conversation that you had with
13  Mr. English, approximately when was that?
14  A.  Oh, I don't recall.  I just don't remember.
15  Q.  Okay.  Was it just yourself and Mr. English, or were
16  more individuals on the phone or -- in other words, with a
17  speakerphone?
18  A.  See, we do it both ways; so, you know, I -- I don't
19  know.
20  Q.  Specifically with regard to this case --
21  A.  No.
22  Q.  -- do you have a --
23  A.  I'm sorry.
24  Q.  -- memory of if there was anyone else on the phone
25  other than yourself and Mr. English?

Page 79

1  A.  I don't have a memory of that.
2  Q.  Did you take any notes from that telephone
3  conversation?
4  A.  No.  Other than what we have in our report.
5  Q.  Well, when you say other than what you have in your
6  report, as far as that information that's in your report,
7  as Mr. English was providing you the information, were
8  you -- were you typing things?
9  A.  No.
10  Q.  After you spoke with Mr. English, did you then type
11  something into your report?
12  A.  We generally do that.
13  Q.  Okay.  Is that what you did?
14  A.  That's what I generally do.
15  Q.  Is that what you did in this case?
16  A.  What I said, as it my general practice, so I would
17  assume I did that.
18  Q.  Okay.  I'm not asking you to assume.  I'm not asking
19  you to guess.  What I'd like to know is if you in fact --
20  A.  Okay.
21  Q.  -- followed that procedure in this case.  You have a
22  memory of that?
23  A.  I don't know.
24  Q.  With regards to Exhibit 95, your August 15th, 2005
25  report -- with regard to that report, did Mr. Hoe assist

Page 80

1  you in preparing that report?
2  A.  Yes, he did.
3  Q.  And in terms of assisting you, what did he do with
4  regard to preparing the report?
5  A.  He did the basic research and basically put in all the
6  assumptions that we talked about.
7  Q.  Before Mr. Hoe put in the assumptions, did he speak to
8  you about the assumptions?
9  A.  Oh, yes.
10  Q.  Okay.  And how long did you meet with Mr. Hoe
11  before -- strike that.
12     As far as preparing the August 15th, 2005 report, did
13  you prepare one portion, Mr. Hoe prepare another portion,
14  on the same document, two separate documents?  How was it
15  put together?
16  A.  We generally work on one -- as our practice, we
17  generally work on one document.  I do not break it up.  So
18  we pass the document back and forth among ourselves.
19  Q.  How many meetings did you have with Mr. Hoe before the
20  August 15th, 2005 report was finalized?
21  A.  On this?  I don't have specific number.  We -- it's
22  the way the office is set up.  Like he sits there, and I
23  sit here.  So he just turns around.  We talk about it.
24  Q.  In other words, you're in close proximity to each
25  other.  That's what you're indicating; correct?

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 81

1  A.  Yeah, and there are no walls either, so he can just
2  turn around and talk to me.
3  Q.  Okay.  But do you have a memory with regard to how
4  many times you spoke with Mr. Hoe about the August 15th,
5  2005 report before it was finalized?
6  A.  I don't -- I don't have an exact number of times.
7  Q.  Do you have an estimate?
8  A.  Probably a dozen times at least.
9  Q.  With regard to any assumptions that Mr. Hoe had
10 provided to you, were there any assumptions where you told
11 Mr. Hoe he should or should not use as an assumption?
12 A.  Should or should not.  We -- I questioned some of the
13 basis that was being used, and, you know, I needed to
14 understand just what he was planning to use on those.  That
15 is about it, I think.
16 Q.  When you say you questioned some of the basis, what
17 basis are you referring to?
18 A.  For example, the union contract.
19 Q.  And what about the union contract were you
20 questioning?
21 A.  Oh, I needed to understand what the union contract
22 basically said and what schedules were being used.
23 Q.  And did Mr. Hoe have that information?
24 A.  Well, he got that information.
25 Q.  To your knowledge, where did he get that information

