Philip English
Report Date: October 26, 2005
Page 25 of 47

from others in dealing with concerns that he must face. He does not feel that his family or friends express adequate caring nor are they seen as likely to be available for support when the need arises.

He was diagnosed with a major depressive disorder, recurrent, moderate severity; an anxiety disorder not otherwise specified, and psychological factors affecting physical condition. He was not given an Axis II (longstanding personality traits from disorders).

### The Letter of Joan H. Koff, Ph.D. to Mr. Thomas Riddle dated July 24, 2003:

Based on her interviews with Mr. English and review of his records, she determined that the date of the injury that is most appropriate for Mr. English's current situations is January 30, 2003 since Mr. English went to Kaiser to see his primary care physician, Dr. Love, and complained of "undue stress related to his work job situation." Dr. Love also noted that Mr. English was not sleeping well and had lost some weight. His assessment was anxiety. He referred Mr. English to behavioral medicine. At that point, Mr. English began receiving treatment with Gerald Coffee, MSW. Dr. Love also focused attention on Mr. English's history of renal cell cancer. As a result, a referral for follow-up in Oncology was initiated.

### The Psychological Evaluation Report of Reneau Kennedy, Ph.D. dated July 30, 2003:

Mr. English reported that his mother is in ill health and was recently diagnosed with lung cancer. He married for the second time in 1984 when he was 30. His wife was attending law school. They moved to Hawaii to be near her family. He indicated that they had developed a successful business and his wife worked as well. They were financially stable. He was in shock when his second wife served him with divorce papers in 1998. He was aware that their relationship was struggling, but he had no idea that his wife was considering a divorce. He stated that he discovered his wife was seeing another guy regularly. He stated that he did not want to make her part on acrimonious terms and unfortunately made the conscious decision not to aggressively litigate the outcome against his attorney's advice. According to his supervisor's response to OSHA, Mr. English said that his wife knew the judge and his attorney did a poor job of representing him, which resulted in an unfavorable outcome for him.

Additionally, according to the supervisor, Mr. English complained that his second wife accused him of abusing her, which he says never happened. Mr. English has frequent visitations with his son; however, he does not share in the co-parenting of his son, as his ex-wife will only communicate with him indirectly. According to the supervisor's response to OSHA, Mr. English attempted to gain custody of his son by stating that his wife was doing a poor job raising their son and he was concerned about his child's welfare. Mr. English also stated that he had strong suspicions that his son was being molested at the Catholic School he was enrolled in. Mr. English also informed the supervisor that when his son was 8 years old he wanted to kill himself. Mr. English reported that his disclosure deeply affected his son and his second wife viewed this as an attack.

Philip English
Report Date: October 26, 2005
Page 26 of 47

Mr. English remarried for the third time in June 2000. He was hired this same month at the Department of Budget & Fiscal Services. Mr. English stated that the marriage had been strained by his troubles at work. His wife reportedly separated from him after he told her that he was going to lose his job. According to Mr. English, his third wife told him "You are going down and I won't go down." He understands that his third wife looked at him as a breadwinner and someone she could count on settling down with. He disclosed that the separation is still painful for him, although he is able to cope with her decision. At this point, he was reportedly uncertain about when they will divorce.

Mr. English reported that he has been in a real estate appraisal business for 23 years. He was initially trained in California and worked for several banks performing his duties. After moving to Hawaii, he reportedly opened his own practice, which at one point was thriving with 12 employees. In 1999, however, his company reportedly suffered from a recession and subsequently downsized to two employees. After he underwent cancer surgery, he was reportedly advised by his doctors to seek employment in a way of stability other than private practice to diminish stress and to ensure long-term health benefits. This is the reason he chose to seek employment with the City and County of Honolulu.

He experienced his first episode of depression during the marital turmoil with his wife in 1998. He attempted suicide twice, the first with a large bottle of aspirin and the second by hanging (Comment: He informed Dr. Koff that his suicide attempts were in 1989 and 1998). After his first suicide attempt, he was reportedly admitted to Queen's Medical Center. Following this, he and his second wife reportedly attended marital counseling for approximately one year. In June 1998, he reportedly fell from a height of 15 feet. He stated that he was unconscious and that he could not breathe or call for help. After he was transported to the emergency room, the doctors found something in his kidney. He reported that one hour after he was served divorce papers from his second wife; he was contacted by his physician who informed him that he had cancer of the kidney. He underwent a nephrectomy and has had no recurrence of the cancer since that time. He does, however, suffer from residuals of surgery with adhesions on the side.

Mr. English presented at Kaiser Permanente with the complaint of "undue stress related to work/job situation." These records indicate that Mr. English complained of disturbance in sleep and weight loss. He was referred by his internist (Dr. Love) to Behavioral Medicine for treatment. On February 13, 2003, Mr. English was seen in the Kaiser Permanente emergency room with complaints of anxiety and stress. On February 27, 2003, Mr. English was seen by a psychiatric social worker (Mr. Coffee) for complaints of ongoing anxiety due to harassment at work and isolation from coworkers.

Mr. Coffee observed the signs and symptoms of a depressed mood, decreased energy, low self-esteem, sense of hopelessness, uncertainty about the future, isolation/social withdrawal, and a limited to no support system. In his assessment, Mr. Coffee noted an unspecified work related stress disorder with a plan for supportive counseling.

Philip English
Report Date: October 26, 2005
Page 27 of 47

Mr. English was seen again by Mr. Coffee on March 10, 2003. He presented with complaints of depression and occupation-related stress disorder. His signs and symptoms included appetite disturbance, decreased energy, feeling like "body is shutting down," frequent and hard naps, decreased motivation, loss of interest in regular activities, a sense of hopelessness, feeling that his career and life were over, feeling more anxious rather than suicidal, isolation/social withdrawal, difficulty controlling worry in public places, becoming upset when confronted with a person or situation, attempting to return to work but could not, limited social support, feeling angry with employer and creating a difficult situation, lack of motivation for behavioral change, and holding on to moral outrage regarding the unfairness of the situation.

Mr. English had informed Dr. Kennedy that he was placed on medical leave by his physician and psychologist. He also described a course of emotional deterioration, which was exacerbated by the absence of a paycheck for six weeks. He reportedly borrowed money from his pastor to survive. The money problem increased to the point where he felt suicidal.

Dr. Kennedy's mental status examination revealed that although Mr. English's mood state appeared calm, he presented as anxious although polite and pleasant. His thinking was linear and goal directed. He maintained the belief system that he had been unfairly prosecuted at work and that he had been the target of slurs, where he was reportedly viewed by others as a potentially dangerous individual, who say that he is capable of harming others in the workplace. Dr. Kennedy did not believe Mr. English had a delusional disorder. He denied any history of hallucinations, illusions, depersonalization, or derealization. Dr Kennedy felt that Mr. English's current and remote memory functions appeared to be intact. Mr. English also appeared to be an accurate historian with recall for both factual and emotional detail.

