Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3    -----------------------------------    )
     PHILIP E. ENGLISH,                      )
4                                            )
                Plaintiff,                   )
5                                            )
        v.                                   )Civil No.
6                                            )04-00108 JMS/KSC
     CITY AND COUNTY OF HONOLULU; GARY       )
7    T. KUROKAWA; ROBERT O. MAGOTA; ANN      )
     C. GIMA; and GK APPRAISALS, INC.;       )
8    JOHN DOES 1-10; JANE DOES 1-10; DOE     )
     PARTNERSHIPS 1-10; DOE CORPORATIONS     )
9    1-10; AND DOE ENTITIES 1-10,            )
                                             )
10              Defendant.                   )
                                             )
11   -----------------------------------    )

12

13

14

15

16              DEPOSITION OF SUZANNE FOUMAI

17   Taken on behalf of the Plaintiff, at 1100 Alakea Street, 23rd

18   Floor, commencing at 1:48 p.m., on August 4, 2006, pursuant

19   to Notice.

20

21

22

23

24   BEFORE:    JESSICA R. PERRY, CSR NO. 404

25              Registered Professional Reporter

EXHIBIT A

Page 2

```
 1              APPEARANCES
 2  For the Plaintiff:
 3        ROGER S. MOSELEY, ESQ.
 4        Moseley Biehl Tsugawa Lau & Muzzi
 5        Alakea Corporate Tower
 6        1100 Alakea Street, 23rd Floor
 7        Honolulu, Hawaii  96813
 8
 9  For the Defendant GK Appraisals, Inc.:
10        ANTHONY L. WONG, ESQ.
11        Matsui Chung
12        735 Bishop Street
13        Suite 411
14        Honolulu, Hawaii  96813
15
16  For the Defendants City & County of Honolulu, Gary T.
17  Kurokawa, Robert O. Magota, and Ann C. Gima:
18        MICHAEL L. LORUSSO, ESQ.
19        Kawashima Lorusso & Tom, LLP
20        Fort Street Tower
21        745 Fort Street, 5th Floor
22        Honolulu, Hawaii  96813
23
24
25
```

Page 3

```
 1           I N D E X
 2  EXAMINATION BY:                        PAGE
 3     Mr. Moseley                          4
 4
 5
 6
 7     EXHIBITS MARKED FOR IDENTIFICATION
 8  102.  Documents produced (10 pages)    12
 9
```

Page 4

```
 1              SUZANNE FOUMAI,
 2  the witness hereinbefore named, being first duly cautioned
 3  and sworn to testify the truth, the whole truth, and nothing
 4  but the truth, testified under oath as follows:
 5
 6              EXAMINATION
 7  BY MR. MOSELEY:
 8      Q.  Good afternoon.  How are you?  I'm Roger Moseley.
 9  I'm Phil English's attorney in this case.
10          Can you state your full name and address for the
11  record?
12      A.  Suzanne Mary Foumai, 1631 Liholiho Street,
13  Apartment 203, Honolulu, Hawaii 96822.
14      Q.  I used to live on Liholiho Street.  Down in
15  Makiki, right?
16      A.  (Nodding head.)
17      Q.  It's so convenient living down there, I'm telling
18  you.  It's just great.
19          Do you mind if I call you Sue?
20      A.  I don't mind.  Everybody calls me that.
21      Q.  Oh, good, because I didn't want to insult you or
22  anything if you didn't like to be called by Sue.  You can
23  call me Roger.  People have called me much worse.  Whatever
24  you like.
25          Anyway, Sue, have you ever had your deposition
```

