Page 46

1  BY MR. MOSELEY:
2  Q. Did you take notes?
3  A. No.
4  Q. Did you have any idea what the purpose of your
5  attendance at that meeting was?
6  A. To discuss his attendance, because of workman's
7  comp.
8  Q. Were you asked about his attendance?
9  A. Yes.
10 Q. What were you asked?
11 A. Regarding the leave without pay.
12 Q. What did they ask you about the leave without pay?
13 A. I can't remember.
14 Q. And then on Monday, March 17th, you found a letter
15 from Bob on your chair?
16 A. Yes.
17 Q. And do you know what that letter said?
18 A. I can't remember.
19 Q. You don't have any idea of the subject matter at
20 all?
21 A. It had to do with his leaves.
22 Q. And then also on Monday, March 17th, you actually
23 talked with Phil on the phone?
24 A. Yes, he called me.
25 Q. Okay. And you advised him that his check had been

Page 47

1  deposited?
2  A. Yes.
3  Q. Is that right?
4      When you say: "I assess to help him by referring
5  him to the Hawaii Food Bank," what did you mean by that?
6  A. I meant to offer some sort of help if he needed
7  food. I said to call the Hawaii Food Bank if he needed food,
8  because he didn't -- he wasn't sure about his check being
9  deposited.
10 Q. Okay. Then Phil called again on March 21st, did
11 he?
12 A. Yes.
13 Q. And he asked about his medical premiums?
14 A. Yes.
15 Q. And what did you tell him?
16 A. Well, I explained to him that the -- the breakdown
17 for the premiums and the change of address form he needed to
18 fill out because it would only delay the check from getting
19 to him if I didn't have his correct address.
20 Q. When you saw Phil on February 28th of 2003, did he
21 look normal to you?
22     MR. LORUSSO: Objection. Vague and
23 ambiguous.
24 BY MR. MOSELEY:
25 Q. Or did he look sick?

Page 48

1  A. I can't recall.
2  Q. On Wednesday, April 9th, 2003, you say there was a
3  later dated -- a letter dated 4/9/03 that was sent to Phil
4  requesting his presence to discuss his annual job performance
5  evaluation. Do you see that?
6  A. Yes.
7  Q. Who told you to that send that letter, or did you
8  send that letter?
9  A. Mr. Magota.
10 Q. Were you the one that actually sent the letter?
11 A. Yes.
12 Q. It says "we request a meeting on 4/17/03," who is
13 the "we" referring to?
14 A. Bob and Annie.
15 Q. Did Bob tell you anything about that letter other
16 than send it?
17 A. He didn't tell me anything, just to send a letter.
18 Q. Did you draft the letter?
19 A. No. He drafted it.
20 Q. He drafted it. Did you type it up?
21 A. Bob had a tendency to type his own letters and I
22 would just send it out.
23 Q. What does this note on April 28th of 2003 mean?
24 This is on page F of Exhibit 102.
25 A. He wanted to cancel Pim from his insurance, and

Page 49

1  because it was -- the open enrollment is only between a
2  certain window of time beginning April 1st and May 1st, and I
3  told him that he doesn't have to worry about not putting --
4  not taking Pim off because it's a new open enrollment, and so
5  whatever he applies, he just applies for himself, then that's
6  just it, he just applies for himself.
7      But I needed to have him send back to me this PCP
8  form, which is a premium conversion plan form, which skims
9  off the medical from your pay so it lowers your net for tax
10 purposes, and I needed to have him sign that form and return
11 it to me as soon as he could. That's why I told him I
12 enclosed the stamped envelope that I enclosed for him to use.
13 Q. Did he tell you why he wanted Pim cancelled from
14 his insurance?
15 A. No.
16 Q. Take a look at page G of Exhibit 102. Can you
17 explain what this is?
18 A. This is from Joyce, telling me what she's doing to
19 adjust Phil's leave pay -- relief records, and to use a
20 coding is used for the pay time and attendance. W7
21 represents workman's comp.
22 Q. I see. So as of April 7th, you changed the time
23 and attendance to workman's comp?
24 A. Yes.
25 Q. And what -- what is the --

Page 50

1  A.  Joyce --
2  Q.  -- the effect of that to Phil?
3  A.  It gives him -- I can't -- I don't know. I'm not
4  the payroll clerk.
5  Q.  I think there was something else you were going to
6  say. I think I interrupted part of your answer. Did I?
7  A.  No.
8  Q.  And page H, what does this mean?
9  A.  I was asking Joyce to fax me Phil's leave record
10 because when a person goes on low leave, the payroll at city
11 hall keeps a card separate from other people, it's a low
12 leave card, and I wanted to -- just to verify what Joyce is
13 doing is correct on my side. That's all.
14 Q.  And she emailed you that card?
15 A.  Yes.
16 Q.  There was also a late entry for sick leave on
17 February 4th of 2003?
18 A.  Yes.
19 Q.  What is a C-H-R-M-S?
20 A.  CHRMS. CHRMS is the City's -- City's -- it's a
21 system, it's a -- that's how -- it's a newer version of this
22 payroll system that they had, but it's no longer in use
23 anymore. It was an increment -- an acronym, I mean, for that
24 program.
25 Q.  Okay. And exhibit -- I mean page J of Exhibit 102

Page 51

1  is a further explanation of the sick leave of February 4th,
2  2003?
3  A.  Yes.
4  Q.  And you looked through your files and you found no
5  other documents responsive to our subpoena request?
6         MR. LORUSSO: Objection. Asked and answered.
7         THE WITNESS: Yes.
8  BY MR. MOSELEY:
9  Q.  And where did you find these documents that are in
10 Exhibit 102?
11 A.  These were from my computer. It was in the file,
12 Phil's file.
13 Q.  Okay. I thought you said that when you looked for
14 these documents, you didn't have access to that?
15 A.  I didn't say that.
16 Q.  What did you say?
17 A.  I said I got this from the email. I printed it
18 out.
19 Q.  So you still have access to your old email files?
20 A.  No. It was deleted when I went over to
21 transportation, everything was wiped out.
22 Q.  When did you print out the documents that are in
23 Exhibit 102?
24 A.  As each day came by, I printed it out.
25 Q.  And where did you keep the hard copies?

