# DIRK von GUENTHNER & ASSOCIATES
## 923 KAHENA STREET
## HONOLULU, HAWAII 96825
### (808) 532-1400 * FAX (808) 395-1201

November 4, 2005

Michael A. Lorusso, Esq.
Kawashima Lorusso & Tom

Kevin P.H. Sumida, Esq.
Anthony L. Wong, Esq.
Matsui Chung Sumida and Tsuchiyama
737 Bishop Street, Suite 1400
Honolulu, HI 96813

> Re:  Philip E. English v. City & County of Honolulu
> Civil No. 04-00108 SOM/KSC
> FINAL REPORT OF DIRK VON GUENTHNER

Gentlemen:

You have engaged me to provide an expert report on the above referenced matter. In order to render this report you have provided me with the equivalent of three archive boxes of documents. The information you provided has been sorted into numbered books. The seventy (70) book numbered index is attached herewith as Exhibit "A". All documents in the books are incorporated in my report. Also attached as Exhibit "B" is my curriculum vitae and my Rule 26 disclosure is identified as Exhibit "C".

The conclusions reached in this report are made with a reasonable degree of economic certainty. If additional information is provided, I reserve the right to amend this report accordingly.

For ease in referencing specific areas of this report, the following index is provided:

| PAGE | DESCRIPTION |
|------|-------------|
| 3 | CONCLUSION |
| 6 | POSITION/HISTORY OF PLAINTIFF |
| 7 | THE APPLICATION FOR EMPLOYMENT WITH THE C&C |

EXHIBIT  A

**PAGE**          **DESCRIPTION**

14            PLAINTIFF'S BANKRUPTCY
17            OTHER ISSUES OF MISLEADING STATEMENTS
19            PLAINTIFF'S WORK FOR CASH AFTER THE CITY JOB
21            PLAINTIFF'S ABILITY TO WORK
29            WHISTLE BLOWING VALUE
37            ALLEGATIONS OF WORKPLACE VIOLENCE (PHILIP ENGLISH)
40            COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT
42            THOMAS T. UENO, CPA REPORT - (BOOK 6)

Thank your for the opportunity to provide my services.

Very truly yours,

Dirk von Guenthner, CFE, DABFA, BCFE, FACFE

Attached: Exhibits A, B and C

# CONCLUSION

1.  My objective in writing this report was to review as much information as there was available, evaluate that information, and opine on the present value of an amount of money that the Plaintiff should receive for special damages due to the liability of the City & County of Honolulu and the other defendants.

2.  Of the many cases I have been engaged to provide an opinion on the special damages of a plaintiff, this case stands out particularly in the area of ethical issues.

3.  Plaintiff essentially claims that due to his steadfast position on moral standards and values, he took it upon himself to resurrect and cure the violations of moral principles and values of the personnel in the Real Property Assessment Division. In doing this deed, Plaintiff claims that the retaliation of the staff of the Real Property Assessment Division has caused him so much harm that he will, according to his expert's report, only be able to work as a guard for 12 hours a week for the rest of his life to mitigate his loss of wages from his job with the City and will need $834,796 to make up the difference.

4.  As set forth herein below, my opinion is that:

    a.  Information on the Plaintiff's application to the City is not factual. The representation makes it appear that he operated a fairly large appraisal business as its owner and manager. Actually, the tax returns have revealed that for several years before completing the application, Plaintiff's business was operating with either no revenue or not enough, making its results of operations insufficient to pay his operating costs nonetheless pay any of his salary reflected on the application. This representation may have given the personnel at the City an opinion that Mr. English was actually successful in operating and managing a large appraisal firm when that is not the truth.

    b.  The Plaintiff's application omitted two part-time jobs that he had as a clerk in a paint department at City Mill and as a carpet cleaner for Electrolux. Had this information been provided, it may have led the interviewer for this City job to focus on Mr. English's mental health issues the years preceding taking the job. That, in itself, should have been enough to clue the interviewer into the fact that Mr. English may have lacked enough fortitude to do his job without his past history of psychological problems coming back into play at the workplace.

c.  Philip English, prior to working for the City, had attempted suicide, had a cancerous kidney removed, was divorced from his wife, had problems with the IRS, was getting ready to file bankruptcy and was severely emotionally upset over those and other personal problems in his life for up to three years immediately preceding taking the job with the City.

