5.  It is my opinion that Plaintiff used the credit lines of his creditors to their detriment during the time that he was psychologically impaired and incapable of working.

# OTHER ISSUES OF MISLEADING STATEMENTS

1. On March 1, 1999, the Plaintiff signed the Income and Expense Statement and filed it with the First Circuit Court, State of Hawaii, (Book 028 @ 0018 - 0021):

    a. This is a documents that was filed in connection with the Plaintiff's divorce with Corlis Chang, Esq.

    b. On the document the Plaintiff identified earnings of $40,000 per year with the caption "Based on an estimated $40,000 a year."

    c. Plaintiff provided the caption, "Planning to start work in March, 1999."

    d. Plaintiff executed the document following the statement, " I hereby declare under the penalty of perjury that I supplied the information used in the foregoing Income and Expense Statement and that I have reviewed the foregoing Income and Expense Statement and certify that the information is accurate, complete, and correct."

    e. The Plaintiff did not start working for the City and County of Honolulu until June, 2000.

    f. From the records I have examined, there is no evidence that Plaintiff was going to have any work for another fifteen months. During this period the Plaintiff lived on his credit cards.

    g. It is my opinion that the statement made by Plaintiff was misleading and not factual it was based on desire rather than realistic assessment.

2. When Plaintiff first applied to the City, his application identified his salary with Philip English and Associates at $40,000 per year. The research above proved that Plaintiff was not truthful on this application, (Book 014 @ Exhibit 3).

    a. When the Plaintiff applied for the position of Appraiser IV on 01/17/03 he also completed an application, (Book 034 @ pages 113 to 116).

    b. The period of work with Philip English and Associates on the 01/17/03 application shows a work period from 1989 to 1998. On the May 1999 application the Plaintiff indicated that he was working for this business in 1999, not 1998.

    c. On the 01/17/03 application (page 114) the Plaintiff identified the salary as

  being $40,000 to $45,000 +. The May 1999 application shows salary of $40k -$40k.

d. The evidence above shows that the Plaintiff did not earn even $40,000 for the following years:

  i. 1994
  ii. 1995
  iii. 1996
  iv. 1997
  v. 1998
  vi. 1999

e. The Plaintiff signed the 01/17/03 application after reading the following statement: "I hereby certify that all statements made on or in connection with this application, including those regarding my education and employment record, are true and correct to the best of my knowledge."

f. Although the Plaintiff had been employed from June 2000 through January 2003 when applying for the position of Appraiser IV, he was untruthful. The amount not only did not agree with his original application, but he even identified a larger salary in an apparent attempt to convince his superiors that his services should command a salary of $40,000 to $45,000 per year.

# PLAINTIFF'S WORK FOR CASH AFTER THE CITY JOB

1. After the job with the City, the Plaintiff continues to work for cash and has failed to pay federal, state or general excise tax on this income.

2. In the deposition of the Plaintiff, (Book 012 @ page 98).

   a. Q. And since working for the guard company, have you sought any other employment?

   b. A. No. I should say that if I can do something to help somebody around the harbor or something where I'm living and someone gives me a job to do, clean the bottom of their boat, you know. I mean, I'm, doing that kind of thing.

   c. Q. That is like a side job for cash?

   d. A. Yes, incidental type. Sometimes even for barter, yeah.

3. Plaintiff 2003 1040EZ, (Book 030 @ 2003), identifies:

   a. Gross wages of $17,342.54 on the first page of the return.

   b. Form W-2 attached to the return reflects $17,342.54 as compensation from the City and County of Honolulu.

   c. No cash or barter income was declared.

   d. Plaintiff signed the return under the caption: "Under penalties of perjury, I declare that I have examined this return, and to the best of my knowledge and belief, it is true, correct and accurately lists <u>all amounts and sources of income I received during the tax year.</u>"

4. Plaintiff 2004 1040EZ, (Book 030 @ 2004), identifies:

   a. Gross wages of $1,161.76 on the first page of the return.

   b. Form W-2 attached to the return reflects $1,161.76 as compensation from the City and County of Honolulu.

    c.    No cash or barter income was declared.

    d.    The Plaintiff signed the return under the caption: "Under penalties of perjury, I declare that I have examined this return, and to the best of my knowledge and belief, it is true, correct and accurately lists <u>all amounts and sources of income I received during the tax year.</u>"

5. I conclude that Plaintiff appears to have avoided paying taxes to various governmental agencies. The Plaintiff signed the 2003 and 2004 tax returns knowing that he has earned cash and barter income that was not disclosed.

