f.  A.  Yes, that is true.

g.  Q.  And from August 1 4, 2 002 throughout December 2002 when Mr. Moseley was retained by you, were you consulting with him with regard to an employment matter, which is why we are here today?

h.  A.  Right. You know, I'm not really clear about that. I'm not really sure about that actually. I think I may have called him or contacted him about something, but I honestly don't remember the details of that, if I did at all. I know there was a period of time where we didn't have communication. I'll leave it at that.

i.  Q.  And from August 14, 2002 and then – let me withdraw that. Why is it that you remember August 14, 2002 as opposed to Approximately August or something like that?

j.  A.  Well, because other things were happening. I wasn't -- it wasn't just -- when I contacted Roger, he actually assisted me in contacting the FBI. And that happened, I believe, either on or about that date.

5.  In the deposition of Plaintiff, (Book 011 @ page 11).

a.  Q.  Did Mr. Moseley  ever contact the U. S. Attorneys Office on your behalf?

b.  A.  I believe that he contacted them to get a name and a phone number for me, right.

6.  It is my opinion:

a.  Since I also have a common practice of turning individuals over to the FBI and the IRS, that Plaintiff contacted these federal agencies in an attempt to bolster their case. It is a tactic that obviously failed.

b.  I am not aware of any action taken at all by the FBI or the U. S. Attorney's offices. That being the case, it then proves that there was not enough substance or issues to have motivated these agencies to act.

7.  On January 22, 2003 Rogers S. Moseley, Esq., counsel for Plaintiff, filed a formal complaint to the Honolulu Ethics Commission on behalf of Plaintiff, (Book 024).

a.  In my opinion, the letter was drafted to facilitate this lawsuit.

8.    In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003 (Book 018 @ Page 483):

    a.    "On the afternoon of February 5, 2003, Mr. Charles W. Totto, Executive Director and Legal Counsel for the Honolulu Ethics Commission, emailed Mr. Kurokawa. Mr. Totto informed that he "received a complaint involving the alleged use of city resources for non-city purposes, by [Mr. Kurokawa] and Chris Graff." In interview, Mr. English stated that "Mr. Totto is Haole," but Supreme Court Justice "Paula Nakayama is Japanese and wants the state to win"."

9.    On February 26, 2003, Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services sent an email to Charles W. Totto, Executive Director and Legal Counsel for the Ethics Commission of the City and County of Honolulu, (Book 018 @ Pages 372 and 373):

    a.    "I am conducting and investigation concerning allegations of possible workplace violence via harassment and threats by Phillip English, Real Property Appraiser, Real Property Assessment Division, BSF. The reason for contacting you is that one of the complainants, Christopher Graff, states in his complaint that Phillip English is verbal intimidating and making threats against him. He states that on Tuesday, 1/7/03 and Friday, 1/10/03, Philip English told him that he was on the "bad list" with the FBI and Corp Counsel Ethics Commission. Mr. English told Christopher that Charles Totto, head of the Ethics Commission, had access to Christopher's computer records concerning doing private appraisal work with Gary Kurokawa's approval while on City time."

    b.    "Mr. English warned Christopher that the Ethics Commission was "nobody to mess around with" and he should not lie when the Commission got around to questioning Christopher. If he lied to them (Ethics), they would know and "hang him out to dry." Christopher felt Mr. English was attempting to intimidate him."

    c.    "Mr. English also said that the Ethics Commission Investigation had progressed so far that Charles Totto said "the best thing Gary Kurokawa could do right now was resign"."

    d.    "Mr. English then told Christopher that if he went forward to the Ethics Commission right now, i.e., prior to a complaint being filed, that Christopher would be "moved off the bad list" and place into "whistle blower" status and therefore I could not be fired. Mr. English claimed that if I did not got to the Ethics Commission I would be fired and go to jail."

e.  "I know that you are conducting your own investigation but I would like to know what you can confirm or deny of the comments made in the complaint."

10. On February 26, 2003, Charles W. Totto, Executive Director and Legal Counsel for the Ethics Commission of the City and County of Honolulu sent an email to Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services in response to the email above, (Book 018 @ Page 372):

a.  "Because Phil's complaint to the Ethics Commission in under investigation, I am not at liberty to answer all your questions thoroughly."

b.  "I told Phil that, assuming that the information provided by Phil directly or thorough his attorney was accurate, Chris and Gary may have violated the ethics laws regarding the use of city resources to benefit private businesses. I added that I would have to conduct an investigation to determine whether a violation may have occurred."

c.  "I do not recall saying anything about a "bad List" and would not characterize subjects of an investigation in that manner. I talked with Phil and his attorney about strategic approaches to the witnesses in the investigation, but I can not say more about that at this time."

d.  "I did not say anything to the effect that Gary should resign."

e.  "Phil filed his complaint with the Commission on January 22, 2003."

