IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,                    ) CIVIL NO. CV04-00108 SOM/KSC
                                      )
        Plaintiff,                    ) MEMORANDUM IN SUPPORT OF MOTION
                                      )
    vs.                               )
                                      )
CITY AND COUNTY OF HONOLULU;          )
GARY T. KUROKAWA; ROBERT O.           )
MAGOTA; ANN C. GIMA; and GK           )
APPRAISALS, INC.; JOHN DOES           )
1-10; JANE DOES 1-10; DOE             )
PARTNERSHIPS; DOE CORPORATIONS        )
1-10; AND DOE ENTITIES 1-10,          )
                                      )
        Defendants.                   )
_____ )

## MEMORANDUM IN SUPPORT OF MOTION

Defendants CITY & COUNTY OF HONOLULU, GARY T. KUROKAWA, ROBERT O. MAGOTA, and ANN C. GIMA (collectively "CITY Defendants"), by and through their attorneys, KAWASHIMA LORUSSO & TOM LLP, hereby submit their motion for partial summary judgment, on Counts I and VIII of the First Amended Complaint for this Court's review and consideration.

## I.    RELEVANT FACTUAL BACKGROUND

### A.    Workers Compensation Settlement

Before the initiation of the instant lawsuit, Plaintiff, on February 28, 2003, filed a claim for workers' compensation benefits under Chapter 386, Hawaii Revised Statutes ("HRS"), against the CITY AND COUNTY OF HONOLULU, DEPARTMENT OF BUDGET AND FISCAL SERVICES for an alleged industrial accident on January 30, 2003, where he reportedly sustained a stress-related

psychic injury.  <u>See</u> **Exhibit "A,"** Compromise, Settlement and
Release Agreement dated 1/20/04; Approval and Order dated
2/26/04, (Workers' Compensation Settlement").

On January 20, 2004, with the assistance and advice of
counsel, Roger Moseley, Esq., Plaintiff accepted a lump sum
payment of eighty-five thousand dollars ($85,000.00) to settle
his workers' compensation claim and was allowed to retain all TDI
and other benefits already conferred on him.  In exchange,
Plaintiff stipulated and agreed to the following terms and
conditions:

> 6.    In order to terminate and discharge in whole any
>       and all claims, rights and causes of action that
>       Claimant may have under Chapter 386, HRS, . . .
>       including without limitation the January 30, 2003
>       claim of injury, the total sum of EIGHTY-FIVE
>       THOUSAND AND NO/ONE-HUNDREDTHS DOLLARS
>       ($85,000.00) shall be remitted to Claimant in a
>       single lump sum . . .

> \*          \*          \*          \*

> 7.    The sufficiency of said sum as consideration of
>       this Agreement is hereby expressly acknowledged by
>       Claimant.   Said sum further contemplates:

> a.    such waivers as articulated in Paragraph 8
>       herein; and

> b.    the termination on January 31, 2004 of the
>       medical care, services and supplies as the
>       nature of the January 30, 2003 claim of
>       injury requires as articulated in Paragraph 9
>       herein; and

> c.    Claimant's resignation from employment with
>       Employer as articulated in Paragraph 11
>       herein . . .

&ast;  &ast;  &ast;  &ast;

9.  <u>Claimant specifically understands and agrees that
    as of January 31, 2004, he will be solely and
    personally responsible to pay for all medical
    care, services and supplies provided by any
    provider after January 31, 2004, which are due to
    the nature of the January 30, 2003 claim of
    injury</u>, and Claimant hereby releases Employer and
    the City and County of Honolulu from any and all
    liability therefor, and specifically agrees to
    protect, defend, indemnify and hold forever
    harmless Employer and the City and County of
    Honolulu from and against all liability for such
    medical payments incurred for all medical care,
    services and supplies provided by any provider
    after January 31, 2004.

&ast;  &ast;  &ast;  &ast;

11. In further consideration for the agreements of
    Employer as set forth herein, <u>Claimant hereby
    voluntarily quits, resigns and terminates his
    employment with Employer, fully, finally,
    irrevocably and forever, effective January 31,
    2004</u> and Claimant hereby waives, releases and
    discharges the City and County of Honolulu from
    any and all of the City and County of Honolulu's
    obligations pursuant to any collective bargaining
    agreement.  <u>Claimant further waives any re-
    employment and priority placement rights as part
    of this Agreement</u> . . .

&ast;  &ast;  &ast;  &ast;

14. This Agreement is made and entered into upon the
    free will of and in good faith by the parties with
    full knowledge of the facts and possibilities of
    the case, and this Agreement contains the full,
    final and complete release and entire agreement
    between the parties for the January 30, 2003 claim
    of injury and the terms of this Agreement are
    contractual in nature and fully enforceable, and
    shall be construed as a mere recital.

15. Claimant specifically acknowledges and represents
    he has been advised of, is aware of, and
    understands all of his legal rights and interests

arising out of the January 30, 2003 claim of injury and he has <u>voluntarily and without duress or undue influence entered into this Agreement</u>. .

<u>See</u> Exhibit "A" (emphasis added).

Throughout his workers' compensation proceedings, Plaintiff was represented by Mr. Moseley. <u>See</u> **Exhibit "B,"** Selected Portions of the Oral Deposition Transcript of Philip English, Volume I, dated 9/30/05 at pg. 61. When specifically asked whether he signed the Workers' Compensation Settlement under duress, Plaintiff answered in the negative:

Q: Are you saying you signed [the Agreement] under duress?

A: <u>No</u>. I'm saying that the only way that they would agree to it is if I agreed to resign.

Q: And with regard to resigning, that was a choice that you could make with the advice of counsel, correct?

A: <u>I had the choice to resign or not</u>, but I could only do it in that context, because that was the only way that would settle the workers' comp claim.

Q: And with regard to paragraph 11, it indicates that you voluntarily quit, correct?

A: because that was the only way –

Q: That is not my question. I'm simply –

A: I voluntarily signed it because I had no other choice. In order to settle this thing, I had to voluntarily sign it.

Q: When you say you had no other choice, I come back again to make sure, Mr. English, are you saying that you signed this Agreement, Exhibit No. 1, under duress?

A:   I'm saying exactly what I said before.  I don't
     know how else to say it.  The only way that this
     agreement would go forward is if I signed this.
     So I had no other choice but to sign it.

Q:   You signed it with the advice of counsel, correct?

A:   I did.

Q:   And you signed it on your own free will and
     volition, correct?

A:   Under the circumstances of what was being
     discussed, yes.

See Exhibit "B" at 64-65 (emphasis added).

