```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4  PHILIP E. ENGLISH,           ) CIVIL NO. 04-00108 JMS/KSC
                                 )
 5            Plaintiff,         )
                                 )
 6       vs.                     )
                                 )
 7  CITY AND COUNTY OF HONOLULU;)
    GARY T. KUROKAWA; ROBERT O. )
 8  MAGOTA; ANN C. GIMA; and GK )
    APPRAISALS, INC.; JOHN DOES )
 9  1-10; JANE DOES 1-10; DOE    )
    PARTNERSHIPS; DOE            )
10  CORPORATIONS 1-10; AND DOE   )
    ENTITIES 1-10,               )
11                               )
              Defendants.        )
12  _____)

13

14              DEPOSITION OF GARY T. KUROKAWA

15  Taken on behalf of the Plaintiff PHILIP E. ENGLISH, at

16  the law offices of Moseley, Biehl, Tsugawa, Lau & Muzzi,

17  Alakea Corporate Tower, 23rd Floor, 1100 Alakea Street,

18  Honolulu, Hawaii 96813, commencing at 9:07 a.m., on

19  Tuesday, August 22, 2006 pursuant to Notice.

20

21         BEFORE:  MYRLA R. SEGAWA, CSR No. 397

22         Notary Public, State of Hawaii

23

24                    EXHIBIT   E

25
```

20

1  positions that might become available?
2      A    I believe so.  I believe that it was an
3  appraiser 1 or 2 level.  It was an entry level
4  position.
5      Q    Did you tell him that those positions might
6  not be appropriate for him?
7      A    I don't recall that.
8      Q    Did you discuss any possibility of
9  advancement with him from those levels?
10     A    I believe that we discussed his experience,
11 his work experience and what types of assignments
12 that he would have internally with the city and that
13 his experience would be valuable.
14     Q    But you didn't discuss with him any
15 potential for advancement from the entry level
16 positions?
17     A    Well, like I said, I explained to him that
18 it would be valuable experience, you know, to work
19 with the city and his knowledge of appraisals.  But
20 the advancement of city employment is through civil
21 service requirements that, you know, we don't have
22 any control of.
23     Q    Okay.  Did you tell him that you felt there
24 would be appraisal 3, 4 or 5 level positions opening
25 up in the future?

```
                                                              22
 1      A    Yes.
 2      Q    When was the next time you saw him?
 3      A    I don't recall.  It would probably be in
 4  our office.
 5      Q    After he got hired?
 6      A    Yes.
 7      Q    Okay.  How did you learn he had been hired?
 8      A    I believe we have a notification from
 9  personnel saying who's, you know, going to be coming
10  into our office, you know, for initial orientation.
11  And that's how, you know, who's being employed by the
12  city.
13      Q    In the hiring process, were you involved in
14  an interview with him?
15      A    No.
16      Q    How does that work?  Who interviews the
17  appraisal 2 candidates, for example?
18      A    It could be a variety of people.  Anybody
19  that is hiring in a position, in the vacancy could be
20  selected to be on the panel.  It could be anybody in
21  our office.
22      Q    Okay.  Are you ever on those panels?
23      A    No.
24      Q    Are there appraiser 4's on those panels or
25  just supervisors?
```

1    A    There's a variety of people that gets
2  selected.
3    Q    And who selects them?
4    A    Usually the person that is responsible for
5  the hiring which would be in that case either the
6  assessor or the group supervisor but more likely the
7  assessor.
8    Q    Okay.  So if Bob Magota was the assessor at
9  the time, then it would have been Bob?
10   A    Yes.
11   Q    I should tell you too, Gary, if you want to
12 break any time, get tired and you want to use the
13 lua, want to talk to your counsel, that's perfectly
14 acceptable.  It's not intended to be an endurance
15 contest.
16   A    Thank you.
17   Q    Although unfortunately sometimes it feels
18 like that for probably all of us.
19        Who was responsible for Phil's assignment
20 once he got hired?
21   A    It would be his immediate supervisor.
22   Q    Who would assign him to a group, for
23 example?
24   A    I believe it would be where the vacancy was
25 available.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI (808) 524-2090

```
                                                              52
 1      Q    Okay.  You don't recall a conversation in
 2  which David Matsunami said out of respect for Phil
 3  English I can't do this kind of work anymore?
 4      A    I don't recall that.
 5      Q    Okay.
 6           MR. YAMAMOTO:  Are you going to change
 7  areas?
 8           MR. MOSELEY:  Want to take a quick
 9  break?
10           MR. YAMAMOTO:  Yes.
11           (Recess from 10:15 a.m. to 10:28 a.m.)
12  BY MR. MOSELEY:
13      Q    Okay.  When was the first time you were
14  contacted by anybody from the ethics commission with
15  respect to the allegation of Chris Graff doing work
16  on city time?
17      A    I received an E-mail from Chuck Totto, and
18  I don't know what the date of that E-mail was.
19      Q    Was it early in 2003?
20      A    I believe so.
21      Q    Not under the present organization but in
22  the prior hierarchy with the administrator and the
23  assessor and then the supervisors under the assessor,
24  who was primarily responsible for personnel problems?
25      A    The branch chiefs.
```

