## MEMORANDUM IN SUPPORT OF MOTION

Plaintiff Philip E. English ("Plaintiff"), by and through his counsel, Moseley Biehl Tsugawa Lau & Muzzi, submits this memorandum in support of his Motion for Partial Summary Judgment on Count IV Unlawful Discrimination and Retaliation against Defendants City and County of Honolulu ("City"), Ann Gima ("Gima"), Gary Kurokawa ("Kurokawa") and Robert Magota ("Magota") (collectively the "City Defendants") as to Liability Only (the "Motion for Summary Judgment").

## I.     UNDISPUTED FACTS

On or about June 1, 2000, Plaintiff became an employee of the Assessment Division of the Department of Budget and Fiscal Services of the City and County of Honolulu (herein the "Defendant City") as an Real Property Appraiser II. See Exhibit A; Declaration of Plaintiff Philip E. English (hereinafter "English Declaration") ¶1.

Defendant Kurokawa is and was at all relevant times the Administrator of the Assessment Division and an employee of Defendant City. English Declaration ¶2. Defendant Kurokawa had, at all times herein relevant, supervisory authority over Plaintiff, over Defendant Magota and over Defendant Gima. Id. at ¶2.

Defendant Kurokawa also served as Vice-President of and was a substantial shareholder in Defendant GK Appraisal, Inc., while he was employed by the City and throughout the time period relevant in this case. See Exhibit B.

Defendant Magota was at all relevant times the City Assessor in the Assessment Division and an employee of Defendant City. English Declaration at ¶3. Defendant MAGOTA had at all times herein relevant, supervisory authority over Plaintiff and over Defendant Gima. Id.

Defendant Gima is, and at all times herein relevant was an Appraiser Supervisor of the Assessment Division, and an employee of the City. Id. at ¶4. Defendant GIMA had, at all relevant times herein, direct supervisory authority over Plaintiff. Id. Defendant Gima was commonly called Annie by the other employees of the Assessment Division. Id.

Beginning about January of 2001, Plaintiff began observing one of his co-workers, Christopher Graff ("Graff"), performing private appraisal work for Defendant GK on City equipment during City time. English Declaration at ¶5. Plaintiff also observed Graff receiving calls from Defendant Kurokawa and others regarding Graff's performance of work for Defendant GK. Id. at ¶5.

2

On February 1, 2001, Plaintiff was promoted to Real Property Appraiser III.  See Exhibit C.

Plaintiff also observed a former City employee that was performing work for Defendant GK have access to nonpublic areas of the Assessment Division to deal with Graff.  See Exhibit C1 - Matsunami Deposition; and English Declaration at ¶7.

Plaintiff verbally reported the misconduct involving Defendant Kurokawa and Defendant GK (the "Kurokawa-GK Misconduct") to Defendant Gima in August 2001.  See English Declaration ¶8.

Sometime between August and November 2001, Defendant Gima told Plaintiff to stop calling her "Annie" because only her friends called her Annie; he could call her "Ann." Id at ¶9.

After observing that the Kurokawa-GK Misconduct failed to diminish, Plaintiff verbally reported the Kurokawa-GK Misconduct to Defendant Magota on or about October 2, 2001.  Id. at ¶10.

When the Kurokawa-GK Misconduct continued apparently undiminished, on February 15, 2002, Plaintiff sent an email to Defendant Magota, complaining that Defendant Kurokawa and Graff were engaged in the unlawful and unethical conducting of Defendant Kurokawa's private

business on City time and with City equipment.  See Exhibit D and English Declaration ¶11.

Prior to reporting the Kurokawa-GK Misconduct to Defendants Magota and Gima in August and October of 2001, Plaintiff received satisfactory Performance Evaluation Reports in 2000.  See Exhibits E, F and G and English Declaration ¶12.

Prior to reporting the Kurokawa-GK Misconduct to Defendants Magota and Gima in August and October of 2001, Plaintiff received Performance Evaluation Reports in 2001 where he was rated as exceeding expectations in all categories.  See Exhibits H and I; and English Declaration ¶13.

