# Transcript of the Testimony of
# PHILIP ENGLISH

1

**Date:** September 30, 2005
**Case No.:** 04-00108
**Case:** ENGLISH v. CITY & COUNTY OF HONOLULU

Carnazzo Court Reporting Company, Ltd.
Phone: (808)532-0222
Fax: (808)532-0234
Internet: www.carnazzo.com

EXHIBIT C

```
            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,         ) CIVIL NO. CV04-00108 JMS/KSC
                           )
        Plaintiff,         )
                           )
    vs.                    )
                           )
CITY AND COUNTY OF HONOLULU;)
GARY T. KUROKAWA; ROBERT   )
MAGAOTA; ANN C. GIMA; and  ) VOLUME I
GK APPRAISALS, INC.; et al.,) PAGE 1 THROUGH 84
                           )
        Defendants.        )
                           )


        DEPOSITION OF PHILIP E. ENGLISH
Taken on behalf of Defendant City and County of Honolulu,
Gary T. Kurokawa, Robert O. Magota and Ann c. Gima, at the
law offices of Watanabe Ing Kawashima & Komeiji, 5th
Floor, Hawaii Tower, 745 Fort Street, Honolulu, Hawaii
96813, commencing at 1:13 p.m., on Friday, September 30,
2005, pursuant to Notice.


BEFORE:

    Donna Kohls, CSR 146
    Notary Public, State of Hawaii
```
Page 1

## INDEX

EXAMINATION BY:                                    PAGE

Mr. Lorusso


EXHIBITS MARKED FOR IDENTIFICATION:

1   Compromise, Settlement and Release Agreement   62

2   Chronology produced by deponent                79

Page 3

```
APPEARANCES:
For Plaintiff:    ROGER S. MOSELEY, ESQ.
                  2300 Alakea Corporate Tower Corporate
                  1100 Alakea Street
                  1001 Bishop Street
                  Honolulu, Hawaii 96813
For Defendant
GK APPRAISALS,
INC.:             ANTHONY L. WONG, ESQ.
                  Matsui Chung
                  1400 Mauka Tower
                  737 Bishop Street
                  Honolulu, Hawaii 96813
For Defendant
City & County of
Honolulu; Gary T.
Kurokawa; Robert
O. Magota; and
Ann C. Gima:      MICHAEL A. LORUSSO, ESQ.
                  Watanabe Ing Kawashima & Komeiji
                  23rd Floor, First Hawaiian Center
                  999 Bishop Street
                  Honolulu, Hawaii 96813
```
Page 2

         (Disclosure presented to counsel)
              PHILIP E. ENGLISH
called as a witness by and on behalf of Defendant City and
County of Honolulu, Gary T. Kurokawa, Robert O. Magota and
Ann C. Gima, being first duly sworn to tell the truth, the
whole truth, and nothing but the truth, was examined and
testified as follows:
              EXAMINATION
BY MR. LORUSSO:
Q   Could you please state your name for the record.
A   **Philip English.**
Q   Mr. English, have you ever had your deposition taken
before?
A   **Yes, I have.**
Q   On how many occasions have you had your deposition
taken ever?
A   **Three occasions.**
Q   I'll go over that in a moment. Even though you have
had your deposition taken before, let me go over the rules
with you in any event.
    First of all, do you understand that you have been
placed under oath?
A   **Yes.**
Q   Do you understand that everything that will be said
here today will be taken down by the court reporter and

Page 4

1 (Pages 1 to 4)

she will prepare a booklet with all the questions and all the answers? Do you understand that?
A **Yes.**
Q Do you also understand that you will have an opportunity to review that booklet and make any changes or corrections to your answers? Do you understand that?
A **Yes.**
Q If you do make any changes or corrections to your answers and this matter goes to trial, at the time of trail, we can comment on any changes or corrections that you have made. Do you understand that?
A **Yes.**
Q Do you also understand that if at the time of trial you should testify as a witness and your testimony at the time of trial is different than your testimony here today, once again we can comment on any changes or differences in your testimony. Do you understand that?
A **Yes.**
Q I would ask that you do not answer any question that you do not understand. Do you understand that?
A **Yes.**
Q If you do not understand one of my questions or any question asked by counsel here today or at any time that we are doing your deposition, would you please stop us and tell us that you do not understand the question?

Page 5

A **Yes, I will.**
Q I would also ask that you do not guess at anything. Do you understand that?
A **Yes.**
Q And there may be times when I do ask you for an estimation or approximation. Do you understand the difference between an estimation or an approximation and a guess?
A **Can you explain that to me.**
Q Sure. A guess would be if I should say to you, "Do I have a brother?" That would be a complete guess on your part.
A **Uh-huh.**
Q However, if I should say to you, "Can you take a look at the table and can you estimate or approximate the length of the table," based upon something that you have seen, actual knowledge or facts that you have, you can then provide an answer.
A **I understand.**
Q Having said that, do you understand the difference between an estimation, an approximation or a guess?
A **Yes, I do.**
Q One of the other things I have to ask you to do, please, is wait for me to completely finish my question before you answer, even though there may be times when you

Page 6

can anticipate my question. The reason for that is twofold. One, the court reporter can only take down one of us speaking at a time.
Secondly, it's very important that you hear the question, understand the question before you provide an answer. Do you understand that?
A **Yes.**
Q If you do not know something, it's perfectly acceptable to say you do not know. Do you understand that?
A **Yes.**
Q If you cannot recall something or remember something, it's perfectly acceptable to state that you cannot recall or you cannot remember something. Do understand that?
A **Yes.**
Q If you do answer one of my questions or any other question that is asked of you throughout the course of the deposition, unless you tell us that you do not understand the question, we are going to presume or assume that you understand the question. Do you understand that?
A **Yes.**
Q Now, have you taken any type of medication today?
A **No, I haven't.**
Q Is there any reason at all why we cannot go forward with the deposition today?

Page 7

A **None that I'm aware of.**
Q From time to time, your attorney, who is seated to the right of you, Mr. Moseley, may make objections to my questions or other questions. If he begins to object, please stop talking and allow him to make the objection. He is making the objection for the record. And then, assuming you understand the question and, of course, unless Mr. Moseley has instructed you not to answer a question, I would ask that you then answer the question, provided that you understood it. Do you understand that?
A **Yes, I do.**
Q We will also take a break usually every hour or so. But if you need to take a break before then, please just tell me and we'll stop and take a break. Do you understand that?
A **Yes, thank you.**
Q However, if I should ask a question and there is a question pending on the table, I would ask that you completely and fully answer my question first before you take the break. Do you understand that?
A **I do.**
Q Now, in terms of the other three depositions that you have provided, can you tell me what they were for and when they were?
A **They were for a case that was pending before the tax**

Page 8

aecaa13b-7ed2-48c0-870c-4b729e4b39d0

**Page 9**

1  appeal court approximately January 2002.
2  Q   And what about the other two depositions?
3  A   They were all for the same case. So there were three
4  depositions for the same case.
5  Q   In terms of it being three depositions, was it three
6  separate cases or simply that you were deposed in one case
7  but it was spread out over the course of three days?
8  A   The latter.
9  Q   When you gave that deposition in the tax appeal case
10 in January of 2002, were you represented by attorneys for
11 the City & County of Honolulu?
12 A   Yes, I was.
13 Q   Who was the attorney on the other side?
14 A   Roger Moseley.
15 Q   Who is now your present attorney, is that correct?
16 A   That's correct.
17 Q   When was it that you first retained Mr. Moseley for
18 your attorney?
19 A   For what purpose?
20 Q   For any purpose.
21 A   It would be approximately, I think, December of 2002
22 with regards to an ethics concern.
23 Q   Had you ever retained Mr. Moseley for any other
24 reason before December of 2002 other than what you have
25 stated as an ethics concern?

**Page 10**

1  A   Have I retained him?
2  Q   Yes, hired him as your lawyer.
3  A   No.
4  Q   Had you ever consulted with Mr. Moseley-- I don't
5  want to know the substance. I just want to know, had you
6  ever consulted with Mr. Moseley for any purpose at all
7  before December of 2002?
8  A   Yes.
9  Q   And when was the first time you had consulted with
10 Mr. Mr. Moseley?
11 A   August 14, 2002.
12 Q   And without going into substance, but as you had
13 indicated in terms of there was an ethics concern that you
14 had specifically retained him for in December of 2002,
15 what was the general reason in which you had consulted Mr.
16 Moseley in August of 2002?
17 A   My first conversation with him was calling him,
18 asking him if he could help me or if he knew of an
19 attorney who might be able to handle a case that had to do
20 with my employment situation.
21 Q   Which is why we are here today, correct?
22 A   Yes, that is true.
23 Q   And from August 14, 2002 throughout December of 2002
24 when Mr. Moseley was retained by you, were you consulting
25 with him with regard to an employment matter, which is why

**Page 11**

1  we are here today?
2  A   Right. You know, I'm not really clear about that.
3  I'm not really sure about that, actually. I think I may
4  have called him or contacted him about something, but I
5  honestly don't remember the details of that, if I did at
6  all. I know there was a period of time where we didn't
7  have communication. I'll leave it at that.
8  Q   And from August 14, 2002 and then-- let me withdraw
9  that. Why is it that you can remember August 14, 2002 as
10 opposed to approximately August or something like that?
11 A   Well, because other things were happening. I
12 wasn't-- it wasn't just-- when I contacted Roger, he
13 actually assisted me in contacting the FBI. And that
14 happened, I believe, either on or about that date.
15 Q   And with regard to contacting either the FBI or U.S.
16 Attorney or anyone else, did Mr. Moseley also contact
17 people on your behalf?
18 A   Other attorneys?
19 Q   No. Let me withdraw and state it this way. Did Mr.
20 Moseley ever contact the FBI on your behalf?
21 A   Not that I'm aware of.
22 Q   Did Mr. Moseley ever contact the U.S. Attorneys
23 Office on your behalf?
24 A   I believe that he contacted them to get a name and a
25 phone number for me, right.

