ORIGINAL

VENETIA K. CARPENTER-ASUI
Attorney at Law
A Law Corporation

VENETIA K. CARPENTER-ASUI  6901
City Center, Suite 600
810 Richards Street
Honolulu, Hawaii 96813
Telephone: (808) 523-6446
Facsimile:  (808) 523-6727

Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 0 6 2000

at ____ o'clock and ____ min ____ M.
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HOWARD W.C.C. TOM SUN ) | Civil No. CV00 00397 |
| ) | |
| Plaintiff, ) | |
| ) | COMPLAINT; DEMAND FOR |
| ) | JURY TRIAL; SUMMONS |
| vs. ) | |
| ) | |
| CITY & COUNTY OF HONOLULU, ) | |
| DEPARTMENT OF ENTERPRISE ) | |
| SERVICES; JOHN DOES 1-10; JANE ) | |
| DOES 1-10; DOE CORPORATIONS ) | |
| 1-10; AND DOE PARTNERSHIPS 1-10, ) | ATTEST: A True Copy |
| ) | SUE BEITIA |
| Defendants. ) | Clerk, United States District |
| ) | Court, District of Hawaii |
| | By _____ Deputy |

## COMPLAINT

Plaintiff HOWARD W.C.C. TOM SUN ("Plaintiff"), by and through his attorney, complaining of Defendants alleges and states:

### I. JURISDICTION & VENUE

1.   This Court has jurisdiction of the claims against Defendants pursuant to 28 U.S.C. ss 1331 and 1337. This Court has jurisdiction over Plaintiff's state law claims against Defendants under the doctrine of pendant jurisdiction.

# EXHIBIT A

2. Venue is proper in this District as both the Plaintiff and the Defendants reside and do business in this District and the events and omissions giving rise to Plaintiff's claims arose in this District.

## II. PARTIES

3. Plaintiff at all times relevant herein was a resident of the City and County of Honolulu, State of Hawaii.

4. Defendant CITY & COUNTY OF HONOLULU, DEPARTMENT OF ENTERPRISE SERVICES ("Defendant DES"), has its principal place of business located at 777 Ward Avenue, Hawaii 96814. Defendant DES is a department of the City and County of Honolulu.

5. Defendants JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, and DOE PARTNERSHIPS 1-10, are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff, except that they are persons and/or entities who are in some manner presently unknown to Plaintiff engaged in the activities alleged herein; and/or are in some manner responsible for the injuries and damages to Plaintiff; and/or persons who conducted some activity in a negligent and/or willful manner; which conduct was the legal cause of the injuries or damages to Plaintiff and/or were in some manner related to the previously named Defendant engaged in the activities alleged herein; and Plaintiff prays leave to insert their true names and capacities, activities and/or responsibilities, whether individual, business or governmental when the same is ascertained. Plaintiff has be unable to ascertain the identities of these DOE Defendants through an examination of all documents available to him/her at this time.

6. All Defendants will be collectively referred to as "Defendants."

## III. FACTS

7. On or about April 1, 1987, Plaintiff began his employment with Defendant DES as a as full time painter.

8. Plaintiff's Performance Evaluation Report (hereinafter "PER") for November 1, 1996 to October 31, 1997 rated Plaintiff as excellent for quality of work; exceeds requirements for quantity of work and attitude toward work; and meets requirements for relationship with people.

9. Plaintiff's PER for November 1, 1997 to October 31, 1998 rated Plaintiff as excellent for quantity of work, quality of work, and attitude toward work; and exceeds requirements for relationship with people.

10. Plaintiff's PER for November 1, 1998 to October 31, 1999 rated Plaintiff as excellent for quantity of work, quality of work, attitude toward work and relationship with people.

