# Thomas T. Ueno, CPA

**844 Queen Street**
**Honolulu, Hawaii 96813**

**Fax 808 591-0813**
**808 591-0441**
E-mail  tueno@hawaii.rr.com

February 6, 2006

Roger S. Moseley, Esquire
Moseley Biehl Tsugawa Lau & Muzzi
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii 96813

RE:     Philip E. English vs City and County of Honolulu, et al.
        Civil No. 04-00108 SOM/KSC

Dear Mr. Moseley:

My rebuttal comments to the report issued by Mr. Von Gunthener on this matter are
presented below.  I reserve the right to update my opinions as additional information
becomes available.

In preparing this report and forming the opinions expressed below, I considered the
information provided in my initial report and that provided in Mr. Von Gunthener's
report.  I also considered my knowledge, training and professional experience as a
professional accountant.

A summary of my qualifications was presented in Attachment B to my initial report.

I am being compensated at our normal hourly rates for this type of work of $285 per hour
to $345 per hour for deposition/testimony; manager at $225 per hour; and professional
staff at $185 to $195 per hour.  Our compensation is not contingent on the outcome of
this litigation.

The cases in which Thomas T. Ueno CPA has testified as an expert at trial or by
deposition within the preceding four years were listed in Attachment C to my initial
report.

# EXHIBIT   C

**Summary**

Mr. Von Guenthner, expert witness for Philip English, presented no calculation of damages. He instead argues that Philip English was not truthful on his employment application with the City. He says the City would not have hired him had the City known about the discrepancies (as alleged by Mr. Von Guenthner). Hence, Mr. Gunther concludes, there are no damages. Mr. Von Guenthner simply states, "Based on the medical history, work history and other references herein, I believe that it has been Philip English's good fortune to have received $85,000 from the City already. I do not believe that he is entitled to any more money." (DVG 5)

We do not opine on areas outside of our expertise as experts in accounting and finance and offer no rebuttal for Mr. Von Guenthner's opinions about no liability to the City and County of Honolulu.

**Analyses**

*1. English's Application*

Mr. Von Guenthner argues:

- "The Plaintiff's application omitted two part-time jobs that he had as a clerk in a paint department at City Mill and as a carpet cleaner for Electrolux. Had this information been provided, it may have led the interviewer for this City job to focus on Mr. English's mental health issues the years preceding taking the job. That, in itself, should have been enough to clue the interviewer into the fact that Mr. English may have lacked enough fortitude to do his job without his past history of psychological problems coming back into play at the workplace."

Ueno Response:

It is unclear what methodology commonly used by financial experts that Mr. Von Guenthner used to form his opinion.

Mr. Von Guenthner cites no sources that link part-time employment to lack of "enough fortitude to do his job without his past history of psychological problems coming back into play at the workplace."

According to the State of Hawaii's Department of Labor, in 2003, 7.6 percent of the labor force worked two or more jobs. Mr. Von Guenthner has not cited any sources that link multiple jobs to Mr. English's "fortitude" or ability to perform his job functions.

*2. English Promoted*

Mr. Von Guenthner argues:

- "Philip English was promoted to Appraiser IV and began to have problems with his ability to perform his job adequately. He blames this poor performance as an Appraiser IV on the retaliation of most of the staff at the Real Property Assessment Division. It is my opinion, more likely than not that Plaintiff at that time he was not competent to do the job based upon other factors which impacted his life." (DVG 4)

Ueno Response:

Mr. Von Guenthner is apparently agreeing that prior to being promoted, Mr. English performed as an Appraiser II and III at least adequately. His review for the period June 1, 2000 through May 31, 2001 shows that his performance at the Appraiser III Level exceeded the requirements of the position. At that time, Ann Gima commented:

> During this evaluation period, Philip has been promoted from Appraiser II to Appraiser III position. He was involved in the review and preparation for a case at the Tax Appeal Court, which has since been settled and is currently in the process of preparing for another two appeals before the Tax Appeal Court. He is also responsible for researching and defending all 2001 appeals before the Board of Review as well as the analysis necessary for the 2002 assessment.

