***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1    IN THE UNITED STATES DISTRICT COURT CIRCUIT

2                STATE OF HAWAII

3                    ---|---

COPY

4  PHILIP E. ENGLISH,           ) CIVIL NO.CV04-00108 SOM KSC
                                )
5            Plaintiff,         )
                                )
6       vs.                     ) TRIAL DATE: 10/02/2006
                                )
7  CITY AND COUNTY OF HONOLULU; )
   GARY T. KUROKAWA;            )
8  ROBERT O. MAGOTA;            )
   ANN C. GIMA; and             )
9  GK APPRAISALS, INC.;         )
   JOHN DOES 1-10;              )
10 JANE DOES 1-10;              )
   DOE PARTNERSHIPS;            )
11 DOE CORPORATIONS 1-10;       )
   AND DOE ENTITIES 1-10,       )
12                              )
             Defendants.        )
13 _____)

14

15           DEPOSITION OF THOMAS UENO, C.P.A.

16  Taken on behalf of the Defendant GK Appraisals, Inc., at

17  the law offices of Sumida & Tsuchiyama, Dillingham

18  Transportation Building, 735 Bishop Street, Suite 411,

19  Honolulu, Hawai`i 96813 commencing at 9:05 a.m., on

20  Wednesday, July 26, 2006, pursuant to Notice.

21

22  BEFORE:
               Valerie Mariano, CSR No. 353
23             Notary Public, State of Hawai`i

24

25                    **EXHIBIT B**

CARNAZZO COURT REPORTING COMPANY, LTD. (808) 532-0222

1  A.  You know, I'm not sure whether there have been studies
2  as to the --
3  Q.  Accuracy of assumptions from that method?
4  A.  Well, not the accuracy of the assumptions, but as to
5  the rate of error.  This is -- the methodology that we use
6  is one that's commonly used.  You know, it's published and
7  everything else.  It's commonly used by CPAs in doing our
8  work in this particular area.  I have not seen --
9  Q.  Are you referring to the method of drawing assumptions
10 from materials given to you by attorneys and from the
11 subject --
12 A.  That's correct.
13 Q.  -- and the records provided to you?
14 A.  That's correct.
15 Q.  But there's no known rate of error for those
16 assumptions drawn from those sources?
17 A.  Well, it's a -- again, it's a commonly used
18 methodology.  It's something that's --
19 Q.  Right.
20 A.  -- you know, taught to us in school --
21 Q.  But my --
22 A.  -- on how to do it.
23 Q.  -- question is, is there any known rate of error?
24 A.  And my answer to you is I don't know.
25     MR. MOSELEY:  Tony, at this point I would like to make

***COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)***

1  the record clear that the information provided by me to
2  Mr. Ueno is the information in that book.  It's not like
3  there were two different sets of information.  That -- he's
4  brought that information with him today.  That's the
5  information on which he relied to make his assumptions that
6  he plugged into his formula to do the calculations.
7  Q.    (By Mr. Wong)  This method that you're using, can it
8  be tested?  And if so, how?
9  A.    Hmm.  Well, the answer is yes, it can be tested.  You
10 can -- and the method of testing it is just to eliminate
11 some of the things that we looked at.  You can eliminate
12 the documents, for example, and you can see whether you can
13 come up with the same assumptions.  Okay.  I don't -- I
14 don't know of any tests that have been done.  This is --
15 again, this is a commonly used -- you know, we use it in
16 auditing.  Okay.  In all of the other work that we do, we
17 use this methodology as to how we actually get our
18 information on which we rely upon.
19 Q.    Well, what we're talking about here is trying to
20 project a future income based on whatever kind of method it
21 is you're following.
22 A.    That's not the question you asked me.
23 Q.    I'm sorry.  Let me ask you that question.
24        In terms of trying to project a future income --
25 A.    Uh-huh.

1  Q.    -- from materials such as you have in front of you,
2  has the accuracy of the method you're following been tested
3  to determine if it --
4  A.    Well --
5  Q.    -- can predict the future?
6  A.    -- as -- has it been tested?
7  Q.    Yes.
8  A.    I don't know of any tests, specific tests that have
9  been done on the methodology.  The methodology
10 incorporates, you know, sound specific methods, okay, such
11 as present valuing, such as looking at historical
12 information, okay, and using -- and again, on the
13 assumptions, all the sources that we mentioned.  Okay.  It
14 incorporates all of that.  I don't know of any specific
15 tests that have been made on this methodology.  It's
16 commonly used.  It's accepted by the courts.  You know,
17 we've testified using this methodology many, many times.
18 It's published.
19 Q.    Okay.  For example, you're not aware of any studies, I
20 take it, where people have done projections such as the one
21 you've done here and then later on as the future evolves
22 compared the projections to what actually transpires?
23 A.    I'm not aware of any of those type of studies.
24 Q.    You said that this method that you're following has
25 been published.

1  A.  Yes, it has been.

2  Q.  Can you tell me what articles and by whom?

3  A.  It's under the -- we call it the Practitioners -- call

4  it PPC.  Okay.  It's a -- a service that we subscribe to.

