**ANSWER:**

Can't remember the dates, but the dates of treatment should be in the Kaiser records provided in initial disclosure and/or in the records of Kaiser subpoenaed by City.

13. State the full name, complete address, and inclusive dates of confinement of every hospital or other institution in which you have been hospitalized, examined, or treated for any purpose at any time and describe the condition for which you were confined.

**ANSWER:**

To the best of my recollection:

When I was approximately five years old, I broke my arm. Can't remember any of the details requested.

When I was approximately twelve years old I broke my collar bone. Can't remember any of the details requested.

In approximately 1974 my dog bit me and I was hospitalized for three days for an infection. This hospitalization was in Pasadena, California at Huntington Memorial Hospital. Doctor was Dr. Edmund Grund.

In approximately late 1997 (but prior to February of 1998) I was hospitalized at the Queens Hospital psychiatric ward for approximately three days. I had been seeing a psychologist, Kay Wong (Biodyne), for marital counseling and then for the distress associated with my troubled marriage. I had been instructed that I should go to the emergency room by Dr. Wong, if I had any suicidal feelings whatsoever. One evening I was feeling especially despondent and did as instructed, but wasn't permitted to leave until the third day even though I requested to leave.

In June of 1998 I fell out of a tree and was taken to the Queens emergency room for examination, no serious injuries, but they discovered a spot on one of my kidneys during the course of the examination.

On November 4, 1998 I had a cancerous kidney removed at Queens Hospital.  My doctor was Dr. Tamar Hoffman at Honolulu Medical Group and the surgeon was Dr. Tsou.

In late 2002 I first broke my toe, then a short time later I broke my foot.  I was treated at Kaiser ER and followed up by orthopedic doctors whose names I do not presently recall.

There were probably other times I went to the doctor for examination and treatment for colds, flu and the like but I presently do not recall any details of those times.

14.  Identify any other claim you or anyone on your behalf has made (including claims for workers' compensation) against any person or organization for damages, personal injury, or mental or emotional pain and suffering, including any claim related to the events alleged in the Complaint, and as to each such claim please state the date, type of claim, and amount sought for the injury sustained.

**ANSWER:**

I do not recall making any other claims against any other person or entity.  However, my first wife was an attorney and she seemed to have made claims and filing suits fairly often.  I may have been included in some of those claims and suits.

15. With respect to your claim for damages, set forth:

a)   The amount of compensatory damages you are claiming.

<u>ANSWER:</u>

Uncertain at this time, but foundational documents such as medical records and payroll records in my possession or control have been provided to Defendants.

Generally I was earning $3,248 per month plus benefits at the City. Approximate calculations (estimated without assistance of any economic expert):

| | |
|---|---|
| $3,300 | base wages |
| 250 | medical |
| 600 | retirement |
| $4,150 | total per month |

x 12 = $50,000 per year
x 20 years = $1,000,000 minimum lost career income even presuming no increases if I had continued employment at City

I also believe that I could reasonably have expected significant advancement throughout my tenure with the City.

The value of the medical services provided by Kaiser is presently unknown, but I think reasonably should be calculated in damage calculations.

(b)  The amount of punitive damages you are claiming.

<u>ANSWER:</u>

I am not certain of the amount of punitive damages that should be awarded. My objective is to make certain that the behavior engaged in by the City is forcefully brought to everyone's attention and that future City employees who object to and report wrongdoing, do not face such retaliation and serious consequences for doing the right thing. Whatever amount is required to make this happen is the amount which should be awarded.

(c)  The manner in which the dollar amount of your
     damages was computed, including without limitation,
     each factor taken into account and each assumption,
     calculation and formula utilized.

ANSWER:

The only calculations I have really done to date
are that generally based on the fact that I was earning
$3,248 per month plus benefits at the City. Approximate
calculations for total loss of income (estimated
without assistance of any economic expert) are as
follows:

        $3,300   base wages
           250   medical
           600   retirement
        $4,150   total per month

x 12 = $50,000 per year
x 20 years = $1,000,000 minimum lost career income
even presuming no increases in compensation, if I
had continued employment at City

I also believe that I could reasonably have
expected significant advancement throughout my tenure
with the City.

The value of the medical services provided by
Kaiser is presently unknown, but I think reasonably
should be calculated in damage calculations.

I don't know how to calculate the monetary value of
other damages to me, such as the mental and emotional
distress and suffering the Defendants have caused me,
their defamation of me, their interference with my
rights under statutes and the constitution, their
interference with my prospective economic advantage and
with my contract with the City, their discrimination
and retaliation against me, their failure to prevent

the violation of my rights, their conspiracy to injure me, and for other damages they caused, such as the loss of my second marriage.

16.   Itemize any and all other losses or expenses incurred as a result of the facts alleged in the Complaint and for which you claim damages in this action.

**ANSWER:**

Other than as set forth above, I'm not certain whether or not there are any other losses or expenses for which I am entitled to recover.

17.   Identify each expert whom you have retained or specially employed regarding the claims which are the subject of this action who is not expected to be called as a witness, and with regard to each expert, state the following:

**ANSWER:**

No experts have yet been retained.

(a)   Each expert's address, occupation, and the identity of his or her employer or the organization which he or she is associated in a professional capacity.

(b)   The subject matter for which said expert was retained or employed.

18.   Identify each person who you will or may call as an expert witness at a trial of this action and, separately, as to each such person, state:

**ANSWER:**

May call treating and examining medical providers listed in this response as experts.  Can't yet respond to the balance of this interrogatory.

(a)   Each expert's address, occupation, and the identity of his or her employer or the organization which he or she is associated in a professional capacity.

(b)  The subject matter on which the expert is expected to testify.

(c)  A summary of the expert's qualifications within the field in which he or she is expected to testify.

(d)  The substance of the opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

19.  Please provide a list of all exhibits you intend to introduce at trial.

**ANSWER:**

**Unknown at this time.**

ROGER S. MOSELEY, ATTORNEY FOR PLAINTIFF, SIGNS AS TO ALL OBJECTIONS RAISED HEREIN:

ROGER S. MOSELEY

## VERIFICATION

STATE OF HAWAII                           )
                                          )SS.
CITY AND COUNTY OF HONOLULU               )


      PHILIP E. ENLGISH being first duly sworn on oath, deposes and says: That he has read the foregoing answers to interrogatories and same are true to the best of his knowledge and belief.


PHILIP E. ENGLISH


Subscribed and sworn to before me this _13th_ day of June, 2005.

