# DIRK von GUENTHNER & ASSOCIATES
## 923 KAHENA STREET
## HONOLULU, HAWAII 96825
## (808) 532-1400 * FAX (808) 395-1201

November 4, 2005

Michael A. Lorusso, Esq.
Kawashima Lorusso & Tom

Kevin P.H. Sumida, Esq.
Anthony L. Wong, Esq.
Matsui Chung Sumida and Tsuchiyama
737 Bishop Street, Suite 1400
Honolulu, HI 96813

Re:    Philip E. English v. City & County of Honolulu
       Civil No. 04-00108 SOM/KSC
       FINAL REPORT OF DIRK VON GUENTHNER

Gentlemen:

You have engaged me to provide an expert report on the above referenced matter. In order to render this report you have provided me with the equivalent of three archive boxes of documents. The information you provided has been sorted into numbered books. The seventy (70) book numbered index is attached herewith as Exhibit "A". All documents in the books are incorporated in my report. Also attached as Exhibit "B" is my curriculum vitae and my Rule 26 disclosure is identified as Exhibit "C".

The conclusions reached in this report are made with a reasonable degree of economic certainty. If additional information is provided, I reserve the right to amend this report accordingly.

For ease in referencing specific areas of this report, the following index is provided:

| PAGE | DESCRIPTION |
|------|-------------|
| 3 | CONCLUSION |
| 6 | POSITION/HISTORY OF PLAINTIFF |
| 7 | THE APPLICATION FOR EMPLOYMENT WITH THE C&C |

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005


DEFENDANT'S EXHIBIT 3002

| PAGE | DESCRIPTION |
|------|-------------|
| 14 | PLAINTIFF'S BANKRUPTCY |
| 17 | OTHER ISSUES OF MISLEADING STATEMENTS |
| 19 | PLAINTIFF'S WORK FOR CASH AFTER THE CITY JOB |
| 21 | PLAINTIFF'S ABILITY TO WORK |
| 29 | WHISTLE BLOWING VALUE |
| 37 | ALLEGATIONS OF WORKPLACE VIOLENCE (PHILIP ENGLISH) |
| 40 | COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT |
| 42 | THOMAS T. UENO, CPA REPORT - (BOOK 6) |

Thank your for the opportunity to provide my services.

Very truly yours,

Dirk von Guenthner, CFE, DABFA, BCFE, FACFE

Attached: Exhibits A, B and C

# CONCLUSION

1.  My objective in writing this report was to review as much information as there was available, evaluate that information, and opine on the present value of an amount of money that the Plaintiff should receive for special damages due to the liability of the City & County of Honolulu and the other defendants.

2.  Of the many cases I have been engaged to provide an opinion on the special damages of a plaintiff, this case stands out particularly in the area of ethical issues.

3.  Plaintiff essentially claims that due to his steadfast position on moral standards and values, he took it upon himself to resurrect and cure the violations of moral principles and values of the personnel in the Real Property Assessment Division. In doing this deed, Plaintiff claims that the retaliation of the staff of the Real Property Assessment Division has caused him so much harm that he will, according to his expert's report, only be able to work as a guard for 12 hours a week for the rest of his life to mitigate his loss of wages from his job with the City and will need $834,796 to make up the difference.

4.  As set forth herein below, my opinion is that:

    a.  Information on the Plaintiff's application to the City is not factual. The representation makes it appear that he operated a fairly large appraisal business as its owner and manager. Actually, the tax returns have revealed that for several years before completing the application, Plaintiff's business was operating with either no revenue or not enough, making its results of operations insufficient to pay his operating costs nonetheless pay any of his salary reflected on the application. This representation may have given the personnel at the City an opinion that Mr. English was actually successful in operating and managing a large appraisal firm when that is not the truth.

    b.  The Plaintiff's application omitted two part-time jobs that he had as a clerk in a paint department at City Mill and as a carpet cleaner for Electrolux. Had this information been provided, it may have led the interviewer for this City job to focus on Mr. English's mental health issues the years preceding taking the job. That, in itself, should have been enough to clue the interviewer into the fact that Mr. English may have lacked enough fortitude to do his job without his past history of psychological problems coming back into play at the workplace.

c.      Philip English, prior to working for the City, had attempted suicide, had a cancerous kidney removed, was divorced from his wife, had problems with the IRS, was getting ready to file bankruptcy and was severely emotionally upset over those and other personal problems in his life for up to three years immediately preceding taking the job with the City.

d.      Philip English, during a 17 month period, incurred new debt (mostly credit card) of $150,235 ($8,837 per month) and then filed bankruptcy in 2000 with $194,035 in unsecured debt, $21,000 of secured debt to the IRS totaling to $215,035 of liabilities and $3,370 of assets. It is my opinion that Mr. English used a system that allowed him to live a lifestyle that he could not have ever in his life afforded thus far. With no possible way of paying back the debt, he filed bankruptcy.

e.      Philip English, in 1999, executed his Income and Expense Statement filed in Family Court under penalty of perjury that he was earning income that he simply was not earning and has never since earned.

f.      Philip English applied to the position of Appraiser IV with the City on 01/17/03, after working with the City for over two and a half years. In that application, Mr. English documented the salary he earned in his private practice to be greater than when he first applied.

g.      Philip English took on part time work after leaving his job with the City doing work for cash and barter. Mr. English failed to include this information on his tax returns and further failed to pay the related tax. Mr. English signed the tax returns with the penalty of perjury without having declared the income.

h.      Philip English was promoted to Appraiser IV and began to have problems with his ability to perform his job adequately. He blames this poor performance as an Appraiser IV on the retaliation of most of the staff at the Real Property Assessment Division. It is my opinion, more likely than not that Plaintiff at that time he was not competent to do the job based upon other factors which impacted his life.

i.      Philip English has hidden behind the protection afforded to a "Whistle Blower." Essentially with hindsight, it is now known that although the FBI, United States Attorney and many departments of the City were involved, the result of all the time and effort is literally nothing. Of all the hoopla that was created to somehow justify the retaliation by the City employees, nothing known to me supports any substantive basis for the Whistle Blowing claims.

j.     Philip English was under investigation for claims against him for "Workplace Violence." The investigation included numerous interviews with a substantial base of information. Lacking in the investigation was an interview with Philip English. The investigation was put on hold until the interview could be completed. Mr. English never did attend the interview, so it is not known if he would have been found innocent or guilty of the charges.

k.     Philip English did settle his Workers' Compensation claims with the City for $85,000. In that settlement document, he stated that he had not sustained any permanent disability from his claimed injury.

