e.    "I know that you are conducting your own investigation but I would like to know what you can confirm or deny of the comments made in the complaint."

10.    On February 26, 2003, Charles W. Totto, Executive Director and Legal Counsel for the Ethics Commission of the City and County of Honolulu sent an email to Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services in response to the email above, (Book 018 @ Page 372):

    a.    "Because Phil's complaint to the Ethics Commission in under investigation, I am not at liberty to answer all your questions thoroughly."

    b.    "I told Phil that, assuming that the information provided by Phil directly or thorough his attorney was accurate, Chris and Gary may have violated the ethics laws regarding the use of city resources to benefit private businesses. I added that I would have to conduct an investigation to determine whether a violation may have occurred."

    c.    "I do not recall saying anything about a "bad List" and would not characterize subjects of an investigation in that manner. I talked with Phil and his attorney about strategic approaches to the witnesses in the investigation, but I can not say more about that at this time."

    d.    "I did not say anything to the effect that Gary should resign."

    e.    "Phil filed his complaint with the Commission on January 22, 2003."

11.    In Plaintiff's Answers to Defendant's Fifth Request for Answers to Interrogatories, (Book 058 @ page 22):

    a.    "Although, by at least March 6, 2003, a City REPRESENTATIVE FROM THE Personnel Division (I believe) apparently did discover that City employees were working for Defendant KUROKAWA'S private business, there was not detailed follow-up investigation, because the allegation was made that the activity on City time was only an occasional telephone call. When officers/employees of the City have such confirmation, their failure to act must be nothing less than intentionally or negligently inflicted emotional distress upon me, by my understanding of those terms.

12.    On February 18th and February 19th 2004, the Honolulu Advertiser published two articles:

   a.    *Faulty tax assessments alleged*, (Book 033 @ page 005).

        i.    "City officials knowingly sent out incorrect property tax bills, had appraisers do work on city time for a company owned by the head of the Assessment Division and his family, and retaliated against an appraiser who tried to blow the whistle, according to a federal civil rights lawsuit."

        ii.    "Many taxpayers were likely assessed taxes they did not owe." according to the suit by appraiser Philip E. English, who says in the lawsuit he has been away from work for nearly a year because of a medical disability."

   b.    *Lawyer says tax agency 'rotten'*, (Book 033 @ page 003).

        i.    "The kind of faulty property tax assessments alleged in a former city appraiser's lawsuit are "very widespread," and many Honolulu residents are likely being overcharged by the city, according to the plaintiff's lawyer.

        ii.    "This is a case that really affects a lot of property owners,' attorney Roger Moseley said, "The kind of things that go on at the Assessment Division are really shocking."

        iii.    "It's just rotten to the core," he said. "That's not to say there aren't some good people over there, but they're absolutely intimidated by the rotten apples."

   c.    In my opinion, these newspaper articles painted a picture of a terrible public problem at the Assessor's office. There obviously had to be investigations done to verify the truth of the Plaintiff's allegations. I am not aware of any action taken to correct this problem painted by the lawsuit and Plaintiff's lawyer, perhaps there was none needed.

13.    On March 3, 2005, over two (2+) years after the complaint was filed with the Honolulu Ethics Commission, Charles W. Totto, Executive Director and Legal Counsel for the Honolulu Ethics Commission drafted a Memorandum to Gary T. Kurokawa entitled "Notice of Possible Violations of the Standards of Conduct." (Book 024)

   a.    "FIRST CLAIM - Your direct and indirect business/financial activities with your subordinate Mr. Graff, through GK Appraisals, Inc. **may have**

**constituted** (emphasis added) a violation...insofar as they **may have been incompatible** (emphasis added) with the discharge of your official duties as Real Property Assessment Division Administrator or **may h ave t ended** (emphasis added) to impair the independence of your judgment in the performance of your official duties as Real Property Assessment Division Administrator."

b. "SECOND CLAIM - The foregoing use of City resources for non-City purposes **may have constituted** (emphasis added) use of your official position to secure or grant yourself special consideration, treatment, advantage, privilege or exemption in violation of ..."

c. "THIRD CLAIM - Your claiming of personal real property tax exemptions to which you were not lawfully entitled **may have constituted** (emphasis added) use of your official position to secure or grant yourself special consideration, treatment, advantage, privilege or exemption in violation of ..."

d. "...you may respond in writing to this Notice within 15 days of the receipt of this Notice, and in your response you may request a hearing before the Commission, at which you may be represented by an attorney and you may present any relevant evidence. If you do not make a written request for a hearing before the Commission within the 15-day period, the Commission may render an opinion based on the information available to it, subject to its determination to further investigate the matter."

e. "Under ... should the Commission find that you violated the ethics laws as alleged above, it may recommend disciplinary action be taken by your appointing authority, including reprimand, probation, demotion, suspension or discharge, as well as other appropriate action."

14. There have been no other documents produced to me which identify any action taken by the Honolulu Ethics Commission. Unless they are produced to me, I will assume that this is the end of the total impact of the whistle blower issue.

15. It is my opinion:

a. That absent:

i. Any arrest(s) by the FBI;

ii. Any indictment and related prosecution(s) by the United States Attorney;

iii.    Any arrest(s) by the Honolulu Police department;

iv.    Any indictment and related prosecution by the Honolulu Prosecutor's Office; and,

v.    Any further reprimand, probation, demotion, suspension or discharge by the Real Property Assessment Division to Gary Kurokawa or Christopher Graff.

vi.    There is no available evidence of arrest or related conviction or other evidence resulting in any punishment to the alleged perpetrators. It illustrates the lack of any substance to Plaintiff's claims of ethical violations since nothing resulted.

vii.    There is no other evidence or support to the allegations, this entire whistle blowing issue is moot.

b.    The "Whistle-Blowing Value" appears to be a big to do about nothing. Plaintiff obviously alienated himself from the staff and management of the division by his actions and deeds and his emotional instability exacerbated this process into enormous claims against the City and County of Honolulu.

