IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

PHILIP E. ENGLISH,              ) CIVIL NO. 04-00108
                                )
          Plaintiff,            )
                                )
vs.                             )
                                )
CITY AND COUNTY OF              )
HONOLULU; GARY T.               )
KUROKAWA; ROBERT O.             )
MAGOTA; ANN C. GIMA; and        )
GK APPRAISALS, INC.; JOHN       )
DOES 1-10; JANE DOES 1-10;      )
DOE PARTNERSHIPS; DOE           )
CORPORATIONS 1-10; AND DOE      )
ENTITIES 1-10,                  )
                                )
          Defendants.           )
_____)

DEPOSITION OF CHRISTOPHER GRAFF

Taken on June 21, 2006, commencing at 9:10 a.m. at the Law Offices of Moseley Biehl Tsugawa Lau & Muzzi, Alakea Corporate Tower, 1100 Alakea Street, 23rd Floor, Honolulu, Hawaii, before Rita King, a Certified Court Reporter in the State of Hawaii.

EXHIBIT __A__

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090   Fax: 808.524.2596



1  that you've had or been in contact because of these
2  other business commitments, I want you to be able
3  to focus on the questions being asked of you.  Do
4  you understand that?
5      A.    Absolutely.
6      Q.    And if you cannot, will you please stop
7  us and tell us?
8      A.    Yes.
9      Q.    I do not want to rush through my portion,
10 or any other attorney's portion, of the
11 questioning.  Do you understand that?
12     A.    Yes.
13     Q.    Now, some of the last questioning that
14 Mr. Moseley just did was if anyone came to you and
15 said, Are you doing outside work on city time for
16 GK Appraisals.  Do you recall that last line of
17 questioning?
18     A.    Yes.
19     Q.    If I understand it correctly, based on
20 your earlier testimony, after you had that lunch
21 meeting with Mr. English, you're the one who came
22 in and told Ann Gima that you were being accused of
23 doing outside work on city time for GK Appraisals;
24 is that correct?
25     A.    Yes.

1    Q.    And you told Ann Gima that you were, in
2    fact, denying that you did outside work on city
3    time for GK Appraisals, correct?
4    A.    Yes.
5    Q.    And then after you met with Ann Gima, you
6    indicated you had met with Bob Magota; is that
7    correct?
8    A.    Yes.
9    Q.    And with regard to meeting with Bob
10   Magota, you told him, essentially, the same thing
11   that you had told Ann Gima with regard to denying
12   doing outside work on city time, correct?
13   A.    Yes.
14   Q.    And with regard to what had occurred at
15   that lunch meeting with Mr. English, that's the
16   information that you had put down and what you had
17   previously looked at in Exhibit 76, that two-page
18   typewritten report; is that correct?
19   A.    Yes.
20   Q.    We may come back to that.
21         Now, in terms of work that you did when
22   it was for David Matsunami, were you ever an
23   employee of David Matsunami?
24   A.    No.
25   Q.    Were you an independent contractor?

```
 1  fill out a workplace violence report against
 2  Mr. English?
 3       A.   Absolutely not.
 4       Q.   Did anyone at GK Appraisals ask you to do
 5  any GK Appraisals' work on city time?
 6       A.   Absolutely not.
 7       Q.   Did anyone at GK Appraisals ask you to
 8  use any city equipment to do GK Appraisals' work?
 9       A.   Never.  Absolutely not.
10       Q.   There was one incident where it's claimed
11  that you were overheard either giving Gary Kurokawa
12  some data or Gary Kurokawa asking you for some data
13  while at work, during work hours.  Did you ever
14  give Gary Kurokawa or did he ever ask you for any
15  data relating to any of GK Appraisals' work while
16  you were in the office on city time?
17       A.   No.
18       Q.   Do you have any other explanation for why
19  you would be giving Gary Kurokawa data or he would
20  be asking you for data in the office on city time?
21       A.   The only possible thing it could be
22  was -- like I said, I got off at 3:45, and it could
23  be one of the instances where Gary asked me to go
24  to the Bureau of Conveyances after work to -- I
25  almost remember.  I think it was to go to the
```

