1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,                )

5                    Plaintiff,        ) CIVIL NO. 04-00108

6                                      )           JMS/KSC

7            vs.                       )

8                                      )

9    CITY AND COUNTY OF HONOLULU;      )

10   GARY T. KUROKAWA; ROBERT O.       )

11   MAGOTA; ANN C. GIMA; and GK       )

12   APPRAISALS, INC.; JOHN DOES 1     )

13   -10; JANE DOES 1-10; DOE          )

14   PARTNERSHIPS; DOE CORPORATIONS    )

15   1-10; AND DOE ENTITIES 1-10,      )

16                    Defendants.      )

17              DEPOSITION OF ANN GIMA

18   Taken on behalf of the Plaintiff at the Law Offices of

19   Moseley Biehl Tsugawa Lau & Muzzi, located at 1100 Alakea

20   Street, 23rd Floor, Alakea Corporate Tower, Honolulu,

21   Hawaii, 96813, commencing at 9:00 a.m. on Thursday,

22   September 14, 2006, pursuant to notice.

23

24   BEFORE:  WENDY M. WATANABE, Notary Public, State of Hawaii

25            Hawaii Certified Court Reporter, CSR 401

EXHIBIT __D__

1      A.    No, I was not.

2      Q.    Okay.  Why did you decide to file a workplace

3    violence report?

4      A.    I filed the workplace violence report because of the

5    reports of threats that were made to me by Chris Graff and

6    various other employees.  Offhand, I don't recall who they

7    were, but there were some expressions of fears.

8      Q.    Did you go around and ask people if they had a

9    problem with -- with Phil English after you heard this story

10   on the 17th of January?

11     A.    No, I did not.

12     Q.    How did it come about that other employees had

13   expressed fears to you?

14     A.    This is an assumption that -- my answer will be an

15   assumption, based upon Chris is a rather gregarious, loud

16   person.  I believe that he may not -- you know, he -- he may

17   have been speaking about it within the earshot of others or

18   speaking to others.

19     Q.    And then did others come to you and express

20   concerns?

21     A.    I don't recall if anybody specifically came to me.

22   I do recall, perhaps, overhearing some conversations.  You

23   know, I take that back.

24           Actually, there were a couple of people who may have

25   come to me and -- and -- and said I heard what happened, and

1    insubordination, and behavior dating back to the beginning

2    of 2002.

3          Is that information you provided to anybody?

4    A.    Specifically, no.  I'm not sure what you mean.

5    Q.    Well, I mean, do you recall providing this

6    information to anybody in -- sometime after February of

7    2003?

8    A.    No.

9    Q.    Okay.  Was it your understanding at about that time

10   that Mr. English did have problems with his work

11   performance, insubordination, and behavior dating back to

12   the beginning of 2002?

13   A.    Was it my understanding that that --

14   Q.    Yes, that this was correct.

15   A.    That these things were -- yes.

16   Q.    Okay.  Can you tell me at that time what areas of

17   work performance you felt he was having problems with?

18   A.    Numerous.  Not understanding or not following

19   previously prescribed procedures, not following through on

20   specific tasks, that there were -- again, there were

21   numerous work performance issues.

22          I think there's probably a whole bunch of documents,

23   a whole bunch of e-mails that would go to that topic, and

24   you've probably got them stacked there.

25   Q.    Okay.  I'm just asking you if you -- I mean, even if

1    you can generally give me the ideas of what work performance

2    problems there were.

3        A.    Yeah, not -- not knowing how to do things that --

4    that he had previously been instructed and previously been

5    doing, you know, not knowing how to validate a sale, not

6    knowing how to input data, not knowing where to input data,

7    not knowing how to find a document, numerous and varied work

8    performance issues.

9        Q.    And these work performance issues dated back to the

10   beginning of 2002?

11       A.    I would say that it may have started -- well,

12   depends on what you mean by the beginning of 2002.  It may

13   have started at, you know, in the first quarter of 2002.

14   I -- I -- I'm sure that there's e-mails that -- that would

15   help to, you know, maybe document it, but I -- I recall it

16   being in 2002.

17       Q.    Okay.

18       A.    And -- and to be fair, maybe there was some other --

19   I mean, there may have been others prior to 2002; but

20   offhand, I -- I can't recall.

21       Q.    All right.  Have you had a chance to look at what's

22   been marked as Exhibit 182?

23       (Deposition Exhibit 182 was marked for identification.)

24       A.    Yes, I'm familiar with it.

25       Q.    Okay.  Is this an e-mail that you sent to Gary

1    Q.    Okay.  In Exhibit 176 on page 325, it also said that

2    there were problems with insubordination, apparently dating

3    back to the beginning of 2002.

4        And I think you testified that even though you

5    didn't write this, that that was your opinion, you know,

6    sometime after February of 2003.  That's correct, isn't it?

7    A.    I don't believe that there was insubordination in

8    the beginning of 2002, which I believe is what you asked in

9    your question.

