```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3

 4    PHILIP E. ENGLISH,              )

 5                 Plaintiff,         ) CIVIL NO. 04-00108

 6                                    )            JMS/KSC

 7            vs.                     )

 8                                    )

 9    CITY AND COUNTY OF HONOLULU;    )

10    GARY T. KUROKAWA; ROBERT O.     )

11    MAGOTA; ANN C. GIMA; and GK     )

12    APPRAISALS, INC.; JOHN DOES 1   )

13    -10; JANE DOES 1-10; DOE        )

14    PARTNERSHIPS; DOE CORPORATIONS  )

15    1-10; AND DOE ENTITIES 1-10,    )

16                 Defendants.        )

17              DEPOSITION OF DENISE TSUKAYAMA

18    Taken on behalf of the Plaintiff at the Law Offices of

19    Moseley Biehl Tsugawa Lau & Muzzi, located at 1100 Alakea

20    Street, Alakea Corporate Tower, 23rd Floor, Honolulu, Hawaii

21    96813, commencing at 9:00 a.m. on Wednesday, September 20,

22    2006, pursuant to notice.

23

24    BEFORE:  WENDY M. WATANABE, Notary Public, State of Hawaii

25             Hawaii Certified Court Reporter, CSR 401
```

RALPH ROSENBERG COURT REPORTERS, INC.
HONOLULU, HI  (808) 524-2090

# EXHIBIT A

1    forth someone who would know a broader spectrum.

2         MR. MOSELEY:  Okay.  Well, I'm happy to proceed with

3    this witness and if it doesn't look like the -- I mean, if

4    it looks like maybe there need to be other witnesses, I

5    guess we can discuss that and try to work it out.

6         MR. YAMAMOTO:  Sure.

7    BY MR. MOSELEY:

8    Q.   Okay.  Thank you for your patience in listening to

9    all that --

10   A.   No problem.

11   Q.   Denise.  The first area of inquiry was knowledge as

12   to all whistleblower complaints filed against the City and

13   County of Honolulu in the last ten years.

14        What do you know about that area of inquiry?  I

15   mean, are you involved with those things?

16   A.   To some extent.  Like Randy just explained, there's

17   no one place to make all complaints.  My position is the

18   only position that's specifically designated to take

19   complaints from employees in the area of discrimination to

20   include retaliation.

21        And so at least since I've been with the City,

22   there's been calls or questions that come in from different

23   departments when an employee says that they're being

24   retaliated against for anything, regardless of what the

25   initial or underlying complaint was.

1           So in that respect, I would have received those if

2    they were internal complaints where management didn't have a

3    source to go to, to deal with them.

4           If they go to a lawsuit directly, which many do,

5    then those go straight to the corporation counsel and are

6    dealt with, with the particular department.

7    Q.    And you don't know about those?

8    A.    I know about them in general terms.  Sometimes I'm

9    called by corporation counsel for discussion on a procedure,

10   but I'm not involved in litigating the case, obviously.

11   Q.    Okay.  Over the last ten years, do you have any idea

12   how many whistleblower complaints have been filed against

13   the City regardless of whether they're in-house or they end

14   up in litigation?

15   A.    Not a specific number.

16   Q.    Do you have records with respect to that?

17   A.    Only the ones that have come to me specifically, but

18   they -- they would come in under the specific area.  If it's

19   an OSHA complaint, if it's EPA complaint, so there's not one

20   clearinghouse, as Randy mentioned, for complaints to be

21   logged somewhere.

22   Q.    When I use the term whistleblower, do you know what

23   I mean?

24   A.    It covers all kinds of protections for employees who

25   make complaints about what they believe to be a violation of

1    internally that are required, for example, notifications to

2    both the complainant and the accused, and this is true of

3    any kind of complaint that I work with, and a definition of

4    the scope of investigation, that's required, and then an

5    assignment to an investigator.

6        Q.    How many investigators do you have?

7        A.    I don't have any investigators right now.  The

8    City's procedure is investigators are selected from among

9    City employees who have been trained in various departments.

10   It's kind of what we call in the federal government

11   collateral duties, additional duties.

12       Q.    Oh, I see.  So you could get an investigator from

13   pretty much any other department?

