IN THE UNITED STATES DISTRICT CIRCUIT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PHILIP E. ENGLISH, | ) CIVIL NO. 04-00108 |
| Plaintiff, | ) |
| vs. | ) |
| CITY AND COUNTY OF HONOLULU; GARY T. KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA; and GK APPRAISALS, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10, | ) |
| Defendants. | ) |

DEPOSITION OF ROBERT MAGOTA

VOLUME III

Taken on June 16, 2006, commencing at 9:05 a.m. at the Law Offices of Moseley Biehl Tsugawa Lau & Muzzi, Alakea Corporate Tower, 1100 Alakea Street, 23rd Floor, Honolulu, Hawaii, before Rita King, a Certified Court Reporter in the State of Hawaii.

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090   Fax: 808.524.2596
**EXHIBIT "R"**

1    Q.    Did Mr. Fisher interview you at all?
2    A.    No.
3    Q.    Did anybody else from the Ethics
4  Commission interview you?
5    A.    No.
6    Q.    Have you ever been provided with any
7  information with respect to any interviews or
8  investigations that the Ethics Commission has
9  conducted with respect to any matter involving Phil
10 English?
11   A.    No.
12   Q.    Have you ever been the subject of an
13 investigation of the Ethics Commission of the City
14 and County of Honolulu?
15         MR. LORUSSO:   Objection, relevancy.
16         Go ahead.
17         THE WITNESS:   No.
18   Q.    BY MR. MOSELEY:   Are you aware if
19 Mr. Kurokawa, Gary Kurokawa, has ever been the
20 subject of an investigation by the Ethics
21 Commission with the City and County of Honolulu?
22   A.    Regarding this recent complaint or prior?
23   Q.    Ever.
24   A.    The only one I'm aware of is the current
25 one.

1   Q.   And how did you become aware of that
2  investigation?
3   A.   I believe Chris Graff had mentioned
4  something about an ethics, some kind of ethics
5  investigation.
6   Q.   And when did Chris -- well, first of all,
7  did he tell you orally or was it in writing?
8   A.   Orally.
9   Q.   Do you know when he told you that?
10  A.   It was around January 17th, 2003.
11  Q.   You're pretty sure of that date, are you?
12  A.   Fairly certain, yes.
13  Q.   You're sure it wasn't January 7th or 10th
14 of 2003?
15  A.   17th.
16  Q.   How do you know it was the 17th?
17  A.   That's the day he had lunch with
18 Mr. English.  Then afterwards he came to my office.
19  Q.   So your understanding is that Chris Graff
20 had lunch with Mr. English and came to your office
21 immediately thereafter?
22  A.   Yes.
23  Q.   And you're absolutely certain it was on
24 January 17th, 2003.
25  A.   Yes.

```
 1      Q.    And is that marked on your calendar at
 2  all?
 3      A.    I don't know if I marked it on my
 4  calendar.
 5      Q.    Did you take notes of that meeting?
 6      A.    No.
 7      Q.    Is there any record of that meeting
 8  anywhere in your files?
 9      A.    I can't recall, but Ann Gima was also in
10  attendance at that meeting.
11      Q.    Might there be records of that meeting in
12  your files?
13            MR. LORUSSO:  Objection, calls for
14  speculation.
15            MR. MOSELEY:  He said he can't recall,
16  I'm just asking him if, in fact, there could be
17  such records.
18            MR. LORUSSO:  Same objection.
19            THE WITNESS:  I don't recall.
20      Q.    BY MR. MOSELEY:  Was anybody else in
21  attendance at that meeting with you, Ann Gima and
22  Chris Graff?
23      A.    No.
24      Q.    What time of the day did that meeting
25  occur?
```

```
 1        A.    After lunch.
 2        Q.    2 o'clock, 3 o'clock, 1:30?
 3        A.    I would say between maybe somewhere after
 4  1 o'clock, roughly.
 5        Q.    How did the meeting come about, did Chris
 6  call you or come by your office or how did the
 7  meeting occur?
 8        A.    Both Ann Gima and Chris -- Ann Gima and
 9  Chris Graff came to my office.
10        Q.    And that's the first you heard about it?
11        A.    Yes.
12        Q.    And who was the first person to talk in
13  that meeting?
14        A.    I believe, Ann Gima.
15        Q.    And what did Ann Gima say?
16        A.    She said something like, You better
17  listen to this.
18        Q.    Anything else she said at first?
19        A.    That's all I recall.
20        Q.    And then who talked next?
21        A.    Mr. Graff.
22        Q.    And what did Mr. Graff say?
23        A.    Mr. Graff told me that he had lunch with
24  Mr. English and that he had been threatened by
25  Mr. English.
```

1  Q. Anything else he said, initially?

2  A. He said he had -- besides having lunch
3  with Mr. English, he had said that Mr. English had
4  told him something about an Ethics Commission
5  investigation, that Mr. English told him that he
6  was in trouble, that he can go to jail, that the
7  FBI was involved in an investigation, along with
8  the Ethics Commission.

