# CASE BIGELOW & LOMBARDI
A LAW CORPORATION

PACIFIC GUARDIAN CENTER, MAUKA TOWER
737 BISHOP STREET, SUITE 2600
HONOLULU, HAWAII 96813-3283

TELEPHONE: (808) 547-5400
FACSIMILE: (808) 523-1888
E-mail: info@casebigelow.com
http://www.casebigelow.com

David F. Andrew
Michael L. Biehl
Daniel H. Case
James M. Cribley
Stacey W. E. Foy
Gregory M. Hansen
Frank T. Kanemitsu
Michael L. Lam
Alan K. Lau
Dennis M. Lombardi, †

Michael R. Marsh
Roger S. Moseley
Ted N. Pettit, Ph.D.
Scott D. Radovich
Robert F. Schneider
Cathy Lee Sekiguchi
Steven E. Thomas
Eric H. Tsugawa
Gary L. Wixom

Claire E. Bender
Christopher J. Muzzi
Lauren R. Sharkey
Leila Rothwell Sullivan
Cathy L. Takase
Nancy J. Youngren

Of Counsel:
Steven L. Rinesmith †
Counsel:
Gary S. Kerwood

Bruce C. Bigelow (1946-2001)

† A Law Corporation

## LETTER OF TRANSMITTAL

**To:** Paul K. W. Au, Esq.
Department of the Corporation Counsel
530 S. King Street, Rm. 110
Honolulu, Hawaii 96813

**Date:** November 20, 2003

**Re:** Philip English
W.C. Case No. 2-03-01887

**Our File:** 27505-2

---

I am sending you (**XX**) attached (   ) under separate cover the following:

Copy of letter dated 11/17/03 with enclosures

(XX) For your information and files
(  ) For review and comment
(  ) For correction
(  ) For distribution
(  ) Per your request
(  ) Per our agreement
(  ) Per our conversation
(  ) Approved
(  ) Approved as noted

(  ) For necessary action
(  ) For signature in BLACK INK and return
(  ) For filing
(  ) Check enclosed to cover Filing or recording fee $_____
(  ) For payment
(  ) Disapproved
(  ) See remarks below

**REMARKS:**

The enclosed letter dated November 17, 2003 is being resent to you, the enclosures were inadvertently omitted from the original letter.

Should you have any questions, Mr. Moseley is available at your convenience.

Kathleen Chrismer, Assistant for
ROGER S. MOSELEY

RSM:kmc

27505/2/354852.1

## CASE BIGELOW & LOMBARDI
### A LAW CORPORATION

PACIFIC GUARDIAN CENTER, MAUKA TOWER
737 BISHOP STREET, SUITE 2600
HONOLULU, HAWAII 96813-3283

TELEPHONE: (808) 547-5400
FACSIMILE: (808) 523-1888

Bruce C. Bigelow (1946-2001)

November 17, 2003

<u>BY FAX AND HAND DELIVERY</u>
808/523-4583

Paul K. W. Au, Esq.
Deputy Corporation Counsel
City and County of Honolulu
530 South King Street
Honolulu, HI 96813

Re: <u>Philip E. English, Workers' Compensation Case No. 2-03-01887</u>

Dear Mr. Au,

Thank you for your settlement offer in this case dated November 12, 2003.

As you have still not provided us with the documents we have repeatedly requested, we are unable to completely evaluate your offer. Our prior document requests are hereby renewed. However, as with our last offer, presuming that there is nothing in those documents, which would materially affect the settlement value of this case, we hereby offer to settle this claim as follows (subject, of course, to any necessary governmental approvals):

1. The City will accept compensability and will pay Mr. English the lump sum amount of $125,000, which amount shall be paid on or before November 28, 2003;

2. The nature of the injury will be described as mental stress and acute exacerbation of a preexisting depressive disorder resulting from illegal retaliation under the "Whistleblower" laws of the State of Hawaii, said retaliation resulting from Mr. English's reporting of improprieties at the Real Property Tax Assessment Division, including, but not limited to, the illegal use of City employees, equipment, and time for advancement of a private commercial enterprise of the management of the Division, as well as the misappraisal of taxpayer properties and the Division's participation in a scheme to fraudulently collect money from taxpayers, not properly owed to the City by those taxpayers.

27505\21354287.1   MEMBER OF LEX MUNDI, THE WORLD'S LEADING ASSOCIATION OF INDEPENDENT LAW FIRMS   PE 00969

3. The City will provide Mr. English with an additional one year of treatment according to a plan devised by his Kaiser providers;

4. The City will pay for additional treatment, deemed necessary, if any, by Mr. English's Kaiser providers after the initial one-year period;

5. This settlement is for claims of Mr. English against the City under the workers' compensation laws only;

6. The City will pay appropriate reimbursement to Kaiser for services previously provided as a result of Mr. English's workers' compensation injury;

7. The City will pay any required reimbursement of TDI payments made to Mr. English;

8. Mr. English will not be required to resign from his job and will be allowed to remain on the City's employment rolls in the same manner, and for the same duration, and subject to the same rights and procedures, as any other employee injured on the job. Further, the City will continue to pay the workers' compensation payments, started as of October 1, 2003, until the close of business on December 31, 2003. These payments will not be recoverable by the City and are in addition to the lump sum settlement amount stated in paragraph 1. above; and

I. The City will waive any rights and remedies under *Hawaii Revised Statutes* §386-8.

Alternatively, we offer to settle this case on the following terms:

A. The City will accept compensability and will pay Mr. English the lump sum amount of $150,000, which amount shall be paid on or before November 28, 2003;

B. The nature of the injury will be described as mental stress and acute exacerbation of a preexisting depressive disorder resulting from illegal retaliation under the "Whistleblower" laws of the State of Hawaii, said retaliation resulting from Mr. English's reporting of improprieties at the Real Property Tax Assessment Division, including, but not limited to, the illegal use of City employees, equipment, and time for advancement of a private commercial enterprise of the management of the Division, as well as the misappraisal of taxpayer properties and the Division's participation in a scheme to fraudulently collect money from taxpayers, not properly owed to the City by those taxpayers.

