# INVOICE

From: David Matsunami Appraisers
      91-942 Kua'e'ewa Place
      Ewa Beach, HI  96706
      Phone: (808) 226-0950

Date: 8/22/2002

Client:
Mr. Edwin Fong, CPA

FEES:
Narrative Appraisal Report:
    Hawaiian Monarch Parking    $2,500.00
    Binding/Printing    $   50.00
    General Excise Tax    $  100.00
    TOTAL    $2,650.00

TOTAL DUE    $2,650.00
    Please Make Check Payable to David Matsunami

Thank you very much for your business!!



PLAINTIFF'S
EXHIBIT
1024

Matsunami
EXHIBIT
17

APPRAISAL OF
THE LEASEHOLD INTEREST
IN COMMERCIAL PARKING UNIT NUMBER SEVEN

IDENTIFIED AS

First Division Tax Map Key 2-6-14-32, CPR 152

Honolulu, Hawaii

Prepared For
Mr. Edwin Y. W. Fong, CPA

DAVID MATSUNAMI APPRAISALS, INC.
May 2002

June 14, 2002

Mr. Edwin Y. W. Fong, CPA
820 Mililani Street, Second Floor
Honolulu, Hawaii · 96813

**Appraisal of the Leasehold Interest in
Hawaiian Monarch Commercial Parking Unit Number Seven
Honolulu, Hawaii**

Dear Mr. Fong:

We have completed an appraisal of the leasehold interest in the Hawaiian Monarch Commercial Parking Unit Number Seven located at 444 Niu Street, Honolulu, Hawaii. The subject property is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-14, Parcel 32, CPR 152.

The subject, described as Hawaiian Monarch Commercial Parking Unit Number Seven, is comprised of 183 parking stalls and three storag/office within the parking structure primarily servicing the needs of the Hawaiian Monarch Residential/Hotel complex. The Hawaiian Monarch is a 44 story high-rise project containing 20 floors of residential units and 18 floors of hotel units. There is also recreation deck with pool, a lobby containing several commercial units and a three story parking structure.

The land underlying the subject holding is currently classified by the State Land Use Commission as Urban and designated by the City and County of Honolulu as Apartment Precinct.

Our analysis and the data disclosed by our research and investigation are set forth in the accompanying report. The market value of the leasehold interest in Commercial Unit Number Seven within the Hawaiian Monarch Development has been estimated herein by Sales Comparison (Direct Market) and Income Methodologies.

It is our opinion, subject to the limiting conditions and assumptions contained herein that the market value of the leasehold interest in Commercial Parking Unit Number Seven

1

located at 444 Niu Street and Identified herein as First Division Tax Map Key 2-6-14, Parcel 32, CPR 152, as of November 28, 2001 was:

<u>**SEVEN HUNDRED FIFTY-TWO THOUSAND DOLLARS**</u>
**($752,000)**

We appreciate the opportunity to have worked on this interesting assignment. Should clarification or further discussion of the study contained herein be necessary, please contact us.

Respectfully submitted,

DAVID MATSUNAMI APPRAISALS, INCORPORATED

David K. Matsunami
Certified General Appraiser
CGA-45 Expiration December 31, 2003

2

hkzx,mr3
rxrrxrr
zxkzxrrkrkkxr

**TABLE OF CONTENTS**

SSIGNMENT AND SUMMARY                     2

Assignment                                2

Summary of Conclusions                    2

Definition of Terms                       4

Limiting Conditions and Assumptions       4

ECONOMIC BACKGROUND                       8

ENVIRONS                                  9

PROPERTY DATA                             10

Identification                            10

Legal Description                         10

Easements and Restrictions                10

Tax Map Key                               10

Census Tract Number                       10

Location and Address                      10

Federal, State, and County
    Classifications                       10

State Land Use                            11

28

County Zoning                                    11

Flood Plain Designation                              11

Title Ownership                                      11

Ground Lease Summary                                 12

Utilities                                            13

Assessed Value and Taxes                         13

Assessed Value                                   13

Real Property Taxes                              13

PROPERTY DESCRIPTION                             14

VALUATION ANALYSIS                               16

Rights Appraised                                 16

Highest and Best Use                             16

Methodology                                      17

Sales Comparison                                 17

Identification of Comparable                     17

Adjustment Process                               17

Valuation of Subjet Parcel                       19

Fee Simple Land Value Conclusion                 19

Ground Rent Determination                        19

29

Income Capitalization                        20

Discounted Cash Flow Conclusion              23

Final Value Conclusion                       23

30

ADDENDA

Exhibit I        - Economic Background:
                 - State of Hawaii and the County of Hawaii
Exhibit II       _. Apartment Precinct Zoning
Exhibit III      _. Market Data Land Transactions

                 Qualifications of the Appraisers

# ASSIGNMENT AND SUMMARY

**Assignment**

Our assignment has been to estimate the market value of the leasehold interest in the Hawaiian Monarch Commercial Parking Unit Number Seven identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-14 Parcel 32, CPR 152.  The function of this report is to provide real property information, real estate market data, and an informed professional opinion of value be used for internal planning purposes.  The effective date of valuation, corresponding to the death of Mary L. Spear, is November 28, 2001.

