APPRAISAL OF
THE FEE SIMPLE INTEREST
IN THE IMPROVED PROPERTY
LOCATED AT


684 and 692 Kilauea Avenue




Located at
Hilo, Hawaii




Prepared For
CENTRAL PACIFC BANK




GK APPRAISALS, INCORPORATED
DECEMBER 2001



PLAINTIFF'S
EXHIBIT
1025

Matsunami
EXHIBIT
18

# GK Appraisals, Inc.

**Real Estate Valuation**      341 Kulana Road * Hilo, Hawaii  96720 * Phone: (808) 935-4483 * FAX (808) 961-0890

Mr. John Tuquero                                                     December 20, 2001
Central Pacific Bank
620 South King Street, Suite 650
Honolulu, Hawaii  96813

**Appraisal of the Fee Simple Interest in the Improved
Property Located at 684 and 692 Kilauea Avenue
Hilo, Hawaii**

Dear Mr. Tuquero

We have completed an appraisal of the fee simple interest in the land and improvements located at 684 and 692 Kilauea Avenue.  The subject properties are identified on Hawaii Tax Maps as Third Division Tax Map Key 2-2-16, Parcels 20 and 28.  Parcel 20 contains 5,241 square feet of land area while Parcel 29 is comprised of 5,339 square feet.  The subject holdings are situated within Hilo's downtown commercial corridor.  Currently, Parcel 20 is improved with a single story masonry commercial structure containing 4,522 square feet of interior space.  The building is presently utilized as a restaurant known as Kay's Lunch Center.  Parcel 28 has been paved and used is being used for restaurant parking.

The subject is currently in escrow for $350,000.  According to the Deposit Receipt, Offer and Acceptance (DROA) dated 10/31/2001, the sale price includes "all items on site location".  The buyer currently occupies the property and indicated that she owns most of the restaurant equipment.  The value concluded in this appraisal is based on the real estate only, and does not include any personal property.

The subject property is currently classified by the State Land Use Commission as Urban and designated by the County of Hawaii as CG-7.5 General Commercial District.

Our analysis and the data disclosed by our research and investigation are set forth in the accompanying report.  The market value of the fee simple interest in the land and improvements for the subject holdings have been estimated herein by Sales Comparison (Direct Market) methodology.

It is our opinion, subject to the limiting conditions and assumptions contained herein that the market value of the fee simple interest in the improved consolidated subject holdings located at 684 and 692 Kilauea Avenue, as of August 31, 2001 was:

<u><b>FOUR HUNDRED TWENTY-FIVE THOUSAND DOLLARS</b></u><br><b>($425,000)</b>

Appraisal of 684 & 692 Kilauea Avenue (Cont.)

We appreciate the opportunity to have worked on this interesting assignment. Should clarification or further discussion of the study contained herein be necessary, please contact us.

Respectfully submitted,

GK APPRIASALS, INCORPORATED

Gary T. Kurokawa
Certified General Appraiser
CGA-50   Expiration December 31, 2003

David K. Matsunami
Certified General Appraiser
CGA-45  Expiration December 31, 2003

Christopher H. Graff

## TABLE OF CONTENTS

ASSIGNMENT AND SUMMARY                                      4
    Assignment                                         4
    Scope of the Appraisal                             4
    Summary of Conclusions                             4
    Definition of Terms                                5
    Limiting Conditions and Assumptions                6

ECONOMIC BACKGROUND                                        9

ENVIRONS                                                  10

PROPERTY DATA                                             11
    Identification                                    11
    Legal Description                                 11
    Easements and Restrictions                        11
    Tax Map Key                                       11
    Location and Address                              11
    Federal, State, and County
    Classifications                                   11
    State Land Use                                    11
    County Zoning                                     11
    Flood Plain Designation                           12
    Ownership                                         12
    Utilities                                         12
    Assessed Value and Taxes                          12
        Assessed Value                             12
        Real Property Taxes                        12

PROPERTY DESCRIPTION                                      13

VALUATION ANALYSIS                                        15
    Rights Appraised                                  15
    Highest and Best Use                              15
    Methodology                                       15

## TABLE OF CONTENTS
## (CONT.)

Sales Comparison                                             16
    Identification of Comparables                   16
    Adjustment Process                              16
    Valuation of Subject Site                       17
    Reproduction Cost Estimate                      17
        Depreciation                          18
Income Approach                                              19
    Direct Capitalization                           19
    Projected Rental Income                         19
    Vacancy & Collection Loss                       19
    Expense Analysis                                19
    Overall Rate                                    19
    Discounted Cash Flow Analysis                   20
    Discounted Cash Flow Conclusion                 21
    Reconciliation of Income Approach               21

CORRELATION OF MARKET VALUE CONCLUSIONS                      22

CERTIFICATION                                                25

ADDENDA
    Exhibit I        - Economic Background:
                     - State of Hawaii and the County of Hawaii
    Exhibit II       -CG-7.5 General Commercial District Zoning
    Exhibit III      -Improvement Sketch
    Exhibit IV       -Market Data Land Transactions
    Exhibit V        -Market Data Improved Transactions
                     -Qualifications of the Appraiser

# ASSIGNMENT AND SUMMARY

**Assignment**

Our assignment has been to estimate the market value of the fee simple interest in the land and improvements located at 684 and 692 Kilauea Avenue. The subject properties are identified on Hawaii Tax Maps as Third Division Tax Map Key 2-2-16 Parcels 20 and 28. The function of this report is to provide real property information, real estate market data, and an informed professional opinion of value be used for mortgage loan purposes. Any personal property relating to the restaurant operation has not been considered in this analysis. The effective date of valuation is August 31, 2001.

**Summary of Conclusions**

Subject to the limiting conditions and assumptions stated within the body of this report, the major conclusions drawn from our investigation of the market and our analysis of the subject property are as follows:

**Property Identification and Description** -- The subject parcels, are identified as Third Division Tax Map Key 2-2-16, Parcels 20 and 28.

**Zoning** -- The subject site is currently zoned CG-7.5 General Commercial District. This designation is intended to provide areas necessary for meeting the retail commercial needs of the surrounding the community.

**Highest and Best Use** -- The highest and best use of the subject holding, would be a commercial/retail use which maximizes density potentials and is in harmony with the existing commercial development in the community.

**Methodology and Scope of Investigation** -- In preparing this study, the subject's immediate Hilo neighborhood, and other competitive locations were researched for current transactions of competitive properties to support the direct market approach discussed herein.

**Date of Value** -- The date of valuation is August 31, 2001.

**Fee Simple Land Value Conclusions** -- Our concluded market value of the fee simple interest in the Subject Parcels 20 and 28, as of August 31, 2001, was $130,000 (rounded).

**Reproduction Cost Estimate** -- The estimated depreciated market value of the subject improvements as of August 31, 2001, was $405,000 (rounded).

**Direct Capitalization Analysis** -- The estimated market value of the subject improvements by Direct Capitalization Analysis as of August 31, 2001, was $461,000 (rounded).

**Discounted Cash Flow Analysis** -- The estimated market value of the subject improvements using Discounted Cash Flow Analysis, as of August 31, 2001, was $418,000 (rounded).

**Final Value** -- Our concluded market value of the fee simple interest in the consolidated subject holdings, as of August 31, 2001, was $425,000

4

## Definition of Terms

Various special terms are used in this report. These terms are defined in the following paragraphs to assist in understanding special appraisal terminology.

## Market Value

"Market value" is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a.   buyer and seller are typically motivated;

b.   both parties are well informed or well advised, and each acting in what they consider their own best interest;

c.   a reasonable time is allowed for exposure in the open market;

d.   payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and

e.   the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## Highest and Best Use

The "highest and best use" is that use which may be reasonably expected to yield the highest net return to the land over a given period of time. This use must be legal and in compliance with the regulations and ordinances within the police power of the city, county, and state including health regulations, zoning ordinances, building code requirements, etc.

## Hawaiian Terms

The Hawaiian words "mauka" and "makai" are commonly used in the islands as indicators of direction. The word "mauka" means toward the mountains and "makai" means toward the ocean.

## Fee Simple

"Fee Simple" is defined as absolute ownership unencumbered by any other interest or estate; subject only to the limitations of eminent domain, escheat, police power, and taxation.

## Leasehold and Leasehold Interest

A "leasehold" is defined as a property held under tenure of lease representing the right to the use and occupancy of real property by virtue of a lease agreement. It is the right of a lessee to use and enjoy real estate for a stated term and upon certain conditions such as the payment of rent. A positive "leasehold interest" generally only exists when economic rent exceeds contract rent.

**Leased Fee Interest**

A "leased fee" or "lessor's interest" is the ownership interest in a property encumbered by a lease agreement. It is the right to receive both fixed contractual income and future renegotiated income during the term of the lease, and the right to receive the reversionary interest in the property at the termination of the lease.

**Limiting Conditions and Assumptions**

The research, analysis, and conclusions for valuation or market studies, performed by Gary T. Kurokawa, David K. Matsunami and Christopher Graff are subject to and influenced by the following:

1.  The report expresses the opinion of the signer as of the date stated in the letter of transmittal; and in no way has been contingent upon the reporting of specified values or findings. It is based upon the then present condition of the national and local economy and the then purchasing power of the dollar.

2.  Legal descriptions used within the report are taken from official documents recorded with the State of Hawaii, Bureau of Conveyances, or have been furnished by the client, and are assumed to be correct. No survey is made for purposes of the report.

3.  Any sketches, maps, plot plans, and photographs included in the report are intended only to show spatial relationships and/or assist the reader in visualizing the property. They are not measured surveys or maps and we are not responsible for their accuracy or interpretive quality.

4.  It is assumed that the subject property is free and clear of any and all encumbrances other than those referred to herein, and no responsibility is assumed for matters of a legal nature. The report is not to be construed as rendering any opinion of title, which is assumed to be good and marketable. No title information or data regarding easements that adversely affect the use, access, or development of the property, other than that referenced in the report, was found or provided. The property is analyzed as though under responsible ownership and competent management.

5.  Any architectural plans and/or specifications examined assume completion of the improvements in general conformance with those documents in a timely and workmanlike manner.

6.  Preparation for, attendance, or testimony at any court or administrative hearing in connection with this report shall not be required unless prior arrangements have been made therefore.

7.  If the report contains an allocation of value between land and improvements, such allocation applies only under the existing program of utilization. The separate valuations for land and building must not be used in conjunction with any other purpose and are invalid if so used.

