01/16/2003 10:59 AM

Received an e-mail from Ann this morning requesting status reports by 1:00pm tomorrow. Memo states we need to submit a status report for appeals, building permits and sales. It goes on to say that we need to make print outs of the "appropriate" queries but does not tell us what the appropriate queries are.

To compound the confusion a list of query files was sent on a later e-mail to be used.

I just spent the last 10 minutes asking Julie T. if she knew what query reports were to be run and although she tried very hard she couldn't figure it out.

We asked Ryan if he had done the assignment and he said no. It appeared he hadn't even thought about it. He didn't know what to do either.

01/16/2003 11:08 AM

I just checked with Ann K. She had no clue either as to what exactly they want. She told me to just try and if it is wrong then they will tell us. She thought it was just an approximation.

I told her that they are asking for a print out of the appropriate queries and she did not know what to do.

**HGEA / AFSCME**

*Working Together*
*for Hawaii*

LOCAL, 152, AFL-CIO

Hawaii Government Employees Association

Charles R. Kendall Building, 888 Mililani St., Suite 601, Honolulu, HI 96813, Phone (808) 536-2351, FAX (808) 528-4059

January 16, 2003

Phil English
720 South Street, PMB 170
Honolulu, HI 96813

Dear Phil:

This letter is to clear up some confusion which has been made apparent by what you indicated in an e-mail to Ann Gima which she forwarded to me. In this e-mail you indicated that you were waiting for something in writing from me outlining the specific agreements and never received anything.

First of all I would like to clarify the fact that you were never on any extended probation. Should your Division have not been willing to make changes to the proposed extended probationary period I would have filed a grievance and argued it in a timely manner. However, after having discussions with the Administrator, he and your supervisor felt that there were merits to my position and were willing to pass your probation effective the end of the August 31, 2002 evaluation period. At the meeting in November we discussed how you wanted to handle the language of the comments in the evaluation attachment. I recommended some language being removed. However during the meeting you indicated that it may be in your best interest to keep that language in. After the meeting you further reiterated that because you are talking with an attorney that it may be best to leave it in. I advised you at that time, that a civil case related to your work performance would be weakened because of the offer made by the Employer to change the language in the proposed attachment. It was during our one on one discussion that it became apparent that you thought that you were on an extended probation.

During the week after the meeting, the week ending November 30, 2002, I received two telephone messages from you as well as two e-mails requesting the proposed changes to your performance evaluation write up for the period ending August 31, 2002. Due to the fact that my schedule did not permit me to meet with you, I requested that your supervisor provide you with a copy of the attachment for the performance evaluation. As I advised you at the meeting in November it would be up to you if the language that the Division is proposing to remove would be satisfactory to you. To date we have been awaiting your concurrence on the proposed changes which include the removal of all bracketed language.(see attached)

RENEAU KENNEDY RE PHILIP ENGLISH                    286

Mr. Phil English
January 16, 2003
Page 2

You should further understand that in your continuing employment, any request by management to meet with you to check on your ongoing work is not subject to any agreement made in the November meeting. I advise you to comply with any reasonable request by management to assess where you are on your workload so that you progress to completing your area of responsibility in a timely manner.

I hope that this clears up any misunderstandings that you may have.

Sincerely,

Waylen Toma
Business Agent

cc: Dwight Ishiguro, steward

RENEAU KENNEDY RE PHILIP ENGLISH                                287

English, Philip E. DF-486
Real Property Appraiser IV
Evaluation Period 06/01/02 – 08/31/02

During this probationary performance evaluation period as an Appraiser IV, Phil has continued to be assigned the responsibility for the Waikiki area condominiums. As noted in his last performance evaluation report, the volume of appeals and number of units in this area necessitates the use of good time management skills in order to meet deadlines and perform all the required duties.

Over the course of the past two months, Philip has been encountering some difficulties in independently performing all of the responsibilities of the Appraiser IV position. His performance has been discussed with him on at least three occasions and efforts have been made toward addressing various issues and problems including misunderstandings and miscommunications. Some items that have been addressed include work hours, timely submission and prior approval of leaves from work, and directions for processing various job tasks. At the present time there are some issues that are affecting his attitude and subsequently his work performance.

Phil will benefit from an additional 3-month probationary period of review for further training and instruction to clarify his duties and responsibilities and ensure his understanding and ability to implement the various job functions.

He is polite in his dealings with taxpayers and appellants.

Areas of evaluation will include:

1. Develop a work plan to organize and prioritize work to meet deadlines.
2. Demonstrate knowledge of practical and routine aspects of the job in accordance with work expectations.
3. Demonstrate the ability to follow written and verbal instructions.
4. Obtain written prior approval for leave.


No classes taken since last evaluation period.

01/21/2003 2:05 PM

Susan Bender came to my desk before going to a doctor's appointment to tell me that
Chris has talked to Lee Agsalud and that the word is out not to talk to me because I might
be wearing a wire!

01/24/2003 7:02 AM

Yesterday I met with Ann regarding my hearing today to give her a final update on what was happening. Apparently there is a new policy for scheduling appeals. It has been that we are to contact our supervisor one week before the hearing and have everything ready to go. I have been doing that since it became the policy. However, I have yet had things prepared to her satisfaction. That is she "will" find something wrong or something more for me to do whether it is substantive or not.

Now the new policy is that we are to have everything ready prior to setting the hearing date. We have not been told whether or not we are to meet with our supervisor first, I am assuming we will and once everything meets the supervisors approval then we can set the hearing date. This is supposed to speed things up and to have fewer BOR dates with postponements and so on.

In this new policy we are to contact the tax payers and get everything ready. In the previous policy we were told that we could not contact appellants until the supervisor had reviewed everything first. Or it may have been something in the middle.

At any rate Ann made a point to advise me that I was not following the new policy for my appeals. I explained to her that it was the first I had heard of it but I will do as she requested.

She made it sound as if I was holding things up because I have lots of appeals to do before the end of the fiscal year! And that I better get with it because with the new policy I have to prepare everything before I can schedule. She said anything scheduled after March.

She also was very condescending during our conversation about my appeals. This is nothing new, in fact it is the way she typically communicates with me. The matter of the condition of a unit at the time of assessment came up. I explained to her that the tax payer had provided information explaining when certain things occurred but Ann felt it necessary to go into a tirade about how you have to know the condition of the property on the date of appraisal just like when you do spot appraisals for a bank. She spoke to me as if I was an appraiser trainee. There is no doubt in my mind that is what she thinks of me. There seems to be little I can do to change her perception.

