**KAISER PERMANENTE – HAWAII**

Diagnostic Imaging Consultation Report
3288 Moanalua Rd. • Honolulu, HI 96819

05/04/2001
0706

MR# 00-63-31-94
UC LOC:83

Name: ENGLISH, PHILIP E
MR# 00-63-31-94 Sex: M DOB: 10/26/1954
Pt.Phone(W):(808) 523-4275 H:(808) 396-5309

Ordering:FUJIMOTO, JUDY
FUJIMOTO, JUDY

Sched. Loc:7
Current Loc:7

R
A
D
I
O
L
O
G
Y

C
O
N
S
U
L
T
A
T
I
O
N

R
E
P
O
R
T

DI#:2601727    Exam Date:05/03/2001    Exam:CT ABD AND PELVIS W CONTRAST

Clinical Info:
    CT ABD/PELVIS : S/P LT NEPHRECTOMY FOR RENAL CELL CA 1998
    R/O RECURRENCE CR.1.3
    JESSICA 4/06
(DH/TAK: ?)

CT ABDOMEN AND PELVIS, 3 MAY 2001:  There are no old studies for
comparison.  Multiple transaxial 7-mm sections were obtained
through the abdomen and pelvis following oral and IV contrast.
Only 75 cc (half dose) of contrast was administered because of the
left nephrectomy.

FINDINGS:  The patient is status post left nephrectomy.  Surgical
clips are present in the left renal bed. The left adrenal gland has
also been removed.

No evidence of recurrent tumor or mass is seen in the postsurgical
bed.

The contralateral right kidney is unremarkable.  It is normal in
size, shape, and density.  There is a small sub-1 mm cystic lesion
in the midpole of the right kidney which is too small to
characterize.

The retroperitoneum is unremarkable.  No adenopathy is seen.  The
IVC and aorta are unremarkable.

The pelvis is unremarkable.   The bladder and rectum are normal.
Small, scattered diverticula are seen in the sigmoid colon.  No
free fluid is seen.

The lungs bases are unremarkable.

The liver, spleen, and right adrenal gland are unremarkable. The
pancreas and gallbladder are normal.

IMPRESSION:

1.    No evidence of tumor recurrence or metastatic disease status
      post left nephrectomy.

2.    Small 7 mm cystic lesion in the midpole of the right kidney
      which is too small to characterize.

OMR CHART COPY/DIAGNOSTIC

RENEGU KENNEDY RE PHILIP ENGLICU

# KAISER PERMANENTE – HAWAII

Diagnostic Imaging Consultation Report

3288 Moanalua Rd. • Honolulu, HI 96819

MRN: 00-63-31-94
ENGLISH, PHILIP E
Sex: M
Chart Loc: ~~83~~ *Hak*

**R A D I O L O G Y   C O N S U L T A T I O N   R E P O R T**

CANCELLATION NOTICE

Acc No: 2434304
(7)CTAPC (CT AB PEL C CON)
On:11/08/2000 1045        Resource: 7CT1
Reason:  No show.
Auth by: CHIBANA, MERLE

MFID: 00-63-31-94   Current Loc: 7CTF

00 97

CMR CHART COPY/DIAGNOSTIC

RENEAU KENNEDY RE PHILIP ENGLISH                471

6331945

ENGLISH, PHILIP

46 yrs    Male

22 MAY 2001

2:59:17PM

BP 132/92

70 in    210 lb

Normal sinus rhythm, rate 66

- NORMAL ECG -

PR    153
QRSD  89
QT    384
QTc   402

--AXES--
P    51
QRS  56
T    3

CONFIRM COPY

KAISER PERMANENTE HAWAII REGION - Hawaii Kai Clinic

RONALD MAIN M.D. - 5 JUN 2001    9:08:51AM

Requested by
1242
Tech 662

C-HP

PRIVILEGED AND CONFIDENTIAL
FOR PROFESIONAL USE ONLY[*]

### Independent Psychological Evaluation

| | |
|---|---|
| **Claimant:** | Philip English |
| **Date of Birth:** | October 26, 1954 |
| **Employer:** | Department of Budget and Fiscal Service |
| **Date of Injury:** | January 02, 2003 |
| **Date of Evaluation:** | April 18, 2003 |
| **Date of Report:** | July 30, 2003 |

### Identifying Information

Mr. Philip English is a 48-year-old Caucasian male, who is employed as a Real Estate Appraiser IV with the Real Property Assessment Division of the Department of Budget and Fiscal Services for the City and County of Honolulu. Mr. English has been divorced twice and he is currently separated from his third wife. He presently resides alone on his boat in the Ala Wai Boat Harbor.

### Purpose of the Evaluation

Mr. English filed a workers' compensation claim on February 28, 2003. In his claim, Mr. English alleges experiencing stress and retaliation after complaining about unethical practices at his place of employment. Thomas Riddle, Workers' Compensation Administrator, requested that I perform an Independent Psychological Evaluation to assess Mr. English's current psychological condition and future needs in order to address further liability and permanent impairment.

---

[*] **NOTE:** This psychological report is privileged and confidential. Examinees may misinterpret or distort testing information. For individuals who do not understand the purpose or technicalities of an IPE, disclosure of information contained in this report or direct release to the claimant may present damaging and irreversible consequences. For the above reasons, the IPE report should only be shown to the claimant under carefully controlled conditions with a clinician or legal counsel who will be responsible in the dissemination of the information. Individuals sharing the information with the claimant should help the individual understand any upsetting information. Failure to follow these recommendations may have untoward consequences which this writer is not responsible for.

1

### Nonconfidentiality Warning and Consent to the Evaluation

Prior to beginning my evaluation with Mr. English, I issued a nonconfidentiality warning to him. I informed Mr. English that I am a forensic and clinical psychologist in private practice and that I had been retained to evaluate him. He was made aware that our discussion was non-confidential, in that I would be writing a report and submitting my findings to Thomas Riddle at the City and County of Honolulu's Department of Human Resources. I informed him that my finding would be based upon psychological testing, clinical interview, and my review of collateral material.

### Foundation for Opinion

In reaching my conclusions, I have relied upon the following information:

**Psychological Testing and Clinical Interview of Mr. English**

- Clinical Interview
- Mental Status Examination (MSE)
- Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
- Personality Assessment Inventory (PAI)
- Butcher Treatment Planning Inventory (BTPI)

**Collateral Data**

- Notification of Personnel Action, City and County of Honolulu, Department of Human Resources, December 29, 2000, 1 page
- Notification of Personnel Action, City and County of Honolulu, Department of Human Resources, March 7, 2001, 1 page
- Probationary Performance Evaluation Report, April 5, 2001, 1 page
- Performance Evaluation Report, City and County of Honolulu, Department of Human Resources, April 23, 2001, 2 pages
- Probationary Performance Evaluation Report, City and County of Honolulu, Department of Civil Service, June 26, 2001, 2 pages
- Notification of Classification Action, City and County of Honolulu, Department of Human Resources, March 11, 2002, 2 pages
- Notification of Personnel Action, City and County of Honolulu, Department of Human Resources, March 19, 2002, 1 page
- Performance Evaluation Report, City and County of Honolulu, Department of Human Resources, April 12, 2002, 2 pages
- Response to comments by Mr. English, 2 pages
- Probationary Performance Evaluation Report, City and County of Honolulu, Department of Civil Service, May 16, 2002, 2 pages
- Notification of Personnel Action, City and County of Honolulu, Department of Human Resources, May 27, 2002, 1 page
- Probationary Performance Evaluation Report, City and County of Honolulu, Department of Civil Service, August 14, 2002, 2 pages
- Response to the Review by Mr. English, 1 page

