DARYL MATTHEWS, M.D., PH.D.
TERESA LATHROP, M.F.T.
DARYL FUJII, PH.D.
TODD ELWYN, M.D., J.D.
SHEILA WENDLER, M.D.

HAWAI'I FORENSIC ASSOCIATES, LLC
345 QUEEN STREET, SUITE 900
HONOLULU, HAWAI'I 96813
PHONE: 808-735-8505
FAX: 808-955-0933

FORENSIC CONSULTANTS IN PSYCHIATRY,
PSYCHOLOGY, AND THE BEHAVIORAL SCIENCES

January 25, 2006

Roger S. Moseley, Esq.
Moseley Biehl Tsugawa Lau & Muzzi
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii 96813

RE: English vs. City & County of Honolulu
Civil No. 04-00108 JMS-KSC

Dear Mr. Moseley:

I reviewed the material you provided me and examined Mr. English in my office on
08/08/2005. My assistant, Teresa Lathrop, M.S., M.F.T., also participated in the
examination. Prior to the examination, I explained to Mr. English that the
examination was being conducted at your request and that I would be preparing a
report that would be directed to you concerning his psychiatric condition and its
relationship to his legal suit. Thus, the evaluation was not confidential. I also
explained to him that I would not undertake to provide him with any medical
treatment or advice. Mr. English understood these considerations and agreed to
proceed with the examination.

It should be noted that this report is reliant on my examination of Mr. English and
the records made available to me. Not all records were received in time to be
included in this report. Further record review may change the findings of this
report.

**Brief Overview of the Problem**

Mr. English was employed as a Real Estate Appraiser for the City and County of
Honolulu. He reported that he suffered retaliation at the hands of his administrators
and co-workers after he complained to them about one of his administrators having
his own personal/ private work done by a city employee on city time. He alleges that
the stress and retaliation at work eventually became so severe that he became
symptomatic and eventually was ordered by his physician off all work.

**Psychiatric Symptoms**

Mr. English described current psychiatric symptoms as insomnia, isolative behaviors,
weight loss, feelings of being violated, anxiety, paranoia, confusion and difficulty
concentrating, tearfulness, emotional and physical fatigue, depression, hopelessness,
constant ruminations, frustrations, and low self-esteem/lack of confidence.

In addition, his examination and records reveal a history of long- standing
personality traits including moralistic/unrealistic values; loneliness; feelings of being
misunderstood; self-importance; preoccupation with rules and details; perfectionism;





EXHIBIT
105
8-16-06 Matthews

Roger Moseley
Re: Philip English
January 25, 2006
Page 2 of 52

over-conscientious or scrupulous behaviors with inflexibility, rigidity and
stubbornness.

### History of the Problem

Mr. English stated that he applied for a City and County of Honolulu Appraiser
position. At the time, there were several higher level positions open. He had
extensive experience managing his own appraiser company and was told that he
qualified for Administrator of the Tax Assessment Department. He said at the time
Gary Kurokawa was an acquaintance of his and had been serving as the "acting"
administrator. Mr. English said that he applied as instructed, but that Mr. Kurokawa
got the job on a permanent basis. The "second in command" position, Manager of
Appraisal Operations, was also open. Mr. English, again, was encouraged to apply.
He said that after his interview for the position, the Corporate counselor told him
that he was the most "outstanding applicant" for the position. However, again the
"acting" manager, Bob Magota, received the permanent position. Mr. English pointed
out that he was tested for these positions and qualified for each one. In fact, his
highest ratings were for the management positions. The only current open position
after the management positions were filled was for Appraiser Trainee. Mr. English
took the position. Within the next years he did well and was advanced from
Appraiser II to Appraiser III to Appraiser IV.

Mr. English said that he became good friends with his manager, Bob Magota. Mr.
English had been through cancer treatments. He said that Mr. Magota's wife had a
similar cancer illness and they had a lot in common. Mr. Magota had been the one
who encouraged him to apply for the supervisory positions. Mr. English expressed
that he was new to this type of appraising. He said that he had always done real
estate appraising, but that this appraising was more like "mass appraisals." It was
similar yet different from his experiences.

Mr. English also became friends with Chris Graff, another appraiser. He enjoyed his
friendship with Mr. Graff and described him as a "very gregarious guy." However, he
said that he began to observe Mr. Graff doing some things on the job that disturbed
him. He said that he observed Mr. Graff doing appraisal work for Gary Kurokawa's
private company, GK Appraisals, on City and County time. He said that he observed
Mr. Graff performing these type "jobs" for Mr. Kurokawa's company on a regular
basis. Mr. English's desk was next to Mr. Graff's desk and Mr. English stated that Mr.
Graff frequently asked him questions about "this or that" having to do with his
performance of this private company work on City time. He said that the office set
up for the Appraisers is a very open one, and "everyone" could see what everyone
else was doing. He related that sometimes the secretaries would take messages and
handle phone calls regarding this private company's work.

Mr. English said that at around this same time, the newspapers had reported that
one of Honolulu's City Council members had gone to jail for having her City Council
staff perform her private work. He said that he told Mr. Graff that he needed to stop
doing this type thing on the job, but Mr. Graff ignored him. Mr. English stated that
he became more and more worried about Mr. Graff's unethical behavior. He
reported that he began to feel that if he did not say something or do something, he
was condoning the behavior. In October 2001, Mr. English reported that he became
so distressed by this continued behavior that he approached his direct supervisor,

Exhibit 105-00002

Roger Moseley
Re: Philip English
January 25, 2006
Page 3 of 52

Ann Gima. He told her what was going on and he said that she responded, "Mind your own business and do your own work."

A few weeks later, Mr. English was still disturbed by the situation, perhaps more disturbed because of what Ms. Gima had said to him. He said that he approached his friend, Bob Magota. Mr. English said that Bob Magota was somewhat concerned, but according to Mr. English, Mr. Magota warned him, "'Phil I wouldn't pursue this, it's your word against theirs.'" However, Mr. Magota also agreed to talk to Gary Kurokawa.

Mr. English said that a day or two later, Mr. Graff approached him and told him that there had been a meeting. Retired Appraiser, David Matsunai, had also been involved in the GK Appraisals' work. Mr. Kurokawa met with Mr. Matsunai and Mr. Graff and informed them that they could keep doing what they were doing, but they needed to be more discreet. Mr. English said that he told Mr. Graff, "That's not enough, you need to stop." On or around February 15, 2002, Mr. English stated that he documented these issues in an email to Bob Magota. He reported the situation as he saw it and asked, "What are you guys gonna do about it?" At the time, Mr. English said that he was still only attempting to get them to stop, as he put it, "pull them up ethically." He said that Bob responded to his email verbally rather then in writing and told him that he was going to deal with the situation. However, Mr. English stated that because of his law suit, he has now been privy to all of the interoffice emails. He stated that he now knew that they were writing emails to each other that said, "'Phil's in a panic, we need to straighten him out.'"

By April or May 2002, Mr. English said that Bob had called him into his office. He alleged that Bob began to speak to him in a very negative manner. He said, "Bob would say, 'you don't like your job much do you?'" He said that Bob talked to him in a threatening manner and pointed out that he was coming in late, not doing paper work correctly, and giving his opinion too much. In addition, his evaluations which had always indicated that he was doing quite well, were now indicating that he was not up to standards.

At his next review, he said that it was noted that he had trouble with work assignments and not following office procedures. He was placed on probation. He reported that he kept asking Bob and Ann Gima to inform him of what was not up to standard so that he could correct it. He asked for a list of what he was doing wrong. However, he stated that they were never clear with him. He contested the probationary status. He said that Dwight Ishigura, a union representative, started communicating with him to help him with questions and paper work.

Mr. English complained bitterly that he often sought help from Ann Gima. He alleged that she was highly critical of him and his work, but refused to help him understand what he was doing incorrectly. He alleged that she said, "'Don't ask me stupid questions, go ask someone else.'" He said that when he would ask the other appraisers, he would get different answers from each. He complained that the office had no clear or written protocols for handling certain situations.

He reported that he began to feel more and more pressure and stress. Mr. English said that prior to taking the City and County position, he had been in the process of rebuilding his life after a nasty divorce. He indicated that the problems at work were

Exhibit 105-00003

Roger Moseley
Re: Philip English
January 25, 2006
Page 4 of 52

seeping into his personal life. He felt tremendous pressure and stress and brought that attitude home with him to his new wife. He stated that she could tell that her husband was falling apart emotionally and she was extremely worried along with him that he would loose his job and they would have great financial difficulties. He said that they had probably married too quickly. She was a young woman from Thailand and needed financial stability. He reported that on one occasion he shared his marital difficulties with his supervisor, Ann Gima, and she wrote a very sympathetic email to him stating how sorry she was that he was having such a rough time.

Mr. English described his work load. He had been assigned the Waikiki condos which were in the process of being reclassified and in this process of reclassification, the tax rates went up. In addition, he alleged that his office changed the rules and made the reclassifications retroactive. He believed that this may have been illegal, but could not convince his supervisors that this should not be done. This resulted in an exorbitant amount of appraisal appeals. Mr. English said that during one year his appeals alone amounted to one quarter of the appeals handled by the entire office. He was having great difficulty handling this type work load and was upset and emotionally stressed.

One of his friends, Julie Tamaori, wrote an email to him and informed him that Bob Magota was having him watched. He confronted his supervisor in an email, but she told him that they were not watching him. He said that he began to doubt whether his union representative was looking out for his best interests. After he had been placed on probation, his union representative, Waylen, did not call him back from August to November. He said that Waylen had secret meetings with his administration and counseled them that the three months probation was not done correctly. As a result, they told Mr. English that they were going to "pass" on the probation, or in his words, "act like it never happened." They typed out a new review form, not the one he had signed, but did not inform him that they had placed him on probation in a faulty manner. Mr. English stated that he was suspicious of whether Waylen was actually operating in his best interests. He asked Waylen, "What is your relationship with Gary and Ann?" He said that Waylen informed him that they were his personal friends and that if it came to a hearing, he would testify on behalf of them and not Mr. English.

Mr. English started looking for an attorney. He said that it was difficult to find someone who would take his case. He knew Roger Moseley from his appraisal work and Mr. Moseley was willing to help him. Mr. English and his attorney went to the Ethics Commissioner. He said that the commissioner asked him to "wear a wire" in order to catch people in the act of working for a private company on City and County time, however, Mr. English declined. He said that he was not deceptive and did not feel comfortable handling things in this manner. However, he said that Susan Bendler, one of the Corporate attorneys, had informed him that the word was around that he might be wearing a wire. He believed Susan to be attempting to help him. Soon, he said that no one would even talk to him in the office. He feared his co-workers believed that he might be attempting to catch them doing something wrong. He also stated that he was contacted by the Federal Bureau of Investigation. The FBI agent questioned him about whether his division was giving favors to Jeremy Harris. He said that he did not know anything about issues with Jeremy Harris.

Roger Moseley
Re: Philip English
January 25, 2006
Page 5 of 52

Mr. English said that he believed that Chris Graff was the best person to approach in order to prove the situation. He said that he went to him and that Chris was grateful that he told him about the Ethics Commission investigation. He said that Chris initially agreed to call the commissioner on the following Monday, however, he never made the call.

In January or February of 2003, Mr. English stated that Bob Magota called him to his office and informed him that they were going to file insubordination claims against him. He said that there were allegations from Ann Gima that he took a leave back in October 2002 without proper authorization. Mr. English explained that he believed there had been a misunderstanding regarding this "leave." He said that he had a broken toe and was gone on a two hour leave for his follow-up medical appointment. By this time, Mr. English had asked for another union representative. Kevin Mulligan was with him at the next meeting with his administration. However, Mr. English was again suspicious that Kevin had already met with Ann Gima and Bob before their scheduled meeting. He said that Kevin pointed out that there was something wrong with them filing at this point in time for an insubordination that occurred approximately four months prior. They decided not to file based on Kevin's statements.

Mr. English alleged that when he returned to his desk after the above meeting, he found a Work Place Violence Report form left on his desk. The form was against him and had been filled out by Julie Tamaori. He was shocked as he had heretofore believed that Julie was one of his friends. Mr. English explained to this examiner that eleven of his co-workers filed Work Place Violence forms against him. However, he also stated that none of the forms actually revealed that he had been violent on the job. Mr. English reported that the Work Place Violence investigator did not find that their claims were substantiated. However, by this time, Mr. English said that Kevin Mulligan had informed him that he was "done" when it came to working for his division or for any division in the City and County.

As these work situations unfolded, Mr. English reported that his stress level continued to increase. He was having difficulty sleeping and he went to see his primary care physician, Dr. Love, at Kaiser. Dr. Love referred him to Jerald Coffee, a social worker, in the mental health clinic. Mr. English said, "For the first time, I broke down and spilled it all out emotionally." His therapist told him that he needed to get away from work in order to get better. On his therapist advice, he went in to his office to fill out leave forms for temporary disability. He said that Tom Reed immediately came to his office. However, he was highly suspicious of Mr. Reed because he seemed not much interested in Mr. English's mental state, but more interested in questioning him regarding his claims against the City and County. Mr. English said that the City hired Reneau Kennedy, Ph.D., to perform his workers' compensation psychological evaluation. He said that she reported that he was not malingering and that he should not be returned to that work place. She referred him to Joan Koff, Ph.D. at Kaiser for mental health treatment.

Mr. English described his symptoms at the time. He said that he was paranoid and afraid to leave the safety of his boat. He was extremely fearful that he would accidentally come across one of his co-workers if he left his boat. Initially, he had a very difficult time even trusting his lawyer or his psychologist, Dr. Koff. He felt that his trust had been violated. He said that heretofore, he believed the world to be an

Roger Moseley
Re: Philip English
January 25, 2006
Page 6 of 52

ethical place, but now he said, "I have made this shift, and I can't seem to go back to being trusting." Now the world seemed unsafe, he had irrational fears that cars next to him might ram into him. He described insomnia and weight loss. He had suicidal thoughts, but stated that he did not act on them. He struggled with being depressed and hopeless. His physician prescribed lorazepam and he said that it was very helpful in allowing him to sleep.

Dr. Koff helped Mr. English to gradually get out more and become more functional. She gradually assisted him by helping him contract to keep active even if it was activity in the confines of his boat. He began taking on projects and fixing his boat. It is an old boat and in need of constant repair. He said that the work helped him take his mind off what had happened to him at the City and County. At first he was unable to go out to the market, but now he can shop. He is more comfortable shopping when he has his son with him. He also feels safe when around another couple that live on a boat near him. His only other support is his church pastor.

Mr. English stated that he continues to have insomnia. On the night before this evaluation, he said that he woke up every hour. Of late, he spends time reading documents for his legal case. He stated that when he is absorbed in his case, it is as if he is "reliving" the trauma over again. He also said that he "had a good cry" before the evaluation. He continues to feel that his "whole world perspective shifted." He mistrusts others and reported, "The burden of rejection has lead to a crisis of confidence and self esteem." He also reported that he continues to live with constant anxiety. He did not believe that he would recover, but said, "I have to learn to live with it."

Mr. English reported that he is in dire financial need. After the resolve of his Workers' Compensation case, he received a settlement of $85,000. However, he said that he had to use most of that money to pay off debts, travel to visit his sick mother, and for his boat loan and repairs. Mr. English stated that although his therapy at Kaiser and his medication were very beneficial, he had to cease treatment in April of this year because he no longer received health benefits.

Mr. English began working for a security company in April of this year on a part time basis. He said that at one time, they had increased his scheduled hours to 37 hours per week. However, when he requested information about the company's health plan, he was told that he did not get health benefits. He said that it was his understanding that those who worked consistently more than 20 hours per week deserved health benefits. Mr. English was very nervous about bringing conflictual issues up with any employer at this point. He stated that soon after he brought up the health care benefits, his work hours were drastically reduced. Currently, he is only assigned one shift per week. He stated that he appreciated the low pressure security job. He works at night and does not have to be around people. Since his problems with the City and County work situation, he does not feel confident enough to be around people in a work setting. He said, "I don't know if I can do what I did before, I don't trust myself in the same way." He said that he is also embarrassed when applying for new jobs because employers always ask him why he left his last position. He worries that no one will hire him knowing that he was a "whistle blower." He has desires to move away from this island, but stated that he was committed to staying with his son until his son completes high school.

Roger Moseley
Re: Philip English
January 25, 2006
Page 7 of 52

## Family History

Mr. English was born on 10/26/1954. He grew up in Pasadena, located in the Southern California area. He has an older brother, older sister, younger brother, and two younger sisters. He said, "I had a great family, super parents." He reported that he was not very close to his father growing up. His father was an executive with Pacific Telephone and traveled frequently. He denied family dysfunctional such as physical or sexual abuse. He denied adolescent dysfunction or rebellion, he said, "I was a kid who played in the orchestra, the brass quintet, and for the church." He reported that on one occasion when he was eighteen years old, his father tried to fight him. As he remembered the incident, he thought that he frustrated his father over something and his father took a few swings at him. He denied history of psychiatric problems in his family during his growing up years, but reported that his mother attempted suicide when he was twenty years old. He thought that her problems were due to marital stress. He said that his father was a "workaholic" like his ex-wife, Corlis. His parents have been retired and living in Northern Nevada for twenty years.

## Educational History

He attended John Muir High School, graduating in 1972. He described himself as an average student overall, but one who excelled in music. He played the trumpet. He attended Pasadena City College and then transferred to California State Los Angeles on a music scholarship. He then transferred to University of Southern California, also on a music scholarship. He said, "My marriage derailed my college," and he dropped out after three years. He bought real estate and attempted to become more business oriented.

## History of Relationships

Mr. English was married for the first time to his "high school sweetheart." He was twenty two years old at the time he married. He said that the marriage ended because the two were very different and wanted different things in life. He also said that some of his friends told him that his wife was unfaithful. He denied history of abuse in this relationship. They were divorced after approximately four years of marriage. There were no children from their union.

Mr. English was married to his second wife, Corlis Chang, in 1984. She is an attorney, practicing in Hawaii. They were married for approximately twelve years and divorced in 1999. The two have a fifteen year old son. He said that his wife handed him divorce papers on the same day his physician notified him that he had been diagnosed with kidney cancer. Mr. English said that his wife tried to "throw him out of the house," but his parents intervened and convinced her to allow him to stay in the house for a time because he was ill with cancer.

He denied abuse in this relationship, but admitted that his wife had reported that he abused her to her physician. The two sought marital therapy, but he said, "My wife fell out of love with me." He said that while they were living in the house together during the divorce proceedings, his wife came to "his part of the house," and started yelling at him. He said that he told her to leave because she was yelling and not

Exhibit 105-00007

Roger Moseley
Re: Philip English
January 25, 2006
Page 8 of 52

helping the situation. When she continued to yell, he placed his hand behind her
back and escorted her out of the room. He said that she turned and said, "That's it
buddy, that's physical abuse." He asked this examiner if this would be considered
abuse, and said, "Maybe it would since I touched her." He denied further instances
of physical incidents and denied restraining orders or police interventions.

Mr. English alleged that Corlis placed everyone and everything ahead of their
marriage. In his opinion, her priorities were incorrect as she prioritized her
profession, her family, and their son above their marriage. He reported, "My son is
just like me and so she has problems with him too." He said that both he and his
son are very emotional and have more needs than his wife in this area. He said that
his son has had a very difficult time since the divorce. According to Mr. English, his
wife's family attended St. Louis private school and so his son was also sent to St.
Louis. He said that his son hated the school and eventually refused to attend. He
was moved to Waldorf School. He reported that his son has been under
psychological or psychiatric care since the divorce and currently is under the care of
Dr. Richard Szuster, a child/adolescent psychiatrist.

He stated that he married a third time in June 2000. He said, "We married too
quickly, she was a younger woman and needed more financial stability than I could
give." He directly relates the failure of his third marriage to his work stressors with
the City and County of Honolulu. He said that his wife believed that he would loose
his job and feared the financial insecurity. He also said that he was always
"emoting" and telling her about the work problems. The two were separated after
approximately two years of marriage. There were no children from this union.

Mr. English expressed concern that he has had three marriages. He said that he has
trouble viewing himself as a person who has been divorced even once. He said,
"When I married Corlis, I gave her my life heart, I can't take it back." He said that
he felt the same way about his marriage to Pam, his third wife. He reported no
current relationships.

## Employment History

Mr. English worked for First Interstate Bank in Southern California in 1979. He said,
"They were good to me and trained me to be a real estate appraiser and helped me
get licensed professionally." In 1986 he left the bank and became a sole
practitioner, independent appraiser. He said that he was very successful. Since his
wife was from Hawaii, in June of 1987, they decided to relocate to Honolulu as they
believed Hawaii a better place for family life.

After relocating, he worked for 1st Nationwide as a Senior Appraiser. In 1989, he
again left the bank and started his own business. He said that his wife was quite the
"entrepreneur," and they eventually had fourteen employees working in their
business. Mr. English explained that the appraiser business is often wrought with
unethical practitioners. However, he said that his business only appealed to those
who wanted high quality, extremely ethical appraisals. He was proud of his
reputation and practices and said that "high power" attorneys, accounting firms, and
banks were his usual clientele.

