1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF HAWAII

3

4   PHILIP E. ENGLISH,              )

5                   Plaintiff,      ) CIVIL NO. 04-00108

6                                   )           JMS/KSC

7           vs.                     )

8                                   )

9   CITY AND COUNTY OF HONOLULU;    )

10  GARY T. KUROKAWA; ROBERT O.     )

11  MAGOTA; ANN C. GIMA; and GK     )

12  APPRAISALS, INC.; JOHN DOES 1   )

13  -10; JANE DOES 1-10; DOE        )

14  PARTNERSHIPS; DOE CORPORATIONS  )

15  1-10; AND DOE ENTITIES 1-10,    )

16                  Defendants.     )

17       RULE 30(b)(6) DEPOSITION OF DENISE TSUKAYAMA

18  Taken on behalf of the Plaintiff at the Law Offices of

19  Moseley Biehl Tsugawa Lau & Muzzi, located at 1100 Alakea

20  Street, Alakea Corporate Tower, 23rd Floor, Honolulu, Hawaii

21  96813, commencing at 9:00 a.m. on Wednesday, September 20,

22  2006, pursuant to notice.

23

24  BEFORE:  WENDY M. WATANABE, Notary Public, State of Hawaii

25           Hawaii Certified Court Reporter, CSR 401

```
 1                DEPOSITION OF DENISE TSUKAYAMA

 2

 3   APPEARANCES:

 4   For the Plaintiff, Philip E. English:

 5              ROGER MOSELEY, ESQ.

 6              Moseley Biehl Tsugawa Lau & Muzzi

 7              Alakea Corporate Tower

 8              1100 Alakea Street, 23rd Floor

 9              Honolulu, Hawaii  96813

10

11   For the Defendant, City & County of Honolulu, Gary T.

12   Kurokawa, Robert O. Magota, and Ann C. Gima:

13              RANDALL YAMAMOTO, ESQ.

14              Kawashima Lorusso & Tom

15              Fort Street Tower

16              745 Fort Street, 5th Floor

17              Honolulu, Hawaii  96813

18

19   For the Defendant, GK Appraisals, Inc.:

20              ANTHONY WONG, ESQ.

21              735 Bishop Street, Suite 411

22              Honolulu, Hawaii  96813

23

24

25
```

1                          I N D E X

2                                                          PAGE

3    EXAMINATION OF WITNESS BY:

4            Mr. Moseley                                      4

5            Mr. Wong                                        91

6            Mr. Moseley                                     93

7            Mr. Wong                                       100

8

9

10

11   EXHIBITS FOR IDENTIFICATION:

12   207    Complaint -- Tom Sun                           27

13   208    Complaint -- Mersburgh                         37

14   209    Complaint -- Wiggins                           39

15   210    Complaint -- Shannon                           43

16   211    Complaint -- Whang                             44

17   212    Complaint -- Olipares                          47

18   213    Newspaper Article                              58

19   214    Declaration of Leslie H. Kondo                 74

20

21

22

23

24

25

1                    DENISE TSUKAYAMA

2    called as a witness on behalf of the Plaintiff, being first

3    duly sworn to tell the truth, the whole truth, and nothing

4    but the truth, was examined and deposed as follows:

5                        EXAMINATION

6    BY MR. MOSELEY:

7         Q.    Can you state your full name for the record?

8         A.    Denise Leialoha Tsukayama.

9         Q.    L-E-I-A-L-O-H-A?

10        A.    Mm-hmm.

11        Q.    And then T-S-U?

12        A.    T-S-U-K-A-Y-A-M-A.

13        Q.    Okay.  Do you mind if I call you Denise?

14        A.    That's fine.

15        Q.    I'm happy to call you anything you want --

16        A.    That's fine.

17        Q.    -- but I don't want to be disrespectful.  I'm

18    disrespectful to these other guys, so -- have you ever had

19    your deposition taken before, Denise?

20        A.    Yes.

21        Q.    And how many times?

22        A.    Actually, I can't remember how many times.  A few

23    times.

24        Q.    A few times?  Very recently?

25        A.    Probably not within the last couple of years.  I've

1    been mostly doing arbitration presentation.

2        Q.    Have you -- what kind of cases have they been?

3        A.    I'm the equal opportunity officer for the City, and

4    I've been doing EEO-type work for about 20 years, so cases

5    are discrimination cases.

6        Q.    I see.  All right.  Well, let me sort of explain

7    some things to you --

8        A.    Mm-hmm.

9        Q.    -- so that we're all on the same page.

10       A.    Okay.

11       Q.    I'm Roger Moseley, and I represent the Plaintiff in

12   this case, a man named Philip English who's a former City

13   employee, and this is a whistleblower lawsuit.

14            I'm going to be asking you some questions, and the

15   court reporter will take down my questions and then you'll

16   answer the questions, and she'll take down the answers.

17            When the whole thing is finished, there will be a

18   little booklet that you'll be able to review to check to see

19   whether everything was recorded accurately, or sometimes you

20   may find that you misheard a question or misunderstood a

21   question or something, and you'll get a chance to make those

22   corrections.

23            This is part of a process in litigation called

24   discovery, and there are three major uses for depositions.

25   One is to actually discover what you know, which is probably

1    mostly what this will be today.

2          The second major use is if there's some reason you

3    can't testify at trial, your deposition could be used in

4    place of your testimony.

5          The third reason would be if you testify differently

6    in trial than you do today, somebody will certainly point

7    that out to you at trial.

8          So it's very important, given the types of uses that

9    this can be put to, that you understand the questions and

10   that your answers are responsive, okay?

11   A.    Okay.

12   Q.    And these guys will tell you if you talk to them

13   privately that I couldn't question my way out of a paper

14   bag, so don't be shy about saying I don't understand your

15   questions because oftentimes, I'll ask a question, and I'll

16   think what the heck did I just ask, so I'm not -- I'm not

17   too proud to correct my questions.

18          In any case, we don't want you to speculate; so if

19   you don't know something, you should tell us.  On the other

20   hand, if you think you know what the probable answer is or,

21   you know, what the likely facts are, it's perfectly okay to

22   tell us those things; but if you do that, I would like you

23   to tell us that that's what you're doing.

