1    A.    Based on my observations.

2    Q.    And what's your opinion about why they wait until

3    the complaints are resolved?

4    A.    One may be that until it gets to that point, there

5    may be a feeling that there was nothing wrong that was done.

6    That's one thing that, I think, sometimes happens, that

7    after a litigation or a complaint is filed, management goes

8    into responding to the complaint, as opposed to accepting

9    that there may be some deficiency there.

10    Q.    I'd like to show you what's been marked as

11    Exhibit 212.  Are you familiar with this complaint?

12    (Deposition Exhibit 212 was marked for identification.)

13    A.    I'm familiar with this complaint just in general

14    terms.

15    Q.    Okay.  Is this also a whistleblower complaint?

16    A.    Yes, it is.

17    Q.    Okay.  Do you know if this complaint has been

18    resolved?

19    A.    It's my understanding it's not resolved.

20    Q.    Okay.  Has anybody -- well, let's see.  What

21    department was involved in this one, the Department of --

22    A.    Community Services.

23    Q.    -- Community Services.  Has there been any effort to

24    initiate some sort of anti-retaliation program in the

25    Department of Community Services to your knowledge?

1    A.    Not to my knowledge.

2    Q.    Okay.  Have you been involved with any of the issues

3    in the Nancy Olipares complaint?  That's O-L-I-P-A-R-E-S.

4    A.    She contacted me before she left the City briefly,

5    so the only thing I know is of her.

6    Q.    And without -- actually, I'm not -- since that's

7    ongoing litigation, I'm not wanting to know any of the

8    substance.  I probably would be within my right to ask it,

9    but I really have no interest in -- in some sort of an

10   improper effort to get you to testify as to something that

11   might be affecting that case.

12         So if I'm going to ask you a question like that, can

13   you consult with your counsel first before you answer?  But

14   in any case, what was the general nature of Nancy Olipares'

15   contact with you?

16   A.    She had a number of concerns about things in her

17   workplace and wanted to discuss them and what her options

18   were.

19   Q.    Okay.  Is she still a City employee?

20   A.    It's my understanding she's not a City employee

21   right now.

22   Q.    Okay.  All right.  Do you -- you testified that in

23   general, the -- I guess the people involved at the City on

24   the -- on the Defendant's side of the City in these types of

25   complaints start out with the position that we did nothing

1   wrong?

2          MR. YAMAMOTO:  Let me object, that mischaracterizes

3   her testimony.

4   BY MR. MOSELEY:

5      Q.   Well, actually, I'm not trying to mischaracterize

6   your testimony.  I'm trying to figure out, really, what it

7   was, so -- and it is possible I've mischaracterized it so if

8   I have, I'd like you to, sort of, correct it for me.

9      A.   You asked for my opinion on why there may be a delay

10  in dealing with this.

11     Q.   Right.

12     A.   And I think one of the reasons may be that when

13  confronted with a complaint or a lawsuit, that management

14  works towards responding to the -- the complaint which is

15  against them in some sense, so that's where they focus.

16     Q.   Okay.  Would it be fair to say they do this to the

17  exclusion of dealing with the potential underlying issues

18  until the complaint is resolved?

19         MR. YAMAMOTO:  Let me object to the extent it calls

20  for speculation.

21  BY MR. MOSELEY:

22     Q.   And I'm just asking you about, you know, your

23  opinion based on your observation.

24         MR. YAMAMOTO:  Same objection.

25         THE WITNESS:  It's my opinion that there's delay

1  while they wait to see what's going to happen.  And unless

2  there's something very clear, and I haven't seen that yet,

3  where they clearly see there's a problem, identifying what

4  to do to resolve it is not going to happen until after the

5  complaint has taken its course.

6  BY MR. MOSELEY:

7      Q.    Okay.  Do you have any understanding about how much

8  money the City spends to defend these complaints in -- in

9  general or any -- any -- any measure of how much they spend

10 on defense in -- like we spend X amount a year for X number

11 of years or X amount per complaint?  I don't know what kind

12 of measure you would have.  Do you have any?

13     A.    I have no specific information about that.

14     Q.    Do you know who would?

15     A.    I don't know if anybody actually is tracking that

16 specifically.

17     Q.    Is that -- is that -- do you know if that kind of

18 money is in the budget?

19     A.    My -- it's my understanding that there is money in

20 the budget for handling all complaints that come into the

21 City or for lawsuits that come into the City, and -- but I

22 don't know that they're broken down into categories by the

23 type.

24     Q.    Okay.  Do you know if there's ever been any attempt

25 by the City to figure out how much money they're spending on

1    these -- on defending these complaints?

2        A.    Not that I know of.

3        Q.    Okay.  Has there ever been any recommendation that

4    anybody's made that the City should, you know, track the

5    amount of money they're spending on this -- on defending

6    these sorts of things?

7        A.    I don't know if anybody's made a specific

8    recommendation.  I know for my own area, I've asked can I

9    find out what it takes us to deal with discrimination cases,

10   for example, and that data is just not available readily.

11       Q.    Okay.  So you've asked, and it hasn't been provided?

12       A.    Well, it was -- it wasn't that it wasn't provided,

13   it was just the -- the explanation was going to be too

14   difficult to get to that information, so we haven't -- I

15   haven't pursued it specifically.

16       Q.    Why did you ask about how much money is being spent

17   on that sort of activity, the defense activity?

18       A.    I think that's part of my job as the City's equal

19   opportunity officer is to know what the City's doing, what

20   it costs us to do that, are we spending the money in the

21   right places.  To me, that's the sort of information I ought

22   to have to make those decisions.

