1           THE WITNESS:  I don't know that it encourages it,

2    but it may -- and it's my opinion, it may fail to prevent

3    it.

4    BY MR. MOSELEY:

5      Q.    Okay.  Is it -- from dealing with the City managers

6    that you deal with, is it fairly commonly known of the kinds

7    of things that Mr. Wiggins described in Exhibit 213, that

8    what happens to you is so bad that I'm just not going to say

9    anything, is that kind of a commonly understood phenomenon

10   between the management and the City -- or among the

11   management and the City that you've had contact with?

12          MR. YAMAMOTO:  Objection, that calls for

13   speculation.

14          THE WITNESS:  Actually, that's not the -- that's not

15   the response I've gotten from management.  They don't

16   believe that -- or I don't think that very many managers

17   believe that it's as bad as he believes -- Mr. Wiggins says

18   he believes it is.

19   BY MR. MOSELEY:

20     Q.    Okay.  Have you ever read any books about

21   whistleblowers or done any research on whistleblowers?

22     A.    Some.  Mostly internet research.

23     Q.    Mostly internet research?

24     A.    Mm-hmm.

25     Q.    Is that prior to today?

1      A.    Yes.

2      Q.    Was it for this deposition?

3      A.    No, not for this deposition only, but, I mean, I did

4   some extra for this, but --

5      Q.    What kind of research did you do extra for this?

6      A.    Just one, I wanted to make sure that, you know, I --

7   I was current in my understanding because I've had these

8   discussions, as I mentioned, with our Corporation Counsel

9   before, and, you know -- for example, the State

10  Whistleblower Law changed a year or so ago to extend the

11  statute for complaining from 90 days to two years, so I --

12     Q.    Actually, I think that was in 2002.

13     A.    It was a while ago, but I remember when that

14  occurred, then we kind of followed that and -- and looked at

15  what impact that might have, and --

16     Q.    I see.  What -- what kind of internet research did

17  you do specifically before today?

18     A.    I just wanted to make sure because I've looked at

19  the whistleblowers for -- for example, we -- we just used a

20  retaliation theory.  I wanted to make sure that it was my

21  understanding that there are many laws that was -- there are

22  so many of them, you know, where to start, there's OSHA,

23  there's EPA and -- and other kinds of laws.

24        Even the retaliation under discrimination is

25  considered in the broad umbrella, and I wanted to make sure

 1    that was still the current way of thinking of the matter.

 2        Q.    Specifically, though, did you see any particular web

 3    sites or any particular authorities in your research before

 4    today?

 5        A.    Oh, before today?

 6        Q.    Yes.

 7        A.    Like right --

 8        Q.    Yeah, that you might have done to refresh yourself

 9    for this deposition.

10        A.    Department of Labor, you know, has -- has

11    information on whistleblowers and --

12        Q.    Did you run across somebody by the name of Kohn,

13    K-O-H-N?

14        A.    No.

15        Q.    In terms of this Exhibit A to our deposition notice,

16    have I pretty much exhausted your knowledge with respect to

17    the issues described in paragraph number 1?

18        A.    Yes.

19        Q.    How about with respect to the issues in paragraph

20    number 2?

21        A.    Yes.

22        Q.    How about in paragraph number 3?

23        A.    Yes.

24        Q.    Does -- does the City have any practices and

25    procedures with respect to whistleblowers and procedures for

```
 1   handling whistleblower complaints?

 2           MR. YAMAMOTO:  Other than what she's already

 3   testified to?

 4           MR. MOSELEY:  Right.

 5   BY MR. MOSELEY:

 6      Q.   I mean, is there anything that could be specifically

 7   described the way I've described it there, other than what

 8   you've testified to?

 9      A.   Not specifically that way.

10           MR. MOSELEY:  Okay.  All right.  I think I'm pau

11   with this deposition.  Do you guys have some questions?

12           MR. WONG:  I have a question.

13           MR. MOSELEY:  Do you want to take a quick break, or

14   how long are you going to be?

15           MR. WONG:  I don't anticipate that it will be very

16   long.

17                       EXAMINATION

18   BY MR. WONG:

19      Q.   Is there any mechanism in place to address the

20   situation where employee X makes a complaint that may or may

21   not be founded and then the employee X's work performance

22   and attitude begins to decline, and the employee's

23   supervisors are in the difficult position where any

24   discipline or change in evaluation may be construed or

25   complained to be some kind of retaliation against that
```

1    employee?

2        A.    Not a specific program.

3        Q.    Is there anything to address that kind of situation

4    that you know of?

5        A.    What I do know of is when we -- when I have

6    situations where people have complained and then subsequent

7    to that, management believes that their performance has

8    declined, we enter into a discussion about how do you make

9    sure that you're really dealing with performance and not

10   retaliating.

11           I do the -- and it's a case-by-case thing, but what

12   kind of documentation do you have, when did you start the

13   documentation, how can you show that this is actually

14   performance decline or deficiency, what kind of measurements

15   do you have, for example.

16       Q.    The programs that you talked about in response to

17   Mr. Moseley's questions to address actual retaliation, would

18   they also be designed to address the kind of situation where

19   an employee, perhaps, spuriously claims retaliation in order

20   to evade negative performance reviews or disciplinary

21   action?

22       A.    That's a long question.  There's no specific program

23   in place.

24       Q.    Yes, but my question was would the programs you

25   discussed with Mr. Moseley on your wish list also address

1  this kind of situation?

2     A.   It would if that was the evidence that was

3  determined.  So the program that we talked about, the wish

4  list, the hypothetical, would be that somebody would

5  complain that that was occurring, for example, and then an

6  investigation would have to demonstrate that their

7  performance was actually declining, and they were making

8  some kind of complaint with -- with a motive.

9        MR. WONG:  Thank you.  I don't have any more

10 questions.

11       MR. MOSELEY:  I get to have a follow-up -- oh,

12 Randy, I'm sorry, I didn't want to preempt your seriously

13 long line of questions.

14       MR. YAMAMOTO:  I have no questions at this point.

15                   FURTHER EXAMINATION

16 BY MR. MOSELEY:

17    Q.   I think in response to one of Mr. Wong's questions,

18 you said if you have a complaint and then a performance

19 decline, you have to deal with the issue of whether or not

20 there's really a performance decline or whether it's just

21 retaliation, is that right?

22    A.   Right.

23    Q.   What kind of indicators do you have of whether it's

24 a performance decline versus retaliation?

25    A.   It's going to be case specific, but one of the

1    discussion I have with managers when they call is one, I

2    want to see the documentation that occurred before the

3    complaint was filed or any evidence of the performance of

4    that individual before so that there can be some -- because

5    obviously, management's response to a claim of retaliation

6    is we didn't retaliate.  This action was taken for some good

7    reason.  So basically, it's show me how you're going to be

8    able to demonstrate that.

9        Q.    Okay.

10       A.    And so if they call me before the complaint is

11   filed, obviously I'm talking to them about the kind of thing

12   that they would need to do to demonstrate that.

13       Q.    But if they call you after the complaint is filed,

14   what do you say, show me the performance evaluation that

15   occurred before?

