16.     In March 2003 Plaintiff reported to the Workforce Investment Board Chairperson, Christine McColgan, and the City and County of Honolulu that federal funds had been wrongfully used to pay the entire cost of a trip by Michael Amii and Councilman Okino.

17.     Michael Amii and Councilman Okino went to Washington, D.C. to attend a NACo Legislative 2002 Conference and the National Association of Workforce Boards Regional Meeting.

18.     The NACo Legislative 2002 Conference was City and County business and the cost for the tuition and related travel expenses should not have been paid for with federal funding for Workforce Development.

19.     In June 2002 Michael Amii refused to extend Plaintiff's leave of absence status from her civil service position, thereby forcing her to resign from that position, six months sooner than she had anticipated.

20.     On or about June 30, 2003 Michael Amii refused to renew Plaintiff's yearly contract as the Executive Director of the Oahu Workforce Investment Board.

21.     Michael Amii's actions were motivated by a retaliatory animus against Plaintiff for her reporting his illegal use of federal funds, and her insistence that the Oahu Workforce Investment Board operate independently from the City and County as required by federal law.

III.     CAUSES OF ACTION

First Cause of Action: VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT

22.     Plaintiff realleges and incorporates by reference the allegations of each of the preceding paragraphs.

23.    Defendant C&C discharged, threatened, or otherwise discriminated against Plaintiff, including creating a hostile working environment, because Plaintiff reported to her employer and a public body, violations or suspected violations of a law or rule adopted pursuant to law of the State of Hawai'i, the City and County of Honolulu, and/or the United States.

24.    The aforesaid discharge, was in violation of H.R.S. §378-61 et seq.

25.    As a direct and proximate result thereof, Plaintiff has suffered damages for injury or loss, including wage loss, general damages, and attorney's fees.  Plaintiff is entitled to the statutory remedies under the Whistleblower Protection Act.

26.    In addition thereto, Defendant C&C is subject to the imposition of fines pursuant to H.R.S. §378-65.

Second Cause of Action:  WRONGFUL AND RETALIATORY TERMINATION IN VIOLATION OF PUBLIC POLICY

27.    Plaintiff realleges and incorporates by reference the allegations of each of the preceding paragraphs.

28.    Plaintiff reasonably believed that Defendant C&C was in violation of the law when she complained to Defendant C&C and the Chairperson of the Workforce Investment Board.

29.    Defendant C&C, and their employees and agents, wrongfully terminated Plaintiff from her employment because she reported violations to her employer, and who were agents and/or employees of Defendant C&C.

30.    As a direct and proximate result of Defendant C&C's wrongful termination of Plaintiff in violation of public policy, and the creation of a retaliatory hostile work environment, Plaintiff has suffered indignities, anguish, pain, emotional

distress, fear, humiliation, damage to her reputation and career, and other damages in amounts to be proven at trial.

PUNITIVE DAMAGES

31.    Plaintiff realleges and incorporates by reference the allegations of each of the preceding paragraphs.

32.    In performing all of the acts and omissions described above, Defendant individually or through their employees and/or agents, acted intentionally, willfully, wantonly, oppressively, or with gross negligence. Defendant is therefore liable to Plaintiff for punitive damages in amounts to be determined at trial.

WHEREFORE, Plaintiff prays for Judgment against the Defendants, jointly and severally, as follows:

1.    Special damages in amounts to be proven at trial;

2.    General damages in amounts to be proven at trial;

3.    Punitive damages in amounts to be proven at trial;

4.    For back pay, front pay, prejudgment interest, lost employment benefits, reasonable attorney's fees and costs, equitable and injunctive relief, and such other relief as the Court deems appropriate, pursuant to H.R.S. §378, including without limitation, H.R.S. §378-63 et seq., and

5.    All such other relief that the Court deems reasonable and proper.

DATED:    Honolulu, Hawaii, _____ SEP 27 2005 _____

DAVID F. SIMONS

Attorney for Plaintiff
NANCY OLIPARES

7

LAW OFFICES OF
DAVID F. SIMONS

DAVID F. SIMONS    2179-0
Ocean View Center, PH-1
707 Richards Street
Honolulu, Hawaii 96813
Telephone: (808) 536-3255
Facsimile: (808) 524-5593

Attorney for Plaintiff
NANCY OLIPARES

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| NANCY OLIPARES,    ) | CIVIL NO. |
| ) | (Other Civil Matter) |
| Plaintiff,    ) | |
| ) | SUMMONS |
| vs.    ) | |
| ) | |
| THE CITY AND COUNTY OF    ) | |
| HONOLULU, and DOE DEFENDANTS 1-    ) | |
| 25,    ) | |
| ) | |
| Defendants.    ) | |
| _____ ) | |

<u>SUMMONS</u>

TO:    DEFENDANT THE CITY AND COUNTY OF HONOLULU

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's

attorney, DAVID F. SIMONS, whose address is stated above, an answer to the

Complaint which is attached. This action must be taken within twenty (20) days after

service of this summons upon you exclusive of the day of service. If you fail to make

your answer within the twenty (20) day time limit, judgment by default will be taken

against you for the relief demanded in the Complaint.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m.

on premises not open to the general public, unless a judge of the above-entitled Court

permits, in writing on this summons, personal delivery during those hours.

A failure to obey this summons may result in an entry of default and default

judgment against the disobeying person or party.

DATED:     Honolulu, Hawaii, _____ SEP 2 7 2005 _____

_____

CLERK OF THE ABOVE-ENTITLED COURT

2

DEPOSITION
EXHIBIT
215

# 'The Honolulu Advertiser

50 YEARS

HOME FINAL
$1.75 on O'ahu
$2.00 on Neighbor Island

HAWAI'I'S NEWSPAPER

HONOLULUADVERTISER.COM

SUNDAY | August 20, 2006

## Mourners struck at site of fatal car crash

### 2 deadly accidents on same day kill 3, injure 6 in Hau'ula

BY MIKE LEIDEMANN
AND MARY VORSINO
*Advertiser staff writers*

Three people were killed and six injured in a pair of traffic accidents at the same site in Hau'ula yesterday.

Two teenagers died and three others were hurt when their speeding car ran off Kamehameha Highway and hit a utility pole at 4:20 a.m., police said.

Nineteen hours later, at about 11 p.m., a group of people apparently paying their respects at a roadside memorial to the crash victims were themselves hit by a car, police said. One person was killed in that accident, one was in extremely critical condition and two others were in critical condition.



**Alithia Ah Nee**

In the first accident, the speeding car was driven by a 15-year-old boy, Pepe Naupoto, who died in the crash, according to the Honolulu Medical Examiner's office. Also killed was Alithia Ah Nee, 16, a former student at Kahuku Intermediate and High School. The three adults in the car, ages 14 to 16, were injured.

"It sounded like they were going 100 miles per hour," said Ryan Garcia, 30, who was camping at nearby Kōkōla Beach Park. "The car was so loud it woke me when I crashed into the pole. A couple of seconds later there was a loud crash. After that, all I heard were the ambulances."