Page 82

1  from?
2  A.  I know that he talked to the union directly, but I'm
3  not sure where he got that information specifically.
4  Q.  And in terms of talking to the union, do you know if
5  there was any particular individual at the union that
6  Mr. Hoe spoke with?
7  A.  I do not know.
8  Q.  Before the August 15th, 2005 report, Exhibit 95, was
9  finalized, was it provided to Mr. English for his review?
10 A.  To Mr. English?
11 Q.  Yes.
12 A.  No.
13 Q.  Before it was finalized, was it provided to
14 Mr. Moseley for his review?
15 A.  I -- before it was finalized, I asked Mr. Moseley to
16 check it for facts, whether my facts were right.
17 Q.  And approximately when did you do that?
18 A.  I do not have a date.  Generally -- I'm not sure what
19 date the 15th is on, like what day of the week it is.  We
20 generally give it about a day or two before it's -- before
21 the report date.
22 Q.  And when you sent it to Mr. Moseley, did he make any
23 changes or corrections or additions to the report?
24 A.  No, he did not.
25 Q.  Did he tell you it was acceptable to him?

Page 83

1  A.  No, he doesn't tell me whether it's acceptable.  All
2  I'm asking him to do is check the facts.  You know, are our
3  facts straight?  Okay.  Because he -- you know, I guess, to
4  me, the attorneys have a much deeper understanding of the
5  facts and everything else.  They probably have more facts
6  than we do.  So I asked him to look at it and tell me, you
7  know, are we straight on these?  Are we okay on these?  And
8  he didn't have any changes.
9  Q.  Then the report was put in the finalized version of
10 the August 15, 2005 report; correct?
11 A.  That's correct.
12 Q.  All right.  Looking at Exhibit 96, which is your
13 July 21, 2006 report, with regard to that report, before it
14 was finalized, did you provide it to Mr. English to review?
15 A.  No.
16 Q.  Before the July 21, 2006 report was finalized, did you
17 provide it to Mr. Moseley to review?
18 A.  No.
19 Q.  And with regard to Exhibit 95 and 96, those are your
20 final opinions with regard to this matter; correct?
21 A.  Other than what we stated related to the onetime tax
22 effect.
23 Q.  Okay.  Now looking at Attachment A-1, Information
24 Considered -- and this is part of Exhibit 95, your August
25 2005 report.

Page 84

1  A.  Yes.
2  Q.  With regard to attachment A-1, it says Information
3  Considered; correct?
4  A.  That's correct.
5  Q.  And with regard to the Information Considered, is the
6  intent of what you have on Attachment A-1 Information
7  Considered supposed to be whatever it is or -- that you had
8  reviewed or gathered information from in order to make your
9  report?
10 A.  Basically we try to, you know, identify it here, and
11 we generally have it also in the body of the report itself,
12 and we do it via footnotes.
13 Q.  In other words, in the body of the report may refer to
14 some of the information that's noted in Attachment A-1;
15 correct?
16 A.  It generally should.  The only reason I say that is as
17 much as we try to keep both, you know, totally in sync,
18 sometimes they get out of sync.
19 Q.  With regard to the Information Considered though, the
20 Information Considered, the intent is to reflect whatever
21 information that had been gathered in order to prepare the
22 report; correct?
23 A.  That is what the intent is.  And I'd like to also say
24 that that is the reason we bring our binder with us,
25 because it has all that information that we relied on and

21 (Pages 81 to 84)

Page 85

1  considered in doing our report.
2  Q. With regard to the Information Considered, there's
3  nothing in the report that indicates that you spoke with
4  Mr. Moseley, correct, in Attachment A-1?
5  A. Let me check that.
6     No, it does not.
7  Q. And there's nothing in the Attachment A-1 Information
8  Considered that you spoke with Mr. English; correct?
9  A. That's correct.
10 Q. And there's nothing to indicate that Mr. Hoe is the
11 individual who spoke with Mr. English; is that correct?
12 A. That's correct.
13 Q. By the way, did Mr. Hoe also speak with Mr. Moseley in
14 terms of gathering any information?
15 A. I believe he did.
16 Q. Okay. Do you know on how many occasions he did?
17 A. No, I don't.
18 Q. Okay. Do you have an estimate?
19 A. No, I don't.
20 Q. Did you ever see any notes or memos or documents from
21 any meetings that Mr. Hoe may have had with Mr. Moseley?
22 A. Other than that which is in our report, no.
23 Q. Okay. When you say other than that which is in the
24 report, you're talking about information that's contained
25 in the report; correct?