Dr. Kennedy administered the Minnesota Multiphasic Personality Inventory-2. Dr. Kennedy noted that Mr. English's scores on the validity scales revealed that he endorsed an extreme number of symptoms and attitude, which she felt was the result of a magnified "plea for help." She also administered the Personality Assessment Inventory. She noted that Mr. English did not complete two pages of the 7-page test booklet. As a result, the profile could not be interpreted.

She administered the Butcher Treatment Planning Inventory. Dr. Kennedy noted that Mr. English's elevated score on the exaggeration scale indicates that he endorsed a considerable number of symptoms, which indicated that he was overtly endorsing acute emotional distress which is relatively common in individuals presenting for psychotherapy. Dr. Kennedy also found that Mr. English scored high on the somatization scale, which suggested that he was endorsing a considerable number of physical problems at the time of testing. Dr. Kennedy felt that Mr. English may perceive his problems as physical rather than dealing with the underlying emotional conflict in a direct manner. On the other hand, Dr. Kennedy noted that since Mr. English is a cancer survivor who has had complications from surgery this may account for some of the elevation on this scale. Mr. English's elevated score on the environment scale suggested that he views others in his environment as being unsupportive

Philip English
Report Date: October 26, 2005
Page 28 of 47

and that he is inclined to feel isolated, alone, and unloved. He also had a very high score on the relationship scale, which indicates that he is having considerable difficulty relating to other people at this time. Dr. Kennedy noted that both of these test findings were consistent with what Mr. English reported in his clinical interview; that he feels alone, unsupported, and that his environment is unhappy.

He reported an extreme number of symptoms that reflect the presence of a possible mood disorder. His significantly elevated depression scale indicates that he feels very depressed with an insufficient amount of energy to follow through in his daily activities. He reported that he has trouble sleeping and feels tired all the time. He also feels that his life is filled with so much unpleasantness that he has difficulty just getting by. His very high anxiety scale score suggested that he feels very anxious, tense, and fearful and that his daily functioning may be severely impaired because of his worries, inability to concentrate, and ineffective decision making.

Dr. Kennedy further noted that Mr. English's scale scores on this test indicated the presence of low self-esteem to such a degree that Mr. English typically assumes a subservient role in interpersonal situations. His high score in the psychotic thinking scale suggested the presence of very unusual thinking and the experience of having difficulty with his thought processes.

Dr. Kennedy diagnosed Mr. English to have major depression, recurrent, severe without psychotic features; with history of inter-episode recovery; and an occupational problem. She did not diagnose any personality disorders. With respect to psychosocial and environmental problems, she identified that Mr. English had problems with his primary support group – marital separation; ill health of his mother; child visitation difficulties with ex-spouse; (problems related to the social environment) including inadequate social support; living alone; difficulty with acculturation; feelings of discrimination; and adjustment to current transition; (occupational problems) difficult work conditions; job dissatisfaction; discord with boss and coworkers; (housing problems) recent complaint by boat yard manager with potential eviction; (economic problems) financial problems while off work. Dr. Kennedy assigned a score of 55 to Mr. English's global assessment to functioning scale (moderate symptoms or moderate difficulty in school, occupational or school functioning).

Dr. Kennedy pointed out that prior to Mr. English's hire with the Department of Budget & Fiscal Services for the City and County of Honolulu, he had several life problems. For example, she indicated that since 1998 he has undergone surgery for cancer, had experienced a difficult divorce with continued problems relating to visitation with his 13-year-old son; he had severe financial problems after being successful; his third marriage is under considerable stress. He anticipates that it will also end in divorce; in addition, he has attempted suicide twice, once resulting in a psychiatric hospitalization.

Dr. Kennedy noted that Mr. English has a history of severe depression and has some significant physical problems. He has also had a number of relationship problems during the past five years. Based on the performance appraisal reports, Mr. English's job performance

Philip English
Report Date: October 26, 2005
Page 29 of 47

appears to have deteriorated during the time when he became concerned about potential ethical problems on the job. Dr. Kennedy felt that although Mr. English was not coping well with being out of work, the process of an ethics investigation coupled with his own worker's compensation claim was very unpleasant and emotionally disturbing for him. Dr. Kennedy also noted that Mr. English was uncomfortable being the focus of attention.

Dr. Kennedy recommended that Mr. English's psychological/mental condition warranted psychotherapeutic and possibly psychopharmalogical treatment for his depression and for coping with the situational difficulties that he is currently experiencing. Dr. Kennedy also noted that Mr. English's support system was limited and thus he would probably benefit from a course of cognitive/behavioral or dynamic psychotherapeutic treatment to ease his symptoms of depression and to help him cope with his situational problems. Dr. Kennedy felt that based on the information furnished by Mr. English and his superiors at the Department of Budget & Fiscal Services, the work relationship among all parties was severely damaged, as both the employer and employee report that they have been wronged and that the emotional and social relationships have eroded to a point, which may not allow for repair.

Dr. Kennedy did not believe that Mr. English was able to return to his usual and customary duties in the same workplace either full time or part time. Given the fact that there was an active ethics investigation, Dr. Kennedy felt that Mr. English would continue to perceive experiencing untoward feelings and may experience others avoiding him. Taken together Dr. Kennedy felt that these experiences would not help him in his depression and felt that his ability to function would be compromised. Dr. Kennedy felt that if there was an alternate placement for Mr. English depending on what is made available, she felt that he could return to part time or possible full time work should he be given an opportunity to work elsewhere.

**The Letter of Joan H. Koff, Ph.D. dated August 28, 2003 to Mr. Thomas Riddle:**

It is Dr. Koff's impression that Mr. English suffered from a work related injury on January 30, 2003, which was an acute exacerbation of a preexisting depressive disorder. She stressed that Mr. English's claim for mental stress does not appear to result solely from any disciplinary action taken in good faith by his employer. They also noted that Mr. English provided an elaborate history of the pattern of negative interactions at the workplace that were not based on disciplinary action, although some of the interactions took that form later on. According to the history provided by Mr. English, the difficulty he had with various coworkers began following his allegation that there were unethical practices in his department. This reportedly resulted in a significant deterioration of workplace communication among himself and various coworkers. Reportedly, he was criticized and demeaned routinely over a protracted period of time, which most likely gave rise to his injury.