Page 5

```
 1  taken before?
 2      A.  No.
 3      Q.  Okay, well, let me sort of explain the process,
 4  why, give you some hints and ground rules so it will make it
 5  a little bit more comfortable and useful for all of us.
 6          This part of a lawsuit is called discovery, and it
 7  really is mostly what it says it is.  In this deposition
 8  process here, I'll be asking you questions and the court
 9  reporter will record my question, and then you'll give me an
10  answer and the court reporter will record the answer.  When
11  the thing is all pau and probably it's like ten days or more
12  or less, it will all be typed up in a little booklet and
13  you'll get a chance to see it and go over and make
14  corrections to make sure that the court reporter has written
15  everything down properly.  Every once in a while there will
16  be maybe a question that once you see it in writing, you
17  realize you didn't understand it, so you might want to make a
18  correction there, too, but you'll get a chance to do that
19  before everything is all finalized.
20          So there are three major purposes for a
21  deposition.  One is, as I said, discovery, to find out what
22  you know, and that's usually a primary purpose for these
23  things.
24          Another purpose is when this case goes to trial,
25  if for some reason you're unavailable as a witness, this
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 6

1 could be used in place of your testimony at trial.
2 Generally, the court will have somebody read the deposition
3 questions and answers and then the jury will actually hear it
4 orally.
5        And the third reason is that if the case goes to
6 trial or when the case goes to trial, if you testify
7 differently than you testify today, somebody will almost
8 certainly point that out.  If I say, well, isn't it true that
9 X, and you say yes, it's true that X today, and then at trial
10 I say isn't it true that X, and you say no, no, no, Y, then
11 I'll point that out.  And that's called impeachment.  So
12 you'll have to explain why you're testifying differently at
13 trial than you are today.
14        Do you understand that?
15    A.   Yes.
16    Q.   And actually this brings us to another piece of
17 information.  The court reporter has a hard time copying down
18 properly things like uh-huh and huh-uh, and so if you would
19 avoid doing things like that that are sort of confusing when
20 they get into print, that will be great.  So if the
21 question -- if you can answer the question yes or no, if you
22 would say yes or no or okay or something along that line, it
23 would be much better than uh-huh or huh-uh.
24        The other thing is in normal conversation
25 oftentimes when people are talking, if they ask a question

Page 7

1 and the other person knows the end of the question before the
2 question is pau, and they already start answering because
3 they know what the question is.  That -- I mean you and I
4 will understand that perfectly well, but for the court
5 reporter, she's going to be taking down two people talking at
6 once, and it makes it very, very difficult.
7        So if you would wait until I'm finished talking
8 before you start answering, that would help the court
9 reporter out, and I'll try to did the same.  I'm just as
10 guilty as anybody else of doing that.  I get into the flow
11 and then I'm talking over everybody else.
12        So then the other thing that will happen is that
13 if you wait a half a beat until I'm finished -- I mean, after
14 I'm finished asking my question, and then the other attorneys
15 have actually the ability to insert objections and that will
16 give them an opportunity to object before you answer.
17        There may be things that I ask you that you're not
18 quite certain of.  I generally want you to avoid just pure
19 speculation, but if, for example, I say, well, you know, what
20 time was it, and you think, well, I think it was 11:00
21 o'clock, but it might have been 10:00, it might have been
22 9:00, it might have been 12:30, tell me what you think the
23 answer is and explain to me that you're not quite certain of
24 that.  So I would like your best response in those cases
25 where you actually think there's a response appropriate

Page 8

1 rather than just guessing.  But I don't want you to just say,
2 for example, well, it's 11:00 o'clock and then don't qualify
3 that when you think it might be 9:30.  I want to make sure
4 you qualify your responses if you think there's a question.
5        Do you understand that?
6    A.   Yes.
7    Q.   Is Mr. Lorusso your attorney today?
8    A.   Yes.
9    Q.   Have you retained Mr. Lorusso as your attorney?
10    A.   The day I was served.
11    Q.   And you have an attorney-client relationship with
12 Mr. Lorusso?
13    A.   Yes.
14    Q.   And that was formed on the day you were served
15 with the subpoena?
16    A.   Yes.
17    Q.   Have you met with Mr. Lorusso before your
18 deposition today?
19    A.   Yes, today.
20    Q.   You met today?
21    A.   Uh-huh.
22    Q.   Is that the only time you've met with him?
23    A.   Today was the only day.
24    Q.   The only time you've met with him?
25    A.   Yeah.

Page 9

1    Q.   And how long did you meet with him today?
2    A.   About half an hour.
3    Q.   About a half an hour.  Immediately before the
4 deposition today?
5    A.   Yes.
6    Q.   And did you discuss your testimony with
7 Mr. Lorusso?
8        MR. LORUSSO:  Let me object to the extent
9 that it calls for attorney-client privilege.  Any
10 communications or things that we talked about, I'll instruct
11 you not to answer.
12 BY MR. MOSELEY:
13    Q.   Okay, I'm asking you if you talked about your
14 testimony, not what you talked about, not the specifics of
15 the conversation.
16        MR. LORUSSO:  Same objection.  You can answer
17 if you understand the question.
18 BY MR. MOSELEY:
19    Q.   You know, in the relationship as your attorney, if
20 he thinks you're going to say something that's violative of
21 the attorney-client privilege, he is within his rights --
22 actually, it's probably his obligation to instruct you not to
23 answer, and then it's your choice to answer or not, but
24 Mr. Lorusso will say, "I instruct you not to answer."
25        So even though the attorneys are making

3 (Pages 6 to 9)

Page 10