Page 52

1  A.  In the file, Phil's personnel file.
2  Q.  Did you just recently look in Phil's personnel
3  file for these documents?
4  A.  No, I had -- I had these.
5  Q.  Where?
6  A.  At home.
7  Q.  You took Phil's personnel information home?
8         MR. LORUSSO: Objection. Misstates the
9  testimony.
10        THE WITNESS: Just -- just these.
11 BY MR. MOSELEY:
12 Q.  You had these files that are in Exhibit 102, you
13 had these at your house?
14 A.  No, they were at the office.
15 Q.  When you just looked for them, did you just look
16 for them in response to our subpoena?
17 A.  I had them with me, these, just this.
18 Q.  Okay. Where did you have them?
19 A.  In my file.
20 Q.  What file?
21 A.  My home file.
22 Q.  Your home file?
23 A.  Uh-huh.
24 Q.  So you had these documents that are in Exhibit
25 102 --

Page 53

1  A.  Yeah.
2  Q.  -- you had them in your file at home?
3  A.  And it's also in Phil's personnel file.
4  Q.  These particular documents here, though, you had
5  these documents in a file at your house; is that right?
6  A.  Correct.
7  Q.  Why did you have Phil's personnel information in a
8  file at your house?
9         MR. LORUSSO: Just for the record, I'll
10 object to the characterization, as opposed to Exhibit 102.
11        THE WITNESS: Well, because I felt that this
12 was pertinent to protect myself, because I was a payroll
13 clerk and I was a secretary.
14 BY MR. MOSELEY:
15 Q.  So you took these pieces of information home to
16 protect yourself?
17        MR. LORUSSO: Objection. Asked and answered.
18 BY MR. MOSELEY:
19 Q.  Is that right?
20 A.  For my information in case -- in case --
21 Q.  I want to be really clear about this. The pieces
22 of paper from A through J --
23 A.  Because --
24        MR. LORUSSO: Let him ask his question.
25 BY MR. MOSELEY:

Page 54

1  Q. The pieces of paper from A through J on Exhibit
2  102 are pieces of paper you brought in today pursuant to
3  subpoena, correct?
4  A. Correct.
5  Q. And you got these pieces of paper from a file that
6  you kept at your house; is that right?
7  A. Yes.
8  Q. Is there anything else in that file that you kept
9  at your house?
10 A. No.
11 Q. Did you believe that you had the right to take
12 this information home with you and keep it in a file in your
13 house?
14     MR. LORUSSO: Objection to the extent it asks
15 for a legal conclusion.
16 BY MR. MOSELEY:
17 Q. I'm asking for your belief.
18     MR. LORUSSO: And argumentative.
19 BY MR. MOSELEY:
20 Q. I'm asking for your belief. Did you believe that
21 you had the right to take this information home and put it in
22 a file in your house?
23     MR. LORUSSO: Same objection.
24     THE WITNESS: I didn't feel that there was
25 anything wrong with keeping this, because this is my notes.

Page 55

1  BY MR. MOSELEY:
2  Q. Isn't this personal information concerning Phil
3  English?
4      MR. LORUSSO: Objection.
5      MR. WONG: Argumentative.
6      MR. LORUSSO: Same, join in the objection.
7  Vague and ambiguous. The documents speak for themselves.
8  BY MR. MOSELEY:
9  Q. Do you want the question read back to you again?
10 A. Yes.
11     MR. MOSELEY: Would you please read the
12 question back?
13     MR. WONG: Also vague and ambiguous as to the
14 definition of "personal."
15     (Record read.)
16     MR. LORUSSO: Same objections and join.
17     THE WITNESS: Because he was a City employee,
18 and I had all this information here, I took this home as --
19 just for my -- just to keep it, just in case if this ever
20 came to this day.
21 BY MR. MOSELEY:
22 Q. I asked you if this is personal information?
23     MR. LORUSSO: Objection. Vague and
24 ambiguous, argumentative, documents speak for themselves.
25     THE WITNESS: This is all --

Page 56

1  BY MR. MOSELEY:
2  Q. I'm asking for your opinion. Do you think this is
3  personal information --
4  A. No.
5  Q. -- with respect to Phil English?
6  A. No.
7  Q. You don't think this is personal information?
8      MR. LORUSSO: Objection. Asked and answered.
9  She just answered the question.
10     MR. MOSELEY: That's true. I was being
11 argumentative.
12 BY MR. MOSELEY:
13 Q. Do you have any similar kind of information about
14 any other employee of the assessment division at your house?
15 A. No.
16 Q. Why would you just take Phil's information?
17     MR. LORUSSO: Objection. Asked and answered.
18 Or to the extent it's been asked and answered.
19 BY MR. MOSELEY:
20 Q. Where did you keep this information at your house?
21 A. In my file.
22 Q. Where's your file? In some kind of a filing
23 cabinet?
24 A. Yes.
25 Q. And who has access to that filing cabinet?