d.  Philip English, during a 17 month period, incurred new debt (mostly credit card) of $150,235 ($8,837 per month) and then filed bankruptcy in 2000 with $194,035 in unsecured debt, $21,000 of secured debt to the IRS totaling to $215,035 of liabilities and $3,370 of assets. It is my opinion that Mr. English used a system that allowed him to live a lifestyle that he could not have ever in his life afforded thus far. With no possible way of paying back the debt, he filed bankruptcy.

e.  Philip English, in 1999, executed his Income and Expense Statement filed in Family Court under penalty of perjury that he was earning income that he simply was not earning and has never since earned.

f.  Philip English applied to the position of Appraiser IV with the City on 01/17/03, after working with the City for over two and a half years. In that application, Mr. English documented the salary he earned in his private practice to be greater than when he first applied.

g.  Philip English took on part time work after leaving his job with the City doing work for cash and barter. Mr. English failed to include this information on his tax returns and further failed to pay the related tax. Mr. English signed the tax returns with the penalty of perjury without having declared the income.

h.  Philip English was promoted to Appraiser IV and began to have problems with his ability to perform his job adequately. He blames this poor performance as an Appraiser IV on the retaliation of most of the staff at the Real Property Assessment Division. It is my opinion, more likely than not that Plaintiff at that time he was not competent to do the job based upon other factors which impacted his life.

i.  Philip English has hidden behind the protection afforded to a "Whistle Blower." Essentially with hindsight, it is now known that although the FBI, United States Attorney and many departments of the City were involved, the result of all the time and effort is literally nothing. Of all the hoopla that was created to somehow justify the retaliation by the City employees, nothing known to me supports any substantive basis for the Whistle Blowing claims.

    j.    Philip English was under investigation for claims against him for "Workplace Violence." The investigation included numerous interviews with a substantial base of information. Lacking in the investigation was an interview with Philip English. The investigation was put on hold until the interview could be completed. Mr. English never did attend the interview, so it is not known if he would have been found innocent or guilty of the charges.

    k.    Philip English did settle his Workers' Compensation claims with the City for $85,000. In that settlement document, he stated that he had not sustained any permanent disability from his claimed injury.

5.    The claims of special damages for lost wages prepared by local CPA, Thomas Ueno were made without Mr. Ueno being aware of most of the information made available to me.

6.    Robert J. Sbordone, Ph.D. opined that he suspected that Mr. English will work in his professional appraiser capacity after this lawsuit is settled.

7.    For the last seven months Philip English worked for the City he had retained counsel who even participated in a news release which criticized the Real Property Assessment Division. This activity included contacting the FBI and the United States Attorney office in an apparent effort to embolden the claims of Mr. English.

8.    Based upon the medical history, work history and other references herein, I believe that it has been Philip English's good fortune to have received $85,000 from the City already. I do not believe that he is entitled to any more money.

# POSITION/HISTORY OF PLAINTIFF

1.      (Book 035 @ page 018) City jobs identified:

    a.     06/01/00 - REAL PROPERTY APPRAISER II,   SR-18C
    b.     02/01/01 - REAL PROPERTY APPRAISER III,   SR-20C
    c.     03/01/02 - REAL PROPERTY APPRAISER IV,   SR-22C
    d.     06/01/02 - REAL PROPERTY APPRAISER IV,   SR-18D

2.      1988 - Suicide attempt (Book 004 @ page 23)

3.      Late 1997 - Suicide attempt/hospitalization, (Book 058 @ page 31).

4.      November 4, 1998 - cancerous kidney removed, (Book 058 @ page 32).

5.      April 29, 1999 - Divorced from 2nd wife, Corlis Chang, Esq., (Book 028 @ page 0011).

6.      June 1, 2000 - Plaintiff Started working for the City, (Book 11 @ page 39).

7.      August 1, 2000 - Plaintiff signed his Voluntary Petition for a Chapter 7 Bankruptcy, (Book 16@ page 137).

8.      February 15, 2002 - Plaintiff issued his first written complaint to Mr. Magota, one week after issuing his second verbal complaint, (Book 018 @ page 477).