6. In order to provide some perspective to the amount of money that Chris Graff earned from GK Appraisals, Inc., copies of documents were produced. Form 1099-Misc. were apparently filed with the Internal Revenue Service and the State of Hawaii by GK Appraisals, Inc. on behalf of Christopher Graff (Book 025):

    a.    The gross compensation was as follows:

        i.    1995 - $1,500
        ii.    1996 - $2,500
        iii.    1997 - $2,250
        iv.    1998 - $1,920
        v.    1999 - $ -0-
        vi.    2000 - $ -0-
        vii.    2001 - $ -0-
        viii.    2002 - $ -0-
        ix.    2003 - $ -0-

    b.    Note - It appears that it would have been improper of Chris Graff to have worked for GK Appraisals on City time. It is unknown how much of the time was done at his job in conflict with his City work and how much time was worked elsewhere, if any. What is known is that the taxing authorities were notified accordingly.

# PLAINTIFF'S ABILITY TO WORK.

1. In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003:

    a. "Mr. English reported that he experienced his first episode of depression during a period of marital turmoil with his second wife, in 1998. He stated that he attempted suicide twice; the first with a large bottle of aspirin and the second by hanging,."(Book 018 Page 487).

    b. "According to the supervisor's response to OSHA, Mr. English "said his wife knew the judge and his attorney did a poor job of representing him, which resulted in an unfavorable outcome for him." Additionally, according to the supervisor, "He would also complain that his second wife accused him of abusing her, which he says never happened. The divorce was finalized in March 1999.".

2. In the deposition of Plaintiff, (Book 011 @ page 38).

    a. Q. And what happened in 1999?

    b. A. In 1999, my – well, in 1998, my life changed quite a bit. I had kidney cancer and my wife wanted to divorce me.

    c. Q. And that would be Ms. Chang?

    d. A. That is correct...And I decided I wanted to do something for Honolulu. I wanted to use my abilities or whatever I could do for the City & County of Honolulu and I applied for the Assessment Division positions.

3. Daryl B. Matthews, M.D., Ph.D. of the Hawaii Forensic Associates, LLC, (Book 023 page 2 and 3), wrote Plaintiff's counsel, "Mr. English had been married for approximately twelve years when in 1998 his wife told him that she did not love him anymore and filed for divorce. By his report, she was a successful attorney and very capable of getting the divorce settlement that was most beneficial. Also, in 1998, Mr. English was diagnosed with kidney cancer and underwent nephrectomy (removal of the kidney). His situational life difficulties, both physical and emotional, caused him a severe depression. He had two suicidal attempts and was diagnosed with a Major Depressive Disorder. He received psychiatric/psychological treatment, including medication, and stated that he eventually got better. He had only recently recovered from this serious psychiatric disorder when he began working for the City

and County of Honolulu as an Appraiser in June, 2000."

4. Plaintiff filed a Voluntary Petition for Bankruptcy on August 15, 2000 (Book 016 @ 137).

5. In the deposition of Plaintiff (Book 011 @ page 38 and 39).

   a. Q. Any other reason why you wanted to work for the City & County of Honolulu?

   b. A. Sure. My doctors told me that I needed to try to be in a type of work that was less stressful and maybe more steady and it seemed like a good thing to do. And I was feeling that just made a whole lot of sense.

6. In the deposition of Plaintiff, (Book 011 @ page 42 and 43).

   a. Q. Before you applied for your job with the City, did you talk to Dr. Tsou, explain to him what the job was and say this is the type of position that I will be taking, since you have told me to take a less stressful job?

   b. A. No. In fact, I'm certain he would not have advised me one way or the other.

   c. Q. But you don't know that, correct?

   d. A. I don't know that. But certainly feel that way, yeah... And just to be clear about it, when I'm saying a less stressful type of position, when you are operating an independent appraisal firm, it's fairly stressful because it's a real estate appraisal type function, but because the nature of business is either extremely busy or there is not much going on. It has lots of ups and downs and that causes a great deal of stress on a person.
   So I think what we are talking about in terms of something less stressful is something that is more steady.