11. In Plaintiff's Answers to Defendant's Fifth Request for Answers to Interrogatories, (Book 058 @ page 22):

a.  "Although, by at least March 6, 2003, a City REPRESENTATIVE FROM THE Personnel Division (I believe) apparently did discover that City employees were working for Defendant KUROKAWA'S private business, there was not detailed follow-up investigation, because the allegation was made that the activity on City time was only an occasional telephone call. When officers/employees of the City have such confirmation, their failure to act must be nothing less than  intentionally or negligently inflicted emotional distress upon me, by my understanding of those terms.

12. On February 18th and February 19th 2004, the Honolulu Advertiser published two articles:

a.   *Faulty tax assessments alleged*, (Book 033 @ page 005).

   i.   "City officials knowingly sent out incorrect property tax bills, had appraisers do work on city time for a company owned by the head of the Assessment Division and his family, and retaliated against an appraiser who tried to blow the whistle, according to a federal civil rights lawsuit."

   ii.  "Many taxpayers were likely assessed taxes they did not owe." according to the suit by appraiser Philip E. English, who says in the lawsuit he has been away from work for nearly a year because of a medical disability."

b.   *Lawyer says tax agency 'rotten'*, (Book 033 @ page 003).

   i.   "The kind of faulty property tax assessments alleged in a former city appraiser's lawsuit are "very widespread," and many Honolulu residents are likely being overcharged by the city, according to the plaintiff's lawyer.

   ii.  "This is a case that really affects a lot of property owners,' attorney Roger Moseley said, "The kind of things that go on at the Assessment Division are really shocking."

   iii. "It's just rotten to the core," he said. "That's not to say there aren't some good people over there, but they're absolutely intimidated by the rotten apples."

c.   In my opinion, these newspaper articles painted a picture of a terrible public problem at the Assessor's office. There obviously had to be investigations done to verify the truth of the Plaintiff's allegations. I am not aware of any action taken to correct this problem painted by the lawsuit and Plaintiff's lawyer, perhaps there was none needed.

13. On March 3, 2005, over two (2+) years after the complaint was filed with the Honolulu Ethics Commission, Charles W. Totto, Executive Director and Legal Counsel for the Honolulu Ethics Commission drafted a Memorandum to Gary T. Kurokawa entitled "Notice of Possible Violations of the Standards of Conduct." (Book 024)

   a.   "FIRST CLAIM - Your direct and indirect business/financial activities with your subordinate Mr. Graff, through GK Appraisals, Inc. **may have**

**constituted** (emphasis added) a violation...insofar as they **may have been incompatible** (emphasis added) with the discharge of your official duties as Real Property Assessment Division Administrator or **may have tended** (emphasis added) to impair the independence of your judgment in the performance of your official duties as Real Property Assessment Division Administrator."

b.   "SECOND CLAIM - The foregoing use of City resources for non-City purposes **may have constituted** (emphasis added) use of your official position to secure or grant yourself special consideration, treatment, advantage, privilege or exemption in violation of ..."

c.   "THIRD CLAIM - Your claiming of personal real property tax exemptions to which you were not lawfully entitled **may have constituted** (emphasis added) use of your official position to secure or grant yourself special consideration, treatment, advantage, privilege or exemption in violation of ..."

d.   "...you may respond in writing to this Notice within 15 days of the receipt of this Notice, and in your response you may request a hearing before the Commission, at which you may be represented by an attorney and you may present any relevant evidence. If you do not make a written request for a hearing before the Commission within the 15-day period, the Commission may render an opinion based on the information available to it, subject to its determination to further investigate the matter."

e.   "Under ... should the Commission find that you violated the ethics laws as alleged above, it may recommend disciplinary action be taken by your appointing authority, including reprimand, probation, demotion, suspension or discharge, as well as other appropriate action."

14.   There have been no other documents produced to me which identify any action taken by the Honolulu Ethics Commission. Unless they are produced to me, I will assume that this is the end of the total impact of the whistle blower issue.