## B.   **The Subject Lawsuit**

Following the settlement of his workers' compensation

claim, Plaintiff filed the instant lawsuit, claiming, among other

things, work-place retaliation arising out of various incidents

that allegedly occurred while Plaintiff was employed by the City

and County of Honolulu as an appraiser with the Real Property

Assessment Division.

As part of his lawsuit, Plaintiff alleges that

Defendant CITY AND COUNTY OF HONOLULU violated § 1983 through the

enactment of a policy of custom, or in the alternative, though

the actions of Defendant GARY KUROKAWA as the "Final Policymaker"

of the Real Property Tax Assessment Division:

94A. Defendant City has, as evidenced by the multiple
whistleblower cases filed against it, among other
actions, had a longstanding pervasive history, custom,
practice, and pattern of retaliating against
whisteblowers and employees who have engaged in
protected speech by exercising concerns about illegal
activities, government waste, corruption, hazardous

5

activities, and matters of public concern occurring at the City.

94B. Defendant City caused Plaintiff to be subjected to the deprivation of his rights, privileges, or immunities secured by the Constitution and laws of the United States, including, but not limited to, violation of Plaintiff's rights to free speech and the enjoyment of his civil rights, by and through the final policymaking authority vested in Defendant KUROKAWA. Defendant KUROKAWA is, and at all times herein relevant, an officer and the Administrator of the Assessment Division, an agency of the executive branch of the City.  Defendant KUROKAWA displayed and exercised his power over personnel actions as they related to City employees.  The actions taken by Defendant KUROKAWA regarding personnel functions were supported, sanctioned and ratified by other City executives and attributable to Defendant City as direct acts of Defendant City.

The underlying factual basis for his claim that CITY Defendants violated 42 U.S.C. § 1983 appears to be that Plaintiff's belief that he was retaliated against for exercising his First Amendment rights, *to wit*, commenting and questioning several internal office policies and procedures, including:

- the application of Uniform Standards of Professional Appraisal Practice ("USAP") Standards (¶ 29 of the First Amended Complaint);

- the number of properties assigned to appraisers far exceeded the recommendations of professional associations (¶ 29 of the First Amended Complaint);

- the Assessment Division appraisers were accepting assignments which could not properly be done with the resources at hand, which, at minimum should have required public disclosure that the assessments produced by the Assessment Division may not be reliable (¶29 of the First Amended Complaint);

6

- the almost complete lack of any comprehensive training program, especially with respect to internal policies and procedures (¶29 of the First Amended Complaint);

- classifications at the Waikiki Shore condominium in various forums, from meetings to individual encounters (¶ 31 of the First Amended Complaint);

- project groupings were not appropriate and the valuations were inconsistent (¶32 of the First Amended Complaint);

- leasehold sales were being used for some valuations (¶32 of the First Amended Complaint);

- there were multiple instances of questionable classification (¶32 of the First Amended Complaint);

- the sales 'validation' system was questionable on a widespread basis (¶32 of the First Amended Complaint);

- land valuations had not changed in years, despite significant moves in the market (¶32 of the First Amended Complaint);

- when the new computer system and mass appraisal system was put in place, no provision had been made to clean up the database before the conversion took place, and in fact there were numerous and serious actual discrepancies in the database.  This was against the specific advice and instructor of the new system (¶32 of the First Amended Complaint);

- there were numerous problems with the appeal process including but not limited to: instances in which the Board of Review did not act in an impartial manner, including, but not limited to, ex parte communications with the Assessment Division, requesting that the decisions be prepared before the hearings so that the BoR could sign them immediately after the hearings, and requesting that Plaintiff act more as an advocate for the Assessment Division's position, rather than trying to achieve the proper assessment; and

7

appraisers actively and improperly discouraging taxpayers from filing appeals and refusing to assist taxpayers in obtaining information relevant to their appeals (¶32 of the First Amended Complaint); and

- the general confusion and lack of understanding in the Assessment Division as to basic appraisal concepts, such as 'as of' a specific date, as opposed to 'on' a specific date (¶34 of the First Amended Complaint).

Plaintiff has also alleged a claim of defamation against _all_ Defendants.  The basis for these claims are that:

1.  Susan Bender, Esq. told him that Defendant MAGOTA call Plaintiff a "wacko;"

2.  Chris Graff told Plaintiff that Defendant MAGOTA told an unnamed MAI Appraiser that Plaintiff was a troublemaker; and

3.  Someone referred to Plaintiff as being similar to Brian (sic) Uesugi in connection with a workplace violence investigation.

See **Exhibit "C,"** Selected Portions of the Oral Deposition Transcript of Philip English, Volume III, dated 10/05/05 at pg. 368, lines 1 - 25.

## II. STANDARD OF REVIEW

A party may obtain summary judgment where the record shows that "there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party moving for summary judgment need not produce actual "evidence" negating the existence of material factual issues, but may rest on the lack of evidence of the essential elements of a claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a party moving for summary judgment has met its burden of proving that there is no genuine issue of material fact, the opposing party must "come forward with specific <u>facts</u> evidencing" a need for trial.  Fed. R. Civ. P. 56(e).  A plaintiff must adduce some "significant probative evidence tending to support the Complaint" and cannot discharge his burden by allegations in the pleadings, legal argument, or a hope that he can produce material evidence at the time of trial.  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  Arguments "based on mere speculation, conjecture or fantasy" are not sufficient to overcome a motion for summary judgment.  <u>O.S.C. Corp. v. Apple Computer, Inc.</u>, 792 F.2d 1464, 1467 (9th Cir. 1986).

## III. DISCUSSION

### A.     There Is No Evidence Establishing Municipal Liability.

Municipalities are liable under 42 U.S.C. § 1983 only when "action pursuant to official policy of some nature cause[s] a constitutional tort."  <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658, 691 (1978).  Liability attaches only when the enforcement of a municipal policy or custom was the "moving force" of the violation of federally protected rights.  <u>Wong v. City & County of Honolulu</u>, 333 F.Supp.2d 942, 950-951 (D. Hawaii 2004).  An action or policy can be "official" if it executes a policy statement, ordinance, regulation, or decision

officially adopted and promulgated by that body's officers.

Monell at 690.   Thus, only when "execution of a government's

policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is

responsible under § 1983." Id. at 694.   Conversely,

municipalities are not subject to section 1983 liability under a

*respondeat superior* theory for the acts of their employees.   Id.

at 691.

If there is no official policy, a plaintiff can

establish a practice or custom by showing:

> a longstanding practice or custom which constitutes the
> standard operating procedure of the local government
> entity.   The custom must be so persistent and
> widespread that it constitutes a permanent and well
> settled city policy.   Liability for improper custom may
> not be predicated on isolated or sporadic incidents; it
> must be founded upon practices of sufficient duration,
> frequency and consistency that the conduct has become a
> traditional method of carrying out policy.

Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996)(emphasis
added).

The alleged policy or custom does not pertain to all

government policies and customs; rather, "the challenged action

must have been taken pursuant to a policy adopted by the official

or officials responsible under state law for making policy in

*that area* of the city's business." City of St. Louis v.

Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924 (1988)(italics

10

in original)(citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469,
482-483, 106 S.Ct. 1292, 1299-1300 (1986)).

The failure of a plaintiff to produce evidence that any
retaliatory or discriminatory actions taken against him or her
resulted from an official policy or custom is fatal to a § 1983
claim.  See <u>Praprotnik</u>, 485 U.S. at 128[1]; <u>McCoy v. City of New
York</u>, 131 F.Supp.2d 363, 378-379 (E.D. N.Y. 2001)[2].

> 1.  **Plaintiff Cannot Establish a Policy or Custom of
> Retaliation Against Whistleblowers Within the Real
> Property Tax Assessment Division.**

Plaintiff broadly alleges in the First Amended
Complaint that Defendant CITY AND COUNTY OF HONOLULU has a long
pervasive history, custom, and practice of retaliating against
whistleblowers and employees who have engaged in protected
speech.  Whatever evidence Plaintiff may have regarding this
allegation, only evidence related to a custom, pattern, or
practice applicable to the Real Property Assessment Division is
relevant.  See <u>Praprotnik</u>; <u>Pino v. City of Miami</u>, 315 F.Supp.2d

---

[1]     In employment retaliation action, city cannot be held
liable where employee does not contend that anyone in city
government ever promulgated, or even articulated, an
unconstitutional municipal policy.

[2]     Municipality could not be held liable for violating
rights of black park services employee, where there was no
showing of official policy or custom under which supervisors and
employees discriminated against employee.

1230 (S.D.Fla.2004)[3]; <u>Alexander v. Fulton County, Georgia</u>, 207
F.3d 1303 (11th Cir. 2000)[4].  To date, there has been no evidence
of a long standing policy or custom of retaliating against
whistleblowers within the Real Property Assessment Division.

Rather, Plaintiff's only evidence is the existence of
other lawsuits and claims involving alleged instances of
retaliation in other unnamed/unidentified City departments, which
CITY Defendants submit is not relevant.

First, this type of evidence is irrelevant as it does
not pertain to any lawsuits filed against the Real Property
Assessment Division for alleged retaliation against
whistleblowers.

Furthermore, the fact that lawsuits were filed, in and
of itself, does not provide a basis for liability, but merely
suggests that the City "was on notice of various civil rights
abuses that had been alleged." <u>Singleton v. City of Newburgh</u>, 1

---

[3]     Plaintiff's § 1983 claim failed where he did not
identify custom or practice of "retaliation against employees who
complained to the State Attorney about corrupt or criminal
conduct by high ranking officials in the police department...[or]
identify any policy enacted by the City Manager or the City
Commission designed to retaliate against plaintiff or anyone
similarly situated." <u>Id.</u> at pg. 1245.

[4]     The 11th Circuit Court of Appeals decided, *en banc*,
that in a § 1983 claim alleging discrimination against whites,
plaintiff could not submit statistical evidence of Fulton County
hiring practices as it was not probative of custom or policy
within the Sheriff's department.

F.Supp.2d 306, 311-12 (S.D.N.Y. 1998)[5]; <u>Somavia v. Las Vegas</u>

<u>Metro. Police Dept.</u>, 816 F.Supp. 638 (D.Nev. 1993)[6]; <u>Mendoza v.</u>

<u>City of Rome, New York</u>, 872 F.Supp 1110 (N.D.N.Y. 1994)[7]; <u>Rogers</u>

<u>v. City of Little Rock, Arkansas</u>, 152 F.3d 790 (8th Cir. 1998)[8];

<u>Kivanc v. Ramsey</u>, 407 F.Supp.2d 270 (D.D.C. 2006)[9]; <u>Hunter v.</u>

<u>City of Electra, Texas</u>, 2006 WL 1814150 (N.D.Tex)(slip copy)[10];

---

[5]    "The mere fact of other lawsuits against the City does not provide a basis for liability...[t]he complaints do no more than suggest that the City was on notice of various civil right abuses that had been alleged." <u>Id.</u> at pg. 311-312.

[6]    In § 1983 action, plaintiff attempted to establish policy and/or custom by stating in her answers to interrogatories that there were several lawsuits filed against the city involving same or similar factual scenarios.  The District Court, in ruling in favor of the defendant City on its motion for summary judgment, stated that plaintiff's "evidence" – without any facts supporting her interrogatory responses - were insufficient to support the allegations of her complaint.

[7]    "[T]he mere fact that claims had been filed against the City of Rome, standing alone, does not establish a pattern, policy, or practice which was causally related [to the underlying claim]." <u>Id.</u> at pg. 1118.

[8]    Before prior claims and/or lawsuits can be considered, it must be shown that the complaints had merit.  <u>Id.</u> at pg. 799.

[9]    "Nor do the existence of unproved, unsubstantiated or unresolved complaints against [defendants] demonstrate deliberate indifference on the part of the District of Columbia.  Anyone can file a complaint.  The question is whether the prior acts by these officers have been proved or substantiated in other fora." <u>Id.</u> at pg. 279.

[10]    Attorney's affidavit submitted in opposition to motion for summary judgment filed by city claiming that a policy or custom existed because of nine other § 1983 lawsuits filed against the City within the last decade determined to be insufficient as the evidence failed to "demonstrate an official 'policy' or 'custom,' especially where the [plaintiffs] cannot

<u>Washington v. Darby Borough</u>, 1993 WL 273418 (E.D.Pa.

1993)(unpublished).  As the Court in <u>Kivanc</u> noted, "<u>[a]nyone can</u>

<u>file a complaint. . . . [t]he question is whether the prior</u>

<u>[complaints] have been proved or substantiated in other fora."</u>

<u>Id.</u>, 407 F.Supp.2d at 279 (emphasis added).

Only one of Plaintiff's examples stated in the First

Amended Complaint were allegedly proven to have merit, while the

<u>majority</u> of the lawsuits settled.  Plaintiff's only "evidence" of

a policy or custom shows why summary judgment should be entered

on Count I – isolated judgments clearly cannot evidence a long

standing and pervasive history of retaliating against

whistleblowers, either at a City-wide level, or within the Real

Property Assessment Division.  <u>See</u> <u>Trevino</u>, <u>supra</u>.