53

1  Q   Okay. And in that situation, it would have
2 been Bob Magota and Robin Freitas?
3  A   For the respective branches, yes.
4  Q   Okay. So how often did you become involved
5 in personnel problems under that hierarchy?
6  A   I wouldn't get involved in the personnel
7 issues really.
8  Q   At all?
9  A   They would be conducting what's necessary,
10 you know, the personnel issues.
11  Q   Okay. At some point in time you got
12 involved with personnel issues dealing with Phil
13 English though, didn't you?
14  A   Yes.
15  Q   And why did you get involved in those
16 personnel issues?
17  A   My involvement is that when I see a
18 recommendation from a supervisor that an employee is
19 not performing, then I'll get involved to make sure
20 that an employee is afforded every opportunity to
21 succeed and to make sure that, you know, that we can
22 provide whatever is needed for that employee to
23 succeed. That's my role if a problem arises, it
24 comes before me. That's the only time I would get
25 involved to make sure the employee is getting what he

54

1  needs, you know, to succeed.
2      Q    And in your tenure as administrator of the
3  assessment division, how often has it occurred that
4  you've gotten involved with personnel problems on
5  that basis?
6      A    This was the second time.
7      Q    And what was the first time?
8      A    I had an employee that was having some
9  difficulties coming to work and we tried to assist
10 that person.
11     Q    Okay.  Is that Mr. Wang?
12     A    No.
13     Q    Is that Chris Graff?
14     A    No.
15     Q    Okay.  Did you get involved in Chris Graff
16 coming to work or not for signing in or signing out
17 timely?
18     A    No.
19     Q    Why would you become involved in the two
20 different cases that you talked about?  Have there
21 been -- well, you said Phil's was the second time.
22          Have there been subsequent times after
23 Phil's that you've become involved?
24     A    No.
25     Q    Why would your involvement have been in

1  types of E-mails but save it for something more
2  important, for example?
3      A    No.
4      Q    Do supervisors commonly cc you on problems
5  they're having with employees?
6              MR. YAMAMOTO:  Object.  Asked and
7  answered.
8              THE WITNESS:  From time to time, they
9  would if they're having a problem.
10 BY MR. MOSELEY:
11     Q    Is that a common occurrence?
12             MR. YAMAMOTO:  Same objection.
13             MR. WONG:  Objection.  Vague and
14 ambiguous.
15             THE WITNESS:  I don't think that we
16 have many employment personnel problems; so it's not
17 a common thing.
18 BY MR. MOSELEY:
19     Q    Okay.  In terms of performance evaluation
20 reports, do you normally sign those?
21     A    Yes.  I believe I normally sign them if I'm
22 available.
23     Q    Okay.  I'm going back to the time when
24 there was the administrator and then the assessor and
25 then the appraisers.  What was the process for

1  performance reviews, where did it start, who reviewed
2  it, who signed off on it, where did it go, that kind
3  of thing?
4      A    I know it starts with the supervisor.
5      Q    Okay.
6      A    The direct supervisor is the one that is
7  responsible for the job performance ratings.
8      Q    And then what happens, does the supervisor
9  just come up with it all on their own and that's it
10 or?
11     A    Yes, because they work directly with that
12 person and anybody else would be involved at that
13 point as far as the performance ratings.
14     Q    Does somebody else have to sign off on it
15 other than the supervisor?
16     A    I don't know.  I'm not real positive.  I
17 know that I will sign at the end though.  I am sure
18 of that as I would sign last before it leaves our
19 office.
20     Q    And where would it go when it leaves your
21 office?
22     A    I'm not sure.  I believe it's our
23 department personnel office.
24     Q    Okay.  When you received performance
25 evaluation reviews -- and again, I'm still talking

62

1  about this time while there was an assessor
2  immediately between you and the appraisers -- when
3  you received a performance review, did you raise
4  questions if it looked like there were any problems
5  with the review?
6      A    Yes.
7      Q    And who would you raise questions with?
8      A    The supervisor.
9      Q    Okay.  Is that something you commonly did?
10     A    If an employee wasn't performing up to
11 standard, yes.
12     Q    Do you recall at all any of the performance
13 reviews with respect to Phil English?
14     A    No, 65.
15     Q    Do you recall at some point in time when
16 the issue was raised that there was some sort of a
17 problem with Phil's performance?
18     A    Yes.
19     Q    Do you remember the circumstances
20 surrounding that information you received?
21     A    I believe it was the JPR itself.
22     Q    And when was the first time that you
23 reviewed a JPR that indicated a problem?
24     A    I don't know.  I don't know what the date
25 was.