On April 22, 2002, Plaintiff received his annual Performance Evaluation Report for his position as Appraiser III.  See Exhibit J.  In this report, Plaintiff's performance rating plummeted from exceeds requirements in every category to meets requirements in every category.  Id.  Further, Defendant Gima, also included, for the first time, negative comments, and stated, in relevant part, "[Plaintiff] seems to be having some difficulties in organizing and prioritizing the many and varied tasks associated with his position. He often disagrees with established office work processes and has

voiced his opinion as to how he believes things may better be accomplished and resists completing tasks in a prescribed manner." Id.

On May 14, 2002, Plaintiff received a Probationary Performance Evaluation for his position of Appraiser IV, which also rated him as meeting requirements in all categories. See Exhibit K.

On or after August 14, 2002, Plaintiff contacted the Federal Bureau of Investigation to report the Kurokawa-GK Misconduct. English Declaration at ¶15.

On August 14, 2002, Plaintiff received a substandard Probationary Performance Evaluation relating to Plaintiff's performance as an Appraiser IV (the "August 14, 2002 Substandard Evaluation"). See Exhibit L.

On August 15, 2002, Defendant Kurokawa signed the August 14, 2004 Substandard Evaluation and purportedly extended Plaintiff's probation period for an additional three months. See Exhibit M.

Extension of Plaintiff's probation meant that Plaintiff could be terminated. See Exhibit M1 - Deposition of Waylen Toma p. 79:20-25.

Apparently, Defendant Kurokawa's decision to extend Plaintiff's probation was too late and Plaintiff was apparently not put on probation. See Exhibit W- Deposition of Gary Kurokawa at p.84:9-18.

Plaintiff, however, was not notified of this, and continued to believe that he was on extended probation. <u>See</u> Exhibit N and English Declaration ¶16.

On or about October 21, 2002, Plaintiff sought leave to see his medical doctors for a cancer follow-up and for an orthopedic matter regarding a broken toe. <u>See</u> Exhibits O and P. Plaintiff's request for medical leave was conditionally granted provided that Plaintiff complete certain tasks. <u>See</u> Exhibit O.

On October 25, 2002, Plaintiff took leave to attend his doctor's appointment. English Declaration at ¶18. Upon returning to work, Defendant Gima accused Plaintiff of taking unauthorized leave. <u>Id</u>.

On January 3, 2003, Plaintiff met with Charles Totto, Executive Director and Legal Counsel to the City and County of Honolulu Ethics Commission to report the continuing Kurokawa-GK Misconduct and other matters. <u>Id</u>. at ¶19.

On January 7 and 10, 2003, Plaintiff spoke with Graff about his contact with the Ethics Commission and the Federal Bureau of Investigation regarding the Kurokawa-GK Misconduct. <u>See</u> Exhibit Q and English Declaration at ¶20. Graff immediately reported his contacts with Plaintiff to Defendant Gima on January 7 and 10, 2003. <u>See</u> Exhibit Q.

Defendant Gima and Graff immediately relayed this information to Defendant Magota. See Exhibit R - Deposition of Defendant Magota.

On January 22, 2003, Plaintiff filed a written complaint regarding, inter alia, the Kurokawa-GK Misconduct. See Exhibit S.

On January 29, 2003, Defendant Gima filed a Workplace Violence Report Against Plaintiff. See Exhibit T. Defendant Gima stated that coworkers "have been made aware of the option of individually filing [workplace violence] reports." Id.

Thereafter, in a Workplace Violence Checklist subsequently submitted, Defendant Gima admits that "The most recent occurrence that precipitated my [workplace violence] complaint was the threatening phone calls and ethics complaint [Plaintiff] initiated against Chris Graff. Chris advised me as his supervisor that he had received phone calls and had a conversation over lunch with Phil where Phil was pressuring Chris to 'tell the truth' and 'come forward before it's too late". See Exhibit U (emphasis added.)

On January 30, 2003, Plaintiff went to see a doctor regarding the workplace stress that resulted from Defendants' conduct. Exhibit W and English Declaration at ¶22.

Defendant Gima's Workplace Violence Report triggered a workplace violence investigation of Plaintiff by Defendant City, whereby at least nine individuals in addition to Defendant Gima were interviewed and completed Workplace Violence Checklists. See Exhibit X.