**Page 12**

1  Q   And approximately when was that?
2  A   Right around that date.
3  Q   That date being August 14, 2002, correct?
4  A   That's correct.
5  Q   To your knowledge, did Mr. Moseley contact anyone
6  else with regard to assisting you between August 14, 2002
7  up until December of 2002?
8  A   I'm not aware of it if he did.
9  Q   Let's go back. In terms of your date of birth, what
10 is your date of birth?
11 A   October 26, 1954.
12 Q   And where were you born?
13 A   Long Beach, California.
14 Q   And in terms of your educational background, you
15 attended high school, correct?
16 A   Yes.
17 Q   What year did you graduate?
18 A   1972.
19 Q   Where did you graduate from?
20 A   John Muir High School.
21 Q   How do you spell that?
22 A   M-u-i-r.
23 Q   After high school, did you have further formal
24 education?
25 A   Yes, I did.

**Page 13**

1  Q  What was that education?
2  A  I attended Pasadena City College, Cal State, Los
3  Angeles and USC.
4  Q  And with regard to Pasadena City College, did you
5  receive any type of degree or certificate?
6  A  No.
7  Q  How long did you attend?
8  A  Maybe a year-and-a-half.
9  Q  Was that immediately after high school?
10 A  Yes.
11 Q  What course of studies did you have?
12 A  Basic entry level college courses as well as music
13 courses.
14 Q  As far as Cal State, Los Angeles, when did you
15 attend?
16 A  I can't think of the exact date. It would be
17 sometime between that time and when I went to USC. I'm
18 sorry, I can't think of the exact date.
19 Q  In other words, was it continuous? You went from
20 high school to Pasadena and then to Cal State, or did you
21 take time off in-between to work?
22 A  Yeah. There may have been six months here or there
23 where I wasn't going to school. You know, I was living at
24 home and I was probably-- yeah.
25 Q  If I had indicated to you as approximately 1973 that

**Page 14**

1  you went to Cal State, does that sound correct to you, or
2  you just don't know?
3  A  No. I think it would have been 1974 or '75,
4  something like that.
5  Q  And how long did you attend Cal State, Los Angeles?
6  A  One year.
7  Q  What course of study?
8  A  My major was music.
9  Q  And did you receive any type of degree or certificate
10 from Cal State?
11 A  No.
12 Q  Why is it that you left Pasadena City College?
13 A  Actually I got a better offer at Cal State LA. It
14 was like a music scholarship. They were paying part of my
15 tuition and paying for my trumpet. I was a trumpet player
16 and they were paying for my education and training as a
17 trumpet player. They were hiring private tutors to teach.
18 Q  As far as scholarship a, was that a one-year,
19 two-year, four-year scholarship?
20 A  It was-- it was an interesting situation because it
21 was actually the band director was actually paying for
22 part of it. So it was, as long as I was there, they would
23 pay for it.
24 Q  Was it a set program, though, other than you saying
25 as long as you are there, they will pay for it?

**Page 15**

1  A  No. While I was there, the band director was willing
2  to pay the money. I don't actually know if he had a
3  source or funds within the institute. I just knew it was
4  coming from his direction. If I went there, they took
5  care of those things.
6  Q  Were you working towards some type of degree or
7  certificate at Cal State, Los Angeles?
8  A  I was a music major.
9  Q  And you were working towards some type of degree or
10 certificate, correct?
11 A  Yes.
12 Q  As far as that degree, how long was that program for,
13 one year, two years?
14 A  The entire program would be a four-year program.
15 Q  And did you receive any type of degree or
16 certificate?
17 A  No, I didn't.
18 Q  How long did you attend Cal State, Los Angeles?
19 A  About a year.
20 Q  And why is it that you stopped going to California
21 State, Los Angeles?
22 A  I got a better offer at USC.
23 Q  And what was the better offer from USC?
24 A  I had a scholarship at USC.
25 Q  And was that a scholarship for a set amount of time?

**Page 16**

1  A  As I recall, it was for the full attendance there.
2  It was a music scholarship. As long as I was there, then
3  I would have that scholarship. That was my impression.
4  That is what I recall.
5  Q  Again, you were working towards some type of degree,
6  is that correct?
7  A  Yes.
8  Q  And that would have been a four-year degree, correct?
9  A  Yes.
10 Q  Did you receive any type of degree from USC?
11 A  No, I didn't.
12 Q  Why did you stop attending USC?
13 A  I needed to work and the work that I was doing was
14 conflicting with my obligations under the music
15 scholarship and that became an issue, so I had to leave.
16 Q  And what type of work were you doing?
17 A  At that time, I was working at Broadway Department
18 Stores.
19 Q  What type of store is Broadway?
20 A  It's a clothing store.
21 Q  And when you say that you had to work, what was your
22 situation that you had to work?
23 A  I got married and had responsibilities.
24 Q  And approximately from when to when did you attend
25 USC?

```
 1  A  1977 and '78.
 2  Q  After USC, did you have any other formal education?
 3  A  Not a university, no.
 4  Q  At any place?
 5  A  Well, I consider the Appraisal Institute a formal
 6  education. I don't know what you would call that exactly.
 7  Q  I'm just looking for your testimony, Mr. English. So
 8  what further formal education did you have?
 9  A  I did have training from the Appraisal Institute.
10  Q  Where was that located?
11  A  Various locations, University of San Diego,
12  University of Colorado at Boulder. I think Western
13  University in Orange County, Southern California.
14  Q  In terms of the Appraisal Institute, was it located,
15  though, in one particular place or did you jump around to
16  three different places?
17  A  They offered courses at those locations. The
18  Appraisal Institute is located in Chicago.
19  Q  Where did you attend the Appraisal Institute?
20  A  The courses I attended were in those locations.
21  Q  So in other words, you had to go to the three
22  different locations, correct?
23  A  Correct.
24  Q  Did you also go to Chicago?
25  A  No, I never did go to Chicago.
                                                    Page 17
```

```
 1  Q  As far as the Appraisal Institute, how many years or
 2  months did you attend the Appraisal Institute?
 3  A  These are one week courses. And I took a number of
 4  them, I don't know the exact number, over a period of five
 5  years. And they were all day courses, that type of thing.
 6  Q  And when did you start first taking courses from the
 7  Appraisal Institute and when did you last take courses
 8  from the Appraisal Institute?
 9  A  I believe the first time was in 1982.
10  Q  And when was the last one?
11  A  I think 1987. I may have taken courses after that
12  which would have been follow up courses.
13  Q  With regards to the Appraisal Institute, was there a
14  certain number or set number of courses that you had to
15  take in order to obtain some type of degree or licensing
16  or certificate?
17  A  Yes.
18  Q  Do you know the approximate number of courses that
19  you had to take?
20  A  I don't recall.
21  Q  Did you obtain some type of degree, certificate or
22  licensing from the Appraisal Institute?
23  A  Yes, I did.
24  Q  What is it that you obtained?
25  A  I obtained the SRA designation.
                                                    Page 18
```

```
 1  Q  Obviously that is an acronym for something. What is
 2  an SRA designation?
 3  A  Senior residential appraiser.
 4  Q  And approximately when did you obtain that?
 5  A  I think in 1993 is when I obtained it.
 6  Q  And it was from the Appraisal Institute?
 7  A  Yes, it was.
 8  Q  And I take it you were still living in California at
 9  that point in time when you obtained it?
10  A  No.
11  Q  Where were you living?
12  A  In Honolulu.
13  Q  Would you have to travel from Honolulu to California
14  or one of these other locations in order to take the
15  courses?
16  A  No. At that point, I had already taken the required
17  courses. What I needed to complete is what they call a
18  demonstrations appraisal report.
19  Q  What is that?
20  A  It's a report that demonstrates your ability to
21  understand the various concepts and principles.
22  Q  Obviously, with regard to real estate appraisal,
23  correct?
24  A  Yes, that's right.
25  Q  Going back, between Pasadena City College and Cal
                                                    Page 19
```

```
 1  State, Los Angeles, were you working?
 2  A  I was living at home and I think I did do some work
 3  in terms of educating. I was an instructor, a trumpet
 4  instructor for younger kids, that sort of thing. I think
 5  I worked at a music store doing that kind of thing.
 6  Q  While you were at Cal State, Los Angeles, you
 7  indicated that you were working at Broadway or was that at
 8  some other point in time?
 9  A  No, that was another point in time.
10  Q  Between Cal State, Los Angeles and USC, were you
11  working?
12  A  I was doing the same kind of work. I would either be
13  teaching or playing. I played in symphonies and that sort
14  of thing.
15  Q  With regard to the Broadway Department Stores,
16  approximately from when to when did you work there?
17  A  I started in 1978, maybe the summer of 1978, until
18  maybe the summer of 1979. I may be a little off on those
19  dates, but right around that time.
20  Q  From the time you graduated from high school until
21  approximately 1979, did you have any other jobs other than
22  the ones that you have already testified to?
23  A  I don't recall having any other jobs.
24  Q  And after USC and before you attended the Appraisal
25  Institute or started taking courses from them, did you
                                                    Page 20
```

**Page 21**

1  have any other jobs?
2  A  After USC and before?
3  Q  Correct, the Appraisal Institute.
4  A  Yes. I worked at Broadway Department Store.
5  Q  Anything else?
6  A  And then, in 1979, I began at First Interstate
7  Mortgage.
8  Q  And when you first began at First Interstate
9  Mortgage, what was your job title?
10 A  I think I began in the mail room there and I was also
11 in charge of record retention, like a librarian type job
12 for all their files.
13 Q  What year was it that you began at First Interstate
14 Mortgage?
15 A  1979.
16 Q  And how long did you work there, approximately?
17 A  Until 1986, I think.
18 Q  And did your job title change from the time you
19 started in 1979 to approximately 1986?
20 A  Yes, pretty quickly.
21 Q  What did your job title change to?
22 A  I went from that job very quickly into working in the
23 area-- what was the job title? It was some kind of
24 compliance area. I worked for the compliance department
25 reviewing appraisals.