11. Plaintiff's work as a painter for Defendant DES exposed him to hazardous components such as: mineral spirits, *xylene; *zirco salt as zr; titanium dioxide; *methol ethyl ketone; *toluene; solvent naphtha (petroleum), light aliphatic; vm&p naphtha, light aliphatic; *isopropyl alcohol; *cobalt salt as cu; butyl acetate, U.G., PM acetate; ethyl-3-ethoxypropionate; stoddard solvent type 1; 1,2,4-tryimethylbenzene; and others. (* indicates toxic chemicals)

12. The Material Safety Data Sheet describes exposure to the hazardous components described in #8 above to include: irritation to mouth, throat and gastrointestinal tract with acute central nervous system depression; headaches; dizziness; staggering gait; confusions; loss of consciousness; coma; confusion; nausea; vomiting; abdominal pain; diarrhea; severe eye irritation, burning, and blurred vision; dermatitis; chemical pneumonitis (potentially fatal); transient corneal damage; conjunctive irritation and burns; drying and cracking of skin; flushing and reddening of the face; feelings of increased body heat; disturbed vision; tremors; salivation; cardiac stress; CNS depression;

kidney, liver and lung disease; cancer; loss of appetite; pallor and bleeding gums; menorrhagia; petechiae and purpura may develop; damage to red blood cells causing blood in the urine; fatigue; weakness; unconsciousness; coma; and death.

13. On January 16, 1996, Plaintiff was appointed as a member of the Building Services Division Safety Committee (hereinafter "Safety Committee") by J. H. Wilkinson, Superintendent (hereinafter "Superintendent Wilkinson"). The functions of the Safety Committee include: a) advising the superintendent of occupational safety and health matters; b) review existing practices and rules related to occupational safety and health; c) suggest changes in existing practices and rules; d) review accidents and recommend corrective actions and preventative measures; e) identify work tasks which require the assignment of at least two employees for safety reasons; and f) conduct safety inspections at the request of the chairman or superintendent.

14. The Safety Committee was requested to convene beginning January 24, 1996, and monthly thereafter.

15. The Safety Committee chairman was to be elected at the first meeting held on January 24, 1996.

16. The Safety Committee chairman was requested to submit written meeting minutes to Superintendent Wilkinson within four (4) working days following each meeting.

17. The issue of Personal Protective Equipment (hereinafter "PPE") for employees was discussed in the first meeting of the Safety Committee on February 27, 1996 and consistently thereafter.

18. On or about July 1996 the Safety Committee recommended that a Safety Specialist be hired to advise Defendant DES of safety issues.

19. In a memorandum from Superintendent Wilkinson dated August 12, 1996, he advised the Safety Committee that the hiring of the Safety Specialist would be delayed due to "funding constraints."

4

20. On or about December 1996, Plaintiff raised issues to the Safety Committee regarding: a) the need for "respirators" for the painters, groundsworkers, chemical applicators and building maintenance personnel, and 2) a requirement that a certificate of medical clearance for respirator use would be required from the City and County of Honolulu, Department of Health.

21. On or about January 1997, names were submitted for trades and essential workers for respirator training classes provided by the City and County of Honolulu, Department of Health on or about April 1997.

22. On or about April 14, 1997, after the respirator training was completed, Plaintiff and other employees were issued certified cards by City and County of Honolulu, Department of Health, John E. Hall, MD (hereinafter "Dr. Hall").

23. Work related injuries for the Department of DES increased in number in 1996 from 1995.

24. On or about April 1997, Plaintiff was assigned to grind, sand, chip and re-paint the DES Blaisdell Center Concourse. Plaintiff, a co-painter, and two (2) Work Hawaii youths worked without the benefit of PPE as Defendant DES provided none. Plaintiff later learned that the underlying paint was lead-based and he, a co-painter, the Work Hawaii youths, as well as the public in the area, were exposed to the lead dust. The lead-based debris that was removed was swept into the rubbish dumpster and duck pond, which was not in compliance with federal and state laws.

25. In May 1997, the funding for the respirators and fit test kits had still not been approved and employees were continuing to work without respirators.

26. On or about July 1997, Superintendent Wilkinson instructed Plaintiff to undergo a second respirator test by the City and County of Honolulu, Department of Health.

27. In a letter from Island Environmental, Inc., Laboratory Manager Pete J. Baccetti to Plaintiff's Supervisor Lope B. Salvatierra, Enterprise Services Trades Section Supervisor, (hereinafter "Supervisor Salvatierra"), dated August 12, 1997, he wrote, "if lead is determined to be present, and demolition or renovation is to be performed on the building/structure where lead-containing material will be impacted, the contractor must (1) supply the employee(s) with PPE, and (2) utilize engineering controls, until a lead dust in air assessment has been performed to determine the airborne concentration of lead dust . . ." However, neither was implemented by Defendant DES for Plaintiff or co-painters working with lead-based paint surfaces.