> Philip's background and foundation in the real estate profession have been extremely valuable in all the court cases and at the Board of Review. He has displayed a good understanding and insight into the tax laws and has learned the basic office procedures.

> He has a good attitude toward his work and is responsible and works well with his fellow employees. He has shown himself to be tactful and courteous in his dealings with the public.

> Philip's work exceeds the minimum requirement of the position and a satisfactory rating is recommended.[1]

Mr. English's personnel file shows that Mr. English was promoted twice; clearly documenting that he could perform his prescribed duties. Mr. Von Guenthner's reasoning that Mr. English's employment application is related to Mr. English's ability to perform his duties is unclear.

*3, Avoiding Taxes*

Mr. Von Guenthner argues:

---

[1] PE00568

- "I conclude that Plaintiff appears to have avoided paying taxes to various governmental agencies. The Plaintiff signed the 2003 and 2004 tax returns knowing that he has earned cash and barter income that was not disclosed."

Ueno Response:

We have not checked into this matter because we find that it does not relate to the scope of our assignment, which was to determine the loss incurred by Mr. English. Paying taxes on unrelated matters is not a factor to consider in estimating the damages Mr. English incurred.

*4. Credit Lines*

Mr. Von Guenthner argues:

- "It is my opinion that Plaintiff used the credit lines of his creditors to their detriment during the time that he was psychologically impaired and incapable of working." (DVG15)
- Mr. Von Guenthner goes on to incorrectly analyze Mr. English's divorce and bankruptcy filing. Stating that the Mr. English "the total debts absorbed by the Plaintiff consequently are total $43,800...In the Voluntary Petition, the Plaintiff listed $194,035 of unsecured creditors. Most of the debts were to credit card companies for credit card purchases totaling $161,966...During this 17 month period the Plaintiff incurred debts of $150,235, ($194,035-$43,800)...The Plaintiff spent an average of $8,837 per month ($150,235 divided by 17)."

Ueno Response:

It is unclear what this allegation or Mr. English's bankruptcy has to do with computing the losses suffered by Mr. English related to this lawsuit.

In addition to this allegation having nothing to do with the computation of damages suffered by Mr. English with regards to this lawsuit, Mr. Von Guenthner's analysis is incorrect.

At the time of Mr. English's divorce from Ms. Corlis Chang, there was at least $107,778 in joint debt which was later included in Mr. English's bankruptcy filing. Mr. English's creditors did not release his obligation at the time of his divorce. Both he and Ms. Chang remained obligated to the creditors after the divorce.

| | |
|---|---:|
| Bank of Hawaii P-flex | 5,000 |
| Bank of Hawaii P-flex | 20,000 |
| MBNA | 40,215 |
| First Card Visa | 13,689 |
| Fleet Advanta | 8,613 |
| Discover | 7,906 |
| Household Bank (Prime Option) | 7,127 |
| Office Max | 2,155 |
| Computer City | 3,073 |
| Joint Debts | 107,778 |

According to Mr. English's bankruptcy filing, there were additional debts incurred prior to the divorce which appear to be erroneously not included in the divorce filings including an additional $5,578:

| | |
|---|---:|
| Bankamericard  1991-1996 | 1,381 |
| Chevron  1993-1998 | 50 |
| GTE Mobilnet  1996 | 1,021 |
| IKON Office  1998 | 1,000 |
| Liberty House  1985-1998 | 1,926 |
| UNOCAL  1998 | 200 |
| Unlisted Debts | 5,578 |

According to Mr. English, Ms. Chang handled all of the couple's financial matters, including any refining done with various credit card companies. When he filed his personal bankruptcy, he did not have complete documentation of all of his (both individual and joint) debts incurred prior to 1999. As such, Mr. English's credit report was used to determine who his creditors were. As such, it is possible that the following creditors were double counted in his bankruptcy filing (even if they were not double counted, the debts were incurred prior to the 1999 divorce):

| | | |
|---|---:|---:|
| First Card Visa  1993-1997 | 15,000 | |
| First USA  1981-1996 | 9,000 | 9,000 |
| Advanta (Fleet Bank) 1993-1997 | 9,000 | 9,000 |
| Fleet Bank 1991 (Advanta) | 9,604 | |
| Household Bank 1993-1997 | 7,500 | |
| Household Bank 1995 | 7,500 | 7,500 |
| Potentially Double Counted Debts | | 25,500 |