5  It's probably -- it's used -- widely used by CPAs.

6  Q.  Who's the author of this publication that you're

7  referring to?

8  A.  I don't know.  It's publish -- Publishers Clearing

9  House, publisher.

10 Q.  How many times has the method -- how many times has

11 the method that you're using been published?

12 A.  Probably thousands and thousands of times.

13 Q.  You say "probably."  But how about insofar as your

14 personal knowledge goes, how many times has it been

15 published?

16 A.  All I remember -- well, I don't know.  All I can say

17 is thousands and thousands of times because it's been in

18 existence for years and years and years.  And it's

19 something that is widely used by CPAs all over the country.

20 So that's all I can tell you.  I don't know what their --

21 you know, the number of their sales are.

22 Q.  Okay.  Well, I don't mean to disparage your

23 profession, but let me just put it this way:  One could say

24 that voodoo's been in existence for thousands of years and

25 been used a lot, but that doesn't necessarily mean it's

1  Q.  -- you say, I do not believe that Mr. English is able
2  to return to his usual and customary duties in the same
3  workplace either full-time or part-time, quoting
4  Dr. Kennedy there.  How did that affect your assumptions or
5  your ultimate conclusion?
6  A.  Well, it affected it from the standpoint that we
7  accepted his mitigated earnings.
8  Q.  Well, did you assume from Dr. Kennedy's statement that
9  he would not return to any kind of employment as an
10 appraiser or just not return to employment in the Real
11 Property Assessment Division of the City and County, or did
12 you assume something else from that?
13 A.  We assumed something else from that.
14 Q.  What did you assume?
15 A.  We assumed that his mitigated earnings was his
16 mitigated earnings.
17 Q.  What do you mean by that?
18 A.  That what he earned is what he got.  That's what he
19 would be getting in the future also.
20 Q.  So you're assuming that Mr. English will work as a
21 security guard for the rest of his life working one day a
22 week; is that true?
23 A.  Basically -- well, a little bit more than one -- he
24 would be working as a security guard, a little bit more
25 than one day a week though.

1  Q.  How many days per week?

2  A.  Gee, I don't -- I don't have the exact number on that

3  because we used his 2005. This is the report subsequent to

4  this, our July 21st report. We then used a 2005 tax

5  return, and that had a higher number in there.

6  Q.  Working as a security guard?

7  A.  Yes, it is.

8  Q.  Now do you have any -- let me rephrase my question.

9      What's the basis for your assumption that he will

10 never work at anything other than a security guard for the

11 rest of his life? Is there any medical opinion to that

12 effect or medical records stating that?

13 A.  Well, basically, we read the -- I guess the reports

14 from Mr. Ken -- Dr. Kennedy. Okay. And we looked at his

15 W-2s, and that's what it's based on.

16 Q.  So if we depose Dr. Kennedy and she says, I don't

17 think he needs to work as a security guard for the rest of

18 his life. I just meant he couldn't go back to work at the

19 City and County. He can work as an appraiser someplace

20 else, how would that affect your ultimate conclusions?

21 A.  Well, I guess if you -- this is a hypothetical? On a

22 hypothetical basis, if you've gotten that opinion from

23 Dr. Kennedy, and you also have a voc rehab specialist or

24 whatever that says that, you know, he can perform these,

25 this type of work, and he actually then gets that type of

1  inappropriate to misstate that conclusion at this point.
2  You can misstate that in argument if you want.
3  Q.  (By Mr. Wong)  Mr. Ueno, did you -- do you have a copy
4  of Dr. Sbordone's report?
5  A.  I have one that's stamped here received November 2nd,
6  2005, if that is the report.
7  Q.  What's the conclusion of that report in terms of
8  Mr. English returning to work?
9  A.  Well, there's a whole bunch of conclusions that he
10 has, and I can't articulate all of them.  I know one of
11 them it says that he made these assumptions about
12 Mr. English, and he says, assuming that this is accurate,
13 Mr. English should be compensated for the emotional pain
14 and suffering he experienced which he claims lead to
15 serious financial and marital difficulties.
16 Q.  Did you take Dr. Sbordone's opinions into account in
17 formulating your assumptions underlying your reports?
18 A.  Formulating our assumptions?  I guess we read
19 everybody's, you know -- all the studies that were done
20 that we have available to us.  We've read those.
21     MR. MOSELEY:  I know this is a late objection, but
22 I've got to interpose it.  In a sense you are unclear on
23 the timing of the report that you're referring to.  The
24 earlier report that he did is plainly before the Sbordone
25 report.  The later report is plainly afterwards.  I don't

1  know which report are you referring to.

2  Q. (By Mr. Wong) Did you take Dr. Sbordone's opinions

3  into account in any of your reports?

4  A. Well, obviously it wasn't taken into account in the

5  initial report that we issued on August 15th, 2005 because

6  that report was received later. We have seen this report,

7  and I can tell you that the information, you know, doesn't

8  change our opinions.

9  Q. It's not mentioned in the July 21st, 2006 report. Why

10  is that?