_____
Notary Public, State of Hawaii
Print Name: Vicky S.W. Young
My commission expires: **August 2, 2007**

VICKY S.W. YOUNG
★ NOTARY PUBLIC ★
STATE OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 1 3 2004

at ___ o'clock and ___ min ___ M
WALTER A.Y.H. CHINN, CLERK

CASE BIGELOW & LOMBARDI

ROGER S. MOSELEY    2060-0
ALAN K. LAU    3981-0
CHRISTOPHER J. MUZZI    6939-0
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400
Facsimile:  (808) 523-1888
Email:  rsm@casebigelow.com

Attorneys for Plaintiff
PHILIP E. ENGLISH

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH,<br><br>       Plaintiff,<br><br>  vs.<br><br>CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1–10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10,<br><br>       Defendants. | Civil No. **CV04 00108 SOM KSC**<br><br>**VERIFIED COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** |

27505/2/336689.1

EXHIBIT A

## VERIFIED COMPLAINT

COMES NOW Plaintiff PHILIP E. ENGLISH (herein "Plaintiff"), by and through his undersigned counsel, and for a complaint against the Defendants named herein, alleges as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

### NATURE OF THE CASE

1.    This action is brought under, 42 U.S.C. §1981 and §§1983-6, Hawaii Revised Statutes §378-62, the United States and Hawaii Constitutions, and common law theories of recovery for the illegal, wrongful and tortuous conduct of Defendants described herein.

### JURISDICTION

2.    Federal question jurisdiction exists under 28 U.S.C. §1331 and §1343, by virtue of the claims of deprivation of constitutional rights and other conduct arising under 42 U.S.C. §1981, § 1983, § 1985 and § 1986, as alleged herein.

3.    This Court has pendant jurisdiction, under 28 U.S.C. §1367(a), over Plaintiff's state law claims herein.

VENUE

4.     All of the acts and omissions complained of herein occurred within the City and County of Honolulu, State of Hawaii, within the District of Hawaii, and venue is proper in this Court.

PARTIES

5.     Plaintiff PHILIP E. ENGLISH ("Plaintiff") was at all times relevant herein an appraiser employed by the Real Property Assessment Division (herein "Assessment Division"), Department of Budget and Fiscal Services, City and County of Honolulu, and a resident of the City and County of Honolulu, State of Hawaii.

6.     Defendant CITY & COUNTY OF HONOLULU (herein "City") is, and was at all times herein relevant, a municipal corporation in the State of Hawaii, created and established under the laws of the State of Hawaii, and is and was charged with control over all City agencies, departments, policies and/or programs, and City employees' activities.  The City is directly liable for the acts herein described and is also liable for the acts of the individual Defendants' actions under the doctrine of respondeat superior, as each of the individual Defendants was acting in the course and scope of his or her employment with City.

7.    Defendant GARY T. KUROKAWA ("KUROKAWA") is, and at all times herein relevant was, the Administrator of the Assessment Division and an employee of the City.  He is sued herein in his official capacity and in his individual capacity.

8.    Defendant KUROKAWA is, and was at all times herein relevant, a resident of the City and County of Honolulu, State of Hawaii.

9.    Defendant KUROKAWA had, at all times herein relevant, supervisory authority over Plaintiff, over Defendant ROBERT O. MAGOTA and over Defendant ANN C. GIMA.

10.    Defendant ROBERT O. MAGOTA ("MAGOTA") is, and at all times herein relevant was, the City Assessor in the Assessment Division and an employee of the City.  He is sued herein in his official capacity and in his individual capacity.

11.    Defendant MAGOTA is, and was at all times herein relevant, a resident of the City and County of Honolulu, State of Hawaii.

12.    Defendant MAGOTA had at all times herein relevant, supervisory authority over Plaintiff and over Defendant ANN C. GIMA.

13.    Defendant ANN C. GIMA ("GIMA") is, and at all times herein relevant was an Appraiser Supervisor of the Assessment Division, and an

employee of the City.  She is sued herein in her official capacity and in her individual capacity.

14.    Defendant GIMA is, and was at all relevant times herein, a resident of the City and County of Honolulu, State of Hawaii.

15.    Defendant GIMA had, at all relevant times herein, direct supervisory authority over Plaintiff.

16.    Defendant GK APPRAISALS, INC. ("GK") is, and was at all times herein relevant, a Hawaii corporation doing business as a real estate appraisal firm in the State of Hawaii, with its principal offices in the County of Hawaii, and was at all times herein relevant, owned and/or controlled, in whole or in part, by Defendant KUROKAWA.  The acts of Defendants herein, related to retaliation against Plaintiff, for his complaint that work was being done for GK, were done by officers and/or directors and/or agents of GK, or at the direction of such individuals, for the purpose of advancing or preserving the economic benefit to GK derived from having City employees do work for GK on City time and with City equipment.

17.    The Doe Defendants are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff except that they are connected in some manner with the identified Defendants herein and/or were the agents, principals, partners, officers, directors, servants,

employees, employers, representatives, co-venturers, associates, consultants, and/or owners of the identified Defendants herein and/or were in some manner presently unknown to Plaintiff engaged in the activities alleged herein and/or were in some manner responsible for the injuries and/or damages to Plaintiff and/or conducted some activity or activities in a negligent or wrongful manner which was a proximate cause of injuries and/or damages to Plaintiff and/or were in some manner related to the named Defendants herein and Plaintiff prays for leave to certify their true names, identities, capacities, activities and/or responsibilities when the same are ascertained.  Plaintiff has reviewed all of the records and files available to him in order to ascertain the identity of any person or entity whose acts or omissions caused damage to Plaintiff as alleged herein.

FACTUAL BACKGROUND

18.    Plaintiff was at all times herein relevant, a real estate appraiser, licensed by the State of Hawaii.

19.    On or about June 1, 2000, Plaintiff became an employee of the Assessment Division of the Department of Budget and Fiscal Services of the City and County of Honolulu (herein the "City").

20.    Generally, for the initial period of his employment at the Assessment Division, Plaintiff spent his time trying to discern the differences between the private appraisal practice, with which he was familiar, and the appraisal practice

in the Assessment Division. Soon, Plaintiff began asking questions, making comments, and making suggestions, as well as requests for practice changes. Plaintiff questioned, commented upon, and/or made suggestions or requests for change of all of the practices and inappropriate actions described herein. While it eventually became apparent that Plaintiff's questions, comments, requests and suggestions were unwelcome, the harassment and retaliation that resulted was difficult to identify and/or define at first. However, when Plaintiff complained in writing about specific clearly illegal activity, in which both the Administrator of the Assessment Division and another appraiser were involved, the situation changed dramatically for the worse and the harassment became so overt, pervasive, and oppressive that Plaintiff eventually had to stop going to work, on his doctor's orders, because of the resulting stress. The harassment to which Plaintiff was subjected was in retaliation not only for the specific complaints about illegal activity, but also for his prior and continuing attempts to correct improper practices and to improve the assessment process at the City.