5.     The claims of special damages for lost wages prepared by local CPA, Thomas Ueno were made without Mr. Ueno being aware of most of the information made available to me.

6.     Robert J. Sbordone, Ph.D. opined that he suspected that Mr. English will work in his professional appraiser capacity after this lawsuit is settled.

7.     For the last seven months Philip English worked for the City he had retained counsel who even participated in a news release which criticized the Real Property Assessment Division. This activity included contacting the FBI and the United States Attorney office in an apparent effort to embolden the claims of Mr. English.

8.     Based upon the medical history, work history and other references herein, I believe that it has been Philip English's good fortune to have received $85,000 from the City already. I do not believe that he is entitled to any more money.

# POSITION/HISTORY OF PLAINTIFF

1.    (Book 035 @ page 018) City jobs identified:

    a.    06/01/00 - REAL PROPERTY APPRAISER II,   SR-18C
    b.    02/01/01 - REAL PROPERTY APPRAISER III,  SR-20C
    c.    03/01/02 - REAL PROPERTY APPRAISER IV,  SR-22C
    d.    06/01/02 - REAL PROPERTY APPRAISER IV,  SR-18D

2.    1988 - Suicide attempt (Book 004 @ page 23)

3.    Late 1997 - Suicide attempt/hospitalization, (Book 058 @ page 31).

4.    November 4, 1998 - cancerous kidney removed, (Book 058 @ page 32).

5.    April 29, 1999 - Divorced from 2nd wife, Corlis Chang, Esq., (Book 028 @ page 0011).

6.    June 1, 2000 - Plaintiff Started working for the City, (Book 11 @ page 39).

7.    August 1, 2000 - Plaintiff signed his Voluntary Petition for a Chapter 7 Bankruptcy, (Book 16 @ page 137).

8.    February 15, 2002 - Plaintiff issued his first written complaint to Mr. Magota, one week after issuing his second verbal complaint, (Book 018 @ page 477).

9.    January 30, 2003 -  Date of injury to Plaintiff, (Book 050 @ page PE 01945).

10.    February 28, 2003 - Plaintiff went on sick leave, (Book 045 @ page PE01152).

11.    October 29, 2003 - Divorced from 3rd wife Sathiporn S. English, (Book 029 @ page 0006).

12.    January 20, 2004 - Plaintiff signed the agreement to settle for $85,000 with the City, (Book 11 @ Page 62).

13.    February 12, 2004 - Plaintiff filed this lawsuit, (Book 26).

# THE APPLICATION FOR EMPLOYMENT
# WITH THE C&C

1.  The "Employment Application" of the City & County of Honolulu was signed by Philip English (hereinafter "Plaintiff") on May 18, 1999, (Book 014 @ Exhibit 3).

2.  In the deposition of Plaintiff, (Book 012 @ page 96).

    a.  Q.  With regard to that application, as we already talked about, you indicated that, on your application, you tried to be as honest as you could, correct?

    b.  A.  Yes.

3.  In the deposition of Plaintiff, (Book 012 @ page 98).

    a.  Q.  Is that your signature that appears on the application?

    b.  A.  Yes.

    c.  Q.  And that is on the first page as well as the fourth page if this document, correct?

    d.  A.  Yes.

4.  In the deposition of Plaintiff, (Book 012 @ pages 98 and 99).

    a.  Q.  And with regard to Question No. 9 on page one of this four-page document, it indicates, "I hereby certify that all statements made on or in connection with this application, including those regarding my education and employment record, are true and correct to the best of my knowledge." Did I read that correctly?

    b.  A.  Yes.

5.  In the deposition of Plaintiff, (Book 012 @ page 99).

    a.  Q.  And it states, "include all previous work experience full time, part time, volunteer and military experience. Begin with your present or last job held. Describe in detail nature of work personally performed by you.

Also give dates and explain unemployed periods. If your duties and responsibilities changed while working for the same employer, list each separately.

First of all, did I read that correctly?

b.　A.　Yes, you did.

6.　The following information is provided to illustrate that Plaintiff did not include factual information on his application in several places.

a.　My opinion is that, if Plaintiff had provided factual information on the application, it is more than likely that he would never have been hired for the job. If Plaintiff had not been hired, there would be no lawsuit and no damages.

7.　The application required the Plaintiff to include "Also give dates and explain unemployed periods".

a.　In the deposition of Plaintiff, (Book 012 @ page 50).

i.　Q.　Your depression back in 1998, when you first began seeing Kay Wong, did it affect your ability to obtain or function in an employment situation?

ii.　A.　Well, it was in the beginning part of 1998 that Corlis told me she wanted a divorce. And that was a severe time for me as far as emotional upset. We Separated

b.　In the deposition of Plaintiff, (Book 012 @ page 51).

i.　Q.　And in terms of earning a living, was that when you applied with the City or was there a period of time when it did affect your ability to earn a living?

ii.　A.　Initially, at the very beginning when the emotional upset was so severe, absolutely I could not work.

iii.　Q.　When you say initially, from when to approximately when was your ability to function in an employment capacity affected?

iv.　A.　I think I would say approximately six months. But it's not that it's over. There were things that continued...At the end of "98, actually all in one day, Corlis gave me divorce papers that

were very severe and an hour later my doctor called me and told me you got kidney cancer and you might not live for more than five years.

c.   In the deposition of Plaintiff, (Book 012 @ page 52).

  i.    Q.   In terms of the impression that it was something that obviously it begins because of events in your life at that period of time, the divorce, the kidney cancer, and I wasn't trying to imply that it goes away, but it is something that continues into the future, correct?

  ii.   A.   For that event, yes.

d.   Please note that the application was dated May 18, 1999.