ENGLISH V. C&C OF HONOLULU
FINAL REPORT OF
DIRK VON GUENTHNER
NOVEMBER 4, 2005                    Page 36 of 49

# ALLEGATIONS OF WORKPLACE VIOLENCE (PHILIP ENGLISH)

1. On March 12, 2003 a report was issued by Mike Golojuch, Administrative Services Officer of the Department of Budget and Fiscal Services, City and County of Honolulu entitled *INTERIM INVESTIGATION REPORT - ALLEGATIONS OF WORKPLACE VIOLENCE (PHILIP ENGLISH)*, (Book 035 @ Page 001 to 009).

    a. (Page 002) "This is an interim report because I have not interviewed the alleged perpetrator Phil English. A interview with Phil English and his HGEA union representative Kevin Mulligan was scheduled for Monday, March 3, 2003. However, Phil started sick leave on Friday, February 28, 2003 and he filed a workers' compensation claim with the Division of Human Resources, Industrial Safety and Workers' Compensation Division. Until he returns to work or is cleared to hold the interview, Phil's interview is postponed."

    b. (Page 003), "The first two initial interviews were with Ann Gima (attachment 3) and Robert Magota (Attachment 4). Phil English is assigned to Ann Gima's team. According to Robert Magota, Philip challenges Ann's authority. Robert stated that Phil becomes defensive when his work, attitude and/or behavior are questioned. Ann repeated that Phil has raised his voice and his behavior is becoming more and more disruptive and counterproductive."

    c. Several staff members were interviewed, excerpts are as follows:

        i. Linda Knowles :

            (1) "She doesn't feel threaten but believes something could happen."

            (2) "Phil acts like nothing has happen."

        ii. Carole Kamisato: "

            (1) "Phil was suppose to cover the counter for the public but he refused. There were loud noises from Phil and Ann. Phil was upset enough that he threw a box or object in his cubicle that was loud enough for others to hear."

            (2) "Another 2002 incident resulted in voices (Phil and Ann) getting

louder and louder for at least 10 minutes. Carol left the area and stayed away."

(3) "Carole had driven Phil home after a class. He talked about ex-wife telling stories and the court decree was wrong."

(4) "Something might trigger him like the Byron Uyesugi (Xerox Case). She understands that others do feel threaten."

iii. Julie Tamer:

(1) "He talks about "we are ALL against him at the office. He feels shunned and ostracized."

(2) "Phil will lie about things, mostly minor things."

(3) "Not sure if she is safe at work."

(4) "Phil speaks of being a good Christian but his actions do not reflect it."

iv. Susanne Foumai:

(1) "She doesn't feel threaten but believes that physical harm is possible."

v. Genie Shito-Leong:

(1) "When he gets loud, people want to get away from him."

(2) "With the pressure Phil is under, he could snap with angry taxpayers."

vi. Chris Graff:

(1) "Chris believes that Phil English has been verbally intimidating and made verbal threats."

(2) "The main thrust of complaint has to do with Phil trying to make Chris agree that he need to come clean to the Ethics Commission. If he didn't, they (Ethics Commission) would "hang Chris out to dry." Phil stated that Chris is on the "bad list" for the FBI and City's Ethics Commission. Phil stated that if

Chris came clean he could be protected as a "whistle blower."

    vii.    Ryan Fujitani:

        (1)    "Ryan believes other employees in the office seem to be on edge because of Phil."

        (2)    "Ryan believes he needs to be cautious because of Phil's attitude and behavior to act like nothing is going on but it is (Ethics Complaint)."

        (3)    "Ryan doesn't feel threaten but is starting to think about Bryon Uyesugi case. Phil's behavior is becoming weird. As far as physical harm, anything is possible."

    d.    Conclusion (Page 8):

        i.    "There is a concern that Phil's behavior has upset several employees of the Real Property Assessment Division."

        ii.    "However, nothing found during the investigation revealed that Phil is under retaliation."

        iii.    "Several people consider his behavior to be something like Bryon Uyesugi and the Xerox case (shootings)."

        iv.    "Whether violent or not, his work performance may be less that satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action."

2.    Since Plaintiff has failed to be interviewed, this workplace violence action against him will not continue until he does offer an interview. No decisions or conclusions will be reached and the result of the workplace violence matter will not determine if Plaintiff is innocent or guilty of workplace violence.

# COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT

1.  On January 20, 2004, Plaintiff signed a document entitled "*COMPROMISE, SETTLEMENT AND RELEASE AGREEMENT*, (Book 014 @ Exhibit 1)

    a.  In the deposition of Plaintiff, (Book 011 @ page 62).

        i.    Q.    With regard to page 8 of that document, is that your signature?

        ii.   A.    Yes, it is.

        iii.  Q.    And the document is dated January 20th, 2004, correct?

        iv.   A.    Yes.

    b.  In the deposition of Plaintiff (Book 011 @ page 64).

        i.    Q.    And with regard to resigning, that was a choice that you could make with the advice of counsel, correct?

        ii.   A.    I had no choice to resign or not, but I could only do it in that context, because that was the only way that they would settle the worker's comp claim.

    c.  In the release agreement, (Book 014 @ Exhibit 1 Page 8):

        i.    "Claimant specifically acknowledges and represents he has been advised of, is aware of, and understands all of his legal rights and interests arising out of the January 30, 2003 claims of injury and he has voluntarily and without duress or undue influence entered into this agreement."

    d.  In the release agreement, (Book 014 @ Exhibit 1 Page 3):

        i.    "Claimant did not sustain any permanent disability as a result of the January 30, 2003 claim of injury."

    e.  In the release agreement, (Book 014 @ Exhibit 1 Page 3):

     i.     "In order to terminate and discharge in whole any and all claims...the total sum of EIGHTY-FIVE THOUSAND AND NO/ONE-HUNDREDTH DOLLARS ($85,000.00) shall be remitted to Claimant in a single lump sum following final approval and filing of this Compromise, Settlement and Release Agreement by the Disability Division, Department of Labor and Industrial Relations, State of Hawaii."