1    A.    I believe so because he called me from
2  his cell phone on my cell phone.
3    Q.    Before, you were talking about an
4  occasion when Bob Magota, I guess, asked you
5  something to the effect of are you doing any
6  private work on city time.  Are you back in that
7  context?
8    A.    Yes.
9    Q.    In relation to that, did Bob Magota ever
10 tell you, hey, it's okay to do non-city work on
11 city time, just be discreet about it or be less
12 obvious about it?
13   A.    Absolutely not.
14   Q.    Did he give you any instruction about
15 whether it was permissible to do non-city work on
16 city time?
17   A.    He said don't do it.
18   Q.    Now, this workplace violence report you
19 did, again, I'll just ask you point blank this
20 question.  Did you do this workplace violence
21 report to retaliate against Phil or his filing an
22 ethics complaint or did you have some genuine
23 concern over what he did, the behaviors he was
24 displaying?
25   A.    I had genuine concern about halfway

```
 1      A.    I don't know.  I suppose worse case
 2 scenario is the Xerox deal.
 3      Q.    What are you referring to?
 4      A.    To the shooting at the Xerox building,
 5 you know.  That's going to the extreme, and that's
 6 a worse case scenario, obviously, but probably
 7 something -- mostly people were concerned with
 8 something just a little more escalated from the
 9 throwing of things around and stuff like that.
10      Q.    You made a comment before that made me
11 think that you had taken over some of Phil's work
12 assignments after he had left the city.
13      A.    Yeah, I sort of inherited his area of
14 Waikiki condominiums after he left.
15      Q.    Did you basically have to pick up where
16 he left off or was there somebody else handling it
17 in between?
18      A.    No, I picked up where he left off, and it
19 was in shambles.
20      Q.    Can you describe that in more detail.
21      A.    Well, the best example is just the
22 voluminous amount of appeals that hadn't been heard
23 just because they weren't prepped.
24      Q.    Anything else that you found in poor
25 working order when you took over Phil's work
```

1  assignments?
2      A.   No, mostly just general neglect in
3  getting assignments done in a timely fashion which
4  then interfered with doing the appeals, which were
5  voluminous, and then everything stacks up, it just
6  got all stacked up backwards, and they were two
7  years behind on appeals.
8      Q.   Did you find any defects in the quality
9  of his work that you had to pick up?
10     A.   I don't recall.
11     Q.   Again, shifting gears, when you were
12 talking about your interview with Mr. Totto and
13 you're asking to see the complaint or whatever it
14 is that had been made, you said something about --
15 and it was on your letterhead or something like
16 that?
17     A.   Yeah.
18     Q.   What did you mean by that?
19     A.   Well, when I first went in to talk to
20 Chuck, he started asking me questions about his
21 investigation, and I says, I think I have a right
22 to see the complaint that's been lodged against me
23 before I ask any questions, and he didn't want to
24 do it.  So finally I said, Look, then I'm going to
25 leave.  So then he went to the next room and

```
 1  STATE OF HAWAII      )
                          ) ss.
 2  COUNTY OF HONOLULU   )

 3

 4           BE IT KNOWN that the foregoing deposition
 5  was taken before me, RITA KING, a Certified
 6  Shorthand Reporter for the State of Hawaii; that
 7  the witness before testifying was duly sworn by me
 8  to testify to the whole truth; that the questions
 9  propounded to the witness and the answers of the
10  witness thereto were taken down by me in shorthand
11  and thereafter reduced to print by computer-aided
12  transcription under my direction; that the witness
13  elected to read and sign; that the foregoing pages
14  are a full, true and accurate transcript of all
15  proceedings and testimony had and adduced upon the
16  taking of said deposition, all done to the best of
17  my skill and ability.
18           I FURTHER CERTIFY that I am in no way
19  related to nor employed by any of the parties
20  hereto nor am I in any way interested in the
21  outcome hereof.
22           DATED at Honolulu, Hawaii, this 10th day of
23  July, 2006.
24                        _____
25                        RITA KING, RPR, CSR No. 373
```