10   Q.    Okay.  Did Phil eventually have problems with

11   insubordination in your view?

12   A.    I believe there were a couple of incidences that

13   could easily be characterized as insubordination.

14   Q.    And when did they occur?

15   A.    There's -- there's at least one occasion, which

16   again was later agreed to be -- or excused to be a

17   misunderstanding, where he had requested leave, vacation

18   leave, and I had told him that it would not be approved

19   unless certain events, certain deadlines were complied with,

20   certain requirements were done, and he left without

21   completing those requirements.  And he -- so that -- that

22   event was considered to be insubordinate.

23       I take that back.  There was an incident that might

24   have been insubordination -- that would have been

25   insubordination in the beginning of 2002 or the end of 2001.

1          We did have requirements of staffing the -- the

2     public counter during the appeals period, basically an area

3     where the -- the taxpayers, the public can come in, discuss

4     their appeals, discuss their problems with the assessments,

5     receive explanations, receive assistance filling out the

6     forms and so on.

7          Every appraiser is given a schedule, and they are

8     required to be there between the hours of 7:45 and 4:30 on

9     the day that they're assigned.  And this is made known to

10     all the staff, and it's mandatory.

11          And on the day that Phil had been assigned, I

12     received a notification from the supervisor who was in

13     charge of the -- that group for that day that he didn't show

14     up and that he just said to that supervisor -- there must be

15     an e-mail in there somewhere, something to the effect of --

16     of I'm not coming.

17     Q.    Any other acts of insubordination that you can think

18     of at this point?

19     A.    You know, there -- I -- I guess if you gave me a

20     textbook definition of insubordination, there might have

21     been other incidents.

22          There were a lot of things that I basically kind of

23     let go in terms of this -- this is not really following

24     instruction, this is not really whatever, you know, what --

25     what was told to be done, but, you know, it's not -- it's

STATE OF HAWAII                    )

                                   )  ss.

CITY AND COUNTY OF HONOLULU )


        I, WENDY M. WATANABE, CSR 401, Notary Public, State

of Hawaii, hereby certify:

        That on Thursday, September 14, 2006, at 9:00 a.m.

appeared before me ANN GIMA, the witness whose deposition is

contained herein; that prior to being examined, the witness

was by me duly sworn;

        That the deposition was taken by me in machine

shorthand and was thereafter reduced to typewriting by

computer-aided transcription; that the foregoing represents,

to the best of my ability, a full, true, and correct

transcript of said deposition.

        I further certify that I am not an attorney for any

of the parties hereto, nor in any way concerned with the

cause.




                    Dated:  September 16, 2006


                    _____

                    Notary Public, State of Hawaii

                    My Commission Expires: 04/07/2010

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,                    )

5                    Plaintiff,     ) CIVIL NO. 04-00108

6                                   )          JMS/KSC

7              vs.                  )

8                                   )

9    CITY AND COUNTY OF HONOLULU;    )

10   GARY T. KUROKAWA; ROBERT O.     )

11   MAGOTA; ANN C. GIMA; and GK     )

12   APPRAISALS, INC.; JOHN DOES 1   )

13   -10; JANE DOES 1-10; DOE        )

14   PARTNERSHIPS; DOE CORPORATIONS  )

15   1-10; AND DOE ENTITIES 1-10,    )

16                    Defendants.   )

17              DEPOSITION OF ANN GIMA

18                   VOLUME II

19   Taken on behalf of the Plaintiff at the Law Offices of

20   Moseley Biehl Tsugawa Lau & Muzzi, located at 1100 Alakea

21   Street, Alakea Corporate Tower, 23rd Floor, Honolulu,

22   Hawaii, 96813, commencing at 9:10 a.m. on Friday, September

23   15, 2006, pursuant to notice.

24   BEFORE:  WENDY M. WATANABE, Notary Public, State of Hawaii

25            Hawaii Certified Court Reporter, CSR 401

1   have been, in my perception, minimum, meeting the minimum.

2      Q.   In attitude toward work, you put below requirements?

3      A.   That's correct.

4      Q.   Why?

5      A.   Because in the -- the -- the factors that go up

6   toward -- go towards the attitude towards work, overall, it

7   was my opinion that it -- majority of the -- the those

8   issues were below requirements.

9      Q.   Do you know what factors those were?

10     A.   Offhand, I can't recite them to you; but if you have

11  a document, the back side -- the back side of this.

12     Q.   Can you take a look at Exhibit 61?  Is this the --

13  what you understood to be what was on the back half of these

14  reviews?

15     A.   Yes.

16     Q.   Okay.  And are you talking about something that is,

17  sort of, toward the middle of the page on the left-hand

18  side, attitude toward work?

19     A.   Yes.

20     Q.   Okay.  What of those requirements did you feel that

21  Phil did not meet?

22     A.   Does the employee try to do the employee's best, is

23  the employee dependable, trustworthy, punctual, does the

24  employee display interest in the employee's work, does the

25  employee accept responsibility, does the employee abide by

1    rules and regulations, and I guess to some extent is the

2    employee adaptable to changing situations.