14       A.    I can request one from any department.

15       Q.    Okay.  Are there departments that you generally

16   request investigators from?

17       A.    It really does depend.  We -- we hope that

18   investigations are done within the department themselves

19   unless there's some reason to take it outside that

20   department.

21            So for the most part because of issues of resources,

22   if a -- if a complaint is from the parks department, we

23   expect the parks department to supply the people to

24   investigate the complaint.

25       Q.    Why do you want the agency involved to be doing the

1    any detailed questions about this exhibit.

2           But you're more than welcomed to review it in detail

3    if you want.  Do you know what this is?

4    A.    Yes, I do.

5    Q.    What is it?

6    A.    This is the complaint of Howard Tom Sun against the

7    department of enterprise services.

8    Q.    Okay.  Were you familiar with the fact this

9    complaint was filed?

10   A.    I was familiar with the complaint being filed after

11   it was already in litigation.

12   Q.    Okay.  Would it be fair to characterize Mr. Tom

13   Sun's complaint as a whistleblower complaint?

14   A.    Based on what I know of it, yes.

15   Q.    Okay.  How did you find out about Mr. Tom Sun's

16   complaint?

17   A.    I was contacted by corporation counsel.

18   Q.    Okay.  Without telling me any of your communications

19   with corporation counsel in terms of substantively, were you

20   asked to do -- to take any sort of a role in the Howard Tom

21   Sun case?

22   A.    After the initial decision, I was asked to discuss

23   what kind of training and/or other kinds of things the

24   department might do to prevent retaliation.

25   Q.    Okay.  When you say after the initial decision, do

1    you know when that was?

2        A.    I don't know exactly when it was.

3        Q.    You have an idea of when it was?

4        A.    Sometime within the last year.

5        Q.    Okay.

6        A.    I think.

7        Q.    And did you have such discussions with the

8    department?

9        A.    Yes, I did.

10       Q.    And is there a program of training or some sort of

11   procedures now in the department of enterprise services with

12   respect to whistleblowers?

13       A.    There's not a program specifically for

14   whistleblowers.  My understanding is that what we

15   recommended is that they provide training and information to

16   let employees know that any complaint was taken seriously

17   and complainants are protected from retaliation.

18       Q.    And is there any training in place now?

19       A.    I actually don't know how far along they are with

20   the plan.

21       Q.    Is there a plan in place?

22       A.    I haven't seen the final.  I -- I've been in a

23   discussion in guidance stage, but I haven't actually

24   followed through and checked and see on how they're doing.

25       Q.    Who was doing the plan?

1     A.    Cathy Maki is the administrative officer for that

2    department.

3     Q.    So this is specific to that department, is that

4    right?

5     A.    Yes.

6     Q.    Okay.  Are there other departments that have such

7    training or such a plan?

8     A.    At the conclusion of particular cases that the City

9    has had for discrimination, particularly where there was

10   allegations of retaliation, we've got -- we just finished

11   with H -- Honolulu Police Department and a three-year

12   program for training its employees, not only in sexual

13   harassment prevent but also in the nonretaliation clauses.

14   There's also a similar process going on with the liquor

15   commission right now.

16    Q.    Is this with respect to other types of harassment,

17   or basically whit whit-type harassment where the

18   whistleblower is complaining of a matter of public concern?

19    A.    The specific training is addressing the -- the

20   issues that came forward which were discrimination issues,

21   which the retaliation piece of that would fall under the

22   general, I think, protection for any complainant and when we

23   talk about that in the training, we talk about the right of

24   any complainant to be protected from retaliation.

25    Q.    Are there any rules and regulations with respect to

1    these programs?

2       A.   There should be and I know there are in the two

3    departments specifically, policies in place for retaliation

4    specific to whatever the underlying claim was in the case

5    for that department.

6       Q.   And you're talking about enterprise services?

7       A.   Enterprise services is -- I don't know how farther.

8    I know Honolulu Police Department and liquor commission are

9    further along.

10      Q.   And do you know when the processes started to put

11   such policies in place at HPD?

12      A.   2000 -- I'm going to be approximate, but I believe

13   it started in 2001.

14      Q.   Is it your understanding that that was precipitated

15   by Sharon Black's complaint?