9  Q. Anything else?

10  A. That if he did not cooperate he could go
11  to jail, and he said he told Mr. English that he
12  had done nothing wrong, that Mr. English got very
13  upset with him. He did mention Chuck Totto's name.

14  Q. So it was your understanding and during
15  the course of this meeting that Chris Graff was
16  reporting to you within at least hours after his
17  first meeting with Mr. English, and that he was
18  reporting to you that Mr. English said he had gone
19  to the Ethics Commission and to the FBI; is that
20  right?

21  A. Yes.

22  Q. And you're very clear that Chris Graff
23  told you this was the initial time that Phil
24  English had told him this; is that right?

25  A. During lunch.

```
 1  STATE OF HAWAII      )
                         ) ss.
 2  COUNTY OF HONOLULU   )
```

 3

 4       BE IT KNOWN that the foregoing deposition

 5  was taken before me, RITA KING, a Certified

 6  Shorthand Reporter for the State of Hawaii; that

 7  the witness before testifying was duly sworn by me

 8  to testify to the whole truth; that the questions

 9  propounded to the witness and the answers of the

10  witness thereto were taken down by me in shorthand

11  and thereafter reduced to print by computer-aided

12  transcription under my direction; that the witness

13  elected to read and sign; that the foregoing pages

14  are a full, true and accurate transcript of all

15  proceedings and testimony had and adduced upon the

16  taking of said deposition, all done to the best of

17  my skill and ability.

18       I FURTHER CERTIFY that I am in no way

19  related to nor employed by any of the parties

20  hereto nor am I in any way interested in the

21  outcome hereof.

22       DATED at Honolulu, Hawaii, this 19th day of

23  June, 2006.

24       _____

25             RITA KING, RPR, CSR No. 373

Ralph Rosenberg Court Reporters, Inc.
Ofc: 808.524.2090   Fax: 808.524.2596

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3   ---------------------------------------------
 4   PHILIP E. ENGLISH,
 5            Plaintiff,
 6       vs.              Civil No. 04-00108 JMS-KSC
 7   CITY AND COUNTY OF HONOLULU; GARY T.
 8   KUROKAWA; ROBERT O. MAGOTA; ANN C. GIMA;
 9   and GK APPRAISALS, INC; et al.,
10            Defendants.
11   ---------------------------------------------
12
13
14              DEPOSITION OF ROBERT MAGOTA
15                      (VOLUME IV)
16
17   Taken on behalf of the Plaintiff at Moseley Biehl
18   Tsugawa Lau & Muzzi, 1100 Alakea St., 23rd Floor,
19   Honolulu, Hawaii 96813, commencing at 9:07 a.m.,
20   Tuesday, August 1, 2006, pursuant to Notice.
21
22
23   BEFORE:  BARBARA ACOBA, CSR No. 412, RPR
24           Notary Public, State of Hawaii
25
```

```
 1      Q.   What did Randy Hiraki talk about?
 2      A.   Again, I don't remember about the exact topic.
 3      Q.   Did he talk about ethics?
 4      A.   I'm not sure.
 5      Q.   Did you see his presentation?  You said you
 6  didn't see his presentation when he gave it, right?
 7      A.   That's correct.  I was not in attendance.
 8      Q.   Okay.  Did you know what his presentation
 9  contained before he gave the presentation?
10      A.   You mean the -- are you referring to the
11  material?
12      Q.   Right.
13      A.   No.
14      Q.   So did anybody review his material before he
15  presented it?
16      A.   I know I didn't.  I don't know if anyone else
17  did.
18      Q.   Well, these were the four presenters.  Was
19  there anybody else involved in organizing or setting
20  this up, this series of training sessions?
21      A.   I think it was pretty much the four of us.
22      Q.   How did it come about that the training session
23  came up in the first place; was that your idea?
24      A.   Well, I think it was talking with corporation
25  counsel and other people in the office that, you know,
```

```
 1    it would be good to do training periodically.
 2         Q.   You hadn't been doing training periodically
 3    prior to this?
 4         A.   No, we have done in-house training.
 5         Q.   But this was a really big one, right?
 6         A.   It was four days, I believe.
 7         Q.   Is that kind of unusually long for your
 8    training sessions?
 9         A.   Not necessarily.  We have had training sessions
10    that have gone a week.
11         Q.   Would it be fair to say those kind of training
12    sessions involved outside vendors or something along
13    that line to help you with your new camera system or
14    something along that line?
15         A.   In addition to courses be bringing from the
16    IAAO.
17         Q.   And any -- this four-day session in February of
18    '03, did you consider that an in-house session?
19         A.   Yes.
20         Q.   Okay.  Were there any other in-house sessions
21    that were this long?
22         A.   We may have had some that had gone a couple
23    days.
24         Q.   Okay.  Was this training session set up because
25    Phil had complained about so many things?
```