C. The City will provide Mr. English with an additional one year of treatment according to a plan devised by his Kaiser providers;

Paul K.W. Au, Esq.
November 17, 2003
Page 3

    D. The City will pay for additional treatment, deemed necessary, if any, by Mr. English's Kaiser providers after the initial one-year period;

    E. This settlement is for claims of Mr. English against the City under the workers' compensation laws only;

    F. The City will pay appropriate reimbursement to Kaiser for services previously provided as a result of Mr. English's workers' compensation injury;

    G. The City will pay any required reimbursement of TDI payments made to Mr. English;

    H. Mr. English will resign from his job effective at the end of business on December 31, 2003. This resignation will be without prejudice and will not be used by the City adversely to any further claims of Mr. English in any forum. Mr. English will be allowed to remain on the City's employment rolls in the same manner, and for the same duration, and subject to the same rights and procedures, as any other employee injured on the job until the effective date of resignation. Further, the City will continue to pay the workers' compensation payments, started as of October 1, 2003, until the effective date of Mr. English's resignation. These payments will not be recoverable by the City and are in addition to the lump sum settlement amount stated in paragraph A. above; and

    I. The City will waive any rights and remedies under Hawaii Revised Statutes Section 386-8.

***This offer will remain open until noon on Friday, November 21, 2003.*** You are advised that the prolongation of the psychological and financial stress on Mr. English continues to damage him further. You are advised of the specific problem that he has been put on notice that he will be ejected from the harbor, along with his boat, if he does not make a payment in excess of $2,600 by November 30, 2003. He has been unable to make this payment because of his cumulative poor financial condition (resulting from the retaliation and from the City's improper denial of compensability), despite the recent payment of benefits for October, which were made without prejudice to the City's position. As of November 17, 2003 no further payments had been made, although a statement presumably describing an additional payment, was received by Mr. English.

We would like to emphasize to you that the City has absolutely no basis for its present denial of compensability. Such denial is not supported by the City's own IPE, nor is it supported by the treating physicians of Mr. English. In the face of a complete lack of factual basis for denying compensability, this action is being taken in bad faith and is, in effect a continuation of the retaliation already suffered by Mr. English at the City's hands. We would request that, regardless of

27505\2\354287.1

PE 00971

Paul K.W. Au, Esq.
November 17, 2003
Page 4

the City's acceptance or rejection of this offer, compensability be immediately recognized.

It is also massively improper to try to use this denial of workers' compensation benefits to leverage a resignation out of Mr. English. There is no provision in the workers' compensation law, which would support such an exaction in exchange for obtaining benefits. We note that it is "unlawful for any employer to suspend or discharge any employee solely because the employee suffers any work injury which is compensable under" the workers' compensation law. Especially in the face of this clearly compensable injury, the exaction of a resignation is tantamount to the violation of HRS §386-142. As you are probably aware, the violation of provisions of the workers' compensation statute can have extremely severe detrimental effects on an employer. We would urge the City immediately to cease and desist this activity.

The offer to resign herein is made solely on the basis that both the City's IPE and Mr. English's treating physician agree that Mr. English cannot continue his employment at the Division without further jeopardizing his health. (Incidentally his union representative has also advised him that, as a practical matter, he will no longer be able to work for the City in any capacity.) This is mainly true because, although the City has a very detailed knowledge of the activities which have transpired, the City has done absolutely nothing to curb the abuses and practices of which Mr. English complained, has failed to discipline any of the City employees involved, and has completely failed to address the problems and management practices which would prevent future and further retaliation against Mr. English and/or other City employees who would otherwise step forward address such improper and illegal practices in the future. It is our opinion that any City employee, officer, or manager, including the Office of the Corporation Counsel, has an absolute and inviolate duty to investigate and take action on such knowledge. This duty is owed independently to the citizens of this City. No employee, officer or manager has any "duty" (or right) to protect any other employee, officer, or manager known to be involved in such activities. In our estimation, any employee, officer or manager of the City who fails to take action in the face of such knowledge becomes complicit in the improper activity.

We also note that your offer, requiring the "nature of the injury" to be described as "job dissatisfaction, difficulties at work and discord with co-workers and supervisors" is not supported by the City's IPE report. That description is part of the "Axis IV: Psychological and Environmental Problems" part of the report. While you must recognize that this report is wholly inadequate and, in fact, does not directly address even the basic underlying question of what caused Mr. English' injury, the report clearly describes the "Clinical Disorders" as "Major Depression, Recurrent, Severe without psychotic features; with history of interepisode recovery" and "Occupational Problem". This is the "nature of the injury" according to the City's IPE. Describing the "nature of the injury" as "job dissatisfaction" and so forth, is tantamount to saying that Mr. English was not injured on the job, and his problems are caused by an inability to get along with

27505\2\354287.1

PE 00972

co-employees and supervisors. This is misleading at best and appears to be nothing more than a blatant attempt to prejudice potential future proceedings. Again, this activity is completely inappropriate in the context of a workers' compensation proceeding.