**Summary of Conclusions**

Subject to the limiting conditions and assumptions stated within the body of this report, the major conclusions drawn from our investigation of the market and our analysis of the subject property are as follows:

**Property Identification and Description** -- The subject holding is identified as First Division Tax Map Key 2-6-14, Parcel 32, CPR 152.

**Zoning** -- The property is zoned Apartment Precinct within the Waikiki District by the City and County Honolulu Land Use Ordinance.  Established to "guide the development of Waikiki with due consideration to optimum community benefits," the Waikiki District controls development within the are makai of the Ala Wai Canal and ewa of Kapahulu Avenue.

**Highest and Best Use** -- The highest and best use of the subject holding, would be a multifamily use in the form of a highrise complex.  Although the site could accommodate more than one dwelling from a zoning perspective, the topographical characteristics of the site effectively prohibit multi-dwelling development.

**Methodology and Scope of Investigation** -- In preparing this study, the subject's immediate neighborhood and other competitive locations were researched for current transactions involving competitive properties through which support the direct market approach and discounted cash flow analysis discussed herein.

**Date of Value** -- The date of valuation, corresponding to the date of death of Mary L. Spear, is November 28, 2001.

3

**Fee Simple Land Value Conclusions** -- Our concluded market value of the fee simple interest in the subject parcel, as of November, 2001, was $3,077,000.

**Discounted Cash Flow Analysis** – Our concluded market value of the leasehold interest using Discounted Cash Flow Analysis (DCF), as of November 28, 2001 was, $752,000.

**Final Value** -- Our concluded market value of the leasehold interest in the subject holding, as of November 28, 2001, was $752,000.

4

## Definition of Terms

Various special terms are used in this report. These terms are defined in the following paragraphs to assist in understanding special appraisal terminology.

### Market Value

"Market value" is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a.   buyer and seller are typically motivated;

b.   both parties are well informed or well advised, and each acting in what they consider their own best interest;

c.   a reasonable time is allowed for exposure in the open market;

d.   payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and

e.   the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

### Highest and Best Use

The "highest and best use" is that use which may be reasonably expected to yield the highest net return to the land over a given period of time. This use must be legal and in compliance with the regulations and ordinances within the police power of the city, county, and state including health regulations, zoning ordinances, building code requirements, etc.

### Hawaiian Terms

The Hawaiian words "mauka" and "makai" are commonly used in the islands as indicators of direction. The word "mauka" means toward the mountains and "makai" means toward the ocean.

**Fee Simple**
"Fee Simple" is defined as absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation.

**Leasehold and Leasehold Interest**
A "leasehold" is defined as a property held under tenure of lease representing the right to the use and occupancy of real property by virtue of a lease agreement. It is the right of a lessee to use and enjoy real estate for a stated term and upon certain conditions such as the payment of rent. A positive "leasehold interest" generally only exists when economic rent exceeds contract rent.

**Leased Fee Interest**
A "leased fee" or "lessor's interest" is the ownership interest in a property encumbered by a lease agreement. It is the right to receive both fixed contractual income and future renegotiated income during the term of the lease, and the right to receive the reversionary interest in the property at the termination of the lease.

**<u>Limiting Conditions and Assumptions</u>**
The research, analysis, and conclusions for valuation or market studies, performed by David K. Matsunami are subject to and influenced by the following:

1.   The report expresses the opinion of the signer as of the date stated in the letter of transmittal; and in no way has been contingent upon the reporting of specified values or findings. It is based upon the then present condition of the national and local economy and the then purchasing power of the dollar.

2.   Legal descriptions used within the report are taken from official documents recorded with the State of Hawaii, Bureau of Conveyances, or have been furnished by the client, and are assumed to be correct. No survey is made for purposes of the report.

3.   Any sketches, maps, plot plans, and photographs included in the report are intended only to show spatial relationships and/or assist the reader in visualizing the property. They are not measured surveys or maps and we are not responsible for their accuracy or interpretive quality.

4.   It is assumed that the subject property is free and clear of any and all encumbrances other than those referred to herein, and no responsibility is assumed for matters of a legal nature. The report is not to be construed as rendering any opinion of title, which is assumed to be good and marketable. No title information or data regarding easements that adversely affect

6

the use, access, or development of the property, other than that referenced in the report, was found or provided. The property is analyzed as though under responsible ownership and competent management.

5.    Any architectural plans and/or specifications examined assume completion of the improvements in general conformance with those documents in a timely and workmanlike manner.

6.    Preparation for, attendance, or testimony at any court or administrative hearing in connection with this report shall not be required unless prior arrangements have been made therefore.

7.    If the report contains an allocation of value between land and improvements, such allocation applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other purpose and are invalid if so used.

8.    If the report contains a valuation relating to a geographical portion or tract of real estate, the value reported for such geographical portion relates to such portion only and should not be construed as applying with equal validity to other portions of the larger parcel or tract; and the value reported for such geographical portion plus the value of all other geographical portions may or may not equal the value of the entire parcel or tract considered as an entity.

9.    If the report contains a valuation relating to an estate in land that is less than the whole fee simple estate, the value reported for such estate relates to a fractional interest only in the real estate involved, and the value of this fractional interest plus the value of all other fractional interest may or may not equal to the value of the entire fee simple estate considered as a whole.

10.   It is assumed that there are no hidden or apparent conditions of the property, subsoil, or structures that would render it more or less valuable; we assume no responsibility for such conditions or for engineering that might be required to discover such factors.