8.  If the report contains a valuation relating to a geographical portion or tract of real estate, the value reported for such geographical portion relates to such portion only and should not be construed as applying with equal validity to other portions of the larger parcel or tract; and the value reported for such geographical portion plus the value of all other geographical portions may or may not equal the value of the entire parcel or tract considered as an entity.

6

9.    If the report contains a valuation relating to an estate in land that is less than the whole fee simple estate, the value reported for such estate relates to a fractional interest only in the real estate involved, and the value of this fractional interest plus the value of all other fractional interest may or may not equal to the value of the entire fee simple estate considered as a whole.

10.   It is assumed that there are no hidden or apparent conditions of the property, subsoil, or structures that would render it more or less valuable; we assume no responsibility for such conditions or for engineering that might be required to discover such factors.

11.   Nothing in the report should be deemed a certification or guaranty as to the structural and/or mechanical (electrical, heating, air-conditioning, and plumbing) soundness of the building(s) and associated mechanical systems, unless otherwise noted.

12.   Information, estimates, and opinions provided by third parties and contained in this report were obtained from sources considered reliable and believed to be true and correct. However, no responsibility is assumed for possible misinformation.

13.   Possession of the report, or a copy thereof, does not carry with it the right of publication, and the report may not be used by any person or organization except the client without the previous written consent of the appraiser, and then only in its entirety. If the client releases or disseminates the reports to others without the consent of the appraiser, the client hereby agrees to hold the appraiser harmless, and to indemnify the analysts from any liability, damages, or losses which the analysts might suffer, for any reason whatsoever, by reason of dissemination of the report by the client. Further, if legal action is brought against the analyst by a party other than the client concerning the report or the opinions stated therein, the client agrees, in addition to indemnifying the analysts for any damages or losses, to defend said analysts in said action at client's expense. However, nothing herein shall prohibit the client or analysts from disclosing said report or opinions contained therein as may be required by applicable law.

14.   Disclosure of the contents of this report is possible only with the permission of the undersigned. Neither all nor any part of the contents of this report (especially any conclusions as to value, or the identity of the appraiser shall be disseminated to the public through advertising media, public relations media, news media, sales media, or any public means of communication without the prior consent and approval of the appraiser.

15.   Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

16.   The Americans with Disabilities Act (ADA) became effective January 26, 1992. I have not made a specific compliance survey and analysis of this property to determine whether or not it

7

is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative effect upon the value of the property. Since we have no direct evidence relating to this issue, we did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

## ECONOMIC BACKGROUND

The economic background for the State of Hawaii and County of Hawaii are included in the Addenda as Exhibit I.  This section contains information and tables that summarize population, income, employment, and economic trends affecting the subject property.

**SUBJECT LOCATION MAP**
**684 & 692 Kilauea Avenue**
**THIRD DIVISION TAX MAP KEY: 2-2-16. Parcels 20 & 28**

## Flood Plain Designation

Established by the National Flood Insurance Program of the Department of Housing and Urban Development, flood elevations and boundaries are designated to protect the life and property of the public and to control the developing of flood hazard areas. According to the National Flood Insurance Boundary Map, Community Panel No.150001 0880C, revised September 28, 1990, the subject is designated "Zone X" which is defined as "areas of minimal flooding"

## Ownership

According to the County of Hawaii Tax Office Records, the fee simple interests in both subject parcels 20 and 28 are owned by Paul L. H. Yoshioka. The subject properties are currently in escrow for $350,000. A real estate broker was not involved in the transaction, so there was no list price for the subject. No other sales or listings of the subject in the year preceding the date of value.

## Utilities

All utilities including water, electricity, and telephone service are available to the subject holdings.

## Assessed Value and Taxes

### Assessed Value

The consolidated subject properties, identified on Hawaii Tax Maps as Third Division Tax Map 2-2-16, Parcels 20 and 28 have been assessed for ad valorem tax purposes for the current year at $105,800 for land and $158,500 for improvements.

### Real Property Taxes

Based on the 2001-2002 fiscal year real property taxes are estimated to be $2,405.25.

12

The condition of the main structure is good considering it's actual age of thirty-four years.  After considering the subject's location, the surrounding neighborhood, and the condition of the subject improvements at the date of inspection, the appraiser estimates the remaining economic life of the building would be approximately thirty years.

The enclosed photographs depict the street frontage and existing physical appearance of the subject property.



View of the subject as seen from Kilauea Avenue.



Street Scene of Kilauea Avenue



View of the restaurant/dining area.



View of the kitchen facilities.

## VALUATION ANALYSIS

### Rights Appraised

This section of this report estimates the current market value for the fee simple interest in land for the consolidated subject parcels. This study assumes the subject parcels to be vacant and available for development according to their commercial use potentials. Any personal property relating to the restaurant operation have not been considered in this analysis. The effective date of value is August 31, 2001.

### Highest and Best Use

Highest and best use of a site results when all of its advantages are maximized, and its disadvantages minimized by the nature of its development or utilization. In evaluating potential uses, one must consider the physical suitability of the site; legal constraints, such as zoning and deed restrictions; and the potential demand for the use in that location relative to the cost of improving the site.

As discussed in the Property Data section of this report, the subject holding is zoned CG-7.5 General Commercial. Although there are several allowable uses, the primary thrust of this zoning is toward commercial uses that accommodate and service the greater Hilo community.

The subject parcels are well situated within the District of Hilo's commercial corridor and is classified by County of Hawaii as CG-7.5 General Commercial. Therefore, it is our opinion that the highest and best use as vacant of the subject holding would be a commercial development which would maximize density potentials, is consistent with its CG-7.5 zoning classification, and is compatible with the surrounding land uses. As previously noted, the existing improvement is on Parcel 20, and a parking lot is on Parcel 28. We opine that the existing improvements contribute to the overall value of the property over and above the value of the land values of both parcels, and as such constitute the highest and best use as improved.

### Methodology

There are six generally accepted methods of fee simple site valuation: Distribution by Allocation, Extraction, Development or Subdivision, Land Residual, Sales Comparison, and Ground Rent Capitalization. One or more may be utilized to value the subject property based on physical, legal development, and market conditions. The distribution and extraction approaches require actual or hypothetical structural improvements on the site, and the land residual, analysis requires an improved income-generating property where the agents of production, other than land (i.e., labor, capital, and coordination) can be quantified. The development (subdivision) approach requires a potential subdivision plan for the property (to achieve its highest and best use), together with detailed development cost estimates.

In this study, we have utilized sales comparison methodology to develop an estimate of value for the subject parcels and to complete the reproduction cost estimate. Income Capitalization utilizing

discounted direct capitalization and cash flow methodology has also been used. The specific methodologies of these approaches are discussed below.

## Land Value

In estimating the market value of the fee simple interest in land for the subject parcels, the consolidated holding has been valued as vacant and available for development in accordance with its CG-7.5 zoning classification. Based on the principle of substitution, the value of the land is best measured by prices generally obtained for similar properties within the immediate area. Our research has concentrated on other commercially zoned sites within Hilo's downtown area. The results of our investigation are presented in the following section.

Identification of Transactions

Transaction 1 -- is the October 1996 sale of a 12,778 square foot site situated on Kilauea Avenue. This nearly rectangular shaped parcel has flat topography and is zoned CG-7.5 General Commercial. The comparable, is identified on Hawaii Tax Maps as Third Division Tax Map Key 2-2-16, Parcel 17. The property sold in May 2001 for a unit price equal to $11.11 per square foot. The site had some older improvements that did not contribute to the sale price.

Transaction 2. -- represents the lease renegotiation for a rectangular shaped 24,678 square foot lot identified as Third Division Tax Map Key 2-2-16, Parcel 16. The lease for this CG-7.5 zoned site that was negotiated in October 1997, for a fee simple price per square foot equivalent to $11.22.

Transaction 3 -- is the May 2000 sale of 20,663 square feet of land identified on Hawaii Tax Maps as Third Division Tax Map Key 2-2-26, Parcel 3. This level rectangular shaped site is zoned CN-20 Neighborhood Commercial. The purchase price of $348,000 equated to a unit price of $16.84 per square foot.

## Adjustment Process

The selected comparable lots have been adjusted, where appropriate, for various comparative factors including general location, corner/frontage, physical characteristics, land use, and size in order to equate them to the individual subject parcels. No time adjustment was employed due to the current nature of the sales and the interim stability of the market.

The components that are considered in the general location orientation adjustment include quality of immediate neighborhood, convenience to shopping and other support service, and vehicular and pedestrian accessibility. Corner/frontage considers the quantity and quality of street frontage.

An adjustment for physical characteristics intended to compensate for shape and topographical differences. Additionally, this category considers the overall development potential as related to soil condition and other factors. Land use relates the subject holdings to the comparables in terms of zoning and other land use constraints.

16



**COMPARABLE LOCATION MAP**
684 & 692 Kilauea Avenue
**THIRD DIVISION TAX MAP KEY: 2-2-16, Parcels 20 & 28**

**Table 1**

## LAND TRANSACTIONS ADJUSTMENT SCHEDULE
### 684 & 692 Kilauea Avenue
### Hilo, Hawaii

| Transaction | SUBJECT | 1 | 2 | 3 |
|---|---|---|---|---|
| Tax Map Key | 2-2-16, Parcels 20 & 28 | 2-2-16-17 | 2-2-16-16 | 2-2-26-03 |
| Zoning | CG-7.5 | CG-7.5 | CG-7.5 | CN-20 |
| Size In Square Feet | 10,580 | 12,778 | 24,678 | 20,663 |
| Date of Transaction | | May-01 | Oct-97 | May-00 |
| Instrument | | Deed | Le. Reneg. | Deed |
| Indicated Price Per Sq. Ft. | | $11.11 | $11.22 | $16.84 |
| Time Adjustment | | 1.00 | 1.00 | 1.00 |
| Time Adjusted Unit Value | | $11.11 | $11.22 | $16.84 |
| **ADJUSTMENTS** | | | | |
| Location | | 0% | 0% | 0% |
| Corner/Frontage | | 0% | 0% | -10% |
| Physical Characteristics/Easements | | 0% | 0% | 0% |
| Zoning & Land Use | | 0% | 0% | 0% |
| Net Adjustments | | 0% | 0% | -10% |
| Adjusted Value Before Size | | $11.11 | $11.22 | $15.16 |
| Size Adjustment | | 1.01 | 1.03 | 1.02 |
| Size Adjusted Unit Value | | $11.22 | $11.56 | $15.46 |
| Weighting Factor | | 0.50 | 0.30 | 0.20 |
| Product | | $5.61 | $3.47 | $3.09 |

| | |
|---|---|
| Mean Unit Value | $12.75 |
| Weighted Unit Value | $12.17 |
| Concluded Unit Value | $12.50 |

**Estimated Fee Simple Land Value (Rounded)**    $130,000

Source: GK Appraisals, Inc., August 2001

The size adjustment, applied last, was used to compensate differences in this factor. As buyers primarily view a purchase of this nature on a per lot basis, variations in lot size are adjusted at a ratio less than the actual proportionate size difference.