I contacted the tax payer and her confirmed everything that I had already explained to Ann was sufficient information to know that things occurred after the assessment date and not before.

02/03/2003 9:04 AM

This morning Ann reviewed two letters that I had drafted to tax payers inquiring why their taxes went up so much in one year. In both cases the issue was that in previous years the office had used leasehold sales and then added an estimated value for the leased fee interest. The attempt was to proximate fee simple value.

Ann and I had discussed from the very first months that I worked with her that there may be a problem with this kind of approach because leasehold values and fee simple values are subject to different kinds of market dynamics. The decision was to input only fee simple sales and eventually the leasehold plus leased fee sales data would not be selected as comps because it would be too old.

This was the year that the models started selecting more current fee simple sales from projects within the neighborhood group as opposed to the leasehold plus leased fee sales in the data base. I had warned Ann that this was coming and that it might cause problems (i.e. large increases in value). The other issue was that the models were not set up to necessarily pull from the right comps. It was kind of an unknown but we did not have time to change the groupings or even to see if they were correct.

However, the model did pull fee simple comps from adjacent similar projects that resulted in much higher assessed values.

Now these two taxpayers want to know what caused the big jump. The previous tax years appears to have resulted in a lower value and given the taxpayer a lower tax. This year we have used fee simple sales of similar properties and appears to have a fee simple market value which would be correct.

I drafted two letters explaining what had happened. Ann came to me this morning and told me that I had to re-draft the letters in a way that did not make it appear that the office had done something wrong. I have a problem with this.

I am uncomfortable with the request to write a letter that seems to cover up some error on our behalf.

**KATHLEEN CHRISMER - Ethics complaint**

From:    "Totto, Charles W." <ctotto@co.honolulu.hi.us>
To:      "Kurokawa, Gary" <gkurokawa@co.honolulu.hi.us>
Date:    2/5/2003 3:54 PM
Subject: Ethics complaint

Hi Gary:

I tried calling you about this, but were in a meeting. We have received a complaint involving the alleged use of city resources for non-city purposes by you and Chris Graff. I will contact you shortly to discuss the matter. At this time we are only investigating the allegations.

I am contacting you today because I have been informed that Phil English has hired Roger Moseley as his attorney on issues related to the matter under investigation. As a result of the relationship between Mr. English and Mr. Moseley, I am requesting that you do not permit Mr. English to work on any matter in which Mr. Moseley or his clients are involved. This will help assure that there is no appearance of conflict of interest or impropriety on the part of the persons concerned or the division.

Of course, should you have any questions, please contact me.

Thanks,
Chuck

CHARLES W. TOTTO
Executive Director and Legal Counsel
Honolulu Ethics Commission
715 South King Street, Suite 211, Honolulu, HI  96813-3091
Office (808) 527-5573  Fax (808) 527-6936
Email:  ctotto@co.honolulu.hi.us
Website:  www.co.honolulu.hi.us/ethics

RENEAU KENNEDY RE PHILIP ENGLISH                                        303

Wednesday, February 05, 2003

Bob Magota, Assessor
City and County of Honolulu

Bob:

Confirming our conversation of this morning regarding a planned meeting for this afternoon to discuss an employment action against me, you stated that would not object to having union representation or an attorney present on my behalf.

My attorney has made himself available for this afternoon and we are waiting a time and place where we can meet.  Please let me know so I can let my attorney know.

Thank you,

Phil English

02/05/2003 12:05 PM

This morning approximately 9am I received a phone call from Bob Magota requesting to meet with me right away. I went directly to his office. Bob had me close the door and began to tell me that the reason he had called me in was that there was a pending disciplinary action that we needed to discuss and it had to do with what was reported as an unauthorized leave.

He began to explain the claim made by Ann Gima my supervisor. I asked him would I have an opportunity to rebut the claim. At that point he called Ann and asked her to attend the meeting. She came into the meeting.

I asked if I could have a third party present and Bob asked if I would like union representation. I told him that I would like another independent third party in the room. At that time the meeting was finished pending communication with a union representative. I requested that Dwight Ishiguro attend.

I was told that Dwight was coming to the office and that we could meet later in the afternoon when he arrived.

At this point I contacted Dwight who told me that he would be in the office momentarily. I also contacted my attorney who requested that I inquiry as to whether of not he could attend, if the meeting could be recorded and the time of the meeting.

I checked with Bob who stated that my attorney could attend.

Dwight came to my desk about 40 minutes later. He took me to the basement conference room where he told me that he had been meeting with Bob. Dwight explained to me that this was a disciplinary action that could be a break in service that could effect my step movements. I asked if it would affect any other benefits and he said no.

We spoke for about 30 to 40 minutes and he tried to stay focused on the issue at hand and that is the disciplinary action. He explained that as it was described to him that I left on unauthorized leave in October and when I returned that there was some discussion between Ann and I the upset fellow workers who felt so threatened that they left the area. I explained to Dwight that this was not true and no one left the area. This was considered to be insubordinate and that was why the action was being taken.

02/05/2003 1:14 PM

After my meeting with Dwight I came back to my desk to find that my mobile phone had been tampered with. Chris told me that he put my phone in the drawer because it was making a funny noise. I inquired to the other employees and no one else heard any funny noise.

02/05/2003 1:17 PM

Ann is wondering around the group humming and whistling in a mocking fashion.  She
appears to be gleeful that the disciplinary action is being taken.  She is hanging around
Julie, Linda, in her ususal mannor.

02/05/2003 1:45 PM

this morning when I came into the office I spoke with Ann K. about some matter on how we do things here. It was quite apparent that she felt that she did not want to say anything to me. She just kept saying I don't know and you should check with Ann.

So it seems that others in my group are unwilling to talk with me.

**English, Philip E.**

| | |
|---|---|
| **From:** | Gima, Ann |
| **Sent:** | Friday, February 07, 2003 10:21 AM |
| **To:** | English, Philip E. |
| **Cc:** | Kurokawa, Gary; Magota, Robert |
| **Subject:** | RE: Letters to taxpayers/ethical issues |

Phil,
Go back and review the assessments for the properties in question.
Make sure that the message you are conveying is accurate. Keep in
mind that you are writing the response as an official of the City and
County of Honolulu.
Prepare the response letter to the best of your ability which you feel
most competently and responsibly reflects an appropriate reply to the
taxpayer's question and submit it to me for review.