2

- Employment Application by Mr. English, January 24, 2003, 11 pages
- Letter by Mr. Waylen Toma to Mr. English, Business Agent, Hawaii Government Employees Association, January 16, 2003, 3 pages
- Email from Mr. Charles W. Toto to Mr. Gary Kurokawa, February 5, 2003, 1 page
- Letter by Mr. English to Mr. Bob Magota, February 5, 2003, 1 page
- Supervisor's Response for OSHA Form 300 Log No. 030135, Report of Industrial Injury or Illness, 123 pages
- Letter by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, March 18, 2003, 2 pages
- Typewritten notes by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, 7 pages
- Letter by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, to Mr. Roger Moseley, February 28, 2003, 1 page
- WC-1 Employer's Report of Industrial Injury, February 28, 2003, 1 page
- Letter, with attached interim workplace violence report for Mr. English, to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, from Mr. Mike Golojuch, Administrative Services Officer, Department of Budget and Fiscal Services, March 12, 2003, 54 pages
- Letter and fax from Mr. Roger S. Moseley, June 10, 2003, 2 pages
- Email from Mr. Thomas Riddle, June 10, 2003, 1 page
- Email from Mr. Thomas Riddle, May 19, 2003, 1 page
- Email from Mr. Thomas Riddle, May 10, 2003, 1 page
- Letter by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, to Mr. Roger S. Moseley, May 5, 2003, 1 page
- Letter, with attached standards from the International Association of Assessing Officers, from Mr. Roger S. Moseley, May 3, 2003, 8 pages
- Letter by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, May 2, 2003, 1 page
- Email from Mr. Thomas Riddle, April 30, 2003, 1 page
- Email from Mr. Thomas Riddle, April 29, 2003, 1 page
- Letter by Mr. Mason Young, Acting Administrator, Division of Boating and Ocean Recreation, Department of Land and Natural Resources, State of Hawaii, April 17, 2003, 1 page
- Letter by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, April 25, 2003, 2 pages
- Letter by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, April 28, 2003, 3 pages
- Letter by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, to Mr. Roger Moseley, April 29, 2003, 2 pages

3

- Two letters by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, to Mr. Roger Moseley, April 30, 2003, 2 pages
- Letter by Mr. Robert O. Magota, Real Property Assessor, City and County of Honolulu, Department of Budget and Fiscal Services, to Mr. English, April 9, 2003, 1 page
- Letter by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, April 16, 2003, 2 pages
- Letter by Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, to Mr. Roger Moseley, April 17, 2003, 2 pages
- Letter, with attached copy of two work slips, by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, April 18, 2003, 2 pages
- Annual Performance Evaluation Report, City and County of Honolulu, Department of Budget and Fiscal Services, April 22, 2003, 3 pages
- Letter, with attached annual performance evaluation, by Mr. Roger S. Moseley to Mr. Thomas Riddle, Workers' Compensation Administrator, City and County of Honolulu, Department of Human Resources, April 30, 2003, 5 pages
- Emails to and from Mr. English, 58 pages
- Handwritten notes by Mr. English, 21 pages
- Typewritten notes by Mr. English, 11 pages
- Kaiser Permanente Medical Records, 98 pages

### History of Present Claim

In 1999, Mr. English applied for the positions of Real Property Administrator and Real Property Assessor. However, in both instances, the acting Administrator and the acting Assessor were selected over Mr. English. Mr. Gary Kurokawa was hired as the Administrator and he presently occupies the position. According to Mr. English, he had more qualifications than the two who were hired for the positions. His supervisor noted, in a written response for OSHA, Mr. English "expressed disappointment and displeasure to others at not being selected for the Administrator's position since he thought he was the best candidate based on his past accomplishments."

On June 1, 2000, Mr. English obtained his first job with the City and County of Honolulu as a Real Property Appraiser II. Mr. English reported that he was hired in an entry level position as an appraiser trainee and that he took the job to get out of private practice for the purpose of reducing stress as advised by his physician. Over time, however, it appears that the purpose for working for the City and County had changed for Mr. English. In a November 12, 2002, email to Mr. Dwight Ishiguro, union steward, Mr. English wrote, "I really have nothing to lose and I want to see that things are corrected and done right here. That was why I signed on board with the City and County and I WILL follow through."

On February 1, 2001, Mr. English was promoted to Real Property Appraiser III. Reports of his performance from June 1, 2000, to July 31, 2001, showed that he "exceeds requirements" on four ratable performance factors, including: 1) quantity of work, 2) quality of work, 3) attitude toward

4

work, and 4) relationship with people. In interview, Mr. English stated that he was there to learn things during his first year. He also stated that he felt he tried to be respectful while he settled into his new job. At the same time, however, Mr. English reportedly observed that Mr. Chris Graff, his friend at the time, conducted business for GK Appraisals, which is a real estate appraisal firm owned by Mr. Kurokawa, during City and County work hours.

In August 2001, Mr. English reportedly issued his first verbal complaint regarding Mr. Graff and Mr. Kurokawa to Mrs. Ann Gima. According to notes of an interview conducted by Mr. Riddle of Mr. English, Mrs. Gima "responded that she didn't know anything about that situation, but would look into it." Mr. English reported that the alleged behavior continued and he subsequently issued his second verbal complaint in February 2002 to Mr. Robert Magota, who supervises Mrs. Gima and who is supervised by Mr. Kurokawa.

According to interview notes from Mr. Riddle, Mr. Magota gave a verbal warning to Mr. Graff. Mr. Magota also reportedly spoke with Mr. Kurokawa, who "indicated that he had told all of his employees not to do any work on city time, and he indicated he would speak with them again." Mr. English was apparently dissatisfied with the outcome.

On February 15, 2002, (the week after issuing the second verbal complaint), Mr. English issued his first written complaint in an email to Mr. Magota, entitled "COMPLAINT AGAINST THE ADMINISTRATOR." In the emailed complaint, Mr. English wrote, in part:

> "MY COMPLAINT IS THAT IT IS IMPROPER THAT THE
> ADMINISTRATOR IS HAVING WORK DONE BY CITY EMPLOYEE
> WHILE ON CITY TIME. I UNDERSTAND THAT WARNINGS HAVE BEEN
> MADE TO THE EMPLOYEE BY HIS SUPERVISOR AND HE HAS EVEN
> BEEN ASKED TO BE MORE DISCRETE. BEING MORE DISCRETE IS NOT
> THE ISSUE AND IT IS NOT THE EMPLOYEE WHO I AM MAKING THE
> COMPLAINT AGAINST. THE ADMINISTRATOR SHOULD KNOW
> BETTER…MY HOPE IS THAT THE ADMINISTRATOR WILL
> UNDERSTAND THE LINES BETWEEN RIGHT AND WRONG AND THAT
> IF HE USES AN EMPLOYEE FROM THIS OFFICE FOR OUTSIDE WORK
> THAT HE MAKE IT CLEAR THAT THE EMPLOYEE MUST DO THE
> WORK OUTSIDE OF WORKING HOURS AND THAT ALL OF THEIR
> COMMUNICATIONS REGARDING OUTSIDE WORK WOULD BE DONE
> OUTSIDE OF WORKING HOURS."