Roger Moseley
Re: Philip English
January 25, 2006
Page 9 of 52

Mr. English stated that after he experienced his second divorce from his wife of twelve years and after undergoing nephrectomy for kidney cancer, he decided to lesson the stress in his life. He phased out his private business. He reported that he had some job opportunities on the Mainland in Seattle and wanted to relocate. However, he said, "My first job is my son," and he decided to stay in Honolulu to be near him. He said, "Honolulu has been good to me, I could do something good for Honolulu." He sought employment with the Honolulu City and County Appraiser Department. He was hired in June 2000.

## Substance Use History

Mr. English denied alcohol or drug abuse. He has never had a DUI or blackout from substances. He drinks occasionally. Sometimes he will have one or two beers per week, some weeks he does not drink at all. He said that during his early college years he smoked marijuana, but discontinued after college.

## Criminal/Civil History

Mr. English denied history of criminal behavior or previous civil suits.

## Medical History

In 1998 Mr. English reported that he was doing yard work when he fell out of a tree. He stated that he was unconscious for approximately ten minutes and badly bruised. He was taken to the emergency room as he feared that he might have broken bones. However, instead, he said the x-rays revealed a spot on his left kidney. Later tests confirmed a renal cell carcinoma, a cancer that does not respond to chemotherapy or radiation. He said that his physician informed him that he had perhaps a 65% chance of living with this condition. A radical nephrectomy was required and performed in November 1998. Mr. English is now past the five year mark and stated that there have been no relapses or new cancers. He denied further serious medical problems.

## Psychiatric History

Mr. English and his second wife, Corlis, attended marital therapy for approximately three months with Dr. Yano. He said that he overheard Corlis in tears telling her physician, "My husband is abusing me." He denied abuse and said he was shocked at her statement. As a result, the two began marital therapy with Dr. Yano, however, Dr. Yano usually saw them in separate sessions. Mr. English said that after three months Dr. Yano told him, "Phil there's nothing wrong with you." He ceased treatment.

Mr. English was in crisis and under mental health care during his divorce from Corlis. He said that he had attempted suicide by ingesting a large amount of aspirin. His wife found out and gave him Epicate, but he said that he did not regurgitate the aspirin, neither did he seek emergency care. He sought treatment for approximately one year for divorce issues with Kaye Wong, Ph.D., a therapist with Biodyne. During this time he was prescribed lorazepam, prn and took the medication for approximately three months.

Roger Moseley
Re: Philip English
January 25, 2006
Page 10 of 52

At the time of his work injury, he was referred by his physician to Kaiser Psychiatric Clinic. He was in treatment with Joan Koff, Ph.D. until approximately one month ago when his medical benefits expired. Kaiser physicians prescribed lorazepam again. He was given a three year refill. He pointed out that he took the medication sparingly. He had filled the prescription four times in three years. He said that the medication lorazepam was perfect for him because he only has one kidney and other medications might have caused kidney difficulties.

**Typical Day**

On a typical day, Mr. English arises between 5:30 and 6:30 a.m. He has a cup of coffee and reads his Bible and prays for approximately thirty minutes to one hour. He reported that his boat is old and needs much repair. He said that he had learned to do many "labor" type jobs since acquiring the boat, "I even learned how to weld," he said. After his devotions, he usually begins one of the many projects related to repairing his boat or sometimes he does an odd job for one of the other boat owners for money. Mr. English said, "I'm good for about half a day." After he works in the morning, he stated that he must rest to "recharge" himself. He said that prior to his current psychiatric state he usually had energy to work ten to twelve hours days. In the afternoons, he sometimes checks in with his attorney or works on paperwork for his legal suit. He has very little money and said that he can only afford approximately one to two meals a day. He also said that he has a low appetite. He usually goes to sleep at approximately 9:30 p.m., but said that he constantly tosses and turns and has difficulty sleeping through the night.

During the summer, Mr. English also has custody of his fifteen year old son for four to five days per week. When he works a shift with the security firm, his hours are from 6:00 p.m. to 6:00 a.m. Currently, he has only one shift on Fridays and makes $8.00 per hour. He attends church on Sundays. He also helps out with the church youth group, participating as a chaperone on outings or recreational activities.

**Mental Status Examination**

Mr. English arrived to his examination on time. He was cooperative and pleasant throughout the examination. He was dressed professionally and was neat and well groomed. There were no behavioral abnormalities. He sat comfortably, made good eye contact, and made no abnormal movements. His speech was fluent, coherent, and normal in rate and productivity. He reported, "I had a good cry this morning." His mood was somewhat frustrated, depressed, and negative. He had thoughts that he viewed the world differently now. He saw himself as having lost his previous "trusting" nature. His affect was normal in range and appropriate to the situation. There was no imminent suicidal or homicidal ideation although he admitted to suicidal thoughts and behaviors in the past.

His thought processes were logical and goal directed. There was no evidence of hallucinations, delusions, obsessions, compulsions, phobias or other abnormal mental phenomena. On cognitive screening, he was correctly oriented to the date, city, and naming of the last four presidents. His attention was normal as evidenced by his ability to recite the months of the year backwards. His memory was normal as evidenced by his ability to remember three of three words at five minutes. Insight and judgment were fair.

Roger Moseley
Re: Philip English
January 25, 2006
Page 11 of 52

### Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

The client's response on the MMPI-2 showed marginal validity. He attempted to present himself in an overly positive light. His approach indicated that he presents himself in a moralistic and unrealistically virtuous manner. He may have more psychological problems then he reflects in his answers to the items.

His profile presents a mixed picture with physical complaints and depressed affect as his salient features. His physical complaints may be extreme and reflect a general lack of effectiveness in life. There are likely to be long-standing personality problems that pre-dispose him to physical symptoms under stress. He is most likely quite tense and nervous. He may become quite irritable and even hostile if his symptoms are not given "proper" attention.

In addition, he endorsed a number of items that indicate low morale and depressed mood. He reported a preoccupation with feeling guilty, unworthy, regretful, and unhappy with life. He indicated that he is plagued by anxiety and worry about the future. Sometimes he feels hopeless, as if he is a condemned man. He may feel that life is no longer worthwhile and that he is loosing control of his thought processes. He views the world as a threatening place and sees himself as being unjustly blamed for others' problems. He feels he is getting a raw deal out of life. He feels misunderstood and lonely. He seems rather high-strung and believes that he feels things more intensely than others do.

Interpersonally, he appears to be rather passive-dependent in relationships. He may manipulate others through physical symptoms and be hostile if sufficient attention is not paid to his complaints. He seems introverted and may have difficulty meeting others. He is probably shy and may be uneasy and somewhat rigid and over-controlled in social situations.

Individuals with this profile are often seen as neurotic and may receive a diagnosis of Somatoform Disorder. Actual organic problems such as ulcers or hypertension might be present. He is probably not a strong candidate for psychotherapy treatment approaches that require self-scrutiny, insight development, and high motivation for change. Behavioral modification techniques are most likely the best approach for treatment. He is generally pessimistic and shows low energy, seeming to have little hope of getting better. He harbors many negative work attitudes that could limit his adaptability in the work place. His low morale and lack of interest in work could impair future adjustment to employment. These factors should be taken into consideration in treatment.

### Record Review

All records received were reviewed, however, not all records are summarized.

### Department of Personnel, City and County of Honolulu, Employment Application, dated 05/18/1999:

Exhibit 105-00011

Roger Moseley
Re: Philip English
January 25, 2006
Page 12 of 52

Mr. English applied for Real Property Appraiser II, III, and IV.

**Human Resources Department, City and County of Honolulu, Notice of Examination Results for Phil English, no date on score sheets:**

Real Property Appraiser II, qualified with a score of 78
Real Property Appraiser III, qualified with a score of 78
Real Property Appraiser IV, qualified with a score of 90

**City and County of Honolulu, Department of Civil Service, Probationary Performance Evaluation, dates indicated:**

08/09/2000: Philip had been attending training sessions and working and accompanying an experienced appraiser. He received "exceeds requirements" in his attitude toward work and "meets requirements" in quantity of work, quality of work, and relationship with people. "Philip has an easy going personality and shows a willingness to learn new things."

11/03/2000: "His experience and appraisal background have lent additional credibility at the Board of Review. He is currently assisting in the preparation for cases at the Tax Appeal Court and analyzing and evaluating the multiple regression models to be used..." "He works well with his fellow employees and is tactful and courteous in his dealings with the public." He met minimum requirements of the position, was given a satisfactory rating, and he was granted permanent status.

03/29/2001: "He has a strong background and foundation in the real estate profession and has been able to apply his skills to the assessment area." "He has a good attitude toward his work and works well with his fellow employees and is tactful and courteous in his dealings with the public." Given ratings of "exceeds requirements" in quantity of work, quality of work, attitude toward his job and relationship with people.

04/23/2001: He was promoted from Appraiser II to and Appraiser III position. Again, he received "exceeds requirements" rating in all areas. He continued to be involved in the review and preparation for cases at the Tax Appeal Court. He was responsible for researching and defending all 2001 appeals before the Board of Review.

06/25/2001: During this period, Mr. English had worked in an Appraiser III position. His work was rated, "exceeds requirements," in all areas. His background in real estate had made him "extremely valuable." He had continued to have responsibility for all of the Waikiki area condominiums and was involved in the review and preparation for cases at the Tax Appeal Court. He was granted permanent status.

04/12/2002: Mr. English achieved "meets requirements" in the four areas which is lower than previous evaluations. In an attached summary it is noted that during the period covered Mr. English was reallocated from the Appraiser III position to Appraiser IV. He continued to be assigned the responsibility for all Waikiki area condominiums. He was involved in review and prep for tax appeal court. He completed analysis for the 2002 assessments and currently had 866 individual

Roger Moseley
Re: Philip English
January 25, 2006
Page 13 of 52

appeals to resolve. His background and foundation in real estate process had been invaluable.

While he continued to progress in his learning of office procedures, he seemed to be having difficulties in organizing and prioritizing the many and varied tasks associated with his position. It is quite often disagrees with established office work processes and voices his opinion as he believes things may be better accomplished and resists completing tasks in the prescribed manner. He was advised he needed to appreciate there were constraints that they needed to work within and that focusing his energies on accomplishing his assigned duties within these constraints was a more productive pursuit. The evaluation indicates that he gets along well with fellow employees.

Mr. English writes a rebuttal to the comments and states that he had been performing tasks over and above the Appraiser III level during the whole period covered. He believed that he should get a rating of "exceeds requirements." He notes that none of these things had been brought to his attention by his supervisor. If they had been, he would have made appropriate adjustments. He stated that he had in many emails requested to be given more guidance on procedures and that he had yet to receive a response to those emails requesting guidance. He said that he believed that there was lack of foresight, insight, and leadership on the part of his supervisors and management that caused great confusion.

He pointed out that he had more management experience than the administrator, the assessor, and any of the supervisors, with the exception of Mike Okamoto. He pointed out that he had been interviewed for the administrative position and that not even one of the other applicants was "close" in the interview. He pointed out that at the time of his interview, Gary Kurokawa had stated to him that there were exciting changes coming and that Bob Magota was looking for outside appraisers to bring in fresh, new blood with market experience. He stated that he believed there was a serious problem in the office in terms of established office practices and he hoped to be part of positive change in the office. He believed his ideas and comments were encouraged and he said he felt a great failure that he had not been a more positive influence on the office. He requested the performance standards be changed to "exceeds requirements" and that all negative comments be removed from the record.

05/13/2002: Probationary Performance Report for Appraiser IV Position,

Mr. English receives "meets requirements" in the four areas of assessment: quantity of work, quality of work, attitude toward work, relationship toward people and supervision of employees.

08/05/2002: Draft submitted to Bob Magota from Ann Gima regarding Mr. English's probationary period as Appraiser IV:

He was still on assignment for responsibility of the Waikiki condos. The volume of appeals and number of units in the area necessitates use of good time management skills in order to meet deadlines. Over the course of the past two months, Phil encountered difficulty in independently performing all of his responsibilities as appraiser four. His performance had been discussed with him at least three times

Roger Moseley
Re: Philip English
January 25, 2006
Page 14 of 52

and efforts had been made to address various issues and problems, including misunderstandings and miscommunications. At the present time, there were issues affecting his attitude and subsequent work performance. She said he would benefit from an additional three month period of review for further training and instruction. She stated he met minimum requirements of the position and overall satisfactory rating was recommended.

There was a second draft of this probationary narrative. Despite written instructions regarding work hour instructions and leave requests, he was still not complying. He needed to be reminded or told instructions that had previously been given. When he was told to check if he had received all appeals, he said that was a clerical job and took over a week to check and claimed that he didn't received all the copies. She stated too often he was not following through on instructions. She said he occasionally exhibited lack of good judgment and she enumerated five instances of that. He admitted he had an attitude that was counterproductive and an outburst regarding his belief that he was being watched on 05/31. She stated that instead of extending his probation, she wanted to meet with him and get through to the problem. She stated it was clear that he didn't like his job and that he wasn't putting the amount of effort into his work that he'd previously displayed.

08/14/2002: Probationary Performance Evaluation Report

For the period covered, Mr. English met requirements in quantity of work, quality of work, and relationships with people. His attitude toward work was rated below requirement.

It is noted that Mr. English submitted a statement that he did not agree with the review, nor did he agree with the three month extension of probation. It was unwarranted and unjustified.

A secondary narrative is included that enumerates areas for Mr. English to improve. 1. Develop a work plan for organize and prioritize work to meet deadlines. 2. Demonstrate knowledge of routine aspects of the job in accordance with work expectations. 3. Demonstrate the ability to follow instructions. 4. Obtain written, prior approval for leave.

On 08/14/2002, Mr. English wrote notes about his performance evaluation session with Bob. He said that Mr. Bob Magota accused him of sneaking around to put in his leave papers. He said that Mr. Magota raised his voice at him when he tried to explain himself. He said that Mr. Magota asked him if he felt paranoid and he told him that he did. He told Mr.Magota he had felt like an outsider since he began the job. He said that Mr. Magota dressed him down in front of the whole group when he had asked an ethical question by saying, "I've seen this kind of thing before when an outside appraiser cannot make the change to mass appraising." He went on to say that Mr. English had "just the fundamentals of appraising." Mr. English said that this all started after he made the complaints about Gary. He alleged that Bob raised his voice, became defensive, and said this has nothing to do with it. In the notes he also said that Bob asked him, "Are you overwhelmed with work?" and he kept telling him that he was not overwhelmed but that there was more work to get done than can be done in one year.

Exhibit 105-00014

Roger Moseley
Re: Philip English
January 25, 2006
Page 15 of 52

**Department of Personnel, City and County of Honolulu, Employment Application, Real Property Appraiser VI, 03/29/2001:**

Mr. English applied for this position. On 04/04/2001, Mr. English submitted an addendum to his application for Real Property Appraiser VI listing over thirty properties that met the criteria of "very difficult appraiser situations." Additionally, in 1989, he began his own appraisal firm, Phillip English and Associates, with twelve employees including six appraisers and six fulltime staff working for him before he ceased his business due to illness.

**Real Property Assessment Division Memorandum, Robert O. Magota, 11/07/2001:**

Mr. Magota requested that Mr. English, Real Property Appraiser III, be reallocated to the Real Property Appraiser position VI. He stated he had fulfilled all requirements including training, education, and experience for this reallocation. In addition, he pointed out that Mr. English had over twenty-two years of appraisal experience in the private sector and government service.

**Interoffice E-mails, various dates:**
Note there were approximately 379 emails that were reviewed. A portion of these are summarized here.

09/04/2001: E-mail from Ann regarding mandatory to report to the Director vacation leaves on a daily basis and requirement to write requested vacation leave on the calendar when submitting leave papers to her.

09/07/2001: Reminder from Ann Gima for employees to e-mail her their start time, lunch time, and Pau Hana times in order to update Mr. Magoda's list. Also, they were informed to notify her when they leave early, and when they were out of the office for research, fieldwork, appointments, etc.

10/01/2001: Phil requests time to talk with Bob Magoda. Also, an e-mail from Phil to Bob informing him that he is going with Susan to Astin to review documents for Waikiki Shore, "Anne seems upset about something."

10/02/2001: Phil asks Bob if he can see him on this date in the afternoon.

10/05/2001: Phil writes Bob to let him know that he had been given contrary instructions about a work matter from Anne. He writes a second email on the same date for clarification regarding his instructions. "What are my instructions? What do you want me to do with the mounting permits behind my desk?"

10/05/2001: Bob Magoda writes Phil with more details regarding the particular work matter and tells him, "check with Annie if you are unsure." Phil responds that he will ask Ann again and "thanks for the advice."

11/06/2001: E-mail from Ann Gima to Gary Kurokawa regarding work assignments. Phil's main responsibility was to create IDLIST for queries "(his main focus for the present is to complete and review the valuations for the 2002 year)"

Roger Moseley
Re: Philip English
January 25, 2006
Page 16 of 52

12/18/2001:  E-mails between Ann Gima and Phil.  Ann instructs Phil not to say that they are using a "new method" as "technically" they have always employed the "market" for valuation of all properties.  She tells Phil to "avoid any implications that we are doing something 'new' that is resulting in the higher values."  Phil responds, "We can say anything that we can create as an explanation so long as we do not say 'new method' (even though we know that it is a NEW METHOD?)  Is that right?"  Ann responds, "If taxpayers are questioning the increases in the building make sure you have a good explanation that does not include the words 'new method.'"

12/26/2001: Phil e-mails Ann Gima, "I am extremely fatigued today and I am certain I can not last the whole day.  I will leave as soon as I can."

01/09/2002: Mr. Goto reminds Mr. English he has counter duty.  Mr. English states he's overwhelmed with other duties and won't be able to make it today.

01/09/2002:  Email from Kenneth Goto to Ann Gima Regarding Mr. English: Mr. Goto writes that it seems as if Ms. Gima's talk with Phil did not "penetrate into his head."  He states he sympathizes with her frustrations with Phil.  He writes that he thought Phil "wasn't a head case like you-know-who," and uses the initials C.G.  "But I guess because P.E. comes across like a gentleman and a smart appraiser we haven't noticed the things he's done or was supposed to do that have made you upset."  Apparently Ms. Gima had instructed Phil to pull his counter duty.  Phil had complied after lunch, but only took a couple of taxpayers and then disappeared and failed to serve until his regular time.

No date:  Memo from Gary Kurokawa to Ann Gima, Robert Magota, Susan Bender, and Phil English: In the memo, Mr. Kurokawa thanks them for continuing work on the Waikiki Shores and thinks it had been a very "trying time for us regarding the actual use law on the condos."  He was suggesting a system of auditing, apportion of the declarations made by the owners, and he was open to suggestions from the others regarding how to make it a smoother process.

02/15/2002: Memo from Phillip English to Robert Magota, Subject: Complaint against the administrator:  Mr. English documents that last week he went to Bob's office to complain that an administrator was having one of his employees work for him on outside work while on city and county time.  He indicated that this had been an ongoing situation for the past eighteen months and probably longer than that.  His complaint was that it was improper for an administrator to have work done by a city employee on city time.

He understood that warnings had been made to the employee by his supervisor and that he has even been asked to be more discreet.  Mr. English points out that being more discreet is not the issue, it's not the employee he's making the claim against but the administrator who should know better.  According to Mr. English, others knew about this, were aware of it but were afraid to say anything for fear of retribution.  He wrote, "the political nature of the situation was to keep your mouth shut and do your job and not make waves."

Mr. Magota returned an email to Phil, stating that he was addressing the problem with both Chris Graff and Gary Kurokawa.  On the same day, 02/15/2002, Phil wrote

Exhibit 105-00016

Roger Moseley
Re: Philip English
January 25, 2006
Page 17 of 52

a second email saying that Chris had come to talk to him and he had informed him of the complaint.

02/19/2002: Interoffice Email from Ann Gima to Group 3: There are thirteen points she makes in the email. Point number eleven states "If any of you are working at a second job, you **must** disclose and fill out the necessary paperwork. At no time are you to conduct business during working hours." Point number thirteen states that apparently Roger Moseley wrote a letter of complaint. According to Ms. Gima, someone at the office told someone on the phone that the changes in classification that were being made this year was the result of a tax appeal court case for the Waikiki shore. Ms. Gima stated this is an incorrect statement and NO ONE should responding to taxpayers in such a manner. Any changes in classification was the result of classifying condominiums based upon consideration of the unit's actual use.

02/21/2002: Interoffice Email from Bob Magota to Ann Gima with a copy to Gary Kurokawa: In this email, Mr. Magota points out that he finished reading Phil's latest email regarding his work load. He said that Ann needs to come see him "(without Phil)." According to Mr. Magota it appears that Phil was losing control and beginning to panic and he wanted to get Ann's opinion on it before he spoke to Mr. English. He wrote, "He may need some straightening out."