24          You can -- I mean, you could say something like

25   well, listen, this is what I think it is, you know, I'd be

```
 1   surprised if it weren't, but I'm not a hundred percent

 2   certain of it, you know, that kind of thing just so that we

 3   know that we're not dealing with an answer that is really as

 4   solid as it could be, okay?

 5       A.   Okay.

 6       Q.   You're doing very well.  And the third thing I was

 7   going to tell you -- or the fourth thing, I wasn't keeping

 8   count, and that's that the court reporter only takes down

 9   oral responses.

10           Well, sometimes she'll get a nod of a head or

11   something, but it's very difficult for her to take anything

12   but oral responses, so your responses should be oral, and

13   you should avoid things like "uh-huh" and "uh-uh" because

14   obviously, those can be misunderstood in the transcript.

15           So if you're going to say "uh-huh," I'd prefer you

16   use "yes," and "uh-uh," "no," or something along those

17   lines.  The other thing is -- or the other thing, there are

18   many other things, your -- your attorney and Mr. Wong down

19   at the other end of the table have an opportunity to

20   interpose objections.

21           So if you would wait until a couple of beats after I

22   ask my question before you answer, you'll give them an

23   opportunity to jump in and object.  Otherwise, and what

24   often happens in a deposition, is that the witness will

25   answer, and the attorney will, you know, be waiting for the
```

1    end of the question, and the answer will be out before -- be

2    blurted out before the attorney gets a chance to object, and

3    even I don't want that.  Although I'd like the answer, I

4    really want the record clean.

5         And what happens, oftentimes, in conversation is

6    that the person you're talking with will start talking

7    before you're finished because they know what you're going

8    to say, and that's a real tendency in depositions, too, and

9    that makes it difficult for the court reporter because she's

10   having to write down two different things at the same time.

11        I promise you I'll do that, too, I'll start asking

12   the next question before you're finished with your answer.

13   I invariably do that.  So have you understood all of that?

14        A.   Yes, I have.

15        MR. MOSELEY:  Okay, very good.  Did I cover all your

16   stuff you usually like to get in?  Is that a yes, or are you

17   just nodding?

18        MR. WONG:  That's a yes.

19   BY MR. MOSELEY:

20        Q.   Okay.  Denise, what is -- you said you're the EEOC

21   officer -- or an EEOC or the EEOC officer for the City?

22        A.   I'm the City's equal opportunity officer.

23        Q.   Okay.  What -- so you're the -- sort of the top dog

24   in the equal opportunity arena in the City?

25        A.   Yes.  I'm responsible for the EEO, as well as other

1    areas of the civil rights laws and regulations that the City

2    may -- may need assistance with.

3        Q.    Okay.  Specifically other than the equal opportunity

4    part, what other civil rights parts are you in charge of?

5        A.    Right now, I'm involved in the Title 6 and ADA kinds

6    of issues that are nonemployment related that the -- when

7    the City uses federal funds, the City is responsible for

8    complying with regulations other than employment

9    regulations, not --

10       Q.    Like the -- like the dropped curbs in intersections

11   and things?

12       A.    Things like that.

13       Q.    But not -- not ADA employment matters?

14       A.    ADA employment and nonemployment matters.

15       Q.    Are both --

16       A.    Are all under my responsibility.

17       Q.    Okay.  So, I mean, you'd be the kind of a person

18   that would handle a complaint that hey, reasonable

19   accommodations weren't made for me as an employee, that kind

20   of thing?

21       A.    Yes, I would.

22       Q.    Is there anything else that you're in charge of

23   besides those kinds of things?

24       A.    Just about anything else they assign to me, but

25   those are the specific areas that are easy to identify.

1    Q.    See, I told you I'd start talking over you.  Who's

2    the person directly above you in terms of supervisory

3    authority?

4    A.    I've been placed under the Director of Human

5    Resources for the purpose of getting paid, essentially, and

6    being organizationally housed with them, but my

7    responsibilities are to report to the mayor and/or the City

8    Council, should there be any issues of discrimination, for

9    example, that need their attention where I need to go above

10   and beyond Human Resources.

11   Q.    Okay.  All right.  How long have you been working

12   for the City?

13   A.    Seven years.

14   Q.    Seven years.  Have you been in this position the

15   whole time?

16   A.    Yes, I have.

17   Q.    Were you in a similar position in another

18   organization prior to the City?

19   A.    Prior to the City, I spent two-and-a-half years at

20   American Savings Bank as the employment relations and

21   affirmative action officer.

22        And prior to that, I was with the Internal Revenue

23   Service for 17 years, the last approximately 10 in the

24   Honolulu District as the EEO officer.

25   Q.    Well, you've got a long depth of experience with the

1    EEO stuff.  The City was served with a notice of taking

2    what's called a 30(b)(6) deposition.

3         What happens in a 30(b)(6) deposition, the person

4    wanting to take the deposition tells the other side the

5    issues that they want a person to testify about.  Are you

6    familiar with that process?

7         A.   Yes.

8         Q.   Okay.  And in ours, there was a list of three, sort

9    of, subject matter areas.  Can I -- did you examine those

10   three areas?

11        A.   I've seen those, yes.

12        Q.   Can you tell me, are you the person that the City

13   qualified are best qualified to talk of each of those areas

14   or only one or parts of some?

15        MR. YAMAMOTO:  Well, I -- in terms of that

16   representation, I'll make the representation that

17   Ms. Tsukayama is the person most knowledgeable with regard

18   to the three designated areas.  There is --

19        MR. MOSELEY:  All three?

20        MR. YAMAMOTO:  All three.

21        MR. MOSELEY:  Okay.

22        MR. YAMAMOTO:  But I will also say that with regard

23   to numbers 1 and 2, there is no person -- there is no

24   central clearinghouse, for lack of a better term, or central

25   person that deals with all of the whistleblower complaints

1    or all of the whistleblower claims that have been made with

2    regard to number 1 in Exhibit A.

3          So to the extent that she has a fair amount of

4    knowledge, she probably is the person most knowledgeable

5    with regard to that, but there is no person that knows it

6    all.  So that's one problem.

7          The second category with regard to all actions

8    undertaken by the City with regard to training,

9    Ms. Tsukayama knows of it and probably is, I believe, the

10   person most knowledgeable, but there are other people who

11   have been involved in the training, actual training, in

12   certain areas and so one such person may be Mike Hansen,

13   whose name came up previously in the deposition of

14   Mr. Kurokawa.

15         I don't know if he can speak to 2 and 3, but we

16   believe to some extent he can, but Ms. Tsukayama is here to

17   speak to all three.