23       Q.    Actually, you make me happy to be a taxpayer, the

24   fact that you're sitting here.

25             The -- I guess the question I have in follow-up to

1    that, you said to make sure they're spending the money in

2    the right places, are you meaning hey, we could spend the

3    money on programs to deal with the problems before they

4    occur, versus defending them after they happen, is that what

5    you're talking about?

6    A.    That, and I've actually been on a -- kind of a

7    mission to get investigative staff that's specifically

8    allocated to this kind of work, as opposed to taking people

9    from departments who are not necessarily always able to or

10   equipped to do the work we ask of them.

11   Q.    What I'm going to ask you for is a list of what you

12   want to do that type of job, okay?  Now, I believe the

13   testimony was that part of the settlement in the Carla Chu

14   case was a requirement that the City implement some sort of

15   a training program.

16         With that in mind, I want you to tell me what you

17   want to do this job.  If I were to say to you, give me what

18   you need to combat this retaliation problem with the City,

19   what do you need?

20         MR. YAMAMOTO:  Let me object to the extent it's

21   compound multiple times and also assumes facts not in

22   evidence.

23         THE WITNESS:  What did you say?  I didn't hear him.

24   BY MR. MOSELEY:

25   Q.    Unless he instructs you not to answer, just -- I

1    know the -- the question was compound and elaborate, but do

2    you know what I'm asking you?

3        A.    Yeah.

4        Q.    Can you give me --

5        A.    You know, obviously when I give that kind of -- I

6    would like to have my -- my research ready and my data

7    ready.

8        Q.    I understand.  And you know what --

9        A.    But off the top of my head, one, there has to be

10   sufficient money and staffing to provide training; and if

11   we're talking training to 9,000-plus employees, I'd have to

12   do a calculation of how many training hours that equates to,

13   how many classes to come up with some staff year number.

14       Q.    So what you need is sufficient money and staffing

15   for training for 9,000 employees of the City, right?

16       A.    Mm-hmm.

17       Q.    That's a yes?

18       A.    That's one, yes.

19       Q.    Okay.

20       A.    Training's one part of it.  After you train people,

21   then you have to be able to deliver on what you trained,

22   essentially.

23       Q.    Okay.  I'm writing this down, so slow down.  Okay.

24   What do you mean by deliver on what you trained?

25       A.    Well, if you tell people that they can file

1    complaints, then you have to be able to take those

2    complaints, you have to be -- have the resources to

3    investigate the complaints, and that there's a -- this gets

4    very compound, the answer.  There's so many things that go

5    into that.

6            The people have to have not only a job, but they

7    have to have the authority to do that job, so they have to

8    be positioned into the right places in that organization so

9    that it matters what they come up with, what they find.

10   Q.    In other words, you don't want a paper tiger?

11   A.    Right.  And you don't want it, you know, squished

12   down on the bottom of an organization somewhere.

13   Q.    So --

14   A.    And the only analysis I have done is before I came

15   to the City, there was just sexual harassment cases, really,

16   that were being investigated.

17           And just based on the ones that I saw during the

18   first two years I was with the City, I had actually tried to

19   capture the hours per -- per year kind of calculation and

20   came up with approximately three people full-time for, you

21   know, each year just to handle complaints of sexual

22   harassment and the related issues that go with that.

23   Q.    And that's just sexual harassment?

24   A.    That's just sexual harassment so what you're talking

25   about would be an enormous kind of resource.

1    Q.    It would be a serious commitment, though, right?

2    A.    Yes.

3    Q.    But would it be fair to say that you view this as a

4    serious problem?

5    A.    I do.

6    Q.    Okay.  So you need money for staffing for training,

7    then you need money for -- what do we call this, is this the

8    establishment of a program and process to deal with the

9    issues?

10    A.    Yes.

11    Q.    Would that be fair?

12    A.    I would -- I would -- that would be fair.  You have

13    to have policies because you have to have the authority to

14    do what you're doing.

15    Q.    Policies, okay.  Now, in terms of policies, who

16    would be the people setting these policies?

17    A.    It -- and I'm going to assume we're talking about

18    policies for employees, so employment policies.

19    Q.    Right.

20    A.    And even in seven years, I'm still getting to know

21    the City even.  We have policies for personnel, so --

22    Q.    Okay.

23    A.    So, you know, to -- notifies employees and managers

24    of what the personnel practices are.

25    Q.    So that's in the Human Resources Department?

1    A.    Human Resources area.

2    Q.    And as I understand it, Human Resources sets

3    personnel policies for all the agencies, is that right?

4    A.    Right.

5    Q.    Okay.

6    A.    And then because of the nature of the kind of thing

7    you're talking about, which it goes beyond the

8    discrimination area, there's probably policies that fall

9    into other areas that would allow these kinds of people to

10    go in somebody else's turf, essentially.

11    Q.    You mean to actually investigate the underlying

12    complaint that -- for which there was retaliation?

13    A.    Right.  To get the records, for example.  How do you

14    get the records from, you know, a department that has to do

15    with the nature of their business.

16    Q.    Sounds like you've thought about this.  What else do

17    you think would be on your wish list?  I'm sorry to do this

18    to you.

19    A.    Yeah, because I have a beautiful plan in my head,

20    but --

21    Q.    I had no idea this -- this examination was going to

22    occur this way, but --

23    A.    Okay.

24    Q.    Anything else that you can think of on your wish

25    list?

1    A.    Those are the high points, I mean, people,

2    authority, the resources to do the job.  There's a whole lot

3    of other things I think that would go into it.