16       A.    I -- I'm going to say you're treading on dangerous

17   territory; and while I'm not saying you can't proceed as

18   you're suggesting, you need to make sure that you're not

19   doing this for the wrong reason and -- so basically, why all

20   of a sudden is this a problem, or was it a problem all

21   along.

22       Q.    In the case where there's an employee that has a

23   pretty stellar record before and no records of complaints

24   and rated exceeds requirements in all categories and then

25   after the complaint is filed, the ratings drop off

1  precipitously, does this suggest to you that there's a more

2  serious problem?

3      MR. YAMAMOTO:  Object to the extent it's an

4  incomplete hypothetical, calls for speculation.

5      THE WITNESS:  I would say it would be a red flag,

6  and I would -- but it doesn't mean that retaliation has

7  occurred, but I would be looking at what's going on behind

8  the scenes on that.

9  BY MR. MOSELEY:

10     Q.   Is it a big red flag or a little red flag?

11     A.   It's one of the textbook red flags.

12     Q.   One of the textbook red flags?

13     A.   Sure.

14     Q.   What are the other textbook red flags?

15     A.   Somebody gets terminated, somebody gets moved to a

16  less prestigious, less -- you know, a job that's not so

17  good.

18     Q.   How about if someone gets a series of workplace

19  violence reports filed against them after complaining?

20     A.   Those may or may not be.  I've got lots of

21  situations like that.  Sometimes timing is just timing, but

22  we have to actually go back and look behind it and see

23  whether or not there's merit to each complaint.

24     Q.   So when you say you have lots of cases like that,

25  you have lots of cases where workplace violence reports are

1   filed after the complaint is made?

2       A.   Complaints of workplace violence or other issues are

3   sometimes brought -- somebody complains; after their

4   complaint is made known, there are other complaints that

5   start getting made about them.  That's something that

6   happens.

7       Q.   That's the typical pattern?

8       A.   Not the typical pattern, but I do see it.

9       Q.   Often?

10      A.   Often.

11      Q.   Is that another one of those textbook red flags?

12      A.   It may be, but it doesn't prove anything.  I have to

13  look -- and we have a specific requirement as a public

14  employer to look at every complaint, and I can't just

15  discount a complaint because it happens to be about somebody

16  else who's complained.  We have to look at each one.

17      Q.   No, I understand that.  But if employee A does --

18  makes a complaint about employee B, and maybe employee B is

19  his boss and then subsequently, there's a flurry of

20  workplace violence complaints and insubordination complaints

21  and things like that, is that one of the typical red flags?

22          MR. YAMAMOTO:  Same objections.

23          THE WITNESS:  Same response.  It may be.  It would

24  probably be on the list of things that would be identified

25  as red flags.

```
 1    BY MR. MOSELEY:

 2        Q.   Okay.  And in that -- in the case of those kinds of

 3    complaints, is it also important to you to look at what the

 4    record was before the complaint was made?

 5             For example, if there was nobody that was

 6    complaining about employee X in terms of workplace violence

 7    or, you know, ability to get along with others and that kind

 8    of thing and then -- I mean, is that the kind of thing you

 9    look for, the before and after?

10             MR. YAMAMOTO:  Same objections.

11             THE WITNESS:  It would be the kind of thing I would

12    look for, case specific, obviously, depending on what's

13    going on.

14    BY MR. MOSELEY:

15        Q.   And then again, can you explain why you would look

16    for that?

17        A.   I need to -- in a case of a claim of retaliation, I

18    need to determine whether or not there is retaliation

19    occurring.  If the complaints made against the person are

20    fabricated, then that's a very big concern in terms of

21    retaliation.

22             If they're true, yet the timing is conveniently

23    close to their complaint, I may still have a duty to do

24    something or to recommend some action, but it -- it's one of

25    those situations where I'd have to get guidance and say we
```

1    may be dealing with a situation of -- recognizing that our

2    duty to do something on -- on this -- this route may put us

3    into the situation of --

4        Q.    Retaliation?

5        A.    Retaliating.

6        Q.    Have you ever -- how commonly are -- could you give

7    me even a rough estimate of the cases you've dealt with in

8    the last seven years in which workplace violence reports

9    have been filed after a complaint has been made?

10       A.    I don't think I could even come up with a real good

11   number, but I know even currently, I've got three situations

12   that complaints are made and then -- and there was a period

13   of time a while back when I first started we probably

14   wouldn't label things workplace violence complaints, but

15   they would have been complaints about the person.

16       Q.    Okay.  There was actually a workplace violence

17   training program and a forum that was put in place and all

18   that stuff, right?

19       A.    There is, yeah, right now.

20       Q.    Is that something that you initiated?

21       A.    No, I did not initiate that.

22       Q.    But did the workplace violence complaints, as

23   labeled that way, start after that policy was put into place

24   and the training programs occurred?

25       A.    I don't know -- I mean, I -- I'd be guessing about

1    the timing because I think there's also a lot of just

2    publicity, in general, and from the media about the subject

3    of workplace violence so people are more aware of it.

4        Q.    Were you aware that Howard Tom Sun had workplace

5    violence complaints issued against him?

6        A.    I did find out about that after.

7        Q.    Okay.  Do you know who Susan Siu is?

8        A.    Yes, I do.

9        Q.    The medical examiner's office?

10        A.    Yes.

11        Q.    Are you aware that workplace violence reports were

12    filed against her after she complained?

13        A.    They're still being investigated.

14        Q.    Those are still being investigated?

15        A.    Yes.

16        Q.    Is that one of the three cases you're talking about?

17        A.    One of them.

18        Q.    Okay.  Can you tell me how many of these other

19    specific cases like that in which workplace violence

20    complaints were handled -- were filed after the complaint

21    was made, do you have any idea how many others you've

22    handled in your seven-year tenure?

23        A.    I'd have to guess.

24        Q.    Is it dozens?

25        A.    I don't know if it's dozens but maybe a dozen for

 1  sure.  I mean, I could probably figure out identifying a

 2  dozen.

 3          MR. MOSELEY:  Okay.  I don't actually think I have

 4  any more questions.

 5          MR. WONG:  I have one follow-up.

 6                    FURTHER EXAMINATION

 7  BY MR. WONG:

 8      Q.   What if any of the red flags were a situation where

 9  an employee sees some kind of disciplinary action coming and

10  then files a complaint in order to head off the anticipated

11  disciplinary action or to make it look like that action is

12  then retaliatory?

13      A.   I would be looking for did they have knowledge that

14  the -- the adverse action was pending or on its way and

15  whether or not there had been an ongoing discussion about

16  the performance so it's no surprises, essentially, that it

17  was coming.

18          That would be one of the things that I'd look for,

19  knowledge.  I still have to look at whether or not the

20  complaint has merit, though, regardless of why somebody

21  files it.

22          MR. WONG:  Okay, thank you.

23          (Deposition concluded at 11:35 a.m.)

24                         -o0o-

25

1          I, DENISE TSUKAYAMA, hereby certify that I have read

2     the foregoing typewritten pages 1-102, inclusive, and

3     corrections, if any, were noted by me and the same is a true

4     and correct transcript of my testimony.