**SEE CRASHES, A10**

## Whistleblowers say ordeal not worth it

### Suffering is cost for stepping forward to expose wrongdoing

BY ROB PEREZ
*Advertiser Staff Writer*

George Smith Jr. wouldn't do it again.

Neither would Kenneth Mersburgh, Solomon Silva, Norman Salsedo nor Charles Wiggins.

All five were Hawai'i whistleblowers whose reports of wrongdoing the past several years led to criminal prosecutions of fellow government workers for charges ranging from theft to bribery.

While cracking down on illegal activities was a positive outcome,

#### RIDDING CRIME

• Tips for those considering exposing wrongdoing | A2
• What government can do to shield, encourage tipsters | A2

the five said the retaliation they suffered for stepping forward was so great that they would keep their mouths shut if faced with similar circumstances again.

"I'm sad to say (that) if it just wasn't worth what I went through and what my family went through," said Wiggins, a former Honolulu Liquor Commission investigator whose testimony

**SEE WHISTLE, A2**

---

INSIDE TODAY

## Akebono's story

story of

# KEEPING MOLOKA'I MOLOKA'I

For many on the Friendly Isle, tourism only works with a 'just visit' policy



REBECCA BREYER | The Honolulu Advertiser

Clockwise, from top: Norman Salsedo, George A. Smith Jr., Solomon Silva and Kenneth Mersburgh at Kailua Wastewater Treatment Plant, where all worked. A jury found the city retaliated against three of them.

# Whistle

CONTINUED FROM A1

timony helped convict eight fellow investigators but who eventually left the state because of the fallout.

Smith, who suffered retaliation after disclosing abuses at Kailua Wastewater Treatment Plant, said the stress continued to health problems and because of major drag on his life. "You end up bringing your problems home. You don't sleep at night. It snowballs right to the bottom of whatever you're involved with," he said.

As the state and city in recent years have taken steps to encourage more people to report fraud and other wrongdoing, Smith, Wiggins and others who have gone through the process say it generates so much strain at work and home that they would advise others to "think twice about stepping forward."

Not even the prospect of a sizeable financial award would be enough to tilt the balance, they say.

Two out of three whistleblowers said they would do it again, either because they were obligated to do so or because they believed people were being physically harmed. But even they advised caution, noting the constant harassment they endured.

If government insiders are reluctant to blow the whistle, the public can pay a hefty price. Fraud and waste can go unchecked.

Had two whistleblowers not stepped forward, Hale Nani Rehabilitation and Nursing Center, the state's largest long-term-care provider, Hale Nani Rehabilitation and Nursing Center, the 2003 agreed to pay a problem more than $1 million in penalties and reimbursements going to the government.

The two Hale Nani whistleblowers split a $250,000 reward.

## ADVICE: DON'T DO IT

The fallout that whistleblowers tend to suffer is not a problem unique to Hawaii. No matter the setting, those who go public with



Wiggins

tipsters can face — even when they prevail at trial, which is rare. Most cases are resolved before going to trial.

Howard Tom Sun, a city painter, alleged that he was written up in 2000 by his supervisor, isolated, not given duties and denied leave after he reported concerns about workplace hazards, including discovering a punctured gasoline tank at the Pali Municipal Golf Course. At one point, Tom Sun said in a sworn affidavit, a supervisor called Tom Sun's co-workers to a meeting and threatened them if they helped with his whistleblower case.

A year ago, a federal jury found in favor of Tom Sun and awarded him $3.5 million in damages. At the time, the Tom Sun said the city was sending a message to the city that it should be more concerned about its workers and the public.

But U.S. Magistrate Judge Barry Kurren several months later virtually wiped out the award, reducing the amount to $2.3 million, although Kurren upheld the jury's findings that Tom Sun's condi-

## WHAT TO TAKE INTO CONSIDERATION

The Government Accountability Project, a nonprofit that helps whistleblowers, has these tips for people considering going that route.

**Talk to family or close friends** about your decision to blow the whistle before you actually do so. Consider whether there's any reasonable way to work within the system.

**Try to discreetly find out** about other witnesses upset about the wrongdoing.

**If you decide to break ranks, think carefully** about whether you want to "go public" with your concerns or remain anonymous. Your decision should depend on the quantity and quality of your evidence, your ability to camouflage your knowledge of key facts, the risks you are willing to assume and your willingness to endure intense public scrutiny.

**Develop a plan** — such as strategically-timed release of information to government agencies — so that your employer is reaching to you, instead of vice-versa.

**Maintain good relations** with administration and support staff.

**Keep a careful record** of events as they unfold. Stick to facts of relevant activities, and remember that your employer will have access to your diary if a lawsuit is filed.

**Identify and copy** all necessary supporting records before you make your concerns known.

**Find a support network** of potential allies, such as elected officials, journalists and activists. The solidarity of key constituencies can be more powerful than the bureaucracy you are challenging.

**Pay for a legal opinion** from a competent lawyer.

**Always be on guard** not to embellish your charges.

**Do your whistleblowing initiatives** on your own time and with your own resources, not your employer's.

**Don't wear your cynicism** on your sleeve when working with authorities.

to the plaintiff the satisfaction of having a court recognize that his constitutional rights were violated," Kurren wrote.

Venetia Carpenter-Asui, Tom Sun's attorney, argued that the court denied her client the opportunity at trial to provide evidence supporting his case, warranting a new trial filing damages. In a court filing she asked for a new trial, but Kurren denied that request as well.

Carpenter-Asui and Tom Sun did not respond to Advertiser requests for comment.

## CITY'S RETALIATION

Although favorable jury verdicts for plaintiffs are rare in whistleblower cases in Hawaii — only a few have been reported over the past decade — a second one came in May.

A state jury found that the city retaliated against Smith, Silva and Saledo, who at one time all worked at the Kailua sewage treatment plant, for reporting neglected wrongdoing several years ago. The jury awarded each $25,000 in damages.

The jury did find in favor of Menburgh, another plant

## FIXING THE SYSTEM

If the government wants to encourage more workers to report suspecting wrongdoing, here are steps that will help, according to whistleblowers, their attorneys and others:

**Establish** an independent office or ombudsman that takes complaints and authority of government retaliation. Or authority can investigate cases and take the findings to the top levels of government. At the city, for instance, a hodgepodge of agencies currently may have jurisdiction over various aspects of a case, whistleblowers say.

**Ensure** that complaints are investigated and resolved in a timely manner and that anonymity, when requested, is protected.

**Send** a clear message that reporting of legitimate claims of wrongdoing are valued by top leadership. The governor or mayor, for instance, should acknowledge and recognize workers who stick their necks out by reporting illegal activities, especially when it results in money recovered by the government or criminal convictions of the perpetrators.

The city declined to answer questions about this case or others because they involved personnel matters, which are confidential.

Rodney Ching, Hauck's attorney, said his client accepted responsibility for what he did but isn't the criminal some people might make him out to be. He noted that Hauck's guilty plea was deferred, and the city proceeded him because his buses recognized the incident was a minor blip in an otherwise stellar career.

Gonsalves' attorney didn't respond to requests for comment.

## ROUGH ROAD TO COURT

It is unusual for whistleblower cases to enter the court arena, partly because attorneys are reluctant to take them on unless the potential for damages is enough to justify filing a lawsuit.