Page 86

1  A. That's correct.
2     MR. LORUSSO: And why don't we take a short break.
3     (Whereupon, a recess was taken. From 11:25 a.m. to
4     11:29 a.m.)
5     MR. LORUSSO: Okay. Back on the record.
6     THE WITNESS: Sure.
7  Q. (By Mr. Lorusso) Mr. Ueno, with regard to Exhibit 96,
8  which is your July 2006 report with your updated opinions,
9  you also put in Information Considered on page 2; is that
10 correct?
11 A. Not in here.
12 Q. Excuse me. If I may, right here.
13 A. Oh, okay. Thanks.
14 Q. With regard to the Information Considered, when you
15 did your updated report, you noted that you had reviewed
16 Mr. English's 2005 Hawai`i Income Tax Return; correct?
17 A. That's correct.
18 Q. Was there any other information, documents, materials
19 that you had reviewed before you prepared your July 21,
20 2006 report?
21 A. I believe that's all I considered. I believe that's
22 it.
23 Q. Okay. Well, you just said that's all you considered,
24 but did you review any other documents before preparing the
25 July 21, 2006 report?

Page 87

1     MR. MOSELEY: Objection. That's vague, ambiguous as
2  to time period. How much before?
3  Q. (By Mr. Lorusso) At any time before you prepared the
4  report?
5     MR. MOSELEY: Are you including before the other
6  report as well?
7     MR. LORUSSO: Thank you.
8  Q. (By Mr. Lorusso) Between August 15, 2005 and your
9  July 21, 2006 report, did you review any other documents or
10 materials before drafting your July 21, 2006 report?
11 A. I don't think so.
12 Q. You did indicate that you had reviewed Dr. Sbordone's
13 report; correct?
14 A. That's correct.
15 Q. And you had -- strike that.
16    You had reviewed Dirk von Guenthner's report; is that
17 correct?
18 A. That's correct.
19 Q. And that was between August 15th, 2005 and July 21,
20 2006; correct?
21 A. Yes. I stand corrected.
22 Q. The fact that it's not listed in your report, does
23 that mean that you did not consider those reports with
24 regard to making your opinions set forth in July 21, 2006?
25 A. Well, I read the reports, and I did not consider

Page 88

1  those.
2  Q. Any particular reason why you did not consider those
3  reports?
4  A. I didn't think that it was applicable.
5  Q. Why wasn't it applicable?
6  A. Professionally? Why?
7  Q. Yes.
8  A. I just didn't think it was.
9  Q. Is there a reason why you did not think that -- let's
10 talk about Dr. Sbordone's report -- why you did not think
11 Dr. Sbordone's report was applicable?
12 A. Well, because based on what I've read in his report,
13 you know, I didn't -- I wasn't able to evaluate his
14 conclusions. And when I read his conclusions, you know,
15 they seemed to say that he could do this and he could do
16 that, and that's all. So, you know, it didn't change my
17 mind.
18 Q. But you considered the report; correct?
19 A. From that standpoint; correct.
20 Q. It's not listed in July 21st, 2006 of information you
21 considered; is that correct?
22 A. That's correct.
23 Q. And what you chose to do with regard to the
24 information contained in Dr. Sbordone's report is not to
25 change -- strike that.

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 89

1    With regard to Dr. Sbordone's report, you did not
2  factor in any of his conclusions or opinions in your
3  report; is that correct?
4  A.  That's correct.
5  Q.  And would that be the same for Dirk von Guenthner's
6  report?
7  A.  In terms of factoring into my report?
8  Q.  Correct.
9  A.  I did not factor in his opinions to my report.
10  Q.  Any other materials that you reviewed between
11  August 15, 2005 and July 21, 2006 report?
12    MR. MOSELEY:  Again, that's vague and ambiguous.  Are
13  you -- he's got a binder here of all the stuff he says he's
14  reviewed.  I -- are you saying other than he's presenting
15  you in the binder, or are you wanting him to locate stuff
16  in the binder?
17  Q.  (By Mr. Lorusso)  Well, if there's things in the
18  binder that would assist you in recalling if you did or did
19  not review anything, such as -- you had Dr. Sbordone's
20  report and Dirk von Guenthner's report in the binder;
21  correct?
22  A.  That's correct.
23    MR. MOSELEY:  I would like to request that we have the
24  witness review the binder and look at the dates on those
25  materials item by item if that's what you're -- if that's