Dr. Koff stated that although she agreed with Dr. Kennedy that Mr. English suffers from a major depressive disorder, recurrent and severe without psychotic features and a history of

inter-episode recovery, the stresses are insignificant measure due to the difficulties at work. She felt that the housing problem of threatened eviction was reportedly secondary to the financial stress he was experiencing since he was no longer able to work. She felt that his economic problems were the result of his no longer being able to work at his current employment. She felt that his feelings of discrimination at work were the result of the workplace conflict. She also felt that Mr. English's marital separation was secondary to the fact that he was no longer able to financially support his wife. Thus, she felt that his psychological and environmental problems that were noted by Dr. Kennedy in her report would not be likely present and/or significant if it were not for the injury of January 30, 2003. She agreed with Dr. Kennedy that treatment needs to be continued. She also felt that Mr. English's psychotropic medication issue was complicated since he has had a history of kidney cancer with nephrectomy and thus the medications were not suitable for him.

Although Dr. Koff agreed with Dr. Kennedy that Mr. English would not be able to return to work in his current department, she did not agree that he is at this point ready to return to work. Hopefully, she felt that once Mr. English's condition improved he would be eligible for vocational rehabilitation services and may find his way to reemployment, which is his stated goal.

## REVIEW OF MEDICAL RECORDS

### The Clinical Notes of Tamar Hoffmann, M.D. dated January 2, 1998:

Patient was diagnosed with umbilical mid abdominal pain, rule out gastritis triggered by anxiety; reactive depression; rule out irritable bowel disease triggered by anxiety and reactive depression; marital problems, reason for anxiety and reactive depression; history of right orchiditis and enlarged prostate; family history of heart disease, testicular cancer, and remote history of colon cancer; and keratotic skin lesions, one with slight irregular and increased pigmentation, for further evaluation. Dr. Hoffmann's notes indicate that regarding Mr. English's depression he admits to occasional ideation of jumping out of the window, desperation regarding marital problems although he denies actual plans and states that he does not think he can really do it. He was advised to discuss this with a psychologist.

### The Clinical Notes of the Honolulu Medical Group dated January 8, 1998:

These notes indicate that Mr. English was diagnosed with an adjustment disorder with disturbance in emotions and conduct. He admitted to being quite angry with his wife. He admitted himself for an overnight stay. He took handfuls of aspirin in years after a fight with his wife. The psychologist noted that patient decided to go on a 6-8 weeks business trip.

Philip English
Report Date: October 26, 2005
Page 31 of 47

**The Report of Tamar Hoffmann, M.D. dated June 15, 1998:**

Mr. English reports falling off a tree house yesterday, and striking his left flank on the ground. He does not remember the falling to the ground. He found himself on the floor. He was taken to the emergency room where his neurological examination was found to be within normal limits. Abdominal CT scan revealed a 1.5 cm hypodense structure at the left lateral kidney consistent with complex cyst. There was no indication for a head CT scan. Regarding his marital stress, he reports that the relationship is over. His wife asked him to leave. Divorce is in progress. He is depressed, and admits to occasional suicidal ideation but does not act on it. He does not travel as frequently as before. On physical examination, he appeared slightly depressed. He stated that he was seeing a psychiatrist, Dr. Kay Wong.

Mr. English reports that he is having difficulties coping with the fact that his marriage is over. He continues to receive psychotherapy. His appetite is irregular. He admits to occasional insomnia at times and does not sleep for 3-4 nights and feels extremely tired after this. His affect was depressed. It was recommended that he continue receiving psychotherapy. They indicate that she would refer Mr. English to a psychiatrist regarding a trial of an antidepressant medication particularly in view of his insomnia.

**Dr. Hoffmann's Clinical Notes dated October 15, 1998:**

Patient has a history of depression, mostly reactive to family problems (divorce in progress) as well as financial difficulties. He is continuing to see his psychologist and psychiatrist. He continues to use medications as per his psychiatrist's advice.

**Dr. Tamar's Clinical Notes dated November 30, 1999:**

Mr. English states that his depression is improving, he sees his psychiatrist on a regular basis. He is not suicidal. He is still unemployed, but has a few prospects.

**The Discharge Summary of Queen's Medical Center dated November 9, 1998:**

Mr. English was diagnosed with renal cell carcinoma after a mass was discovered incidentally on a CT scan. He underwent a left radical nephrectomy on November 4, 1998. He tolerated the procedure well and has moved to the recovery room in satisfactory condition. He was discharged on November 9, 1998.

**The Clinical Progress Notes of Kaiser Permanente dated January 30, 2003:**

Mr. English complained of undue stress related to work/job situation. He notes that he does not sleep well and that he has lost some weight. He has a history of renal cell carcinoma and underwent a left nephrectomy in 1998.

Philip English
Report Date: October 26, 2005
Page 32 of 47

**Clinical Progress notes of Gerald Coffee, LCSW dated February 27. 2003:**

These records indicate that Mr. English was referred for an occupational related stress disorder. He reports ongoing anxiety due to harassment at work and isolation from coworkers. Dr. Coffee observed the following signs and symptoms: Depressed mood, ongoing depressed energy, ongoing low self-esteem, questions deciding to get involved; sense of hopelessness, uncertainty regarding his future, isolation/social withdrawal and having a limited to no social support system. Mr. English complained that he was feeling unable to work due to ongoing/escalated harassment.

Dr. Coffee's physical examination noted that Mr. English adheres to an idealistic justification (moral/ethical) for his actions. He is not accepting the natural consequences. His mood was observed to be depressed. His affect was flat.

**The Clinical Progress Notes of Gerald Coffee, LCSW dated March 10, 2003:**

Mr. English reports that his body is shutting down. He takes frequent and hard naps. He complains of decreased motivation and a loss of interest in regular activities, a sense of hopelessness, and feels that his career and life are over. He denies any suicidal ideation, unlike during the divorce. He is feeling more anxious than suicidal. He has difficulty controlling his worry in public places. He becomes upset when confronted with a person or situation, and attempted to return to work but could not. His social support is limited. He has feelings of anger, he is angry at his employer for having created a difficult situation, and is motivated for behavioral changes. He reports that he is holding on to moral outrage and describes the unfairness of the situation.

Mr. English's affect was noted to be flat. His cognitive processes were described as blocked. Mr. Coffee discussed the pros and cons of "moving on" versus "holding on to his moral outrage." He was also encouraged to seek alternative employment to maintain income and reputation in the field.

**The Clinical Progress Notes of Gerald Coffee, LCSW dated March 24, 2003:**

Mr. English reports an increase in social isolation and withdrawal and anxiety for work stress. He appeared depressed. He reports ongoing negative thoughts about the past, anxiety about the future, and intense feelings of "betrayal." He is unable to increase his physical activity as discussed in treatment. He is unable to go out in public. He has lost interest in regular activities. He has low self-esteem and a sense of hopelessness. He has become isolated and socially withdrawn. He reports staying on his boat most of the time with the windows and hatch closed. He is unresponsive to social invitations. His mood is anxious. His course is worsening. His severity is severe. He reports suicidal ideation but denies making any plans stating that his relationship with God prevents him from considering suicide seriously. Mr. Coffee also observed that Mr. English's ongoing preoccupation with feeling morally wronged appeared to be preventing Mr. English's self-care. He wishes that this could be all over. He is resisting the use of antidepressant

Philip English
Report Date: October 26, 2005
Page 33 of 47

medications despite an increase in his depressive symptoms and inability to adjust his lifestyle to minimize symptoms. He was advised to minimize his ongoing loss.