1 objections, unless Mr. Lorusso says, "I'm instructing you not
2 to answer," then you should answer the question. And a point
3 of fact, even if Mr. Lorusso says, "I instruct you not to
4 answer," if you choose to waive the privilege, which I'm sure
5 Mr. Lorusso has explained to you, you can still do that,
6 although I'm sure he would advise you not to do that.
7         Do you understand that?
8     A.  Yes.
9     Q.  The question was:  Did you discuss your testimony
10 today with Mr. Lorusso?
11         MR. LORUSSO:  Same objections. And also to
12 the extent it's vague and ambiguous. You can answer.
13         THE WITNESS:  What was -- can you repeat
14 that?
15 BY MR. MOSELEY:
16     Q.  Did you discuss your testimony today with
17 Mr. Lorusso?
18     A.  Yes.
19     Q.  And did you spend the whole half an hour
20 discussing your testimony?
21         MR. LORUSSO:  I'm going to object. Vague and
22 ambiguous, and to the extent it calls for attorney-client
23 privilege. Go ahead. You can answer if you understand. If
24 you understand the question.
25         THE WITNESS:  We talked about --

Page 11

1         MR. Lorusso:  Don't say what we did discuss
2 specifically.
3         THE WITNESS:  Okay.
4 BY MR. MOSELEY:
5     Q.  Let me tell you one other thing, too. At any time
6 during the course of this deposition you're entitled to take
7 a break if you want to use the restroom or get up and stretch
8 your feet or get a drink of water. That also includes if you
9 want to consult with your attorney. If you have -- if you
10 have a response that you're not sure whether you should be
11 giving in the sense of the privilege, you are certainly
12 within your rights to consult with Mr. Lorusso and get his
13 advice and counsel as to whether that's an appropriate
14 answer.
15         MR. LORUSSO:  In other words, don't talk
16 about the specific content. In other words, I said X, you
17 said Y, or anything. That's what I mean by asserting the
18 attorney-client privilege.
19         THE WITNESS:  Okay.
20         MR. MOSELEY:  Can you read back my last
21 question?
22         (Record read.)
23         MR. LORUSSO:  Same objections. Vague and
24 ambiguous.
25         THE WITNESS:  Yes.

Page 12

1 BY MR. MOSELEY:
2     Q.  Were you served with a subpoena for your
3 deposition here today?
4     A.  Yes.
5     Q.  I don't see any documents. Did you bring any
6 documents?
7     A.  Yes, I did.
8     Q.  Oh, may I see the documents you brought?
9         MR. MOSELEY:  Let's go off the record for a
10 minute.
11         (Off the record.)
12         (Exhibit No. 102 marked.)
13 BY MR. MOSELEY:
14     Q.  I'm going to show you what's been marked Exhibit
15 102. Are these the documents that you found which you
16 thought were responsive to my subpoena?
17     A.  Yes.
18     Q.  Did you look for documents in every category of my
19 subpoena? There were a lot of categories. There were 32
20 categories.
21         MR. LORUSSO:  By "categories" he means each
22 of the questions.
23         THE WITNESS:  I cannot retain -- get those
24 copies because I'm no longer with real property.
25 BY MR. MOSELEY:

Page 13

1     Q.  Where are you now?
2     A.  I'm at transportation services.
3     Q.  Oh, I see. So you obtained all the copies that
4 were in your personal possession?
5     A.  Yes.
6     Q.  And the copies that you have given us in Exhibit
7 102 are the only ones you had in your personal possession
8 that were responsive to any category in the subpoena; is that
9 right?
10     A.  Yes.
11     Q.  When did you move to -- the Department of
12 Transportation Services, right?
13     A.  Yes.
14     Q.  Okay, when did you move to the Department of
15 Transportation Services?
16     A.  April 1st was my last day at real property, so --
17     Q.  Of this year, '06?
18     A.  No, '05. So the first Monday, April 4th, was my
19 first day at DTS.
20     Q.  And what do you do at DTS?
21     A.  I'm the secretary for the traffic engineering
22 division.
23     Q.  Is that a promotion or a higher job category than
24 what you had at the assessment division?
25     A.  Yes.

4 (Pages 10 to 13)

Page 14

1    Q.   How did you come to transfer to DTS?  Is that
2  something you sought out?
3    A.   No.  I put my application in several years for
4  Secretary 3 within the City, and they selected my name from
5  the list just about the time in January or February of '05,
6  and I was called in for an interview.
7    Q.   Were you a Secretary 2 at the assessment division?
8    A.   Yes.
9    Q.   What's the difference between a Secretary 2 and a
10  Secretary 3?
11    A.   Secretary 2 is an SR 14 pay and a Secretary 3 is
12  SR 16.
13    Q.   Are the job qualifications significantly
14  different?
15    A.   Yes, a little bit more higher level with
16  department directing -- with the director and with the branch
17  chiefs.  My duties were more on a managerial level.
18    Q.   As an SR 16?
19    A.   Yes.
20    Q.   I hope they gave you a significant raise as well?
21    A.   They did.
22    Q.   Good.
23         How long have you worked for the City and County
24  of Honolulu?
25    A.   Close to 13 years now.

Page 15

1    Q.   13 years.  All right, were there no Secretary 3
2  positions open in the assessment division?
3    A.   Yes.
4    Q.   Okay, so you were just looking throughout the City
5  for whatever Secretary 3 position would come up?
6    A.   Yes.
7    Q.   Are there any Secretary 3 positions in the
8  assessment division?  Not open ones, but are there any
9  positions even if they're filled?
10    A.   There's one.
11    Q.   One, and who is that?
12    A.   Donnie Wong.
13    Q.   That's Gary's secretary?
14    A.   Yes.
15         MR. LORUSSO:  Let him finish his question,
16  even though you can anticipate what he's going to ask.
17  That's okay.
18  BY MR. MOSELEY:
19    Q.   I'll do that, too.  We'll catch you if we think
20  about it, but oftentimes I have to confess, we let it slide,
21  too, and the court reporter just does the best she can, and
22  she's very good, by the way, but -- okay.
23         Any other reason for wanting to transfer out of
24  the assessment division?
25    A.   No.

Page 16

1    Q.   You were happy there?
2    A.   Yes.
3    Q.   You had no concerns about your job there at all?
4    A.   No.
5    Q.   Are you familiar with Phil English?
6    A.   Yes.
7    Q.   That's the gentleman sitting here to my left?