Page 57

1  A. Just me.
2  Q. Just you. Is it locked?
3  A. Yes.
4  Q. And there is nothing else in there of any import
5  with respect to any other personnel issues of any other
6  employee of the assessment division?
7      MR. LORUSSO: Objection. Asked and answered.
8  You've answered it. You can tell him again.
9      THE WITNESS: I can tell you that all this
10 information --
11     MR. LORUSSO: No, no, it's just -- his
12 question is, is there -- as you've answered --
13     MR. MOSELEY: Can you let her answer the way
14 she's going to answer?
15     MR. LORUSSO: But she wasn't answering your
16 question.
17     MR. MOSELEY: She was answering. She started
18 to say "all I can tell you is."
19     THE WITNESS: Can you say it -- can you give
20 me the question again?
21 BY MR. MOSELEY:
22 Q. Why don't you just give me the answer you were --
23 A. No, give me the question again.
24     MR. MOSELEY: Can you read the question back,
25 please?

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 58

```
 1            (Record read.)
 2            THE WITNESS:  No.
 3            MR. LORUSSO:  Let's take a short break,
 4   please.
 5            (Recess taken.)
 6   BY MR. MOSELEY:
 7       Q.   Okay, Sue, I'm going to show you what we marked
 8   previously as exhibit -- you have it already?  Oh, good --
 9   previously as Exhibit 72 in depositions in this case.  It's a
10   two-page document.  It's entitled "Workplace Violence
11   Checklist, February 10th, 2003."
12            Have you seen this document before?
13       A.   Yes.
14       Q.   Can you tell me what it is?
15       A.   It's just questions; my comments.
16       Q.   Did you -- did somebody interview you on or about
17   February 10th, 2003?
18       A.   Yes.
19       Q.   And who interviewed you?
20       A.   Michael Golojuch.
21       Q.   And where did he interview you?
22       A.   On the third floor of 842 Bethel Street.
23       Q.   At the assessment division?
24       A.   Yes.
25       Q.   Did he interview you on February 10th, 2003, or
```

Page 59

```
 1   was it later?
 2       A.   February 10th?
 3       Q.   Do you remember specifically that it was February
 4   10th?
 5       A.   It was February 10th.
 6       Q.   How do you remember it being February 10th?
 7       A.   I don't know.  It says February 10th on the paper.
 8       Q.   Other than it saying February 10th on the paper,
 9   do you have an independent recollection of it being February
10   10th?
11       A.   No.
12       Q.   Could it have been in March?
13            MR. LORUSSO:  Objection.  Calls for
14   speculation.
15            THE WITNESS:  I don't know.  It states on the
16   paper.
17   BY MR. MOSELEY:
18       Q.   Does this reflect a series of questions that were
19   asked to you and your answers to those questions?
20       A.   Yes.
21       Q.   Okay.  And question numbered 7 on the first page,
22   you said:  "Within the first two weeks Phil had some
23   mandatory training with Roy, director.  Suzanne had sent an
24   email to Phil and Willy giving them the date and time of
25   training."
```

Page 60

```
 1            Do you see that?
 2       A.   Yes.
 3       Q.   Is that what's referenced in Exhibit 102 A, B, and
 4   C?
 5       A.   Yes.
 6       Q.   Okay.  So what you're saying is that within two
 7   weeks of June 1st, 2000, Phil missed a training session; is
 8   that right?
 9       A.   No, he went.  He was late.
10       Q.   So do you mean that by June 15th he went to the
11   training session late with Roy?
12       A.   Can you restate that?
13            MR. MOSELEY:  Can you read that question
14   back, please?
15            (Record read.)
16            THE WITNESS:  Where does it say June 15?
17   BY MR. MOSELEY:
18       Q.   Well, it says Phil English started on June 1st,
19   and within the first two weeks, which is -- two weeks is 14
20   days, is it not?
21       A.   Uh-huh.
22       Q.   If you add 14 days to June 1st, then you get June
23   15th, do you not?
24       A.   That's correct.
25       Q.   So what you're saying here is that sometime
```

Page 61

```
 1   between June 1st and June 15th Phil had a mandatory training
 2   with Roy; is that right?
 3       A.   Correct.
 4       Q.   And that you had sent an email to Phil and Willy
 5   giving them the date and time of training, correct?
 6       A.   Correct.
 7       Q.   And Sue was called and asked where is Phil,
 8   correct?
 9       A.   Correct.
10       Q.   And Phil was at his desk at approximately 9:30
11   a.m., right?
12       A.   Correct.
13       Q.   And the training start time was 8:30 a.m., right?
14       A.   Correct.
15       Q.   Actually, all that is not correct, is it?
16            MR. LORUSSO:  Correct that you just read it?
17   BY MR. MOSELEY:
18       Q.   It's correct that I just read it, but it's not
19   correct that it happened that way, is it?
20            MR. LORUSSO:  Do you understand the question?
21            THE WITNESS:  No.
22   BY MR. MOSELEY:
23       Q.   Did Phil have a mandatory training session with
24   Roy within the first two weeks of his start?  Did he have a
25   training session with Roy, the director, within the first two
```

Page 62

1 weeks of his start date?
2    A.  Yes.
3    Q.  So when was the date of the training session?
4        MR. LORUSSO:  What are you pointing to?  102?
5        THE WITNESS:  I'm not sure if -- I didn't
6 write this.
7 BY MR. MOSELEY:
8    Q.  Did you review this?  And when I say "this," I'm
9 referring to Exhibit 72.
10    A.  I looked at it.
11    Q.  Did you approve this?
12    A.  I think there was other training besides that one.
13    Q.  So on multiple occasions Phil was late for
14 training; is that right?
15    A.  I don't know.
16    Q.  You don't know?
17    A.  Just that one.
18    Q.  You're pointing to Exhibit 102?
19    A.  Yes, that's the only one I know.
20    Q.  This Exhibit 72, after you interviewed with Mike
21 Golojuch, did he send you a draft of the interview notes?
22    A.  Yes.
23    Q.  Did you review those notes?
24    A.  Yes.
25    Q.  And did you approve them as correct?