9.      January 30, 2003 -  Date of injury to Plaintiff, (Book 050 @ page PE 01945).

10.     February 28, 2003 - Plaintiff went on sick leave, (Book 045 @ page PE01152).

11.     October 29, 2003 - Divorced from 3rd wife Sathiporn S. English, (Book 029 @ page 0006).

12.     January 20, 2004 - Plaintiff signed the agreement to settle for $85,000 with the City, (Book 11 @ Page 62).

13.     February 12, 2004 - Plaintiff filed this lawsuit, (Book 26).

# THE APPLICATION FOR EMPLOYMENT
# WITH THE C&C

1.      The "Employment Application" of the City & County of Honolulu was signed by Philip English (hereinafter "Plaintiff") on May 18, 1999, (Book 014 @ Exhibit 3).

2.      In the deposition of Plaintiff, (Book 012 @ page 96).

    a.      Q.      With regard to that application, as we already talked about, you indicated that, on your application, you tried to be as honest as you could, correct?

    b.      A.      Yes.

3.      In the deposition of Plaintiff, (Book 012 @ page 98).

    a.      Q.      Is that your signature that appears on the application?

    b.      A.      Yes.

    c.      Q.      And that is on the first page as well as the fourth page if this document, correct?

    d.      A.      Yes.

4.      In the deposition of Plaintiff, (Book 012 @ pages 98 and 99).

    a.      Q.      And with regard to Question No. 9 on page one of this four-page document, it indicates, "I hereby certify that all statements made on or in connection with this application, including those regarding my education and employment record, are true and correct to the best of my knowledge." Did I read that correctly?

    b.      A.      Yes.

5.      In the deposition of Plaintiff, (Book 012 @ page 99).

    a.      Q.      And it states, "include all previous work experience full time, part time, volunteer and military experience. Begin with your present or last job held. Describe in detail nature of work personally performed by you.

Also give dates and explain unemployed periods. If your duties and responsibilities changed while working for the same employer, list each separately.

First of all, did I read that correctly?

b.    A.    Yes, you did.

6.    The following information is provided to illustrate that Plaintiff did not include factual information on his application in several places.

a.    My opinion is that, if Plaintiff had provided factual information on the application, it is more than likely that he would never have been hired for the job. If Plaintiff had not been hired, there would be no lawsuit and no damages.

7.    The application required the Plaintiff to include "Also give dates and explain unemployed periods".

a.    In the deposition of Plaintiff, (Book 012 @ page 50).

    i.    Q.    Your depression back in 1998, when you first began seeing Kay Wong, did it affect your ability to obtain or function in an employment situation?

    ii.    A.    Well, it was in the beginning part of 1998 that Corlis told me she wanted a divorce. And that was a severe time for me as far as emotional upset. We Separated

b.    In the deposition of Plaintiff, (Book 012 @ page 51).

    i.    Q.    And in terms of earning a living, was that when you applied with the City or was there a period of time when it did affect your ability to earn a living?

    ii.    A.    Initially, at the very beginning when the emotional upset was so severe, absolutely I could not work.

    iii.    Q.    When you say initially, from when to approximately when was your ability to function in an employment capacity affected?

    iv.    A.    I think I would say approximately six months. But it's not that it's over. There were things that continued...At the end of "98, actually all in one day, Corlis gave me divorce papers that

were very severe and an hour later my doctor called me and told me you got kidney cancer and you might not live for more than five years.

c.  In the deposition of Plaintiff, (Book 012 @ page 52).

    i.    Q.    In terms of the impression that it was something that obviously it begins because of events in your life at that period of time, the divorce, the kidney cancer, and I wasn't trying to imply that it goes away, but it is something that continues into the future, correct?

    ii.    A.    For that event, yes.

d.  Please note that the application was dated May 18, 1999.

8.  The application included the language, "include all previous work experience full time, part time, volunteer and military experience. Begin with your present or last job held. Describe in detail nature of work personally performed by you."

a.  The employment with City Mill (working in the paint department as a clerk) and with Electrolux (cleaning carpet) after quitting his business with his own company and starting at the City were omitted on the employment application.

b.  In the deposition of Plaintiff, (Book 012 @ page 40).

    i.    Q.    Going back, you had indicated that, at the time you were making a change again from working for Philip English & Associates to going to working with the City - - by the way, were there other jobs in that interim period?

    ii.    A.    Yes.

    iii.    Q.    What other jobs were there?

    iv.    A.    I worked at City Mill.

    v.    Q.    And what did you do at City Mill?