   e. Q. But going back to my question, Dr. Tsou had indicated to you you should take a less stressful position, correct?

   f. A. Yes.

   g. Q. And did you?

    h.    A.    Let me also – I'm sorry. I'm not stating this correctly, Mike. What he really said was to make your life less stressful. He didn't specifically say go out and find a job that is less stressful. I'm incorrect when I said that before. That is not correct. He said make your life in general less stressful. That is what he said.

    i.    Q.    And did you speak with Dr. Tsou with regard to your application with the City as a real estate appraiser?

    j.    A.    No.

    k.    Q.    Did you speak with any other physician with regard to your application to work for the City?

    l.    A.    No, I didn't.

7. The "Employment Application" of the City & County of Honolulu was signed by Plaintiff on May 18, 1999, (Book 050 @ page PE 01975).

8. On December 20, 1999, Roy Amemiya, Jr., Director of the Department fo Budget and Fiscal Services wrote Plaintiff a letter, (Book 050 @ page PE 01970).

    a.    "Thank you for your time and effort in interviewing for our Real Property Assessor position.

    b.    "The interview panel was asked to find a person with experience in assessing real property as well as administering a large, unique operation. They found an applicant who is a good match in both areas. While someone else was selected, we hope you will continue to consider the City as a potential employer.

9. In the deposition of Plaintiff, (Book 011 @ page 39).

    a.    Q.    When was it that you first began working with the City?

    b.    A.    June 2000, June 1st, 2000.

10. In the performance appraisal of Plaintiff for the period from 06/01/01 to 05/31/02 (Book 034 @ page 017):

    a.    "During this performance evaluation period, Philip has been working in an Appraiser III position and has recently been reallocated to the Appraiser IV

        position commensurate with his assigned duties."

    b.   "While he has continued to progress in his learning of office procedures, he seems to be having some difficulties in organizing and prioritizing the many and varied tasks associated with his position. He often disagrees with established office work processes and has voiced his opinion as to how he believes things may better be accomplished and resists completing tasks in the prescribed manner."

11.   In the deposition of Plaintiff, (Book 011 @ page 10 and 11).

    a.   Q.   And from August 14, 2002 throughout December 2002 when Mr. Moseley was retained by you, were you consulting with him with regard to an employment matter, which is why we are here today?

    b.   A.   Right

12.   On January 16, 2003 Waylen Toma, Business Agent for Plaintiff's Union, Hawaii Government Employees Association wrote (Book 034 @ page 090):

    a.   "First of all I would like to clarify the fact that you were never on any extended probation."

13.   Thomas Riddle, Workers' Compensation Administrator for the City and County of Honolulu, on March 18, 2003 wrote, (Book 017 page 310), "...I offered to try to find an alternate temporary work location for Mr. English so he would not be without income during this period. He said he would have to consult his doctor regarding this. After the meeting with Mr. English, I called various individuals within his department, and a completely different story unfolded which cast doubt on Mr. English's allegations and the reason for his claim. These include the possibility that he filed this claim to overcome allegations of poor work performance, personal problems affecting his job, and complaints of work harassment filed by other employees."

14.   On May 6, 2003 Joan H. Koff Ph.D. wrote an Initial Psychological Evaluation, (Book 036 @ page 046):

    a.   "However, his demands and complaints, even with health care personnel, may exasperate others."

15.   In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003:

    a.    (Book 018 @ 482 and 485) - Mr. Mike Golojuch, an administrative services officer concluded, "Since he has raised Ethics issues, he considers himself protected under the whistle blower provisions. This is true for any retaliation. However, nothing found during the investigation revealed that Phil is under retaliation. Instead, there is concern that Phil's behavior may lead to something violent. He is soft-spoken and calm in appearance but has raised his voice and thrown things when confronted. Several people consider his behavior to be something like Byron Uyesugi and the Xerox case (shootings). Whether violent or not, his work performance may be less than satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action."

    b.    (Book 018 Page 494), "If there is an alternate placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or possibly full time work."