15.   It is my opinion:

a.   That absent:

i.   Any arrest(s) by the FBI;

ii.   Any indictment and related prosecution(s) by the United States Attorney;

ENGLISH  V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005                    Page 35 of 49

iii.  Any arrest(s) by the Honolulu Police department;

iv.  Any indictment and related prosecution by the Honolulu Prosecutor's Office; and,

v.  Any further reprimand, probation, demotion, suspension or discharge by the Real Property Assessment Division to Gary Kurokawa or Christopher Graff.

vi.  There is no available evidence of arrest or related conviction or other evidence resulting in any punishment to the alleged perpetrators. It illustrates the lack of any substance to Plaintiff's claims of ethical violations since nothing resulted.

vii.  There is no other evidence or support to the allegations, this entire whistle blowing issue is moot.

b.  The "Whistle-Blowing Value" appears to be a big to do about nothing. Plaintiff obviously alienated himself from the staff and management of the division by his actions and deeds and his emotional instability exacerbated this process into enormous claims against the City and County of Honolulu.

# ALLEGATIONS OF WORKPLACE VIOLENCE
# (PHILIP ENGLISH)

1.      On March 12, 2003 a report was issued by Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services, City and County of Honolulu entitled *INTERIM INVESTIGATION REPORT - ALLEGATIONS OF WORKPLACE VIOLENCE (PHILIP ENGLISH)*, (Book 035 @ Page 001 to 009).

  a.      (Page 002) "This is an interim report because I have not interviewed the alleged perpetrator Phil English. A interview with Phil English and his HGEA union representative Kevin Mulligan was scheduled for Monday, March 3, 2003. However, Phil started sick leave on Friday, February 28, 2003 and he filed a workers' compensation claim with the Division of Human Resources, Industrial Safety and Workers' Compensation Division. Until he returns to work or is cleared to hold the interview, Phil's interview is postponed."

  b.      (Page 003), "The first two initial interviews were with Ann Gima (attachment 3) and Robert Magota (Attachment 4). Phil English is assigned to Ann Gima's team. According to Robert Magota, Philip challenges Ann's authority. Robert stated that Phil becomes defensive when his work, attitude and/or behavior are questioned. Ann repeated that Phil has raised his voice and his behavior is becoming more and more disruptive and counterproductive."

  c.      Several staff members were interviewed, excerpts are as follows:

    i.      Linda Knowles :

        (1)      "She doesn't feel threaten but believes something could happen."

        (2)      "Phil acts like nothing has happen."

    ii.      Carole Kamisato: "

        (1)      "Phil was suppose to cover the counter for the public but he refused. There were loud noises from Phil and Ann. Phil was upset enough that he threw a box or object in his cubicle that was loud enough for others to hear."

        (2)      "Another 2002 incident resulted in voices (Phil and Ann) getting

louder and louder for at least 10 minutes. Carol left the area and stayed away."

(3)  "Carole had driven Phil home after a class. He talked about ex-wife telling stories and the court decree was wrong."

(4)  "Something might trigger him like the Byron Uyesugi (Xerox Case). She understands that others do feel threaten."

iii.  Julie Tamer:

(1)  "He talks about "we are ALL against him at the office. He feels shunned and ostracized."

(2)  "Phil will lie about things, mostly minor things."

(3)  "Not sure if she is safe at work."

(4)  "Phil speaks of being a good Christian but his actions do not reflect it."

iv.  Susanne Foumai:

(1)  "She doesn't feel threaten but believes that physical harm is possible."

v.  Genie Shito-Leong:

(1)  "When he gets loud, people want to get away from him."

(2)  "With the pressure Phil is under, he could snap with angry taxpayers."

vi.  Chris Graff:

(1)  "Chris believes that Phil English has been verbally intimidating and made verbal threats."

(2)  "The main thrust of complaint has to do with Phil trying to make Chris agree that he need to come clean to the Ethics Commission. If he didn't, they (Ethics Commission) would "hang Chris out to dry." Phil stated that Chris is on the "bad list" for the FBI and City's Ethics Commission. Phil stated that if

Chris came clean he could be protected as a "whistle blower."

    vii.    Ryan Fujitani:

        (1)    "Ryan believes other employees in the office seem to be on edge because of Phil."

        (2)    "Ryan believes he needs to be cautious because of Phil's attitude and behavior to act like nothing is going on but it is (Ethics Complaint)."