The only credible evidence is that a former Real

Property Assessment Division, <u>Defendant MAGOTA</u>, was never

retaliated against after he blew the whistle on a former City

administrator, Malcolm Tom.  At his deposition, Defendant MAGOTA

testified that he appeared on KITV news in the mid to late 1990's

as a "whistleblower" in an interview exposing improper property

valuations made by or at the direction of Malcolm Tom.  <u>See</u>

**Exhibit "D,"** Selected Portions of Oral Deposition Transcript of

_____

show that the city was found liable in any of those instances. .
.[and] does not create a genuine issue of material fact that the
City [ ] should be found liable as a municipality." <u>Id.</u> at pg.
8.

Robert Magota, Volume IV, dated 08/01/06 at pg. 21, line 12 - pg. 22, line 24.  At the time, Defendant MAGOTA wanted to bring the issues to the public's attention and understood that there was to be no retaliation against whistleblowers.  Id. at pg. 41, lines 9 - 24.  If he was retaliated against, he planned to seek legal counsel or his union representative.  Id.  Defendant MAGOTA was never retaliated against.

As a former "whistleblower," Defendant MAGOTA would not tolerate any retaliation against any other "whistleblower."  Id. at pg. 88, lines 2 - 17.

For the foregoing reasons, CITY Defendants submit that Plaintiff has not and cannot establish a pattern or custom of retaliation within the City, including the Real Property Assessment Division and summary judgment should enter in CITY Defendants' favor on Count I of the First Amended Complaint.

>   **2.    There is No Evidence that Defendant Kurokawa was a Final Policymaker.**

Plaintiff has alleged that the City is liable for the actions of Defendant KUROKAWA to the extent that he acted as a final policymaker when he allegedly retaliated against Plaintiff. It is significant to note that Plaintiff has not alleged that Defendant KUROKAWA ratified the conduct of others, including but not limited to Defendant GIMA and Defendant MAGOTA.

In order to establish that Defendant KUROKAWA was a final policymaker, the Plaintiff must establish either that: (1) Defendant KUROKAWA was granted final policymaker authority by legislative enactment; or (2) was delegated final policymaker authority by an official who possessed such authority. Lyte v. Carl, 382 F.3d 978, 983 (9th Cir. 2004). Furthermore, "when determining whether an individual has final policymaking authority, 'we ask whether he or she has authority in a particular area, or on a particular issue.'" Id. (Italics in original).

In Lyte, the Ninth Circuit Court of Appeals approved of the district court's determination that the defendants were final policymakers regarding employment/discipline decisions because they were delegated the final policymaker authority for personnel matters such as hiring, placement, sick leave, and discipline. Likewise, in the case of Gillette v. Delmore, 979 F.2d 1342, 1350 (9th Cir. 1992), the Court ruled that the City Fire Chief was not a "final policymaker" with regard to employee discipline as he was not responsible for establishing the City's employment policy.

Here, the relevant area of inquiry is whether Defendant KUROKAWA was delegated or had final policymaker authority with regard to employment decisions within the Real Property Tax Assessment Division.

16

A number of depositions have been completed, including those of Defendant KUROKAWA, Defendant MAGOTA, and other Real Property Tax Assessment Division employees; yet, there is no testimony or other documentary evidence that would substantiate Plaintiff's claim that Defendant KUROKAWA had "final policymaking" authority with regard to employment decisions within the Real Property Assessment Division.  Defendant KUROKAWA does not, and did not control any policy decision; he did not set the number of position available on hires/fires.

Defendant KUROKAWA's deposition testimony on this subject clearly establishes that he is not a "final policymaker." For instance, Defendant KUROKAWA neither interviewed nor hired Plaintiff; this was done by other assessor(s).  See **Exhibit "E,"** Selected Portions of the Oral Deposition Transcript of Gary Kurokawa, dated 08/22/06, at pg. 22, line 2 – pg. 23, line 10. After being hired, Plaintiff's supervisor assigned Plaintiff to a specific group, based on need.  Id. at pg. 23, lines 19 – 25. Any personnel problems within the division were primarily handled by Defendant MAGOTA.  Id. at pg. 52, line 21 – pg. 53, line 10. Defendant KUROKAWA would, however, get involved from time to time only when a supervisor informed him that an employee is not performing as expected.  Id. at pg. 53, line 11 – pg. 54, line 1.

Employee evaluations were not handled by Defendant KUROKAWA and were reserved for the employee's immediate

17

supervisor(s) (i.e., Defendant GIMA). Id. at pg. 60, line 19 –
pg. 61, line 13. Defendant KUROKAWA would review and sign the
evaluations before sending it off to personnel department.
Id. at pg. 61, line 14 - 23. If there were questions about an
employee not performing up to standard, Defendant KUROKAWA would
then raise questions with the supervisor. Id. at pg. 61, line 24
to pg. 62, line 11.

Advancement within the department as that is handled
through civil service requirements, which Defendant KUROKAWA had
no control over. Id. at pg. 20, lines 5 – 20. However,
immediate supervisors like Defendant GIMA could, and in this
case, did recommend Plaintiff for promotion from an Appraiser III
position to an Appraiser IV position. Id. at pg. 160, line 11 –
pg. 161, line 6; pg. 162, line 7 - 18. Although he does not
specifically recall whether he signed off on Plaintiff's
recommendation, Defendant KUROKAWA testified that he would
typically rely on Defendant GIMA's recommendation and sign-off on
it. Id. at pg. 164, lines 8 - 18.

Based on these facts, which CITY Defendants submit
cannot be disputed, Defendant KUROKAWA cannot be considered a
"final policymaker" of the Real Property Tax Assessment Division;
therefore, judgment should be entered in favor of CITY Defendants
on Count I of the First Amended Complaint.

B.  **There is No Violation of a Government Employee's First Amendment Rights When His/Her Speech Concerns Private Matters and/or is Made Pursuant to His/Her Job Duties**

In order for Plaintiff to establish a valid First Amendment claim of retaliation, he must first prove that "the government employee spoke <u>as a citizen</u> on a matter of public concern." <u>Garcetti v. Ceballos</u>, 126 S.Ct. 1951, 1958 (2006)(emphasis added).

Matters of "public concern" include "information about wasteful misuse of public funds. . .the inept administration of a governmental activity, or a breach of public trust." <u>Weeks v. Bayer</u>, 246 F.3d 1231 (9th Cir. 2001)(internal citations omitted). However, "individual personnel disputes and grievances [ ] that would be of no relevance to the public's evaluation of the performance of governmental agencies" are not generally matters of "public concern." <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003).