160

1    A    Yes.

2    Q    Do you know who asked him to be the expert?

3    A    I believe that he was doing the assessments
4    for it; so he became the expert.

5    Q    At the time he did that, was he an
6    appraiser 3?  Maybe that's not a fair question.  At
7    the time he began working on the expert report, do
8    you know if he was an appraiser 3?

9    A    I'm not positive.  I would have to go and
10   look.  I'm not sure.

11   Q    Do you remember a time in which Phil had
12   put in for a promotion to appraiser 4, were you
13   involved in that process at all?

14   A    No, there's no -- he doesn't put in for any
15   promotion to appraiser 4.

16   Q    He just applied for an appraiser 4
17   position?

18   A    No, there's no --

19   Q    How does that work?

20   A    A supervisor reallocates the appraiser from
21   a 3 to 4.  The applicant has nothing to do with it.

22   Q    Okay.  So if Ann Gima was his supervisor,
23   it would have been Ann Gima that reallocated him from
24   a 3 to a 4?

25   A    Ann Gima would have initiated the paperwork

161

1  to reallocate Phil, yes.
2       Q    And then who would have followed up on
3  that?
4       A    The division head would be signing and then
5  it would be forwarded to the director for
6  reallocation.
7       Q    So you would have signed off on such a
8  thing?  Actually, could I direct you to Exhibit 37.
9            MR. YAMAMOTO:  I have no idea where it
10 is.
11           MR. MOSELEY:  It's like an inch from
12 the back.
13           MR. YAMAMOTO:  All right.  Sorry 19.
14           MR. MOSELEY:  The other way it's like
15 this thick.
16           MR. YAMAMOTO:  Thirty-nine.
17           MR. MOSELEY:  Thirty-seven.
18           MR. YAMAMOTO:  Thirty-seven.
19 BY MR. MOSELEY:
20      Q    Have you ever seen this document before?
21      A    No.
22      Q    Okay.  Does it look like Ann Gima, from the
23 text of this exhibit, that Ann Gima had put in for a
24 reallocation of Phil to an appraiser 4 position?
25           MR. YAMAMOTO:  Objection.  Calls for

162

1  speculation.
2           THE WITNESS: Yeah, I don't know what
3  this is referring to.
4  BY MR. MOSELEY:
5     Q    Okay. Were you aware at some time that
6  Phil was reallocated to an appraiser 4 position?
7     A    Yes, I was under the understanding that he
8  was reallocated or the allocation was forwarded. His
9  reallocation was forwarded.
10    Q    Okay. When the supervisor decides that
11 somebody should be reallocated to a higher position,
12 is there a determination made that the person
13 fulfills the requirements for the higher position?
14    A    I believe it's the supervisor's decision to
15 do that, yes.
16    Q    Okay. Is there a review of this decision
17 by anybody else?
18    A    No.
19    Q    Okay. So if, for example -- well, would it
20 be something that an appraiser 4 would have to be
21 able to do, for example, to start up a new
22 condominium in your system, is that a job that an
23 appraiser 4 would have to be able to do?
24    A    An appraiser 4, I guess, basically would
25 have to be able to do a wide range of activities,

164

throughout their period and then they're evaluated once they reach -- they're re-evaluated again.

Q   Is that what the probation period is about?

A   Yes.

Q   So did you understand that Phil was qualified to be reallocated to an appraiser 4 if he met the minimum requirements?

A   I'm assuming that Ann Gima had, you know, reviewed Phil and recommended that.  And once the recommendation comes across our desk, we have to rely on our supervisors to do the recommendations.

Q   Did you sign off on Phil's reallocation to appraiser 4?

A   I would typically sign off on reallocations, but I don't know if particularly Phil's one was signed off by myself.

Q   Is there anybody else that could do it?

A   Bob Magota could do it also.

Q   You know, I think I asked you this question before in a different context, but when did you first learn that Phil English had made any kind of complaints to anybody that concerned you, Gary Kurokawa, or let's say it involved you?

A   The first time I heard about it was when Robert Magota talked to me.  I don't know when that