On February 5, 2003, Plaintiff was again accused of insubordination for attending his October 25, 2002 medical doctor appointment. English Declaration at ¶23.

On February 10, 2003, Defendant Gima and Defendant Magota met with Plaintiff and a union agent and reprimanded Plaintiff "regarding an act of insubordination, hostility towards his supervisor, and failure to follow instructions for an incident on 10/25/02." See Exhibit Y.

After his interview on February 12, 2003 regarding the workplace violence report filed by Defendant Gima, Graff files a Confidential Workplace Violence Incident Report against Plaintiff. See Exhibit Q.

By February 13, 2003, many of Plaintiff's coworkers are aware of Plaintiff's filing of an Ethics Complaint against Defendant Kurokawa and Graff. See Exhibit X.

On February 20, 2003, someone placed a draft of the Workplace Violence Checklist of Julie Tamayori on Plaintiff's work chair. See Exhibit Z. Plaintiff was unaware that a workplace violence report had been filed against him or that an investigation was pending. English Declaration at ¶24 . The contents of Ms. Tamayori's Workplace Violence Checklist disturbed Plaintiff greatly. Id.

On February 21, 2003, Plaintiff attended a mandatory training session for all Assessment Division employees conducted by Defendant City. Id. at ¶25. At the mandatory training, the training coordinator showed a Dilbert cartoon mocking ethics. Id. ; Exhibits AA and AA1. Additionally, jokes were made about whistleblowers. English Declaration at ¶25. At the seminar Assessment Division employees were told that they are not bad persons because bad stuff goes on around them; that they did not have to report bad things; that going to the Ethics Commission is not practical; and that the Ethics Commission cannot do anything anyway. Id. at ¶25. The trainer's comments were not logically related to the subject matter of the training. See Exhibit R- Deposition of R. Magota p. . Some attendees found the comments inappropriate. See Exhibit BB – Deposition of Linda Knowles.

9

Beginning in May of 2002, Plaintiff began suffering stress from Defendants' conduct, and, in January and February 2003, Plaintiff felt ostracized and isolated at work.  Id. at ¶26.

On February 27, 2003, Defendant City sought to interview Plaintiff regarding the Workplace Violence Complaint filed against him.  See Exhibit CC; English Declaration ¶27.

February 28, 2003 is Plaintiff's last day of reporting to work on advice of his treating physician because of work-related stress, and Plaintiff files claim for worker's compensation.  English Declaration ¶28.

On February 28, 2003, Defendant City and County of Honolulu employee Thomas Riddle ("Riddle"), who was investigating Plaintiff's Worker's Compensation claim spoke with Charles Totto ("Totto"), Executive director and Legal Counsel for the City and County of Honolulu, Ethics Commission.  Riddle's notes of his conversation with Totto stated:

> After meeting with [Plaintiff], I called Totto of the Ethics Commission to verify whether English had filed a complaint with them.  Totto indicated that he had and that they were investigating his complaint.  Although Totto could not discus the details of the complaint or his investigation, he seemed to be supportive of English (just my opinion from the tone of his voice).  I did ask him if anything in his investigation so far had found any of English's complaints to be true. He acknowledged yes.  I also ask [sic] if his investigation so far had found any of English's complaints to be false, and he answered no.  So, it appears there is an element of truth to what [Plaintiff] is alleging.

See Exhibit DD (emphasis added.)

February 28, 2003 though November 7, 2003, Defendant City denies Plaintiff worker's compensation benefits. English Declaration ¶29.

In an undated Draft Supervisors Report prepared by Defendant Gima, Defendant Gima states that Plaintiff is under investigation for acts of insubordination occurring on February 19 and 25, 2003. See Exhibit Y.

On April 9, 2003, Defendant City notifies Plaintiff that they want to meet with him to discuss a substandard Performance Evaluation Report. See Exhibit EE.

By letter dated April 16, 2003, Plaintiff's counsel requested that Defendant Magota and the City not continue with its activities regarding the substandard Performance Evaluation Report mentioned in the April 9, 2003 letter. See Exhibit FF.

By letter dated April 17, 2003, Riddle confirmed that he had spoken with Defendant Magota and Defendant Magota would put Plaintiff's annual performance evaluation "on hold until after the workers' compensation matter is addressed." See Exhibit GG.