**Page 22**

1  Q  And in terms of reviewing appraisals, did you have to
2  have any type of special training in order to do that?
3  A  They were training me on the job, and that is in fact
4  when my training started.
5  Q  Did your job title change again after that while you
6  were still at First Interstate?
7  A  Yes, it did.
8  Q  What did it change to?
9  A  It changed to appraiser.
10 Q  As far as being an appraiser, were you actually going
11 out and appraising properties?
12 A  Yes, I was.
13 Q  What type of properties, residential, commercial,
14 both?
15 A  In the course of my career?
16 Q  No, while at First Interstate.
17 A  My career at First Interstate?
18 Q  Yes.
19 A  Yes, both.
20 Q  And after having a job title of appraiser, did your
21 job title change at any other time while at First
22 Interstate?
23 A  No, it did not.
24 Q  And with regard to First Interstate when you were no
25 longer working there in approximately 1986, did you quit

**Page 23**

1  or were you fired?
2  A  I quit.
3  Q  Why did you quit?
4  A  To open my own appraisal business.
5  Q  And first Interstate Appraisal was in Pasadena?
6  A  Yes.
7  Q  And when you opened your own appraisal business, what
8  was the name of it?
9  A  You know, I don't recall. I thought about it and I
10 can't remember.
11 Q  And where was it located?
12 A  I worked out of my home in Pasadena.
13 Q  And where was that? Do you recall the address?
14 A  The address?
15 Q  Yes, if you remember.
16 A  I believe it was 3482 Grayburn Road, I think.
17 Q  Is that in Pasadena?
18 A  The address is called a Pasadena address. But I
19 think it's actually a county area between Pasadena and San
20 Bernardino.
21 Q  How long did have you this particular appraisal
22 business?
23 A  About a year-and-a-half.
24 Q  Did you have employees?
25 A  I did.

**Page 24**

1  Q  How many employees?
2  A  Two.
3  Q  What were the job titles of the other employees?
4  A  One was an appraiser trainee and one was the office
5  clerical person.
6  Q  And by the way, at First Interstate, were you in
7  charge or in any supervisory position with regard to
8  anyone?
9  A  We had people that wrote up our reports. This was
10 the old days. We actually dictated into phones and people
11 typed them up, so in that regard. But they weren't
12 reporting to me. I didn't have to do performance
13 evaluations on them or anything like that. But as far as
14 directing their efforts to assist us in what we were
15 doing, to that limit, yes.
16 Q  Just to be clear, in terms of when you were at First
17 Interstate, are you supervising staff or are you
18 supervising other appraisers?
19 A  Staff.
20 Q  It would be like other clerical staff, as you had
21 just described, correct?
22 A  That is correct. I think, at one point, I did have
23 one or two trainees under me where I was helping them
24 learn the ropes, so to speak, but that was it.
25 Q  And as far as your own appraisal business that you

| | |
|---|---|
| 1  had for approximately a year-and-a-half, do you recall | 1  divorced. But I know that I hired the lawyer and did all |
| 2  from when to when that as was, what years? | 2  of the necessary things to have it done. |
| 3  A   It would be '86 to '87. And I think it was April of | 3  Q   So in the divorce to Sharlene, did you have your own |
| 4  '86 to about June of '87, actually. | 4  attorney and your ex-wife wife also have her own attorney? |
| 5  Q   As far as the appraisal business that you had from | 5  A   No, it was a mutual thing. |
| 6  approximately 1986 to 1987, did you sell your business or | 6  Q   But you were the one who had contacted the attorney |
| 7  why did you stop that business? | 7  and did everything with the attorney, correct? |
| 8  A   I stopped it because I was moving to Hawaii and I had | 8  A   I took care of that part of it for us, yes. We had |
| 9  a job in Hawaii. | 9  been separated a couple years ago. |
| 10 Q   So what year did you come to Hawaii? | 10 Q   With regard to your second marriage, that was to |
| 11 A   1987. | 11 Corlis Chang, is that correct? |
| 12 Q   Why did you move to Hawaii? | 12 A   That's correct. |
| 13 A   I was married. My wife was from Honolulu and we | 13 Q   With regard to Ms. Chang, when was it that you were |
| 14 decided to move back here. She had a job here already | 14 married to her? |
| 15 working here and I followed her a couple months later when | 15 A   1984. |
| 16 I got my job. | 16 Q   And also divorced from Ms. Chang, correct? |
| 17 Q   And that was the only reason why you came to Hawaii, | 17 A   That's right. |
| 18 correct, that you just mentioned? | 18 Q   What year were you divorced? |
| 19 A   The fact that my wife and I wanted to move here? | 19 A   It was final in 1999. |
| 20 Q   Right. And that your wife was from Hawaii. | 20 Q   And in that particular divorce proceeding, was there |
| 21 A   She was from here, sure, yeah. | 21 a plaintiff and a defendant? |
| 22 Q   What is your first wife's name? | 22 A   I believe there was. |
| 23 A   Sharlene. | 23 Q   And who was the plaintiff and who was the defendant? |
| 24 Q   Is that with a C or S? | 24 A   I think Corlis would have been the plaintiff. I |
| 25 A   S. | 25 think that is just how it was written. Although it was-- |
| Page 25 | Page 27 |
| 1  Q   What is her maiden name? | 1  it wasn't really mutual, but it was agreed that we would |
| 2  A   Kuriyama. | 2  get a divorce. |
| 3  Q   And was she from California, Hawaii, someplace else? | 3  Q   In the divorce proceeding with Ms. Chang, were you |
| 4  A   California. | 4  represented by counsel? |
| 5  Q   Do you have her present address? | 5  A   Yes. |
| 6  A   No, I don't. | 6  Q   Who was your counsel? |
| 7  Q   What is the last location that you are aware of for | 7  A   Chuck Kleintop. |
| 8  her? | 8  Q   Of Sterling & Kleintop, correct? |
| 9  A   In Los Angeles, that is the only thing I can tell | 9  A   Yes, that's correct. |
| 10 you. | 10 Q   And at some point, you were remarried, is that |
| 11 Q   When was the last time you had any contact with your | 11 correct? |
| 12 first wife? | 12 A   That's correct. |
| 13 A   I think we spoke on the telephone in 1999. | 13 Q   When was your third marriage? |
| 14 Q   In terms of your marriage to Sharlene, from when to | 14 A   June of 2000. |
| 15 when was that, approximately? | 15 Q   And your wife's name in that marriage? |
| 16 A   I'm trying to think here. 1977 and it was-- there | 16 A   Sathiporn. |
| 17 was a final divorce in 1982. | 17 Q   Can you spell that, please. |
| 18 Q   Since you were still living in California at that | 18 A   S-a-t-h-i-p-o-r-n. |
| 19 time, the divorce took place in California, correct? | 19 Q   What was her marriage? |
| 20 A   Yes, it did. | 20 A   Songsorn. |
| 21 Q   In terms of the divorce, whatever proceedings that | 21 Q   Can you spell that. |
| 22 you went through, who was the defendant and who was the | 22 A   S-o-n-g-s-o-r-n. |
| 23 defendant? | 23 Q   And she goes by the nickname Pim, is that right? |
| 24 A   I don't know if there was a defendant or plaintiff or | 24 A   Correct. |
| 25 defendant. It was a mutual agreement that we would be | 25 Q   P-i-m? |
| Page 26 | Page 28 |

## Page 29

1  A  Yes.
2  Q  And you are divorced from her, correct?
3  A  Yes.
4  Q  When did you get a divorce from Pim?
5  A  I'm not sure of the exact date. It would have been
6  within the last year-and-a-half, maybe last year,
7  year-and-a-half.
8  Q  So it was 2004, 2003, 2005?
9  A  2004, I believe. I'm sorry, this is a real fuzzy
10  time. During this period of my life, it gets pretty
11  fuzzy. I think it was 2004.
12  Q  That is just your best memory as you sit here?
13  A  Yes, that is my best.
14  Q  With regard to that divorce proceeding, who was the
15  plaintiff and who was the defendant?
16  A  I would have been the plaintiff.
17  Q  And were you represented by counsel?
18  A  Yes.
19  Q  And who was your attorney?
20  A  I can't remember his name. I'm sorry. I don't
21  remember his name.
22  Q  Was he with a firm?
23  A  He had his own firm. He was a sole practitioner, I
24  believe.
25  Q  Was your wife represented by counsel?

## Page 30

1  A  No.
2  Q  Going back now to your jobs. After you had your own
3  appraisal business that you stopped, what do you do, the
4  one that you had while in California? You moved to
5  Hawaii?
6  A  Yeah. I was hired by First Nationwide Bank.
7  Q  When you were first hired, what was your bank title?
8  A  Senior appraiser for the State of Hawaii.
9  Q  How long did you work at First Nationwide Bank.
10  A  I left in 1989.
11  Q  So it was in '87 to 1989, correct?
12  A  That's correct.
13  Q  And did your job title as a senior appraiser ever
14  change while you were with the First Nationwide Bank?
15  A  No, it never did.
16  Q  Did your job duties change?
17  A  No, they never changed. I would say the only thing
18  that changed is the reason they hired me. They didn't
19  have a senior appraiser before. And we basically started
20  an appraisal department and we had a number of employees
21  by the time I left.
22  Q  And as the senior appraiser at First Nationwide Bank,
23  did you supervise or train anyone?
24  A  Yes.
25  Q  How many people did you supervise or train?