28. On or about August, 1997, Plaintiff expressed concerns that the painters were being exposed to "lead" at work.

29. On or about August 1997, Plaintiff conducted tests on the paint of the main DES concourse which the painters were sanding and grinding for approximately nine (9) months. The paint tested positive for "lead." Witnesses to the testing were Chairman of the Safety Committee Mr. Dennard Byrd, United Public Workers Shop Steward Mr. John Kuamoo, and co-painter Mr. Marion Borges.

30. On or about August 27, 1997, the Safety Committee requested the results of tests conducted by Defendant DES on the paint issued to the painters for the presence of lead.

31. On or about September 1997, the City and County of Honolulu, Department of Health, Dr. Hall advised that Plaintiff could perform painting functions that require the wearing of a respirator for only one (1) hour per week.

32. In a memo by Superintendent Wilkinson dated September 12, 1997, he wrote, "Lead Samples. The test result of the main concourse paint samples was the same as that obtained unilaterally by Mr. Byrd and [Plaintiff]; specifically, positive for lead. The Trades Section Supervisor has the documentation."

6

33. On or about 1998, Defendant DES entered into a contract with Muranaka Environmental Consultants, Inc. for removal and disposal of asbestos containing material.

34. On or about 1998, Plaintiff was assigned by Supervisor Salvatierra to assist Electrician Paul Nguyen to remove lighting fixtures in the stars dressing rooms in the DES Arena. In the process of removing the lighting fixtures the ceilings were damaged. Supervisor Salvatierra instructed Plaintiff to re-paint the ceiling, which included scraping, chiseling, sanding and patching. Defendant DES failed to inform Plaintiff that the plaster lath ceiling contained asbestos >1-5% chrysotile and >1-2% tremolite, and Plaintiff worked without the benefit of PPE as none were available for his use.

35. On or about 1998, Defendant DES entered into a contract with Muranaka Environmental Consultants, Inc. for removal and disposal of lead containing material.

36. The contract with Muranaka Environmental Consultants, Inc. stated in relevant part, "[p]aint of the surfaces subject to renovation shall be considered lead-containing for the purposes of this contract. The work covered by this section includes removal of underlying asbestos-containing materials; and the procedures and equipment required to protect workers and occupants of the building or area, or both, from contact with lead. Personal protection shall be the responsibility of the Contractor when working on surfaces with any lead content in accordance with these specifications . . ." while at the same time, Defendant DES failed to provide PPE for Defendant DES employees working there.

37. In the Safety Committee meeting held on October 27, 1999, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were not being restocked for employee use.

38. From the inception of his employment, Plaintiff and co-painters were permitted to make work-related purchases.

39. On or about November 1999, Supervisor Salvatierra, stated to Plaintiff, "Jay doesn't want anybody to add anything to the [purchase order] list after [Superintendent Wilkinson] authorizes the purchases." However, Supervisor Salvatierra did *not* state that the policy and practice of making emergency supply purchases was to cease.

40. In the Safety Committee meeting held on November 24, 1999, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were still not being restocked for employee use.

41. In a memo from Superintendent Wilkinson dated January 25, 2000, he wrote, "PPE. Concur. Request the Senior Clerk take for action ASAP."

42. In the Safety Committee meeting held on February 23, 2000, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were still not being restocked for employee use and the fact that purchasing would not be completed until March 31, 2000.

43. In a memo from Superintendent Wilkinson dated February 29, 2000, he wrote, "PPE. Comments noted."

44. On February 28, 2000, Plaintiff was on his way to work at the Ted Makalena Golf Course when he and co-painters stopped at the Pacific Paint Center - which had been recently taken over by Spectra Tone Paint of Hawaii, Inc. (hereinafter "Spectra Tone") - and noticed that they had dust masks in stock for the first time in months. Plaintiff purchased two (2) boxes totaling twenty dollars ($20.73) from Spectra Tone, which Plaintiff wore as co-painter Leslie Oyama sprayed paint that day. After work, Plaintiff took the receipt and purchase order to Supervisor Salvatierra who was not in, so Plaintiff left the receipt on Supervisor Salvatierra's desk.