Another nearly $9,000 was incurred by Mr. English for medical costs.

| | |
|---|---:|
| Hilo Medical Group  1999 | 25 |
| Queen's Medical Center  1999 | 4,500 |
| Radiology Assoc.  1999 | 4,160 |
| Honolulu Medical Group  1999 | 14 |
| Dr. Yano  1999 | 213 |
| Medical costs | 8,912 |

If the joint debts, unlisted debts, potentially double counted debts, and medical costs, are accounted for, then Mr. English only incurred $2,467 in "new debt" during the period, not the $150,235 sighted in Mr. Von Guenthner's report.

| | |
|---|---:|
| Joint debts | 107,778 |
| Unlisted debts | 5,578 |
| Potentially double counted debts | 25,500 |
| Medical Costs | 8,912 |
| Personal Debt on Divorce | 43,800 |
| | 191,568 |
| Bankruptcy Filing | 194,035 |
| "New Debt" | 2,467 |

It is also important to note that according to Mr. English's bankruptcy filing, the following debts were incurred at some point during 1999:

| | |
|---|---:|
| Capitol One 1999 | 1,000 |
| GTE  1999 | 2,140 |
| Shell Oil   1999 | 70 |
| Sterling & Klientop  1999 | 570 |
| | 3,780 |

These debts could have been incurred prior to the divorce filing, and might not be new debt at all.  If this is indeed the case, then Mr. English actually reduced his debt over the 17 month period in question.[2]

*5. Dr. Reneau Kennedy's Report*

Mr. Von Guenthner argues:

- "Ueno failed to identify the following information on the same page (22) of Dr. Reneau Kennedy's report:"
  - If there is an alternated placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or possibly full time work.

---

[2] Reneau Kennedy RE Philip English 91-94, 146-152

- ○ Ueno did not even consider the Plaintiff working as a guard at 40 hours per week which would compute to $16,640 ($8 x 40 hours per week x 52 weeks). Further Ueno did not consider the Plaintiff working at a job that could have fully mitigated any lost wages.
- ○ Ueno did not consider that the Plaintiff had severe psychological problems the year before starting his job at the City and he still was able to function acceptably at Appraiser II and Appraiser III. Ueno simply assumed that Plaintiff's mitigation was to be $8 per hour for a 12 hour week. Assuming the Plaintiff is entitles to any damagers, there should have been a calculation or at least commentary that Plaintiff could have fully mitigated the special damages if he recovered mentally and was able to return to comparable work." (DVG 43-44)

Ueno Response:

I identified Dr. Kennedy's entire report in "Attachment A-1" of my report as a part of the information I considered in computing the damages suffered by Mr. English. Mr. Von Guenthner identifies the precise reason I used part-time instead of full-time employment as the basis for Mr. English's mitigating earnings. The Kennedy report as quoted by Mr. Von Guenthner states that Mr. English could "possibly" return to full time work. The use of the word "possibly" makes returning to full-time employment speculative.

Mr. Von Guenthner failed to identify Dr. Daryl Matthews report which states:

> "Also important are Mr. English's current employment difficulties. He continues to exhibit diminished confidence that he can express himself at work without fear of retribution. His personality disorder features undermine the ability necessary to lift himself out of his occupational decline. He lacks the interpersonal skill set to recover from his work injury and develop a new career at his previous level of employment. In short, his mental health disorders prevent his ability to "bounce back," and continue on in some productive employment venue. His long-term prognosis is not good." (Matthews page 3)

The results of Dr. Matthews' examination show that it is more likely that Mr. English will not return to his chosen profession. Mr. English has lost the capacity to earn similar wages from that profession.