11  A. Because it didn't change our opinions.

12  Q. How do you decide which reports or medical opinions to

13  quote in your reports? For example, you do quote Reneau

14  Kennedy, but you do not quote any portion of Dr. Sbordone's

15  report.

16  A. Well, I guess the main reason is that when we did the

17  report in August of 2005, we had Dr. Kennedy's report.

18  Q. But in July of 2006 you did have Dr. Sbordone's

19  report, and you don't mention it at all there. What -- how

20  did you decide to quote --

21  A. Not to mention --

22  Q. -- Dr. Kennedy but not Dr. Sbordone?

23  A. Okay. Again, what we did is -- the purpose of the

24  August 2005 report sets forth all of our opinions. In the

25  2006, what we're doing here is we're making some technical

1  corrections to our report, and we're updating it for new
2  information that came available for the 2005 tax return.
3  Q.   But again, my question is, why don't you mention
4  Dr. Sbordone's report at all?
5  A.   Again, because it didn't affect us.
6  Q.   How do you decide whether or not it affects your
7  assumptions or affects your opinions?
8  A.   How do I?  From my professional judgment.
9  Q.   What was it about your professional judgment that made
10 you decide to rely on Dr. Kennedy versus Dr. Sbordone?
11 A.   Well, basically reading the -- that conclusion which I
12 just read to you earlier from Dr. Sbordone and reviewing
13 what Dr. Kennedy had stated, we then -- all we've done is
14 we've followed then -- you know, we said that his
15 mitigating damages were based on the facts of what he's now
16 doing.
17 Q.   If you'll excuse me, I'd like to go over there and
18 point out a part of Dr. Sbordone's report to you.
19 A.   Sure.
20 Q.   You quoted a portion of Dr. Sbordone's report that
21 says if the retaliation claim is in fact in place, he
22 should be compensated.
23      MR. MOSELEY:  I've got to object.  That wasn't the
24 full thing he quoted.  That was --
25 Q.   (By Mr. Wong)  Did you read this part of

1  Q.  Do you have any recollection of the generalities of
2  it?
3  A.  No, I'd be guessing.
4  Q.  Did you do any evaluation of how long Mr. English
5  typically held positions in the past versus whether that
6  would meet the minimum requirements of employment with the
7  City to qualify for the retirement package?
8  A.  No, I did not.
9  Q.  Moving on to page 4, you talk about retirement age,
10 and you refer to data from the Bureau of Labor Statistics
11 with a footnote to life work -- Work Life Estimates,
12 Effects of Race and Education.  Why do you mention that?
13 A.  That is a typical source used in the methodology for
14 the compu -- for the estimating of the work life.
15 Q.  And from that you draw the assumption that Mr. English
16 would work another 16.3 years?
17 A.  From it, that's correct.
18 Q.  In arriving at that assumption, did you take into
19 account any of Mr. English's medical history?
20 A.  His specific medical -- the -- okay.  Estimate of the
21 work life in itself looks at people in general, and so
22 people in general have, you know, various ailments or
23 whatever and medical histories and whatever, and all of
24 that is put together, and you come up with an overall
25 estimate.  And so this is an overall estimate that does

1  consider some of those. But if your question is
2  specifically as to himself, no, it's not.
3  Q.   So this figure is basically an average for the
4  population given his age and ethnicity?
5  A.   Age, ethnicity, years of schooling.
6  Q.   If someone had heart disease, severe in nature, would
7  this 16.3 years change for that individual?
8  A.   It may.
9  Q.   Why is that?
10 A.   He might die before then or --
11 Q.   How about if someone had heart disease, was a heavy
12 smoker, and had a history of cancer in the family, would
13 this 16.3 years change for that individual?
14 A.   I don't know.
15 Q.   How about if somebody had a history of -- a specific
16 history of cancer, heart disease, and was a heavy smoker,
17 would this 16.3 years expected work life change for that
18 hypothetical individual?
19 A.   See, you're asking me to give you a medical opinion,
20 and I -- I can't give you one. I'm not qualified to do
21 that.
22 Q.   Okay. Moving to Mr. English's specific situation, did
23 you take into account in projecting this 16.3 years of work
24 life that he had a personal history of cancer?
25 A.   We took into account that the -- that the studies

```
STATE OF HAWAI`I           )
                           )   SS.
                           )
```

I, Valerie Mariano Swiderski, C.S.R., a Notary Public in and for the State of Hawai`i, do hereby certify:

That on Wednesday, July 26, 2006, at 9:05 a.m. appeared before me THOMAS UENO, CPA, the witness whose testimony is contained herein, that prior to being examined, the witness was by me duly sworn or affirmed; that the proceedings were taken in computerized machine shorthand by me and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the proceedings had in the foregoing matter;

That, if applicable, the witness was notified through counsel, by mail, or by telephone to appear and sign; that if the deposition is not signed, either the reading and signing were waived by the witness and all parties, or the witness has failed to appear and the original has been sealed unsigned;

That pursuant to HRCP 30(f)(1) the original will be forwarded to noticing counsel for retention.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

Dated: July 30th, 2006

_____
Valerie Mariano Swiderski, C.S.R. #353
Notary Public, State of Hawai`i
My Commission Expires: June 16, 2006