21. Prior to and immediately after the inception of his employment with the Assessment Division, Plaintiff was advised by Defendants KUROKAWA and MAGOTA that their plan was to make the Assessment Division more professional and that they needed people with outside experience to do so. However, during the course of Plaintiff's employment, Defendant GIMA

constantly instructed Plaintiff that things must be done according to "prior practices" and that Plaintiff would have to be "patient" about any change.

22.     Plaintiff's original position with the City was as a "Real Property Appraiser II", and on or about February 1, 2001, Plaintiff was promoted to the position of "Real Property Appraiser III".

23.     During the first week of Plaintiff's employment, Plaintiff was called into a meeting with his then supervisor, who proceeded to ask about Plaintiff's background and experience and then he advised Plaintiff that the supervisor had no time to train Plaintiff and would not do so.

24.     On or about August 3, 2000, Plaintiff was assigned to the appraiser group headed by Defendant GIMA, as supervisor, and Plaintiff was assigned to work on certain condominium, cooperative, and timeshare projects in Waikiki and adjacent areas.

25.     Defendant GIMA advised Plaintiff that his initial job was to "validate" sales for condominiums in Waikiki and that there had been no sales input since the at least the beginning of June, when the prior appraiser assigned to this area had left the Assessment Division.

26.     Defendant GIMA advised Plaintiff that there was "no time" for any verification of sales, and that the only thing he should do was to determine if the sales were "closed".   When Plaintiff questioned whether this process was

sufficient to determine whether the sales were truly valid, he was directed by Defendant GIMA that there was no time to check and to just "plug them in".

27.     Immediately prior to the time Plaintiff was assigned the Waikiki condominium assessments, in approximately August or September of 2000, the "Gold Coast" area, at the foot of Diamond Head, was added to the waterfront Waikiki condominium model, later known as "Model 42". Plaintiff was not consulted prior to the decision to add this area to the Waikiki model. The "Gold Coast" data had numerous errors and was not properly set up for market modeling.

28.     Despite the known errors and problems, and the knowledge that erroneous assessments would result, the Gold Coast area was inserted into Model 42 and the erroneous assessments it produced for tax year 2001 were mailed out to taxpayers. Plaintiff did not learn of the problems with the Gold Coast data until after the assessments for that year were mailed out. The following year Plaintiff tried to remedy the problems with the Gold Coast data, but was not given adequate time to fully evaluate and correct the obvious problems with Model 42.

29.     On numerous occasions throughout Plaintiff's tenure at the Assessment Division, Plaintiff raised the issue of ethical and professional standards, including, but not limited to:

(a)    the application of Uniform Standards of Professional Appraisal Practice ("USPAP") standards, to which he was told, by Defendant KUROKAWA that there was a "blanket" exception and that the Assessment Division did not have to follow USPAP standards;

(b)    the number of properties assigned to appraisers far exceeded the recommendations of professional associations;

(c)    the Assessment Division appraisers were accepting assignments which could not properly be with the resources at hand, which, at minimum should have required public disclosure that the assessments produced by the Assessment Division may not be reliable;

(d)    the Assessment Division used methodology which was not generally recognized by the appraisal profession to be proper, for example the depreciation methodology, which was introduced to the system by Defendant MAGOTA, and produced large and improper fluctuations in valuations, and which was not consistent with the vendor recommendations of the new Computer Automated Mass Appraisal System ("CAMA") system; and

(e)    the almost complete lack of any comprehensive training program, especially with respect to internal policies and procedures.

30.    In response to some of Plaintiff's comments and questions with respect to ethical and professional standards, Plaintiff was advised by Defendant MAGOTA that the Division had had trouble with guys like Plaintiff before (meaning appraisers with outside professional experience) and that Plaintiff would just have to learn to cut corners.   In fact, Defendant MAGOTA specifically dressed Plaintiff down in front of a group of his colleagues in the Assessment Division, stating that "I've seen this kind of thing before where an

outside appraiser cannot make the transition to mass appraising." Further, in front of the same group Defendant MAGOTA described Plaintiff as having "just the fundamentals" of appraising, implying that Plaintiff's professional abilities were suspect.

31.    In or about October of 2000, Plaintiff became aware of multiple appeals with respect to the Waikiki Shore condominium. During that time Plaintiff became aware that there was substantial internal discussion and confusion about the classification system, which had resulted in the classification of the Waikiki Shore condominium units in question as "Hotel and resort", and that apparently such classifications had been done differently by different appraisers and supervisors. Plaintiff began to realize that this and many other important decisions and determinations were being done on an ad hoc basis with no consistency and not necessarily with any relationship to proper appraisal practice. Plaintiff began to question these practices and to offer comments and suggestions in various forums, from meetings to individual encounters. Sometime later, Plaintiff was advised by either Defendant GIMA or Defendant MAGOTA, or both, that Plaintiff asked too many questions.

32.    In or about January of 2001, Plaintiff began to handle real property tax appeals and, in conjunction with those appeals, and throughout approximately

the following year, Plaintiff became aware of multiple inconsistencies and failures in the assessment system, including but not limited to:

> (a)    project groupings were not appropriate and the valuations were inconsistent;

> (b)    leasehold sales were being used for some valuations;

> (c)    there were multiple instances of questionable classification;

> (d)    the sales "validation" system was questionable on a widespread basis;

> (e)    land valuations had not changed in years, despite significant moves in the market;

> (f)    when the new computer system and mass appraisal system was put in place, no provision had been made to clean up the database before the conversion took place, and in fact there were numerous and serious actual discrepancies in the database. This was against the specific advice and instruction of the vendor of the new system.;

> (g)    there were numerous problems with the appeal process, including but not limited to: instances in which the Board of Review did not act in an impartial manner, including, but not limited to, ex parte communications with the Assessment Division, requesting that the decisions be prepared before the hearings so that the BoR could sign them immediately after the hearings, and requesting that Plaintiff act more as an advocate for the Assessment Division's position, rather than trying to achieve the proper assessment; and appraisers actively and improperly discouraging taxpayers from filing appeals and refusing to assist taxpayers in obtaining information relevant to their appeals.

33.    Plaintiff's questions and comments on these issues were ignored or Plaintiff was consistently instructed that nothing could or would be done.

34.    At about the same time period (approximately 2001-2002), Plaintiff began to observe that there was general confusion and lack of understanding in the Assessment Division as to basic appraisal concepts, such as "as of" a specific date, as opposed to "on" a specific date.   With respect to this specific issue, Defendant GIMA responded to Plaintiff's concerns by rallying the other supervisors to support her own position that assessments were to be made "on" October 1 of the year preceding the tax year, rather than "as of" that date, as required in the ordinance (and as would be required by proper appraisal practice as understood by Plaintiff).   In the process of rallying the support against Plaintiff's position on this issue, Defendant GIMA substantially undermined and damaged Plaintiff's reputation and respect among the other appraisers and supervisors in the Assessment Division.