8.   The application included the language, "include all previous work experience full time, part time, volunteer and military experience. Begin with your present or last job held. Describe in detail nature of work personally performed by you."

a.   The employment with City Mill (working in the paint department as a clerk) and with Electrolux (cleaning carpet) after quitting his business with his own company and starting at the City were omitted on the employment application.

b.   In the deposition of Plaintiff, (Book 012 @ page 40).

  i.    Q.   Going back, you had indicated that, at the time you were making a change again from working for Philip English & Associates to going to working with the City - - by the way, were there other jobs in that interim period?

  ii.   A.   Yes.

  iii.  Q.   What other jobs were there?

  iv.   A.   I worked at City Mill.

  v.    Q.   And what did you do at City Mill?

  vi.   A.   I worked in the paint department.

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005                        Page 9 of 49

vii.   Q.   And from approximately when to when did you work for City Mill?

viii.   A.   I'm not sure of the dates. It would have been in 1999. And that was a matter of months. I'm not sure of the dates.

c.   In the deposition of Plaintiff, (Book 012 @ page 100).

i.   Q.   When you say no, it's not, with regard to my question, the position that you held with City Mill is not on the application, correct?

ii.      Correct, it is not on the application.

d.   In the deposition of Plaintiff, (Book 012 @ page 100).

i.   Q.   And in addition to City Mill, before you began you work with the City, you also worked at Electrolux, is that correct?

ii.   A.   I worked at -- I'm not even sure if I was an employee...

e.   In the deposition of Plaintiff (Book 012 @ page 100 and 101)

i.   Q.   Yes, what were you doing?

ii.   A.   I was helping my friend who you had a carpet cleaning business.

iii.   Q.   Did you receive any monies from helping or assisting you friend at Electrolux?

iv.   A.   He paid me out of his money...

f.   In the deposition of Plaintiff, (Book 012 @ page 40).

i.   Q.   Were you paid in cash?

ii.   A.   I was paid in cash. Again, I was helping my friend. It was an extremely part-time type of work. Yes.

iii.   Q.   What is the your friends name?

iv.   A.   John Ahuna.

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005

g.    In the deposition of Plaintiff, (Book 012 @ page 101).

    i.    Q.    And for how long did you assist Mr. Ahuna at Electrolux?

    ii.    A.    Off and on for maybe three months.

h.    Book 30 includes income tax records produced by the Plaintiff. Note that there is no evidence that the Plaintiff paid income taxes on the cash earnings from the Electrolux related work in 1998 or 1999.

9.    On the employment application, (Book 050 @ PE 01976), the Plaintiff identifies his most recent position at Philip English & Associates from the period 1989 to the present in 1999. The salary identified for each of the ten year period was recorded on the employment application as $40,000.

a.    Information by the Plaintiff on the application does not reconcile insofar as his employment with Philip English & Associates (hereinafter, "His Company) and also on the salary he earned.

b.    In 1999, the tax return produced (Book 030 @ 1999 page 091) includes a Schedule C.

    i.    The return identifies no income or cash receipts in 1999.

    ii.    It identifies no compensation to officer, Plaintiff.

    iii.    No salaries or wages paid to staff - zero.

    iv.    It identifies a loss for the year of <$11,201.21>.

c.    The tax return produced for 1998 (Book 030 @ 1998) includes tax information from the IRS for a married filing jointly.

    i.    No information is available to determine if the Plaintiff earned anything from his company.

    ii.    Unless documentation is provided that the Plaintiff earned anything from his company, I have to assume that there were no earnings in 1998 and the return was not produced with the intent to hide that fact.

d.    In 1997 no documents were produced.

e.　In 1996, the 1120S tax return produced, (Book 030 @ 1996):

   i.　Reflects gross income for his company of $19,021.

   ii.　No compensation to the officer (Plaintiff).

   iii.　No salaries or wages paid to staff - zero.

   iv.　A loss for the year of -$58,808. Note the only officer of the company was the Plaintiff as 100% owner.

f.　In 1995, the 1120S tax return produced, (Book 030 @ 1995):

   i.　Includes gross receipts of $71,727.

   ii.　There is no evidence of any salary or compensation earned by the Plaintiff.

   iii.　There is no evidence that the Plaintiff had 12 appraisers plus staff since there is no evidence of any payroll paid.

   iv.　The company had ordinary income of only $7,812.

g.　In 1994, the 1120S tax return produced, (Book 030 @ 1994):

   i.　Includes gross receipts of $249,308.

   ii.　The compensation to the Plaintiff was $29,899. Note the application reflected compensation of $40,000 for each year and this is the last year that the Plaintiff earned compensation before 1999.

   iii.　Salaries and wages totaled only $96,287. If the Plaintiff had 14 employees, each employee had to average $573 per month. This suggests that the Plaintiff did not have 14 people working in 1994 or thereafter (12 appraisers + staff).

h.　In 1993, the tax return produced, (Book 030 @ 1993):

   i.　Includes gross receipts of $429,973.

   ii.　The compensation to the Plaintiff was $54,571. Note the application reflected compensation of $40,000 for each year. This is the only year in which the Plaintiff earned an amount commensurate with the

information given on the application.

iii.    Salaries and wages totaled only $202,976. If Plaintiff had 14 employees, each employee had to be paid an average $1,208 per month, (or $14,498 per year) which illustrates that Plaintiff did not have 14 people working in 1994 or thereafter (12 appraisers + staff).