2.    Less than a month after the $85,000 was agreed upon, the Plaintiff filed suit in Federal District Court on February 13, 2004. (Book 026).

# THOMAS T. UENO, CPA REPORT - (BOOK 6)

1.    It is my opinion that the information provided to Mr. Ueno (hereinafter "Ueno") was insufficient for him to reach an informed opinion and render an accurate report. Further, information that was provided to him lacked the necessary research and evaluation for Ueno to interpret it accurately.

2.    The documents that Ueno was provided with are as follows:

  a.    Complaint;

  b.    HGEA Contract Agreement July 1, 1999 - June 30, 2003;

  c.    Independent Psychological Evaluation - Dr. Reneau Kennedy;

  d.    Performance reviews of Philip English;

  e.    Various employment records:

     i.    Letter dated 04/28/99;

     ii.    Appraiser Examination Results;

     iii.    Job Applications; and,

  f.    State and Federal Tax Returns fo Philip English.

3.    Overall, the Ueno report assumes that the trier will have concluded that every claim and allegation, every representation and the entire basis for the claims by Plaintiff are accurate and without question. Considering that, Ueno opines that Plaintiff is entitled to special damages of $834,706.

4.    Ueno was provided with the job application and tax returns. Examination would identify:

  a.    Of the 25 years of experience in real estate appraisal - (Attachment A - Page 1) - My analysis above identifies that in some years Plaintiff did not earn any revenue. Unless Plaintiff was working for cash, there is no evidence that he did appraisal work in some of the years and obtain the appraisal experience in doing so. There is no experience gained during all periods of

unemployment.

b.  Mr. English's corporation employed 12 appraisers and staff (Attachment A - Page 1) - My analysis above indicates that there were many years represented on the employment application where there is no financial evidence of the employment of 12 appraisers and staff.

5.  Ueno represented that "On February 27, 2003, Mr. English was advised by his physician not to return to work for the City" (Attachment A - Page 2):

a.  The impact of this statement establishes an assumption that Plaintiff was told not to work any more.

b.  Ueno added in the Front Pay calculation, (Attachment A - Page 3), the quote from page 22 of Dr. Ed. Reneau Kennedy's report, "I do not believe that Mr. English is able to return to his usual and customary duties in the same work place, either part-time or full time. Mr. English and people at his place of employment appear to have a damaged, if not irreparable relationship."

c.  Ueno failed to identify the following information on the same page (22) of Dr. Ed. Kennedy's report:

i.  "If there is an alternate placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or **possibly full time work** (emphasis added)."

ii.  "I am of the opinion that Mr. English can resume some type of work."

iii.  Ueno has used mitigated earnings of $8 per hour for 12 hours of work per week (Attachment A - Page 2). This results in $4,992 per year ($8 X 12 hours per week X 52 weeks).

iv.  Ueno did not even consider the Plaintiff working as a guard at 40 hours per week which would compute to $16,640 ($8 X 40 hours per week X 52 weeks). Further Ueno did not consider the Plaintiff working at a job that could have fully mitigated any lost wages.

v.  Ueno did not consider that the Plaintiff had severe psychological problems the year before starting his job at the City and he still was able to function acceptably at Appraiser II and Appraiser III. Ueno simply assumed that Plaintiff's mitigation was to be $8 per hour for a 12 hour week. Assuming the Plaintiff is entitled to any damages, there should have been a calculation or at least commentary that Plaintiff

could have fully mitigated the special damages if he recovered mentally and was able to return to comparable work.

6.  Ueno identifies that "based on his prior experience, performance reviews (prior to bringing to light any problems os the Division), promotion history, and the fact that he had already been considered "qualified" for the position in 1999: Mr. English clearly had the capacity to become an administrator for the City's Real Property Assessment Division." (Attachment A -page 2)

    a.  Plaintiff was promoted to Real Property Appraiser IV on 03/01/02, (Book 016 @ page 69).

    b.  Plaintiff received an Annual Performance Report for the period from 6/01/02 to 05/31/03 (Book 016 - @ pages 46, 47 and 48)

        i.  Ueno apparently has received the job performance but has not considered:

            (1)  "Over the course of the past nine months, Philip has been encountering numerous difficulties in independently performing all of the responsibilities of his position. His performance has been discussed with him on several occasions including two meetings conducted with union agents in attendance."

            (2)  "Some specific issues that have been addressed include acts of insubordination, meeting stated deadlines, following written and verbal directions, correct methods for processing various job tasks, utilizing good judgment and repeated errors."

            (3)  "Prior to his absence, he was made aware of numerous incomplete assignments."

            (4)  "At the present time there are several outstanding issues regarding work performance and conduct still to be addressed upon his return to work. In his absence he has missed several mandatory training sessions."

    c.  Plaintiff was not working in his Appraiser IV job effectively. Ueno may argue that due to the "Whistle Blower" issue that the Plaintiff's superiors have somehow conspired to rank him low to get even with him. I am not aware of any proof to that claim and I therefore side on the documents to attest to facts.

d.  Further, there is no evidence that Plaintiff has any administrative skills in the environment of the City's Real Property Assessment Division. His prior ten years of experience in private practice ended in failure and there is no evidence he was a good administrator, his business went belly-up.

e.  It appears from what I have read, as identified above, that most of the City staff disliked him. Clearly, that uncomfortable environment is no evidence as a focus basis for promotion and respect from subordinates.