3           So I -- in pretty much all of those, I don't know if

4    you want to call them factors that go towards that attitude

5    toward work category, in my opinion -- in -- in my opinion,

6    in most of those, he wasn't meeting what would be minimally

7    required at the level or maybe at any -- you know, for this

8    rating period.

9    Q.    Okay.  With respect to does the employee try to do

10   the employer's best, what made you think that Phil was not

11   trying to do his best?

12   A.    I think it kind of goes towards a lot of the

13   documents that we had already -- you know, that we've

14   produced.  We probably could go through them one by one, and

15   I could give you -- cite you examples of where it was

16   becoming -- well, in my interpretation, he wasn't trying to

17   do his best.

18          There were numerous things that he had been

19   instructed on that he was seemingly unable to accomplish

20   without asking how to do it, and some of these were -- were

21   things that he had been doing in prior -- you know, the

22   prior year or, you know, the prior few months, you know, a

23   different cycle, so it was -- it just became, to me, clear

24   that he wasn't trying to do his best.

25   Q.    Do you have any specific examples of things that he

1    did or did not do that made you think he wasn't trying to do

2    his best?

3        A.    Let me think.  You know, this was a really long,

4    ongoing thing, and I think it goes back to the beginning of

5    -- somewhat the beginning of '02 so, you know, it -- it kind

6    of mixes in my mind which -- which questions were asked at

7    what point in time.

8            So some of the issues might have been, you know,

9    what do I need to do to validate a sale, and that's the

10   basic that -- that's the beginning of our -- of our

11   instruction for staff, where do I find -- where do I find a

12   certain document, how do I -- where do I go to input this.

13           This -- it -- it just basically was overall

14   conveying to me that he -- he should have known, he had the

15   resources to do it, he had the training, or he had

16   previously demonstrated that he had the training and the

17   capability of doing certain things, and somehow for some

18   reason it was evolving that he was -- he was now saying he

19   didn't know how, he wasn't able to, or just, you know, that

20   he was -- he just wasn't doing his best.

21       Q.    Okay.  The next thing says is the employee

22   dependable.  What -- do you have any specific examples of

23   Phil not being dependable?

24       A.    Again, if I could review notes or something like

25   that, it would probably help, you know, in terms of the time

1    frame, but I remember that there were occasions when he'd

2    been asked to prepare lists or research something or he's --

3    or he had, for example, maybe board of review cases where

4    there's deadlines, there's, you know, things that should be

5    done, and I was finding it increasingly necessary to check

6    to see if certain things had been done.

7            So, you know, in terms of his dependability, and I

8    guess it goes towards the -- the -- you know, the

9    punctuality issue of whether he was accomplishing a -- you

10   know, accomplishing what he's been asked to do or what he

11   should know that he's required to do at this level, knowing

12   that he was able to do that.

13   Q.    Do you have any specific examples?

14   A.    Probably board of review -- review requirements or

15   just, you know, following -- you know, like I said, there

16   were -- there were times when he was requested to do certain

17   research, and he would need to be reminded, you know,

18   sometimes more than once.

19           I believe there was a -- I think it was in this time

20   frame where there was a board of review scheduled.  He

21   notified me that the appellant wouldn't be available, and

22   that was the only cases that were scheduled for that day so

23   I told him you need to go and notify clerical because they

24   need to cancel the board so that the board doesn't come.

25           So, you know, he'd been told to do that; and when I

1  checked, it hadn't been -- he -- he didn't notify anybody,

2  and he needed to be reminded to notify clerical, to notify

3  the board members.

4       Q.   Any other specific examples you can think of?

5       A.   Yeah, there were -- I -- offhand, it would be really

6  racking my brain to remember a lot of, you know, specifics.

7  It was just a general if he was asked to do something, it

8  was becoming apparent I needed to go and check to see if he

9  followed through.

10      Q.   Okay.  How about the -- the word trustworthy in that

11 attitude toward work section?

12      A.   I don't know how it's defined here, but, I mean, you

13 know, what my interpretation of what trustworthy is, it kind

14 of goes along to the dependable, whether you -- if you ask

15 somebody to do something, you trust that they'll do it and

16 that they -- that they demonstrate that they're -- they're

17 able to do what you've asked; therefore, you can instill

18 trust in them.

19      Q.   Okay.  Any specific examples, or is that the same

20 examples with the dependability you gave me?

21      A.   I'm trying to think if there's anything that was

22 more along the lines of trustworthy, as opposed to

23 dependable, and -- right now, I can't really think of

24 anything.

25           I know that there was a -- there was a board of

1   review hearing where I wasn't going to be present, and I had

2   asked for another supervisor to sub in, and Phil was advised

3   to -- you know, to remind the -- the supervisor because it

4   wasn't a normal schedule, even for him.