16      A.   Yes, it was.

17      Q.   And enterprise services process was precipitated by

18   Howard Tom Sun's complaint?

19      A.   That's the discussions I've been involved in.

20      Q.   Do you know when the process started in the liquor

21   commission?

22      A.   Following Carla Chu's complaints against the City

23   and her settlement, which would be --

24      Q.   What was Carla Chu's complaint about?

25      A.   Initial ly complained about sexual harassment,

1    gender discrimination, sexual orientation, retaliation.

2    Those are the ones that I can recall offhand.

3        Q.    Are there any other departments or agencies within

4    the City that have -- are either on working on you putting

5    such policies in place or have such policies in place with

6    respect to retaliation?

7        A.    I'm working right now with the parks department on a

8    similar kind of situation.

9        Q.    Okay.  And was there some complaint that

10   precipitated this action on the parks department?

11       A.    Yes.

12       Q.    And what was that?

13       A.    That's an EEOC complaint by a grounds keeper named

14   Peter Jensen.

15       Q.    Was there an issue of retaliation in that complaint

16   as well?

17       A.    He claimed discrimination and retaliation, yes.

18       Q.    Okay.  Are there any other -- and that's one that's

19   not implemented yet, it's being put into place?

20       A.    We actually started the training during August, and

21   rolling out other pieces of the plan.

22       Q.    So -- and are all these plans -- do all these plans

23   have similar elements?

24       A.    I'm going to say they have similar elements

25   basically.

```
 1      A.   There's several people.  It could be a supervisor

 2   unless the supervisor is the person who's engaging in that

 3   behavior, anybody in their chain of command, and they can

 4   bring it to their designated EEO coordinator in each

 5   department or personnel officer in each department can take

 6   a complaint and -- and/or they can bring it to me.  We also

 7   tell them about the outside agencies at least in the

 8   discrimination area that are available to them.

 9      Q.   The EEOC?

10      A.   And the HCRC.

11      Q.   That's the Hawaii Civil Rights Commission.  Is that

12   all there is in the training component, sounds like that

13   would be a short class.

14      A.   It that shall the that --

15      Q.   I'm sorry for that gratuitous comment.  I take that

16   back but is that all there is in the training component?

17      A.   Well, the training starts off explaining what kinds

18   of things can be complained about and there's generally some

19   kind of a video that we put in the training so that people

20   can see an example of whatnot to do.

21      Q.   Okay.  Is there a component that specifically speaks

22   about the state whistleblower act?

23      A.   Not specifically.

24      Q.   Non specifically does it deal with that?

25      A.   I mean, I think the discussion of complainants
```

1     should be protected from retaliation and -- and that it's

2     all of our job to make sure that happens would fall

3     within -- generally.

4          Q.   Okay.  Is the state whistleblower act even referred

5     to in this training?

6          A.   No.

7          Q.   Okay.  Would it -- are there any other programs that

8     are either in place or sort of anticipated to be in place in

9     any City agencies other than the four that you've listed,

10    which were enterprise services, HPD, liquor commission, and

11    parks department?  Any others that you know of?

12         A.   I mean, I'd like to but right now, we're doing the

13    response to complaints as they surface and addressing those.

14    I'm one person by myself, so --

15         Q.   I understand.  But there -- there are no other

16    programs that have been initiated or installed in any other

17    departments to your knowledge at the moment, right?

18         A.   Not that I'm aware of.

19         Q.   Okay.  Would it be fair to say that in each

20    instance, that the programs that either have been initiated

21    or were put in place were the result of litigation filed by

22    employees?

23         A.   Yes, that's my understanding.

24         Q.   Okay.  Is there some reason the City waits for an

25    employee to have to sue before they initiate such programs?

1     A.    I don't know that I can speak for the whole City.

2     Q.    Well, you're -- you're sort of in the cappercy.  Do

3     you have any explanation that you think or any reason that

4     you think would explain that?

5     A.    I don't -- I don't think I could have anything that

6     would speak to the City as a whole.

7     Q.    Has there been some discussion that on the basis of

8     Phil English's complaint such a program would be instituted

9     in the assessment division?

10    A.    I am not aware of those specific discussions if

11    there are any.

12    Q.    Are you the person that would be involved if such a

13    discussion -- if such a program were to be initiated?