```
 1   Resources, to your knowledge?  This is in the time when
 2   you were there from when you started to actually right
 3   now.
 4        A.   I believe workplace violence.
 5        Q.   Okay.  Any other types of subject matter you
 6   believe were generated by the Department of Human
 7   Resources?
 8        A.   There may be more, but I just don't recall at
 9   this point.
10        Q.   Okay.  How many workplace violence training
11   sessions do you recall in the time you've been at the
12   City?
13        A.   I believe more than one, but I can't recall the
14   exact number.
15        Q.   Okay.  After the training session in February
16   of 2003, did you receive any comments from anybody about
17   the four days of training?
18        A.   I believe I did receive some -- one or two
19   complaints.
20        Q.   And the complaints were about what?
21        A.   Randy Hiraki's presentation.
22        Q.   And what were the complaints about Randy
23   Hiraki's presentation?
24        A.   Something about referencing or something about
25   the content of whistle blowing, something along those
```

```
 1   lines.
 2       Q.    And who did you receive complaints from?
 3       A.    I don't recall offhand.
 4       Q.    Were they appraisers that attended or...
 5       A.    Well, like I said, the appraisal staff was in
 6   attendance.
 7       Q.    Was anybody else in attendance?
 8       A.    I wasn't at that session, so I'm not sure who
 9   was there.
10       Q.    But you can't remember -- I mean, can you
11   remember at least about the -- was it more than one
12   person complained about Randy Hiraki's presentation?
13       A.    Yeah, I believe it was one or two.
14       Q.    Do you remember whether it was -- whether they
15   were male or female or anything about them at all?
16       A.    No, I don't recall.
17       Q.    Did Ann Gima complain?
18       A.    I don't recall.
19       Q.    Is the text of Randy Hiraki's presentation
20   still around?
21       A.    That, I don't know.
22       Q.    Is that type of thing typically kept?
23       A.    Well, it was in Randy's possession, so I don't
24   know if it's there or not.
25       Q.    Did anybody complain about a cartoon that was
```

```
 1   got on Randy Hiraki's presentation, did you speak with
 2   Randy about those complaints?
 3        A.   Yes, I did.
 4        Q.   What did you tell Randy?
 5        A.   I asked him about his presentation and why he
 6   was presenting a topic that was not part of the original
 7   plan.  I also told him that, you know, what he did was
 8   basically inappropriate, and that the next time if he
 9   conducts training, he should clear the material with me
10   or his supervisor.
11        Q.   Anything else you told him or asked him, either
12   way?
13        A.   That's pretty much it.  I was -- like I said, I
14   was concerned that he was presenting material that was
15   not part of our agenda or our training plan.
16        Q.   Okay.  So anything about whistle blowers had
17   not been part of the training plan originally?
18        A.   Correct.
19        Q.   Okay.  When you asked him about his
20   presentation, did you ask him what he had done?
21        A.   Can you be more specific.
22        Q.   Did you say, well, what did you present?  You
23   said you asked him about his presentation, what did you
24   ask him about?
25        A.   I believe I asked him about, you know, some of
```

```
 1   the content matter and he had mentioned this Malcolm Tom
 2   incident.
 3        Q.   So when you say you asked him about some of the
 4   content matter, did you say what was the contents or did
 5   you say, did it include X or Y or Z?
 6        A.   I'm sorry, repeat the question.
 7        Q.   Well, I want to know when you say you asked him
 8   about the content matter, did you ask him generally,
 9   hey, what was in it or did you ask him whether specific
10   things were in it?
11        A.   Basically what was in it.
12        Q.   And what did he tell you was in it?
13        A.   He had mentioned the Malcolm Tom incident and I
14   found that unusual because Mr. Hiraki was not a whistle
15   blower in that incident, yet he was talking about
16   whistle blowing.
17        Q.   What did he say about the Malcolm Tom incident?
18   What did he report to you having said about the Malcolm
19   Tom incident?
20        A.   He didn't go into detail.  He just mentioned he
21   had talked about the Malcolm Tom incident, and because I
22   was involved in that previously, I knew what he was
23   talking about.
24        Q.   Did he say anything further about what he said
25   about whistle blowing?
```