Enclosed for your information is a copy of a brief letter from Mr. English's treating physician to Mr. Riddle, addressing certain items in Dr. Kennedy's purported IPE. Also enclosed is a partial summary of errors in Dr. Kennedy's report, also previously sent to Mr. Riddle. These items are being sent to you because we believe they will assist in your professional evaluation of this case and the resulting performance of your duty as a City attorney. We are not certain whether you have had these items available to you. Additionally, we would be happy to provide further information if you have any follow-up questions.

**By making this offer we are not relieving you of the responsibility to supply the information and documents repeatedly requested earlier. We demand that those documents and that information be provided immediately.**

If you have any questions, please do not hesitate to call me directly at 547 5447.

Thank you for your anticipated timely response.

Very truly yours,

Roger S. Moseley

Approved:

Philip English

RSM\kmc
Enclosure
cc. Phil English

27505\2\354287.1

PE 00973

PE 00974

CASE BIGELOW & LOMBARDI
A LAW CORPORATION

PACIFIC GUARDIAN CENTER, MAUKA TOWER
737 BISHOP STREET, SUITE 2600
HONOLULU, HAWAII 96813-3283

TELEPHONE: (808) 547-5400
FACSIMILE: (808) 523-1888
E-mail: info@casebigelow.com
http://www.casebigelow.com

September 16, 2003

<u>BY FAX AND HAND DELIVERY</u>
808/527-6782

Thomas Riddle
Workers' Compensation Administrator
City and County of Honolulu
550 South King Street
Honolulu, HI 96813

Re: Philip E. English, Workers Comp. Case No. 2-03-01887

Dear Mr. Riddle,

We have not received any of the further information we requested with respect to Dr. Kennedy's report dated July 30, 2003. You were required by law to provide those records within ten working days following the date of that request. Your failure to abide by the law is hampering our evaluation of Dr. Kennedy's report, however, upon review of the report received, and presuming it is the final and complete report, we have a number of comments.

First, it is quite apparent that Dr. Kennedy did her best not to answer the central question of whether or not Phil English's injuries are compensable under the Workers Compensation laws.

Second, it is quite apparent that Dr. Kennedy made an overt and intentional attempt to obscure the plain fact that, while Mr. English suffered some rather severe emotional effects from several very traumatic events in his life, all of those emotional effects had been satisfactorily resolved and Mr. English was doing very well in his employment and in his personal life for more than two years before the injuries he suffered at the hands of his employer, after he began to take action with respect to dishonesty and lack of professionalism in the Assessment Division. The emotional effects of prior traumatic events were not the cause, or even a cause, of any of Mr. English's present injuries.

Frankly, Dr. Kennedy's report is so skewed, in its history, in its analysis, and in its presentation that it can hardly qualify as an "independent" evaluation. (We are enclosing a partial analysis of the many areas in which Dr. Kennedy skewed or misstated the factual history of this matter.) Despite the extraordinary efforts of Dr. Kennedy to hide the ball, it is impossible not to conclude from her report that Mr. English

27505\2\346760.1   MEMBER OF LEX MUNDI, THE WORLD'S LEADING ASSOCIATION OF INDEPENDENT LAW FIRMS

PE 00975

September 16,
Page 2

has suffered a compensable injury under the Workers Compensation statute. Dr. Kennedy recognized that Mr. English does have a current injury, in the form of major depression at least. Dr. Kennedy was also forced to recognize that, prior to the time he began to take action, his performance appraisal reports showed him performing his duties well. His "performance was documented to have deteriorated" after he began taking action.

Dr. Kennedy was also forced to recognize that "Mr. English is at a point in his life where he will need to reevaluate his career path." In other words, Mr. English needs to change his profession. Further Dr. Kennedy found that Mr. English cannot return to his job in the Assessment Division, "either part-time or full time." Interestingly, while Dr. Kennedy states that Mr. English could return to work elsewhere, either part time or full time, she carefully conditions that evaluation by saying "depending on what is made available". Dr. Kennedy gives no clue as to what she has in mind.

Dr. Kennedy further stated that Mr. English needs at least six months of additional treatment, with an evaluation at the end of that time as to further treatment.

Frankly, the bottom line is that Mr. English suffered a compensable injury on the job, he is presently disabled from employment at his old job, or at any other job, he needs therapy, he needs training in a new career, and, finally, the City's continued refusal to act on this matter is continuing to damage Mr. English. The City cannot, in good faith take any other position than he is, and was, entitled to worker's compensation from the outset as a result of his injuries.

Mr. English should immediately start receiving workers compensation payments, along with back payments resulting from the initial denial of coverage. Kaiser also should be compensated, from the inception as well as currently, for providing treatment, which should have been paid by workers compensation. You are urged to take these actions immediately.

With respect to future treatment, we are still considering your lump sum offer, although the failure to timely provide requested information is hindering these efforts.