11.   Nothing in the report should be deemed a certification or guaranty as to the structural and/or mechanical (electrical, heating, air-conditioning, and plumbing) soundness of the building(s) and associated mechanical systems, unless otherwise noted.

12.   Information, estimates, and opinions provided by third parties and contained in this report were obtained from sources considered reliable and believed to be true and correct. However, no responsibility is assumed for possible misinformation.

7

13.  Possession of the report, or a copy thereof, does not carry with it the right of publication, and the report may not be used by any person or organization except the client without the previous written consent of the appraiser, and then only in its entirety. If the client releases or disseminates the reports to others without the consent of the appraiser, the client hereby agrees to hold the appraiser harmless, and to indemnify the analysts from any liability, damages, or losses which the analysts might suffer, for any reason whatsoever, by reason of dissemination of the report by the client. Further, if legal action is brought against the analyst by a party other than the client concerning the report or the opinions stated therein, the client agrees, in addition to indemnifying the analysts for any damages or losses, to defend said analysts in said action at client's expense. However, nothing herein shall prohibit the client or analysts from disclosing said report or opinions contained therein as may be required by applicable law.

14.  Disclosure of the contents of this report is possible only with the permission of the undersigned. Neither all nor any part of the contents of this report (especially any conclusions as to value, or the identity of the appraiser shall be disseminated to the public through advertising media, public relations media, news media, sales media, or any public means of communication without the prior consent and approval of the appraiser.

15.  Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

16.  The Americans with Disabilities Act (ADA) became effective January 26, 1992. I have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative effect upon the value of the

8

property.  Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

## ECONOMIC BACKGROUND

The economic background for the State of Hawaii and City and County of Honolulu are included in the Addenda as Exhibit I.  This section contains information and tables that summarize population, income, employment, and economic trends affecting the subject property.

10

## ENVIRONS

The subject property is located within the District of Waikiki on the Island of Oahu. Situated approximately three miles diamond head of downtown Honolulu, Waikiki is the center of Hawaii's visitor industry. The boundaries of the Waikiki district consist of the Ala Wai Canal to the north and west, Kapahulu Avenue to the east, and the ocean to the south. Kalakaua Avenue, which runs one way in a diamond head direction, is Waikiki's major thoroughfare. Other primary east-west arterials include Kuhio Avenue, a two-way roadway beginning at Kuamoo Street and terminating at Kaphulu Avenue; and Ala Wai Boulevard, which runs one way in an ewa direction.

Various visitor industry related uses including hotels, retail stores, restaurants and office buildings comprise the strip commercial segments of Kalakaua and Kuhio Avenues. Some of the major shopping facilities include the International Market Place containing 65,000 square feet of retail space. There is also the 100,000 square foot Hyatt Regency Hotel shops, 280,000 square foot Royal Hawaiian Shopping Center, and the Waikiki Shopping Plaza comprised of 188,00 square feet. Numerous other retail shops and small shopping complexes are situated in hotel lobbies and along various interior roadway.

The subject's immediate neighborhood, characterized by a mixture of low- and high-rise multi-family projects with a variety of commercial uses including restaurants, small shops, and motorcycle and car rental operations.

City water, sewer, and electricity are available throughout the area. The majority of the streets in Waikiki are fully improved roadways. Public transportation consists of bus routes along Kalakaua and Kuhio Avenues.

Numerous private and public schools as well as churches of various denominations are located with or in close proximity to the Waikiki area. Recreational areas proximate to the subject holding include the Honolulu Zoo, Kapiolani Park and Bandstand, Waikiki Shell, Waikiki Aquarium and the world famous Waikiki Beach.

11

## PROPERTY DATA

**Legal Description**

The land underlying the Hawaiian Monarch and the subject holding has the following legal description:

> All of those certain parcels of land situate at Waikiki, Honolulu, City and County of Honolulu, State of Hawaii described as follows. Lot 8-B-16, area 4,500, square feet Lot 8-B-17, 4,500 square feet, Lot 8-B-18 4,500 square feet, Lot 101 Area 13,336 square feet, Lot 8-B-12 area 5,165, Lot 108 area 6,457. For a total area of 38,458 square feet.

Commercial Parking Unit 7 has been assigned an undivided common interest in the above described land equal to 1.3398 percent.

**Easements and Restrictions**

Several easements are situated on the land underlying the subject property. The first is an approximately 5 foot wide electrical maintenance easement running along the northeasterly boundary of Lot 101. The second is a ten foot wide sewer easement along the westerly boundary of Lot 108. Both of these easements are within the zoning setback areas and do not effect the development potentials of the site.

**Tax Map Key**

The subject parcel is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-14 Parcel 32, CPR 152.

**Location and Address**

The subject property is located at 444 Niu Street in the District of Waikiki, Oahu, Hawaii.

**Federal, State, and County Classifications**

**State Land Use**

The State Land Use (SLU) classifications establish the basic legal framework of land uses within the state. The SLU classifies land into four broad use districts--Conservation, Agricultural, Rural, and Urban. The counties are required to confine their land use designations within the broad intent of the SLU district designations. The subject property is SLU classified as "Urban."

**County Zoning**

County of Hawaii Zoning Ordinances are designed to standardize the land use of residential, agriculture, commercial, industrial, and other proposed uses, in terms of density, height, location, etc. The subject property is currently zoned Apartment Precinct.