### Valuation of the Subject Parcels

Utilizing the adjustment criteria as previously cited we have constructed an adjustment schedule (Table 1) addressing the relationship between the selected comparable transactions and the subject parcel. As we have previously stated, due to the relative stability of the marketplace no time adjustment was utilized in valuing the subject parcel.

All of the comparables were deemed to possess similar location characteristics. No adjustment was made for this factor. The subject has a single street orientation. Transactions 1 and 2 have similar street frontages. Transaction 3 has two street frontages on Kawili and Kinoole Street. This was seen as superior to the subject. Therefore, a downward adjustment was applied to this transaction.

All of the comparables share similar physical characteristics and the subject. Additionally, no easements directly affect the subject or the comparables. No allocations were made for these factors. The subject and the comparables share similar commercial zoning so no adjustment was made.

### Fee Simple Land Value Conclusion

As shown on Table 1, the size adjusted transactions ranged from $11.22 to $15.46 per square foot with a mean of $12.75 and a weighted unit value of $12.17 per square foot. Based on the foregoing analysis, it is our opinion that the market value of the unencumbered fee simple interest the 10,580 square foot subject consolidated parcel, as of August 31, 2001, was equal to $12.50 per square foot or a total fee simple value of $130,000 (rounded).

### Reproduction Cost Analysis

The Cost Approach is based upon the principle of substitution, which states that an informed purchaser will pay no more for a property than he would for a vacant site on which he could construct an improvement with equal desirability, utility, and without undo delay. Consequently, the Cost Approach can be used as an indication of property value assuming that adequate information is available on construction costs, depreciation, and land value.

Improvements -- In order to arrive at an accurate estimate of the cost to construct the subject improvements, the appraisers have utilized the Marshall and Swift Valuation Manual. Research indicated that the building should be valued using the Good Cost Restaurant factor. The Cost Approach is outlined in Table 2, which is located on the following page.

The subject restaurant has an interior area of 4,522 square feet. An adjusted cost of $73.56 per square foot was applied to the improvement area to arrive at a replacement cost new of $382,554. As shown on Table 2, the cost new associated with the paving of Parcel 28 in the amount of 26,989

17

Table 2

## REPLACEMENT COST ANALYSIS
### 684 And 692 Kilauea Avenue
### Hilo, Hawaii

**SQUARE FOOT REFINEMENTS:**

| | |
|---|---:|
| Base Cost per s.f. Good Class D Restaurant | $49.28 |
| Story Height Multiplier | 0.957 |
| Perimeter Multiplier | 1.08 |
| Adjusted Base Cost | $50.93 |
| Regional -- Multiplier | 1.430 |
| Adjusted Cost | $72.84 |
| Hilo -- Local Multiplier | 1.010 |
| **FINAL SQUARE FOOT COST** | **$73.56** |
| Area of Building (Sq. Ft.) | 4,522 |
| **TOTAL COST OF RESTAURANT** | **$332,655** |
| Plus Developer's Profit @ 15% | $49,898 |
| **TOTAL REPLACEMENT COST OF RESTAURANT** | **$382,554** |

**PLUS COST OF PARKING LOT PAVING: Parcel 28**

| | |
|---|---:|
| Base Cost per square foot | $3.50 |
| Current Cost Multiplier | 1.01 |
| Honolulu -- Local Multiplier | 1.43 |
| **FINAL SQUARE FOOT COST** | **$5.06** |
| Total Square Footage | 5,339 |
| **TOTAL COST OF PARCEL 28 PAVED AREA** | **$26,989** |
| **PLUS COST OF RESTAURANT** | **$382,554** |
| **TOTAL COST OF RESTAURANT AND PAVING** | **$409,542** |
| LESS: Depreciation at 34% | $134,244 |
| **DEPRECIATED VALUE OF SUBJECT IMPROVEMENTS** | **$275,298** |
| PLUS: FEE SIMPLE LAND VALUE FROM TABLE 1 | $130,000 |
| **TOTAL INDICATED VALUE BY COST APPROACH** | **$405,298** |
| **ROUNDED:** | **$405,000** |

Source: GK Appraisals, August 2001.

was added to the restaurant cost to arrive at a total cost new for both subject parcel improvements of $409,542.

Depreciation --Depreciation is defined as a loss in utility from all causes. It may result from functional, economic, or physical deterioration.

Functional obsolescence is defined as a "reduction in utility of the structure resulting from the decreased capacity of the structure, to perform the function for which it is intended." Functional obsolescence is typically caused by condition within the property such as poor floor plan, inadequacy, or super-adequacy due to mechanical equipment, size, style, age, or other factors which decrease functional utility. Functional obsolescence can either be curable, or incurable, depending on the feasibility of correcting the deficiencies.

Functional obsolescence curable are those deficiencies which can be economically corrected. The measure of the diminished utility is the cost to cure the deficiency. Items that are not considered to be economically feasible to correct in the structure, are considered incurable. This type of obsolescence may by caused by a deficiency in the structure, or by super-adequacy. There were no items of functional obsolescence noted on the subject property.

Economic obsolescence is caused by factors external to the subject property. It is the loss of desirability or useful life from changes such as government restrictions, changes in supply and demand, or adjacent adverse property uses. Economic obsolescence is by nature incurable, since little can be done by the affected property owner to enact a cure. Economic obsolescence is measured by the capitalized rent loss due to the condition. In the case of the subject property, no economic obsolescence was observed.

Physical deterioration reflects the loss of value brought about by use, disintegration, and the actions of the elements. It is evidenced by wear and tear, decay, cracks, encrustations, structural defects, etc. Physical deterioration can by either curable or incurable depending of the economic feasibility of enacting that cure. Physical deterioration curable is often termed deferred maintenance. Items of deferred maintenance are those items that a prudent buyer would expect to correct upon purchasing. The subject property has been fairly well maintained. However, some minor items of deferred maintenance and physical deterioration were found.

Based on the observed condition of the restaurant space, we have estimated an effective age of 20 years out of an economic life of 50 years. Based on the Marshall and Swift depreciation tables depreciation was estimated at a maximum 34% or a total of $134,244 for the restaurant improvements.

As shown on Table 2 subtracting the total depreciation from the replacement cost new of the warehouse and office segments of the improvements in a current depreciated value of $275,298. Adding to this figure the estimated fee simple land value of $130,00 equates to a total $407,548.

We have concluded that the depreciated value of the fee simple interest in the land and improvements by Reproduction Cost Analysis, as of August 31, 2001 to be $408,000 (rounded).

18

## Income Capitalization

Investment properties are normally valued in proportion to their ability to produce a net annual income. Value is estimated by deducting all applicable expenses from anticipated gross income to arrive at projected net income which is then capitalized at an overall rate, or investment yield rate, commensurate with the risks inherent in the ownership of the property. In the case of the subject, we have employed a discounted cash flow model, and a direct capitalization approach using an overall rate extracted from sales of similar commercial building in the Island of Hawaii.

### Direct Capitalization

The annual net income of the subject property is capitalized into a value indication employing an overall rate (OAR) abstracted from actual market transactions. An analysis of OARs as they relate to the subject is included later in this section. Integral to this technique is a thorough understanding of the subject's income producing potential and operating expenses. These items are displayed (later in the text) on Table 5 the results of our investigation addressed individually in the following paragraphs.

Projected Rental Income – In estimating the income-producing ability of the subject, we have researched restaurant/retail/office rents presently being achieved for similar structures within the subject's competitive market area

As shown on Table 3, triple net restaurant/office/retail rents within this area typically range from $0.75 to $1.05 per square with the lower end of the range representative of second floor space. The most recent rental data, from the commercial project located at 776 Kilauea Avenue, revealed that 1,200 square feet of ground floor retail space leased for $1.00 per square foot on a triple net basis. The recent rentals bracket this figure well.

Based on the forgoing research and analysis of comparable rental rates, it is our opinion that the subject could currently command a rental rate of $0.95 per square foot on a triple net basis.

Vacancy and/or Credit Loss -- Vacancy and/or credit loss was stabilized at five percent of the total potential gross income.

Expense Analysis -- As the tenant lease is assumed to be on a triple net basis, most of the operating expenses would be paid directly by the tenants based on the total applicable expenses. Inasmuch as the property is owner occupied, historical data was available from which to summarize the property's operating expense history. These actual items have been utilized in our analysis

Expenses typically range from fifteen to thirty percent of gross revenue. In the case of the subject the actual expenses were near the upper end of the range at circa twenty-four percent. The appraisers feel this figure properly accounts for building expenses related to the restaurant nature of the subject.

### Overall Rates

Overall Rates (OAR) extracted from actual market transactions are a significant value indicator for income producing properties because they directly reflect the actions of buyers and sellers in the

19

Table 3

## COMPARABLE RENT SURVEY
### 684 And 692 Kilauea Avenue
### Hilo, Hawaii

| Address/Project | Area Sq. Ft. | Floor | Use | Rental Date | Term | Mo. Rent Per Sq. Ft. | Comments |
|---|---|---|---|---|---|---|---|
| Waiakea Square Shopping Center | 6,990 | First | Restaurant | Feb-00 | 4 | $1.05 | Fiasco's Restaurant and Bar. After initial four year term has expired tenant has option to renew. CAM is $0.30 per square foot. |
| Restaurant Osaka (Off Kamoelehua Ave) | 2,300 | First | Restaurant | Jul-00 | 2 | $1.00 | NNN. Tenant pays own electricity. CAM charges equal to $0.30 per square foot. Electricity separately metered. |
| 776 Kilauea Ave | 1,200 | First | Retail | Jun-01 | 1 yr | $1.00 | NNN. Tenant pays own electricity. CAM charges equal to $0.30 per square foot. Electricity separately metered. Second floor asking $0.75 per square foot triple net. |
| Pacific Building | 1,000 | First | Office | Aug-00 | 3 | $1.00 | NNN. Tenant pays own electricity. CAM charges equal to $0.17 per square foot. Electricity separately metered. |
| Hilo Drug Building | Varies | First | Retail | Asking | Open | $1.00 | Asking Rent. |

Source: GK Appraisals, Inc. August 2001.