Annie

-----Original Message-----
**From:**      English, Philip E.
**Sent:**      Thursday, February 06, 2003 3:37 PM
**To:**        Gima, Ann
**Cc:**        Kurokawa, Gary; Magota, Robert
**Subject:**   Letters to taxpayers/ethical issues

Ann,

I am struggling with the last couple of re-writes that you have asked me to do. Particularly
the responses to taxpayers whereby in the previous years we were using sales from buildings
where the sales were leasehold. An estimate of the leased-fee was added but it fell far short
of fee simple value.

As we discussed when I first started working in your group perhaps a better approach would
be to find fee-simple sales transactions from similar buildings. As I told you in the fall of last
year this is the year that the old lease-hold sales would probably not be pulled and fee simple
sales from the neighborhood groups (such as they are) would be pulled. So the increases
are not a surprise.

I wrote the letters and explained to the taxpayers what happened. What I wrote was
essentially the truth. You reviewed the letters and asked that I re-write them in a way that
would make it appear that our office had done nothing wrong. I am not sure what you mean
exactly and I feel uncomfortable writing something that may be misleading.

I know that protecting the office has always been important and I am sure that is what you
have in mind. But, respectfully, I think it becomes an ethical issue if I write a letter that does
not reveal the truth and maybe even covers it up. Maybe you can give me an example of
how you think the letter should be written. As for me, I have looked at them since Monday
when you made the request and I am having a hard time writing them in any different way.

While I am on the point of ethical issues I do have more concerns that I have expressed
before but it may be a good time to revisit them.

It is simply the volume of work that needs to be done and the resources that we have to get it done. There is a problem and it is an ethical one as well. I have nearly 20,000 condo and co-op units to appraise in one of the most complex real estate markets in the world. I know that I am not the only one who has this kind of work load! We as appraisers have a responsibility to say something when we think that we have more work than we can reasonably get done in the allotted time and do with any reasonable reliability.

There is no question that the assessments must go out every year. But there is also no question that we are not catching up but falling behind. This only results in more appeals and more time spent defending appeals and far less time working on the models and making them better so that we can produce better results and maybe have less appeals. I know these are not new concerns to you either and in fact a number of appraisers have expressed the same issue in their areas.

In the past year or so I have spent a great deal of my time working on BOR or TAC items. In the 2002-2003 tax year I had nearly one quarter of the entire office's appeals (almost 1,000 condo and co-op units). Many to do with the classification issue and leasehold values. You are aware of much of those time requirements. I have also spent a lot of time working on the management of the classification issue. These are the areas where I have spent most of my time.

The other area of time is sorting through and validating thousands of sales. As you know this is not truly a verification process. We kind of do a statistical validation meaning if the value appears to be in the range then we validate it. I have gone through later in cleaning up sales data and found many straight leasehold sales, foreclosures, sales between related parties. They were just validated because they appeared to be close enough. There is a lot of data that still yet needs to be cleaned up.

I have had little time to work on models. You know the actual valuation stuff. I had worked hard on the Gold Coast area because as you know that area was not set up for market modeling and much of the data still needs to be corrected. The other models also have many problems. The areas that need to be fixed are very fundamental like groupings and data. But I have had little time to work on these areas. I have started and have a file of some of the groupings that I would like to look into. The groupings in some cases are OK. In others they just seem bizarre. They all need to be reviewed.

The problem is simply this that there is not enough time in one assessment year to do all of the things that need to be done. It is our ethical responsibility to inform our client that there is a problem.

This is in fact what I was trying to talk to Bob about when he dressed me down right here in front of Dawn's desk by saying that he has seen this kind of thing before and outside appraisers can't seem to make the transition to mass appraisal and he even went on to say that I was an appraiser who only knew the fundamentals of appraising. We had just completed our IAAO class on ethics and I was just trying to point out to him that I had an ethical concern. He certainly did not want to hear it.

I am not sure how I fit into the assessment office. I have always tried to maintain high ethical standards in all of my appraisal practice and since working at this office I feel that I have been ethically challenged on more than one occasion and for more than one reason.

I am writing to go on record about these issues as well as to seek your guidance on the letters in question. I will do as you request but I think it is worth while noting my concerns.

Phil

## English, Philip E.

**From:** Kurokawa, Gary
**Sent:** Friday, February 07, 2003 5:24
**To:** English, Philip E.

I have received an email outlining your concerns and serious allegations of ethical misconduct. Before I can do an inquiry and follow-up to respond to your allegations I am asking your assistance in clarifying some statements.

1. Did your supervisor ask you to specifically re-write a letter to make it appear that our office had "done nothing wrong"? It appears from that statement that : 1) Something was done wrong by someone. What specifically, under what provision and by whom?

2) Although you state that you are not sure what she meant, how did you come to this conclusion?

2. Did your supervisor ask you to "protect the office" in your correspondence and how are you "sure that is what you have in mind"

3. Did your supervisor ask you to "not reveal the truth" and maybe "cover-up" the truth. If so what is being covered up and by whom.

4. The amount of work and the time frame in which you are given to accomplish the assessments are an ethical violation. Please provide me with the standard, provision or source by which I can research and reply to your concern.

5. You have stated that "You have been ethically challenged on more than one occasion and for more than one reason" please provide me with specific occasions and reasons. Did someone make you participate in a situation that was unethical or did you on your own make that decision?

If you have any questions please contact me. Thank you

Gary Kurokawa, Administrator
Real Property Assessment Division
842 Bethel Street
Honolulu, Hawaii 96813
(808) 527-5502
gkurokawa@co.honolulu.hi.us

02/10/2003

RENEAU KENNEDY RE PHILIP ENGLISH

**Workplace Violence Checklist, February 10, 2003**

1. Name: Julie Tamayori
2. Job Title: Real Property Appraiser IV
3. Position Number: DF-475
4. How long with the City/Department/Division: With Real Property since 1989; prior with Motor Vehicles 1985 -1989
5. Phone number: 527-5530
6. Confidentiality – The results of my investigation will be kept as confidential as possible. What I mean is that I will only release information and/or names of individuals when required by law and City requirements. There may be a requirement to provide your name in the future for "due process" requirements. Also the information discussed should not be discussed with others.
7. There have been allegations made that a possible condition exists that has resulted in non-physical threats and/or could lead to physically confrontations. What do you know about this and who is involved if you know?

   Phil (Philip) English is a nice guy, sweet non-violent in appearance. However, Phil has recently done some "back stabbing" with co-worker Chris (Christopher) Graff.   Phil is acting like nothing has happen. Phil has made some type of charges against Chris about doing personal work on the job.

   Co-workers are scared. Ran away last year 2002 when there was an incident between Phil and supervisor Ann.