In future emails he authored, Mr. English alleged that he suffered from retaliation due to the above written complaint. In interview, Mr. English reported, "I really didn't want to pick a battle and I was thinking about the division, thinking of protecting the office." He also stated that he tried to be respectful, but "he got on bad side of these guys real quick," due to being a "mainland haole."

In interview, Mr. English cited the lack of a "moral compass" at his place of employment. However, the supervisor's response to OSHA indicates that Mr. English requested permission to use the office fax machine for personal reasons in 2002. According to the supervisor, "Mr.

Magota told him that the fax machine is for work-related purposes and not for personal business. Mr. English then became very upset, gave Mr. Magota a glaring look, and left the building slamming the door behind him."

On February 21, 2002, Mr. English emailed his supervisors (Mrs. Gima, Mr. Magota, and Mr. Kurokawa), in what appears to be an attempt to seek guidance in prioritizing his work. In the email, Mr. English notably expressed his extreme frustration about being "asked to do many things that are of a priority to someone else (or that are not appraiser related functions that is they are more clerical in nature)." Mr. English further wrote: "I am not sure what, if anything, is being done to remedy the situation or even if administration even has a realistic view of the tasks at hand and what it will take to get the job done adequately." According to the supervisor, "Mr. English expected to be treated differently and was always criticizing other employees and management."

On March 1, 2002, Mr. English was promoted to Real Property Appraiser IV. Records also indicate that Mr. English applied for the position of Real Property Appraiser VI on March 29, 2001. However, his Performance Evaluation Report, dated April 12, 2002, showed a decline in his performance on the four ratable performance factors from "exceeds requirements" to "meets requirements." In addition, his supervisors commented, in part:

> "he seems to be having some difficulties in organizing and prioritizing the many and varied tasks associated with his position. He often disagrees with established office work processes and has voiced his opinion as to how he believes things may better be accomplished and resists completing tasks in the prescribed manner...he needs to appreciate that there are constraints we need to work within and that focusing his energies on accomplishing his assigned duties within these constraints is a more productive pursuit."

Mr. English entered a written response to his performance evaluation in which he expressed disagreement with the ratings, as well as portions of the comments. In addition, Mr. English offered his evaluation of the administration, specifically citing Mr. Kurokawa. Mr. English wrote, in part:

> "But it was the lack of foresight, insight, and leadership on behalf of management that caused great confusion. I feel that it is inappropriate to state that I have lack of focus when this may be more of a management problem...It is known by the administrator, the assessor, and individuals within the office, that I have extensive appraisal experience and management experience. I have more management experience than the administrator, the assessor, and any of the supervisors (with the exception of Mike Okamoto)."

On May 13, 2002, Mr. English endorsed his performance evaluation for the period March 1, 2002, to May 31, 2002. Again, Mr. English was rated as "meets requirements" on the four performance factors. He received positive comments and his probationary status was continued as established.

On May 23, 2002, Mr. English began to correspond via email with Mr. Ishiguro regarding his complaint. In the email, Mr. English also wrote about a meeting he had the day before with Mr. Magota and Mrs. Gima. According to Mr. English, he was informed that he "was not complying with scheduled office hours and that [he] had a bad attitude." Mr. English reportedly viewed the claims of his supervisors as "baseless." He also wrote, "I feel they are out to get me." In interview, Mr. English expressed feeling harassed about his schedule.

In an email to Mr. Ishiguro, dated May 28, 2002, Mr. English clarified that his complaint was not so much directed at Mr. Graff, but against Mr. Kurokawa, who "carries the greatest responsibility because he is the one in authority!" Mr. English further wrote, in part, "I have come forward and now I have been subject to scrutiny and complaints against me...There is no doubt that I have voiced my opinion...But it was only after my complaint about Gary (not Chris) that I received such a review." Mr. English also reiterated his view that he had more real estate appraisal and supervisory experience than his supervisors.

On May 31, 2002, an email to Mrs. Gima and Mr. Magota indicated that Mr. English "was just informed by Julie Tamayori that I am being 'watched' by Bob." Mr. English wrote, "This is my second complaint of a hostile work environment. It is interesting to me that all of this including the narrative on my review have come after my complaint about the administrator using C&C [City and County] employees to do work for his private company while on C&C time." In response, Mrs. Gima informed Mr. English that he was not being "watched." She also attempted to explain Mrs. Tamayori's comment. Mr. English later responded to clarify his understanding of his schedule. He also wrote, in part:

> "The reason for my concern is that there is no training for office policies and procedures or even past practices. You kind of have to learn as you go...I am anxious and desiring to get some direction and leadership. It is difficult to come by in this office. I am frequently told that I should already know things...It seems that there is a right way and a wrong way and the RPA way of doing things. That is where I seem to be falling short and that is learning the RPA way."

Mr. English also expressed his concern about being "targeted" in an email to Mr. Ishiguro on May 31, 2002. Mr. English wrote, "I am beginning to feel the harassment because I have said things perhaps that I shouldn't have (at least in their minds). And I am talking about the stuff about Gary."

On June 1, 2002, Mr. English received a raise. However, his performance evaluation report, for the period June 1, 2002 to August 31, 2002, showed a rating of "below requirements" for "attitude toward work." His supervisors commented:

> "Over the course of the past two months, Philip has been encountering some difficulties in independently performing all of the responsibilities of the Appraiser IV position. His performance has been discussed with him on at least three occasions and efforts have been made toward addressing various issues and problems including misunderstandings and miscommunications. Some items that have been addressed include work hours, timely submission and prior approval of leaves from work, and directions for processing various job tasks. At the present

7

time there are some issues that are affecting his attitude and subsequently his work performance."

His supervisors recommended "an additional 3-month probationary period." Mr. English responded in disagreement with the review, as well as "with the 3-month extension of probation." On August 14, 2002, Mr. English apparently met with Mr. Magota and Mrs. Gima for the purpose of discussing his job performance. In his handwritten notes, Mr. English wrote that Mr. Magota "asked me if I felt paranoid and I told him yes and that I wanted to explain." Mr. English also wrote, in part:

> "Since I started here I have felt like an outsider because that is how I am treated...I also explained to Ann [and] Bob that all of this started after I made my complaint about Gary...Bob became very defensive[.] Bob raised his voice and said it has nothing to do with it...Why they want to make me some kind of example I do not know. It doesn't all add up. Bob said many times 'are you overwhelmed with the work!?['] I kept telling him that I am not 'overwhelmed' but that there is more work to be done than can get done in one year!"

According to the supervisor, "Mr. Magota advised Mr. English to seek counseling through the City's Employee Assistance Program," but Mr. English "raised his voice at Mr. Magota and stated there was nothing wrong with him and he didn't need counseling." The supervisor noted that Mr. English openly discussed his personal problems and that "[h]e was constantly portraying himself as the victim and would blame others for his misfortunes." Later, on August 14, 2002, Mr. English informed Mr. Ishiguro of the meeting. Mr. English wrote, "Something does not smell right and I feel that there is some kind of retaliation...I am feeling a great deal of hostility and oppression here."