02/21/2002: Interoffice Email from Phil English to Bob Magota: Mr. English attempts to ascertain what has happened to his application for Appraiser IV position. He documents a complaint about the excuses that have been given him such as the loss of paperwork on two different occasions, how he had followed up weekly to find out what had happened to the paperwork and that in December all positions were frozen. He wonders what holds up the allocation. On the same date, Bob wrote Phil a return email documenting that the reallocation had been approved for March 14th.

02/21/2002, Interoffice Email from Phillip English to Ann Gima: In the email Phil complains he has no time to prepare. He says "we are running around like chickens with our heads cut off...again." He then specifically gives five bullet points: he's just completing his organization appeals, he may need to follow-up on more of the declarations, he needs to participate in more of the determination of what buildings are hotels and what are not, he needs to write letters/complaints, he's still answering letters or returning phone calls related to the classification issue. He states that he has approximately 850 appeals and these include the Waikiki Shore, the Imperial Hawaiian Resort, and several other entire projects. He also had a tax appeal court trial coming up in April that he needed to prepare for. He points out that there are nearly 25,000 condos in a complex, specialized market and the model needs to be looked at more carefully. He states that he's not complaining about work but that there's more work than can be realistically done. He asks for some direction as to priority. He also believed there remained a false sense of what the job was and what it would take to get it done.

He admits that he finds himself getting into trouble because he is doing the things he thinks are of the greatest urgency and is extremely frustrated because he gets asked to do many things that are a priority to someone else (or that are not appraiser related functions. That is, they are clerical in nature.) He writes that it is an ethical matter and that he feels responsible to say something because there is not enough hours in the year for him to accomplish everything that he has to get done. He

Exhibit 105-00017

Roger Moseley
Re: Philip English
January 25, 2006
Page 18 of 52

states he understands that office is shorthanded and that others are also overworked and he doesn't know if anything is being done to remedy the situation or if the administration has a realistic view of the task at hand and what it will take to get the job done.

02/25/2002: Mr. English is reminding Ms. Gima that he wants a response to his February 21st email about his priorities. He was preparing for a deposition with Roger Moseley on Thursday and was going to be moving sometime that week. He had a heavy appeal case load and he needed to prepare for the Waikiki Shores trial coming up in April. He also says that he continues to believe there's more to be done than could realistically be done. He says he's been told that "the only way we can get anything done is to cut corners." He furthers states "if we cut corners on analyzing data then it will come down to 'garbage in/garbage out' which I believe already exists and has contributed to some problems. Further, he says that he had complaints and calls and appeals from taxpayers saying that they are using comps of highly updated units. He said their data does not reflect condition nor do their models take condition into account.

02/25/2002: Ms. Gima asks Mr. English to give her what he feels is proper prioritization of his work load and then she gives him some advice about priorities. She also points out that no one had assigned him the task of identifying any hotel properties.

03/13/2002: Email from Ann Gima to Bob Magota: Ms. Gima updates Bob on what had transpired since her talk with Phil. She wrote he finally submitted his list of appeals but there was something wrong with them. She still had not received what he feels was a proper prioritization on his work load and had not had a response from him on that question. She believed Phil was very preoccupied by the court case which was scheduled for next month as evident by his need to prepare for a deposition for two entire days and being seemingly unable to do anything else. He was continuing to sign in at various times. She said he comes and goes seemingly at his whim despite my direction and instruction that everyone has set working hours which they must follow. She said he knows that this is the case.

01/10/2003: A request from Phil English is made on this date to take vacation leave from 12/31/2002 through 01/03/2003.

05/21/2002: The email was sent by Mr. English to all supervisors, with copies to all the staff, pointing out an existing problem where appraisers are to act as both the appraiser representing the tax office and the hearing clerk. He said these problems arise from this practice range from inefficiency to legal issues. He then delineated in a long email how the hearings would be much more efficient if run by a hearing clerk and detailed all the things an appraiser must do when wearing two hats. He asked them to consider having a hearing clerk at the board of review hearing.

05/22/2002: Mr. English requested that he be allowed to adjust his starting time to 7a.m. to 6:30 p.m. so that he could spend more time with his son. Request made to Ann Gima.

05/22/2202: Mr. English in an email to Ann Gima, apologizes for giving his opinions too much and states that he appreciates her as a supervisor. He points out there are

Roger Moseley
Re: Philip English
January 25, 2006
Page 19 of 52

frustrations in his personal life that are unrelated to his job. He knows money is an issue for everyone. He states "I have also realized that contentment is not a hallucination but a realization of what you have." He believes he has an interesting job and that's what he likes most about it. He says for her to please excuse him if he asks a stupid question, it is not because he is lazy. He states that if she could only point him to a manual or memo that would be fine, he would do the legwork. He tells her that he appreciates all that she has done for him and that he knows he could not have made it to appraiser four if it had not been for her efforts and advice.

05/22/2002: Ms. Gima writes that she sincerely apologizes for her gruffness to Mr. English. She writes, "I must learn to deal with my frustration and take more initiative before I resort to the disruption in communication we have recently experienced." She hoped for improved communication for the future and told him to continue to ask questions and voice his opinions but not to be offended when his suggestions are not acted upon and to be prepared to comply with the "old methods."

05/23/2002: Mr. English writes to Dwight Ishiguro stating that things in the office are slipping from bad to worse and that he thinks he has gotten on the bad side of management. Phil believes they don't like people who ask too many questions or question what they do. He also pointed out the thing he had complained about with Chris working on private business on city and county time. He says that Ann refused to do anything about it because she had never seen it but he proceeded to go to Bob Magota with his complaints. According to Phil, Bob told him just because one employee has a complaint doesn't mean something's going on and "it would be my word against his." He said nothing happened and Chris continued to work for GK Appraisals during City and County time. He further informs Dwight that yesterday he had been called into Bob's office with Ann so that he could be told he was not complying with scheduled office hours and that he had a bad attitude. He said "he was on someone's sh-t list." He said that to him it appeared to be a "witch hunt." He implied that he was being set up.

05/28/2002: Mr. Ishiguro writes to Mr. English that he was surprised about the email stating that Ann was taking the kind of stand she was against him. He pointed out that Phil's complaints should have been checked out. He advised still to keep track of events that occur with date, time, and subject matter because he thought that if this continued, he might need to make a formal complaint. He also pointed out that some of the managers don't have the necessary skills and that they got there by default.

05/28/2002: Mr. English thanks Dwight Ishiguro for his advice. He is surprised that Ann Gima denied knowledge of the fact that Chris Graff had been working for Gary Kurokawa during city and county time. He described an incident where he had been standing at Chris' desk when Gary called and asked Chris to complete something right then because a client needed it. Mr. English acknowledged after the phone conversation that it was Gary and that he had to do something right away for a client. He then worked the rest of the afternoon on City and County time and delivered it that afternoon. Phil was especially upset that people in charge were deflecting this responsibility to Chris when Gary was the responsible party.

Roger Moseley
Re: Philip English
January 25, 2006
Page 20 of 52

03/31/2002:  Mr. English describes to Mr. Ishiguro feelings of being harassed.  He
asks Mr. Ishiguro's advice on whether he should go to Violet Lee or directly to Chuck
Tatto of the ethics board or the prosecutor.  Mr. Ishiguro writes back that perhaps he
should try and handle it by going to the people involved but at this point Phil does
not trust them.  He also points out that he feels like he is being targeted even
though he was told at one point he had a shot at being supervisor which, in his
opinion, meant he was more qualified for the job than any of the other candidates.

05/31/2002:  In the email Phil English tells his supervisor, Ann Gima, that he's been
informed by Julie Tamaori that he is being "watched by Bob."  Phil asked if he was
being watched for some reason, "could someone please explain what that reason is."
He feels that they are making for a hostile work environment with rumors being
allowed to spread that someone's being singled out and watched.  Ms. Gima's
response is that no, he is not being watched anymore than anyone else is being
monitored for their performance.  Mr. English points out that it was interesting to
him that all these reviews and bad narratives come after his complaint about an
administrator using City and County employees to do work for his private company
on City and County time.

08/15/2002:  In the emails Mr. English is asking Gary Kurokawa whether they have
decided to extend his probation or not.  As he had already discussed, he did not
agree with the extension and believed it to be unwarranted and unjustified and he
also felt his only option left was to seek legal counsel to his alternative.

08/15/2002:  Mr. Kurokawa emails Mr. English that he has revised the performance
evaluation, he was extending it for three months, the revision was needed to amend
the evaluation to list goals that, if met, will lead to establishing a satisfactory
performance rating.

10/14/2002:  In the email to Ms. Gima, Mr. English states, "I am trying.  I am
reaching out for help.  Again, if you do not wish to help me, please say so and send
me somewhere else... If it is your desire to see me fail you're right on track."  In
response Ms. Gima wrote back that she had no desire to see him fail and she was
trying to provide him with assistance and she gave him two sentence directions on
what to do regarding in question.

10/18/2002:  In the email, Ms. Gima informs Gary Kurokawa that she met with
Waylen on last Friday and had no disagreements with proceeding as he suggested.
She said she would also like to meet with just her, Gary, and Waylen regarding what
to do on and review any actions since they had already missed the one month review
in September because HR would probably dictate that the probation was terminated
anyway.  Apparently, Waylen did not want Bob Magota involved in the meeting and
there was some issue as to how to continue without involving Bob.

10/21/2002: The emails are concerning Mr. English's request for vacation leave on
10/22 and 10/25.  Ms. Gima tells him that his leaves will be granted provided he
submits some missing work that was due on 10/04.  Mr. English states,
"Furthermore, I have received very little assistance from you in spite of my request.
If there was any delay in my completing my coefficients by 10/04, it should be on
record that I did not get the support that I requested."  There were a total of eight

Exhibit 105-00020

Roger Moseley
Re: Philip English
January 25, 2006
Page 21 of 52

emails back and forth from Ann Gima, Bob Magota, Phil English, and Dwight Ishiguro
over this issue.

On 10/30/2002, there is a flurry of emails, over fifteen in regards to Mr. English's
request for leave which was disapproved unless Mr. English completed certain work.
Mr. English complains to Dwight Ishiguro about the management practices and Ms.
Gima complains to Gary Kurokawa about how "Mr. English takes no responsibility for
his work product." Mr. English then explains to Mr. Ishiguro that he feels singled out
and harassed and that things are getting worse and not better. He is trying to figure
out "who is on my side and who I can trust. This is so obvious. In the city and
county I do not feel that there are many that I can trust." He was also having
difficulty trusting his union representative. There is an email from Ann Gima to Phil
English on 10/31/2002 which states that "the list of errors Norma emailed you about
must be corrected before we can run the entire population again. November 1,
Friday is the deadline and we cannot extend past that day... Because of the
situation, your request for vacation for Friday, November 1, is disapproved." In this
flurry of emails, Mr. English documented that he needed the leave to take care of
doctor's appointments for his follow-up for cancer and his broken toe.

11/13/2002: Mr. English consults Mr. Ishiguro on his problems with management.
Mr. English writes, "...plus I don't just roll over and take it when they do things or
say things they shouldn't be doing or saying. I have tried my best to document once
I figured out what was going on and I appreciate your counsel in this regard." He
also enumerates cases where Ann Gima did work for others that she refused to do
for him. He continued to feel singled out and mistreated by management and said
"Dwight, they are out to get me. They want me to fail."

Mr. English further points out to Mr. Ishiguro that he has tried to follow the areas of
evaluation for his second probation but felt that they had been thwarted in the event
that he had not been given the assistance requested from Ann. He also complained
that there had been absolutely no training for the areas they needed help in. He
continued to say that Ann would complain that he had not followed her directions
and his statement was that she had never requested the things she was requiring.

He also complained that he had requested leave but had each and every request
denied even though it was for necessary medical appointments. His email was
several pages long. On 11/21/2002, Mr. English writes to Mr. Ishiguro that he has
contacted several attorneys and was waiting to hear back from them. He asked Mr.
Ishiguro what he thinks of hiring Peter Trask.

12/05/2002: There are a series of nine emails back and forth from Phil English to
Dwight Ishiguro. The gist of the emails is that Mr. English is talking critically about
management. Of his own management style he says, "I have also had great
successes when managing myself. I have always had excellent professional
relationships with all of my employees... I am not just bragging; it is true and it is
something I am proud of." On the contrary, he feels his current management style
is "Do as I say and if it goes wrong or is unclear, it is your fault." Mr. Ishiguro writes
back the "team" is geared to support management and not the lined staff. I believe
that this administration does not want to hear of potential problems with the
implementation of their new programs. They want us to say yes and implement and
fix problems as we go along. This type management is not new." At the same time,

Roger Moseley
Re: Philip English
January 25, 2006
Page 22 of 52

Mr. Ishiguro states, "On some issues, we cannot address because it is 'management's' prerogative." He further writes, "Bottom line is that we cannot grieve bad management." In another email he states, Ann will have to start treating you as a professional and you need to demonstrate the ability to carry out the assignments/duties."

## Records of Kaiser Permanente

**Personal Health Appraisal Summary Report, Undated:**

The assessment format indicated that this thirty-four year old male was healthy with no major problems. He had an incident in the past where he got so constipated he could not have a bowel movement times one year. A total workup was done and it was found he needed more fiber and a more regular diet. It improved his nutrition drastically. Both he and his wife were modifying their lifestyle with exercise and lowering their salt intake. In August of '83, the patient had a leg infection from a dog bite. Mr. English was given a cholesterol test and, on 06/01/1989, he scored in the borderline high range. On 11/01/2000, Mr. English had a recheck with oncology for his nephrectomy performed in November of 1998. It was noted that cancer recurrences usually recur during the first two years post-op. The plan was no need to re-refer; Mr. English was doing well.

**Examination on 05/03/2001:**

The patient was status post-nephrectomy. There was no evidence of recurrent tumor or mass in the post-surgical bed/no evidence of tumor recurrence or metastatic.

**Examination on 05/22/2001:**

Mr. English was taken by ambulance to Kaiser after he was experiencing difficulty breathing in his chest area, worse on inspiration. He was experiencing constant pain which was worse with deep breaths. Diagnostic Imaging Consultation Report's impression was no definite acute pulmonary disease.

**Progress Note, Frank W. Uhr, M.D., 01/13/2003:**

Patient was seen approximately eight days after sustaining an inversion fluxion to his foot when he missed a step coming off his boat. He had a mild swelling and he could precede as tolerated for activities. He should return for follow up in three weeks, take anti-inflammatory medication as needed. If he is back to normal, he can call and cancel the follow up.

**WC-2 Physician's Report, 02/13/2003:**

Tam Sing, M.D., at the Honolulu Urgent Clinic, filed a report as the patient was experiencing work stress. He had associated complaints of agitation and stress related to his job. He stated that this all occurred in the context of him being a "whistle blower" and issues at work.

Roger Moseley
Re: Philip English
January 25, 2006
Page 23 of 52

**Progress Note, Gerald Coffee, 02/27/2003 through 03/10/2003:**

Mr. English was seen by Gerald Coffee for anxiety. The note indicated that this was
session two. The problem was occupational stress disorder. The patient reported
ongoing anxiety due to harassment at work and isolation from coworkers. His
symptoms were depressed mood, ongoing decreased energy and self-esteem. He
questioned his decision to "get involved," he is restless about the future, he was
isolating and showing withdrawal, and he reported limited to no support from the
system.

Also on 02/27/2003, Mr. Coffee noted the patient under cognitive processes from his
mental status exam that the patient adhered to idealistic justification (moral/ethical)
as justification for actions, not excepting of consequences.

Another session is indicated on 03/10/2003 as his fourth session. Signs and
symptoms included appetite disturbance and decreased energy. He also reported
that he felt like his body was "shutting down," that he was taking frequent and hard
naps. He had decreased motivation and regular activities, a sense of hopelessness
and feelings that his career and life were over, suicidal ideation though none at the
present, more feeling anxious rather than suicidal. He was isolating and showing
social withdrawal and had difficulty controlling his worry in public places. He had
feelings of anger with is employer for creating a difficult situation and lack of
motivation for behavioral change. He reported holding onto "moral outrage"
regarding the unfairness of it. Then benefits of anti-anxiety and antidepressant
medications were discussed. The benefits of a long term antidepressant rather than
diazepam PRN were discussed. He was also educated regarding the process of loss
and the benefits of moving on versus holding on to correct damaging emotions. He
was to speak with his physician about sick leave and to discuss antidepressants. He
was given what Mr. Coffee called reality therapy in that Mr. English was encouraged
to finish the process at work if reward/risk was worth it, simultaneously to seek
alternate employment to maintain his income and positive reputation in the field.

**Kaiser, Initial Psychological Evaluation, Joan H. Koff, Ph.D., 05/06/2003:**

The presenting problem was that the patient indicated on 02/12/2003, he began to
discover he was being persecuted because he had begun a process of "whistle
blowing." He said that his administration was preparing to file an insubordination
complaint against him around that same time. He told Dr. Koff that he found a
paper stuck to his chair that reported he had been involved in workplace violence
with a formerly friendly coworker named Julie. He said when he saw this he began
to feel a great deal of anxiety and felt that things were "spinning out of control." He
began to see a therapist, Gerry Coffee, M.S.W., about the situation. He claimed that
he was being investigated by his administration for workplace violence, that there
had been complaints by his co-employees and that an administrative agent, Michael
Gulich, was interviewing everyone at his work. He consulted with his union agent
and claimed that the union agent advised him that he may not be able to work for
this office or the City and County or possibly for the state any longer.

**Kaiser Progress Note, Joan Koff, Ph.D., 02/12/2003 through 02/23/2004:**

Roger Moseley
Re: Philip English
January 25, 2006
Page 24 of 52

During the approximate year Dr. Koff treated Mr. English for a total of 24 individual psychotherapy sessions lasting 45 to 50 minutes. On 02/12/2003, Dr. Koff noted that the patient was feeling a little bit better. His depression was a little less. He made statements that he behaved "like a doormat." He believed that his TDI was being delayed purposefully. He had been prescribed Trazedone and Zoloft but had not taken any.

Over the period treated, some of his symptoms included his isolating, difficulty trusting people, and feelings of humiliation. He complained of the unfairness of being the one responsible for twenty thousand Waikiki units and that the number of appraisals required of him was excessive. His second wife was leaving him during this period due to unnatural strains. He had been prescribed lorazepam PRN and took it throughout the period of treatment. He had worries and anxieties about his personal safety and the safety of his son since he was seen as a whistle blower. He demonstrated isolative behaviors and on outings in public places, he feared his anxiety would overwhelm him.

He believed that his union had divided loyalties and he believed that the deterioration of his marriage with his current wife was due to the "domino effect," meaning that his work situation had caused the end of his marriage. His work situation had also eroded his self-confidence. He had increased anxiety and felt stressed. He had difficulty trusting people. He was thankful for his church which had many times provided him with food since his financial situation was very difficult without work. He shared his fears and worries about his pending legal situation. At times he felt extremely shamed and humiliated.

There was slow improvement. In July of 2003, he was experiencing extreme financial stress. He believed there was relentless criticism after reporting the wrongdoing at work. His self-confidence was down. He distrusted people and was upset and had difficulty focusing. He also had vague suicidal ideation and Dr. Koff made frequent safety plans with him. He had difficulty figuring out his TDI: the amount of money he was receiving and what the statement indicated he had received. It left him anxious and confused. During the same period of time, from 05/15/2003 through 11/17/2003, Mr. English attended group therapy at Kaiser with social worker, Lily Mundone, L.S.W. During the period covered he attended a total of sixteen group sessions. Most of the progress notes indicated that he participated in the group and shared his anxieties, fears, and depression over his work situation with them.

### Initial Report, Psychological Evaluation, Reneau Kennedy, ED.D, Clinical and Forensic Psychologist, 04/20/2003:

Dr. Kennedy was hired by Thomas Riddle of the Workers' Compensation Administration Department of Human Resources to perform a psychological evaluation on Phillip English for his workers' compensation claim. She examined him on 04/18/2003 in a nine hour evaluation that included psychological testing, clinical interview, and mental status exam. She issued a preliminary report on 04/20/2003. It was her opinion that Mr. English was in current severe mental distress and that his condition warranted immediate medical attention and relief from the workers' compensation department. Dr. Kennedy ruled out malingering of his symptoms for secondary gain. She found Mr. English in acute need of assistance both

Roger Moseley
Re: Philip English
January 25, 2006
Page 25 of 52

psychiatrically and financially. She found him totally unable to work at the time of
the evaluation and his psychiatric needs overrode alternate temporary work
relocation. She planned to consult with his psychological treatment providers at
Kaiser concerning her initial findings. She found that there was more than sufficient
data to support Mr. English's claim for workers' compensation and she stated that
because he was currently without financial resources that immediate financial relief
would diminish some of the pressure Mr. English was living under. A full report was
being prepared; however, it could not be completed until Dr. Kennedy received all
the records that had been ordered.