18         MR. MOSELEY:  Okay.  I think the other day, Randy,

19   you indicated there might be two witnesses --

20         MR. YAMAMOTO:  Yes.

21         MR. MOSELEY:  -- and I don't think that Hansen was

22   one of the names.  Was there another --

23         MR. YAMAMOTO:  I didn't provide any names.  But he

24   is one of the others.  There is no other person that we have

25   looked at in terms of having information in these three

1  areas.  But like again, as to number 1, there is no set --

2  no person or even persons that would know about --

3      MR. MOSELEY:  All right.

4      MR. YAMAMOTO:  -- whistleblower complaints, other

5  than the people who are actually involved in the lawsuit.

6      MR. MOSELEY:  Okay.  Is the Corporation Counsel not

7  knowledgeable with respect to complaints and lawsuits and

8  that kind of thing?

9      MR. YAMAMOTO:  Well, the same thing would happen

10 with regard to the Corporation Counsel, is the Corporation

11 Counsel would only -- the person most knowledgeable would be

12 the one -- the attorney handling the file, and we would

13 claim an attorney-client privilege, of course, with regard

14 to that.  But it's not one person.

15     MR. MOSELEY:  Yeah.  I don't think you're going to

16 claim attorney-client privilege with respect to the types of

17 questions I'm going to ask.

18     MR. YAMAMOTO:  I don't know.

19     MR. MOSELEY:  I mean, are you going to take the

20 position that Marie Gavigan did that if it's an attorney,

21 you can't ask any questions?  That's been -- that's been

22 pretty unsuccessful in this case, Randy.

23     MR. YAMAMOTO:  No.  I'm not saying that if it's an

24 attorney, you cannot ask any questions, but the areas of

25 questioning would be very severely limited and so we put

1    forth someone who would know a broader spectrum.

2          MR. MOSELEY:  Okay.  Well, I'm happy to proceed with

3    this witness; and if it doesn't look like the -- I mean, if

4    it looks like maybe there need to be other witnesses, I

5    guess we can discuss that and try to work it out.

6          MR. YAMAMOTO:  Sure.

7    BY MR. MOSELEY:

8      Q.   Okay.  Thank you for your patience in listening to

9    all that --

10     A.   No problem.

11     Q.   -- Denise.  The first area of inquiry was knowledge

12   as to all whistleblower complaints filed against the City

13   and County of Honolulu in the last ten years.

14          What do you know about that area of inquiry?  I

15   mean, are you involved with those things?

16     A.   To some extent.  Like Randy just explained, there's

17   no one place to make all complaints.  My position is the

18   only position that's specifically designated to take

19   complaints from employees in the area of discrimination to

20   include retaliation.

21          And so at least since I've been with the City,

22   there's been calls or questions that come in from different

23   departments when an employee says that they're being

24   retaliated against for anything, regardless of what the

25   initial or underlying complaint was.

1          So in that respect, I would have received those if

2     they were internal complaints where management didn't have a

3     source to go to, to deal with them.

4          If they go to a lawsuit directly, which many do,

5     then those go straight to the Corporation Counsel and are

6     dealt with, with the particular department.

7     Q.    And you don't know about those?

8     A.    I know about them in general terms.  Sometimes I'm

9     called by Corporation Counsel for discussion on a procedure,

10    but I'm not involved in litigating the case, obviously.

11    Q.    Okay.  Over the last ten years, do you have any idea

12    how many whistleblower complaints have been filed against

13    the City, regardless of whether they're in-house or they end

14    up in litigation?

15    A.    Not a specific number.

16    Q.    Do you have records with respect to that?

17    A.    Only the ones that have come to me specifically, but

18    they -- they would come in under the specific area, if it's

19    an OSHA complaint, if it's an EPA complaint, so there's not

20    one clearinghouse, as Randy mentioned, for complaints to be

21    logged somewhere.

22    Q.    When I use the term whistleblower, do you know what

23    I mean?

24    A.    It covers all kinds of protections for employees who

25    make complaints about what they believe to be a violation of

1    law.

2        Q.    Okay.  All right.  Discounting litigation, do you

3    know how many whistleblower complaints have been made at

4    least during your tenure with the City?  You said you've

5    been with the City seven years?

6        A.    Seven years.  I've taken in three, specifically.

7        Q.    Three?  And what was the nature of these

8    whistleblower complaints?

9        A.    Whistleblower complaints from employees of the

10   wastewater treatment plant believing that they had reported

11   misconduct of their supervisors and felt that they had been

12   retaliated against as a response.

13       Q.    All three from the wastewater treatment plants?

14       A.    Mm-hmm.

15       Q.    Were they all at the same time?

16       A.    Yes, they were.

17       Q.    Did those complaints end up in litigation?

18       A.    They did.

19       Q.    Were there three complainants, you said?

20       A.    There were three people who specifically came

21   forward.  There were other people, I understand, that went

22   through as part of the litigation.

23       Q.    I'm trying to remember which case is which.  Was

24   this the Mersburgh, Salsedo, Smith, and Silva?

25       A.    Yes.

1    Q.    Okay.  And in the last seven years, you haven't

2    handled any other whistleblower cases?

3    A.    No.

4    Q.    Okay.  In the case -- in a whistleblower case like

5    the Mersburgh case, what -- when it comes to your attention,

6    does it come up in some particular form, or how does a case

7    like that get referred to you?

8    A.    Generally, the employees call.

9    Q.    They just call?

10   A.    Yeah.

11   Q.    And then what do you do when the employee calls?

12   A.    Do an intake process, talk with them, find out what

13   their concerns are, why they believe they've been retaliated

14   against.

15   Q.    Is this a formal process?  I mean, do you have

16   certain questions you ask, or is it an ad hoc process?

17   A.    It's case by case specific.  Obviously, I do need to

18   know what happened that causes them to believe that they had

19   protection and then what occurred that they believe was

20   adverse, get witnesses or any other information I think is

21   relevant, but that's generally the initial meeting with

22   them.

23   Q.    Okay.  And then what happens after that initial

24   meeting?

25   A.    After that, there's a -- there's some procedures

1    internally that are required, for example, notifications to

2    both the complainant and the accused, and this is true of

3    any kind of complaint that I work with, and a definition of

4    the scope of investigation that's required, and then an

5    assignment to an investigator.