4    Q.    Okay.  But they would be sort of collateral?

5    A.    Collateral meaning --

6    Q.    Collateral to the high points?  I mean -- well, I

7    mean, I suppose if you have investigators, you have to have

8    clerical staff, filings --

9    A.    Yeah, administrative supports.

10    Q.    Those are kind of things that are implied?

11    A.    You have to draw them into a detailed plan, but if

12    we're looking at just kind of the high points of --

13    Q.    Okay.  As you're sitting here today, do you even

14    have a ballpark idea of how much money you'd be talking

15    about every year to do this, I mean, even the roughest idea?

16    A.    I -- I would want to do some research to see how big

17    the scope is, really, right now before doing that.  Like I

18    said, all I've looked at is sexual harassment so I knew that

19    was a specific number that I could actually pinpoint to how

20    I came up with --

21    Q.    Well, does that mean that before you'd actually even

22    start implementing the program, you'd have to have the

23    resources to conduct research on a study as to the extent of

24    the problem?  I mean, you would really have to get down in

25    the trenches and find out what's there, right?

1        A.    And I wouldn't want to take so long on it that it

2    prevents it from happening, but --

3        Q.    Right.

4        A.    -- you'd have to do enough of that to just determine

5    --

6        Q.    So you'd need a staff and budget to do that, right?

7        A.    Possibly, yes.

8        Q.    Are there outside consultants that get hired to do

9    those kinds of things?

10       A.    I'm sure there's a consultant for just about

11   anything, so --

12       Q.    Well, when you were with American Savings Bank, for

13   example, did you guys do everything in-house, or did you, I

14   mean, contact -- aren't there national organizations that

15   deal with this sort of thing?

16       A.    This sort of thing?

17       Q.    Well, I mean, retaliation and, I mean, you were

18   dealing with EEO matters, right, but --

19       A.    Right, and the employment issues.  I mean, at the

20   bank, we had outside counsel, obviously, for employment

21   matters.  We'd handle our own internal investigations.

22       Q.    Okay.  All right.  This is -- I'm showing you what's

23   been marked as Exhibit 213.  Did you see this newspaper

24   article?

25       (Deposition Exhibit 213 was marked for identification.)

1    A.    Yes, I did.

2    Q.    Did you read it?

3    A.    Yes, I did.

4    Q.    Did you have any opinions about whether it was an

5    accurate description of the issue it was reporting on?

6    A.    I can -- can I tell you that I was contacted by the

7    City's communications people --

8    Q.    Sure.

9    A.    -- when Mr. Perez made his request of the City for

10   information to respond, so I supplied information to Bill

11   Brennan who supplied it to Perez, obviously, in response to

12   what the City does currently with regard to retaliation.

13   Q.    Okay.  And can you identify in this article the

14   information you supplied, or is it woven into --

15   A.    It's woven in, yeah, and I believe that other people

16   actually contributed as well, information, so --

17   Q.    I understand.  Is there anything that you can really

18   specifically or clearly identify as something that you

19   supplied?

20   A.    I know I did see something when I was reading it the

21   first time.  I'm not seeing it, but I remember reading it.

22   Q.    Can I direct you to the very last page of this

23   exhibit?

24   A.    Mm-hmm.

25   Q.    In the -- in the -- on this page, and I'm going to

1  mispronounce this word, treated like a pariah, right below

2  that, it says, "The city encourages workers to report

3  misconduct and provides a variety of ways, including a

4  complaint line, to make such reports."

5       Is that something you might have provided?

6  A.    Yes.

7  Q.    Okay.  How does the City encourage workers to report

8  misconduct?

9  A.    I think we do it in an -- at least a number of real

10 specific areas.  The -- sexual harassment is one of them, we

11 have training in the prevention of workplace violence,

12 there's also some training that's provided in the area of

13 the ethics laws.

14      We have management issues forums several times

15 during the year which specifically cover different topic

16 areas, and topic areas are dependent on either something of

17 interest or something of need, so we have -- actually, right

18 when I first came to the City, about a week or two before I

19 started, they had a large forum on retaliation specifically,

20 all forms of retaliation.

21 Q.    Including retaliation that would be covered under

22 the Hawaii Whistleblower Act?

23 A.    That's my understanding, it covered everything, all

24 different kinds of retaliation.  That was the specific focus

25 that was teaching managers about what they need to do when

1   employees complain about anything.

2       Q.   Do you know who attended -- that was before you came

3   on board, you said?

4       A.   I was invited as a guest.  It was -- I had already

5   accepted the job, but I hadn't actually started so I

6   attended as a guest.

7       Q.   Okay.  Do you know how widespread the attendance was

8   in terms of managers at the City?

9       A.   I know it was at the Pikake Room at the Blaisdell

10  Center, and the room was full so I would guess about 200 or

11  so of our managers, which is generally our attendance at

12  these sorts of assemblies.

13      Q.   Do you know if division heads were required to

14  attend these things -- or this thing?

15      A.   I wouldn't know that they'd be required to, but

16  they're invited.

17      Q.   Okay.  Do you have a specific recollection of

18  whether or not there was anything to do with the Hawaii

19  Whistleblowers Act -- Whistleblower Protection Act?

20      A.   I don't have a specific recollection of that.

21      Q.   Okay.  You've dealt -- you've talked about work --

22  of sexual harassment, workplace violence, and ethics laws.

23  Sexual harassment and workplace violence are generally,

24  wouldn't you say, kind of internal problems, is that right?

25      A.   Yes.  Some -- sometimes it's perpetrated by someone

1    outside, but --

2        Q.    You know, I -- leaving aside your saying that there

3    were something to do with ethics laws, are you aware of

4    anything specifically that talked about whistleblowers or

5    employees who wanted to report on matters of public concern

6    rather than internally?