5

6

7

8     _____

9

10

11

12    Signed before me this  _____

13    day of  _____, 20  _____.

14

15    _____

16

17

18

19

20

21

22    English vs. City and County of Honolulu; DENISE TSUKAYAMA;

23    United States District Court; Civil No. 04-00108 JMS/KSC;

24    Taken on Wednesday, September 20, 2006; By Wendy M.

25    Watanabe, CSR 401

SEP 2 5 2006

```
 1   STATE OF HAWAII                )
 2                                  )  ss.
 3   CITY AND COUNTY OF HONOLULU )
 4
 5        I, WENDY M. WATANABE, CSR 401, Notary Public, State
 6   of Hawaii, hereby certify:
 7        That on Wednesday, September 20, 2006, at 9:00 a.m.
 8   appeared before me DENISE TSUKAYAMA, the witness whose
 9   deposition is contained herein; that prior to being
10   examined, the witness was by me duly sworn;
11        That the deposition was taken by me in machine
12   shorthand and was thereafter reduced to typewriting by
13   computer-aided transcription; that the foregoing represents,
14   to the best of my ability, a full, true, and correct
15   transcript of said deposition.
16        I further certify that I am not an attorney for any
17   of the parties hereto, nor in any way concerned with the
18   cause.
19
20
21                          Dated:   September 22, 2006
22
23                          Wendy M. Watanabe
24                          Notary Public, State of Hawaii
25                          My Commission expires: 04/07/2010
```

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4    PHILIP E. ENGLISH,                    )

5                    Plaintiff,            ) CIVIL NO. 04-00108

6                                          )            JMS/KSC

7            vs.                           )

8                                          )
                                             EXHIBITS TO THE
9    CITY AND COUNTY OF HONOLULU;          )  Deposition of Denise
                                              Tsukayama
10   GARY T. KUROKAWA; ROBERT O.           )

11   MAGOTA; ANN C. GIMA; and GK           )

12   APPRAISALS, INC.; JOHN DOES 1         )

13   -10; JANE DOES 1-10; DOE              )

14   PARTNERSHIPS; DOE CORPORATIONS        )

15   1-10; AND DOE ENTITIES 1-10,          )

16                    Defendants.          )

17        RULE 30(b)(6) DEPOSITION OF DENISE TSUKAYAMA

18   Taken on behalf of the Plaintiff at the Law Offices of

19   Moseley Biehl Tsugawa Lau & Muzzi, located at 1100 Alakea

20   Street, Alakea Corporate Tower, 23rd Floor, Honolulu, Hawaii

21   96813, commencing at 9:00 a.m. on Wednesday, September 20,

22   2006, pursuant to notice.

23

24   BEFORE:  WENDY M. WATANABE, Notary Public, State of Hawaii

25            Hawaii Certified Court Reporter, CSR 401

ORIGINAL

VENETIA K. CARPENTER-ASUI
Attorney at Law
A Law Corporation

VENETIA K. CARPENTER-ASUI 6901
City Center, Suite 600
810 Richards Street
Honolulu, Hawaii 96813
Telephone: (808) 523-6446
Facsimile: (808) 523-6727

Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 0 6 2000

at _____ o'clock and _____ min. _____ M.
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

HG   BMI

| | | |
|---|---|---|
| HOWARD W.C.C. TOM SUN | ) | Civil No. CV00 00397 |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT; DEMAND FOR |
| | ) | JURY TRIAL; SUMMONS |
| vs. | ) | |
| | ) | |
| CITY & COUNTY OF HONOLULU, | ) | |
| DEPARTMENT OF ENTERPRISE | ) | |
| SERVICES; JOHN DOES 1-10; JANE | ) | |
| DOES 1-10; DOE CORPORATIONS | ) | |
| 1-10; AND DOE PARTNERSHIPS 1-10, | ) | ATTEST: A True Copy |
| | ) | SUE BEITIA |
| Defendants. | ) | Clerk, United States District |
| | ) | Court, District of Hawaii |
| | | By _____ Deputy |

## COMPLAINT

Plaintiff HOWARD W.C.C. TOM SUN ("Plaintiff"), by and through his attorney,

complaining of Defendants alleges and states:

### I. JURISDICTION & VENUE

1.    This Court has jurisdiction of the claims against Defendants pursuant to 28

U.S.C. ss 1331 and 1337. This Court has jurisdiction over Plaintiff's state law claims

against Defendants under the doctrine of pendent jurisdiction.

DEPOSITION
EXHIBIT
207

2.     Venue is proper in this District as both the Plaintiff and the Defendants reside and do business in this District and the events and omissions giving rise to Plaintiff's claims arose in this District.

## II. PARTIES

3.     Plaintiff at all times relevant herein was a resident of the City and County of Honolulu, State of Hawaii.

4.     Defendant CITY & COUNTY OF HONOLULU, DEPARTMENT OF ENTERPRISE SERVICES ("Defendant DES"), has its principal place of business located at 777 Ward Avenue, Hawaii 96814.  Defendant DES is a department of the City and County of Honolulu.

5.     Defendants JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, and DOE PARTNERSHIPS 1-10, are sued herein under fictitious names for the reason that their true names and identities are presently unknown to Plaintiff, except that they are persons and/or entities who are in some manner presently unknown to Plaintiff engaged in the activities alleged herein; and/or are in some manner responsible for the injuries and damages to Plaintiff; and/or persons who conducted some activity in a negligent and/or willful manner; which conduct was the legal cause of the injuries or damages to Plaintiff and/or were in some manner related to the previously named Defendant engaged in the activities alleged herein; and Plaintiff prays leave to insert their true names and capacities, activities and/or responsibilities, whether individual, business or governmental when the same is ascertained.  Plaintiff has be unable to ascertain the identities of these DOE Defendants through an examination of all documents available to him/her at this time.

6.     All Defendants will be collectively referred to as "Defendants."

## III. FACTS

7.    On or about April 1, 1987, Plaintiff began his employment with Defendant DES as a as full time painter.

8.    Plaintiff's Performance Evaluation Report (hereinafter "PER") for November 1, 1996 to October 31, 1997 rated Plaintiff as excellent for quality of work; exceeds requirements for quantity of work and attitude toward work; and meets requirements for relationship with people.

9.    Plaintiff's PER for November 1, 1997 to October 31, 1998 rated Plaintiff as excellent for quantity of work, quality of work, and attitude toward work; and exceeds requirements for relationship with people.

10.    Plaintiff's PER for November 1, 1998 to October 31, 1999 rated Plaintiff as excellent for quantity of work, quality of work, attitude toward work and relationship with people.