Over the past 12 years, the city has handled only 14 such lawsuits, according to city figures.

...ion and Nursing Center, the state may not have reached a 2003 settlement that resulted in more than $1 million in penalties and reimbursements going to the government.

The two Hale Nani whistleblowers split a $250,000 reward.

### ADVICE: DON'T DO IT

The fallout that whistleblowers tend to suffer is not a problem unique to Hawaii. No matter the setting, those who go public with charges of wrongdoing often are branded as snitches or troublemakers, bucking in some cases an accepted workplace culture.

"Stepping forward can be so traumatic that the Project, a national nonprofit group that defends whistleblowers, doesn't advise people to do it.

"It weighs so heavily on a person's life that we don't actively encourage it," said Dylan Blaylock, the project's communication director. "We leave that decision to the person."

Two recent cases in which Honolulu government workers won their whistleblower lawsuits underscore the difficulties such

---

year a[...] eral ju...

in favor of Tom Sun and award ed him $1.5 million against him at the time, Tom Sun said the jury was sending a message to the city that it should be more concerned about its workers and the public.

But U.S. Magistrate Judge Barry Kurren several months later virtually wiped out the verdict, reducing the amount to $1. Although Kurren upheld the jury's findings that Tom Sun's constitutional rights were violated after he spoke out, the judge ruled that Tom Sun failed to prove any actual damages and therefore was entitled to only a nominal award of $1. Kurren also denied Tom Sun's request that the city pay his attorney fees, which totaled more than $147,000, according to court records.

In his January written ruling, the judge noted that Tom Sun continued to work as a sprinkler painter, that his duties and working conditions appeared to be unchanged and that the city's policies for painters essentially remained the same.

"In short, this litigation accomplished little beyond giving

---

wl      over        n Han
— only a few have been reported over the past decade — a second one came in May.

A state jury found that the city retaliated against Smith, Silva and Salkedo, who at one time all were part of the Kailua sewage treatment plant for reporting suspected wrongdoing several years ago. The jury awarded each $25,000 in damages.

The jury did not find in favor of Mersburgh, another plant worker and the fourth plaintiff in the lawsuit. Mersburgh was the first to report suspected wrongdoing to police and prompted the other three to come forward.

Their whistle-blowing led to an investigation that resulted in one Kailua plant supervisor, Harry Hauck, pleading guilty in 2004 to theft, and another supervisor, Jay Gonsalves, pleading no-contest last year to theft.

Silva and Salsedo told police they were taken by Hauck to work on a sprinkler system at the home of Gonsalves' relative while on company time. In one instance in 2002 he spent more than four hours at the private residence.

Yet after the wrongdoing came to light, the supervisors were promoted while the four rank-and-file employees suffered retaliation, the workers said.

"The system is a failure," Silva said.

In court documents, Hauck's attorney even cited the fact that his client was promoted after being disciplined to argue that the criminal charges should be dismissed because the case was old. Two bribery charges subsequently were dropped.

For at least three of the four whistleblowers, their lives have since taken a turn for the worse. Mersburgh is on unpaid leave, and Smith is fighting the city over compensation issues for a planned retirement he said was hastened by the retaliation. Silva was fired for allegedly threatening a supervisor. The jury ruled the firing did not violate his rights, but Silva said the incident happened because of the retaliation.

Only Salsedo, a mechanic now working at the city's Sand Island treatment plant, has fared better on the job, having been promoted twice. But even he believes the system leaves whistleblowers unprotected from harassment. He said he was the target of threatening and intimidating

---

Gonsalves' attorney didn't respond to requests for comment.

### ROUGH ROAD TO COURT

It is unusual for whistleblower cases to enter the court arena, partly because attorneys are reluctant to take them on unless the potential for damages is enough to justify filing a lawsuit.

Over the past 12 years, the city has handled only 14 such lawsuits, according to city figures. Five, including the Tom Sun and Kailua sewage-worker cases, resulted in financial settlements or jury verdicts against the city. The settlements and verdicts totaled nearly $1.2 million. Seven of the lawsuits are still pending, while two were dismissed.

Employees can avoid the potential fallout from blowing the whistle if they do so anonymously. But workers say that usually doesn't result in a serious investigation. Anonymity also tends to make investigating a case more difficult because investigators can't ask follow-up questions.

While Hawaii' whistleblowers say they weren't afforded adequate protection from retaliation, the state's Whistleblower Protection Act is considered a strong one.

"I think Hawaii has as broad protections as anywhere," said attorney David Simons, who represents whistleblowers.

The law basically prohibits employers from retaliating against an employee who reports or is about to report a suspected violation of law or regulation. In 2002 it was strengthened to broaden the circumstances under which the law applies and to lengthen the statute of limitations to two years, instead of 90 days.

The problem, according to those who have gone through the process, is that the law doesn't prevent the many different ways, sometimes subtle, sometimes indirect, that a person can be harassed and intimidated before and even after a lawsuit is brought.

Detective Kenneth Kamakana, a highly decorated Honolulu Police Department officer who received $650,000 from the city in 2003 to settle a whistleblower case, said he was subjected to constant harassment, had his car vandalized, was shunned by other officers and given the least-desirable assignments after reporting to the FBI about alleged wrongdoing in HPD's elite Criminal Intelligence Unit.

---

## Thank You Hawaii, For Making Us #1*

**Hawaii's Most Comprehensive REVERSE MORTGAGE SEMINAR**

**Wednesday, August 23, 2006**
9:30 am—11:30 am
**Filipino Community Center–Waipahu**

**Saturday, August 26, 2006**
9:00 am—11:00 am
**Times Coffee Shop – Kaneohe**

"*This is the most informative seminar that I've attended. It was well-worth my time*" — The Nishimura Family, Aiea

**For Reservations & Information**
**Call (808) 591-2219 or Toll Free**

For Homeowners 62 Years of Age or Older:
• Preserve equity for your heirs.
• No income or asset qualifications.
• No restrictions on how cash is used.



INDICH collection

OUTER ISLANDS
Maui Mall
Kona, ...
...Center
...City ...
...com • Mon-Sat 9:30-5:30 Sun 10-4

HOKU
Finest Jewelers Since 1924
...oating Plumeria Pendant
$749
14K Yellow White Gold • Chain additional

questi...

White Hawai'i whistleblowers say they weren't afforded adequate protection from retaliation, the state's Whistleblower Protection Act is considered a strong one.

"I think Hawai'i has as broad protections as anywhere," said attorney David Simons, who represents whistleblowers.

The law basically prohibits employers from retaliating against an employee who reports or is about to report a suspected violation of law or regulation. In 2002, it was strengthened to broaden the circumstances under which the law applies and to lengthen the statute of limitations to two years, instead of 90 days.

The problem, according to those who have gone through the process, is that the law doesn't prevent the many different ways, sometimes subtle, sometimes indirect, that a person can be harassed and intimidated before and even after a lawsuit is brought.