Page 90

1  what you want.
2  Q.  (By Mr. Lorusso)  Well, as you sit here, do you recall
3  reviewing any other documents --
4  A.  Okay.
5  Q.  -- other than those two reports?
6  A.  All of the documents that we have and we looked at are
7  contained in this binder and this binder.  So that would be
8  Exhibits 97 and 98.
9  Q.  Okay.  I understand.
10    In terms of documents that you reviewed between your
11  first report and your second report, August 2005 and July
12  2006, as you sit here, do you have a memory of what
13  documents you reviewed in between, other than the ones
14  we've already talked about?  And if you need to look at the
15  binder, please feel free to look at the binder, or binders.
16  A.  Well, the difficulty I have in answering that is, you
17  know, I've looked at everything, again, and so I don't know
18  what I looked at once before or after.  Okay.  And so I can
19  tell you that, you know, these are all the documents.
20  Q.  But you're not sure, other than the two reports --
21  Sbordone, von Guenthner -- of anything else that you
22  reviewed between August 2005 and July 2006; is that
23  correct?
24  A.  There's another one.  Let me bring that.
25  Q.  And, of course, the 2005 tax return.

Page 91

1  A.  Correct.  And there's also a report from Dr. Matthews
2  dated January 25th, 2006.
3  Q.  And did you consider that before you wrote your
4  July 21, 2006 report?
5  A.  I didn't see any changes per se that I -- that would
6  change my opinions.
7  Q.  I didn't ask that.  What I asked was did you review it
8  before -- strike that.
9    Did you consider it before writing your July 21, 2006
10  report?
11  A.  Well, okay.  What -- I read it.  Okay.
12  Q.  And again, as far as Information Considered, that's
13  not listed here in your report; correct?
14  A.  That's correct.
15  Q.  Anything else other than what we've -- you've already
16  testified to?
17  A.  No, I think that's about it.
18  Q.  Now with regard to Mr. English's 2005 Hawai`i Income
19  Tax Return, did you see a 2005 Federal Income Tax Return?
20  A.  No.  I only have a Hawai`i Income Tax Return.
21  Q.  Did you request a Federal Income Tax Return for 2005
22  or for any other year?
23  A.  We normally ask for just income tax returns.  That's a
24  general statement that we -- I normally ask for.
25  Q.  Did you specifically ask for a Federal Income Tax

Page 92

1  Return?
2  A.  No.
3  Q.  Were there any documents that you did request either
4  from Mr. English or Mr. Moseley or his office and you did
5  not receive?
6  A.  I think we got everything we asked for.
7  Q.  So is your answer then there were no documents that
8  you asked for that you did not receive?
9  A.  That's correct.
10  Q.  With regard to your July 21, 2006 report, your
11  opinion is that Mr. English lost wages and benefits in the
12  amount of $989,057; correct?
13  A.  That the -- our opinion is that his lost wages and
14  benefits net of the mitigating damages is 989,057.
15  Q.  In terms of when the time period for that starts,
16  would that -- we look at Exhibit 2 to show the time period
17  of when it starts up until the time period of when it ends
18  in order to calculate that amount?
19  A.  That's correct.
20  Q.  And in terms of when the starting period is, you start
21  at February 28, 2003; is that correct?
22  A.  That's correct.
23  Q.  Why did you pick that date?
24  A.  That was the day after his doctor had advised him to
25  not continue working there.

23  (Pages 89 to 92)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 93

1  Q.  As part of the documents that you reviewed, did you
2  ever review a Compromise, Settlement and Release Agreement,
3  Approval and Order between Mr. English and the City and
4  County of Honolulu Department of Budget and Fiscal
5  Services?
6  A.  I'm not sure exactly what that document is.
7  Q.  I'll show you what it looks like.
8  A.  May I see that, please?
9  Q.  Sure.
10    MR. LORUSSO:  And what I did is I just handed Mr. Ueno
11  the document that I referenced, which is also Exhibit 1 to
12  the master set of exhibits.
13    THE WITNESS:  Yes, I've seen this.
14  Q.  (By Mr. Lorusso)  And so that would be included in
15  your binder; correct?
16  A.  Yes, it is.
17  Q.  And with regard to the Compromise, Settlement and
18  Release Agreement, does that indicate that Mr. English
19  would be receiving benefits up to and including January 31,
20  2004?
21  A.  I need to see that again, if you could point me to
22  that, please?  I don't have it in here.
23  Q.  First of all, let me be clear.  Do you have that, in
24  fact, this document, in your binder, that I showed you?
25  A.  I think I have because I remember seeing it.  I