**The Clinical Notes of James Love, M.D. dated March 27, 2003:**

Mr. English was scheduled for an appointment. He was seen by Psychiatry within five days. Dr. Love and Mr. English agreed that it was both appropriate and reasonable to allow a psychiatrist to see him and if needed prescribe an antidepressant.

**The Clinical Progress Notes dated April 22, 2003:**

These notes indicate that Mr. English was prescribed trazodone 15 mg tablets 1-2 tablets orally in the evening as needed to sleep by Dr. Balogh. He was also instructed to take sertraline 100 mg tablets orally, one tablet per mouth daily (Comment: This medication is an antidepressant).

**The Clinical Progress Notes dated June 26, 2003:**

These notes indicated that Mr. English had questions regarding medications. These notes also indicate that Mr. English informed Dr. Dalila that he was not taking any medications.

**The Clinical Progress Notes dated August 18, 2003:**

These noted indicate that Mr. English was not taking any medications.

**The Progress Notes of Dr. Love dated August 18, 2003:**

He indicated that he had reviewed Mr. English's anxiety and stress situation. He agreed to try Ativan 0.5 mg p.r.n. Dr. Love appreciated Mr. English's concerns about starting and taking any SSRI (antidepressant medications) long term.

**Dr. Koff's Interim Psychotherapy Report dated May 13, 2003:**

Mr. English states that he feels a little bit better as per his depression. He describes his relationship with his coworkers and had hoped to have their support. He acknowledges that he understands that he may at times behave "like a goner" and has tried over the years to become more assertive. He says that this has been difficult for him. He says that he expects that others at times would take advantage of him, but feels that his current work situation is in excess of that. He explains that he has not received any temporary disability insurance checks and speculates that the checks are delayed purposely. He says that finances have been a terrible problem for him and as much as he has not been able to afford to pay the rent on the slip where his boat is housed. He describes his interaction with the psychiatrist. Although he has been prescribed trazodone and Zoloft, he has not taken them (Comment: Mr. English does not appear to be medically compliant with the treatment of his psychiatric disorders).

Philip English
Report Date: October 26, 2005
Page 34 of 47

**The Psychiatric Report of Mark Dillen Stitham, M.D. dated August 20, 2003:**

Dr. Stitham indicated that he had not personally examined Mr. English but had reviewed the various records that had been sent to him.

**Dr. Stitham's Report noted on March 10, 2003:**

Mr. Riddle had a phone discussion with Mr. Magota. During this discussion, Mr. Magota discussed Mr. English's work history. At first, Mr. Magota felt sorry for Mr. English because he had a lot of personal problems. He invited Mr. English to his church, invited him to family dinners during the holidays, and even lent him some money. He noted that Mr. English's behavior became more bizarre as time went on. He seemed to be very unhappy and was having trouble adjusting to his personal problems. This included filing for bankruptcy, divorce from his first marriage, the failure of the second marriage, the problems with the IRS regarding tax matters, and custody problems with his children. They indicated in their discussion that they were going to suggest that Mr. English seek counseling and suggested that he might see Enna Horne. Dr. Stitham points out that there was a series of meetings with Mr. English and his supervisor, Ann Gima, regarding his performance. She noted that his job performance appeared to be slipping since he would not finish assignments on time and would do them unsatisfactorily. He denied he had had extensive on site experience. Dr. Stitham noted that Mr. English would always blame others telling Mr. Magota that he was not given all the required information or that he was improperly trained. During some of these meetings, Mr. English would yell at Ms. Gima or Mr. Magota. When Mr. Magota suggested counseling, Mr. English said there was nothing wrong with him, that he did not have any problems, and did not see the need to see a counselor. He denied that he had a temper or that he had yelled at others. He would yell at the employees and but later deny it. Other employees were sometimes frightened of him and his personality. He accused that department of holding up his promotion. This was not true since others were promoted at the same time and the process just takes a long time. At the last meeting with the union agent when Mr. Magota indicated that his personal problems might be affecting his work performance, Mr. English said, "Bob, I have no problems."

Dr. Stitham discusses Mr. Golojuch's memo to Mr. Kurokawa regarding the interim investigation report on workplace violence for Mr. English. His findings indicate that there was a general concern about Mr. English and his behavior over a period. Although there was a safety concern from various employees, none of the employees stated anything about getting "with" Philip English. Rather, the main concern was that he gets some kind of Employee Assistance Program counseling. Only one person admitted to feeling threatened by Mr. English's presence at the work site. However, four individuals indicated that they felt uneasy with his current behavior. Mr. English's work performance has not always been at a satisfactory level. He has exhibited inappropriate behavior, which has resulted in disciplinary action and a pending investigation on additional alleged devulsions. Attached to this report was a workplace violence checklist by Ann Gima who observed on more than one incident of outbursts of temper. She stated that she had numerous meetings with Mr. English to work on communication and attitude issues. She felt that she was dealing with an

individual who is deliberately behaving in a counter-productive manner and had become increasingly argumentative and perhaps even delusion. He voiced his beliefs that things were being "done to him" at work. He believed that he was being harassed, and that false claims were being made about him. He believes that criticisms only help flare up. He has made many statements and has them in writing that twists the truth and someone is just playing wise.

Dr. Stitham had noted that this was an exceedingly complex case. He felt that Mr. English appeared to utilize two relatively primitive defenses such as denial and projection. It also appeared that Mr. English had traits of grandiosity, rigidity, and suspiciousness/paranoia. He wondered whether Mr. English had a bipolar affective disorder (manic - depressive illness), depressed phase. He also felt that there were multiple non-industrial stresses that had plagued Mr. English including: Three failed marriages, severe financial problems including with the IRS, bankruptcy, failed business, renal cancer, deteriorating health of his mother, custody dispute, and two serious suicide attempts.

Dr. Stitham felt that Mr. English's assertion that he has no problems and everything was caused by work and in Dr. Stitham's mind was "simply not credible." Dr. Stitham felt that to a reasonable medical probability Mr. English had a rather severe mood disturbance, which subsequently affected his work performance. He felt that due to Mr. English's personality structure, he reacted with defenses of projection and denial. Dr. Stitham recommended psychotropic medication as well as an investigation into possible bipolar affective disorder by a psychiatrist. He also recommended that the applicant complete the missing part of the Personality Assessment Inventory so that it could be accurately interpreted.