8    A.   (Nodding head.)
9    Q.   You were working in the assessment division when
10  Phil worked there, weren't you?
11    A.   Yes.
12    Q.   Were you there when he started?
13    A.   Yes.
14    Q.   And you were there when he no longer came to work?
15    A.   Yes.
16    Q.   Did you, as the -- you were a Secretary 2, but who
17  was your boss there at the assessment division?
18    A.   Robert Magota.
19    Q.   As Robert Magota's secretary, did you have any
20  specific duties with respect to personnel?
21    A.   Yes.
22    Q.   And what were those duties?
23    A.   Do payroll, keep attendance of all the leaves, of
24  sick and vacation, of all the employees -- appraisal
25  employees.

Page 17

1    Q.   But not clerical?
2    A.   Clerical, budget, and clerical work.
3    Q.   Okay, what I meant was clerical, you didn't keep
4  attendance and keep track of sick leave and vacation for the
5  clerical employees?
6    A.   Yes, I did.
7    Q.   How about PTO?
8    A.   No, PTO took care of their own.
9    Q.   So you took care of the appraisers and the
10  clerical.  That would include appraisal assistants?
11    A.   Yes.
12    Q.   Okay, so were you responsible for telling people
13  whether or not they had sick leave or vacation time or other
14  types of time and leave available to them?
15    A.   Yes.
16    Q.   Wasn't -- was there also a printout of that stuff
17  that came in the -- was there something that attached to the
18  paycheck that showed that kind of stuff as well?
19    A.   The paycheck itself showed the balance at a
20  certain period of time, but it didn't show the actual
21  vacation or sick leave for the accrual, because the accrual
22  was maybe two months not put on, but that was the only time
23  you would see the balance, is on the pay stub.
24    Q.   But that was sort of behind the times by about two
25  months?

5 (Pages 14 to 17)

Page 18

1    A.  Uh-huh, yes.
2    Q.  But you were the person that would know in the
3  division what you had coming, if you wanted to know what it
4  was, right?
5    A.  Yes.
6    Q.  Okay.  All right, so you were there when Phil
7  started?
8    A.  Yes.
9    Q.  I notice in Exhibit 102, the first page of this,
10  actually, the first -- looks like the first three pages of
11  this, cover a specific subject, and that's an orientation
12  meeting; is that right?
13    A.  Yes.
14    Q.  And the orientation meeting was to start on
15  Wednesday, July 26th, 2000 at 8:00 a.m.; is that right?
16    A.  Yes.
17    Q.  Was this essentially your first contact with Phil
18  English, was with respect to this meeting?
19    A.  Can you clarify that?
20    Q.  Well, did you have any formal contact with Phil
21  English before this meeting?
22    A.  Can you clarify "meeting"?
23    Q.  Before the meeting that is referred to in Exhibit
24  102 on the first three pages.
25    A.  Well, this is my first incident.

Page 19

1    Q.  Okay, did you meet him earlier than this, though,
2  did he come in, for example, and sign up paperwork with you
3  or something?
4    A.  No.
5    Q.  So you hadn't actually dealt with him before this
6  incident?
7    A.  Oh.
8    Q.  Is that right?
9    A.  No, I dealt with him when he first came to real
10  property.
11    Q.  And what did that dealing consist of?
12    A.  Paperwork, signing his -- keeping track of -- not
13  keeping track, an address of the employees, address,
14  telephone number, emergency information, paper that -- filing
15  for his beneficiary forms, mainly personnel.
16    Q.  So you were responsible for doing all those sort
17  of initial personnel things?
18    A.  Yes.
19    Q.  Contact information, benefit forms, Social
20  Security information, health insurance, what have you; is
21  that right?
22    A.  Yes.
23    Q.  So that was your first contact with Phil, right?
24    A.  Yes.
25    Q.  And was the incident described in the first three

Page 20

1  pages of Exhibit 102, was that your next contact with Phil?
2    A.  No.
3    Q.  You had a contact in between?
4    A.  We would talk about -- just say hi, good morning.
5    Q.  I guess I should have limited it to in terms of
6  actually doing business rather than social pleasantries.
7    A.  This is the first -- this is actually the first --
8  I would say important incident that I considered, I felt,
9  that was necessary to bring it up.
10    Q.  Okay.  Taking a look at the first page of Exhibit
11  102, on the second paragraph there it says beginning with
12  "Violet Lee," do you see that paragraph?
13    A.  Yes.
14    Q.  First of all, is this an email to somebody?
15    A.  Yes, this email is to Philip and to Wilfred.
16    Q.  On this first page?
17    A.  Yes, it's to Philip.
18    Q.  How can you tell it's to Philip?
19    A.  It has his name on there.
20    Q.  As required attendees?
21    A.  Yes.
22    Q.  This is not just a note to the file to explain
23  what happened?
24    A.  Yes, it's a file to explain what happened, why he
25  was not there at the orientation when he was supposed to be

Page 21

1  there.
2    Q.  Basically it says that you received a call from
3  Violet Lee, and you went to Phil's desk and saw him there at
4  around 9:30, and then he opened his task on the Outlook and
5  pulled up an email that you sent him and he pointed his
6  finger at start time and showed you a different time, later
7  than what I originally sent him.  Do you see that?
8    A.  Yes.
9    Q.  What time did he show you?
10    A.  11:00 o'clock, 11:30.  11:00 or 11:30.  I remember
11  it was something.
12    Q.  What happened is you went over there to find out
13  why he wasn't at the meeting?
14    A.  Yes, because Violet Lee wanted me to find out
15  where he was and to go to the director's office because they
16  were all waiting for him.
17    Q.  And so he -- what, did he say you -- I thought it
18  was later?
19    A.  He told me that I sent him an email task that
20  showed 11:00 o'clock instead of 8:00 o'clock.
21    Q.  Did he pull it up for you and show it to you?
22    A.  It was already open.  His monitor was there and I
23  saw it.
24    Q.  And it said 11:00 o'clock on it?
25    A.  Yeah.

6 (Pages 18 to 21)

Page 22

1    Q.   Other than that time, did it look like something
2  you had sent him?
3    A.   No.  I sent him the original email that I have
4  here that says 8:00 o'clock.