Page 63

1    A.  I didn't respond to him.  I just looked at it.
2    Q.  Then you didn't respond, yes, these are correct or
3 not?
4    A.  Yeah.
5    Q.  Did he send them to you via email?
6    A.  Yes.
7    Q.  Did he ask you to see if they were okay?
8    A.  I can't remember.
9    Q.  When you reviewed this, did you determine that the
10 things that you -- that were said in paragraph numbered 7
11 were incorrect?
12    A.  Maybe the date is incorrect.
13    Q.  And the times are incorrect, right?
14    A.  The times are incorrect.
15    Q.  And the date is incorrect?
16    A.  The date is incorrect.
17    Q.  Okay.  Did you tell -- but are these times and
18 dates, dates that you gave to Mike Golojuch when he
19 interviewed you?
20    A.  I can't remember.  It's been so long.  But
21 whatever --
22    Q.  Sue --
23        MR. LORUSSO:  Would you please let her finish
24 her answer.
25        THE WITNESS:  Whatever I have on here, if I

Page 64

1 talked to him that day, maybe the time, the dates were --
2 because there was a lot of training that new employees have
3 to go to, but I believe this date -- I believe this whole
4 thing was the dates were not correct.
5 BY MR. MOSELEY:
6    Q.  But at the time you had this interview with Mike
7 Golojuch --
8    A.  It was --
9    Q.  -- you had all the information available to you,
10 did you not?
11        MR. LORUSSO:  Objection.  Vague and
12 ambiguous.
13 BY MR. MOSELEY:
14    Q.  All the stuff that you've given to me in Exhibit
15 102, you had available to you when you interviewed with Mike
16 Golojuch, did you not?
17    A.  Yes.
18    Q.  Well, why did you get all the dates and times
19 wrong?
20        MR. LORUSSO:  Object to the form of the
21 question.  Argumentative, overbroad, and misstates the
22 document.
23        THE WITNESS:  I don't know.
24 BY MR. MOSELEY:
25    Q.  Sue, did you create the documents in Exhibit 102,

Page 65

1 did you create these later to protect yourself?
2    A.  No.
3    Q.  Okay.  There are numerous references here to the
4 start of the training time at 8:30, do you see that?  And I'm
5 referring to Exhibit 72, paragraph 7.  Do you see that?  It's
6 referred -- the start time is referred to at least four times
7 as 8:30, do you see that?
8    A.  Yes.
9    Q.  In your Exhibit 102, you're very clear that the
10 start time is 8:00 o'clock, aren't you?
11    A.  8:00 o'clock, meaning they had to be there by
12 8:30.  That's what the 8:00 o'clock is, get there before
13 8:30.
14    Q.  So 8:00 o'clock means get there before 8:30?
15    A.  Right.
16    Q.  Okay.  And then you say that Phil showed you a
17 start time at 11:30, do you see that?
18    A.  Right.
19    Q.  Of course in your record here you say the start
20 time was different, but you don't say a start time.  Do you
21 see that?
22    A.  Yes.
23    Q.  I think when you testified a little earlier you
24 said the start time he showed you on his email was 11:00; is
25 that right?

Page 66

1   A. Yes.
2   Q. Do you now still say the start time he showed you
3   was 11:00 or 11:30?
4   A. It was 11:00.
5   Q. Further down in paragraph 7 on Exhibit 72 it says:
6   "Another time Sue was explaining a process to Phil."
7       Do you see that?
8   A. Yes.
9   Q. What is that about?
10  A. Okay, I can't remember the date, but we were
11  getting new computers, Dell Dimension computers, we were
12  going to be getting OptiPlex computers and the IT, which is
13  the department of technology, informed our division to have
14  all the groups, by sections, download all their files onto
15  diskettes because they're going to be coming in and they're
16  going to be installing the new computers.
17      So what I did was I emailed the groups to please
18  clean out your files on your computer and download it to a
19  diskette because if the IT comes, they will -- all your
20  information will be wiped out.
21      So I had to explain that to him. And what
22  happened was Phil was the only one that emailed me back, and
23  he told me that, "I can't do that." And I said to him -- I
24  remember talking to him, and I said, "You have to, because if
25  you don't download or save all your files, everything is

Page 67

1   going to be wiped out."
2   Q. When did this occur?
3   A. I can't remember.
4   Q. Was it near the end of Phil's tenure there?
5   A. No, it was sometime in the middle.
6   Q. How many times did you guys get new computers
7   during the time Phil was there?
8   A. Just once.
9   Q. And then you got new computers again once after he
10  left?
11  A. No, we still had the same OptiPlex when I left.
12  When I left, we still had the same ones.
13  Q. Do you know if they've -- and you left in when in
14  '05?
15  A. '05, April 1st, I left.
16  Q. And do you know if the division got new computers
17  after you left?
18  A. I think they did get new computers.
19  Q. Again?
20  A. Yes.
21  Q. Did Phil tell you why he couldn't clean and save
22  the files?
23  A. No.
24  Q. Did he tell you that you had to do it or lose the
25  files?