    vi.    A.    I worked in the paint department.

vii.   Q.   And from approximately when to when did you work for City Mill?

viii.   A.   I'm not sure of the dates. It would have been in 1999. And that was a matter of months. I'm not sure of the dates.

c.   In the deposition of Plaintiff, (Book 012 @ page 100).

i.   Q.   When you say no, it's not, with regard to my question, the position that you held with City Mill is not on the application, correct?

ii.   Correct, it is not on the application.

d.   In the deposition of Plaintiff, (Book 012 @ page 100).

i.   Q.   And in addition to City Mill, before you began you work with the City, you also worked at Electrolux, is that correct?

ii.   A.   I worked at – I'm not even sure if I was an employee...

e.   In the deposition of Plaintiff (Book 012 @ page 100 and 101)

i.   Q.   Yes, what were you doing?

ii.   A.   I was helping my friend who you had a carpet cleaning business.

iii.   Q.   Did you receive any monies from helping or assisting you friend at Electrolux?

iv.   A.   He paid me out of his money...

f.   In the deposition of Plaintiff, (Book 012 @ page 40).

i.   Q.   Were you paid in cash?

ii.   A.   I was paid in cash. Again, I was helping my friend. It was an extremely part-time type of work. Yes.

iii.   Q.   What is the your friends name?

iv.   A.   John Ahuna.

g.    In the deposition of Plaintiff, (Book 012 @ page 101).

    i.    Q.    And for how long did you assist Mr. Ahuna at Electrolux?

    ii.    A.    Off and on for maybe three months.

h.    Book 30 includes income tax records produced by the Plaintiff. Note that there is no evidence that the Plaintiff paid income taxes on the cash earnings from the Electrolux related work in 1998 or 1999.

9.    On the employment application, (Book 050 @ PE 01976), the Plaintiff identifies his most recent position at Philip English & Associates from the period 1989 to the present in 1999. The salary identified for each of the ten year period was recorded on the employment application as $40,000.

a.    Information by the Plaintiff on the application does not reconcile insofar as his employment with Philip English & Associates (hereinafter, "His Company) and also on the salary he earned.

b.    In 1999, the tax return produced (Book 030 @ 1999 page 091) includes a Schedule C.

    i.    The return identifies no income or cash receipts in 1999.

    ii.    It identifies no compensation to officer, Plaintiff.

    iii.    No salaries or wages paid to staff - zero.

    iv.    It identifies a loss for the year of <$11,201.21>.

c.    The tax return produced for 1998 (Book 030 @ 1998) includes tax information from the IRS for a married filing jointly.

    i.    No information is available to determine if the Plaintiff earned anything from his company.

    ii.    Unless documentation is provided that the Plaintiff earned anything from his company, I have to assume that there were no earnings in 1998 and the return was not produced with the intent to hide that fact.

d.    In 1997 no documents were produced.

e.     In 1996, the 1120S tax return produced, (Book 030 @ 1996):

     i.     Reflects gross income for his company of $19,021.

     ii.     No compensation to the officer (Plaintiff).

     iii.     No salaries or wages paid to staff - zero.

     iv.     A loss for the year of -$58,808. Note the only officer of the company was the Plaintiff as 100% owner.

f.     In 1995, the 1120S tax return produced, (Book 030 @ 1995):

     i.     Includes gross receipts of $71,727.

     ii.     There is no evidence of any salary or compensation earned by the Plaintiff.

     iii.     There is no evidence that the Plaintiff had 12 appraisers plus staff since there is no evidence of any payroll paid.

     iv.     The company had ordinary income of only $7,812.

g.     In 1994, the 1120S tax return produced, (Book 030 @ 1994):

     i.     Includes gross receipts of $249,308.

     ii.     The compensation to the Plaintiff was $29,899. Note the application reflected compensation of $40,000 for each year and this is the last year that the Plaintiff earned compensation before 1999.

     iii.     Salaries and wages totaled only $96,287. If the Plaintiff had 14 employees, each employee had to average $573 per month. This suggests that the Plaintiff did not have 14 people working in 1994 or thereafter (12 appraisers + staff).

h.     In 1993, the tax return produced, (Book 030 @ 1993):

     i.     Includes gross receipts of $429,973.

     ii.     The compensation to the Plaintiff was $54,571. Note the application reflected compensation of $40,000 for each year. This is the only year in which the Plaintiff earned an amount commensurate with the

information given on the application.