16.    In the deposition of Plaintiff, (Book 011 @ page 54).

    a.    Q.    For how long a period of time before you started for Master Guard company, were you unemployed?

    b.    A.    I guess from December 2003 until that time.

    c.    Q.    Between December 2003 and up until April of 2005 when you began working for the Master Guard company, did you seek other employment?

    d.    A.    Yes.

    e.    Q.    What other employment did you seek?

    f.    A.    I looked for jobs as a driver. I looked for jobs as wait help at conventions and that sort of thing. Those were the – there were various places. But those were the types of jobs. This was all part of therapy with Dr. Koff in trying to get me back into the working situation. And so we decided that we would try to have some kind of job like that. The guard job has proved to be a good job for that.

    g.    Q.    Any other jobs that you sought in that December 2003 up until April 2005 time period?

    h.    A.    No.

17. In the deposition of Plaintiff, (Book 011 @ page 55).

   a. Q. Did you begin to do real estate appraisals on your own?

   b. A. No, I did not.

   c. Q. Why not?

   d. A. I'm trying to get jobs where I can go a little bit at a time to make sure that I can function in them okay. If I were to – the idea is I don't want to start a job and then fail. And that I don't want to experience similar things that I experienced at the City. I mean, there is no guarantee that an employee won't behave in a way that causes someone to hurt them in a way. But through the therapy with Dr. Koff, the approach was just to try and get out there, see want kind of job I could get.
   The therapy from the beginning in fact was to first get me to a point where I could feel comfortable going to the market. So I mean, I have come a long way since that time and I'm pretty grateful to Dr. Koff for that. In fact, I really wish I could still have therapy with her. But she has really helped me a lot in that regard.

18. In the deposition of Plaintiff, (Book 011 @ page 57 and 58).

   a. Q. ...with regard to December 2003, when you stopped working for the City, up until the present time, you testified that Dr. Koff never told you you could not work as a real estate appraiser, is that correct?

   b. A. That's correct. But what I'm trying to say is that the entire treatment process that I've been going through, the whole effort of that treatment process is to get me back into the work environment, and that the types of jobs that I applied for were part of the treatment plan with Dr. Koff.

19. In the deposition of Plaintiff, (Book 011 @ page 56).

   a. Q. Did any physician, psychologist, psychiatrist, counselor ever tell you you cannot work as a real estate appraiser from December 2003 until the present time?

   b. A. Well, the only restriction that I'm aware of is that they said I could not work at the City & County as a real estate appraiser. That is the only restriction that I'm aware of.

20. In the deposition of Plaintiff, (Book 011 @ page 59).

   a. Q. Mr. English, please listen to my question. Just in terms of a time period, December 2003 up until today September 30, 2005, did Dr. Koff say to you you cannot work as a real estate appraiser?

   b. A. No, she didn't say that to me. What she did say was, we need to get you back in the work force and we need to try and find these kinds of jobs, these entry level jobs where you might be able to start working again.

21. In the deposition of Plaintiff, (Book 011 @ page 70).

   a. Q. And with regard to the Master Guard Company, are you a full time or part time employee?

   b. A. Part time.

   c. Q. And approximately how many hours a week do you work?

   d. A. At the moment, 12 hours a week.

22. In the deposition of Plaintiff, (Book 011 @ page 71).

   a. Q. In terms of your rate of pay, what is your rate of pay?

   b. A. $8.00 per hour.

23. On August 20, 2003, Mark Dillen Stitham, M.D. issued a report to the Workers' Compensation Administrator, (Book 036 @ page 003 to 011)

   a. (Page 003) "Additionally, as English was promoted to higher levels, he showed an inability to complete his work assignments in a timely manner and was counseled repeatedly concerning his work performance. During meetings with his supervisors, he would raise his voice, make accusatory statements, and deny he was experiencing any problems."

   b. (Page 010) "The most surprising omission in the psychological evaluation by Reneau Kennedy, Ed.D. was the lack of any notation on Axis II (personality). From the record, it certainly appears that Mr. English has traits of grandiosity, rigidity, and suspiciousness/paranoia. Indeed, one wonders if he has bipolar affective disorder [manic-depressive illness], depressed phase. This should be explored by his current physician."

c. Page (010) "Also noteworthy are the <u>multiple</u> non-industrial stressors that have plagued this man including: three failed marriages, severe financial problems including with the IRS, bankruptcy, failed business, renal cancer, deteriorating health of mother, custody dispute, and two serious suicide attempts. Mr. English's assertion that he has no problems and that everything is caused by work in not credible."

d. (Page 010) "To the contrary, in reasonable medical probability, this early middle-aged man had a rather severe mood disturbance, which subsequently affected his work performance. Due to his personality structure, he reacted with defenses of protection and denial."