        (3)    "Ryan doesn't feel threaten but is starting to think about Bryon Uyesugi case. Phil's behavior is becoming weird. As far as physical harm, anything is possible."

    d.    Conclusion (Page 8):

        i.    "There is a concern that Phil's behavior has upset several employees of the Real Property Assessment Division."

        ii.    "However, nothing found during the investigation revealed that Phil is under retaliation."

        iii.    "Several people consider his behavior to be something like Bryon Uyesugi and the Xerox case (shootings)."

        iv.    "Whether violent or not, his work performance may be less that satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action."

2.    Since Plaintiff has failed to be interviewed, this workplace violence action against him will not continue until he does offer an interview. No decisions or conclusions will be reached and the result of the workplace violence matter will not determine if Plaintiff is innocent or guilty of workplace violence.

# COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT

1.  On January 20, 2004, Plaintiff signed a document entitled *"COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT*, (Book 014 @ Exhibit 1)

    a.  In the deposition of Plaintiff, (Book 011 @ page 62).

        i.  Q.  With regard to page 8 of that document, is that your signature?

        ii.  A.  Yes, it is.

        iii.  Q.  And the document is dated January 20th, 2004, correct?

        iv.  A.  Yes.

    b.  In the deposition of Plaintiff (Book 011 @ page 64).

        i.  Q.  And with regard to resigning, that was a choice that you could make with the advice of counsel, correct?

        ii.  A.  I had no choice to resign or not, but I could only do it in that context, because that was the only way that they would settle the worker's comp claim.

    c.  In the release agreement, (Book 014 @ Exhibit 1 Page 8):

        i.  "Claimant specifically acknowledges and represents he has been advised of, is aware of, and understands all of his legal rights and interests arising out of the January 30, 2003 claims of injury and he has voluntarily and without duress or undue influence entered into this agreement."

    d.  In the release agreement, (Book 014 @ Exhibit 1 Page 3):

        i.  "Claimant did not sustain any permanent disability as a result of the January 30, 2003 claim of injury."

    e.  In the release agreement, (Book 014 @ Exhibit 1 Page 3):

i.  "In order to terminate and discharge in whole any and all claims...the total sum of EIGHTY-FIVE THOUSAND AND NO/ONE-HUNDREDTH DOLLARS ($85,000.00) shall be remitted to Claimant in a single lump sum following final approval and filing of this Compromise, Settlement and Release Agreement by the Disability Division, Department of Labor and Industrial Relations, State of Hawaii."

2.  Less than a month after the $85,000 was agreed upon, the Plaintiff filed suit in Federal District Court on February 13, 2004. (Book 026).

# THOMAS T. UENO, CPA REPORT - (BOOK 6)

1.    It is my opinion that the information provided to Mr. Ueno (hereinafter "Ueno") was insufficient for him to reach an informed opinion and render an accurate report. Further, information that was provided to him lacked the necessary research and evaluation for Ueno to interpret it accurately.

2.    The documents that Ueno was provided with are as follows:

   a.    Complaint;

   b.    HGEA Contract Agreement July 1, 1999 - June 30, 2003;

   c.    Independent Psychological Evaluation - Dr. Reneau Kennedy;

   d.    Performance reviews of Philip English;

   e.    Various employment records:

      i.    Letter dated 04/28/99;

      ii.    Appraiser Examination Results;

      iii.    Job Applications; and,

   f.    State and Federal Tax Returns fo Philip English.

3.    Overall, the Ueno report assumes that the trier will have concluded that every claim and allegation, every representation and the entire basis for the claims by Plaintiff are accurate and without question. Considering that, Ueno opines that Plaintiff is entitled to special damages of $834,706.

4.    Ueno was provided with the job application and tax returns. Examination would identify:

   a.    Of the 25 years of experience in real estate appraisal - (Attachment A - Page 1) - My analysis above identifies that in some years Plaintiff did not earn any revenue. Unless Plaintiff was working for cash, there is no evidence that he did appraisal work in some of the years and obtain the appraisal experience in doing so.    There is no experience gained during all periods of

ENGLISH  V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005                      Page 42 of  49

unemployment.

b.   Mr. English's corporation employed 12 appraisers and staff (Attachment A - Page 1) - My analysis above indicates that there were many years represented on the employment application where there is no financial evidence of the employment of 12 appraisers and staff.