Where the speech in question is a product of a government employee's job duty, the speech, even if concerning matters of public concern, is no longer afforded First Amendment protection. <u>Garcetti v. Ceballos</u>, 126 S.Ct. at 1959-1961.

In <u>Garcetti</u>, the plaintiff/respondent Ceballos, a deputy district attorney, filed a lawsuit against his former employer claiming retaliation based on, among other things, First

19

Amendment grounds.  The basis for the claim stems from Ceballos'
investigation into a pending criminal matter.

Following his investigation (basically finding
inconsistencies in the affidavit), Ceballos drafted a memo to his
superiors recommending that the criminal case be dismissed.  A
meeting was held shortly thereafter to discuss the affidavit; in
attendance was Ceballos, his supervisors, the sheriff in
question, and other employees.  In spite of Ceballos' concerns,
his supervisors decided to go forward with the prosecution,
pending the outcome of a defense motion to challenge the warrant.
At the hearing on the motion, Ceballos was called by the defense
as a witness and testified about his observations of the warrant.

Thereafter, Ceballos claimed that he was retaliated
against by being reassigned from his calendar deputy position to
a trial deputy position, transfered to another courthouse, and
denied a promotion.  He claimed the retaliation was based on his
memos that were submitted to his superiors.

On appeal before the United States Supreme Court, the
Court reversed the Ninth Circuit Court of Appeals' decision, and
ruled in favor of the employer.  In making its decision, the
Court recognized that there must be a balance struck between the
a public employee's right to free speech and an employer's right
to control it's employee's words and actions:

The Court's decisions, then, have sought both to
promote the individual and societal interests that are
served when employees speak as citizens on matters of
public concern and to respect the needs of government
employers attempting to perform their important public
functions. [ ] Underlying our cases has been the
premise that while the First Amendment invests public
employees with certain rights, it does not empower them
to 'constitutionalize their employee grievances.'
Id., 126 S.Ct. at 1959 (internal citations omitted).

Nevertheless, when the employee's speech is made

pursuant to his/her official duties, an employer may, without

violating the employee's First Amendment right, discipline the

employee for his employment-related speech.  As determined by the

U.S. Supreme Court:

The controlling factor in Ceballos' case is that his
expressions were made pursuant to his duties as a
calendar deputy.   That consideration – the fact that
Ceballos spoke as a prosecutor fulfilling a
responsibility to advise his supervisor about how best
to proceed with a pending case – distinguishes
Ceballos' case from those in which the First Amendment
provides protection against discipline.  We hold that
when public employees make statements pursuant to their
official duties, the employees are not speaking as
citizens for First Amendment purposes, and the
Constitution does not insulate their communications
from employer discipline.

        *          *          *          *

The significant point is that the memo was written
pursuant to Ceballos' official duties.  Restricting
speech that owes its existence to a public employee's
professional responsibilities does not infringe any
liberties the employee might have enjoyed as a private
citizen.  It simply reflects the exercise of employer
control over what the employer itself has commissioned
or created.

Id., 126 S.Ct. at 1959-1960.

21

In the wake of this decision, the Seventh Circuit Court of Appeals, in <u>Mills v. City of Evansville, Indiana</u>, 452 F.3d 646 (7th Cir. 2006), interpreted <u>Garcetti</u> to include situations where an employee was acting in her "capacity as a public employee contributing to the formation and execution of official policy." <u>Id.</u> at 648.

Likewise, the Eighth Circuit Court interpreted <u>Garcetti</u> to preclude a plaintiff's first amendment claim because the employee's speech was concerned with "furthering his own interests" and "with internal policies or practices which are of relevance only to the employees of that institution," and therefore, the employees speech is not a matter of public concern. <u>Bailey v. Dept. of Elementary and Secondary Ed.</u>, 451 F.3d 514, 518 (8th Cir. 2006); <u>see also</u> <u>Cochran v. City of Los Angeles</u>, 222 F.3d 1195, 1200 (9th Cir. 2000)("Speech that deals with 'complaints over internal office affairs' is not protected when it is not relevant to the public's evaluation of a governmental agency's performance").

Here, the basis of Plaintiff's First Amendment claim stems from, among other things, Plaintiff's questioning and commenting on various internal tax assessment policies and procedures. These type of complaints do not rise to the level of "public concern" and are more internal grievances about internal

policies and procedures that are not afforded First Amendment
protection.

Moreover, even if Plaintiff's alleged "speech" is
assumed to be of "public concern," it nonetheless cannot be
afforded First Amendment protection as Plaintiff was acting in
his capacity as a government employee "contributing to the
formation and execution of official policy," regardless if the
recommendations were followed.  See Mills, supra.

Based on the Garcetti decision and the facts of this
case, CITY Defendants submit Plaintiff's § 1983 claim cannot be
premised on any "speech" that does not rise to the level of
public concern and/or made pursuant to his job duties and/or made
in his capacity as a government employee contributing to the
formation and execution of official policy.

Thus, Plaintiffs cannot assert the § 1983 claim based
on his comments, complaints or questioning of his job duties –
the City's appraisal process – and his complaints, as set fort on
pages 6 and 7 herein, cannot be the basis of his retaliation
claim.

C.    **Judicial Estoppel Applies to Plaintiff's Workers'
      Compensation Settlement Agreement**

Plaintiff is judicially estopped from taking positions
inconsistent with those made in the Workers Compensation
Settlement. See Rissetto v. Plumbers and Steamfitters Local 343,
94 F.3d 597 (9th Cir. 1996).

In <u>Rissetto</u>, a former employee brought suit against her employer after having obtained a favorable workers' compensation settlement based on her assertion that <u>she could not work</u>, asserting legal claims based on her <u>ability to work</u>. 94 F.3d 597. The Ninth Circuit Court of Appeals ruled that the doctrine of judicial estoppel applied to a plaintiff's workers' compensation settlement (which was approved by the workers' compensation appeals board), precluding her from taking inconsistent positions in the subsequent lawsuit. <u>Id</u>. The <u>Rissetto</u> court reasoned:

> Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. . .
>
> The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of the judicial proceedings . . . Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts . . . Because it is intended to protect the dignity of the judicial process, it is an equitable doctrine invoked by a court at its discretion.

<u>Rissetto</u>, 94 F.3d at 600-601.

In making this ruling, the <u>Rissetto</u> court first determined that federal law governs the application of judicial estoppel in federal court. <u>Rissetto</u>, 94 F.3d 597, 603-04 (9th Cir. 1996). Second, the <u>Rissetto</u> court specifically found that judicial estoppel "is not rendered inapplicable...by the fact

24

that plaintiff's prior position was taken in a worker's compensation proceeding rather than in court." Id., 94 F.3d at 604. Third, the Rissetto court held that obtaining a favorable settlement is equivalent to a favorable judgment, and constitutes "success" for the purpose of applying judicial estoppel. Id., 94 F.3d at 604-05. Finally, the Rissetto court explicitly concluded that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation. Id., 94 F.3d at 605.