By letter April 17, 2003, Defendant City noticed Plaintiff of a substandard performance evaluation for the period 06/01/02 through 5/31/03 (the "Notice of Substandard Performance Evaluation"). See Exhibit HH.

The Notice of Substandard Performance Evaluation identified Plaintiff's performance as substandard in the following areas:  Meeting Deadlines, Knowledge and understanding of processes and procedures for routine job functions; Following written and verbal instructions; Adequate preparation for BOR hearing presentations by stated deadlines; Exercising good and appropriate judgment in work related matters including all types of correspondence with taxpayers and representatives; Following through to completion for all job functions, including such areas as returning telephone calls, written correspondence, processing BOR recommendations for deferrals and decisions, corrections etc.  Id.  The Notice of Substandard Performance Evaluation indicated that Plaintiff was being placed on a special three month performance evaluation, and that "if [Plaintiff] is unable to satisfactorily meet the performance expectations of [his] position, [it] may result in removal or discharge from [his] position."  Id.

On April 22, 2003, Defendant City sent Plaintiff's a Performance Evaluation Report contrary to Defendant City's agreement with Plaintiff not to send such report until the worker's compensation matter had been addressed. See Exhibit GG; Exhibit HH Deposition of Thomas Riddle; and Exhibit R.  The April 22, 2003 Performance Evaluation Report rated Plaintiff's performance as substandard in every factor, except for

"Reliability and Initiative" and "safety and use of equipment," where Plaintiff was ranked as performing satisfactorily. See Exhibit GG.

From February 28, 2003 through January 24, 2004, Plaintiff takes medical leave because of work-related stress. English Declaration ¶30.

January 24, 2004, Defendant City requires Plaintiff to resign in order to receive worker's compensation benefits through a settlement agreement. English Declaration at ¶31.

In the course of discovery in this action, a number of witnesses have testified to facts corroborating the allegations in Plaintiff's January 22, 2003 complaint to the Ethics Commission. See, Section III.1., *infra*.

The Ethics Complaint relating to the Kurokawa-GK Misconduct is still pending before the Ethics Commission. See Exhibit II Totto Deposition.

## II.    APPLICABLE LAW

## A.    <u>Motions For Summary Judgment</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317. 323, 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer. Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion merely by citing to general references to evidence without page or line numbers. S. Cal. Gas Co. v. City of Santa Anna, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").

## III.  ARGUMENT

The Hawaii Whistleblowers Protection Act provides a private cause of action to a plaintiff that has suffered discrimination or retaliation as a consequence of engaging in protected conduct.  Haw. Rev. Stat. §§378-61 through 378-69 (hereinafter, the "Hawaii Whistleblowers Protection Act" or "HWPA").  Specifically, Haw. Rev. Stat. § 378-62 provides, in relevant part, that:

**Discharge of, threats to, or discrimination against employee for reporting violations of law**.

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment[1] because:

(1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:

(A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States;

. . . .

unless the employee knows that the report is false.

---

[1] "The terms 'compensation, terms, conditions, location, or privileges of employment' are not defined in HRS chapter 378. The ordinary definition of 'condition' includes 'attendant circumstances; existing state of affairs . . .' (Webster's New International  Dictionary 556 (2d ed. 1960)) and 'situation with respect to circumstances; existing state or case . . . .'" Crosby v. State Dep't of Budget & Fin., 76 Haw. 332, 341, 876 P.2d 1300, 1309 (1994).

The HWPA was intended to protect individuals reporting violations

suspected of the law from any adverse employment action.

> Legislative history confirms that the HWPA provides protection
> to employees who report suspected violations of law from "any form
> of retaliation by their employers." Sen. Stand. Comm. Rep. No. 1127,
> in 1987 Senate Journal, at 1392 (emphasis added). Specifically, the
> legislature intended that the HWPA bar "discharge, discrimination and
> other forms of adverse action. . . ." Sen. Stand. Comm. Rep. No. 833,
> in 1987 Senate Journal, at 1249 (emphasis added). Furthermore, the
> HWPA is a remedial statute. See Flores v. United Airlines, Inc., 70
> Haw. 1, 12 n.8, 757 P.2d 641, 647 n.8 (1988) (citations  omitted). As
> such, the HWPA should be construed liberally to accomplish the
> purpose for which it was enacted. Id. (citation omitted); see also
> Richardson (Klein, J., dissenting), 75 Haw. at __, 868 P.2d at 1215-
> 16.