## Page 31

1  A  I would say I think about eight.
2  Q  Is that appraisers and staff or what type of
3  employees are you referring to?
4  A  That would be maybe two staff and six appraisers, I
5  think, something around that number.
6  Q  Again, that is your best recollection, correct?
7  A  That's correct.
8  Q  With regard to your job at First Nationwide Bank, did
9  you quit or were you fired?
10  A  I quit.
11  Q  Why did you quit?
12  A  Corlis had given birth to our son and she was very
13  anxious to go back to work. And between the two of us--
14  actually, from the very beginning of our marriage, we
15  agreed that she could have her career, that would be her
16  thing, and I would do other things. That is why I opened
17  up the appraisal business in Pasadena and things. But I
18  was the one willing to give up basically my career for
19  that. So I gave up my job to change diapers and feed my
20  son.
21  Q  And I don't mean this in a demeaning way, you were
22  like a Mr. Mom?
23  A  Yeah, sure. Very proud of it, actually.
24  Q  And I meant it in a good way. For how long a period
25  of time were you at home taking care of your son?

## Page 32

1  A  Well, as it was, I started doing appraisals almost
2  immediately on the side and things grew very rapidly. I
3  had more and more business. So I started hiring employees
4  right fairly quickly. And then my mother-in-law came to
5  help watch the son. So it kind of-- I started having
6  enough work that I needed to hire somebody. Then that is
7  what I did.
8  Q  So in terms, though, of being as we called it a Mr.
9  Mom and not doing any outside work, not doing any
10  appraisal work but basically being a caretaker for your
11  son, a homemaker for your family, how long a period of
12  time was that?
13  A  Maybe I should restate what happened.
14  Q  Okay.
15  A  When I did go home to take care of Shawn, the deal
16  was I would do appraisal work part time. So really I
17  started right away. So maybe I was a part-time Mr. Mom.
18  Q  With regard to that situation of being a part-time
19  Mr. Mom as well as doing appraisals from your home,
20  approximately how long a period of time was that?
21  A  Before I opened an office, you mean?
22  Q  Is that what happened?
23  A  Yes, that is what happened next. I needed to hire
24  somebody. The laws don't allow you to do that in your
25  home. So I opened up an office right across the street

**Page 33**

1  here on Queen Street. So I guess that would have been in
2  1989 or 1990, right in that frame fairly quickly.
3  Q  And did that business have a name?
4  A  Philip English & Associates.
5  Q  Who were the associates?
6  A  At that time when we opened up, Emma Mateo was our
7  office manager, I guess. And Gene Castagnetti was one of
8  the other appraisers, and Chris White was another
9  appraiser.
10 Q  How long did you have Philip English & Associates?
11 A  As an entity, it changed. It was a sole
12 proprietorship, then it became a corporation, then the
13 corporation was dissolved and then it became a sole
14 proprietorship again. We engaged in different activities
15 under the name of Philip English & Associates, real
16 appraisal as well as engaged in another activity under
17 that tile.
18 Q  What was the other activity?
19 A  We got involved in an import/export type business.
20 It was something that Corlis and I both got involved in
21 and we just used the Philip English & Associates sole
22 proprietorship at that time to operate it. That was maybe
23 1996 and '97. So about a year between '96 and '97.
24 Q  What was '96, '97?
25 A  That would be where we were involved in this other

**Page 34**

1  activity.
2  Q  The import/export business?
3  A  Right. I think the real estate market had kind of
4  slowed down and we were looking for other opportunities
5  and that is what we did.
6  Q  Going back for a moment. When you were in California
7  as the independent appraiser, was that as a sole
8  proprietorship, corporation, some other type of entity?
9  A  Sole proprietorship.
10 Q  As Philip English & Associates, how long a period of
11 time or approximately was it a sole proprietorship, when
12 did it become a corporation and when did it go back to
13 sole proprietorship?
14 A  I don't think I can remember.
15 Q  Is it that you don't remember, which is fine?
16 A  I don't recall.
17 Q  In terms of the corporation, who was the president,
18 vice president, treasurer, secretary of the corporation?
19 A  I was the president. I don't remember who the other
20 officers were. I can't remember. But they would have
21 been, I'm fairly certain, that we had named some of the
22 other employees that were there, but they had no shares
23 actually.
24 Q  Any particular reason why it went from sole
25 proprietorship to corporation, back to sole

**Page 35**

1  proprietorship?
2  A  I think at the time we were concerned about liability
3  issues. Because of being in business for yourself, there
4  is a great deal of liability and we were doing a lot of
5  business. So we became, I think it was, an S corporation.
6  Actually I-- I didn't handle a lot of those issues, Corlis
7  did. And so I'm not really keen on all of the specifics
8  why. But she handled those things.
9  Q  In terms of Philip English & Associates in any form
10 with regard to doing real estate appraisals versus doing
11 the import/export business, was there a point in time when
12 you were no longer doing real estate appraisals but were
13 only operating the import/export portion of Philip English
14 & Associates?
15 A  During 1996 and '97, again, the real estate market
16 had really slowed down and we were trying to see if we
17 could generate something.
18 Q  In 1996, 1997, during that period of time, had you
19 let go any appraisers that had been working for Philip
20 English & Associates?
21 A  Yes. All of them were-- we found jobs for everybody
22 and made sure everybody got going again. Some of them are
23 still real estate appraisers on their own and some of them
24 have gone into other things.
25 Q  As far as the import/export business, what type of

**Page 36**

1  products were you importing/exporting?
2  A  They were personal care products, which would be
3  shampoos and soaps, that sort of thing.
4  Q  Any particular area of the world?
5  A  Yes, Southeast Asia and Asia. The corporation is
6  called Nu Skin. We hooked up with some people with this
7  corporation and they said they were moving into Asia and
8  they wanted to meet people with contacts in Asia.
9  Actually I didn't, but Corlis had plenty of contacts in
10 Asia. It's just that I was the one that was the
11 entrepreneurial one, I guess. That was the decision in
12 our marriage, so I was the one to kind of be the person
13 pursuing that. But that was her contacts.
14 Q  In terms of the import/export portion of Philip
15 English & Associates, did that have any employees working
16 either when it was a sole proprietorship or when it was a
17 corporation?
18 A  In Thailand, we employed Pim, actually, as, I don't
19 know, an assistant. I didn't speak Thai, so it was very
20 helpful to have somebody over there.
21 Q  And Pim, again, being your third wife, correct?
22 A  That's correct.
23 Q  As far as the import/export business, I know you
24 indicated it's from 1986 to 1997. After 1997, whatever
25 point in time in 1997, did it cease its operations?

**Page 37**

1   A   Yes. Actually it would be right in the beginning of
2   1998. The reason was simply there was an Asian economic
3   crisis and the exchange rates went completely the wrong
4   way for us.
5   Q   After that period of time of the import/export
6   business, what did you do in terms of a job or career?
7   A   I began real estate appraising.
8   Q   And was that on your own or with someone else?
9   A   It was on my own.
10  Q   And did it have a name in terms of the company?
11  A   I named it Philip English & Associates. It was still
12  the same company. In my view, it never really went away.
13  It just changed its functions a little bit.
14  Q   From when to when did it operate as Philip English &
15  Associates in terms of doing real estate or focus on real
16  estate appraising after you operated the import/export
17  business from 1996 to 1997? Do you understand my
18  question?
19  A   No. Could you say that again.
20  Q   Sure. In approximately 1996, you stopped doing real
21  estate appraisals and you focused doing the import/export
22  business, is that correct?
23  A   That is correct.
24  Q   And then after 1997, as you indicated, at the very
25  beginning of 1998, you go back to doing the real estate

**Page 38**

1   appraisals, correct?
2   A   That's right.
3   Q   And then from 1998 until when are you still operating
4   as Philip English & Associates where the focus is on real
5   estate appraisals?
6   A   Right until about 1999.
7   Q   And what happens in 1999?
8   A   In 1999, my-- well, in 1998, my life changed quite a
9   bit. I had kidney cancer and my wife wanted to divorce
10  me.
11  Q   And that would be Ms. Chang?
12  A   That is correct. And I think when-- after I had my
13  kidney removed and the divorce was final, I did a lot of
14  thinking about life. Some people may call it soul
15  searching, if they want to. And I decided that I wanted
16  to do something for Honolulu. I wanted to use my
17  abilities or whatever I could do for the City & County of
18  Honolulu and I applied for the Assessment Division
19  positions.
20  Q   And in terms of that change in wanting to work for
21  the City & County, is it because you wanted to give back
22  to the City, is that correct?
23  A   Yeah.
24  Q   Any other reason why you wanted to work for the City
25  & County of Honolulu?

**Page 39**

1   A   Sure. My doctors told me that I needed to try to be
2   in a type of work that was less stressful and maybe more
3   steady and it seemed like a good thing to do. And I was
4   feeling that just made a whole lot of sense.
5   Q   Any other reason that you wanted to work for the City
6   & County of Honolulu?
7   A   No, that is the reasons.
8   Q   And so you applied to the Assessment Division in
9   approximately 1999, correct?
10  A   That's right.
11      MR. LORUSSO: Why don't we take a short break.
12      (Recess)
13  Q   (By Mr. Lorusso) Mr. English, with regard to your
14  working with the City, when is it that you began working
15  with the City? Obviously, when I use the term City, I'm
16  always referring to the City & County of Honolulu so I
17  don't have to keep repeating that long string of words. Do
18  you understand that?
19  A   Yes.
20  Q   When was it that you first began working with the
21  City?
22  A   June 2000, June 1st, 2000.
23  Q   And when did your position with the-- when did you
24  stop working with the City?
25  A   You mean when I was officially no longer an employee?