8

45. On February 29, 2000, Supervisor Salvatierra angrily accused Plaintiff of making an "illegal purchase." Plaintiff explained that the Safety Committee and painters have been waiting for months for dust masks and in the interim painters were working without the benefit of PPE or safety procedures which was against federal and state laws.

46. On March 2, 2000, Plaintiff was summoned into a meeting with Superintendent Wilkinson and Supervisor Salvatierra. In retaliation for engaging in protected speech, Superintendent Wilkinson issued Plaintiff a "Counseling Sheet" for: a) unauthorized procurement of goods, and b) insubordination in speaking with Supervisor Salvatierra on February 29, 2000.

47. The Counseling Sheet was the first form of disciplinary action ever received by Plaintiff since the inception of his employment on April 1, 1987.

48. Plaintiff's co-painters continued to make emergency supply purchases from Spectra Tone and submit the receipt with the purchase order to Supervisor Salvatierra who did not issue the co-painters a "Counseling Sheet."

49. On or about April 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra refused to communicate with Plaintiff or issue Plaintiff his daily work assignments.

50. On or about April 7, 2000, at 9:00 a.m., Plaintiff met with Mr. Anthony Buswinck of the State of Hawaii, Department of Labor and Industrial Relations, Hawaii Occupational Safety and Health Division. Defendant DES became aware of this meeting.

51. On or about April 6, 2000, at 2:30 p.m., Plaintiff met with City and County of Honolulu Safety Specialist Alan Hiramatsu. Defendant DES became aware of this meeting.

52. On or about April 10, 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra held a meeting for all of the tradesmen, including painters, air condition repairmen, mechanics, electricians, plumbers and soundmen. Supervisor Salvatierra stated, "one person [Plaintiff] is an unhappy camper right now and he's trying

9

to put me in trouble . . . I want to make everybody aware if you're a part of this you'll be accountable for this, because I just want to make sure, because this is going to happen . . . He's [Plaintiff] trying to get me. So I'm just trying to tell you, I received a warning on Friday. So, I'm letting you know that everyone's concerned about this. So right now I'm going to go to the authority because I have some safety jeopardy on myself here . . ."

53. On or about April 2000, in retaliation for engaging in protected speech, Superintendent Wilkinson began interrogating Plaintiff's co-workers - questioning them about Plaintiff.

54. On or about April 2000, a Defendant DES supervisor informed Plaintiff that he was warned to "be very careful whenever you speak to [Plaintiff]."

55. On or about April 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

56. On or about April 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra falsely accused Plaintiff of "building a case against him" and falsely stated that he was "scared" of Plaintiff.

57. On or about April 2000, in retaliation for engaging in protected speech, Defendant DES began an investigation of Plaintiff pursuant to the false allegations by Supervisor Salvatierra. Plaintiff was ordered to attend four (4) investigative meetings into the false allegations by Supervisor Salvatierra on April 11, 14, 28, and May 11, 2000.

58. On or about April 24, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

59. On or about May 1, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

60. On or about May 8, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

61. On or about May 1, and 10, 2000, Plaintiff filed a workers compensation claim for long term exposure to dangerous chemicals.

62. Plaintiff was retaliated against for speaking out against Defendant DES' failure to properly train the painters, failure to provide PPE for the painters, failure to monitor and supervise the painters, failure to provide guidelines or policies and procedures for the painters, failure to warn the painters of exposure to dangerous chemicals and substances, failure to protect the public from exposure to dangerous chemicals and substances, failure to properly dispose of dangerous chemicals and substances, failure to comply with State of Hawaii laws, failure to comply with federal laws, and others.

63. Defendant DES' retaliatory actions towards Plaintiff were substantially motivated by Plaintiff's exercise of protected speech on matters of public concern. The United States Supreme Court has recognized that a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Meyers, 461 U.S. 138, 140, 103 S. Ct. 1684, 1686, 75 L. Ed. 2d. 708 (1983) (citing Pickering v. Board of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d. 811 (1968)). A fundamental design of the First Amendment is to foster participation in the interchange of political and social ideas without suffering retaliatory employment actions. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Connick, 461 U.S. at 144-45, 103 S. Ct. at 1688-89.