*6. Normal Life Expectancy*

Mr. Von Guenthner argues:

- "My opinion is that the normal life expectancy is only one possibility of the method to compute special damages. From the above information, the life expectancy requires a comparative time to reflect his cancer and his suicidal tendencies. Without further documents to focus on an actual time period opined

by the appropriate physician, it appears that Plaintiff may have a life expectancy of as few as three to five years." (DVG 47)

Ueno Response:

Mr. Von Guenthner is correct; normal life expectancy is only one possible method to compute special damages. The National Vital Statistics Reports prepared by the United States Department of Health, which I chose to use as a basis for my calculation, is one of if not the most commonly used sources used to calculate life expectancy.

The statistics provided by the Department of Health include individuals who have died due to illness, or accidents as well as those from "natural" deaths. Using statistics from a United States Government office is a standard methodology used by CPAs to compute life expectancy. Mr. Van Guenthner has failed to provide documentation of any other methodology commonly used by financial experts to form his opinion.

If, as Mr. Van Guenthner states, he requires a physician to opine on life expectancy, then the support for his conclusion that "Plaintiff may have a life expectancy of as few as three to five years" is unclear. Mr. Von Guenthner provided no supporting medical testimony.

*7. 12 Hours Per Week*

Mr. Von Guenthner argues:

- "Plaintiff's testimony identifies additional work above 12 hours per week, yet Ueno has assumed the rate of 12 hours a week until retirement. I believe that is an erroneous assumption since Plaintiff admits to working more." (DVG 48)

Ueno Response:

During brief periods, Mr. English has been able to work more than 12 hours per week. Since leaving his position at the City, Mr. English has been unable to work 12 hours per week. It is unclear how Mr. Von Guenthner addresses the issue of Mr. English working fewer than 12 hours per week. We considered Mr. English's ability and the conditions of the marketplace in determining mitigating earnings. Mr. English has been unable to secure permanent work which may provide him longer hours.

Mr. Von Guenthner has failed to opine on the number of hours Mr. English is likely to work in the future.

*8, Factual Information on Application*

Mr. Von Guenthner argues:

- "My opinion is that, if Plaintiff had provided factual information on the application, it is more than likely that he would never have been hired for the job. If Plaintiff had not been hired, there would be no lawsuit and no damages." (DVG 8)

Ueno Response:

Prior to exposing potential misuse of City resources, Mr. English received high employee evaluation scores. Mr. English was promoted numerous times. City managers praised and promoted him. Mr. English not only performed his expected job but demonstrated capabilities beyond his present job.

Mr. Von Guenthner has cited no support for his opinion that the City would not have hired Mr. English. Mr. English had years of documented experience in the appraisal industry.

*9. Successful Appraiser*

Mr. Von Guenthner argues:

- "If the application had indicated the losses identified above, it is likely that the City personnel may have questioned the Plaintiff's ability to be a successful appraiser and abstained from hiring him. When the Plaintiff indicated that he had a business for 10 years with 12 appraisers and a staff earning $40,000 for all those years, the City was misled believing that Plaintiff was a successful and accomplished appraiser." (DVG 13)
- "If Plaintiff had listed his unemployed period in 1998, 1999, and 2000, City personnel could have found out about his psychological problems and a related suicide attempt during that period of unemployment. If the employment misrepresentation on the application had been accurately stated it may have been sufficient information for the City not to have hired him" (DVG 13)
- "The evidence also reflects that the Plaintiff's representations are not factually based that he had 12 appraisers + staff from 1994 through 1999" (DVG 13)

Ueno Response:

Mr. Von Guenthner provided no evidence confirming the City's hiring policies and guidelines as stated above. He cited no interviews with the City's human resource managers or any departmental interviews.

Mr. Von Guenthner's argument relating an "accomplished appraiser" and a business owner is flawed. Being a proficient and competent appraiser alone has little to do with operating a successful appraisal business. There are numerous factors in addition to technical knowledge which result in a successful business. These include a successful marketing program, being able to bid on work correctly, having the right connections to secure work, securing financing, and developing and training employees. Just because a player is an all star football player does not mean he is capable of owning a team.