35.    In response to Plaintiff's questioning procedures which did not appear to be proper appraisal practice, at least one other appraiser in the Assessment Division related to Plaintiff that Defendant MAGOTA had described the mission of the Assessment Division appraisers as to get the "highest value" possible on property and maximize taxes.

36.    In or about January of 2001 Plaintiff began to observe that one of the appraisers in Defendant GIMA's group was doing outside appraisal work on City equipment and during City time.

37.     Plaintiff initially approached the appraiser involved and advised him that this sort of activity was not proper and should cease.  The appraiser involved advised Plaintiff that a scheme had been worked out, which made the activity permissible.  The scheme was then described to Plaintiff as that the work was being done for a former employee of the City, who, in turn, did work for Defendant KUROKAWA, so that Defendant KUROKAWA was not directly involved, therefore making the activity permissible.  Plaintiff advised the appraiser involved that this scheme did not resolve the issue.  In the period following, Plaintiff observed that this communication with the appraiser had no effect, as the activity continued.

38.     Plaintiff also observed that the former employee involved continued to come in and out of the private work area of the City appraisers, at will, to deal with the appraiser involved.  Plaintiff also was, on one morning, standing near the appraiser's desk when the appraiser received a telephone call.  The appraiser immediately stopped working on his City work and began to work on his private work, stating that "Gary" had called and told him the private assignment he was working on was urgent and had to be delivered by 5:00 P.M.  That same afternoon the appraiser left the office in a hurry to deliver the private assignment.

39.     When the activity continued, apparently undiminished, Plaintiff approached the appraiser's supervisor, Defendant GIMA, and advised her of the

illegal activity.  Defendant GIMA's response to Plaintiff was that he should do his own work and not to be concerned with the business of others and, in any case, she had not observed the activity.

40.    When no additional response was heard from Defendant GIMA, in late 2001, or early 2002, Plaintiff spoke with Defendant MAGOTA directly about the continuing illegal activity.  Defendant MAGOTA's initial response was that the appraiser involved would be disciplined if it was found that he was doing outside work.  Plaintiff then advised Defendant MAGOTA that there were not just one, but two individuals involved and that Plaintiff was especially concerned because the work was being done for the Assessment Division Administrator, Defendant KUROKAWA, under the Administrator's direct orders.  Defendant MAGOTA then advised Plaintiff that he would talk with Defendant KUROKAWA about the matter, but that Plaintiff should not continue to pursue the issue because, in any dispute, it would be Plaintiff's word against the word of the appraiser and Defendant KUROKAWA.    Defendant MAGOTA also admonished Plaintiff that other former employees had tried to file lawsuits against the Assessment Division and that those suits had failed, and that any suit by Plaintiff would also fail.  Plaintiff regarded these statements of Defendant MAGOTA as threatening and intimidating.

41.   The appraiser involved later described, to Plaintiff, a meeting with Defendant KUROKAWA, the appraiser involved and the former City employee (and possibly others, but Plaintiff is not presently aware of their identities), in which Defendant KUROKAWA had advised the appraiser that it was okay to continue doing the private work, but that the appraiser should be more "discrete".

42.   It continued to appear that nothing would be done to put an end to the conducting of private business on City time with City equipment, only that the activity would become less visible by being more "discrete". Because of this, on February 15, 2002, Plaintiff sent a written complaint via email to Defendant MAGOTA outlining the complaint made verbally, that the appraiser involved was still doing private work on City time and with City equipment for GK Appraisals, Inc., a company believed by Plaintiff to be owned and controlled by Defendant KUROKAWA, the Administrator of the Division.

43.   Plaintiff consulted a union representative about this matter and the union representative concurred with Plaintiff's opinion that this activity should stop. This initial contact with the union representative occurred at about the time Plaintiff first informed Defendant GIMA of the situation.

44.   In approximately this same time period of 2001, Plaintiff witnessed Defendant GIMA going through files and folders. When Plaintiff inquired as to what Defendant GIMA was doing, Defendant GIMA replied that she was

"sanitizing" the files before they were to be produced in the ongoing Waikiki Shore litigation, and that (in reference to a particular document) "We don't want him seeing that." When Plaintiff inquired as to whether this was proper, Plaintiff was advised by Defendant GIMA that she had attended a meeting with Corporation Counsel wherein the employees of the Assessment Division were instructed to "sanitize" files before they were produced in litigation.

45.   In approximately this same time period of the last half of 2001, Plaintiff received increasingly and significantly conflicting instructions on what he should be doing.   For example, Defendant MAGOTA instructed everyone, including Plaintiff to work on incorporating building permit information, while Defendant GIMA specifically instructed Plaintiff to ignore the building permit information for his assigned area, which had not been incorporated since prior to 2000.   Had this information been placed in a single stack, it would have been more than three feet tall.

46.   In the time period approaching October of 2001, Defendant MAGOTA came up with the idea to send a letter to certain condominium associations in Waikiki and require that they gather information and submit information, with respect to the use of each condominium unit.   The associations would be given two weeks in which to reply.   The consequence of failure to reply would be to change the classification of the condominium units to "Hotel and

resort", which had a tax rate more than two times that of the "Apartment" classification. Over Plaintiff's objection to Defendant GIMA, at minimum, that the time frame was too short for proper response and the matter should be more carefully studied and resolved, Plaintiff was required to sign this letter, which was then mailed out to the affected condominium associations.

47.     After mailing out the initial letter, the Assessment Division received limited substantive responses and a great number of complaints from the condominium associations.  Upon this development, Defendant KUROKAWA, over Plaintiff's strenuous objection as to the propriety of doing so, caused the Assessment Division, in early December of 2001, to send out a second letter, signed by defendant MAGOTA, stating that due to failure of response to the first letter, the affected condominium units were being reclassified to "Hotel and resort" if there were no additional responses.  This letter gave only three weeks for additional response.    Neither letter reflected any past practice of the Assessment Division of which Plaintiff was aware, nor was Plaintiff aware of any rule or regulation which permitted such a practice.

48.     The number of appeals for the tax year, which had been the subject of these letters, was very heavy, with Plaintiff's assigned area accounting for approximately one fourth of all appeals filed.  Many of the appeals appeared to be the result of the reclassifications due to the letters.    Plaintiff requested

additional help be assigned to deal with the appeals, but Defendant GIMA refused, stating that whatever appraiser was free could help. As a practical matter Defendant GIMA knew that there were generally no appraisers with any significant free time and that lack of familiarity with the issues would severely diminish the value of such help.

49.    Files were set up to handle the resulting appeals, but because of unfamiliarity, many mistakes were made and much misinformation was given to taxpayers. The end result was that Plaintiff's workload was dramatically increased and many taxpayers were likely assessed taxes they did not owe.