i.    No documents were produced before 1993.

j.    The evidence provided above reflects the lack of truthful disclosure on the employment application when the Plaintiff represented that he had $40,000 per year salary in the following years:

    i.    1994
    ii.    1995
    iii.    1996
    iv.    1997
    v.    1998
    vi.    1999

k.    The evidence also reflects that the Plaintiff's representations are not factually based that he had 12 appraisers + staff from 1994 through 1999.

l.    If the application had indicated the losses identified above, it is likely that the City personnel may have questioned the Plaintiff's ability to be a successful appraiser and abstained from hiring him. When the Plaintiff indicated that he had a business for 10 years with 12 appraisers and a staff earning $40,000 for all those years, the City was misled believing that Plaintiff was a successful and accomplished appraiser.

m.    If Plaintiff had listed his unemployed period in 1998, 1999, and 2000, City personnel could have found out about his psychological problems and a related suicide attempt during that period of unemployment. If the employment misrepresentations on the application had been accurately stated it may have been sufficient information for the City not to have hired him.

# PLAINTIFF'S BANKRUPTCY

1.  In the documents produced by Reneau Kennedy is the *Agreement Incident To Divorce* (hereinafter, "AITD") filed with the Family Court, First Circuit State of Hawaii on March 17, 1999 on behalf of Plaintiff and his then wife, Corlis Chang, (Book 016 @ page 100).

    a.  Page 110 of the documents produced is the AITD which identifies debts awarded to husband, Plaintiff. Note the document was signed by Plaintiff on March 5, 1999.

    b.  The items identified as Plaintiff's debts are as follows:

        i.    Bank of Hawaii P-flex ($10,000.00)

        ii.   Citibank Visa

        iii.  Sears

        iv.   NML Insurance Company (Husband's policy)

        v.    Associates Capitol Bank

        vi.   Associates Financial Bank

        vii.  His personal Friend.

2.  On March 1, 1999 the Plaintiff signed his Asset and Debt Statement which was filed in Family Court on March 8, 1999, (Book 016 @ page 91).

    a.  Since the date of the Asset and Debt Statement was signed four days before the AITD, I assume that all amounts of debts are the same.

    b.  The amounts of debts absorbed by the Plaintiff in the AITD are identified on the Asset and Debt Statement as follows:

        i.    Bank of Hawaii P-flex ($10,000.00)

        ii.   Citibank Visa ($2,600.00)

    iii.    Sears ($3,000.00)

    iv.    NML Insurance Company (Husband's policy) ($4,300.00)

    v.    Associates Capitol Bank ($11,900.00)

    vi.    Associates Financial Bank ($7,000.00)

    vii.    His personal Friend ($5,000.00)

    viii.    The total debts absorbed by the Plaintiff consequently are total **$43,800**.

3.    The monthly payments of the Plaintiff, for the above debts are $720 per month. If the child support provided from the Plaintiff to his ex-wife on the AITD of $370 is added, (Book 016 @ page 103), the Plaintiff (in April 1999) was required to pay $1,090 per month before making any payments for his own support, ($13,800 annually).

4.    On August 1, 2000, Plaintiff (Book 016 @ page 162), signed his Voluntary Petition for a Chapter 7 Bankruptcy #00-02917, (Book 016 @ page 137), with the United States Bankruptcy Court in the District of Hawaii.

    a.    In the Voluntary Petition, the Plaintiff listed **$194,035** of unsecured creditors. Most of the debts were to credit card companies for credit card purchases totaling $161,966.

    b.    Overall, the Plaintiff's unsecured debts increased from $43,800 on March 1, 1999 to $194,035 on August 1, 2000.

    c.    Note that this is the period that Plaintiff worked for City Mill and Electrolux.

    d.    Further note that Plaintiff started working for the City & County in June 2000 at an annual salary of $29,340.

    e.    During this 17 month period the Plaintiff incurred debts of **$150,235**, ($194,035 - $43,800).

    f.    The Plaintiff spent an average of **$8,837** per month ($150,235 divided by 17).

5.    It is my opinion that Plaintiff used the credit lines of his creditors to their detriment during the time that he was psychologically impaired and incapable of working.

# OTHER ISSUES OF MISLEADING STATEMENTS

1.  On March 1, 1999, the Plaintiff signed the Income and Expense Statement and filed it with the First Circuit Court, State of Hawaii, (Book 028 @ 0018 - 0021):

    a.  This is a documents that was filed in connection with the Plaintiff's divorce with Corlis Chang, Esq.

    b.  On the document the Plaintiff identified earnings of $40,000 per year with the caption "Based on an estimated $40,000 a year."

    c.  Plaintiff provided the caption, "Planning to start work in March, 1999."

    d.  Plaintiff executed the document following the statement, " I hereby declare under the penalty of perjury that I supplied the information used in the foregoing Income and Expense Statement and that I have reviewed the foregoing Income and Expense Statement and certify that the information is accurate, complete, and correct."

    e.  The Plaintiff did not start working for the City and County of Honolulu until June, 2000.

    f.  From the records I have examined, there is no evidence that Plaintiff was going to have any work for another fifteen months. During this period the Plaintiff lived on his credit cards.

    g.  It is my opinion that the statement made by Plaintiff was misleading and not factual it was based on  desire rather than realistic assessment.