7.  Ueno's report reflects, "Since his departure from the City, Mr. English has searched for comparable alternative employment; but with little success. He has been unable to secure employment that would place him in a similar field or provide him with equivalent promotional opportunities, compensation, benefits, and working conditions. Mr. English has found it difficult to secure any type of employment; he has been forced to accept what few positions have been offered to him." (Attachment A - page 2):

a.  In the deposition of Plaintiff, (Book 011 @ page 54).

   i.   Q.  For how long a period of time before you started for Master Guard company, were you unemployed?

   ii.  A.  I guess from December 2003 until that time.

   iii. Q.  Between December 2003 and up until April of 2005 when you began working for the Master Guard company, did you seek other employment?

   iv.  A.  Yes.

   v.   Q.  What other employment did you seek?

   vi.  A.  I looked for jobs as a driver. I looked for jobs as wait help at conventions and that sort of thing. Those were the – there were various places. But those were the types of jobs. This was all part of therapy with Dr. Koff in trying to get me back into the working situation. And so we decided that we would try to have some kind of job like that. The guard job has proved to be a good job for that.

   vii. Q.  Any other jobs that you sought in that December 2003 up until April 2005 time period?

viii.    A.    No.

b.    Ueno's report was issued prior to the deposition of the Plaintiff. It is not known how Ueno could make such and inaccurate statement or otherwise base it as an assumption in his report. Evidence shows the Plaintiff has not tried to gain employment in the field of real estate appraisal at all.

8.    Ueno's report reflects, "In order to make Mr. English whole, I computed the difference between his earnings (including benefits) at the City and his earnings as an employee of Masterguard, Inc. I assumed that Mr. English has the capacity to work at a level of employment until the date of his retirement. Mr. English informed me that of late, his current employers reduced his workload to one day per week, approximately 12 hours per day.

a.    In the deposition of Plaintiff, (Book 011 @ page 70).

i.    Q.    "Is there a reason why you are working part time at 12 hours or approximately 12 hours per seek?"

ii.    A.    "As far as my employment goes, the effort is to try to get me back into a work environment. The Master Guard Company initially had me working more than 20 hours per week. And if they can fill me in at other places where people are sick or whatever, then they call me and I can fill in."

b.    In the report of Robert J. Sbordone, Ph.D. dated October 26, 2005:

i.    (Book 004 @ page 5) "He began looking for employment in February 2005. He found a job as a security guard and began working in this capacity in April 2005. He states that this job is not stressful since he does not have to deal with any supervisor or other employees. He earns $8 an hour. He likes the owners of the company (Master Guard). He began working three nights a week, 36 hours a week. He tried to get medical insurance. When he tried to get his company to pay for his health insurance, he claims that they cut him back to 12 hours a week."

ii.    (Book 004 @ page 5) "He has given some thought to working as an appraiser, but claims that he is unable to find work because he is "too honest and objective" since the job requires someone to "fudge the numbers." He claims that the current environment requires fudging the data to support the claims' request for a predetermined value."

c.   Plaintiff's testimony identifies additional work above 12 hours per week, yet Ueno has assumed the rate of 12 hours a week until retirement. I believe that it is an erroneous assumption since Plaintiff admits to working more.

9.   Ueno's report includes, "Mr. English would be promoted to and SR24 beginning on February 28, 2004 in accordance with his historical promotion pattern. Similarly, as of February 28, 2005, Mr. English would move from Step D to a Step E," (Attachment A - Page 3).

a.   Thomas Riddle, Workers' Compensation Administrator for the City and County of Honolulu, on March 18, 2003 wrote (Book 017 @ page 310), "...I offered to try to find an alternate temporary work location for Mr. English so he would not be without income during this period. He said he would have to consult his doctor regarding this.  After the meeting with Mr. English, I called various individuals within his department, and a completely different story unfolded which cast doubt on Mr. English's allegations and the reason for his claim. These include the possibility that he filed this claim to overcome allegations of poor work performance, personal problems affecting his job, and complaints of work harassment filed by other employees."

10.   Life Expectancy (Attachment A - Page 4) - "Mr. English was 48 years of age at the time he was forced to leave his employment with the City. Based on the data from the Center for Disease Control, Mr. English will live another 30.2 years, until the age of 78.58."

a.   In the deposition of Plaintiff (Book 011 @ page 51).

i.   A.   "At the end of '98 , actually all in one day, Corlis gave me divorce papers that were very severe and an hour later my doctor called me and told me you got kidney cancer and you **might not live more than five years** (emphasis added)."

b.   In the "Independent Psychological Evaluation of Reneau Kennedy, Ed.D a Clinical and Forensic Psychologist, dated July 30, 2003, (Book 018 @ Page 490):

i.   "On the other hand, Mr. English is a cancer survivor who has had complications from his surgery. This may account for some of the elevation on this scale as well. When the results are more closely examined in terms of content responses, Mr. English endorsed having many symptoms which are commonly associated with channeling psychological conflict into physical symptoms, (e.g., headache, pain, stomach distress)."

c.    In the report of Robert J. Sbordone, Ph.D. dated October 26, 2005:

    i.    "He said at the time he was talking about survival rates for his up and coming proposed surgery since there was a significant risk he would die," (Book 004 @ page 23).

    ii.   "He underwent removal of his left kidney on November 4, 1998. He was in the hospital for a week. After this, he returned home for months of recovery," (Book 004 @ page 14).

    iii.  "He reports experiencing recurrent thoughts related to a suicidal act. Although only a small percentage of individuals who entertain such thoughts actually act upon them, his score suggests the potential of suicide," (Book 004 @ page 44)

    iv.   "Mr. English admitted that he had attempted suicide twice in the past, once in 1989 and another in 1998," (Book 004 @ page23).

d.    My opinion is that the normal life expectancy is only one possibility of the method to compute special damages. From the above information, the life expectancy requires a comparative time to reflect his cancer and his suicidal tendencies. Without further documents to focus on an actual time period opined by the appropriate physician, it appears that Plaintiff may have a life expectancy of as few as three to five years.