5           And when the -- the hearing commenced, the

6   supervisor wasn't there and so the hearing went on without

7   supervision, which is not to say always -- you know, it's

8   not to say that it's -- it's an uncommon occurrence.  It

9   does happen from time to time, and some appraisers are truly

10  comfortable doing that and fully capable of conducting a

11  hearing by themselves -- excuse me, participating in a

12  hearing by themselves.

13          But in this particular instance, I think there was

14  some communication during that hearing that -- that was, I

15  believe, a little alarming to one of the board members, and

16  I believe that a complaint was made as to Phil's conduct not

17  necessarily -- I guess going towards the okay, you work for

18  the City, you're -- you're a representative of the City; and

19  in that respect, the City -- you know, you should be able to

20  conduct your -- yourself as a -- as a City representative.

21      Q.   And what was the comment the board member made?

22      A.   I believe it was something along the lines of he --

23  he was making comments as to his own opinion, as opposed

24  to -- as opposed -- or making his own editorial comments in

25  that respect, as opposed to just stating that this is the

1    policy and -- you know, he was not necessarily -- and I'm

2    not saying that he was incorrect in doing so.

3         There are moments when, maybe, that is correct to --

4    to do so, but I believe that he was -- it was kind of

5    characterized to me that he was being a proponent of the

6    appellant's position.  And again, I wasn't at that hearing

7    so I don't know exactly what transpired.  This is just my

8    hearing about events.

9    Q.   You got the tape of that hearing, though, didn't

10   you?

11   A.   He was asked to give me the tape, and the tape is

12   incomprehensible.  There's no -- there's nothing on the

13   recording.

14   Q.   Okay.  Isn't it true sometimes that the appraiser at

15   a hearing like that will figure out that the taxpayer is

16   correct and that the City should go along with that

17   position?

18   A.   Yes.  And if that's the case and then that's the

19   recommendation that the appraiser should make, and that

20   should be very clear at the -- the -- with the taxpayer and

21   the board, and that would be presented as a recommendation.

22   Q.   Okay.  Isn't it possible that the taxpayer could

23   present evidence at the hearing that would affect the

24   initial evaluation and cause the appraiser to determine that

25   hey, the taxpayer was correct after all?

1         It's more displaying an interest in wanting to get

2    things changed, which -- you know, or his dissatisfaction

3    with -- with current processes.

4         Q.    Then the next line down, it says does the employee

5    accept responsibility.  Can you give me examples of when

6    Phil did not accept responsibility?

7         A.    I recall that there was a -- there was an instance

8    of an error made in one of the inputs that was done, and I

9    believe it was pertaining to classification.

10        And when it was brought to his attention that --

11   that this was done, you know, that this entry was done in

12   error or -- or why is this seemingly this way when it should

13   have been this way, it was well, somehow it got changed, you

14   know, as opposed to saying oh, you know, I made a mistake.

15   And are we still talking about just in this time frame --

16        Q.    Yes.

17        A.    We are still talking about just in this time frame,

18   right?

19        Q.    Yes.

20        A.    Yeah, it really would help if I could just go

21   through a bunch of the documents that were -- that were in

22   place, you know, during this time frame.

23        Q.    As we go through the documents, I might ask you to

24   --

25        A.    Okay.

1    Q.    -- say oh, go back to that question.  This is one of

2    the things that I was talking about.  Because some of the

3    things that you've mentioned, I do have documents on.

4    A.    Okay.  Because -- because, you know, to have me rack

5    my brain to try to go through instances pertaining to this

6    is kind of difficult.

7    Q.    Okay.  How about the is the employee adaptable to

8    changing situations.  Can you think of any examples of that?

9    A.    You know, since you say we're going to go through

10   documents later, I don't know, could we just kind of leave

11   --

12   Q.    No.

13   A.    No?  Then right now, offhand, I -- I -- I'm not

14   going to even try to rack my brain and try to think of

15   something in this time frame because, you know, you have to

16   remember now, this is -- this was in a long period of time,

17   there was a lot of back and forth, and this evaluation

18   basically was the -- the six month -- the ending of the

19   six-month period, where at that point in time, my

20   understanding is that he's supposed to be able to

21   independently perform all of the responsibilities at that

22   level.

23   Q.    But he was actually meeting that requirement, right?

24   A.    In some areas, yes.  Overall in some areas and not

25   so much so in some of the others.

1    Q.   But overall, he met the requirements for

2    performance, did he not?

3    A.   I would say no.

4    Q.   Okay.  How about the does the employee abide by

5    rules and regulations, can you think of examples in which he

6    didn't abide by rules and regulations?

7    A.   Let me think.  Offhand, I can't think of anything.

8    Q.   Okay.  Going back to Exhibit 42, this probationary

9    performance evaluation report we were talking about, at the

10   very bottom, it says certificate of appointing authority or

11   designated representative.  Do you see that?

12   A.   Yes.

13   Q.   Do you recognize the signature at the bottom of this

14   page?