14    A.    I would assume that I'll be part of that discussion.

15    Q.    But you're just not aware of any such discussions?

16    A.    Not specific to his complaint.

17    Q.    In these other -- in the other instances that we

18    talked about, enterprise services, HPD, liquor commission,

19    and parks department, did the City wait until the underlying

20    litigation or claim was resolved before initiated programs?

21    A.    On those four, yes, specifically.

22    Q.    Has there been any discussion that the City's going

23    to wait until Phil English's case is resolved before they

24    initiate something in the assessment division?

25    A.    Not any discussion with me on that.

1    Q.   Have you heard any discussion amongst other people?

2    A.   I have not.

3    Q.   I take it from your responses that you believe that

4    this should be a City wide program?

5    A.   That's my personal opinion that there's a lot of

6    things we should be doing.

7    Q.   Okay.

8    A.   This might be part of it.

9    Q.   I see.  And are we talking about -- do any of these

10   programs specifically focus on whistleblowers under the

11   umbrella of the Hawaii whistleblowers protection act?

12   A.   Not specifically.

13   Q.   Not specifically.  They just deal with retaliation

14   in general?

15   A.   Yes.

16   Q.   Okay.  Okay, I'd like to show you -- well I I'm

17   going to get it marked first.  That's the process here.  Get

18   it marked.  Off the record.

19        (Discussion held off the record.)

20   BY MR. MOSELEY:

21   Q.   Okay, let's go back on the record.  I've shone you

22   what's been marked as Exhibit 208.

23   A.   Mm-hmm.

24   Q.   Can you tell me what this is?

25   A.   It's the complaint of Kenny -- Kenneth Mersburgh,

1      A.   It's a complaint by Kerry Shannon against the liquor

2    commission.

3      Q.   Are you familiar with this complaint?

4      A.   Not specifically.

5      Q.   Not specifically.  Are you in general familiar with

6    it?

7      A.   I've heard the name that's about it.

8      Q.   All right.  This complaint has not yet been

9    resolved, is that right?

10     A.   I don't know.

11     Q.   To your knowledge?

12     A.   I don't know.

13     Q.   Okay.  Do you know if the City has taken any special

14   action other than defending the litigation as a result of

15   Kerry Shannon's complaint?

16     A.   I don't know.

17     Q.   Okay.  By the way, is it your understanding that

18   Charles Wiggins's complaint is essentially a whistleblower

19   complaint as well?

20     A.   That's my understanding.

21     Q.   How about your understanding of Kerry Shannon's

22   complaint?

23     A.   I'm not specifically certain.

24     Q.   Okay.  Do you want to take a moment to look at it?

25   Actually, if you look at page two under nature of the case?

```
 1      A.   Mm-hmm.

 2      Q.   Do you have an understanding now of whether this is

 3   a whistleblower case?

 4      A.   Yes, I do.

 5      Q.   Okay.  And it is, right?

 6      A.   Yes, it is.

 7      Q.   Okay.  I'm showing you what's been marked as

 8   Exhibit 1211 in this case.  This is -- do you know what this

 9   is?

10      A.   It's a complaint by Craig Whang against the

11   prosecutor's office.

12      Q.   Were you familiar with this complaint as well?

13      A.   I did read about it in the paper.

14      Q.   But not within the City?

15      A.   I wasn't contacted specifically about his complaint.

16      Q.   Okay.  Has this complaint ever been discussed

17   within -- in terms of your knowledge -- see, I told you I

18   can't ask a question.  Have you ever been involved in any

19   discussions about this complaint?

20      A.   Only to the extent that he filed a complaint.

21      Q.   And who did you discuss that with?

22      A.   I believe it was Iwalani White, who was the formally

23   the Deputy Prosecuting Attorney.

24      Q.   Okay.  Do you know if this is also a whistleblower

25   complaint?
```

1     full-time for, you know, each year just to handle complaints

2     for sexual harassment and related issues that go with that.

3         Q.   And that's just sexual harassment?

4         A.   That's just sexual harassment so what you're talking

5     about would be an enormous kind of resource.

6         Q.   It would be a serious commitment, though, right?

7         A.   Yes.

8         Q.   But would it be fair to say that you view this as a

9     serious problem?