```
 1       A.   I don't recall any specific details about
 2  whistle blowing.
 3       Q.   Okay.
 4       A.   I told him that, again, it was -- his
 5  presentation was inappropriate and that next time he
 6  does training, he should clear it with me or his
 7  supervisor.
 8       Q.   Why did you tell him his training was
 9  inappropriate?
10       A.   First of all, it was not part of the original
11  plan we had come up with.  And part of it, too, was the
12  topic that he was really not involved in.
13       Q.   Did you believe he had provided misinformation
14  to people or incorrect information to people?
15       A.   Well, my main concern was it was not part of
16  the overall agenda for the training and, again, it was a
17  topic that I don't think he -- I don't know if he
18  understood it or not, but like I said, he was not a
19  whistle blower in the Malcolm Tom incident.
20       Q.   So he didn't understand what it meant to be a
21  whistle blower?
22       A.   That's my opinion, yes.
23       Q.   Did he tell you why he included it in his
24  presentation?
25       A.   No.
```

```
 1      Q.   Did you ask him why he included it?
 2      A.   No.  I just told him I felt it was not part of
 3  the topic matter.  It was inappropriate.
 4      Q.   Did you ever try to investigate as to why he
 5  included it in the program?
 6      A.   As far as why?
 7      Q.   Yeah.
 8      A.   No.
 9      Q.   Didn't this whistle blowing thing that he did,
10  didn't this seem like kind of a nonsequitur in terms of
11  everything else that was going on in this training
12  program?
13      A.   I'm sorry, can you repeat that.
14      Q.   A nonsequitur, something that really didn't
15  belong in the training program as you envisioned it?
16      A.   Yeah, I didn't believe this topic belonged in
17  the training session.
18      Q.   But you didn't investigate as to why or how it
19  became part of his presentation?
20      A.   Well, it's just basically something he made up
21  or put into it.
22      Q.   Did you ask him if that was just what he wanted
23  to do or whether he was directed to do that by someone
24  else?
25      A.   No, I believe he did it on his own.
```

```
 1   the division at the time he made the presentation?
 2            MR. LORUSSO:  Objection.  Assumes facts not in
 3   evidence.  Lacks foundation.
 4            THE WITNESS:  Repeat the question again.
 5            MR. MOSELEY:  Can you repeat the question,
 6   please.
 7            (Reporter read back)
 8            MR. LORUSSO:  Same objections.
 9            THE WITNESS:  I was concerned that the material
10   was inappropriate.
11   BY MR. MOSELEY:
12      Q.   Were you concerned that it might have had some
13   affect on Phil English?
14      A.   I don't know if it would have had an affect on
15   Mr. English, but my concern was, you know, if Randy was
16   gonna talk about whistle blowing, that, you know, it
17   should have been made clear, that's if he was allowed to
18   do it and, again, it was not part of the plan.  But
19   basically when it comes to whistle blowing, there is to
20   be no retaliation.
21      Q.   Did you have any concern about the affect that
22   this might have had on Phil English?
23            MR. LORUSSO:  Objection.  Asked and answered.
24            THE WITNESS:  I'm not sure how it would have
25   affected him or if he was affected.
```

BY MR. MOSELEY:

    Q.   Okay. I'm asking you, at the time you found out that Randy Hiraki had done this, if you had a concern, then, that it might have affected Phil English?

    MR. LORUSSO:  Same objections.

    THE WITNESS:  I think there was a concern it may have.

BY MR. MOSELEY:

    Q.   Did you speak with Phil about it after finding out about this incident, this presentation?

    A.   No, I don't recall talking to Phil.

    Q.   Well, actually, you know, when did you learn about the presentation, immediately after it happened or was it days later? Or something in between maybe?

    A.   You know, I don't recall. It may have been over a day or two, I'm not sure. In fact, I don't even recall what day it was that Randy gave his presentation.

    Q.   Okay. Do you recall whether Phil had stopped coming into work by the time you found out about Randy's presentation?

    A.   I'm sorry, repeat that.

    Q.   Do you recall whether Phil had stopped coming into work at the time you found out about Randy's presentation?

    A.   That, I'm not sure of. Because again, I'm not

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII              )

 3   CITY AND COUNTY OF HONOLULU  )

 4            I, BARBARA ACOBA, Certified Shorthand

 5   Reporter and Notary Public, State of Hawaii, do

 6   hereby certify:

 7            That on Tuesday, August 1, 2006, at

 8   9:07 a.m., appeared before me ROBERT MAGOTA, the

 9   witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11            That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17            I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20            Dated this 13th day of August, 2006,

21   in Honolulu, Hawaii.

22                           _____

23                           BARBARA ACOBA, CSR NO. 412

24                           Notary Public, State of Hawaii

25                           My Commission Exp: 10-22-2008
```