Very truly yours,

Roger S. Moseley

RSM/kmc
Enclosure
cc. Phil English
    Dr. Koff

27505\1\346760.1

PE 00976

# ERRORS IN THE "HISTORY" PORTION OF DR. KENNEDY'S REPORT DATED JULY 30, 2003

In the course of Dr. Kennedy's evaluation of Mr. English's injury we were asked to supply documentation of the activities of which Mr. English complained. A substantial number of documents were supplied to Dr. Kennedy and those documents (actually supplied twice as we understood that Dr. Kennedy's office had lost the first set) were also supplied to Tom Riddle. While these were not the only documentation available to substantiate Mr. English's claims, the documents provided were thought to establish Mr. English's veracity without being such a number so as to overwhelm any reader. An examination of those documents will reveal the accuracy of the statements made herein. (Specific document references will be provided upon request.) While not a complete list and description of the errors, the following are some of the errors we noted in the "History of Present Claim" section of Dr. Kennedy's report dated July 30, 2003 (keyed to page numbers in Dr. Kennedy's report):

### Page 4:

We have no independent knowledge of what is contained in the OSHA report referenced, however, Mr. English is unaware of any time he expressed disappointment to anyone at the Assessment Division for not being selected as the Administrator. While Mr. English clearly had substantial management and professional appraisal experience, and probably more than the other candidates, including Mr. Kurokawa, suggestions that he was more qualified probably came from co-workers and supervisory personnel, rather than Mr. English. Dr. Kennedy, of course, never discussed these allegations by Ann Gima and it is difficult to evaluate this reported statement of Ms. Gima's out of context. The plain purpose of the inclusion of this and potentially for Ms. Gima's reported statement, would be to paint Mr. English's subsequent complaints as "sour grapes" and degrade the seriousness and sincerity of his complaints as well as that of the resulting retaliation.

While it is true that one of Mr. English's purposes for seeking City employment was to reduce the stress, it is plain that there have always been multiple purposes, including genuine interest in the mass appraisal/assessment process and a desire to contribute to the betterment of the process. Dr. Kennedy was clearly told of conversations, even with Mr. Kurokawa, in which it was stressed to Mr. English that this would be a great job because the Division was in transition and was in the process of becoming more professional. The picture painted by Dr. Kennedy is that Mr. English changed his objectives, which is not the case and Dr. Kennedy clearly was aware of this fact. This is one of several instances in which Dr. Kennedy improperly and knowingly portrays Mr. English as a person who has not been consistent about his goals and objectives or feelings and beliefs about things. By November 12, 2002 Mr. English had already suffered almost a year of retaliation and psychological attack by his supervisors and coworkers. By that time he had already been advised by union officials that his career in the Assessment Division was probably at an end. The feeling of having "nothing to lose" was a direct result of the retaliatory attacks on Mr. English, and not some untoward component of his personality, or an expression of some kamakazi-type original purpose for seeking employment with the City.

The initial assessments of Mr. English's job performance that he "exceeds requirements" on all of the ratable performance factors. Dr. Kennedy indicates that this occurred on "four" of the factors, but neglects to state that there were only four factors. The implication is that there may have been some other factor upon which his ratings were not as high. Again, this is an unfair and improper "spin" on this important factual support for Mr. English's claims. The plain

27505/2/346764.1

PE 00977

facts are that prior to becoming a whistleblower he was rated as "exceeds requirements" and after that point he was rated lower and lower on each succeeding evaluation. This was part of the psychological attack on Mr. English and resulted in significant distress and damage to him.

**Page 5:**

It is true that Mr. English was new to the assessment process and throughout his employment he continually tried to learn everything he could about the process. He did begin, early on, to discern that the Assessment Division seemed to deny and/or contradict a number of very basic tenants of accepted professional valuation processes, including both substantive and ethical issues. Additionally he did become aware of the performance of private commercial appraiser services by Chris Graff for Gary Kurokawa's outside appraisal company. He further determined to take some action on this issue, beginning with speaking to Chris Graff about it.

When that had no apparent effect, Mr. English properly went up the chain to his supervisor, Ann Gima. Ms. Gima's response was not that she would "look into it". Ms. Gima's response was that she did not know anything of the matter and that Mr. English should concentrate on his own work and not worry about the activities of others. Mr. English did not believe that Ms. Gima could not have been aware of the activities in question. Only later did Mr. English become aware of Ms. Gima's contact with Mr. Magota about this issue. It is apparent, from subsequent activities, that the consultation between Ms. Gima and Mr. Magota was not about how to clean up the improper situation with Mr. Graff, but was that Mr. English was a "problem" employee because Mr. English would not let such activity pass without action. The reason this is apparent is that the situation with Mr. Graff continued unabated and Mr. English began to have the screws turned on him. Dr. Kennedy was specifically advised of these issues and not only misquotes either Tom Riddle's notes or Tom Riddle's notes are inaccurate as to what was said to him by Mr. English. Tom Riddle's notes have not, to date, been made available to Mr. English, even though relied upon by Dr. Kennedy and specifically requested. Categorically, Mr. English never told anyone, at any time, that Ann Gima's response was that she would "look into it". Ms. Gima's response was quite the opposite, chastising Mr. English for "meddling" in the affairs of others.