The intent of this district is to provide for medium and high density apartment development oriented to a resident population. The minimum lot size is 10,000 square feet.

The Revised Ordinance of The City and County of Honolulu is included in the Addenda of this report as Exhibit II.

**Flood Plain Designation**

Established by the National Flood Insurance Program of the Department of Housing and Urban Development, flood elevations and boundaries are designated to protect the life and property of the public and to control the developing of flood hazard areas. According to the National Flood Insurance Boundary Maps the map for this area is not printed "entire area not in flood zone".

**Ownership**

According to the County of Hawaii Tax Office Records, the fee simple interest in subject property is owned by S. N. K. Partners, Inc. Mary L. Spear, Trust (66.66%) and Ana June Alvaro (33.33%) currently own the leasehold interest in the site. Commercial Unit Seven has a percent of common interest in the Hawaiian Monarch equivalent of 1.3398 percent.

13

party notifies the other in writing thirty (30) days notice of their intentions.

**Utilities**

All utilities including water, electricity, and telephone service are available to the subject holding.

**Assessed Value and Taxes**

**Assessed Value**

The subject property, identified on Hawaii Tax Maps as Third Division Tax Map 2-6-14, Parcel 32, CPR 152, has been assessed for ad valorem tax purposes for the current year at $166,800 for vacant land and $1,092,220 for improvements.

**Real Property Taxes**

Based on the 2001-2002 fiscal year real property taxes are estimated to be $11,645.75.

15

# PROPERTY DESCRIPTION

**Land** -- The land underlying the Hawaiian Monarch Hotel complex is a flat irregularly shaped shaped lot having approximately 145 lineal feet fronting Niu Street on its southeasterly side, 145 fronting Ala Wai Boulevard along its northerly side, 343.39 feet of frontage along its rear or southwesterly border, and finally 84.86 feet on its southerly border with the Jack in the Box restaurant along Kalakaua Avenue. The parcel contains a total of 38,498 square feet of Apartment Precinct land. The subject lot has an average lot depth from Niu Street of circa 155 feet. The site is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-14, Parcel 32, CPR 152.

Access to the subject parcel is provided by two curb cuts leading from Niu Street. This roadway is a two land lane one-way street city maintained surface roadway extending from Ala Wai Boulevard to Kalakaua Avenue. The first entrance primarily services the hotel port cochere. The second or makai entrance directly leads to the Commercial Unit 7 (parking structure). The Niu Street frontage is improved with curbs, sidewalks, and gutters.

As shown on the accompanying Property Location Map several easements run along the rear section of the property. There is an approximately ten foot wide wastewater easement extending along the rear or southwesterly portion of the site.

**Improvements** – The subject Commercial Unit 7 is the parking structure for the Hawaii Monarch Hotel development. The Hawaiian Monarch is a 44 story high-rise project containing twenty floor floors of residential condominium use and 18 floors of hotel units. There is also a recreation deck with pool, three story parking structure (Commercial Unit 7), several commercial condominiums, and a hotel/residential lobby.

A fire sprinkler system is situated along the entire parking structure's ceiling. Lighting is provided by overhead fluorescent lighting. Parking stalls and ingress/egress directional locators are identified via floor striping.

Commercial Unit 7 is consists of a three story parking structure containing 183 stalls. The parking structure, constructed on a split-level basis, is connected to the Hawaiian Monarch high-rise along its makai side. As stated in the proceeding paragraphs ingress/egress to the commercial unit is provided by a driveway entrance directly fronting Niu Street. Construction material is entirely of reinforced concrete. The design features an open-air design featuring up/down ramps along the southwesterly portion of the complex ringed with parking stalls.

16

There are two storage room enclosures located on the third and fourth floors and an office/storage space on the fifth floor. The third floor storage unit is situated along the southwesterly side of the structure and contains approximately 260 square feet. The fourth floor storage area essentially mirrors the lower floor unit in terms of dimensions, locale, and size. The fifth level unit is centrally located and comprised of two sections and an entryway.

The entry is enclosed with an iron "cage" security enclosure complete with security door. Each of the office/storage areas contains 160 square feet and has a separate entrance.

Overall the Commercial Unit 7 is in fair condition. However, there are several items of deferred maintenance which are worthy of mention. First, there are several areas on the third, fourth, and fifth floors which appear to have water seepage problems. According to Engineer Marc M. Siah, PhD of Marc M. Siah and Associates. If the water seepage has corroded the reinforcing rebar within the cement it may ultimately compromise the structural integrity of the parking building. Dr. Siah indicated that the water seepage must be corrected immediately. First, the source of the seepage must be found and stopped. Second, any corroded rebar must be treated to prevent further corrosion.

The enclosed photographs depict the street frontage and existing physical appearance of the subject property.

17

## VALUATION ANALYSIS

**Rights Appraised**

The rights appraised in this report are those associated with the market value of the leasehold interest in Commercial Parking Unit 7. This is accomplished utilizing Discounted Cash Flow (DCF) methodology. In this analysis a series of yearly cash flows is converted in a present value using the discounting process. A crucial part of this methodology is found in the expense represented by current or future ground rent payments. Ground rent payments are typically a percentage of fee simple land value. Therefore, an analysis of the market value of the fee simple land value is required.