**Rent Comparables:**



776 Kilauea Avenue

Restaurant Osaka

Waiakea Square Shopping Center





Hilo Drug Building

Pacific Building

Table 4

## SUMMARY OF IMPROVED TRANSACTIONS
### 684 and 692 Kilauea Avenue
#### Hilo , Hawaii

| Transaction | Transaction A | Transaction B | Transaction C |
|---|---|---|---|
| Tax Map Key | 2-2-19-57 | 7-5-04, Parcel 62 | 7-5-22, Parcel 9 |
| Location | 776 Kilauea Avenue | Off Henry Street | World Auto Site |
| Description | Commercial Building | Commercial Building | Comml/Office Building |
| Sale Price | $140,000 | $3,146,129 | $650,000 |
| Transaction Date | Oct-01 | Jan-98 | Aug-00 |
| Estimated Net Operation Income | $13,045 | $281,410 | $58,506 |
| Indicated Overall Capitalization Rate | 9.32% | 8.94% | 9.00% |
| | | | |
| Concluded Capitalization Rate | 9.00% | | |

Source: G K Appraisals, Inc., August 2001.

marketplace. In selecting and analyzing transactions to be used in the comparative process, caution must be exercised to insure that the terms of the purchase and the thinking of the purchaser are correctly reflected. Analysis and calculation of the market capitalization rates were based on the potential income at the time of sale and were applied to the corresponding first year net income of the subject.

Table 4 summarizes the data and conclusions relating to overall rates demonstrated from these sales. The overall rates range between 8.94 percent and 9.32 percent, with an arithmetic mean of 9.09 percent. The subject was compared to each of these in terms of building quality, age, location, and desirability both from an aesthetic and economic viewpoint. Considering these factors, we conclude an overall capitalization rate for the subject property of 9.0 percent

Direct Capitalization Conclusion

As shown on Table 5, capitalizing the subject's net income of $41,447 at the concluded overall rate of 9.0 percent results in an indicated property value by Direct Capitalization, as of August 31, 2001, of $461,000 (rounded).

Discounted Cash Flow Analysis

In this analysis, the income-producing ability of the property is converted into an indication of value using a discounted cash flow model--considered most appropriate as it reflects an allowance for anticipated changes in the forecast. This process involves deducting from the potential gross income an allowance for vacancy and/or credit loss and all applicable expenses to arrive at the annual operating income. The cash flow and property reversion at the end of the anticipated income projection period are discounted at an appropriate discount rate to estimate the present value of the property.

Potential Gross Income Estimate -- Table 6 displays the forecasted potential gross estimate for the subject property, over a ten-year income projection period. Because the property is currently owner operated, market rents have been employed in our analysis. Reference is made to the Direct Capitalization section for a listing of estimated market rents for the subject space.

In the case of the subject we have incorporated five year fixed periods followed by annual escalations of five percent.

For other income, general excise taxes increase along with rental collections, while all other categories are escalated based on an annual increase of three percent.

Vacancy and/or Credit Loss -- As previously mentioned in the Direct Capitalization section of this report, a stabilized five percent vacancy was forecast. This stabilized percentage allowance was used to compensate for unanticipated delinquent rental payments an/or tenant turnover and reflects the property operating at a stabilized occupancy level.

Operating Expenses -- Operating expenses were estimated for the first year of the cash flow employing an identical methodology as in the Direct Capitalization section. For future years of the cash flow, expenses were increased at an annual rate compound rate of three percent.

20

**Table 5**

**DIRECT CAPITALIZATION ANALYSIS**
**684 And 692 Kilauea Avenue**
**Hilo, Hawaii**

| Potential Gross Income | Leasable Area | Monthly Rent | Annualized |
|---|---|---|---|
| Leasable Area | 4,522 | | |
| Potential Rental Income | | $4,295 | $51,540 |
| Tenant Recoveries | | | $9,916 |
| Plus: General Excise Tax | | | $2,062 |
| Total Potential Gross Income | | | $63,517 |
| Vacancy and/or Credit Loss | | | $3,176 |
| Effective Gross Income | | | $60,341 |

| Expenses | | | |
|---|---|---|---|
| Real Property Tax | | | $1,854 |
| Mangement Fee | | | $3,092 |
| Utilities | | | $6,000 |
| Insurance | | | $1,200 |
| General Excise Tax | | | $2,062 |
| Leasing Commisions | | | $1,140 |
| Reserves For Replacement | | | $2,000 |
| Miscellaneous | | | $1,546 |
| Total Expenses | | | $18,894 |
| Net Operating Income | | | $41,447 |
| Capitalization Rate | | | 9.00% |
| Total Property Value | | | $460,524 |
| **Rounded** | | | **$461,000** |

Source: GK Appriasals, Inc. August , 2001

Discount Rate – Discounting is a process which exposes that future income or benefits are worth less than the same income or benefits now, and they decrease in value systematically, as the time for their receipt is further deferred into the future. By applying a rate selected from the marketplace, the discounting process may be accomplished. Expressed as an annual percentage, the choice of a rate entails many factors, the most integral being returns offered by competing investments, risk inherent in the investment, and amenable benefits, such as liquidity and tax implications, attributable to the investment position.

As discussed and hereafter illustrated, the cash flows are brought back to a present worth at a rate which represents both the time value of money at a safe investment rate, and the risks associated with this particular project. Inasmuch as risk is a function of whether or not all income and expense forecasts have been fairly represented, the resulting discount rate should not overly penalize the property. We have therefore incorporated a discount rate of 12.0 percent over the ten-year investment-holding period of the project.

Terminal Capitalization Rate – The anticipated resale price was calculated by capitalizing the forecasted stabilized net income in perpetuity by an appropriate capitalization rate. A capitalization rate of 10.5 percent was employed in this analysis. This rate was selected by slightly increasing the indicated market extracted overall rate (used in the Direct Capitalization section of this report) of 9.0 percent, due to the added risk associated with forecasting the reversion.

Discounted Cash Flow Conclusion – As shown on Table 6, discounting the annual cash flow, and employing an appropriate discount rate results in a net present value for the subject holding of $418,000 (rounded). The property reversion was calculated by deducting from the projected resale price of $527,225 transaction costs at six percent. Transaction costs include commissions and other closing costs. Subtracting these items produces net proceeds of $495,592. Discounting this amount at 12 percent results in a present value of the reversion of $159,567. Adding the net present value of the annual cash flows of $258,681 yields a total rounded fee simple property value of $418,000 (rounded).

**Reconciliation of Income Approach**

In this study, we have utilized two capitalization techniques that were based on market conditions. In the discounted cash flow analysis, the basic assumption is that net income must satisfy competitive yield requirements. Utilizing an overall capitalization rate extracted from actual commercial project sales measures the market's pulse for commercial holdings, but is somewhat insensitive to the availability and cost of current investor money. Implicit within the overall rate are considerations for future growth in the net annual income, and gain at the end of the income projection period.

However, since this rate is applied against the stabilized income, it does not account for the risks of an extended absorption period. The discounted cash flow model best simulates investor rationale and is considered the primary indicator. Based on the preceding income analyses, it is our opinion by the Income Approach $425,000.

Table 6

## DISCOUNTED CASH FLOW ANALYSIS
### 684 & 692 Kilauea Avenue
### Hilo, Hawaii

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Stabilized |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Potential Rental Income | $51,551 | $51,551 | $51,551 | $51,551 | $51,551 | $62,892 | $62,892 | $62,892 | $62,892 | $62,892 | $66,037 |
| Gross Excise Recovery | $2,062 | $2,206 | $2,206 | $2,206 | $2,206 | $2,692 | $2,692 | $2,692 | $2,692 | $2,692 | $2,826 |
| Tenant Recoveries | $9,258 | $8,452 | $8,702 | $8,865 | $9,033 | $11,417 | $10,516 | $10,701 | $10,890 | $11,085 | $11,417 |
| Total Potential Gross Income | $62,871 | $62,209 | $62,459 | $62,622 | $62,790 | $77,001 | $77,001 | $77,001 | $77,001 | $77,001 | $80,851 |
| Vacancy and/or Credit Loss | $2,578 | $2,578 | $2,578 | $2,578 | $2,578 | $7,700 | $7,700 | $7,700 | $7,700 | $7,700 | $8,085 |
| Effective Gross Income | $60,293 | $59,632 | $59,882 | $60,045 | $60,213 | $69,301 | $69,301 | $69,301 | $69,301 | $69,301 | $72,766 |
| **EXPENSES** | | | | | | | | | | | |
| Real Property Tax | $1,854 | $1,910 | $1,967 | $2,026 | $2,087 | $2,149 | $2,214 | $2,280 | $2,349 | $2,419 | $2,492 |
| Management Fee | $3,093 | $3,186 | $3,281 | $3,380 | $3,481 | $3,586 | $3,693 | $3,804 | $3,918 | $4,036 | $4,157 |
| Utilities | $6,000 | $6,180 | $6,365 | $6,556 | $6,753 | $6,956 | $7,164 | $7,379 | $7,601 | $7,829 | $8,063 |
| Insurance | $1,200 | $1,200 | $1,236 | $1,273 | $1,311 | $1,351 | $1,391 | $1,433 | $1,476 | $1,520 | $1,566 |
| Reserves For Replacement | $2,000 | $2,060 | $2,122 | $2,185 | $2,251 | $2,319 | $2,388 | $2,460 | $2,534 | $2,610 | $2,689 |
| Leasing Commissions | $4,296 | $430 | $430 | $430 | $430 | $5,241 | $520 | $520 | $520 | $520 | $520 |
| Miscellaneous | $1,547 | $1,593 | $1,641 | $1,690 | $1,741 | $1,793 | $1,847 | $1,902 | $1,959 | $2,018 | $2,078 |
| Total Expenses | $19,989 | $16,558 | $17,042 | $17,540 | $18,054 | $19,808 | $15,524 | $15,974 | $16,438 | $16,915 | $17,407 |
| Net Operating Income | $40,304 | $43,074 | $42,840 | $42,504 | $42,159 | $49,493 | $53,777 | $53,327 | $52,863 | $52,385 | $55,359 |
| Discount Factor @12% | 0.8928571 | 0.7971938 | 0.7117802 | 0.6355181 | 0.5674269 | 0.5066311 | 0.4523492 | 0.4038832 | 0.36061 | 0.3219732 | |
| Present Value of Cash Flows | $35,986 | $34,338 | $30,493 | $27,012 | $23,922 | $25,075 | $24,326 | $21,538 | $19,063 | $16,867 | |

| | |
|---|---|
| Resale Price | $527,225 |
| Less Sales Costs | $31,634 |
| Net Proceeds | $495,592 |
| Discount Factor | 0.3219732 |
| Present Value of Reversion | $159,567 |
| Net Present Value of Cash Flow | $258,618 |
| INDICATED PROPERTY VALUE | $418,186 |
| ROUNDED | $418,000 |

Source: G K Appraisals, Inc., August 2001

## CORRELATION OF MARKET VALUE CONSIDERATIONS

The two approaches to value which were utilized in this appraisal indicate the following fee simple market values for the land and improvements on the subject property, and are as follows:

| | |
|---|---|
| **Cost Approach** | **$405,000** |
| **Direct Market Comparison** | **N/A** |
| **Income Approach** | **$425,000** |

The value indicated by the income approach was considered the primary value indicator for the property. This approach is considered to most closely approximate the rationale investor's use in the marketplace. The cost approach is particularly applicable when appraising new properties that have not yet suffered substantial accrued depreciation.