   Phil has talked about his ex-wife who made some allegations about Phil being abusive but Phil said he wasn't. Phil said something like "Do I look abusive?" It is the attorneys after me. His ex-wife is an attorney.

   Phil will lie about things – minor things. He said he had to take the day off because of a parent – teacher conference. She found out that there was no school that day and no parent –teacher conferences.

   Phil lies to justify his position. He says he is not told how to do a particular job but the instructions have been provided to everyone via email. He will still do something the wrong way even after the instructions/email are provided. Everyone else seems to get the instructions, which are good. They are also easy to follow.

   Something not quite right – he sees the email, gets upset but acts like nothing has happen.

8. Who is the alleged assailant/ perpetrator?
   Philip English

RENEAU KENNEDY RE PHILIP ENGLISH

9.     How long has this person been working at this location? Not sure – maybe 2 to 3 years.

10.    Have they're been more than one incident? If so, how many and when? Chris incident and Phil's lies.

11.    Do you feel threaten?
       Not threaten.

12.    Do you believe that physical harm is possible? Not sure

13.    Have any of his/her patterns of behavior changed before this incident occurred? Sometimes more agitated.

14.    Has an incident been reported to police and/or security? No.

15.    Do others feel threaten? Yes – others do. Think of other violent stories.

16.    Can I have their names so I can interview them?
       No one new.

17.    Do you feel safe at work? Not sure.

18.    What would you recommend to prevent similar incidents? Possible psychology evaluation for Phil to see if he is ok.

19.    Have you attended any workplace violence training? No class, just a handout.

20.    Do you know if the alleged perpetrator has attended any workplace violence training? Don't know.

21.    Is there anything else that you would like to add? Phil says he is acting as a Christian but more like he is acting out. She feels uneasy at work because of Phil's behavior. Phil makes it looks like everyone is against him.

RENEAU KENNEDY RE PHILIP ENGLISH

02/10/2003 11:05 AM

Completed meeting with Ann G., Bob M. and Kevin M. at about 10am. Meeting ran from about 8:45 to 10am.

Donnie Wong called to tell me there was a meeting and that Kevin would meet me up stairs. I asked her when did Kevin arrive and did he meet with Bob and Ann already and Donnie said that she didn't know. When I arrived up stairs Kevin entered the room the same time I did as if he had been waiting outside for a staged entrance the same time I entered. I believe that he most likely met with Ann and Bob first.

There seem to be some agreements reached between them already. One, that the disciplinary action would only be a verbal warning. Still based on an event that happened in October.

Bob explained the events as they were related to him. He said that on October 25th that I took leave without proper authorization. He went on to say that after my return that when Ann confronted me that I yelled her and that it was so bad that other employees heard it and stated that they had to leave the area. It was for this reason that I was being warned. Bob also stated that I need to control my temper.

I told them that this is not what happened. I explained that I believed that Ann told me that I could go. I also explained that on all other occasions whereby my request for vacation were denied that I complied and that I had completed all of my work assignments and that I had her approval from two days before

Kevin stated that vacation time can be used for necessary medical reasons and that it should not be withheld by management.

Ann said that it is the policy that the employee should try to make appointments for weekends and off hours. I explained that it was necessary and that the appointment had been set for me. I explained that I had broken my toe.

Ann commented that I change things around that is her comments. We had some discussion about previous meetings.

Bob stated that in meetings with him that I yelled.

I explained that I never yelled at anyone at anytime but that I have expressed my frustration and shock and my voiced would be raised but no more than what we were talking in the meeting then and anything else is simply not true.

Bob said that other employees would testify that I yelled. (threat)

Bob also stated that he had brought this to the attention of Mike G and Violet Lee back in January so that it was before the ethics investigation and therefore is not part of any retaliation. He kept pressing me as to when I first went to the ethics commissioner.

Ann indicated that there is probably something wrong with my work product. There is no question that the models need a lot of work. That is what I have been telling them for some time. I have even raised it as an ethical issue.

But it is clear to me that they are in full swing trying to make a case against me. I guess the best defense is an offense.

Bob also indicated that another complaint has been made against someone in the office performing work while on company time/computers. I wouldn't be surprised if it was against me at this point. Retaliation and harassment!

Bob suggested I seek counseling for my "personal" problems and I told him any personal situation was not the problem but that I have been very stressed over the situation at the office. I told him that I was seeking assistance from an outside source because I didn't know whom I could trust at the city.

There was some discussion about the extended probation and Ann and Bob insisted that there never was an extended probation. When I told them I have a memo from Gary that said that he was going forward with the extended probation Bob and Ann looked at one another with great surprise. Shock! They were disturbed by that!

But I have been honest from the beginning and have always tried to comply with their request and advised them when there were problems.

Conclusion:

Bob-that I need to be very careful about notifying my supervisor when I leave and that I need to control my temper.

Ann- that I should be moved to another supervisor

Kevin- that something needs to be done to defuse the situation and if there are future problems they need to be brought forward in a timely manner.

Phil- that I hoped that everyone would just tell the truth.

02/13/2003 11:12 AM

Ann G appeared to be talking to Carl T. about something to do with me. There is a great deal of whispering going on. I have no idea what she was saying but when I got up to get some water they both looked at me and stopped talking.

I am confident that Ann is discussing my personnel issues with other employees.

**English, Philip E.**

| | |
|---|---|
| From: | English, Philip E. |
| Sent: | Friday, February 14, 2003 3:45 PM |
| To: | Gima, Ann; Gima, Ann |

Ann,

Responding to your request for answers regarding the Feb. 19th BOR appeals

1. Can you explain why the cases are not fully prepped and ready for my review?
2. Why was the field inspection conducted only this week? (By performing the inspection only 1 week prior to the hearing you do not give yourself sufficient time to do your analysis before the deadlines.)
3. When did you notice that the unit was on cost?
4. What is the use of the unit?
5. When did you mention this unit to Gary Kubota?
6. Who did you speak to regarding this unit?

The quickest way for me to respond is to take the easiest answers first and they are in the reverse order starting with #6:

#6    who did you speak to regarding this unit?
   • I spoke to Gary Kubota

#5    when did you mention this unit to Gary Kubota?
   • Gary and I spoke Monday and Tuesday

#4    what is the use of the unit?
   • The use has not been determined. I am waiting for a response from Management as to how to proceed (this per Gary Kubota and confirmed with you by e-mail). I believe it is the front desk area but the original building plans appear different than what I observed when I inspected.