On August 15, 2002, Mr. English apparently met with Mr. Kurokawa to address his concerns regarding his evaluation. Mr. English's handwritten notes reflect that Mr. Kurokawa indicated, "he knows that it takes a while to get into the mass appraisal system...[Mr. Kurokawa] said it is a three year process." Mr. English wrote, "I told [Mr. Kurokawa] I understand the process." Mr. English further wrote, "I am confused about it and do not understand. I believe there are other motives at play." In an email to Mr. English, dated August 15, 2002, Mr. Kurokawa wrote that he would extend the probationary period for three months and that the evaluation would be amended with a list of goals and objectives. Mr. English responded with disappointment; Mr. English wrote, "It is still very unclear as to why. I am seeking legal counsel as a last resort."

In September 2002, Mr. English reportedly "posted a Help Wanted article...on the employee bulletin board showing mainland job opportunities to express his dissatisfaction at the salaries the City paid its employees." According to the supervisor, Mr. English "was becoming more frustrated and outspoken about his salary. He would tell other employees that he could earn just as much money working for City Mill."

In October 2002, Mr. English requested vacation leave on two days for follow up visits with his physician. On October 21, 2002, Mrs. Gima responded in email that the requested vacation leave would be approved contingent upon completion of an overdue task. Evidently, Mr.

English had already used all of his sick leave. Mr. English responded via email that any delay in completing his task was due to not receiving the support he requested.

On October 30, 2002, Mrs. Gima provided Mr. English with specific instructions regarding a task to be completed by way of email. During the same day, Mr. English expressed his frustration concerning Mrs. Gima to Mr. Ishiguro in a series of emails. Mr. English also indicated that he was uncertain about who to trust. He wrote that he was "being singled out" and that he was being asked to do things that others were not being asked to do. He further wrote, in part:

> "From the beginning when I spoke out about Gary using Chris to do work for his private company while on City and County time things have gone steadily and more rapidly down hill for me. I can not say if all of these things are related for sure or not. But it seems to me at this point that it is pretty clear Gary is letting them (meaning Bob and Ann) have [their] way with me, justified or not. Why is he doing that? If he is supporting his management team then he is just as much involved in the harassment as Ann and Bob. If he is just letting them have their way with me knowing that it is wrong then that too is wrong. Something's not right about this."

On October 31, 2002, Mrs. Gima informed Mr. English that his request for vacation leave on November 1, 2002, was disapproved, as the deadline for his assigned task could not be extended.

On November 12, 2002, Mr. English emailed Mr. Ishiguro about his workload. Mr. English wrote, "It is apparent that they are making an effort to make life as difficult for me as they can...If the models come out badly and there are many appeals again it is the result of not getting the help." Mr. English also detailed his disagreement with the list of objectives added to his evaluation.

Mr. English continued to correspond with Mr. Ishiguro via email on November 13, 2002. Mr. English alleged that Mrs. Gima provided assistance to other workers, but not to him. Mr. English reiterated his stance, "There is a problem with management...they are out to get me. They want me to fail." He also wrote, "The only possible way that I have brought this to me is that I have asked too many of the wrong kinds of questions and they don't like it. Plus I don't just roll over and take it when they do things or say things that they shouldn't be doing and saying." Mr. English concluded, "There is a serious problem with management. I have nothing to lose. I think they went after the wrong guy this time."

In an email to Mr. Ishiguro on November 18, 2002, Mr. English expressed his frustration about attempting to get help from Mrs. Gima. Mr. English wrote, "I know that I am singled out and that she perceives me as a problem for her...I am not sure why she perceives me as a problem...I am getting very little support from my supervisor."

On November 21, 2002, Mr. English emailed Mr. Ishiguro about his telephone conversation with Mr. Waylen Toma, union business agent. Mr. English wrote:

9

"I will tell you that I am thoroughly disappointed. It appears that the union has a very narrow view of this kind of thing and it seems to be some kind of negotiated settlement between Waylen and Gary...Here's the problem. I should never, ever have been on probation in the first place. The reason I was placed on probation was never made clear and appears to be as the result of some form of retaliation for my speaking up."

On November 22, 2002, Mr. English met with Mr. Toma, Mr. Kurokawa, and Mrs. Gima. In his handwritten notes, Mr. English restated his understanding of the meeting, as well as his thoughts concerning the meeting. Mr. English noted that he completed his probationary period for his current position, which meant that the extended probationary period never occurred. He also wrote that Mr. Kurokawa would remove certain portions of the comments in his performance evaluation, if he agreed. Mr. English also recorded his job expectations, including working independently and communicating differently with Mrs. Gima. According to the supervisor's response to OSHA, Mr. English "was given verbal warnings regarding his work performance, insubordination, hostility towards his supervisor, and failure to follow instructions." In addition, Mr. English noted that Mr. Kurokawa offered to move him to another jurisdiction. Mr. English questioned, in his notes, "why does he want to get rid of me?" Mr. English described Mrs. Gima as "quiet most of the time but clearly hostile to me" during the meeting. Mr. English further wrote that Mr. Toma is "a personal friend" of Mr. Kurokawa.

In an email, dated November 25, 2002, Mr. English notified Mr. Ishiguro of the meeting. Mr. English indicated that he was not allowed to question "the motivation behind his [performance evaluations] suddenly becoming so negative." Mr. English wrote about his concern over not being protected from "retaliation or a hostile work environment." Mr. English also expressed his disbelief about being informed that Mrs. Gima found his emails "offensive." Mr. English concluded, "I am on my own...I am still on Bob's sh_t list for reason that remain unknown to me, Ann is still hostile to me...and in some ways I am in a weaker position because now we know that the union is apparently not willing to protect employees from retaliation."

On January 7, 2003, Mrs. Gima requested that Mr. English prepare for a review of his monthly progress and production, as discussed in the November meeting. Mr. English responded that he was unaware of such an agreement. In a letter, dated January 16, 2003, Mr. Toma wrote, "any request by management to meet with you to check on your ongoing work is not subject to any agreement made in the November meeting. I advise you to comply with any reasonable request by management to assess where you are on your workload so that you progress to completing your area of responsibility in a timely manner."

Mr. Graff submitted a "Confidential Workplace Violence Incident Report" to Mr. Mike Golojuch, administrative services officer, on February 12, 2003. In the report, Mr. Graff alleged that Mr. English verbally threatened and intimidated him in person on January 17, 2003, and January 22, 2003, as well as over the telephone on January 18, 2003. Mr. English reportedly informed Mr. Graff about his complaint to the ethics commission. In interview, Mr. English reported that he urged Mr. Graff to "tell them the truth" in order to "get you on the good guys side." In typewritten notes, dated January 21, 2003, Mr. English wrote, "Susan Bender came to my desk...to tell me that Chris has talked to Lee Agsalud and that the word is out not to talk to

me because I might be wearing a wire!" Mr. Graff reportedly notified Mrs. Gima and Mr. Magota about the ethics complaint on January 22, 2003.

Mr. English submitted an application for the position of Real Property Appraiser VI on January 24, 2003. On the same day, Mr. English recorded his perception of a conversation he had with Mrs. Gima, which took place the previous day. Mr. English wrote, "She also was very condescending...She spoke to me as if I was an appraiser trainee. There is no doubt in my mind that is what she thinks of me. There seems to be little I can do to change her perception." On January 29, 2003, Mrs. Gima filed a written complaint against Mr. English alleging concerns of workplace violence. In an interview with Mr. Golojuch, Mrs. Gima stated, "Admittedly I have been at a loss in dealing with him as his behavior is not typical."