**Full Report, Independent Psychological Evaluation, Reneau Kennedy, ED.D,
Clinical and Forensics Psychologist, 04/30/2003:**

Dr. Kennedy's full psychological evaluation was twenty-three pages long. She
reviewed all the records that had been provided her which were extensive. Dr.
Kennedy outlined a history of Mr. English's present claim. In her history taking she
noted that in 1999 Mr. English had applied for both the positions of real property
administrator and real property assessor; however, in both instances the jobs had
been given to the acting administrator and acting assessor. Dr. Kennedy pointed out
that a supervisor noted that Mr. English had been disappointed and displeased that
he hadn't been chosen because he thought he was the best candidate for those jobs.

Dr. Kennedy noted that Mr. English had been hired in June of 2000 in an entry level
position, that he initially took the job in order to get out of the stress of being in
private practice work. However, she pointed out that his goal for taking the job
must have changed because in November of 2000 he wrote that he had nothing to
lose and that he wanted to see things corrected and done right.

During that first year, Mr. English began to notice that his friend, Chris Graff, was
conducting business for GK Appraisals which is a Real Estate Appraisal Firm owned
by Mr. Kurokawa and that he was performing this work on City and County time. In
August of 2001, Mr. English issued a verbal complaint about this behavior to Ann
Gima, his supervisor. According to a note by Mr. Riddle, Mr. English said that Ms.
Gima responded that she didn't know anything about the situation, but she was
going to look into it. Mr. English submitted a second verbal complaint in February of
2002 to Ron Magota, Ms. Gima's supervisor, who was supervised by Mr. Kurokawa.
Mr. Riddle's notes indicated that Mr. Magota gave a verbal warning to Mr. Graff about
this behavior and also spoke to Mr. Kurokawa who indicated that he had told all of
his employees not to work on city time. Mr. English was not happy with the outcome
so he filed a complaint against the administrator for this type of behavior.

Further emails indicated that Mr. English had suffered retaliation due to the written
complaints. He cited the administrator's lack of "moral compass." Dr. Kennedy also
pointed out that there was a note from OSHA indicating that Mr. English had
requested to use the office fax machine for personal reasons in 2002.

Dr. Kennedy summarized further emails which were often attempts by Mr. English to
gain guidance from them in prioritizing his work. He expressed frustration in his
emails about the type of work that would be assigned. According to his supervisors,
Mr. English seemed to expect to be treated differently and was always criticizing
other employees and management.

Exhibit 105-00025

Roger Moseley
Re: Philip English
January 25, 2006
Page 26 of 52

Mr. English was promoted in March of 2002 to Real Property Appraiser IV position; however, his 04/12/2002 performance evaluation showed a decline in all four ratable performance factors. It was noted he had difficulty organizing and prioritizing his tasks, and he disagreed with established office work processes, and that he resisted completing tasks in the prescribed manner. Mr. English entered a written response that he disagreed with this evaluation and he believed it was a lack of insight on leadership that caused the confusion.

In further emails to Mr. Ishiguro, Mr. English pointed out that he thought that they were out to get him and that he felt harassed. He believed that because he had come forward about Mr. Kurokawa's behaviors, he had become subject to many complaints and scrutiny against him. By August of 2002, Mr. English's performance evaluation was below requirements in attitude toward work. According to his administrator, he had difficulty in independently performing all of responsibilities as appraiser four and that they had talked to him at least three times, making efforts toward addressing his various issues and problems. It was recommended he have an additional three month probation period. Mr. Magota advised Mr. English to seek counseling through the city's employee's assistance program, but according to his supervisor, Mr. English raised his voice at Mr. Magota and stated there was nothing wrong with him and he didn't need counseling. After this bad evaluation and return to probationary period, Mr. English sought legal counsel.

In September of 2002, Dr. Kennedy pointed out that Mr. English reportedly posted a "help wanted" article on the employee's bulletin board showing numerous job opportunities. He did this to express his dissatisfaction at the salaries the city paid its employees. His supervisor believed Mr. English was becoming frustrated and outspoken about his salary. Dr. Kennedy pointed out that there were disagreements and confusion about Mr. English taking leave time. Mr. English pointed out an email to Mr. Ishiguro that he felt Ms. Gima would help others but not him. He reiterated about them making life difficult for him and made statements like "they had picked the wrong guy this time." He believed that people were singling him out.

Further handwritten notes were referred to by Dr. Kennedy of meetings Mr. English had with his supervisors trying to straighten these problems out. Mr. English was not happy with these meetings and did not feel any satisfaction. Dr. Kennedy pointed out that in February of 2003, Mr. Chris Graff submitted a confidential workplace violence incident report saying that Mr. English had verbally threatened and intimidated him on 01/17/2003. According to Mr. English, he had encouraged Mr. Graff at that meeting to "just tell the truth and get you on the good guys' side." Dr. Kennedy pointed out that Mr. English stated that there were rumors going around that he "might be wearing a wire."

Dr. Kennedy also noted that in February of 2003, Mr. Totto, executive director of the legal counsel for the Honolulu Ethics Committee Commission had emailed Mr. Kurokawa about a complaint alleging use of city resources for non-city purposes by Mr. Kurokawa and Chris Graff. According to Dr. Kennedy, in the interview Mr. English pointed out that Mr. Totto was a "haole but that the supreme court justice, Paula Nakagima was Japanese and wanted the state to win." Dr. Kennedy wrote that Mr. English reported that he thought his career as an appraiser and supervisor was finished. He believed that perhaps he should return to college for retraining.

Exhibit 105-00026

Roger Moseley
Re: Philip English
January 25, 2006
Page 27 of 52

He reported the following symptoms: difficulty sleeping, nightmares, tearfulness, isolative behaviors, hyper-alertness, stomach problems, and migraine headaches. Mr. English's support network was limited to Frank Ramil, who was the pastor of Fellowship Bible Church. Dr. Kennedy noted that Mr. English's mother was in ill health and had recently been diagnosed with lung cancer. Mr. English also reported to Dr. Kennedy that he was shocked when his second wife filed divorce papers. He thought their marriage was struggling, but not to the point of divorce. He also told Dr. Kennedy that he had discovered his wife was seeing another man regularly.

In the interview with Dr. Kennedy, Mr. English told her that he told his son when he was eight years old that he had wanted to kill himself and that this disclosure had deeply effected his son. He said that his second wife viewed this as an attack. Dr. Kennedy wrote that Mr. English had told her in 1999 his company had suffered from a recession and had downsized from twelve employees to two. He reported he chose employment with the City and County of Honolulu upon his doctor's advice that he needed better stability than private practice offered and he needed to diminish his stress to ensure long term health benefits.

Dr. Kennedy noted that Mr. English experienced his first depressive episode in 1998 during marital turmoil with his wife. He attempted suicide twice; first with a large bottle of Aspirin, and second by hanging. After the first attempt, he was admitted to Queen's Medical Center. He then subsequently attended marriage counseling at Biodine for approximately one year.

According to other notes by Dr. Kennedy, Mr. English reported his depression worsened after he was told by his doctor and psychologist to go off work. He was without a paycheck for six weeks and had to borrow money from his pastor in order to get by. The money problem heightened to the point where he again felt suicidal.

Dr. Kennedy administered a battery of psychological tests. Mr. English's MMPI-2 profile was not valid for statistical analysis or normative base comparisons. The validity scales revealed that he responded in an exaggerated manner as he endorsed an extreme number of symptoms and attitudes. His MMPI-2 results likely arose from either a magnified "plea for help or severe psychological deterioration." Dr. Kennedy believed Mr. English's responses were the former.

On the Butcher Treatment Planning Inventory, Mr. English's scores again indicated elevated exaggeration scales. The findings were consistent with his MMPI-2 findings where he is overtly endorsing acute emotional distress. The treatment issue scales for the Butcher Treatment Planning Inventory indicated that he was high on sommatization scale, indicating that he's experiencing a considerable amount of physical distress at the time of the testing. Dr. Kennedy found that Mr. English endorsed symptoms which are commonly associated with channeling psychological conflict into physical symptoms. Mr. English reported a number of symptoms reflecting the presence of possible mood disorder; specifically, the depression scale indicated he felt very depressed. He also had a very high anxiety scale suggesting he felt anxious, tense, and fearful. The tests were informative to the point that Mr. English tends to internalize emotional conflict into physical symptoms. This would be in line with his physicians telling him that as a post-cancer survivor, he would need to consider less stressful work environments; however, he has not find the

Exhibit 105-00027

Roger Moseley
Re: Philip English
January 25, 2006
Page 28 of 52

government to be a less stressful work environment and it may not be in his best
interests to continue in that line of work.

Dr. Kennedy diagnosed:
Axis I: major depression, recurrent, severe without psychotic features; with history
of inter-episode recovery; occupational problem
Axis II: No diagnosis or condition
Axis III: Kidney cancer with nephrectomy
Axis IV : Problems with primary support group, marital separation, ill health of
mother, and child visitation difficulties with his ex-spouse; problems related to the
social environment, inadequate social support, living alone, difficulty with
acculturation, feelings of discrimination, adjustment to current transition;
occupational problems: difficult work conditions, job dissatisfaction, discord with boss
and coworkers; housing problems: recent complaint by boatyard manager with
potential eviction; Economic problems, financial problems while off from work
Axis V: global assessment of functioning was 55 current.

Dr. Kennedy found a number of factors contributed to Mr. English's mental
functioning. He had several life problems prior to working for the City and County of
Honolulu in 1998. They included undergoing surgery for cancer, a difficult divorce
with problems relating to visitation to his thirteen year old son, and severe financial
problems. He had two suicidal attempts during the break up of his second marriage.
In addition, his third marriage has since undergone difficulties and he anticipated it
would end in divorce.

Dr. Kennedy also found Mr. English's work situation to be a factor contributing to his
current mental health. He believed he had received unfair discriminatory treatment
from his supervisors. He believed that this treatment was directly related to their
unethical workplace behaviors that he had "blown the whistle on." He prided himself
at having a superior work ethic and thus it was very difficult for him to cope with the
work environment where he believed he was not accepted, appreciated, or viewed as
a collaborative worker.

Dr. Kennedy could not determine with finality how much of his difficulties prior to the
work situation contributed to current problems. She did elaborate on his history of
severe depression and significant physical problems. Also, she indicated that the
number of relationship problems in the past five years were also contributory. She
documented that according to his performance appraisals, he had initially done well
and was viewed by others as performing so, but there was deterioration around the
same time and period that he became concerned about potential ethical problems.

Dr. Kennedy found that the current situation, for both his coworkers and superiors at
the Department of Budget and Fiscal Services, was that each party felt they had
been wronged and that their emotional detachments had been eroded to a point that
might now be beyond repair.

Dr. Kennedy was asked to identify subsequent, non-related work injuries or issues
that might be cause of his current condition. Dr. Kennedy opined that Mr. English
was not coping well with being out of work, that the process of the ethics
investigation coupled with his own workers' compensation claim was very unpleasant
and emotional disturbing for him. She stated he was uncomfortable being the focus

Roger Moseley
Re: Philip English
January 25, 2006
Page 29 of 52

of attention. She also pointed out he had several family issues that were painful: being separated from his third wife, difficulty with visitations to his son, and his mother ill with cancer. She stated that he cared about his loved ones, and therefore these issues impacted his wellbeing.

Dr. Kennedy responded that further care was warranted and also psychopharmicalogical treatment was indicated for Mr. English's depression. She recommended a course of cognitive behavior or dynamic psychotherapeutic treatment and believed the therapy would ease symptoms of depression and help him with his methods for coping with his situational problems. She also recommended he reevaluate his career path. She thought therapy could be accomplished on an outpatient basis and that it would probably depend on how long the work related stressors continue.

Dr. Kennedy did not believe Mr. English was ready to return to usual and customary duty either part time or fulltime. She believed that the place-of-employment relationships were most likely irreparably damaged. She also opined that if an alternate placement was available, he might be able to return possibly part time or fulltime. She also recommended that any sanctions he had received be either suspended, or kept at the other place of work, and not transferred to where he might be placed.

## Letters

**01/16/2003, Letter to Phil English from Waylen Toma, Business Agent:**

The letter was written to cure of confusion. According to Mr. Toma, Mr. English was 'never on any probation.' Mr. Toma says he would have filed a grievance if the division had argued this issue. The agent clarifies that at the meeting that he had recommended that some of the language be removed; however, Mr. English had wanted the language left in because it might be in his best interest as he was talking to an attorney. He advised him at that time that his civil case might be weakened because the offer was made by the employer to change the language in the purposed attachment.

Mr. Toma documents that during the week after the meeting, he received two phone messages from Mr. English as well as two emails. According to Mr. Toma, the changes to the performance evaluation had been sent to Mr. English and they were awaiting his concurrence on the proposed changes which included a removal of all bracketed language. He advised Mr. English to agree to reasonable requests of management.

**02/07/2003, Letter from Gary Kurokawa to Phil English**

Mr. Kurokawa writes to Mr. English regarding his serious allegations of ethical misconduct. Mr. Kurokawa writes that he wants to do an inquiry and follow up, but he needs to clarify the allegations. He asked if the supervisor asked him to do something that was wrong, and if so who asked him to do it and what was he specifically asked to do. He asked him if a supervisor asked him to "protect the office." He asked him if a supervisor asked him to "not reveal the truth or cover up

Roger Moseley
Re: Philip English
January 25, 2006
Page 30 of 52

the truth." According to Mr. Kurokawa, Mr. English also said the amount of work and
the time frame which you are given to accomplish the assessments is an ethical
violation. He asked for a standard provision or resource by which he could research
and reply to that concern. He also wanted specific occasions and reasons when Mr.
English felt he had been ethically challenged at work.

### State of Hawaii Division of Boating and Recreation, Mason Young, Acting Administrator, 04/17/2003:

This note notifies Mr. English that he is in default in his account, that as of
03/31/2003, he was in default in the amount of $1,235.72. Failure to cure his
default within fifteen days of receipt of the notice would result in the termination of
his permit and require his vessel to leave the harbor.

### Case, Bigelow, & Lombardi, Roger S. Mosley, 04/25/2003:

Mr. Moseley in this letter was requesting that Mr. Riddle expedite Mr. English's claim
due to the fact that he could not pay his health insurance starting 03/01/2003. It
would be cancelled due to nonpayment and the fact that he was to be evicted from
his boat because he couldn't pay his slip as of 04/30/2003.

### Department of Human Resources, City and County of Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/29/2003:

Mr. Riddle responds to Mr. Moseley's letter of 04/28/2003 by saying "there is little
that can be done under workers' compensation that will help Mr. English." He said
that he had explained that these type claims take some time to process. He said he
had worked hard to secure an early appointment with Dr. Kennedy for the evaluation
and that he had been trying to obtain the records from Kaiser for some time. He
further stated that he called Kaiser and asked for the records; however, he was
unwilling to intercede for Mr. English with his boat rental fees or his health insurance.
He thought that was the job of his attorney. He could also do nothing regarding the
waiting of the physician's form for TDI because his office handled only workers'
compensation.

### Department of Human Resources, City and County of Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/30/2003:

Mr. Riddle had been concerned about Mr. English after his discussion with Dr.
Kennedy. He was concerned Mr. English's past history of multiple suicide attempts
and suicidal ideation. He believed that Mr. English's stress had reached a crisis level
and only seemed to be getting worse. He was contacting Mr. Moseley, Mr. English's
attorney, to get him to contact Mr. English's pastor to assist him in his current crisis.
He also gave him the crisis hotline and suicide prevention hotline.

### Case, Bigelow, & Lombardi, Roger S. Moseley, 04/30/2003:

Mr. Moseley was concerned and upset with Mr. Riddle. He believed that Mr. Riddle
had indicated Mr. English's annual performance evaluation would be placed on hold.
However, Mr. English received it in the mail and it was very negative. He informed
Mr. Riddle that Mr. English's present condition had worsened since receiving the

Roger Moseley
Re: Philip English
January 25, 2006
Page 31 of 52

evaluation. He believed that Mr. English's supervisors continued to attempt to retaliate with this evaluation. Mr. Moseley called for the discharge of Robert Magota and Ann Gima for their "despicable act of sending this evaluation to Mr. English at this present time."

**Email from Thomas Riddle to Reneau Kennedy, 04/30/2003:**

Mr. Riddle informed Dr. Kennedy that he had passed on the information to Mr. English's attorney about Mr. English's need to talk to someone like his pastor or the suicide crisis centers. Mr. Riddle informed Dr. Kennedy that he had spoken with Robert Magota who had assessment division about Dr. Kennedy going to the division to speak with people in the office to glean more information.

**Letter from Thomas Riddle to Mr. Moseley, 05/01/2003:**

Mr. Riddle thanked Mr. Moseley for his letter and points out that he can only handle workers' compensation issues. He said if Mr. Moseley had questions about control, supervision, authority, responsibility, or anything else that occurs within the City, he would have to take these concerns to the director of the Department of Budget and Fiscal services, Ivan Lui-kwan.

**Case, Bigelow, & Lombardi, Roger S. Moseley, 05/02/2003:**

Attorney Moseley writes Mr. Riddle requesting that he assist in preserving the health insurance coverage of Mr. English. HGEA had informed him that the city needed to contact them to confirm that Phil had been on authorized leave without pay since 02/28/2003. Mr. Moseley left Mr. Riddle the phone number of who to call to make this confirmation.

**Email from Phillip English to "Mom and Dad":**

This email written by Mr. English to his father's address, states that he was going on two-week work leave immediately and he had a meeting with the administrative service officer regarding complaints against him including workplace violence and sneaking around trying to gather info on people for a lawsuit. Mr. English informed his father that the new union agent said that something "really stinks." He said it sounded like retaliation and harassment. According to Mr. English, his union agent told him that he would probably not be able to work in the assessment division in the future for fear of retaliation. Mr. English informed his father he was pretty shook up about this; however, he said he had an ally that they do not know about and "I'm sure he is on my side."

**Case, Bigelow, & Lombardi, Roger S. Moseley, 05/03/2003:**

This letter to Dr. Reneau Kennedy states that Mr. English was assigned approximately 20,000 condominium and co-op units in one of the most complicated real estate markets in the world, Waikiki. Even if the co-op units were counted as single units, it would still be an excess of 18,000 properties. He included attached with this letter the IAAO standards (International Association of Assessing Officers). These standards indicated that 5,000 properties per assessor would be cause for

Roger Moseley
Re: Philip English
January 25, 2006
Page 32 of 52

concern. (Standard On Mass Appraisal of Real Property, 03/19/1984, International Association of Assessing Officers, No. 5 Managerial Considerations 5.2 Staffing)

**07/24/2003 Letter to Thomas Riddle, City and County of Honolulu, Workers' Compensation, from Joan H. Koff, Ph.D.:**

Dr. Koff was responding to Mr. Riddle's letter of 07/09/2003. She had reviewed Mr. English's records and had determined the date of injury most appropriate for his current situation as 01/30/2003. This is the date that Mr. English came to Kaiser to see his primary care physician, James Love, M.D., and complained of the undue stress related to his work situation. Dr. Love noted at that time that he wasn't sleeping well and had lost weight. He had anxiety and was referred to behavioral medicine. Treatment at that time began with therapist Gerry Coffee, M.S.W.

**08/28/2003, Letter from Joan Koff, Ph.D., to Thomas Riddle, City and County of Honolulu, Workers' Compensation Division:**

Dr. Koff pointed out that she had frequently asked to receive a copy of Mr. English's independent psychological evaluation and that she had only recently received it from his attorney, Roger Moseley. She stated that after viewing the report and her own clinical impressions, she believed Mr. English suffered from a work-related injury on 01/30/2003. She believed the injury was an acute exacerbation of a preexisting depressive disorder. Dr. Koff agreed with Dr. Kennedy that Mr. English suffered from a major depressive disorder; however, she believed the stressors were in a significant measure due to work difficulties. She attributed his housing problems, financial distress, economic problems, and feelings of discrimination, as well as marital separation all as secondary to his work problems. She believed that his psychosocial environmental problems noted by Dr. Kennedy would not likely be present to any significant degree if it were not for the injury of 01/30/2003. She recommended continued treatment.

He was presently receiving individual therapy and group psychotherapy, and had recently been assessed for psychotropic medication. The psychotropic medication was difficult due to his history of kidney cancer with nephrectomy which some medications would not be suitable for. She agreed with Dr. Kennedy that the patient would not be able to return to work in his current department. She did not agree that he was ready to return to work in another capacity. She believed that, if his condition improved, he would be eligible for rehabilitation service and find his way to reemployment at a later time.

Mr. English admitted to having two previous suicidal attempts, that his current suicidal thoughts were only ideation with no plan. He reported suicidal attempts in 1998 and 1999 related to the divorce by his wife of fifteen years. He was currently willing to contract for safety. He was having difficulty paying the rent for his boat as he hadn't received any temporary disability insurance. Dr. Koff noted under mental health history that the patient had a paternal grandmother reportedly with schizophrenia. Dr. Koff also tested Mr. English with the MMPI-2 and the Millon Behavioral Health Inventory.