6        Q.    How many investigators do you have?

7        A.    I don't have any investigators right now.  The

8    City's procedure is investigators are selected from among

9    City employees who have been trained in various departments.

10   It's kind of what we call in the federal government

11   collateral duties, additional duties.

12       Q.    Oh, I see.  So you could get an investigator from

13   pretty much any other department?

14       A.    I can request one from any department.

15       Q.    Okay.  Are there departments that you generally

16   request investigators from?

17       A.    It really does depend.  We -- we hope that

18   investigations are done within the department themselves,

19   unless there's some reason to take it outside that

20   department.

21           So for the most part because of issues of resources,

22   if a -- if a complaint is from the Parks Department, we

23   expect the Parks Department to supply the people to

24   investigate the complaint.

25       Q.    Why do you want the agency involved to be doing the

1   investigation?

2       A.    Well, they have the resources, and it's their

3   complaint.  They're responsible for examining it and making

4   any kind of corrective action, generally.

5       Q.    Okay.  What happens after the -- or is there a set

6   process for investigation?

7       A.    The one set process that we do have is outlined in

8   ordinance for sexual harassment, and we've been guiding

9   people to follow that basic procedure for investigations of

10  other kinds of complaints.

11      Q.    Okay.  And can you give me a thumbnail sketch of

12  what that procedure is?

13      A.    Okay, similar to what I've already started, the

14  intake process, notification of the -- to the parties,

15  assigning to investigation, completing an investigation,

16  preparing a report.

17          And in most cases, that report would go to the --

18  the department head, if it's in a department, unless the

19  department head is the person who's accused.

20      Q.    Okay.  Do you get retaliation complaints other than

21  for whistleblowers?

22      A.    Retaliation complaints for Title 7 complaints

23  mostly, ADA, all the EEO areas.

24      Q.    Okay.  How does -- how does a retaliation complaint

25  work in one of those areas?  Let's do the ADA, for example.

1    A.    Okay.  If someone complained that they weren't

2    getting an accommodation that they requested; and subsequent

3    to that, they believe they've been -- encountered some kind

4    of adverse employment action, and they think it's -- that

5    action is because of the complaint that they made or the

6    request that they made for accommodation, that would be how

7    they make their initial complaint.  And then we go through

8    the process of determining whether or not that is actually

9    what happened.

10   Q.    Is that for employees of the City or outside the

11   City?

12   A.    The -- people who don't work for the City but who

13   have claims against the City can do the same thing.

14   Generally speaking, I don't get very many complaints of

15   retaliation from outside the City.  Those would often go to

16   a lawsuit, I would imagine.

17   Q.    Okay.  So how does a City employee that has an ADA

18   complaint, makes it, and then feels like they're retaliated

19   against, how is that different from the whistleblower

20   complaint?

21   A.    It's not much different.  Whistleblower -- my

22   understanding is that the -- the analysis of a

23   whistleblower's claim is much the same as a retaliation

24   under what we teach in the discrimination area, making a

25   complaint that's protected or engaging in protected

1    activity, adverse action occurs, and those things are

2    causally connected to each other.

3         Q.   And how many harassment-type claims have you handled

4    in your seven years in the City?  Harassment -- let's say

5    harassment with the retaliation aspect.

6         A.   I don't actually have a number, but quite a few

7    complaints of that.

8         Q.   Can you give me an estimate?  Are we talking 15, are

9    we talking a hundred?  I mean, what kind of scale are we

10   talking about?

11        A.   I mean, if I had to pick a number, I'd say about ten

12   a year that make that as the allegation.

13        Q.   And once the report is done, the report goes to the

14   department head, you said?

15        A.   The appointing authority.

16        Q.   And what does the appointing authority do then with

17   the report?

18        A.   They're expected to determine whether or not any

19   kind of corrective action is required and identify that,

20   take the action if it's necessary.

21        Q.   Does the report include a recommended corrective

22   action?

23        A.   It sometimes can.  I -- the investigative training

24   that we've been doing with the City in the last -- since

25   I've been with the City asks that the investigators not make

1    recommendations before the appointing authority has had a

2    chance to review the case.

3        Q.   Why is that?

4        A.   In some cases, the appointing authority has more

5    information about the entire department's practices in terms

6    of past practices, disciplinary, for example, levels that

7    have been issued for a particular kind of misconduct.

8            If somebody who doesn't have that knowledge makes a

9    recommendation, that recommendation may be inconsistent, and

10   we may not be able to effect that response because of

11   collective bargaining issues.  We can't treat people

12   disparately than others who've acted in the same way, for

13   example.

14       Q.   Are you aware of any specific procedures or specific

15   programs that are available to whistleblowers in particular?

16           MR. YAMAMOTO:  Let me object as being vague and

17   ambiguous.

18   BY MR. MOSELEY:

19       Q.   I neglected to tell you earlier even if he objects

20   --

21       A.   I could still answer.

22       Q.   Yeah.  Unless he instructs you not to answer, which

23   he may on occasion.  If I said, you know, what did you guys

24   talk about before you came here today, he'd object and

25   instruct you not to answer, and -- I'm sorry, go ahead.

1    A.    Okay.  You have to ask the question again.

2         MR. MOSELEY:  Can you read the question back?

3         (Reporter read requested proceedings.)

4         THE WITNESS:  Is this within the City?

5    BY MR. MOSELEY:

6    Q.    Yes.

7    A.    Within the City, no.

8    Q.    And there's -- I understand from our earlier

9    discussion, there's no person or particular agency in the

10   City who has assigned to it the particular responsibility

11   for dealing with whistleblowers, is that right?

12   A.    Dealing with the complaints of retaliation because

13   of whistleblowing, true.

14   Q.    Okay.  Thank you, that's actually technically more

15   correct.  Okay.  Are you aware of any discussion that's ever

16   occurred that indicated there was some sort of a necessity

17   for that sort of a person or entity within the City?

18   A.    Subsequent to the current discussions about my -- my

19   preparing for this, there may have been some discussion.

20   Prior to that, the only discussion that I've had was when we

21   had people seeking to complain about retaliation because of

22   whistleblowing, trying to find out who they -- who would

23   handle that kind of a complaint.

24        I did talk with the Corporation Counsel and received

25   guidance that while there isn't any source for them to

1    complain to in the City specifically, that I could take

2    those complaints, if they wanted to make them with me, and

3    investigate them.