7        A.    The only one that I think that's close to that is

8    following the Kahapea case, there was a similar forum for

9    managers in which I believe Mike Hansen from Internal

10   Control, as well as somebody from the prosecutor's office, I

11   think it was Randy Lee, and it's -- I'm doing recall.  That

12   may not be accurate, but -- and they talked about procedures

13   for reporting internal --

14       Q.    Theft?

15       A.    -- theft, fraud, that sort of thing.

16       Q.    Stealing?  Kahapea was the housing guy, right?

17       A.    Yes.

18       Q.    All right.  Is Mike Hansen the person charged with

19   investigating reports of theft, or --

20       A.    I'm not sure what the exact scope of his job is, you

21   know, where his -- he starts and ends in terms of his area

22   of responsibility.

23       Q.    Okay.  Is -- do you understand that he has any

24   responsibilities to take action to protect whistleblowers?

25       A.    I -- that's my understanding that he does if they

1   complain -- if the complaint comes in to him, it's a matter

2   that he's investigating, and I think it's in his policy.

3       Q.    In his policy?

4       A.    Or the policy for the Internal Control.  And I may

5   be mislabeling his title, but that's generally what it is.

6       Q.    Do you know of any effort to get this information

7   out to the employees of the City?

8       A.    I'm not aware of the specific ways they're doing

9   that.

10      Q.    Okay.  In the physical area that you occupy when

11  you're working for the City, are there bulletin boards or

12  something somewhere in the area?

13      A.    In most offices, there's some kind of employer

14  bulletin board and also a place for the union, obviously, to

15  have materials that can be posted.

16      Q.    Okay.  Have you ever seen anything posted on these

17  bulletin boards with respect to whatever it is Mike Hansen

18  does?

19      A.    Not specific to him.

20      Q.    Okay.  Is there -- have you ever seen his name or

21  position or contact information --

22      A.    On a bulletin board?

23      Q.    Right.

24      A.    No.

25      Q.    Have you ever seen anything like that in a handout,

1    or is there -- is there, like, a City newsletter or

2    something?

3        A.    There's a Human Resources newsletter that is

4    distributed, and I don't know what the cycle on that is.

5        Q.    Is that given to everybody or just managers?

6        A.    I'm not sure how they distribute it.

7        Q.    Do you have any idea of what the program is to

8    disseminate information throughout the 9,000-some-odd

9    employees with the City?

10       A.    I don't know that there's one program.  There's

11   different avenues that -- or vehicles that are used.  That

12   newsletter is one, the back of the paycheck often is used to

13   communicate general interest kind of information.

14       Q.    Okay, getting back to the news article in

15   Exhibit 213 in that same last page?

16       A.    Mm-hmm.

17       Q.    The next paragraph down -- oh, the same paragraph,

18   are -- were you aware of a complaint line to report

19   misconduct?

20       A.    Actually, the -- the City's Customer Services

21   Department handles that -- it used to be called the Office

22   of Information and Complaint, the name has changed in the

23   change of administrations, but there's a number that anyone

24   can call, they report the pothole problems.

25           I've gotten complaints through that line where they

1    call us to report a City employee, for example, who they

2    believe was discriminating against them.

3        Q.    But that's available to City employees as well?

4        A.    City employees have used that line to make

5    complaints.

6        Q.    Is that what the line was intended for?

7        A.    I don't know that that was what it was intended for,

8    but it's available to anyone.

9        Q.    I guess because you can't prevent them from calling

10   the number, right?

11       A.    That's true.

12       Q.    Okay.  Is there any sort of publication or program

13   to encourage employees to use that line?

14       A.    Not that I'm aware of.

15       Q.    Okay.  In the next paragraph down, it says,

16   "Whenever a city employee files a complaint about another

17   worker, both parties are reminded that retaliation is

18   prohibited."

19            Is that your understanding that that happens?

20       A.    That's my understanding, and that's what I'm

21   training people to do.

22       Q.    And is that your understanding that that's what's

23   supposed to happen or that that is what happens?

24       A.    On the cases I see, and in fact, I -- I put together

25   the training for the City on internal investigations.

1      Q.    Right.

2      A.    And we actually recommend a notice of rights and

3   responsibilities that includes a nonretaliation clause into

4   it, and we've recommended that it's used for all internal

5   investigations so that it's documented that the individual

6   parties were notified of what their rights and

7   responsibilities were.

8      Q.    Is this a lengthy document, this notice of rights

9   and responsibilities?

10     A.    Two, three pages.

11     Q.    Okay.  But so far, it's limited in use to programs

12  that have actually been implemented by you, is that right?

13     A.    Or people who have gone to the training that I've

14  hosted.

15     Q.    Okay, the training that you've hosted was in

16  conjunction with these four different programs, though,

17  right?

18     A.    No.  In addition -- in the regular part of my job.

19     Q.    Oh, the regular part of your job.

20     A.    Let's see.  It's more information than you want, but

21  initially, I started training just in my area, or what I

22  thought was my primary area which is discrimination, so my

23  -- I first came into the City, recognized that there was no

24  formal training program for the people who investigate so I

25  held training for conducting EEO investigations.

1        Found after the first couple of classes that people

2    were signing up just because there was no other training

3    available for investigations in general, so I worked with

4    our labor relations staff to create and bring in a training

5    program that was available to anyone who's going to conduct

6    any kind of internal investigation, whether it's

7    for workplace violence, for theft, for drug abuse, for

8    sexual harassment.