11.    Plaintiff's work as a painter for Defendant DES exposed him to hazardous components such as: mineral spirits, *xylene; *zirco salt as zr; titanium dioxide; *methol ethyl ketone; *toluene; solvent naphtha (petroleum), light aliphatic; vm&p naphtha, light aliphatic; *isopropyl alcohol; *cobalt salt as cu; butyl acetate, U.G., PM acetate; ethyl-3-ethoxypropionate; stoddard solvent type 1; 1,2,4-tryimethylbenzene; and others. (* indicates toxic chemicals)

12.    The Material Safety Data Sheet describes exposure to the hazardous components described in #8 above to include: irritation to mouth, throat and gastrointestinal tract with acute central nervous system depression; headaches; dizziness; staggering gait; confusions; loss of consciousness; coma; confusion; nausea; vomiting; abdominal pain; diarrhea; severe eye irritation, burning, and blurred vision; dermatitis; chemical pneumonitis (potentially fatal); transient corneal damage; conjunctive irritation and burns; drying and cracking of skin; flushing and reddening of the face; feelings of increased body heat; disturbed vision; tremors; salivation; cardiac stress; CNS depression;

3

kidney, liver and lung disease; cancer; loss of appetite; pallor and bleeding gums; menorrhagia; petechiae and purpura may develop; damage to red blood cells causing blood in the urine; fatigue; weakness; unconsciousness; coma; and death.

13. On January 16, 1996, Plaintiff was appointed as a member of the Building Services Division Safety Committee (hereinafter "Safety Committee") by J. H. Wilkinson, Superintendent (hereinafter "Superintendent Wilkinson"). The functions of the Safety Committee include: a) advising the superintendent of occupational safety and health matters; b) review existing practices and rules related to occupational safety and health; c) suggest changes in existing practices and rules; d) review accidents and recommend corrective actions and preventative measures; e) identify work tasks which require the assignment of at least two employees for safety reasons; and f) conduct safety inspections at the request of the chairman or superintendent.

14. The Safety Committee was requested to convene beginning January 24, 1996, and monthly thereafter.

15. The Safety Committee chairman was to be elected at the first meeting held on January 24, 1996.

16. The Safety Committee chairman was requested to submit written meeting minutes to Superintendent Wilkinson within four (4) working days following each meeting.

17. The issue of Personal Protective Equipment (hereinafter "PPE") for employees was discussed in the first meeting of the Safety Committee on February 27, 1996 and consistently thereafter.

18. On or about July 1996 the Safety Committee recommended that a Safety Specialist be hired to advise Defendant DES of safety issues.

19. In a memorandum from Superintendent Wilkinson dated August 12, 1996, he advised the Safety Committee that the hiring of the Safety Specialist would be delayed due to "funding constraints."

4

20.     On or about December 1996, Plaintiff raised issues to the Safety Committee regarding: a) the need for "respirators" for the painters, groundsworkers, chemical applicators and building maintenance personnel, and 2) a requirement that a certificate of medical clearance for respirator use would be required from the City and County of Honolulu, Department of Health.

21.     On or about January 1997, names were submitted for trades and essential workers for respirator training classes provided by the City and County of Honolulu, Department of Health on or about April 1997.

22.     On or about April 14, 1997, after the respirator training was completed, Plaintiff and other employees were issued certified cards by City and County of Honolulu, Department of Health, John E. Hall, MD (hereinafter "Dr. Hall").

23.     Work related injuries for the Department of DES increased in number in 1996 from 1995.

24.     On or about April 1997, Plaintiff was assigned to grind, sand, chip and re-paint the DES Blaisdell Center Concourse. Plaintiff, a co-painter, and two (2) Work Hawaii youths worked without the benefit of PPE as Defendant DES provided none. Plaintiff later learned that the underlying paint was lead-based and he, a co-painter, the Work Hawaii youths, as well as the public in the area, were exposed to the lead dust. The lead-based debris that was removed was swept into the rubbish dumpster and duck pond, which was not in compliance with federal and state laws.

25.     In May 1997, the funding for the respirators and fit test kits had still not been approved and employees were continuing to work without respirators.

26.     On or about July 1997, Superintendent Wilkinson instructed Plaintiff to undergo a second respirator test by the City and County of Honolulu, Department of Health.

27.     In a letter from Island Environmental, Inc., Laboratory Manager Pete J. Baccetti to Plaintiff's Supervisor Lope B. Salvatierra, Enterprise Services Trades Section Supervisor, (hereinafter "Supervisor Salvatierra"), dated August 12, 1997, he wrote, "if lead is determined to be present, and demolition or renovation is to be performed on the building/structure where lead-containing material will be impacted, the contractor must (1) supply the employee(s) with PPE, and (2) utilize engineering controls, until a lead dust in air assessment has been performed to determine the airborne concentration of lead dust . . ." However, neither was implemented by Defendant DES for Plaintiff or co-painters working with lead-based paint surfaces.

28.     On or about August, 1997, Plaintiff expressed concerns that the painters were being exposed to "lead" at work.

29.     On or about August 1997, Plaintiff conducted tests on the paint of the main DES concourse which the painters were sanding and grinding for approximately nine (9) months.  The paint tested positive for "lead."  Witnesses to the testing were Chairman of the Safety Committee Mr. Dennard Byrd, United Public Workers Shop Steward Mr. John Kuamoo, and co-painter Mr. Marion Borges.

30.     On or about August 27, 1997, the Safety Committee requested the results of tests conducted by Defendant DES on the paint issued to the painters for the presence of lead.

31.     On or about September 1997, the City and County of Honolulu, Department of Health, Dr. Hall advised that Plaintiff could perform painting functions that require the wearing of a respirator for only one (1) hour per week.

32.     In a memo by Superintendent Wilkinson dated September 12, 1997, he wrote, "Lead Samples.  The test result of the main concourse paint samples was the same as that obtained unilaterally by Mr. Byrd and [Plaintiff]; specifically, positive for lead.  The Trades Section Supervisor has the documentation."

33.     On or about 1998, Defendant DES entered into a contract with Muranaka Environmental Consultants, Inc. for removal and disposal of asbestos containing material.

34.     On or about 1998, Plaintiff was assigned by Supervisor Salvatierra to assist Electrician Paul Nguyen to remove lighting fixtures in the stars dressing rooms in the DES Arena.  In the process of removing the lighting fixtures the ceilings were damaged. Supervisor Salvatierra instructed Plaintiff to re-paint the ceiling, which included scraping, chiseling, sanding and patching.  Defendant DES failed to inform Plaintiff that the plaster lath ceiling contained asbestos >1-5% chrysotile and >1-2% tremolite, and Plaintiff worked without the benefit of PPE as none were available for his use.

35.     On or about 1998, Defendant DES entered into a contract with Muranaka Environmental Consultants, Inc. for removal and disposal of lead containing material.

36.     The contract with Muranaka Environmental Consultants, Inc. stated in relevant part, "[p]aint of the surfaces subject to renovation shall be considered lead-containing for the purposes of this contract.  The work covered by this section includes removal of underlying asbestos-containing materials; and the procedures and equipment required to protect workers and occupants of the building or area, or both, from contact with lead.  Personal protection shall be the responsibility of the Contractor when working on surfaces with any lead content in accordance with these specifications . . ." while at the same time, Defendant DES failed to provide PPE for Defendant DES employees working there.

37.     In the Safety Committee meeting held on October 27, 1999, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were not being restocked for employee use.