Detective Kenneth Kamakana, a highly decorated Honolulu Police Department officer who received $650,000 from the city in 2003 to settle a whistleblower case, said he was subject to constant harassment, had his car vandalized, was shunned by other officers and given the least-desirable assignments after reporting to the FBI about alleged wrongdoing in HPD's elite Criminal Intelligence Unit.

"It was like hell," Kamakana said.

In a recent interview over breakfast, Kamakana said he still suffers nightmares because of the horrible experiences. Yet he

SEE WHISTLE, A3

---

w... overt ... in the
Hauck and Gonsalves were friends. Salsedo told police in one instance in 2002 he spent more than four hours at the private residence.

Yet after the wrongdoing came to light, both supervisors were promoted while the four rank-and-file employees suffered retaliation, the workers said.

"The system is a failure," Silva said.

In court documents, Hauck's attorney even cited the fact that his client was promoted after being disciplined to argue that the criminal charges should be dismissed because the case was old. Two bribery charges subsequently were dropped.

For at least three of the four whistleblowers, their lives have since taken a turn for the worse. Marshburgh is on unpaid leave, and Smith is fighting the city over compensation issues for a planned retirement he said was hastened by the retaliation. Silva was fired for allegedly threatening a supervisor. The jury ruled the firing did not violate his rights, but Silva said the incident happened because of the retaliation.

Only Salsedo, a mechanic now working at the city's Sand Island treatment plant, has fared better on the job, having been promoted twice. But even he believes whistleblowers are unprotected from harassment. He said he was the target of threatening and intimidating comments, sometimes even getting calls at home.

Asked if he would ever blow the whistle again, Salsedo didn't hesitate with a reply: "I wouldn't even think twice about opening my mouth. I would just look the other way."

---

Iwi... "it cas... "which... for p... essen..."
manned the same.
"In short, this litigation accomplished little beyond giving

Honolulu government workers won their whistleblower lawsuits underscore the difficulties such

## Thank You Hawaii For Making Us #1*

**Hawaii's Most Comprehensive REVERSE MORTGAGE SEMINAR**

**Wednesday, August 23, 2006**
9:30 am - 11:30 am
Filipino Community Center-Waipahu

**Saturday, August 26, 2006**
9:00 am - 11:00 am
Times Coffee Shop - Kaneohe

For Homeowners 62 Years of Age or Older

- Preserve equity for your heirs.
- No income or asset qualifications.
- No restrictions on how cash is used.

"This is the most informative seminar that I've attended. It was well worth my time"
The Nishimura Family, Aiea

For Reservations & Information
**Call (808) 591-2219**
or Toll Free
**888-333-4550**

Financial Mortgage USA Inc.
PACIFIC DIVISION



Shani S. Motooke-Higa

he'll be floating on air when she sees this.



Floating Plumeria Pendant $479
...14k Yellow or White Gold - Chain additional

A HOKU
's Finest Jewelers Since 1924

ENTER (Mall level, next to Longs) 808.946.2100

ADDITIONAL LOCATIONS:
...Village (Rainbow Bazaar), 808.942.4858
...sian Cultural Center, 808.293.8942
NaHoku.com · 1.800.260.3912





**maximize | organize | customize**

## Who knows, it may have belonged to you in a past life.

As you enter our showroom, you're transported to another time and place. At C.S. Wo, we carry the state's largest selection of antique furniture from Southeast Asia. We invite you to find that one-of-a-kind piece that's sure to turn heads. No matter what century it is.

*C.S. Wo*
When beautiful homes begin

Honolulu: 702 South Beretania Street · Ph: (808) 451-5088
Weekdays 10 to 7, Sat & Sun, 10 to 6
Kailua-Kona: 75-5701 Makaa Street · Ph: (808) 326-9191
Daily 9:30 to 6

---

...took part in the investigation also were involved in the money-counting, Neuman said.

Hara thought there was a conflict of interest.

...of the agents who that can make you a millionaire." ... the investigators were there from the start, and the temporarily seized money was tallied by Hawai'i National Guard

...pentiary for 20 years, on charges including larceny, conspiring against U.S. forces and aiding insurgents. He thought it was an attempt to make him confess.

"You could tell me I'd hang ... won in the end, while ... man has been cleared."

*Reach William Cole at wcole@honoluluadvertiser.com or 525-5459.*

# Whistle

CONTINUED FROM A2

said he would report suspected wrongdoing again if faced with similar circumstances because "that's my job. If you can't do your duty, you don't belong in this occupation."

Dr. Terry Allen, a former Hawai'i prison physician, likewise said he would blow the whistle again, although he probably wouldn't pursue a civil lawsuit.

Allen was awarded $110,000 in damages from the state in 1999 for retaliation he suffered after publicly disclosing inmate abuse.

The state appealed the federal court decision, but the 9th Circuit Court of Appeals upheld the ruling in 2002. Allen's attorney fees, which the state also had to pay, totaled more than $500,000.

Allen, now a Washington state resident, said the system is not weighted toward how the typical worker can fight back. The tremendous amount of time and cost involved in taking such a fight to court — with no guarantee of winning — makes the process beyond the reach of most people, he said.

**'DAVID VS. GOLIATH'**

Attorney Michael Lilly, a former state attorney general, said he's turned down hundreds of people who had meritorious whistleblower or wrongful termination cases over the years, not because they lacked merit but because the potential damages didn't justify pursuing litigation.

"We're talking about in most cases David vs. Goliath," Lilly said. "Those employees are taking on a gorilla who has most of the evidence" and tremendous resources to devote to a case.

Many people don't even bother to call attorneys, let alone report their concerns to superiors.

Randy Perreira, deputy executive director of the Hawai'i Government Employees Association, said he hears about cases in which workers are reluctant to speak up because of retaliation fears.

"That feeling is very real," he said.

Perreira noted that the union in a few cases in recent years has pursued grievances on behalf of employees who alleged they were retaliated against.

"I encourage people to report fraud against the government," the state enacted a law in 2001 that allows whistleblowers to get a percentage of money recovered by the government.

Attorney Tom Grande, who has represented clients using the statute, believes it has had a major effect on not only recovering money for the government but stopping practices that hurt the delivery of healthcare to seniors and the poor.

In one such case, the state reached a $4 million settlement in a medical-fraud lawsuit in 2001, and the two pharmaceutical company employees who disclosed the illegal recycling of prescription drugs split $750,000.

**TREATED LIKE A PARIAH'**

The city encourages workers to report misconduct and provides a variety of ways, including a complaint line, to make such reports.

Whenever a city employee files a complaint about another worker, both parties are reminded that retaliation is prohibited, according to city spokesman Bill Brennan.

When the whistleblower law works, the wrongdoing is identified, corrected and no retaliation occurs, Brennan said.

He questioned the notion that few cases come to light because employees are afraid to report suspected wrongdoing. "In the end, there may not be anything about which to 'blow the whistle,'" Brennan said in a written response.

Wiggins, the former city liquor inspector, said the city didn't seem to welcome his stepping forward. The city never even thanked him for his role in helping federal authorities get convictions of the other liquor inspectors, he said.

"The city treated me like I was a pariah, (like) I was the bad guy," he said.

In 2005, Wiggins settled his whistleblower lawsuit against the city for $387,500. The government did not admit liability.