Page 94

1  remember reading it, so I think I do.
2    Is this the same thing, this Compromise, Settlement
3  and Release Agreement, Approval and Order?
4  Q.  Yes, it is.
5    And with regard, by the way, to that particular
6  document, the Compromise, Settlement and Release Agreement,
7  as far as it being listed on the Attachment A-1 for
8  Exhibit 95, it's not listed there; is that correct?
9  A.  No, it's not.
10  Q.  And it's not listed in Exhibit 96 either; is that
11  correct?
12  A.  That's correct.
13  Q.  And with regard to that particular document,
14  Exhibit 1, if you can take a look at page 3 --
15  A.  Yes.
16  Q.  -- and paragraph 5, that indicates or states, Claimant
17  shall keep, maintain, and retain any and all workers'
18  compensation benefits voluntarily paid to or on behalf of
19  Claimant by Employer for the January 30th, 2003 claim of
20  injury.  Such payments presently agreed to extend to the
21  period ending January 31, 2004.
22    First of all, did I read that correctly?
23  A.  That's correct.
24  Q.  And with regard to that paragraph, does that indicate
25  that Mr. English would be receiving his benefits up to and

Page 95

1  including January 31, 2004?
2  A.  It says that shall keep, maintain, and retain all
3  workers' compensation benefits.
4  Q.  To January 31, 2004; correct?
5  A.  Through 2004, January 31st; correct.
6  Q.  And with regard to Exhibit 96, where you begin to
7  calculate the -- where the period starts, you started on
8  February 28, 2003; is that correct?
9  A.  That's correct.
10  Q.  Okay.  Having read Exhibit 1 and looking at Exhibit 2
11  of 2005 in Exhibit 96 -- strike that.
12    Having looked at Exhibit 1 and having looked at the
13  chart that's contained in Exhibit 96, would that change the
14  calculation?
15  A.  It probably would.
16  Q.  And how would it change it?
17  A.  It may reduce the first line of benefits, by lost
18  benefits.
19  Q.  Any other changes?
20  A.  No
21  Q.  By the way, with regard to preparing the -- the chart
22  that's contained in Exhibit 96, did you do that, or did
23  Mr. Hoe do that?
24  A.  He did initially, and I checked it.
25  Q.  And you approved it; correct?

Page 96

1  A.  That's correct.
2  Q.  And you indicate that in your July 21, 2006 report
3  that it's updating your opinions; correct?
4  A.  That's correct.
5  Q.  And with regard to the update, you indicate that
6  there's corrections of certain mathematical errors in your
7  original computation; is that correct?
8  A.  That's correct.
9  Q.  And in terms of the mathematical errors, what
10  mathematical errors are you referring to?
11  A.  Mathematically, I applied the -- the benefits
12  percentage from his mitigating damages to the City and
13  County wages and the City and County benefits percentage to
14  the mitigating damages, which is incorrect, so I just
15  changed those combinations around.
16  Q.  And why is it in correct?
17  A.  Because the City and County benefits should apply to
18  the City and County wages, and the mitigating benefits
19  should apply to the mitigating salaries.
20  Q.  In terms of making that change, how did that change
21  come about?
22  A.  How did it come about?
23  Q.  Sure.  In other words, I take it you have various
24  files and cases that you're working on; correct?
25  A.  Correct.