### The Handwritten Progress Notes of Joan Koff, Ph.D. dated May 20, 2003:

These notes indicated that he was worried about taking psychiatric medications as prescribed. He was trying to be more active and hoped to start doing some exercise.

### Dr. Koff's Handwritten Progress Notes dated May 15, 2003:

Mr. English stated that he is surprised that others had similar problems like him and also had the same emotions.

### The Handwritten Progress Notes of Lillie Mundon, LSW dated May 15, 2003:

Patient had an initial group therapy session. He presented with apprehension, decreased mood, and increased anxiety. He improved as the group progressed.

### The Clinical Progress Notes of Lillie Mundon, LSW dated May 22, 2003:

Mr. English admits that he thinks about and blames those at work for his present situation. When he was asked when he does not do this, he answered, "When I am with my son." He presents with concerns, worries, and decreased mood. He learns that he does not have to be being experiencing negative thoughts and that he can make changes.

Philip English
Report Date: October 26, 2005
Page 36 of 47

**The Clinical Progress Notes of Joan Koff, Ph.D. dated May 28, 2003:**

Mr. English says broad threats were made at the workplace as a result of his complaints. The handwritten notes indicate that Mr. English furnished with a probation statute regarding a temporary restraining order.

**The Clinical Progress Notes of Lillie Mundon, LSW dated May 29, 2003:**

Mr. English reported his concerns regarding his worker's compensation claim being labeled a"whistle blower." He worries about his and his son's safety and his future. He presents with an improved mood, increasing anxiety, and was grateful to go home. He worries about finances and his career. He was looking forward to volunteering his services.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated June 5, 2003:**

Mr. English reports that his church is giving him some food supplies. He describes how his mood decreased when he has to relate to his worker's compensation situations. He presents with decreased mood and continues to worry about his situation playing in his future.

**The Clinical Notes of Lillie Mundon, LSW dated June 19, 2003:**

Mr. English reports difficulty concentrating. He was having financial problems and facing safety issues. He is thankful for his church supplies him with food. He volunteers his time with his church, the group of his choice.

**The Handwritten Progress Notes of Joan Koff, Ph.D. dated June 29, 2003:**

Mr. English spoke about his tendency to withdraw. He was worried and exhibited loss of confidence. He described the anxiety attacks and appeared depressed.

**The Clinical Progress Notes of Lillie Mundon, LSW dated June 26, 2003:**

He describes facing many unknowns, financial problems, security, and safety issues. He continues seeking help from his church and may be able to volunteer services. He presents with anxiety, worries all the time, depressed mood, and is unsure of the future.

**The Clinical Handwritten Progress Notes of Lillie Mundon, LSW dated July 2, 2003:**

He reports how confused and frustrated he has been with his work situation. He starts temporary disability soon, but is unable to make heads or tails of what has happened. He appears anxious, has difficulty concentrating, and has difficulty remembering dates, days, and time.

**The Clinical Handwritten Progress Notes of Joan Koff, Ph.D. dated June 7, 2003:**

Mr. English describes relentless criticism at the workplace following his awareness of reported long day. There has been a decrease in his self-confidence. His confidence

Philip English
Report Date: October 26, 2005
Page 37 of 47

continues to be poor. He expresses difficulty with trust and anxiety. He is very upset and is unable to focus.

**Dr. Koff's Handwritten Progress Notes dated July 14, 2003:**

Patient speaks on a variety of subjects such as trust, interpersonal avoidance, interpersonal relationships, etc. His condition was noted to have improved slightly.

**Dr. Koff's Handwritten Clinical Progress Notes dated July 21, 2003:**

Financial stress has become critical. Patient threatened with seizure of his boat. He appeared very depressed. He refused to undergo psychiatric hospitalization.

**The Clinical Handwritten Progress Notes of Lillie Mundon, LSW dated July 24, 2003:**

Patient seemed very quiet and did not say much. He seemed withdrawn. He presented with decreased mood, increased anxiety, but was able to listen to group members and did say where he worked to a new member.

**Dr. Koff's Handwritten Progress Notes dated July 24, 2003:**

Mr. English feels humiliated and beaten down. He relates this to more and more negative interactions at work. He tries to avoid others. His anxiety is generalized.

**The Handwritten Clinical Progress Notes of Lillie Mundon, LSW dated August 7, 2003:**

Patient states that he had a "shift" and is feeling better and isolated himself less. He is setting goals for himself. Although his mood is down, it is improved from his last visit. He continues to be anxious, worries about his future, but not all of the time.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated August 14, 2003:**

Mr. English describes his fears of not trusting people and has difficulty understanding his behavior. He is willing to set goals for himself.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated August 21, 2003:**

He appears more open and keeps writing about what had happened at work and how abusive and threatening his boss and coworkers were.

**The Handwritten Clinical Notes of Joan Koff, Ph.D. dated August 25, 2003:**

He continues to suffer from severe financial problems, talks about his feelings of being hurt by his employer, and unable to stop it. His second wife is leaving him due to financial strain.

Philip English
Report Date: October 26, 2005
Page 38 of 47

**Dr. Koff's Handwritten Clinical Notes dated September 3, 2003:**

Mr. English is very upset about reported mistakes in his independent psychological examination. Dr. Koff's notes indicate that Mr. English was taking lorazepam as needed for anxiety. He appeared more focused. She observed a slight improvement in his behavior.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated September 4, 2003:**

Mr. English describes his emotions and worries about his worker's compensation claim. He fears for his safety and tends to isolate himself but manages to spend time with his son. He discussed his feelings of being out of control, but appeared calmer as the session ended.

**Dr. Koff's Handwritten Clinical Notes dated September 8, 2003:**

Mr. English describes his efforts to respond to the independent psychological examination that was done. He goes on to describe dissolution of his marriage.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated September 18, 2003:**

Mr. English states that his moods have evened out as a result of treatment. Things are more positive regarding his worker's compensation claim. He continues to worry about finances and his future. He showed an improvement in his mood and verbalized with ease.

**Dr. Koff's Handwritten Clinical Notes dated September 22, 2003:**

Mr. English states that his paychecks have been unequal. He complained about the union representative and issue of divided loyalties. He complained that the workplace individuals would not treat him fairly.

**Dr. Koff's Handwritten Clinical Notes dated October 1, 2003:**

He described that he is upset at the developments with his wife's situation.

**Dr. Koff's Handwritten Clinical Notes dated October 9, 2003:**

He talks about increased stress and talks about being upset at work and erosion of his self-confidence.

**The Handwritten Clinical Notes of Joan Koff, Ph.D. dated October 23, 2003:**

Mr. English describes problems trusting others and continues to have financial stress. He describes a positive interaction with his son.

**Dr. Koff's Handwritten Clinical Notes dated October 30, 2003:**

Mr. English talks about his feelings of shame. He describes social isolation except for his son and pastor.