5    Q.   Okay, other than the difference in time, is what
6  he had on his screen the same as your original email?
7    A.   Can you rephrase that?
8    Q.   What was it he had on his screen that said 11:00
9  o'clock?
10   A.   The time that he had to be there.
11   Q.   Okay, but what -- what was the document that he
12 was showing you?
13   A.   The task document that I sent him, this email.
14   Q.   The --
15   A.   This one right here.
16   Q.   Page 2 of this exhibit?
17   A.   Page 3.
18   Q.   Page 3.  So he showed you something that looked
19 like page 3 but instead of 8:00 a.m. it said 11:00 a.m.?
20   A.   Yes.
21   Q.   But other than that, it looked exactly like page 3
22 did?
23   A.   Yes.
24        MR. WONG:  When you're referring to page 3,
25 you're referring to --

Page 23

1         MR. MOSELEY:  Page 3 of Exhibit 102, the
2  third page of Exhibit 102.  Actually, maybe we should
3  identify it further.  It says, "Subject:  New employment
4  departmental orientation," and then two lines below it says,
5  "Start, Wednesday, 7/26/2000 at 8:00 a.m."
6         MR. LORUSSO:  I'm sorry, counsel, that's very
7  similar to the way the front starts.
8         MR. MOSELEY:  Okay, how do we differentiate?
9         MR. LORUSSO:  May I suggest going 102 A, B,
10 C?
11        MR. MOSELEY:  Okay, we'll mark them A for the
12 first page, B for the second page, C for the third page, D
13 for the fourth page, E for the fifth page, F for the sixth
14 page, G for the seventh page, H for the eighth page, I for
15 the ninth page, and J for the tenth page.
16 BY MR. MOSELEY:
17   Q.   So what I'm talking about and what you're talking
18 about is 102 C; is that correct?
19   A.   Correct.
20   Q.   Did -- when Phil showed you that page, did you
21 make any comments or ask him any questions about it?
22   A.   Yes.
23   Q.   What did you say or ask?
24   A.   I told him that I sent him the email that showed
25 8:00 o'clock a.m., that he had to be at the department of --

Page 24

1  BFS director's office at 8:00 o'clock, but he said that he
2  was -- he showed me 11:00 o'clock and I thought that was odd.
3    Q.   Are these emails in a format that you can change
4  them --
5    A.   Yes.
6    Q.   -- after you receive them?
7    A.   Yes.
8    Q.   Okay.  And what was the end time that was shown on
9  his email?
10   A.   I don't know.
11   Q.   You say in -- on page A of 102 that you went back
12 to your desk and showed him your printed email you sent him
13 and pointed out that he must have changed the time on his
14 task reminder.  Do you see that?
15   A.   Yes.
16   Q.   And so you believe that he had changed the time on
17 his task reminder?
18   A.   Yes.
19   Q.   Okay, you further say:  "He then said if I could
20 call Violet and let her know it wasn't his fault for being
21 late and stated to me, 'I'm not a flake.'"
22        Is that what he said to you, "I'm not a flake"?
23   A.   Yes.
24   Q.   And he asked you to call Violet and tell her it
25 wasn't his fault?

Page 25

1    A.   Yes.
2    Q.   And you didn't call Violet?
3    A.   I called Violet and I told her that Phil was
4  leaving the office to go to the meeting.
5    Q.   But you didn't say anything further to Violet?
6    A.   No.
7    Q.   What is page B of Exhibit 102?
8    A.   That was the email I sent to Wilfred Martin.  He
9  responded to my email.
10   Q.   That was on July 19th, 2000?
11   A.   Yes.
12   Q.   What is the sentence on the bottom?  "Therefore,
13 just to confirm that the orientation was set for 8:00 a.m.,
14 Wilfred Martin sent me an acknowledgment that he will go
15 directly to city hall to attend the orientation as
16 scheduled."
17        What does that mean?
18   A.   This is the acknowledgment right here that he
19 responded to my email.
20   Q.   Wilfred Martin did?
21   A.   Yes.
22   Q.   Which email did he respond to?
23   A.   This one right here, B.
24        MR. LORUSSO:  You're pointing to -- is the
25 middle of the page where it says under original appointment;

Page 26

1   is that correct?
2            THE WITNESS:  Correct.
3   BY MR. MOSELEY:
4       Q.  Does this mean that there was a change in the
5   time?
6       A.  No.  It just states that he responded to me and
7   confirmed that he read my email and was -- put it on his
8   calendar and would go to the meeting.
9       Q.  He would go directly to city hall?
10      A.  Yes.
11      Q.  What does that mean?
12      A.  He would go directly to city hall for the meeting
13  with the director.
14      Q.  Rather than showing up for work?
15      A.  Yes.
16      Q.  Did you send Phil English an email similar to that
17  set forth in 102 B?
18      A.  Yes.
19      Q.  And did he respond to you?
20      A.  No.  It states not yet responded as of July 26th.
21      Q.  I'm sorry, where does it say not yet responded as
22  of July 26th?
23      A.  Meeting status.
24            MR. LORUSSO:  On A.
25            MR. MOSELEY:  Oh, on A.

Page 27

1            MR. LORUSSO:  Can we go off the record or are
2   you fine?
3            MR. MOSELEY:  Sure.
4            (Recess taken.)
5   BY MR. MOSELEY:
6       Q.  Off the record an explanation has been proffered
7   to me that essentially what appears on 102 B was the original
8   email you sent to both Wilfred Martin and Phil English.  Then
9   apparently the Outlook calendar, when the person accepts the
10  email, it sends a message back to you that the person has
11  accepted it.  Is that right?
12      A.  Yes.
13      Q.  And then this note, "just to confirm," that was
14  your note to the file basically saying that he -- Wilfred
15  Martin acknowledged it and he would go directly; is that
16  right?
17      A.  Yes.
18      Q.  And if you look at page 102 A, as of the date of
19  102 A, which I guess is July 26th, '07, I mean July 26th,
20  2000, Philip English had not yet responded?
21      A.  Yes.
22      Q.  So what -- what does C show?  Is that just like A
23  except without the note on the bottom?
24      A.  Yes, it still shows that he did not respond.  This
25  is from my computer.

Page 28

1       Q.  On both A and C it says:  "Show time as
2   tentative."  What does that mean?
3       A.  It was part of a default on the Outlook.
4       Q.  Okay.
5       A.  It's a default title that's used.
6       Q.  And what do you have to do to take care of that
7   show time as tentative?