Page 68

1   A. I don't know.
2   Q. Did he want an explanation of why it was done?
3   A. Yes. I had to explain to him.
4   Q. Why it was done?
5   A. Why it was done. Why he needs to clean up his
6   files.
7   Q. What was his objection? He just said he couldn't
8   do it, or he had some objection to doing it?
9   A. He just said, "I can't do that."
10  Q. You mean he was unable to do it?
11  A. I don't know.
12  Q. Do you know if he eventually did it?
13  A. I don't know.
14  Q. Did you do it?
15  A. No.
16  Q. On paragraph number 11 it says: "Do you feel
17  threatened?" Do you see that?
18  A. Uh-huh.
19  Q. Yes?
20  A. Yes.
21  Q. Did you feel threatened by Phil?
22  A. No.
23  Q. On number 12 it says: "Do you feel that physical
24  harm is possible?" And you said: "Physical, maybe."
25      Do you see that?

Page 69

1   A. Yes.
2   Q. Was that your response?
3   A. Yes.
4   Q. You felt that Phil could physically harm somebody?
5   A. Physically harm himself.
6   Q. Okay. How about harming anybody else?
7   A. No.
8   Q. Did you ever see Phil do anything violent?
9   A. No.
10  Q. Did you ever see Phil lose his temper?
11  A. No.
12  Q. Did Phil treat you any way other than nicely?
13  A. No, Phil was very nice to me.
14  Q. In paragraph numbered 13 on the second page of
15  Exhibit 72 you say: "Have any of his patterns of behavior
16  changed before this incident occurred?" You say: "Still the
17  same"; is that right?
18  A. Yes.
19  Q. So from your perspective, Phil behaved the same
20  way the whole time you knew him?
21  A. Yes.
22  Q. Actually, you didn't have a lot of contact with
23  Phil, though, did you?
24  A. No.
25  Q. Did you see Phil daily, do you think?

18 (Pages 66 to 69)

Page 70

1   A.  No.
2   Q.  You were kind of in a different section of the
3   building, right?
4   A.  Yes.
5   Q.  In paragraph 15 it says: "Do others feel
6   threatened?" And you said: "Yes, in group 3."
7       Do you see that?
8   A.  Yes.
9   Q.  Did anybody in group 3 tell you that they felt
10  threatened?
11  A.  Yes.
12  Q.  And when did they tell you that?
13  A.  I can't remember.
14  Q.  Did you have lunch with the people in group 3
15  pretty often?
16  A.  No.
17  Q.  What was your lunchtime?
18  A.  I ate lunch at my desk.
19  Q.  What was your lunchtime?
20  A.  12:00 o'clock.
21  Q.  12:00 o'clock. And in number 17 it says: "Do you
22  feel safe at work?" You said: "Yes"?
23  A.  Yes.
24  Q.  Did you tell Phil on the last day you saw him that
25  you actually feared for your job because of some things that

Page 71

1   Bob Magota was doing with respect to the way he handled
2   employees?
3   A.  I can't remember. I don't know.
4   Q.  Did you have concerns about the way Bob Magota
5   handled employees?
6   A.  No.
7   Q.  You felt that he did everything properly with
8   respect to handling employees?
9   A.  Yes.
10  Q.  On paragraph 18 it says: "What would you
11  recommend to prevent similar incidents?"
12      Do you see that paragraph?
13  A.  Yes.
14  Q.  And it says: "Anger management to control
15  temper."
16      Do you see that?
17  A.  Yes.
18  Q.  Was that your response?
19  A.  Yes.
20  Q.  Did any of the incidents described in your
21  interview constitute some sort of an anger or an angry
22  interchange?
23  A.  No.
24  Q.  And did he exhibit a bad temper in any of those
25  incidents?

Page 72

1   A.  No.
2   Q.  Why would you suggest that he get anger management
3   to control his temper?
4   A.  Well, I figured that because he was having
5   whatever was happening in the office with the computer
6   problem, he said, "I can't do that," I figured he was angry.
7   So I thought maybe he can take some -- take anger management
8   to learn something from it, because I took an anger
9   management class myself and it's good to learn.
10  Q.  Did he speak to you in an angry manner when he
11  said he couldn't do the computer thing?
12  A.  No, it was an email.
13  Q.  Was it an angry email or was it --
14  A.  Very abrupt. It was: "I can't do that."
15  Exactly. "I can't do that."
16  Q.  Okay, on paragraph number 21 you say: "Is there
17  anything else that you would like to add?"
18      Do you see that?
19  A.  Yes.
20  Q.  And then it says: "Everyone is happy when Phil
21  doesn't come to work because he is out on sick or on
22  vacation."
23      Do you see that?
24  A.  Yes.
25  Q.  On what basis did you make that statement?

Page 73

1   A.  I don't understand what you're saying.
2   Q.  Well, I mean, did you observe that when he wasn't
3   there everybody was happy?
4   A.  It's basically what I heard.
5   Q.  From whom?
6   A.  I don't know. I can't talk for them. It's just
7   basically the atmosphere that I -- when I went downstairs, I
8   saw the girls just talking, working, and that's about it.
9   That was my observation.
10  Q.  And so when you went downstairs, you saw the girls
11  talking and working; is that right?
12  A.  Yes.
13  Q.  And on that basis you determined that everybody is
14  happy when Phil doesn't come to work?
15  A.  I can't talk for them. I don't know.
16  Q.  No, I'm asking about your determination?
17  A.  I feel -- it didn't bother me. I was okay.
18  Q.  What is the -- why did you say everyone is happy
19  when Phil doesn't come to work?
20      MR. WONG: I think that's been asked and
21  answered.
22  BY MR. MOSELEY:
23  Q.  What did you base that on?
24  A.  I already answered.
25  Q.  Okay, answer it again then. What did you base