iii.   Salaries and wages totaled only $202,976. If Plaintiff had 14 employees, each employee had to be paid an average $1,208 per month, (or $14,498 per year) which illustrates that Plaintiff did not have 14 people working in 1994 or thereafter (12 appraisers + staff).

i.   No documents were produced before 1993.

j.   The evidence provided above reflects the lack of truthful disclosure on the employment application when the Plaintiff represented that he had $40,000 per year salary in the following years:

i.     1994
ii.    1995
iii.   1996
iv.   1997
v.    1998
vi.   1999

k.   The evidence also reflects that the Plaintiff's representations are not factually based that he had 12 appraisers + staff from 1994 through 1999.

l.   If the application had indicated the losses identified above, it is likely that the City personnel may have questioned the Plaintiff's ability to be a successful appraiser and abstained from hiring him. When the Plaintiff indicated that he had a business for 10 years with 12 appraisers and a staff earning $40,000 for all those years, the City was misled believing that Plaintiff was a successful and accomplished appraiser.

m.   If Plaintiff had listed his unemployed period in 1998, 1999, and 2000, City personnel could have found out about his psychological problems and a related suicide attempt during that period of unemployment. If the employment misrepresentations on the application had been accurately stated it may have been sufficient information for the City not to have hired him.

# PLAINTIFF'S BANKRUPTCY

1.    In the documents produced by Reneau Kennedy is the *Agreement Incident To Divorce* (hereinafter, "AITD") filed with the Family Court, First Circuit State of Hawaii on March 17, 1999 on behalf of Plaintiff and his then wife, Corlis Chang, (Book 016 @ page 100).

    a.    Page 110 of the documents produced is the AITD which identifies debts awarded to husband, Plaintiff. Note the document was signed by Plaintiff on March 5, 1999.

    b.    The items identified as Plaintiff's debts are as follows:

        i.    Bank of Hawaii P-flex ($10,000.00)

        ii.    Citibank Visa

        iii.    Sears

        iv.    NML Insurance Company (Husband's policy)

        v.    Associates Capitol Bank

        vi.    Associates Financial Bank

        vii.    His personal Friend.

2.    On March 1, 1999 the Plaintiff signed his Asset and Debt Statement which was filed in Family Court on March 8, 1999, (Book 016 @ page 91).

    a.    Since the date of the Asset and Debt Statement was signed four days before the AITD, I assume that all amounts of debts are the same.

    b.    The amounts of debts absorbed by the Plaintiff in the AITD are identified on the Asset and Debt Statement as follows:

        i.    Bank of Hawaii P-flex ($10,000.00)

        ii.    Citibank Visa ($2,600.00)

  iii. Sears ($3,000.00)

  iv. NML Insurance Company (Husband's policy) ($4,300.00)

  v. Associates Capitol Bank ($11,900.00)

  vi. Associates Financial Bank ($7,000.00)

  vii. His personal Friend ($5,000.00)

  viii. The total debts absorbed by the Plaintiff consequently are total **$43,800**.

3. The monthly payments of the Plaintiff, for the above debts are $720 per month. If the child support provided from the Plaintiff to his ex-wife on the AITD of $370 is added, (Book 016 @ page 103), the Plaintiff (in April 1999) was required to pay $1,090 per month before making any payments for his own support, ($13,800 annually).

4. On August 1, 2000, Plaintiff (Book 016 @ page 162), signed his Voluntary Petition for a Chapter 7 Bankruptcy #00-02917, (Book 016 @ page 137), with the United States Bankruptcy Court in the District of Hawaii.

  a. In the Voluntary Petition, the Plaintiff listed **$194,035** of unsecured creditors. Most of the debts were to credit card companies for credit card purchases totaling $161,966.

  b. Overall, the Plaintiff's unsecured debts increased from $43,800 on March 1, 1999 to $194,035 on August 1, 2000.

  c. Note that this is the period that Plaintiff worked for City Mill and Electrolux.

  d. Further note that Plaintiff started working for the City & County in June 2000 at an annual salary of $29,340.

  e. During this 17 month period the Plaintiff incurred debts of **$150,235,** ($194,035 - $43,800).

  f. The Plaintiff spent an average of **$8,837** per month ($150,235 divided by 17).