# WHISTLE BLOWING VALUE

1. In the Report of Industrial Injury or Illness, (Book 016 @ Page 57):

    a. "In late 2001, Mr. English raised allegations that another employee (and close personal friend), Mr. Christopher Graff, Real Property Appraiser IV, was involved in outside employment during city working hours and was doing this on instructions from Mr. Gary Kurokawa, Real Property Administrator. These allegations were brought to the attention of Mr. Robert Magota, Real Property Assessor."

    b. "Mr. English could provide no evidence to Mr. Magota to support his claim. Mr. Magota interviewed Mr. Graff regarding this matter and Mr. Graff denied these allegations. Mr. Magota then gave Mr. Graff a stern warning that no outside employment was to be conducted during City working hours and any future incidents would result in disciplinary action. Mr. Magota also interviewed Mr. Kurokawa and discussed the allegations raised by Mr. English. Mr. Kurokawa said that he had also given Mr. Graff a warning regarding this matter."

    c. "According to another employee, Mr. English was not satisfied with the actions taken by Mr. Magota. He expressed dissatisfaction and said that Mr. Kurokawa was going to reward Mr. Magota by promoting him when the division's reorganization plan if finalized."

2. In Plaintiff's Answers to Defendant's Fifth Request for Answers to Interrogatories, (Book 058 @ page 25):

    a. "In late 2001 or early 2002, Defendant MAGOTA advised me that he would talk with Defendant KUROKAWA about the matter fo City employees doing work for Defendant KUROKAWA's appraisal company on City time, but that I should not continue to pursue the issue because, in any dispute, it would be my word against the word of the appraiser and Defendant KUROKAWA.

3. In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003, (Book 018 @ Page 477):

    a. "On February 15, 2002, (the week after issuing the second verbal complaint, Mr. English issues his first written complaint in an email to Mr. Magota, entitled "COMPLAINT AGAINST THE ADMINISTRATOR." In the emailed

complaint, Mr. English wrote, in part:"

    i. "MY COMPLAINT IS THAT IT IS IMPROPER THAT THE ADMINISTRATOR IS HAVING WORK DONE BY CITY EMPLOYEE WHILE ON CITY TIME. I UNDERSTAND THAT WARNINGS HAVE BEEN MADE TO THE EMPLOYEE BY HIS SUPERVISOR AND HE HAS EVEN BEEN ASKED TO BE MORE DISCRETE. BEING MORE DISCRETE IS NOT THE ISSUE AND IT IS NOT THE EMPLOYEE WHO I AM MAKING THE COMPLAINT AGAINST. THE ADMINISTRATOR SHOULD KNOW BETTER...MY HOPE IS THAT THE ADMINISTRATOR WILL UNDERSTAND THE LINES BETWEEN RIGHT AND WRONG AND THAT IF HE USES AN EMPLOYEE FROM HIS OFFICE FOR OUTSIDE WORK THAT HE MAKE IT CLEAR THAT THE EMPLOYEE MUST DO THE WORK OUTSIDE OF WORKING HOURS AND THAT ALL OF THEIR COMMUNICATIONS REGARDING OUTSIDE WORK WOULD BE DONE OUTSIDE OF WORKING HOURS."

    ii. "In interview, Mr. English reported, "I really didn't want to pick a battle and I was thinking about the division, thinking of protecting the office," He also stated that he tried to be respectful, but "he got on the bad side of these guys real quick," due to being a "mainland haole"."

    iii. "In interview, Mr. English cited the lack of "moral compass at his place of employment."

4. In the deposition of Plaintiff, (Book 011 @ pages 10 and 11).

    a. Q. And when was the first time you consulted with Mr. Moseley?

    b. A. August 14, 2002.

    c. Q. And without going into substance, but as you had indicated in terms of there was an ethics concern that you had specifically retained him for in December of 2002, what was the general reason in which you had consulted Mr. Moseley in August 2002?

    d. A. My first conversation with him was calling him, asking him if he could help me or if he knew of an attorney who might be able to handle a case that had to do with my employment situation.

    e. Q. Which is why we are here today, correct?