5.   Ueno represented that "On February 27, 2003, Mr. English was advised by his physician not to return to work for the City" (Attachment A - Page 2):

a.   The impact of this statement establishes an assumption that Plaintiff was told not to work any more.

b.   Ueno added in the Front Pay calculation, (Attachment A - Page 3), the quote from page 22 of Dr. Ed. Reneau Kennedy's report, "I do not believe that Mr. English is able to return to his usual and customary duties in the same work place, either part-time or full time. Mr. English and people at his place of employment appear to have a damaged, if not irreparable relationship."

c.   Ueno failed to identify the following information on the same page (22) of Dr. Ed. Kennedy's report:

i.   "If there is an alternate placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or **possibly full time work** (emphasis added)."

ii.   "I am of the opinion that Mr. English can resume some type of work."

iii.   Ueno has used mitigated earnings of $8 per hour for 12 hours of work per week (Attachment A - Page 2). This results in $4,992 per year ($8 X 12 hours per week  X 52 weeks).

iv.   Ueno did not even consider the Plaintiff working as a guard at 40 hours per week which would compute to $16,640 ($8 X 40 hours per week X 52 weeks). Further Ueno did not consider the Plaintiff working at a job that could have fully mitigated any lost wages.

v.   Ueno did not consider that the Plaintiff had severe psychological problems the year before starting his job at the City and he still was able to function acceptably at Appraiser II and Appraiser III. Ueno simply assumed that Plaintiff's mitigation was to be $8 per hour for a 12 hour week. Assuming the Plaintiff is entitled to any damages, there should have been a calculation or at least commentary that Plaintiff

could have fully mitigated the special damages if he recovered mentally and was able to return to comparable work.

6.  Ueno identifies that "based on his prior experience, performance reviews (prior to bringing to light any problems os the Division), promotion history, and the fact that he had already been considered "qualified" for the position in 1999: Mr. English clearly had the capacity to become an administrator for the City's Real Property Assessment Division." (Attachment A -page 2)

    a.  Plaintiff was promoted to Real Property Appraiser IV on 03/01/02, (Book 016 @ page 69).

    b.  Plaintiff received an Annual Performance Report for the period from 6/01/02 to 05/31/03 (Book 016 - @ pages 46, 47 and 48)

        i.  Ueno apparently has received the job performance but has not considered:

            (1)  "Over the course of the past nine months, Philip has been encountering numerous difficulties in independently performing all of the responsibilities of his position. His performance has been discussed with him on several occasions including two meetings conducted with union agents in attendance."

            (2)  "Some specific issues that have been addressed include acts of insubordination, meeting stated deadlines, following written and verbal directions, correct methods for processing various job tasks, utilizing good judgment and repeated errors."

            (3)  "Prior to his absence, he was made aware of numerous incomplete assignments."

            (4)  "At the present time there are several outstanding issues regarding work performance and conduct still to be addressed upon his return to work. In his absence he has missed several mandatory training sessions."

    c.  Plaintiff was not working in his Appraiser IV job effectively. Ueno may argue that due to the "Whistle Blower" issue that the Plaintiff's superiors have somehow conspired to rank him low to get even with him. I am not aware of any proof to that claim and I therefore side on the documents to attest to facts.

     d.     Further, there is no evidence that Plaintiff has any administrative skills in the environment of the City's Real Property Assessment Division. His prior ten years o f experience i n p rivate p ractice ended in f ailure a nd t here is n o evidence that he was a good administrator, his business went belly-up.

     e.     It appears from what I have read, as identified above, that most of the City staff disliked him. Clearly, that uncomfortable environment is no evidence as a focus basis for promotion and respect from subordinates.

7.     Ueno's report reflects, "Since his departure from the City, Mr. English has searched for comparable alternative employment; but with little success. He has been unable to secure employment that would place him in a similar field or provide him with equivalent promotional opportunities, compensation, benefits, and working conditions. Mr. English has found it difficult to secure any type of employment; he has been forced to accept what few positions have been offered to him." (Attachment A - page 2):

     a.     In the deposition of Plaintiff, (Book 011 @ page 54).

          i.     Q.     For how long a period of time before you started for Master Guard company, were you unemployed?

          ii.     A.     I guess from December 2003 until that time.

          iii.     Q.     Between December 2003 and up until April of 2005 when you began working for the Master Guard company, did you seek other employment?

          iv.     A.     Yes.

          v.     Q.     What other employment did you seek?

          vi.     A.     I looked for jobs as a driver. I looked for jobs as wait help at conventions and that sort of thing. Those were the – there were various places. But those were the types of jobs. This was all part of therapy with Dr. Koff in trying to get me back into the working situation. And so we decided that we would try to have some kind of job like that. The guard job has proved to be a good job for that.

          vii.     Q.     Any other jobs that you sought in that December 2003 up until April 2005 time period?