Other courts are in accord and have consistently applied the doctrine judicial estoppel in maintaining the integrity of positions taken by claimants in workers' compensation settlements. See Dush v. Appleton Elec. Co., 124 F.3d 957 (8ᵗʰ Cir. 1997)[11]; Cheatwood v. Roanoke Industries, 891 F.Supp. 1528 (N.D.Ala. 1995)[12].

In CITY Defendants' Answers to Plaintiff Philip E.

---

[11]    Court ruled that employee, who claimed at a workers' compensation hearing that he was unable to continue to work light duty on any long term basis, was judicially estopped from claiming otherwise before the trial court on a ADA claim.

[12]    In rejecting the employee's contention that he was a qualified individual with a disability, the district court invoked the doctrine of judicial estoppel, noting that the workers' compensation proceeding had determined that plaintiff was "physically unable to perform the essential functions of any job at the defendant's plant," and thereupon granted summary judgment for the employer.

English's First Amended Complaint filed January 12, 2006, the
CITY Defendants asserted the defense of estoppel.  <u>See</u> Defendant
City and County of Honolulu's Answer to Plaintiff Philip E.
English's First Amended Complaint filed January 12, 2006, filed
on 1/27/06 herein; Defendants Gary T. Kurokawa, Robert O. Magota,
and Ann C. Gima's Answer to Plaintiff Philip E. English's First
Amended Complaint filed January 12, 2006, filed on 1/27/06
herein. Applying the doctrine of judicial estoppel to this case,
Plaintiff is precluded from asserting a claim for damages of lost
earnings subsequent to January 31, 2004 when he voluntarily
resigned from his position with the Defendant CITY based on
negotiated and agreed-upon terms of the Workers' Compensation
Settlement.

>    **1.    Plaintiff is Judicially Estopped from Claiming
>            Damages for Lost Earnings Subsequent to January
>            31, 2004 When He Voluntarily Resigned.**

In the instant case, Plaintiff is clearly estopped from
claiming constructive discharge and damages for lost earning
subsequent to his conceded January 31, 2004, voluntary
resignation.  It is anticipated that Plaintiff will take two
contradicting positions.  First, through his Workers'
Compensation Settlement, he "<u>voluntarily quits, resigns and</u>
<u>terminates his employment with [Defendant CITY], fully, finally,</u>
<u>irrevocably and forever, effective January 31, 2004</u>", and that he
"<u>further waives any re-employment and priority placement rights</u>

as part of this Agreement." See Exhibit "A" at 6. Yet, it is anticipated that he will subsequently claim that he was constructively discharged and entitled to damages for lost earnings based on future employment and eventual promotion with the City.

Applying the factors for judicial estoppel, it is clear that Plaintiff is not entitled to claim damages for lost earnings subsequent to his January 31, 2004 voluntary resignation. Plaintiff's first position was taken in a workers' compensation proceeding before the Department of Labor and Industrial Relations, a quasi-judicial administrative proceeding recognized under the judicial estoppel doctrine. See Rissetto, 94 F.3d 597 (9th Cir. 1996). Plaintiff was "successful" in asserting his first position in that he received the sizable consideration of eighty-five thousand dollars ($85,000.00) for his voluntary resignation, later approved and ordered by the Director of Labor and Industrial Relations. Id. See also Exhibit "A" at 10.

The two (2) positions are clearly and totally inconsistent, as one explicitly indicates a voluntary resignation, and the subsequent, an involuntary discharge for which he is entitled to lost earnings. Finally, Plaintiff asserted his first position with the assistance and advice of present counsel, acknowledging and representing that "he has been advised of, is aware of, and understands all of his legal rights

27

and interests arising out of the January 30, 2003, claim of injury and he has voluntarily and without duress of undue influence entered into this Agreement." See Exhibit "A" at 8.

The fact that Plaintiff voluntarily resigned on January 31, 2004 negates his claim for damages in lost earnings through employment with the City thereafter. Plaintiff also agreed not to seek re-employment with the City, further prohibiting any claims for lost earnings with the City after January 31, 2004. Such agreements were made on the basis of free will and good faith, and accordingly, Plaintiff is judicially estopped from asserting any future damages based on employment with the City after his January 31, 2004 voluntary resignation.

### 2.    Plaintiff is Judicially Estopped from Claiming Future Medical Specials

Plaintiff is judicially estopped from presenting evidence, testimony, or otherwise taking positions inconsistent with the following stipulations regarding his medical condition and treatment:

> 4.    Plaintiff will be solely and personally responsible to pay for all medical care, services, and supplies provided by any provider after January 31, 2004, which are due to the nature of the January 30, 2003 claim of injury.

See Exhibit "A" (emphasis added).

Based on the Workers Compensation Settlement, Plaintiff waived all rights to receive future medical care, services, and

supplies.  Again applying the judicial estoppel factors, this position was taken in a quasi-judicial administrative proceeding resulting in a "successful" Workers' Compensation Settlement that was stipulated to with the advice of counsel and an explicit understanding of the terms.  Plaintiff is therefore judicially estopped from claiming future medical expenses, and any evidence to that effect cannot be introduced at trial.

### 3.    Plaintiff is Judicially Estopped from Claiming Duress and/or Coercion

It is anticipated that Plaintiff will assert at trial that he was under duress when he entered into the Workers' Compensation Settlement.  Yet, the explicit terms of the agreement state:

> 15.  Claimant specifically acknowledges and represents he has been advised of, is aware of, and understands all of his legal rights and interests arising out of the January 30, 2003 claim of injury and he has voluntarily and without duress or undue influence entered into this Agreement.

See Exhibit "A" at 8.

Thus, Plaintiff's first position directly contradicts Plaintiff's subsequent and self-serving assertion that he resigned and/or signed the Workers' Compensation agreement under duress or coercive circumstances.  Moreover, the general rule adopted by the United States Circuit Court of the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.  Kennedy v. Allied

29

Mutual Insurance Co. 952 F.2d 262, 266 (9th Cir. 1991)(citing Foster v. Arcata Associates, 772 F. 2d 1453, 1462 (9th Cir. 1985), and Radobenko v. Automated Equipment Corp. 520 F.2d 540, 544 (9th Cir. 1975)("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). Thus, Plaintiff's anticipated claim of duress, if it is asserted in the form of an affidavit, is insufficient to create an issue of fact in opposing summary judgment.