Crosby v. State Dep't of Budget & Fin., 76 Haw. 332, 341-342, 876 P.2d

1300, 1309-1310 (1994).

The HWPA was specifically contemplated to protect government

employees who report ethical or other violations of law:

> Our review of the legislative history of the HWPA reveals that
> the legislature intended to safeguard the general public by giving
> certain protections to individual employees who "blow the whistle"
> for the public good. See Senate Stand. Comm. Rep. No. 1127, 1987
> Senate Journal, at 1391-92 ("providing protection to government
> employees and citizens who are willing to 'blow the whistle' when
> they are aware of ethical or other violations of law will help the State
> maintain high standards of ethical conduct."); see also Hse. Stand.
> Comm. Rep. No. 25, 1987 House Journal, at 1090.

Norris v. Hawaiian Airlines, 74 Haw. 235, 261 (1992)

The elements of a claim for violation of the HWPA are simple and straightforward.  On its face, the statute requires only [1] that an employee either report, or be about to report, a violation of the law and [2] that the employer take some adverse action against the employee as a result.  The statute does not contain an explicit good faith requirement. The sole restriction relating to the employee's state of mind is that an employee is not entitled to protection for a report he or she knows to be false.  In interpreting HRS § 378-62, the Hawaii Supreme Court has not identified any elements to the cause of action in addition to those clearly contained in the statute." Nelson v. Nat'l Car Rental Sys., 2006 U.S. Dist. LEXIS 44922  (D. Haw. June 30, 2006).[2]

"[A] causal connection between the alleged retaliation and the 'whistleblowing' is required."  Crosby v. State Dep't of Budget & Fin., 76 Haw. 332, 341-342, 876 P.2d 1300, 1309-1310 (1994).    Timing of the discrimination/retaliation is sufficient to establish causation:

---

[2]  Although, not apparently recognized by other jurists as an element in a prima facie claim for violation of the HWPA, a magistrate in this district has held that, "A further essential element of a whistleblowers' claim is the proof of actual damages. HRS § 378-63(a)."  Tom Sun v. City & County of Honolulu, 2006 U.S. Dist. LEXIS 25623 (D. Haw. January 18, 2006).  As set forth herein, Plaintiff has suffered actual damages.  Evidence of some of these actions damages is set forth in support of this motion, but Plaintiff intends to prove the full extent of such damages at trial, as Plaintiff only seeks judgment at to liability by way of the Motion for Summary Judgment.

"[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002) (citing Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 507 (9th Cir. 2000) (noting that causation can be inferred from timing alone); Miller v. Fairchild Indus., 885 F.2d 498, 505 (9th Cir. 1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after the investigation ended)).

Lopes v. Kapiolani Med. Ctr., 410 F. Supp. 2d 939, 956 (D. Haw. 2005)

(finding that timing of adverse actions sufficient to infer causal connection

under HWPA).

1.    **Reporting To His Employer Or A Public Body The Violation Of A Law, Rule, Ordinance, Or Regulation, Adopted Pursuant To Law Of This State, A Political Subdivision Of This State**

Here, Plaintiff reported that Defendant Kurokawa and Graff were

using Defendant Kurokawa was using City employees on City time with

City equipment for outside private business, i.e, the Kurokawa-GK

Misconduct, which is a violation of, *inter alia*,  the Revised Charter of

Honolulu § 11-101, 11-102 and 11-104; City and County of Honolulu

Administrative Directive effective 05/17/02 Re:  Fraud Reporting[3]; and HRS

§ 708-830.  Plaintiff reported these violations as follows: (a) verbal report of

---

[3] See Exhibit KK.