**Page 40**

1   Q   Correct.
2   A   I'm not sure of that date. I think I might have been
3   December of 2003.
4   Q   Going back, you had indicated that, at the time that
5   you were making a change again from working for Philip
6   English & Associates to going to working with the City--
7   by the way, were there any other jobs in that interim
8   period?
9   A   Yes.
10  Q   What other jobs were there?
11  A   I worked at City Mill.
12  Q   And what did you do at City Mill?
13  A   I worked in the paint department.
14  Q   And from approximately when to when did you work for
15  City Mill?
16  A   I'm not sure of the dates. It would have been in
17  1999. And that was a matter of months. I'm not sure of
18  the dates.
19  Q   And in terms of working in the paint department, was
20  your job title a clerk?
21  A   Yes.
22  Q   Why is it that you went from real estate appraising,
23  import/export business back to real estate appraising to
24  work at City Mill?
25  A   Well, as I mentioned, there was a change that

Page 41

1  happened in my life in 1998, late 1998. And after my
2  surgery and, in 1999, when my divorce with Corlis was
3  finalized, I guess I needed some time to regroup my life
4  and get going again. I think that is mainly the reason.
5  Q   And then, in terms of applying to work with the City,
6  you felt that you were capable of performing your job with
7  the City, correct?
8  A   Yes.
9  Q   That would have been as a real estate appraiser,
10 correct?
11 A   I was a real estate appraiser, yes. In fact, if I
12 could add, they told me they were looking for outside
13 appraisers. They needed people with outside appraisal
14 experience. So it seemed like everything was coming
15 together and that was the right thing to do.
16 Q   In terms of that particular job, was that something
17 that you had seen in the classified ads, heard about from
18 someone else? How was it that that job came about as far
19 as you applying for it?
20 A   My initial application was I just walked down to the
21 human resources and asked them for the application.
22 Q   And before you applied to the City, had you checked
23 with any doctor to see if you were capable of handling the
24 work as a real estate appraiser for the City?
25 A   No, I don't think that would have been necessary.

Page 42

1  Q   I'm not suggesting it was or wasn't necessary. But
2  you have indicated that you were seeing a doctor before
3  you had applied with the City, correct?
4  A   My physicians having to do with my cancer surgery?
5  Q   Correct.
6  A   Yes.
7  Q   Which doctors were you seeing for your cancer surgery
8  or for your cancer condition?
9  A   The name of the doctor?
10 Q   Yes.
11 A   Dr. Tsou. He was with the Honolulu Medical Group at
12 the time.
13 Q   Any other doctor?
14 A   He was a urologist and surgeon, so he was the guy.
15 Q   Was it Dr. Tsou that indicated to you that you should
16 take a job that was less stressful?
17 A   Yes.
18 Q   Before you applied for your job with the City, did
19 you talk to Dr. Tsou, explain to him what the job was and
20 say this is the type of position that I will be taking,
21 since you have told me to take a less stressful job?
22 A   No. In fact, I'm certain he would not have advised
23 me one way or the other.
24 Q   But you don't know that, correct?
25 A   I don't know that. But I certainly feel that way,

Page 43

1  yeah. From our conversations that we had about things,
2  for example, having to do with exercise programs that you
3  advised me about, he would-- he consistently would not be
4  specific about doing this or doing that.
5      And just to be clear about it, when I'm saying a less
6  stressful type of position, when you are operating an
7  independent appraisal firm, it's fairly stressful
8  because-- not just because it's a real estate appraisal
9  type function, but because the nature of business is
10 either extremely busy or there is not much going on. It
11 has lots of ups and downs and that causes a great deal of
12 stress on a person.
13     So I think what we are talking about in terms of
14 something less stressful is something that is more steady.
15 Q   But going back to my question, Dr. Tsou had indicated
16 to you you should take a less stressful position, correct?
17 A   Yes.
18 Q   And did you?
19 A   Let me also-- I'm sorry. I'm not stating this
20 correctly, Mike. What he really said was to make your
21 life less stressful. He didn't specifically say go out
22 and find a job that is less stressful. I'm incorrect when
23 I said that before. That is not correct. He said make
24 your life in general less stressful. That is what he
25 said.

Page 44

1  Q   And did you speak with Dr. Tsou with regard to your
2  application with the City as a real estate appraiser?
3  A   No.
4  Q   Did you speak with any other physician with regard to
5  your application to work for the City?
6  A   No, I didn't.
7  Q   So is it fair to say that in terms of applying to the
8  City as a real estate appraiser, that was a decision that
9  you made on your own, correct?
10 A   That was not only a decision that I made on my own,
11 but I believe it was a decision that Dr. Tsou was telling
12 me to make on my own.
13 Q   Let's be really clear. Dr. Tsou never told you one
14 way or the other to take that position or not take that
15 position, correct?
16 A   That is correct. He would say it was up to me to
17 make that decision.
18 Q   So that decision was your decision to make, correct?
19 A   Yes, it was.
20 Q   And you made that decision, correct?
21 A   Right.
22 Q   Now, in terms of the type of real estate appraisal
23 that you were doing as Philip English & Associates before
24 you began to work at City Mill and before you applied and
25 began working at the City, was that commercial,

**Page 45**

1  residential or both?
2  A  It was residential.
3  Q  As Philip English & Associates, did you ever do any
4  appraisals on commercial real estate?
5  A  I don't recall. We may have. I don't recall. I
6  know we did narrative reports as opposed to form reports
7  on occasion. But I don't recall whether we did anything
8  that was specifically what you would call commercial.
9  Q  With regard to the residential appraisals that you do
10 recall that you did as Philip English & Associates, was
11 that residential in terms of being single family homes,
12 was it condominiums, something else?
13 A  Single family homes, condominiums and small
14 income-producing properties.
15 Q  And in terms of the condominiums, was it an appraisal
16 for an individual condominium or was it for an entire
17 condominium building?
18 A  Individual condominiums.
19 Q  Now, with regard to Philip English & Associates, at
20 any time, did that entity either as a sole proprietorship
21 or corporation or whatever legal form that it was in, did
22 it ever file for bankruptcy?
23 A  Philip English & Associates?
24 Q  Correct.
25 A  No.

**Page 46**

1  Q  Is Philip English & Associates still a viable
2  entity? In other words, is it still listed with the
3  Department of Commerce & Consumer Affairs?
4  A  I don't believe it is.
5  Q  With regard to yourself, did you ever file for
6  bankruptcy?
7  A  Yes, I did.
8  Q  When did you file for bankruptcy? I don't mean the
9  specific date, but in the time period.
10 A  I think it must have been in 1999.
11 Q  And was this while you were still operating Philip
12 English & Associates, were you at City Mill, were you not
13 employed or something else?
14 A  I was not operating Philip English & Associates at
15 that time. And I don't know if I was at City Mill or
16 not. I don't really recall.
17 Q  With regard to the bankruptcy, was it before or after
18 you had been divorced from Ms. Chang?
19 A  It was after.
20 Q  And do you know approximately how long a period of
21 time it was after you were divorced?
22 A  I think it was probably-- actually, I think it was
23 probably in early 2000 maybe that I filed for bankruptcy.
24 So it would have been at least a year or longer.
25 Q  Between the divorce and the bankruptcy, correct?

**Page 47**

1  A  That's right.
2  Q  As far as the bankruptcy, do you recall what chapter
3  it was, 7, 11, 13?
4  A  I think it was Chapter 7.
5  Q  And that was a personal bankruptcy, correct?
6  A  Yes.
7  Q  Since that one bankruptcy, have you ever filed
8  bankruptcy again?
9  A  No.
10 Q  Before you had applied to the City, other than Dr.
11 Tsou, were you seeing any other doctors or health care
12 providers?
13 A  Before?
14 Q  Yes.
15    MR. MOSELEY: I have to make an objection. I
16 don't have to make the objection if you restate your
17 question.
18 Q  (By Mr. Lorusso) Sure. In the five-year period
19 before you applied to the City, were you seeing any other
20 physicians other than Dr. Tsou?
21 A  Yes.
22 Q  Who else were you seeing?
23 A  Let me think. At the Honolulu Medical Group, there
24 was a Dr. Tamar Hoffman. She was my internal medicine
25 doctor.

**Page 48**

1  Q  Anyone else?
2  A  For the five years prior to that, I think she was my
3  doctor.
4  Q  Were you seeing any psychiatrist, psychologist or
5  counselors before you had applied to the City?
6  A  Yes.
7  Q  Who were you seeing?
8  A  I was seeing a Kay Wong.
9  Q  W-o-n-g?
10 A  Yes.
11 Q  And what was Kay Wong?
12 A  She is a psychologist.
13 Q  And when did you first begin seeing Kay Wong?
14 A  I'm going to guess in 1998.
15 Q  That is your best estimate?
16 A  That is my best, yes. That is the approximate time.
17 Q  And when was the last time you saw Kay Wong,
18 approximately?
19 A  I think maybe that same year.
20 Q  And in terms of seeing Kay Wong, what were the
21 reasons why you saw Kay Wong?
22 A  I saw her because of depression. It had to do with
23 the pending divorce and the dissolution of the marriage.
24 Q  Any other reason why you saw Ms. Wong?
25 A  No, that was the reason.