## COUNT I

(Freedom of Speech)

64. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 63 above as though fully set forth herein.

11

65. Defendant DES violated Plaintiff's First and Fourteenth Amendment rights under the United States Constitution and Hawaii State Constitution at Article I, Section 4. As a result of the above statements, acts and/or conduct of Defendant DES, individually and/or collectively, Plaintiff did suffer and continues to suffer severe mental and/or emotional distress and thereby sustains damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT II

(Hawaii Whistleblowers Protection Act)

66. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 65 above as though fully set forth herein.

67. Defendant DES violated Plaintiff's rights under the Hawaii Whistleblowers Protection Act, Chapter 378, Hawaii Revised Statutes. As a result of the above statements, acts and/or conduct of Defendant DES, individually and/or collectively, Plaintiff did suffer and continues to suffer severe mental and/or emotional distress and thereby sustains damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT III

(Intentional Infliction of Emotional Distress)

68. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 67 above as though fully set forth herein.

69. The above statements, acts and/or conduct of Defendant DES, individually and/or collectively, constitute intentional infliction of emotional distress, extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society, all done with malice and the intent to cause, or the knowledge that it would cause, severe mental and/or emotional distress to Plaintiff.

## COUNT IV

(Negligent Infliction of Emotional Distress)

70. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 69 above as though fully set forth herein.

71. By their above statements, acts, and/or conduct, Defendants, individually and/or collectively, constitute negligent infliction of emotional distress upon Plaintiff who, as a proximate result of said mental and/or emotional distress did sustain damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT V

(Punitive Damages)

72. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 71 above as though fully set forth herein.

73. The above statements, acts, and/or conduct of Defendants, individually and/or collectively, demonstrate extreme and outrageous conduct sufficient to justify an award of punitive or exemplary damages for Plaintiff, in an amount to be demonstrated at the time of trial herein.

WHEREFORE, Plaintiff prays as follows:

a. that Plaintiff be awarded compensatory damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial;

b. that Plaintiff be awarded special damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial;

c. that Plaintiff be awarded exemplary or punitive damages in an amount to be determined at trial;

d. that Plaintiff be awarded attorney's fees and litigation expenses of filing and prosecuting this lawsuit; and

e. that Plaintiff be awarded such other and further relief as this Court deems necessary and proper.

DATED: Honolulu, Hawaii, June 2, 2000.

                                                                                            _____
VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HOWARD W.C.C. TOM SUN )<br>)<br>         Plaintiff, )<br>   vs. )<br>)<br>CITY & COUNTY OF HONOLULU, )<br>DEPARTMENT OF ENTERPRISE )<br>SERVICES; JOHN DOES 1-10; JANE )<br>DOES 1-10; DOE CORPORATIONS )<br>1-10; AND DOE PARTNERSHIPS 1-10, )<br>)<br>         Defendants. )<br>_____ ) | Civil No. _____<br>(Non-motor Vehicle Tort)<br><br>DEMAND FOR JURY TRIAL |

## DEMAND FOR JURY TRIAL

COMES NOW, HOWARD W.C.C. TOM SUN, Plaintiff above-named and hereby demands a trial by jury and all issues so triable.

DATED: Honolulu, Hawaii, June 2, 2000.

_/s/ Venetia K. Carpenter-Asui_
VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

# United States District Court

FOR THE DISTRICT OF HAWAII

Howard W.C.C. Tom Sun,

    Plaintiff,

V.

City & County of Honolulu,
Department of Enterprise Services;
John Does 1-10; Jane Does 1-10;
Doe Corporations 1-10; and Doe
Partnerships 1-10,

    Defendants.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

TO: (Name and address of defendant)

ABOVE-NAMED DEFENDANTS

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

VENETIA K. CARPENTER-ASUI, ESQ.
The Law Office of Venetia K. Carpenter-Asui
City Center, Suite 600
810 Richards Street
Honolulu, Hawaii 96813

an answer to the complaint which is herewith served upon you, within __twenty (20)__ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

WALTER A.Y.H. CHINN

CLERK

(BY) DEPUTY CLERK

DATE    JUN 0 6 2000