Mr. Von Guenthner believes that Mr. English business was a failure. He has provided no analysis or information to support this conclusion.

Mr. English was licensed by the State of Hawaii as a Certified General Appraiser.[3] Mr. English had the ability to appraise real estate. To become a Certified General Appraiser, candidates are required to complete,

> "at least one hundred sixty-five classroom hours with particular emphasis on the appraisal of nonresidential properties…at least thirty classroom hours directly related to income valuation and at least thirty classroom hours directly related to the valuation of nonresidential property…two thousand hours of appraisal experience," and "successfully pass the appropriate examination which has been approved by the Appraiser Qualifications Board of the Appraisal Foundation."[4]

State of Hawaii statistics show that there are currently fewer than 200 licensees residing on Oahu.

Mr. English ceased operations of Philip English and Associates in an attempt to comply with his physician's recommendation to make his life less stressful.[5]

*10. FBI and IRS*

Mr. Von Guenthner argues:

- "Since I also have a common practice of turning individuals over to the FBI and the IRS, that Plaintiff contacted these federal agencies in an attempt to bolster their case. It is a tactic that obviously failed." (DVG 31)

---

[3] PE00328
[4] Hawaii Administrative Rules Title 16, Chapter 114
[5] Deposition of Philip English, Volume 1, page 43, lines 19-25.

- "I am not aware of any action taken at all by the FBI or the U.S. Attorney's offices. That being the case, it then proves that there was not enough substance or issues to have motivated these agencies to act." (DVG 31)
- "On January 22, 2003 Roger S. Moseley, Esq., counsel for Plaintiff, filed a formal complaint to the Honolulu Ethics Commission on behalf of Plaintiff. (Book 024).
   - In my opinion, the letter was drafted to facilitate this lawsuit." (DVG 31)

Ueno Response:

Mr. Von Guenthner's methodology to support his opinion "that there was not enough substance or issues to have motivated these agencies to act" is unclear. Mr. Von Guenthner appears to be making an argument related to liability and not damages. Mr. Von Guenthner also appears to be opining on federal agencies' investigative practices.

*11. Newspaper Articles*

Mr. Von Guenthner argues:

- "In my opinion, these newspaper articles painted a picture of a terrible public problem at the Assessor's office. There obviously had to be investigations done to verify the truth of the Plaintiff's allegations. I am not aware of any action taken to correct this problem painted by the lawsuit and Plaintiff's lawyer, perhaps there was none needed." (DVG 34)

Ueno Response:

Mr. Von Guenthner's methodology that he relied on to form this opinion is unclear.

*12. Whistle Blowing Issue is Moot*

Mr. Von Guenthner argues:

- "In my opinion…There is no other evidence or support to the allegations, this entire whistle blowing issue is moot." (DVG 36)

Ueno Response:

Offering such an opinion is not within our expertise as experts in finance and accounting.

Mr. Von Guenthner argues:

- "There is no other evidence or support to the allegations, this entire whistle blowing issue is moot. The "Whistle-Blowing Value" appears to be a big to do about nothing. Plaintiff obviously alienated himself from the staff and management of the division by his actions and deeds and his emotional instability

exacerbated this process into enormous claims against the City and County of Honolulu" (DVG 43)

Ueno Response:

The methodology that Mr. Von Guenthner relied on to form this opinion is unclear.

*13. Superiors Conspired*

Mr. Von Guenthner argues:

- "Plaintiff was not working in his Appraiser IV job effectively. Ueno may argue that due to the "Whistle Blower" issue that the Plaintiff's superiors have somehow conspired to rank him low to get even with him. I am not aware of any proof to that claim and I therefore side on the documents to attest to facts." (DVG 44)

Ueno Response:

Mr. English's performance evaluation timeline:

6/1/00 – 8/31/00 - All performance factors "Meets" or "Exceeds" Requirements
2/5/01 - Promoted from Real Property Appraiser II to Real Property Appraiser III
2/1/01 – 4/30/01 – All performance factors "Exceeds" Requirements
5/1/01 – 7/31/01 – All performance factors "Exceeds" Requirements
2/02 – Claims made against employees
6/1/01 – 5/31/02 – All performance factors "Meets" Requirements

Mr. English received high performance evaluations prior to his whistle blowing allegations of misuse of government funds.    The above chronology shows that his supervisors claimed his performance was substandard only after Mr. English reported his findings of misuse of government funds.