50.    After Plaintiff had made the verbal report to Defendant MAGOTA, but before Plaintiff made the written report on February 15, 2002, in approximately December of 2001, a Deputy Corporation Counsel asked Plaintiff to begin preparation of an expert report for the Waikiki Shore litigation. Defendant GIMA then instructed Plaintiff to merely copy some maps and floor plans from the file and that this would be enough. The Deputy Corporation Counsel then insisted that this was not what was required for an expert report. Plaintiff began to work on the expert report, but was stopped by Defendant GIMA. Plaintiff was then called into Defendant KUROKAWA's office for an "after hours" meeting and was told by Defendant KUROKAWA, that Plaintiff should work within the confines of his job, and that Plaintiff should "not take too

much initiative." Plaintiff inquired of Defendant KUROKAWA as to who would do the report, to which Defendant KUROKAWA replied that Plaintiff should not worry about it. An additional concern was raised that Plaintiff was not an Appraiser IV and therefore was not qualified to give expert opinion in court.

51.    In approximately this same time period, Defendant MAGOTA had a meeting of the appraisers to explain the "new" way of classification of properties. Most of the appraisers in attendance did not seem to fully understand the classification process being explained by Defendant MAGOTA.

52.    In early 2002 Plaintiff became aware that the Assessment Division was going to attempt to promulgate a rule, which would, and was intended to, substantially undermine the claims being made against the City in the Waikiki Shore litigation. Plaintiff understood that counsel for the Waikiki Shore taxpayers was being avoided to prevent his knowledge of the process, including the public hearing. Plaintiff, Corporation Counsel, and Plaintiff's supervisors all understood that Waikiki Shore's counsel had expressed a specific interest in participating in any such rule making process. Plaintiff later learned that from April 1, 2002 to April 10, 2002, the Deputy Corporation Counsel assigned to the Waikiki Shore litigation did not even return the telephone calls of the counsel for the Waikiki Shore. The hearing for this rule was held on April 10, 2002 and no one from the public attended. Subsequent to the hearing, additional material

changes were made to the rule before it was sent to the City Clerk in its final form.

53.    By mid-2002 Plaintiff was effectively deprived of further authority to handle any matter dealing with the Waikiki Shore litigation and appeals of Waikiki Shore assessments.

54.    In or about October 2002 Plaintiff became aware of an error in the appraisal of units in the Hawaiian Monarch condominium project, which resulted in studio units being assessed at greater values than the one-bedroom units in the same project for the 2003 tax year.  Plaintiff brought this obvious error to the attention of Defendant GIMA and requested permission to work on the correction of the problem before the erroneous assessments were mailed out.  Defendant GIMA denied permission and ordered that the erroneous assessments be processed so they would be mailed out to taxpayers as is.  Defendant GIMA and/or Defendant MAGOTA stated to Plaintiff that if the taxpayers didn't like the assessments, they could file appeals.

55.    During the course of Plaintiff's employment with the City, he received periodic performance evaluation reports all of which described his performance factors as "Exceeds Requirements", until February 15, 2002, which was the date Plaintiff sent a written complaint to Defendant MAGOTA stating that a fellow appraiser was doing private work on City time and with City

equipment for GK Appraisals, Inc., a company believed by Plaintiff to be owned and controlled by Defendant KUROKAWA, the Administrator of the Assessment Division.    After February 15, 2002, the subsequent periodic performance evaluation reports immediately declined to "Meets Requirements" (on April 22, 2002) and the same on a May 16, 2002 "Probationary Performance Evaluation Report.  Plaintiff's evaluations declined further on the next performance report, where one performance factor was rated "Below Requirements" and the rest "Meets Requirements" (Probationary Performance Evaluation Report dated August 23, 2002).

56.    After February 15, 2002 Plaintiff became clearly aware of a substantial change in attitude toward him by supervisory and other personnel of the Assessment Division and Plaintiff began to experience numerous occurrences of retaliation.

57.    In or about March of 2002 Plaintiff was promoted to Appraiser IV, a promotion for which he had applied much earlier, prior to October 2001, and for which he had been informed that he had been approved.  This promotion had been substantially delayed and the explanation for the delay was that the "paperwork" had been lost twice in the processing of the promotion.

58.    On or about May 31, 2002 one of Plaintiff's coworkers informed Plaintiff that she had been told that Plaintiff was being "watched" by Defendant MAGOTA.

59.    No later than May of 2002, as a result of the retaliation Plaintiff began experiencing, Plaintiff contacted the union representative to assist him in putting an end to the retaliatory actions of the supervisory personnel of the Assessment Division, but the union was not able to resolve the problem and the retaliation continued.

60.    On or about May of 2002, as well as subsequent to that date and specifically on August 14, 2002, Defendant MAGOTA made threats on Plaintiff's employment, such as: "You don't seem to care about your job."

61.    Sometime on or after August 14, 2002, Plaintiff contacted an FBI Agent to complain of the illegal activities occurring at the Assessment Division. At this contact, Plaintiff was informed that unless there was some evidence of illegal campaign contributions, Plaintiff would have to go to the City Prosecutor with his complaint, and that the FBI was essentially too busy with illegal campaign contribution investigations to investigate Plaintiff's complaints.

62.    On August 15, 2002 at 5:57 P.M., Plaintiff was notified by Defendant KUROKAWA that Plaintiff's "probationary period" was being

extended three months.  Plaintiff contacted the union about this development but there was essentially no action until a November of 2002.

63.    In or about August or September of 2002, Defendant MAGOTA, in a meeting of some of the staff of the Assessment Division, told the attendees, that Plaintiff was "Wacko".

64.    In approximately the same time period, Defendant MAGOTA in a lunch meeting with an outside private appraiser, advised that appraiser that Plaintiff was causing all kinds of trouble at the Assessment Division.

65.    In or about October 2002 Defendant GIMA denied Plaintiff leave for scheduled appointments with physicians for a broken foot and for kidney cancer follow-up.  While Plaintiff was forced to reschedule the follow-up appointment for his kidney cancer, he did keep the appointment for the broken foot, as he understood that this appointment should not be changed and he misunderstood Defendant GIMA's directions.  This was the incident for which disciplinary action was threatened in February of 2003, after Defendants learned of Plaintiff's contact with the Ethics Commission.

66.    On or about November 22, 2002, a meeting was held in which Defendant KUROKAWA, Defendant GIMA, the union agent, and Plaintiff were in attendance.  At this meeting Defendant KUROKAWA stated that that the negative actions in Plaintiff's file could have been much worse, that Plaintiff

owed his job to Defendant KUROKAWA, that everyone should just "forget about" the whole situation, that he could have Plaintiff transferred to another jurisdiction (Big Island), and that Plaintiff may be assigned to work directly for Defendant MAGOTA, or transferred to the Kapolei office (which Defendant KUROKAWA knew would be a substantial hardship because Plaintiff bicycled to work). Plaintiff regarded these comments as intimidating and exceedingly threatening and as intended to be a display of Defendant KUROKAWA's power over Plaintiff, not just in the sense of his employment, but also in a more general "political" sense. At this meeting Plaintiff was not allowed to inquire about the reason for and motivation behind the retaliatory actions against him, despite repeated attempts to do so.