2.  When Plaintiff first applied to the City, his application identified his salary with Philip English and Associates at $40,000 per year. The research above proved that Plaintiff was not truthful on this application, (Book 014 @ Exhibit 3).

    a.  When the Plaintiff applied for the position of Appraiser IV on 01/17/03 he also completed an application, (Book 034 @ pages 113 to 116).

    b.  The period of work with Philip English and Associates on the 01/17/03 application shows a work period from 1989 to 1998.  On the May 1999 application the Plaintiff indicated that he was working for this business in 1999, not 1998.

    c.  On the 01/17/03 application (page 114) the Plaintiff identified the salary as

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005

being $40,000 to $45,000 +. The May 1999 application shows salary of $40k -$40k.

d.     The evidence above shows that the Plaintiff did not earn even $40,000 for the following years:

    i.     1994
    ii.    1995
    iii.   1996
    iv.    1997
    v.     1998
    vi.    1999

e.     The Plaintiff signed the 01/17/03 application after reading the following statement: "I hereby certify that all statements made on or in connection with this application, including those regarding my education and employment record, are true and correct to the best of my knowledge."

f.     Although the Plaintiff had been employed from June 2000 through January 2003 when applying for the position of Appraiser IV, he was untruthful. The amount not only did not agree with his original application, but he even identified a larger salary in an apparent attempt to convince his superiors that his services should command a salary of $40,000 to $45,000 per year.

# PLAINTIFF'S WORK FOR CASH
# AFTER THE CITY JOB

1.    After the job with the City, the Plaintiff continues to work for cash and has failed to pay federal, state or general excise tax on this income.

2.    In the deposition of the Plaintiff, (Book 012 @ page 98).

    a.    Q.    And since working for the guard company, have you sought any other employment?

    b.    A.    No. I should say that if I can do something to help somebody around the harbor or something where I'm living and someone gives me a job to do, clean the bottom of their boat, you know. I mean, I'm, doing that kind of thing.

    c.    Q.    That is like a side job for cash?

    d.    A.    Yes, incidental type. Sometimes even for barter, yeah.

3.    Plaintiff 2003 1040EZ, (Book 030 @ 2003), identifies:

    a.    Gross wages of $17,342.54 on the first page of the return.

    b.    Form W-2 attached to the return reflects $17,342.54 as compensation from the City and County of Honolulu.

    c.    No cash or barter income was declared.

    d.    Plaintiff signed the return under the caption: "Under penalties of perjury, I declare that I have examined this return, and to the best of my knowledge and belief, it is true, correct and accurately lists all amounts and sources of income I received during the tax year."

4.    Plaintiff 2004 1040EZ, (Book 030 @ 2004), identifies:

    a.    Gross wages of $1,161.76 on the first page of the return.

    b.    Form W-2 attached to the return reflects $1,161.76 as compensation from the City and County of Honolulu.

    c.     No cash or barter income was declared.

    d.     The Plaintiff signed the return under the caption: "Under penalties of perjury, I declare that I have examined this return, and to the best of my knowledge and belief, it is true, correct and accurately lists <u>all amounts and sources of income I received during the tax year.</u>"

5.     I conclude that Plaintiff appears to have avoided paying taxes to various governmental agencies. The Plaintiff signed the 2003 and 2004 tax returns knowing that he has earned cash and barter income that was not disclosed.

6.     In order to provide some perspective to the amount of money that Chris Graff earned from GK Appraisals, Inc., copies of documents were produced. Form 1099-Misc. were apparently filed with the Internal Revenue Service and the State of Hawaii by GK Appraisals, Inc. on behalf of Christopher Graff (Book 025):

    a.     The gross compensation was as follows:

        i.      1995 - $1,500
        ii.     1996 - $2,500
        iii.    1997 - $2,250
        iv.    1998 - $1,920
        v.     1999 - $ -0-
        vi.    2000 - $ -0-
        vii.   2001 - $ -0-
        viii.  2002 - $ -0-
        ix.    2003 - $ -0-

    b.     Note - It appears that it would have been improper of Chris Graff to have worked for GK Appraisals on City time. It is unknown how much of the time was done at his job in conflict with his City work and how much time was worked elsewhere, if any. What is known is that the taxing authorities were notified accordingly.

# PLAINTIFF'S ABILITY TO WORK.

1.  In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003:

    a.  "Mr. English reported that he experienced his first episode of depression during a period of marital turmoil with his second wife, in 1998. He stated that he attempted suicide twice; the first with a large bottle of aspirin and the second by hanging,."(Book 018 Page 487).

    b.  "According to the supervisor's response to OSHA, Mr. English "said his wife knew the judge and his attorney did a poor job of representing him, which resulted in an unfavorable outcome for him." Additionally, according to the supervisor, "He would also complain that his second wife accused him of abusing her, which he says never happened. The divorce was finalized in March 1999.".

2.  In the deposition of Plaintiff, (Book 011 @ page 38).

    a.  Q.    And what happened in 1999?

    b.  A.    In 1999, my – well, in 1998, my life changed quite a bit. I had kidney cancer and my wife wanted to divorce me.

    c.  Q.    And that would be Ms. Chang?

    d.  A.    That is correct...And I decided I wanted to do something for Honolulu. I wanted to use my abilities or whatever I could do for the City & County of Honolulu and I applied for the Assessment Division positions.

3.  Daryl B. Matthews, M.D., Ph.D. of the Hawaii Forensic Associates, LLC, (Book 023 page 2 and 3), wrote Plaintiff's counsel, "Mr. English had been married for approximately twelve years when in 1998 his wife told him that she did not love him anymore and filed for divorce. By his report, she was a successful attorney and very capable of getting the divorce settlement that was most beneficial. Also, in 1998, Mr. English was diagnosed with kidney cancer and underwent nephrectomy (removal of the kidney). His situational life difficulties, both physical and emotional, caused him a severe depression. He had two suicidal attempts and was diagnosed with a Major Depressive Disorder. He received psychiatric/psychological treatment, including medication, and stated that he eventually got better. He had only recently recovered from this serious psychiatric disorder when he began working for the City

and County of Honolulu as an Appraiser in June, 2000."

4.    Plaintiff filed a Voluntary Petition for Bankruptcy on August 15, 2000 (Book 016 @ 137).

5.    In the deposition of Plaintiff (Book 011 @ page 38 and 39).

    a.    Q.    Any other reason why you wanted to work for the City & County of Honolulu?

    b.    A.    Sure. My doctors told me that I needed to try to be in a type of work that was less stressful and maybe more steady and it seemed like a good thing to do. And I was feeling that just made a whole lot of sense.