11.  Ueno failed to include $85,000 paid to Plaintiff in the Compromise, Settlement and Release Agreement as identified above, (Book 014 @ Exhibit 1).

a.    Ueno failed to mitigate the Plaintiff's damages by $85,000. Since this information was not presented to Ueno, he was unable to reflect this amount which would have reduced the Plaintiffs claim by $85,000.

b.    Further, the Plaintiff stated on the Compromise:

    i.    "Claimant did not sustain any permanent disability as a result of the January 30, 2003 claim of injury."

    ii.   Ueno also did not know that the Plaintiff stated that "there was no permanent disability." That should have shortened Ueno's claim to a temporary period.

12.   In the report of Robert J. Sbordone, Ph.D. dated October 26, 2005, (Book 004 @ Page 47).

a.   "His ability to engage in competitive employment does not appear to have been compromised since he is currently working as a security guard. While he claims that he took this job to avoid people, I am puzzled at why he continues to work at this job when it does not allow him to work full-time or receive medical benefits. Since he has a real estate appraiser's license and has over 25 years of experience, I have a difficult time understanding why he has not sought work in this area. His argument that he would have to comprise his integrity to work in this area again makes little sense since he had worked as an appraiser for most of his life. At the risk of sounding cynical, I suspect that he will work in this capacity again after his law suit is settled."

13.   Therefore, based upon the above information and observations, I conclude that Ueno's report fails to identify facts which should have been presented to him and also should have been incorporated into his report. The failure of not including that information in his report renders it unreliable and misleading.

# DIRK von GUENTHNER & ASSOCIATES
## 923 KAHENA STREET
## HONOLULU, HAWAII 96825
## (808) 532-1400 * FAX (808) 395-1201

### INDEX TO RECORDS

### ENGLISH V. C&C OF HONOLULU

**BOOK**
**NO.   DESCRIPTION**

1.   INDEX TO RECORDS
2.   FINAL REPORT OF DIRK VON GUENTHNER
3.   _____
4.   CV OF ROBERT J. SBORDONE, Ph.D
5.   REPORT OF ROBERT J. SBORDONE Ph.D
6.   REPORT OF THOMAS UENO
7.   CHRONOLOGY
8.   DEPOSITION QUESTIONS FOR PHILLIP ENGLISH
9.   _____
10.   _____
11.   PHILLIP ENGLISH DEPOSITION - VOLUME 1
12.   PHILLIP ENGLISH DEPOSITION - VOLUME 2
13.   PHILLIP ENGLISH DEPOSITION - VOLUME 3
14.   PHILLIP ENGLISH DEPOSITION - EXHIBITS
15.   _____
16.   RENEAU KENNEDY - SDT - VOLUME 1 (REPORT 473)
17.   RENEAU KENNEDY - SDT - VOLUME 2
18.   RENEAU KENNEDY - SDT - VOLUME 3
19.   _____
20.   KAISER PERMANENTE - SDT - VOLUME 1

EXHIBIT " A "

**BOOK**

**NO.** | **DESCRIPTION**

21. **KAISER PERMANENTE - SDT - VOLUME 2**
22. _____
23. **REPORT OF DARYL B. MATTHEWS, M.D., Ph.D**
24. **ETHICS COMMISSION - NOTICE OF POSSIBLE VIOLATIONS**
25. **DOCUMENTS FROM GK APPRAISALS**
26. **VERIFIED COMPLAINT - ENGLISH V. C&C**
27. _____
28. **2ND WIFE - CORLIS CHANG 1984-1999**
29. **3RD WIFE - SATHIPORN ENGLISH 2000-2003**
30. **TAX RECORDS 1993 TO 2004 (MISSING 1997)**
31. _____
32. **WORKERS' COMPENSATION RECORDS (1 OF 6)**
33. **WORKERS' COMPENSATION RECORDS (2 OF 6)**
34. **WORKERS' COMPENSATION RECORDS (3 OF 6)**
35. **WORKERS' COMPENSATION RECORDS (4 OF 6)**
36. **WORKERS' COMPENSATION RECORDS (5 OF 6)**
37. **WORKERS' COMPENSATION RECORDS (6 OF 6)**
38. _____
39. **PE 00001 TO PE 00161**
40. **PE 00162 TO PE 00263**
41. **PE 00264 TO PE 00378**
42. **PE 00379 TO PE 00573**
43. **PE 00574 TO PE 00882**
44. **PE 00883 TO PE 01117**
45. **PE 01118 TO PE 01326**
46. **PE 01327 TO PE 01400 RENEAU REPORT**
47. **PE 01401 TO PE 01538**
48. **PE 01539 TO PE 01691**
49. **PE 01692 TO PE 01826**
50. **PE 01827 TO PE 02121**