15   A.   Yes.

16   Q.   Okay.  Whose signature is that?

17   A.   It's Gary Kurokawa's.

18   Q.   Okay.  That certificate says I have reviewed the

19   performance evaluation report of this employee, and I am --

20   it says check one, extending the probationary period for

21   three months.  Do you see that?

22   A.   Yes.

23   Q.   Did you understand that Gary Kurokawa was extending

24   the probationary period for three months?

25   A.   What I understood it was that he was signing off on

1    A.    Okay.  I think I have.

2    Q.    Okay.  The next paragraph says all of the above

3    mentioned has been brought to the attention of my superiors.

4    Do you see that?

5    A.    Yes.

6    Q.    To whom was all of the above brought to the

7    attention of when you say superiors?

8    A.    I believe I mentioned to Bob that I was going to be

9    filing.  By superiors, I meant within the division.  And --

10   and because this was being given to Gary, this was bringing

11   it to your attention and so I -- I -- I was of the belief

12   that Gary would be forwarding this to someone, probably Mike

13   Golojuch.

14   Q.    Okay.  So what you're saying is you talked about

15   these issues with Bob; and by this particular complaint,

16   you're bringing it to Gary's attention as well?

17   A.    Yes.

18   Q.    Okay.  The last paragraph there, two sentences, says

19   additionally, coworkers who are aware to varying degrees of

20   the ongoing situation have expressed fears as to his

21   behavior.

22         Do you know at this time who the coworkers were that

23   expressed fears as to Phil's behavior?

24   A.    At this point in time, I believe that it was

25   probably -- in all likelihood, it was probably Julie, Carol,

1    Linda, that -- that were voicing some concerns.  And I --

2    I'm not sure who else, you know, that -- that I was aware of

3    who, at that point in time, was expressing their fears.

4          It may have been related to me later, some others,

5    but at this time, that's the only thing I can -- the only

6    people I can remember.

7    Q.    And the last sentence, it says they have been made

8    aware of the option of individually filing a report.  What

9    did you mean by that?

10    A.    That whoever came to me was -- was made aware that,

11    you know, if -- if -- if you feel sufficiently threatened,

12    then -- or -- or scared, then, you know, you do have that

13    opportunity.

14    Q.    You advised those people, right?

15    A.    I would have notified those people that they -- they

16    have that -- that option.

17    Q.    Okay.  Was it a great number of the -- or a big

18    percentage of the people in your group that came and

19    expressed those fears, or was it probably just Julie, Carol,

20    and Linda?

21    A.    You asked me, like, two questions there so wait, I'm

22    trying to count, yeah?  I think in this time frame, there

23    might have been only eight people within the group, and I

24    would have to go back and check, you know, with -- I think

25    I've got to actually, you know, make -- make some kind of a

```
 1    read --
 2        Q.    No, no, that's fine.  That's fine.
 3             MR. MOSELEY:  Let's go off the record.
 4             (Break in proceedings.)
 5             THE WITNESS:  Okay, now that I've read this, I
 6    forget what your question is.
 7             MR. MOSELEY:  Back on the record.  Can you read the
 8    question back?
 9             (Reporter read requested proceedings.)
10             THE WITNESS:  I believe that aside from maybe one
11    correction in terms of the -- the date of number ten under
12    my supervision, I believe that was in 2000 and not 2001.
13    BY MR. MOSELEY:
14        Q.    Okay.
15        A.    Other than that, this is probably what -- I mean,
16    I -- I -- all these statements were made.  Some of it is in
17    Mike's -- I guess his own --
18        Q.    Language?
19        A.    -- language, but --
20        Q.    But it's kind of an accurate reflection of what you
21    told him?
22        A.    Yes.  I would say it's fairly accurate.  I wouldn't
23    say there's anything that's -- that's --
24        Q.    Okay.  Okay, in the item numbered seven, and there
25    are four paragraphs in that item, in the third paragraph
```

1  down, it says Ann's concern is based upon a behavior pattern

2  of outbursts by Phil starting back from January 2002.  Then

3  it says he was upset and threw a box down, and his voice was

4  raised when speaking to Ann.

5       Is that an event that you understood happened in

6  January of 2002?  Are those two sentences linked?

7     A.   I'm pretty sure that it was in January of 2002.  I

8  may have some documents, actually, that -- that shows it was

9  in December of '01, but it was -- it was in that appeal

10  period.

11       And this goes back to that situation, again, where I

12  told you yesterday about how he was required to man the --

13  you know, physically man the -- the public service counter,

14  and --

15     Q.   Right.

16     A.   -- and he didn't go there.  And when he was told

17  that he -- he needed to do that, at the time, he was -- he

18  was carrying a box of documents.

19     Q.   Having to do with his expert report, or do you know

20  what was in the box?

21     A.   I believe the contents of the box was the -- was

22  some of the declaration filings, which is the -- the forms

23  that had been mailed October that were coming -- October,

24  December, what -- whenever those dates were.

25     Q.   Okay.

1     A.    And some of those were the receipts and the

2  documentation that the people were providing.