10        A.   I do.

11        Q.   Okay.  So you need money for staffing for training,

12    then you need money for -- what do we call this, is this the

13    establishment of a program in process to deal with the

14    issues?

15        A.   Yes.

16        Q.   Would that be fair?

17        A.   I would -- I would -- that would be fair.  You have

18    to have policies because you have to have the authority to

19    do what you're doing.

20        Q.   Policies, okay.  Now, in terms of policies, who

21    would be the people setting these policies?

22        A.   It -- and I'm going to assume we're talking about

23    policies for employees so employment policies.

24        Q.   Right.

25        A.   And even in seven years I'm still getting to know

1     Q.   Right.

2     A.   No.

3     Q.   Have you ever seen anything like that in a handout,

4     or is there -- is there like a City newsletter or something?

5     A.   There's a human resources newsletter that is

6     distributed, and I don't know what the cycle on that is.

7     Q.   Is that given to everybody or just managers?

8     A.   I'm not sure how they distribute it.

9     Q.   Do you have any idea of what the program is to

10    disseminate information throughout the 9,000 some odd

11    employees of the City?

12    A.   I don't know that there's one program.  There's

13    different avenues that -- or vehicles that are used.  That

14    newsletter is one, the back of the paycheck often is used to

15    communicate general interest kind of information.

16    Q.   Okay, getting back to the news article in

17    Exhibit 213 in that same last page?

18    A.   Mm-hmm.

19    Q.   The next paragraph down -- oh, the same paragraph,

20    are -- were you aware of a complaint line to report

21    misconduct?

22    A.   Actually, the -- the City's customer services

23    department handles that -- it used to be called the office

24    of information and complaint, the name has changed in the

25    change of administrations, but there's a number that anyone

1    can call, they report the pothole problems.  I've gotten

2    complaints through that line where they call us to report a

3    City employee, for example who they believe was

4    discriminating against them.

5        Q.   But that's available to City employees as well?

6        A.   City employees have used that line to make

7    complaints.

8        Q.   Is that what the line was intended for?

9        A.   I don't know that that was what it was intended for,

10    but it's available to anyone.

11        Q.   I guess because you can't prevent them from calling

12    the number, right?

13        A.   That's true.

14        Q.   Okay.  Is there any sort of publication or program

15    to encourage employees to use that line?

16        A.   Not that I'm aware of.

17        Q.   Okay.  In the next paragraph down it says whenever a

18    City employee files a complaint about another worker, both

19    parties are reminded that retaliation is prohibited.

20            Is that your understanding that that happens?

21        A.   That's my understanding, and that's what I'm

22    training people to do.

23        Q.   And is that your understanding that that's what's

24    supposed to happen or that that is what happens?

25        A.   On the cases I see, and in fact -- I -- I put

1    to get them to do.

2        Q.    Okay.  Is it your understanding that supervisory

3    level employees have certain duties and obligations if they

4    learn of -- first of all, let's start of some kind of wrong

5    doing at the City.

6        A.    It's my understanding that if they learned of

7    something that's wrong doing -- that raises to a certain

8    level, they may have a responsibility.

9        Q.    What kind of level would that be?

10       A.    I think particularly violation of -- of where

11   there's a potential violation of a law or some specific

12   policy.

13       Q.    Or potentially a theft?

14       A.    Potentially a theft.

15       Q.    Okay.  And then in a case of a supervisor employee

16   who learns of something like that, you think there is a

17   responsibility to do something, is that right?

18       A.    I think so.

19       Q.    Okay.  How about what if a supervisory employee

20   learns that -- a supervisory -- part of the supervisory

21   personnel of the City learns that an employee believes that

22   that employee's being retaliated against for making such a

23   complaint, does the supervisory personnel then have

24   responsibilities to do anything to follow up on that as

25   well?

1      A.    I believe they do.

2      Q.    Okay.  And what is the responsibility?  Is it --

3  does it fulfill the responsibility just to go to the next

4  person above them?

5      A.    I think it would be case fen dent but for the most

6  part that's the first thing we tell them to do is don't let

7  it stop with you, tell somebody who has -- who can either

8  give you guidance or who has the responsibility to address

9  the situation.

10     Q.    Do you tell them what to do if it's -- if the

11 complaint is against their boss or their boss's boss?