The next level of action taken by Mr. English was not to put the complaint in writing to Mr. Magota in February of 2002, but to again verbally go up the proper chain to Ms. Gima's supervisor, Robert Magota. At the time of the verbal report to Mr. Magota the response was multifold. First Mr. Magota seemed to be surprised (although it is now apparent that he had been advised by Ms. Gima of the situation, if he didn't already know). Second Mr. Magota specifically told Mr. English that he could not prevail in such an allegation, that it would be "your word against theirs". Mr. Magota also related a story about another appraiser who had unsuccessfully made claims against the Division and did not prevail – indicating that Mr. English should not even think about "trying it" (in context, Mr. English understood this other appraiser to be a "haole"). Mr. Magota also stated that he would speak to Gary Kurokawa and also stated that Chris Graff would bear the burden ("it will be his ass") if this became a problem. Chris Graff subsequently told Mr. English that there was a meeting at which he was in attendance, along with Mr. Kurokawa, and David Matsunami, a former Division employee then doing work for Gary Kurokawa's company. Mr. Graff reported that at this meeting Mr. Kurokawa advised them that they could continue with their activities but that they needed to be more "discrete". Dr. Kennedy was told these specifics, but chose to ignore or miscast them in her report.

Mr. English was justifiably dissatisfied with Mr. Magota's response and told Mr. Magota he was missing the point, it was not a question of being "discrete" and that it was not Mr. Graff's

27596/1/342043.2                                      2

PE 00978

sole problem, but the more important issue was that the Administrator of the Division was involved in this improper activity for his personal gain. The activity continued unabated and Mr. English determined he must put the complaint into writing to Mr. Magota, which he did shortly thereafter. Dr. Kennedy was made aware of these specific facts. Any report that Mr. Magota issued a directive not to do private work on City time is not credible. If that had occurred, the activity would either have stopped, or Mr. Graff would have been disciplined when it did not. Furthermore, one would have expected Mr. Magota to address the situation with Gary Kurokawa, in any case, and if Gary Kurokawa did not put an end to the practice, Mr. Magota should have raised the issue to higher levels yet.

Mr. English did at one time request permission to use the office fax machine for an emergency situation with respect to a matter dealing with the IRS. Mr. English had been told he had to fax information to the IRS within minutes or he would lose the benefit of a compromise on substantial taxes claimed by the IRS. However, Mr. English's "moral compass" is, and was, fully intact. He did not use the machine, he requested permission and when permission was denied (which he fully expected may have been the case and which is why he asked) he was not disappointed or angry, just frantic. He then asked several of his co-workers where a commercial machine might be in the neighborhood and proceeded to fax the information on that machine. The use of this incident to question Mr. English's integrity, especially by Dr. Kennedy, is nothing short of extraordinary. The use of this machine for this purpose, on an isolated occasion, would have been *de minimis* and immaterial to say the least. Even under those circumstances, however, Mr. English wouldn't think of using City resources for his own benefit without first seeking authorization. Dr. Kennedy, of course, never discussed this incident with Mr. English and has again improperly and arbitrarily cast the incident in a light reflecting poorly on Mr. English's character.

### Page 6:

On February 21, 2002 and on numerous other occasions Mr. English sought guidance as to how to follow RPA procedures and guidelines for mass appraisal (there are no apparent formal office policies and procedures). This was done because there were commonly conflicting instructions, blatantly contrary instructions, or no instructions at all. There was a remarkable lack of training, there was a remarkable lack of supervisory guidance, there was a remarkable lack of resources. Mr. English did not expect to be treated differently from others....he repeatedly observed others receiving supervisory assistance (even to the extent of the supervisors doing the work requested themselves). What Mr. English did expect was that he be given clear instructions and an opportunity to do the work required in a professional, honest, and reasonable manner.

Mr. English had an increasingly heightened concern that the Assessment Division was not producing reliable or accurate assessments, that the Division was not conducting its activities in a professionally acceptable manner, that the Division was not conducting itself in an ethical manner and that dishonesty was rampant, not only in the professional arena, but also in matters for which any lay person would know better. Mr. English was increasingly concerned that his top supervisor could steal from the City with impunity and that Mr. English could be made to suffer for objecting. What Mr. English did expect was to be treated no worse than other employees. Instead Mr. English was singled out for treatment calculated to end his employment with the City and to do him personal damage. Dr. Kennedy was specifically aware of numerous, and well documented facts, which support these assertions and contradict the recitations in her report.

Of course [Mr. En]glish responded to the improper, retaliatory and unfair performance evaluation. His reference to his own management experience was taken out of context was not an expression of "sour grapes" but rather was an attempt to add credibility to his complaints, since he was otherwise being ignored or punished for speaking his mind against unprofessional, unethical, and criminal activities.

### Page 7:

Mr. English did contact the union early on about the improper activities. Again, he thought that was the proper course of action. His union contacts certainly included the numerous management accusations against him, subsequent to his complaints, of his own alleged "misbehavior". Those allegations were all completely without substance and were clearly made in retaliation. Had this not been the case, the accusations would have been made timely, instead of literally months after the alleged behavior. Dr. Kennedy was specifically aware of the timing of these issues and of the outcomes, and of the union's mostly ineffective involvement.