This section of this report estimates the current market value for the fee simple interest in land underlying the Hawaiian Monarch Hotel complex. This study assumes the underlying subject parcel to be vacant and available for development according to its Apartment Precinct use potentials. The effective date of value is November 28, 2001.

**Highest and Best Use**

Highest and best use of a site results when all of its advantages are maximized, and its disadvantages minimized by the nature of its development or utilization. In evaluating potential uses, one must consider the physical suitability of the site; legal constraints, such as zoning and deed restrictions; and the potential demand for the use in that location relative to the cost of improving the site.

As discussed in the Property Data section of this report, the subject holding is zoned Apartment Precinct. There are several allowable uses the primary thrust of this zoning is toward multifamily use, which accommodate and service Waikiki.

In evaluating potential uses, one must consider the four elements of highest and best use. These include whether the use is physically possible, legally permissible, financially feasible and maximally productive. Considering the convenient location of the Hawaiian Monarch project within an established multifamily neighborhood/resort district of Waikiki we conclude that the Hawaiian Monarch is best suited for multi-family resort development similar to its current use.

18

Therefore, it is our opinion that the highest and best use of the subject holding would be multi-family development which is compatible with the surrounding land uses.

**Methodology**

There are six generally accepted methods of fee simple site valuation: Distribution by Allocation, Extraction, Development or Subdivision, Land Residual, Sales Comparison, and Ground Rent Capitalization. One or more may be utilized to value the subject property based on physical, legal development, and market conditions. The distribution and extraction approaches require actual or hypothetical structural improvements on the site, and the land residual, analysis requires an improved income-generating property where the agents of production, other than land (i.e., labor, capital, and coordination) can be quantified. The development (subdivision) approach requires a potential subdivision plan for the property (to achieve its highest and best use), together with detailed development cost estimates.

In this study, we have utilized sales comparison methodology to develop an estimate of value for the subject parcel to determine any future ground rent reopenings. Income Capitalization utilizing discounted cash flow methodology has also been used. The specific methodologies of these approaches are discussed below.

**Land Value**

In estimating the market value of the fee simple interest in land for the subject parcel, the holding has been valued as vacant and available for development in accordance with its Apartment Precinct zoning classification. Based on the principle of substitution, the value of the land is best measured by prices generally obtained for similar properties within the immediate area. Our search within the Waikiki neighborhood revealed that there were several transactions involving properties similar to the subject. These indices of value, along with the results of our investigation are presented in the following section.

Identification of Transactions

Transaction 1 -- is the ground rent renegotiation of 10,000 square feet of land located at 2015 Ala Wai Boulevard This nearly square shaped parcel has flat topography and is zoned Apartment Precinct. The lot is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-15, Parcel 35. This transaction represents the ground rent renegotiation of the remaining four leasehold apartment owners and lessor. Rent was established based on a fee simple land value estimate of $830,000 or $83.00 per square foot.

19

Transaction 2 -- is the ground rent renegotiation for a 18,921 square foot parcel situated at the intersection of Ala Wai Boulevard and Tusitala Street. This rectangular shaped parcel has flat topography and is zoned Apartment Precinct. The lot is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-24 Parcel 73. The ground rent reopening was for the 28.5 year period commencing January 1, 2002. The rent was based on a fee simple land equivalent of $1,590,000 or $84.03 per square foot.

Transaction 3 --is the ground rent renegotiation of 10,974 square feet of land located at 444 Lewers Street This rectangular shaped parcel has flat topography and is zoned Apartment Precinct. The lot is identified on Hawaii Tax Maps as First Division Tax Map Key 2-6-17, Parcel 31. This transaction represents the ground rent renegotiation by mutual agreement of the parties. Rent was established based on a fee simple land value estimate of $866,946 or $79.00 per square foot

## Adjustment Process

The selected comparable lots have been adjusted, where appropriate, for various comparative factors including general location, corner/frontage, physical characteristics, land use, and size in order to equate them to the individual subject parcels. No time adjustment was employed due to the current nature of the sales, and the interim stability of the market.

The components that are considered in the general location orientation adjustment include quality of immediate neighborhood, convenience to shopping and other support service, and vehicular and pedestrian accessibility. Corner/frontage considers the quantity and quality of street frontage.

An adjustment for physical characteristics intended to compensate for shape and topographical differences. Additionally, this category considers the overall development potential as related to soil condition and other factors. Land use relates the subject holdings to the comparables in terms of zoning and other land use constraints.

The size adjustment, applied last, was used to compensate differences in this factor. As buyers primarily view a purchase of this nature on a per lot basis, variations in lot size are adjusted at a ratio less than the actual proportionate size difference.

20

**Valuation of the Subject Parcel**

Utilizing the adjustment criteria as previously cited, we have constructed an adjustment schedule (Table 1) addressing the relationship between the selected comparable transactions and the subject parcel. As stated previously due to the relative stability of the marketplace time adjustment was utilized in valuing the subject parcel.

All of the comparables are located within Waikiki and therefore possess similar locational characteristics. No adjustment was made for this factor. The subject has two street frontages. Transactions 1 and 2 have double street frontages. These transactions were not adjusted for this factor. Transaction 3 has a single street orientation. Therefore, an upward allocation was made for this difference.

All of the transactions share similar physical characteristics as the subject. No adjustment was deemed necessary. The subject and the comparables share similar Apartment Precinct zoning so no adjustment was made.