Based on our analysis, and the various approaches to value, we conclude that the estimated value of the fee simple interest in the subject holding as improved, located at 684 and 692 Kilauea Avenue, subject to the assumptions and limiting conditions contained herein, on August 31, 2001, was $425,000.

### FOUR-HUNDRED TWENTY-FIVE THOUSAND DOLLARS
### ($425,000.00)

The value stated above is based on a reasonable exposure time of approximately twelve months. The value stated above does not include any personal property, or restaurant fixtures.

## CERTIFICATION

The undersigned do hereby certify that, to the best of my knowledge and belief, the statements of fact contained in this report are true and correct. It is further certified that the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions. We further certify that we have no present or prospective interest in the property that is the subject of this report, and have no personal interest or bias with respect to the parties involved. Our compensation is not contingent on a predetermined value or direction in value that favors the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event. The appraisal analysis and opinions were developed, and this report has been prepared in conformance with (and the use is subject to) the requirements outlined in the Uniform Standards of Professional Appraisal Practice (USPAP). We further certify that we have made a personal inspection of the property that is the subject of this report, and that no other persons provided significant professional assistance. David Matsunami conducted a physical inspection of the subject property on August 31, 2001.

The State of Hawaii conducts a mandatory licensing program for all appraisers dealing with federally related transactions. The undersigned appraisers have been designated Certified General Appraisers in the State of Hawaii through December 31, 2003.

GK APPRAISALS, INC.


Gary T. Kurokawa
Hawaii State Certified
General Appraiser, CGA-50
Exp. Date December 31, 2003


David K. Matsunami
Hawaii State Certified
General Appraiser, CGA-45
Exp. Date December 31, 2003


Christopher H. Graff

**EXHIBIT I:**

## ECONOMIC BACKGROUND
### State of Hawaii

The following narrative is a brief outline of the economic background of the State of Hawaii. The information contained in this section is provided to give the reader general information on the economy of the State of Hawaii. This report contains facts existing only at the times indicated and have been included solely to furnish information on current trends in the economy of the State. No representation is made or should be inferred that the economy will continue as projected.

## STATE OF HAWAII

Hawaii was admitted as the 50th State in 1959. Since that time, Hawaii has grown into a major Pacific Basin market through which both eastbound and westbound goods travel. Although generally thought of as a tourism based economy, Hawaii actively pioneers the fields of energy, land management and the realization of multi-ethnic ideals.

### Geography and Population

Huge volcanic eruptions from the ocean floor created the 1,610 mile long archipelago which consists of seven major and 124 minor islands. The seven major islands, Hawaii, Maui, Molokai, Lanai, Oahu, and Kauai account for more than 98 percent of the 6,450 square miles of land.

Hawaii is located 20 degrees north of the equator and 2,400 miles west of the U.S. Mainland. The islands' location and tropical climate provide fresh water, temperate climate and fertile land. In addition its remote location has resulted in many unique and endangered species of flora and fauna. Land stretches from the beaches at sea level to the snow capped mountains 13,800 feet above. Hawaii offers both one of the wettest spots on the earth, as well as one of the sunniest. Hawaii's agricultural past has contributed to it's unique multi-cultural background which offers equally appealing extremes. These contrasts, both physical and cultural, have helped to shape Hawaii's past and is setting the pattern for it's future growth.

The civilian population has grown rapidly since World War II. The population as of July 1991 was 1,134,800. Persons of Japanese and Caucasian descent make up nearly one half of the population, representing 33.0 and 24.9 percent of the State total respectively. The of the population is divided between Part Hawaiian, Filipino, Chinese, Korean and persons representing other ethnic backgrounds.

### Industry and Income

Personal income in Hawaii reached an all time high of 22.663 billion in 1990, an 11 percent increase over the previous year and up 220% from 1980. This resulted in an average income of $20,356 per capita, according to the U.S. Department of Commerce, which almost doubled 1980's mark of $10,617.

During the 80s business experienced brisk growth, and the number of employment opportunities increased. There were 579,850 occupied jobs in 1990, and with 524,000 people currently employed out of an active labor force of 539,000, the average unemployment figure remains low at 2.8%, though higher than the 1989 figure.

Hawaii continues to be one of the favorite vacation spots for both eastbound as well as westbound travellers. In 1990 6,971,180 people visited Hawaii, spending an average of $1,120 during their 8.5 day stay.

The hotel industry currently employs 38,800 persons directly and has shown a relatively steady growth over the last ten years. The hotel industry envisions continued growth through targeting the upscale markets as evidenced by the development of luxury hotels on the South Kohala Coast of the Big Island of Hawaii.

The weakening of the U.S. dollar on the international market has made Hawaii more attractive to foreign visitors. Hawaii is expected to reap the benefits of this trend.

These factors along with the airline fare wars, facilitate travel to Hawaii which should be good news for the visitor industry. The construction of new, upscale hotels provides another reason to believe that long term growth potential exists. Therefore, the overall outlook for Hawaii's visitor industry is positive.

**Trade**

Also closely related to tourism is the trade industry, particularly local retail and wholesale, which amounted to $17.64 billion in 1986.

The trade industry is currently Hawaii's largest employer offering more than 116,700 job opportunities.

**Government**

The Department of Defense has traditionally been a major employer, however various Federal, State and County departments have annually infused large amounts of money into the economy so that all levels of the public sector expended slightly over $7.4 billion in 1985.

The federal government has cut spending and many of the jobs and services that were previously offered to the citizens of Hawaii. Current political and fiscal policies have also limited growth on both the State and County levels.

## Agriculture

Sugar and diversified agriculture continue to be the major agricultural products of Hawaii, accounting for $401 million in sales. After recovering from the instability brought on by the expiration of the Federal Sugar Act in the mid-70's, the processing of sugarcane remains an integral part of island industry. Competition from other sweeteners and producing third world countries have severely hampered the industry in the past years. Government restrictions on foreign sugar imports have helped to preserve Hawaii's sugar industry. Sugar currently employs 3,100 people and produced a gross revenue of $214 million in 1990, a decrease in both jobs and revenues when compared to the previous year.

Hawaii's pineapple industry is likewise experiencing extreme competition from foreign competitors. The pineapple industry has severely cut back production and packaging operations in the State, as indicated by the closing of its Molokai and Lanai plantations. Sales of $99 million with 1,850 employed in 1990 indicated a decrease in both sales and employment over the previous year. Given information about rising world production capacity, it appears unlikely that the local pineapple industry will dramatically expand.

## Construction

After struggling through severe setbacks as a result of the nationwide recessions of 1982 and 1983, the construction industry reached $4.1 billion spent in 1990. The increase in foreign investment, coupled with the redevelopment of existing properties has increased the amount of construction occurring in Hawaii.

## Land and Development

With only 4.1 million acres of gross land area on the six major islands, land is currently Hawaii's most valuable commodity. In order to utilize this precious resource most efficiently, the State Plan of Hawaii and County Zoning Codes were enacted with long range development, urban planning and conservation being the major concerns addressed.

Only 178,114 acres are currently in urban use. The other major uses are: conservation, 1.96 million acres; agriculture, 1.96 million acres; and rural areas of 10,175 acres. With the passing of each year, the community is becoming increasingly aware of the need for environmentally sound development and well planned recreational and conservation areas.

## Economic Outlook

After decades of tremendous prosperity in the islands, many people today are worried about the future of Hawaii's stagnating economy.

The beginning of 1991 saw a drop in the number of visitors, rising housing prices and decreases in consumer spending. Many island residents, unable to buy a home began migrating to the mainland where prices were more affordable. In order to try to cure some of these problems, Hawaii has been forced to seek an expansion of its traditional visitor markets and to further diversify island industry.

Industrial capabilities are being expanded in areas such as petroleum refining, cement making, various electronic services, garment and furniture manufacturing. These industries, along with the trendsetting ideas which are already in place, geothermal energy, oceanic and astronomical research and international free trade zones, have added to the stable growth patterns which appear in the forecast for a new decade of economic vitality for the State of Hawaii.

## THE ISLAND OF HAWAII

The Island of Hawaii is the largest and "youngest" in the State. Known as the Big Island, its area is still being expanded by volcanic eruptions. It is now almost twice as large as all of the other Islands in the State combined. Although large in physical size, the Big Island's resident population -- estimated at 120,317 in 1990 -- is only about 10 percent of the State total.

Historically, the economy of the Big Island was subsistence. Discovery by western civilization led to the development of trade and commercial agriculture. Sugarcane production became the mainstay of the Island's economy. The visitor industry was slow to develop but gathered momentum with growth of commercial airline service after World War II. Today, the principle industries on the Big Island are tourism and milling and diversified agriculture.

A number of issues concerning constraints on economic development were identified which present challenges to growth and development efforts. One area of concern involves the problems associated with having a large land area and a small population base. The relatively long distances between major communities elevate the cost of transporting both people and goods around the Island. These distances also mean that it is relatively more expensive to provide highways and utility infrastructure than it is on the other islands.