Note: I believe more research will need to be done on the entire building. There are some discrepancies regarding room count and view amenity for a variety of units. As I previously stated, these units were not set up for modeling prior to being thrown into a model. The problem with our assessments is due to data and modeling.

#3    When did you notice that the unit was on cost?
   • Late last week as I was preparing the MK21's. It is a Pitt 7 unit.

#2    why was the field inspection conducted only this week? (By performing the  inspection only 1 week prior to the hearing you do not give yourself sufficient time to do your analysis before the deadlines.)
   • I called the taxpayer the previous week when I became aware that the D.H. Ambassador appeals were postponed. This was the first opportunity we had to meet.

#1    Can you explain why the cases are not fully prepped and ready for my review?
   • See below:

I can only say at this point that I am feeling extraordinarily frustrated and harassed. As you know in the past two weeks I have been called into meetings for disciplinary actions of claimed insubordination which supposedly occurred in October of 2002 (of which the disciplinary action was changed to a verbal warning only because of the recommendation of the union agent), I have had to consult with union agents, I have had to document all of these meetings with contemporaneous notes, (as recording of the meetings was not allowed and that in more than one meeting with you, Bob and others statements have been restated and recanted). There have been false claims made against me and I am experiencing a great deal of pressure due to retaliatory tactics because of a complaint that I made months ago that has resulted in an ongoing Ethics Commission investigation into unethical activities of Gary Kurokawa, the Administrator and other(s) City and County employees.

In the past two weeks I have been responding to letters and trying very hard to draft them in a way that is acceptable to you but finding it difficult when you ask me to write something that "doesn't make it look like our office did something wrong." I only wrote down what was factual and you seem to imply that something that was done was wrong. I still have letters to re-write or to follow-up on.

In the past two weeks I have been fielding many calls because of classification issue. The second half 2002 assessment bill came in and everyone wants to know why his or her bill is so high. Each of these cases must be researched in order to give a complete and accurate explanation.

Additionally I have been asked by the administrator to respond to "ethical" concerns that I have raised. I am unclear whether I should respond as Kevin Mulligan, the union agent," recommended that Gary recuse himself from any dealings concerning me since he is the subject of an ethics complaint made by me

My workload is significant which is something that I have mentioned more than once before and have asked for help specifically from you and that you have not been forthcoming with assistance. Of the 2002 appeals I had close to (if not more than) 1,000 condo and co-op units appeal cases (nearly a quarter of the appeals for the entire office). Through the first four months of 2002 I was nearly entirely consumed with TAC and I still have a number of 2002 appeals to go. The 2003 appeals (although far less) need to be organized per your instructions.

Even with regards to the BOR hearing this coming Wednesday I have asked for your assistance and instead of offering assistance you want me to spend the limited time that I have responding to questions which could clearly wait until after the hearing.

I am doing my best to do a good job under the circumstances. When I ask for direction and assistance I do not get it. Instead I get continued harassment, accusations, and attempts to thwart my ability to do my job.

From meetings dating back to May of 2002 I have been expressing my desire to get my job done and comply with all of your request. In each and every meeting since that time false accusations have been made against me and in each and every meeting that we have had since that time when I have known what it is that you want me to do I have done my best to comply.

Nonetheless I have experienced continued and ongoing harassment, false accusations, and retaliation. As I have stated before on more than one occasion all I want is an opportunity to my job, get the support and direction I need to accomplish my job, and finally to be treated like a professional and an adult.

Phil

2

**English, Philip E.**

| | |
|---|---|
| **From:** | English, Philip E. |
| **Sent:** | Friday, February 28, 2003 8:31 AM |
| **To:** | 'Mom and Dad' |

Dad,

I went to the Doctor yesterday. They are putting me on a two week work leave immediately. I will be seeing him in about 10 days and we will review the situation then.

On Monday I have a meeting with the Administrative Services Officer (top personnel guy for the department of Budget and Fiscal Services) regarding complaints made against me including workplace violence and sneaking around trying to gather info on people for a law suit. It has gone to the next higher level of government now.

My new union agent says something really stinks and he does not like what is happening. He says that it sounds to him like retaliation and harassment. It is actually one worse than that it is intimidation! He even went on to say that I probably won't be able to work in the assessment division in the future for fear of future retaliation. That is how it works here in the City and apparently there are a lot of people who are aware of the tactics. Others are watching now so we shall see how it all plays out.

I am pretty shook up about all of this. I have been carrying a big load for awhile. I have an ally that they do not know about and I am sure he is on my side. I have told only the truth and will continue to do so. They have lied repeatedly. I have urged them all to do the right thing. They have attempted to escalate the harassment and intimidation. I have prayed constantly on this issue.

Whatever the outcome I know that God is in control and the out come will be his.

I love you,

Phil

1

RENEAU KENNEDY RE PHILIP ENGLISH

DEPARTMENT OF HUMAN RESOURCES

# CITY AND COUNTY OF HONOLULU

550 SOUTH KING STREET
HONOLULU, HAWAII 96813

JEREMY HARRIS
MAYOR



CHERYL K. OKUMA-SEPE
DIRECTOR

March 18, 2003

Reneau Kennedy, Ph.D.
3001 Diamond Head Road
Honolulu, Hawaii 96815

Re:    Claimant:    Philip English
       Employer:    Department of Budget and Fiscal Service
       Carrier:     Self Insured – Department of Human Resources
       D/Accident:  January 2, 2003

Dear Dr. Kennedy:

Thank you for agreeing to see Philip English for an independent psychological evaluation on Friday, April 18, 2003 at 8:30 a.m.

Mr. English came to see me on February 28, 2003 in a tearful mood, obviously under a great deal of stress. He is an appraiser with the Real Property Assessment Division of the Department of Budget and Fiscal Services who was hired in June 2000. He said in August 2001 he discovered other employees were conducting appraisals on city time for a private company, which was owned by the Division Chief of the appraisal branch, Gary Kurokawa. He reported this to his supervisor, Ann Gima, and when it was not handled to his satisfaction, he reported it to her supervisor, Bob Magota. When Mr. Magota failed to act as he deemed appropriate, English put his complaint in writing to Mr. Magota. After that, he started getting retaliation from the division staff. He received poor performance ratings, he was told his work was unsatisfactory, and he was put on probation for insubordination. In general, this has escalated to the point when his mental health worker at Kaiser Permanente (Gerald Coffee), told his to stop working. He also engaged an attorney, Roger Moseley, and filed a complaint with the City Ethics Commission. Please refer to the enclosed notes on the details of my discussion with Mr. English.