In typewritten notes, dated February 5, 2003, Mr. English noted that he received a telephone call in the morning from Mr. Magota requesting a meeting. Mr. English wrote that he met with Mr. Magota shortly thereafter and that he was informed about "a pending disciplinary action" regarding "an unauthorized leave." Later, Mr. English met with Mr. Ishiguro, who explained that "I left on unauthorized leave in October [2002] and when I returned that there was some discussing between Ann and I [that] upset fellow workers who felt so threatened that they left the area." Mr. English denied the incident and wrote that "no one left the area."

In further typewritten notes, Mr. English wrote that upon returning from his meeting with Mr. Ishiguro, he discovered "that my mobile phone had been tampered with." Mr. English also concluded, based on his interaction with one employee, "So it seems that others in my group are unwilling to talk with me." In interview, Mr. English stated that as the complaint proceeded through channels, he noticed that people would not speak to him at work.

On the afternoon of February 5, 2003, Mr. Charles W. Totto, Executive Director and Legal Counsel for the Honolulu Ethics Commission, emailed Mr. Kurokawa. Mr. Totto informed that he "received a complaint involving the alleged use of city resources for non-city purposes by [Mr. Kurokawa] and Chris Graff." In interview, Mr. English stated that "Mr. Totto is Haole," but Supreme Court Justice "Paula Nakayama is Japanese and wants the state to win."

In an email, dated February 6, 2003, Mr. English alleged that Mrs. Gima requested he write letters to taxpayers "in a way that would make it appear that our office had done nothing wrong." Mr. English further wrote:

> "I am not sure what you mean exactly and I feel uncomfortable writing something that may be misleading...I think it becomes an ethical issue if I write a letter that does not reveal the truth and maybe even covers it up. Maybe you can give me an example of how you think the letter should be written. As for me, I have looked at them since Monday when you made the request and I am having a hard time writing them in any different way."

In the same email, Mr. English also indicated "the volume of work that needs to be done and the resources that we have to get it done," as an ethical concern. Mr. English wrote:

11

"I am not sure how I fit into the assessment office. I have always tried to maintain high ethical standards in all of my appraisal practice and since working at this office I feel that I have been ethically challenged on more than one occasion and for more than one reason."

Additionally, Mr. English specified that he "was trying to talk to Bob about when he dressed me down right here in front of Dawn's desk…" In interview, Mr. English reported that Mr. Magota would "dress him down in front others" and that he was "really being demeaned constantly." On February 7, 2003, Mr. Kurokawa emailed Mr. English with questions about his "serious allegations of ethical misconduct." In interview, Mr. English identified the email as "threatening" and "very accusatory."

On February 10, 2003, Mr. English met with Mrs. Gima, Mr. Magota, and Mr. Kevin Mulligan, HGEA union agent. Mr. English was issued a verbal warning for an October 25, 2002, incident "regarding an act of insubordination, hostility towards his supervisor, and failure to follow instructions." The contents of the meeting were reportedly discussed previously on January 15, 2003, with Mr. Golojuch, Mr. Magota, and Ms. Violet Lee of personnel. In his handwritten notes pertaining to the meeting, Mr. English wrote that Mr. Magota "suggested I seek counseling for my 'personal' problems and I told him any personal situation was not the problem but that I have been very stressed over the situation at the office." According to the supervisor's response to OSHA, "Mr. English also said that if other employees don't come forward and tell the truth, their lifestyles are going to change."

In an email to Mrs. Gima, dated February 14, 2003, Mr. English responded to six work-related questions posed to him by Mrs. Gima. Mr. English wrote, in part:

> I can only say at this point that I am feeling extraordinarily frustrated and harassed…There have been false claims made against me and I am experiencing a great deal of pressure due to retaliatory tactics because of a complaint that I made months ago that has resulted in an ongoing Ethics Commission investigation into unethical activities of Gary Kurokawa, the Administrator and other(s) City and County employees…I am doing my best to do a good job under the circumstances. When I ask for direction and assistance I do not get it. Instead I get continued harassment, accusations, and attempts to thwart my ability to do my job."

On February 27, 2003, Mr. Golojuch reportedly notified Mr. English about an investigation concerning the "City's Workplace Violence Policy." Mr. English is reportedly being investigated for "threatening and abusive behavior towards other employees" and "recent acts of insubordination and work performance issues." In the supervisor's response for OSHA, the supervisor alleges that "Mr. English may be using this claim of stress to delay [the two] ongoing internal investigations by the employer." In interview, Mr. English shared his view that his employer was "maneuvering to fire" him. On February 28, 2003, Mr. English filed his workers' compensation claim with Mr. Riddle.

On March 12, 2003, Mr. Golojuch submitted an interim investigation report regarding the allegations of workplace violence by Mr. English. On February 10, 2003, and February 12,

2003, Mr. Golojuch conducted interviews of several relevant employees. Mr. Golojuch concluded that "there is a concern that Phil's behavior has upset several employees of the Real Property Assessment Division...[but] there does not appear to be sufficient evidence to conclude that Phil has actually verbally threaten[ed] or taken physical action against other employees in the context of workplace violence." Mr. Golojuch also identified the presence of "some sort of friction between Phil English and his supervisor Ann Gima." Mr. Golojuch recommended that Mr. English seek assistance through the Employee Assistance Program and/or his private medical provider. Mr. Golojuch also concluded:

> "Since he has raised Ethics issues, he considers himself protected under the whistle blower provisions. This is true for any retaliation. However, nothing found during the investigation revealed that Phil is under retaliation. Instead, there is a concern that Phil's behavior may lead to something violent. He is soft-spoken and calm in appearance but has raised his voice and thrown things when confronted. Several people consider his behavior to be something like Byron Uyesugi and the Xerox case (shootings). Whether violent or not, his work performance may be less than satisfactory and his behavior inappropriate and/or insubordinate requiring administrative action."

In interview, Mr. English reported that he continued to feel harassed and retaliated against after leaving his place of employment. Mr. English accused Mr. Graff of making veiled threats, asking "if he had an escape plan if his boat would sink." Mr. English also alleged that "someone called the harbor master, a friend of Mr. Graff's," to question him about living on his boat. Mr. English further reported receiving only half of his vacation pay and letters from his employer, including his annual performance evaluation, dated April 22, 2003.

Mr. English reported that he believes his career as an appraiser and supervisor is finished. He believes he should be sent to college for retraining. Mr. English reported experiencing the following symptoms: difficulty sleeping, nightmares, tearful, isolative, hyperalert, stomach problems, and migraine headaches. Mr. English's support network is reportedly limited to Frank Ramil, who is a pastor of the Fellowship Bible Church.

## Clinical History

### Family and Social History

Mr. English is the fourth of six children born to Howard and Phyllis English. Mr. English's parents met when his father was in the Navy and stationed in Boston. After his parents married, the family traveled with the father in his service. Mr. English was born in Long Beach, California while his father was on service duty in the Pacific. He was raised in Pasadena, California.