The Millon Behavioral Health Inventory indicated that he came become distraught emotionally and may be inclined to expect trouble in relationships. He anticipates

Exhibit 105-00032

Roger Moseley
Re: Philip English
January 25, 2006
Page 33 of 52

being hurt by others which might account for his detached and isolated lifestyle. When life events are going extremely well, his behavior might be more affable and go in a comfortable direction; however, on distress, he may revert to a fearful, troubled, and restricted lifestyle. His moodiness and isolation make him highly susceptible to body elements of the psychosomatic nature. What he probably needs most is nurturing, understanding responses; however, his demands and complaints may exacerbate others. His future appears to look bleak and hopeless to him. He has a feeling of being without personal resources and is unable to gain support from others in dealing with the concerns that must be faced. He also indicated a history of chronic gastrointestinal disorder. Dr. Koff diagnosed:

Axis I: Major Depressive Disorder, Recurrent, Moderate; Anxiety Disorder NOS
Psychological Factors Effecting Physical Condition
Axis II: Deferred
Axis III: kidney cancer
Axis IV: moderate to severe work-related stress
Axis V: current GAF was 55, past year probable was 55.

Dr. Koff created a treatment plan including collaboration with other treatment providers as well as his new psychiatrist, Dr. Balogh. Initial treatment would be for fifteen sessions of cognitive, behavioral, individual psychotherapy on a weekly or bimonthly basis; supported group therapy to lessen than isolation and increase support; psychotropic medication, evaluation, and prescription; and, as needed, crisis intervention.

## Case, Bigelow, & Lombardi, Roger S. Moseley, 08/28/2003:

Attorney Moseley, representing Mr. English, wrote to Thomas Riddle of the workers' compensation administration requesting all records that were available on his client. He also in the letter acknowledged the settlement offer made by Mr. Riddle's department verbally in workers' comp only, in the amount of a cash payment of $60,000, six months continued treatment pursuant to an acceptable treatment plan, and Mr. English's resignation from his job. He notified Mr. Riddle that Mr. English and he were in the process of evaluating the offer.

## Honolulu Advertiser, "Lawyer Says Tax Agency Rotten," 02/19/2004:

According to the plaintiff's lawyer, the faulty property tax assessments alleged in former city appraiser's lawsuits are "very widespread and many Honolulu residents are likely being overcharged by the city." The federal lawsuit filed by Phillip English charges that division officials knowingly sent out incorrect property tax bills and retaliated against English after he challenged the practice. Moseley, English's attorney, said the division was chronically understaffed, leaving the employees overworked, demoralized, and afraid to complain about problems. The suit also charges that city employees were working for Gary Kurokawa, assessment division administrator's private business, during city time. Chuck Totto, the City Ethics Commission Director stated that a complaint filed by English last year remains pending.

According to this article, the city sent property tax bills totaling more than 400 million for 2003. Assessments had increased over 6.6% over 2002. By November, about 1.4 million in refunds had been returned to 147 property owners who

Roger Moseley
Re: Philip English
January 25, 2006
Page 34 of 52

successfully challenged their assessments. There were more than 16,000 appeals
still pending. Federal lawsuits stated that city officials knowingly sent out incorrect
property tax bills, had appraisers do work on city time for a company owned by the
head of the assessment division and his family, and retaliated against the appraiser
who tried to blow the whistle. Rather than correct the faulty tax bills, according to
English, a supervisor stated that "if taxpayers didn't like the assessment they could
file appeals." Also according to English, officials discouraged taxpayers from
challenging their bills and refused to provide the information they needed and rigged
the outcome of some real hearings. English stated that he would point out the faulty
assessments to his supervisors, but would be ordered to process them anyway.

### Handwritten Notes
Note that there were approximately 24 handwritten note entries reviewed. Some of
these notes were quite extensive, one by Mr. English was 27 small notebook sized
pages.

### 08/01/2002, Notes written by Gary Kurokawa

Mr. Kurokawa lists three things that were discussed in the meeting, all specific
directions as to how Mr. English could improve his job performance:
"I. Get model priorities done by dates. 'Cannot do all' everything. Look for the big
fires. If the models are due, turn them in 80% okay, 20% to look at and work on.
'Cannot do everything well.'
II. Check in with supervisor before you leave.
III. Chain of command, communications, and using proper venue."

### 09/09/2002, Notes, Phil English

The note indicates that on this date Ann Gima spoke angrily with him when he asked
her about work matters. When he asked her for specifics, he said she refused to tell
him any. He said she "remained very curt with me. It is very hostile. I still do not
know or understand why she treats me this way. It's very upsetting and disturbing
to be singled out and not know why." In addition, he pointed out that she spends
most of the days talking with her few favorites.

### 09/16/2002, Notes, author unknown

Mr. Kurokawa had a meeting with Waylen Tomma, an agent with HGEA. It was
suggested by Waylen that the administration not pursue probation based upon the
language that was used in the performance evaluation rating. According to Mr.
Tomma, the language was that of a punitive nature that maybe a grievable issue. It
was suggested that they monitor Phil for a three month period and if that
performance is not satisfactory, they can implement a special probation. The notes
seem to be written by Ann Gima.

### 11/22/2002, Notes, Phil English

Mr. English writes notes about his meeting with Waylen, Gary, and Ann. Many issues
were covered and solutions brought forth. He notes, some things were
accomplished, however, it was pointed out in the meeting that Waylen was a
personal friend of Gary's and that Phil believed, "that it was left up to me to agree to

Roger Moseley
Re: Philip English
January 25, 2006
Page 35 of 52.

the 'deal' made between Gary K. and Waylen T." He ended the meeting by asking if
he could think about all these things. He was given until 11/22/2002 to respond.
The notes of the meeting were twelve pages long. He wrote, "So there offer to me
was more of a threat. Do what we say or we will put you under Bob M. or move you
to Kapolei." He was also upset that they had offered to arrange to move him to the
Big Island because they had heard he wanted to move there; however, his plan was
to stay on Oahu for five years until his son was out of high school.

### 12/04/2002, Notes, Phil English

In the notes he says that Susan Bender offered him a "haven if he needed someplace
to go and talk." Susan believed that Chris could refuse the work assigned by Gary if
he so chose. However, she stated, she did not have firsthand knowledge of this
activity. She was suspicious of one incident where she witness Gary come over and
hand Chris a disk.

### 12/18/2002 and 12/19/2002, Notes, Phil English

In the notes Mr. English writes about instances where he is suspicious that his
supervisor Ann Gima is talking about him to other coworkers. He writes that if he
walks over where they are talking, they become quiet and secretive. He also
documents an incident of Chris not being reprimanded when he was out to lunch
from 11:30 until 1:15. He believed this to be a double standard since lunch is not
supposed to go past 12:30.

### 01/21/2003, Notes, typewritten, Mr. English

He writes, "Susan Bender came to my desk before going to a doctor's appointment
to tell me that Chris has talked to Lee Agsalud and that the word is out not to talk to
me because I might be wearing a wire.

### 01/24/2003, Notes, Mr. English

Ann was very condescending to him and he writes, "...that is she will find something
wrong or something for me to do whether it is substantive or not."

### 02/13/2003, Typewritten Note, Phil English

It said that Ann G. was talking to Carl T. about something to do with him. He said
there was a great deal of whispering and he didn't know what they were saying but
when he got up to get water they both looked at him and stopped talking. He was
confident that Ann was discussing his personal issues.

### 02/30/2003, Notes, Mr. English

He documents that he had written letters to two taxpayers who were enquiring why
their tax payments went up so much. He said that Ms. Gima instructed him to
change the letters in a way that did not make it appear that the office had done
something wrong. He had a problem with this and felt uncomfortable with her
request to write a letter that seemed to cover up some error on the department's
behalf.

Roger Moseley
Re: Philip English
January 25, 2006
Page 36 of 52

**01/29/2003, Ms. Gima**

Ms. Gima submitted a letter stating that she had reviewed the workplace violence policies and wants to report a situation that needed attention. She wrote that during the course of approximately one year, Phil English had displayed unacceptable behaviors, "raising his voice and other outbursts," and that she had to verbally counsel him about this. She believed that he had irrational beliefs of persecution and retaliation which had escalated into a situation where she had been informed that he had made intimidating and coercive phone calls to a fellow employee. She feared future violence. She also stated Phil's coworkers had expressed fears as to his behavior.

**02/05/2003, Note, Mr. English**

Mr. English noted that he had been called into Bob Magota's office. The door was closed, he was told of an impending disciplinary action, something about an unauthorized leave. The issue had to do with his supervisor, Ann Gima. At that point Mr. Magota asked her to come into the room also. Mr. English requested to have a third party present and said he would like an independent party such as Dwight Ishiguro to attend or his attorney. He subsequently spoke to Dwight who talked to him thirty or forty minutes about this disciplinary action that had something to do with an unauthorized leave in October. They also accused him of insubordination. In his notes, he writes that when he returned from the meeting he believed that someone, "Chris," had tampered with his mobile phone. He wrote at the same time Ann Gima was wandering around the group "humming and whistling" in a mocking fashion. He believed her "gleeful" because he was about to receive disciplinary action.

**02/10/2003, Notes, author unknown**

In attendance: Phil English, Bob Magota, Kevin Mulligan, and Ann Gima. It is unclear who wrote these notes. Mr. Magota is concerned and wants to prevent a hostile work environment. He point out that Mr. English has raised his voice at him and that this type behavior is counterproductive and affects people in the workplace. Mr. English brings up things that he is still unclear about; for example, the extended probation situation and their failure to explain to him why they were going to place him on extended probation. Mr. Mulligan suggested ways to address the level of mistrust; for example, not having Gary Kurokawa be involved with issues with Mr. English. Mr. English points out that there were other issues that were being investigated and so he went to Chris. He wanted Chris to tell the truth because the ethics commission "already knows" and he said, "I'm told people's lifestyles will be changing." There was a reminder to clear leave requests and keep his temper under control. Mr. English stated, "I don't have a temper."

**02/20/2003, Notes, Mr. English**

He documents that he saw a request for leave for Julie on a desk in which she was given different kind of privileges than he had been given. On the same date, he had a handwritten note about noticing that Ryan had been working on blueprints and plans for some proposal or improvement to his house. He wrote that some of the

Exhibit 105-00036

Roger Moseley
Re: Philip English
January 25, 2006
Page 37 of 52

other workers had been talking to him about it on City and County time. He also
noted that Ryan was one of Gary Kurokawa's "special buddies." He alleged that Ann
had been especially helpful to Chris, helping him with certain work duties that she
refused to help Phil with. He described some situation in which she loudly brought
into attention some issue with his work. He called this very abusive and said it had
been going on for some time now. Phil noted that he felt very isolated, more than
before. The other employees were avoiding him or being careful around him. He
thought Susan Bender was a friend and a safe haven for him and she had stated that
she should no longer talk to him.

He also noticed that "Dwight the union representative had always been a friend to
me (or so I thought)." He now felt that Dwight's loyalty to the office and longtime
friendships had affected his objectivity. He thought it strange how people stick
together or lay low and stay out of it. He noted that they were nice people, but their
sense of right and wrong was definitely skewed. In all there were twenty-seven
pages of notes on a small notepad for this date. 02/24/2003, there are two pages of
notes, handwritten on a small notepad. Phil is feeling very isolated and depressed.
In handwritten notes totaling seventeen pages on 02/27/2003 on a small notepad,
Mr. English writes that Kevin, his union rep, has told him that he would most likely
be moved out of the division due to his allegations of unethical conduct for fear of
future retaliation. Phil believed that he might not have a future in working for the
State of Hawaii. He writes that he will be marked because he spoke up. He also
wrote that when this "whole thing started" he had to go to Kaiser by ambulance
because they thought he was having a heart attack. He attributed his third wife
leaving him to his work situation and her fears that he wouldn't be able to take care
of her.

### Workplace Violence Reports

### 02/06/2003, Workplace Violence Checklist, Interview of Ann Gima:

Ms. Gima pointed out that Phil English had words with Chris Graff and Phil had
brought some allegations against Chris which was also under ethics investigation.
She also said, Phil has been pressuring Chris to "tell him the truth about Gary
Kurokawa." This occurred in January of 2003. She had a concern about behavior
patterns and outbursts by Phil starting in January of 2002. She said he was upset
and threw a box down and his voice was raised when speaking to Ann. She said he
was upset and took an accusatory, belligerent tone when he confronted her in July of
2002 about a payroll verification.

She reported that in October of 2002, he had asked for four hours vacation leave
and when it was denied, he got upset and raised his voice. It was her opinion that
he appears to be a quiet person but he has raised his voice and his attitude can be
strained with other employees. She believed he was capable of physical violence.
She did not feel in any imminent danger. She further said that his attitude after six
months took a downward turn. She said at first he was capable and showed
initiative, but now he complained that they haven't taught him anything, he made
his own schedule, and his work quality and attitude had gone down. He saw
everyone else as wrong, he made mistakes but never admitted responsibility for

Roger Moseley
Re: Philip English
January 25, 2006
Page 38 of 52

errors because he had never been taught or told how to do the task. He also spent a lot of time writing emails and typing which is typically not a requirement of his job.

**02/06/2003 Workplace Violence Checklist, Interview of Bob Magota:**

Bob said there had been friction between Phil English and Ann Gima, his supervisor. He challenged her authority. He reported Mr. English capable but sometimes missed deadlines and then stated that he was never told and had not received training. Bob attached a list of training Phil has had. He said others had this training and did not have any problems. He said Phil is defensive, he blames everyone else, and he is not responsible.

He also stated that there was at least one more incident between Ann and Phil but he did not witness it. He said Phil misinterprets what he is told. Bob had told him that the Appraiser IV is not the supervisor. He said that others might see Phil as a quiet person, but he is sometimes an irrational thinker and misses deadlines. He said his language with Ann can be considered abusive at times. He can be charming and then fly off the hammer. He said he did not feel threatened by Phil but he did have concern about being misquoted by Phil.

**02/10/2003, Workplace Violence Checklist, Interview of Julie Tamayori:**

Julie stated that "Phil English is a nice guy; sweet, nice, nonviolent and mild-mannered in appearance; however, he's recently done some backstabbing with a coworker, Chris Graff. Phil is acting like nothing has happened. Phil has made some type of charges against Chris about doing personal work on the job. She had never witnessed Phil being physically aggressive but there where times when he did get argumentative with his supervisor, Ann. Coworkers were scared, ran away last year, 2002, when there was an incident between Phil and his Ann."

She stated further that Phil had explained to her that his ex-wife had accused him of being abusive, but Phil denied it. She stated she saw a parallel between how he described his ex-wife and all the attorneys and judge being on her side to here in the office, how he is claiming everyone is siding with the administration. In her opinion, this "everyone's against me" theme is a bit paranoid. She explained that Phil will lie about things, minor things: for example, that he had to take the day off because of a parent-teacher conference. She found out that there was no school that day and no parent-teacher conferences. She said, "Phil will lie to justify his position. He'll say he's not been told something, in particular about the job, when the information has been provided to everyone via email. He will do things the wrong way even though instructions and emails are provided." She stated that she did not feel threatened by him, but when asked about physical harm she wasn't sure.

**02/10/2003, Workplace Violence Checklist, Interview of Linda Knowles:**

Linda said that Phillip English is stressed. There is tension between Phil and Ann Gima, the supervisor. His email replies to Ann Gima are often obnoxious in tone. He will state that he is not been trained or no one has told him something when email messages have been sent out. She said, "Phil has even gone after one person, Chris, who is the nicest to Phil." She said that Phil had threatened Chris: he better turn Gary in or Chris will lose his job. She felt scared that if he would do that to

Roger Moseley
Re: Philip English
January 25, 2006
Page 39 of 52

Chris that he would do it to someone else if it fit his agenda. She said Phil is charged that he has been ostracized by the group, when in fact he has always been invited to participate when we have food or share things. When asked if she felt threatened she said "no," but that "Phil could stab anyone in the back."

**02/10/2003, Workplace Violence Checklist, Interview of Carol Kamisato:**

Carol was aware of two encounters between Phil and Ann. It got loud when he had been told to go downstairs and work the counter and he had refused. Ann confronted him. She said voices got loud on both sides and Phil had gotten upset. She said that she heard a loud noise and Phil had thrown or dropped a box.

She witnessed another incident, also in 2002. It started at Phil's desk. Ann left and went to her desk. Phil followed and got loud, so loud that it scared Carol and she walked away from the area. She said it went on for approximately ten minutes. She stayed away for twenty minutes. She stated on another occasion, she had gone with Phil to a real property class near Kapiolani Park. She offered him a ride home. She said that when they got to his residence he would not get out of the car which was running. He talked to her for twenty minutes about his ex-wife and mother-in-law and he was justifying the divorce. He mentioned that his ex-wife was telling stories and that the court decision was wrong, that he did not physically abuse his ex-wife. Finally she told him she needed to get home and said that since then she has kept her distance. When asked if she felt threatened she said, "no," but she was scared because of what was going on in Phil's life. She enumerated his stressors such as his divorce, his son adjusting to the divorce, his second wife from Thailand moving out, him investing in a boat with no bathroom or electricity or running water. She said that Phil was being pushed to the limits financially and emotionally. She said he had a lot going on and he might explode. Something might trigger him such as what happened in the "Bryan Xerox case."

**02/10/2003, Workplace Violence Checklist, Interview of Susanne Foumai:**

Su explained that she had some difficulties with Phil over him not being clear about training start times or on another occasion when she tried to explain to him how to do a particular thing on the computer and he kept asking why and how and said that he couldn't do it. He said that she must do it or lose the files. She said he wants an explanation on why it is done. She said that she did feel safe at work. She said that anger management to control his temper, might help.

**02/12/2003, Workplace Violence Checklist, Interview of Eugenie E. Shito-Leong:**

On one occasion, Genie heard Phil talking to Ann in a loud voice. She said she didn't feel comfortable about what was going on. This was in the fall of 2001. She said it was during the appeals timeframe. She said Phil was under pressure just getting a lot of calls from taxpayers about a letter they received regarding their property classification. She said maybe he was on a short temper because of that situation. She heard loud talking. She was worried about him getting violent so she left.

**02/12/2003, Workplace Violence Checklist, Interview of Dwight A. Ishiguro:**

Roger Moseley
Re: Philip English
January 25, 2006
Page 40 of 52

Dwight said that Phil is a low key individual and a soft-spoken guy. He is religious, a Christian and Dwight was Buddhist and they would have discussions. Dwight never heard him get upset. Dwight said he had some discussions with Phil because he used to be a union representative. There were no incidences of problems with Phil that Dwight was aware. He said he never saw any outward displays. He said Phil seemed cordial. When asked if physical harm seemed possible, Dwight said he didn't know because anyone could be pushed beyond his or her limits. He recommended that prevention by hearing both sides of the story might help. He said that people need to stay on track; communication between managers and employees need improvement.

**02/12/2003, Workplace Violence Checklist, Interview with Christopher Graff:**

Chris explained a situation when Phil had asked to use the fax machine for personal IRS work. When it was not approved he said Phil slammed things down and was upset. He left the office and slammed the door. He witnessed another incident when Phil was assigned the counter and he didn't report. He was called to go, but didn't want to because he was doing something else. He said that Phil was forced to go to counter duty and slammed boxes on a desk. He also said Phil had mentioned to him that he and Ann had a shouting match. He also believed Phil had become more morose over the years, that he gives comments and suggests that people are out to get him. He seems paranoid. He reported that Phil was acting as a victim and had some job problems he needed to correct. He believed the ladies in the office felt threatened.

**02/13/2003, Workplace Violence Checklist, Interview of Annette Kabasawa:**

Annette was not sure of any conflict. She had heard some others talking, but had never seen anything herself. She didn't know anything about any allegations. She did not feel threatened.

**02/13/2003, Workplace Violence Checklist, Interview of Ryan Fujitani:**

Ryan had had heard from other workers about confrontations with Phil English. He had no direct confrontations with Phil. He said, "but other employees do seem to be on edge." He was worried about Phil being stable. He believed he needed to be cautious around Phil because of his attitude and behavior. He was aware that Phil had a divorce and that his ex-wife took everything. He said that Phil felt like he was the one victimized. He was aware Phil had physical problems; a kidney removed and financial problems. He also mentioned that in conversation Phil sometimes said that he borrowed money from his son. When asked if he felt threatened he said, "not really," but he did start to think about the Byron Uyesugi case and how Phil's behavior seemed weird, a little psycho, especially since hiring Roger Moseley, the same guy he was defending assessments against.