4        Q.    Is that the -- see, I started to talk over you.  I

5    told you I would do that.  I live up to my word.

6              Listen, did you have those discussions when the

7    Mersburgh group --

8        A.    Yes.

9        Q.    -- came?

10       A.    That was the --

11       Q.    Okay.  And so somebody called you and said can we

12   talk to you about this, and you said I don't know and talked

13   to Corp. Counsel and got some guidance yourself?

14       A.    Right.

15       Q.    Okay.  Do you know how -- can I -- I'll call them

16   the Mersburgh group.  Do you know how the Mersburgh group

17   got ahold of you in the first place?  I mean, how did they

18   know to call you at all?

19       A.    I had other -- other complaints from Kenny Mersburgh

20   of discrimination, as well as from George Smith and his

21   wife.  So they knew me, I think, because they had already

22   brought other complaints.

23       Q.    What sorts of complaints were those?

24       A.    As I -- and I'm not prepared to --

25       Q.    I don't need --

1    A.    Discrimination complaints for believing that

2    discrimination based on -- and I can't remember.  I'm not --

3    I can't remember the basis of the discrimination, but yeah.

4    Q.    Okay.  Did they say they were being retaliated

5    against for that, for complaining about that discrimination?

6    A.    There were multiple issues that they brought.

7    Q.    I see.

8    A.    And so separating out what -- what did you believe

9    you were being retaliated for, was it for this or for this

10   or for this.

11   Q.    Okay.  And at some point in these discussions, it

12   appeared to you that Mersburgh and group were complaining

13   about something and being -- allegedly being retaliated

14   against for making those complaints in some sort of public

15   issue, is that right?

16   A.    That's right.

17   Q.    Okay.  All right.  But prior to that, this issue

18   hadn't come up for you at least?

19   A.    Not to me.

20   Q.    Okay.  Who was your predecessor in this job?

21   A.    I'm the first person holding the position as a civil

22   servant.  Prior to that, it was a position that was

23   appointed in the Managing Director's Office, so there was --

24   I have a list back in the office of 20 people before who've

25   held it as appointees.

1    Q.    You don't know, though --

2    A.    The last -- before that was Paula Loomis before I

3    actually came in.

4    Q.    Do you know of any history that they had or Paula

5    Loomis or her predecessors had with these kinds of issues?

6    A.    I do not.

7    Q.    But from your perspective, the Mersburgh

8    whistleblower issue was a first?

9    A.    First where we specifically identified there was

10   more than one underlying concern for retaliation that wasn't

11   part of discrimination.

12   Q.    Okay.  I believe you testified as well that -- did

13   you say there may have been discussions, or there have been

14   discussions about whether or not you should have some sort

15   of a separate process or separate agency or separate person

16   to deal with whistleblower complaints?

17   A.    Right now, I've had a couple of discussions within

18   my own office with different people.  It's basically

19   pondering that should we do this, should -- is this

20   something HR is responsible for, for example, is there

21   someone else in the City, where should it go.

22   Q.    Is wow a question?  Actually --

23         MR. MOSELEY:  Let's go off the record.

24         (Discussion held off the record.)

25         MR. MOSELEY:  Let's go back on the record.

1    BY MR. MOSELEY:

2        Q.    Listen, were you -- I'm going to mark this 207.

3    Okay, I'm going to show you what's been marked as

4    Exhibit 207.    I'm not going to ask you any detailed

5    questions about this exhibit, but you're more than welcome

6    to review it in detail if you want.    Do you know what this

7    is?

8        (Deposition Exhibit 207 was marked for identification.)

9        A.    Yes, I do.

10       Q.    What is it?

11       A.    This is the complaint of Howard Tom Sun against the

12    Department of Enterprise Services.

13       Q.    Okay.    Were you familiar with the fact this

14    complaint was filed?

15       A.    I was familiar with the complaint being filed after

16    it was already in litigation.

17       Q.    Okay.    Would it be fair to characterize Mr. Tom

18    Sun's complaint as a whistleblower complaint?

19       A.    Based on what I know of it, yes.

20       Q.    Okay.    How did you find out about Mr. Tom Sun's

21    complaint?

22       A.    I was contacted by Corporation Counsel.

23       Q.    Okay.    Without telling me any of your communications

24    with Corporation Counsel in terms of substantively, were you

25    asked to do -- to take any sort of a role in the Howard Tom

1   Sun case?

2       A.    After the initial decision, I was asked to discuss

3   what kind of training and/or other kinds of things the

4   department might do to prevent retaliation.

5       Q.    Okay.  When you say after the initial decision, do

6   you know when that was?

7       A.    I don't know exactly when it was.

8       Q.    Do you have an idea of when it was?

9       A.    Sometime within the last year.

10      Q.    Okay.

11      A.    I think.

12      Q.    And did you have such discussions with the

13  department?

14      A.    Yes, I did.

15      Q.    And is there a program of training or some sort of

16  procedures now in the Department of Enterprise Services with

17  respect to whistleblowers?

18      A.    There's not a program specifically for

19  whistleblowers.  My understanding is that what we

20  recommended is that they provide training and information to

21  let employees know that any complaint is taken seriously,

22  and complainants are protected from retaliation.

23      Q.    And is there any training in place now?

24      A.    I actually don't know how far along they are with

25  the plan.

1    Q.    Is there a plan in place?

2    A.    I haven't seen the final.   I -- I've been in a

3    discussion in guidance stage, but I haven't actually

4    followed through and checked and see on how they're doing.

5    Q.    Who was doing the plan?

6    A.    Cathy Maki is the administrative officer for that

7    department.

8    Q.    So this is specific to that department, is that

9    right?

10    A.    Yes.

11    Q.    Okay.   Are there other departments that have such

12    training or such a plan?

13    A.    At the conclusion of particular cases that the City

14    has had for discrimination, particularly where there was

15    allegations of retaliation, we've got -- we just finished

16    with H -- Honolulu Police Department and a three-year

17    program for training its employees not only in sexual

18    harassment prevention but also on the nonretaliation

19    clauses.   There's also a similar process going on with the

20    Liquor Commission right now.

21    Q.    Is this with respect to other types of harassment,

22    or basically whistleblower-type harassment where the

23    whistleblower is complaining of a matter of public concern?