9        And so at least once a year, we hold a training

10   class on internal investigations for up to about 40 people.

11   So it's in that context of anybody who has come through that

12   training program, where we're saying here's the model, it's

13   not just in the -- a discrimination EEO type model, it's a

14   model for conducting an internal investigation in any

15   subject matter.

16       Q.   It's called notice of rights --

17       A.   And responsibilities.

18       Q.   And in that notice, it says nobody is going to

19   retaliate?

20       A.   Everyone has a right to complain, and they should be

21   protected from retaliation.

22       Q.   If somebody does retaliate, what's -- what's the

23   remedy for the complainant?

24       A.   Of retaliation?

25       Q.   Yes.

1    A.    It would depend on what we found, obviously.  If we

2    did find that somebody retaliated, we'd have to identify

3    what corrects that.

4    Q.    Okay.  Is it your understanding that the Ethics

5    Commission can also investigate these sorts of things?

6    A.    It's my understanding they can investigate things

7    that are within the scope of the -- the ethics law.

8    Q.    The ethics law.  Does that include retaliation for

9    whistleblowing, do you know?

10    A.    That, I don't know if it's specifically included in

11    it.

12    Q.    Okay.  But your notice of rights and

13    responsibilities would -- is broad enough to encompass the

14    rights of whistleblowers?

15    A.    What we ask is that the -- it gets modified for the

16    particular case the individual is working on so if it's a

17    workplace violence case, you have to change some of the

18    words in there, obviously.

19    Q.    Okay.

20    A.    You know, everyone has a right to file a complaint

21    of whatever it is.

22    Q.    Okay, say -- say manager X is doing something wrong,

23    and -- and manager X's employee makes a complaint, say, to

24    Mike Hansen, and then the employee feels like the employee's

25    being discriminated against or retaliated against.

1          Is there some additional mechanism that can be

2    utilized by the employee to try to stop the retaliation?

3          A.    In the cases that -- that -- in the training that we

4    do, we tell the investigator when they're talking to the

5    individual, let them know that they can report that either

6    back to the investigator or to any of those people who are

7    in the chain of command or -- they need to tell somebody,

8    basically.

9          Q.    And then is there a subsequent investigation that

10   would follow up on the retaliation part?

11         A.    It would either be investigated separately or

12   depending on whoever was going to make the decision of

13   whether or not the current -- say if the -- the current --

14   if there was a complaint current -- currently being

15   investigated and a claim of retaliation came in during that

16   investigation of the current complaint, it may or may not be

17   included or added to the scope of the -- the first

18   assignment.  That's going to be a judgment call.

19         Q.    Okay.  Is -- is this -- is this a formal program of

20   the City, or is this just something you've tried to get

21   people to do?

22         A.    I would probably say it's more something I've tried

23   to get them to do.

24         Q.    Okay.  Is it your understanding that supervisory

25   level employees have certain duties and obligations if they

1  learn of -- first of all, let's start of some kind of

2  wrongdoing at the City.

3      A.   It's my understanding that if they learn of

4  something that's wrongdoing that raises to a certain level,

5  they may have a responsibility.

6      Q.   What kind of level would that be?

7      A.   I think particularly violation of -- of where

8  there's a potential violation of a law or some specific

9  policy.

10     Q.   Or potentially a theft?

11     A.   Potentially a theft.

12     Q.   Okay.  And then in a case of a supervisor employee

13  who learns of something like that, you think that there is a

14  responsibility to do something, is that right?

15     A.   I think so.

16     Q.   Okay.  How about what if a supervisory employee

17  learns that -- a supervisory -- part of the supervisory

18  personnel of the City learns that an employee believes that

19  that employee's being retaliated against for making such a

20  complaint, does the supervisory personnel then have

21  responsibilities to do anything to follow up on that as

22  well?

23     A.   I believe they do.

24     Q.   Okay.  And what is the responsibility?  Is it --

25  does it fulfill the responsibility just to go to the next

1  person above them?

2      A.    I think it would be case dependent; but for the most

3  part, that's the first thing we tell them to do is don't let

4  it stop with you, tell somebody who has -- who can either

5  give you guidance or who has the responsibility to address

6  the situation.

7      Q.    Do you tell them what to do if it's -- if the

8  complaint is against their boss or their boss's boss?

9      A.    I don't specifically give one specific guidance.  It

10  really is case dependent when people call me.

11      Q.    What do you think, in your experience in this arena,

12  of the wisdom of if somebody complains that the supervisor's

13  boss is doing something improper, say, for example, stealing

14  from the City, what do you think the advisability is of

15  advising -- what a question.

16          What do you think the advisability is of that

17  supervisor going to the very person the complaint was made

18  against with the problem?

19      A.    And I -- I'm going to say just based on that, that's

20  probably not what I would recommend, but it -- I don't know

21  what information they had and if they were just seeking

22  information or they were actually telling the supervisor --

23  their boss that somebody's complaining about you, so

24  depending on what they went forward with, I guess.

25      Q.    When you are training investigators, do you tell the

1    investigators that, look, one of the first things you have

2    to do is marshal the information before somebody has a

3    chance to destroy it?

4         A.    That's among the things we talk to them about.

5         Q.    Okay.  Is that what you consider sort of minimally a

6    required investigative technique?

7         A.    Securing the evidence is on the checklist of things

8    that are important, yes.

9         Q.    But wouldn't that be, like, near the top of things

10   that would be important?

11        A.    Near the top, yes.

12        Q.    Okay.  And that's what you teach in your training

13   class for investigators?