38.     From the inception of his employment, Plaintiff and co-painters were permitted to make work-related purchases.

7

39.     On or about November 1999, Supervisor Salvatierra, stated to Plaintiff, "Jay doesn't want anybody to add anything to the [purchase order] list after [Superintendent Wilkinson] authorizes the purchases." However, Supervisor Salvatierra did *not* state that the policy and practice of making emergency supply purchases was to cease.

40.     In the Safety Committee meeting held on November 24, 1999, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were still not being restocked for employee use.

41.     In a memo from Superintendent Wilkinson dated January 25, 2000, he wrote, "PPE.  Concur.  Request the Senior Clerk take for action ASAP."

42.     In the Safety Committee meeting held on  February 23, 2000, a discussion occurred regarding the fact that PPE such as glasses, gloves, coveralls, ear plugs, dust masks, respirators, etc. were still not being restocked for employee use and the fact that purchasing would not be completed until March 31, 2000.

43.     In a memo from Superintendent Wilkinson dated February 29, 2000, he wrote, "PPE.  Comments noted."

44.     On February 28, 2000, Plaintiff was on his way to work at the Ted Makalena Golf Course when he and co-painters stopped at the Pacific Paint Center - which had been recently taken over by Spectra Tone Paint of Hawaii, Inc. (hereinafter "Spectra Tone") - and noticed that they had dust masks in stock for the first time in months.  Plaintiff purchased two (2) boxes totaling twenty dollars ($20.73) from Spectra Tone, which Plaintiff wore as co-painter Leslie Oyama sprayed paint that day.  After work, Plaintiff took the receipt and purchase order to Supervisor Salvatierra who was not in, so Plaintiff left the receipt on Supervisor Salvatierra's desk.

45.    On February 29, 2000, Supervisor Salvatierra angrily accused Plaintiff of making an "illegal purchase." Plaintiff explained that the Safety Committee and painters have been waiting for months for dust masks and in the interim painters were working without the benefit of PPE or safety procedures which was against federal and state laws.

46.    On March 2, 2000, Plaintiff was summoned into a meeting with Superintendent Wilkinson and Supervisor Salvatierra. In retaliation for engaging in protected speech, Superintendent Wilkinson issued Plaintiff a "Counseling Sheet" for: a) unauthorized procurement of goods, and b) insubordination in speaking with Supervisor Salvatierra on February 29, 2000.

47.    The Counseling Sheet was the first form of disciplinary action ever received by Plaintiff since the inception of his employment on April 1, 1987.

48.    Plaintiff's co-painters continued to make emergency supply purchases from Spectra Tone and submit the receipt with the purchase order to Supervisor Salvatierra who did not issue the co-painters a "Counseling Sheet."

49.    On or about April 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra refused to communicate with Plaintiff or issue Plaintiff his daily work assignments.

50.    On or about April 7, 2000, at 9:00 a.m., Plaintiff met with Mr. Anthony Buswinck of the State of Hawaii, Department of Labor and Industrial Relations, Hawaii Occupational Safety and Health Division. Defendant DES became aware of this meeting.

51.    On or about April 6, 2000, at 2:30 p.m., Plaintiff met with City and County of Honolulu Safety Specialist Alan Hiramatsu. Defendant DES became aware of this meeting.

52.    On or about April 10, 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra held a meeting for all of the tradesmen, including painters, air condition repairmen, mechanics, electricians, plumbers and soundmen. Supervisor Salvatierra stated, "one person [Plaintiff] is an unhappy camper right now and he's trying

9

to put me in trouble . . . I want to make everybody aware if you're a part of this you'll be accountable for this, because I just want to make sure, because this is going to happen . . . He's [Plaintiff] trying to get me. So I'm just trying to tell you, I received a warning on Friday. So, I'm letting you know that everyone's concerned about this. So right now I'm going to go to the authority because I have some safety jeopardy on myself here . . ."

53.    On or about April 2000, in retaliation for engaging in protected speech, Superintendent Wilkinson began interrogating Plaintiff's co-workers - questioning them about Plaintiff.

54.    On or about April 2000, a Defendant DES supervisor informed Plaintiff that he was warned to "be very careful whenever you speak to [Plaintiff]."

55.    On or about April 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

56.    On or about April 2000, in retaliation for engaging in protected speech, Supervisor Salvatierra falsely accused Plaintiff of "building a case against him" and falsely stated that he was "scared" of Plaintiff.

57.    On or about April 2000, in retaliation for engaging in protected speech, Defendant DES began an investigation of Plaintiff pursuant to the false allegations by Supervisor Salvatierra. Plaintiff was ordered to attend four (4) investigative meetings into the false allegations by Supervisor Salvatierra on April 11, 14, 28, and May 11, 2000.

58.    On or about April 24, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

59.    On or about May 1, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

60.     On or about May 8, 2000, in retaliation for engaging in protected speech, Plaintiff's request for vacation leave to obtain medical attention for exposure to dangerous chemicals was denied by Defendant DES.

61.     On or about May 1, and 10, 2000, Plaintiff filed a workers compensation claim for long term exposure to dangerous chemicals.

62.     Plaintiff was retaliated against for speaking out against Defendant DES' failure to properly train the painters, failure to provide PPE for the painters, failure to monitor and supervise the painters, failure to provide guidelines or policies and procedures for the painters, failure to warn the painters of exposure to dangerous chemicals and substances, failure to protect the public from exposure to dangerous chemicals and substances, failure to properly dispose of dangerous chemicals and substances, failure to comply with State of Hawaii laws, failure to comply with federal laws, and others.

63.     Defendant DES' retaliatory actions towards Plaintiff were substantially motivated by Plaintiff's exercise of protected speech on matters of public concern. The United States Supreme Court has recognized that a "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Meyers, 461 U.S. 138, 140, 103 S. Ct. 1684, 1686, 75 L. Ed. 2d. 708 (1983) (citing Pickering v. Board of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d. 811 (1968)). A fundamental design of the First Amendment is to foster participation in the interchange of political and social ideas without suffering retaliatory employment actions. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Connick, 461 U.S. at 144-45, 103 S. Ct. at 1688-89.

## COUNT I

### (Freedom of Speech)

64.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 63 above as though fully set forth herein.

11

65.     Defendant DES violated Plaintiff's First and Fourteenth Amendment rights under the United States Constitution and Hawaii State Constitution at Article I, Section 4. As a result of the above statements, acts and/or conduct of Defendant DES, individually and/or collectively, Plaintiff did suffer and continues to suffer severe mental and/or emotional distress and thereby sustains damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT II

(Hawaii Whistleblowers Protection Act)

66.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 65 above as though fully set forth herein.

67.     Defendant DES violated Plaintiff's rights under the Hawaii Whistleblowers Protection Act, Chapter 378, Hawaii Revised Statutes.  As a result of the above statements, acts and/or conduct of Defendant DES, individually and/or collectively, Plaintiff did suffer and continues to suffer severe mental and/or emotional distress and thereby sustains damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT III

(Intentional Infliction of Emotional Distress)

68.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 67 above as though fully set forth herein.

69.     The above statements, acts and/or conduct of Defendant DES, individually and/or collectively, constitute intentional infliction of emotional distress, extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society, all done with malice and the intent to cause, or the knowledge that it would cause, severe mental and/or emotional distress to Plaintiff.