But even after Wiggins moved to the Mainland, the case continued to haunt him.

Wiggins said he was turned down for numerous law enforcement jobs after the agencies learned he was a whistleblower. "No one wants to hire one," he said. "It was like poison."

Only three months ago, Wiggins landed his first job in law enforcement since leaving Hawai'i. He was hired as an investigator for the Virginia public defender's office. But Wiggins said his nine years with HPD and his nine years with the liquor commission were not counted toward his salary, essentially meaning he is getting rookie pay.

Despite all that has happened, Wiggins doesn't regret blowing the whistle. But he said his experience sends a clear message to others contemplating blowing the whistle. "What it says is you're better off keeping your mouth shut," he said.

*Reach Rob Perez at 525-8054 or at rperez@honoluluadvertiser.com.*



LINDA LINGLE
GOVERNOR

JAMES R. AIONA, JR.
LIEUTENANT GOVERNOR

**STATE OF HAWAII**
OFFICE OF THE LIEUTENANT GOVERNOR
**OFFICE OF INFORMATION PRACTICES**
NO. 1 CAPITOL DISTRICT BUILDING
250 SOUTH HOTEL STREET, SUITE 107
HONOLULU, HAWAI'I 96813
Telephone: (808) 586-1400    FAX: (808) 586-1412
E-MAIL: oip@hawaii.gov
www.hawaii.gov/oip

LESLIE H. KONDO
DIRECTOR

## DECLARATION OF LESLIE H. KONDO

I, LESLIE H. KONDO, hereby declare as follows:

1.      I am the Director of the Office of Information Practices ("OIP"), State of Hawaii.  I am competent to testify to the matters stated herein and make this declaration based upon records of which I am custodian.

2.      Attached as Exhibit 1 to this Declaration is a true and correct copy of OIP Opinion Letter Number 98-1 issued by this office.

3.      Attached as Exhibit 2 to this Declaration is a true and exact copy of the letter dated September 9, 1993, received by OIP on September 9, 1993, from Carolyn L. Stapleton, legal counsel, Ethics Commission, as the same appears on file and of record in this office.

4.      Attached as Exhibit 3 to this Declaration is a true and exact copy of the letter dated July 15, 1996, received by OIP on July 15, 1996, from Carolyn L.

DEPOSITION
EXHIBIT
214

Stapleton, legal counsel, Ethics Commission, as the same appears on file and of record in this office.

DATED:     Honolulu, Hawaii, August 11, 2006.

LESLIE H. KONDO
Director

BENJAMIN J. CAYETANO
GOVERNOR

MARGERY S. BRONSTER
ATTORNEY GENERAL



**STATE OF HAWAII**

DEPARTMENT OF THE ATTORNEY GENERAL
## OFFICE OF INFORMATION PRACTICES
235 S. BERETANIA STREET, ROOM 304
HONOLULU, HI 96813-2437
TELEPHONE: 808-586-1400 • FAX: 808-586-1412

MOYA T. DAVENPORT GRAY
DIRECTOR

January 16, 1998


Carolyn L. Stapleton
Executive Director and Legal Counsel
Ethics Commission of the City and County of Honolulu
719 South King Street, Suite 211
Honolulu, Hawaii 96813

Dear Ms. Stapleton:

Re:    Public Requests for City Ethics Commission Advisory Opinions


This is in reply to your letter to the Office of Information Practices ("OIP") dated September 9, 1993, requesting an advisory opinion concerning the above-referenced matter.

## ISSUE PRESENTED

Whether, under the Uniform Information Practices Act (Modified), chapter 92F, Hawaii Revised Statutes ("UIPA"), the Ethics Commission of the City and County of Honolulu ("Commission") must disclose an advisory opinion about an identified individual, when the advisory opinion has already been disclosed by a person other than the Commission.

## BRIEF ANSWER

No.  In this case, the OIP reviewed two of the Commission's duties: the duty to make public segregated advisory opinions, and the duty to promote and encourage ethical behavior by City and County employees.  The OIP believes that disclosure of advisory opinions in a manner that would confirm the identity of those involved would frustrate the Commission's ability to investigate future claims of unethical behavior or to advise on questions about

OIP Op. Ltr. No. 98-1

**Exhibit 1**

Carolyn L. Stapleton
January 16, 1998
Page 2

ethical behavior. Disclosing, or merely confirming or denying the existence of
an advisory opinion about a specific individual even in this one limited
instance would likely impede the Commission's ability to receive complaints
and candid information in the future. Specifically, the mere possibility that
their identities would be revealed and the fear of reprisal would discourage
future callers and complainants[1] from seeking advice or reporting misconduct
to the Commission. Disclosure of individually identifiable advisory opinions
would, therefore, frustrate the Commission's function of investigating and
advising on ethical behavior. Because the frustration of a legitimate
government function exception applies here, the Commission may choose not
to disclose advisory opinions in a manner which identifies those persons
involved in the matter.[2]

## FACTS

The Commission's advisory opinions generally discuss potential and
actual conflicts of interest in acceptance of gifts, or allegations of unethical
conduct by City employees or officers. The Commission's advisory opinions
contain information about individuals such as possible employment related
misconduct, possible ethical violations, and other personal information such as
home addresses. Advisory opinions are published only after the necessary
redactions to prevent the disclosure of the identity of the persons involved are
made. Rev. Charter of the City and County of Honolulu, art. XI, § 11-107 (rev.
ed. 1984). The Charter of the City and County of Honolulu ("City Charter")
provides that the Commission may, on its own initiative:

> [R]ender advisory opinions with respect to
> [article XI] of the charter. Advisory opinions
> shall be rendered pursuant to the written
> request of any elected or appointed officer or
> employee concerned and may be rendered

---

[1]A complainant is a person who files a written complaint with the Commission
alleging an ethical violation by a City employee.

[2]It should be noted that the OIP concluded in a previous opinion letter that
information contained in the Commission's advisory opinions, in ordinary circumstances,
carries a significant privacy interest which would be protected from disclosure by the
UIPA's clearly unwarranted invasion of personal privacy exception. See OIP Op. Ltr. No.
96-2 (July 16, 1996).

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 3

> pursuant to the request of any person. <u>The
> commission shall publish its advisory opinions
> with such deletions as may be necessary to
> prevent disclosure of the identity of the persons
> involved</u>.

Rev. Charter of the City and County of Honolulu art. XI, § 11-107 (rev. ed. 1984) (emphasis added). In addition, section 3-6.5(d), Revised Ordinances of Honolulu 1990 (1995 Ed.) ("ROH") provides that the Commission shall publish its advisory opinions in a form and with such deletions as may be necessary to prevent the disclosure of the identity of the persons involved.

When it is possible to redact an advisory opinion so it contains no information which would identify any individual, the redacted opinion is published by the Commission, pursuant to the ROH and the City Charter. Redacted published advisory opinions provide the public and City officials with a guide as to ethical conduct required of City and County employees and officials. Rev. Charter of the City and County of Honolulu art. XI, § 11-107 (rev. ed. 1984). The Commission provides an unedited version of its advisory opinion to the complainant and a version in which the complainant's identity is not revealed to the subject of the opinion.