24  (Pages 93 to 96)

Deposition of Thomas Ueno; 7/26/06
***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

Page 97

1  Q.  Is it that you reached into your files and said, let
2  me look at the report I did for Mr. English, and then you
3  reviewed it, said, oh, jeez, I was wrong?  Or did someone
4  point it out to you that it was incorrect?
5  A.  It's -- it's the former.
6  Q.  When you say "it's the former," please tell me the
7  process.  What happened?
8  A.  I was looking at the model, and then it hit me that
9  the wrong column was used in the benefits column.  Okay.
10  So we made the change.
11  Q.  And if we were to look at Exhibit 95 and 96 and look
12  at the columns side by side, what column or columns are you
13  referring to?
14  A.  If you look at Exhibit 3, okay, those are the two
15  columns, City and County and mitigating.
16  Q.  And in terms of a column like that, is that reflected
17  somewhere in Exhibit 96?
18  A.  Column like that?
19  Q.  In other words, this particular chart that you have,
20  Exhibit 3 --
21  A.  Correct.
22  Q.  -- of 95, there's not a similar chart in Exhibit 96;
23  correct?
24  A.  No, because it doesn't change.
25  Q.  Just want to make sure I understand what change was

Page 98

1  made.  What is the change that was being made?
2  A.  The change is -- we didn't -- we don't change the --
3  the calculation.  Okay.  What's happening is that when we
4  apply the benefits, we applied City and County benefits
5  rate, 17.9 percent -- we applied that to the mitigating
6  earnings.  Okay.  So that was the wrong benefits to apply.
7  We're supposed to be applying the mitigating benefits at
8  11.6 to the mitigating earnings and the City and County
9  rate of 17.9 to the City and County earnings.  That's what
10  the problem was.
11  Q.  Thank you.  And in terms of having applied the 17.9 in
12  your initial report of August of 2005 --
13  A.  Uh-huh.
14  Q.  -- why was it done that way?
15  A.  It was a mistake.
16  Q.  And again, that's the only change, correct, from
17  Exhibit 95 to Exhibit 96?
18  A.  No.
19  Q.  Okay.  I'm sorry.  What other change was there?
20  A.  The other thing is when we did the present value, for
21  some reason, we didn't go down all the way to the end
22  period of 5/4/2003.  Okay.  I think we stopped up at the
23  work period, the end of the work life of 6/13/2019.
24  Q.  And again, that was a mistake?
25  A.  That's a mistake.

Page 99

1  Q.  And that was something that Mr. Hoe had initially put
2  together; correct?
3  A.  I can't blame him.  I would say that both of us made a
4  mistake.  He may have put it together that way, and I
5  didn't -- I didn't catch it on review.
6  Q.  Okay.  Bear with me.  Let me ask my question.
7  Mr. Hoe initially put the table or chart together;
8  correct?
9  A.  That's correct.
10  Q.  You reviewed it; correct?
11  A.  Correct.
12  Q.  And you reviewed it, and after you had reviewed it,
13  you approved it; correct?
14  A.  That's correct.
15  Q.  And then it was submitted as your August 2005 report;
16  correct?
17  A.  That's correct.
18  Q.  With regard to your retention in this case, the
19  purpose of your retention in this case was to calculate a
20  loss of earnings; correct?
21  A.  The damages incurred; correct.
22  Q.  When you say --
23  A.  The financial -- financial damages incurred.
24  Q.  And your job -- and you were not retained to determine
25  the cause of any of those damages; is that correct?

Page 100

1  A.  That's correct.
2  Q.  And you're not rendering an opinion as to the cause of
3  any of the damages; correct?
4  A.  We're not rendering an opinion on causation, no.
5  Q.  Okay.  Excuse me for jumping around.
6  A.  No.
7  Q.  When you had given earlier testimony with regard to
8  reviewing Mr. English's company, you indicated that there
9  was a change from earnings from appraisals to commissions,
10  and you did not know the source with regard to that change
11  or the reason for the change; is that correct?
12  A.  I think what I -- let me make sure that I say the
13  right things here.
14  Q.  And I'm not trying to put words in your mouth.  I'm
15  just stating what you had said.
16  A.  Okay.  Yeah, what I said was that prior to 1996, the
17  business Philip English & Associates -- the business was
18  described as -- the business activity was the appraisal
19  whereas in 1996 the business activity is commission sales.
20  Q.  And in terms of the change in any type of income, did
21  you ask Mr. English why there was a change or the source of
22  the income?
23  A.  No.
24  Q.  And there were a number of questions with regard to
25  Mr. English's ability to manage.  And with regards to his

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222