Philip English
Report Date: October 26, 2005
Page 39 of 47

**Dr. Koff's Handwritten Clinical Progress Notes dated November 4, 2003:**

Mr. English feels quite apprehensive about the possibility of a settlement.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated November 6, 2003:**

Mr. English returns to the group after a long absence. He related to the group the problems that he has encountered with his worker's compensation claim. He reports that promises have been broken and the distress with the system. He cannot wait until this is over.

**The Handwritten Clinical Progress Notes of Lillie Mundon, LSW dated November 10, 2003:**

Mr. English reports that he felt uncomfortable in the group session. He was having difficulty being around a lot of people. He does not trust others. He may be engaging in self-protection since he was so emotionally injured at work.

**The Handwritten Clinical Notes of Lillie Mundon, LSW dated November 17, 2003:**

Mr. English stated that he had not been paid even though he had received a statement in the mail. He states that it is unbelievable after our people who do wrong by cheating the state and get away with it. He continues to worry about his finances, but appears more at ease, focused, and future oriented.

**Dr. Koff's Handwritten Clinical Notes dated December 16, 2003:**

Mr. English describes that he is in the process of settling his worker's compensation case. He states that he wakes up and feels that he is fighting with someone.

**Dr. Koff's Handwritten Clinical Notes dated December 24, 2003:**

His settlement offer is being drafted. Mr. English discusses his concerns for the future. His concerns were very specific with specific questions offered for consideration and emphasis on clarifying conflicts and concepts regarding behavioral reactions.

**Dr. Koff's Handwritten Clinical Notes dated January 7, 2004:**

Mr. English describes increasing social support follows an increased awareness of his need for social support to buffer stress. He felt an increased concern in his own personal safety. He is taking lorazepam p.r.n. and is sleeping better.

**Dr. Koff's Handwritten Notes dated January 28, 2004:**

Mr. English is in the process of claim closure.

Philip English
Report Date: October 26, 2005
Page 40 of 47

**Dr. Koff's Handwritten Clinical Notes dated February 23, 2004:**

Mr. English states that his worker's compensation settlement has been approved by the State as of February 19, 2004. He says he is trying to be more cautious to avoid possible threat.

**Dr. Koff's Handwritten Clinical Notes dated March 8, 2004:**

His claim has been settled completely. He talks about financial strain. He also notes that related legal issues are also continuing.

**Dr. Koff's Handwritten Clinical Notes dated March 22, 2004:**

Mr. English describes complex relationships with others as they develop. He indicates that he is somewhat confused.

**Dr. Koff's Handwritten Clinical Notes dated April 26, 2004:**

Mr. English describes developments with his family. His son is in home school. He was talking to his ex-wife. These are expanding his connections, but they are not always positive. He takes lorazepam as needed.

**Dr. Koff's Handwritten Clinical Notes dated May 17, 2004:**

Mr. English describes issues with his son and ex-wife and legal developments and new corrections with his boat.

**Dr. Koff's Handwritten Clinical Notes dated June 7, 2004:**

Mr. English talks about specific real estate appraisal issues. He indicated that as a result of his questioning, he alienated coworkers. He knows that this led to the difficulties he still struggles with.

**Dr. Koff's Handwritten Clinical Notes dated June 28, 2004:**

(These noted could not be read, as they did not appear legible).

**The Typed Clinical Notes of Dr. Koff dated August 12, 2004:**

Mr. English states that a mediation hearing is scheduled in early October 2004 regarding his claims of retaliation. He describes the impact of process on his relationship with his ex-wife; his inability to provide financial security for her, and reportedly is paranoid from their separation. He describes he is upset about this. He continues to derive pleasure with his relationship with his son. He reports new dreams of those subjects such as feelings of isolation, feelings of rejection by others. He continues to work on his boat. He was diagnosed with major depression in partial remission; anxiety disorder, and psychological factors affecting medical condition.

Philip English
Report Date: October 26, 2005
Page 41 of 47

**Dr. Koff's Typed Clinical Progress Notes dated January 3, 2005:**

Mr. English speaks about the stress of ongoing legal developments arising out of his worker's compensation claim and whistle blower action. He feels upset by the mediation and expects this case may go to trial. He also notes financial stress of this process. However, at this time, he is beginning to start to get a job. He describes a positive relationship with his family and son. His appetite is good. His sleep is better (he is not waking up in the middle of the night with upset); he is euthymic and forward thinking. He uses lorazepam as needed for sleep, but very occasionally at the present time.

**The Typed Clinical Progress Notes of Lillie Mundon, LSW dated January 31, 2005:**

Mr. English indicates that he is taking a new contract job and describes his apprehension about this as a result of his recent experiences in his past job. He realizes, however, that he needs to work. There was a discussion in depth about his feelings of mistrust. He talks about many relationships and changes and begins to understand this. He is playing music. He seems to be moving forward.

**Lillie Mundon's, LSW chart notes dated February 18, 2005:**

 Mr. English states that he believes two City and County persons had been down to the boat marina twice making inquiries about him. There was a particular charge allegedly made on his credit card. He has been rejected as he tries to get work.

**The Typed Clinical Progress Notes of Lillie Mundon, LSW:**

Mr. English describes his lack of self-confidence as he tries to get new jobs. He states that he is having difficult with himself in trying to answer questions that are posed to him. He also wonders if his employees have difficulty accepting him. Sometimes, he feels "rejected" and this upsets him.

**The Typed Clinical Notes of Lillie Mundon, LSW dated April 21, 2005:**

Mr. English indicates that he has taken a job as a security guard at a minimal income. He struggles with his lack of income and lack of prestige. He has lost a great deal of faith in others and is fearful. He also realizes the depth of this and is really sad.

**BEHAVIORAL OBSERVATIONS:**

Mr. English presented as an alert and oriented 50-year-old right-handed white male in no acute distress. He wore glasses and had thinning light brown hair with specks of gray. He wore a blue shirt and jeans. He spoke clearly in an articulate manner with no evidence of word finding difficulties, paraphasic errors, dysphasia, or circumstantial or tangential thinking. He made fairly good eye contact. His recent and remote memory appeared intact. He appeared to be of above average intelligence. There was no evidence of auditory or visual hallucinations, psychotic behavior, bizarre thinking, inappropriate behavior,

Philip English
Report Date: October 26, 2005
Page 42 of 47

aggressive outbursts, or loose associations. Although his mood was generally euthymic, he became visibly upset while he was discussing the fact that problems he has had at work and how they have affected his life. Although he did not exhibit frank paranoia, he described feeling persecuted by his former coworkers and supervisors. The entire examination lasted 8.5 hours.