8       A.  You can go in and say that it's a tentative time,
9   but as for attendance purposes, they have to be there at 8:00
10  o'clock.  That's -- because I did payroll.  I had to make
11  sure that for attendance purposes, if they didn't show up to
12  work, I know that they were there at this meeting.  That's
13  what tentative means, because they may not go because they're
14  sick.
15      Q.  Okay.  So when this message went to Phil, did it
16  say show time as tentative?
17      A.  Yes.
18      Q.  And this -- when did he start working there?
19      A.  I can't recall.
20      Q.  Well, if this was an initial orientation, it was
21  not too long before then, was it?
22      A.  Correct.
23      Q.  And you're thinking is that Phil changed the time
24  somehow to 11:00 a.m. from 8:00 a.m.; is that right?
25      A.  Yes.

Page 29

1       Q.  I did not know you could do that on incoming
2   emails.  And the system you use is Microsoft Outlook?
3       A.  Yes.
4       Q.  And the recipient can modify the message sent to
5   the recipient on that system; is that right?
6       A.  Yes.
7       Q.  What is shown on -- let's go back to the first
8   three pages.  Did Phil offer any other explanation other than
9   to show you the original time as 11:00 a.m.?
10            MR. LORUSSO:  Objection.  Asked and answered
11  and to the extent that the document speaks for itself.
12            THE WITNESS:  It states right there.  It's
13  stated right here.
14  BY MR. MOSELEY:
15      Q.  That's the only explanation he offered you was
16  just to show you that the original start time on his was
17  11:00 a.m.?
18      A.  Yes.
19      Q.  Did you say to him you must have changed it?
20      A.  Yes.
21      Q.  And what did he say when you said that to him?
22      A.  He didn't say anything.  And then he said can you
23  please call Violet and let her know that it wasn't his fault
24  for being late and that I'm not a flake.
25      Q.  Anything else he said to you?

8 (Pages 26 to 29)

Page 30

1    A.  No.
2    Q.  Did this ever come up at some later date?
3    A.  No.
4    Q.  So after this exchange, this was the last bit of
5  controversy about this particular incident?
6    A.  Correct.
7    Q.  Taking a look at page D, as in dog, of Exhibit
8  102, can you tell me what we're looking at here?
9    A.  It's the first day that, Friday, 2/28/03, I came
10  to work, all the appraisers were at training, at an IAAO
11  training, and there was a note on my chair and it said call
12  him ASAP.  So I called Phil.  He asked me -- he wanted to
13  fill out a form for someone who was sick, and I had to ask
14  him if it's a workman's compensation form that he's referring
15  to and he said yes.
16    Q.  And then what happened?  He gave you a doctor's
17  note?
18    A.  Yes, he gave me a note to look at, and I -- it
19  said D-E-F, and I didn't understand what that meant, and he
20  said it means deferred, meaning it's confidential.  And so I
21  explained to him the process of filing a workman's comp.  It
22  needs to have the signature of the supervisor as to how
23  the -- when the sickness started, and it needed to go to the
24  personnel department, too, for processing, because if there's
25  no supervisor's note or signature, the workman's comp form

Page 31

1  will be sent back to our department to fill it out, and it
2  will just only delay the process.
3    So I explained that to him, that you needed to
4  have all that information done with the note and it goes to
5  personnel to process for workman's comp.
6    Q.  So what happened then?
7    A.  Then he came back and he said he wanted to -- I
8  think he went down there.  He came back and he said he called
9  up the workman's comp, and I'm not sure if he even called
10  that man, Adam Kupau.  He may not have been at the office.
11  But he said he's going to go down there and speak with
12  somebody, because someone at the workman's comp told him that
13  it's okay, as long as he had a supervisor's -- from, I guess,
14  just to sign, a statement, just a statement.  But I asked him
15  if he was going to leave the office, he needed to, you know,
16  contact his supervisor and let him know that he was leaving
17  the office because he was supposed to have gone to a
18  mandatory training.
19    Q.  And then what happened?
20    A.  So then I went back downstairs to collect the
21  sign-in sheets, and I was surprised to see Phil sitting down
22  at Julie's desk talking to Carole, and I asked if -- when he
23  was leaving.  He said he was waiting.  So I just walked away.
24    I went downstairs to the basement to collect the
25  other sign-in sheets and I saw Gary.  He asked why Phil was

Page 32

1  not at the meeting, and I told Gary that -- exactly what
2  happened here.
3    Q.  Did Gary ask you why Phil was not at the meeting,
4  or did he ask you why Phil was still in the office?
5    A.  He was -- he was still -- why he was still in the
6  office and wasn't at the training.
7    Q.  So did Gary indicate that he had seen Phil in the
8  office?
9    A.  I don't know.
10    Q.  When did you make this note?
11    A.  That same day.
12    Q.  At around 8:05 a.m.?
13    A.  Correct.
14    Q.  Did somebody ask you to make this note?
15    A.  I did it myself.
16    Q.  And then the second note on here, Monday, 3/3/03,
17  did you also do that yourself?
18    A.  Yes.
19    Q.  And did anybody ask you to make that note?
20    A.  Can you repeat that again?
21    Q.  Did somebody ask you to make that note?
22    A.  No, I did it myself.
23    Q.  Are these notes you put in Phil's file?
24    A.  Yes.
25    Q.  What -- can you explain the first paragraph under

Page 33

1  Monday, 3/3/03?
2    MR. LORUSSO:  This one.
3  BY MR. MOSELEY:
4    Q.  It says you collected time sheets Monday.
5    MR. LORUSSO:  Sign-in sheets.
6  BY MR. MOSELEY:
7    Q.  I'm sorry, sign-in sheets on Monday?
8    A.  Correct.
9    Q.  These were the sign-in sheets for Friday?
10    A.  Yes.  He didn't sign out.
11    Q.  He did not sign in or he did not --
12    A.  He did not sign in.  So I had to find out how I
13  was going to complete the pay time and attendance for Phil
14  for the entire division because it will be held back, and we
15  had a deadline.  Wednesday is the deadline.
16    Q.  And how did you check on that?
17    A.  I had to call -- I spoke with Annie.
18    Q.  That's Ann Gima?