Page 74

1  that on? Let's be clear on this.
2  MR. LORUSSO: Objection. Asked and answered.
3  THE WITNESS: I saw the girls laughing,
4  talking. It's a comfortable atmosphere.
5  BY MR. MOSELEY:
6  Q. And then when he was there you went down and they
7  weren't laughing and talking?
8  A. Yes.
9  Q. Was this the case during the entire time Phil
10 worked there?
11 A. I can't remember.
12 Q. Did you notice a period of time in which things
13 changed with respect to what everybody felt when Phil was not
14 there?
15 A. When Phil was there working, he was a very good
16 appraiser. He took care of the customers on the telephone
17 and he did his work. Once -- I don't know when it happened,
18 but this whole thing, the problems with the girls feeling --
19 it's by my observation.
20 Q. Okay.
21 A. No one else told me anything. It's what I felt,
22 what I heard -- just the overall feeling, but a lot of us
23 like Phil. Phil did his job. He was very cordial in the
24 office. I had no problems with Phil. He's very nice.
25 But there are times I went -- when I would pick up

Page 75

1  my sign-in sheets, and I would walk around, and I noticed
2  that it's very quiet, very, you know, quiet.
3  Q. Sort of like a distant feeling when you walked in
4  the room or what?
5  A. No, everybody just was working. We were very
6  busy. Because during the real property -- during appeal
7  time. It's very, very busy and everybody is working.
8  Q. But was there a difference between when Phil was
9  there and when he wasn't there?
10 A. No.
11 Q. I mean, when you walked, say, into group 3, which
12 is Ann Gima's group, right, when you walked into group 3 and
13 Phil wasn't there, were people happy?
14 A. People were always happy. Group 3 was -- in fact,
15 the whole group was happy.
16 Q. Okay. Were they happy because he was out sick or
17 on vacation?
18 A. I can't answer for that.
19 Q. Well, isn't that what you told Mike Golojuch, that
20 everyone was happy when Phil doesn't come to work because
21 he's out sick or on vacation? Did you not tell Mike Golojuch
22 that?
23 A. Yes, I told him that.
24 Q. Is that true, that people were happy when he
25 didn't come to work because he was out sick?

Page 76

1  A. Maybe it was happening at that time, that day,
2  maybe something that day when I was picking up papers.
3  Q. Well, let me ask, were you tying to convey to Mike
4  Golojuch that at some point in time Phil's presence changed
5  the mood of group 3?
6  A. I think the stress of what was happening.
7  Q. Changed the mood for group 3?
8  A. Group 3 had the bulk of the Waikiki appeals, and
9  it was a stressful time, and I think as time went on with
10 what was happening in here, with the workload, the pressure
11 of trying to get everything out, the mood started to change.
12 Q. Okay. And when the mood changed and Phil didn't
13 show up for work because he was sick or on vacation, people
14 were happier when he wasn't there?
15 A. Not really.
16 Q. Well, I don't understand, then, what you're saying
17 everybody is happy when Phil doesn't come to work because he
18 is out sick or on vacation. It seems to imply to me that
19 when he's out sick or on vacation everybody is happier, and
20 when he's not out sick or on vacation and he's attending work
21 people are less happy. Isn't that what that means?
22 MR. LORUSSO: Object to the extent the
23 document speaks for itself.
24 BY MR. MOSELEY:
25 Q. Are you going to answer the question?

Page 77

1  A. I'm thinking.
2  Q. Okay. Just checking.
3  A. Well, when Phil came to work, it was -- I can't
4  talk for other people, because I was way on the other end.
5  It's what I felt.
6  Q. Okay.
7  A. Yeah.
8  Q. Well, when you -- does this mean when you -- that
9  you felt everyone was happy when he didn't come to work; is
10 that what you felt?
11 A. I felt that, yes.
12 Q. Did you feel that people were not as happy when he
13 did come to work?
14 A. Yes, because Phil would talk to certain
15 individuals and you never know what he was going to -- he was
16 sharing his personal feelings of -- like for me, he would
17 stop me when I was Xeroxing and he would talk to me about the
18 problems that he was feeling. And I didn't want to hear it.
19 I didn't want to get involved. I just didn't want to hear
20 it. So that's why people were feeling stressed by that. So
21 when he wasn't there --
22 Q. So when he wasn't there, people were less
23 stressed?
24 A. Yes.
25 Q. And what did you observe that made you feel that

Page 78

1  way about group 3? Aside from your own personal dealings
2  with Phil, you talk about everyone, let's just start with
3  group 3, did you -- you said earlier that you would go
4  downstairs and when Phil wasn't there people would be happy
5  and talking; is that right?
6      A.  Yes.
7      Q.  And when Phil was there, people were generally
8  just working and not talking?
9      A.  You had people talking. You had to talk because
10 of the work that they were involved in.
11     Q.  I understand, but it wasn't the same happy,
12 congenial feeling; is that right?
13     A.  Yes.
14     Q.  Let me move on to the next sentence. It says:
15 "Others seem to get upset with Phil in the background because
16 something might happen."
17         How did you come to that conclusion?
18     A.  I'm referring it to myself, because if I were to
19 tell Phil something, he would take it out of context.
20     Q.  So this -- when you say others seem to get upset
21 with Phil, you mean yourself?
22     A.  I saw other people get upset.
23     Q.  Okay. And what did you see them get upset with
24 Phil about?
25     A.  He would -- he would stop them and talk to them.