Plaintiff can offer absolutely no other evidence to substantiate any claim of duress or coercion, and merely submitted a self-serving declaration in opposition to CITY Defendants' previous motion claiming duress. Although Plaintiff is expected to claim that accepting the terms of the Settlement Agreement was the only way to settle his workers' compensation claim, this assertion ignores Plaintiff's exercise of volition in settling the underlying workers' compensation claim (even with advice of counsel). In short, if Plaintiff did not want to resign, he could have chosen not to settle, not to reap the benefits of the eighty-five thousand dollar ($85,000.00) lump sum payment, and pursued his workers' compensation claim.

D.    **Plaintiff Cannot Claim Retaliatory Discharge Based on the Workers' Compensation Settlement Agreement**

Hawaii courts have recognized voluntary resignation as a common and well accepted practice that does not amount to retaliatory discharge:

> We agree with the circuit court that Fireman's Fund's settlement offer did not violate public policy or amount to an unlawful retaliatory discharge by including Wittig's resignation as one of its terms.  As in other jurisdictions, Hawai'i has a public policy supporting the resolution of disputes through settlement agreements.  There is nothing inherently wrong with a voluntary settlement agreement that includes the employee's resignation as a condition, particularly where the employee is offered additional compensation for resigning.  A settlement on such terms may be attractive to the employee and serve the employee's interests.
>
> Workers' compensation settlements that include an employee's resignation are not uncommon.  Instead of violating public policy, permitting a settlement offer to include an employee's resignation expands the opportunity for settlement and advances the public policy favoring dispute resolution through voluntary settlement agreements.

Wittig v. Allianz, A.G., ___ P.3d ___, 2006 WL 1731142 at pg. *8 (Haw.App. 2006)(internal citations omitted).

Likewise, in Dominique v. District of Columbia Department of Employment Services, 574 A.2d 862(1990) the District of Columbia Court of Appeals held that an employer who required its employee to resign as a condition for receiving a lump-sum settlement of a workers' compensation claim did not commit a retaliatory discharge as a matter of law.  The court reasoned:

31

> As a matter of public policy, settlements are encouraged and, like any other type of contract, they are binding on the parties when valid. . . Settlements cannot take place with a quid pro quo. The claimant must be willing and able to waive his or her rights under the Workers' Compensation Act or there will be no incentive for employers to come to such agreements. <u>Once a claimant, acting in accord with the advice of experienced counsel, agrees to waive such rights in return for a lump-sum and receives that sum, it is entirely reasonable for the Director to conclude that, as a matter of law, the employer does not "retaliate" against the claimant by reaping the benefits of the agreement</u>.

> <u>Id</u>. 574 A.2d at 865-66 (emphasis added).

Here, Plaintiff voluntarily resigned as part of his Workers' Compensation Settlement. To now claim that he was subject to a retaliatory discharge is inconsistent with the meaning and concept of the term "voluntary resignation." Had the resignation truly been anything other than "voluntary," Plaintiff had the means and opportunity to negotiate the terms and conditions of the Workers' Compensation Settlement through his counsel, Mr. Moseley to eliminate that condition and/or term. Plaintiff cannot now, approximately two (2) years after entering into the Workers' Compensation Settlement, and for purposes of his current lawsuit, claim otherwise; such defense was waived at the moment the document was signed. <u>See</u> Section "C."

CITY Defendants submit that the <u>Wittig</u> case controls, and that Plaintiff cannot claim retaliatory discharge by virtue of his Workers' Compensation Settlement.

32

**E.    There Is No Evidence to Support Plaintiff's Defamation Claim**

In proving a claim for defamation, Plaintiff must establish:

1.    A false and defamatory statement concerning another;

2.    An unprivileged publication to a third party;

3.    Fault amounting at least to negligence on the part of the publisher, and

4.    Either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Courtney v. Canyon Television & Appliance Rental, 899 F.2d 845 (9th Cir. 1990)(citing Beamer v. Nishiki, 66 Haw. 572, 578-579, 670 P.2d 1264, 1271 (1983)).

**1.    Hearsay Evidence is Inadmissible to Establish Claim of Defamation**

The basis of Plaintiff's defamation claim is primarily based on statements Defendant MAGOTA allegedly made in the presence of Susan Bender (Paragraph 63 of the First Amended Complaint) and an unnamed person (Paragraph 64 of the First Amended Complaint). See Exhibit "C." This evidence, however, is inadmissible hearsay and cannot form the basis of his defamation claim.

Hearsay, under Rule 801(c), Federal Rules of Civil Procedure, is defined as "'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted'. . .and is

33

inadmissible unless it is defined as non-hearsay under
Fed.R.Evid. 801(d) or falls within a hearsay exception under
Fed.R.Evid. 803, 804, or 807." <u>OWBR, LLC v. Clear Channel
Communications, Inc.</u>, 266 F.Supp.2d 1214, 1231 (D.Hawaii 2003).

     In this case, Plaintiff's testimony that Susan Bender
told him that Defendant MAGOTA called Plaintiff a "wacko" at a
meeting is a classic example of inadmissible hearsay.
Furthermore, Plaintiff's testimony that Chris Graff told him that
an unnamed third party heard Defendant MAGOTA say that Plaintiff
was a troublemaker constitutes <u>double</u> hearsay, and is also
inadmissible.

     Federal courts have consistently dismissed defamation
claims based on inadmissible hearsay.  For example, in <u>Courtney</u>,
<u>supra</u>, the 9th Circuit Court upheld the entry of summary judgment
in favor of the defendant when the only evidence support the
claim was inadmissible hearsay.  <u>See also</u> <u>Bularz v. Prudential
Ins. Comp. Of America</u>, 93 F.3d 372 (7th Cir. 1996); <u>Albert v.
Loksen</u>, 239 F.3d 256 (2nd Cir. 2001); <u>John and Vincent Arduni
Inc. v. NYNEX</u>, 129 F.Supp.2d 162 (N.D.N.Y. 2001); <u>Leo Winter
Assoc., Inc. v. Dept. of Health & Human Services</u>, 497 F.Supp. 429
(D.D.C. 1980).

     Other than Plaintiff's self-serving testimony, there
are no other witnesses who support this claim.  In fact, Susan
Bender – the individual Plaintiff alleges heard the defamatory

statement – has no recollection telling Plaintiff that Defendant MAGOTA called Plaintiff a "wacko," denies hearing Defendant MAGOTA making such comments, and is not part of the Real Property Assessment Division and would therefore not be in any meeting as described in Paragraph 63 of the First Amended Complaint.  See Declaration of Susan Bender.