Kurokawa-GK Misconduct to Defendant Gima in August 2001; (b) verbal

report of Kurokawa-GK Misconduct to Defendant Magota in October 2001;

(c) written report of Kurokawa-GK Misconduct to Defendant Magota in

February 2002; (d) written report of Kurokawa-GK Misconduct to the

Federal Bureau of Investigation in August 2002; (e) January 3, 2003 verbal

report of Kurokawa-GK Misconduct to Ethics Commission; and (f) January

22, 2003 written complaint and request for an opinion to the Ethics

Commission regarding Kurokawa-GK Misconduct.

For each of the reports set forth above, Plaintiff believed his reports to

be true, as he had personally observed the Kurokawa-GK Misconduct.

Plaintiff did not know his reports to be false. Evidence obtained in

discovery has confirmed the truth, or at a minimum, that Plaintiff had a

reasonable basis to believe his reports were not false. This evidence

includes:

- Riddle's notes of a telephone call with Totto of the Ethics Commission where Totto confirms that Totto's investigation, at the time, had found evidence that the allegations in Plaitniff's Ethic's Complaint to be true, and had not found anything that would show that Plaintiff's allegations in the Ethics Complaint were false.

- Testimony of David Matsunami- Exhibit C1: that Graff was performing work for Matsunami for Defendant GK; that Graf worked or may have worked on at least eight appraisals for Defendant GK with Matsunami; that Defendant Kurokawa knew that Graff was working on GK matters; that David

Matsunami possibly talked to Graff and Defendant Kurokawa about GK work at the Assessment Division; and that Matsunami was allowed access to nonpublic areas of Assessment Division to do GK work; that 70% of Matsunami's business contact with Defendant Kurokawa was with Defendant Kurokawa at his City office; that Matsunami left messages for Defendant Kurokawa with his City secretary; that Matsunami may have email Graff about outside business at Graff's City email;

- Testimony of Graff:  Exhibit LL: that Graff did work for Matsunami; that Graf did some work for Defendant GK after 1998; that Graff continued to do sporadic work for Defendant GK until he left the Assessment Division in 2004; that Graff and Defendant Kurokawa did parts of appraisals; that Defendant Kurokawa probably contributed to all reports in some way; that Graff may have taken a couple phone calls on his City phone;  and that Graff had Defendant GK spreadsheets on his City computer;

- Testimony of Carole Kamisato:  Exhibit MM:  that she shared a City phone with Graff; that Matsunami called Graff a couple of times a week over a period of two years; that sometimes Matsunami would leave messages for Graff; and that, at times, Defendant Kurokawa would come talk to Graff.

- Ethics Commission has drafted a Notice of Possible Violation for Defendant Kurokawa related to Plaintiff's Ethics Complaint.  See Exhibit NN.

### 2.    Adverse Employment Action.

As a result of Plaintiff's reports, Plaintiff suffered repeated and severe

adverse employment actions.  With respect to Plaintiff's verbal report of

Kurokawa-GK Misconduct to Defendant Gima in August 2001, Plaintiff was

retaliated/discriminated against when Defendant Gima told Plaintiff to stop

calling her "Annie" because only her friends called her Annie; he could call her "Ann."

With respect to the verbal report of Kurokawa-GK Misconduct to Defendant Magota in October 2001 and the written report of Kurokawa-GK Misconduct to Defendant Magota in February 2002, Plaintiff was retaliated/discriminated against as follows:

- On April 22, 2002, Plaintiff received an annual Performance evaluation Report with negative comments.

- Plaintiff received the August 14, 2002 Substandard Evaluation.

- On August 15, 2002, Plaintiff purportedly had his probation extended for three months by Defendant Kurokawa.

- On October 25, 2002, Plaintiff was accused by Defendant Gima of insubordination for allegedly taking leave without authorization to see his medical doctor.

With respect to the written report of Kurokawa-GK Misconduct to the Federal Bureau of Investigation in August 2002; the January 3, 2003 verbal report of Kurokawa-GK Misconduct to Ethics Commission; and the January 22, 2003 written complaint and request for an opinion to the Ethics Commission regarding Kurokawa-GK Misconduct, Plaintiff was subject to the following adverse employment action:

21

- Defendant Gima filed a workplace violence report against Plaintiff on January 29, 2003, which triggers a workplace violence investigation against Plaintiff.