**Page 49**

1  Q   And you only saw her for approximately one month?
2  A   No, one year. It was early 1998, and actually I
3  think I did see her maybe through early 1999. I can't
4  really remember.
5  Q   And other than the pending divorce, ultimately the
6  divorce, any other reason why you saw Ms. Wong?
7  A   No.
8  Q   And with regard to your depression, when you say that
9  you had depression, what do you mean by that?
10 A   The pending divorce, I guess the only thing I can say
11 was it caused me to be very distraught, and that is why I
12 was seeing her, to help me through those situations.
13 Q   What I'm getting at, Mr. English, in terms of words
14 like being distraught or depression, that may mean one
15 thing to me and may mean entirely something different to
16 you. So when you use the terms depression or being
17 distraught, I would like to know what you mean by that. In
18 other words, how it affected you either physically,
19 mentally, emotionally. What does depression mean? What
20 were you suffering?
21 A   I was distraught over the end of the marriage.
22 Q   And in terms of depression, define for me what you
23 mean by being depressed?
24 A   I was very saddened by the event.
25 Q   Other than being sad, anything else? In other words,

**Page 50**

1  did it affect your sleep? Did it affect your ability to
2  think, do things? What do you mean by being depressed?
3  A   It did affect my ability to sleep. It did affect my
4  ability to do things, as well.
5  Q   Such as?
6  A   I was extremely distraught. I couldn't put together
7  sentences. I was so distraught over it. That is how my
8  mental capacities were so impaired by being distraught
9  over it, that I was in a bad way. It was very emotionally
10 upsetting.
11 Q   Did it affect your ability to eat?
12 A   I don't recall one way or the other.
13 Q   Your depression back in 1998, when you first began
14 seeing Kay Wong, did it affect your ability to obtain or
15 function in an employment situation?
16 A   Well, it was in the beginning part of 1998 that
17 Corlis told me she wanted the divorce. And that was a
18 severe time for me as far as emotional upset. We
19 separated. And while I was living somewhere else, that is
20 when I started doing real estate appraising. But I
21 continued to see Dr. Wong, as well.
22 Q   So is it your testimony that the depression that you
23 had where you began seeing Kay Wong in 1998 did not affect
24 your ability to earn a living?
25 A   Subsequently, after treatment, no, it didn't.

**Page 51**

1  Q   And in terms of earning a living, was that when you
2  had applied with the City or was there a period of time
3  when it did affect your ability to earn a living?
4  A   Initially, at the very beginning when the emotional
5  upset was so severe, absolutely I could not work.
6  Q   When you say initially, from when to approximately
7  when was your ability to function in an employment
8  capacity affected?
9  A   I think I would say approximately six months. But
10 it's not that it's over. There were things that
11 continued. At the end of 1998-- you see, in the
12 beginning, Corlis, in 1998, she tells me I want a
13 divorce. During that time, we are maybe trying to
14 reconcile. We are trying to-- we are separated, but I
15 continue to come over to the house and do the yard work.
16 You understand what I'm saying. Things aren't coming
17 apart. You still have to make a living and you are still
18 trying to do whatever you can do.
19     At the end of '98, actually all in one day, Corlis
20 gave me divorce papers that were very severe and an hour
21 later my doctor called me and told me you got kidney
22 cancer and you might not live for more than five years.
23 That was a pretty tough day.
24     So I don't want to imply that this is-- there is an
25 ongoing certain condition/event that is happening in

**Page 52**

1  life. So you understand maybe more clearly.
2  Q   In terms of the impression that it was something that
3  obviously it begins because of events in your life at that
4  period of time, the divorce, the kidney cancer, and I
5  wasn't trying to imply that it goes away, but it is
6  something that continues into the future, correct?
7  A   For that event, yes.
8  Q   Obviously, depending on circumstances in life, it may
9  be a matter of degree in terms of the depression and how
10 severe or not severe it is, is that a fair statement?
11         MR. MOSELEY: Can you repeat that?
12         MR. LORUSSO: Let me withdraw the question and
13 start it again.
14         MR. MOSELEY: I'm sorry, Mike. I just have no
15 idea of what you said.
16         THE WITNESS: I didn't either.
17 Q   (By Mr. Lorusso) That is fine. That is what I want
18 you to do, Mr. English, just stop me and tell me if you
19 don't understand my question.
20     With regard to the depression, would it be fair to
21 say that there is different degrees in terms of the
22 depression, severe, moderate, mild, that you are
23 experiencing at different times? Is that a fair
24 statement?
25 A   Yes.

**Page 53**

1  Q   And so the depression begins and it continues on from
2  the point it starts into the future, correct?
3  A   Yes.
4  Q   And while you have the depression, again, just
5  depending on what circumstances are happening with your
6  life, that may affect the level of depression that you are
7  having at any given time, is that a fair statement?
8  A   No.
9  Q   And why isn't the depression affected by what is
10 going on in your life?
11 A   I think you have got it backwards. I think things in
12 my life have caused me to be depressed. There is events
13 that have occurred in my life that have caused me to have
14 depression.
15 Q   Since the time you have worked with the City, have
16 you had other employment?
17 A   Yes.
18 Q   And what other employment have you had?
19 A   I worked for a guard company.
20 Q   What guard company?
21 A   It's called Master Guard.
22 Q   And when did you start working for the guard company?
23 A   In April.
24 Q   Of what year?
25 A   Of this year, 2005.

**Page 54**

1  Q   For how long a period of time before you started for
2  Master Guard company were you unemployed?
3  A   I guess from December 2003 until that time.
4  Q   Between December 2003 and up until April of 2005 when
5  you began working for the Master Guard company, did you
6  seek other employment?
7  A   Yes.
8  Q   What other employment did you seek?
9  A   I looked for jobs as a driver. I looked for jobs as
10 wait help at conventions and that sort of thing. Those
11 were the-- there were various places. But those were the
12 types of jobs. This was all part of therapy with Dr. Koff
13 in trying to get me back into the working situation. And
14 so we decided that we would try to have some kind of job
15 like that. The guard job has proved to be a good job for
16 that.
17 Q   Any other jobs that you sought in that December 2003
18 up until the April 2005 time period?
19 A   No.
20 Q   With regard to a job as a driver or wait help or as a
21 security guard, was it Dr. Koff who told you that was the
22 only type of job that you could work?
23 A   No.
24 Q   Did you apply for any jobs with regard to doing real
25 estate appraisal?

**Page 55**

1  A   No, I didn't.
2  Q   Did you begin to do real estate appraisals on your
3  own?
4  A   No, I did not.
5  Q   Why not?
6  A   I'm trying to get jobs where I can go a little bit at
7  a time to make sure that I can function in them okay. If
8  I were to-- the idea is I don't want to start a job and
9  then fail. And that I don't want to experience similar
10 things that I experienced at the City. I mean, there is
11 no guarantee that an employee won't behave in a way that
12 causes someone to hurt them in a way. But through the
13 therapy with Dr. Koff, the approach was just to try and
14 get out there, see what kind of job I could get.
15     The therapy from the beginning in fact was to first
16 get me to a point where I could feel comfortable going to
17 the market. So I mean, I have come a long way since that
18 time and I'm pretty grateful to Dr. Koff for that. In
19 fact, I really wish I could still have therapy with her.
20 But she has really helped me a lot in that regard.
21        MR. MOSELEY: I think we ought to take a little
22 break here.
23        MR. LORUSSO: Sure.
24        (Recess)
25 Q   (By Mr. Lorusso) Mr. English, as you just did in

**Page 56**

1  terms of taking a break, please feel free at any time that
2  you want, as I told you at the beginning of the
3  deposition, that if you need to take a break, we will take
4  a break. Do you understand that?
5  A   Yes, thank you.
6  Q   Going back now, in terms of working as a real estate
7  appraiser from December 2003 up until the present time,
8  did Dr. Koff ever say to you you should not work as a real
9  estate appraiser?
10 A   No.
11 Q   Did any physician, psychologist, psychiatrist,
12 counselor ever tell you you cannot work as a real estate
13 appraiser from December 2003 until the present time?
14 A   Well, the only restriction that I'm aware of is that
15 they said that I could not work at the City & County as a
16 real estate appraiser. That is the only restriction that
17 I'm aware of.
18 Q   In terms of my question, my question was, with regard
19 to working as a real estate appraiser, did anyone tell you
20 that you could not work in your capacity as a real estate
21 appraiser, any health care provider, physician,
22 psychologist, psychiatrist or counselor?
23 A   Maybe I don't understand the question. But if I
24 could try to answer it--
25 Q   Let me try and rephrase it, then, if you don't

**Page 57**

1  understand it. You worked with the City as a real estate
2  appraiser, correct?
3  A  Yes.
4  Q  And before the time you worked for the City, you
5  worked as a real estate appraiser at different times,
6  correct?
7  A  Yes.
8  Q  So now, just in terms of the profession of being a
9  real estate appraiser, that's all I'm referring to, not
10 whether you could or could not work or whether it's for
11 yourself or whether it's for someone else, just simply in
12 the capacity of a real estate appraiser, do you understand
13 that? Do you understand that is what I'm referring to?
14 A  I understand that. Maybe what I don't understand is
15 the time frame you are talking about. Because Dr. Koff
16 and I believe Dr. Kennedy have stated that, at least
17 certainly in the beginning of their treatment or analysis,
18 that I could not work at that time, and whether it's at
19 the City & County Real Estate Property Assessment Division
20 or any work, depending on which doctor it is.
21 Q  Okay. Let me go back and be clear. As I understood
22 your testimony a few minutes ago, with regard to December
23 of 2003, when you stopped working for the City, up until
24 the present time, you testified that Dr. Koff never told
25 you you could not work as a real estate appraiser, is that

**Page 58**

1  correct?
2  A  That's correct. But what I'm trying to say is that
3  the entire treatment process that I've been going through,
4  the whole effort of that treatment process is to get me
5  back into a work environment, and that the types of jobs
6  that I applied for were part of the treatment plan with
7  Dr. Koff. I'm not really sure how I can answer your
8  question any other way. When I say no, that she didn't
9  say I couldn't work as a real estate appraiser, she wasn't
10 limiting me in that regard. What we are trying to do is
11 get me back into the work force at some level to start
12 with.
13 Q  Mr. English, we can talk about in terms of what was
14 trying to be done or not trying to be done with regard to
15 your therapy. But to my specific question, which is a yes
16 or no question, did Dr. Koff ever tell you you could not
17 work as a real estate appraiser from December 2003 up
18 until the present time?
19 A  I don't know how I can answer that question because
20 you are asking me to say that she didn't-- if I said she
21 didn't tell me that I couldn't work as a real estate
22 appraiser, it almost implies like she is saying I could,
23 and she didn't say that.
24 Q  I'm not implying anything, Mr. English. It's a
25 simple question--