*14. Comparable Alternative Employment*

Mr. Von Guenthner argues:

- "Ueno's report reflects, "Since his departure from the City, Mr. English has searched for comparable alternative employment; but with little success. He has been unable to secure employment that would place him in a similar field or provide him with equivalent promotional opportunities, compensation, benefits and working conditions. Mr. English has found it difficult to secure any type of employment; he has been force to accept what few positions have been offered to him…Ueno's report was issued prior to the deposition of the Plaintiff. It is not known how Ueno could make such and inaccurate statement or otherwise base it

as an assumption in his report. Evidence shows the Plaintiff has not tried to gain employment in the field of real estate appraisal at all." (DVG 44-45)

Ueno Response:

We interviewed Mr. English to determine his employment status and results of his job search. Given his past illnesses, Mr. English's primary focus was on finding employment that would provide him with comparable medical benefits. He has been unable to secure any "substantial" employment. Mr. English is unable to secure work in the real estate appraisal field because he is emotionally incapable of doing so, as evidenced in Dr. Matthews' report.

Mr. Von Guenthner argues:

- "Ueno's report includes, 'Mr. English would be promoted to and SR24 beginning on February 28, 2004 in accordance with his historical promotion pattern. Similarly, as of February 28, 2005, Mr. English would move from Step D to a Step E,' (Attachment A – Page 3).
  - o Thomas Riddle, Workers' Compensation Administrator for the City and County of Honolulu, on March 18, 2003 wrote (Book 017 @ page 310), '…I offered to try to find an alternate temporary work location for Mr. English so he would not be without income during this period. He said he would have to consult his doctor regarding this. After the meeting with Mr. English, I called various individuals within his department, and a completely different story unfolded. Which cast doubt on Mr. English's allegations and the reason for his claim. These include the possibility that he filed this claim to overcome allegations of poor work performance, personal problems affecting his job, and complaints of work harassment filed by other employees." (DVG 47)

Ueno Response:

It is unclear exactly what Mr. Von Guenthner's opinion is regarding these quotes. He does not offer an opinion.

It is also important to note that "Step" advances are made not on merit, but on the time worked in a position. Based on contracts between the Hawaii Government Employees Association and the City, step increases are given every two to three years.

*15. Bankruptcy*

Mr. Von Guenthner argues:

- Mr. English's Bankruptcy

Ueno's Response

It is unclear what connection Mr. Von Guenthner attempts to make between Mr. English's personal bankruptcy and his lost wages.

<u>Mitigating Earnings</u>

It appears as though Mr. Von Guenthner does not agree with my assumption regarding Mr. English's potential future employment.   Mr. Von Guenthner notes that I "did not even consider the Plaintiff working as a guard at 40 hours per week...Further Ueno did not consider the Plaintiff working at a job that could have fully mitigated any lost wages." (DVG 43).

I considered these factors when estimating Mr. English's potential for future employment. For example, I calculated his probable earnings as a security guard from the day after he left employ at the City through the end of his estimated work life.  Mr. English has been unable to secure any work beyond his current employ.  I relied on the testimony of the psychological experts to determine if he would be able to work full time.

My research into whistle blowers shows that there is little chance Mr. English will return to the appraisal field, "Dr. Penina Glazer, the co-author of a major study on whistle blowing, testified in one case that it was 'extremely difficult, if not virtually impossible' for whistleblowers to find 'comparable work in the same industry after blowing the whistle.'"[6]

Thomas T. Ueno, CPA

---

[6] Concepts and Procedures in Whistleblower Law, Stephen Kohn page 332.