67.     Immediately after this November 2002, meeting, the union agent met with Plaintiff and advised Plaintiff that he was a friend of Defendant KUROKAWA's and that he would testify against Plaintiff if the matter were litigated.

68.     On January 3, 2003, Plaintiff met with the Executive Director and Legal Counsel for the Ethics Commission of the City and described many of the activities set forth in this complaint, including, but not limited to, the fact that a City employee was doing work for Defendant KUROKAWA's private appraisal firm, on City time and with City equipment.

69.    On or about January 17, 2003, Plaintiff applied for a supervisory position and went through the interview process. Much earlier, Plaintiff had been encouraged by Defendant MAGOTA to apply for the position and was told that there was a need for supervisors and that Plaintiff was qualified. After the interview process, Plaintiff was informed, by a Deputy Corporation Counsel assigned to the Assessment Division, that no other applicant even came close to Plaintiff's qualifications for the supervisor job. However, another applicant was selected for the job.

70.    On or about January 17, 2003 Plaintiff spoke with the City appraiser who had been doing the private work for Defendant KUROKAWA and advised him of Plaintiff's visit with the Executive Director of the Ethics Commission and advised the employee to go talk to the Ethics Commission and to tell the truth.

71.    On or about January 21, 2003 Plaintiff was advised by a Deputy Corporation Counsel that the "word is out" not to talk to Plaintiff because he might be "wearing a wire".

72.    On or about January 22, 2003, Plaintiff caused a formal complaint to be filed with the Ethics Commission. This formal complaint included, inter alia, allegations regarding:

      (a)    the use of City employees, on City time, with City equipment, for outside private business;

(b)    the granting of improper property tax exemptions to the Assessment Division Administrator;

(c)    the rewarding of a high level supervisor for his role in keeping the theft of City time and services quiet;

(d)    the retaliation against Plaintiff and the tarnishing of Plaintiff's reputation in the community, because of his questioning the improper use of City personnel and equipment and because of his questioning the propriety and reliability of the methodology and systems used by the Assessment Division; and

(e)    the mailing out of assessment notices, which are known to be false, and which result in the collection of taxes that taxpayers do not owe, in violation of Federal mail fraud and racketeering laws.

73.    On or about February 5, 2003, the Executive Director and Legal Counsel for the Ethics Commission informed Defendant KUROKAWA, by email, that Plaintiff had made a complaint against Defendant KUROKAWA, as well as against the City employee doing the work for Defendant KUROKAWA, that than investigation was being conducted, and that Plaintiff should be removed from any cases upon which Plaintiff's counsel represented taxpayers (this included the Waikiki Shore litigation).

74.    On or about February 5, 2003, Defendant MAGOTA requested a meeting with Plaintiff and, at that meeting, Plaintiff was informed by Defendant MAGOTA that there was a pending disciplinary action against Plaintiff for taking "unauthorized leave" in October of 2002.

75.    On or about February 6, 2003, Defendant GIMA requested that Plaintiff write a letter to taxpayers making it appear that the Assessment Division had done nothing wrong, in an instance where the Assessment Division had used a faulty basis for establishing fee simple valuations in certain condominiums. Plaintiff refused to write the letter in such a misleading fashion.

76.    On or about February 7, 2003, Defendant KUROKAWA emailed Plaintiff with questions about his "serious allegations of ethical misconduct". Plaintiff viewed this email as hostile and as a threat. Plaintiff felt extremely threatened and intimidated and did not respond to this email.

77.    On or about February 10, 2003, a co-worker of Plaintiff filed a "Confidential Workplace Violence Report" against Plaintiff, alleging that Plaintiff was "back stabbing" the appraiser who was the subject of Plaintiff's complaint of illegal activities and that Plaintiff's co-workers were "scared" of him.

78.    On or about February 12, 2003, the employee who had been doing the private work for Defendant KUROKAWA filed a "Confidential Workplace Violence Report" against Plaintiff, alleging that Plaintiff verbally threatened him and intimidated him on January 17, 2003 and January 22, 2003.

79. On or about mid-February, 2003, Defendant GIMA, to the best of Plaintiff's information and belief, also filed "Confidential Workplace Violence Report" against Plaintiff.

80. To Plaintiff's knowledge the complaint to the Ethics Commission is still being investigated, but the City has not provided enough funding or resources for the Ethics Commission to actually conduct a through and complete investigation of this and other matters. The funding to the Ethics Commission is intentionally calculated by the City to make it ineffective in the execution of its duties of investigating complaints, reporting its findings, and recommending appropriate disciplinary actions.

81. The personal and official treatment accorded Plaintiff after he made the written complaint on February 15, 2002, was harsh and substantially different from the treatment accorded others in the Assessment Division. For example, some appraisers were allowed to take vacation leave during the height of the busy season, some appraisers were apparently not disciplined for activities such as leaving work during business hours to watch sporting events on television at a neighboring bar, or not disciplined for hit and run auto accidents with City vehicles, or not disciplined for failing to appear for Board of Review hearings due to hangover, or not disciplined for having a second, outside job, during City work hours. Plaintiff was shunned by supervisors and other employees in the

Assessment Division; physically threatening remarks were made, such as "I hope you have an escape plan if your boat sinks". Some supervisors and others refused to help Plaintiff with any problems or questions and refused to provide information and direction. Defendant GIMA instructed Plaintiff not to call her by her nickname, as only her friends were allowed to do that, even though Defendant GIMA appeared to be commonly addressed by her nickname by all others in the Assessment Division.

82.    As a direct result of the harassment/retaliation, and the other actions of Defendants described herein, to which Plaintiff was subjected, Plaintiff suffered actual physical injury, such as the inability to sleep, lack of energy, and weight loss, and Plaintiff first sought medical treatment for this injury on January 30, 2003.

83.    On or about February 27, 2003, Plaintiff was advised by a City official of an investigation of Plaintiff concerning reported violation of the City workplace violence policy.

84.    As a direct result of the harassment/retaliation, and the other actions of Defendants described herein, to which Plaintiff was subjected, Plaintiff suffered severe emotional and mental distress and injury, and Plaintiff first sought medical treatment for this injury on February 27, 2003.

85.    On February 27, 2003, Plaintiff was advised by his physician not to go back to work and Plaintiff has not worked since that time.