6.    In the deposition of Plaintiff, (Book 011 @ page 42 and 43).

    a.    Q.    Before you applied for your job with the City, did you talk to Dr. Tsou, explain to him what the job was and say this is the type of position that I will be taking, since you have told me to take a less stressful job?

    b.    A.    No. In fact, I'm certain he would not have advised me one way or the other.

    c.    Q.    But you don't know that, correct?

    d.    A.    I don't know that. But certainly feel that way, yeah... And just to be clear about it, when I'm saying a less stressful type of position, when you are operating an independent appraisal firm, it's fairly stressful because it's a real estate appraisal type function, but because the nature of business is either extremely busy or there is not much going on. It has lots of ups and downs and that causes a great deal of stress on a person.

        So I think what we are talking about in terms of something less stressful is something that is more steady.

    e.    Q.    But going back to my question, Dr. Tsou had indicated to you you should take a less stressful position, correct?

    f.    A.    Yes.

    g.    Q.    And did you?

h.    A.    Let me also -- I'm sorry. I'm not stating this correctly, Mike. What he really said was to make your life less stressful. He didn't specifically say go out and find a job that is less stressful. I'm incorrect when I said that before. That is not correct. He said make your life in general less stressful. That is what he said.

i.    Q.    And did you speak with Dr. Tsou with regard to your application with the City as a real estate appraiser?

j.    A.    No.

k.    Q.    Did you speak with any other physician with regard to your application to work for the City?

l.    A.    No, I didn't.

7.    The "Employment Application" of the City & County of Honolulu was signed by Plaintiff on May 18, 1999, (Book 050 @ page PE 01975).

8.    On December 20, 1999, Roy Amemiya, Jr., Director of the Department fo Budget and Fiscal Services wrote Plaintiff a letter, (Book 050 @ page PE 01970).

    a.    "Thank you for your time and effort in interviewing for our Real Property Assessor position.

    b.    "The interview panel was asked to find a person with experience in assessing real property as well as administering a large, unique operation. They found an applicant who is a good match in both areas. While someone else was selected, we hope you will continue to consider the City as a potential employer.

9.    In the deposition of Plaintiff, (Book 011 @ page 39).

    a.    Q.    When was it that you first began working with the City?

    b.    A.    June 2000, June 1st, 2000.

10.    In the performance appraisal of Plaintiff for the period from 06/01/01 to 05/31/02 (Book 034 @ page 017):

    a.    "During this performance evaluation period, Philip has been working in an Appraiser III position and has recently been reallocated to the Appraiser IV

position commensurate with his assigned duties."

b.     "While he has continued to progress in his learning of office procedures, he seems to be having some difficulties in organizing and prioritizing the many and varied tasks associated with his position. He often disagrees with established office work processes and has voiced his opinion as to how he believes things may better be accomplished and resists completing tasks in the prescribed manner."

11.     In the deposition of Plaintiff, (Book 011 @ page 10 and 11).

a.     Q.     And from August 14, 2002 throughout December 2002 when Mr. Moseley was retained by you, were you consulting with him with regard to an employment matter, which is why we are here today?

b.     A.     Right

12.     On January 16, 2003 Waylen Toma, Business Agent for Plaintiff's Union, Hawaii Government Employees Association wrote (Book 034 @ page 090):

a.     "First of all I would like to clarify the fact that you were never on any extended probation."

13.     Thomas Riddle, Workers' Compensation Administrator for the City and County of Honolulu, on March 18, 2003 wrote, (Book 017 page 310), "...I offered to try to find an alternate temporary work location for Mr. English so he would not be without income during this period. He said he would have to consult his doctor regarding this.  After the meeting with Mr. English, I called various individuals within his department, and a completely different story unfolded which cast doubt on Mr. English's allegations and the reason for his claim. These include the possibility that he filed this claim to overcome allegations of poor work performance, personal problems affecting his job, and complaints of work harassment filed by other employees."

14.     On May 6, 2003 Joan H. Koff Ph.D. wrote an Initial Psychological Evaluation, (Book 036 @ page 046):

a.     "However, his demands and complaints, even with health care personnel, may exasperate others."

15.     In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003:

a.     (Book 018 @ 482 and 485) - Mr. Mike Golojuch, an administrative services officer concluded, "Since he has raised Ethics issues, he considers himself protected under the whistle blower provisions. This is true for any retaliation. However, nothing found during the investigation revealed that Phil is under retaliation. Instead, there is concern that Phil's behavior may lead to something violent. He is soft-spoken and calm in appearance but has raised his voice and thrown things when confronted. Several people consider his behavior to be something like Byron Uyesugi and the Xerox case (shootings). Whether violent or not, his work performance may be less than satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action."

b.     (Book 018 Page 494), "If there is an alternate placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or possibly full time work."

16.     In the deposition of Plaintiff, (Book 011 @ page 54).

a.     Q.     For how long a period of time before you started for Master Guard company, were you unemployed?

b.     A.     I guess from December 2003 until that time.

c.     Q.     Between December 2003 and up until April of 2005 when you began working for the Master Guard company, did you seek other employment?

d.     A.     Yes.

e.     Q.     What other employment did you seek?

f.     A.     I looked for jobs as a driver. I looked for jobs as wait help at conventions and that sort of thing. Those were the – there were various places. But those were the types of jobs. This was all part of therapy with Dr. Koff in trying to get me back into the working situation. And so we decided that we would try to have some kind of job like that. The guard job has proved to be a good job for that.

g.     Q.     Any other jobs that you sought in that December 2003 up until April 2005 time period?

h.     A.     No.