**BOOK**

**NO.**  **DESCRIPTION**

51.  **PE 02122 TO PE 02312**
52.  **PE 02313 TO PE 02524**
53.  **PE 02525 TO PE 02666**
54.  **PE 02667 TO PE 02742**
55.  **PE 02743 TO PE 02840**
56.  **PE 02841 TO PE 02959**
57.  _____
58.  **PLAINTIFF ANSWERS TO DEFENDANT INTERROGATORIES**
59.  _____
60.  **PLAINTIFF 1ST REQUEST FOR ANSWERS TO ADMISSIONS**
61.  **PLAINTIFF 2ND REQUEST FOR ANSWERS TO ADMISSIONS**
62.  **PLAINTIFF 3RD REQUEST FOR ANSWERS TO ADMISSIONS**
63.  **PLAINTIFF 4TH REQUEST FOR ANSWERS TO ADMISSIONS**
64.  **PLAINTIFF 5TH REQUEST FOR ANSWERS TO ADMISSIONS**
65.  **PLAINTIFF 6TH REQUEST FOR ANSWERS TO ADMISSIONS**
66.  **PLAINTIFF 7TH REQUEST FOR ANSWERS TO ADMISSIONS**
67.  _____
68.  _____
69.  _____
70.  _____

# DIRK von GUENTHNER & ASSOCIATES
### 923 KAHENA STREET
### HONOLULU, HAWAII 96825
### OFFICE (808) 532-1400 * FAX (808) 395-1201 CELLULAR (808) 779-4224
### E-mail: dvg@pixi.com

## CURRICULUM VITAE

Dirk von Guenthner & Associates has provided forensic research and litigation support services to attorneys for twenty-four years. Assignments are accepted through service contracts with counsel or their clients to provide support, direction, organization, analysis and valuation of litigation matters including special damages in complicated and large document cases as an expert or a consultant.

## BACKGROUND

Dirk von Guenthner was raised in Kona while attending Hawaii Preparatory Academy in Kamuela. Mr. von Guenthner worked on the professional staff of Peat Marwick Mitchell & Co., (KPMG), after obtaining a Bachelor of Science degree in business administration with a major in accounting from CSULB in 1973.

From 1975 through 1981, USLIFE Corporation employed Mr. von Guenthner as their Western Regional Audit Manager to direct a staff, including CPA's, in auditing a 32 branch savings and loan, two escrow companies, a life insurance company and a data processing center with combined assets over one billion dollars.

Up to 1983, Mr. von Guenthner served as Chief Financial Officer and Senior Vice President with SCCT Financial Corporation, a parent company with four subsidiaries, each with a title plant, and nineteen escrow offices.

Dirk von Guenthner is a Board Certified Forensic Examiner, "BCFE"; a Certified Fraud Examiner, "CFE"; certified as a Diplomate of the American Board of Forensic Accountants, "DABFA"; a Diplomate and Fellow of the American College of Forensic Examiners, "FACFE"; past President and Chairman of the Board of Directors of the Hawaii Chapter - Association of Certified Fraud Examiners and recipient of the chapter's 1997 Distinguished Achievement Award; recipient of the 2001 "Top Cop" Award; a 1994 candidate for Western Regional Governor of the Association of Certified Fraud Examiners; a Contributing Editor to the nationally published periodical, "The Forensic Examiner"; author of the "Treasurer's Manual" of the State of Hawaii Campaign Spending Commission and used by all candidates seeking public office in the State of Hawaii; a trained Arbitration Panelist (arbitrator of 26 arbitrations); a trained Mediator; and, previously licensed in real estate.

EXHIBIT " B "

**PROFESSIONAL EXPERIENCE**

In 1976, Dirk von Guenthner began providing forensic research services to attorneys. In Hawaii, services have been provided for litigation in the Circuit Court, the Federal District Court and the U.S. Bankruptcy Court relating to civil, domestic, bankruptcy and criminal matters.

Dirk von Guenthner has been qualified as an expert witness before Judge Jon Chinen, Judge Ben H. Gaddis, Hon. Alan Kay, Judge Shunichi Kimura, Judge Edward C. King, Judge Evelyn Lance, Judge Rosalyn Loomis, Judge Marjorie Manuia, Judge Togo Nakagawa, Judge Frank Takao, Judge Michael A. Town, Judge Frances Wong, many arbitration tribunals, and the Department of Commerce and Consumer Affairs.

In addition to providing forensic research and litigation support services to attorneys in Guam, Alaska, California, New York, Washington, Utah and Colorado, Dirk von Guenthner & Associates has worked on behalf or in association with the following Hawaii attorneys:

| CODE | DESCRIPTION |
|------|-------------|
| AAA | Arbitration |
| BC | Business Consulting |
| BNK | Bankruptcy |
| CL | Civil Litigation |
| CML | Criminal Litigation |
| CP | Co-Panelist in Arbitration |
| DCCA | Dept. of Commerce and Consumer Affairs |
| FL | Family Law |
| PI | Personal Injury |
| TRM | Trust Related Matter |

Fred Y. Abe (FL)
James Y. Agena (PI)
Jan M. L. Y. Amii (PI)
James Robert Arnett II, (CL)
George W. Ashford, Jr. (CL)
Lance Scott Au (PI)
Rustam A. Barbee (CML)
Scott I. Batterman (CL)
R. Charles Bocken (CP)
Phillip D. Bogetto (CL)
James J. Bickerton (CL)(PI)
Patricia A. Brady (FL)

George W. Brandt (CP)
Steven T. Brittain (PI)
R. Mark Browning (PI)
Peter B. Carlisle (BC)
Moon Ki Chai (AAA)
Roy K. S. Chang (PI)
John A. Chanin (CL)
Robert E. Chapman (AAA)
Darwin L. D. Ching (CML)
Steven L. Ching (AAA)
Harrison P. Chung (CL)
Ellen A. Cirangle (CL)