3     Q.    Okay.

4     A.    I believe that that's what he was carrying at the

5  time.  And when he was informed that, you know, he needed --

6  he needed to go down and man the counter -- I -- I don't

7  know the exact sequence of events, but -- but it -- he -- he

8  did slam the box down on the desk and said well, then, you

9  do it and then he went.  He left.

10    Q.    Okay.  Was he sitting down when he did that?

11    A.    No, he was standing.

12    Q.    He was standing?  And he slammed it down on the

13 desk?

14    A.    Yes.

15    Q.    When you say slammed it on the desk, is it like he

16 picked it up higher than when he was carrying it, or he

17 dropped it from the level he was carrying it, or how did he

18 physically do that?

19    A.    I don't know the physical mechanics, actually, to --

20 to what was involved.  He did -- it -- it was an intentional

21 slamming of the box on the desk.  It wasn't a drop.

22           It wasn't an accidental slip.  It wasn't an oh, this

23 is too heavy, I'm going to -- I'm going to throw this over

24 here.  It was an intentional slamming the box on the desk

25 because it coincided with his well, then, you do it.

1    Q.    Okay.  Did you actually see him slam it on the desk?

2    A.    Yes, I did.

3    Q.    Okay.  I'm going to ask you to draw a little

4    picture.  Maybe I should have you draw it in pen.  Let me

5    get a pen.

6          (Break in proceedings.)

7    BY MR. MOSELEY:

8    Q.    Are you a good artist?

9    A.    No.

10   Q.    Let's stay on the record while I tell you what I

11   want you to draw.  What I'd like you to draw is, sort of, at

12   the time of this incident of the box slamming, where Phil's

13   desk was, sort of the immediate environment.

14         You don't have to draw the whole office complex, but

15   sort of immediately what was around him and where Phil was

16   standing and where it hit down on the desk and where you

17   were standing, okay?

18         And I'll ask you some questions after you do it, and

19   I'm going to stipulate that it's not going to be to scale,

20   and I don't care if you draw the flowers on his desk or the

21   paper clips or things like that.

22         MR. MOSELEY:  Let's go off the record for a minute

23   while she does this.

24         (Break in proceedings.)

25   BY MR. MOSELEY:

Q.   Okay.  And was there anything else you wanted to add about this incident that we didn't discuss previously when we were talking about the February verbal reprimand?

A.   I don't recall what we -- we talked about on the -- the February reprimand, so --

Q.   Well, maybe, then, in that case it would probably be better to say well, can you describe what happened in a little bit more detail?

You said that he was told he couldn't take his leave unless certain things happened, and they didn't happen. What, for example, was the leave for?

A.   I believe there were actually two leave requests that he had submitted.  And because they were on and very near very critical deadlines that -- that we have set within the office -- and this is on the schedule that's disseminated to the entire staff at the beginning of the year.

Because those leave requests -- and these, again, are leave requests for vacation.  Understandably, he was -- it was for doctors' appointments, but these were still vacation requests.

Because the deadlines were very critical, I -- I just told him that -- you know, that I -- unless he was able to accomplish all of the things that needed to be accomplished, then the leave would be denied.  And I believe

1    that there's a -- there's an e-mail to that effect.

2           I -- I did speak with him about it, and I said, you

3    know, if you can reschedule these appointments, then, you

4    know, maybe now would be a good time to try to do that

5    because then you have some time, you know, maybe the doctors

6    will be able to fit the -- fit you in their schedule.

7           He agreed to reschedule the first one, and I had

8    told him that okay, well, we'll see about the -- the Friday

9    one.  You know, if you're able to accomplish all of your

10   stuff by then, then it shouldn't be a problem.

11          So anyway, Friday came -- well, actually, Thursday

12   came, and the -- the work that -- that I had asked him to

13   accomplish had not been accomplished.  So when Friday came,

14   I just assumed he would be there working on it, trying to

15   finalize and finish up what needed to be done by that day.

16          And I -- I don't know when it came to my attention

17   that he -- he wasn't there.  And when I had inquired --

18   initially, I think the people that were -- were present

19   didn't know.  There was nothing written on the -- the board

20   or on the -- the time -- the time sign-in sheet, indicating

21   that he was -- you know, that -- why he was gone.

22          And so I just waited, and he then came -- he came

23   back later in the afternoon.  And then when I went to ask

24   him Phil, where were you, he -- you know, he kind of turned

25   to me and said well, you know where I was, you know I had a

225

1    doctor's appointment.

2           And then I said that well, you weren't authorized to

3    take leave, that, you know, you haven't accomplished the

4    work that -- that I had set out for you.  And basically, it

5    kind of just escalated from -- from there.

6           And I -- my take -- okay, again, this is my

7    perception was that he was getting defensive and that to me,

8    it either seemed that he knew that he wasn't supposed to go,

9    and he went anyway.