12     A.    I don't specifically give one specific guidance.  It

13 really is case dependent when people call me.

14     Q.    What do you think in your experience in this arena

15 of the wisdom of if somebody complains that the supervisor's

16 boss is doing something improper, say for example, stealing

17 from the City, what do you think the advisability is of

18 advising -- what a question.

19           What do you think the advisability is of that

20 supervisor going to the very person the complaint was made

21 against with the problem?

22     A.    And I -- I'm going to say just based on that, that's

23 probably not what I would recommend, but it -- I don't know

24 what information they had and if they were just seeking

25 information or they were actually telling the supervisor --

1    their boss that somebody's complaining about you so

2    depending on what they went forward with, I guess.

3        Q.   When you are training investigators, do you tell the

4    investigators that look, one of the first things you have to

5    do is marshal the information before somebody has a chance

6    to destroy it?

7        A.   That's among the things we talk to them about.

8        Q.   Okay.  Is that what you consider sort of minimally a

9    required investigative technique?

10       A.   Securing the evidence is on the checklist of things

11   that are important, yes.

12       Q.   But wouldn't that be like near the top of things

13   that would be important?

14       A.   Near the top, yes.

15       Q.   Okay.  And that's what you teach in your training

16   class for investigators?

17       A.   Yes.

18       Q.   What do you think of the investigative technique of

19   I complain that Joe blow is doing something wrong with his

20   City computer and so my supervisor goes to Joe blow and says

21   Joe blow, are you doing this?  And Joe blow says no.

22           Is that a proper investigative technique?

23           MR. WONG:  Objection, incomplete hypothetical.

24           THE WITNESS:  There's not enough information there.

25   But I can also say that we have collective bargaining

1    an action taken by a City officer or employee that they

2    believe is wrong.

3        Do you see that?

4    A.    Mm-hmm.  Yes, I do.

5    Q.    Okay.  In the very last sentence of that paragraph,

6    it says because of their fear of repercussions, I have had

7    people only willing to call me back at a specified time

8    rather than have me contact them.

9        Did you -- do you understand that City employees

10   commonly have a fear of repercussions if they complain of

11   anything?

12   A.    My understanding is most people have a fear of

13   complaining.

14   Q.    A fear of repercussions?

15   A.    Retaliation or repercussions.

16   Q.    But in terms of specifically with the City, is it

17   your understanding that that's fairly widespread among City

18   employees?

19   A.    I would be guessing on the -- the answer to that,

20   but I can tell you that in the three different employees

21   that I've worked for in this kind of area, that is a concern

22   that people discuss when they call.

23   Q.    Okay.  But you've never -- you 'never seen this

24   letter before?

25   A.    I haven't read this letter before.  We may have --

RALPH ROSENBERG COURT REPORTERS, INC.
HONOLULU, HI  (808) 524-2090

1    practices about it?

2        A.    Not specifically about her doing this.

3        Q.    Does the experience that Ms. Staple ton relates

4    there, does that sort of correspond with your general

5    experiences with City employees?

6        A.    With some.

7        Q.    With some?

8        A.    Mm-hmm.

9        Q.    That's yes?

10       A.    Yes.

11       Q.    Okay.  Is there anything the City has done, let's

12   start with City wide first, to address such a problem?

13       A.    I'm in the aware of anything specific.

14       Q.    Is there anything that has been done within any of

15   the departments to address such a problem?

16       A.    Not specifically that I'm aware of.

17       Q.    Okay.  Is that one of your concerns presently in

18   your capacity with the City?

19            MR. YAMAMOTO:  Let me object as being vague and

20   ambiguous.

21            THE WITNESS:  It's actually a topic that we talk

22   about during the training, and it's -- there's other OIP

23   decisions that also address confidentiality of

24   investigations and complaints.  When people call me with

25   this concern, I have to explain to them that one, we have a

1      Q.   Okay.  Is there -- is there any reason to your

2    knowledge that when these individual lawsuits occur, the

3    City doesn't -- instead of -- instead of going sort of

4    department by department or agency by agency in a piecemeal

5    approach to try to address the problems of retaliation

6    against whistleblowers, is there any reason that the City

7    just doesn't do this City wide?