The balance of this page seems to hold Mr. English out as being somewhat paranoid and partial in his view of how he was being treated. However, the activities and attitudes observed by Mr. English were not the product of a baseless paranoia, they were part of the reality of the retaliation being leveled against him. Julie Tamayori did inform Mr. English that he was being "watched". This was apparently on the basis that Julie Tamayori had observed Mr. Magota carefully examining Mr. English's time sheets. For over a year, Mr. English apparently followed a schedule on Wednesdays and Fridays in which he arrived early and left early. This had been done with the knowledge and permission of Ann Gima. After Mr. English complained of the improprieties, Mr. English was accused of coming and going when he wished. Frankly there were several other employees of the Division which had different schedules as well. There were a number of others who left the office when they wanted for the purpose of watching sporting events at a near by bar, or to conduct their outside commercial enterprises. The minimal shift in hours for two days per week, with permission, was nothing in comparison to the activities of other employees and the complaint about this was further evidence of the retaliation and psychological pressure being brought to bear on Mr. English.

The raise Mr. English received on June 1, 2002 was a regular step movement raise, and not evidence of some lack of continued retaliation and harassment. The "performance" issues discussed with Mr. English were essentially two fabricated problems – one being the issue of his schedule and the other being a leave paper left on Ann Gima's desk (which Mr. English had been advised by other appraisers in the office was the practice when Ms. Gima was not available). There is no history of poor performance prior to Mr. English's complaints in question and the complaints subsequent were plainly manufactured to soil his employment record. This was completely clear to Dr. Kennedy and yet she seems to present the comments from management as credible.

### Page 8:

Again on this page, Dr. Kennedy liberally reports events through the words of the management and does not recognize the substantial contrary evidence. Furthermore, Dr. Kennedy, in a rather purposeful looking fashion, takes statements made by Mr. English completely out of context. For example, in his handwritten notes Mr. English did not say "I understand the process" but "I am confused and do not understand." The way these statements are quoted makes Mr. English look incompetent. In actuality, Mr. English wrote on one page of his notes that he understood the mass appraisal process. Mr. English also said that he didn't

27596/1/342043.2                    4

understand, but this was in the second page of those notes in response to a statement that Mr. English was rated as "meeting the requirements of his job", but that "he needed to show that he could do the work." A statement that he understands the appraisal process is not related to his expression of an inability to understand Mr. Kurokawa's nonsensical statement about his performance. The juxtaposition manufactured by Dr. Kennedy is the worst kind of deception as it portrays a completely false picture of Mr. English.

Mr. English properly objected to and disagreed with the imposition of additional probation. Later that additional probation was rescinded and then management denied that it had ever been imposed. Dr. Kennedy also was completely aware of these facts and of the supporting documentation she had been provided. If somehow she "forgot" these facts during the very extended period in which she prepared her evaluation, that is a problem with her own abilities and organization and not with those of Mr. English. Mr. English did, over the years express more and more of his observations that the organization, structure and management of the Division was inadequate to meet professional standards. This included pay scales. Mr. English did, indeed, bring to Mr. Magota's attention and then to others' attention that much less demanding jobs, for example, at Home Depot paid more than those at the Assessment Division. This was part and parcel of his constant push to improve the Division and the assessment practices of the City. Of course, Dr. Kennedy did not discuss the Home Depot matter with Mr. English before she used it to portray him as a malcontent and neer-do-well.

Mr. English was, indeed, harassed about completing certain tasks before he would be allowed to attend follow-up doctor appointments for problems such as his cancer. However, even a cursory reading of the documents provided to Dr. Kennedy will reveal again that the issues with his performance were manufactured. Instructions were confusing at best and there was no provision of support which Mr. English had specifically requested. There was no identification of the "documentation", which was requested. This episode was specifically engineered to interfere with Mr. English's medical treatment, most importantly for his cancer history. Not only did Dr. Kennedy have documentation showing how improper management's behavior was, but this issue was clearly explained to Dr. Kennedy.

**Page 9:**

Ann Gima's "instructions" were anything but specific. Those instructions were more like "Win the war in Iraq", specific to the extent of what war you want won, but with no indication of the steps necessary to accomplish the directed task. Furthermore the process for reviewing comparable sales was one of the processes which Mr. English had pointed out could not be properly done in the time provided. Sales were counted, or not, on a completely ad hoc basis and without any generally professionally recognized methodology. Mr. English was responsible for 20,000 or more residential units, while the national standard required fewer than 5000 per appraiser. Dr. Kennedy was made aware of this situation and was specifically given a copy of the IAAO standards.

The balance of this page describes in a patchy way, and with a negative spin, that Mr. English had a growing recognition that his improper treatment was, in fact, retaliation. Again, this is not baseless paranoia, but was the reality of the worsening situation at the Assessment Division. Dr. Kennedy could not have inadvertently failed to recognize the documented build up of the retaliation which was before her.

**Page 10:**

This page further describes, with a slant toward management, the increase in retaliation and fabrication of "problems" for Mr. English's personnel file. Mr. English was never insubordinate. Mr. English was not hostile. Mr. English did not write emails to Ann Gima that any reasonable person would have found offensive.

Mr. English did point out that the additional reporting requirement had not been earlier agreed to, but also stated that he would comply in any case, with whatever management wanted from him. Again information with respect to this issue was specifically provided to Dr. Kennedy. The problem to be recognized here was that in meetings management would say and do one thing and then later "revisionist history" would take hold and the events would be characterized and described in a completely different way. This was one tactic management used consistently to keep the psychological pressure on Mr. English. Dr. Kennedy was aware of this situation, but, of course, there is no comment with respect to this view.