**Fee Simple Land Value Conclusion**

After allowances for these factors, the indicated size adjusted values range from $78.85 to $81.51 per square foot, with a mean of $80.15. The individual values were then awarded weighting factors giving the greatest weight to Transaction 2 due to its larger size. This resulted in a weighted average of $80.15 per square foot. We conclude a value per square foot of $80.00. Multiplying this figure by the subject's land area of 38,458 square feet results in an indicated overall total property value, by direct market comparison of $3,077,000 (rounded).

**Ground Rent Reopening**

As mentioned in preceding narrative, a crucial part of future ground rent reopenings for leasehold properties is an estimate of the unencumbered market value of the fee simple interest in land. Typically, future ground rent reopenings are based on a percentage of the fee simple land value. This is the case with the subject property.

21

As stated in the Lease Summary with the Property Data Section of this report; for each of next four (4) successive ten-year periods of the term hereof, such annual rental shall be renegotiated. The total annual rental for each such period shall be equal to seven percent (7%) of the fee simple value of the land as vacant and available for development. However, the rent shall in no way be less than the preceding period

The current ground period for the subject began on June 2, 1999 and ends June 1, 2009. The ground rent associated with the remaining seven (7) years of the present term is equivalent to $4,623.13 per annum or $385.26 per month  However, by mutual agreement between lessor and lessee this ground rent has been waived in lieu of the exclusive use of three parking stalls in perpetuity until the agreement is terminated by either party. This effectively creates a steady level ground rent "payment" for the duration of the lease. The cash equivalent of the three parking stalls (having been effectively removed from the rental pool) is $225 per month.

If the parking stall agreement is terminated the ground rent will revert to $385.26 per month for the remaining seven years of the existing fixed period. Further, under this scenario the ground rent will renegotiate according to the master lease terms at the end of the existing period (June 2, 2009). This reopening of rent may have a positive/negative impact on the subject property. Therefore, an analysis of the ground rent payments associated with the upcoming fixed term is necessary.

As stated the next fixed period is to begin on June 2, 2009. This rent is to based on seven percent (7%) of the fee simple land value in proportion to its percentage of common interest. Seven percent of the concluded fee simple land value as previously determined in text would be equal to $215,000 ($3,077,000 / .7% = 215,000). As indicated within the Property Data Section of this report, Commercial Unit Seven has a percentage of common interest equal to 1.3398.

As such, its corresponding ground rent would be equivalent to 1.3398 percent of $215,000 or $240 per month should the existing parking stall agreement be terminated. The master ground lease stipulates that in no event shall the rent for any future fixed period be less than the preceding fixed period. Therefore, we conclude that the next ground rent fixed period will not effect the cash flow of Commercial Unit Seven or value concluded as of a specified date within this report.

**Income Capitalization**

Investment properties are normally valued in proportion to their ability to produce a net annual income. Value is estimated by deducting all applicable expenses from anticipated gross income to arrive at projected net income which is then capitalized at an overall rate, or investment yield rate, commensurate with the risks inherent in the ownership of the property. In the case of the subject, we

have employed a discounted cash flow model, and a direct capitalization approach using an overall rate extracted from sales of commercial buildings on the island of Hawaii.

The annual net Income of the subject property is capitalized into a value indication employing an overall rate (OAR) abstracted from actual market transactions. An analysis of OARs as they relate to the subject is included later in this section. Integral to this technique is a thorough understanding of the subject's income producing potential and operating expenses. These items are addressed individually in the following paragraphs.

Projected Rental Income -- In estimating the income-producing ability of the subject, we have researched economic rents presently being achieved for parking stalls within Waikiki. Our research focused on competitive parking structures within the subject's competitive market area and is summarized on Table 3. As indicated in this chart, the rents range from $41 to $110 per month. These rents have been negotiated on a gross basis with no other cost to the tenant other than the flat rate. The lower end of the range is comprised of an uncovered stall within the Eaton Square project. The upper end of the range is represented by a reserved stall within Discovery Bay.

After comparing the subject with available market data, we have made estimates of economic rent for the 180 rentable stalls within the subject parking structure. Considering the location and physical layout of the subject property, we have projected the initial year's economic rent as shown in Table 6. We believe that an appropriate rental rate for the 180 leaseable stalls would be circa $78 per month. Other income would be from the three small storage spaces. It is our opinion that these would command $300 per month. These figures have been utilized to develop our initial years income forecast.

Vacancy and/or Credit Loss -- Vacancy and/or credit loss was calculated at five percent of total potential gross income. This factor allows for the long-term effects of extended vacancies, unanticipated delinquencies, and tenant turnover. Deducting the allowance for vacancy and collection loss and expenses from the potential gross income results in an initial effective gross income of $177,989.

Expense Analysis -- Since the subject is a condominium unit and pays a maintenance fee the majority of the operating expenses are covered within this cost. Other typical owner's expenses not covered within the maintenance fee have been identified and included within our expense projections. These include estimates for real property taxes, general excise tax of four percent, miscellaneous expenses, management fee, utilities, lease rent, repairs and maintenance, and insurance.

23

Discount Rate

Discounting is the process that states that future income or benefits are worth less than the same income or benefits today, and they decline in value as their receipt is further deferred into the future. By applying a rate that is selected from the marketplace, the discounting process can be accomplished. The discount rate chosen considers alternate returns from competing investments, the risk inherent in the investment, liquidity of investment, and tax implications.