The Island's relatively small population also limits the availability of direct air and surface shipping to U.S. Mainland markets. The increased cost of transporting most people and cargo through Honolulu negatively affects the growth of both the visitor and diversified agriculture industries.

Another area of concern is the supply of labor needed for economic growth. While there are many potential members of the labor force on the Big Island, many reside too far away from the high-growth region of West Hawaii to commute. In addition the cost of housing in West Hawaii is too high for many prospective workers to relocate.

The high cost and limited availability of land for productive business and housing are also perceived as having significant negative influence on economic growth. Although there is no shortage of land on the Big Island, less than 1.5 percent of the total is classified Urban. The State and Federal governments own approximately 40 percent of the land, most of which is not generally available for sale and/or development. Opinion is divided about whether more urban land is necessary at the present time, given limitations on water availability and an excessive number of visitor accommodations. However, speculative investment in West Hawaii land could keep the land prices high regardless of the amount made available for urban use.

Water availability is another constraint on development. The readily available surface water resources have been fully exploited and future demand will have to be met by drilling wells, an expensive undertaking. State and County funds for water development are limited. Alternative means of funding have centered on private sector participation.

Transportation to and from the Island is an issue that was raised repeatedly throughout the course of the study. All levels of the Island's import-export oriented economy are affected by the availability and cost of transportation links to the outside world. Most goods and people traveling between the

Big Island and out-of-State areas transit through Honolulu, utilizing primarily the two inter-island air carriers and the inter-island freight barge system. The Big Island's direct link to the Mainland and foreign countries are currently limited to United Airlines' flights from the Mainland to Keahole Airport, and limited surface shipping. The need to transit through Honolulu to or from out-of-state points results in higher costs to Big Island visitors and to Island farmers shipping to Mainland and foreign markets.

Financing the many infrastructure requirements for growth such as roads and sewer systems is also an important concern. State tax revenues and consequently expenditures have slowed in the past several years and the County's primary funding source, real property tax collections, has reached a plateau. Alternative means of financing are needed.

## EVOLVING ECONOMIC DEVELOPMENT EFFORTS

A strategy for economic development has evolved in response to the constraints imposed by the large land area, small tax base, and difficulties in financing infrastructure expansion. The County Administration advocates "pocket" development which reduces infrastructure servicing costs. Other elements of the strategy include targeting different areas of the Island for specific types of growth; for example, agriculture and selected industries in the Hilo and Puna Districts and tourism in North Kona and South Kohala. The promotion of alternative energy development is another element, designed to reduce dependency on imported petroleum and control energy costs. Priority for infrastructure development is given to high growth and critical areas.

The roles of the public and private sectors in the economic development process have undergone considerable changes over the past decades. During the economic growth era of the 1960s and early 1970s, the role of government was primarily to control and direct growth. A slower growing economy since the late 1970s has led to a shift in emphasis to active promotion of economic growth, while maintaining protection for the quality of life and the environment. The change in the economic climate has also produced a change in the perception of the importance of the business sector to the well-being of the community. A three-way partnership towards the economic stabilization and growth of the Big Island seems to be developing among the County government, the private sector, and in a supportive role, the State government. The County's Department of Research and Development is involved in supporting existing industries and developing new opportunities. The County has formed a New Industry Development Committee, composed primarily of private sector members, that is actively seeking new industries. The private sector has formed the Island-wide Hawaii Island Economic Development Board whose purpose is to unify the County's private sector behind an overall economic development program. The various Chambers of Commerce have also collaborated on a joint approach for participating in the economic development process.

An event of major concern of the Island was the closing of the Puna Sugar Company in 1984. The closing has removed about 15,000 acres from sugarcane production and has idled the remaining 265 workers. The former sugarcane land will offer the potential for the production of other crops, and consequently the potential of replacement jobs. Opportunities under consideration for the use of vacated sugar lands include growing papayas, macadamia nuts, bananas and trees for wood chips

to be used in generating electric power.

A number of other economic activities are either planned or proposed for the Puna-Hilo region which could provide additional employment opportunities for displaced Puna sugar workers. These include a 450 acre Industrial Park, in construction, by the W.H. Shipman Co., Ltd.; the possibility of a Puna High Technology Facility at the present geothermal site to use the by-products of the well; and an air cargo distribution center at General Lyman Field being explored by the county and the private sector. If additional geothermal facilities are developed, it is anticipated that many of the job skills needed will be comparable to those existing in the sugar industry.

## THE VISITOR INDUSTRY

The Big Island's visitor industry is now comparable in economic importance to the total agricultural industry on the Island. Tourism's considerable growth potential, however, makes it the most important industry in the foreseeable future. From the early 1960s, tourism grew reasonably well until 1979 when sharp escalations in overseas air fares, the loss of the common fare program, increases in inter-Island air fares, and the decline in group tour traffic resulted in a sharp decline in visitor arrivals and exceptionally low hotel occupancy rates. Since the low point in 1981, slow but steady recovery has occurred in the Island's visitor industry.

While some of the problems facing the visitor industry are beyond the Island's control, others are amenable to possible remedies. One area that is receiving increasing attention is the image of the Island projected in marketing and promotional efforts. In the past the Big Island has not been viewed as a beach resort destination area by potential visitors. The Island's major attraction has been sightseeing, especially the volcanoes. However, with recent development of new beach resorts in South Kohala, there is now an opportunity to alter the Island's "sightseeing only" image. Another image problem appears to be one of name identity; that is, distinguishing the Island of Hawaii from the State of Hawaii in the mind of the prospective visitor. The term "Big Island" has had limited success in this regard.

Other issues involving the visitor industry include providing for future growth in light of the necessity to provide facilities and infrastructure, the balance between the growth of condominiums and resort hotels, and the relationship between accelerated visitor industry growth and in-migration.

The Big Island of Hawaii is succeeding in attracting more tourists. New hotels and championship golf courses intended to lure an upscale market have been built along the Big Island's north-west shoreline, and massive new luxury resorts are planned or are already under construction there. Direct airline flights from mainland cities to Kailua-Kona are boosting visitor arrivals on Hawaii's west side.

## THE AGRICULTURE INDUSTRY

The Island of Hawaii is the State's major agricultural producer. The industry is today comprised of diversified agriculture.

Large landowners are replacing sugarcane plantings with other crops, mainly papaya and macadamia nuts. The macadamia nut continues to be important in island agriculture. In 1984, growers produced 37.7 million pounds, virtually the entire U.S. corp. In 1984, there were 16,900 acres in macadamia, 15,460 of them on the Big Island, and sales were valued at $25.95 million. The island also produces avocados, oranges, tangerines, flowers, and foliage. It is the world's largest orchid producer and has the nation's only coffee industry.

Hawaii's coffee industry, previously confined to a small sector of the Big Island's Kona district, is making a comeback with a high-quality, high visibility product. Farmers who let their fields turn to wilderness are once again planting coffee trees, but a significant increase in harvest is several years in the future.

## OTHER INDUSTRIES AND ACTIVITIES AFFECTING ECONOMIC DEVELOPMENT

Education and research are becoming important segments of the islands' economy. In 1981-82, the University of Hawaii at Hilo employed 550 persons and had an operating budget of $13 million, with most of that spent within the local community. The astronomical research station at the top of Mauna Kea employed 106 people in 1982 and had an operating budget of $6.7 million. Additional telescopes and support facilities planned for completion by 1990 could result in an estimated $92.5 million spent on construction, additional annual operating expenses of $8.8 million, and an estimated 110 new direct jobs. The Natural Energy Laboratory of Hawaii, located at Keahole Point in West Hawaii, is the only facility in the world that can provide significant amounts of warm and cold ocean water for ocean thermal energy conversion (OTEC) research. Research on OTEC-aquaculture has led to commercial demonstration projects which, if successful, could lead to increased jobs and revenues.

Manufacturing is a significant part of the island's economy, accounting for approximately seven percent of the total number of jobs in 1983. About half of all manufacturing jobs were at sugar mills. Other food processing accounted for about 30 percent of the jobs, with the remaining 20 percent distributed among durable and nondurable goods. About one-third of non-sugar manufacturing is geared for export markets, and it appears that most of the growth in diversified manufacturing has been due to the sharp increase in exported specialty foods. Factors limiting growth include: the high cost of transporting raw materials to -- and finished goods from -- the Island, the high cost of land (relative to the Mainland), and the high cost of energy.

Positive developments in the past few years could bolster the islands' potential for growth in the manufacturing sector. The development of geothermal and other alternate energy sources could stabilize energy costs, and provide ample energy for growth. The boom in high technology products, if successfully nurtured on the Big Island, could provide new manufacturing opportunities. Finally, efforts are being made to develop a new industrial park which would reduce costs to individuals by consolidating cost elements. Three prospective manufacturing activities are worthy of study since they could utilize raw material on or near the island. They are: a cattle feed lot/meat processing operation (commenced operations 1987), furniture and wood products operations.

Energy is one of the basic resources necessary for economic growth. The State and the County of Hawaii are committed to developing alternate energy resources to replace imported petroleum products. The Big Island is blessed with many possible sources of alternate energy. Although the State as a whole relies on petroleum for 90 percent of its electricity generation, petroleum produces only 55 percent on the Big Island. The remainder is provided by biomass (38 percent), hydroelectric (4 percent), and geothermal (3 percent). In addition, solar water heating, photovoltaic, and wind machines reduce the demand for electricity from the Hawaii Electric Light Company. Wind farms are being constructed that will also sell power to the utility company.

Geothermal energy, derived from heat trapped within the earth, can be used to produce electricity or as process heat for agricultural and industrial processes. The geothermal resource in the Puna area is estimated to have the capacity to provide up to 500 megawatts continuously for a century. If fully developed, this potential could supply about one-third of the State's present electricity demand, provided that an undersea transmission cable can be built and installed to distribute the electricity throughout the State. Benefits could also include stabilizing local utility rates, providing new jobs, attracting selected industries, and improving the State's balance of payments by reducing the need for petroleum imports.

Although commercial fishing on the Big Island represents a relatively small part of the economy, it has experienced a substantial increase in State market share, moving from 10.9 percent to 38.6 percent of the statewide fish catch over the past decade. The industry is oriented primarily toward the fresh fish market, with fresh Ahi as the primary export to the Mainland and Honolulu. A majority of the commercial fish landings are made by small craft that operate along the coastline. The major problems facing the industry include periodic low catch rates, "burnt tuna" (a poor condition in the quality of the tuna flesh), and inadequate harbor and support facilities.