Renean Kennedy, Ph.D.
March 18, 2003
Page 2

After our discussion, I assisted Mr. English in filing a workers' compensation stress
claim, using the date of injury as January 2, 2003, although this has been an ongoing
problem for several months. I explained that workers' compensation stress claims take
several weeks to work through the system, and I offered to try and find an alternate
temporary work location for Mr. English so he would not be without income during
this period. He said he would have to consult his doctor regarding this.

After the meeting with Mr. English, I called various individuals within his department,
and a completely different story unfolded which cast doubt on Mr. English's allegations
and the reason for his claim. These include the possibility that he filed this claim to
overcome allegations of poor work performance, personal problems affecting his job,
and complaints of work harassment filed by other employees. Please review the
attached notes of my discussions with Mike Golojuch, the Administrative/Personnel
Officer with the Department of Budget and Fiscal Services, Ann Gima (his immediate
supervisor), and Bob Magota (the head of his Division). I also spoke with Anna Horne,
the City's Employee Assistance Counselor.

I will attempt to obtain records from Kaiser Medical Center, but because these must be
subpoenaed, they may not arrive prior to your appointment with Mr. English. Also,
you may wish to discuss his situation with the individuals above. Here are their phone
numbers:

                    Mike Golojuch - 523-4755
                    Ann Gima - 527-5513
                    Bob Magota - 527-6859
                    Anna Horne - 272-2904 (pager)

Thank you for agreeing to assist us in evaluating this employee. If you require any
additional information, please call me at 523-4971.

                              Sincerely,

                              THOMAS RIDDLE
                              Workers' Compensation Administrator

BELPHIN KENNED... RE PHILIP ENGLISH

## NOTES ON WORKERS' COMPENSATION CLAIM OF PHILIP ENGLISH

Interview with Philip English on 2/28/2003

English was hired in June 2000 as a Real Estate Appraiser IV (SR-22) with Real Property Assessment Division of the Department of Budget and Fiscal Services. The Division Chief is Gary Kurokawa (Real Property Assessment Administrator EM-8) and his immediate supervisor is Ann Gima (Real Property Appraiser VI SR-26).

In late 2001 English learned that Gary Kurokawa was owner or part owner of a real estate appraisal firm called GK APPRAISALS. He further learned that some of the City appraisers were working for him either part time or as independent contractors and were conducting appraisals for his company on City time. The problem seemed to be wide spread.

Around August 2001, English went to see his supervisor, Ann Gima, who responded that she didn't know anything about that situation, but would look into it. When he didn't hear anything and the problem continued, he went to see Bob Magota, Branch Chief of the Real Property Assessment Branch in Sept or Oct 2001. Magota indicated that it appeared to be his work against the other people, but he would look into it. When nothing happened, he put his concerns in writing to Magota.

After that, he starting getting retaliation from the Division staff. He started receiving poor performance ratings, even though his prior ones were good. He was called into meetings where he was told he was taking too much initiative , that he should confine himself to his job and not worry about the rest of the Division. He eventually was put on probation for insubordination (not sure why this was as English did not elaborate). There was a meeting with the Division and his union agent concerning the poor evaluations. But the union agent (Wyland Toma of HGEA) later told English that Kurokawa was a personal friend of his and he would have to support Kurokawa over English. A new union agent has been assigned to work with him – Kevin Mulligan. English indicated that after the meeting, Kurokawa told him that it was because of him that English was hired and that he should be grateful for the and forget about this and move forward.

English saw an attorney, Roger Moseley (735 Bishop Street, #2600, 547-5447) and they have filed a formal complaint with the Ethics Commission (Chuck ~~Totter~~, 527-5573)  *TOTTO*

About four weeks ago the pressure started to get too much for him and English went to his Kaiser doctor who referred him to Gerald Coffee, Ph.D. at Kaiser. Dr. Coffee took him off work effective 2/28/2003.

I had English fill out a workers' compensation claim and told him we would be opening it with a denial, pending investigation. I explained that we needed records from Kaiser, that I would touch base with his attorney and try to verify his complaint with the Ethics Commission. I would also send a copy of the claim to the BFS for them to fill out the back of the claim form.

I spoke with his attorney and will send a medical release form to him for English to sign. I also explained that, depending on Coffee's reports, we may need an IME and I suggested Dr. Rogers.

RENEAU KENNEDY RE PHILIP ENGLISH

Phone discussion with Bob Magota on 03/10/2002

I asked Magota about the complaint English made with him in August 2001 regarding other employees doing work for an outside firm on city time. He specifically had named Chris Graff. Magota explained that previously there had been a complaint against another employee for the same thing and he had called the employee in and explained the seriousness of doing this. The employee was warned that disciplinary action would be taken if it were discovered that this happened. The employee was told that no outside employment could interfere with his city job and could not be done on city time. A verbal warning was given.

After English's complaint against Chris Graff, Graff was called in and the same discussion outlined above was conducted. Magota also spoke with Gary Kurokawa (who is actually his boss) and told about the allegations. Kurokawa, who owns an appraisal firm on the big island, indicated that he had told all of his employees not to do any work on city time, and he indicated he would speak with them again.

English was dissatisfied with the response from Magota, even though Magota told him that disciplinary matters are confidential.

Magota then discussed English's work history. At first, Magota felt sorry for English, because he had a lot of personal problems. Magota invited him to his church, invited him to family dinners during the holidays and even lent him some money. But English's behavior became more bizarre as time went on. He seemed to be very unhappy and was having trouble adjusting to his personal problems. These included filing for bankruptcy, divorce from his first marriage and failure of his second marriage, problems with the IRS regarding tax matters and custody problems with his children. Magota suggested English seek counseling, suggested he might see Anna Horne.

There were a series of meetings with English and his supervisor, Ann Gima, regarding his performance. His job performance appeared to be slipping; he would not finish assignments on time or do them unsatisfactorily, even though he had extensive outside experience. English would always blame others, telling Magota he wasn't given all the required information or that he was improperly trained. During some of these meetings English would yell at Gima or at Magota. When Magota suggested counseling, English said there was nothing wrong with him, that he didn't have any problems and didn't need to see a counselor. He denied he had a temper or that he had yelled at others.

Magota discussed English with Anna Horne at least twice, asking what he could do to help him. Other employees were sometimes frightened of him and his personality. He would yell at them, but later deny it. He would constantly twist the truth around to suit his views.

He accused the department of holding up his promotion. This was not true as others were promoted at the same time and the process just takes a long time. Everyone had to wait until the process was finalized. At the last meeting with the union agent present, when Magota indicated that English's personal problems might be affecting his work performance, English said, "Bob, I have no problems."