Mr. English reported that he has one brother, who is deceased. This brother, who is just older than Mr. English, died in early childhood from pneumonia. Mr. English reported that other members of his family are still living. However, his mother is reportedly in ill health, as she was recently diagnosed with lung cancer.

Mr. English reported that the marriage to his high school sweetheart lasted six years, with the latter two spent separated. After his divorce he remarried for a second time in 1984, at age 30. Mr. English met his second wife, Corlis Jean Chang, while she attended law school. In 1997, the couple moved to Hawaii to be near her family. Mr. English reported that the marriage was good during the first five years, during which time their son, Sean, was born. Mr. English's son is now age 13.

Mr. English reported that he developed a successful business and his wife worked as well. The couple bought a home in the Kahala area; they were stable financially. Mr. English reported that he was shocked when his second wife served him with divorce papers in 1998. He stated he was aware that their relationship was struggling, but he had no idea that his wife was considering a divorce. Mr. English stated that he discovered his wife was seeing another guy regularly. He stated that he did not want to part on acrimonious terms, and unfortunately made the conscious decision not to aggressively litigate the outcome, against his attorney's advice. According to the supervisor's response to OSHA, Mr. English "said his wife knew the judge and his attorney did a poor job of representing him, which resulted in an unfavorable outcome for him." Additionally, according to the supervisor, "He would also complain that his second wife accused him of abusing her, which he says never happened." The divorce was finalized in March 1999.

Mr. English's second wife paid him $25,000 for the division of property and allocation of responsibility for debts, as indicated in the Agreement Incident to Divorce. Mr. English also withdrew $77,000 from his second wife's retirement plan as part of the settlement. On August 15, 2000, Mr. English filed for Chapter 7 bankruptcy. On February 28, 2001, Mr. English was granted a discharge by the District of Hawaii, United States Bankruptcy Court.

Mr. English reported that he presently has frequent visitation with his son, whom he claims to be very close to. However, Mr. English reportedly does not share in the co-parenting of his son, as his ex-wife will only communicate with him indirectly. According to the supervisor's response to OSHA, Mr. English attempted to gain custody of his son. The supervisor wrote: "[Mr. English] stated that his second wife was doing a poor job raising their son and he was concerned for the child's welfare...He had strong suspicions that his son was being molested at the Catholic school he is enrolled in." In interview, Mr. English stated he told his son that when he was 8-years-old he wanted to kill himself. Mr. English reported that his disclosure deeply affected his son and his second wife viewed this as an attack.

Mr. English reported that he remarried for a third time, in June 2000. This was the same month when he was hired at the Department of Budget and Fiscal Service. Mr. English stated that the marriage has been strained due to his troubles with work. His third wife reportedly separated from him after he told her that he was going to lose his job. According to Mr. English, his third wife told him, "You are going down and I want out." Mr. English stated he understands that his third wife looked to him to be a breadwinner and someone she could count on settling down with. He further stated that he understands her point of view and does not hold ill feelings toward her. Mr. English disclosed that the separation is still painful for him, though he reported that he is able to cope with her decision. At this point, Mr. English is reportedly uncertain about when they will divorce.

14

## Academic and Prior Employment History

Mr. English attended Longfellow Elementary School, and then Elliott Junior High School.  In 1972, Mr. English graduated from John Muir High School.  After graduating from high school, Mr. English attended Pasadena Community College.  He later transferred to California State, and then University of Southern California, where he was awarded scholarship for his musical skills playing the trumpet.  During his college years, Mr. English married his high school sweetheart.  He subsequently withdrew from his studies in order to support his family.  Mr. English reported that he did not complete his university education.

Mr. English reported that he has been in the real estate appraisal business for 23 years.  According to Mr. English, he was initially trained in California and he worked for several banks performing these duties.  After moving to Hawaii, Mr. English reportedly opened his own practice, which at one point was thriving with twelve employees.  In 1999, however, his company reportedly suffered from a recession and subsequently downsized to two employees.  After Mr. English underwent cancer surgery, he was reportedly advised by his doctors to seek employment with greater stability, other than a private practice, in order to diminish stress and to ensure long-term health benefits.  Mr. English reported this as the reason he chose to seek employment with the City and County of Honolulu.

## Medical and Psychiatric History

Mr. English reported that he experienced his first episode of depression during the period of marital turmoil with his second wife, in 1998.  He stated that he attempted suicide twice; the first with a large bottle of aspirin and the second by hanging.  After the first attempt, Mr. English was reportedly admitted to the Queen's Medical Center.  Subsequently, Mr. English and his second wife reportedly attended marriage counseling at Biodyne for approximately one year.

In June 1998, Mr. English reportedly fell from a height of fifteen feet.  He stated that he was unconscious, and that he could not breathe or call for help.  Mr. English was eventually transported to the emergency room, where the medical doctors "found something" on his kidney.  Mr. English reported that one hour after he was served divorce papers from his second wife, he was contacted by his physician, who informed that he had cancer of the kidney.  In November 1998, Mr. English underwent a nephrectomy and he has not had any recurrence since.  Mr. English, though, reportedly suffers the residuals of surgery with adhesions on the side.

On January 30, 2003, Mr. English presented at the Kaiser Permanente for the complaint of "undue stress related to work/job situation."  Medical records indicate that Mr. English reported a disturbance in sleep and weight loss.  James E. Love, M.D., an internist, recorded his assessment as an unspecified anxiety and referred Mr. English for Behavior Medicine.  The Kaiser Permanente medical records indicate that Mr. English was seen on February 12, 2003.  However, no data were provided regarding this visit.  On February 13, 2003, Mr. English visited the Kaiser Permanente emergency room, with complaints of anxiety and stress.

On February 27, 2003, Mr. English visited with Mr. Gerald L. Coffee, clinical therapist, for a second session (records of the first session were not provided).  Records indicate that Mr. English reported "ongoing anxiety due to harassment at work and isolation from co-workers."

15

Mr. Coffee noted the signs and symptoms of depressed mood, decreased energy, low self-esteem, sense of hopelessness, uncertainty about the future, isolation/social withdrawal, and limited to no support system. In his assessment, Mr. Coffee noted an unspecified work-related stress disorder, with a plan for supportive counseling.

On March 10, 2003, Mr. English visited with Mr. Coffee for a fourth session (records of the third session were not provided). Mr. English presented for "depression" and "occupation-related stress disorder." His signs and symptoms included: appetite disturbance, decreased energy, feeling like "body is shutting down," "frequent and hard naps," decreased motivation, loss of interest in regular activities, sense of hopelessness, feeling his "career and life are over," "more feeling anxious rather than suicidal," isolation/social withdrawal, "difficulty controlling worry in public places," "upset when confronted with person or situation," "attempted to return to work could not," limited social support, feeling "angry with employer for creating a [difficult] situation," "lack of motivation for behavioral change, and "holding onto moral outrage [regarding] unfairness of [situation]." Mr. Coffee provided the assessment of unspecified depression and recommended "reality therapy."

In interview, Mr. English stated that he has depression, diagnosed by his internal medicine physician and his psychologist. According to Mr. English, he was placed on medical leave at "their" direction, not at his request. Further, Mr. English described a course of emotional deterioration. He reported that his situation has worsened with the absence of a paycheck for six weeks. He reportedly borrowed money from his pastor in order to get by. He stated that the money problem heightened to the point where he again felt suicidal.