**03/12/2003, Confidential Report from Mike Golojuch to Gary Kurokawa, Administrative Services Officer, Regarding Interim Investigative Report Allegations of Workplace Violence against Phil English:**

Roger Moseley
Re: Philip English
January 25, 2006
Page 41 of 52

His findings included:
1. There was a general concern about Phil English and his behavior over a period of time.
2. Although there was a safety concern among some of the employees, none of them stated anything about getting rid of Phil. The main concern was that he receive some sort of employee assistance counseling.
3. Only one person admitted to feeling threatened by Phil's presence at the worksite.
4. The incidences of loud voices and items being thrown down occurred over six months ago.
5. The most recent confrontation occurred between Phil and Chris Graff on two occasions in January of 2003. These had to do with Phil telling Chris he needed to tell the Ethics Commission the truth.
6. Chris spoke to Chuck Totto, on the ethics commission. Although it was only Chris' side of the story, Chris stated that what he had done was minor. He alleged that Chuck told him that he should not do it again.
7. Only a partial number of real property assessment division personnel have attended workplace violence training.
8. Phil's workplace performance has not always been at satisfactory level.
9. Phil has exhibited inappropriate behavior resulting in disciplinary action that was pending an investigation.
10. During this investigation, Mr. Phil English filed a worker's compensation claim.

Mr. Golojuch's conclusions were that there was some concern that Phil's behavior had upset employees. It was proper for the employees to bring their problems forward; however, there did not appear to be sufficient evidence to conclude that Phil had actually verbally threatened or taken physical action against other employees in the context of workplace violence.

He stated that there was some sort of friction between Mr. English and Ann Gima. He believed Mr. English's actions must be documented carefully. Since he has raised ethics issues, he considers himself protected under the whistle blower provisions. This is true for any retaliation; however, Mr. Golojuch found nothing during the investigation revealing that Phil was under retaliation. He recommended that Phil's behavior be monitored, that Phil be encouraged to go to EAP or other counseling. The division needs to take appropriate steps to correct or improve Phil's work. The division may consider moving Phil to another team. The division must ensure that no retaliation is taken against Phil for filing an ethics complaint. The department will work for the division to receive workplace violence training. After Phil English can be interviewed (he was not available to be interviewed in this investigation,) a full report will be made. The court investigator will continue to coordinate the case with DHR and corporate counsel.

**Medical Records Review, Mark Killen Stitham, M.D., Ltd., dated 08/20/2003:**

At the request of Thomas Riddle, Workers' Compensation Administrator, Dr. Stitham performed a record review. He did not examine Mr. English. Mr. Riddle asked Dr. Stitham to address Mr. English's personality problems and his response to the many stressors he had experienced in recent years. Mr. Riddle wanted Dr. Stitham to comment on how these problems affect his daily life and his employment. Dr. Stitham's 08/20/2003 bill, indicates that he spent 3.50 hours on the record review

Exhibit 105-00041

Roger Moseley
Re: Philip English
January 25, 2006
Page 42 of 52

and his report. His report was 9 pages in length. Dr. Stitham's opinions are summarized.

He found Mr. English's situation to be an "exceedingly complex case." Dr. Stitham found that Mr. English exhibited denial and projection defenses, "The former is seen by his denial of raised voices or any personal problems [which are extensive]. The latter can be seen in his blaming his problems on everyone else rather than accepting responsibility for his performance failures." Dr. Stitham was surprised that Dr. Kennedy did not find Mr. English to have an Axis II diagnosis. His record review revealed grandiosity, rigidity, and paranoia. He surmised that Mr. English might have Bipolar Affective Disorder currently in the depressed phase.

Dr. Stitham did not find Mr. English credible regarding statements that all of his problems were work related. He enumerated personal problems, non-work related, that were revealed in the records. He wrote, "...in reasonable medical probability, this early middle-aged man had a rather severe mood disturbance which subsequently affected his work performance. Due to his personality structure, he reacted with defenses of projection and denial."

Dr. Stitham further opined that the Claimant was too ill to work and required treatment and medication. He recommended that the treating physician investigate for possible Bi-polar Affective Disorder. It is most likely a "typing error," however, it should be noted that Dr. Stitham did not examine Mr. English, but in the last paragraph of his report he writes, "This report is based upon the record review and the examination of the claimant and is totally independent of the requesting agent."

**Report of Industrial Injury or Illness, Supervisor's Response, OSHA, Form 300 Log No. 030135, Regarding Employee Phillip E. English:**

The supervisor indicated that the knowledge of the facts about Mr. English's injury did not agree with the statements of Mr. English. He also stated that the injury was due to one of the following; misconduct, negligence, intoxication, or intent to injure self or another. The supervisor wrote the facts as he saw them:

1. Mr. English claimed the injury occurred on 01/02/2003 which was questionable because Mr. English was on vacation from 12/21/2002 to 01/03/2003.

2. The supervisor stated that Mr. English alleged injury based on "stress associated with retaliation from internal investigation of wrongdoing in the department was unfounded." The supervisor indicated that Mr. English had been warned numerous times regarding his work performance, insubordination, behavior, and attitude, and stated that these were not related to his claim. If Mr. English was suffering injury due to stress, the supervisor believed that he brought it upon himself and it was not due to retaliation on the employer's part.

3. He further pointed out that Mr. English had retained an attorney for his Ethics Commission complaint and that that attorney, Mr. Roger Moseley, had tax appeal cases pending against the city before the board of review, the tax appeal court, the circuit court and the supreme court. Mr. English was the city's main witness and was responsible for running the assessments that are the subject to these appeals. The supervisor alleged that Mr. Moseley was providing free legal services to Mr. English

Roger Moseley
Re: Philip English
January 25, 2006
Page 43 of 52

for his Ethics Commission complaint and that it was evident that Mr. English had
been providing information to Mr. Moseley in support of his recent circuit court and
tax appeal court filings. The supervisor said this was an obvious conflict of interest
that had not been resolved at this time.

4. The supervisor responded to the first complaint of an internal investigation. He
said that in late 2001 Mr. English raised allegations that another employee, a close,
personal friend, Mr. Chris Graff, was involved in outside employment during city
working hours and was doing this on instruction of Mr. Gary Kurokawa. The
supervisor pointed out that allegations could not be proven and that Mr. Graff denied
the allegations. Mr. English wasn't satisfied with the actions taken by Mr. Magota.

5. The supervisor responded to the second complaint having to do with Mr. English's
claim that administration was retaliating because he submitted an Ethics Commission
complaint. The supervisor claimed to be unaware of the ethics complaint
investigation initiated by Mr. English until 01/22/2003 when Mr. Graff brought it to
the attention of Ms. Gima and Mr. Magota. Mr. Graff said that Mr. English had
verbally threatened and intimidated him twice regarding his role as a potential
witness.

6. Mr. English had received a verbal reprimand for work related issues on
02/10/2003 which included failure to follow his supervisor's instructions,
insubordination, and inappropriate conduct towards his supervisor which occurred on
10/25/2002. According to the supervisor, these issues had been discussed at an
earlier meeting on 01/15/2003. At that time, they were unaware that Mr. English
had filed with the ethics commission investigation. Therefore, it was their contention
that they could not be retaliating over this issue as they were unaware of the
complaint.

7. At the 02/10/2003 meeting, the supervisor stated that Mr. English admitted that
he had spoken to Mr. Graff before he had been interviewed by Mr. Totto. Mr. English
also admitted that he had said if other employees don't start coming forward to tell
the truth, their lifestyles are going to change. The supervisor indicated that this
could be construed as a threat. The supervisor believed that Mr. English might be
using his claim of stress to delay other ongoing internal investigations by the
employer.

8. It also appeared to the supervisor that he might be trying to avoid completing
current work assignments and had already missed two deadlines, one on 02/11/2003
and 02/18/2003 that he had been aware of since 12/12/2002.

9. The supervisor further opined that Mr. English filed his workers' compensation
claim immediately after receiving notice that he was under investigation for
threatening and abusive behavior towards coworkers. He said Mr. English also
delayed the meeting that was supposed to address these threats scheduled for
03/03/2003.

10. The supervisor further pointed out that on 02/28/2003, Mr. English was
supposed to be at a mandatory training class and instead appeared at the office
asking a secretary for a workers' compensation application. When he was told that

Roger Moseley
Re: Philip English
January 25, 2006
Page 44 of 52

the application had to be submitted to management for review, the secretary stated
he became very upset and gave her a glaring look that frightened her.

11. The supervisor stated that Mr. English had deceived another employee to find out
who had submitted workplace violence allegations against him. The second internal
investigation was ongoing and included acts of insubordination and work
performance issues. These incidents occurred on February 11, 18, 19, and 25, 2003.

12. The supervisor said that this investigation had also been delayed due to Mr.
English's recent absence from work.

13. The supervisor further spoke to issues of behavior, personal problems and work
performance. Mr. English's claim of retaliation might also stem from delays in his
promotion to Real Property Appraiser IV position. He alleged that Mr. English was
hired at the same time as another employee and that both of them had to wait to
receive this promotion from 11/01/2001 to February of 2002. Therefore, this was
proof that there was no "singled out" retaliation.

14. The supervisor also said that after his promotion to Real Property Appraiser IV,
Mr. English's work performance became more problematic. He missed deadlines, he
failed to follow supervisor's instructions that were clearly outlined, and he became
more argumentative and insubordinate and made excuses for his inability to
complete assignments. Some of these excuses were statements such as "you never
told me." Ms. Gima had to give him instructions in writing through email. He
complained that he had not received proper training and used this as an excuse. The
supervisor pointed out that Ms. Gima and technical staff were available to assist him.
The division had provided classroom training to Mr. English and an exhibit was
attached delineating all training.

15. Also, it was pointed out that Mr. English had recently applied for Real Property
Appraiser VI position in March of 2001. In his application, he emphasized his
competency and capabilities in the assessment field contradicting his claim of lack of
training.

16. The supervisor documented that Mr. English had problems planning ahead and
scheduling his work, setting priorities, multitasking, and completing assignments.

17. Mr. English complained to management that certain clerical tasks such as using
the copy machine were "below him" and that he shouldn't be required to do such
menial tasks. When it was explained to him that the division was understaffed, he
became even more upset. The supervisor opined that Mr. English expected to be
treated differently and was always criticizing other employees and management.

18. The supervisor also said that last year at a meeting with Ms. Gima, Mr. Magota
advised Mr. English to seek counseling from the City's Employee Assistance Program.
Mr. Magota was very considerate of Mr. English's personal problems and how they
were affecting his job performance. On this occasion, according to the supervisor,
Mr. English raised his voice at Mr. Magota and stated there was nothing wrong with
him and he didn't need counseling. He also said that everyone was out to get him.
He told Mr. Magota that he felt paranoid.

Roger Moseley
Re: Philip English
January 25, 2006
Page 45 of 52

19. According to the supervisor, Mr. English initiated many discussions with other employees about his personal life, anyone who would listen, or was in any way sympathetic to his problems. He was constantly portraying himself as the victim and would blame others for his problems. A list of these "victim" situations is included: a.) His second wife filed for divorce in 1999; he blamed her for the breakup of their marriage. He said that his wife knew the judge and his attorney did a poor job of representing him and he got an unfavorable outcome. B.) Mr. English was required to attend the Kids First Program on 03/24/1999. It was mandatory to attend with his wife and son before the divorce decree could be entered. In a letter dated 03/24/1999, Mr. English stated he was unable to attend because he was out of the country. He had told other employees that during and after his divorce, he had great difficulty and so he was traveling to Thailand to do some "soul searching." C.) He was trying to gain custody of his son and complained that his second wife was doing a poor job of raising him. He was concerned for the child's welfare. He had strong suspicions that his son was being molested by someone at the Catholic school he was attending. D.) He was having marital problems with his third wife. They had married in June of 2000 and he said that she needs to "grow up." His third wife who was a former employee of his export business in Thailand left him in late 2002.

20. He openly discussed his financial problems with other employees and management. One sympathetic employee offered to give him money and another offered him a loan. The supervisor pointed out that Mr. English was originally hired at a salary rate of $29,340 as a Real Property Appraiser II.

21. He had openly criticized Mr. Kurokawa and management for the way the office was being run.

22. His financial problems were extensive. There is detailed information about his second divorce decree and how much money the family owed. His wife's income and expense statement on the divorce decree said that her monthly income was $11,230, but she had to cash her IRA account, pay bills on credit card accounts, borrow money form her mother, and cash out an insurance policy to make ends meet. In the settlement, Mr. English said that he would have to receive spousal support or he would have to use his credit cards to pay for his living expenses which included child support of $370 per month.

He told other employees that he had never paid his child support payments to his second wife. In the decree, he received $25,000 in the division of property and also $77,000 from his wife's retirement plan which he withdrew in 1999 for a total settlement of $102,000. The wife was awarded the Kahala house and sole responsibility for the mortgage payments. The following year August 2000, he filed Chapter 7 Bankruptcy. He owed $2,100 to the IRS for his retirement withdrawal. He owed money for his attorney and legal services provided in his second divorce.

In his bankruptcy filing, according to the supervisor, Mr. English stated that his occupation was Real Estate Appraiser from 1989 to 1996; however, from 1996 to 1997, his new business was exporting personal care products to Thailand and the Philippines. He lost this business due to inflated money exchange rate. He then returned to real estate appraisal in 1998; however, he had not listed this export business on his application with the city. The supervisor wrote that Mr. English had been less than honest on his job application, stating that he made an annual salary

Roger Moseley
Re: Philip English
January 25, 2006
Page 46 of 52

of between $40,000 to $45,000 as owner and appraiser of his company for ten
years. Mr. English had not worked for quite sometime, had not been making any
money for quite sometime, and had been living on his retirement and divorce
settlement.

He complained frequently that his third wife was sending money home to her family
in Thailand and he was upset over this. He was often behind on his rent for his
Hawaii Kai condominium that he had resided in since 1999. In August of 2002 he
decided to buy a boat to live on. He told others he was having problems qualifying
for a loan to purchase the boat. He had to borrow money from relatives to do so.
Soon after moving out of his condo and onto his boat, his third wife left him.

23. In the preceding year he had become more open and frustrated about his salary
and told other employees that he would earn just as much money working for City
Mill. He posted a help wanted article dated September 2002 on the employee
bulletin board showing mainland job opportunities to express his dissatisfaction at
the salaries the city paid its employees.

24. Last year, he asked Mr. Magota to use the office fax machine to send documents
to the IRS when he was told that the fax machine was only for work related
purposes. Mr. English became very upset, gave Mr. Magota a glaring look, and left
the building slamming the door behind him.

25. He had argumentative and intimidating behavior towards others including his
supervisors. He had been warned numerous times of this behavior. At a meeting on
08/14/2002, he was given an extended probationary period after a six month normal
probation for Real Property Appraiser IV position.
When warned about raising his voice in hostility towards Ms. Gima he denied that he
had ever raised his voice at her. This contradicts witness's statements. Mr. English
said that on 10/25/2002 Ms. Gima was the aggressor and charged at him; however,
he had told another employee that he had gotten into an argument with her,
admitted to yelling at her, and boasted at getting the best of her in this
confrontation. When told by Mr. Magota to control his temper, he denied having a
temper. On numerous occasions, he has demonstrated his temper in front of other
employees and management.

**Psychological Report, Robert J. Sbordone, Ph.D., Inc., dated 10/26/2005:**

Dr. Sbordone reported that his evaluation took 8.5 hours. He administered four
psychological tests and wrote a 47 page report. His testing results and opinions are
summarized.

According to Dr. Sbordone, the Beck Anxiety Inventory assessed Mr. English's
subjective symptoms of anxiety. His score was 34 in the severely anxious range,
however, Dr. Sbordone did not find him visibly anxious upon examination. His Beck
Depression Inventory-II score placed him in the severely depressed range, but Dr.
Sbordone found that he was euthymic except when discussing the actions of his
former supervisors and coworkers.

Dr. Sbordone administered the Personality Assessment Inventory assessing long
standing personality characteristics. According to Dr. Sbordone, Mr. English may not

Roger Moseley
Re: Philip English
January 25, 2006
Page 47 of 52

have answered the questions in an entirely forthright manner, however, there was
no evidence to suggest that he was defensive or motivated to portray himself as
being free of common shortcomings or faults. He may have portrayed himself in an
unduly negative manner and had unusual combinations of clinical features.

His clinical scales suggested depression, hostility, and pessimism because of negative
life experiences that he believed were caused by others. He exhibited heightened
sensitivity in social interactions, suspiciousness and hostility and was socially
isolative. He appeared to harbor anger and resentment as much at himself as at
others. He appeared to have experienced a traumatic event. His self-concept was
harsh and negative. He had indecision and uncertainty about his plans for the
future. He also exhibited recurrent suicidal ideation.

Mr. English was also administered the Minnesota Multiphasic Personality Inventory-2.
The scoring indicated he may have distorted the test responses to create a certain
impression or that he may be generally unsophisticated. His profile indicated much
psychological distress with intense self-doubt and low morale. He exhibited major
problems with anxiety and depression and tends toward being high strung and
insecure. Individuals with this pattern tend to have high standards, but feel that
they fall short and blame themselves harshly. He demonstrated insecurity and
pessimism about his future and felt inferior, had little self-confidence, and did not
feel capable of solving his own problems. He exhibited introversion and low self-
esteem. He worried a great deal about his problems, but had little energy to solve
them. Antidepressant medication was suggested and cognitive-behavioral
psychotherapy.

Dr. Sbordone found a "striking discrepancy" between Mr. English's claims of
harassment and the statements of his former supervisors and coworkers. He opined
that if Mr. English's assessment of these events was accurate then his resultant
problems socially, financially, and psychologically were most likely the result of the
exacerbation of his preexisting psychological problems by the work harassment.
However, he also reports that if his perception of the events that occurred at work
reflect "a pattern of self-defeating behavior, projection, and inflexible thinking then
the actions of the City and County of Honolulu must be seen as appropriate and not
retaliatory."

Dr. Sbordone also points out the importance of Mr. English's significant non-
industrial stressors such as severe financial problems, bankruptcy, a failed business,
renal cancer, his mother's health problems, a custody dispute, suspicions that his
son was being molested at school, and two divorces. He opines that Mr. English's
problems thus could not all be caused by the workplace.

Dr. Sbordone reported that the MMPI-2 results over the past several years have
remained consistent. He points to the lack of psychological improvement and
stability of his elevated profile across 8 of the 10 clinical areas even after he has not
worked for the City and County for two years. Dr. Sbordone sees this as evidence
that his problems have been longstanding and non-remitting and thus part of his
personality structure verses caused by his work problem.

Dr. Sbordone opines that Mr. English's recurrent depression may have been
exacerbated by the work stress, but points out that he has been quite reluctant to

Roger Moseley
Re: Philip English
January 25, 2006
Page 48 of 52

move on even though encouraged to do so by his psychotherapists. Dr. Sbordone
finds that Mr. English is naïve to the effect that allegations of illegal activities would
have on coworkers and supervisors. Mr. English continued to maintain that his
"whistle blowing" was justified. Dr. Sbordone sees this as reflecting "a long-standing
pattern of moral rigidity and self-defeating behavior; which he apparently fails to
acknowledge since he appears to project the blame for his failures on the actions of
others." Dr. Sbordone points to Mr. English's history of blaming others for his life
problems.

Further, Dr. Sbordone does not find that Mr. English's capacity to work has been
compromised since he had a job as a security guard at the time of his examination.
He was puzzled by the fact that Mr. English had not sought work again as an
appraiser since his current job did not provide him with medical benefits. He stated,
"At the risk of sounding cynical, I suspect that he will work in this capacity again
after his law suit is settled."

Dr. Sbordone diagnosed:
Axis I:     1. Major depression, recurrent, severe without psychotic features.
            2. Anxiety disorder.
            3. Psychological factors affecting medical condition.
Axis II:   Rule out personality disorder with borderline, self-defeating, and dependent
            features.
Axis III:  History of kidney cancer with nephrectomy.
Axis IV:   Financial difficulties, inadequate social support, dissatisfactions with his
            Current job, the health of his mother, and fears of becoming homeless.
Axis V:    GAF: 65 (current)

**Report of Dirk Von Guenthner & Associates, dated 11/04/2005:**

Mr. Guenthner's attached Curriculum Vitae indicated that he is employed in forensic
research and litigation support services in the area of accounting. He holds a
Bachelor of Science degree in business administration with a major in accounting.
His report was 42 pages in length.

His conclusions are summarized:

1. He concluded that the Plaintiff misrepresented himself in his employment
   application to the City. He opined that Mr. English was not actually successful
   at operating and managing a large appraisal firm as he seemed to indicate on
   his application. According to Mr. Von Guenthner, the Plaintiff's business was
   operating with either no revenue or not enough in its last years of operation.
   Therefore, he did not find that Mr. English could have been paying himself the
   salary that he indicated on his application.
2. He found that Mr. English omitted two part-time jobs in his application. He
   did not reveal that he had worked as a clerk at City Mill and a carpet cleaner
   for another company. Mr. Guenthner believed that if Mr. English had included
   these two jobs, the City interviewer would most likely have discovered that
   Mr. English had mental health issues. He believed the interviewer would have
   been able to discover that Mr. English did not have the "mental fortitude" to
   do the job.