24    A.    The specific training is addressing the -- the

25    issues that came forward which were discrimination issues,

1  which the retaliation piece of that would fall under the

2  general, I think, protection for any complainant.

3      And when we talk about that in the training, we talk

4  about the right of any complainant to be protected from

5  retaliation.

6      Q.    Are there any rules and regulations with respect to

7  these programs?

8      A.    There should be, and I know there are in the two

9  departments specifically, policies in place for

10 nonretaliation specific to whatever the underlying claim was

11 in the case for that department.

12     Q.    And you're talking about Enterprise Services?

13     A.    Enterprise Services is -- I don't know how far they

14 are.  I know Honolulu Police Department and Liquor

15 Commission are further along.

16     Q.    And do you know when the processes started to put

17 such policies in place at HPD?

18     A.    2000 -- I'm going to be approximate, but I believe

19 it started in 2001.

20     Q.    Is it your understanding that that was precipitated

21 by Sharon Black's complaint?

22     A.    Yes, it was.

23     Q.    And Enterprise Services' process was precipitated by

24 Howard Tom Sun's complaint?

25     A.    That's the discussions I've been involved in.

1    Q.   Do you know when the process started in the Liquor

2  Commission?

3    A.   Following Carla Chu's complaints against the City in

4  her settlement, which would be --

5    Q.   What was Carla Chu's complaint about?

6    A.   Initially complained about sexual harassment, gender

7  discrimination, sexual orientation, retaliation.  Those are

8  the ones I can recall offhand.

9    Q.   Are there any other departments or agencies within

10  the City that have -- are either working on putting such

11  policies in place or have such policies in place with

12  respect to retaliation?

13    A.   I'm working right now with the Parks Department on a

14  similar kind of situation.

15    Q.   Okay.  And was there some complaint that

16  precipitated this action on the Parks Department?

17    A.   Yes.

18    Q.   And what was that?

19    A.   That's an EEOC complaint by a groundskeeper named

20  Peter Jensen.

21    Q.   Was there an issue of retaliation in that complaint

22  as well?

23    A.   He claimed discrimination and retaliation, yes.

24    Q.   Okay.  Are there any other -- and that's one that's

25  not implemented yet, it's being put into place?

1    A.    We actually started the training during August and

2    rolling out other pieces of the plan.

3    Q.    So -- and are all these plans -- do all these plans

4    have similar elements?

5    A.    I'm going to say they have similar elements,

6    basically.

7    Q.    Can you tell me, I mean, what -- what would be in

8    such a plan?

9    A.    One, that there's a training component to put people

10   on, kind of, additional notice, we already have a certain

11   amount of training; that the particular department put in

12   place an internal policy, not just the City policy, but

13   their own internal message from their appointing authority,

14   and there's some focus to supervisors being given additional

15   guidance.

16   Q.    Any other components to the programs?

17   A.    Not that I can make out of my head.

18   Q.    Is there a mechanism being set up for which people

19   complaining of retaliation can utilize to address their

20   concerns?

21   A.    Are you asking if there's a separate procedure being

22   set up for complaints of retaliation?

23   Q.    Right.

24   A.    Not specifically.

25   Q.    Okay.  So in the training component?

1    A.    Mm-hmm.

2    Q.    What do you tell people?

3    A.    That they -- they can make complaints, that they

4    should be able to do that without fear of retaliation; and

5    if they believe they've been retaliated, they can report

6    that.

7    Q.    To whom?

8    A.    There's several people.  It can be a supervisor,

9    unless the supervisor is the person who's engaging in that

10    behavior, anybody in their chain of command, and they can

11    bring it to -- their designated EEO coordinator in each

12    department or personnel officer in each department can take

13    a complaint, and -- and/or they can bring it to me.

14        We also tell them about the outside agencies, at

15    least in the discrimination area, that are available to

16    them.

17    Q.    The EEOC?

18    A.    And the HCRC.

19    Q.    That's the Hawaii Civil Rights Commission.  Is that

20    all there is in the training component?  Sounds like that

21    would be a short class.

22    A.    It does?

23    Q.    I'm sorry for that gratuitous comment.  I take that

24    back, but is that all there is in the training component?

25    A.    Well, the training starts off explaining what kinds

1  of things can be complained about, and there's generally

2  some kind of a video that we put into the training so that

3  people can see an example of what not to do.

4      Q.   Okay.  Is there a component that specifically speaks

5  about the State Whistleblower Act?

6      A.   Not specifically.

7      Q.   Nonspecifically does it deal with that?

8      A.   I mean, I think the discussion of complainants

9  should be protected from retaliation and -- and that it's

10  all of our job to make sure that happens would fall

11  within -- generally.

12      Q.   Okay.  Is the State Whistleblower Act even referred

13  to in this training?

14      A.   No.

15      Q.   Okay.  Would it -- are there any other programs that

16  are either in place or, sort of, anticipated to be in place

17  in any City agencies, other than the four that you've listed

18  which were Enterprise Services, HPD, Liquor Commission, and

19  Parks Department?  Any others that you know of?

20      A.   I mean, I'd like to; but right now, we're doing the

21  response to complaints as they surface and addressing those.

22  I'm one person by myself, so --

23      Q.   I understand.  But there -- there are no other

24  programs that have been initiated or installed in any other

25  departments to your knowledge at the moment, right?

1    A.    Not that I'm aware of.

2    Q.    Okay.  Would it be fair to say that in each

3  instance, that the programs that either have been initiated

4  or were put in place were the result of litigation filed by

5  employees?

6    A.    Yes, that's my understanding.

7    Q.    Okay.  Is there some reason the City waits for an

8  employee to have to sue before they initiate such programs?

9    A.    I don't know that I can speak for the whole City.

10    Q.    Well, you're -- you're sort of in the catbird seat.

11  Do you have any explanation that you think -- or any reason

12  that you think would explain that?

13    A.    I don't -- I don't think I could have anything that

14  would speak to the City as a whole.

15    Q.    Has there been some discussion that on the basis of

16  Phil English's complaint, such a program will be instituted

17  in the Assessment Division?

18    A.    I am not aware of those specific discussions if

19  there are any.

20    Q.    Are you the person that would be involved if such a

21  discussion -- if such a program were to be initiated?