14        A.    Yes.

15        Q.    What do you think of the investigative technique of

16   I complain that Joe Blow is doing something wrong with his

17   City computer and so my supervisor goes to Joe Blow and says

18   Joe Blow, are you doing this?  And Joe Blow says no.

19             Is that a proper investigative technique?

20             MR. WONG:  Objection, incomplete hypothetical.

21             THE WITNESS:  There's not enough information there.

22   But I can also say that we have collective bargaining

23   agreements which require us to tell the person who's accused

24   of what they're accused of and allow them a chance to

25   respond.

1          The order or sequence of that happening is left to

2     the discretion of the people who are looking into the matter

3     or investigating it.

4     BY MR. MOSELEY:

5        Q.    What if the person who's the target is not subject

6     to the collective bargaining agreement?

7             MR. WONG:  Objection, assumes facts not in evidence

8     and an incomplete hypothetical.

9             THE WITNESS:  I -- I don't even know.  Like I said,

10    I'd have to have enough information specific.

11    BY MR. MOSELEY:

12       Q.    Okay.  That's fair enough.  I -- without getting

13    into a really long dissertation, I couldn't give you enough

14    information, and Randy would have 1200 objections, probably.

15            Going back to Exhibit 213 again on that very last

16    page, the next paragraph down says, "When the whistleblower

17    law works, the wrongdoing is identified, corrected and no

18    retaliation occurs."

19            That seems to be sort of a common sensical

20    statement, but is that your understanding of what happens

21    when the whistleblower law works?

22       A.    That would be my understanding of what should

23    happen.

24       Q.    Is that your understanding of what actually happens?

25       A.    And this is opinion, speculating -- I think we get

1   information regularly about misconduct or concerns that

2   we -- we, managers and supervisors, address, and it doesn't

3   go any further than that.  It gets corrected.

4       Q.   Okay.  But regularly, do you get information about

5   complaints where the whistleblower law doesn't work?

6       A.   I don't.

7       Q.   I'm going to show you what's been marked as

8   Exhibit 214.  The facing page of this exhibit is a

9   declaration by the director of the Office of Information

10  Practices of the State of Hawaii that -- that the following

11  exhibits are true and exact copies of letters in their

12  files.

13       What I'd like you to do is take a look at -- it's

14  actually the last -- it's actually the last -- it's

15  Exhibit 3 on this, and it's a letter dated July 15th, 1996.

16       It appears to be addressed to Moya T. Davenport

17  Gray, and it's -- it's a two-paged letter, and it's signed

18  by Carolyn L. Stapleton, legal counsel for the Ethics

19  Commission.

20       On the first page of this letter in the second --

21  oh, first of all, have you ever seen this letter before?

22      (Deposition Exhibit 214 was marked for identification.)

23       A.   No, not specifically.

24       Q.   On the first page of this letter in the second

25  paragraph, down toward the middle of that paragraph, it

1    says, "A number of those have asked me before formally

2    requesting an opinion whether the process is confidential.

3    They have wanted to be reassured that no one else will know

4    that they are considering doing something that they might

5    decide not to pursue."  Do you see that?

6        A.    Mm-hmm.

7        Q.    Yes?

8        A.    Yes, I do.

9        Q.    Okay.  Is that your understanding of something that

10   happens rather commonly when people are talking about making

11   a complaint of some kind?

12            MR. YAMAMOTO:  Let me just object.  That calls for

13   speculation, and it's beyond the scope of the designated

14   areas, since this is about Ethics Commission advisory

15   opinion.

16            THE WITNESS:  I can speak to the question about

17   confidentiality does come to me on the areas of complaint

18   that I handle.

19   BY MR. MOSELEY:

20       Q.    Okay.  And actually, you've handled a whistleblower

21   complaint, too, right?

22       A.    Yes, I have.

23       Q.    Did that -- was that raised in that case, or were

24   their identities already known?

25       A.    My understanding is identities were already known.

1    Q.    Okay.  In the third paragraph from the top, in the

2    third line down, it says, "In these cases, they have

3    observed an action taken by a City officer or employee that

4    they believe is wrong."  Do you see that?

5    A.    Mm-hmm.  Yes, I do.

6    Q.    Okay.  In the very last sentence of that paragraph,

7    it says, "Because of their fear of repercussions, I have had

8    people only willing to call me back at a specified time,

9    rather than have me contact them."

10         Did you -- do you understand that City employees

11   commonly have a fear of repercussions if they complain of

12   anything?

13   A.    My understanding is most people have a fear of

14   complaining.

15   Q.    A fear of repercussions?

16   A.    Retaliation or repercussions.

17   Q.    But in terms of specifically with the City, is it

18   your understanding that that's fairly widespread among City

19   employees?

20   A.    I would be guessing on the -- the answer to that,

21   but I can tell you that in the three different employers

22   that I've worked for in this kind of area, that is a concern

23   that people discuss when they call.

24   Q.    Okay.  But you've never -- you've never seen this

25   letter before?

1    A.    I haven't read this letter before.  We may have --

2    Q.    So nobody ever told you that the legal counsel for

3    the Ethics Commission as far back as 1996 was concerned

4    enough about this problem that she would write to the Office

5    of Information Practices, did they?

6    A.    No.

7    Q.    Okay.  Looking at the very -- the paragraph that

8    begins on the very bottom of the first page, it says,

9    "Related to this concern, let me share a particularly

10   shocking conversation I had several years ago."

11        And it goes on, "An appointed City employee

12   complained to me about" the pressure -- "about pressure that

13   was being put on her by her superiors to support the

14   campaign of a person running for City office.  When I asked

15   her to file a complaint so that the Ethics Commission could

16   investigate it, she responded, no way.  I'm not going to put

17   my pension in jeopardy.