## COUNT IV

### (Negligent Infliction of Emotional Distress)

70.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 69 above as though fully set forth herein.

71.     By their above statements, acts, and/or conduct, Defendants, individually and/or collectively, constitute negligent infliction of emotional distress upon Plaintiff who, as a proximate result of said mental and/or emotional distress did sustain damages, as aforesaid, in an amount to be demonstrated at the time of trial herein.

## COUNT V

### (Punitive Damages)

72.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 71 above as though fully set forth herein.

73.     The above statements, acts, and/or conduct of Defendants, individually and/or collectively, demonstrate extreme and outrageous conduct sufficient to justify an award of punitive or exemplary damages for Plaintiff, in an amount to be demonstrated at the time of trial herein.

WHEREFORE, Plaintiff prays as follows:

a.     that Plaintiff be awarded compensatory damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial;

b.     that Plaintiff be awarded special damages, assessed jointly and severally against all Defendants, in an amount to be determined at trial;

c.     that Plaintiff be awarded exemplary or punitive damages in an amount to be determined at trial;

d.     that Plaintiff be awarded attorney's fees and litigation expenses of filing and prosecuting this lawsuit; and

e.     that Plaintiff be awarded such other and further relief as this Court deems necessary and proper.

DATED:  Honolulu, Hawaii, June 2, 2000.

VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HOWARD W.C.C. TOM SUN | ) | Civil No. _____ |
| | ) | (Non-motor Vehicle Tort) |
| Plaintiff, | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| vs. | ) | |
| | ) | |
| CITY & COUNTY OF HONOLULU, | ) | |
| DEPARTMENT OF ENTERPRISE | ) | |
| SERVICES; JOHN DOES 1-10; JANE | ) | |
| DOES 1-10; DOE CORPORATIONS | ) | |
| 1-10; AND DOE PARTNERSHIPS 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **DEMAND FOR JURY TRIAL**

COMES NOW, HOWARD W.C.C. TOM SUN, Plaintiff above-named and hereby

demands a trial by jury and all issues so triable.

DATED:  Honolulu, Hawaii, June 2, 2000.

VENETIA K. CARPENTER-ASUI
Attorney for Plaintiff
HOWARD W.C.C. TOM SUN

15

AO 440 (Rev. 10/93) Summons In a Civil Action

# United States District Court

FOR THE DISTRICT OF HAWAII

Howard W.C.C. Tom Sun,

            Plaintiff,

                V.

City & County of Honolulu,
Department of Enterprise Services;
John Does 1-10; Jane Does 1-10;
Doe Corporations 1-10; and Doe
Partnerships 1-10,

            Defendants.

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

TO: (Name and address of defendant)

ABOVE-NAMED DEFENDANTS

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

VENETIA K. CARPENTER-ASUI, ESQ.
The Law Office of Venetia K. Carpenter-Asui
City Center, Suite 600
810 Richards Street
Honolulu, Hawaii  96813

an answer to the complaint which is herewith served upon you, within ___twenty (20)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

WALTER A.Y.H. CHINN

JUN 0 6 2000

CLERK                                    DATE

(BY) DEPUTY CLERK

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2002 JUN -7 PH 3: 25

N. ANAYA
CLERK

LAW OFFICES OF WILLIAM FENTON SINK

WILLIAM FENTON SINK #3546
Dillingham Transportation Building
735 Bishop Street, Suite 400
Honolulu, Hawai`i 96813
Telephone: 531-7162

Attorney for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| KENNETH MERSBURGH, NORMAN SALSEDO, GEORGE A. SMITH, JR., and SOLOMON SILVA,<br><br>          Plaintiffs,<br><br>   vs.<br><br>WAYNE SALAS, KENNETH SPRAGUE, HARRY HAUCK, JAY GONSALVES, IVAN HAWKINS, NICK MUSICAL, CITY & COUNTY OF HONOLULU, DEPARTMENT OF ENVIRONMENTAL SERVICES TREATMENT AND DISPOSAL DIVISION, KAILUA REGIONAL TREATMENT PLAN, JOHN AND MARY DOES 1-10, DOE CORPORATIONS, PARTNERSHIPS, or OTHER ENTITIES 1-10,<br><br>          Defendants. | CIVIL NO. 02-1-1394-06<br>(Non-Motor Vehicle Tort, Whistle-blowing, Intentional Interference with Economic Advantage, Intentional Infliction of Emotional Distress, Unlawful Job action in Violation of Public Policy, Civil Conspiracy, Retaliation)<br><br>**COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** |

DEPOSITION
EXHIBIT
208

## COMPLAINT

     Plaintiffs, by and through their above named attorney, for a complaint against the defendants, allege and aver as follows:

RECEIVED
$425.00

I do hereby certify that this is a full, true and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

1.   At all times mentioned herein, Plaintiff KENNETH MERSBURGH ("KENNETH") resided in the City and County of Honolulu, State of Hawai`i.

2.   At all times mentioned herein, Plaintiff NORMAN SALSEDO ("NORMAN") resided in the City and County of Honolulu, State of Hawai'i.

3.   At all times mentioned herein, Plaintiff GEORGE A. SMITH ("GEORGE") resided in the City and County of Honolulu, State of Hawai'i.

4.   At all times mentioned herein, Plaintiff SOLOMON SILVA ("SOLOMON") resided in the City and County of Honolulu, State of Hawai'i.

5.   At all times mentioned herein, Defendant WAYNE SALAS ("SALAS") resided in the City and County of Honolulu, State of Hawai'i.

6.   At all times mentioned herein, Defendant KENNETH SPRAGUE ("SPRAGUE") resided in the City and County of Honolulu, State of Hawai'i.

7.   At all times mentioned herein, Defendant HARRY HAUCK ("HAUCK") resided in the City and County of Honolulu, State of Hawai'i.

8.   At all times mentioned herein, Defendant JAY GONSALVES ("GONSALVES") resided in the City and County of Honolulu, State of Hawai'i.

2

9.    At all times mentioned herein, Defendant IVAN HAWKINS ("HAWKINS") resided in the City and County of Honolulu, State of Hawai'i.

10.    At all times mentioned herein, Defendant NICK MUSICAL ("MUSICAL") resided in the City and County of Honolulu, State of Hawai'i.

11.    At all times mentioned herein, Defendant CITY AND COUNTY OF HONOLULU, DEPARTMENT OF ENVIRONMENTAL SERVICES TREATMENT AND DISPOSAL DIVISION, KAILUA REGIONAL TREATMENT PLANT ("C&C") was a governmental agency operating in the City and County of Honolulu, State of Hawai'i.

12.    At all times mentioned herein, Defendants JOHN and MARY DOES 1-10, DOE CORPORATIONS, PARTNERSHIPS, or OTHER ENTITIES 1-10 are employees of Defendant, or other individuals or entities, who are not presently known to plaintiff but who, based upon information and belief, are in some way liable for plaintiffs' injuries and damages.  Plaintiffs pray leave to amend their complaint when said DOES become known.