In this case, a complainant ("Complainant") made allegations of unethical behavior about a former high-ranking City official. The Commission investigated the complaint, and in the advisory opinion recommended appropriate action be taken by that official. Apparently, the Complainant released her version to the media and publicly disclosed the name of the subject of the opinion.

In a letter to the OIP, Ms. Carolyn Stapleton, Executive Director and Legal Counsel for the Commission, stated that Common Cause Hawaii asked the Commission for a copy of the advisory opinion issued in response to a complaint filed against the former high-ranking City official specifically identified by Common Cause Hawaii. Ms. Stapleton asked the OIP for an opinion as to whether the Commission is required to release that advisory opinion. In her two detailed letters to the OIP, Ms. Stapleton asserted that release of advisory opinions which are requested about a specific individual, or merely the confirmation or denial of the existence of an advisory opinion about a specific individual, would have a chilling effect on potential callers and complainants. She argues that without information on possible ethical

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 4

violations or concerns, the Commission would be unable to perform its duties under the City Charter and the ROH. Ms. Stapleton asserts that this holds true even if an advisory opinion was already made public by someone outside the agency, as was done in this instance, because such disclosures may encourage what Ms. Stapleton calls "fishing expeditions" by requesters that will have a chilling effect on anyone considering filing a complaint.[3]

According to Ms. Stapleton, the Commission frequently receives anonymous telephone calls from people who observed behavior they believe is unethical and wish to report it. These people are often in such fear of retaliation and repercussion that they will not leave their telephone numbers or even provide the Commission with their first names. In addition, callers sometimes refuse to file formal complaints with the Commission because they fear they will lose their jobs, their pensions, or otherwise suffer repercussions. The Commission's efforts to protect its informants include keeping its file cabinets locked, and shredding documents and even envelopes, in addition to the standard practice of making employees sign confidentiality affirmations.

Ms. Stapleton also asserts that the Commission frequently receives questions from City employees as to whether certain actions they are

---

[3]In relying on Ms. Stapleton's written statements, the OIP notes Windels, Marx, Davies & Ives v. Dep't of Commerce, 576 F. Supp. 405, 410 (D.C. Cir. 1983), a federal case interpreting the Federal Freedom of Information Act ("FOIA"), which states:

> [d]isputes regarding risks created by disclosure, inherently a matter of some speculation, are not sufficient to create a triable issue of fact when the agency possessing relevant expertise has provided sufficiently detailed affidavits to justify its position that disclosure would pose significant risks, see Gardels v. C.I.A., 689 F.2d 1100, 1106 & 1106 n.5 (D.C. Cir. 1982).

In Windels, the Federal Department of Commerce sought to prevent disclosure of a computer program used to perform calculations necessary to determine if a foreign steel producer violated U.S. "antidumping" laws by selling steel in the U.S. market for less than fair value. Windels at 408.

The OIP believes the two letters from Ms. Stapleton are sufficient to opine on the facts herein and an affidavit is not necessary because the OIP is not the trier of fact in this case, but is instead providing an advisory opinion.

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 5

contemplating would be ethical.  These callers are concerned about confidentiality because they do not want others to know about the actions they considered.

## DISCUSSION

## I.  INTRODUCTION

The UIPA states that "[e]xcept as provided in section 92F-13, Hawaii Revised Statutes, each agency upon request by any person shall make government records available for inspection and copying during regular business hours."  Haw. Rev. Stat. § 92F-11(b) (1993).  Under the UIPA, the term "government record" means "information maintained by an agency in written, auditory, visual, electronic, or other physical form."  Haw. Rev. Stat. § 92F-3 (1993).  The Commission's advisory opinions are government records for purposes of the UIPA.  See OIP Op. Ltr. No. 96-2 at 3-4 (July 16, 1996) (public access to City Ethics Commission advisory opinions).  Accordingly, access to the Commission's advisory opinions is governed by the UIPA.

There are five exceptions to disclosure of government records in section 92F-13, Hawaii Revised Statutes, and these include:  (1) government records which, if disclosed, would constitute a clearly unwarranted invasion of personal privacy; (2) government records that would not be discoverable in a judicial or quasi-judicial action to which the State or county is or may be a party; (3) government records that must be kept confidential to avoid the frustration of a legitimate government function; (4) government records that are protected from disclosure by State or federal law, including State or federal court orders; and (5) personnel files of legislative members, draft working papers of legislative committees, including unfiled committee reports and budget worksheets, and records of investigating committees of the Legislature that are closed pursuant to legislative rules.  Haw. Rev. Stat. § 92F-13 (1993).  The OIP finds that exception (3) is relevant to the facts presented.[4]

---

[4] Although the ROH and the City Charter protect the identities of individuals in advisory opinions from disclosure, the UIPA does not recognize county ordinances as "state law" for purposes of applying exception (4).  See OIP Op. Ltr. No. 95-14 at 5-7 (May 8, 1995).

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 6

## II.    FRUSTRATION OF A LEGITIMATE GOVERNMENT FUNCTION

The UIPA permits government agencies to keep certain government records confidential under the UIPA exception for records that must be confidential to avoid the frustration of a legitimate government function. Haw. Rev. Stat. § 92F-13(3) (1993). The legitimate government function of the Commission which is relevant here is the rendering of advisory opinions pursuant to requests from elected officials, City and County employees, and any other person. Rev. Charter of the City and County of Honolulu, art. XI, § 11-107 (rev. ed. 1984).

The OIP believes the Commission's advisory opinions are also evidence of the Commission's workload and performance level, and thereby make the Commission accountable to the public. However, the facts herein present a conflict between the Commission's duty to publish advisory opinions, and the duty to encourage ethical behavior in City government employment through the issuance of advisory opinions. Furthering one of these duties may hinder the other when there has been a request for an advisory opinion about a specific individual.

In her letters to the OIP (see "FACTS"), Ms. Stapleton asserts that when a public request is made for an advisory opinion about a specific named individual, even if individually identifying information is redacted prior to its release, the Commission cannot protect the privacy interests of those involved because the requester already knows who the advisory opinion is about. If such public disclosure requests are honored by the Commission, even if only in one limited instance, the OIP agrees with the Commission's contention that it will chill the Commission's ability to solicit candid information in the future. Callers and complainants will be reluctant to contact the Commission if they believe there is *any possibility* that their identity may be revealed through such a request. As a result, potential unethical behavior will go on unaddressed by the Commission and the Commission's functions of investigating and rendering advisory opinions will be frustrated.

The OIP finds that it is a primary function of the Commission to investigate, advise and make recommendations on possible ethical violations under the City Charter and the ROH. Rev. Ordinances of Honolulu at 6, et. seq. While the Commission does have authority to hold hearings pursuant to the City Charter, art. XI, section 11-107, and section 3-6.3(d), of the ROH,

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 7

according to evidence presented by Ms. Stapleton, no hearing was held in this particular investigation. Thus, as is mandated by section 3-6.5(c), ROH, all records, reports, writings, documents, exhibits and other evidence received by the Commission must be held in confidence unless this information was presented and received by the Commission at a hearing or meeting open to the public.[5]

The UIPA does not recognize county ordinances as "state law" for purposes of applying the exceptions to disclosure of government records under section 92F-13, Hawaii Revised Statutes. See OIP Op. Ltr. No. 95-14 at 5-7 (May 8, 1995). However, in this case, the OIP views section 3-6.3, ROH, as additional evidence of an intent to protect the Commission's functions of investigating and rendering advisory opinions.