## PSYCHOLOGICAL TESTING

**Test Administered:**

Beck Anxiety Inventory
Beck Depression Inventory-II
Personality Assessment Inventory
Minnesota Multiphasic Personality Inventory-2

## TEST FINDINGS

He was administered the Beck Anxiety Inventory to assess his subjective symptoms of anxiety. Although he made a score of 34, which placed him in the severely anxious range, he did not visibly appear anxious or exhibit nonverbal signs of anxiety such as sighs, or nervous hand movements.

He was administered the Beck Depression Inventory-II to assess his subjective symptoms of depression. His score on this test placed him in the severely depressed range; he did not appear to be this depressed based on his nonverbal behavior during the interview. For example, with the exception of becoming upset while he discussed the actions of his former supervisors and coworkers that had negatively influenced his life and emotions, his affect seemed generally euthymic. He also exhibited no evidence of psychomotor retardation, or depressed affect. He worked quickly on each of the psychological tests he was administered.

An analysis of the items he endorsed on this test indicated that he endorsed a statement "I feel I am being punished." He also endorsed the following statements, "I cry over every little thing," "I criticize myself for all of my faults," "it is hard to get interested in anything," "I have trouble making any decisions," "I feel more worthless as compared to other people," "I do not have enough energy to do very much," "it is hard to keep my mind on anything very long," and "I am too tired or fatigued to do a lot of things I used to do."

He was administered the Personality Assessment Inventory to assess his longstanding personality characteristics and psychological difficulties and makeup. Analysis of his validity profile indicated that he may not have answered the test questions in a completely forthright manner, which might need to be evaluated to form a somewhat accurate impression of him. There was no evidence to suggest that he was unduly defensive or was motivated to portray himself as being relatively free of common shortcomings or minor faults. There were, however, subtle indications that he tended to portray him in an unduly

Philip English
Report Date: October 26, 2005
Page 43 of 47

negative manner in a number of areas. He also presented with certain patterns or combinations of clinical features that are unusual or atypical in bonafide clinical patients.

The configuration of his clinical scales suggests an individual with prominent depression and hostility. He may be experiencing and embedded pessimism with many of the negative circumstances occurring in his life, which he attributes to the shortcomings of others. He sees little hope that he can change this. His heightened sensitivity in social interactions has led to significant withdrawal, which probably serves as a formidable obstacle or element in close relationships. Although he appears to harbor considerable anger and resentment, this anger is as much directed at himself as it is directed toward others.

His clinical profile indicates that he is likely to be plagued by thoughts of worthlessness, hopelessness, and personal failure. He openly admits to feelings of sadness, a loss of interest in normal activities as well as a loss of pleasure in things that he previously enjoyed. He is also likely to show a disturbance in his sleep pattern, decrease in his level of energy and sexual interest as well as a loss of appetite and/or weight.

His clinical profile reveals significant suspiciousness and hostility in his relations with others. He is likely to be a hypervigilant individual who often questions and mistrusts the motives of those around him. He is extremely sensitive in his interactions with others and is quick to feel that he is being treated unfairly and tends to hold grudges against others even if the personal affront is unintentional. Consistent with the constellation of hypervigilance and suspiciousness, he is probably being seen by others as quite hostile. His working relationships with others are likely to be very strained despite any efforts by others to demonstrate support and assistance.

He describes himself as a socially isolated individual who has few interpersonal relationships that could be described as close and warm. He may have difficulty interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships. His social isolation and detachment may server to decrease his sense of discomfort that interpersonal contact fosters. He describes himself as rather moody. Others, however, may view him as overly sensitive. He may be dissatisfied with his more important relationships and uncertain about major life goals. He appears to have experienced a disturbing traumatic event in the past, which continues to distress him and produce recurrent episodes of anxiety. Whereas the item content of this test does not address specific causes of traumatic stress, possible traumatic events involve victimization (e.g., rape, abuse), combative experiences, life threatening accidents, and natural disasters.

His self-concept appears to be generally harsh and negative. He is prone to be self-critical and pessimistic, and tends to dwell on past failures and lost opportunities. He experiences considerable uncertainty and indecision about his plans and goals for the future. Given his self-doubt, he tends to blame himself for setbacks and sees any prospects for future success as dependent on the actions of others.

He is likely to be self-conscious in his social interactions and is probably not skilled or comfortable in asserting himself. Previous efforts at assertion may have led to conflicts that

Philip English
Report Date: October 26, 2005
Page 44 of 47

he does not handle well and would prefer to avoid. Others possibly may view him as a rather passive, unassuming yet fairly sensitive individual to the appraisals of others.

His responses indicate that he is likely to be experiencing notable stress and turmoil in a number of major life areas. A review of his current employment situation, financial status, and family and/or close relationships would most likely clarify the importance of these in his overall clinical picture. He experiences a somewhat lower level of support than is experienced by the average adult. Thus, he may have relatively few close relationships or be dissatisfied with the quality of these relationships. Interventions directed at any problematic relationship such as those involving his family or his marital problems may be of some use in alleviating one potential source of dissatisfaction.

He reports experiencing recurrent thoughts related to a suicidal act. Although only a small percentage of individuals who entertain such thoughts actually act upon them, his score suggests the potential for suicide. A careful follow-up regarding the details of his suicidal thoughts and potential suicidal behavior is warranted as well as an evaluation of his life circumstances and available support systems as potential mediating factors.

He describes himself as a very meek and unassertive person who has difficulty standing up for himself even when assertiveness is warranted. Thus, he may have some difficulty in the appropriate expression of anger.

His level of treatment motivation is somewhat lower than is typical of individuals who are being seen in treatment settings. His responses suggest that he is satisfied with himself as he is and that he sees little need for changes in his behavior. If he should enter into psychological or psychiatric treatment, he may have some difficulty placing trust in a treating professional as a part of his more general problems in close relationships.

He was administered the Minnesota Multiphasic Personality Inventory-2. A computer generated interpretive reports indicated that he may have consciously distorted the test responses to create a particular impression or he may be generally unsophisticated. As a consequence, his clinical profile should be interpreted with caution. His responses to items in the latter portion of this test was somewhat exaggerated in comparison to his responses to earlier items. There is a possibility that he became more careless in responding to these latter items raising questions about that portion of the test. Thus, caution should be taken in interpreting his content scales and supplementary scales.

His clinical profile reflects much psychological distress at this time. He is experiencing intense feelings of self-doubt and low morale in the context of a mixed pattern of psychological problems. He has major problems with anxiety and depression and tends to be high strung and insecure. He also may be having somatic problems. He is probably experiencing loss of sleep and appetite and the slowness in his personal tempo. Individuals with this profile often have high standards and a strong need to achieve but feel that they fall short of their expectations and then blame themselves harshly. He feels quite insecure and pessimistic about his future. He also feels quite inferior, has little self-confidence, and does not feel capable of solving his own problems.