19    A.  Yes.  She advised me to call Violet.  Violet
20  advised me to talk to Mike Golojuch.
21    Q.  Since he was taking care of this case; is that
22  right?
23    A.  Yes.
24    Q.  Did you know what she was talking about when she
25  said Mike Golojuch is taking care of this case?

9 (Pages 30 to 33)

Page 34

1    A.  I don't know.

2    Q.  Do you know what case they were talking about?

3    A.  No.

4    Q.  You have it also listed here Monday, 3/03/03, 8:30

5    a.m.: "Called Mike Golojuch at 8:30 and left message for him

6    to call me back."

7       Do you see that?

8    A.  Yes.

9    Q.  Did you just ask him to call you back, or did you

10   leave any further messages?

11   A.  I just left a message for him to call me back.

12   Q.  Did Mike Golojuch call you back?

13   A.  Yes, he did, at 1:00 o'clock.

14   Q.  Okay, let's go down to the next entry on page D,

15   as in dog.  "Monday, 3/3/03 at 10:30 a.m., Bob called me to

16   his office."

17       Did you write this note?

18   A.  Yes.

19   Q.  And, again, you were just documenting your

20   activities for the file?

21   A.  Yes.

22   Q.  What -- what happened that you're documenting

23   here?

24   A.  Can you clarify that?

25   Q.  Sure.  Tell me what happened.

Page 35

1    A.  I'm sitting in here trying -- they called me in

2    basically to discuss the attendance, and they wanted my --

3    they wanted me there so that I can understand how the

4    attendance would go into the PT&A, so I needed direction,

5    because I couldn't just put in anything without

6    authorization.

7    Q.  And eventually they said to put in that you

8    authorized him to go see Tom Riddle?

9    A.  No.  That was a note to myself that I needed to

10   confirm from Bob, Gary, Annie had the day that Phil left

11   they had to have at least authorized him from leaving the

12   office, because I don't want them telling me that he left the

13   office because you told him to leave.  Because I'm not his

14   supervisor.  Bob was his supervisor -- Annie was his

15   supervisor.

16   Q.  What does this mean:  "Bob, Annie and Gary agreed

17   that Phil would say Sue allowed him to go see Tom Riddle"?

18       Were they speculating about what Phil was going to

19   say about who authorized him to go?

20   A.  Correct.

21   Q.  So in other words, they were saying that Phil was

22   going to blame you for that; is that right?

23   A.  Correct.

24   Q.  And then apparently -- so what was determined in

25   terms of who authorized him to go see Tom Riddle?

Page 36

1    A.  I don't know.

2    Q.  And then Bob directed you to deduct vacation pay

3    starting 2/28/03?

4    A.  Correct.

5    Q.  Until it's depleted, and then if he's not in

6    office, leave without pay?

7    A.  Yes.

8    Q.  That's what LWOP means?

9    A.  Correct.  That's the usual procedure we all use in

10   the City payroll system procedure.

11   Q.  Is that eventually what you did?

12   A.  Correct.

13   Q.  On the next page, E, it says "Monday, 03/03/03 at

14   1:00 p.m.," is this the note with respect to Mike Golojuch

15   calling you back?

16   A.  Yes.

17   Q.  And what did Mike Golojuch say when he called you

18   back?

19   A.  He advised me to discuss with Bob and Gary to

20   contact Phil by the end of the week or a couple of days of

21   the projected vacation it will run out.  So I had to Phil

22   informed that his vacation is running out.  Basically

23   payroll -- payroll has the last say.  I'm just doing the

24   attendance.  I'm just keeping attendance.

25   Q.  Basically, it looks like Mike told you to discuss

Page 37

1    it with Bob and Gary; is that right?

2    A.  Yes.

3    Q.  What did they want Bob and Gary to discuss with

4    you?

5    A.  To contact Phil and send him the balance of

6    what -- I had a -- I created a running -- a leave report that

7    showed all the entries, and it gave you a detailed amount of

8    how much he would have left if he were to use up all his

9    vacation and at what point in time it would go into leave

10   without pay.  So I sent that to Phil by letter to keep him

11   informed.

12   Q.  And then at the bottom of that paragraph it says:

13   "See email I sent to Bob outlining what Mike Golojuch

14   advised."

15   A.  Yes, this is exactly what he told me.  I don't

16   have the email.

17   Q.  Was there a separate email?

18   A.  I can't remember.

19   Q.  Would you have referred to a separate email if you

20   didn't have one?

21   A.  Yes.

22   Q.  If somebody who's not familiar with your process

23   reads "see email I sent to Bob outlining what Mike Golojuch

24   advised," doesn't that seem to suggest there's an email you

25   sent to Bob outlining what Mike Golojuch advised?

10 (Pages 34 to 37)

Page 38

1    A.  Yes.
2    Q.  But there wasn't one?
3    A.  There was one.
4    Q.  Oh, there was one?
5    A.  I didn't print it out.  I don't know what happened
6  to it.
7    Q.  When did you print all this stuff up?
8    A.  Daily.  It's a daily entry.
9    Q.  When did you print this -- these entries out?
10   A.  That was back in -- must have been '04, '03?  '03.
11  I would present it out as each week came, I would print it
12  out, put it in, and as it'd be updated, I typed it in,
13  reprint it and put it back in to show the sequence of what
14  has been happening.
15   Q.  So it says Monday 03/03/03 at 3:13 p.m., "See
16  email."  What's that reference to, the "see email"?
17   A.  That was about a leave that was taken on 10/25/02
18  for four hours of vacation, because it was unauthorized
19  leave, and I had to find out if that four hours was going to
20  be deducted or as a late entry on the pay time and
21  attendance.
22   Q.  And did you deduct that?
23   A.  Yes.
24   Q.  So who approved that leave?
25   A.  Bob did.

Page 39

1    Q.  And Bob also instructed you to deduct four hours
2  of vacation?
3    A.  Correct.
4    Q.  Was it, in fact, a four-hour absence on 10/25/02?
5    A.  It was vacation.
6    Q.  Was it a four-hour absence?
7    A.  Yes.
8    Q.  Do you know what time he started?
9    A.  I can't recall.
10   Q.  But you calculated it to be four hours; is that
11  right?
12   A.  On the pay -- on the sign-in sheet it showed four
13  hours that was unaccounted for.
14   Q.  So he signed out and he signed out four hours