Page 79

1      Q.  Is that the "something" they thought might happen?
2      A.  I don't know.
3      Q.  Well, I'm trying to find out what you meant. What
4  did you mean when you said: "Others seem to get upset with
5  Phil in the background because something might happen." What
6  did you mean by that?
7      A.  Well, I -- they were afraid that Phil would get
8  violent.
9      Q.  Who was afraid?
10     A.  In general, it was everyone.
11     Q.  You weren't afraid, though?
12     A.  I wasn't afraid.
13     Q.  Who told you they were afraid? Did anybody tell
14 you they were afraid?
15     A.  No.
16     Q.  How did you know they were afraid?
17     A.  I could sense it.
18     Q.  Did you sense that they were more cautious in
19 their dealings with Phil?
20     A.  Yes.
21     Q.  A little bit standoffish maybe?
22         MR. LORUSSO: Objection. Vague and
23 ambiguous.
24 BY MR. MOSELEY:
25     Q.  I'm searching for the right words to describe what

Page 80

1  this is. I don't know what they are, but...
2      A.  Well, you had to be careful how you interact with
3  him.
4      Q.  What kind of --
5      A.  It was -- your day-to-day conversations, he --
6  that's it.
7      Q.  You say: "Phil looks innocent and quiet."
8         Was he -- does that mean that his looks are
9  deceiving, or do you think he is innocent and quiet?
10     A.  Well, I -- he is -- he looks quiet. He's innocent
11 and quiet.
12     Q.  Then below that you say: "When things happen,
13 it's always someone else's fault."
14        Do you -- what's the reference there? What things
15 are you talking about?
16     A.  First of all, I'm referring back to my email.
17     Q.  Okay.
18     A.  He -- in a way he was saying that I sent him an
19 email that stated it was 11:00 o'clock.
20     Q.  Is there any other things that happened that
21 were -- essentially you're saying things happen that are his
22 fault but he blames on other people; is that right?
23     A.  Yes.
24     Q.  Is there anything else that you knew of that was
25 his fault that he blamed on anybody else?

Page 81

1      A.  I can't remember.
2      Q.  Did anybody ever tell you of anything like that?
3      A.  No.
4      Q.  The next sentence there says: "He has been
5  scolded for not doing his work."
6         Do you see that?
7      A.  Yes.
8      Q.  How did you know he had been scolded for not doing
9  his work?
10     A.  Because I heard.
11     Q.  From whom?
12     A.  I actually saw him -- the supervisor was talking
13 to him.
14     Q.  What supervisor?
15     A.  Annie.
16     Q.  And when was this?
17     A.  I don't know.
18     Q.  And what was it about?
19     A.  It was about his benchmarks.
20     Q.  And what did Annie say about his benchmarks?
21     A.  I don't know. All I saw is I saw the two of them
22 standing there, and she was telling him that he had to do his
23 work.
24     Q.  She was scolding him?
25     A.  Just reprimanding him, just as a supervisor is

Page 82

1  telling his -- his staff to do the work.
2     Q.  Is that the only time you ever saw him scolded?
3     A.  That was the only time.
4     Q.  Do you know of any other time he's been scolded?
5     A.  No, I don't know.
6     Q.  "He applies for supervisor jobs but says he
7  doesn't understand."
8          Do you see that?
9     A.  Yes.
10    Q.  Did you know he applied for supervisor jobs?
11    A.  Yes.
12    Q.  How did you know that?
13    A.  I saw the application.  His name came up when the
14 administrator's position was being TAed by Gary after Richard
15 Nathaniel passed away.  There was a certified list of
16 applicants and I saw his name on the list.
17    Q.  Is that a supervisor job?
18    A.  That is an administrator's job and another
19 position opened up.  I remember that one.  He applied for an
20 Appraiser 4, I believe.
21    Q.  Is that a supervisor job?
22    A.  Appraiser 6.  No, it was Appraiser 6, I'm sorry,
23 Appraiser 6 position, he applied.
24    Q.  How do you know he applied?
25    A.  Because I process the applications.

Page 83

1     Q.  Anything else he applied for in terms of a
2  supervisor job?
3     A.  That was the only one I can remember.
4     Q.  What do you mean, "but says he doesn't
5  understand"?
6     A.  He said he doesn't understand why he didn't get
7  the supervisor job.  He doesn't understand why he was not
8  selected.
9     Q.  Did you have -- why would you tell Michael
10 Golojuch that Phil didn't understand why he wasn't selected?
11    A.  Because Mike was asking me about that.
12    Q.  Mike asked you if Phil understood why he wasn't
13 selected?
14    A.  Yes.
15    Q.  What else did Mike ask you?
16    A.  That's it.
17    Q.  Okay, did you ever tell anybody else in the
18 assessment division that Phil had applied for supervisor
19 jobs?
20    A.  It was common knowledge.
21    Q.  How would that get to be common knowledge?
22    A.  Everybody would know -- everybody would try and
23 tell each other, well, apply for the job, go apply for it.
24    Q.  Well, how would anybody know that Phil actually
25 applied for it?

Page 84

1         MR. LORUSSO:  Objection to the extent it
2  calls for speculation.
3         THE WITNESS:  I didn't know.  No one would
4  know.
5  BY MR. MOSELEY:
6     Q.  But you said it was common knowledge?
7     A.  Well, I'm sorry, I have to take that back.
8     Q.  Okay.
9     A.  We would always tell the lower level appraisers to
10 try out, to apply, put their application in.  That's what I
11 meant.
12    Q.  But did anybody know that Phil had applied for
13 supervisor jobs?
14         MR. LORUSSO:  Objection.  Calls for
15 speculation.
16         THE WITNESS:  No.
17 BY MR. MOSELEY:
18    Q.  So as far as your understanding was, you knew that
19 he had applied because you were processing the application?
20    A.  Yes, and I didn't say anything.
21    Q.  You didn't say anything and you didn't know that
22 anybody else knew that?
23    A.  No.
24    Q.  Under that you says -- you said:  "He has had
25 problems with his first and second wives."