Because there is no admissible and/or non-hearsay evidence substantiating Plaintiff's claim of defamation, summary judgment should enter in CITY Defendant's favor on Count VIII to the extent that it is based on Paragraphs 63 and 64 of the First Amended Complaint.

CITY Defendants point out that there has been no evidence produced to date or any new allegations made by Plaintiff that either Defendant KUROKAWA or Defendant GIMA made any defamatory statements regarding Plaintiff; therefore, summary judgment should be granted in favor of Defendant KUROKAWA and Defendant GIMA with regard to Count VIII of the First Amended Complaint.

2.    **The term "Wacko" is Non-Actionable Rhetorical Hyperbole**

Assuming, *arguendo*, that Defendant MAGOTA called Plaintiff a "wacko" – a claim which is specifically denied – the term "wacko" is not defamatory.

35

The threshold issue in any defamation claim is whether the statement is reasonably susceptible of a defamatory meaning. Gold v. Harrison, 88 Hawaii 94, 962 P.2d 353 (1998).

To aid in this determination, Hawaii courts have adopted a three-part test:

> (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact;
>
> (2) whether the defendant used figurative or hyperbolic language that negates that impression; and
>
> (3) whether the statement in question is susceptible of being proved true or false

Id., 88 Hawaii at 101, 962 P.2d at 360 (citing Fasi v. Gannett Co., Inc., 930 F.Supp. 1403 (D.Haw. 1995)).

The basis for Plaintiff's claim of defamation is an alleged statement made by Defendant MAGOTA to unnamed staff members in an August/September 2002 meeting that Plaintiff was "Wacko." Although there was no context provided for this alleged statement, and Defendant MAGOTA denies ever making this statement, and Susan Bender denies ever hearing and/or uttering the phrase to Plaintiff, the term "wacko" is not defamatory.

Although there were no appellate decisions directly on point, Courts in other jurisdictions have held that such terms as "insane," "delusional," "crazy" and "psycho" were nonactionable rhetorical hyperbole. See Estate of Martinieau v. ARCO Chemical Company, 203 F.3d 904 (5th Cir 2000); Pease v. International

36

<u>Union of Operating Engineers Local 150</u>, 208 Ill.App..3d 863, 567 N.E.2d 614 (Ill.App. 1991); <u>Kryeski v. Schott Glass Technologies, Inc.</u>, 426 Pa.Super. 105, 626 A.2d 595 (1993); <u>Pospicil v. The Buying Office, Inc.</u>, 71 F.Supp.2d 1346 (N.D.Georgia 1999).

Here, like in the cases cited above, the phrase "wacko" is merely rhetorical hyperbole and nonactionable.   Therefore, Plaintiff cannot base his defamation claim on the term "wacko."

> **3.    Any Alleged Defamatory Statements Made Pursuant to An Official Investigation Were Not Made by any <u>CITY Defendants and are Nonetheless Privileged</u>**

Another basis for Plaintiff's defamation claim is alleged statements made in connection with a confidential internal workplace violence report issued by a "City official." <u>See</u> Paragraph 87 of First Amended Complaint.   Thus far, however, no evidence has been produced linking or identifying any of the individual CITY Defendants as the "City official" who issued the alleged defamatory report.   Absent such evidence, summary judgment should enter in CITY Defendants favor.

Even assuming, *arguendo*, that one or all of the CITY Defendants created the report or participated in the underlying investigation, any alleged defamatory statements that they may have made were privileged.   A claim of privilege arises:

> (1) when the author of a defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social and (2) where the publication concerns a subject matter in which the author and the recipients of the publication have a correlative interest or duty.

\*          \*          \*          \*

> An interest which is protected by a qualified privilege is one where (1) the publisher and recipient have a common interest and (2) the communication is of a kind reasonably calculated to protect or further such interest.
>
> Kainz v. Lussier, 4 Haw.App. 400, 404-405, 667 P.2d 797, 801 (1983)(internal citations omitted).

In Hawaii, qualified privileges have applied to allegedly defamatory statements made by: (1) a corporate secretary writing to shareholders advising them on the status of their investment[13]; (2) a private club president speaking with his supervisors about an alleged theft[14]; (3) an employee's immediate supervisor in a letter to the director detailing her difficulties with the employee[15]; and (4) board members of a condominium association in the course of the Hawaii Civil Rights Commission investigation, Honolulu Police Department investigation, and at a Circuit Court hearing.[16]

Here, any allegedly defamatory statements made in connection with an internal workplace violence investigation,

---

[13]    See Kainz, supra.

[14]    See Vlasaty v. Pacific Club, 4 Haw.App. 556, 670 P.2d 827 (1983)

[15]    See Chow v. Alston, 2 Haw.App. 480, 634 P.2d 430 (1981).

[16]    See Dubois v. AOAO 2987 Kalakaua, 453 F.3d 1175 (D.Haw. 2006).

either as the author of the report or a witness, are privileged. Not only was the author of the report discharging his/her work duties in conducting and reporting the results of the investigation, but the author also shares a common interest in the subject matter (workplace violence) with his/her superiors and the employees potentially impacted by workplace violence. Likewise an employee's alleged defamatory statement made in the course of a workplace violence investigation is also privileged as his/her cooperation in the investigation fulfills not only a private work duty by a moral obligation as well and concerns a subject matter shared by a third party (i.e., the investigator).[17]

For the foregoing reasons, whatever defamatory statements were made in the workplace violence reports cannot be attributed to any CITY Defendants and even it they can be, they are nonetheless privileged and cannot form the basis of Plaintiff's defamation claim.

---

[17]    In a similar situation, an Alabama District Court, in Wyatt v. Bellsouth, Inc., 998 F.Supp. 1303, 1313 (M.D.Ala. 1998), ruled that:

> [t]he fact that two employees may have lied about [plaintiff] during an internal investigation is simply not defamation.  Any communications during the internal investigation are properly characterized as communications among employees in the course of transacting the company's business and hence, are privileged.

IV.  <u>CONCLUSION</u>

Based on the foregoing facts and authorities cited above, Defendants DEFENDANTS CITY AND COUNTY OF HONOLULU, GARY T. KUROKAWA, ROBERT O. MAGOTA, and ANN C. GIMA submit that Counts I and VIII of the First Amended Complaint must be dismissed.

DATED: Honolulu, Hawaii, _____SEP 1 2 2006_____.


_____
JAMES KAWASHIMA
RANDALL Y. YAMAMOTO
BRIAN Y. HIYANE
CARTER K. SIU
Attorneys for Defendants
CITY AND COUNTY OF HONOLULU,
GARY T. KUROKAWA,
ROBERT O. MAGOTA, and
ANN C. GIMA

40