- On or about January 29, 2003, Defendant Gima advises coworkers of the "option of individually filing [workplace violence] reports" against Plaintiff.

- At least nine of Plaintiff's coworkers are interviewed as part of the workplace violence investigation, and, are thus made aware of the allegations of workplace violence against Plaintiff.

- On February 10, 2006, Plaintiff was verbally reprimanded by Defendants Magaota and Gima for alleged failure to follow Defendant Gima's instructions, insubordination, and conduct towards Defendant GIMA, all of which allegedly occurred on October 15, 2002.

- On February 12, 2006, Graff files a workplace violence report relating to contact Plaintiff had with Graff in January of 2003.

- On February 20, 2003, a draft of Julie Tamayori's workplace violence checklist to be completed in Defendant City's workplace violence investigation is left on Plaintiff's work chair.

- On February 21, 2003, Plaintiff was publicly ridiculed at a mandatory training seminar for Assessment Division employees put on by Defendant City.

- Thereafter, Defendant Gima states that Plaintiff is under investigation for alleged acts of insubordination occurring on February 19 and 25, 2003.

- On April 9, 2003, Defendant City notifies Plaintiff that they want to meet with him to discuss a substandard Performance Evaluation Report.

- By letter April 17, 2003, Defendant City sent Plaintiff the Notice of Substandard Performance Evaluation . The Notice of Substandard Performance Evaluation indicated that Plaintiff was being placed on a

special three month performance evaluation, and that "if [Plaintiff] is unable to satisfactorily meet the performance expectations of [his] position, [it] may result in removal or discharge from [his] position."

- On April 22, 2003, Defendant City sent Plaintiff a Performance Evaluation Report rating Plaintiff's performance as substandard in most categories.

- January 24, 2004, Defendant City requires Plaintiff to resign in order to receive worker's compensation benefits through a settlement agreement.

**3.    Causal Connection.**

With respect to the retaliation/discrimination arising from Defendant Gima filing of a workplace violence report on January 29, 2003, a causal connection with the protected activity has been admitted and cannot now be denied: "The most recent occurrence that precipitated my [workplace violence] complaint was the threatening phone calls and ethics complaint [Plaintiff] initiated against Chris Graff." See Exhibit U.

With respect to all the other acts of discrimination/retaliation, causation can be inferred from the timing of such events alone. Lopes, 410 F. Supp. 2d at 956. This is particularly true as most of the retaliatory/discriminatory events within two months of Plaintiff's filing of a

23

written Ethics Complaint on January 22, 2003. Id. (citing Yartzoff, 809 F.2d

at 1376 (sufficient evidence existed where adverse actions occurred less than

three months after complaint filed, two weeks after charge first investigated,

and less than two months after the investigation ended)).    Further, all the

retaliation/discrimination occurred during the time that the Ethics Complaint

was being investigated. Id.

   Thus, there cannot be disputed that there is a causal connection

between the Plaintiff's protected activity of filing an Ethics Complaint and

Defendant Gima workplace violence report against Plaintiff and its

consequences.  It also cannot be disputed that the timing the adverse

employment action is sufficient close to the various protect activities that a

causal connection can be inferred.

### 4.    Damages.

   In the event that Court concludes that damages are an element that

must necessarily be established in order to prove a *prima facie* case of a

violation of the HWPA, Plaintiff submits evidence of significant damages.

Plaintiff's declaration establishes that he has suffered significant general and

special damages, including, but not limited to:  (1) lost wages; (2) mental

anguish, pain and suffering; (3) medical expenses; and (4) costs in pursing

this HWPA action.  <u>See also</u> Exhibits OO, PP, QQ, and RR, which are exemplars of Plaintiff's damages.

Plaintiff is not seeking summary judgment on the amount of his damages at this time, as the full amount of damages will be proven at trial.

## IV.    CONCLUSION

For the reasons set froth above, there is no dispute as to any material fact and Plaintiff is entitled to judgment as a matter of law on his HWPA claim as to liability only.

Dated:  Honolulu, Hawaii, ___SEP 1 2 2006_____.

_____
ROGER S. MOSELEY
CHRISTOPHER J. MUZZI
RENEE M. FURUTA
Attorney for Plaintiff
PHILIP E. ENGLISH