**Page 59**

1  A  Let me answer the question--
2  Q  Wait. Did Dr. Koff say to you you should go work as
3  a real estate appraiser?
4  A  Absolutely not.
5  Q  Did Dr. Koff say to you you should not work as a real
6  estate appraiser from December 2003 up until the present
7  time?
8  A  Up until the last time?
9  Q  Up until the present time.
10 A  I haven't seen her in a while because I'm not having
11 therapy.
12 Q  Mr. English, please listen to my question. Just in
13 terms of a time period, December 2003 up until today
14 September 30, 2005, did Dr. Koff say to you you cannot
15 work as real estate appraiser?
16 A  No, she didn't say that to me. What she said was, we
17 need to get you back in the work force and we need to try
18 and find these kinds of jobs, these entry level jobs where
19 you might be able to start working again.
20 Q  So the answer to my question is no, correct?
21 A  That is correct.
22     MR. MOSELEY: I might suggest that we clarify
23 the time period. I'm not sure when Phil was forced to
24 resign, I mean physically forced to resign. But I think
25 after February 28th, 2004, I don't think he ever actually

**Page 60**

1  worked, did any work for the City.
2     MR. LORUSSO: Just so there is no
3  misunderstanding, I'm just making a record, counsel, that
4  in terms of forced to resign, obviously we disagree in
5  terms of forced to resign.
6     MR. MOSELEY: I'm fine with that clarification.
7  There was a period of time at which he did resign. I
8  think that may have been in December, but he was not
9  actually doing any work for the City, regardless of his
10 technical status as an employee. I just wanted to make
11 sure that we are sort of clear on the record there.
12 Q  (By Mr. Lorusso) Let's talk about that concept just
13 for a second, too. With regard to your ending of
14 employment with the City, is it your testimony that you
15 were terminated by the City?
16 A  What I recall is that I was forced to resign.
17 Q  By forced to resign, what do you mean by that?
18 A  As I recall, it seems to me that, in order to-- well,
19 there is a couple situations. We have a doctor's report
20 saying I should not go back to the Assessment Division.
21 My union agent was telling me I shouldn't go back to the
22 Assessment Division. And in working with the City during
23 a worker's comp claim settlement, they essentially, this
24 is my understanding, said that if you want to settle this,
25 you have to quit or you have to resign your position.

```
 1    So I see that as, all of those things put together,
 2    they wanted me gone. And if I wanted to resolve the issue
 3    with them, I had to resign my position.
 4  Q  With regard to your worker's compensation claim
 5    against the City, you were represented by counsel,
 6    correct?
 7  A  That's correct.
 8  Q  In fact, you were represented by Mr. Moseley,
 9    correct?
10  A  Yes.
11  Q  And with regard to that worker's compensation claim,
12    you signed a document entitled Compromise, Settlement and
13    Release Agreement, correct? Is that correct?
14  A  I don't have it in front of me. I don't recall. So
15    whatever the document was. I signed some document.
16  Q  With regard to any document that you would sign,
17    would it be fair to say what you would do is you would
18    read it first, correct?
19  A  Yes.
20  Q  With regard to any agreement that you signed with the
21    City for your worker's compensation claim, again that was
22    done with the advice of counsel, correct?
23  A  Yes.
24  Q  Let me show you what we'll have marked as Exhibit 1
25    to the deposition.
Page 61
```

```
 1      (Exhibit 1 marked for identification.)
 2  Q  (By Mr. Lorusso) This is a document entitled
 3    Compromise, Settlement and Release Agreement, Approval and
 4    Order. First of all, Mr. English, have you ever seen that
 5    document before?
 6  A  I don't recall.
 7  Q  Why don't you take as much time as you want to look
 8    at the document. And I'm only going to ask you a few
 9    questions with regard to it right at this moment. But I
10    want you to be comfortable and, like I said, take as much
11    time as you want to look at this document.
12      Let's go off the record.
13        (Recess)
14  Q  (By Mr. Lorusso) Mr. English, with regard to Exhibit
15    1, the Compromise, Settlement and Release Agreement,
16    Approval and Order, have you had an opportunity to review
17    that document?
18  A  I just reviewed it.
19  Q  With regard to that document, on page 8 of that
20    document, is that your signature?
21  A  Yes, it is.
22  Q  And the document is dated January 20th, 2004,
23    correct?
24  A  Yes.
25  Q  And on the next page of that document, there appears
Page 62
```

```
 1    the names of a number of people, including your attorney
 2    Mr. Moseley, is that correct?
 3  A  Yes.
 4  Q  If you look at Exhibit No. 1, can you look at
 5    paragraph 11 which appears on page six of the document.
 6  A  Yes.
 7  Q  And with regard to paragraph 11, it indicates, and
 8    please make sure I'm reading this, "In further
 9    consideration for the agreements of Employer as set forth
10    herein, Claimant hereby voluntarily quits, resigns and
11    terminates his employment with Employer, fully, finally,
12    irrevocably and forever, effective January 31, 2004, and
13    Claimant hereby waives, releases and discharges the City &
14    County of Honolulu from any and all of the City & County
15    of Honolulu's obligations pursuant to any collective
16    bargaining agreement."
17      I read that correctly?
18  A  Yes.
19  Q  It further indicates in that paragraph, "Claimant
20    further waives any reemployment and priority placement
21    rights as part of this agreement." Did I also read that
22    correctly?
23  A  Yes.
24  Q  With regard to Exhibit 1, based upon paragraph No.
25    Number 11, would you agree me that you signed a document
Page 63
```

```
 1    that indicated that you voluntarily quit, resigned and
 2    terminated your employment with the City?
 3  A  Based on No. 11?
 4  Q  Yes, based on paragraph 11.
 5  A  In context of the entire document, it's telling me,
 6    the way I read it, is that the only way this agreement
 7    will go forward is if I voluntarily sign this.
 8  Q  Are you saying that you signed Exhibit 1 under
 9    duress?
10  A  No. I'm saying that the only way that they would
11    agree to it is if I agreed to resign.
12  Q  And with regard to resigning, that was a choice that
13    you could make with the advice of counsel, correct?
14  A  I had the choice to resign or not, but I could only
15    do it in that context, because that was the only way that
16    they would settle the worker's comp claim.
17  Q  And with regard to paragraph 11, it indicates that
18    you voluntarily quit, correct?
19  A  Because that was the only way--
20  Q  That is not my question. I'm simply--
21  A  I voluntarily signed it because I had no other
22    choice. In order to settle this thing, I had to
23    voluntarily sign it.
24  Q  When you say that you had no other choice, I come
25    back again to make sure, Mr. English, are you saying that
Page 64
```

**Page 65**

1  you signed this agreement, Exhibit No. 1, under duress?
2  A  I'm saying exactly what I said before. I don't know
3  how else to say it. The only way that this agreement
4  would go forward is if I signed this. So I had no other
5  choice but to sign it.
6  Q  You signed it with advice of counsel, correct?
7  A  I did.
8  Q  And you signed it on your own free will and volition,
9  correct?
10 A  Under the circumstances of what was being discussed,
11 yes.
12 Q  Okay. We can put that aside, Mr. English.
13 A  Okay.
14      MR. MOSELEY: Before we go on, can we have an
15 exhibit convention agreed to here that we just start from
16 one, and with whatever deposition of whatever exhibit, we
17 just go next in order? Are you okay with that?
18      MR. LORUSSO: Yes.
19      MR. WONG: A single comprehensive set of
20 exhibits?
21      MR. MOSELEY: Yes.
22 Q  (By Mr. Lorusso) With regard to your employment with
23 the City, at least according to Exhibit 1, the Compromise,
24 Settlement and Release Agreement, it indicates that you
25 are no longer employed with the City as of January 31,

**Page 66**

1  2004, correct?
2  A  Yes.
3  Q  Other than Dr. Koff, have you seen any other health
4  care provider between December of 2003 and the present
5  time?
6  A  Any other health care provider?
7  Q  You understand what I mean by health care provider?
8  If not, I'm happy to define it for you.
9  A  Would you, please.
10 Q  Sure. Health care provider is any doctor, physician,
11 psychiatrist, psychologist, counselor, chiropractor,
12 acupuncturist, anyone providing you some type of health
13 care services, be it for your physical, mental or
14 emotional reasons.
15 A  They are providing me a service?
16 Q  Correct.
17 A  Okay. Dr. Koff, Lilly Mundon at Kaiser, and maybe
18 Dr. Love, who is my internal medicine doctor.
19 Q  What kind of doctor is Lilly Mundon?
20 A  Actually she may not be a doctor. She may be a
21 therapist. I'm not sure. But I think she is in charge of
22 the department that Dr. Koff works in, whatever that is.
23 Q  And so when you say that Lilly Mundon-- is it
24 M-u-n-d-e-n?
25 A  d-o-n.