86.    On February 28, 2003, the City was notified as to Plaintiff's condition, through a workers' compensation claim, and on March 18, 2003 Plaintiff was notified that the City had arranged an independent examination of Plaintiff on Friday, April 18, 2003.

87.    On or about March 12, 2003, the City official investigating the workplace violence claims, issued a report, which compared Plaintiff to Byron Uyesugi (Xerox case) and concluded that Plaintiff's "work performance may be less than satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action." This report caused substantial additional injury to Plaintiff.

88.    On or about April 16, 2003, Plaintiff received notification (dated April 9, 2003) from Defendant MAGOTA that there would be a meeting on April 17, 2003 for the purpose of discussing Plaintiff's annual performance review.

89.    On April 16, 2003, the City was notified that such a meeting and performance review were inappropriate and a senseless exacerbation of the damage being done to Plaintiff.

90.    On April 17, 2003, Plaintiff was advised that the performance review would be put "on hold until after [Plaintiff's] workers' compensation matter is addressed".

91.    On April 30, 2003, the City workers' compensation administrator wrote that "both Dr. Kennedy and I are concerned with Mr. English's mental state, especially considering his past history of multiple suicide attempts or ideation.   His stress has reached a crisis level and only seems to be getting worse."   On the very same day, Plaintiff received an "Annual Performance Evaluation Report", dated April 22, 2003.   This report rated Plaintiff "substandard" in all but two categories and gave Plaintiff an "overall evaluation" of "substandard".   Further, the report contained an extensive narrative, which substantially misrepresented Plaintiff's work performance and abilities.   The preparation and sending of this report, signed by both Defendant GIMA and Defendant MAGOTA was intentional and knowingly calculated to cause further substantial injury to Plaintiff.

92.    The acts of Defendants complained of herein have resulted in substantial injury and damage to Plaintiff, including, but not limited to: actual physical pain and suffering, severe emotional and mental distress, loss of personal, professional and financial reputation, loss of employment, loss of his professional career, and termination of Plaintiff's marriage.

## COUNT I - VIOLATION OF CIVIL RIGHTS

93.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

94.    Defendants, under color of statutes, ordinances, regulations, customs, or usages of the State of Hawaii, or the City & County of Hawaii, subjected Plaintiff, a citizen of the United States, or caused Plaintiff to be subjected to, the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States, including, but not limited to, violation of Plaintiff's rights to free speech, due process of the law, equal protection of the law, and the enjoyment of his civil rights.

95.    The unconstitutional deprivation of his rights by Defendants as set forth herein, directly and proximately caused Plaintiff to suffer monetary damages, physical injury, and severe mental and emotional distress.

96.    The actions of Defendants herein were willful, wanton, malicious, and in such callous and reckless disregard of the civil rights of Plaintiff as to entitle Plaintiff to recover punitive damages therefor.

97.    Defendants are liable to Plaintiff for special and general damages that he suffered as a result of the above-described unlawful acts, which were committed in violation of, inter alia, 42 U.S.C. §1983.

27505/1/336689.1                              33

## COUNT II - CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

98.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

99.    Defendants conspired together for the purpose of:

(a)    deterring Plaintiff, directly or indirectly, by force, intimidation, or threat from attending federal court or testifying in a matter pending therein, freely, fully, and truthfully, and/or of injuring Plaintiff in his person or property on account of his having so attended or testified;

(b)    impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in the State of Hawaii, with intent to deny to Plaintiff the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; and

(c)    depriving Plaintiff, directly or indirectly, the equal protection of the laws, and/or the equal privileges and immunities under the laws; and/or of preventing or hindering the constituted authorities of the State of Hawaii from giving or securing Plaintiff the equal protection of the laws.

100.  Defendants, who were engaged in the conspiracy, did, or caused to be done, acts in furtherance of the object of such conspiracy, whereby Plaintiff has suffered injuries and damages.

101.  The Defendants' wrongful acts as set forth herein, directly and proximately caused Plaintiff to suffer monetary damages, physical injury, and severe mental and emotional distress.

102.  The actions of Defendants herein were willful, wanton, malicious, and in such callous and reckless disregard of the civil rights of Plaintiff as to entitle Plaintiff to recover punitive damages therefor.

103.  Defendants are liable to Plaintiff for special and general damages that he suffered as a result of the above-described wrongful acts of Defendants, which were committed in violation of, inter alia, 42 U.S.C. § 1985.

## COUNT III - NEGLECT TO PREVENT INTERFERENCE WITH CIVIL RIGHTS

104.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

105.  Defendants collectively and individually had a duty to protect Plaintiff's civil rights and/or to prevent or aid in preventing the commission of wrongs conspired to be done.

106.  Defendants breached this duty.

107.  The Defendants' wrongful acts, as set forth herein, directly and proximately caused Plaintiff to suffer monetary damages, physical injury, and severe mental and emotional distress.

108.  The actions of Defendants herein were willful, wanton, malicious, and in such callous and reckless disregard of the civil rights of Plaintiff as to entitle Plaintiff to recover punitive damages therefore.

109. Defendants are liable to Plaintiff for special and general damages that he suffered as a result of the above-described wrongful acts of Defendants, which were committed in violation of, inter alia, 42 U.S.C. § 1986.

## COUNT IV - UNLAWFUL DISCRIMINATION AND RETALIATION

110. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

111. Defendants constructively discharged, threatened, retaliated and/or otherwise discriminated against Plaintiff regarding Plaintiff's compensation, terms, conditions, location, or privileges of employment because of Plaintiff's unwillingness to condone improper and/or criminal activities, and because Plaintiff brought some or all of these activities to the attention of the City's supervisory personnel, the City Ethics Commission, and other individuals and entities and agencies.

112. Defendants' wrongful acts as set forth herein, directly and proximately caused Plaintiff to suffer monetary damages, actual physical injury, and actual severe mental and emotional distress.

113. The actions of Defendants herein were willful, wanton, malicious, and in such callous and reckless disregard of the civil rights of Plaintiff as to entitle Plaintiff to recover punitive damages therefor.

114.  Defendants are liable to Plaintiff for special and general damages that he suffered as a result of the above-described acts of Defendants, which were committed in violation of, inter alia, H.R.S. §378-62.

## COUNT V - WILLFUL, WANTON, AND RECKLESS CONDUCT

115.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

116.  Defendants' wrongful conduct above-described was willful and/or wanton, and/or reckless in nature and was with specific intent to cause injury to Plaintiff.

117.  Plaintiff suffered injuries and damages and Defendants' wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages.

118.  Pursuant to Iddings v. Mee-Lee, 82 Haw. 1 (1996), Defendants are liable for Plaintiff's injuries, and damages.

## COUNT VI - INTENTIONAL INFLICTION OF SEVERE MENTAL OR EMOTIONAL DISTRESS

119.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

120. By engaging in the above-described wrongful conduct, Defendants knowingly and intentionally caused severe emotional or mental distress to Plaintiff.