17.   In the deposition of Plaintiff, (Book 011 @ page 55).

   a.   Q.   Did you begin to do real estate appraisals on your own?

   b.   A.   No, I did not.

   c.   Q.   Why not?

   d.   A.   I'm trying to get jobs where I can go a little bit at a time to make sure that I can function in them okay. If I were to – the idea is I don't want to start a job and then fail. And that I don't want to experience similar things that I experienced at the City. I mean, there is no guarantee that an employee won't behave in a way that causes someone to hurt them in a way. But through the therapy with Dr. Koff, the approach was just to try and get out there, see want kind of job I could get.
         The therapy from the beginning in fact was to first get me to a point where I could feel comfortable going to the market. So I mean, I have come a long way since that time and I'm pretty grateful to Dr. Koff for that. In fact, I really wish I could still have therapy with her. But she has really helped me a lot in that regard.

18.   In the deposition of Plaintiff, (Book 011 @ page 57 and 58).

   a.   Q.   ...with regard to December 2003, when you stopped working for the City, up until the present time, you testified that Dr. Koff never told you you could not work as a real estate appraiser, is that correct?

   b.   A.   That's correct. But what I'm trying to say is that the entire treatment process that I've been going through, the whole effort of that treatment process is to get me back into the work environment, and that the types of jobs that I applied for were part of the treatment plan with Dr. Koff.

19.   In the deposition of Plaintiff, (Book 011 @ page 56).

   a.   Q.   Did any physician, psychologist, psychiatrist, counselor ever tell you you cannot work as a real estate appraiser from December 2003 until the present time?

   b.   A.   Well, the only restriction that I'm aware of is that they said I could not work at the City & County as a real estate appraiser. That is the only restriction that I'm aware of.

20.   In the deposition of Plaintiff, (Book 011 @ page 59).

    a.    Q.    Mr. English, please listen to my question. Just in terms of a time period, December 2003 up until today September 30, 2005, did Dr. Koff say to you you cannot work as a real estate appraiser?

    b.    A.    No, she didn't say that to me. What she did say was, we need to get you back in the work force and we need to try and find these kinds of jobs, these entry level jobs where you might be able to start working again.

21.   In the deposition of Plaintiff, (Book 011 @ page 70).

    a.    Q.    And with regard to the Master Guard Company, are you a full time or part time employee?

    b.    A.    Part time.

    c.    Q.    And approximately how many hours a week do you work?

    d.    A.    At the moment, 12 hours a week.

22.   In the deposition of Plaintiff, (Book 011 @ page 71).

    a.    Q.    In terms of your rate of pay, what is your rate of pay?

    b.    A.    $8.00 per hour.

23.   On August 20, 2003, Mark Dillen Stitham, M.D. issued a report to the Workers' Compensation Administrator, (Book 036 @ page 003 to 011)

    a.    (Page 003) "Additionally, as English was promoted to higher levels, he showed an inability to complete his work assignments in a timely manner and was counseled repeatedly concerning his work performance. During meetings with his supervisors, he would raise his voice, make accusatory statements, and deny he was experiencing any problems."

    b.    (Page 010) "The most surprising omission in the psychological evaluation by Reneau Kennedy, Ed.D. was the lack of any notation on Axis II (personality). From the record, it certainly appears that Mr. English has traits of grandiosity, rigidity, and suspiciousness/paranoia. Indeed, one wonders if he has bipolar affective disorder [manic-depressive illness], depressed phase. This should be explored by his current physician."

c.     Page (010) "Also noteworthy are the <u>multiple</u> non-industrial stressors that have plagued this man including: three failed marriages, severe financial problems including with the IRS, bankruptcy, failed business, renal cancer, deteriorating health of mother, custody dispute, and two serious suicide attempts. Mr. English's assertion that he has no problems and that everything is caused by work in not credible."

d.     (Page 010) "To the contrary, in reasonable medical probability, this early middle-aged man had a rather severe mood disturbance, which subsequently affected his work performance. Due to his personality structure, he reacted with defenses of protection and denial."

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005              Page 28 of 49

# WHISTLE BLOWING VALUE

1.  In the Report of Industrial Injury or Illness, (Book 016 @ Page 57):

    a.  "In late 2001, Mr. English raised allegations that another employee (and close personal friend), Mr. Christopher Graff, Real Property Appraiser, IV, was involved in outside employment during city working hours and was doing this on instructions from Mr. Gary Kurokawa, Real Property Administrator. These allegations were brought to the attention of Mr. Robert Magota, Real Property Assessor."

    b.  "Mr. English could provide no evidence to Mr. Magota to support his claim. Mr. Magota interviewed Mr. Graff regarding this matter and Mr. Graff denied these allegations. Mr. Magota then gave Mr. Graff a stern warning that no outside employment was to be conducted during City working hours and any future incidents would result in disciplinary action. Mr. Magota also interviewed Mr. Kurokawa and discussed the allegations raised by Mr. English. Mr. Kurokawa  said that he had also given Mr. Graff a warning regarding this matter."

    c.  "According to another employee, Mr. English was not satisfied with the actions taken by Mr. Magota. He expressed dissatisfaction and said that Mr. Kurokawa was going to reward Mr. Magota by promoting him when the division's reorganization plan if finalized."

2.  In Plaintiff's Answers to Defendant's Fifth Request for Answers to Interrogatories, (Book 058 @ page 25):

    a.  "In late 2001 or early 2002, Defendant MAGOTA advised me that he would talk with Defendant KUROKAWA about the matter fo City employees doing work for Defendant KUROKAWA's appraisal company on City time, but that I should not continue to pursue the issue because, in any dispute, it would be my word against the word of the appraiser and Defendant KUROKAWA.