Kathleen A. Clark (CL)
Bradley A. Coates (FL)
Stuart M. Cowan (CL,FL,TRM)
Joachim P. Cox (CL)
Lyle P. Creadick (FL)
Robert J. Crudele (CL)
Charles W. Crumpton (CL)
James P. Dandar (CL)
William J. Deeley (CL)
Stacey K. Djou (CL)
Durell A. Douthit (FL)
K. Bartlett Durand, Jr. (CL)
William J. Eggers, III (FL)
Raymond E. Engle (FL)
Robert J. Faris (AAA)
David C. Farmer (FL)(BC)
Jay M. Fidell (CL)
Michael L. Freed (CL)
Gregory P. Frey (CL,FL)
Richard L Frunzi (BC)
Stuart N. Fujioka (CL)
Kenneth K. Fukunaga (CL)
Janice T. Futa (CL)
Manuel D. Garcia (TRM)
Preston A. Gima (CL)
David S. Glanz (CL)
Burnham H. Greeley (CL)
Richard K. Griffith (DCCA)
David A. Gruebner (CL)
Robert M. Harris (FL)
Harvey E. Henderson, Jr. (CL)
James H. Hershey (BC,CL)
Brenda M. Hoernig (CL)
Peter C. Hsieh (CL)
Roy F. Hughes (CL)
Jean M. Ireton (FL)
Brandon T. Ito (CL)
Deborah S. Jackson (CL)
Robert P. Jaress (AAA)
Mary Blaine Johnston (AAA)(CL)
James Kawashima (PI)
Edward Kemper (CL)(PI)
Kaiulani E. S. Kidani (CL)
Dennis W. King (CL)
Samuel P. King, Jr. (CML)

Walter S. Kirimitsu (PI)
Audrey E. Kitagawa (FL)
Jonathan A. Kobayashi (AAA)
Tedson H. Koja (CL)
Kevin M. Kondo (CL)
James E. T. Koshiba (BNK)(CL)(CML)
Scott E. Kubota (PI)
Bruce L. Lamon (CL)
Phillip J. Leas (AAA)
Paul L'Ecuyer (PI)
Larry C. Y. Lee (CL)
Linda-Mei Y. K. Leong (AAA)
Michael R. Levine (CML)
Wilson M. N. Loo (AAA)
Colin L. Love (BC)
Michele-Lynn E. Luke (CL)
Leslie C. Maharaj (CL)
Stanford M. J. Manuia (AAA)
Kenneth A. Martyn (AAA)
Melanie S. Matsui (PI)
Robert K. Matsumoto (AAA)
Michael T. McEnerney (FL)
Howard F. Mc Pheeters (CL)
Glenn T. Melchinger (CL)
Katsugo Miho (AAA)
Lynn Minagawa (DCCA)
Duane R. Miyashiro (CL)
Caryn S. Morita (CL)
Marilyn S. H. Naitoh (PI)
Kelly G. A. Nakano (CL)
Paula A. Nakayama (PI)
Greg L. Nishioka (TRM)
Michael A. Okazaki (CL)
Peter W. Olsen (CL)
Elena J. Onaga (PI)
Cory Y. S. Park (CL)
Wayne D. Parsons (CML)
James T. Paul (CL)
Richard T. Pafundi (PI)
Davor Z. Pevec (CL)
Ellen B. Politano (FL)
Teresa Quon (CL)
Anthony L. Rankin (PI)
Kevin M. Rankin (PI)
Robert P. Richards (CL)

Arthur F. Roeca (CL)
William J. Rosdil (CL)
Janice Hee Saito (BNK)(CL)(CML)
William W. Saunders (CL)
Robert R. Sadaoka (CL)
Scott K. Saiki (PI)
Hiroshi Sakai (CL)
Evan R. Shirley (CL)
Mark T. Shklov (CL)(AAA)
David F. Simons (BNK)(CL)
John B. Simpson (AAA)
William Fenton Sink (CL)
Randolph R. Slaton (BNK)(CL)
Dana Wesley Smith (FL)
Robert A. Smith (CML)
Lisa K. Strandtman (CL)
J. Stephen Street (BC)(CL)
Barry A. Sullivan (CL)

Kevin P. H. Sumida (CL)
Cynthia M. Surrisi (CL)
Cori A. Takamiya (CL)
Brian Tamanaha (CML)
Jan M. Tamura (CL)
Judy A. Tanaka (CL)
Jeffrey M. Taylor (AAA)
Terrance W. H. Tom (PI)
Danny J. Vasconcellos (AAA)
Thomas T. Watts (CL)
John R. Williams (BC)(BNK)(CL)(FL)
Anthony L. Wong (PI)
Wayson W. S. Wong (FL)
Vernon Y. T. Woo (CL)(PI)
Keith Y. Yamada (CL)
Stanley K. Yamada, Jr. (BNK)
Joy Yanagida (PI)
Nathan H. Yoshimoto (CL)

DvG&A has also provided services to the U.S. Attorney and the Federal Bureau of Investigation.

## CASE MANAGEMENT

Dirk von Guenthner meets with counsel to discuss the background of the case and the areas of work to be performed. A Service Contract is prepared to reflect the scope of work and the terms of the engagement.

Mr. von Guenthner may staff the engagement with associates who are appropriately qualified, as necessary. Available documents, often hundreds of thousands, including appropriate client records, document production, subpoena duces tecum records, depositions, interrogatories, admissions, pleadings, expert reports and other discovery documents are frequently organized, assembled, and indexed.

Custom designed spread sheets are created, then sorted in a data base to produce specific information for Dirk von Guenthner to write reports, other experts to prepare their reports and counsel and the client in learning about specific issues and key documents of the case. The data base can be used to research and link all kinds of significant case matters and assists counsel in preparing for depositions and trials.