10          And I believe that because of the -- his voice was

11   getting escalated, I walked back to my desk.  I walked from

12   his desk back towards my desk, and he followed me towards my

13   desk.

14          After -- after this whole incident, anyway, you

15   know, just hearing from other -- there were other people

16   present in the area.  They left the area because of --

17   because of the raised voices.  They didn't want to, you

18   know, be around.

19          You know, most people don't want to be around when

20   they -- they start seeing some kind of a, you know, argument

21   going on.  my understanding is most people, kind of, run

22   away.

23          And -- anyway, he -- he kind of calmed down

24   eventually and then -- and then he -- you know, he returned

25   to his desk.  I do believe that there was one -- one

1    issue.  I -- I -- I don't know how else to answer that

2    because I believe that a lot of the e-mails that -- that the

3    correspondence between us was not confidential.

4        Q.    Okay.  In that same page 340, it says do you feel

5    threatened?  And then on page 341, it says yes, Ann feels

6    personally threatened, stress level is high.  She's not

7    really afraid of him but concerned about his behavior.

8             Is that what you told Mike Golojuch?

9        A.    Yes.

10       Q.    Okay.  When it says Ann feels personally threaten,

11   actually, it's probably meant to be threatened with a D at

12   the end, but --

13       A.    Sure.

14       Q.    It says Ann feels personally threatened, stress

15   level is high.  What did you mean by that?

16       A.    What I meant was that I personally was experiencing

17   a high level of -- of -- of stress.  There -- there was

18   the -- I'm trying to put myself back in this place, in -- in

19   this point in time where -- where I could -- I could see

20   that some, you know, physiological response to -- to being

21   around was, you know, kind of a fear type of -- or threat

22   type of response, if you can understand, you know when your

23   pulse gets a little accelerated.  And part of that is

24   stress, part of that is -- you know.

25       Q.    Are you speaking of you?

233

```
 1      A.    Myself.  Myself.

 2      Q.    You --

 3      A.    Me, myself, personally because that's what we're

 4  talking about here.

 5      Q.    Okay.  What kind of threat did you think you were

 6  being subjected to?

 7      A.    I didn't know.

 8      Q.    Okay.  Were you in fear of physical attack or

 9  something?

10      A.    That was a possibility.  It could have been a

11  possibility.

12      Q.    Did you feel like it was a likelihood?

13      A.    Well, here, I mean, if you continue to read it, I'm

14  not really afraid of him, but I was concerned about his

15  behavior.  In the back of your mind, there's always the

16  possibility of, you know, some kind of a physical encounter.

17          We had already had some interactions where I don't

18  know if you've been the recipient of one of his glares, but

19  they're a little bit intimidating.  Let's see what else.

20          You know, the raised voices, that's not a -- it's a

21  threatening situation.  And I guess if you look at just

22  stature alone, I mean, he's substantially larger than I am.

23      Q.    Okay.  On the section numbered 14 on that same page

24  341, down near the bottom, it says he spends a lot of time

25  sending e-mails and typing, but this is typically not a
```

1    Q.    Yeah, what's referenced in this exhibit.

2    A.    And the answer is I don't know when he started

3  preparing.

4    Q.    Right.

5    A.    And the property is Diamond Head Beach Hotel.  That

6  would have been noted on that CC424.

7    Q.    Okay, I'm sorry, I guess I got confused.  There's a

8  reference to a delay of the Diamond Head Ambassador appeal

9  on the second page of this exhibit, but I think you're

10  right.

11        So you don't know when he started his review of

12  these appeals?

13    A.    No, I do not.

14    Q.    Okay.  Do you think that it was possible that he

15  started in time, that he normally should have been able to

16  finish this up but ran into some unusual problems and just

17  couldn't get it done?

18    A.    I couldn't speculate on that.

19    Q.    Okay.  Well, if a person starts their work in a

20  timely fashion and they can't get it done because of

21  problems that were unanticipated, is that insubordination if

22  they don't complete it five days before the hearing?

23    A.    I believe that what should be done is -- and I --

24  I'm not saying that his not completing it is

25  insubordination.  That's not what's referenced, okay?

1       Q.    Okay, what is the --

2       A.    What -- what I'm trying to convey, the information

3   I'm trying to convey is that if you know you're running into

4   problems, then you should be notifying your -- your

5   supervisor.

6           Postponements, deferrals are not uncommon.  If he

7   was running into, you know, unexpected difficulties,

8   situations that he was unaware of, it would not have been

9   unreasonable to ask the appellants and myself for either a

10  postponement, and that would have been granted as it was

11  with the Diamond Head Ambassador.

12          You know, if someone is not going to be ready, you

13  don't wait until less than one week before the hearing to --

14  to say I'm not going to be ready.

15          You realize that these people are given, you know,

16  15 days' notice, they've rearranged their schedules, they're

17  making their own plans and allowances to appear at a

18  hearing.