8            MR. YAMAMOTO:  Let me object, that assumes facts not

9    in evidence.

10            THE WITNESS:  I think the litigation are handled by

11    the corporation counsel with the particular department and

12    there isn't any one person who's looking at the whole City.

13    BY MR. MOSELEY:

14      Q.   Is it your opinion there should be one person

15    looking at the whole City?

16      A.   My opinion?

17      Q.   Yes.

18      A.   Is that would be a good thing.

19      Q.   Okay.  Do you regard the City's current training

20    programs to be adequate to deal with complaints of

21    retaliation across the board and throughout the City?

22      A.   Again, that's my opinion?

23      Q.   Yes.

24      A.   I don't think it's adequate.

25      Q.   Okay.  Have you expressed that opinion to -- you

1    said you report directly to the mayor, right?

2        A.    I report -- I -- I sit under human resources.

3        Q.    I understand?

4        A.    But I have the ability to report to the mayor if

5    anything needs his attention.

6        Q.    Have you expressed that opinion either to the head

7    of human resources or to the mayor?

8        A.    To the head of human resources.  I've had three

9    human resources directors since I've been there and I've had

10   that discussion with all three.

11       Q.    And what has the response been?

12       A.    I'm going to say this -- these are discussions so

13   there a -- it's not like I was asking for decisions to be

14   made.

15       Q.    I understand.  But it's an issue you raised, right?

16       A.    Raised the issue.

17       Q.    And when you raised the issue, what has the response

18   been?  Has there been three different responses or pretty

19   uniform?

20       A.    No, I -- I mean, if I had to characterize the

21   responses, there's an understanding or a recognition that we

22   have concerns and they're part of a larger problem of lack

23   of training and training resources for supervisors and

24   managers, particularly, and then following to with

25   employees.

1    Q.   Okay.  But the response when you raised these issues

2    has been okay, we'll jump right on that and do something,

3    or -- we can't do it because we don't have the money or

4    don't bother me, I don't care?  I mean, I'm just suggesting

5    some things.

6    A.   It -- just -- you know, there's no dispute that

7    there's a need, but we don't know where to start or who's

8    going to do it and -- all those things go into the response.

9    Q.   You is it a question of hey, nobody has the

10   responsibility to do this?

11   A.   There's a -- there's a training component to the

12   City.

13   Q.   I understand?

14   A.   But they don't necessarily have the authority to say

15   all city employees or all City managers must do X, Y, and Z.

16   Q.   So they don't have the authority.  Do they have the

17   responsibility?

18   A.   To deliver the training upon demand.

19   Q.   Okay.  Do you think that the -- the failure to

20   provide the level of training that you think would be

21   adequate actually either contributes to some form of

22   retaliation in some cases, or -- or is the reason that --

23   that retaliation is not prevented?

24   A.   I don't know that I could say that that that's the

25   reason.

1    BY MR. MOSELEY:

2        Q.   I'm just asking for your?

3        A.   I think they're going to happen anyway.  The

4    question is what are we going to do about it, same with

5    things I deal with sexual harassment.  It's going to happen,

6    but do people know what to do when it does.

7        Q.   Okay.  So there's no way -- the prevention aspect of

8    this then is really sort of immaterial, is that right?

9        A.   I think there's an aspect to it but honestly, the

10    training provides a foundation for management to do

11    something about it once it does occur because then people

12    have been put on notice.

13        Q.   Okay.  But you think it has no affect in preventing

14    things?

15        A.   I don't know that it has no affect but I don't know

16    that it will make it all go away.

17        Q.   Oh, I wasn't talking about making it all go away.

18    I'm talking about, I mean, you've obviously dealt with and

19    thought about these problems a lot.

20           I'm just asking in your opinion if -- if the lack of

21    training either makes it easier for these acts of

22    retaliation to happen or provides a, you know, an

23    environment in which they -- if they -- they encourage it to

24    happen, one or the other?