While Mr. English had no knowledge prior to Dr. Kennedy's report, that Chris Graff submitted a workplace violence report, and has never seen the report, there can be no basis for such a report. Mr. English is not a violent man. Mr. English did encourage Chris Graff to go to the Ethics Commission and to tell the truth about the corrupt activities. How this could possibly be interpreted as improper in any view, is inexplicable. Dr. Kennedy, of course did not see fit to discuss Mr. Graff's report with Mr. English. It is apparently the case that the workplace violence reports were investigated and found to be without basis, however, Mr. English's file now has "workplace violence reports" in it and this was the intended result of this, apparently coordinated, smear campaign.

**Page 11:**

This page reveals that there were a total of at least three workplace violence reports in a short period of time, Gima, Tamayori, and Graff. These apparently all occurred almost immediately after the Division learned that Mr. English had filed a formal complaint with the Ethics Commission. These reports were not discussed with Mr. English, with the sole exception of that of Julie Tamayori. The balance of this page is again a mostly one-sided recounting of additional events of retaliation.

However, the passage with respect to Charles Totto is blatantly incorrect. Mr. English did not say, or imply, to Dr. Kennedy that there was some potentially racial issue with respect to Mr. Totto's wife, who is on the State Supreme Court. The only possible reason for Dr. Kennedy to insert such a hot button fabrication into her report is to potentially drive a wedge between Mr. Totto, who is in charge of the investigation, and Mr. English who presently appears to be the sole Division employee willing to step forward to end corrupt and improper practices in the Assessment Division. The issue of racial discrimination and harassment was briefly discussed with Dr. Kennedy. Mr. English told her that he did have a distinct feeling that some of his problems may have been caused by racial considerations, but that he was uncomfortable discussing or pursuing that issue. Categorically, Mr. English has never said that Justice Nakayama is Japanese and wants the state to win, or even anything similar to this. We have specifically requested Dr. Kennedy's notes and this issue is one that will most certainly be refuted upon examination of those notes.

With respect [to] the letter to the taxpayer in which Ms. Guna requested Mr. English not to make it look as the Division had done something wrong, this is precisely and exactly what happened. A constant struggle for Mr. English was the Division's improper conduct with respect to taxpayers. Among other serious misconduct, appeals were actively discouraged, incorrect assessments were knowingly sent out, and the Division's activities were "covered up". This was, of course, a matter of serious ethical and professional concern for Mr. English. He did resist these activities, even to the point where the Board of Review complained that in cases he did not "advocate" for the Division's position at hearings, if he thought it to be wrong. These were matters presented to Dr. Kennedy, but there is essentially no recounting of the factual basis for Mr. English's concerns showing their justifiable nature.

### Page 12:

It is absolutely true that Mr. English was "dressed down" and belittled in front of others in the office, sometimes in front of large gatherings. Again, Dr. Kennedy does not recount any of the incidents described to her and makes it seem that this was just Mr. English's own perception. It is further the truth that Mr. English did describe Mr. Kurokawa's email as threatening. Dr. Kennedy does not, however, describe the contextual basis for that perception.

The warnings and attempted disciplinary actions against Mr. English were also clearly part of the program to discredit him and to make his life so uncomfortable that he would leave his employment. These were nothing more than harassment and retaliation as a result of his complaining about improper and unprofessional activities at the Division.

Dr. Kennedy's description of the notification by Mr. Golojuch does not note that Mr. English's complaints of stress significantly preceded any possible notice he had that there was some sort of an "investigation" of him. The timing, which was purposefully ignored by Dr. Kennedy, plainly shows that the "stress" claim was not an artifice to avoid an investigation, but that the "investigation" was part of an ongoing, intentional, and coordinated program of psychological retaliation which resulted in Mr. English finally becoming disabled, on February 27, 2002, and unable to work.

### Page 13:

Inserting the portion of Mr. Golojuch's report which compared Mr. English to Byron Uyesugi, without ascribing these statements to their sources, or discussing this issue with Mr. English is inexcusable. This is almost the worst smear of the coordinated retaliation. There was also no discussion of what things were "thrown" or how, either with Mr. English or in Dr. Kennedy's report. If Mr. English has ever "thrown" paper down on his desk or something similar, as a result of frustration, this should have been distinguished from some sort of violent act.

It is true that Mr. English believes that his career as an appraiser and his employment with the City is now impossible. He has been so advised by union representatives and others whose judgment in this matter he has no reason to doubt.

On page 13 Dr. Kennedy misreported the "facts" time after time, for example, his father was out of the navy and worked for Pacific Telephone when Mr. English was born. This particular error is probably immaterial, but shows just how sloppy Dr. Kennedy's history really is.

## Page 14:

Again, the history, with respect to his former wife's care of their son, their divorce, his former wife's infidelity, and other aspects were distorted or completely fabricated. It is unclear as to the source of this "information" for Dr. Kennedy, but she clearly got many of the facts wrong. Furthermore, Mr. English did not tell his eight-year old son that he had attempted suicide. Where Dr. Kennedy got this information is not clear as Mr. English did not discuss this, his son in connection with suicide attempts, with Dr. Kennedy.

While it is true that his present marriage is troubled as a direct result of the retaliation against him at work, this issue was not discussed as described by Dr. Kennedy.

In conclusion, the largely one-sided, supposedly factual presentation of the "History of Present Claim" sets the stage for the balance of the report of Dr. Kennedy, which appears to cast the claim as one in which Mr. English's injuries are partially the result of his prior condition and experiences. While this may have some elements of an "eggshell skull" case, there is no question that Mr. English has been injured on the job and as a result of concerted, organized and intentional retaliation against him. It is shocking that Dr. Kennedy did not plainly and directly so state.

Dr. Kennedy's assertions, of such things such as that the relationships have been "damaged" and that "both parties will need to make an effort to repair a seriously eroded relationship", implicitly give improper credibility to and value to the plain attempts by the management to smear and damage Mr. English. Dr. Kennedy, was not permitted to conduct an interview with Mr. English so that she could counsel the parties and attempt to mediate or suggest some sort of "solution" to the "relationship" problem. Dr. Kennedy was permitted by Mr. English to conduct an "independent" examination so that she could render her professional opinion as to the nature of and compensability of the injury for which Mr. English now makes a claim. The fact that she distorted, misrepresented, and neglected historical events so badly in this case, and then followed up with essentially a non-evaluation makes at least some of her findings highly suspect and unreliable. This examination and report is not in any way sufficient basis upon which to deny Mr. English's claim.

PE 00985

**KAISER PERMANENTE.**

August 28, 2003

Mr. Thomas Riddle
City and County of Honolulu, Department of Human Services
Workers' Compensation Division
350 South King Street
Honolulu, Hawaii 96813

RE:  Claimant: ENGLISH, Philip E.
     Date of Birth: October 26, 1954
     Employer: Department of Budget & Fiscal Services
     Date of Injury: January 30, 2003
     DCD Number: 20301887
     Kaiser Record Number: 633194

Dear Mr. Riddle:

Despite my frequent request for the independent psychological evaluation for Philip English, I have only now been provided this independent evaluation by the patient's attorney, Roger Moseley. I have read this report and, taken together with my own clinical impressions and evaluation, I believe that Mr. English did suffer from a work-related injury on January 30, 2003. I believe this injury was an acute exacerbation of a preexisting depressive disorder.

It is noteworthy that this patient's claim for mental stress does not appear to result solely from any disciplinary action taken in good faith by his employer. The patient gives elaborate history of a pattern of negative interactions at the workplace that were not based in disciplinary action although some of the interactions took that form later on. According to the patient's history, this difficulty with various coworkers began following his allegation that there were unethical practices in his department. This reportedly resulted in a significant deterioration of workplace communication among himself and various coworkers. Reportedly he was criticized and demeaned routinely over a protracted period of time and this likely gave rise to his injury.

Although I agree with Dr. Kennedy that this patient suffers from major depressive disorder recurrent and severe without psychotic features with a history of inter-episode recovery, the stressors are in significant measure due to the difficulties at work. That is, his housing problem of threatened eviction is reportedly secondary to the financial distress he experiences because he is no longer able to work. His economic problems are also because he is no longer able to work at his current employment. His feelings of discrimination at work are reportedly due to the workplace conflict. His marital separation is secondary to the fact that he is no longer able to financially support his wife. Thus, many of the psychosocial

PE 00986

Director of the D[...]ent of Labor & Industrial Relations
August 28, 2003
Page 2

RE: ENGLISH, Philip
Kaiser MR# 933194

and environmental problems which are noted by Dr. Kennedy would not be likely present and/or as significant were it not for the injury of January 30, 2003.

I also agree with Dr. Kennedy that treatment needs to be continued. Presently this patient is receiving individual psychotherapy, group psychotherapy and has recently been assessed for psychotropic medication. His psychotropic medication assessment was complicated because he has had a history of kidney cancer with nephrectomy and thus some medications were not deemed suitable for him. Thus, considerable medical intervention and testing were to allow for the prescription of a more noninvasive psychotropic medication.

Although I agree with Dr. Kennedy that this patient will likely not be able to return to work in his current department, I do not agree that he is at this point ready to return to work. Hopefully once his condition improves he will become eligible for vocational rehabilitation services and then find his way to reemployment, which is his stated goal.

Mr. English reported that there are many statements in the IPE of Dr. Kennedy that are untrue and led to improper conclusions about his character and are inconsistent with what he has told me. He will be presenting evidence to the labor board about these matters.

I hope this letter answers your concerns.

Yours truly,

Joan H. Koff, Ph.D.
Licensed Psychologist
Diplomate in Clinical Psychology, ABPP
Senior Disability Analyst, ABDA
Chief, Occupational Mental Health Services

JHK:cki

cc:   Department of Labor and Industrial Relations
      Roger S. Moseley, Attorney-at-Law
      Mr. Philip English
      OMHS
      PPP

OCCUPATIONAL HEALTH SERVICES
1010 Pensacola Street/Honolulu, HI 96814/(808) 432-2200        3288 Moanalua Road/Honolulu, HI 96819/(808) 432-8200
80 Mahalani Street/Wailuku, HI 96793/(808) 243-6453            1292 Waianuenue Avenue/Hilo, HI 96720/(808) 327-2900
94-235 Leoku Street/Waipahu, HI 96797/(808) 432-3103           45-602 Kam Hwy/Kaneohe, HI 96744/(808) 432-3800
                75-184 Hualalai Road/Kailua-Kona, HI 96740/(808) 327-2900

PE 00987