United States Treasury Bills are currently guaranteeing interest returns of approximately 4.55 percent depending on the length of the hold. Current yields on Aaa Corporate Bonds are 7.00 percent, with Baa Bonds offering 7.90 percent.

For real estate investments, surveys of major investors was undertaken by Real Estate Research Corporation and Peter Korpacz & Associates, were utilized as sources of discount rate indicators. These studies display discount rates on commercial properties for the fourth quarter of 2001 ranging from 10.50 to 16.50 percent. Additionally, a national survey for overall capitalization rates for industrial properties reveals rates that range from 8.00 to 10.75 percent.

We have employed a discount rate of 12.00 percent over the ten-year projection period. We feel that the rate selected reflects the risk and opportunity that the subject property presents.

Terminal Capitalization Rate

Overall rates from actual market transactions are a significant value indicator for income producing properties because they directly reflect the actions of buyers and sellers in the marketplace. In selecting and analyzing transactions to be used in the comparative process, caution must be exercised to insure that the terms of the purchase and the expectations of the purchaser are correctly reflected. Analysis and calculation of the market capitalization rates were based on the potential income at the time of sale and were applied to the corresponding first year net income of the subject.

Facing Table 3 summarizes the data and conclusions relating to overall rates demonstrated from these sales. The overall rates range between 8.37 and 9.00 percent with an arithmetic mean of 8.54. The subject property was compared to these sales in terms of building quality, age, location, and desirability. After considering these factors, we conclude an overall capitalization rate of 8.50 percent.

The anticipated resale price was calculated by capitalizing the forecasted net income in perpetuity at an appropriate terminal capitalization rate. A terminal capitalization rate of 9.5 percent was utilized.

24

The terminal capitalization rate was derived by taking the indicated overall capitalization rate, and increasing it to reflect the added risk inherent in forecasting the reversion.  The Peter Korpacz survey discloses terminal capitalization rates ranging from 8.76 to 9.70 percent, supporting our conclusion.

25

**Discounted Cash Flow Value Conclusion**

As shown on Table 4 on the following page, discounting the annual cash flows results in a net present value of cash flows of $480,003. Capitalizing the stabilized net operating income at the end of the projection period at a terminal capitalization rate of 9.5 percent results in a resale price of $897,176. Sales costs of six percent were then deducted, and the resultant value was then discounted to arrive at a present value of the reversion. The present value of the cash flows was added to the present value of the reversion to arrive at a total rounded value of $752,000 by Discounted Cash Flow Analysis.

**Final Value Conclusion**

Based on the preceding analyses, it is our opinion as of November 28 2001, subject to the limiting conditions and assumptions contained within the body of this report, that the market value of the leasehold interest in the Hawaiian Monarch Commercial Unit Number 7, was $752,000.

26

CERTIFICATION

The undersigned do hereby certify that, to the best of our knowledge and belief, the statements of fact contained in this report are true and correct. It is further certified that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions. We further certify that we have no present or prospective interest in the property that is the subject of this report, and have no personal interest or bias with respect to the parties involved. Our compensation is not contingent on a predetermined value or direction in value that favors the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. The appraisal analysis and opinions were developed, and this report has been prepared in conformance with (and the use is subject to) the requirements outlined in the Uniform Standards of Professional Practice (USPAP). We further certify that we have made a personal inspection of the property that is the subject of this report, and that no other persons provided significant professional assistance.

The State of Hawaii conducts a mandatory licensing program for all appraisers dealing with federally related transactions. The undersigned appraisers have been designated Certified General Appraisers in the State of Hawaii through December 31, 2003.

David K. Matsunami
Hawaii State Certified
General Appraiser, CGA-45
Exp. Date December 31, 2003

27

Table 1

## LAND TRANSACTIONS ADJUSTMENT SCHEDULE
### Hawaiian Monarch Commercial Unit 7
#### Honolulu, Oahu, Hawaii

| Transaction | SUBJECT | 1 | 2 | 3 |
|---|---|---|---|---|
| Tax Map Key | 2-6-14- 32, CPR 152 | 2-6-15-35 | 2-6-24-73 | 2-6-17-31 |
| Zoning | Apartment Precinct | Apartment | Apartment | Apartment |
| Size In Square Feet | 38,458 | 10,000 | 18,921 | 10,974 |
| Date of Transaction | | Jan-01 | Jan-01 | Jan-01 |
| Instrument | | Le. Reneg. | Le. Reneg. | Le. Reneg. |
| Indicated Price Per Sq. Ft. | | $83.00 | $84.03 | $79.00 |
| Time Adjustment | | 1.00 | 1.00 | 1.00 |
| Time Adjusted Unit Value | | $83.00 | $84.03 | $79.00 |
| **ADJUSTMENTS** | | | | |
| Location | | 0% | 0% | 0% |
| Corner/Frontage | | 0% | 0% | 5% |
| Physical Characteristics/Easements | | 0% | 0% | 0% |
| Zoning & Land Use | | 0% | 0% | 0% |
| Net Adjustments | | 0% | 0% | 5% |
| Adjusted Value Before Size | | $83.00 | $84.03 | $82.95 |
| Size Adjustment | | 0.95 | 0.97 | 0.96 |
| Size Adjusted Unit Value | | $78.85 | $81.51 | $79.63 |
| Weighting Factor | | 0.30 | 0.40 | 0.30 |
| Product | | $23.66 | $32.60 | $23.89 |
| Mean Unit Value | | | | $80.00 |
| Weighted Unit Value | | | | $80.15 |
| Concluded Unit Value | | | | $80.00 |
| Estimated Fee Simple Land Value (Rounded) | | | | **$3,077,000** |

Source: David Matsunami Appraisals, Inc., May 2002

Table 2

## COMPARABLE PARKING STALL RENT SURVEY
### Hawaiian Monarch Commercial Unit 7
### Honolulu, Oahu, Hawaii

| Address/Project | Type Of Stall | Rental Date | Term | Mo. Rent | Comments |
|---|---|---|---|---|---|
| Eaton Square | Uncovered | Available | Open | $42.00 | Unassigned Open Stall. |
| Eaton Square | Covered | Available | Open | $84.00 | Unassigned Covered Stall. |
| Discovery Bay Complex | Covered | Available | Open | $105.00 | Unassigned Covered Stall. |
| Discovery Bay Complex | Covered | Available | Open | $155.00 | Assigned Covered Stall. |
| Mirramar Hotel | Covered | Available | Open | $98.00 | Unassigned Covered Stall. |
| Waikiki Landmark | Covered | Available | Open | $110.00 | Unassigned Covered Stall. |

Source: David Matsunami Appraisals, Inc. May 2002.

Table 4

**DISCOUNTED CASH FLOW ANALYSIS**
**Hawaiian Monarch Commercial Unit 7**
**Honolulu, Oahu, Hawaii**

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Stabilized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Potential Rental Income | $179,280 | $184,658 | $190,198 | $195,904 | $201,781 | $207,835 | $214,070 | $220,492 | $227,107 | $233,920 | $245,616 |
| Gross Excise Recovery | $7,673 | $7,903 | $8,140 | $8,385 | $8,636 | $8,895 | $9,162 | $9,437 | $9,720 | $10,012 | $10,512 |
| Total Potential Gross Income | $186,953 | $192,562 | $198,339 | $204,289 | $210,417 | $216,730 | $216,730 | $216,730 | $216,730 | $216,730 | $227,566 |
| Vacancy and/or Credit Loss | $8,964 | $8,964 | $8,964 | $8,964 | $8,964 | $21,673 | $21,673 | $21,673 | $21,673 | $21,673 | $22,757 |
| Effective Gross Income | $177,989 | $183,598 | $189,375 | $195,325 | $201,453 | $195,057 | $195,057 | $195,057 | $195,057 | $195,057 | $204,810 |
| **EXPENSES** | | | | | | | | | | | |
| Real Property Tax | $11,464 | $11,808 | $12,162 | $12,527 | $12,903 | $13,290 | $13,689 | $14,099 | $14,522 | $14,958 | $15,407 |
| Management Fee | $37,000 | $38,110 | $39,253 | $40,431 | $41,644 | $42,893 | $44,180 | $45,505 | $46,870 | $48,277 | $49,725 |
| Utilities | $1,800 | $1,854 | $1,910 | $1,967 | $2,026 | $2,087 | $2,149 | $2,214 | $2,280 | $2,349 | $2,419 |
| General Excise Tax | $7,171 | $7,171 | $7,171 | $7,171 | $7,171 | $4,921 | $4,921 | $4,921 | $4,921 | $4,921 | $5,069 |
| Maintenance Fee | $28,605 | $28,605 | $28,605 | $28,605 | $28,605 | $29,463 | $29,463 | $29,463 | $29,463 | $29,463 | $30,347 |
| Repairs and Maintenance | $3,500 | $3,605 | $3,713 | $3,825 | $3,939 | $4,057 | $4,305 | $4,305 | $4,434 | $4,567 | $4,704 |
| Lease Rent | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 | $3,600 |
| Insurance | $4,682 | $4,822 | $4,967 | $5,116 | $5,270 | $5,428 | $5,591 | $5,758 | $5,931 | $6,109 | $6,292 |
| Miscellaneous | $1,500 | $1,545 | $1,591 | $1,639 | $1,688 | $1,739 | $1,791 | $1,845 | $1,900 | $1,957 | $2,016 |
| Total Expenses | $99,322 | $101,121 | $102,973 | $104,881 | $106,846 | $107,478 | $109,563 | $111,710 | $113,922 | $116,200 | $119,578 |
| Net Operating Income | $78,667 | $82,477 | $86,402 | $90,444 | $94,608 | $87,579 | $85,494 | $83,347 | $81,135 | $78,857 | $85,232 |
| Discount Factor @12% | 0.8929 | 0.7972 | 0.7118 | 0.6355 | 0.5674 | 0.5066 | 0.4523 | 0.4039 | 0.3606 | 0.3220 | |
| Present Value of Cash Flows | $70,238 | $65,750 | $61,499 | $57,479 | $53,683 | $44,370 | $38,673 | $33,662 | $29,258 | $25,390 | |

Resale Price $897,176
Less Sales Costs $53,831
Net Proceeds $843,346
Discount Factor 0.3220
Present Value of Reversion $271,535
Net Present Value of Cash Flow $480,003

INDICATED PROPETY VALUE $751,538

ROUNDED $752,000

Source: David Matsunamal Appraisals, Inc., May 2002