Many forms of underground, or illegal, economic activity generate income on the island, but the only apparent underground activity large enough to have significant economic development implications is the growth of marijuana. Hawaii County law enforcement officials confiscated 75 tons of marijuana in 1983, with an estimated retail (street) value of $31 million. Although the marijuana industry is often credited with putting significant amounts of cash into the local economy, law enforcement officials indicate that perhaps as much as 90 percent of the activity is conducted by young Mainlanders who spent a few years on the Big Island, send the marijuana to the Mainland where the profits are accumulated, and then return to the Mainland. Thus, not as high a proportion of marijuana revenue returns to the island as is commonly believed.

The potential of other small, diversified economic activities have been suggested for the Big Island. Retirement communities might become popular because of the warm, dry climate in West Hawaii and could contribute to the economic base. Annual sports, recreation or cultural events such as the Ironman Triathlon attract visitors and bring in new sources of income. There is a potential for attracting more filming activities to the Big Island with its scenic beauty and variety. Legalized gambling and parimutuel betting have been proposed periodically, but there is serious doubt about the overall benefits of these activities. Commercial aquaculture is a small but growing industry on the Big Island. Many industries have been and could further considered that would utilize locally available raw materials, replace imported goods, or increase exports.

**EXHIBIT II:**

## Division 11. CG, General Commercial Districts

### Section 25-5-110
### Purpose and Applicability

a) The CG (General Commercial) district applies to an area suitable for commercial uses and services on a broad basis to serve as the central shopping or principal downtown area for a city or a region.

b) No CG district shall be established until there is a demonstrated need for such action and no two CG districts shall be established in such relationship to each other that they cannot act as one center ad yet are too close together to serve two distinct regions.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999.)

### Section 25-5-111
### Designation of CG Districts

Each CG (General Commercial) district shall be designated by the symbol "CG" followed by a number which indicates the minimum land area, in number of thousands of square feet, required for each building site.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999)

### Section 25-5-112
### Permitted Uses

(a) The following uses shall be permitted in the CG District:
    (1)   Adult day care homes.
    (2)   Amusement and recreation facilities, indoor.
    (3)   Art galleries, museums.
    (4)   Art studios.
    (5)   Automobile sales and rentals.
    (6)   Automobile service stations.
    (7)   Bars, nightclubs and cabarets.
    (8)   Bed and breakfast establishments, as permitted under Section 25-4-7.

(9) Boarding facilities, rooming, or lodging houses, provided that the maximum density shall be one thousand two hundred fifty square feet of land per rentable unit.

(10) Broadcasting services

(11) Business services.

(12) Car washing, providing that if it is mechanized, sound attenuated structures or sound attenuated walls shall be erected and maintained on the property lines.

(13) Catering establishments.

(14) Cemeteries and mausoleums, as permitted under Chapter 6 Article 1 of this Code.

(15) Churches, temples, and synagogues.

(16) Cleaning plants using only nonflammable hydrocarbons in a sealed unit as the cleaning agent.

(17) Commercial parking lots and garages.

(18) Community buildings, as permitted under Section 25-4-11.

(19) Convenience stores.

(20) Crop production.

(21) Day care centers.

(22) Display rooms for products sold elsewhere.

(23) Dwellings, double family or duplex, provided that the maximum density shall be one thousand two hundred fifty square feet of land area per rentable unit or dwelling unit.

(24) Dwellings, multiple-family, provided that the maximum density shall be one thousand two hundred fifty square feet of land area per rentable unit or dwelling unit.

(25) Dwellings, single-family.

(26) Equipment sales and rental yards, and other yards where retail products are displayed in the open.

(27) Family child care homes.

(28) Farmers markets. When the vending activity in a farmers market involves more than just the sale of local fresh and/or raw produce, plant life, fish and local homegrown and homemade products for more than two days a week, the director, at the time of approval, shall restrict the hours of use, maintenance and operations and may require improvements as determined appropriate to ensure its compatibility with the existing character of the surrounding area.

(29) Financial institutions.

(30) Group living facilities.
(31) Home occupations, as permitted under Section 25-4-13.
(32) Hospitals, sanitariums, old age, convalescent, nursing and rest homes and other similar uses.
(33) Hotels.
(34) Ice storage and dispensing facilities.
(35) Laboratories, medical and research.
(36) Laundries.
(37) Light manufacturing, processing and packaging, where the only retail sales outlet for products produced is on the premises where produced.
(38) Medical clinics.
(39) Meeting facilities.
(40) Model homes, as permitted under Section 25-4-8.
(41) Mortuaries.
(42) Neighborhood parks, playgrounds, tennis courts, swimming pools, and similar neighborhood recreational areas and uses.
(43) Offices.
(44) Personal services.
(45) Photography studios.
(46) Public uses and structures, as permitted under Section 25-4-11.
(47) Printing shops, cartographing, and duplicating processes such as blueprinting or photostating shops.
(48) Repair establishments, minor.
(49) Restaurants.
(50) Retail establishments.
(51) Schools.
(52) Telecommunication antennas, as permitted under Section 25-4-12.
(53) Theaters.
(54) Time share units.
(55) Utility substations, as permitted under Section 25-4-11.
(56) Veterinary establishments.

(b) In addition to those uses permitted under subsection (a) above, the following uses may be permitted in the CG district, provided that a use permit is issued for each use:

(1) Crematoriums.

(2)   Golf courses and related golf course uses, including golf driving ranges, golf maintenance buildings and golf club houses.

(3)   Major outdoor amusements and recreation facilities.

(4)   Yacht harbors and boating facilities.

(c)   Residential uses in connection with the operation of any permitted uses shall be permitted in the CV district.

(d)   Buildings and uses normally considered accessory to the uses permitted in this section shall also be permitted in the CV district.

(1996, Ord. No. 96-160, Sec. 2; ratified April 6, 1999.)


## Section 25-5-113
## Height Limit

(a)   The height limit in the CG district shall be forty-five feet, except in those areas designated in subsections (b) and (c) below.

(b)   The height limit in the City of Hilo shall be one hundred twenty feet.

(c)   The height limit in the North Kona district designated as high density urban on the general plan land use pattern allocation guide (LUPAG) map shall be ninety feet.

(1996, Ord. No. 96-160, Sec. 2, ratified April 6, 1999.)


## Section 25-5-124
## Minimum Building Site Area

The minimum building site area in the CG district shall be seven thousand five hundred square feet.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999)

## Minimum Building Site Average Width

Each building site in the CG district shall have a minimum building site area average width of sixty feet.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999.)

## Section 25-5-126
## Minimum Yards

The minimum yards in the CG district shall be as follows:
(1)   Front or rear yards, fifteen feet; and
(2)   Side yards, none, except where the adjoining building site is in an RS, RD, RM, or RCX district, there shall be a side yard which conforms to the side yard requirements for dwelling use of the adjoining district.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999)

## Section 25-5-127
## Landscaping of Yards

(a) All front yards in the CG district shall be landscaped, except for necessary access drives and walkways.
(b) Where required, side or rear yard in the CG district adjoins a building site in an RS, RD, RM, or RCX district, the side or rear yard shall be landscaped with a screening hedge not less than forty-two inches in height, within five feet of the property line, except for necessary drives and walkways.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999.)

## Section 25-5-128
## Other Regulations

(a) Plan approval shall be required for all new structures and additions to existing structures in the CG district.

(b) Exceptions to the regulations for the CG district regarding heights, building site average widths and yards, may be approved by the director within a planned unit development.

(1996, Ord. No. 96-160, sec. 2; ratified April 6, 1999.)

# IMPROVEMENT SKETCH

File No  3/22-216-20

| | |
|---|---|
| Property Address  684 Kilauea Avenue | |
| City  Hilo | County  Hawaii    State  Hawaii    Zip  96720 |
| Borrower  Okuda, Inc, dba Kay's Lunch Center | |
| Lender/Client  CENTRAL PACIFIC BANK | L/C Address  220 South King St., Suite 650, Honolulu, HI |
| Appraiser Name  David Matsunami | Appr Address  91-942 Kua'e'ewa Pl., Ewa Beach, HI |



Restaurant

Scale:  1 = 20

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Totals |
| GBA1 | First Floor | 4522.80 | 4522.80 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTAL BUILDING** (rounded) | | | **4523** |

| BUILDING AREA BREAKDOWN | | | |
|---|---|---|---|
| Breakdown | | | Subtotals |
| First Floor | | | |
| | 6.0 x | 21.5 | 129.00 |
| 0.5 x | 12.8 x | 87.3 | 559.47 |
| | 13.9 x | 49.2 | 686.14 |
| 0.5 x | 0.3 x | 0.8 | 0.12 |
| 0.5 x | 5.8 x | 1.0 | 2.77 |
| 0.5 x | 67.5 x | 11.3 | 380.16 |
| 0.5 x | 3.4 x | 20.9 | 35.73 |
| | 1.0 x | 68.5 | 65.76 |
| 0.5 x | 1.8 x | 68.0 | 60.03 |
| | 19.8 x | 61.9 | 1225.61 |
| 0.5 x | 0.2 x | 18.3 | 2.25 |
| 0.5 x | 1.5 x | 6.1 | 4.51 |
| | 6.1 x | 18.3 | 110.81 |
| 9 remaining calculations | | | 1260.43 |
| **22 Areas Total** (rounded) | | | **4523** |

## MARKET DATA LAND TRANSACTION

**Transaction 1**

| | |
|---|---|
| Location | 636 Kilauea Avenue |
| Third Division | |
| Tax Map Key | 2-2-16, Parcel 17 |
| Land Area | 12,778 Square Feet |
| County Zoning | CG-7.5 General Commercial |
| Grantor | Kathleen Matsumura and Ernest Matsumura |
| Grantee | Na |
| Instrument | Deed |
| Date of Sale | May 2001 |
| Sale Price | $ 169,000 |
| Unit Price | $ 11.11 Per Square Foot |
| Comments | This transaction represents the sale of an improved 12,778 square foot lot situated on Kilauea Avenue.   Although the property was improved at the time of sale, the selling broker indicated that no value was attributable to them.  A demolition cost of $2,000 was acknowledged. |



## MARKET DATA LAND TRANSACTIONS

**Transaction 2**

| | |
|---|---|
| Location | 614 Kilauea Avenue |
| Third Division Tax Map Key | 2-2-16, Parcel 16 |
| Land Area | 24,678 Square Feet |
| County Zoning | CG-7.5 General Commercial |
| Grantor | Hilo Chinese School |
| Grantee | Occidental Underwriters of Hawaii, Ltd. |
| Instrument | Lease Renegotiation |
| Recordation | October 1, 1997 in Document  97-158702 |
| Indicated Value | $ 276.923 |
| Unit Price | $ 11.22 Per Square Foot |
| Comments | This comparable is a large, rectangular shaped parcel that has a slight upslope topography from Kilauea Avenue.  This ground rent renegotiation was set at $18,000 per annum.  The rent was based on six and one-half percent of the then fair market value of $276,923. |



## MARKET DATA LAND TRANSACTIONS

**Transaction 3**

| | |
|---|---|
| Location | Kinoole Street |
| Third Division Tax Map Key | 2-2-26, Parcel 3 |
| Land Area | 20,663 Square Feet |
| County Zoning | CN-20 Neighborhood Commercial |
| Grantor | Michael K. Masutani & Site Engineering Inc. |
| Grantee | Frontline, LLC. |
| Instrument | Deed |
| Date of Sale | May 5, 2000 in Document 00-00061387 |
| Sales Price | $ 348,000 |
| Unit Price | $ 16.84 Per Square Foot |
| Comments | This level, rectangular shaped parcel is located at the intersection of Kinoole and Kawili Streets.  The property, zoned CN-20 sold for $16.84 per square foot. |



**MARKET DATA APPROVED TRANSACTIONS**        **EXHIBIT V**

**Transaction A**

| | |
|---|---|
| Location | 776 Kilauea Avenue |
| Third Division Tax Map Key | 2-2-19, Parcel 57 |
| Land Area | 3,046 Square Feet |
| Interior Area | 2,376 Square Feet |
| County Zoning | CG-7.5 General Commercial District |
| Grantor | Michael & Kumiko Sakaguchi |
| Grantee | Kevin & Rhonda Nichols |
| Instrument | Deed |
| Date of Sale | October 31, 2001 in Document 01-171622 |
| Sale Price | $ 140,000 |
| Overall Rate | 9.32% |

| | |
|---|---|
| Potential Gross Income | $ 19,440 (Projected) |
| Less Vacancy | $ 972 |
| Effective Gross Income | $ 18,468 |
| Less Expenses (Projected) | |
|   Real Property Tax | $ 800 |
|   Management Fee | $ 923 |
|   Utilities/Insurance | $ 2,000 |
|   Reserves For Replacement | $ 1,200 |
|   Miscellaneous | $ 500 |
| Total Expenses | $ 5,423 |
| Net Operating Income | $ 13,045 |



MARKET DATA   PROVED TRANSACTIONS                              EXHIBIT V

**Transaction B**

| | |
|---|---|
| Location | Off Henry Street |
| Third Division Tax Map Key | 7-5-4, Parcel 62 |
| Land Area | 35,340 Square Feet |
| Interior Area | 14,820 Square Feet |
| County Zoning | CG-20 General Commercial District |
| Grantor | Maryl Development, Inc. |
| Grantee | Betty Lau etal. |
| Instrument | Deed |
| Date of Sale | January 30, 1998 in Document 98-012772 |
| Sale Price | $ 3,146,129 |
| Overall Rate | 8.94% |

| | |
|---|---|
| Potential Gross Income | $370,276 (Actual) |
| Less Vacancy | $  18,513 |
| Effective Gross Income | $351,763 |
| Less Expenses (Projected) | |
|    Real Property Tax (Vacancy) | $     975 |
|    Management Fee | $ 28,141 |
|    Utilities/Insurance | $ 18,649 |
|    Reserves For Replacement | $  5,000 |
|    Miscellaneous | $ 17,588 |
| Total Expenses | $ 70,353 |
| Net Operating Income | $281,410 |



**MARKET DATA ...PROVED TRANSACTIONS**                                    **EXHIBIT V**

**Transaction C**

| | |
|---|---|
| Location | 75-5721 Kuakini Highway |
| Third Division Tax Map Key | 7-5-22, Parcel 9 |
| Land Area | 30,294 Square Feet |
| Interior Area | 3,689 Square Feet |
| County Zoning | CV-7.5 Village Commercial District |
| Grantor | Auto World Of Hawaii, Inc. |
| Grantee | Geeta Mallick. |
| Instrument | Deed |
| Date of Sale | August 4, 2000 in Document 00-108305 |
| Sale Price | $ 650,000 |
| Overall Rate | 9.00% |

| | |
|---|---|
| Potential Gross Income | $ 76,982 (Projected) |
| Less Vacancy | $   3,849 |
| Effective Gross Income | $ 73,133 |
| Less Expenses (Projected) | |
|   Real Property Tax (Vacancy) | $      325 |
|   Management Fee | $   5,851 |
|   Utilities/Insurance | $   2,794 |
|   Reserves For Replacement | $   2,000 |
|   Miscellaneous | $   3,657 |
| Total Expenses | $ 14,627 |
| Net Operating Income | $ 58,506 |



## PROFESSIONAL QUALIFICATIONS
## OF
## DAVID K. MATSUNAMI

PROFESSIONAL LICENSE

- State Certified General Appraiser #CGA-45, Expires December 31, 2003.

EDUCATION

- Bachelor of Arts (BA), Real Estate Development, University of Hawaii, 1985.

- Hilo High School, 1980.

Courses in Real Estate and Appraisal

- Real Estate 300, Introduction to Real Estate Principles, University of Hawaii, 1984.

- Real Estate 310, Real Estate Law, University of Hawaii, 1984.

- Real Estate 320, Real Estate Appraisal, University of Hawaii, 1984.

- Real Estate 399, Real Estate Finance and Investment, University of Hawaii, 1985.

- Planning 610, Real Estate Development, University of Hawaii, 1985.

- The Income Approach to Valuation, International Association of Assessing Officers, August, 1989.

- Foundations of Real Estate Appraisal, University of Hawaii, 1991.

- Appraising the Single Family Residence, University of Hawaii, 1991.

PROFESSIONAL QUALIFICATIONS
OF
DAVID K. MATSUNAMI
(Continued)

## PROFESSIONAL EXPERIENCE

**DAVID MATSUNAMI APPRAISALS,** Real Estate Appraisal/Analyst/Owner, 1991-Current. Appraisal of commercial, industrial, apartment, agricultural, fractional interests and complex residential properties for financial institutions, government agencies, and private parties.

**J. MICHAEL CHUN & CO. REAL ESTATE APPRAISERS, INC.,** Real Estate Appraiser/Analyst, 1993-1999. Appraisal of residential and commercial properties for financial institutions, government agencies, and private parties.

**GK APPRAISALS, INCORPORATED,** Real Estate Appraiser/Analyst, 1991-Current. Appraisal of commercial and residential properties on the Island of Hawaii for various clients.

**CITY & COUNTY OF HONOLULU,** Finance Department, Real Property Appraiser IV, 1987-1993. Valuation of residential, condominium, vacant land, apartment, agricultural, commercial, industrial, and hotel properties.

**APPRAISAL RESOURCE CORPORATION,** Associate Appraiser, 1987. Appraisal of residential, condominium, and vacant land for financial institutions, government agencies, and private parties.

**THE HALLSTROM APPRAISAL GROUP, INC.,** Research Analyst, 1986. Responsible for conducting research on various commercial assignments. Duties included preliminary land analysis, rent surveys, site inspection, and verification of sales.

## WORKSHOPS AND SEMINARS

Standards of Professional Practice-Part C, May 2001, Appraisal Institute-Hawaii Chapter.

The FHA and the Appraisal Process, September 1999, Appraisal Institute.

New Industrial Valuation, October 1998, Appraisal Institute.

Highest and Best Use Applications, September 1997, Appraisal Institute-Hawaii Chapter.

Appraisal of Retail Properties, May 1996, Appraisal Institute-Hawaii Chapter

Appraising the Secondary Market, May 1996, Appraisal Institute-Hawaii Chapter.

PROFESSIONAL QUALIFICATIONS
OF
DAVID K. MATSUNAMI
(Continued)

## WORKSHOPS AND SEMINARS (Continued)

Current Issues and Misconceptions in Appraising, August 1995, Appraisal Institute.

Lenders and the Law, December 1994, National Flood Insurance Program, Region IX.

Residential Case Studies, June 1994, Appraisal Institute.

The New Uniform Residential Appraisal Report (URAR), November 1993, Appraisal Institute.

Advanced Income Capitalization, October 1993, Appraisal Institute.

Standards of Professional Appraisal Practice Part A, March 1993, Appraisal Institute.

Standards of Professional Appraisal Practice Part B, March 1993, Appraisal Institute.

Appraising the Tough Ones, May 1993, Appraisal Institute.

Appraisal of Leased Fee Interests, May 1993, Appraisal Institute.

Appraisal of Leasehold Interests, May 1993, Appraisal Institute.

Capitalization Theory & Techniques, October 1992, Appraisal Institute.

Hotel-Motel Valuation, July 1992, Appraisal Institute.

Arbitration Principles and Pitfalls, July 1992, Appraisal Institute.

Institutional Investment in Real Estate, July 1992, Appraisal Institute.

Capitalization Overview, August 1990, American Institute of Real Estate Appraisers.

Standards of Professional Professional Practice, June 2000, VAL2000 Conference.

Standards of Professional Practice, Part C, June 2001, Appraisal Institute.

TYPICAL CLIENTS

Most major banks, savings and loans, mortgage companies, attorneys, and government agencies including:

American Savings Bank
Central Pacific Bank
Edmunds, Maki, Verga & Thorn Attorneys At Law, A Law Corporation
First Federal Savings and Loan Association
Goodsill, Anderson, Quinn and Stifel A Limited Liability Law Partnership, LLP.
GE Capital Corporation
Hawaii Federal and State Employees Credit Union
International Savings and Loan Assn. Ltd.
Liberty Mortgage, Inc.
Mortgage Brokers Consortium, Inc.
Nakamoto, Okamoto and Associates Attorneys At Law
New Century Mortgage Corporation
New World Mortgage Corporation
Peter Kubota Attorney At Law
State of Hawaii Hawaiian Homes Commission
State of Hawaii Department of Land and Natural Resources
Trust Mortgage
U.S. Army Corps of Engineers