Although Magota did not see the complaint made to the Ethics Commission, he head there were several employees listed, included department secretaries, who would know nothing about these allegations. Magota has spoken to Totto of the Commission and agreed to provide all of this information, but so far Totto has not called him for an interview.

Phone discussion with Mike Golojuch on 3/6/2003

Mike was in the process of conducting an investigation concerning a complaint against English for work place violence. He had interviewed all parties and was about to complete the investigation by interviewing English. But when he tried to set up the appointment, that is when English filed the workers' compensation claim and went off work. So the investigation is on hold.

The person filing the complaint was Chris Graff. Chris is the person that English complained about to the Ethics Commission. According to Mike, Chris and other workers in the unit felt uncomfortable with English. Although he is soft spoken, he at times became very loud and irrational and even threw things on the desk. Several times he confronted Chris to "tell the truth". Some of the workers' interviewed by Mike indicated they were increasingly uncomfortable with English, even comparing the situation to the Brian Uyesugi case. Mike felt the complaint of workplace violence was probably not correct, it was more of a very uncomfortable environment created by English.

On the topic of employees working on City time, this is not proven. Gary Kurokawa is involved in a family business of property assessment – mostly on the Big Island according to Mike. This is a long time business and his participation in the ownership is properly registered with Personnel. Although Chris indicated he did work occasionally for Kurokawa, it was not on City time, although he may have taken a phone call occasionally regarding some of this work. He freely admitted this and it does not seem to rise to the level of inappropriate behavior.

I told Mike I would schedule a psych evaluation and have the doctor call him to obtain additional information regarding this matter.

Phone discussion with Ann Gima on 03/10/2003

Ann Gima was asked to call me by Bob Magota, as he was tied up in meetings today. This was in response to our memo of 02/28/2003 to Ivan Lui-Kwan asking for additional information.

Ann indicated that English was hired in mid June 2000 and appeared to be doing a good job initially. After a year, she put in for reallocation to the next level in the progressive series of Real Estate Appraisers. English was dissatisfied with the slow progress of this reallocation and started complaining about his low pay (saying he could make more by working at Home Depot), and his attitude seemed to change dramatically. There were several counseling session with him regarding his performance – some documented, some not. Gima indicated she had a file about four inches thick regarding this. English seemed to feel he was more knowledgable than others in the division and that he deserved more pay.

Gima indicated that Magota had suggested that they meet with WC to discuss this claim and provide whatever background information they had. I said I would call back and schedule.

Phone discussion with Chuck Totto of the Ethics Commission on 02/28/2003.

After meeting with English, I called Totto of the Ethics Commission to verify whether English had filed a complaint with them. Totto indicated that he had and that they were investigating his complaint. Although Totto could not discuss the details of the complaint or his investigation, he seemed to be supportive of English (just my opinion from his tone of voice). I did ask him if anything in his investigation so far had found any of English's complaints to be true. He acknowledged yes. I also ask if his investigation so far had found any of English's complaints to be false, and he answered no. So, it appears there is an element of truth to what English is alleging.

DEPARTMENT OF HUMAN RESOURCES
# CITY AND COUNTY OF HONOLULU
550 SOUTH KING STREET
HONOLULU, HAWAII 96813



JEREMY HARRIS
MAYOR

CHERYL K. OKUMA-SEPE
DIRECTOR

February 28, 2003

Roger Moseley, Esq.
735 Bishop Street, Suite 2600
Honolulu, Hawaii 96813

Re:  Claimant:     Philip E. English
     Employer:     Department of Budget and Fiscal Services
     Carrier:      Self Insured – Department of Human Resources
     D/Accident:   January 2, 2003

Dear Mr. Moseley:

Thank you for speaking with me regarding the workers' compensation claim of Philip
English. I will be handling this claim, along with Sharon Maeda, and we look forward
to working with you. You may call me at 523-4971 if you have questions or need
information regarding this claim. Enclosed is a copy of the WC-1 report which formally
opens the claim with the State Department of Labor and Industrial Relations, as well as
a medical release to enable us to obtain the records from Kaiser Permanente.

We would appreciate you keeping us informed regarding the progress of this case and
Mr. English's complaint with the Ethics Commission.

Sincerely,

THOMAS RIDDLE
Workers' Compensation Administrator

RENEOU KENNEDY RE PHILIP ENGLISH

Every work injury to an employee causing absence for one day or more or which requires medical services other than first aid treatment must be reported within 7 working days after the injury. Failure to report promptly is a misdemeanor punishable by not more than a $5,000 fine. (Sec. 386-95, H.R.S. NOTIFY THE DIVISION IMMEDIATELY IF INJURY RESULTS IN DEATH.) EVERY QUESTION MUST BE ANSWERED FULLY TO AVOID FURTHER CORRESPONDENCE.

The law requires the employer to furnish the injured employee a copy of this report.

## WC-1 EMPLOYER'S REPORT OF INDUSTRIAL INJURY

### IDENTIFICATION SECTION

| EMPLOYEE NAME - LAST | FIRST | M.I. | SOC SEC NO | DATE OF BIRTH | SEX | MARITAL STATUS |
|---|---|---|---|---|---|---|
| English | Philip | E | 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 | 10 / 26 / 1954 | ☒ MALE ☐ FEMALE | ☒ MARRIED ☐ SINGLE |

| ADDRESS | ADDITIONAL ADDRESS INFORMATION (C/O) | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 1741 Ala Moana Blvd., Unit 22 | | Honolulu | HI | 96815 |

| PHONE | OCCUPATION | DATE HIRED | WORK COMP CODE | DEPARTMENT | PAYROLL COMP CLASS CODE |
|---|---|---|---|---|---|
| (808)754-2136 | Real Property Appraiser | / / | | Budget and Fiscal Services | |

| REGISTERED EMPLOYER | DBA |
|---|---|
| City & County of Honolulu | |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| PHONE | NATURE OF BUSINESS | DATE INJURY/ILLNESS REPORTED | DATE OF INJURY/ILLNESS | DOL NUMBER |
|---|---|---|---|---|
| | Municipal Corp. | 02 / 28 / 2003 | 01 / 02 / 2003 | C000001250 |

### DETAIL OF INJURY / ILLNESS

| TIME OF INJURY/ILLNESS | PLACE OF INJURY IF DIFFERENT FROM EMPLOYER'S MAILING ADDRESS | CITY | STATE | ON EMPLOYER'S PREMISES |
|---|---|---|---|---|
| 8:00 AM | | | HI | ☒ YES ☐ NO |

HOW DID THIS ACCIDENT OCCUR? (Please describe fully the events that resulted in injury or occupational disease. Tell what happened. Please use separate sheet if necessary)

After claimant complained about unethical practices in the Real Property Appraisal unit, he experienced retaliation, causing stress

TIME WORK/SHIFT BEGAN 07:45 AM

WHAT WAS EMPLOYEE DOING WHEN INJURED? (Please be specific. Identify tools, equipment or material the employee was using)

Refer to above

OBJECT OR SUBSTANCE THAT DIRECTLY INJURED EMPLOYEE (e.g. the machine employee struck against or struck him, the vapor or poison inhaled or swallowed; the chemical that irritated his skin. In cases of strains, the thing he was lifting, pulling, etc.)

Person(s)

DESCRIBE IN DETAIL THE NATURE OF THE INJURY, ILLNESS AND PART OF THE BODY AFFECTED

Stress

### TIME LOST INFORMATION

| DATE DISABILITY BEGAN | WAS EMPLOYEE FURNISHED MEALS OR LODGING | AVG WKLY WAGE | IF EMPLOYEE IS BACK TO WORK GIVE DATE | WAS EMPLOYEE PAID IN FULL FOR DAY OF INJURY/ILLNESS | IF EMPLOYEE DIED GIVE DATE | HOURLY WAGE | MONTHLY SALARY | HRS WKD / WK |
|---|---|---|---|---|---|---|---|---|
| / / | ☐ YES ☒ NO | 749 \| 54 | / / | ☒ YES ☐ NO | / / | | 3248 \| 000 | 40 \| 00 |

GIVE NAME AND ADDRESS OF SURVIVORS ON BACK

### TREATMENT    OBTAIN NAME OF TREATING PHYSICIAN FROM EMPLOYEE

| NAME OF PHYSICIAN | ADDRESS |
|---|---|
| Gerald Coffee, Ph.D. | Kaiser Permanente |

| NAME OF MEDICAL FACILITY | | |
|---|---|---|
| | INPATIENT OVERNIGHT? ☐ YES ☒ NO | |
| | EMERGENCY ROOM ONLY? ☐ YES ☒ NO | |

### INSURANCE    CARRIER I.D. 1999

| NAME OF WC INSURANCE CARRIER | NAME OF ADJUSTING COMPANY | IF LIABILITY DENIED – WHY? | IS LIABILITY DENIED? |
|---|---|---|---|
| Self Insured | City & County of Honolulu | Pending investigation | ☒ YES ☐ NO |

| POLICY NO. | POLICY PERIOD | ADJUSTER NAME | CARRIER CASE NO. |
|---|---|---|---|
| SELF-INSURED | 01/01/1901-12/31/2050 | Sharon Maeda | 030135 |

| | ADJUSTER I.D. 3144 | MEDICAL DEDUCTIBLE |
|---|---|---|

| SIGNATURE | TITLE | DATE |
|---|---|---|
| [signature] | Adjuster    523-4986 | 02 / 28 / 2003 |

(REV. NOV/01)

RENEAU KENNEDY RE PHILIP ENGLISH

# CONFIDENTIAL

March 12, 2003

TO:      TOM RIDDLE, WORKERS' COMPENSATION ADMINISTRATOR
DEPARTMENT OF HUMAN RESOURCES

FROM:    MIKE GOLOJUCH, ADMINISTRATIVE SERVICES OFFICER
DEPARTMENT OF BUDGET AND FISCAL SERVICES

SUBJECT:  WORKPLACE VIOLENCE REPORT FOR PHILIP ENGLISH

Tom,

Attached is the complete interim report for Philip English. With the workers' compensation claim, the rest of the investigation is on hold. However, you can read that I have asked the Real Property Assessment Division to proceed with the recommendations as appropriate.

Copies of this report are being sent to:
      a.    Real Property Assessment Division
      b.    BFS Deputy Director Chris Diebling
      c.    DHR/EAP Ana Horne
      d.    DHR/ISWC  Alan Hiramasu

Attachments

RENEAU KENNEDY RE PHILIP ENGLISH

DEPARTMENT OF BUDGET AND FISCAL SERVICES

# CITY AND COUNTY OF HONOLULU

530 SOUTH KING STREET, ROOM 208, HONOLULU, HAWAII 96813-3018
Phone: (808) 523-4616 • Fax: (808) 523-4771
Website: www.co.honolulu.hi.us



JEREMY HARRIS
MAYOR

IVAN M. LIU-KWAN
DIRECTOR

CHRIS A. DIEBLING
DEPUTY DIRECTOR

IN REPLY REFER TO:

March 12, 2003

**CONFIDENTIAL**

TO:      GARY KUROKAWA, ADMINISTRATOR
               REAL PROPERTY ASSESSMENT DIVISION

FROM:    MIKE GOLOJUCH, ADMINISTRATIVE SERVICES OFFICER

SUBJECT:   INTERIM INVESTIGATION REPORT – ALLEGATIONS OF WORKPLACE
               VIOLENCE (PHILIP ENGLISH)

Attached for your review and possible action is the interim investigation report in response to
several workplace violence charges by Ann Gima, Real Property Appraiser VI and Christopher
(Chris) Graff, Real Property Appraiser IV against Philip (Phil) English, Real Property Appraiser
IV.

This is an interim report because I have not interviewed the alleged perpetrator Phil English. A
interview with Phil English and his HGEA union representative Kevin Mulligan was scheduled
for Monday, March 3, 2003. However, Phil started sick leave on Friday, February 28, 2003 and
he filed a workers' compensation claim with the Department of Human Resources, Industrial
Safety and Workers' Compensation Division. Until he returns to work or is cleared to hold the
interview, Phil's interview is postponed.

It is important to complete and/or take follow up actions on allegations of workplace violence.
Therefore, this interim report is issued. Further, when appropriate recommended actions need to
be reviewed to see if any immediate action needs to be taken. Page 7 of the attached report
contains eight recommendations for your consideration.

Ana Home and I are working with Bob Magota to conduct workplace violence training for your
Division personnel. The tentative dates are: Bethel Street – Monday, March 24, 2003 and
Monday, April 7, 2003; Kapolei – Wednesday, April 16, 2003.

I will complete my investigation as soon as the situation allows. Please feel free to contact me at
523-4765 if you have any questions.

Attachments

RENEAU KENNEDY RE PHILIP ENGLISH