## Mental Status Examination (MSE)

A Mental Status Examination (MSE) is an assessment of the client's state of mind. It refers to my trained clinical observations about Mr. English and his behavior, which are *separate* from his self-report and from the psychological test data. Mr. English's mental status was assessed throughout the course of our face-to-face interview and testing in Honolulu on April 18, 2003. The details of his MSE are provided below.

Mr. English presented as a well nourished, Caucasian male of medium height and stocky stature, who appeared proximate to his stated age of 48. He is blue-eyed with short, blond, thinning hair. He appeared for the evaluation clean shaven. Mr. English wore an immaculately trimmed goatee, which showed white around the edges. He was cleanly dressed in an ironed, white sleeved shirt with jeans pants and slip on leather shoes.

*Mood* is a pervasive and sustained emotion experienced by the individual being assessed. Mr. English's mood state appeared calm and he presented as anxious, though polite and pleasant. *Affect* refers to the outward manifestation of a person's mood. It is a way a person shows their feelings. Mr. English demonstrated a range of expression which was appropriate to the subject matter.

*Thought Process* refers to the form and flow of the person's thoughts in conversation. Mr. English's thinking was linear and goal directed. He denied any history of racing or dulled

16

thoughts. *Thought content* refers to the ideas one expresses. Mr. English maintains the belief system that he has been unfairly persecuted at work, and that he has been the target of slurs, where he is reportedly viewed by others at work as a potentially dangerous individual, who others says he is capable of harming others in the workplace. He has documented this point of view over the course of many months. His employer and coworkers maintain a different view. It is doubtful that Mr. English has a delusional disorder, rather the perceptions of all appear to be at opposite ends of a normative spectrum. *A thought disorder* is a disturbance of thought content, thought process, or both. A *formal thought disorder* specifically denotes abnormal thought process. Mr. English denied any history of hallucinations, illusions, depersonalization or derealization.

Mr. English was not formally tested for intelligence due to the limitations of time. No abnormalities in orientation were noted. Mr. English's current and remote memory functions appeared intact; he appeared to be an accurate historian with recall for both factual and emotional detail.

**Psychological Testing**

Mr. English was administered a battery of psychological tests for the purpose of empirically describing his current personality structure and psychological functioning. The results from these tests are described below.

## Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

The most widely used psychological measure for evaluation of a person's mental health status in personal injury is the MMPI-2. It is also the most widely used instrument in forensic assessment and in personality-clinical research. The MMPI-2 is a paper and pencil questionnaire comprised of 567 symptoms, beliefs, and attitudes that reflect potential mental health problems in test takers who respond honestly to the items.

Mr. English's responses were scored using the Minnesota Report created by Dr. James N. Butcher. Mr. English's MMPI-2 profile was not interpretively valid for statistical analysis and normative based comparisons. The validity scales revealed that Mr. English responded in an exaggerated manner, as he endorsed an extreme number of symptoms and attitudes. The degree and consistency of Mr. English's item response pattern indicates that the results likely arise from either a magnified "plea for help" or severe psychological deterioration. Based upon my clinical interviewing of Mr. English, I am of the opinion that the former is more likely the case.

## Personality Assessment Inventory (PAI)

Mr. English was administered the Personality Assessment Inventory (PAI), which is an objective test of personality and psychopathology. It is designed to provide diagnostic information on critical client variables. The test contains 344 items that are answered on a four-alternative scale. Each response is weighted according to the intensity of the feature.

17

The PAI provides a number of validity indices that are designed to provide an assessment of factors that could distort the results of testing. Mr. English did not respond to two complete pages of the seven page test booklet. With so many unanswered items, the profile could not be generated for clinical interpretation.

**Butcher Treatment Planning Inventory (BTPI)**

The Butcher Treatment Planning Inventory (BTPI) is a 210-item self-report measure used to assess relevant personality and symptomatic information for purposes of treatment development. It is a normative-based, behaviorally oriented instrument that specifically addresses the individual's attitude toward treatment, personality factors involved in psychotherapeutic treatment, and motivational factors that can interfere with the change process.

Protocol Validity

Mr. English's elevated Exaggeration scale (EXA) indicates that he endorsed a considerable number of symptoms on the BTPI. His pattern of symptom endorsement, however, is a relatively common occurrence among individuals presenting for psychotherapy. This finding is consistent with the MMPI-2 findings, where he is overtly endorsing acute emotional distress.

Treatment Issue Scales

Mr. English scored extremely high on the Somatization (SOM) scale, which suggests that he endorsed experiencing a considerable amount of physical distress at the time of testing. The results of this finding, on first glance suggest that Mr. English may feel that his problems are physical and he prefers to avoid dealing with emotional conflict in a direct manner. On the other hand, Mr. English is a cancer survivor who has had complications from his surgery. This may account for some of the elevation on this scale as well. When the results are more closely examined in terms of content responses, Mr. English endorsed having many symptoms which are commonly associated with channeling psychological conflict into physical symptoms, (e.g., headache, pain, stomach distress).

The BTPI results identified self-views that may warrant address in treatment. Mr. English's elevated Environment (ENV) scale suggests that he views others in his environment as being unsupportive and that he is inclined to feel isolated, alone, and unloved. Mr. English also obtained a very high score on the Relationship (REL) scale, which demonstrates that he acknowledges having considerable difficulty relating to other people at this time. Both findings are consistent with what Mr. English reports in clinical interview. He feels alone, unsupported and that his environment is unhappy.

Current Symptom Scales

Mr. English reported an extreme number of symptoms that reflect the presence of a possible mood disorder. The significantly elevated Depression (DEP) scale indicates he feels very depressed, with an insufficient amount of energy to follow through in his daily activities. On the BTPI, Mr. English also reported that he has trouble sleeping and he feels tired all the time.

Philip English IPE                                                    July 30, 2003

Moreover, he feels his life is filled with so much unpleasantness that he has difficulty just getting by.

In addition, Mr. English's very high Anxiety (ANX) scale suggests that he feels very anxious, tense, and fearful. His daily functioning may be severely impaired, due to his worries, inability to concentrate, and ineffective decision-making.

Mr. English also obtained a high score on the A-I scale, which shows that he tends to internalize anger and punish himself unreasonably at times. Mr. English further reported the presence of low self-esteem, to such a degree that he typically assumes a subservient role in interpersonal situations. His high score on the Psychotic Thinking (PSY) scale reflects the presence of very unusual thinking and the experience of having difficulty with his thought processes.

Treatment Planning

Informing Mr. English about what appears to be a tendency to internalize emotional conflict into physical symptoms should be a fundamental consideration. Given the fact that his physicians suggested that he obtain a less stressful government position for his health as a post-cancer survivor, Mr. English needs to consider whether the work environment is has been in with the government is in the best interests of his own health.

If Mr. English is approached about his mental health in view of the related issues concerning his long term physical health, he is likely to be more responsive. Given his prior history of cancer, a medical consultation is recommended to determine what portion of his symptoms relate to medical concerns and what symptoms are driven from a mental health problem.

Mr. English's BTPI results show that since Mr. English perceives he is living in an unsupportive environment. This lack of a supportive context for change can prove frustrating to his efforts at self-improvement. It appears that he is in need of therapeutic intervention, preferably from an individual who can address the physical and psychological needs. Moreover, his severe depressive symptoms need to be targeted in early therapeutic sessions, with either cognitive-behavioral or dynamic treatment strategies and perhaps with pharmacology.

### Analysis of Claim

1.     **Diagnosis and prognosis of the patient's current condition.**

Based upon my analysis of the above reported clinical interview, mental status examination and test results, as well as a review of pertinent collateral materials, I am of the opinion that Mr. English meets criteria for the following DSM-IV-TR disorders:

|  |  |
|---|---|
| **Axis I:** | **Clinical Disorders** |
| 296.33 | Major Depression, Recurrent, Severe without psychotic features; with history of interepisode recovery |
| V62.2 | Occupational Problem |

19

| Axis II: | Personality Disorders |
|---|---|
| V71.09 | No diagnosis or condition observed |
| Axis III: | General Medical Conditions |
| | History of kidney cancer with nephrectomy |
| Axis IV: | Psychosocial and Environmental Problems |

Problems with primary support group—marital separation; ill health of mother; child visitation difficulties with ex-spouse

Problems related to the social environment—inadequate social support; living alone; difficulty with acculturation; feelings of discrimination; adjustment to current transition

Occupational Problems—difficult work conditions; job dissatisfaction; discord with boss and co-workers

Housing problems—recent complaint by boatyard manager with potential eviction

Economic problems—financial problems while off from work

| Axis V: | Global Assessment of Functioning Scale |
|---|---|

Global Assessment of Functioning = 55 (current)

**2.     What are the patient's current conditions a result of?**

There are a number of factors which contribute to the mental functioning picture of Mr. English at this time.  Prior to his hire with the Department of Budget and Fiscal Services for the City and County of Honolulu, Mr. English had several life problems.  Since 1998, he has had a number of serious problems, each of which could have a negative sustained impact upon his functioning. Mr. English has undergone surgery for cancer; he experienced a difficult divorce with continued problems relating to visitation with his 13 year old son; he has had severe financial problems after been successful.  Mr. English reported two suicide attempts during the break-up of his second marriage.  His third marriage has since undergone difficulties and Mr. English reports that he anticipates it will also end in divorce.

In terms of Mr. English's work situation, he has made claim that he has received unfair, discriminatory treatment at work from his supervisors.  He is of the opinion that the response he has received is directly related to his address of ethical improprieties in the work place.  He is of the belief that his inability to cope any longer at work was the result of an eroded work environment where he was not accepted, appreciated, or viewed as a collaborative worker.  Since

20

Mr. English has prided himself on a superior work ethic, this perceived attitude toward him has been exceptionally difficult.

**3.**    **Identifying any pre-existing conditions that have caused or contributed to the patient's current condition.**

As stated above, there are a number of pre-existing conditions which may well contribute to Mr. English's current mental state. Psychology is not an exact science and it is not possible for me to determine how much of his difficulties preceded his current difficulties with work or are sustained in the depression he presently has. Clearly, Mr. English has a history of severe depression, and he has had some significant physical problems. Additionally, Mr. English has had a number of relationship problems in the past five years.

Based upon the performance appraisal reports of Mr. English when he initially started working for the Department of Budget and Fiscal Services, he was viewed by others as performing his duties well. It appears his performance was documented to have deteriorated at the time period when he became concerned about potential ethical problems on the job.

Based upon the reports of all, Mr. English and his superiors at the Department of Budget and Fiscal Services are at a point where the work relationship amongst all parties is severely damaged. Both employer and employee report they have been wronged, and, separate from work tasks, emotional attachments have been eroded to a point which may not allow for repair.

**4.**    **Identifying any subsequent non work related injuries or issues that may be the cause of the patient's current condition.**

Mr. English is not coping well with being out of work. The process of an ethics investigation, coupled with his own workers' compensation claim, is very unpleasant and emotionally disturbing for Mr. English. He is uncomfortable being the focus of attention.

Mr. English has several family issues which are painful. He is separated from his third wife, he has difficulties concerning visitation with his son, and his mother is ill with cancer. He cares about loved ones, therefore these issues impact on his well being.

**5.**    **If in your opinion, further psychotherapy is warranted, please provide us with your recommendations for future treatment.**

Yes, I am of the opinion that Mr. English's mental condition warrants psychotherapeutic, and possibly psychopharmacological treatment for his depression and for coping with the situational difficulties he is presently experiencing. His support system is limited, and, should he be willing, he could benefit from a course of cognitive-behavioral or dynamic psychotherapeutic treatment. The therapy should help with easing symptoms of depression and with methods for coping with his situational problems. Mr. English is at a point in his life where he will need to re-evaluate his career path. He may benefit from therapy to clarify personal issues and in seeking potential shifts in employment direction. I believe his treatment can be accomplished on an outpatient basis. The length of treatment will depend upon the course of ongoing work-related

21

stressors Mr. English continues to experience. I would recommend that, at a minimum, that Mr. English be afforded opportunity to seek psychotherapy at least once, if not twice weekly, for a course of six months. I believe that at the end of this time frame, his treatment provider would be in a position to report on Mr. English's mental functioning and further therapeutic needs.

**6.      In your opinion, is the patient able to return to full duty at his usual and customary duties from a psychological standpoint?**

I do not believe that Mr. English is able to return to his usual and customary duties in the same work place, either part-time or full time. Mr. English and people at his place of employment appear to have a damaged, if not irreparable relationship. Given the fact that an ethics investigation is active, Mr. English will continue to perceive experiencing untoward feelings. He may also experience others avoiding him. Taken together, these experiences will not help him in his depression. His functioning will likely be compromised by his reported ability to be motivated, able to concentrate and perform without undue emotional drain.

If there is an alternate placement for Mr. English, depending upon what is made available, I do believe that he could return to part-time, or possibly full time work. Should he be given an opportunity to work elsewhere, I would recommend that the sanctions he has received by either suspended or kept at the other place of work, and not transferred to where he might be placed.

**a.      If not, please identify what his current disability is attributed to.**

As stated above, a number of factors, many of which are *not* work related are affecting Mr. English.

**b.      If patient is incapable of returning to his usual and customary duties, are his restrictions permanent?**

Mr. English and his employers will need to decide whether they are able to work together again. For some time Mr. English has documented his problems with his supervisors. More recently, his supervisors have been documenting their problems with Mr. English. My clinical interviews of various parties suggest that they have a long way to go before reaching a common ground where the workplace will have minimized tensions.

I am of the opinion that Mr. English can resume some type of work. I am not familiar with the Real Property Assessment Division of the department of Budget and Fiscal Services for the City and County of Honolulu, so am unable to make any specific recommendations regarding what might be available to him. If a temporary or permanent reassignment for Mr. English is possible, then a possible alternative to reinstating Mr. English at his former work station would be to place him somewhere else. If this is not possible, then I believe both parties will need to make an effort to repair a seriously eroded relationship. I do not know whether Mr. English qualifies for certain protection concerning the ethics complaint, and defer that judgment to labor specialists.

All opinions expressed in this report are to a reasonable psychological certainty. In keeping with standard practice, my findings are provisional insofar as other information may become available for consideration.

Thank you for the opportunity of being able to evaluate Mr. English. If further questions or issues arise, please contact me at (808) 923-2266.

Respectfully submitted,

Reneau Kennedy, Ed.D
Clinical and Forensic Psychologist
Massachusetts and Hawaii Licensed

23