Roger Moseley
Re: Philip English
January 25, 2006
Page 49 of 52

3.  Mr. Guenther summarized that in the three years prior to employment with the City, Mr. English: attempted suicide, experienced kidney cancer, experienced divorce, had problems with the IRS, was about to file bankruptcy, and was severely emotionally upset over personal problems.

4.  He reports that during a 17 month period, Mr. English incurred new debt of up to $150,235 and then filed bankruptcy in 2000 with $193,035 in unsecured debt, $21,000 of secured debt to the IRS totaling to $215,035 of liabilities and $3,370 of assets. He found that Mr. English lived a lifestyle way above his means with no ability to pay back his debt.

5.  He found that in 1999, Mr. English's income and expense statement filed in Family Court under penalty of perjury was false. He reported that Mr. English was not earning this amount and has never since earned it.

6.  Mr. Guenther noted that Mr. English's Appraiser IV application documented the salary he earned in his private practice to be greater than when he first applied.

7.  He reported that Mr. English took on part time work after leaving his job with the City. He worked for cash and did not report this on his tax returns.

8.  He opined that Mr. English was not competent to perform as an Appraiser IV based on other factors which impacted his life.

9.  He found the "Whistle Blower" issue to be "hoopla" and claimed there was no evidence made available to him that justified his Whistle Blowing claims.

10. He pointed out that it had not been determined that Mr. English was innocent or guilty of the charges of violence in the work place due to the fact that Mr. English was never interviewed.

11. Mr. Guenther pointed out that Mr. English received a Workers' Compensation settlement of $85,000 and in that settlement Mr. English admitted that he had not sustained any permanent disability.

12. Mr. Guenther reported that special damages for lost wages prepared by Thomas Ueno, CPA, were made without Mr. Ueno reviewing all the facts of the case.

13. He further pointed out that Robert Sbordone, Ph.D. had opined that Mr. English would most likely work as a professional appraiser again at some point.

14. He noted that Mr. English's attorney participated in a news release criticizing the Real Property Assessment Division. He reported that the attorney's activity included contacting the FBI and the United States Attorney office in an attempt to strengthen Mr. English's claims.

15. Mr. Guenther believed that Mr. English should consider himself to have experienced "good fortune" to have already received an $85,000 workers' compensation claim. Mr. Guenther did not find that Mr. English was entitled to any further remuneration.

**Diagnosis**

Axis I:          Major Depressive Disorder, Recurrent, Moderate, Without Psychotic Features, With History of Interepisode Recovery History of Panic Disorder Not Otherwise Specified

Axis II:         Personality Disorder Features (Paranoid, Obsessive Compulsive, Narcissistic)

Roger Moseley
Re: Philip English
January 25, 2006
Page 50 of 52

Axis III:        History of kidney cancer and nephrectomy, 1998

Axis IV:        Occupational problems
                Financial problems
                Housing problems
                Problems with access to medical care
                Psychiatric problems of fifteen year old son
                History of marital problems

Axis V:         Current: 55    Highest in Past Year:  55

### Conclusions

Mr. English had been married for approximately twelve years when in 1998 his wife told him that she did not love him anymore and filed for divorce. By his report, she was a successful attorney and very capable of getting the divorce settlement that was most beneficial to her situation. Also, in 1998, Mr. English was diagnosed with kidney cancer and underwent nephrectomy. His situational life difficulties, both physical and emotional, precipitated a severe depression. He had two suicide attempts and was diagnosed with a Major Depressive Disorder.

He received psychiatric/psychological treatment, including medication, and stated that he eventually got better. He had only recently recovered from this serious psychiatric disorder when he began working for the City and County of Honolulu as an Appraiser in June 2000. Mr. Guenthner in his 11/04/2005 report indicated that the interviewer would have ruled Mr. English out for the appraiser job if he had known that Mr. English did not have the "mental fortitude" to perform the work. I found no evidence in the records reviewed that Mr. English had a problem performing his job until 2002 when he claimed that he witnessed unethical practices in his work place. The <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision</u>, states, "Major Depressive Episodes may end completely (in about two-thirds of cases), or only partially or not at all (in about one-third of cases)." Mr. English has Major Depressive Disorder with Interepisode Recovery. He was recovered at the time of his interview in 2000. Neither Mr. Guenthner, nor the County interviewer would have enough psychiatric training to predict or assess mental illness in Mr. English.

Mr. English had misgivings that the job he was hired for was beneath his skill level. Even so, initially, he felt good about his new career, his administrators, and co-workers. His early employee evaluations confirm his success at work. However, he believed that after he "blew the whistle" on his administrator's inappropriate behaviors, he was subject to retaliation. He believes his employee evaluations and subsequent return to probationary status are a result of this retaliation.

If it can be presumed that Mr. English did witness and confront inappropriate/illegal behaviors on the part of his supervisor, then his psychiatric symptoms are resultant from this work situation. His tenuous psychiatric state, including some entrenched personality disorder features, was not able to withstand the stress and pressure of

Roger Moseley
Re: Philip English
January 25, 2006
Page 51 of 52

dealing with this possibly volatile situation. Currently, he is not recovered. He is able to go out more and has ceased his most total isolative behaviors, but he is negative and pessimistic about his future.

While it is beyond the scope of my expertise to determine unlawful or inappropriate behaviors by Mr. English's superiors, it is important to note that I found no indication in Mr. English's personality features of a tendency to malinger, distort, or deceive.

Even the defense expert, Robert Sbordone, Ph.D., in his 10/26/2005 report opined that if Mr. English's assessment of these events was accurate then his resultant problems socially, financially, and psychologically were most likely the result of the exacerbation of his preexisting psychological problems by the work harassment. He further notes that if Mr. English's perception of the events reflects "a pattern of self-defeating behavior, projection, and inflexible thinking then the actions of the City and County of Honolulu must be seen as appropriate and not retaliatory." While Dr. Sbordone and I are qualified to diagnose personality disorders, neither of us are able to determine unlawful or inappropriate behaviors by Mr. English's superiors.

Also important are Mr. English's current employment difficulties. He continues to exhibit diminished confidence that he can express himself at work without fear of retribution. His personality disorder features undermine the ability necessary to lift himself out of his occupational decline. He lacks the interpersonal skill set to recover from his work injury and develop a new career at his previous level of employment. In short, his mental health disorders prevent his ability to "bounce back," and continue on in some productive employment venue. His long-term prognosis is not good.

He is in need currently of continued psychiatric treatment, and has responded well to such treatment in the past. However, he has no further medical insurance, and cannot afford to pay for treatment. Mr. English is in need of long-term psychiatric intervention, most probably he will need two to five years, including psychotherapy and medication. Dr. Stitham in his 08/20/2003 report, did not have the benefit of an actual examination of Mr. English. Although I disagree with his specific diagnosis, we both agree that Mr. English has a mood disorder and requires treatment.

fIt is also evident that his ability to perform in a similar work capacity has been compromised. His anxiety is such that he has difficulty trusting himself or others in a professional work setting, where he must constantly interact with others. This may improve should he receive proper treatment, but it is impossible to predict at this time if and when he might return to professional work. His mental illness has curtailed his earning ability significantly.

Please let me know if further clarification is needed at this point.

Sincerely,


Daryl B. Matthews, M.D., Ph.D.

Roger Moseley
Re:  Philip English
January 25, 2006
Page 52 of 52

DARYL MATTHEWS, M.D., PH.D.
TERESA LATHROP, M.F.T.
DARYL FUJII, PH.D.
EUGENE WANG, M.D.
SHEILA WENDLER, M.D.

**HAWAI'I FORENSIC ASSOCIATES, LLC**
345 QUEEN STREET, SUITE 900
HONOLULU, HAWAI'I 96813
PHONE: 808-735-8505
FAX: 808-955-0933

FORENSIC CONSULTANTS IN PSYCHIATRY,
PSYCHOLOGY, AND THE BEHAVIORAL SCIENCES

August 7, 2006

Roger S. Moseley, Esq.
Moseley Biehl Tsugawa Lau & Muzzi
Alakea Corporate Tower
1100 Alakea Street, 23rd Floor
Honolulu, Hawaii 96813

   RE: English vs. City & County of Honolulu
     Civil No. 04-00108 JMS-KSC

Dear Mr. Moseley:

Please accept this addendum to my report in the above referenced case.

**Fees for Services Provided**

I have charged $400.00 per hour for services provided. These services, to date, have included; consultations with you, record review, examination and testing, and report preparation. Thus far, Hawaii Forensic Associates, LLC, has billed for $4,576.00 for my time. All future services will be billed at the $400.00 per hour rate.

**Listing of Collateral Records Reviewed and Psychological Testing**

Department of Personnel, City and County of Honolulu, Employment Application, dated 05/18/1999

Human Resources Department, City and County of Honolulu, Notice of Examination Results for Phil English, no date on score sheets

City and County of Honolulu, Department of Civil Service, Probationary Performance Evaluations, Phillip English, 08/09/2000 through 08/14/2002

Department of Personnel, City and County of Honolulu, Employment Application, Real Property Appraiser VI, Phillip English, 03/29/2001

Real Property Assessment Division Memorandum, Robert O. Magota, 11/07/2001

Interoffice E-mails, various, dated 09/2001 through 12/2002 (379 emails were reviewed)

Records of Kaiser Permanente
Personal Health Appraisal Summary Report, Undated
Medical Progress notes 05/03/2001, 05/22/2001, 01/13/2003
WC-2 Physician's Report, 02/13/2003
Progress Notes, psychiatric, Gerald Coffee



EXHIBIT
106
8-16-06 Matthews

Initial Psychological Evaluation, Joan H. Koff, Ph.D., 05/06/2003
Progress Notes, Joan Koff, Ph.D.

Initial Report, Psychological Evaluation, Reneau Kennedy, ED.D, Clinical and Forensic
Psychologist, 04/20/2003
Full Report, Independent Psychological Evaluation, Reneau Kennedy, ED.D, Clinical
and Forensics Psychologist, 04/30/2003

01/16/2003, Letter to Phil English from Waylen Toma, Business Agent

02/07/2003, Letter from Gary Kurokawa to Phil English

Letter to Phil English from State of Hawaii Division of Boating and Recreation, Mason
Young, Acting Administrator, 04/17/2003

Letter to Thomas Riddle from Case, Bigelow, & Lombardi, Roger S. Moseley,
04/25/2003

Letter to Roger Moseley from Department of Human Resources, City and County of
Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/29/2003

Letter to Roger Moseley from Department of Human Resources, City and County of
Honolulu, Thomas Riddle, Workers' Compensation Administrator, 04/30/2003

Email from Thomas Riddle to Reneau Kennedy, 04/30/2003

Letter to Thomas Riddle from Case, Bigelow, & Lombardi, Roger S. Moseley,
04/30/2003

Letter from Thomas Riddle to Mr. Moseley, 05/01/2003

Letter to Thomas Riddle from Case, Bigelow, & Lombardi, Roger S. Moseley,
05/02/2003

Email from Phillip English to "Mom and Dad"

Letter to Dr. Reneau Kennedy from Case, Bigelow, & Lombardi, Roger S. Moseley,
05/03/2003

07/24/2003 Letter to Thomas Riddle, City and County of Honolulu, Workers'
Compensation, from Joan H. Koff, Ph.D.

08/28/2003, Letter from Joan Koff, Ph.D., to Thomas Riddle, City and County of
Honolulu, Workers' Compensation Division

Letter to Thomas Riddle from Case, Bigelow, & Lombardi, Roger S. Moseley,
08/28/2003

Note by Gary Kurokawa dated 08/01/2002

Various Handwritten and Typed Notes Written by Phil English dated 09/09/2002
through 02/20/2003 (22 notes)

Note by Ann Gima, dated 01/29/2003

Workplace Violence Reports
02/06/2003, Workplace Violence Checklist, Interview of Ann Gima
02/06/2003, Workplace Violence Checklist, Interview of Bob Magota
02/10/2003, Workplace Violence Checklist, Interview of Julie Tamayori
02/10/2003, Workplace Violence Checklist, Interview of Linda Knowles
02/10/2003, Workplace Violence Checklist, Interview of Carol Kamisato
02/10/2003, Workplace Violence Checklist, Interview of Susanne Foumai
02/12/2003, Workplace Violence Checklist, Interview of Eugenie E. Shito-Leong
02/12/2003, Workplace Violence Checklist, Interview of Dwight A. Ishiguro
02/12/2003, Workplace Violence Checklist, Interview with Christopher Graff
02/13/2003, Workplace Violence Checklist, Interview of Annette Kabasawa
02/13/2003, Workplace Violence Checklist, Interview of Ryan Fujitani
03/12/2003, Confidential Report from Mike Golojuch to Gary Kurokawa,
Administrative Services Officer, Regarding Interim Investigative Report Allegations of
Workplace Violence against Phil English

Report of Industrial Injury or Illness, Supervisor's Response, OSHA, Form 300 Log
No. 030135, Regarding Employee Phillip E. English

Medical Records Review, Mark Killen Stitham, M.D., Ltd., dated 08/20/2003

Article Honolulu Advertiser, "Lawyer Says Tax Agency Rotten," 02/19/2004

Report of Industrial Injury of Illness, Supervisor's Response, OSHA, Form 300, Log
No. 030135, Regarding Employee Phillip E. English

Psychological Report, Robert J. Sbordone, Ph.D., Inc., dated 10/20/2005

Report of Dirk Von Guenthner & Associates, dated 11/04/2005

Mr. English was administered the Minnesota Multiphasic Personality Inventory-2 on
08/08/2005, the results of his testing were utilized in helping formulate diagnosis
and conclusions.

**<u>Previous Testimony  (four years prior to 08/07/06)</u>**

<u>Case, Testimony Date, Location of Case—retaining party</u>

Juline v. ValueOptions, Yager, ABS et al. 8/16/02, Phoenix, Arizona
---defense

State of Hawaii v. Mark Davis, Jr. , 8/20/02--8/21/02, 9/1//02, Hilo, Hawaii ---
prosecutor

State of Missouri v. Raymond Wood, 7/30/03, Warrensburg, Missouri---prosecutor

State of Texas v. Kent Sprouse, 9/9/03, Waxahatchie, Texas---prosecutor

Prosecutor v. Pavle Strugar, 4/29/04, The Hague, Netherlands---prosecutor

U.S. v. David Paul Hammer, 9/21/05-/9/22/05, Martinsburg, PA---prosecutor

California v. Adrian Camacho, 11/2/2005, San Diego, CA---prosecutor

Idaho v. Alan Dunlap, 2/21/05, Soda Springs, Idaho---prosecutor.

Washington v. James Lakey,4/04/06, Seattle, WA---prosecutor

## Publications

Please see pages 9-10 of my current cv (attached).  This is a complete list of all publications.

Sincerely,


Daryl B. Matthews, M.D., Ph.D.
Diplomate in Psychiatry and Forensic Psychiatry,
American Board of Psychiatry and Neurology

Curriculum Vitae

## DARYL BRUCE MATTHEWS, M.D., Ph.D.

Office Address:
345 Queen Street, Suite 900
Honolulu, Hawaii 96813
Phone: 808-735-8505
Fax: 808-356-0739
email: dmatthews@jhu.edu

Date of Birth:          September 26, 1947 (Cleveland, Ohio, U.S.A.)

Citizenship:            United States of America

FORMAL EDUCATION

1971-1977          The Johns Hopkins University
                   Doctor of Philosophy (Sociology)

1969-1973          The Johns Hopkins University
                   Doctor of Medicine

1967-1969          The Johns Hopkins University
                   Bachelor of Arts (Human Biology)

1965-1967          Dartmouth College

POSTGRADUATE MEDICAL EDUCATION

1981-1982          Fellow in Forensic Psychiatry
                   Institute of Law, Psychiatry, and Public Policy
                   Schools of Law and Medicine
                   The University of Virginia

1973-1976          Resident in Psychiatry
                   The Johns Hopkins Hospital

1973-1976          Fellow in Psychiatry and Behavioral Sciences
                   The Johns Hopkins Hospital

MEDICAL QUALIFICATIONS

Licensure:         Active:  Hawaii, Arkansas, Tennessee
                   Inactive:  Maryland, Massachusetts, Virginia

Certification:     American Board of Psychiatry and Neurology
                     Psychiatry, 1984
                     Subspecialty of Forensic Psychiatry, 1994
                   American Board of Forensic Psychiatry, 1986

Daryl Bruce Matthews                                              Page 2

ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2006- | Clinical Professor of Psychiatry and Director Emeritus<br>Forensic Psychiatry Program<br>John A. Burns School of Medicine<br>University of Hawaii<br>Honolulu, Hawaii |
| 1995- | Consultant, U.S. Army Medical Command, and<br>Co-Director of Training in Forensic Psychiatry<br>Tripler Army Medical Center<br>Honolulu, Hawaii |
| 2002-2006 | Professor of Psychiatry and Director,<br>Forensic Psychiatry Program<br>John A. Burns School of Medicine<br>University of Hawaii<br>Honolulu, Hawaii |
| 1995-2001 | Clinical Professor of Psychiatry<br>John A. Burns School of Medicine<br>University of Hawaii<br>Honolulu, Hawaii |
| 1990-1995 | Professor and Director of Education<br>Department of Psychiatry<br>University of Arkansas for Medical Sciences<br>Little Rock, Arkansas |
| 1994-1995 | Adjunct Faculty<br>School of Law<br>University of Arkansas at Little Rock<br>Little Rock, Arkansas |
| 1987-1990 | Associate Professor of Psychiatry<br>John A. Burns School of Medicine<br>University of Hawaii |
| 1982-1987 | Associate Clinical Professor of Psychiatry<br>John A. Burns School of Medicine<br>University of Hawaii |
| 1982-1984 | Chief, Kauai Community Mental Health Center<br>Lihue, Hawaii |
| 1981-1982 | Associate Professor of Behavioral Medicine<br>and Psychiatry<br>University of Virginia School of Medicine |

Daryl Bruce Matthews                                                          Page 3

| | |
|---|---|
| 1976-1981 | Assistant Professor of Psychiatry and of<br>  Socio-Medical Sciences and Community Medicine<br>Boston University School of Public Health |
| 1973-1976 | . Lecturer in Behavioral Sciences<br>The Johns Hopkins University<br>School of Public Health |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2006- | Editorial Board<br>*Focus: the Journal of Lifelong Learning in Psychiatry* |
| 2004- | Forensic Psychiatry Consultant<br>Office of the Prosecutor<br>International Criminal Tribunal for the Former Yugoslavia, The Hague |
| 2004- | Forensic Psychiatry Consultant<br>Office of Military Commissions (Defense Counsel)<br>United States Department of Defense, Arlington, Virginia |
| 2004-2006 | Faculty Senate, John A. Burns School of Medicine<br>University of Hawaii |
| 2002- | Director, Forensic Psychiatry Evaluation Service<br>Department of Psychiatry, John A. Burns School of Medicine<br>University of Hawaii |
| 2001-2003 | Training Director<br>Forensic Examiner Certification Program<br>State of Hawaii, Department of Health |
| 2001- | Forensic Psychiatry Consultant<br>State of Hawaii, Department of Health |
| 2001- | Forensic Psychiatry Certification/Recertification Committee<br>American Board of Psychiatry and Neurology |
| 1999 | Visiting Professor of Psychiatry<br>University of Madrid, Spain |
| 1998-2002 | Admissions Interviewer<br>John A Burns School of Medicine<br>University of Hawaii |
| 1998-2000 | Education Co-Chair<br>Scientific Program Committee<br>World Psychiatric Association<br>Conference on Forensic Psychiatry |

Madrid, Spain

| | |
|---|---|
| 1996- | Specialist Site Visitor in Forensic Psychiatry<br>Residency Review Committee for Psychiatry<br>Accreditation Council for Graduate Medical Education |
| 1995-1998 | Hawaii State Task Force on Individuals with Mental<br> Illness in the Criminal Justice System |
| 1995- | Private Practice of Forensic Psychiatry |
| 1993-1995 | Arkansas Attorney General's Committee<br> on Anti-Stalking Legislation |
| 1993 | Visiting Professor<br>Department of Psychiatry<br>John A. Burns School of Medicine<br>University of Hawaii |
| 1992-1995 | Medical Ethics Faculty<br>Division of Medical Humanities<br>University of Arkansas for Medical Sciences |
| 1992- | Editorial Board<br>Psychiatry Resident in Training Examination<br>American College of Psychiatrists |
| 1992- | Article Referee<br>Bulletin of the American Academy of<br> Psychiatry and the Law; Journal of the American<br> Academy of Psychiatry and the Law |
| 1991 | Visiting Professor<br>Tripler Army Medical Center<br>Honolulu, Hawaii |
| 1990-1995 | Medical Expert<br>Department of Health and Human Services<br>Social Security Administration |
| 1989 | Article Referee<br>Journal of Forensic Sciences |
| 1988-1990 | Chairman<br>Kauai Service Area Board for Mental Health and Substance Abuse |
| 1988-1990 | Steering Committee<br>Certification Program in Forensic Mental Health<br>Department of Health, State of Hawaii |

Daryl Bruce Matthews                                                                                        Page 5

| 1988- | Examiner in Psychiatry<br>American Board of Psychiatry and Neurology |
|---|---|
| 1987- | Psychiatric Consultant<br>Threat Assessment Group, Inc.<br>Newport Beach, California |
| 1985-1990 | Medical Advisory Committee<br>Department of Commerce and Consumer Affairs<br>State of Hawaii |
| 1983-1985 | Board of Editors<br>Law, Medicine & Health Care |
| 1982-1990 | Private practice of general and forensic psychiatry |
| 1981-1983 | Associate Editor<br>Law, Medicine & Health Care |
| 1981-1982 | Member<br>Commissioner's Committee on Forensic Services<br>Virginia Department of Mental Health |
| 1981-1982 | Certified Forensic Examiner<br>State of Virginia |
| 1980-1981 | Member of the Council (Medicine)<br>American Society of Law and Medicine |
| 1980 | Chair, Institutional Review Board<br>Bridgewater State Hospital<br>Bridgewater, Massachusetts |
| 1979-1981 | Associate Editor<br>Medicolegal News |
| 1979-1980 | Chair, Admissions Committee<br>Boston University School of Public Health |
| 1979-1980 | Consulting Psychiatrist, Complaint Committee<br>Massachusetts Board of Registration in Medicine |
| 1976-1981 | Associate Director of Undergraduate Education<br>Division of Psychiatry<br>Boston University School of Medicine |

HOSPITAL STAFF APPOINTMENTS

| 2001- | Academic Medical Staff |
|---|---|

Daryl Bruce Matthews                                                    Page 6

|  | Hawaii State Hospital<br>Honolulu, Hawaii |
|---|---|
| 1995-2001 | Courtesy Medical Staff<br>Hawaii State Hospital<br>Honolulu, Hawaii |
| 1990-1995 | Medical Staff<br>University Hospital<br>Little Rock, Arkansas |
| 1990-1992 | Consulting Staff<br>North Little Rock Veterans<br>  Administration Hospital<br>North Little Rock, Arkansas |
| 1983-1990 | Courtesy Medical Staff<br>G.N. Wilcox Memorial Hospital<br>Lihue, Hawaii |
| 1989-1990;<br>1982-1986 | Active Medical Staff<br>Samuel Mahelona Memorial Hospital<br>Kapaa, Hawaii |
| 1981-1982 | Visiting Physician<br>University of Virginia Medical Center<br>Charlottesville, Virginia |
| 1981-1982 | Psychiatric Consultant<br>Forensic Evaluation Unit<br>Western State Hospital<br>Staunton, Virginia |
| 1976-1981 | Assistant Visiting Physician<br>University Hospital, Boston, Massachusetts |

HONORS, AWARDS, & LISTINGS

Jack S. Annon Award for Excellence in Forensic Mental Health Services, State of Hawaii,
Department of Health, 2006

Outstanding Teacher 2002-2003, University of Hawaii, Department of Psychiatry

Distinguished Fellow, American Psychiatric Association, 2003

Fellow, American Psychiatric Association, 1999

Emile Eckart Award for Excellence in Resident Education, University of Arkansas for Medical
Sciences, 1995

Daryl Bruce Matthews                                                Page 7

Arkansas Institute of Continuing Legal Education:  Best of CLE 1992

Who's Who of Emerging Leaders in America

West's Who's Who in Health & Medical Services

Who's Who Among Human Services Professionals

Who's Who in Medicine and Healthcare

Who's Who in Science and Engineering

Who's Who in the South and Southwest

Who's Who in the West

Sol. W. Ginsburg Fellow, Group for the Advancement of Psychiatry

Commonwealth Fund International Fellow in Medical Care

Haas Memorial Fund Scholar

<u>PROFESSIONAL ORGANIZATIONS</u>

American Academy of Forensic Sciences

American Academy of Psychiatry and the Law
        Councilor, 1996-1999
        Education Committee, 1991-1997; 1999-
            Chair, 1994-1997
        Ethics Committee, 1995-1999
            Chair, 1995-1999
        Nominating Committee 1997-1999
        Learning Resource Committee, 1994-1996
        Program Committee, 1994-1997
        Awards Committee, 1994-1997
        Task Force on Practice Guidelines
          for Forensic Evaluations, 1995-1999
        Liaison to Spanish Society for Legal Psychiatry, 1999-
        Committee on Computers and Forensic Psychiatry, 2003-2006
        Committee on Culture and Forensic Psychiatry, 2006-

American Association of Directors of Residency Training in Psychiatry

American Association for Social Psychiatry

American College of Psychiatrists
        Psychiatry Resident in Training Exam, Editorial Board, 1994-2005
        Chair, PRITE Fellowship Committee, 2005-

Daryl Bruce Matthews                                                     Page 8

American Psychiatric Association
    Committee on Confidentiality, 1999-2000
    Fellow, 2000-2003
    Committee on Judicial Action, 2002-
    Distinguished Fellow, 2003-
    Isaac Ray Award Committee, 2006-

Arkansas Psychiatric Society 1990-1995
    President, 1993-1994
    President-elect, 1992-1993
    Secretary, 1991-1992
    Local Arrangements Chairman, 1991-1992
    Program Committee, 1990-1992

Association of Directors of Forensic Psychiatry Fellowships

Hawaii Psychiatric Medical Association 1982-1990; 1995-
    Legislative Committee 1999-
    Task Force on Involuntary Medication 1999-2000
    Chair, Forensic Committee 2001-

International Academy of Forensic Mental Health Services

International Academy of Law and Mental Health

Sociedad Española de Psiquiatría Legal

PUBLICATIONS

*Books*

D. Matthews, Disposable Patients: Situational Factors in Emergency Psychiatric Decisions, Lexington Books, 1980.

N. Scotch, J. Swazey, and J. Sorenson, with D. Matthews and C. Kavanagh, Reproductive Pasts, Reproductive Futures: Genetic Counseling and Its Effectiveness, Alan R. Liss, 1981.

W. Tseng, D. Matthews and T. Elwyn, Cultural Competency in Forensic Psychiatry, Brunner/Routledge, 2004.

*Chapters*

R. Hingson, D. Matthews, and N. Scotch, "The Use and Abuse of Psychoactive Substances," in H. Freeman, S. Levine, and L. Reeder (eds.) Handbook of Medical Sociology (Third Edition), Prentice-Hall, 1978.

P. Dietz, S. Platman, and D. Matthews, "The Organization and Delivery of Mental Health Services," in G. Balis et al. (eds.) The Psychiatric Foundations of Medicine, Butterworth, 1978.

Daryl Bruce Matthews                                                                Page 9

D. Matthews and W. Tseng, "Forensic Psychiatry" in W. Tseng and J. Streltzer (eds.) Cultural Competency in Psychiatry, American Psychiatric Press, Inc., 2004.

S. Wendler and D. Matthews, "Cultural Competence in Suicide Assessment and Management" in R. Hales and R. Simon, Textbook of Suicide Assessment and Management, American Psychiatric Press, Inc., 2006.

*Articles*

D. Matthews, "The Noncompliant Patient," Primary Care, Vol. 2, No. 2 (June, 1975).

D. Matthews and R. Hingson, "Improving Patient Compliance: A Guide for Physicians," Medical Clinics of North America, Vol. 61, No. 4 (July, 1977).

D. Matthews and P. Dietz, "Labeling Theory and the Family Dynamics of Schizophrenia," Child Psychiatry Quarterly, Vol. 11, No. 4 (October, 1978).

D. Matthews, "Where There's Smoke There's Ire," Medicolegal News, Vol. 7, No. 4 (Winter, 1979).

C. Kavanagh, D. Matthews, J. Sorenson, and J. Swazey, "Multi-Institutional Review of a Genetic Counseling Study," I.R.B.: A Review of Human Subjects Research, Vol. 1, No. 2 (April, 1979).

D. Matthews, "The Right to Refuse Psychiatric Medication," Medicolegal News, Vol. 8, No. 2 (April, 1980).

D. Matthews and P. Coyne, "Arbeit Macht Frei: Vocational Rehabilitation and Virginia's Criminally Insane," University of Richmond Law Review, Vol. XVI, No. 3 (Spring, 1982)..

P. Dietz, D. Matthews, J. Warren, C. Van Duyne, T. Stewart, J. Crowder, and D. Martell, "Threatening and Other Inappropriate Letters to Hollywood Celebrities," Journal of Forensic Sciences, Vol. 36, No. 1 (January 1991).

P. Dietz, D. Matthews, D. Martell, T. Stewart, D. Hrouda, and J. Warren, "Threatening and Other Inappropriate Letters to Members of Congress," Journal of Forensic Sciences, Vol. 36, No. 5 (September 1991).

K. Rost, G. R. Smith, D. Matthews, and B. Guise, "The Deliberate Misdiagnosis of Major Depression in Primary Care," Archives of Family Medicine, Vol. 3 (April 1994).

S. Tisza, J. Motti, D. Matthews, "Current trends in workers' compensation stress claims," Current Opinion in Psychiatry, Vol. 16, 571, 2003.

D. Matthews, "Physicians Duties and Prisoner Health," Virtual Mentor: Ethics Journal of the American Medical Association, Vol. 6, No. 9 (September 2004)

D. Matthews and S. Wendler, "Ethical Issues in Psychiatry and the Death Penalty", Current Opinion in Psychiatry, in press..

Daryl Bruce Matthews                                                              Page 10

D. Matthews, "Psychiatry and Torture," World Psychiatry, in press.

SELECTED (1990-) PRESENTATIONS AND ABSTRACTS

1990

"Psychotropic Medications and Malpractice," Defense Research Institute, San Francisco, California, March.

"Stalking Behavior," National Academy of Sciences, Institute of Medicine, Washington, DC, April.

"Cults that Kill," University of Hawaii, John A. Burns School of Medicine, Department of Psychology, grand rounds, Honolulu, Hawaii, April.

"Forensic Psychiatry and Mental Injury," Pulaski County Bar Association, Little Rock, Arkansas, October.

1991

"Current Liability Issues in Mental Health Care," Health Services Research Center, special conference series, Little Rock, Arkansas, February.

"Malpractice Issues for Community Mental Health Professionals," Mental Health Council of Arkansas, 19th Annual Mental Health Institute, Hot Springs, Arkansas, August.

"The Insanity Defense," Arkansas Institute for Continuing Legal Education, criminal law seminar, Little Rock, Arkansas, October.

"Mental Health Issues in Capital Sentencing," Arkansas Psychological Association, annual meeting, Little Rock, Arkansas, November.

"Patient-Therapist Sexual Relations and the Law," Arkansas Psychiatric Society, annual meeting, Little Rock, Arkansas, November.

1992

"The Tarasoff Case," Youth Home of Arkansas, Little Rock, Arkansas, January.

"The Role of Forensic Psychiatry in Civil Litigation," Arkansas Trial Lawyers' Association, midwinter conference, Little Rock, Arkansas, February.

"Current Issues in Forensic Mental Health Training in State Mental Health Systems and University Settings," American College of Forensic Psychiatry, annual meeting, San Francisco, California, April.

"The Insanity Defense," Arkansas Institute for Continuing Legal Education, Little Rock, Arkansas, June.

Daryl Bruce Matthews                                                                    Page 11

"The Defense of Mental Disorder," Arkansas Bar Association, annual meeting, Little Rock, Arkansas, June.

"Recent Developments in the Law of Insanity," Louisiana State University Medical Center, Shreveport, Louisiana, September.

    1993

"The Insanity Defense and the Role of the Forensic Psychiatrist," UALR School of Law, Little Rock, Arkansas, February.

"Something Special for Our Residents:  Propranolol?," Association for Academic Psychiatry, annual meeting, Tucson, Arizona, March.
"Duty to Protect" Arkansas Psychological Association, annual meeting, Little Rock, Arkansas, April.

"Testifying in Court," St. Vincent Infirmary Medical Center, Little Rock, Arkansas, April.

"Malpractice Issues in Managed Care," American Psychiatric Association, annual meeting, San Francisco, California, May.

"Malpractice Liability and Managed Care," Mental Health Council of Arkansas, 21st Annual Mental Health Institute, Hot Springs, Arkansas, August.

"Murder, Madness, & Medicine," BridgeWay Hospital, North Little Rock, Arkansas, August.

"Implications of DSM-IV for Forensic Psychiatry," American Academy of Psychiatry and the Law, 24th annual meeting, San Antonio, Texas, October.

    1994

"The Videotaped Good-Bye of the Perpetrator of a Mass-Murder/ Suicide," University of Arkansas for Medical Sciences, Department of Psychiatry, grand rounds, Little Rock, Arkansas, January.

"A Cluster of Multiple Personality Disorder Cases in a State Forensic Hospital," American Academy of Forensic Sciences, 46th annual meeting, San Antonio, Texas, February.

"Developments in the Law of Sanity and DSM-IV," University of Arkansas at Little Rock School of Law, Criminal Law Association, program entitled Psychiatric Issues in Criminal Trials, Little Rock, Arkansas, March.

"Workplace Violence," Arkansas Division of Mental Health Services, First Annual Forensic Conference, Arkansas Department of Mental Health Services, North Little Rock, Arkansas, April.

"Workplace Violence," Violence in Today's Society, first annual forensic conference, North Little Rock, Arkansas, April.

"Update on Malpractice Issues in Managed Care," American Psychiatric Association, annual meeting, Philadelphia, Pennsylvania, May.

Daryl Bruce Matthews                                              Page 12

"Impaired Drivers, HIV, and Abandonment," Arkansas Psychiatric Society and Arkansas Psychological Association (joint meeting), Little Rock, Arkansas, June.

    1995

"Lecture Attendance and Performance on NBME Shelf Examination in Sophomore Behavioral Sciences Course," Association for Academic Psychiatry, annual meeting, San Antonio, Texas, March.

"Professional Ethics in Mental Health," Arkansas Psychological Association, spring conference, Little Rock, Arkansas, April.

"On-Line Database Searching in Forensic Psychiatry" in Course, "Computers in Forensic Psychiatry: An Introduction," American Academy of Psychiatry and Law, 26th Annual Meeting, Seattle, October.

    1996

"Medicolegal Aspects of Inpatient Violence," Grand Rounds, Tripler Army Medical Center, Honolulu, February.

"Ethical Practice in Forensic Psychiatry: The AAPL Ethical Guidelines" American Academy of Psychiatry and Law, 27th Annual Meeting, San Juan, October.

"Medicolegal Issues in Inpatient Psychiatry," Grand Rounds, Tripler Army Medical Center, Honolulu, November.

    1997

"Social Policy Issues in Severe Mental Illness," University of Hawaii School of Social Work, Honolulu, February.

"Current Issues in Psychiatry and Criminal Law," Annual Symposium, State of Hawaii, Office of the Public Defender. Honolulu, May.

"The Use and Misuse of Psychiatrists in Criminal Cases," Annual Meeting, Association of Government Attorneys in Capital Litigation, San Antonio, July.

"Physician Sexual Misconduct," Physicians Insurance Company, Defense Counsel Seminar, Seattle, October.

"Multiple Homicide," VIIth National Congress, Sociedad Española de Psiquiatría Legal, Avila, Spain, October.

"Ethics and Pre-Arraignment Psychiatric Evaluations," American Academy of Psychiatry and Law, 28th Annual Meeting, Denver, October.

"Psychiatric Issues in Sex Offenses," Kauai Community Mental Health Center, Lihue, December.

Daryl Bruce Matthews                                                    Page 13

    1998

"Evaluation of Mental State at the time of Alleged Offense,"
University of Hawaii, School of Social Work, Honolulu, February

"Psychiatric Illness and Occupational Stress," State of Hawaii, Department of Education,
Honolulu, July.

"Murder Followed by Suicide," G.M. Wilcox Memorial Hospital, Lihue, Hawaii, August.

"Murder Followed by Suicide," Department of Psychiatry and Psychological Medicine, University
of Madrid, Spain, September.

"The Analysis and Presentation of Forensic Data," VIIIth National Congress, Sociedad Española
de Psiquiatría Legal, San Sebastian, Spain, October.

    1999

"Multiple Homicide," University of Hawaii School of Social Work, Honolulu, March.

"Malpractice Liability for Suicide," Department of Psychiatry and Psychological Medicine,
University of Madrid, Spain, July.

    2000

Stalking and Murder/Suicide, University of Hawaii School of Social Work, March.

Competency for Execution, Psychiatric Grand Rounds, Tripler Army Medical Center, May.

The Forensic Evaluation of the >False Memory Syndrome= World Psychiatric Association
Conference on Forensic Psychiatry, Madrid, Spain, June.

The Weed Becomes a Rose: The Development of Forensic Training and Practice in the United
States of America, First World Psychiatric Association Conference on Forensic Psychiatry,
Madrid, Spain, June.

Psychiatric Issues in Capital Litigation, Capital Litigation Symposium, Office of Legal Education,
Executive Office for United States Attorneys, U.S. Department of Justice, National Advocacy
Center, Columbia, South Carolina, October.

    2001

Psychiatric Evaluations in Workplace Homicides: The Honolulu Xerox Shooting, University of
Hawaii, School of Social Work, Honolulu, February.

Forensic Issues in Psychiatric Social Work, Department of Social Work, Hawaii State Hospital,
Kaneohe, May.

Daryl Bruce Matthews                                                   Page 14

Assessing Competency to Stand Trial, Psychiatric Grand Rounds, Hawaii State Hospital, Kaneohe, June.

   2002

Psychiatry and the Death Penalty, Department of Psychology, Reed College, Portland Oregon, April.

Assessing the Risk of Violence in Psychiatric Patients; Hawaii State Department of Health, Kauai and Maui, Hawaii, May.

Criminal and Civil Litigation Involving Selective Serotonin Reuptake Inhibitors, Sociedad Española de Psiquiatría Legal, Oviedo, October.

   2003

Barriers to Culturally Competent Forensic Exams for Guantánamo Detainees, American Academy of Psychiatry and the Law, October.

Forensic Psychiatry in the Evaluation of Clergy Sexual Misconduct, Sociedad Española de Psiquiatría Legal, Almagro, November.

Ethical and Cultural Issues in the Forensic Evaluation of the Guantánamo Detainees, Sociedad Española de Psiquiatría Legal, Almagro, November.

Absence of U. S. Criminal Law Protections in the Trials of the Guantánamo Detainees: Implications for Professional Ethics, New College, Oxford University, UK, November.

Mental Defenses: Origins And Evaluation, Indiana Prosecutors Association, Indianapolis, December.

   2004

Methamphetamine Use and the Insanity Defense, Hawaii Forensic Examiners Training Symposium, March.

Mental Health Aspects of the Guantánamo Detentions, Boston University, Health and Human Rights Symposium, Boston, April.

Toward an Evidence-Based Practice Model for Competency Restoration Programming, American Psychological Association Annual Convention, Honolulu, July.

Assessing Violence Risk in Psychiatric Patients, Sociedad Española de Psiquiatría Legal, Malaga, October.

The Case of Pavle Strugar: Alleged Incompetence to Stand Trial at the International Criminal Tribunal for the Former Yugoslavia, Sociedad Española de Psiquiatría Legal, Malaga, October.

   2005

Daryl Bruce Matthews                                                    Page 15

Forensic Psychiatry and International Human Rights Law, Grand Rounds, Department of
Psychiatry, John A. Burns School of Medicine, Honolulu, January.

Ethical Issues in the Forensic Evaluation of Guantanamo Bay Detainees, Annual Residential
Meeting, Faculty of Forensic Psychiatry, Royal College of Psychiatrists, Belfast, February.

Clinician and Examiner: You Shouldn't Be Both!  Solving the "Two Hats" Problem in Hawaii's
Forensic Mental Health System, Honolulu, March.

Inpatient Forensic Evaluation of Trial Competence and Violence Risk, State of Hawaii, Annual
District Court Judges Training Symposium, June.

Forensic Psychiatric Issues in War Crimes Tribunals, Course, Office of the Prosecutor,
International Criminal Tribunal for the Former Yugoslavia, The Hague, Holland, September

Psychosocial Sequelae of Solitary Confinement, XIII World Congress of Psychiatry,  Cairo, Egypt,
September.

Forensic Psychiatric Aspects of the Guantanamo Detentions, XIII World Congress of Psychiatry,
Cairo, Egypt, September.

Criminal Responsibility Evaluations: Standards of Practice in U.S. Jurisdictions, Hospital
Universario Gregorio Marañón, Universidad Complutense de Madrid, Madrid, Spain, November.

        2006

Forensic Psychiatric Evaluations For Military Tribunals: Technical, Medicolegal and Ethical
Issues. Psychiatric Grand Rounds, University of Arkansas for Medical Sciences, February.

Developments in the Law of Competency to Stand Trial Before International Tribunals: Rudolf
Hess to Pavle Strugar, Best Practices Symposium, Hawaii Adult Mental Health Division, April.

                                                              revised 04/06