22    A.    I would assume that I'll be part of that discussion.

23    Q.    But you're just not aware of any such discussions?

24    A.    Not specific to his complaint.

25    Q.    In these other -- in the other instances that we

1  talked about, Enterprise Services, HPD, Liquor Commission,

2  and Parks Department, did the City wait until the underlying

3  litigation or claim was resolved before initiating the

4  programs?

5      A.   On those four, yes, specifically.

6      Q.   Has there been any discussion that the City's going

7  to wait until Phil English's case is resolved before they

8  initiate something in the Assessment Division?

9      A.   Not any discussion with me on that.

10     Q.   Have you heard of any discussion amongst other

11  people?

12     A.   I have not.

13     Q.   I take it from your responses that you believe that

14  this should be a Citywide program?

15     A.   It's my personal opinion that there's a lot of

16  things we should be doing.

17     Q.   Okay.

18     A.   This might be part of it.

19     Q.   I see.  And are we talking about -- do any of these

20  programs specifically focus on whistleblowers under the

21  umbrella of the Hawaii Whistleblowers Protection Act?

22     A.   Not specifically.

23     Q.   Not specifically.  They just deal with retaliation

24  in general?

25     A.   Yes.

1      Q.    Okay.   Okay, I'd like to show you -- well, I'm going

2   to get it marked first.   That's the process here, get it

3   marked.

4            MR. MOSELEY:   Off the record.

5            (Discussion held off the record.)

6            MR. MOSELEY:   Okay, let's go back on the record.

7   BY MR. MOSELEY:

8      Q.    I'm showing you what's been marked as Exhibit 208.

9      (Deposition Exhibit 208 was marked for identification.)

10     A.    Mm-hmm.

11     Q.    Can you tell me what this is?

12     A.    It's the complaint of Kenny -- Kenneth Mersburgh,

13  Salsedo, Smith, and Silva against Environmental Services.

14     Q.    Okay.   And this is the -- I was referring to them as

15  the Mersburgh group, but this is the -- these are the people

16  you were talking about originally when we were talking about

17  you -- the only complaint that you've had that was a

18  whistleblower complaint?

19     A.    Right.

20     Q.    Okay.   And when did you first become aware of their

21  complaints?

22     A.    I became aware -- and I don't have the exact date,

23  but before they filed their lawsuit.

24     Q.    Okay.   Was there anything done to resolve their

25  complaints of retaliation or to attempt to resolve their

1    complaints of retaliation before they filed the lawsuit?

2        A.    After they filed their complaint, we attempted to

3    conduct an investigation.

4        Q.    When they file their complaint -- actually, the

5    first piece of paper in a lawsuit is called a complaint, so

6    --

7        A.    Okay, their internal complaint.

8        Q.    Oh, their internal complaint.  Okay, thank you.

9        A.    We began an investigation.  The investigation was

10   halted because their attorney refused to let us speak to

11   them if the attorney couldn't speak to the City's employees

12   incident through the investigative interviews so the

13   complaint was actually withdrawn, essentially.

14       Q.    Okay.  So there was nothing done prior to the

15   lawsuit?

16       A.    We didn't get to the final analysis.

17       Q.    Okay.  And this was -- what was your plan for trying

18   to resolve their complaints before it was withdrawn?

19       A.    As with any complaint, once we have the facts and

20   secured, then looking at what the cause of the -- those

21   situations are, if -- if there is actually a concern, and

22   then attempting to remedy those things; but as I said, we

23   didn't get to that point.

24       Q.    Okay.  This lawsuit actually was decided fairly

25   recently, but do you know if the City has or plans to appeal

1  the verdict in this lawsuit?

2       A.    I am not aware of that.

3       Q.    Okay.  And do you know what the -- I'm pretty sure

4  Mersburgh was awarded nothing, but do you know what the

5  other three Plaintiffs were awarded in the lawsuit?

6       A.    I know what I read in the paper.

7       Q.    Which was $25,000 --

8       A.    25,000 a piece, yes.

9       Q.    Okay.  Do you know what -- what the jury verdict for

10 Howard Tom Sun was?

11      A.    Initially, it was a million dollars, and it was

12 appealed, and it was reduced to a dollar.

13      Q.    It was 1.5 million or a million?

14      A.    It was over a million, but I'm not sure exact.

15      Q.    Okay.  And then the judge reduced it to a dollar?

16      A.    To a dollar.

17      Q.    Okay.  Okay, I'm showing you what's been marked as

18 Exhibit 209.  Do you know what this is?

19      (Deposition Exhibit 209 was marked for identification.)

20      A.    It's a compliant of Charles Wiggins versus the City

21 Liquor Commission.

22      Q.    Okay.  Are you familiar with this complaint?

23      A.    Only in very general terms.

24      Q.    Okay.  How are you familiar with this complaint?

25      A.    What I heard in the -- the media, for the most part.

1    Q.    And you haven't dealt with this complaint internally

2    at all?

3    A.    Not specifically with the complaint.

4    Q.    Okay.  How about with the issues underlying the

5    complaint?

6    A.    The issues underlying this complaint and other

7    complaints are part of the discussions that we've been

8    having about retaliation in general.

9    Q.    In general --

10    A.    And then putting the Liquor Commission training plan

11    in place.

12    Q.    Okay.  The Liquor Commission's training plan is not

13    in place yet?

14    A.    We put it in place.  We started it last year with

15    the first training occurring last year.

16    Q.    But Mr. Wiggins filed his complaint it looks like in

17    2002, so it was put in place after Mr. Wiggins filed this

18    complaint?

19    A.    Yes.

20    Q.    Okay.  Was part of the reason for trying to put a

21    program together in the Liquor Commission Mr. Wiggins'

22    complaint, or was it solely Carla Chu?

23    A.    Solely Carla Chu.

24    Q.    Okay.  Was there anything additional added to any

25    plan or any discussion about adding anything to any plan as

1   a result of Charles Wiggins' complaint?

2        A.    Not that I can specifically recall.

3        Q.    Okay.  Was it thought that the Carla Chu plan would

4   deal with problems such as Mr. Wiggins was expressing?

5        A.    I would only be speculating on that.

6        Q.    Okay.  So there was just no discussion that you were

7   involved with, is that right?

8        A.    Not specific to Mr. Wiggins.

9        Q.    Okay.  Do you know if Mr. Wiggins' complaint has

10  been resolved?

11       A.    It's my understanding that it -- he did prevail in

12  his lawsuit.

13       Q.    Okay.  Do you know -- you mean he got a judgment

14  against the City?

15       A.    Yes.

16       Q.    Do you know what the judgment was?

17       A.    That's my understanding.  I know there was a

18  monetary amount to it.  I don't know it specifically.

19             MR. YAMAMOTO:  Okay, I --

20             MR. MOSELEY:  Go ahead.

21             MR. YAMAMOTO:  I would correct the witness.  That

22  may be her understanding, but there was no judgment.

23             MR. MOSELEY:  Was it a settlement?

24             MR. YAMAMOTO:  It was because I settled it.

25             MR. MOSELEY:  Oh, you did?

1          MR. YAMAMOTO:  And I settled Carla Chu, too, so --

2          MR. MOSELEY:  Okay.

3          MR. YAMAMOTO:  There was no judgment, though.

4          MR. MOSELEY:  I don't want to make you a witness,

5     but what was the settlement amount with Wiggins?  It's not

6     confidential.

7          MR. YAMAMOTO:  I don't -- I'm not saying it is.  I

8     just don't remember.  I don't remember what it was in Carla

9     Chu either, but I can tell you that the training that --

10    just, you know, to abbreviate this somewhat, the training

11    that Ms. Tsukayama is talking about was part of the

12    settlement in Carla Chu.

13    BY MR. MOSELEY:

14        Q.   It's C-H-U, right?

15        A.   Mm-hmm.

16        MR. YAMAMOTO:  Yes.

17        MR. MOSELEY:  That settlement is public record,

18    right?

19        MR. YAMAMOTO:  My understanding is they're all

20    public record because the City cannot have a confidential

21    agreement or what have you, but I'm not positive about that.

22    That's my understanding, though.

23        MR. MOSELEY:  All right.  And again, I'm -- by

24    Randy's representations here, I'm not intending to make him

25    a witness, and I'm sure he wasn't intending to put himself

1    in that position, and I won't be urging that at any point.

2    I'm -- but I do appreciate the additional insight.  Thank

3    you, Randy.

4            MR. WONG:  How much longer are you expecting to go?

5            MR. MOSELEY:  Do you need to take a break?

6            MR. WONG:  I'm just wondering if we should take a

7    break or --

8            MR. MOSELEY:  Let's take a little break.

9        (Recess taken at 10:00 a.m. and resumed at 10:08 a.m.)

10           MR. MOSELEY:  Okay.  Let's go back on the record.

11   BY MR. MOSELEY:

12       Q.    I'd like to show you what's been marked as

13   Exhibit 210 for these depositions.  Do you know what this

14   is?

15       (Deposition Exhibit 210 was marked for identification.)

16       A.    It's a complaint by Kerry Shannon against the Liquor

17   Commission.

18       Q.    Are you familiar with this complaint?

19       A.    Not specifically.

20       Q.    Not specifically.  Are you, in general, familiar

21   with it?

22       A.    I've heard the name.  That's about it.

23       Q.    All right.  This complaint has not yet been

24   resolved, right?

25       A.    I don't know.

1    Q.    To your knowledge?

2    A.    I don't know.

3    Q.    Okay.  Do you know if the City has taken any special

4    action, other than defending the litigation as a result of

5    Kerry Shannon's complaint?

6    A.    I don't know.

7    Q.    Okay.  By the way, is it your understanding that

8    Charles Wiggins' complaint is essentially a whistleblower

9    complaint as well?

10   A.    That's my understanding.

11   Q.    How about your understanding of Kerry Shannon's

12   complaint?

13   A.    I'm not specifically certain.

14   Q.    Okay.  Do you want to take a moment to look at it?

15   Actually, if you look at page 2 under, Nature of the Case?"

16   A.    Mm-hmm.

17   Q.    Do you have an understanding now of whether this is

18   a whistleblower case?

19   A.    Yes, I do.

20   Q.    Okay.  And it is, right?

21   A.    Yes, it is.

22   Q.    Okay.  I'm showing you what's been marked as

23   Exhibit 211 in this case.  This is -- do you know what this

24   is?

25   (Deposition Exhibit 211 was marked for identification.)

1     A.    It's a complaint by Craig Whang against the

2  Prosecutor's Office.

3     Q.    Were you familiar with this complaint as well?

4     A.    I did read about it in the paper.

5     Q.    But not within the City?

6     A.    I wasn't contacted specifically about his complaint.

7     Q.    Okay.  Has this complaint ever been discussed

8  within -- in terms of your knowledge -- see, I told you I

9  can't ask a question.

10         Have you ever been involved in any discussions about

11  this complaint?

12     A.    Only to the extent that he filed a complaint.

13     Q.    And who did you discuss that with?

14     A.    I believe it was Iwalani White, who was the --

15  formally the Deputy Prosecuting Attorney.

16     Q.    Okay.  Do you know if this is also a whistleblower

17  complaint?

18     A.    It's my understanding that it is.

19     Q.    Okay.  Do you know if this complaint was resolved?

20     A.    It's my understanding it's not resolved.

21     Q.    Okay.  Do you understand, with respect to Craig

22  Whang's complaint, whether there's any discussion within the

23  Department of the Prosecuting Attorney to try to implement

24  some sort of a -- one of these anti-retaliation programs

25  that you've been discussing?

1    A.    Not to my knowledge.

2    Q.    Okay.  Is it your understanding that won't be done

3    until the case is resolved?

4    A.    I don't know that specifically.

5    Q.    Is that generally the City's practice?

6    A.    I can't speak for the City as a whole.  What the --

7    when I've been involved, it's generally asking --

8    departments asking for guidance after something has

9    occurred.

10    Q.    Or after the litigation has been resolved, right?

11    A.    Is completed, yes.

12    Q.    Okay.  Has -- have any of these people that have

13    contacted you in that manner explained to you why they

14    wanted it done after the litigation was resolved?

15    A.    The discussions are generally what do we need to do

16    in response to this finding or this conclusion from a --

17    kind of a good employer, what would a good employer do when

18    this occurs.  That's the kind of discussions.

19    Q.    Okay.  Do you know why they'd wait until after the

20    complaint is resolved, though?

21    A.    I would only be guessing.

22    Q.    Well, is it a guess, or is it sort of an opinion

23    based on your observations with the City?

24    A.    I'd call it an opinion.

25    Q.    Based on your observations --