18        I told her that the Ethics Commission has subpoena

19   powers and could compel her to testify.  Her answer was that

20   go ahead.  I'll lie under oath before I'll risk my job.

21   That incident is indicative of the level of fear that I have

22   observed over the years on the part of some City employees."

23        Were you ever informed that this was considered to

24   be a serious enough problem that the legal counsel for the

25   Ethics Commission wrote to the State Office of Information

1    Practices about it?

2        A.    Not specifically about her doing this.

3        Q.    Does the experience that Ms. Stapleton relates

4    there, does that, sort of, correspond with your general

5    experiences with City employees?

6        A.    With some.

7        Q.    With some?

8        A.    Mm-hmm.

9        Q.    That's yes?

10       A.    Yes.

11       Q.    Okay.  Is there anything the City has done, let's

12   start with Citywide first, to address such a problem?

13       A.    I'm not aware of anything specific.

14       Q.    Is there anything that has been done within any of

15   the departments to address such a problem?

16       A.    Not specifically that I'm aware of.

17       Q.    Okay.  Is that one of your concerns presently in

18   your capacity with the City?

19            MR. YAMAMOTO:  Let me object as being vague and

20   ambiguous.

21            THE WITNESS:  It's actually a topic that we talk

22   about during the training, and it's -- there's other OIP

23   decisions that also address confidentiality of

24   investigations and complaints.

25            When people call me with this concern, I have to

1    explain to them that one, we have a duty to do an

2    investigation and that we'll -- we can keep it as

3    confidential as possible, but there's certain people who

4    have the right to know the information and to see the

5    evidence presented against them.

6         The -- following that discussion is that -- with

7    that individual person is while you may have those fears, we

8    need a basis for those fears, and have you seen someone else

9    who's experienced this, where does that fear come from.

10        But there's an honest discussion that goes along

11   with if you have a concern and you don't bring it forward

12   and you don't allow it to be investigated, then you may not

13   have the ability to have it, one, corrected, and it could

14   happen to somebody else.

15        So I can't force them to complain, but I can explain

16   to them and try to convince them that I'm going to do the

17   right thing and that we have to -- they have recourse

18   available should someone else not do the right thing.

19   BY MR. MOSELEY:

20   Q.    Are you able to explain to them we have mechanisms

21   in place to protect you from retaliation?

22   A.    We talk about -- I talk about that, you know, the

23   City expects there's no retaliation.  What those specific

24   responses will be if there is an issue is going to be,

25   again, specific to the situation.

1          If retaliation is occurring, it -- or it's reported,

2    we have to look at where it's allegedly being reported from

3    and how it's allegedly being perpetrated and then what's the

4    correction or the -- something to stop it while it can be

5    evaluated.   There's just not one thing that can be done

6    specifically.

7    Q.    But there's no -- you're not able to tell such an

8    employee that, look, we have a mechanism in place that we

9    can protect you from retaliation?

10   A.    There is no one mechanism that I'm aware of to

11   protect from retaliation.

12   Q.    Are there -- are there any mechanisms to protect

13   employees from retaliation?

14   A.    It will depend on what occurs or -- and how it

15   occurs and how we can address it.   But this is -- I can't

16   change their identities and move them to another place and

17   that sort of thing.

18   Q.    Okay.   Do you have any power to order other people

19   in the City to stop retaliation?

20   A.    I don't have the authority to make anybody do

21   anything, but I have a lot of influence and ability to go

22   straight to the mayor if I have to, that's provided for in

23   my job description and my -- and the ordinance at least in

24   the area of sexual harassment, to talk to a director of a

25   department.

81

1    Q.    So essentially, the authority that you would have to
2    look to, to stop some sort of a retaliation would be to go
3    to the mayor?
4    A.    If that were required.  And it depends on where
5    something may be happening.  If it's happening in the middle
6    of an organization, we go to the place where it's occurring,
7    and --
8    Q.    I'm talking about the place where your influence
9    doesn't work and, you know, somebody needs to tell some
10   supervisor to stop retaliating.  That -- that authority is
11   the mayor?
12   A.    It may be.  And I've had to threaten it before I
13   even had to exercise it, but when I think something needs to
14   be stopped and I give that advice and it's not, then I --
15   it's my job to take it to the next level.
16   Q.    Have you ever had to take it to the mayor to have
17   the mayor order somebody to stop retaliating?
18   A.    Not yet.  Not yet.
19   Q.    That threat, itself, has been enough?
20   A.    It's been enough so far.
21   Q.    And the retaliation we're talking about is in the
22   retaliation in your primary sphere which would be the EEO
23   problems and sexual harassment, that sort of thing, right?
24   A.    Yes.
25   Q.    In the -- in the last column on the last page of

1    Exhibit 213, it says, "In 2003, Wiggins settled his

2    whistleblower lawsuit against the city for $387,500."  Do

3    you see that?

4        A.   Yes, I do.

5        Q.   Does that refresh your recollection a little bit

6    about what Wiggins settled his lawsuit for?

7        A.   Yes.

8        Q.   Okay.  Look at the very last paragraph in this

9    newspaper article on the last page of Exhibit 213.  Wiggins

10   is quoted as saying, "He said his experience sends a clear

11   message to others contemplating blowing the whistle.  What

12   it says is you're better off keeping your mouth shut, he

13   said."

14        Have you handled enough retaliation claims to have

15   an understanding about whether that's a common mindset of

16   people who make retaliation claims?

17       A.   Again, I'd be assuming that I know what they are

18   feeling inside.

19       Q.   Is that something that's expressed to you, like I

20   wouldn't do this again, I would never report this kind of

21   stuff again?

22       A.   In all areas that I deal with, that's often the

23   response by the person who's complained.

24       Q.   Okay.  It's just that it's -- it's too much of a

25   price to pay for making the complaint, is that right?

1   A.   That's what I hear.

2   Q.   Okay.  Is there -- is there any reason to your

3   knowledge that when these individual lawsuits occur, the

4   City doesn't -- instead of -- instead of going, sort of,

5   department by department or agency by agency in a piecemeal

6   approach to try to address the problems of retaliation

7   against whistleblowers, is there any reason that the City

8   just doesn't do this Citywide?

9        MR. YAMAMOTO:  Let me object, that assumes facts not

10  in evidence.

11       THE WITNESS:  I think the litigation are handled by

12  the Corporation Counsel with the particular department, and

13  there isn't any one person who's looking at the whole City.

14  BY MR. MOSELEY:

15  Q.   Is it your opinion there should be one person

16  looking at the whole City?

17  A.   My opinion?

18  Q.   Yes.

19  A.   Is that would be a good thing.

20  Q.   Okay.  Do you regard the City's current training

21  programs to be adequate to deal with complaints of

22  retaliation across the board and throughout the City?

23  A.   Again, that's my opinion?

24  Q.   Yes.

25  A.   I don't think it's adequate.

1    Q.   Okay.  Have you expressed that opinion to -- you

2    said you report directly to the mayor, right?

3    A.   I report -- I -- I sit under Human Resources --

4    Q.   I understand.

5    A.   -- but I have the ability to report to the mayor if

6    anything needs his attention.

7    Q.   Have you expressed that opinion either to the head

8    of Human Resources or to the mayor?

9    A.   To the head of Human Resources.  I've had three

10   Human Resources directors since I've been there, and I've

11   had that discussion with all three.

12   Q.   And what has the response been?

13   A.   I'm going to say this -- these are discussions so

14   there -- it's not like I was asking for decisions to be

15   made.

16   Q.   I understand.  But it's an issue you raised, right?

17   A.   Raised the issue.

18   Q.   And when you raised the issue, what has the response

19   been?  Has there been three different responses or pretty

20   uniform?

21   A.   No.  I -- I mean, if I had to characterize the

22   responses, there's an understanding or a recognition that we

23   have concerns, and they're part of a larger problem of lack

24   of training and training resources for supervisors and

25   managers, particularly, and then following, too, with

1    employees.

2        Q.    Okay.  But the response when you raised these issues

3    has been okay, we'll jump right on that and do something,

4    or we can't do it because we don't have the money, or don't

5    bother me, I don't care?  I mean, I'm just suggesting some

6    things.

7        A.    It just -- you know, there's no dispute that there's

8    a need, but we don't know where to start or who's going to

9    do it and -- all those things go into the response.

10       Q.    Is it a question of hey, nobody has the

11   responsibility to do this?

12       A.    There's a -- there's a training component to the

13   City.

14       Q.    I understand.

15       A.    But they don't necessarily have the authority to say

16   all City employees or all City managers must do X, Y, and Z.

17       Q.    So they don't have the authority.  Do they have the

18   responsibility --

19       A.    To deliver the training upon demand.

20       Q.    Okay.  Do you think that the -- the failure to

21   provide the level of training that you think would be

22   adequate actually either contributes to some form of

23   retaliation in some cases or -- or is the reason that --

24   that retaliation is not prevented?

25       A.    I don't know that I could say that, that that's the

1    reason.

2        Q.    But do you think it would contribute to that?

3        A.    It might.

4        Q.    Well, let me ask you this.  If your -- if your

5    opinion is that you should have such training, the reason

6    for that would be, I'm assuming, that such training might

7    help prevent such occurrences, right?

8        A.    That's one of the goals of the training of any

9    subject matter, I think, to prevent.  The second is to

10   provide an avenue for people to know what to do when it

11   happens.

12       Q.    Okay.  So would it be fair to say that an absence of

13   training either contributes to these events happening or

14   provides an environment in which they could happen more

15   easily?

16           MR. YAMAMOTO:  Let me object to the extent it lacks

17   foundation, assumes facts not in evidence, and calls for

18   speculation and also asked and answered.

19           THE WITNESS:  I forgot the question.

20           MR. MOSELEY:  That was the longest objection you've

21   had in 20 minutes.

22           MR. YAMAMOTO:  That's true.

23           MR. MOSELEY:  Can you read the question back?

24           (Reporter read requested proceedings.)

25           THE WITNESS:  I -- I'd have to guess, but --

BY MR. MOSELEY:

Q.    I'm just asking for your --

A.    I think they're going to happen anyway, the question is what are we going to do about it.  Same with things I deal with sexual harassment.  It's going to happen, but do people know what to do when it does.

Q.    Okay.  So there's no way -- the prevention aspect of this, then, is really sort of immaterial, is that right?

A.    I think there's an aspect to it; but honestly, the training provides a foundation for management to do something about it once it does occur because then people have been put on notice.

Q.    Okay.  But you think it has no effect in preventing things?

A.    I don't know that it has no effect, but I don't know that it will make it all go away.

Q.    Oh, I wasn't talking about making it all go away. I'm talking about, I mean, you've obviously dealt with and thought about these problems a lot.

I'm just asking in your opinion if -- if the lack of training either makes it easier for these acts of retaliation to happen or provides a -- you know, an environment in which they -- if they -- they encourage it to happen, one or the other?

MR. YAMAMOTO:  Same objection.