13.    Plaintiffs were employees of C&C and were supervised or employed by defendants.

14.    Plaintiffs objected to being forced into theft of overtime from the City and informed the C&C that certain activities, including theft, were illegal and unethical.

3

15. All defendants violated their promises made in contract by refusing to act in good faith and thereafter breached plaintiffs' contract. This breach took place after plaintiffs blew the whistle on the illegal activities.

14. Defendants engaged in a pattern of deceit and cover up by telling City employees to work on private jobs at the taxpayers' expense, which cheated plaintiffs out of their prospective economic advantage, and defendants engaged and are engaging in these activities so that they can personally benefit.

15. Plaintiffs reported the fact that defendants were engaging in crimes which would cheat the taxpayers and were harassed on the job because of their honesty.

16. Once plaintiffs refused to agree to be a parties to the illegal acts engaged in by defendants, defendants changed plaintiffs' working conditions under false pretenses and retaliated against plaintiffs.

17. In their greed to steal and cover up their illegal acts, all defendants conspired to and did have plaintiffs' terms and condition of their jobs changed in violation of public policy.

18. Because plaintiffs complained about and resisted being involved in illegal acts, defendants conspired to and did change the employment conditions of plaintiffs.

4

19.   Under the common law and the broad reaching provisions of HRS §§ 378-61, 378-62 and 378-69, Plaintiffs were subjected to changes in their working conditions because of their whistle-blowing status, and other violations of public policy by defendants.

20.   In order to cover up their civil conspiracy, and as a separate cause of action, all defendants conspired to have plaintiffs' employment interfered with.   Further, all defendants intentionally interfered with plaintiffs' prospective and present economic advantage and inflicted severe emotional distress.   Defendants intentionally interfered with plaintiffs' present and prospective economic advantage.   In an attempt to cover up their illegal activities and to punish plaintiffs for whistle-blowing, some or all defendants engaged in a conspiracy, and in violation of public policy did engage, by threats, discrimination and retaliation, against plaintiffs' compensation, terms, conditions, locations and privileges of employment in violation of public policy.

21.   As a direct result of defendants' intentional acts, plaintiffs have suffered severe emotional and psychological injuries, as well as severe mental distress; suffered a diminished capacity to enjoy life; sustained loss of income, a diminished earning capacity, and other economic losses.

22.   Defendants' intentional interference with plaintiffs' prospective economic advantage has impacted plaintiffs' income in an amount to be proven.

WHEREFORE, Plaintiff prays for judgment against the Defendants for damages in excess of the minimum jurisdictional limits of this court as follows:

1.   Reinstatement of back pay, benefits, and work conditions;

2.   General damages to be determined by the court;

3.   Special damages to be determined by the court;

4.   Punitive damages in an amount to punish and set an example for defendants; and

5.   For such other relief as the court deems just and proper.

DATED: Honolulu, Hawai'i _____ 7 June 2002 _____

_____
WILLIAM FENTON SINK
Attorney for Plaintiffs

6

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | | |
|---|---|---|
| KENNETH MERSBURGH, NORMAN SALSEDO, GEORGE A. SMITH, JR., and SOLOMON SILVA, | ) ) ) ) | CIVIL NO. _____ (Non-Motor Vehicle Tort, Whistle-blowing, Intentional |
|       Plaintiffs, | ) ) | Interference with Economic Advantage, Intentional |
|    vs. | ) ) ) | Infliction of Emotional Distress, Unlawful Job action in Violation of Public |
| WAYNE SALAS, KENNETH SPRAGUE, HARRY HAUCK, JAY GONSALVES, IVAN HAWKINS, NICK MUSICAL, CITY & COUNTY OF HONOLULU, DEPARTMENT OF ENVIRONMENTAL SERVICES TREATMENT AND DISPOSAL DIVISION, KAILUA REGIONAL TREATMENT PLAN, JOHN AND MARY DOES 1-10, DOE CORPORATIONS, PARTNERSHIPS, or OTHER ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Policy, Civil Conspiracy, Retaliation)  **DEMAND FOR JURY TRIAL** |
|       Defendants. | ) ) | |

## DEMAND FOR JURY TRIAL

    Plaintiffs, by and through their attorney, hereby demand a jury by trial on all issues in the above case.

    DATED: Honolulu, Hawai`i  7 June 2002

_____
WILLIAM FENTON SINK
Attorney for Plaintiffs

7

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

KENNETH MERSBURGH, NORMAN   )    CIVIL NO. _____
SALSEDO, GEORGE A. SMITH,   )    (Non-Motor Vehicle Tort,
JR., and SOLOMON SILVA,     )    Whistle-blowing, Intentional
                            )    Interference with Economic
          Plaintiffs,       )    Advantage, Intentional
                            )    Infliction of Emotional
     vs.                    )    Distress, Unlawful Job action
                            )    in Violation of Public
                            )    Policy, Civil Conspiracy,
WAYNE SALAS, KENNETH        )    Retaliation)
SPRAGUE, HARRY HAUCK, JAY   )
GONSALVES, IVAN HAWKINS,    )
NICK MUSICAL, CITY & COUNTY )    **SUMMONS**
OF HONOLULU, DEPARTMENT OF  )
ENVIRONMENTAL SERVICES      )
TREATMENT AND DISPOSAL      )
DIVISION, KAILUA REGIONAL   )
TREATMENT PLAN, JOHN AND    )
MARY DOES 1-10, DOE         )
CORPORATIONS, PARTNERSHIPS, )
or OTHER ENTITIES 1-10,     )
                            )
          Defendants.       )
_____ )

**SUMMONS**

STATE OF HAWAI`I

To the above-named Defendants:

        You are hereby summoned and required to serve upon

Plaintiff's attorney, William Fenton Sink, whose address is the

Law Offices of William Fenton Sink, Dillingham Transportation

Building, 735 Bishop Street, Suite 400, Honolulu, Hawai`i,

96813, an answer to the complaint which is herewith served upon

you, within twenty (20) days after service of this summons upon

you, exclusive of the day of service.  If you fail to do so,

judgment by default will be taken against you for the relief demanded in the complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.

DATED: Honolulu, Hawai`i _____ JUN - 7 2002

_____

CLERK OF THE ABOVE-ENTITLED COURT

2

WINER MEHEULA DEVENS & BUSH LLP

THOMAS E. BUSH  #4737-0
970 N. Kalaheo Avenue
Suite A-300, Pali Palms Plaza
Kailua, Hawaii 96734
Telephone No.: (808) 254-5855

Attorneys for Plaintiff



FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 27 2002

Attacked 10 min. []

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CV 0 2 00622  DAB

CHARLES J. WIGGINS,                    )
                 Plaintiff,            )
                                       )
        vs.                            )
                                       )
                                       )
CITY & COUNTY OF HONOLULU;             )
HONOLULU LIQUOR COMMISSION;            )
JOHN P. SPIERLING; in his official     )
capacity as Chair of the HONOLULU      )
LIQUOR COMMISSION; WALLACE W.          )
WEATHERWAX, individually and in his    )
capacity as an agent and employee of the )
City & County of Honolulu; JOHN        )
CARROLL, individually and in his capacity )
as an agent and employee of the City & )
County of Honolulu; THOMAS             )
MENDONCA, individually and in his      )
capacity as an agent and employee of the )
City & County of Honolulu; DAVID K.H.  )
LEE, individually and in his capacity as an )
agent and employee of the City & County of )
Honolulu; HARVEY T. HIRANAKA,          )
individually and in his capacity as an agent )
and employee of the City & County of   )
Honolulu; ARTHUR M. ANDRES,            )
individually and in his capacity as an agent )
and employee of the City & County of   )
Honolulu; SAMUEL K.Y. HO, individually )
and in his capacity as an agent and    )
employee of the City & County of       )
Honolulu; EDUARDO C. MINA,             )
individually and in his capacity as an agent )
and employee of the City & County of   )
Honolulu; COLLIN M. OSHIRO,            )
individually and in his capacity as an agent )
and employee of the City & County of   )
Honolulu; WILLIAM B. RICHARDSON,       )
JR., individually and in his capacity as an )
agent and employee of the City & County of )
Honolulu; KENNETH L. WRIGHT,           )

CIVIL NO. _____
(Other Civil Rights)

COMPLAINT; DEMAND FOR JURY
TRIAL; SUMMONS

KSC

DEPOSITION
EXHIBIT
209

individually and in his capacity as an agent )
and employee of the City & County of        )
Honolulu; THOMAS RIDDLE, individually )
and in his capacity as an agent and          )
employee of the City & County of             )
Honolulu; and DOE DEFENDANTS 1-25. )
                                             )
          Defendants.                        )

L:\General Office\tebush\Complaint.doc

---

## COMPLAINT

COMES NOW Plaintiff CHARLES J. WIGGINS, by and through his undersigned

counsel, and for a complaint against the Defendants named herein, alleges as follows:

### NATURE OF THE CASE

1.     This is an action under the Civil Rights Act of 1991, 42 U.S.C. §1981 and

§§1983-5, the Hawaii Whistleblowers' Protection Act, Hawaii Revised Statutes §378-62, the

United States and Hawaii Constitutions, and common law theories of recovery to obtain full and

complete relief and to redress the illegal and tortuous conduct described herein.

### JURISDICTION

2.     Jurisdiction exists under 28 U.S.C. §1331 and §1343, by virtue of the claims of

deprivation of constitutional rights and racketeering conduct arising under 42 U.S.C. §1981,

§1983, §1985 and §1986, as alleged herein.

3.     This court has supplemental jurisdiction under 28 U.S.C. §1367(a) over Plaintiff's

state law claims.

### VENUE

4.     The unlawful acts and employment practices alleged herein were committed

within the District of Hawaii, and this action properly lies in the District of Hawaii.

### PARTIES

5.     Plaintiff CHARLES J. WIGGINS ("Plaintiff") is, and at all times relevant herein

was, a Liquor Control Investigator employed by the Liquor Commission, Department of Budget

2

and Fiscal Services, City & Count of Honolulu, and a resident of the State of Hawaii.

6.    At all times relevant herein, Defendant CITY & COUNTY OF HONOLULU

("the City") was and is a municipal corporation in the State of Hawaii, created and established

under the laws of the State of Hawaii, and is charged with control over all City boards and

commissions, policies and/or programs, and City employees' activities.

7.    At all times relevant herein, Defendant HONOLULU LIQUOR COMMISSION

("Liquor Commission") was and is an agency and/or division of the City & County of Honolulu,

State of Hawaii.

8.    Defendant JOHN P. SPEIRLING ("Speirling") is, and at all times herein relevant

was, the Chair of the Liquor Commission, and a resident of the State of Hawaii. He is sued in

his official capacity.

9.    Defendant WALLACE W. WEATHERWAX ("Weatherwax") is, and at all times

herein relevant was, the Liquor Control Administrator, employed by the Liquor Commission,

Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the

State of Hawaii. He is sued in his individual and official capacity.

10.    Defendant JOHN CARROLL ("Carroll") is, and at times herein relevant was, the

Chief Investigator, employed by the Liquor Commission, Department of Budget and Fiscal

Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his

individual and official capacity.

11.    Defendant THOMAS MENDONCA ("Mendonca"), was, at times herein relevant,

the Supervising Investigator for the Enforcement Section, employed by the Liquor Commission,

Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the

State of Hawaii. He is sued in his individual and official capacity.

12.    Defendant DAVID K.H. LEE ("Lee") was at all times herein relevant, a Liquor

Control Investigator and Plaintiff's supervisor, employed by the Liquor Commission,

3

Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

13. Defendant HARVEY T. HIRANAKA ("Hiranaka") was at all times herein relevant, a Liquor Control Investigator and Plaintiff's supervisor, employed by the Liquor Commission, Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

14. Defendant ARTHUR M. ANDRES ("Andres") was at all times herein relevant, a Liquor Control Investigator and Plaintiff's supervisor, employed by the Liquor Commission, Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

15. Defendant SAMUEL K.Y. HO ("Ho") was at all times herein relevant, a Liquor Control Investigator, employed by the Liquor Commission, Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

16. Defendant EDUARDO C. MINA ("Mina") was at all times herein relevant, a Liquor Control Investigator, employed by the Liquor Commission, Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

17. Defendant COLLIN M. OSHIRO ("Oshiro") was at all times herein relevant, a Liquor Control Investigator, employed by the Liquor Commission, Department of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his individual and official capacity.

18. Defendant WILLIAM B. RICHARDSON, JR. ("Richardson") was at all times herein relevant, a Liquor Control Investigator, employed by the Liquor Commission, Department

4

of Budget and Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii.
He is sued in his individual and official capacity.

19.    Defendant KENNETH L. WRIGHT ("Wright") was at all times herein relevant, a
Liquor Control Investigator, employed by the Liquor Commission, Department of Budget and
Fiscal Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in
his individual and official capacity.

20.    Defendant THOMAS RIDDLE ("Riddle") is, and at all times herein relevant was,
the Worker's Compensation Administrator, employed by the Department of Budget and Fiscal
Services, City & County of Honolulu, and a resident of the State of Hawaii. He is sued in his
individual and official capacity.

21.    Doe Defendants 1-25 are sued herein under fictitious names for the reason that
their true names and identities are presently unknown to Plaintiff, except that they are connected
in some manner with the named Defendants, and are agents, servants, employees, employers,
representatives, co-venturers, associates, vendors, suppliers, manufacturers, sub-contractors or
contractors of the named Defendants, and/or are in some manner responsible for the injuries and
damages to Plaintiff, and/or in some other manner are related to the named Defendants and that
their true names, identities, capacities, activities and/or responsibilities are presently unknown to
the  Plaintiff or his attorney.  Plaintiff herein prays leave to amend his Complaint to allege the
true names, identities, capacities, activities and/or responsibilities of the Defendants set forth in
this paragraph when the same are ascertained.

## BACKGROUND

22.    On or about May 1999, Plaintiff was approached by a Special Agent of the
Federal Bureau of Investigation ("FBI"). Plaintiff was told that his name had been given to the
agent by a bar owner who was complaining about corruption among the Liquor Commission

5