Previously, the OIP opined that government agencies may withhold public access to information in the Commission's opinions which, if released, would frustrate a legitimate government function under section 92F-13(3), Hawaii Revised Statutes. OIP Op. Ltr. No. 96-2 at 10 (July 16, 1996) (identities of individuals named in City Ethics Commission advisory opinions may be withheld from the public). In that opinion letter, although the OIP's primary basis for opining in favor of nondisclosure was based on the significant privacy interests of the subjects and complainants, the OIP also determined that the Commission need not disclose the identities of complainants because the Commission relies on complainants "to inform it of possible conflicts of interest and unethical conduct." Id. The OIP Opinion Letter No. 96-2 was written in response to a request from the Honolulu City Council, which was considering amending the City Charter to mandate that Commission advisory opinions be public in their entirety, including the names of those involved. The OIP opined that disclosure of complainants' identities would frustrate the Commission's ability to perform its legitimate government function of rendering opinions because such disclosures "would discourage requesters from requesting the opinions and providing information so that the Commission can provide guidance regarding the prevention or correction of the alleged violation of the City's Standards of Conduct." Id.

---

[5] At the state level, the State Ethics Commission ("SEC") may also investigate and render advisory opinions, and proceedings at this stage are not public. Haw. Rev. Stat. § 84-31(b) (Supp. 1996). However, if the SEC determines that there is probable cause to believe that a violation of chapter 84 of the Hawaii Revised Statutes occurred, then more formal proceedings are begun by the SEC itself. Id. Decisions of the SEC after hearing are public record. Haw. Rev. Stat. § 84-31(d) (Supp. 1996).

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 8

     In comparison, in OIP Opinion Letter No. 92-23 (Nov. 18, 1992), the OIP found that if the Department of Education ("DOE") allowed public inspection and copying of FBI reports it uses to conduct criminal background investigations, the FBI would likely cease to provide that information. OIP Op. Ltr. 92-23 at 6-7 (Nov. 18, 1992) (criminal history record information obtained from the FBI may be withheld from the public). If the FBI no longer provided such information, the DOE would be unable to perform its legitimate government function of conducting criminal history checks. Id. Therefore the OIP concluded that section 92F-13(3), Hawaii Revised Statutes, allowed the DOE to withhold from public disclosure information provided to it from the FBI in order to avoid the frustration of its legitimate government function. Id.

     The OIP recognizes that aside from its duty to issue advisory opinions, the Commission has the additional duty or function to publish advisory opinions redacted of individually identifiable information when possible. Rev. Charter of the City and County of Honolulu art. XI, §11-107 (rev. ed. 1984). The OIP concludes that to disclose the advisory opinion about an individual identified by the requester would result in the frustration of a legitimate government function because the Commission's ability to receive candid information about future ethical violations and, in turn, to opine on such alleged violations, would be diminished.

     The OIP believes its opinion here does not minimize the accountability for ethical behavior of the subject of an advisory opinion. The subject of an advisory opinion that is not disclosed to the public is still advised on how to remedy the ethical violation if the advisory opinion finds that an ethical standard was violated. It should also be noted that the Commission does publish "sanitized" summaries of its opinions when it is possible to segregate individually identifiable information. This publication makes the Commission accountable to the public, while at the same time protecting both privacy interests, as well as the Commission's ability to carry out its duties.

     Rather than providing to the requester an opinion about a specific individual named by the requester, the OIP recommends that the Commission, in response to a request such as the one discussed herein, provide the requester with copies of all the Commission's advisory opinions which have already been segregated for public disclosure or publication. The requester is then free to choose the advisory opinions that the requester is interested in.

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 9

### III.  CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

In addition to the disclosure exception for the frustration of a legitimate government function, the UIPA's privacy exception is relevant to the question of disclosure of the Commission advisory opinions.  Because the OIP found that the subjects of the Commission advisory opinions have a significant privacy interest in the information identifying them in the opinions, the OIP previously determined that the subjects' identities generally were exempt from disclosure pursuant to the exception for "[g]overnment records, which if disclosed, would constitute a clearly unwarranted invasion of personal privacy."  OIP Op. Ltr. No. 96-2 (July 16, 1996).  However, the significance of an individual's privacy interest and the weight of the public interest in disclosure are affected by the circumstances involved in any particular case.  See, e.g., Nakano v. Matayoshi, 68 Haw. 140 (1985) (protection of privacy interest in financial affairs is more limited for government official than private individual); OIP Op. Ltr. No. 93-13 (Sept. 17, 1993) (disclosure of identities of nominees for State Ethics Commission is proper where disclosure would reveal actions of the nominating agency and provide insight as to appointment process).[6]  Here, because the issue of disclosure is resolved by section 92F-13(3), Hawaii Revised Statues, the OIP need not discuss whether the exception to disclosure for a clearly unwarranted invasion of personal privacy applies.

### CONCLUSION

The OIP believes the Commission's ability to perform its functions and duties under the City Charter and the City Ordinances will be frustrated by the release of an advisory opinion about an identified individual, even after segregation of individually identifiable information, because the identity of the subject of the opinion is already known to the requester.  Under such circumstances, no amount of segregation can protect the individual's identity.  Disclosure would have a chilling effect on the Commission's ability to perform

---

[6] Circumstances that could have an effect on an individual's privacy interests may include such occurrences as publication of the information, the position that the government employee or official holds, or a waiver by those holding privacy interests.  For example, in OIP Opinion Letter Number 94-21 (Nov. 15, 1994), a member of the Hawaii State House of Representatives gave an interview regarding information contained in her workers' compensation records.  The OIP found that this public disclosure confirming a work-related injury and the benefits resulting therefrom greatly diminished her privacy interests in the information.  Thus, relevant portions of her workers' compensation records were open for public inspection.

OIP Op. Ltr. No. 98-1

Carolyn L. Stapleton
January 16, 1998
Page 10

its duties in the future because informants and complainants will be reluctant
to provide information to the Commission for fear of reprisal if their identities
became known.  Although the Commission takes steps to ensure the
confidentiality of informants, the fear of possible disclosure is enough to
obstruct the Commission's work.  Therefore, the Commission is not required to
disclose the advisory opinion about an identified subject because disclosure
would cause the frustration of a legitimate government function.

If you have any questions regarding this opinion, please contact me at
586-1400.

Very truly yours,

Carlotta M. Dias
Staff Attorney

APPROVED:

Moya T. Davenport Gray
Director

CMD:pm
c:     Daniel Mollway
       Hawaii State Ethics Commission

ETHICS COMMISSION

# CITY AND COUNTY OF HONOLULU

715 SOUTH KING STREET, SUITE 211
HONOLULU, HAWAII 96813

FRANK F. FASI
MAYOR



CAROLYN L. STAPLETON
EXECUTIVE DIRECTOR AND LEGAL COUNSEL

RECEIVED
OFC INFORM PRACTICES

September 9, 1993

'93 SEP -9 P4:00

TO:      KATHLEEN A. CALLAGHAN, DIRECTOR, OFFICE OF INFORMATION
         PRACTICES

FROM:    CAROLYN L. STAPLETON, LEGAL COUNSEL, ETHICS COMMISSION

SUBJECT: <u>REQUEST FOR OPINION</u>

The Ethics Commission of the City and County of Honolulu has
received the attached letter from Common Cause Hawaii.  I am
requesting an opinion from the Office of Information Practices as
to whether I am required to give the requested information to
Common Cause or to any other organization or person.

The Revised Ordinances of Honolulu 1990 [ROH] in § 3-6.5 (e)
state the following:

> All records, reports, writings, documents, exhibits and
> other evidence received by the commission shall be held
> in confidence and no information as to the contents
> thereof shall be disclosed unless such items are
> presented and received by the commission at a hearing
> or meeting that is open to the public.

Further, ROH § 3-6.5 (b) states in pertinent part that

> [i]f the request [for an opinion] involves an employee
> or officer and the request is made by a person other
> than such employee or officer, a copy of the request
> shall be sent to the employee or officer so involved
> **with the name of the person making the request deleted**
> so that such person's name will not be disclosed.
> (emphasis added)

The Revised Charter of the City and County of Honolulu 1973 (1984
Ed.) § 11-107 states that "[t]he commission shall publish its
advisory opinions with such deletions as may be necessary **to
prevent disclosure of the identity of the persons involved**
(emphasis added)."  Further, ROH § 3-6.5 (d) states that "[a]ll
opinions rendered by the commission shall be published and shall
be in such form and with such deletions as may be necessary **to**

OIP 93-0909-02
RFO 93-98

KATHLEEN A. CALLAGHAN            -2-            September 8, 1993

**prevent the disclosure of the identity of the persons involved**
(emphasis added)."

Ethics Commission opinions have been printed in three volumes
covering the years 1967-83, the last of which was published in
1989.  Because of other demands on staff time, we have been
unable to publish another volume in recent years.  In order to
address this problem, the City Council recently appropriated
funds to hire someone to edit and index the opinions since 1984
and to prepare them for publication.  We are in the process of
trying to secure a consultant for that task, but are unclear
whether the Mayor's freeze on hiring will prevent us from being
able to do so at this time.

Because of the mandates of the Charter and Ordinances, the Ethics
Commission believes an unedited opinion can only be provided to
the parties involved and to the appointing authority of any
person who is found to have violated the Standards of Conduct.
In the case of the attached request, no amount of editing will
"prevent the disclosure of the identity of the persons involved"
because a specific opinion has been asked for by name.  In the
past, those inquiring about a specific opinion have been told
that they would have to wait until it was published.  Common
Cause was unwilling to accept that answer.

Although the requested opinion of the Ethics Commission is known
in the community because the parties chose to go to the press,
that is not the usual case.  One fear is that if this opinion is
released in these circumstances, the press or others could call
and ask to be sent any opinions that have recently been issued in
regard to any particular officer or employee of the City and
County of Honolulu, thus engaging in "fishing expeditions" that
would have a chilling effect on anyone considering filing an
ethics complaint.

If you need any additional information in order to provide me
with an opinion, please call me at 527-5573 during the morning
hours.

                         Sincerely,

                         CAROLYN L. STAPLETON
                         Legal Counsel
                         Ethics Commission


Attachment

ETHICS COMMISSION

# CITY AND COUNTY OF HONOLULU

715 SOUTH KING STREET, SUITE 211
HONOLULU, HAWAII 96813-3091



JEREMY HARRIS
MAYOR

CAROLYN L. STAPLETON
EXECUTIVE DIRECTOR AND LEGAL COUNSEL

July 15, 1996    RECEIVED
OFC INFORM PRACTICES

Moya T. Davenport Gray, Director
Office of Information Practices          '96 JUL 15 P3:34
235 S. Beretania Street, Room 304
Honolulu, HI  96813-2437

Dear Moya:

As a result of our recent meeting in regard to the Ethics
Commission's pending request for an opinion, you asked that I
provide you with evidence as to what effect the disclosure of
unedited advisory opinions by the Commission would have on the
filing of requests for opinions.  As I told you, my experience
working in this field for over seven years indicates that such a
practice would have a chilling effect.

Let me share with you some of the responses I have encountered on
the part of employees of the City and County of Honolulu in
regard to requests for opinions.  First, well over half of our
opinions deal with questions being raised prospectively by
persons who, prior to taking action, want to be sure that they
will not violate the ethics laws.  A number of those have asked
me before formally requesting an opinion whether the process is
confidential.  They have wanted to be reassured that no one else
will know that they are considering doing something that they
might decide not to pursue.  They also have wanted assurance that
if the Commission decided that a certain course of action would
violate the Standards of Conduct, no one else will know that they
had considered doing it.

Second, several times per year I receive anonymous phone calls,
usually from City employees, inquiring whether some action is a
violation of the ethics laws.  In these cases, they have observed
an action taken by a City officer or employee that they believe
is wrong.  If I need to do some research before I can answer
their question, these persons are often unwilling to give me even
their first name and phone number.  Because of their fear of
repercussions, I have had people only willing to call me back at
a specified time, rather than have me contact them.

Related to this concern, let me share a particularly shocking
conversation I had several years ago.  An appointed City employee

**Exhibit 3**

MOYA T. DAVENPORT GRAY            -2-            July 15, 1996

complained to me about pressure that was being put on her by her
superiors to support the campaign of a person running for City
office.  When I asked her to file a complaint so that the Ethics
Commission could investigate it, she responded, "No way!  I'm not
going to put my pension in jeopardy."  I told her that the Ethics
Commission has subpoena powers and could compel her to testify.
Her answer to that was, "Go ahead!  I'll lie under oath before
I'll risk my job."  That incident is indicative of the level of
fear that I have observed over the years on the part of some City
employees.

Third, during some phone conversations with anonymous persons, I
have listened to allegations such as, "If I put this in writing,
I know how things work in the City.  I know people will find out
that I'm the one who's filed a complaint."  At that point, I have
gone to great lengths to try to reassure the person by citing the
precautions we take to insure confidentiality, such as keeping
our file cabinets locked, shredding even envelopes, requiring all
Commissioners and staff to sign a confidentiality affirmation
when they begin, etc.  Sometimes, that information has been
sufficient to convince them that they can trust the Commission,
but it has required serious advocacy on my part.

One further aspect of this issue which I feel compelled to
address is that the present practice of complete confidentiality
allows the Ethics Commission to fulfill its duties as set forth
by the Charter and Ordinances.  Without assurances of
confidentiality, it is likely that the flow of necessary
information will be impeded and the effectiveness of the
Commission will be compromised.

I hope this information will be helpful to you.

                          Sincerely,


                          CAROLYN L. STAPLETON
                          Legal Counsel
                          Ethics Commission