Philip English
Report Date: October 26, 2005
Page 45 of 47

He appears to be quite passive and dependent in his interpersonal relationship and does not speak up for himself even when others take advantage of him. He avoids confrontation and seeks nurturance from others often at the price of his own independence. He forms deep emotional attachments and tends to be quite vulnerable to being hurt. He also tends to blame himself for interpersonal problems. Individuals with this profile are often experiencing psychological distress in response to stressful events. The intense feelings, however, may diminish overtime or with treatment.

He appears to be a very introverted person who has difficulty meeting and interacting with others. He appears shy and emotionally distant. He tends to be very uneasy, rigid, and over controlled in social situations. His shyness is probably symptomatic in the pattern of social withdrawal. His generally reclusive behavior, introverted lifestyle, and tendency toward interpersonal avoidance may be prominent in any future test results.

His self-esteem is low. He tends to blame himself too much for his difficulties. Although he worries a great deal about his problems, he seems to have little energy left over for actions to resolve them. Symptomatic relief for his depression may be provided by antidepressant medication. Psychotherapy, particularly cognitive behavioral treatment may also be beneficial. He also appears to be a good candidate for assertiveness training.

**Impression:**

A review of Mr. English's employment records, notes, and the numerous records which have been generated in this case, indicate a striking discrepancy between Mr. English's claims of harassment and alleged retaliation following his notification of unethical behavior by coworkers, and the various statements and reports that have been generated by his former supervisors and coworkers.

If Mr. English's assessment of these events is accurate then the development of his psychological, marital, and financial difficulties is most likely the result of the exacerbation of his preexisting psychological problems by the alleged mistreatment, harassment, social isolation, and feelings of alienation and retaliations he received while he was working as an appraiser for the City and County of Honolulu. Assuming this is accurate; Mr. English should be compensated for the emotional pain and suffering he experienced, which he claims led to serious financial and marital difficulties.

If on the other hand his perception of the events that occurred during his employment for the City and County of Honolulu reflects a pattern of self-defeating behavior, projection, and inflexible thinking then the actions of the City and County of Honolulu must be seen as appropriate and not retaliatory.

A number of issues bear on the ultimate determination of this complex issue. Most importantly there appeared to have been a number of significant non-industrial stressors in his life prior, and during his employment with the City and County of Honolulu which might have accounted for his emotional problems at that time, as well for many of the problems he had at work. For example, he had severe financial problems, had problems with the IRS,

Philip English
Report Date: October 26, 2005
Page 46 of 47

had to file bankruptcy, had a failed business, was diagnosed with renal cancer and underwent nephrectomy, had to deal with the deteriorating health of his mother, was not able to receive support from his elderly father, was involved in a custody dispute over his son, his fears that his son was being molested, serious marital problems, and two of his wives filing for divorce. With this in mind, it is difficult to accept Mr. English's explanation that all of his problems were caused by the harassment and retaliatory behavior at his workplace.

Mr. English's profiles on the MMPI-2 that were administered to him over the past two-and-a-half years by Dr. Koff, Dr. Kennedy, and myself are quite similar in their profile configurations even though Mr. English appears to have been under considerable emotional stress as a result of his claims of harassment, alienation, mistrust, and retaliation when he was given this test in 2003. The lack of improvement and stability of his significantly elevated profile across 8 of the 10 clinical scales is inconsistent with the fact that he has not worked for the City and County of Honolulu for the past two years.

One possibility is that the stability and consistency of his clinical scales on this test over a period of approximately two-and-a-half years could reflect the fact that Mr. English had a longstanding history of psychiatric and emotional problems. This is corroborated by the fact that Mr. English had a prior history of psychiatric treatment for depression, including hospitalizations for two attempted suicides in 1989 and 1998. Furthermore, his relatively poor employment history prior to the accident, which resulted in his having to declare bankruptcy, suggests that he may have been so depressed at that time that it seriously interfered with his ability to function at his job and contributed to his suicide attempt in 1998. Thus, he appears to have a history of recurrent depression with inter-episode recoveries.

Although it is possible that Mr. English's history of recurrent depression may have been exacerbated by the stress of his job while working for the City and County of Honolulu, he seems to be quite reluctant to move on with his life and remains fixated on these issues despite being encouraged to move on by his psychotherapist (Gerald Coffee, LCSW). He also seems quite naïve regarding the effect his allegations of illegal activities would have on his coworkers and superiors. He seems unable to understand and accept this while rigidly maintaining that his "whistle blowing "was morally justified. This seems to reflect a long-standing pattern of moral rigidity and self-defeating behavior: which he apparently fails to acknowledge since he appears to project the blame for his failures on the actions of others.

Mr. English does not appear to accept any responsibility whatsoever for the problems that he appears to have created while working for the City and County of Honolulu. This appears consistent with his long-standing history of blaming others for his failures and projecting the cause of his problems to their malevolent actions. For example, he attributed the divorce of his second wife to her infidelity, blamed the attorney who was handling his divorce as having done a poor job of representing him, stated that his wife was doing a poor job of raising their son, had strong suspicions that his son was being molested at the Catholic School that he was enrolled in; felt that the actions of the harbor master regarding living

Philip English
Report Date: October 26, 2005
Page 47 of 47

aboard his boat were the result of the influence of two of his coworkers; and that his paychecks were deliberately held up in order to cause him financial difficulties

His ability to engage in competitive employment does not appear to have been compromised since he is currently working as a security guard. While he claims that he took this job to avoid people, I am puzzled at why he continues to work at this job when it does not allow him to work full-time or receive medical benefits. Since he has a real estate appraiser's license and has over 25 years of experience, I have a difficult time understanding why he has not sought work in this area. His argument that he would have to comprise his integrity to work in this area again makes little sense since he had worked as an appraiser for most of his life. At the risk of sounding cynical, I suspect that he will work in this capacity again after his law suit is settled

I reserve the right to change any of the opinions stated above based on my review of additional records and documents.

## DIAGNOSIS:

| | | |
|---|---|---|
| Axis I: | 1. | Major depression, recurrent, severe without psychotic features. |
| | 2. | Anxiety disorder. |
| | 3. | Psychological factors affecting medical condition. |
| Axis II: | | Rule out personality disorder with borderline, self-defeating, and dependent features. |
| Axis III: | | History of kidney cancer with nephrectomy. |
| Axis IV: | | Financial difficulties, inadequate social support, dissatisfactions with his current job, the health of his mother, and fears of becoming homeless. |
| Axis V: | | Global assessment of functioning = 65 (current). |

Robert J. Sbordone, Ph.D.

Diplomate, American Board of Clinical Neuropsychology
Diplomate, American Board of Professional Neuropsychology
Diplomate, American Board of Assessment Psychology
Fellow, National Academy of Neuropsychology
Fellow, American College of Professional Neuropsychology