15  early; is that right?
16   A.  Correct.
17   Q.  What late entry was made on 3/4/03 on the time and
18  attendance of 2/23/03?
19   A.  The 10/25/02.
20   Q.  But you're writing this on 3/3/03 that says see
21  late entry made on the following day?
22   A.  Yes.
23   Q.  So you intended to make that late entry; is that
24  right?
25   A.  No.

Page 40

1    Q.  You had already made the late entry?
2    A.  No.
3    Q.  Okay, I don't understand the reference to the
4  following day, then.  How can you refer to something that
5  happened on the following day when the following day hasn't
6  come yet?
7    A.  I made the late entry on 3/4/03 to deduct the four
8  hours for 10/25/02.
9    Q.  And you wrote that down on 3/3/03?
10   A.  No, that was the day he approved it.
11   Q.  He approved it on 3/3/03?
12   A.  Yes.
13   Q.  So these days and times are not necessarily
14  reflective of the time you're writing down this note?
15   A.  No, this is what happened.  The day he -- 3/3
16  represents the day that he approved the leave to be deducted
17  from the payroll.
18   Q.  And when did you write this note?
19   A.  3/3.
20   Q.  I submit to you, you didn't write it on 3/3 if you
21  said see late entry made on 3/4.
22       MR. LORUSSO:  Object to the form.
23  Argumentative.
24       THE WITNESS:  The next day I made the late
25  entry, 3/4.

Page 41

1  BY MR. MOSELEY:
2    Q.  But you didn't write this particular note on 3/3,
3  did you?
4    A.  I did.
5    Q.  So it should have said see late entry I will make
6  on 3/4?
7       MR. LORUSSO:  Objection.  Argumentative.  Do
8  you understand his question?
9  BY MR. MOSELEY:
10   Q.  How can you write a note on 3/3 about something
11  that you did in the past tense on 3/4?
12       MR. LORUSSO:  Object to the form.
13  Argumentative.  Document speaks for itself.
14       THE WITNESS:  See the bottom where it says
15  "since Joyce was on vacation 3/3"?
16  BY MR. MOSELEY:
17   Q.  Yes.
18   A.  Only Joyce could make that late entry.
19   Q.  Okay.
20   A.  So that's why the next day it was made by Joyce.
21   Q.  Well, then --
22   A.  See, Joyce is the payroll clerk.
23   Q.  Did you -- this entry that's described 03/03/03 at
24  3:13 p.m., when did you make this note?
25   A.  I made that note that day, because you see we can

11 (Pages 38 to 41)

Page 42

1  go into the payroll and make a late entry the next day. I
2  think I might have made this 3/4. I made a mistake maybe.
3      Q.  Okay, so you created this note on 3/4 describing
4  things that happened on 3/3; is that right?
5      A.  Correct.
6      Q.  You see the problem now that I'm having
7  understanding this, yes?
8      A.  Okay.
9      Q.  Yes? Okay. How do you know that you didn't make
10 it -- or how can I tell that you didn't make this entry a
11 significant time later?
12     A.  Because I documented it that time. I was typing
13 it at that hour.
14     Q.  But you weren't typing it on 3/3/03 at 3:13 p.m.,
15 were you?
16     A.  I was.
17     Q.  Okay. If you were typing it at 3/3 -- on March
18 3rd of 2003 at 3:13 p.m., how could you possibly know a late
19 entry was made on March 4th of '03?
20     A.  Because if Bob approved it, then I would know it
21 would be the next day I would put it in.
22     Q.  It would be made?
23     A.  It would be made.
24     Q.  Not that it had been made?
25     A.  It would be made.

Page 43

1      Q.  So your note here is not saying that it was made,
2  but that instead it would be made?
3      A.  Yes.
4      Q.  The next date says Tuesday, March 3rd -- or March
5  4th of '03, "Joyce responds to my email."
6      Do you see that?
7      A.  Yes.
8      Q.  What are you explaining here?
9      A.  I'm explaining his low leaves for the days of
10 10/25/02, 2/28/03, and I'm asking Joyce to -- we were going
11 over, back and forth, to explain to me how many hours does he
12 have left. That's basically what was discussed here and
13 explained here.
14     MR. LORUSSO:  Can we take a short break,
15 please?
16     MR. MOSELEY:  Sure.
17     (Recess taken.)
18     MR. MOSELEY:  Okay, let's go back on the
19 record.
20 BY MR. MOSELEY:
21     Q.  Now, I'm not sure it's going to be worthwhile to
22 get into detail about each one of these entries. Basically,
23 the rest of this log details your conversations with various
24 people on how to deal with Phil's payroll, vacation, and
25 leave without pay; is that right?

Page 44

1      A.  Yes.
2      Q.  And when we were talking about the last item, you
3  talked about Joyce and you discussing the non-accrual of 14
4  hours for February; is that right?
5      A.  Yes.
6      Q.  Eventually, was there an accrual of 14 hours for
7  February?
8      A.  Eventually there was given hours back to him
9  because the workman's comp was approved and he -- Joyce had
10 to adjust the entries so that he could get back the accrual.
11     Q.  There is a note here on Thursday, March 6th of '03
12 that Bob called you into his office, and you didn't go to see
13 him until 2:00 p.m.; is that right?
14     A.  Yes.
15     Q.  And Gary Kurokawa and Ann Gima were there?
16     A.  Yes.
17     Q.  Did either one of them say anything to you?
18     A.  No.
19     Q.  But Bob handed you a letter and said just send
20 this to Philip?
21     A.  Yes.
22     Q.  What did the letter say?
23     A.  I can't remember.
24     Q.  Did it deal with his sick leave and vacation pay
25 and things like that?

Page 45

1      MR. LORUSSO:  Objection to the extent it
2  calls for speculation.
3      THE WITNESS:  I'm not sure.
4  BY MR. MOSELEY:
5      Q.  Okay. Again on Monday, March 10th of 2003, it
6  says Bob called you into his office and Gary Kurokawa was
7  present; is that right?
8      A.  Yes.
9      Q.  And Bob gave an overview of what he learned from
10 Tom Riddle; is that right?
11     A.  Yes.
12     Q.  And what did Tom Riddle say -- what did Bob report
13 that Tom Riddle said?
14     A.  I can't recall.
15     Q.  Did it discuss Philip's condition at all?
16     A.  Can't recall.
17     Q.  How long was this discussion?
18     A.  I can't recall.
19     Q.  Do you know why you were called into this
20 discussion?
21     A.  No.
22     Q.  Did you find it odd that you were there?
23     MR. LORUSSO:  Objection. Vague and
24 ambiguous.
25     THE WITNESS:  Well, I'm the secretary.

12 (Pages 42 to 45)