Page 85

1         Do you see that?
2     A.  Yes.
3     Q.  Did he tell you about those problems?
4     A.  Yes.
5     Q.  And those were the problems that you didn't want
6  to hear about?
7     A.  Yes.
8     Q.  And also there have been situations with his son?
9     A.  Yes.
10    Q.  And you didn't want to hear about that?
11    A.  (Nods head.)
12         MR. LORUSSO:  You have to answer out loud.
13         THE WITNESS:  Yes.
14 BY MR. MOSELEY:
15    Q.  Did you -- from January -- your desk was not
16 anywhere near Bob Magota's; is that right?
17    A.  Yes, it was far.  I was on --
18    Q.  You were on the other side of the building, right?
19    A.  Correct.
20    Q.  So did you know who was coming in and out of Bob
21 Magota's office?
22    A.  No.
23    Q.  Did people make appointments with you to come and
24 see Bob Magota?
25    A.  No.

Page 86

1  Q.  So they just made appointments with him directly?
2  A.  Yes.
3  Q.  You didn't run his calendar at all?
4  A.  No.
5  Q.  So were you aware of Mike Golojuch coming and
6  speaking with Bob Magota at any time during this period, say,
7  from January 1st, 2003 to March 1st, 2003?
8  A.  No.
9  Q.  Did you see Mike Golojuch at any time during that
10 period with the exception of the interview you had?
11 A.  No.
12 Q.  Did you fill out a workplace violence report
13 against Phil?
14 A.  No.
15 Q.  Did anybody give you a workplace violence report
16 that they had filled out against Phil?
17 A.  I can't remember.
18 Q.  Were you the person designated to accept those
19 things? I'm going to show you a form here. This is Exhibit
20 76. This is a form that is filled out by --
21         MR. WONG:  Excuse me, are we starting a new
22 area?
23         MR. MOSELEY:  Yeah, but I'm almost pau,
24 actually.
25         MR. WONG:  Okay.

Page 87

1  BY MR. MOSELEY:
2  Q.  This is a form that's filled out by Chris Graff,
3  but I don't care about that. What I'm wanting to do is have
4  you take a look at the form. Are you familiar with this
5  form?
6  A.  I can't remember.
7  Q.  Not this particular one, but just the form.
8  A.  I don't remember.
9  Q.  Were you the one designated to receive forms like
10 this?
11 A.  No, because it was either -- either Mike Golojuch
12 would collect that. I don't know. I have no knowledge of
13 that.
14 Q.  You wouldn't collect that?
15 A.  No.
16 Q.  Did you ever receive a form like that from any of
17 the other employees in the assessment division?
18 A.  Maybe I did and I gave it to -- how did the
19 process go? I would -- if they gave it to me, I would give
20 it to Mike Golojuch himself.
21 Q.  Do you remember ever collecting a form like this
22 from anybody in the assessment division at any time?
23 A.  I can't remember. I can't remember.
24 Q.  Let me see if I can make sure the record is clear.
25 You can't remember whether you did or not, or you don't

Page 88

1  remember ever collecting such a form?
2  A.  I don't remember collecting such a form.
3  Q.  Did you collect such a form from Chris Graff?
4  A.  No.
5         MR. MOSELEY:  All right, let's take a quick
6  break, and I'm going to just sort of review my notes, talk
7  with Phil, and we may be pau, and I know that will be a good
8  piece of news.
9         THE WITNESS:  Great.
10        MR. MOSELEY:  Let's go off the record.
11 (Off the record.)
12        MR. MOSELEY:  I only have a couple more
13 questions.
14 BY MR. MOSELEY:
15 Q.  Are you paying for Mr. Lorusso's services as your
16 attorney?
17        MR. LORUSSO:  Objection. Not relevant.
18 Instruct you not to answer. It's not relevant. The terms,
19 of my employment.
20        MR. MOSELEY:  Are you saying that's
21 privileged and instructing her not to answer?
22        MR. LORUSSO:  Yes.
23        MR. MOSELEY:  That's privileged?
24        MR. LORUSSO:  Yes, and I'll take the risk,
25 counsel, if I'm wrong.

Page 89

1         MR. MOSELEY:  Okay. That's all.
2  Oh, do you have any questions?
3         MR. WONG:  No.
4         MR. MOSELEY:  Okay, pau. Thank you very
5  much.
6         THE WITNESS:  Thank you.
7              (The deposition concluded at 4:18 p.m.)

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

Page 90

1    I, SUZANNE FOUMAI, hereby certify that I have read the
2  foregoing typewritten pages 1 through 89, inclusive, and
3  corrections, if any, were noted by me and the same is a true
4  and correct transcript of my testimony.
5
6
7
8
9  SUZANNE FOUMAI
10
11
12
13
14      Signed before me this      day of
15            , 20   .
16
17
18
19
20      English vs. City & County of Honolulu, U. S.
21  District, Civil No. 04-00108, taken on August 4, 2006, by
22  Jessica R. Perry, CSR.
23
24
25

Page 91

1  STATE OF HAWAII           )
2                            ) ss:
3  CITY & COUNTY OF HONOLULU    )
4
5         I, JESSICA R. PERRY, do herby certify:
6         That on August 4, 2006, at 1:48 p.m. appeared
7  before me SUZANNE FOUMAI, the witness whose deposition is
8  contained herein; that prior to being examined he was by me
9  duly sworn;
10        That the deposition was taken down by me in
11 machine shorthand and was thereafter reduced to typewritten
12 form by computer-aided transcription; that the foregoing
13 represents, to the best of my ability, a full, true and
14 correct transcript of said deposition.
15        I further certify that I am not attorney for
16 any of the parties hereto, nor in any way concerned with the
17 cause.
18        DATED this 24th day of August, 2006, in
19 Honolulu, Hawaii.
20
21
22
   Jessica R. Perry, CSR 404
23 Notary Public, State of Hawaii
   My commission expires: 5/11/09
24
25