**Page 67**

1  Q  With regard to Lilly Mundon, has she provided
2  services in terms of psychological services toward you?
3  A  Yes.
4  Q  And are you still seeing her?
5  A  No. Dr. Koff is the primary. When Dr. Koff is out
6  of town, Lilly Mundon is the secondary. And Lilly Mundon
7  handles the group therapies that I have attended.
8  Q  Are you still in group therapy?
9  A  No.
10 Q  When was the last time you attended group therapy?
11 A  I don't recall.
12 Q  Can you give me an estimate. I don't need the exact
13 date.
14 A  It would have been in 2004. I don't recall the exact
15 date. In fact, I'm not sure. But somewhere in that first
16 year I did group therapy.
17 Q  With regard to the group therapy, did you stop on
18 your own or were you discharged from group therapy or was
19 it decided you didn't need further group therapy?
20 A  I stopped on my own.
21 Q  And why did you stop on your own?
22 A  I wasn't finding it to be beneficial to me. And I
23 think that the doctors said that was okay, to see Dr.
24 Koff.
25 Q  Who said it was acceptable not to continue with group

**Page 68**

1  therapy?
2  A  I think both Mundon and Koff both said if it's not
3  working for you, just continue with the other therapy.
4  Q  And with regard to Dr. Koff, are you still seeing Dr.
5  Koff?
6  A  No.
7  Q  Approximately when was the last time you saw Dr.
8  Koff?
9  A  March.
10 Q  Of 2005?
11 A  It might have been before that. But early 2005,
12 maybe late 2004.
13 Q  And with regard to seeing Dr. Koff, were you
14 discharged from her care, did you stop on your own? What
15 were the circumstances?
16 A  My COBRA ran out and I could no longer see her.
17 Q  Have you sought any other type of health care--
18 strike that. With regard to Dr. Koff, did you ever try to
19 make financial arrangements with her in order to continue
20 to see her?
21 A  With Kaiser?
22 Q  With Dr. Koff, with Kaiser.
23 A  Actually it's being talked about. But I couldn't do
24 it with Dr. Koff. I would have to do it with Kaiser. And
25 so we are talking about that, trying to figure out what we

## Page 69

1  can do.
2  Q  As you sit here today, have there been some type of
3  financial arrangements being made with Kaiser so that you
4  can continue to see Dr. Koff or any other Kaiser health
5  care provider?
6  A  No.
7  Q  And is it fair to say, Mr. English, that if you felt
8  you needed health care, be it for any mental, emotional or
9  physical condition, that you would do so?
10 A  Where would I seek health care?
11 Q  I'm not suggesting the where.
12 A  My answer then is, I would like to, but I don't know
13 where to at this point.
14 Q  Have you gone to anyone to get advice as to where you
15 could get health care?
16 A  We are talking where, you know.  My counsel has been
17 calling various people.  Actually my guard company, I was
18 hoping, would provide health care coverage, but apparently
19 they are not going to do that.  So that is where I'm at.
20 Q  With regard to getting further health care, you have
21 indicated there is discussions going on with, is it
22 yourself and Kaiser?
23 A  I have primarily been talking to counsel who has made
24 telephone calls and inquirers and they are trying to
25 figure out what to do.

## Page 70

1  Q  Other than Kaiser, any other health care facility or
2  other specific provider that you have tried to make a
3  arrangements with to get health care?
4  A  Not specifically.
5  Q  When you say not specifically, what do you mean?
6  A  My guard company was to provide me health care, but I
7  don't have the hours.  Initially I did, but now I don't.
8  And their company was, I think, another company.  Anyway
9  that never happened.
10 Q  And with regard to the Master Guard Company, are you
11 a full time or part time employee?
12 A  Part time.
13 Q  And approximately how many hours a week do you work?
14 A  At the moment, 12 hours a week.
15 Q  And has any health care provider indicated to you
16 that you cannot work more than 12 hours a week?
17 A  No.
18 Q  Is there a reason why you are working part time at 12
19 hours or approximately 12 hours a week?
20 A  As far as my employment goes, the effort is to try to
21 get me back into a work environment.  The Master Guard
22 Company initially had me working more than 20 hours a
23 week.  But as of late, I'm working 12 hours a week.  And
24 if they can fill me in at other places where people are
25 sick or whatever, then they call me and I can fill in.

## Page 71

1  Q  In terms of the 20 hours to 12, why was that done?
2  A  I'm not sure.
3  Q  Did you ever inquire or ask?
4  A  No.
5  Q  In terms of your rate of pay, what is your rate of
6  pay?
7  A  $8.00 per hour.
8  Q  And since working with the guard company, have you
9  sought any other employment?
10 A  No.  I should say that if I can do something to help
11 somebody out around the harbor or something where I'm
12 living and someone gives me a job to do, clean the bottom
13 of their boat, you know.  I mean, I'm doing that kind of
14 thing.
15 Q  That is like a side job for cash?
16 A  Yes, incidental type.  Sometimes even for barter,
17 yeah.
18 Q  And speaking of which, you have indicated that you
19 are living on a boat, correct?
20 A  Yes.
21 Q  And at the boat harbor?
22 A  Yes.
23 Q  A particular boat harbor?
24 A  Ala Wai.
25 Q  And how long have you been doing that?

## Page 72

1  A  Since August of 2002.
2  Q  And you live there by yourself?
3  A  Yes.
4  Q  Is there a particular, is it a slip number?
5  A  G-62.
6  Q  When you had applied to the City for a job as a real
7  estate appraiser, when you filled out any type of
8  application, you were, of course, truthful in your
9  application, correct?
10 A  At best as I can recall, yes.
11 Q  When you began working with the City, what was your
12 classification or job title?
13 A  Appraiser 2.
14 Q  And when you first began working for the City, did
15 you believe that your classification should be different
16 than as Appraiser 2?
17 A  No.
18 Q  When you first began working for the City, who was
19 your immediate supervisor?
20 A  Michael Okamoto.
21 Q  For how long did you work with Mr. Okamoto that he
22 was your immediate supervisor?
23 A  Approximately two-and-a-half months.
24 Q  And then after who was your supervisor?
25 A  Ann Gima.

**Page 73**

1  Q  Was Ms. Gima your supervisor from Mr. Okamoto up
2  until the time that you terminated your employment with
3  the City?
4  A  Yes.
5  Q  While you were working with the City, were there any
6  times in which you applied for a job outside of the City
7  before the termination of your employment?
8  A  No. I spoke to a gentleman on the Big Island, but I
9  never applied for a position.
10 Q  Who did you speak with on the Big Island?
11 A  I just remember his name was Stan.
12 Q  Was there a particular company that Stan was
13 associated or affiliated with?
14 A  He was working in the Assessment Division on the Big
15 Island. So it would be with the Hawaii County Assessment
16 Division.
17 Q  When was it that you had this conversation with Stan?
18 A  I believe it was in June of 2002.
19 Q  Was it one conversation or more than one
20 conversation?
21 A  Well, I met with him in Kona one time. And Pim and I
22 went over there just looking to see what it was about, if
23 it was something we might want to do. And after that,
24 subsequent to that, we may have had a phone call and I
25 think he emailed me and I emailed him once, something like

**Page 74**

1  that.
2  Q  With regard to your conversations with Stan, was he a
3  supervisor? What was his level at the County of Hawaii?
4  A  I believe he was the supervisory person in charge of
5  the Kona office.
6  Q  With regard to your discussions with Stan, was it
7  that he approached you or did you approach him?
8  A  I approached him. We were in Kona and we were
9  checking out what the-- just looking at potentially moving
10 there. And we went in to see him, what the job situation
11 was like at the County of Hawaii.
12 Q  When you met with Stan, you indicated to him that you
13 might be interested in a position on the Big Island if
14 there was a position open, correct?
15 A  I might be interested in a position, right.
16 Q  Did Stan tell you that there was or was not a
17 position open?
18 A  He said that there might be.
19 Q  And after you met with him in Kona, you then had
20 follow up contact with him, as you indicated, by telephone
21 conversation or by email, correct?
22 A  Yes.
23 Q  In terms of your initial meeting with Stan, how long
24 was that, approximately?
25 A  Maybe 20 minutes.

**Page 75**

1  Q  And did you go to Kona for the specific purpose of
2  inquiring about a job opening?
3  A  No.
4  Q  You had gone to the Kona area for what purpose?
5  A  Specifically to check out the Big Island. Things
6  were going bad for me at the Assessment Division at the
7  time and I was already getting concerned about my future
8  employment. Pim and I went over there just to see-- she
9  had never been there and we took a trip over there to see
10 what it was like. And while we were there, I stopped into
11 the Kona office and met Stan.
12 Q  After Stan had indicated to you that there might be
13 an opening, in your follow up telephone conversation, did
14 you indicate to Stan that you were continuing to be
15 interested in a job if there was one available?
16 A  No.
17 Q  What happened in that follow up telephone
18 conversation?
19 A  I told him-- it was actually an email and I told him
20 that I was having problems at the Honolulu office. And I
21 think by the time we corresponded, they had put me on an
22 extended probation. I told him I didn't know what that
23 was about and whether or not I could transfer or I could--
24 there is no transfer. They are two different counties.
25 But I felt it was an issue that needed to be resolved.

**Page 76**

1  And I didn't want to have, you know, some kind of black
2  record, a black mark on my record that shouldn't have
3  there.
4  Q  So you then told Stan what?
5  A  I don't remember exactly what I told him. But
6  essentially it was I'm having problems in Honolulu and I
7  don't think I can-- there is no way I can move to any kind
8  of position that might be open.
9  Q  With regard to the specific problems that you were
10 having, did you tell Stan what those specific problems
11 were?
12 A  No, I didn't.
13 Q  Did he ask?
14 A  I'm sorry. I told him-- I believe I told him I was
15 on probation. Did he ask, no. He never returned anything
16 or asked about it, I don't think he did.
17 Q  With regard to potentially moving to Kona or the Big
18 Island, did you inform anyone at the City that you were
19 considering moving to the Big Island?
20 A  No. Because I wasn't necessarily considering moving
21 to the Big Island. I went over there just to check it
22 out, just to look, you know, window shop, so to speak. I
23 wasn't necessarily considering moving to the Big Island.
24 Q  At any time in your conversations with anyone at the
25 City, did you indicate to them that you were going through