121. Plaintiff suffered injuries and damages and Defendants' wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages.

122. Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT VII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

123. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

124. By engaging in the above-described wrongful conduct, Defendants negligently caused emotional distress to Plaintiff.

125. Plaintiff suffered injuries and damages, including actual physical injury and pain, and Defendants' wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages.

126. Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT VIII– DEFAMATION

127.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

128.  By engaging in the above-described conduct, Defendants intentionally and knowingly published and made false statements, to third-parties, which were intended to and did harm the reputation of Plaintiff in the community and/or deter others from associating with him.

129.  Plaintiff suffered injuries and damages and Defendants' wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages.

130.  Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT IX – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

131.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

132.  At all times herein relevant, Plaintiff had a contractual employment relationship with the City.

133.  By engaging in the above-described conduct, Defendants, other than the Defendant City, intentionally and knowingly interfered with, and eventually

damaged and destroyed, all of Plaintiff's rights under his employment contract with the City.

134.  Plaintiff suffered injuries and damages and Defendants', other than Defendant City, and the wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages in the loss of those contract rights.

135.  Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT X – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

136.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

137.  At all times herein relevant, Plaintiff had a contractual employment relationship with the City, as well as the prospects for future advancement at the City and/or other additional economic advantage to be gained in the private real estate appraisal profession.

138.  By engaging in the above-described conduct, Defendants, intentionally and knowingly interfered with, and eventually damaged and destroyed, all of Plaintiff's rights and prospects for future advancement and/or

other additional economic advantage to be gained in the private real estate appraisal profession.

139. Plaintiff suffered injuries and damages and Defendants' wrongful conduct above-described was a direct and proximate cause of Plaintiff's injuries and damages in the loss of prospective economic advantage.

140. Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT XI – VIOLATION OF RIGHTS UNDER HAWAII CONSTITUTION

141. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

142. The above-described wrongful conduct of Defendants violated Plaintiff's rights secured to him by the Constitution of the State of Hawaii, including, but not limited to, due process of law, freedom of speech, equal protection of the law, and enjoyment of his civil rights.

143. Plaintiff suffered injuries and damages, including actual physical injury and pain, and Defendants' wrongful conduct above-described, was a direct and proximate cause of Plaintiff's injuries and damages.

144. Defendants are liable to Plaintiff for damages that he suffered as a result of their wrongful conduct described above.

## COUNT XII - PUNITIVE DAMAGES

145.  Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

146.  Defendants acted intentionally, wantonly, willfully, and oppressively, with such malice as implies a spirit of mischief, and with conscious indifference to the consequences of their acts and the Defendants' acts are characterized by aggravating circumstances sufficient to justify imposition of punitive or exemplary damages.

147.  Such willful misconduct warrants an award of punitive damages against Defendants and in favor of Plaintiff.

148.  Defendant City has evidenced a persistent and pervasive pattern of retaliation against whistleblowers and others who act to prevent illegal or improper behavior of City agencies, officers and employees.  The award of very substantial punitive damages against the City is necessary to discourage this pattern of retaliation.  Recent settlements of such claims are in amounts too small to focus the City's attention on the severity of the problem involved.  The award of substantial punitive damages against the individuals involved is necessary to deter other from committing such acts, since the City does not seem interested in providing such deterrence in their disciplinary practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment

against Defendants on all causes of action and grant relief as follows:

A.     General and special damages in amounts to be proven at trial;

B.     Punitive damages as to all Defendants; and

C.     Attorneys' fees, costs of suit, and both pre-judgment and post

judgment interest to the extent allowed by law; and circumstances.

D.     Such other and further relief as the Court deems just and proper

under the circumstances.

DATED:  Honolulu, Hawaii, February 13, 2004.

ROGER S. MOSELEY
ALAN K. LAU
CHRISTOPHER J. MUZZI
Attorneys for Plaintiff

# VERIFICATION

I, PHILIP E. ENGLISH, being first duly sworn on oath depose and say that I am the plaintiff above-named and that I have reviewed the foregoing Verified Complaint, and that the allegations contained therein are true and correct to the best of my knowledge and belief.

_____
PHILIP E. ENGLISH

Subscribed to and sworn to before me,
this 13th day of February, 2004.

_____
Print Name:  Kathleen Chrismer
Notary Public, State of Hawaii

My commission expires:  May 13, 2005

```
KATHLEEN CHRISMER
★   NOTARY PUBLIC   ★
    STATE OF HAWAII
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,

          Plaintiff,

    vs.

CITY AND COUNTY OF
HONOLULU; GARY T.
KUROKAWA; ROBERT O.
MAGOTA; ANN C. GIMA; and GK
APPRAISALS, INC.; JOHN DOES 1
–10; JANE DOES 1-10; DOE
PARTNERSHIPS; DOE
CORPORATIONS 1-10; AND DOE
ENTITIES 1-10,

          Defendants.

Civil No. _____
(Discrimination)

DEMAND FOR JURY TRIAL

---

DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, PHILIP E. ENGLISH, by and through his
undersigned counsel, and hereby demands trial by jury of all issues so triable
herein.

DATED: Honolulu, Hawaii, February 13, 2004.

ROGER S. MOSELEY
ALAN K. LAU
CHRISTOPHER J. MUZZI
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,

                Plaintiff,

    vs.

CITY AND COUNTY OF
HONOLULU; GARY T.
KUROKAWA; ROBERT O.
MAGOTA; ANN C. GIMA; and GK
APPRAISALS, INC.; JOHN DOES 1
–10; JANE DOES 1-10; DOE
PARTNERSHIPS; DOE
CORPORATIONS 1-10; AND DOE
ENTITIES 1-10,

                Defendants.

Civil No. _____
(Discrimination)

SUMMONS

## **SUMMONS**

STATE OF HAWAII

To the above-named Defendants:

    You are hereby summoned and required to serve upon Case Bigelow &
Lombardi, Plaintiff's attorneys, whose address is Pacific Guardian Center, Mauka
Tower, 737 Bishop Street, Suite 2600, Honolulu, Hawaii, 96813, an answer to
the Complaint, which is herewith served upon you, within twenty (20) days after
service of this summons upon you, exclusive of the day of service.  If you fail to

27505/2/336689.1

do so, judgment by default will be taken against you for the relief demanded in the Complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a Judge of the above-entitled Court permits, in writing on this summons, personal delivery during those hours.

Failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

DATED:  Honolulu, Hawaii, _____ **FEB 1 3 2004** _____.

**WALTER A.Y.H. CHINN**
_____
CLERK OF THE ABOVE-ENTITLED COURT

/s/ Erin Taniguchi

Deputy Clerk, United States
District Court, District of Hawaii