3.  In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003, (Book 018 @ Page 477):

    a.  "On February 15, 2002, (the week after issuing the second verbal complaint, Mr. English issues his first written complaint in an email to Mr. Magota, entitled "COMPLAINT AGAINST THE ADMINISTRATOR." In the emailed

complaint, Mr. English wrote, in part:"

    i.    "MY COMPLAINT IS THAT IT IS IMPROPER THAT THE ADMINISTRATOR IS HAVING WORK DONE BY CITY EMPLOYEE WHILE ON CITY TIME. I UNDERSTAND THAT WARNINGS HAVE BEEN MADE TO THE EMPLOYEE BY HIS SUPERVISOR AND HE HAS EVEN BEEN ASKED TO BE MORE DISCRETE. BEING MORE DISCRETE IS NOT THE ISSUE AND IT IS NOT THE EMPLOYEE WHO I AM MAKING THE COMPLAINT AGAINST. THE ADMINISTRATOR SHOULD KNOW BETTER...MY HOPE IS THAT THE ADMINISTRATOR WILL UNDERSTAND THE LINES BETWEEN RIGHT AND WRONG AND THAT IF HE USES AN EMPLOYEE FROM HIS OFFICE FOR OUTSIDE WORK THAT HE MAKE IT CLEAR THAT THE EMPLOYEE MUST DO THE WORK OUTSIDE OF WORKING HOURS AND THAT ALL OF THEIR COMMUNICATIONS REGARDING OUTSIDE WORK WOULD BE DONE OUTSIDE OF WORKING HOURS."

    ii.    "In interview, Mr. English reported, "I really didn't want to pick a battle and I was thinking about the division, thinking of protecting the office," He also stated that he tried to be respectful, but "he got on the bad side of these guys real quick," due to being a "mainland haole"."

    iii.    "In interview, Mr. English cited the lack of "moral compass at his place of employment."

4.    In the deposition of Plaintiff, (Book 011 @ pages 10 and 11).

    a.    Q.    And when was the first time you consulted with Mr. Moseley?

    b.    A.    August 14, 2002.

    c.    Q.    And without going into substance, but as you had indicated in terms of there was an ethics concern that you had specifically retained him for in December of 2002, what was the general reason in which you had consulted Mr. Moseley in August 2002?

    d.    A.    My first conversation with him was calling him, asking him if he could help me or if he knew of an attorney who might be able to handle a case that had to do with my employment situation.

    e.    Q.    Which is why we are here today, correct?

f.    A.    Yes, that is true.

g.    Q.    And from August 1 4, 2 002 throughout December 2002 when Mr. Moseley was retained by you, were you consulting with him with regard to an employment matter, which is why we are here today?

h.    A.    Right. You know, I'm not really clear about that. I'm not really sure about that actually. I think I may have called him or contacted him about something, but I honestly don't remember the details of that, if I did at all. I know there was a period of time where we didn't have communication. I'll leave it at that.

i.    Q.    And from August 14, 2002 and then – let me withdraw that. Why is it that you remember August 14, 2002 as opposed to Approximately August or something like that?

j.    A.    Well, because other things were happening. I wasn't -- it wasn't just -- when I contacted Roger, he actually assisted me in contacting the FBI. And that happened, I believe, either on or about that date.

5.    In the deposition of Plaintiff, (Book 011 @ page 11).

a.    Q.    Did Mr. Moseley  ever contact the U. S. Attorneys Office on your behalf?

b.    A.    I believe that he contacted them to get a name and a phone number for me, right.

6.    It is my opinion:

a.    Since I also have a common practice of turning individuals over to the FBI and the IRS, that Plaintiff contacted these federal agencies in an attempt to bolster their case. It is a tactic that obviously failed.

b.    I am not aware of any action taken at all by the FBI or the U. S. Attorney's offices. That being the case, it then proves that there was not enough substance or issues to have motivated these agencies to act.

7.    On January 22, 2003 Rogers S. Moseley, Esq., counsel for Plaintiff, filed a formal complaint to the Honolulu Ethics Commission on behalf of Plaintiff, (Book 024).

a.    In my opinion, the letter was drafted to facilitate this lawsuit.

8.  In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003 (Book 018 @ Page 483):

    a.  "On the afternoon of February 5, 2003, Mr. Charles W. Totto, Executive Director and Legal Counsel for the Honolulu Ethics Commission, emailed Mr. Kurokawa. Mr. Totto informed that he "received a complaint involving the alleged use of city resources for non-city purposes, by [Mr. Kurokawa] and Chris Graff." In interview, Mr. English stated that "Mr. Totto is Haole," but Supreme Court Justice "Paula Nakayama is Japanese and wants the state to win"."

9.  On February 26, 2003, Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services sent an email to Charles W. Totto, Executive Director and Legal Counsel for the Ethics Commission of the City and County of Honolulu, (Book 018 @ Pages 372 and 373):

    a.  "I am conducting and investigation concerning allegations of possible workplace violence via harassment and threats by Phillip English, Real Property Appraiser, Real Property Assessment Division, BSF. The reason for contacting you is that one of the complainants, Christopher Graff, states in his complaint that Phillip English is verbal intimidating and making threats against him. He states that on Tuesday, 1/7/03 and Friday, 1/10/03, Philip English told him that he was on the "bad list" with the FBI and Corp Counsel Ethics Commission. Mr. English told Christopher that Charles Totto, head of the Ethics Commission, had access to Christopher's computer records concerning doing private appraisal work with Gary Kurokawa's approval while on City time."

    b.  "Mr. English warned Christopher that the Ethics Commission was "nobody to mess around with" and he should not lie when the Commission got around to questioning Christopher. If he lied to them (Ethics), they would know and "hang him out to dry." Christopher felt Mr. English was attempting to intimidate him."

    c.  "Mr. English also said that the Ethics Commission Investigation had progressed so far that Charles Totto said "the best thing Gary Kurokawa could do right now was resign"."

    d.  "Mr. English then told Christopher that if he went forward to the Ethics Commission right now, i.e., prior to a complaint being filed, that Christopher would be "moved off the bad list" and place into "whistle blower" status and therefore I could not be fired. Mr. English claimed that if I did not got to the Ethics Commission I would be fired and go to jail."