In cases where other experts may be required to evaluate documents to determine liability, evaluate damages, or report on other case issues, it is often helpful to have the documents numbered, indexed and input by Dirk von Guenthner and his associates in advance. Doing so will have a time and cost saving benefit for other experts. By working in conjunction with counsel and other experts, Dirk von Guenthner & Associates can segregate unnecessary and duplicate documents to save costs to input them into the comprehensive indexed spread sheets.

In large document cases where it is cost justified, huge indexes are prepared and then sorted to identify all documents related to individuals, specific subjects and/or issues in chronological order by document type, name, subject, specially coded items or a combination of criteria which frequently develops patterns and logic to otherwise unrelated documents.

When appropriate documents are indexed, the status of missing documents, or documents otherwise not produced by a party or witness can be evaluated and reported on accordingly when their existence can be otherwise proven.

Mr. von Guenthner and his associates work with counsel, client and others to refine case objectives and produce evidentiary results prepared to answer issues in a logical and organized manner. When the case concludes, clients often benefit by having all their records indexed and organized in files for continued use in the future.

# Dirk von Guenthner
# RULE 26 DISCLOSURES

1. **NATIONAL PUBLICATIONS**

   a.  "FORENSIC EXAMINER" - October 1994  - "Forensic Accounting"

   b.  "FORENSIC EXAMINER" - December 1994- "Forensic Accounting"

   c.  "FORENSIC EXAMINER" - February 1995 - "Forensic Accounting"

   d.  "FORENSIC EXAMINER" - October 1995 -   "Forensic Accounting"

   e.  "FORENSIC EXAMINER" - December 1995- "Forensic Accounting"

2. **BOOK PUBLICATION**

   a.  "TREASURER'S MANUAL" STATE OF HAWAII CAMPAIGN SPENDING COMMISSION - PUBLISHED IN 1998, 1999, 2000, and 2002

   b.  "INCENTIVE" - COPYRIGHT 2004 - LIBRARY OF CONGRESS NUMBER 2004101198 - ISBN # 0-9741741-3-0 - PUBLISHED MAY 2004

3. **SPEECHES**

   a.  Institute of Managerial Accountants - 08/19/93

   b.  Institute of Internal Auditors - 01/18/94

   c.  EEOC Counsel - 10/30/95

   d.  Institute of Managerial Accountants - 12/14/95

   e.  Independent Association of Questioned Document Examiners - 09/26/96

   f.  University of Hawaii - Accounting Department - 04/30/99

   g.  Legislative Auditor, Marion Higa and senior staff members - 07/20/01

EXHIBIT " C "

h.   Institute of Internal Auditors - 09/18/01

i.   Hawaii Chapter - Association of Certified Fraud Examiners - Fraud Workshop 11/15/02

j.   Mercury Business Association - 11/08/04

k.   Hawaii Chapter - Association of Certified Fraud Examiners - Corporate Con Workshop - 07/24/03

l.   Hawaii Chapter - Association of Certified Fraud Examiners - Other People's Money Workshop - 07/15/04

m.   Hawaii Chapter - Association of Certified Fraud Examiners - Detecting and Preventing Fraud Workshop -05/19/05

n.   Hawaii Chapter - Association of Certified Fraud Examiners - The Fight Against Fraud: Methods, Concepts and Techniques Workshop - 07/21/05

o.   Hawaii Chapter - Association of Certified Fraud Examiners - Bad Paper Workshop - 09/15/05

4.   **CASES WHERE I HAVE TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION IN THE PRECEDING FOUR YEARS**

a.   NICOLE WELDON V. MIYAKE CONCRETE AND AMERIGAS
CIVIL NO. 97-0748(2)

b.   USA V. MAI THI DO
CR NO. 97-1039 ACK-15

c.   YOUNG SUK LEE V. JAMES S. SHIROMA
CIVIL NO. 98-3465-08

d.   VITOUSEK V. WOODY'S
CIVIL NO. 98-5132-11

e.   ABEL V. STATE OF HAWAII
CIVIL NO. 99-0583

f.   C&L SANDBLASTING V. MARISCO
CIVIL NO. 00-00281 SPK

g.   LATHAM V. KERR MICHAELS DESIGN & CONST. MGMT.
CIVIL NO. 00-1-1679-05

h.   SEABIRD V. AMERICAN MARINE
     CIVIL NO. 00-1-0821-03

i.   OCHS V. HMSA ET AL.
     CIVIL NO. 01-1-0459(3)

j.   SOUZA V. LIBERTY MUTUAL
     AL658-024579-02

k.   BLOOM V. TATIBOUET
     CIVIL NO. 02-1-0431-02 DTK (05/29/03)

l.   EIDAI INTERNATIONAL, INC. V. MEIJI SEIKA KAISHA, LTD
     CIVIL NO. 02-00055 LEK (10/23/03)

m.   KUCHLER V. DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII
     PCH-2003-21

n.   MARISCO V. KIRIBATI SEAFOOD CO., L.L.C.
     CV02-00093 DAE LEK

o.   INTERNATIONAL SPECIALITY, INC V. MARISCO, LTD.
     CIVIL NO. CV02-00272 DAE LEK

5.   **APPOINTMENT BY U.S. DISTRICT COURT OF HAWAII**

     AUGUST 13, 2004 APPOINTED BY JUDGE HELEN GILLMOR AS SPECIAL
     MASTER IN PACE ET AL V. HONOLULU DISPOSAL SERVICE, INC. ET AL -
     CIVIL NO. 97-00335 HG-KSC

6.   **COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY**

     a.   My hourly rate is $195 for all work and $250.00 for testimony.

     b.   The approximate hours I have spent working on this matter to the present is
          75.

     c.   My estimated billings as of the preparation of this report including support
          staff and costs total $15,234.00.