19      Q.    So your problem is that he didn't tell you early

20  enough that he was having unanticipated problems with these

21  reviews, is that right?

22          MR. YAMAMOTO:  Well, let me object, that assumes

23  facts not in evidence.

24          THE WITNESS:  My problem is that the deadline is

25  there for a reason, and the reason being all of those issues

1    I -- I brought up.  So yes, it was a problem that he was not

2    complying with the -- the written -- my written

3    instructions.

4    BY MR. MOSELEY:

5        Q.    The very first page of this, you apparently -- this

6    Exhibit 186, you apparently looked up a definition of -- of

7    insubordination, right?

8        A.    I did not necessarily look up.  I believe it's part

9    of what I have in my little packet of -- of information when

10   I'm preparing performance evaluations.  So yeah, I guess if

11   you want to say I looked it up, it was in that packet.

12       Q.    You wanted to make sure you had clear in your mind

13   what insubordination meant?

14       A.    Yes.

15       Q.    Okay.  And to make sure that what you were going to

16   complain about with respect to Phil fit the definition of

17   insubordination?

18       A.    Yes, I wanted to be clear.

19       Q.    Okay.  And your conclusion was that the events

20   surrounding the Diamond Head Beach Hotel and the board of

21   review hearing for February 19th, 2003, fit the definition

22   of insubordination, is that right?

23       A.    I believe that the events -- wait, hold on a second.

24   I believe that the -- the events and these numerous

25   noncompliances were -- were indications of insubordination.

1    Q.   Okay.  And you believe you documented those with

2  your e-mails to Bob and your e-mails to Phil that you had

3  sent copies to Bob, is that right?

4    A.   Document -- the -- the CCs to Bob was not the

5  documentation.  It was -- it was to keep him advised and --

6  and to recap the specific issues, the specific instances.

7    Q.   Did you advise Bob of problems you had with other

8  appraisers in -- under your supervision?

9    A.   Historically?

10   Q.   Right.

11   A.   Yes.

12   Q.   So you always advised Bob of any problems you had

13 with appraisers under your supervision?

14   A.   If there are instances where I feel that -- that

15 there may need to be -- what's the word I'm looking for,

16 additional support, maybe a little more experience, perhaps

17 even some situations some corroboration and -- and, in part,

18 given that this is -- this is in February of 2003, that this

19 is after the workplace violence, that whole issue had

20 arisen, had come up and there was a -- to some extent, I

21 guess, a little trepidation on my part to just one-on-one.

22       MR. YAMAMOTO:  Okay.  Before you move on to this new

23 exhibit, I'd like to take a break.  We've been going over

24 and hour.

25       MR. MOSELEY:  Okay.

278

```
 1        (Recess taken at 2:27 p.m. and resumed at 2:36 p.m.)

 2   BY MR. YAMAMOTO:

 3        Q.    Can you take a look at what's been marked as

 4   Exhibit 187?

 5        (Deposition Exhibit 187 was marked for identification.)

 6        A.    Okay.

 7        Q.    Do you know what this is?

 8        A.    This is something I wrote up prior to his

 9   performance evaluation that was signed in August of 2002.

10        Q.    Okay.  Was this, sort of, a draft of things or a

11   list of -- or is it just a list or what?  What is it?

12        A.    It's, maybe, a summary of various issues, various

13   indications that -- that he's having some difficulties with

14   performing independently as an Appraiser IV.

15        Q.    Okay.  The bottom of -- at the bottom of this,

16   there's some handwritten stuff that looks like it's cut off.

17   Is that your handwriting?

18        A.    Yes, it is.

19        Q.    Okay.  That says meeting with Bob and Ana Horne,

20   right?

21        A.    That's correct.

22        Q.    Go ahead and extend probation?

23        A.    Yes.

24        Q.    Okay.  You had a meeting with Bob and Ana Horne?

25        A.    I had a meeting where Bob -- there was a meeting
```

324

```
 1    STATE OF HAWAII                )

 2                                   )  ss.

 3    CITY AND COUNTY OF HONOLULU )

 4

 5         I, WENDY M. WATANABE, CSR 401, Notary Public, State

 6    of Hawaii, hereby certify:

 7         That on Friday, September 15, 2006, at 9:10 a.m.

 8    appeared before me ANN GIMA, the witness whose deposition is

 9    contained herein; that prior to being examined, the witness

10    was by me duly sworn;

11         That the deposition was taken by me in machine

12    shorthand and was thereafter reduced to typewriting by

13    computer-aided transcription; that the foregoing represents,

14    to the best of my ability, a full, true, and correct

15    transcript of said deposition.

16         I further certify that I am not an attorney for any

17    of the parties hereto, nor in any way concerned with the

18    cause.

19

20

21              Dated:   September 17, 2006

22

23    _____

24    Notary Public, State of Hawaii

25    My Commission Expires:  04/07/2010
```

RALPH ROSENBERG COURT REPORTERS, INC.
HONOLULU, HI  (808) 524-2090