25           MR. YAMAMOTO:  Same objection.

```
 1          THE WITNESS:  I don't know that it encourages it but

 2    it may -- and it's my opinion it may fail to prevent it.

 3    BY MR. MOSELEY:

 4      Q.   Okay.  Is it from dealing with the City managers

 5    that you deal with, is it fairly commonly known of the kinds

 6    of things that Mr. Wiggins described in Exhibit 213 that

 7    what happens to you is so bad that I'm just not going to say

 8    anything S that kind of a commonly understood phenomenon

 9    between the management and the City or among the management

10    and the City that you've had contact with?

11          MR. YAMAMOTO:  Objection, that calls for

12    speculation.

13          THE WITNESS:  Actually, that's not the -- that's not

14    the response I've gotten from management.  They don't

15    believe that -- or I don't think that very managers believe

16    that it's as bad as he -- Mr. Wiggins says he believes it

17    is.

18    BY MR. MOSELEY:

19      Q.   Okay.  Have you ever read any books about

20    whistleblowers or done any research on whistleblowers?

21      A.   Some.  Mostly internet research.

22      Q.   Mostly internet research?

23      A.   Mm-hmm.

24      Q.   Is that prior to today?

25      A.   Yes.
```

1    complaint was filed or any evidence of the performance of

2    that individual before so that there can be some -- because

3    obviously manager's response to a claim of retaliation is we

4    didn't retaliate, this action was taken for some good

5    reason.

6         So basically, it's show me how you're going to be

7    able to demonstrate that.

8    Q.   Okay.

9    A.   And so if they call me before the complaint is

10   filed, obviously I'm talking to them about the kind of thing

11   that they had need to do to non strait that.

12   Q.   But if they call you after the complaint is filed,

13   what do you say, show me the performance evaluation that

14   occurred before?

15   A.   I -- I'm going to say you're treading on dangerous

16   territory and while I'm not saying you can't proceed as

17   you're suggesting, you need to make sure that you're not

18   doing this for the wrong reason and so basically, why all of

19   a sudden is this a problem or was it a problem all along.

20   Q.   In the case where there's an employee that has a

21   pretty stellar record before and no records of complaints

22   and rated exceeds requirements in all categories, and then

23   after the complaint is filed the ratings drop off

24   precipitously, does this suggest to you that there's a more

25   serious problem?

```
 1          MR. YAMAMOTO:  Object to the extent it's an

 2    incomplete hypothetical, calls for speculation.

 3          THE WITNESS:  I would say it would be a red flag but

 4    it doesn't mean that retaliation has occurred.  But I would

 5    be looking at what's going on behind the scenes on that.

 6    BY MR. MOSELEY:

 7     Q.    Is it a big red flag or a little red flag?

 8     A.    Its's one of the textbook red flags.

 9     Q.    One of the textbook red flags?

10     A.    Sure.

11     Q.    What are the other textbook red flags?

12     A.    Somebody gets terminated, somebody gets moved to a

13    less prestigious, let -- you know, a job that's not so good.

14     Q.    How about someone gets a series of workplace

15    violence reports filed against them after complaining?

16     A.    Those may or may not be.  I've got lots of

17    situations like that.  Sometimes timing is just timing but

18    we have to actually go back and look behind it and see

19    whether or not there's merit to each complaint.

20     Q.    When you say you have lots of case like that, you

21    have lots of cases where workplace violence reports are

22    filed after the complaint is made?

23     A.    Complaints of workplace violence or other issues are

24    sometimes brought -- somebody complains.  After their

25    complaint is made known, there are other complaints that
```

1     A.   I did find out about that after.

2     Q.   Okay.  Do you know who Susan Siu is?

3     A.   Yes, I do.

4     Q.   Medical examiner's office?

5     A.   Yes.

6     Q.   Are you aware that workplace violence reports were

7  filed against her after she had complained?

8     A.   They're still being investigated.

9     Q.   Those are still being investigated?

10    A.   Yes.

11    Q.   Is that one of the three cases you're talking about?

12    A.   One of them.

13    Q.   Okay.  Can you tell me how many of these other

14  specific cases like that in which workplace violence

15  complaints were handled were filed after the complaint was

16  made, do you have any idea how many others you've handled in

17  your seven-year tenure?

18    A.   I'd have to guess.

19    Q.   Is it dozens?

20    A.   I don't know if it's dozens but maybe a dozen fur

21  sure:  I mean, I could probably figure out identifying a

22  dozen.

23    Q.   Okay.  I don't think I actually have any more

24  questions.

25  BY MR. WONG: